# Exhibit A



August 7, 2020

Direct Dial: 320-656-3522
Kvanbruggen@RinkeNoonan.com

Director Aurelia Skipwith
c/o: Map Appeal
U.S. Fish and Wildlife Service
U.S. Department of the Interior
1849 C Street, NW
Washington, D.C. 20240

**SENT VIA U.S. MAIL & EMAIL TO: DIRECTOR_APPEALS@FWS.GOV**

**Re:    Peterson, Cody: Map Appeal
        Our File No. 29364-0001**

Dear Director Skipwith:

I write this letter on behalf of my clients, Leonard, Patty, and Cody Peterson (the "Petersons"), to appeal the map of U.S. Fish and Wildlife Service ("FWS") Easement 69X in LaMoure County, North Dakota, that my clients received by certified mail on February 24, 2020.

My clients submitted their objections to the new map of Easement 69X to Kulm Wetland Manager Michael Erickson within 40 days from the date they received the map. Mr. Erickson issued his decision on the objections in a letter dated April 30, 2020.

The Petersons timely appealed Mr. Erickson's decision to Regional Director Noreen Walsh within 30 calendar days receipt of his decision. The parties had a conference call with Ms. Walsh on July 1, 2020 to discuss their objections to FWS's mapping of Easement 69X. Ms. Walsh issued her decision on my clients' appeal in a letter dated July 9, 2020, which was received on July 14, 2020. The appeal rights outlined in Ms. Walsh's letter and in the initial letter my clients received from FWS with the new map of Easement 69X provide landowners 30 calendar days to submit an appeal of the Regional Director's decision to the Director. This letter appealing the Regional Director's decision and FWS's map of Easement 69X is therefore timely.

*Applicable Law*

Easements are contractual nonpossessory property interests that give the easement holder the right to use property owned by another in a certain manner. Pursuant to N.D. Cent. Code § 47-05-07, "[t]he extent of a servitude is determined by the terms of the grant[.]"

Suite 300 US Bank Plaza
1015 W. St. Germain St.
P.O. Box 1497
St. Cloud, MN  56302
320.251.6700

www.rinkenoonan.com                                    [3878897] Van Bruggen Letter to Director Skipwith (Peterson)
                                                        8/7/2020 1:10 PM

August 7, 2020
Page 2

The language of the grant of FWS waterfowl production area easements, like Easement 69X, specifically restrict the landowner from "draining or permitting the draining, through the transfer of appurtenant water rights or otherwise, of any surface water . . . now existing or reoccurring due to natural causes on the above-described tract by ditching or any other means; . . . filling in with earth or any other material or leveling any part or portion of the above-described tract on which surface water or marsh vegetation is now existing or hereafter recurs due to natural causes; and . . . burning any areas covered with marsh vegetation." The easement gives examples of naturally-existing or reoccurring surface water as "including lakes, ponds, marshes, sloughs, swales, swamps, or potholes[.]"

Case law holds that restrictions contained in these FWS waterfowl production area easements only apply to wetland areas on the property at the time the easement was conveyed and do not apply to fluctuating, after-expanded or after-developed wetland areas. *U.S. v. Johansen*, 93 F.3d 459, 465-66 (8th Cir. 1996) (citing *North Dakota v. U.S.*, 460 U.S. 300 (1983)). This is not to say that the water levels within a wetland area on the property do not fluctuate; however, wetland areas for which there is no evidence of existence prior to or at the time of conveyance are not protected.

The key inquiry when interpreting contracts that convey an interest in real property "is to ascertain and effectuate intent of the grantor." *Id*. at 463 (citing *Malloy v. Boettcher*, 334 N.W.2d 8, 9 (N.D. 1983)). Accordingly, and absent a negotiated and agreed-upon map between the grantor and FWS showing areas subject to the easement's restrictions, the location and boundaries of wetland areas on the property that were in existence at the time the easement was conveyed are the only areas protected by the easement because those are the areas the grantor could have known were present on the landscape and intended to be subject to the easement's restrictions. *Id*. at 467.

In a recent case involving a pre-1976 FWS easement, *United States v. Mast*, 4:14-CR-40078-01-KES (D.S.D. May 21, 2020) the court confirmed, as in *Johansen*, that the relevant date for determining the areas protected by the easement's terms is the date of conveyance. The court in *Mast* explained that although more recent aerial images can be consulted to verify potential wetland signatures on historic aerial images, aerial images pre-dating the easement's conveyance must, in the first place, show evidence of surface water and marsh vegetation in an area for it to be protected by the easement.

Restrictions contained in FWS waterfowl production area easements are also limited, at a maximum, to the number of acres that FWS noted it paid the landowner for in the summary record. *Johansen*, 93 F.3d at 465-66. The court in *Johansen* found that interpreting the easement's restrictions as covering fluctuating, after-expanded, or after-developed wetland areas violates the easement program's enabling statutes because the number of protected acres would constantly fluctuate and could thereby exceed the gubernatorial consent limitation. *Id*.

Easement 69X does not have a negotiated and agreed-upon map between FWS and the grantor, or any other landowner, showing the areas that are subject to the easement's restrictions. In accordance with the terms of the easement and applicable law, any areas with surface water existing or occurring on the property due to natural causes at the time the easement was conveyed cannot be drained or filled. Manipulation of after-expanded or after-developed wetland areas are beyond the scope of the FWS's easement authority.

August 7, 2020
Page 3

### History of Easement 69X

Easement 69X was conveyed by previous landowners, Lyle and Vivian Trapp, to the U.S. Fish and Wildlife Service ("FWS") on November 15, 1963. FWS's summary record for Easement 69X notes the following information:

> Easement Consideration: $630.00; Tract Acreage: 327.73; Cost per acre: $1.92; Wetland Acreage 42.00; Wetland cost per acre: $15.00; Estimate of Value: $630.00

### Objections to FWS's Map of Easement 69X

In a letter dated April 3, 2020 to the Kulm Wetland Refuge Manager, my clients submitted the following objections to the 2020 map of Easement 69X that covers their land in the W½ of 2-136N-61W:

> First, the Easement Mapping References checklist indicates the aerial photos taken in the following years were utilized to create the map: 1957, 1964, mid-1990s, 2002, 2003, 2004, 2005, 2006, 2008, 2009, and 2012. Only two of these eleven photos were taken prior-to or relatively close in time to when the Easement was conveyed in 1963. The remaining nine photos used to create the map were taken approximately 32 to 49 years after the easement was conveyed. As discussed above, the key inquiry when determining the scope of pre-1976 FWS easements is to determine the location and boundaries of wetland areas present on the property at the time the easement was conveyed. Photos taken over three decades after Easement 69X was conveyed do not represent the condition of the property at the time and, as such, are not an accurate representation of the contracting parties' intent and agreement.

> Second, the FWS map indicates numerous, small 0.2, 0.1 and <0.1-acre wetland areas are protected by the Easement. These areas are identified as A, G, K, N, O, P, Q, R, S, T, and U on the enclosed map in the Wenck report. These areas are almost always cropped straight through and do not have evidence of surface water on images prior to 1969, as is specifically protected by the Easement. Accordingly, under the terms of the Easement, we do not believe FWS purchased the right to protect these areas.

> Third, the FWS map indicates one large 12.9-acre wetland along the eastern portion of the property. This area is identified as area L on the enclosed map. This area actually consists of two, smaller wetland areas – totaling 8.3 and 1.8 acres respectively. Area L is not one continuous wetland because there is higher ground in the middle that is consistently been farmed through and does not pond water.

> Fourth, the FWS map indicates a 6.8-acre wetland in the northeastern portion of the property. This area is identified as area B on the enclosed map. The inundation and marsh vegetation in this area is much larger than the area drawn by FWS. Accordingly, we believe this area to approximately 14.9 acres, not 6.8.

> Fifth, the FWS map indicates five medium sized wetlands of 2.5 acres, 2.8 acres, 0.6 acres, 1.3 acres, and 5.2 acres. These acres are identified as H, I, J, M, and V on the enclosed

August 7, 2020
Page 4

map. The actual inundation and marsh vegetation in these areas at the time the easement was conveyed is much smaller, however. We determined the inundation and marsh vegetation in these areas to be 1.64 acres, total.

My clients' objection letter also enclosed a report from technical consultant Matt Retka that explained in more detail the basis for his determination of the size and location of the naturally-existing and occurring wetland areas on the Peterson property at the time Easement 69X was conveyed. This letter and Mr. Rekta's report are enclosed with this letter.

### *Refuge Manager's Decision on 69X*

Refuge Manager Michael Erickson issued his decision on my client's objections in a letter dated April 30, 2020, which is enclosed with this letter.

In response to the first objection, Mr. Erickson said that FWS uses "all available resources" to determine the protected wetland areas, and the "[m]aping resources that we use are not limited to aerial photos taken before the easement acquisition."

In response to the second objection, Mr. Erickson stated:

> "The presence of surface water in photography near the time of acquisition is not a requirement for mapping of wetland areas. Wetlands do not cease being protected when they [sic] naturally dry or devoid of marsh vegetation."

In response to the third and fifth objection, Mr. Erickson removed wetland areas N, Q, and T. In regards to wetland L, Mr. Erickson "agree[d] that there is likely higher ground that reappears during drier periods" but that it "often appears as one continuous wetland as mapped" and therefore did not reshape area L.

In response to the fourth objection, Mr. Erickson did not make any adjustments to the size of wetland B and stated that "FWS utilized and adhered to all four criteria" the agency follows "[i]n situations where more wetland area is present than the purchased summary acreage."

### *Appeal of Refuge Manager's Decision on 69X*

In a letter dated May 28, 2020 to Regional Director Noreen Walsh, the Petersons reiterated and reincorporated their previous objections to FWS's mapping of Easement 69X and submitted the following additional objections and comments to Mr. Erickson's decision:

> First, we understand that the mapping and appeal process set forth in the Department of Interior's December 23, 2019 Memorandum and the initial letter they received from FWS with the new easement maps guarantee them the right to "discuss and/or meet" with the refuge manager to "review . . . concerns and correct any errors." In my clients' objection letter to Mr. Erickson, they specifically requested a conference call to discuss their objections to the map. Neither Mr. Erickson, nor anyone else at the wetland management district office, contacted me or my clients to set up a call to discuss the objections. Mr. Erickson simply issued his decision without any further notice or discussion. We object to the agency's failure to follow the procedural process and hereby request a meeting to discuss our concerns with the map.

[29364-0001/3878897/1]

August 7, 2020
Page 5

Second, the Petersons disagree with the agency's use of aerial photos taken years or decades after the easement was conveyed to determine the location and size of areas protected by the easement. As discussed in the applicable law section above, the key inquiry when determining the scope of pre-1976 FWS easements is to determine the location and boundaries of wetland areas present on the property at the time the easement was conveyed. Mr. Erickson acknowledged in his response letter that the agency uses all imagery available to it at the time of mapping and conceded the agency believes that areas, which are "devoid" of surface water and marsh vegetation in aerial photos close in time to the easement's acquisition, can still be protected by the easement if they show up on later aerial images. The contracting parties, however, could not have known that such areas would appear wet much further into the future and thus, could not have intended or agreed that the easement would protect these after-occurring or after-expanded areas. These are acres that the parties to the contract had not, in their lifetimes, experienced as containing surface water or reoccurring surface water. These are acres the parties to the contract had farmed and had not, in their lifetimes, observed as constituting the characteristics of existing or reoccurring "lakes, ponds, marshes, sloughs, swales, swamps, or potholes." We therefore object to the agency's use of photos taken after the easement was conveyed as evidence to determine the areas protected by the easement.

Third, we understand from conversations with other refuge managers that the agency uses the instructions and procedures in the 2016 Prairie Pothole Region Easement Manual (the "Manual") to map areas protected by the easement. My clients disagree with the agency's use of the Manual to map the areas protected by the easement. As a matter of contract law, the Manual itself was created decades after the easement was conveyed and is not a part of the agreement with the landowner. In addition, even if the Manual is applicable, the Manual contains instructions that are inconsistent with case law and with the specific contractual language of the easement agreement. Without stating all of these, we give as an example the following on page 89-90 of the Manual:

> "The U.S. Attorney's February 4th 1998 letter to Judge Webb emphasizes this point in notation #2, second paragraph: 'The Eighth Circuit has always recognized the inherent expansion and contraction of prairie potholes. …There is no requirement anywhere that a pothole have water in it when the easement is acquired. Wetlands are defined by many factors other than the presence or absence of standing water on a particular day. Most North Dakota potholes are essentially dry by fall in a normal year.'"

The U.S. Attorney's letter to Judge Webb is simply not the law and has no legal binding authority. The Eighth Circuit in *Johansen* specifically rejected the government's interpretation of after-expanded or "future wetlands" and "easement restrictions [] fluctuat[ing] with the amount of rainfall." 93 F.3d at 466. The Eighth Circuit explained that such an interpretation is inconsistent with "traditional norms of real property conveyance," which "require[e] definiteness" and also inconsistent with FWS's notation of the wetland acres in its easement summary record and "the gubernatorial-consent component of the program's authorizing statute." *Id*. The Eighth Circuit therefore found that the easements

August 7, 2020
Page 6

only protect "identifiable, covered wetlands as existing at the time of the easement's conveyance and described in the easement summary." *Id.* at 467.

The Manual also provides the following on page 93:

> "The mapping technician will prepare a wetland map of all naturally-occurring wetland basins utilizing all off-site mapping tools available (Exhibit XI-5). The map will include those basins which have historically been present over time; i.e., present on historical aerial photos. The mapper will use all wetland photographic signatures to help determine the presence or absence of wetlands basins. Wetland indicators may include hydrophytic vegetation, surface water, saturated conditions, mud flats, flooded or drowned-out crops, unharvested crops, isolated areas that are not farmed with the rest of the field, areas of greener vegetation (especially during dry years), mature upland tree rings, and recurring cropping patterns that avoid wet areas."

The contractual language of the easement does not cover "basins," "saturated conditions," "mud flats," "flooded or drowned-out crops," "unharvested crops," "isolated areas that are not farmed," "areas of greener vegetation," "mature upland tree rings," or "recurring cropping patterns." The easement protects areas with "surface water" (i.e., inundated areas with water at or above the surface of the ground) and "marsh vegetation" (hydrophytic vegetation) that is "now existing" (existing at the time the easement was conveyed) or "reoccurring" (it occurred and reoccurred prior to when the easement was conveyed; reoccurring is commonly known to mean occurring and then occurring again periodically or repeatedly over time) "due to natural causes" (due to normal precipitation and not due to artificial or manmade drainage or other manipulation of the landscape). Pursuant to the terms of the easement, we do not believe the above-quoted mapping instruction in the Manual accurately leads to identifying areas that the contracting parties intended and agreed to be protected by the easement.

Fourth, the Petersons disagree that areas identified as A, G, K, O, P, R, S and U on the enclosed report from Mr. Retka are protected by the terms of the easement. Historical aerial photos close in time to when the easement was conveyed do not show conclusive evidence of inundation and marsh vegetation in these areas. Pursuant to the terms of the easement, which protects areas with naturally-existing and reoccurring surface water and marsh vegetation, we do not believe these areas are protected by the terms of the easement, and they should therefore be removed from the map.

Fifth, the Petersons disagree with size and boundaries of the areas identified as B, H, I, J, L, M and V on the enclosed report from Mr. Retka. In area B, historical aerial images show evidence of surface water and marsh vegetation in a larger area than that mapped by FWS. We accordingly believe area B should be mapped at approximately 14.9 acres, not 6.8 acres. In area L, historic aerial photos near the time of the easement's acquisition show conclusive evidence of inundation and marsh vegetation in two separate areas, not one continuous area. We accordingly believe area L should be mapped as two separate 8.3 and 1.8-acre areas, rather than one, continuous 12.9-acre area. In areas H, I, J, M, and V, historic

August 7, 2020
Page 7

aerial photos show conclusive evidence of inundation and marsh vegetation in substantially smaller areas than that mapped by FWS. As such, we believe area H should be mapped as two separate <0.1 acre areas; area I should be mapped as two separate 0.5 and 0.7 acre areas; area J should be mapped as a <0.1 acre area; area M should be mapped as a 0.1 acre area, and area V should be mapped as a 0.2 acre area.

My clients' May 28, 2020 appeal letter to Regional Director Noreen Walsh is enclosed with this letter for your reference.

***Regional Director's Decision***

Ms. Walsh issued her decision on my clients' appeal in a letter dated July 09, 2020, which I received by mail on July 14, 2020.

In response to my clients' disagreement with the agency's reliance on aerial photos taken after the easement was conveyed to determine the areas protected by the easement, Ms. Walsh responded that she partially disagreed with our interpretation of case law and stated the following:

> "The key inquiry when determining what is protected by the terms of the easement is to determine what wetland areas 1) existed at the time the easement was conveyed, and 2) are included in the acres for which the original landowner was paid. The term 'existed does not refer to the water levels in the wetland areas on the day the easement was signed. . . . The FWS uses a variety of resources to determine the locations and boundaries of wetland areas and is not limited to aerial photos taken before easement acquisition. Courts have concluded that comparing photographs of the landscape from before and after an easement was conveyed is an acceptable and reliable method of establishing the existence of wetland areas at a certain moment in time. (see *U.S. v. Mast; U.S. v. Peterson*)."

In response to my clients' objection to the agency use of the Manual, Ms. Walsh responded that "[t]he manual sets forth and provides current procedures and standards for the administration of the easement program in order to be compliant with the applicable statutes, regulations and policies while adhering to case law." Ms. Walsh also said the mapping technicians review aerial photography for "basins," "saturated conditions," and "isolated areas that are not farmed" because those are "indicators of recurring surface water."

In response to my clients' position that certain areas mapped by the FWS do not show evidence of inundation and marsh vegetation and therefore are not protected by the easement, Ms. Walsh said, "The absence of surface water or marsh vegetation on photos taken near the time of the easement conveyance does not provide evidence that a wetland area did not exist." Ms. Walsh concluded that she found "the wetland areas in question existed at the time of easement conveyance and meet the wetland area definition as defined in the easement contract which includes ' . . . any surface water including lakes, ponds, marshes, sloughs, swales, swamps or potholes, now existing or reoccurring . . .'"

Regarding my clients' disagreement with the sizing of the remaining wetland areas, Ms. Walsh revised the sizing of wetland areas B, I, L, M, V and U.

August 7, 2020
Page 8

*Appeal of Regional Director's Decision*

The Petersons reiterate and reincorporate their previous objections and have the following comments on Ms. Walsh's decision:

> First, my clients disagree with Ms. Walsh's interpretation of *U.S. v. Mast* as allowing the FWS to utilize aerial photos after the easement's conveyance to establish the presence of wetland areas protected by the easement. In *U.S. v. Mast*, Mast filed a motion in limine to exclude aerial photos taken after the easement was conveyed. The Honorable Karen E. Schreier ruled from the bench on this motion at the pretrial conference.  A transcript of the pretrial proceedings in this case is enclosed with this letter for your reference. Please see pages 38-50 of the transcript for further guidance on the court's ruling on this motion in limine. Judge Schreier's ultimate ruling on the motion was that an easement map developed by the FWS in 2010, which primarily utilized aerial photos taken after the easement conveyance, was not admissible for the purpose of evidencing the wetland areas actually present at the time of the easement conveyance and thus actually protected by the easement; the map was only admissible for purpose of showing the defendant had knowledge that FWS believed the areas identified on its map to be protected by the easement. Judge Schreier clarified in her May 21, 2020 decision in the second *Mast* trial that aerial photos taken after the easement's conveyance could be relevant to verifying wetland areas already identified on photos pre-dating the easement, but maintained that such wetland areas must <u>first</u> be identified on aerial images pre-dating the easement.

> Here, we understand that FWS's map of Easement 69X predominately utilizes aerial imagery that post-dates the easement conveyance to determine the areas the Service believes to be protected by the easement, without any regard to whether aerial photos or other evidence proves the mapped areas existed prior to or at the time of the easement conveyance. This is extremely troublesome and contrary to the applicable case law and long-established contract law principles. The Principal Deputy Director's December 23, 2019 Memo instructed the maps to depict the protected wetland areas. According to Judge Schreier's order, the FWS's map and any aerial images post-dating the easement's conveyance are not admissible to show potential wetland areas protected by the easement. Therefore, the thousands of maps the FWS has developed in response to the December 23, 2019 Memorandum, including the Petersons' map on appeal before you now, would not be admissible evidence in court to show the protected wetland areas. Having misapplied the standard for relevant and admissible evidence in cases ruling on the easement's terms, the FWS maps are of no value in providing certainty to the landowners who receive them.

> As discussed with the refuge manager and the regional director, our technical consultant Mr. Retka reviewed all imagery available to him to determine the areas with surface water and marsh vegetation on my clients' property, but only consulted aerial imagery post-dating the easement's conveyance for the purpose of verifying signatures of inundation and marsh vegetation that he already identified on aerial images pre-dating the easement's conveyance.  Mr. Retka's procedure is consistent with Judge Schrier's ruling in *United States v. Mast*, the evidence in *U.S. v. Peterson*, and other case law. Mr. Retka's report

August 7, 2020
Page 9

provides an accurate representation of location and size of the wetland areas that the contracting parties would have understood the easement to protect at the time they entered into the agreement. We therefore disagree with FWS's mapping procedures and use of aerial photos taken after the easement conveyance to identify areas protected by the easement.

Second, my clients reiterate their position that certain areas mapped by the FWS are not protected by the easement. These areas identified as A, G, K, O, P, R, S and U on the enclosed report from Mr. Retka. Ms. Walsh states in her response that "[t]he absence of surface water or marsh vegetation on photos taken near the time of the easement conveyance does not provide evidence that a wetland area did not exist." Ms. Walsh does not provide any details or further information whether she found any evidence of surface water or marsh vegetation in these areas on any aerial imagery pre-dating the easement conveyance, which is required under the applicable case law. Here, our technical consultant reviewed aerial imagery pre-dating the easement conveyance and did not find conclusive evidence of inundation or hydrophytic vegetation in these areas. We accordingly do not believe these areas are protected by the easement's terms and therefore should be removed from the map.

Third, my clients restate their disagreement with the sizing of the remaining wetland areas. Although Ms. Walsh resized some these areas, my clients believe further adjustments should be made. In area B, historical aerial images show evidence of surface water and marsh vegetation in a larger area than indicated on Ms. Walsh's revised map. We accordingly believe area B should be mapped at approximately 14.9 acres, not 12.7 acres. In areas H, I, J, M, and V, historic aerial photos show conclusive evidence of inundation and marsh vegetation in substantially smaller areas than Ms. Walsh's revised map. As such, we believe area H should be mapped as two separate <0.1 acre areas; area I should be mapped as two separate 0.5 and 0.7 acre areas; area J should be mapped as a <0.1 acre area; area M should be mapped as a 0.1 acre area, and area V should be mapped as a 0.2 acre area. We note that there have been issues with the culvert just south of area V that has caused water to artificially back up and accumulate on the Petersons' land in recent years. Please also note that part of area I is a manmade stock pond that was dug out before the easement was conveyed (see 1957 and 1964 aerial photos in Mr. Retka's report). We respectfully ask that you reconsider and reevaluate the sizing of these areas in accordance with aerial images that pre-date the easement's conveyance. For these FWS maps to have any value to the Petersons, they must be based on evidence pre-dating or concurrent with the grant of the easement.

Finally, my clients disagree with Ms. Walsh's position that the wetland acreage recorded on the easement summary sheet represents the actual number of wetland acres that the easement encumbers. We understand the easement summary sheet was created by the FWS alone for administrative purposes. The easement summary sheet is not a part of, incorporated by reference, or otherwise mentioned in the easement agreement with the landowner. There is no evidence that the conveying landowner had any knowledge of the easement summary sheet, nor the number of wetland acres the FWS recorded thereon.

August 7, 2020
Page 10

> There is no evidence that the conveying landowner was subsequently provided a copy of the easement summary sheet either. Still further, there is no court decision that unequivocally allows the FWS to protect the number of wetland acres it recorded on its easement summary sheet. As discussed previously with respect to *Johansen*, courts have limited the FWS to, at maximum, the wetland acres it listed on the easement summary sheet. The FWS must first prove, however, that the acreage of wetland areas *as existing at the time of the easement's conveyance* meets or exceeds the summary acreage in order protect the total number of wetland acres on the easement summary sheet. We therefore disagree that the FWS has no duty or obligation to revise its easement maps simply because the acreage of wetlands it mapped is below the number of wetland acres it recorded on the easement summary.

In accordance with the above, we respectfully request that you grant my clients' appeal and that you revise the FWS map to meet the areas mapped by Mr. Retka. We ask that you please keep us informed of any decision on this matter or any alteration to the map of Easement 69X that your office may make.

Thank you for your attention to this matter. If you have any questions or need any additional information, please do not hesitate to contact me.

Sincerely,

*/s/ Kale R. Van Bruggen*

Kale R. Van Bruggen
KRV/JEE

Enclosures

cc:    Leonard & Patty Peterson (w/encls.)
       Cody Peterson (via email only w/atts.)

1

```
 1          UNITED STATES DISTRICT COURT
 2           DISTRICT OF SOUTH DAKOTA
 3              SOUTHERN DIVISION
    * * * * * * * * * * * * * * * * * * *
 4                            Cr. 17-40078

 5   UNITED STATES OF AMERICA,

 6              Plaintiff,

 7     -vs-

 8
     KEVIN JAY MAST,
 9
                Defendant.
10

11
                      U.S. Federal Courthouse
12                     Sioux Falls, SD
                       January 16, 2018
13                     8:10 a.m.
     * * * * * * * * * * * * * * * * * * *
14
               PRETRIAL CONFERENCE
15
     * * * * * * * * * * * * * * * * * * *
16   BEFORE:  The Honorable Karen E. Schreier
              U.S. District Court Judge
17            Sioux Falls, SD

18   APPEARANCES:

19   Mr. Jeffrey C. Clapper
     Assistant U.S. Attorney
20   PO Box 2638
     Sioux Falls, SD 57101-2638
21                        for the Plaintiff

22   Mr. Gary R. Leistico
     Rinke Noonan
23   Suite 300, US Bank Plaza
     1015 West St. Germain Street
24   St. Cloud, MN 56301
                          for the Defendant
25
     PRESENT:  Defendant Kevin J. Mast
```

2

```
 1        * * * * * JANUARY 16, 2018 * * * * *

 2        (In open Court, counsel and Defendant present,

 3   at 8:10 a.m.)

 4        THE COURT:  The record should reflect we're

 5   having a hearing outside the presence of the jury.

 6        This is the matter of the United States of

 7   America vs. Kevin Jay Mast.

 8        Would counsel please note their appearances

 9   for the record.

10        MR. CLAPPER:  Jeff Clapper on behalf of the

11   United States.

12        MR. LEISTICO:  Gary Leistico on behalf of

13   Mr. Mast.

14        THE COURT:  This trial is scheduled to start

15   in an hour.  How many days do you think the trial will

16   last?

17        MR. CLAPPER:  It might depend on your

18   rulings today, but I will be done tomorrow for sure.

19        THE COURT:  Mr. Leistico?

20        MR. LEISTICO:  Today is Tuesday.  The

21   Government is done tomorrow.  I could be done

22   Thursday.

23        THE COURT:  I'll tell the jury you both

24   estimate three days.  We'll be seating 31 jurors and

25   striking down to 13, so there will be one alternate.
```

3

```
 1   The Defendant has 11 strikes, and the Government has

 2   seven.

 3        When we're selecting the jury, if you could

 4   refer to them by their number, and not their name, so

 5   they can retain some anonymity in the courtroom.

 6   You'll be able to see their number on their lapel.

 7        For voir dire, I'll ask some preliminary

 8   questions, and then the jurors have a questionnaire,

 9   and then they will go through each of those questions

10   individually out loud.

11        How much time, Mr. Clapper, would you like?

12        MR. CLAPPER:  Twenty minutes, Your Honor.

13        THE COURT:  Mr. Leistico?

14        MR. LEISTICO:  I wouldn't take more than

15   half an hour.

16        THE COURT:  Thirty minutes per side.  How

17   much time for opening?

18        MR. CLAPPER:  Fifteen, Your Honor.

19        MR. LEISTICO:  Fifteen to 20 minutes,

20   Your Honor.

21        THE COURT:  Twenty minutes per side.  I see

22   all of the exhibits have been marked and provided to

23   the other side.  Correct?

24        MR. CLAPPER:  Yes, Your Honor.

25        MR. LEISTICO:  They have, Your Honor.
```

4

```
 1        THE COURT:  Then I'll take up the motions in

 2   limine.

 3        The first Government's motion in limine is

 4   Docket 20.  No. 1 is to preclude any reference to

 5   penalty or punishment.  Any objection?

 6        MR. LEISTICO:  No objection.

 7        THE COURT:  That's granted.  No. 2 is to

 8   preclude witness opinions of guilt or innocence.

 9        MR. LEISTICO:  No objection.

10        THE COURT:  That's granted.  No. 3 is to

11   preclude reference to matters required to be raised by

12   pretrial motion.

13        MR. LEISTICO:  No objection.

14        THE COURT:  That's granted.  No. 4 is

15   entrapment by estoppel.  The Government has moved to

16   bar the Defendant from commenting about this

17   affirmative defense until he meets his burden of proof

18   at trial.

19        I did review the Defendant's written

20   response.  Did you want to add anything else?

21        MR. LEISTICO:  I think I set it out in my

22   response.  I don't need to spend any more of the

23   Court's time on that.  It's unfair.  If we meet our

24   burden, that would go to the jury.  Being unable to

25   comment before that time, it would put us at a great
```

5

1  disadvantage.

2          THE COURT:  Mr. Clapper?

3          MR. CLAPPER:  If the Court finds he does not

4  meet his burden and the jury does not get an

5  instruction, it would be prejudicial to the Government

6  to mention an affirmative defense that later in the

7  trial is not applicable to the trial.

8          THE COURT:  It's also prejudicial to the

9  defense if they are not able to ascertain if jurors

10  are willing to apply the estoppel defense if the

11  instruction is given.  Isn't it?

12          MR. CLAPPER:  I hadn't thought about that,

13  Your Honor.  I tried to be clear about mentioning it

14  as a defense.  I guess it goes both ways, unfair to

15  both sides to mention it or not mention it.

16          I guess what I'm asking is that it not be

17  mentioned, but the defense be allowed to elicit the

18  facts in the case to lead whether the Court makes a

19  ruling whether that defense applies.

20          THE COURT:  I think the facts are clearly

21  admissible, and it would be unfair for the Defendant

22  to not inquire during jury selection whether they

23  would apply an estoppel defense if the facts were

24  submitted.  So I'm going to deny the motion in limine.

25          MR. LEISTICO:  One other matter.  I believe

6

1  there are witnesses in the courtroom the defense

2  intends to call.  On some of these motions in limine

3  there will be discussion on what the likely testimony

4  will be from the witnesses.

5          I don't know the Court's test in the

6  sequestering of witnesses.  I would ask they not be

7  allowed in the courtroom until released from

8  testifying.  I think these go to the issues that

9  unfairly allow the same results if they sit and listen

10  to other witnesses.  I ask they be excluded from the

11  courtroom and then released.

12          MR. CLAPPER:  If the Court agrees with that,

13  we will comply.

14          THE COURT:  The motion is granted.  Anyone

15  testifying should step out.

16          MR. CLAPPER:  I do have Dave Azure at the

17  table with me on the case.  I would like him to stay,

18  but he is a witness.

19          MR. LEISTICO:  He is going to be a principal

20  witness in the case.  I understand he wants a client

21  in the courtroom, but he has many witnesses, and I ask

22  that he be excluded.

23          THE COURT:  The case law lets the case agent

24  stay in the courtroom.

25          MR. CLAPPER:  There is an officer that

7

1  initially investigated the case.  He was the case

2  agent.  Mr. Azure supervised him.  That's why I would

3  like him.

4          THE COURT:  Under these circumstances, he is

5  the person you are relying on.  That in my opinion

6  makes him the case agent.

7          The next motion is the second motion in

8  limine regarding NRCS regulations at Document 31.

9          Here the Government is moving to preclude

10  any evidence regarding the NRCS regulations, NRCS's

11  definition of wetlands, and NRCS's criteria for

12  wetland delineation.

13          I've reviewed the Government's motion and

14  response.  Mr. Clapper, do you want to address this

15  issue?

16          MR. CLAPPER:  Yes, Your Honor.  The subject

17  matter is an easement purchased by the U.S. Fish and

18  Wildlife Service, which is an agency of the Department

19  of the Interior.

20          What I've been able to surmise from the

21  notice of the expert witness is they intend to offer

22  evidence on the NRCS, which is the National Resource

23  Conservation Service, which is an agency of the

24  Department of Agriculture, a completely different

25  entity.

8

1          The reason we object to that is a number of

2  reasons that I outlined in my brief.

3          One, this is an easement.  The terms of the

4  easement are defined in the easement.  The easement

5  was purchased by Fish and Wildlife in 1973 and

6  recorded that same year.

7          Under the principles of dealing with the

8  terms of that easement, it's a contract.  The terms of

9  it are definitely found within the easement itself.

10          One case that I should have included in my

11  brief is the United States vs. Vesterso case.  It's a

12  1987 Eighth Circuit case, 828 F.2d 1234.  Throughout

13  that case it mentions multiple times the "easement

14  agreement" language defines the interests of the

15  United States property interests.

16          Then it goes through to talk about in that

17  case that it has the exact same easement we're talking

18  about here.

19          At one point it says, "The definition in the

20  easement, however, uses several terms 'lakes, ponds,

21  marshes, sloughs, swales, swamps and potholes' whose

22  meaning is clear to 'ordinary people.'"

23          There is no reason to offer definitions from

24  another agency to help the jury determine what applies

25  to this easement and that it was violated in this

**9**

1 case.

2      Second, when it was applied to the easement,
3 these regulations weren't in existence. It could not
4 have been a meeting of the minds or agreement of the
5 parties to be bound by some future regulations some
6 years later.

7      My third argument is that these regulations,
8 the NRCA ones, are not applicable to an easement.
9 They are meant to be for Farm Program benefits as a
10 means to exclude participants from participating in
11 The Farm Bill or receiving Government funding through
12 The Farm Bill. They are not meant to define the terms
13 of an easement by a completely different agency, in
14 this case Fish and Wildlife Service.

15      Last, I think what I was able to determine
16 from the Defendant's response is he's switched to a
17 Fish and Wildlife Manual that I was able to locate
18 yesterday.

19      The provision he's citing to doesn't have
20 application to easements under the Fish and Wildlife
21 Service. They have a particular provision in their
22 manual dealing with easements. It's very specific as
23 to that and doesn't have a definition of wetlands. I
24 would purport the reason is because the contract or
25 the easement speaks for itself.

**10**

1      THE COURT: Mr. Leistico?

2      MR. LEISTICO: This motion in limine does
3 bleed into the response in our motions in limine to
4 the Government's experts.

5      The Government is saying that because in
6 contract interpretation, if the terms of the contract
7 are not ambiguous, you are not able to then admit
8 extrinsic evidence out of the contract, define the
9 terms, because they're unambiguous. The Government
10 concedes they are unambiguous.

11      What they're saying, and I do think the Fish
12 and Wildlife Service Manual does dictate to their
13 employees for regulatory purposes, and they're
14 regulating their easement. It doesn't say it doesn't
15 include that. Then it expressly mentions the NRCS.
16 Provisions of wetlands on ag land. This is an ag land
17 case.

18      Moreover, what the Government is saying is
19 they are conceding the terms of the contract are
20 unambiguous. I've tried a lot of contract cases. You
21 don't get experts to come in and argue what that term
22 meant, which is what the Government is doing, because
23 the jury doesn't need to do that.

24      The contract is basically the rules of the
25 case, and the jury can decide from the facts whether

**11**

1 the contract was breached or wasn't breached.

2      I do think NRCS regulations are applicable
3 to define what a wetland is on this case. Moreover,
4 if you look at the easement, the easement doesn't
5 define wetlands. It doesn't say you do anything with
6 wetlands.

7      In 1973 the term wasn't what it is today.
8 All the experts have it engrained in them. They are
9 all trained on what a wetland is. This doesn't bring
10 that up. They talk about surface water or recurring
11 water naturally caused such as, and then a set of
12 examples. They are illustrative of what kind of water
13 they are talking about.

14      The Government says you don't get your
15 expert. You don't get your regulations.

16      They've conceded it's unambiguous.
17 Therefore, there is no basis they need their experts,
18 and they should not be able to testify on defining a
19 wetland. None of them were around in '73 doing this
20 work.

21      I kind of agree in the contract they get
22 into that. What the jury thinks a wetland means in
23 2018 isn't what the contract says. It doesn't use the
24 term. It talks about surface water or recurring water
25 naturally caused.

**12**

1      It's unfair the Government would say, "We
2 get our experts, but you don't get your expert." They
3 are going to define the term and talk about it, and if
4 you look at their CVs, their articles, they have
5 little wetland background. It's mostly species that
6 have that for a habitat.

7      What they do have regarding water doesn't
8 have to do with this question. This would be an issue
9 -- if we are going to have an expert, you get an
10 English professor and say what the term meant. It's
11 unambiguous.

12      Therefore, we have no one else. The jury
13 simply gets the easement. If it's something more than
14 that, it's fundamentally unfair to not have our expert
15 testify.

16      I have no understanding how the Government
17 gets to testify about what wetlands are on the site,
18 and we don't get to argue what certain wetland
19 definition applies. Because if it's clear within the
20 contract, no wetland definition applies. I think
21 their manual has altered the contract.

22      The public is aware to have ag lands, the
23 Agency looks to NRCS. They do that for a logical
24 reason. Everybody understands what that is. If it
25 rains in the courtroom, there will be water standing

13

1  there.  That doesn't make it a wetland.  It is surface
2  water.  NRCS has a clear definition.
3          Overall, if NRCS guidelines don't come in,
4  then there should be no testimony about what a wetland
5  is because it's not part of the contract.
6          THE COURT:  Mr. Clapper?
7          MR. CLAPPER:  And that's where we disagree,
8  Your Honor.  The terms of the easement and the crime
9  charged -- let's start there.
10          The crime charged is whether property
11  interests of the United States were damaged without
12  permission.
13          What are property interests?  That's where
14  we go to an easement.  Does it rely on a definition of
15  wetlands?  No.  It relies on the terms of the
16  easement.
17          I would agree a hundred percent if they said
18  describe wetlands period.  End of it.  We would know
19  what they are talking about.
20          That's not the issue we have here.  What we
21  have in the easement, we have a clear, according to
22  the Vesterso case even back in 1987, as to what the
23  terms of the easement are or were and still are.
24          "Any surface water, including lakes, ponds,
25  marshes, sloughs, swales, swamps, or potholes, now

14

1  existing or recurring due to natural causes on the
2  easement tract."  We're not presenting evidence about
3  trying to define a wetland.
4          The elements of this case, one of which is
5  what are the identifiable wetlands that existed at the
6  time the easement was conveyed.  The cases, Peterson,
7  Johansen, Vesterso, all talk about the ways in which
8  evidence was presented to the Court to identify the
9  wetlands areas at the time the easement was conveyed.
10  They did that by looking at the presence of water on
11  the property through aerial photography.
12          They did not use the sophisticated scheme by
13  NRCS to measure soil and vegetation and how long water
14  ponds on that.  Those were all developed over a decade
15  later, and they have application that's very limited.
16  I've already said that, and I won't go into that
17  again.  It has no application, however, to this case.
18  There's not one single case out there that cites that
19  that's an applicable use of evidence for the elements
20  of this crime.
21          And any other testimony from the experts we
22  offered -- one of the other elements is did the
23  activity disturb, injure, or destroy the wetland areas
24  at all?
25          Well, Mr. Loesch is there to tell the jury

15

1  about the suitability of these small pothole areas for
2  waterfowl production.  Those are terms that are used
3  in the easement.  I'm sorry if I'm getting a little
4  askew here, but he brought up our experts.
5          They are not there to define what a wetland
6  is or offer testimony about that.  They're there --
7  Mr. Estey, to help identify wetlands from evidence
8  that exists, or -- when I say "wetlands," I mean the
9  terms as defined in the easement.
10          Then whether they were disturbed or
11  destroyed, I think the jury has the right to know what
12  the effect of installing drain tile underneath the
13  ground of a basin or area on the farmland that
14  seasonally collects water that's useful for waterfowl
15  production, how it affects those areas.
16          THE COURT:  So do you know when the NRCS
17  developed the definition of wetlands that it currently
18  uses?
19          MR. LEISTICO:  I believe I do so,
20  Your Honor.  The current manual was defined in 1994.
21  But the original swampbuster definition, which is the
22  same, was enacted prior to December 23, 1985, which is
23  the date that swampbuster became effective, which is
24  where the Government required if you are going to
25  receive the benefits from The Farm Program, subsidy

16

1  payments, federal crop, reductions in policy, that you
2  cannot alter a wetland.
3          A wetland was defined on December 23, 1985,
4  as hydric soil, which has a definition, hydrophytic
5  vegetation, which is water-loving vegetation, that
6  needs water to survive in its habit, and then a
7  duration.
8          So an example of water on the carpet is what
9  the NRCS was looking at in those regulations, and it
10  has to have a certain period of hydrology.  So this
11  landscape, 14 days of surface water during the growing
12  season, because that needs that for the hydric
13  vegetation.  They have standards on how you determine
14  that.  The most recent enactment was in 1994.  But I
15  will grant that wasn't in place in 1973.
16          So my position here is -- I get where the
17  Government is coming from, but they are going way
18  beyond.  This wasn't in these other cases.  No one
19  raised it.  The Government didn't concede it's
20  unambiguous, and we don't get these experts.
21          But Mr. Loesch and Michael Estey are coming
22  in.  They're trained on, under their CVs, and I
23  believe their testimony to be consistent with that,
24  National Wetland Inventory and the Cowardin standard,
25  which is a different standard for defining wetlands.

17

1    That was published by Cowardin in 1979.

2    All of those things happened later. All of
3    this is irrelevant if the document is actually
4    unambiguous.

5    If this was a fence line case and we had an
6    easement where the fence line was, nobody gets to have
7    experts coming in and talking about where the fence
8    should be or where it shouldn't be. The jury looks at
9    it. They look at the document. It says a fence can
10   be in a certain spot, and they decide that it is there
11   or it isn't there. Someone wins and someone loses.

12   This is especially prevalent in a criminal
13   case. I mean there are serious penal consequences to
14   this.

15   And the Government is saying, "We get our
16   experts to come in and define what we saw out there
17   that meets the definition of an unambiguous contract."
18   I can't find a case that that's ever been allowed,
19   because it's never been allowed.

20   What Johansen and the other cases, Peterson,
21   Eighth Circuit holding, talk about you are held to the
22   four corners of the document. That's what they do
23   say. In those cases they are holding the Government
24   to the maximum they are allowed under this easement.
25   Government is overreaching, and they said, "No, you're

18

1    held to the four corners of the contract."

2    But the Government here did more. They
3    conceded it's unambiguous. You just look to the terms
4    of the contract, and the jury can decide. They can
5    decide what that is. It doesn't talk about wetlands
6    within the part that the parties agreed to, what they
7    agreed to actually do and not do.

8    So I believe the Manual for the NRCS goes to
9    the National Wildlife Refuge Act, which is the --
10   that's what they say in their Manual, which is the Act
11   that allowed these contracts to be purchased from
12   these landowners.

13   So now the Government is saying but not for
14   these, because it's unambiguous. You get your
15   contract. But we get three prominent experts to come
16   in and talk about were wetlands there, and we'll get
17   to our motions on the impropriety of talking about the
18   benefits of wetlands or the harm not having wetlands.

19   But to be able to testify with expert
20   testimony about an unambiguous term would be
21   fundamentally unfair, especially in a criminal case,
22   especially when the same Government is arguing we
23   don't get to use our expert on what we think a wetland
24   is. So we don't get to talk. They get to talk. Then
25   they're going to hold me to the contract, and Mr. Mast

19

1    to the contract. It's one or the other.

2    So I strongly object to the reasoning they
3    have. They've conceded it's unambiguous. I think the
4    law is pretty clear. The contract speaks for itself.
5    We don't need anybody to define those terms, because
6    they are, in fact, unambiguous, the Government has
7    conceded.

8    So we just put up the photos. Once the jury
9    sees the hard facts in front of it, like we would on
10   any contract case, then the jury can decide.

11   THE COURT: So here I'm dealing with the
12   Government's second motion in limine, which is to
13   preclude reference to the NRCS regulations, NRCS's
14   definition of wetlands, and NRCS criteria for wetland
15   delineation.

16   The NRCS regulations, and the NRCS
17   definition of wetland, and the criteria for wetland
18   delineation had not been developed in January of 1973,
19   which is when this easement went into place and was
20   agreed upon by the parties. So anything that
21   developed after that I find is not relevant.

22   In the Eighth Circuit case of U.S. vs.
23   Peterson and U.S. vs. Johansen, they made it clear
24   that you're supposed to look at the existence at the
25   time of the conveyance, and determine the wetlands

20

1    that existed then, and that is what would apply.

2    So any definition or regulations that were
3    adopted after that would not be relevant. So I'm
4    going to grant the motion in limine.

5    MR. LEISTICO: Your Honor, if I could ask
6    for just one matter of clarity.

7    What I understand the Government is saying
8    is that Wes Boll will not be able to come in and
9    testify about the specific NRCS standards and what he
10   found relative to the standards.

11   He's also intending to testify as to the
12   other conditions out on the site, which he's the only
13   certified delineator that's been noticed as a witness.

14   I believe the Court's holding would not
15   exclude him from testifying. He just couldn't testify
16   to that these are not wetlands based on the NRCS
17   criteria. Is that correct?

18   THE COURT: That's what their motion is
19   limited to, yes.

20   MR. LEISTICO: Thank you, Your Honor.

21   THE COURT: The next matter I wanted to take
22   up is the Defendant's motion in limine to exclude
23   testimony of the United States' experts, Charles
24   Loesch and Mark Wiltermuth. Mr. Leistico?

25   MR. LEISTICO: Thank you, Your Honor. This

21

1  motion is based on initially, without the guidance
2  from the Court here this morning on the motion for the
3  last motion in limine that the Government filed, has
4  to do with that when you look at the notice required
5  under Rule 16, they set out what they intend to
6  testify to.
7           As to those matters, as I've set out in my
8  memorandum, they do not under Rule 702 or under the
9  terminology of this contract give any guidance to the
10  jury, and it would otherwise confuse the jury, and it
11  would be prejudicial to the Defendant.
12          So as I've set out in my brief, they're
13  intending in their notice, which is what they're
14  required to file, talking about the benefits of
15  wetlands, the benefits to ducks and the needs to
16  ducks, and whether or not those type of things are
17  present in this case, I guess.
18          I think that would be highly prejudicial to
19  the Defendant.  It's not relevant to whether the
20  contract was breached or not.  They shouldn't be
21  allowed to testify to that.
22          I think in addition, had I known that the
23  Government was going to file a late motion in limine
24  seeking to exclude NRCS regulations and hold that the
25  contract -- argue that the easement is unambiguous, I

22

1  would have very forcefully argued, and I believe I
2  have, that these same two witnesses should not be
3  allowed to testify.
4           They're not qualified to know what the
5  agreement meant or didn't mean in 1973, and the jury
6  needs no guidance, because it's unambiguous, as the
7  Government has conceded.  So they should not be able
8  to come in now, based on training that postdates the
9  easement, as to what wetlands are or what wetlands are
10  not.
11          All of their training, all of their
12  articles, all of their purported testimony is going to
13  be what wetlands were there at the time, before the
14  easement, and after, and those type of things, which
15  the "after" isn't relevant, as the Court directed.
16          So I think this would be highly prejudicial
17  to allow these witnesses, just as the Government has
18  argued it would be highly prejudicial to the
19  Government for NRCS standards to come into a case that
20  didn't exist in 1973.
21          So for both reasons, they should not be able
22  to testify.
23          I mean this is a criminal case.  It's
24  probably one of the few times where breach of contract
25  is a crime, arguably.  But if it's a contract case,

23

1  these type of things would go to damages.  They
2  wouldn't go to liability, because it would be unfair
3  to be talking about the harm.  Mr. Clapper and I have
4  talked at length about this.
5           The issue is whether a person committed bank
6  robbery.  What they want to do is bring experts in and
7  show the harm to the financial system we have to have
8  Federal banks robbed.  That's simply not relevant to
9  whether this person robbed the bank as to liability.
10          So I would ask the Court to exclude these
11  two witnesses from testifying.  One, anything to do
12  with the quality of wetlands, the benefits of
13  wetlands, the harm from draining wetlands, and having
14  to do with anything as to a definition of wetlands,
15  the Court has held, that's not relevant in this case,
16  and I would ask the Court to exclude these experts for
17  both of those reasons.
18          THE COURT:  Mr. Clapper?
19          MR. CLAPPER:  As I mentioned before,
20  Your Honor, a couple of the elements of the crime
21  charged lead to the testimony from these witnesses.  I
22  include Mr. Estey in this.
23          How to identify the areas, the property
24  interest of the United States at the time of the
25  conveyance is an issue for the jury to consider.  As

24

1  held in the Peterson case, a way to do that is to
2  review aerial photographs.  Mr. Estey was a witness,
3  and is mentioned in the Peterson case as to what he
4  would testify to.
5           The Government is not offering these
6  witnesses to testify as to the definition of a
7  wetland.
8           What they are purported to be offered for is
9  based on their review of aerial photography, what
10  evidence in the photography is there of the areas
11  protected by the easement, the lakes, the swamps, the
12  swales, the potholes, or the recurrence of water on
13  that property.  That's what they do for a living.
14          Mr. Estey, as I mentioned, testified in the
15  Peterson case, and the CV we provided for him shows
16  that he has over 20 years of doing this.  That's what
17  he does.  He reviews photographs for evidence of the
18  presence of those property interests protected by the
19  United States.  He doesn't go into the ultimate issue,
20  is this a wetland or not.  Then he would demonstrate
21  what on the photo is indicative to him of what those
22  areas protected are; the presence of lakes, ponds,
23  et cetera.
24          As to Mr. Loesch, another element of the
25  crime is whether or not the areas protected are

25

1  disturbed, injured, or destroyed. Well, the average
2  juror doesn't understand the suitability, which is a
3  term in the easement, the suitability of those wetland
4  areas defined in the easement for waterfowl
5  production.
6        His testimony would be offered for them to
7  understand the nature of small pothole areas and the
8  recurrence of water, surface water on a property,
9  other terms used in the easement, to the breeding of
10 waterfowl and the migratory nature of those birds in
11 this area, especially in South Dakota.
12       THE COURT: What does Mr. Wiltermuth add?
13       MR. CLAPPER: Quite honestly, Your Honor, I
14 would rather have Mr. Estey than Mr. Wiltermuth. If
15 the Court permits it, I would just offer Mr. Estey.
16       THE COURT: Mr. Leistico?
17       MR. LEISTICO: Thank you, Your Honor. I
18 believe Mr. Estey is my second, different motion in
19 limine. So I don't want to bleed into the wrong
20 motion if the Court has directed to talk about this
21 one.
22       THE COURT: You can. I'll consider both of
23 them at the same time.
24       MR. LEISTICO: Thank you, Your Honor. So
25 Mr. Estey, I believe, was late notice. The Court had

26

1  issued an order. Federal rules require what is
2  noticed by the Government on this.
3        THE COURT: I don't see in the rule where
4  there's a time line, a deadline.
5        MR. LEISTICO: I understood there was as far
6  as the notice of the expert.
7        THE COURT: Where in the rule does it say
8  there is a deadline?
9        MR. LEISTICO: I understood the Court's
10 order had indicated for the motions in limine to
11 add --
12       THE COURT: I'm asking about a deadline for
13 disclosure of expert witnesses.
14       MR. LEISTICO: I don't have a specific rule,
15 Your Honor.
16       THE COURT: So if there was a deadline, one
17 of the remedies is that the Court can grant a
18 continuance. Do you feel you need a continuance?
19       MR. LEISTICO: Well, I think it somewhat
20 depends on what the Court is determining as to the
21 ultimate issues now with these experts.
22       So what the Government is saying on these
23 experts -- first, the Government is saying the
24 contract is unambiguous. If the contract is
25 unambiguous under South Dakota contract law, which the

27

1  easement is, no extrinsic evidence of what the meaning
2  of the terms are are allowed into the trial, because
3  the contract is unambiguous, which the Government has
4  conceded. I can't find that the Government has ever
5  done that in these other cases. But they did so here,
6  and the Court ordered.
7        So what the Government is saying is it's an
8  unambiguous contract. Everybody knows what surface
9  waters, ponds are, what swamps are, but we want our
10 experts.
11       And what Mr. Clapper just indicated with
12 Mr. Michael Estey, he's been doing this for 20 years.
13 He wasn't doing it in 1973. He wasn't trained in what
14 was going on in 1973. That is the law of the case,
15 and that is the contract terms which the Government
16 argues are unambiguous. The same goes with the
17 Court's ruling on Mr. Wes Boll.
18       None of the -- the regulations that they're
19 using to determine what is a wetland out in the
20 landscape, so what wetlands are there, one, it isn't
21 even for them to decide. It's a jury question.
22 That's a fact. The contract is clear as to those
23 issues.
24       So it's unfair for their experts to come in
25 and testify, based on training and guidance from

28

1  regulations that weren't in place in 1973, they still
2  want to come in and talk about what is a wetland under
3  the contract. One, that term should be struck from
4  the case, because it's not part of the contract. I
5  mean that genuinely.
6        If they are going to argue it's the
7  contract, then it is the contract. I don't believe
8  they should be able to testify what wetlands they see
9  out on the landscape or what wetlands they don't see
10 out on the landscape prior to the contract or at the
11 time of the contract, because the jury can look at
12 those and decide. That's what they would do.
13       I think it's unfair. These are aerial
14 photos. They've been admitted -- they haven't been
15 admitted. They've been noticed to the parties. They
16 can be looked at and determine -- a jury can decide if
17 they see that or not see that.
18       If there needs to be someone to assist them
19 with that, it wouldn't be individuals trained on other
20 wetland law. If you look at the CVs, they have
21 training in the National Wetland Inventory and the
22 Cowardin Method. It was published by Cowardin in
23 1979.
24       That is the same standard that the Court
25 held to Wes Boll, and I would ask the Court to hold

29

1  the same standard to the Government in this case.
2       My other objections to the benefits of
3  wetlands, I think is just fundamentally unfair for the
4  Government to even ask that be admissible in the
5  trial, whether this easement was violated or not.
6  It's completely irrelevant, highly prejudicial.  I
7  think under 403, it should be excluded on its own.
8  Thank you.
9       THE COURT:  I'm sorry, I missed the very
10  beginning part.  What are you saying is highly
11  prejudicial?
12      MR. LEISTICO:  What's highly prejudicial is
13  that individuals now at the Fish and Wildlife Service
14  that were trained -- they weren't even out of college
15  in 1973 -- that they've been trained on other wetland
16  law, and this term is so engrained in these people,
17  that they use that.  That's what they think and that's
18  what their training is.
19      But they're trying to say we're going to
20  hold you to the terms of the contract.  You can't use
21  later regulations on the NRCS, but you can use theirs.
22      THE COURT:  So I just missed the very, very
23  last thing you made.  You said you didn't want them to
24  use the term "wetland."  Is that --
25      MR. LEISTICO:  Correct.  That could be

30

1  highly prejudicial, because it's -- people today have
2  a meaning for that, and it's not in the contract.
3  Thank you.
4       THE COURT:  Okay.  I just missed the term
5  that you reference, which was "wetlands."
6       MR. LEISTICO:  Sometimes I start, and I just
7  go, Your Honor.  I apologize.
8       THE COURT:  Okay.  Mr. Clapper?
9       MR. CLAPPER:  Your Honor, the easement
10  itself states, "Whereas the lands described below
11  contain or include small wetland or pothole areas
12  suitable for use as waterfowl production areas."
13      Again, I'm not and I won't purport to have
14  any witness determine that this is a wetland.  What
15  they are offering is evidence of areas on the land
16  that are protected by the easement.
17      One other thing as to one of the experts as
18  to the effect of drain tile on a property.  That is a
19  -- that is definitely a relevant issue for the Court
20  to consider -- or for the jury to consider on whether
21  or not the land was disturbed or damaged.
22      THE COURT:  First of all, with regard to the
23  use of the word "wetlands" when the witnesses are
24  testifying, because it is referenced in the contract,
25  I am not going to grant the motion in limine to

31

1  exclude use of the word "wetlands."  It is part of the
2  negotiated terms in the contract, part of the
3  easement.  So that motion is denied.
4       With regard to testimony of Mr. Loesch, part
5  of his testimony -- first of all, I find that he is
6  qualified to give an expert opinion.  I reviewed his
7  background.  It is extensive based on his prior
8  training and experience.  He has the qualifications to
9  testify as an expert.
10      So then the issue is whether he has any
11  relevant testimony and any testimony that would help
12  the jury to understand the issues in this case.
13      Part of his proposed testimony is how the
14  land, after it was drained, whether that would impact
15  the ability to provide waterfowl production, whether
16  it would impact the prior easement that existed.
17      One of the issues the jury will need to
18  decide is whether there is an impact on the ability to
19  serve as a waterfowl production area.  I find his
20  testimony is relevant on that issue.  So I'm not going
21  to preclude his testimony on that issue.
22      So there can be testimony about the area's
23  ability to provide habitat for waterfowl, including
24  vegetation, the cycle of nutrients, decomposition, and
25  food resources.

32

1       Because the issue here is limited to, was
2  there an easement and what was the scope of the
3  easement back in 1973 versus what exists today, I find
4  that he cannot testify about the wet and dry cycle of
5  the wetland areas, because that seems to encompasses a
6  much broader period of time than comparing then to
7  now.
8       So his testimony would be limited to what
9  was evident in 1973 when the easement went into place,
10  and what is evident now after the alleged draining
11  took place.
12      Next I'm going to rule on Mr. Estey.  I've
13  reviewed his qualifications.  Based on his educational
14  training and his work experience, I find that he is
15  well-qualified to give an expert opinion in this case.
16  He also served as an expert witness in United States
17  vs. Peterson, an Eighth Circuit Opinion from the
18  Eighth Circuit in 2011.
19      From the items that are described as his
20  testimony, and there are six included within his
21  notice, I find that he can give an opinion on
22  everything, except whether the recurring surface water
23  appeared in photos between the periods of 1973 up
24  until the time of the Indictment here, that the
25  recurring surface water issue is not relevant except

33

1  for the time period of when the easement went into
2  effect and what it was at the time of the alleged
3  violation.  I think anything in between there would
4  just cause confusion to the jury.
5       MR. LEISTICO:  So the testimony being
6  allowed for the recurring issue is from 1973 until
7  when?
8       THE COURT:  Comparing 1973 to the time of
9  the alleged violation, those two time periods.
10      Mr. Clapper?
11      MR. CLAPPER:  Your Honor, may the witness
12 testify about photos prior to 1973?
13      THE COURT:  Mr. Leistico?  Well, let me ask.
14 What was used at the time they negotiated the terms of
15 the easement?  What photos were used?
16      MR. CLAPPER:  I don't believe they used
17 photos, Your Honor.  My understanding of the process
18 is someone from the Fish and Wildlife would go there.
19 They would use something a lot more crude than what is
20 available today, and had a chart and a little -- I
21 don't know what to call this thing -- a little graft
22 ruler to try to estimate the amount of wetland acres
23 on a piece of property.  Then those number of acres
24 were recorded in an acreage summary.
25      In this particular case the Government

34

1  purchased 33 acres of wetland areas between two tracts
2  of property that are included in this easement, and
3  the nearest -- you know, there wasn't a photo taken on
4  the date or right near the time.
5       All of the photos that the Defendant's
6  expert and our people used, their photos, I believe,
7  all of them are publicly available on the Internet.
8  They are aerial photography.  I think they're
9  maintained by the Department of Agriculture.  They are
10 just periodically taken sometimes yearly, sometimes
11 every other year, sometimes even bigger gaps than
12 that.  I believe the closest one in time to this was
13 1972.
14      I will say, Your Honor, not in our experts,
15 but as part of the facts of how this case was
16 investigated, a mapping person within the office in
17 2010 used a series of photographs dating back, I
18 believe, to 1954 through present day, at that time was
19 2010, to make a draft map for Fish and Wildlife to
20 use.
21      I don't know how much the Court knows about
22 the facts of this case, but when the easement was --
23      THE COURT:  I know what's in the Indictment
24 and in your briefing.  That's it.
25      MR. CLAPPER:  Okay.  So just as a way of a

35

1  little background, this might be helpful in the
2  Court's ruling.
3       At the time the easement was entered, no map
4  was made, and no photographs were taken of the
5  property that were in the Fish and Wildlife file.
6       Then fast-forward a few decades to 2010 when
7  a request comes in that Mr. Mast wants to install some
8  drain tile.  Then there's a need to identify the areas
9  that Fish and Wildlife believes are protected under
10 the terms of the easement.
11      The way they do that is to look at a variety
12 of aerial photography that's available on the
13 Internet, and they do this on the computer, and they
14 identify signs of surface water that are depicted on
15 those photographs, and they look for consistency over
16 a period of time.  That's how they create the map.
17      That is testimony that I would offer that
18 happened in this case as part of the investigation.
19      Actually it wasn't part of the
20 investigation.  It was part of the file three years
21 before Mr. Mast installed drain tile on his land.  I
22 hope I haven't confused the Court with that.
23      THE COURT:  Mr. Leistico?
24      MR. LEISTICO:  Thank you, Your Honor.  I
25 mean the case law is quite clear that the relevant

36

1  time to be looked at is when the contract was
2  executed.  It was April 25, 1973.
3       Mr. Clapper is correct that in 2010 Fish and
4  Wildlife did do a review of the property, which did
5  include aerial photographs prior to 1973.  I know they
6  used one from 1956 in that initial review.  That is
7  not a negotiated mapping of the site.
8       That's not what happened in '73 when the
9  Vostads entered into this.  That was something Fish
10 and Wildlife Service on their own initiative looked at
11 aerial photos.  Most of those, all but one of those, I
12 believe.  It's one of the documents that's been
13 marked.
14      So it gets to be -- I mean all of the
15 evidence that the Government is going to be -- that
16 has noticed us as to be entered into evidence would
17 include from all of those dates.  I would have to go
18 back and look over those things to determine what was
19 used at what time.
20      So we understand the Government may
21 introduce its 2010 mapping, but they used photographs
22 during all this time, including before.  So it gets to
23 be difficult to understand -- it's one of the
24 problems.
25      The Government's motion in limine as to some

37

1  of these issues came late, that the Court issued
2  orders when a scheduling order, when they should come.
3  I raised those in my brief.
4          One of the problems in doing that, we sit
5  here at the beginning of a jury trial, with witnesses
6  subpoenaed and ready to go, and we don't know the
7  footing we get until this moment.
8          It's clear Wes Boll, my expert, did look at
9  aerial photographs before the time the easement was
10  entered into and after the time of the easement.  I
11  think everyone looked at aerial photographs after the
12  time of the Indictment.
13         I think we would have to purify their
14  testimony at this point, because it is all checkered
15  now within that.
16         THE COURT:  So are you saying all of the
17  photos should be admissible?
18         MR. LEISTICO:  Well, I mean if -- so the
19  Court is saying with Mr. Estey -- I'm not saying all
20  the photographs should be admissible.
21         One of the reasons we're here is Fish and
22  Wildlife in '73 didn't put together an identifiable
23  map and contemporaneously record it with this
24  easement.  When they did that later, it made these
25  much easier for everyone so people were on notice.

38

1          So the Court is considering right now, or I
2  believe maybe has issued the order already, but at
3  least considering, that Mr. Estey cannot give an
4  opinion on everything except recurring surface water
5  from '73 to 2013.  I'm using 2013.  I know there's a
6  date there.  But that he would not be able to use
7  those photographs.  But that he would be able to use
8  photographs prior to '73 for the purpose of arguing
9  what was there in '73.
10         THE COURT:  Correct.  That's consistent with
11  the opinion in U.S. vs. Peterson.  In Peterson they
12  used photos that were taken four years before the
13  easement was conveyed to show what existed at the time
14  of the easement.  So if photos here were taken, I
15  think Mr. Clapper said, two years before the easement
16  went into place, that's what would show what was under
17  the easement in 1973.
18         MR. LEISTICO:  Correct.  And there are some
19  in the '40s, some in the '50s, some in the '60s, so
20  they would all be allowed to be looked at.  But once
21  we hit '73, then no more aerial photos.  Is that my
22  understanding?
23         THE COURT:  Mr. Clapper?
24         MR. CLAPPER:  The easement says recurring.
25  So how do we know what was in place in 1973?  It's

39

1  kind of like a scar.
2          THE COURT:  I guess that's your burden to
3  prove what was in place in 1973.
4          MR. CLAPPER:  Right.  And that's what I'm
5  saying is evidence of surface water depicted on
6  photographs after 1973 is an indication of, although
7  not proof positive, indication of recurring water that
8  was on the land in 1973, because water doesn't just
9  show up in these pothole areas.  It's been there over
10  hundreds of years, centuries probably.  That is
11  helpful for the jury to understand.
12         THE COURT:  Mr. Leistico?
13         MR. LEISTICO:  I agree with the Court's
14  reasoning on that.  What Mr. Clapper is leaving out of
15  the discussion of recurring is it said -- the contract
16  says, the easement says, "existing at the date of the
17  easement, April 25th, and recurring thereafter from
18  natural causes."
19         Recurring, I can't find that it's defined
20  anywhere.  It's not defined in the easement.  It's not
21  defined in any applicable regulations, if there are
22  any, from '73.  But recurring requires one simple
23  English basic understanding.  Something can't recur
24  that never happened before.  It had to happen -- it
25  had to occur before it can recur.

40

1          I think it's their burden to show it
2  occurred, and thereafter then it recurred.  So they
3  have to first show that it existed at the time, along
4  with the surface water, on April 25, 1973.
5          Otherwise they get in through a back door
6  what the Court's concerns are.  So I agree.  I think
7  aerial photos prior to '73 are fair to show what was
8  there in '73, and the experts can argue back and forth
9  and the jury can decide.  But after that time is going
10  to confuse the jury on what that meant, because you
11  have to first get to the occur, and that's what their
12  burden is.
13         THE COURT:  So I'm concerned that if
14  photographs between '73 and the date of the alleged
15  illegal activity are admitted, that that would cause
16  more confusion to the jury than what they would
17  benefit from.  It would be more prejudicial than
18  probative.
19         So I'm going to limit the evidence to
20  photographs prior to 1973, and then from the date --
21  you can also admit photographs from the date of the
22  alleged criminal activity up until now, but nothing
23  for that period in between.  Mr. Clapper?
24         MR. CLAPPER:  I don't want to argue,
25  Your Honor.  I want to comply with the Court's ruling.

41

1  So I have a witness from Fish and Wildlife
2  that created the map in 2010. The map she created was
3  based on a dozen aerial photos, only one of which was
4  prior to the easement. That one was in 1956.
5  I'm inquiring as to how the Court would like
6  me to deal with that particular issue, because she
7  created a map, which I think is admissible evidence,
8  but the map that she created is a drawing based on
9  review of photographs the Court is saying are not
10  admissible. So I don't want to be in violation of the
11  Court's ruling.
12  THE COURT: Mr. Leistico?
13  MR. LEISTICO: Thank you, Your Honor. I
14  think without the Court excluding that map, there
15  would be no way for the same confusion to be suffered
16  by the jury, because they are using those exact same
17  photographs.
18  The Court has said Mr. Estey, and I assume
19  our experts, as well, can't testify or admit to those
20  photographs between '73 and the Indictment. What they
21  would be doing, if they get this map from 2010 in,
22  which is simply a hand-drawn map on a piece of white
23  paper with the outline of the parcel, and it's using
24  all but one photograph, aerial photograph to
25  determine, it would simply allow the Government to get

42

1  the same evidence in through a different witness. The
2  same prejudice would occur.
3  So I would ask that that map and the issues
4  related to that map would have to be, for the Court's
5  order to have meaning, would have to be excluded, as
6  well.
7  THE COURT: I agree. Your testimony has to
8  be limited to maps or photos prior to 1973.
9  MR. CLAPPER: So based on that, Your Honor,
10  I would still intend to offer that witness as to the
11  map she created in 2010, and then not offer the basis
12  for all of the review of those photographs afterwards
13  for that map.
14  THE COURT: But the map itself is based on
15  subsequent photos, so it would not be admissible.
16  MR. CLAPPER: But the map then was used by
17  Fish and Wildlife after the violation, after they
18  discovered the violation, to go out and physically
19  inspect the field to determine whether the
20  installation of the drain tile affected those areas
21  they believed were protected.
22  So they used that as a guide to identify the
23  locations on the property, that map.
24  THE COURT: Mr. Leistico?
25  MR. LEISTICO: And that would be getting

43

1  them the same result as if their expert witnesses or
2  this U.S. Fish and Wildlife employee testified to the
3  same thing. The flaw is in the map.
4  They used the aerial photographs that are
5  not admissible to make a map, which then is conveyed
6  to the jury. It's the same information. It's just
7  channeled through this map.
8  I mean I would be forced to try to -- I
9  think the Court's order goes to all purposes,
10  including impeachment. I couldn't impeach that
11  witness without bringing in these aerial photos, that
12  they're wrong, and, therefore, I can't do that without
13  violating. I'm not asking to.
14  I just think a map made from evidence not
15  admissible can't be admissible. It's basically a
16  spreadsheet made from inadmissible evidence, which is
17  then, therefore, not admissible. It's tainted by
18  that.
19  It would be fundamentally unfair. They are
20  just getting, as the Agency testified, this is what
21  was there on that day. It's pre-Indictment. They are
22  investigating it. I think it's their burden. They
23  can go out and they can say based on what was in '73,
24  he violated it.
25  THE COURT: I want to make clear. It's not

44

1  from the date of the Indictment. It's from the date
2  of the alleged criminal activity. If they're alleging
3  that your client put in a tile line, it's from the
4  date that he put that tile line in.
5  MR. LEISTICO: I understand. But the map
6  was made from evidence prior to that.
7  THE COURT: I understand that. But you were
8  referring to the date of the Indictment. I just want
9  to make clear that it's the date of the alleged
10  criminal activity.
11  MR. LEISTICO: I misspoke. I think I
12  understand the Court. That it's from when he put the
13  tile in in 2013. But the map was not made off aerial
14  photos in 2013, because they didn't have those yet.
15  It takes -- usually these lag a year or two.
16  I'm trying not to misspeak to the evidence,
17  but I can't find it right now, where that summary
18  sheet is, but it's one prior to '56 and everything
19  after that they used was things prior to the
20  installation of the tile.
21  MR. CLAPPER: Exhibit 23.
22  THE COURT: So, Mr. Clapper, your witnesses
23  can go out and testify about what they saw, but they
24  would have to relate it to a map that was prior to
25  1973, rather than the map made in 2010.

45

1  MR. CLAPPER:  Can I be heard on one other
2  factual issue, Your Honor?
3  THE COURT:  Yes.
4  MR. CLAPPER:  The map was created in 2010 in
5  August.  That map was sent to the Defendant, certified
6  mail, on October 11, 2010, putting the Defendant on
7  notice of the claims of the Fish and Wildlife Service
8  of areas of his property that they deemed to be
9  protected under the easement.
10  It was after that that the drain tile was
11  installed in the fall of 2013.  Therefore, as to the
12  element of knowledge of the Defendant, that map is
13  relevant to that issue.
14  THE COURT:  Mr. Leistico?
15  MR. LEISTICO:  Your Honor, I understand the
16  Court's order is the probative value is outweighed by
17  the prejudicial value and the confusion to the jury.
18  The Government would be getting the same
19  thing in.  I understand it's the Government's claim,
20  again, it's the Government's claim, that these are the
21  right aerial photos to use to get to this map.  But I
22  agree it's prejudicial to do so.
23  So by getting in the map, they get in the
24  photos, because the map is based off the photos.  They
25  looked at the aerial photos.  They took a piece of

46

1  paper, and they hand drew in.  It's physically what
2  they did.
3  To be able to admit that hand-drawing based
4  on these non-admissible photographs, and they are from
5  '79, 2010, '86, '97, 2003, 2004, 2005, 2006, 2008.
6  They are not even close to the time that -- from the
7  tile -- the tile was all placed after that.
8  So I think it would just be a back-door way
9  to get the same thing in.  I would be almost unable to
10  question it because they just said it so.  But the
11  photographs don't even -- nobody can look at them.  I
12  think it would be prejudicial to allow the jury to
13  look, and prejudicial to this map, which is a
14  depiction of all of those photos.
15  They can bring in the 1956 aerial photo, but
16  the map shouldn't come in.
17  MR. CLAPPER:  Your Honor, may I have one
18  other?
19  THE COURT:  You may.
20  MR. CLAPPER:  The map is not merely based on
21  a review of aerial photography.  It was a draft
22  created by Emily Fischer.  Once the draft was
23  completed, then the supervisor in the office,
24  Tom Tornow, went out to do a field inspection of the
25  office in 2010 for him to see if the areas on the map

47

1  were areas that he felt were protected under the terms
2  of the easement.
3  He then approved the drawing, the map, and
4  it's not just a handwritten document.  It's created by
5  a computer.  That was approved in August, and all of
6  that is in evidence.  That's Exhibit 23.
7  Then the map itself was sent to the
8  Defendant on October 11, 2010, a couple years prior to
9  the time he installed that.
10  So we don't have to offer evidence about all
11  of the photographs that were reviewed into entering
12  the map, because that's not the only basis for it.
13  There was a physical inspection of the property based
14  on a draft of that map by Mr. Tornow.  Then when the
15  Defendant was put on notice of it, that goes directly
16  to the issue of knowledge.
17  THE COURT:  So when I made my earlier ruling
18  that the unfair prejudice outweighed the probative
19  value, the Government had not identified that the map
20  had been sent to the Defendant, and that based on
21  that, they could establish knowledge, and that the
22  crime was committed knowingly.
23  The Government has now disclosed that as
24  relevant, and that the evidence does have significant
25  probative value.

48

1  So re-weighing it, I find that the probative
2  value outweighs any unfair prejudice to the Defendant,
3  because it does go to the issue of knowledge.
4  The Defendant can impeach the witness with
5  photos during the time period between 1973 and the
6  date of the alleged illegal activity and can certainly
7  question the reliability of the map.
8  So I'm reversing my ruling and find that the
9  evidence is admissible.
10  So I've considered all of the proposed
11  expert testimony of Mr. Estey, and find that it is
12  relevant and admissible, and if there are specific
13  parts of it that the Defendant thinks should be
14  excluded while he's testifying, make your objection
15  and I'll rule on it at that point.
16  MR. CLAPPER:  One clarification.  Does that
17  mean -- I just want to be sure I understand the Court.
18  All of the photos then are admissible after
19  '73?
20  THE COURT:  Because they go to the basis for
21  that 2010 map.  Yes.
22  MR. LEISTICO:  Your Honor, are the aerial
23  photos -- now I understand at all times all aerial
24  photos are admissible.  Is it just as to the ones used
25  to produce this map?

49

1      THE COURT: Mr. Clapper, are there other
2  photos?
3      MR. CLAPPER: There are, but I haven't --
4  actually I have. Not for her testimony, but for
5  Mr. Estey's testimony, there are other photos.
6      THE COURT: So if there are other photos
7  that did not go into making that map, those are
8  excluded.
9      MR. CLAPPER: Except those that are prior
10  to, as I understand it, prior to the easement in '73.
11      THE COURT: Correct. Anything prior to 1973
12  is admissible; the things that were relied upon in
13  making the 2010 map are admissible; and those from the
14  date of the alleged criminal activity up until now are
15  admissible.
16      MR. CLAPPER: Thank you, Your Honor.
17      THE COURT: So are you going to call
18  Mr. Wiltermuth?
19      MR. CLAPPER: No, Your Honor.
20      THE COURT: All right. Then I'm going to
21  grant the Defendant's motion to exclude him as an
22  expert.
23      MR. LEISTICO: If I could ask for one point
24  of clarity. Is it my understanding because the Court
25  finds that the probative value of these photographs as

50

1  to this map was produced, that there -- my
2  understanding is that the Court still would not allow
3  those to be used for other purposes, that they go to
4  this map. The expert witnesses could not testify to
5  those, but Miss Fisher could as to they were used to
6  produce the map that was produced in 2010. So it
7  would be limited to just that one witness.
8      THE COURT: It would not be admissible to
9  show evidence of recurring surface water between the
10  period of 1973 and the time of the alleged criminal
11  activity. It would be used as the basis for that
12  2010 map.
13      MR. LEISTICO: And only for that basis.
14      THE COURT: Correct. Mr. Leistico, one of
15  the questions I asked you at the beginning was
16  whether, in light of the late disclosure of Mr. Estey,
17  if you would want to have a continuance. You said
18  that you needed to hear what my rulings were before
19  you could make that determination. So I wanted to
20  circle back to that question.
21      MR. LEISTICO: Could I have a moment? This
22  is very much, I feel, a client decision, as well.
23  Could I have a five-minute recess to just talk to
24  Mr. Mast?
25      THE COURT: You may.

51

1      MR. LEISTICO: Thank you. Could I leave the
2  courtroom for that purpose, Your Honor?
3      THE COURT: So let me just finish with the
4  pretrial conference. Are there any other issues I
5  haven't ruled on that anybody wanted to bring up?
6      MR. CLAPPER: I'm assuming sequestration
7  goes both ways.
8      THE COURT: That's correct.
9      MR. LEISTICO: There were issues to do with
10  jury instructions.
11      THE COURT: We take those up at the end of
12  the trial. Were there any objections to the
13  preliminary instructions?
14      MR. CLAPPER: I have no objections,
15  Your Honor. I would ask for a lesser included offense
16  instruction to be included.
17      THE COURT: Then you should propose one.
18      MR. CLAPPER: Okay. Thank you.
19      THE COURT: That would not go into the
20  preliminaries, though.
21      MR. CLAPPER: I understand that, Your Honor.
22      THE COURT: Mr. Leistico, anything regarding
23  the preliminary? Any objection to the preliminaries?
24      MR. LEISTICO: Could I speak with Mr. Mast?
25  I think it goes to one of the issues in the jury

52

1  instructions as to what the Court ordered.
2      The Government did put in a knowledge
3  instruction, which I would ask the Court incorporate
4  that.
5      THE COURT: So I would put that in the
6  finals. But are there any objections to the
7  preliminary instructions?
8      MR. LEISTICO: No, not to the preliminaries.
9  Thank you, Your Honor.
10      THE COURT: Anything else from either side?
11      MR. CLAPPER: No, Your Honor.
12      THE COURT: All right. We'll be in recess
13  for five minutes.
14      (Recess from 9:26 until 9:33)
15      THE COURT: Mr. Leistico?
16      MR. LEISTICO: We're prepared to go forward,
17  Your Honor.
18      THE COURT: Please bring in the jury. Just
19  a minute. Counsel, I forgot to ask. One of the Fish
20  and Wildlife agents indicated that when he was coming
21  up to the Federal Building, someone who he now thinks
22  is one of the potential jurors had just stopped and
23  asked him where the Federal building was, and he
24  pointed to it. That's the only communication he had
25  with the person.

53

1           Is there anything anybody wants me to do

2   about that?

3           MR. LEISTICO:  I do not.

4           THE COURT:  Okay.  Now bring in the jury.

5           (End of pretrial conference at 9:35 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

54

1   UNITED STATES DISTRICT COURT
    DISTRICT OF SOUTH DAKOTA   :SS CERTIFICATE OF REPORTER
2   SOUTHERN DIVISION

3

4           I, Jill M. Connelly, Official United States
    District Court Reporter, Registered Merit Reporter,
    Certified Realtime Reporter, and Notary Public, hereby
5   certify that the above and foregoing transcript is the
    true, full, and complete transcript of the
6   above-entitled case, consisting of Pages 1 - 53.

7           I further certify that I am not a relative or
    employee or attorney or counsel of any of the parties
8   hereto, nor a relative or employee of such attorney or
    counsel, nor do I have any interest in the outcome or
9   events of the action.

10          IN TESTIMONY WHEREOF, I have hereto set my
    hand this 27th day of June, 2018.

11

12          /s/ Jill M. Connelly
    _____
13          Jill M. Connelly, RMR, CRR
    Court Reporter
14          United States Courthouse
    400 S. Phillips Avenue
15          Sioux Falls, SD 57104
     Phone:  (605) 330-6669
16          E-mail:  Jill_Connelly@sdd.uscourts.gov

17

18

19

20

21

22

23

24

25

**'**

**'40s** [1] - 38:19
**'50s** [1] - 38:19
**'56** [1] - 44:18
**'60s** [1] - 38:19
**'73** [15] - 11:19, 36:8, 37:22, 38:5, 38:8, 38:9, 38:21, 39:22, 40:7, 40:8, 40:14, 41:20, 43:23, 48:19, 49:10
**'79** [1] - 46:5
**'86** [1] - 46:5
**'97** [1] - 46:5
**'lakes** [1] - 8:20
**'ordinary** [1] - 8:22

**/**

**/s** [1] - 54:12

**1**

**1** [2] - 4:4, 54:6
**1015** [1] - 1:23
**11** [3] - 3:1, 45:6, 47:8
**1234** [1] - 8:12
**13** [1] - 2:25
**14** [1] - 16:11
**16** [3] - 1:12, 2:1, 21:5
**17-40078** [1] - 1:4
**1954** [1] - 34:18
**1956** [1] - 36:6, 41:4, 46:15
**1972** [1] - 34:13
**1973** [30] - 8:5, 11:7, 16:15, 19:18, 22:5, 22:20, 27:13, 27:14, 28:1, 29:15, 32:3, 32:9, 32:23, 33:6, 33:8, 33:12, 36:2, 36:5, 38:17, 38:25, 39:3, 39:6, 39:8, 40:4, 40:20, 42:8, 44:25, 48:5, 49:11, 50:10
**1979** [2] - 17:1, 28:23
**1985** [2] - 15:22, 16:3
**1987** [2] - 8:12, 13:22
**1994** [2] - 15:20, 16:14

**2**

**2** [1] - 4:7

**20** [4] - 3:19, 4:4, 24:16, 27:12
**2003** [1] - 46:5
**2004** [1] - 46:5
**2005** [1] - 46:5
**2006** [1] - 46:5
**2008** [1] - 46:5
**2010** [18] - 34:17, 34:19, 35:6, 36:3, 36:21, 41:2, 41:21, 42:11, 44:25, 45:4, 45:6, 46:5, 46:25, 47:8, 48:21, 49:13, 50:6, 50:12
**2011** [1] - 32:18
**2013** [5] - 38:5, 44:13, 44:14, 45:11
**2018** [4] - 1:12, 2:1, 11:23, 54:10
**23** [14] - 15:22, 16:3, 44:21, 47:6
**25** [2] - 36:2, 40:4
**25th** [1] - 39:17
**2638** [1] - 1:20
**27th** [1] - 54:10

**3**

**3** [1] - 4:10
**300** [1] - 1:23
**31** [2] - 2:24, 7:8
**33** [1] - 34:1
**330-6669** [1] - 54:15

**4**

**4** [1] - 4:14
**400** [1] - 54:14
**403** [1] - 29:7

**5**

**53** [1] - 54:6
**56301** [1] - 1:24
**57101-2638** [1] - 1:20
**57104** [1] - 54:15

**6**

**605** [1] - 54:15

**7**

**702** [1] - 21:8

**8**

**828** [1] - 8:12
**8:10** [2] - 1:13, 2:3

**9**

**9:26** [1] - 52:14
**9:33** [1] - 52:14
**9:35** [1] - 53:5

**A**

**a.m** [3] - 1:13, 2:3, 53:5
**ability** [3] - 31:15, 31:18, 31:23
**able** [15] - 3:6, 5:9, 7:20, 9:15, 9:17, 10:7, 11:18, 18:19, 20:8, 22:7, 22:21, 28:8, 38:6, 38:7, 46:3
**above-entitled** [1] - 54:6
**according** [1] - 13:21
**acreage** [1] - 33:24
**acres** [3] - 33:22, 33:23, 34:1
**Act** [2] - 18:9, 18:10
**action** [1] - 54:9
**activity** [8] - 14:23, 40:15, 40:22, 44:2, 44:10, 48:6, 49:14, 50:11
**add** [4] - 4:20, 25:12, 26:11
**addition** [1] - 21:22
**address** [1] - 7:14
**admissible** [20] - 5:21, 29:4, 37:17, 37:20, 41:7, 41:10, 42:15, 43:5, 43:15, 43:17, 46:4, 48:9, 48:12, 48:18, 48:24, 49:12, 49:13, 49:15, 50:8
**admit** [4] - 10:7, 40:21, 41:19, 46:3
**admitted** [3] - 28:14, 28:15, 40:15
**adopted** [1] - 20:3
**aerial** [23] - 14:11, 24:2, 24:9, 28:13, 34:8, 35:12, 36:5, 36:11, 37:9, 37:11, 38:21, 40:7, 41:3, 41:24, 43:4, 43:11, 44:13, 45:21, 45:25,

46:15, 46:21, 48:22, 48:23
**affected** [1] - 42:20
**affects** [1] - 15:15
**afterwards** [1] - 42:12
**ag** [3] - 10:16, 12:22
**agency** [4] - 7:18, 7:23, 8:24, 9:13
**Agency** [2] - 12:23, 43:20
**agent** [3] - 6:23, 7:2, 7:6
**agents** [1] - 52:20
**agree** [6] - 11:21, 13:17, 39:13, 40:6, 42:7, 45:22
**agreed** [3] - 18:6, 18:7, 19:20
**agreement** [3] - 8:14, 9:4, 22:5
**agrees** [1] - 6:12
**Agriculture** [2] - 7:24, 34:9
**alleged** [10] - 32:10, 33:2, 33:9, 40:14, 40:22, 44:2, 44:9, 48:6, 49:14, 50:10
**alleging** [1] - 44:2
**allow** [5] - 6:9, 22:17, 41:25, 46:12, 50:2
**allowed** [5] - 5:17, 6:7, 17:18, 17:19, 17:24, 18:11, 21:21, 22:3, 27:2, 33:6, 38:20
**almost** [1] - 46:9
**alter** [1] - 16:2
**altered** [1] - 12:21
**alternate** [1] - 2:25
**ambiguous** [1] - 10:7
**AMERICA** [1] - 1:5
**America** [1] - 2:7
**amount** [1] - 33:22
**anonymity** [1] - 3:5
**apologize** [1] - 30:7
**appearances** [1] - 2:8
**APPEARANCES** [1] - 1:18
**appeared** [1] - 32:23
**applicable** [5] - 5:7, 9:8, 11:2, 14:19, 39:21
**application** [3] - 9:20, 14:15, 14:17
**applied** [1] - 9:2
**applies** [4] - 5:19, 8:24, 12:19, 12:20
**apply** [5] - 5:10,

5:23, 20:1
**approved** [2] - 47:3, 47:5
**April** [3] - 36:2, 39:17, 40:4
**area** [3] - 15:13, 25:11, 31:19
**area's** [1] - 31:22
**areas** [21] - 14:9, 14:23, 15:1, 15:15, 23:23, 24:10, 24:22, 24:25, 25:4, 25:7, 30:11, 30:12, 30:15, 32:5, 34:1, 35:8, 39:9, 42:20, 45:8, 46:25, 47:1
**arguably** [1] - 22:25
**argue** [6] - 10:21, 12:18, 21:25, 28:6, 40:8, 40:24
**argued** [2] - 22:1, 22:18
**argues** [1] - 27:16
**arguing** [2] - 18:22, 38:8
**argument** [1] - 9:7
**articles** [2] - 12:4, 22:12
**ascertain** [1] - 5:9
**askew** [1] - 15:4
**assist** [1] - 28:18
**Assistant** [1] - 1:19
**assume** [1] - 41:18
**assuming** [1] - 51:6
**attorney** [2] - 54:7, 54:8
**Attorney** [1] - 1:19
**August** [2] - 45:5, 47:5
**available** [3] - 33:20, 34:7, 35:12
**Avenue** [1] - 54:14
**average** [1] - 25:1
**aware** [1] - 12:22
**Azure** [2] - 6:16, 7:2

**B**

**back-door** [1] - 46:8
**background** [3] - 12:5, 31:7, 35:1
**bank** [2] - 23:5, 23:9
**Bank** [1] - 1:23
**banks** [1] - 23:8
**bar** [1] - 4:16
**based** [17] - 20:16, 21:1, 22:8, 24:9, 27:25, 31:7, 32:13, 41:3, 41:8, 42:9,

42:14, 43:23, 45:24, 46:3, 46:20, 47:13, 47:20

**basic** [1] - 39:23

**basin** [1] - 15:13

**basis** [6] - 11:17, 42:11, 47:12, 48:20, 50:11, 50:13

**became** [1] - 15:23

**BEFORE** [1] - 1:16

**beginning** [3] - 29:10, 37:5, 50:15

**behalf** [2] - 2:10, 2:12

**believes** [1] - 35:9

**below** [1] - 30:10

**benefit** [1] - 40:17

**benefits** [7] - 9:9, 15:25, 18:18, 21:14, 21:15, 23:12, 29:2

**between** [8] - 32:23, 33:3, 34:1, 40:14, 40:23, 41:20, 48:5, 50:9

**beyond** [1] - 16:18

**bigger** [1] - 34:11

**Bill** [2] - 9:11, 9:12

**birds** [1] - 25:10

**bleed** [2] - 10:3, 25:19

**Boll** [4] - 20:8, 27:17, 28:25, 37:8

**bound** [1] - 9:5

**Box** [1] - 1:20

**breach** [1] - 22:24

**breached** [3] - 11:1, 21:20

**breeding** [1] - 25:9

**brief** [4] - 8:2, 8:11, 21:12, 37:3

**briefing** [1] - 34:24

**bring** [6] - 11:9, 23:6, 46:15, 51:5, 52:18, 53:4

**bringing** [1] - 43:11

**broader** [1] - 32:6

**brought** [1] - 15:4

**Building** [1] - 52:21

**building** [1] - 52:23

**burden** [7] - 4:17, 4:24, 5:4, 39:2, 40:1, 40:12, 43:22

---

**C**

---

**cannot** [3] - 16:2, 32:4, 38:3

**carpet** [1] - 16:8

**case** [47] - 5:18,

6:17, 6:20, 6:23, 7:1, 7:6, 8:10, 8:11, 8:12, 8:13, 8:17, 9:1, 9:14, 10:17, 10:25, 11:3, 13:22, 14:4, 14:17, 14:18, 17:5, 17:13, 17:18, 18:21, 19:10, 19:22, 21:17, 22:19, 22:23, 22:25, 23:15, 24:1, 24:3, 24:15, 27:14, 28:4, 29:1, 31:12, 32:15, 33:25, 34:15, 34:22, 35:18, 35:25, 54:6

**cases** [6] - 10:20, 14:6, 16:18, 17:20, 17:23, 27:5

**caused** [2] - 11:11, 11:25

**causes** [2] - 14:1, 39:18

**centuries** [1] - 39:10

**certain** [3] - 12:18, 16:10, 17:10

**certainly** [1] - 48:6

**CERTIFICATE** [1] - 54:1

**certified** [2] - 20:13, 45:5

**Certified** [1] - 54:4

**certify** [2] - 54:5, 54:7

**cetera** [1] - 24:23

**channeled** [1] - 43:7

**charged** [3] - 13:9, 13:10, 23:21

**Charles** [1] - 20:23

**chart** [1] - 33:20

**checkered** [1] - 37:14

**circle** [1] - 50:20

**Circuit** [5] - 8:12, 17:21, 19:22, 32:17, 32:18

**circumstances** [1] - 7:4

**cites** [1] - 14:18

**citing** [1] - 9:19

**claim** [2] - 45:19, 45:20

**claims** [1] - 45:7

**Clapper** [18] - 1:19, 2:10, 3:11, 5:2, 7:14, 13:6, 23:3, 23:18, 27:11, 30:8, 33:10, 36:3, 38:15, 38:23, 39:14, 40:23, 44:22, 49:1

**CLAPPER** [38] - 2:10, 2:17, 3:12, 3:18,

3:24, 5:3, 5:12, 6:12, 6:16, 6:25, 7:16, 13:7, 23:19, 25:13, 30:9, 33:11, 33:16, 34:25, 38:24, 39:4, 40:24, 42:9, 42:16, 44:21, 45:1, 45:4, 46:17, 46:20, 48:16, 49:3, 49:9, 49:16, 49:19, 51:6, 51:14, 51:18, 51:21, 52:11

**clarification** [1] - 48:16

**clarity** [2] - 20:6, 49:24

**clear** [12] - 5:13, 8:22, 12:19, 13:2, 13:21, 19:4, 19:23, 27:22, 35:25, 37:8, 43:25, 44:9

**clearly** [1] - 5:20

**client** [3] - 6:20, 44:3, 50:22

**close** [1] - 46:6

**closest** [1] - 34:12

**Cloud** [1] - 1:24

**collects** [1] - 15:14

**college** [1] - 29:14

**coming** [4] - 16:17, 16:21, 17:7, 52:20

**comment** [1] - 4:25

**commenting** [1] - 4:16

**committed** [2] - 23:5, 47:22

**communication** [1] - 52:24

**comparing** [2] - 32:6, 33:8

**complete** [1] - 54:5

**completed** [1] - 46:23

**completely** [3] - 7:24, 9:13, 29:6

**comply** [2] - 6:13, 40:25

**computer** [2] - 35:13, 47:5

**concede** [1] - 16:19

**conceded** [6] - 11:16, 18:3, 19:3, 19:7, 22:7, 27:4

**concedes** [1] - 10:10

**conceding** [1] - 10:19

**concerned** [1] - 40:13

**concerns** [1] - 40:6

**conditions** [1] - 20:12

**conference** [2] - 51:4, 53:5

**CONFERENCE** [1] - 1:14

**confuse** [2] - 21:10, 40:10

**confused** [1] - 35:22

**confusion** [4] - 33:4, 40:16, 41:15, 45:17

**Connelly** [1] - 54:3, 54:12, 54:13

**consequences** [1] - 17:13

**Conservation** [1] - 7:23

**consider** [4] - 23:25, 25:22, 30:20

**considered** [1] - 48:10

**considering** [2] - 38:1, 38:3

**consistency** [1] - 35:15

**consistent** [2] - 16:23, 38:10

**consisting** [1] - 54:6

**contain** [1] - 30:11

**contemporaneously** [1] - 37:23

**continuance** [3] - 26:18, 50:17

**contract** [46] - 8:8, 9:24, 10:6, 10:8, 10:19, 10:20, 10:24, 11:1, 11:21, 11:23, 12:20, 12:21, 13:5, 17:17, 18:1, 18:4, 18:15, 18:25, 19:1, 19:4, 19:10, 21:9, 21:20, 21:25, 22:24, 22:25, 26:24, 26:25, 27:3, 27:8, 27:15, 27:22, 28:3, 28:4, 28:7, 28:10, 28:11, 29:20, 30:2, 30:24, 31:2, 36:1, 39:15

**contracts** [1] - 18:11

**conveyance** [2] - 19:25, 23:25

**conveyed** [4] - 14:6, 14:9, 38:13, 43:5

**corners** [2] - 17:22, 18:1

**correct** [9] - 3:23, 20:17, 29:25, 36:3, 38:10, 38:18, 49:11, 50:14, 51:8

**counsel** [5] - 2:2, 2:8, 52:19, 54:7, 54:8

**couple** [2] - 23:20,

47:8

**COURT** [80] - 1:1, 2:4, 2:14, 2:19, 2:23, 3:13, 3:16, 3:21, 4:1, 4:7, 4:10, 4:14, 5:2, 5:8, 5:20, 6:14, 6:23, 7:4, 10:1, 13:6, 15:16, 19:11, 20:18, 20:21, 23:18, 25:12, 25:16, 25:22, 26:3, 26:7, 26:12, 26:16, 29:9, 29:22, 30:4, 30:8, 30:22, 33:8, 33:13, 34:23, 35:23, 37:16, 38:10, 38:23, 39:2, 39:12, 40:13, 41:12, 42:7, 42:14, 42:24, 43:25, 44:7, 44:22, 45:3, 45:14, 46:19, 47:17, 48:20, 49:1, 49:6, 49:11, 49:17, 49:20, 50:8, 50:14, 50:25, 51:3, 51:8, 51:11, 51:17, 51:19, 51:22, 52:5, 52:10, 52:12, 52:15, 52:18, 53:4, 54:1

**Court** [37] - 1:16, 2:2, 5:3, 5:18, 6:12, 14:8, 21:2, 22:15, 23:10, 23:15, 23:16, 25:15, 25:20, 25:25, 26:17, 26:20, 27:6, 28:24, 28:25, 30:19, 34:21, 35:22, 37:1, 37:19, 38:1, 41:5, 41:9, 41:14, 41:18, 44:12, 48:17, 49:24, 50:2, 52:1, 52:3, 54:4, 54:13

**Court's** [13] - 4:23, 6:5, 20:14, 26:9, 27:17, 35:2, 39:13, 40:6, 40:25, 41:11, 42:4, 43:9, 45:16

**Courthouse** [2] - 1:11, 54:14

**courtroom** [8] - 3:5, 6:1, 6:7, 6:11, 6:21, 6:24, 12:25, 51:2

**Cowardin** [1] - 16:24, 17:1, 28:22

**Cr** [1] - 1:4

**create** [1] - 35:16

**created** [8] - 41:2, 41:7, 41:8, 42:11, 45:4, 46:22, 47:4

**crime** [7] - 13:8, 13:10, 14:20, 22:25, 23:20, 24:25, 47:22

**criminal** [8] - 17:12, 18:21, 22:23, 40:22, 44:2, 44:10, 49:14, 50:10
**criteria** [4] - 7:11, 19:14, 19:17, 20:17
**crop** [1] - 16:1
**CRR** [1] - 54:13
**crude** [1] - 33:19
**current** [1] - 15:20
**CV** [1] - 24:15
**CVs** [3] - 12:4, 16:22, 28:20
**cycle** [2] - 31:24, 32:4

**D**

**Dakota** [2] - 25:11, 26:25
**DAKOTA** [2] - 1:2, 54:1
**damaged** [2] - 13:11, 30:21
**damages** [1] - 23:1
**date** [14] - 15:23, 34:4, 38:6, 39:16, 40:14, 40:20, 40:21, 44:1, 44:4, 44:8, 44:9, 48:6, 49:14
**dates** [1] - 36:17
**dating** [1] - 34:17
**Dave** [1] - 6:16
**days** [3] - 2:15, 2:24, 16:11
**deadline** [4] - 26:4, 26:8, 26:12, 26:16
**deal** [1] - 41:6
**dealing** [3] - 8:7, 9:22, 19:11
**decade** [1] - 14:14
**decades** [1] - 35:6
**December** [2] - 15:22, 16:3
**decide** [10] - 10:25, 17:10, 18:4, 18:5, 19:10, 27:21, 28:12, 28:16, 31:18, 40:9
**decision** [1] - 50:22
**decomposition** [1] - 31:24
**deemed** [1] - 45:8
**Defendant** [18] - 1:9, 1:24, 1:25, 2:2, 3:1, 4:16, 5:21, 21:11, 21:19, 45:5, 45:6, 45:12, 47:8, 47:15, 47:20, 48:2, 48:4, 48:13

**Defendant's** [5] - 4:19, 9:16, 20:22, 34:5, 49:21
**defense** [9] - 4:17, 5:6, 5:9, 5:10, 5:14, 5:17, 5:19, 5:23, 6:1
**define** [9] - 9:12, 10:8, 11:3, 11:5, 12:3, 14:3, 15:5, 17:16, 19:5
**defined** [8] - 8:4, 15:9, 15:20, 16:3, 25:4, 39:19, 39:20, 39:21
**defines** [1] - 8:14
**defining** [2] - 11:18, 16:25
**definitely** [2] - 8:9, 30:19
**definition** [16] - 7:11, 8:19, 9:23, 12:19, 12:20, 13:2, 13:14, 15:17, 15:21, 16:4, 17:17, 19:14, 19:17, 20:2, 23:14, 24:6
**definitions** [1] - 8:23
**delineation** [3] - 7:12, 19:15, 19:18
**delineator** [1] - 20:13
**demonstrate** [1] - 24:20
**denied** [1] - 31:3
**deny** [1] - 5:24
**Department** [3] - 7:18, 7:24, 34:9
**depicted** [2] - 35:14, 39:5
**depiction** [1] - 46:14
**describe** [1] - 13:18
**described** [2] - 30:10, 32:19
**destroy** [1] - 14:23
**destroyed** [2] - 15:11, 25:1
**determination** [1] - 50:19
**determine** [10] - 8:24, 9:15, 16:13, 19:25, 27:19, 28:16, 30:14, 36:18, 41:25, 42:19
**determining** [1] - 26:20
**developed** [4] - 14:14, 15:17, 19:18, 19:21
**dictate** [1] - 10:12
**different** [5] - 7:24, 9:13, 16:25, 25:18, 42:1

**difficult** [1] - 36:23
**dire** [1] - 3:7
**directed** [2] - 22:15, 25:20
**directly** [1] - 47:15
**disadvantage** [1] - 5:1
**disagree** [1] - 13:7
**disclosed** [1] - 47:23
**disclosure** [2] - 26:13, 50:16
**discovered** [1] - 42:18
**discussion** [2] - 6:3, 39:15
**DISTRICT** [4] - 1:1, 1:2, 54:1, 54:1
**District** [2] - 1:16, 54:4
**disturb** [1] - 14:23
**disturbed** [3] - 15:10, 25:1, 30:21
**DIVISION** [2] - 1:3, 54:2
**Docket** [1] - 4:4
**document** [4] - 17:3, 17:9, 17:22, 47:4
**Document** [1] - 7:8
**documents** [1] - 36:12
**done** [4] - 2:18, 2:21, 27:5
**door** [2] - 40:5, 46:8
**down** [1] - 2:25
**dozen** [1] - 41:3
**draft** [4] - 34:19, 46:21, 46:22, 47:14
**drain** [6] - 15:12, 30:18, 35:8, 35:21, 42:20, 45:10
**drained** [1] - 31:14
**draining** [2] - 23:13, 32:10
**drawing** [3] - 41:8, 46:3, 47:3
**drawn** [1] - 41:22
**drew** [1] - 46:1
**dry** [1] - 32:4
**ducks** [2] - 21:15, 21:16
**due** [1] - 14:1
**duration** [1] - 16:7
**during** [4] - 5:22, 16:11, 36:22, 48:5

**E**

**E-mail** [1] - 54:16
**easement** [69] - 7:17,

8:3, 8:4, 8:8, 8:9, 8:13, 8:17, 8:20, 8:25, 9:2, 9:8, 9:13, 9:25, 10:14, 11:4, 12:13, 13:8, 13:14, 13:16, 13:21, 13:23, 14:2, 14:6, 14:9, 15:3, 15:9, 17:6, 17:24, 19:19, 21:25, 22:9, 22:14, 24:11, 25:3, 25:4, 25:9, 27:1, 29:5, 30:9, 30:16, 31:3, 31:16, 32:2, 32:3, 32:9, 33:1, 33:15, 34:2, 34:22, 35:3, 35:10, 37:9, 37:10, 37:24, 38:13, 38:14, 38:15, 38:17, 38:24, 39:16, 39:17, 39:20, 41:4, 45:9, 47:2, 49:10
**easements** [2] - 9:20, 9:22
**easier** [1] - 37:25
**educational** [1] - 32:13
**effect** [2] - 15:12, 30:18, 33:2
**effective** [1] - 15:23
**Eighth** [5] - 8:12, 17:21, 19:22, 32:17, 32:18
**either** [1] - 52:10
**element** [2] - 24:24, 45:12
**elements** [4] - 14:4, 14:19, 14:22, 23:20
**elicit** [1] - 5:17
**Emily** [1] - 46:22
**employee** [2] - 43:2, 54:7, 54:8
**employees** [1] - 10:13
**enacted** [1] - 15:22
**enactment** [1] - 16:14
**encompasses** [1] - 32:5
**end** [2] - 13:18, 51:11
**End** [1] - 53:5
**English** [2] - 12:10, 39:23
**engrained** [1] - 11:8, 29:16
**entered** [4] - 35:3, 36:9, 36:16, 37:10
**entering** [1] - 47:11
**entitled** [1] - 54:6
**entity** [1] - 7:25
**entrapment** [1] -

4:15
**especially** [4] - 17:12, 18:21, 18:22, 25:11
**establish** [1] - 47:21
**Estey** [16] - 15:7, 16:21, 23:22, 24:2, 24:14, 25:14, 25:15, 25:18, 25:25, 27:12, 32:12, 37:19, 38:3, 41:18, 48:11, 50:16
**Estey's** [1] - 49:5
**estimate** [2] - 2:24, 33:22
**estoppel** [3] - 4:15, 5:10, 5:23
**et** [1] - 24:23
**events** [1] - 54:9
**evidence** [26] - 7:10, 7:22, 10:8, 14:2, 14:8, 14:19, 15:7, 24:10, 24:17, 27:1, 30:15, 36:15, 36:16, 39:5, 40:19, 41:7, 42:1, 43:14, 43:16, 44:6, 44:16, 47:6, 47:10, 47:24, 48:9, 50:9
**evident** [2] - 32:9, 32:10
**exact** [2] - 8:17, 41:16
**example** [1] - 16:8
**examples** [1] - 11:12
**except** [4] - 32:22, 32:25, 38:4, 49:9
**exclude** [8] - 9:10, 20:15, 20:22, 21:24, 23:10, 23:16, 31:1, 49:21
**excluded** [6] - 6:10, 6:22, 29:7, 42:5, 48:14, 49:8
**excluding** [1] - 41:14
**executed** [1] - 36:2
**Exhibit** [2] - 44:21, 47:6
**exhibits** [1] - 3:22
**exist** [1] - 22:20
**existed** [5] - 14:5, 20:1, 31:16, 38:13, 40:3
**existence** [2] - 9:3, 19:24
**existing** [2] - 14:1, 39:16
**exists** [2] - 15:8, 32:3
**experience** [2] - 31:8, 32:14
**expert** [19] - 7:21, 11:15, 12:2, 12:9,

12:14, 18:19, 18:23, 26:6, 26:13, 31:6, 31:9, 32:15, 32:16, 34:6, 37:8, 43:1, 48:11, 49:22, 50:4

**experts** [22] - 10:4, 10:21, 11:8, 11:17, 12:2, 14:21, 15:4, 16:20, 17:7, 17:16, 18:15, 20:23, 23:6, 23:16, 26:21, 26:23, 27:10, 27:24, 30:17, 34:14, 40:8, 41:19

**expressly** [1] - 10:15

**extensive** [1] - 31:7

**extrinsic** [2] - 10:8, 27:1

## F

**F.2d** [1] - 8:12

**fact** [2] - 19:6, 27:22

**facts** [7] - 5:18, 5:20, 5:23, 10:25, 19:9, 34:15, 34:22

**factual** [1] - 45:2

**fair** [1] - 40:7

**fall** [1] - 45:11

**Falls** [4] - 1:12, 1:17, 1:20, 54:15

**far** [1] - 26:5

**Farm** [4] - 9:9, 9:11, 9:12, 15:25

**farmland** [1] - 15:13

**fast** [1] - 35:6

**fast-forward** [1] - 35:6

**Federal** [5] - 1:11, 23:8, 26:1, 52:21, 52:23

**federal** [1] - 16:1

**felt** [1] - 47:1

**fence** [4] - 17:5, 17:6, 17:7, 17:9

**few** [2] - 22:24, 35:6

**field** [2] - 42:19, 46:24

**fifteen** [2] - 3:18, 3:19

**file** [4] - 21:14, 21:23, 35:5, 35:20

**filed** [1] - 21:3

**finals** [1] - 52:6

**financial** [1] - 23:7

**finish** [1] - 51:3

**first** [6] - 4:3, 26:23, 30:22, 31:5, 40:3, 40:11

**Fischer** [1] - 46:22

**Fish** [19] - 7:17, 8:5, 9:14, 9:17, 9:20, 10:11, 29:13, 33:18, 34:19, 35:5, 35:9, 36:3, 36:9, 37:21, 41:1, 42:17, 43:2, 45:7, 52:19

**Fisher** [1] - 50:5

**five** [2] - 50:23, 52:13

**five-minute** [1] - 50:23

**flaw** [1] - 43:3

**food** [1] - 31:25

**footing** [1] - 37:7

**forced** [1] - 43:8

**forcefully** [1] - 22:1

**foregoing** [1] - 54:5

**forgot** [1] - 52:19

**forth** [1] - 40:8

**forward** [2] - 35:6, 52:16

**four** [3] - 17:22, 18:1, 38:12

**front** [1] - 19:9

**full** [1] - 54:5

**fundamentally** [4] - 12:14, 18:21, 29:3, 43:19

**funding** [1] - 9:11

**future** [1] - 9:5

## G

**gaps** [1] - 34:11

**Gary** [2] - 1:22, 2:12

**genuinely** [1] - 28:5

**Germain** [1] - 1:23

**given** [1] - 5:11

**Government** [47] - 2:21, 3:1, 4:15, 5:5, 7:9, 9:11, 10:5, 10:9, 10:18, 10:22, 11:14, 12:1, 12:16, 15:24, 16:17, 16:19, 17:15, 17:23, 17:25, 18:2, 18:13, 18:22, 19:6, 20:7, 21:3, 21:23, 22:7, 22:17, 22:19, 24:5, 26:2, 26:22, 26:23, 27:3, 27:4, 27:7, 27:15, 29:1, 29:4, 33:25, 36:15, 36:20, 41:25, 45:18, 47:19, 47:23, 52:2

**Government's** [7] - 4:3, 7:13, 10:4, 19:12, 36:25, 45:19, 45:20

**graft** [1] - 33:21

**grant** [5] - 16:15,

20:4, 26:17, 30:25, 49:21

**granted** [4] - 4:7, 4:10, 4:14, 6:14

**great** [1] - 4:25

**ground** [1] - 15:13

**growing** [1] - 16:11

**guess** [4] - 5:14, 5:16, 21:17, 39:2

**guidance** [4] - 21:1, 21:9, 22:6, 27:25

**guide** [1] - 42:22

**guidelines** [1] - 13:3

**guilt** [1] - 4:8

## H

**habit** [1] - 16:6

**habitat** [2] - 12:6, 31:23

**half** [1] - 3:15

**hand** [4] - 41:22, 46:1, 46:3, 54:10

**hand-drawing** [1] - 46:3

**hand-drawn** [1] - 41:22

**handwritten** [1] - 47:4

**hard** [1] - 19:9

**harm** [4] - 18:18, 23:3, 23:7, 23:13

**hear** [1] - 50:18

**heard** [1] - 45:1

**hearing** [1] - 2:5

**held** [5] - 17:21, 18:1, 23:15, 24:1, 28:25

**help** [3] - 8:24, 15:7, 31:11

**helpful** [1] - 35:1, 39:11

**hereby** [1] - 54:4

**hereto** [1] - 54:8, 54:10

**highly** [7] - 21:18, 22:16, 22:18, 29:6, 29:10, 29:12, 30:1

**hit** [1] - 38:21

**hold** [4] - 18:25, 21:24, 28:25, 29:20

**holding** [3] - 17:21, 17:23, 20:14

**honestly** [1] - 25:13

**Honor** [38] - 3:12, 3:18, 3:20, 3:24, 3:25, 5:13, 7:16, 13:8, 15:20, 20:5, 20:20, 20:25, 23:20, 25:13,

25:17, 25:24, 26:15, 30:7, 30:9, 33:11, 33:17, 34:14, 35:24, 40:25, 41:13, 42:9, 45:2, 45:15, 46:17, 48:22, 49:16, 49:19, 51:2, 51:15, 51:21, 52:9, 52:11, 52:17

**Honorable** [1] - 1:16

**hope** [1] - 35:22

**hour** [2] - 2:15, 3:15

**hundred** [1] - 13:17

**hundreds** [1] - 39:10

**hydric** [2] - 16:4, 16:12

**hydrology** [1] - 16:10

**hydrophytic** [1] - 16:4

## I

**identifiable** [2] - 14:5, 37:22

**identified** [1] - 47:19

**identify** [6] - 14:8, 15:7, 23:23, 35:8, 35:14, 42:22

**illegal** [2] - 40:15, 48:6

**illustrative** [1] - 11:12

**impact** [3] - 31:14, 31:16, 31:18

**impeach** [2] - 43:10, 48:4

**impeachment** [1] - 43:10

**impropriety** [1] - 18:17

**IN** [1] - 54:10

**inadmissible** [1] - 43:16

**include** [5] - 10:15, 23:22, 30:11, 36:5, 36:17

**included** [5] - 8:10, 32:20, 34:2, 51:15, 51:16

**including** [4] - 13:24, 31:23, 36:22, 43:10

**incorporate** [1] - 52:3

**indicated** [2] - 26:10, 27:11, 52:20

**indication** [2] - 39:6, 39:7

**indicative** [1] - 24:21

**Indictment** [7] - 32:24, 34:23, 37:12,

41:20, 43:21, 44:1, 44:8

**individually** [1] - 3:10

**individuals** [2] - 28:19, 29:13

**information** [1] - 43:6

**initial** [1] - 36:6

**initiative** [1] - 36:10

**injure** [1] - 14:23

**injured** [1] - 25:1

**innocence** [1] - 4:8

**inquire** [1] - 5:22

**inquiring** [1] - 41:5

**inspect** [1] - 42:19

**inspection** [2] - 46:24, 47:13

**install** [1] - 35:7

**installation** [2] - 42:20, 44:20

**installed** [3] - 35:21, 45:11, 47:9

**installing** [1] - 15:12

**instruction** [4] - 5:5, 5:11, 51:16, 52:3

**instructions** [4] - 51:10, 51:13, 52:1, 52:7

**intend** [3] - 7:21, 21:5, 42:10

**intending** [2] - 20:11, 21:13

**intends** [1] - 6:2

**interest** [2] - 23:24, 54:8

**interests** [5] - 8:14, 8:15, 13:11, 13:13, 24:18

**Interior** [1] - 7:19

**Internet** [2] - 34:7, 35:13

**interpretation** [1] - 10:6

**introduce** [1] - 36:21

**Inventory** [2] - 16:24, 28:21

**investigated** [2] - 7:1, 34:16

**investigating** [1] - 43:22

**investigation** [2] - 35:18, 35:20

**irrelevant** [2] - 17:3, 29:6

**issue** [18] - 7:15, 12:8, 13:20, 23:5, 23:25, 24:19, 30:19, 31:10, 31:20, 31:21, 32:1, 32:25, 33:6,

41:6, 45:2, 45:13,
47:16, 48:3
  **issued** [3] - 26:1,
37:1, 38:2
  **issues** [10] - 6:8,
26:21, 27:23, 31:12,
31:17, 37:1, 42:3,
51:4, 51:9, 51:25
  **items** [1] - 32:19
  **itself** [6] - 8:9, 9:25,
19:4, 30:10, 42:14,
47:7

**J**

  **JANUARY** [1] - 2:1
  **January** [2] - 1:12,
19:18
  **Jay** [1] - 2:7
  **JAY** [1] - 1:8
  **Jeff** [1] - 2:10
  **Jeffrey** [1] - 1:19
  **Jill** [3] - 54:3, 54:12,
54:13
  **Jill_Connelly@sdd.
uscourts.gov** [1] -
54:16
  **Johansen** [3] - 14:7,
17:20, 19:23
  **Judge** [1] - 1:16
  **June** [1] - 54:10
  **juror** [1] - 25:2
  **jurors** [4] - 2:24, 3:8,
5:9, 52:22
  **jury** [41] - 2:5, 2:23,
3:3, 4:24, 5:4, 5:22,
8:24, 10:23, 10:25,
11:22, 12:12, 14:25,
15:11, 17:8, 18:4,
19:8, 19:10, 21:10,
22:5, 23:25, 27:21,
28:11, 28:16, 30:20,
31:12, 31:17, 33:4,
37:5, 39:11, 40:9,
40:10, 40:16, 41:16,
43:6, 45:17, 46:12,
51:10, 51:25, 52:18,
53:4

**K**

  **Karen** [1] - 1:16
  **Kevin** [2] - 1:25, 2:7
  **KEVIN** [1] - 1:8
  **kind** [3] - 11:12,
11:21, 39:3
  **knowingly** [1] -
47:22
  **knowledge** [5] -

45:12, 47:16, 47:21,
48:3, 52:2
  **known** [1] - 21:22
  **knows** [2] - 27:8,
34:21

**L**

  **lag** [1] - 44:15
  **lakes** [3] - 13:24,
24:11, 24:22
  **land** [7] - 10:16,
30:15, 30:21, 31:14,
35:21, 39:8
  **landowners** [1] -
18:12
  **lands** [2] - 12:22,
30:10
  **landscape** [4] -
16:11, 27:20, 28:9,
28:10
  **language** [1] - 8:14
  **lapel** [1] - 3:6
  **last** [4] - 2:16, 9:15,
21:3, 29:23
  **late** [4] - 21:23,
25:25, 37:1, 50:16
  **law** [7] - 6:23, 19:4,
26:25, 27:14, 28:20,
29:16, 35:25
  **lead** [2] - 5:18, 23:21
  **least** [1] - 38:3
  **leave** [1] - 51:1
  **leaving** [1] - 39:14
  **Leistico** [16] - 1:22,
2:12, 2:19, 3:13, 10:1,
20:24, 25:16, 33:13,
35:23, 39:12, 41:12,
42:25, 44:15, 50:14,
51:22, 52:15
  **LEISTICO** [45] - 2:12,
2:20, 3:14, 3:19, 3:25,
4:6, 4:9, 4:13, 4:21,
5:25, 6:19, 10:2,
15:19, 20:5, 20:20,
20:25, 25:17, 25:24,
26:5, 26:9, 26:14,
26:19, 29:12, 29:25,
30:6, 33:5, 35:24,
37:18, 38:18, 39:13,
41:13, 42:25, 44:5,
44:11, 45:15, 48:22,
49:23, 50:13, 50:21,
51:1, 51:9, 51:24,
52:8, 52:16, 53:3
  **length** [1] - 23:4
  **lesser** [1] - 51:15
  **liability** [2] - 23:2,
23:9

**light** [1] - 50:16
  **likely** [1] - 6:3
  **limine** [16] - 4:2, 4:3,
5:24, 6:2, 7:8, 10:2,
10:3, 19:12, 20:4,
20:22, 21:3, 21:23,
25:19, 26:10, 30:25,
36:25
  **limit** [1] - 40:19
  **limited** [6] - 14:15,
20:19, 32:1, 32:8,
42:8, 50:7
  **line** [4] - 17:5, 17:6,
44:3, 44:4
  **listen** [1] - 6:9
  **living** [1] - 24:13
  **locate** [1] - 9:17
  **locations** [1] - 42:23
  **Loesch** [5] - 14:25,
16:21, 20:24, 24:24,
31:4
  **logical** [1] - 12:23
  **look** [14] - 11:4, 12:4,
17:9, 18:3, 19:24,
21:4, 28:11, 28:20,
35:11, 35:15, 36:18,
37:8, 46:11, 46:13
  **looked** [6] - 28:16,
36:1, 36:10, 37:11,
38:20, 45:25
  **looking** [2] - 14:10,
16:9
  **looks** [2] - 12:23,
17:8
  **loses** [1] - 17:11
  **loud** [1] - 3:10
  **loving** [1] - 16:5

**M**

  **mail** [2] - 45:6, 54:16
  **maintained** [1] - 34:9
  **Manual** [4] - 9:17,
10:12, 18:8, 18:10
  **manual** [3] - 9:22,
12:21, 15:20
  **map** [49] - 34:19,
35:3, 35:16, 37:23,
41:2, 41:7, 41:8,
41:14, 41:21, 41:22,
42:3, 42:11, 42:13,
42:14, 42:16, 42:23,
43:3, 43:5, 43:7,
43:14, 44:5, 44:13,
44:24, 44:25, 45:4,
45:5, 45:12, 45:21,
45:23, 45:24, 46:13,
46:16, 46:20, 46:25,
47:3, 47:7, 47:12,

47:14, 47:19, 48:7,
48:21, 48:25, 49:7,
49:13, 50:1, 50:4,
50:6, 50:12
  **mapping** [3] - 34:16,
36:7, 36:21
  **maps** [2] - 42:8
  **Mark** [1] - 20:24
  **marked** [2] - 3:22,
36:13
  **marshes** [2] - 8:21,
13:25
  **mast** [3] - 35:7,
35:21, 51:24
  **Mast** [5] - 1:25, 2:7,
2:13, 18:25, 50:24
  **MAST** [1] - 1:8
  **matter** [5] - 2:6, 5:25,
7:17, 20:6, 20:21
  **matters** [2] - 4:11,
21:7
  **maximum** [1] - 17:24
  **mean** [10] - 15:8,
17:13, 22:5, 22:23,
28:5, 35:25, 36:14,
37:18, 43:8, 48:17
  **meaning** [4] - 8:22,
27:1, 30:2, 42:5
  **means** [2] - 9:10,
11:22
  **meant** [6] - 9:9, 9:12,
10:22, 12:10, 22:5,
40:10
  **measure** [1] - 14:13
  **meet** [2] - 4:23, 5:4
  **meeting** [1] - 9:9
  **meets** [2] - 4:17,
17:17
  **memorandum** [1] -
21:8
  **mention** [3] - 5:6,
5:15
  **mentioned** [4] - 5:17,
23:19, 24:3, 24:14
  **mentioning** [1] -
5:13
  **mentions** [2] - 8:13,
10:15
  **merely** [1] - 46:20
  **Merit** [1] - 54:4
  **Method** [2] - 28:22
  **Michael** [2] - 16:21,
27:12
  **might** [2] - 2:17, 35:1
  **migratory** [1] - 25:10
  **minds** [1] - 9:4
  **minute** [2] - 50:23,
52:19
  **minutes** [5] - 3:12,
3:16, 3:19, 3:21,

52:13
  **Miss** [1] - 50:5
  **missed** [3] - 29:9,
29:22, 30:4
  **misspeak** [1] - 44:16
  **misspoke** [1] - 44:11
  **MN** [1] - 1:24
  **moment** [2] - 37:7,
50:21
  **moreover** [2] - 10:18,
11:3
  **morning** [1] - 21:2
  **most** [2] - 16:14,
36:11
  **mostly** [1] - 12:5
  **motion** [22] - 4:3,
4:12, 5:24, 6:14, 7:7,
7:13, 10:2, 19:12,
20:4, 20:18, 20:22,
21:1, 21:2, 21:3,
21:23, 25:18, 25:20,
30:25, 31:3, 36:25,
49:21
  **motions** [5] - 4:1,
6:2, 10:3, 18:17,
26:10
  **moved** [1] - 4:15
  **moving** [1] - 7:9
  **MR** [83] - 2:10, 2:12,
2:17, 2:20, 3:12, 3:14,
3:18, 3:19, 3:24, 3:25,
4:6, 4:9, 4:13, 4:21,
5:3, 5:12, 5:25, 6:12,
6:16, 6:19, 6:25, 7:16,
10:2, 13:7, 15:19,
20:5, 20:20, 20:25,
23:19, 25:13, 25:17,
25:24, 26:5, 26:9,
26:14, 26:19, 29:12,
29:25, 30:6, 30:9,
33:5, 33:11, 33:16,
34:25, 35:24, 37:18,
38:18, 38:24, 39:4,
39:13, 40:24, 41:13,
42:9, 42:16, 42:25,
44:5, 44:11, 44:21,
45:1, 45:4, 45:15,
46:17, 46:20, 48:16,
48:22, 49:3, 49:9,
49:16, 49:19, 49:23,
50:13, 50:21, 51:1,
51:6, 51:9, 51:14,
51:18, 51:21, 51:24,
52:8, 52:11, 52:16,
53:3
  **multiple** [1] - 8:13

# N

**name** [1] - 3:4
**National** [4] - 7:22, 16:24, 18:9, 28:21
**natural** [2] - 14:1, 39:18
**naturally** [1] - 11:11, 11:25
**nature** [2] - 25:7, 25:10
**near** [1] - 34:4
**nearest** [1] - 34:3
**need** [7] - 4:22, 10:23, 11:17, 19:5, 26:18, 31:17, 35:8
**needed** [1] - 50:18
**needs** [5] - 16:6, 16:12, 21:15, 22:6, 28:18
**negotiated** [3] - 31:2, 33:14, 36:7
**never** [2] - 17:19, 39:24
**next** [3] - 7:7, 20:21, 32:12
**nobody** [2] - 17:6, 46:11
**non** [1] - 46:4
**non-admissible** [1] - 46:4
**none** [2] - 11:19, 27:18
**Noonan** [1] - 1:22
**Notary** [1] - 54:4
**note** [1] - 2:8
**nothing** [1] - 40:22
**notice** [9] - 7:21, 21:4, 21:13, 25:25, 26:6, 32:21, 37:25, 45:7, 47:15
**noticed** [4] - 20:13, 26:2, 28:15, 36:16
**NRCA** [1] - 9:8
**NRCS** [21] - 7:8, 7:10, 7:22, 10:15, 11:2, 12:23, 13:2, 13:3, 14:13, 15:16, 16:9, 18:8, 19:13, 19:14, 19:16, 20:9, 20:16, 21:24, 22:19, 29:21
**NRCS's** [3] - 7:10, 7:11, 19:13
**number** [4] - 3:4, 3:6, 8:1, 33:23
**nutrients** [1] - 31:24

# O

**object** [2] - 8:1, 19:2
**objection** [6] - 4:5, 4:6, 4:9, 4:13, 48:14, 51:23
**objections** [4] - 29:2, 51:12, 51:14, 52:6
**occur** [2] - 39:25, 40:11, 42:2
**occurred** [1] - 40:2
**October** [2] - 45:6, 47:8
**OF** [4] - 1:2, 1:5, 54:1
**offense** [1] - 51:15
**offer** [8] - 7:21, 8:23, 15:6, 25:15, 35:17, 42:10, 42:11, 47:10
**offered** [3] - 14:22, 24:8, 25:6
**offering** [2] - 24:5, 30:15
**office** [3] - 34:16, 46:23, 46:25
**officer** [1] - 6:25
**Official** [1] - 54:3
**once** [3] - 19:8, 38:20, 46:22
**one** [43] - 2:25, 5:25, 8:3, 8:10, 8:19, 12:12, 14:4, 14:18, 14:22, 16:18, 19:1, 20:6, 22:24, 23:11, 25:21, 26:16, 27:20, 28:3, 30:17, 31:17, 34:12, 36:6, 36:11, 36:12, 36:23, 37:4, 37:21, 39:22, 41:3, 41:4, 41:24, 44:18, 45:1, 46:17, 48:16, 49:23, 50:7, 50:14, 51:17, 51:25, 52:19, 52:22
**ones** [2] - 9:8, 48:24
**open** [1] - 2:2
**opening** [1] - 3:17
**opinion** [6] - 7:5, 31:6, 32:15, 32:21, 38:4, 38:11
**Opinion** [1] - 32:17
**opinions** [1] - 4:8
**order** [7] - 26:1, 26:10, 37:2, 38:2, 42:5, 43:9, 45:16
**ordered** [2] - 27:6, 52:1
**orders** [1] - 37:2
**original** [1] - 15:21
**otherwise** [2] - 21:10, 40:5

# P

**Pages** [1] - 54:6
**paper** [2] - 41:23, 46:1
**parcel** [1] - 41:23
**part** [12] - 13:5, 18:6, 28:4, 29:10, 31:1, 31:2, 31:4, 31:13, 34:15, 35:18, 35:19, 35:20
**participants** [1] - 9:10
**participating** [1] - 9:10
**particular** [3] - 9:21, 33:25, 41:6
**parties** [5] - 9:5, 18:6, 19:20, 28:15, 54:7
**parts** [1] - 48:13
**payments** [1] - 16:1
**penal** [1] - 17:13
**penalty** [1] - 4:5
**people** [5] - 8:22, 29:16, 30:1, 34:6, 37:25
**per** [2] - 3:16, 3:21
**percent** [1] - 13:17
**period** [8] - 13:18, 16:10, 32:6, 33:1, 35:16, 40:23, 48:5, 50:10
**periodically** [1] - 34:10
**periods** [2] - 32:23, 33:9
**permission** [1] - 13:12
**permits** [1] - 25:15
**person** [5] - 7:5, 23:5, 23:9, 34:16, 52:25
**Peterson** [9] - 14:6, 17:20, 19:23, 24:1, 24:3, 24:15, 32:17, 38:11

**outcome** [1] - 54:8
**outline** [1] - 41:23
**outlined** [1] - 8:2
**outside** [1] - 2:5
**outweighed** [2] - 45:16, 47:18
**outweighs** [1] - 48:2
**overall** [1] - 13:3
**overreaching** [1] - 17:25
**own** [2] - 29:7, 36:10

**Phillips** [1] - 54:14
**Phone** [1] - 54:15
**photo** [3] - 24:21, 34:3, 46:15
**photograph** [2] - 41:24
**photographs** [25] - 24:2, 24:17, 34:17, 35:4, 35:15, 36:5, 36:21, 37:9, 37:11, 37:20, 38:7, 38:8, 39:6, 40:14, 40:20, 40:21, 41:9, 41:17, 41:20, 42:12, 43:4, 46:4, 46:11, 47:11, 49:25
**photography** [6] - 44:11, 24:9, 24:10, 34:8, 35:12, 46:21
**photos** [31] - 19:8, 28:14, 32:23, 33:12, 33:15, 33:17, 34:5, 34:6, 36:11, 37:17, 38:12, 38:14, 38:21, 40:7, 41:3, 42:8, 42:15, 43:11, 44:14, 45:21, 45:24, 45:25, 46:14, 48:5, 48:18, 48:23, 48:24, 49:2, 49:5, 49:6
**physical** [1] - 47:13
**physically** [2] - 42:18, 46:1
**piece** [3] - 33:23, 41:22, 45:25
**place** [8] - 6:15, 19:19, 28:1, 32:9, 32:11, 38:16, 38:25, 39:3
**placed** [1] - 46:7
**Plaintiff** [2] - 1:6, 1:21
**Plaza** [1] - 1:23
**PO** [1] - 1:20
**point** [4] - 8:19, 37:14, 48:15, 49:23
**pointed** [1] - 52:24
**policy** [1] - 16:1
**ponds** [5] - 8:20, 13:24, 14:14, 24:22, 27:9
**position** [1] - 16:16
**positive** [1] - 39:7
**postdates** [1] - 22:8
**potential** [1] - 52:22
**pothole** [4] - 15:1, 25:7, 30:11, 39:9
**potholes** [2] - 13:25, 24:12
**potholes'** [1] - 8:21

**pre** [1] - 43:21
**pre-Indictment** [1] - 43:21
**preclude** [6] - 4:4, 4:8, 4:11, 7:9, 19:13, 31:21
**prejudice** [3] - 42:2, 47:18, 48:2
**prejudicial** [15] - 5:5, 5:8, 21:11, 21:18, 22:16, 22:18, 29:6, 29:11, 29:12, 30:1, 40:17, 45:17, 45:22, 46:12, 46:13
**preliminaries** [3] - 51:20, 51:23, 52:8
**preliminary** [4] - 3:7, 51:13, 51:23, 52:7
**prepared** [1] - 52:16
**presence** [4] - 2:5, 14:10, 24:18, 24:22
**PRESENT** [1] - 1:25
**present** [3] - 2:2, 21:17, 34:18
**presented** [1] - 14:8
**presenting** [1] - 14:2
**PRETRIAL** [1] - 1:14
**pretrial** [3] - 4:12, 51:4, 53:5
**pretty** [1] - 19:4
**prevalent** [1] - 17:12
**principal** [1] - 6:19
**principles** [1] - 8:7
**probative** [6] - 40:18, 45:16, 47:18, 47:25, 48:1, 49:25
**problems** [2] - 36:24, 37:4
**process** [1] - 33:17
**produce** [2] - 48:25, 50:6
**produced** [2] - 50:1, 50:6
**production** [6] - 15:2, 15:15, 25:5, 30:12, 31:15, 31:19
**professor** [1] - 12:10
**Program** [2] - 9:9, 15:25
**prominent** [1] - 18:15
**proof** [2] - 4:17, 39:7
**property** [16] - 8:15, 13:10, 13:13, 14:11, 23:23, 24:13, 24:18, 25:8, 30:18, 33:23, 34:2, 35:5, 36:4, 42:23, 45:8, 47:13
**propose** [1] - 51:17
**proposed** [2] -

31:13, 48:10
  **protected** [9] -
24:11, 24:18, 24:22,
24:25, 30:16, 35:9,
42:21, 45:9, 47:1
  **prove** [1] - 39:3
  **provide** [2] - 31:15,
31:23
  **provided** [2] - 3:22,
24:15
  **provision** [2] - 9:19,
9:21
  **provisions** [1] -
10:16
  **public** [1] - 12:22
  **Public** [1] - 54:4
  **publicly** [1] - 34:7
  **published** [2] - 17:1,
28:22
  **punishment** [1] - 4:5
  **purchased** [4] - 7:17,
8:5, 18:11, 34:1
  **purify** [1] - 37:13
  **purport** [2] - 9:24,
30:13
  **purported** [2] -
22:12, 24:8
  **purpose** [2] - 38:8,
51:2
  **purposes** [3] - 10:13,
43:9, 50:3
  **put** [6] - 4:25, 19:8,
37:22, 44:3, 44:4,
44:12, 47:15, 52:2,
52:5
  **putting** [1] - 45:6

**Q**

  **qualifications** [2] -
31:8, 32:13
  **qualified** [3] - 22:4,
31:6, 32:15
  **quality** [1] - 23:12
  **questionnaire** [1] -
3:8
  **questions** [3] - 3:8,
3:9, 50:15
  **quite** [2] - 25:13,
35:25

**R**

  **rains** [1] - 12:25
  **raised** [3] - 4:11,
16:19, 37:3
  **rather** [2] - 25:14,
44:25

  **re** [1] - 48:1
  **re-weighing** [1] -
48:1
  **ready** [1] - 37:6
  **Realtime** [1] - 54:4
  **reason** [4] - 8:1,
8:23, 9:24, 12:24
  **reasoning** [2] - 19:2,
39:14
  **reasons** [4] - 8:2,
22:21, 23:17, 37:21
  **receive** [1] - 15:25
  **receiving** [1] - 9:11
  **recent** [1] - 16:14
  **recess** [3] - 50:23,
52:12, 52:14
  **record** [3] - 2:4, 2:9,
37:23
  **recorded** [2] - 8:6,
33:24
  **recur** [2] - 39:23,
39:25
  **recurred** [1] - 40:2
  **recurrence** [2] -
24:12, 25:8
  **recurring** [14] -
11:10, 11:24, 14:1,
32:22, 32:25, 33:6,
38:4, 38:24, 39:7,
39:15, 39:17, 39:19,
39:22, 50:9
  **reductions** [1] - 16:1
  **refer** [1] - 3:4
  **reference** [4] - 4:4,
4:11, 19:13, 30:5
  **referenced** [1] -
30:24
  **referring** [1] - 44:8
  **reflect** [1] - 2:4
  **Refuge** [1] - 18:9
  **regard** [2] - 30:22,
31:4
  **regarding** [4] - 7:8,
7:10, 12:7, 51:22
  **Registered** [1] - 54:4
  **regulating** [1] -
10:14
  **regulations** [16] -
7:8, 7:10, 9:3, 9:5,
9:7, 11:2, 11:15, 16:9,
19:13, 19:16, 20:2,
21:24, 27:18, 28:1,
29:21, 39:21
  **regulatory** [1] -
10:13
  **relate** [1] - 44:24
  **related** [1] - 47:23
  **relative** [3] - 20:10,
54:7, 54:8
  **released** [2] - 6:7,

6:11
  **relevant** [14] - 19:21,
20:3, 21:19, 22:15,
23:8, 23:15, 30:19,
31:11, 31:20, 32:25,
35:25, 45:13, 47:24,
48:12
  **reliability** [1] - 48:7
  **relied** [1] - 49:12
  **relies** [1] - 13:15
  **rely** [1] - 13:14
  **relying** [1] - 7:5
  **remedies** [1] - 26:17
  **REPORTER** [1] -
54:1
  **Reporter** [4] - 54:4,
54:4, 54:13
  **request** [1] - 35:7
  **require** [1] - 26:1
  **required** [4] - 4:11,
15:24, 21:4, 21:14
  **requires** [1] - 39:22
  **Resource** [1] - 7:22
  **resources** [1] - 31:25
  **response** [5] - 4:20,
4:22, 7:14, 9:16, 10:3
  **result** [1] - 43:1
  **results** [1] - 6:9
  **retain** [1] - 3:5
  **reversing** [1] - 48:8
  **review** [8] - 4:19,
24:2, 24:9, 36:4, 36:6,
41:9, 42:12, 46:21
  **reviewed** [4] - 7:13,
31:6, 32:13, 47:11
  **reviews** [1] - 24:17
  **Rinke** [1] - 1:22
  **RMR** [1] - 54:13
  **robbed** [2] - 23:8,
23:9
  **robbery** [1] - 23:6
  **rule** [5] - 26:3, 26:7,
26:14, 32:12, 48:15
  **Rule** [2] - 21:5, 21:8
  **ruled** [1] - 51:5
  **ruler** [1] - 33:22
  **rules** [2] - 10:24,
26:1
  **ruling** [7] - 5:19,
27:17, 35:2, 40:25,
41:11, 47:17, 48:8
  **rulings** [2] - 2:18,
50:18

**S**

  **saw** [2] - 17:16,
44:23
  **scar** [1] - 39:1

  **scheduled** [1] - 2:14
  **scheduling** [1] - 37:2
  **scheme** [1] - 14:12
  **Schreier** [1] - 1:16
  **scope** [1] - 32:2
  **SD** [4] - 1:12, 1:17,
1:20, 54:15
  **season** [1] - 16:12
  **seasonally** [1] -
15:14
  **seating** [1] - 2:24
  **second** [4] - 7:7, 9:2,
19:12, 25:18
  **see** [3] - 3:6, 3:21,
28:17, 46:25
  **seeking** [1] - 21:24
  **sees** [1] - 19:9
  **selecting** [1] - 3:3
  **selection** [1] - 5:22
  **sent** [3] - 45:5, 47:7,
47:20
  **sequestering** [1] -
6:6
  **sequestration** [1] -
51:6
  **series** [1] - 34:17
  **serious** [1] - 17:13
  **serve** [1] - 31:19
  **served** [1] - 32:16
  **Service** [8] - 7:18,
7:23, 9:14, 9:21,
10:12, 29:13, 36:10,
45:7
  **set** [6] - 4:21, 11:11,
21:5, 21:7, 21:12,
54:10
  **seven** [1] - 3:2
  **several** [1] - 8:20
  **sheet** [1] - 44:18
  **show** [8] - 23:7,
38:13, 38:16, 39:9,
40:1, 40:3, 40:7, 50:9
  **shows** [1] - 24:15
  **side** [4] - 3:16, 3:21,
3:23, 52:10
  **sides** [1] - 5:15
  **significant** [1] -
47:24
  **signs** [1] - 35:14
  **simple** [1] - 39:22
  **simply** [4] - 12:13,
23:8, 41:22, 41:25
  **single** [1] - 14:18
  **Sioux** [4] - 1:12,
1:17, 1:20, 54:15
  **sit** [2] - 6:9, 37:4
  **site** [3] - 12:17,
20:12, 36:7
  **six** [1] - 32:20

  **sloughs** [1] - 8:21,
13:25
  **small** [3] - 15:1, 25:7,
30:11
  **soil** [2] - 14:13, 16:4
  **someone** [5] - 17:11,
28:18, 33:18, 52:21
  **Sometimes** [1] - 30:6
  **sometimes** [3] -
34:10, 34:11
  **somewhat** [1] -
26:19
  **sophisticated** [1] -
14:12
  **sorry** [2] - 15:3, 29:9
  **SOUTH** [2] - 1:2,
54:1
  **South** [2] - 25:11,
26:25
  **SOUTHERN** [2] - 1:3,
54:2
  **speaks** [2] - 9:25,
19:4
  **species** [1] - 12:5
  **specific** [4] - 9:22,
20:9, 26:14, 48:12
  **spend** [1] - 4:22
  **spot** [1] - 17:10
  **spreadsheet** [1] -
43:16
  **SS** [1] - 54:1
  **St** [2] - 1:23, 1:24
  **standard** [4] - 16:24,
16:25, 28:24, 29:1
  **standards** [4] -
16:13, 20:9, 20:10,
22:19
  **standing** [1] - 12:25
  **start** [3] - 2:14, 13:9,
30:6
  **STATES** [3] - 1:1,
1:5, 54:1
  **States** [10] - 2:6,
2:11, 8:11, 8:15,
13:11, 23:24, 24:19,
32:16, 54:3, 54:14
  **states** [1] - 30:10
  **States'** [1] - 20:23
  **stay** [2] - 6:17, 6:24
  **step** [1] - 15:5
  **still** [4] - 13:23, 28:1,
42:10, 50:2
  **stopped** [1] - 52:22
  **Street** [1] - 1:23
  **strikes** [1] - 3:1
  **striking** [1] - 2:25
  **strongly** [1] - 19:2
  **struck** [1] - 28:3
  **subject** [1] - 7:16
  **submitted** [1] - 5:24

**subpoenaed** [1] - 37:6

**subsequent** [1] - 42:15

**subsidy** [1] - 15:25

**suffered** [1] - 41:15

**suitability** [3] - 15:1, 25:2, 25:3

**suitable** [1] - 30:12

**Suite** [1] - 1:23

**summary** [2] - 33:24, 44:17

**supervised** [1] - 7:2

**supervisor** [1] - 46:23

**supposed** [1] - 19:24

**surface** [14] - 11:10, 11:24, 13:1, 13:24, 16:11, 25:8, 27:8, 32:22, 32:25, 35:14, 38:4, 39:5, 40:4, 50:9

**surmise** [1] - 7:20

**survive** [1] - 16:6

**swales** [3] - 8:21, 13:25, 24:12

**swampbuster** [2] - 15:21, 15:23

**swamps** [4] - 8:21, 13:25, 24:11, 27:9

**switched** [1] - 9:16

**system** [1] - 23:7

**T**

**table** [1] - 6:17

**tainted** [1] - 43:17

**talks** [1] - 11:24

**term** [11] - 10:21, 11:7, 11:24, 12:3, 12:10, 18:20, 25:3, 28:3, 29:16, 29:24, 30:4

**terminology** [1] - 21:9

**terms** [23] - 8:3, 8:8, 8:20, 9:12, 10:6, 10:9, 10:19, 13:8, 13:15, 13:23, 15:2, 15:9, 18:3, 19:5, 25:9, 27:2, 27:15, 29:20, 31:2, 33:14, 35:10, 47:1

**test** [1] - 6:5

**testified** [3] - 24:14, 43:2, 43:20

**testify** [21] - 11:18, 12:15, 12:17, 18:19, 20:9, 20:11, 20:15, 21:6, 21:21, 22:3, 22:22, 24:4, 24:6,

27:25, 28:8, 31:9, 32:4, 33:12, 41:19, 44:23, 50:4

**testifying** [6] - 6:8, 6:15, 20:15, 23:11, 30:24, 48:14

**TESTIMONY** [1] - 54:10

**testimony** [27] - 6:3, 13:4, 14:21, 15:6, 16:23, 18:20, 20:23, 22:12, 23:21, 25:6, 31:4, 31:5, 31:11, 31:13, 31:20, 31:21, 31:22, 32:8, 32:20, 33:5, 35:17, 37:14, 42:7, 48:11, 49:4, 49:5

**THE** [78] - 2:4, 2:14, 2:19, 2:23, 3:13, 3:16, 3:21, 4:1, 4:7, 4:10, 4:14, 5:2, 5:8, 5:20, 6:14, 6:23, 7:4, 10:1, 13:6, 15:16, 19:11, 20:18, 20:21, 23:18, 25:12, 25:16, 25:22, 26:3, 26:7, 26:12, 26:16, 29:9, 29:22, 30:4, 30:8, 30:22, 33:8, 33:13, 34:23, 35:23, 37:16, 38:10, 38:23, 39:2, 39:12, 40:13, 41:12, 42:7, 42:14, 42:24, 43:25, 44:7, 44:22, 45:3, 45:14, 46:19, 47:17, 48:20, 49:1, 49:6, 49:11, 49:17, 49:20, 50:8, 50:14, 50:25, 51:3, 51:8, 51:11, 51:17, 51:19, 51:22, 52:5, 52:10, 52:12, 52:15, 52:18, 53:4

**theirs** [1] - 29:21

**thereafter** [2] - 39:17, 40:2

**therefore** [5] - 11:17, 12:12, 43:12, 43:17, 45:11

**they've** [5] - 11:16, 19:3, 28:14, 28:15, 29:15

**thinks** [3] - 11:22, 48:13, 52:21

**third** [1] - 9:7

**thirty** [1] - 3:7

**three** [3] - 2:24, 18:15, 35:20

**throughout** [1] - 8:12

**Thursday** [1] - 2:22

**tile** [12] - 15:12, 30:18, 35:8, 35:21, 42:20, 44:3, 44:4, 44:13, 44:20, 45:10, 46:7

**timeline** [1] - 26:4

**today** [6] - 2:18, 2:20, 11:7, 30:1, 32:3, 33:20

**together** [1] - 37:22

**Tom** [1] - 46:24

**tomorrow** [2] - 2:18, 2:21

**took** [2] - 32:11, 45:25

**Tornow** [2] - 46:24, 47:14

**tract** [1] - 14:2

**tracts** [1] - 34:1

**trained** [2] - 11:9, 16:22, 27:13, 28:19, 29:14, 29:15

**training** [7] - 22:8, 22:11, 27:25, 28:21, 29:18, 31:8, 32:14

**transcript** [2] - 54:5, 54:5

**trial** [9] - 2:14, 2:15, 4:18, 5:7, 27:2, 29:5, 37:5, 51:12

**tried** [2] - 5:13, 10:20

**true** [1] - 54:5

**try** [2] - 33:22, 43:8

**trying** [3] - 14:3, 29:19, 44:16

**Tuesday** [1] - 2:20

**twenty** [2] - 3:12, 3:21

**two** [6] - 22:2, 23:11, 33:9, 34:1, 38:15, 44:15

**type** [2] - 21:16, 22:14, 23:1

**U**

**U.S** [8] - 1:11, 1:16, 1:19, 7:17, 19:22, 19:23, 38:11, 43:2

**ultimate** [2] - 24:19, 26:21

**unable** [2] - 4:24, 46:9

**unambiguous** [20] - 10:9, 10:10, 10:20, 11:16, 12:11, 16:20, 17:4, 17:17, 18:3, 18:14, 18:20, 19:3, 19:6, 21:25, 22:6,

26:24, 26:25, 27:3, 27:8, 27:16

**under** [15] - 7:4, 8:7, 9:20, 16:22, 17:24, 21:5, 21:8, 26:25, 28:2, 29:7, 35:9, 38:16, 45:9, 47:1

**underneath** [1] - 15:12

**understood** [2] - 26:5, 26:9

**unfair** [13] - 4:23, 5:14, 5:21, 12:1, 12:14, 18:21, 23:2, 27:24, 28:13, 29:3, 43:19, 47:18, 48:2

**unfairly** [1] - 6:9

**UNITED** [3] - 1:1, 1:5, 54:1

**United** [1] - 2:6, 2:11, 8:11, 8:15, 13:11, 20:23, 23:24, 24:19, 32:16, 54:3, 54:14

**up** [12] - 4:1, 11:10, 15:4, 19:8, 20:22, 32:23, 39:9, 40:22, 49:14, 51:5, 51:11, 52:21

**US** [1] - 1:23

**useful** [1] - 15:14

**uses** [2] - 8:20, 15:18

**V**

**value** [6] - 45:16, 45:17, 47:19, 47:25, 48:2, 49:25

**variety** [1] - 35:11

**vegetation** [5] - 14:13, 16:5, 16:13, 31:24

**versus** [1] - 32:3

**Vesterso** [3] - 8:11, 13:22, 14:7

**violated** [3] - 8:25, 29:5, 43:24

**violating** [1] - 43:13

**violation** [5] - 33:3, 33:9, 41:10, 42:17, 42:18

**voir** [1] - 3:7

**Vostads** [1] - 36:9

**vs** [7] - 1:7, 2:7, 8:11, 19:22, 19:23, 32:17, 38:11

**W**

**wants** [3] - 6:20, 35:7, 53:1

**water** [28] - 11:10, 11:11, 11:12, 11:24, 12:7, 12:25, 13:2, 13:24, 14:10, 14:13, 15:14, 16:5, 16:6, 16:8, 16:11, 24:12, 25:8, 32:22, 32:25, 35:14, 38:4, 39:5, 39:7, 39:8, 40:4, 50:9

**water-loving** [1] - 16:5

**waterfowl** [8] - 15:2, 15:14, 25:4, 25:10, 30:12, 31:15, 31:19, 31:23

**waters** [1] - 27:9

**ways** [3] - 5:14, 14:7, 51:7

**weighing** [1] - 48:1

**well-qualified** [1] - 32:15

**Wes** [4] - 20:8, 27:17, 28:25, 37:8

**West** [1] - 1:23

**wet** [1] - 32:4

**Wetland** [2] - 16:24, 28:21

**wetland** [32] - 7:12, 11:3, 11:9, 11:19, 11:22, 12:5, 12:18, 12:20, 13:1, 13:4, 14:3, 14:23, 15:5, 16:2, 16:3, 18:23, 19:14, 19:17, 24:7, 24:20, 25:3, 27:19, 28:2, 28:20, 29:15, 29:24, 30:11, 30:14, 32:5, 33:22, 34:1

**wetlands** [36] - 7:11, 9:23, 10:16, 11:5, 11:6, 12:17, 13:15, 13:18, 14:5, 14:9, 15:7, 15:8, 15:17, 16:25, 18:5, 18:16, 18:18, 19:14, 19:25, 20:16, 21:15, 22:9, 22:13, 23:12, 23:13, 23:14, 27:20, 28:8, 28:9, 29:3, 30:5, 30:23, 31:1

**whereas** [1] - 30:10

**WHEREOF** [1] - 54:10

**white** [1] - 41:22

**Wildlife** [20] - 7:18,

8:5, 9:14, 9:17, 9:20,
10:12, 18:9, 29:13,
33:18, 34:19, 35:5,
35:9, 36:4, 36:10,
37:22, 41:1, 42:17,
43:2, 45:7, 52:20

**willing** [1] - 5:10
**Wiltermuth** [4] -
20:24, 25:12, 25:14,
49:18
**wins** [1] - 17:11
**witness** [15] - 4:8,
6:18, 6:20, 7:21,
20:13, 24:2, 30:14,
32:16, 33:11, 41:1,
42:1, 42:10, 43:11,
48:4, 50:7
**witnesses** [16] - 6:1,
6:4, 6:6, 6:10, 6:21,
22:2, 22:17, 23:11,
23:21, 24:6, 26:13,
30:23, 37:5, 43:1,
44:22, 50:4
**word** [2] - 30:23,
31:1
**written** [1] - 4:19

## Y

**year** [3] - 8:6, 34:11,
44:15
**yearly** [1] - 34:10
**years** [8] - 9:6, 24:16,
27:12, 35:20, 38:12,
38:15, 39:10, 47:8
**yesterday** [1] - 9:18

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>          vs.<br><br>KEVIN JAY MAST,<br><br>                    Defendant. | 4:17-CR-40078-01-KES<br><br><br>MEMORANDUM OPINION AND<br>ORDER |

A superseding information was filed charging defendant, Kevin Jay Mast, with "disturbing protected wetlands of the United States" in violation of 16 U.S.C. § 668dd(c) and (f)(2). Docket 94. A bench trial was held on February 5, 2020. Docket 108. Based on the evidence and testimony submitted and the arguments of both parties, the court makes the following findings.

**BACKGROUND**

In 1973, the United States Fish and Wildlife Service (FWS) acquired an easement on Mast's property from the previous property owners—the Vostads. Tr. 57; Ex. 1. The easement prohibited draining of "small wetland or pothole areas suitable for use as waterfowl production areas." Tr. 379; *see also* Ex. 1. The easement also restricted the landowner from "draining or permitting the draining, through the transfer of appurtenant water rights or otherwise, of any surface water . . . now existing or recurring due to natural causes on the above-described tract . . . ." Tr. 58; Ex. 1.

To make his land more suitable for farming, Mast decided to install drain

tile to drain water from certain areas of his property in Brookings County, South Dakota. Tr. 271. In 2010, Mast requested approval for his drainage project from the United States Natural Resources Conservation Service (NRCS). Tr. 35, 217-18. Mast filled out an AD-1026 form, as required by the Federal Food Security Act Program, requesting NRCS to complete a formal wetland determination on his property prior to installing the drain tile. Tr. 217-18, 220-21, 245. NRCS informed Mast that his property was subject to the 1973 FWS easement and instructed Mast to seek permission from FWS for his property project. Tr. 219-23; Ex. 27.

Mast then contacted FWS. Tr. 183, 399. FWS created and sent Mast a map of the 7 wetland areas FWS had identified on his property. Tr. 177, 179-80; Ex. 3. With the map, FWS explained that Mast's proposed drain tile project would violate the 1973 easement terms and suggested alternative locations where Mast could install the tile without interfering with the identified wetlands. Tr. 80-82, 180-83; Ex. 3. The letter advised Mast that it was Mast's "responsibility to contact [FWS] if there are any questions concerning mapped wetlands" and requested that Mast provide FWS notice at least three days prior to any excavation or drain tile installation on his property. Tr. 84, 183; Ex. 3.

In 2012, two years after Mast's initial request, NRCS sent Mast a map that differed from the 2010 FWS map. Tr. 225-27, 245-48; Ex. 28. The gap in processing time was attributable to a backlog of AD-1026 requests within the agency. Tr. 227-29. Because Mast had not cancelled his original 2010 AD-1026 form after contacting FWS, NRCS proceeded with Mast's request. Tr. 230. With

the map, NRCS advised Mast that it was Mast's "responsibility to ensure that [his] actions do not impact wetlands protected by [FWS] or any other conservation easement." Tr. 223, 251; Ex. 28.

In 2013, Mast installed drain tile on his property with the help of two contractors, Brandon Hope and Jordan Warne. Tr. 270-71, 295-309; Ex. 18-20, 50. The tile contractors installed drain tile on approximately 15,800 feet of land. Tr. 77. The United States now alleges the tile was installed in violation of the 1973 easement and disturbed the FWS identified wetlands. Docket 94.

## PROCEDURAL HISTORY

On September 6, 2017, Mast was charged with "disturbing protected wetlands of the United States" in violation of 16 U.S.C. § 668dd(c) and (f)(1). Docket 2. On January 18, 2018, a jury found Mast guilty of the lesser included offense of violating 16 U.S.C. § 668dd(c)and (f)(2). Docket 45. On April 20, 2018, Mast filed a timely appeal to the Eighth Circuit Court of Appeals. Docket 59. On September 16, 2019, the Eighth Circuit vacated Mast's conviction and remanded the case for further proceedings. Docket 80; *see also United States v. Mast*, 938 F.3d 973, 978 (8th Cir. 2019). A superseding information was filed on January 10, 2020, charging Mast with only the lesser included offense of "disturbing protected wetlands of the United States" in violation of 16 U.S.C. § 668dd(c) and (f)(2). Docket 94. The United States moved for a bench trial. Docket 93. The court granted the motion for a bench trial, and a bench trial was held on February 5, 2020. Dockets 100, 108. The parties stipulated that all previous evidence, exhibits, testimony, motions in limine, orders on motions

in limine, objections, and orders on objections from the first jury trial would be part of the record in the bench trial as if it was one continuous trial. Docket 110 at 6-7. The United States presented no additional evidence at the second trial. *Id.* at 8. Mast recalled defense expert Wes Boll. *Id.* at 9-10.

## ANALYSIS

### I.    Superseding Information

16 U.S.C. § 668dd(c)—part of the National Wildlife Refuge System Administration Act of 1996—outlines permitted and prohibited activities on land within the National Wildlife Refuge System. The statute provides that "[n]o person shall disturb, injure, cut, burn, remove, destroy, or possess any real or personal property of the United States, including natural growth, in any area of the [National Wildlife Refuge] System[.]" *Id.* In the superseding information, United States alleges that:

> Between on or about July 22, 2010 and January 10, 2020, in Brookings County, in the District of South Dakota, the defendant, Kevin Jay Mast, did disturb, injure, and destroy real property of the United States in that he drained and caused to be drained, without the authority and permission of the United States of America, wetlands included in Brookings County Easement number 80X, 1, covering the SE 1/4 NW 1/4 and Lots 1 and 2 of Section 30, Township 110N, Range 51W, 5th Prime Meridian, all in violation of 16 U.S.C. §§ 668dd(c) and 668dd(f)(2).

Docket 94. The charge in the superseding information is classified as a Class B misdemeanor. *See* 18 U.S.C. § 3559(a)(7). The maximum punishment Mast faces under 16 U.S.C. § 668dd(c) and (f)(2) is a term of imprisonment of not more than 180 days, a fine of not more than $5,000, or both prison and a fine. *See* 16 U.S.C. § 668dd(c) and (f)(2); 18 U.S.C. § 3571(b)(6).

## II.    Elements

The United States must prove Mast's guilt beyond a reasonable doubt.

*See Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993). The parties agree that the

United States must prove the following 6 elements beyond a reasonable doubt:

1. The United States holds a property interest, established through a properly recorded and accepted easement;

2. Identifiable wetlands existed at the time the easement was conveyed;

3. Mast knew or should have known that there was a substantial risk that his actions would violate or fail to comply with any of the provisions of the National Wildlife Refuge Act or any regulations issued thereunder;

4. Mast engaged in prohibited activity by disturbing, injuring, or destroying one or more of the wetlands at issue;

5. Mast's actions caused surface and/or subsurface damage that injured, disturbed, or destroyed one or more of the wetlands; and

6. Mast's activity was not permitted or otherwise authorized.

*See* Docket 111 at 2-3; Docket 112 at 2; *see also Mast*, 938 F.3d at 977; *United*

*States v. Peterson*, 2008 WL 4922413, at *1 (D.N.D. Nov. 12, 2008), *aff'd*, 632

F.3d 1038, 1043 (8th Cir. 2011); 16 U.S.C. § 668dd(c) and (f)(2). Mast argues

that the United States did not meet its burden of proof on each of the elements.

Docket 112 at 2. The court will address each element in turn.

### A.    Element 1: The United States holds a property interest, established through a properly recorded and accepted easement.

The first element the United States must prove beyond a reasonable

doubt is that the United States holds a property interest, established through a

5

properly recorded and accepted easement. *See Peterson*, 2008 WL 4922413, at

*1. South Dakota lies within the prairie pothole region. Tr. 363. The prairie

pothole region has many small wetlands scattered throughout the area. *Id.* The

latest inventory of water wetlands in eastern South Dakota is over 800,000

wetland basins. Tr. 367. The region is the "primary breeding area for

continental waterfowl populations in North America." Tr. 363. Because of this,

the United States purchased numerous easements from landowners to protect

these wetlands. Tr. 46; *see North Dakota v. United States*, 460 U.S. 300, 303-05

(1983). Known as negative easements, the easements convey to the easement

holder the right to "restrain[] the owner from doing that with, and upon, his

property which, but for the grant or covenant, he might lawfully have done[.]"

*Chapman v. Sheridan-Wyoming Coal Co.*, 338 U.S. 621, 626-27 (1950) (internal

quotation omitted). Thus, the easements prohibit landowners from draining

wetlands or destroying a wetland's suitability for waterfowl. *See North Dakota*,

460 U.S. at 303.

     Here, an easement was conveyed by the previous landowners, the

Vostads, and executed by the United States on April 25, 1973. Tr. 57; Ex. 1.

The United States paid the Vostads $1,000 for the easement rights over "small

wetland or pothole areas suitable for use as waterfowl production areas"

located on the property. Tr. 57, 379; Ex. 1. The Vostads, heirs, successors, and

assignors agreed to "cooperate in the maintenance of the aforesaid lands as a

waterfowl production area" by not draining, ditching, filling, leveling, or

burning any of those areas. Tr. 58-59; Ex. 1. The easement also specifically

restricted the landowner from "draining or permitting the draining, through the transfer of appurtenant water rights or otherwise, of any surface water . . . now existing or recurring due to natural causes on the above-described tract . . . ." Tr. 58; Ex. 1. The easement was properly recorded in the Brookings County Register of Deeds Office as Brookings County Easement number 80X, 1, covering the SE 1/4 NW 1/4 and Lots 1 and 2 of Section 30, Township 110N, Range 51W, 5th Prime Meridian. *See* Ex. 1, 3. As such, the legal rights of the United States stem from the easement. *See United States v. Vesterso*, 828 F.2d 1234, 1242 (8th Cir. 1987) (explaining that a recorded easement properly accepted is "sufficient proof that the United States has a property interest" in the parcel). In his closing argument brief, Mast acknowledges the 1973 easement and does not dispute that the United States has a property interest in the property and that the easement restricts the landowner from draining "any surface water" that existed at the time the easement was conveyed or is recurring. *See* Docket 112 at 3. The United States has put forth proof beyond a reasonable doubt that the United States holds a property interest in Mast's property, established through a properly recorded and accepted easement. *See* Tr. 56-59; Ex. 1. Thus, the United States has met its burden on this element.

    **B.**    **Element 2: Identifiable wetlands existed at the time the easement was conveyed.**

        **1.**    **Easement and Easement Summary Text**

In conjunction with the first element, the United States must next prove beyond a reasonable doubt that identifiable wetlands existed at the time the

easement was conveyed. *See Peterson*, 2008 WL 4922413, at *1. Wetlands are

defined as land that:

> (1) Has predominance of hydric soils; (2) Is inundated or saturated
> by surface or groundwater at a frequency and duration sufficient to
> support a prevalence of hydrophytic vegetation typically adapted for
> life in saturated soil conditions; and (3) Under normal
> circumstances does support a prevalence of such vegetation . . . .

7 C.F.R. § 12.2(a). Here, as was typical of pre-1976 easements, there is no

contemporaneously-filed map from 1973. *See* Tr. 379. Although no map was

filed at the time the easement was conveyed, "[a]s with many such easements

negotiated by FWS before 1976, FWS utilized a standard wetland conveyance

document that included the entire tract of land in its legal description."

*Peterson*, 632 F.3d at 1040. The United States does "not need to legally

describe the confines of each covered wetland under the pre-1976 easements."

*Id.* at 1042 (internal quotation omitted). "Without the aid of a map filed with

the easement . . . however, the [United States] still can prevail by proving that

the easement encumbers *all* wetlands on the tract that were in existence at the

time of the conveyance." *Id.* (emphasis in original). Thus, the Eighth Circuit has

found that the United States can prove the existence of wetlands covered under

a pre-1976 easement "despite the easement's failure to include a

contemporaneously-filed map or provide a section-by-section breakdown of the

wetlands acreage." *Id.* at 1043.

     Here, the text of the 1973 easement supports a conclusion that the

easement covers all wetlands then-existing on the property. The easement

prohibits "draining or permitting the draining, through the transfer of

appurtenant water rights or otherwise, of *any* surface water, including lakes, ponds, marshes, sloughs, swales, swamps, or potholes, *now existing or recurring* due to natural causes on the above-described tract . . . ." Tr. 58; Ex. 1 (emphasis added). As David Azure, former FWS regional easement coordinator, testified at trial, based on the language of the easement, no wetland areas then-existing on the property were intended to be excluded from the easement. Tr. 375, 379. Along with the language of the easement, the easement summary tract record lists that FWS had purchased 33 acres of wetlands between the 2 tracts of land owned by the Vostads. *See* Tr. 382-84; Ex. 29. And the identified wetlands between the 2 tracts are estimated to total 24.8 acres. Tr. 108. Thus, read together, the easement text and the easement summary demonstrate that the 1973 easement covers all wetlands on the tract that were in existence at the time of conveyance or recurring. *See Peterson*, 632 F.3d at 1042.

### 2.    Then-Existing Wetlands in 1973

Because the easement covers all wetlands that were in existence at the time of conveyance or recurring, the United States must next prove that the identified wetlands existed in 1973. *See id.* at 1041-42. Mast argues that the United States has failed to prove the existence of 6 of the 7 identified wetlands. Docket 112 at 4. Mast does not contest that wetland area 3 is a wetland that was identifiable and existing at the time the easement was conveyed in 1973, but contests the 6 other areas identified by FWS. *Id.* The United States argues it has proven beyond a reasonable doubt the existence in 1973 and recurrence

of each of the 7 identified wetlands based on the aerial photography and expert

testimony in evidence. Docket 111 at 4-11.

Comparing photographs of landscape from before and after an easement

was conveyed is an acceptable and reliable method of establishing the

existence of wetland areas at a certain moment in time. *See Peterson*, 632 F.3d

at 1041 (finding that the use of aerial photography and expert testimony

amounted to substantial evidence that the wetlands existed at the time of

conveyance). Because there is no contemporaneously-filed map identifying the

protected wetlands, like the court in *Peterson*, this court must look to all

testimony and evidence, including statements and opinions of expert

witnesses, in deciding whether identifiable wetlands existed at the time the

easement was conveyed in 1973. At the jury trial, the United States presented

aerial photography and testimony from several witnesses about the existence of

the wetlands in 1973, and the defense presented a rebuttal expert witness. The

court will summarize the testimony and evidence below.

First, Emily Fischer, a biology technician with FWS, testified at trial. Tr.

93-94. In her capacity as a biology technician, Fischer mapped pre-1976

wetland easements. Tr. 94. In 2010, Fischer created a map of Mast's property

that outlined areas FWS believed to be wetlands covered under the 1973

easement. Tr. 94-99. Fischer discussed how she reviewed the full FWS file of a

property when creating a pre-1976 easement map. Tr. 95. Fischer testified that

she reviews the legal description of the property, evaluates if there are any

areas to be excluded from the easement, and then collects available aerial

10

photographs of the property to create the FWS map. Tr. 95-96. A computer

software program then layers the aerial photographs so that Fischer can view

and compare the same space and location on a property over a period of years.

Tr. 99-101. Fischer testified that once the photographs are transposed, she

looks for signatures of wetland basins that have similar shapes, sizes, and

locations over the years. Tr. 102-04. With the images transposed, the software

then makes a diagram of a map in draft form. Tr. 104. After Fischer's map is

printed in draft form, a manager with FWS completes a physical ground check

of the areas that were identified in the draft map. Tr. 104-05.

Using this same technique, Fischer viewed aerial photographs of Mast's

property from before and after the 1973 easement. Tr. 94-110; *see also* Ex. 51-

64. The earliest photograph Fischer used was from 1956. Tr. 110. The

remaining photographs were taken after 1973. *Id.* On each aerial photograph,

Fischer marked the areas that in her opinion appeared to show evidence of

wetland signatures and created the map. Tr. 101-02; Ex. 2. The map showed 7

wetland areas. *See* Ex. 2. The map was approved by her supervisor, Tom

Tornow, on August 16, 2010. Tr. 106; Ex. 23.

Second, Tornow, former project leader and refuge manager for FWS,

testified at trial. Tr. 171-72. Tornow visited Mast's property on August 13,

2010, to see if there were depressed areas that would hold water and to verify

the areas identified on the draft map created by Fischer. Tr. 106, 174-78.

Tornow noted that when he conducts site visits, he looks for plant life and the

type of vegetation that develops over and around wetland conditions because

plant life around depressions can be indicative of whether the area is a wetland. Tr. 206. Tornow testified that often wetlands are very temporary in nature and will hold water during spring months and then dry up during summer and fall months. Tr. 178. Tornow explained that when an area has both permanent wetlands and wetlands that change with seasons, the property becomes very valuable to both early and late migration birds. *Id.*

Based on his training and observations in August of 2010, Tornow verified that the 7 areas on Mast's property were wetland areas and that each area had some depression or ability to hold water at some point during the year. Tr. 178-79. Later in 2010, after completing the ground check, Tornow provided Mast with Fischer's map diagram and a letter that stated in part:

> The attached maps provided to you represents the [FWS's] effort to depict the approximate location, size and shape of all wetland basins protected by the provisions of the easement contract using the 'Summary Acreage' figure information, maps and aerial photographs available at the time this map was prepared. However, wetlands are hydrologically dynamic systems, with expanding and contracting water levels. This map is not meant to depict water levels in the wetland in any given year.

Ex. 3; *see also* Tr. 80-81, 179. The letter also explained what wetlands are and how wetlands are a hydrologically dynamic system that can fill or dry up throughout the year. Tr. 181.

Mike Estey, FWS deputy chief of the habitat and population evaluation team, also testified at trial. Tr. 319. Estey has over 20 years of experience analyzing aerial photography to identify the presence of wetland signatures and delineating wetlands. Tr. 321-26; Ex. 47. In his current position, Estey supervises staff that analyze aerial photography to identify wetlands. Tr. 325-

26; Ex. 47. Estey has viewed thousands of photographs to identify wetland

signatures, conducted thousands of visits to properties to analyze aerial

photography, and delineated tens of thousands of wetlands. Tr. 324-25; Ex. 47.

Estey testified that he examined aerial photographs of Mast's property

from both before and after 1973 to look for evidence of wetland areas or

signatures. Tr. 328. Estey testified that he analyzes the aerial photographs for

wetland "signatures," like typical wetland area color and texture combinations.

Tr. 324. Estey explained that the method of viewing aerial photographs for

wetland signatures from both before and after the date of conveyance is a

reliable method to identify wetlands because "[w]etlands are persistent through

long periods of time." Tr. 327. This is in part because wetland areas formed

during glaciation will continue to exist unless destroyed. *Id.* Estey also

explained that analyzing aerial photographs to determine the presence of

wetland areas is helpful because "you get distinct signatures from those

wetland conditions that are easy to observe from the air." *Id.* Thus, Estey's

review of aerial photographs over a period of time can provide evidence that a

wetland area historically existed and existed in a certain year. *See* Tr. 328. The

Eighth Circuit in *Peterson*[1] recognized Estey's review of aerial photography as a

---

[1] In *Peterson*, the United States "introduced an aerial photograph of [the
landowner's property] taken in 1962, four years before the easement was
conveyed." 632 F.3d at 1041. Like his testimony in the present case, Estey
testified in *Peterson* that the wetlands depicted in the photograph were of the
same approximate size, shape, and location as the identified, drained wetlands.
*Id.* The Eighth Circuit concluded that the photographic evidence and Estey's
expert testimony taken together amounted to substantial evidence that the
drained wetlands existed at the time of conveyance. *Id.*

13

method of identifying the existence of wetland areas at a certain time period.
*See* 632 F.3d at 1041.

Like his method in *Peterson*, Estey reviewed over 50 aerial photographs
of Mast's property dating back to September of 1972. Tr. 329-47; Ex. 66-71.
Estey explained that he analyzes the photographs for actively growing
vegetation, while also looking at the texture and color of areas on the
photographs. Tr. 330. Changes in landscape design, growing or cropped
vegetation, and darker colors or textures in the photographs are all
"signatures" of wetlands. *Id.* Estey explained that in his expert opinion each of
the "signatures" were signatures of wetland areas. Tr. 330-47. Estey also
explained the signatures of wetland areas in aerial photographs of Mast's
property from 1940, 1951, 1952, 1964, 1970, and 1972. Tr. 337-47; Ex. 66-71.
Estey methodically identified the 7 wetland areas at issue. Tr. 339-47.[2] While
doing so, he explained that a wetland area will not always be the same shape
or color in each aerial photograph, depending on how wet the area is when the
photograph is taken or the time of year. Tr. 342.

After reviewing the aerial photographs that pre-dated the 1973
conveyance, Estey also reviewed aerial photographs of Mast's property from
2010 and determined that the wetlands depicted in the historical aerial
photographs were of the same approximate size, shape, and location as the
wetlands in the 2010 aerial photograph. Tr. 345-47; Ex. 54. After testifying

_____

[2] The court refers to the identified wetlands by the wetland numbers used by
Estey and other witnesses throughout the trial. *See* Tr. 339.

14

about each photograph, Estey noted that he was "confident those areas identified [by FWS] are all of the same general size and location and wetlands." Tr. 347. Thus, in Estey's expert opinion, aerial photography for decades before and after the 1973 easement was conveyed demonstrate that each of the 7 areas are identifiable wetlands that existed in 1973. Tr. 346-47.

Brandon Hope also testified at trial. Tr. 268. In 2013, Hope was a contractor hired by Mast to install drain tile on Mast's property. Tr. 269-70. Hope testified at trial that he viewed Google Earth aerial photographs prior to excavating Mast's property to best determine where to install the drain tile. Tr. 271-72. Hope noted that he looked "for wet spots where crop does not grow." Tr. 272. Hope installed more drain tile in wetland area 4 and near wetland areas 5, 6, and 7 because in his opinion those areas were "wet." Tr. 281-82.

Jordan Warne with Meyer Services, Inc., another contractor hired by Mast to install drain tile, testified that he also used Google Earth aerial imagery and spoke to Mast to determine what areas were problem wet areas on Mast's property. Tr. 294-95, 299-300; *see also* Ex. 20, 50. Warne stated that "anything other" than the main line installed by Warne was an area that Mast identified as a wet problem area. Tr. 301. Thus, all the areas drained, other than the main line, were low spots Warne and Mast identified as wet problem areas. Tr. 301-02. These areas are the same wetland areas identified by FWS as wetland areas 1 and 2. *Compare* Ex. 2 *with* Ex. 20, 50. In Warne's opinion, the areas identified as wetland areas 1 and 2 were "nonproducing" areas where drain tile should be installed. Tr. 302. On April 11, 2014, FWS officers

15

observed and photographed these areas on Mast's property while conducting routine aerial compliance flights and ground checks. Tr. 49-69; Ex. 4-17.

FWS wildlife biologist Charles Loesch also testified at trial. Tr. 359. Loesch has over 27 years of experience and testified about the suitability of the wetland areas on Mast's property for waterfowl production. Tr. 359-74; Ex. 48. Based on his experience, Loesch provided information about the 7 wetland areas identified by FWS and the property's suitability for waterfowl production. Tr. 366-73. Loesch explained that because South Dakota is in the prairie pothole region, potholes are the "primary breeding area for continental waterfowl populations . . . ." Tr. 363. Loesch noted that "[t]he presence of wetlands is paramount in that the wetlands are the primary feature on the landscape that drives the distribution abundance of waterfowl populations in the prairies" and that without wetlands, there can be no waterfowl. Tr. 366. Loesch described that a pothole does not have to hold surface water year-round for the area to be useful for waterfowl production and that instead some wetland areas tend to be small, fairly shallow, and dry out periodically to allow quick decomposing of vegetation. Tr. 368-71. These characteristics make a shallow or small wetland's value "magnified." Tr. 368. Loesch explained that wetlands are extremely valuable in South Dakota because duck production benefits from small, shallow areas that are intermittently wet and dry. Tr. 367-68.

Loesch described the wetland areas depicted in the aerial photographs of Mast's property as a wetland "complex," noting that the small, shallow wetland

16

areas are valuable because they allow more ducks to breed than large wetland areas like wetland area 3. Tr. 369-72. Loesch noted that the small wetlands on Mast's land can be occupied by higher densities and quantities of waterfowl as opposed to a property with fewer, large wetlands. Tr. 371. This is because, as Loesch explained earlier, small and shallow areas that dry out periodically allow vegetation to decompose quicker and are thus extremely important to waterfowl in the spring. Tr. 367-371.

Finally, defense expert Wes Boll testified at both the jury trial and court trial. Tr. 411; Docket 110 at 10. Boll is a wetland scientist who does wetland delineations in South Dakota, North Dakota, and Minnesota. Tr. 412-14; Ex. 242. Boll's expert opinion concerns the distinction between "saturation" and "inundation" in aerial photography. In Boll's expert opinion, simply seeing "signatures" of wetlands in aerial photography is not enough to determine whether there is standing water in the area. Tr. 421-22. "[S]aturation is understood to be close to the surface" but not actually on the surface, and if an area shows saturation the area may not have surface water. Tr. 424. If an area shows inundation, however, the area would show an "observation of surface water, meaning water above the surface, ponded water." Docket 110 at 25. Like Estey, Boll went through each pre-1973 aerial photograph and described what he saw as indicators of saturation, but not inundation. Tr. 422-37. Boll opined that the pre-1973 photographs showed no indication of surface water in identified wetland areas 1, 2, 4, 5, 6, and 7, even if the areas showed indicators

of wetness from saturation. Tr. 438-39. In Boll's opinion, those areas are not "wetlands" and would not be protected under the FWS easement. Tr. 459-60.

In 2012, Boll created a LIDAR data map of Mast's property. Docket 110 at 12; Ex. 289. LIDAR is a data set that is collected aerially using radar flown in a gridline pattern to produce one-foot topographic contours of the land. Docket 110 at 13-15. In Boll's opinion, when the LIDAR map is transposed over aerial photographs of Mast's property prior to 1973, none of the FWS identified wetland areas were "inundated" in the photographs. *Id.* at 32-44. Instead, in Boll's opinion, any topography changes and drainage patterns pointed out by FWS experts at the jury trial in the aerial photographs were not the result of inundation or ponding surface water, and thus were not wetlands. *Id.* at 117.

After considering all the evidence, the court finds that the United States has proven beyond a reasonable doubt that each of the 7 identified wetlands existed when the easement was conveyed in 1973. The court finds that the reoccurrence of wetland signatures is consistently displayed in the 7 identified protected areas in aerial photographs from before and after 1973. *See* Ex. 66-71. Although some of the photographs are lower resolution and taken during drier months of the year, making the wetland areas more difficult to observe, the expert testimony consistently concluded that there was evidence of wetland signatures in each of the 7 identified areas, and photographs from different years and seasons showed wetland signatures in the same approximate size, shape, and location as the identified, drained wetlands. *See* Tr. 339-47. Both Estey and Loesch explained how wetlands are persistent over a historical

18

period of time and the importance to waterfowl of smaller, more shallow

wetlands that are not wet year-round. *See* Tr. 327, 369-72. Tornow, Warne,

Hope, and FWS officers all went on site to Mast's property and testified to the

wetland features they observed. *See* Tr. 178-79, 270-72, 299-302. The court is

not convinced that photographs from late summer months with minimal

ponded water demonstrate the identified protected areas were not wetlands in

1973. Rather, these areas were the areas both contractors determined should

be drained and were areas consistently identified by FWS officers to show

signatures of wetlands. Taken together, the testimony and photographic

evidence introduced at trial establishes beyond a reasonable doubt that the 7

areas identified by FWS existed when the easement was conveyed in 1973 and

have been recurring wetlands following the time of conveyance.

Mast argues that this court previously ruled at the pretrial hearing that

the 2010 map created by Fischer and any testimony regarding the map was

inadmissible to prove the existence of a wetland or surface water at the time

the easement was conveyed in 1973. Docket 112 at 5; *see also* Docket 72 at

47-48, 50. But Mast mischaracterizes the United States's reliance on the map

or the testimony of witnesses about the map. Each witness did not use the

2010 map to prove the existence of the wetlands. Instead, each witness used

the map as a guide to identify each wetland by a number. *See, e.g.*, Tr. 339.

Witnesses then testified with the use of aerial photography taken before and

after 1973 to show the existence of the 7 wetland areas. The witnesses

discussed photos taken in 1940, 1951, 1952, 1956, 1964, 1970, 1972, 1979,

1984, 1986, 1993, 1994, 1997, 2003, 2004, 2005, 2006, 2008, and 2010. *See* Tr. 101-03, 114-22, 127-28, 337-47; *see also* Ex. 40, 51-71. Thus, consistent with its previous ruling, this court does not rely on the 2010 map as evidence of the existence of the wetlands in 1973, and instead relies on the testimony and aerial photographs admitted at trial.

Mast also argues that Loesch only made generalized statements and that his testimony was evasive. Docket 112 at 7-8. Mast argues that Loesch never confirmed that any areas on Mast's property constituted a complex wetland system at the time the easement was conveyed in 1973. *Id.* The court disagrees. Loesch focused most of his testimony on the suitability of an area for waterfowl production. Tr. 363-73. At trial, Loesch testified with supporting photos displayed on easels in the courtroom. Tr. 369-72. Loesch testified that based on his experience and reviewing the photographs, the areas identified as wetlands would be suitable for waterfowl production. Tr. 369, 372. Loesch was not a witness whose primary focus was on identifying the 7 wetlands. Instead, Loesch's testimony focused on the identified areas on Mast's property being part of a wetland "complex," and he explained how varying sizes of wetlands are extremely valuable to migratory waterfowl in the prairie pothole region. Tr. 363-73. Loesch's testimony also explained how an area can still be classified as a wetland even if it is small, shallow, or dries out periodically. *See* Tr. 368-69. Thus, the court does not characterize Loesch's testimony as evasive or generalized.

Mast next argues that Estey is not a certified wetland delineator. Docket

112 at 8. Estey has over twenty years of employment with FWS, has held titles
as wildlife biologist and geographic information specialist, and has extensive
experience classifying wetlands in the prairie pothole region. Tr. 321-23; *see
also* Ex. 47. Estey has viewed thousands of photographs to identify wetland
signatures, conducted thousands of visits to properties to analyze aerial
photography, and delineated tens of thousands of wetlands. Tr. 324-25.

Mast also argues that Estey never went to Mast's property to physically
inspect the wetlands on site. Docket 112 at 8; *see also* Tr. 348. But Estey
testified that his method of identifying wetlands focuses in great part on
analyzing aerial photographs for the presence of wetlands signatures. Tr. 334-
37. Estey explained that surveying aerial photographs actually provides a
better understanding of what areas are identifiable wetlands as opposed to
completing a site visit because a biologist can only see the landscape of a
property as it is on that single day, during that specific season, when
conducting a site visit. Tr. 327. With aerial photography, however, Estey
explained that one can better observe the property over a historical period of
varying seasons, climates, and years. *Id.* And although Estey never completed a
ground check, numerous FWS officers did and testified to what they observed.
*See* Tr. 49-69, 90, 174-78, 375-403. Thus, although Estey never went to Mast's
property, Estey completed a thorough review of aerial photographs of the
property and identified the wetlands.

Finally, Mast argues that Estey could only identify with certainty wetland
area 3. Docket 112 at 9. The court disagrees. Throughout his testimony Estey

21

discussed pre-1973 photographs and described each of the 7 identified areas.
Tr. 339-47. For example, Estey testified that in the 1940 aerial photograph you
could see wetland area 3 very clearly, that wetland area 4 was dried out but
that the wetland "signature is still present," and that wetland areas 5, 6, and 7
were not as clear as the 1972 photograph but you could "see the signatures
there still going on" in area 6. Tr. 339-40; Ex. 66. As to the 1951 photograph,
Estey immediately pointed out wetland areas 1 and 2, testified that there was a
"pretty clear signature" in wetland area 4, that wetland area 5 was "very clear"
with a "lighter center" indicating that the area is wetter, and that wetland area
6 was identifiable by the "blotchiness of tall-growing vegetation, wetland
vegetation" surrounding it. Tr. 340-41; Ex. 67. In that same photograph, Estey
also quickly identified wetland areas 3 and 7. Tr. 340-41; Ex. 67. Estey pointed
out each of the 7 wetland areas on the 1952 aerial photograph, noting that
wetland area 5 "is right there and very clear on that date" compared to earlier
photographs. Tr. 341-42; Ex. 68.

   As to the 1964 aerial photograph, Estey explained that wetland area 4
had a "pretty clear signature" indicative of "standing water there earlier in the
season" and that you "can easily" see wetland areas 1 and 2, including a whole
drainageway channel between areas 1 and 2. Tr. 342-43; Ex. 69. Estey also
identified the 7 wetland areas in the 1970 photograph, noting that wetland
area 6 was shaped much more clearly and that wetland area 7 is "very clear,
distinct" and has crop around it. Tr. 345; Ex. 70. Estey then compared these

pre-1973 photographs with an aerial photograph from 2010. Tr. 345-47; Ex. 54.

Although Estey opined that some aerial photographs were better than others, that some photographs were taken during drier years or months, and that some wetland areas on the property were larger and more permanent throughout the seasons and years, Estey still identified each of the 7 wetland areas during his testimony. *See* Tr. 339-47. After testifying to each photograph, Estey noted that he was "confident those areas identified [by FWS] are all of the same general size and location and wetlands." Tr. 347. Thus, the court disagrees that Estey expressed doubt about the 6 other identified wetland areas and finds his testimony credible.

Even defense expert Boll agreed that evidence of saturation was consistently displayed in the aerial photographs. Tr. 469-70. On cross-examination, Boll agreed that all 7 wetland areas identified by FWS "repeatedly showed up for most of the years" in the aerial photographs. Tr. 466. Boll also agreed that "[a]t a minimum" all 7 areas identified by FWS had signatures of saturation. *Id.*; *see also* Docket 110 at 66. Boll testified that apart from wetland 5, all the other identified wetlands also had disturbed cropping. Tr. 467. Boll testified that the saturated areas were wetter than all the other areas around them and that he could not say for certain that the areas didn't pond water at some point during the year. Tr. 469. Boll also testified that some of the identified wetland areas did not have crops growing in the area until 2014, after the drain tile was installed. Tr. 468.

23

At the court trial, Boll also agreed that the aerial photographs of Mast's property would only show "ponding" water at the time the photographs were taken. Docket 110 at 66. As to a 1993 photograph, Boll testified that he saw surface water in wetland area 3 and that there was indication of saturation and possible inundation in wetland areas 2, 6, and 7. *Id.* at 96. Boll also admitted that because his LIDAR map only showed one-foot increment changes, the map would not display changes in elevation that occurred that were potentially less than one-foot. *Id.* at 65. Thus, in Boll's LIDAR map, depressions in the ground less than 12 inches lower than elevation would not be displayed. *Id.*

Because Boll's LIDAR map did not show changes in elevation of less than one-foot, Boll agreed that there could be ponding water in a particular area that would not be detected by LIDAR. *Id.* at 65, 67. Boll also changed several of his statements in the court trial when shown photographs with evidence of "ponding" water. For example, Boll admitted, after being shown an aerial photograph from 1984, that the dark signatures of the identified protected wetland areas were consistent with areas of ponding water. *Id.* at 68-71, 100; Ex. 53. Boll agreed that aerial photographs from 1993 and 1994 showed wetland signatures and "prove[d]" that water could be a pond in those areas. Docket 110 at 74-77; Ex. 40. And Boll agreed that an area can hold water one year, but, dependent on the amount of rainfall the following year, may not hold much water at all. Docket 110 at 100. Thus, the court finds the testimony of Estey and his use of analyzing aerial photography more credible than the testimony of Boll and the use of LIDAR in this case.

24

After reviewing the record, the court finds that the photographic evidence, maps, and expert testimony, taken together, amount to substantial evidence beyond a reasonable doubt that the 7 wetland areas existed at the time of the easement's conveyance in 1973. The United States has met its burden of proof on this element.

## C. Element 3: Mast knew or should have known that there was a substantial risk that his actions would violate or fail to comply with any of the provisions of the National Wildlife Refuge Act or any regulations issued thereunder.

The third element the United States must prove beyond a reasonable doubt is that Mast knew or should have known that there was a substantial risk that his actions would violate or fail to comply with any of the provisions of the National Wildlife Refuge Act or any regulations issued thereunder. *See Mast*, 938 F.3d at 977. On appeal, the Eighth Circuit Court of Appeals held that the United States must also prove a *mens rea* element based on the statutory language and legislative history of 15 U.S.C. § 668dd(c) and (f)(2). *Id.* The Eighth Circuit concluded that "subsection (f)(2) requires the government to prove beyond a reasonable doubt that Mast should have known that there was a substantial risk that his actions would violate[] or fail[] to comply with any of the provisions of th[e] Act or any regulations issued thereunder[.]" *Id.* (internal quotation marks omitted). The Eighth Circuit also stated that "the lesser offense requires proof of the defendant's negligence. In our view, the evidence presented at trial would have been sufficient to allow a reasonable juror to convict Mast under the proper formulation of the lesser offense." *Id.* at 978 (citing *United States v. Keys*, 721 F.3d 512, 519 (8th Cir. 2013)). At the court

25

trial, Mast did not present any additional evidence as to the remanded *mens rea* element. *See* Docket 110.

Here, the court finds that the United States has met its burden on this element. Mast knew, or should have known, that his actions would "violate[] or fail[] to comply with any of the provisions of th[e] Act or any regulations issued thereunder[.]" *Mast*, 938 F.3d at 977 (internal quotation marks omitted). At trial, the United States put forth evidence that Mast completed an AD-1026 form and contacted NRCS in February of 2010, seeking approval for his drain tile project. Tr. 218. On July 22, 2010, Ryan Forbes of NRCS sent Mast a letter, explaining that NRCS had received Mast's AD-1026 request. Tr. 219-220; Ex. 27. The letter alerted Mast that his land was protected by the 1973 FWS easement and specifically instructed Mast to contact Tornow with FWS "to obtain permission from [FWS] for [Mast's] proposed drainage project." Tr. 222; Ex. 27. The letter also instructed Mast to contact NRCS once he received a response from FWS to let NRCS know whether Mast wished to proceed forward with his AD-1026 request. Tr. 222; Ex. 27. Forbes testified that NRCS could not give Mast permission to do the drainage project on areas protected by the FWS easement because it was not within the agency's authority. Tr. 222-23. Finally, the letter informed Mast that it was Mast's "responsibility to ensure that [his] actions do not impact wetlands protected by the [FWS] easement or any other conservation easement." Tr. 223; Ex. 27.

Mast contacted Tornow as instructed. Tr. 399. In response, Tornow sent Mast a letter from FWS by certified mail on October 11, 2010. Tr. 78, 179; Ex.

3. Mast signed a certified mail receipt when he received the letter on October 13, 2010. Tr. 78-79, 179-80. This return receipt was then attached to a copy of the sent letter and stored in an FWS file. *See* Ex. 3. Mast maintains that he was busy with harvest at the time he received the letter and does not remember reviewing the letter or signing for it. Tr. 402. With the letter, Tornow enclosed a copy of the 1973 FWS easement and a copy of the map prepared by Fischer and FWS depicting the wetland areas that FWS determined were protected under the easement. Tr. 180-82; Ex. 3. Tornow explained that there was "a conflict" with Mast's tiling plan and the FWS identified wetlands. Ex. 3. Tornow also attached an aerial photograph of Mast's property with hand-drawn markings. *See* Ex. 3. This photograph was a "tiling map" Mast had originally provided to FWS indicating the areas where Mast intended to install drain tile on his property. Tr. 183; Ex. 3. FWS sent the photograph back to Mast with red markings indicating areas where FWS would permit drain tile installation. Tr. 184; Ex. 3. None of the areas that FWS identified as protected wetlands were marked in red. Tr. 83-84.

Tornow's letter explained that although the FWS map was intended "to depict the approximate location, size and shape of all wetland basins protected by the provisions of the easement contract," because "wetlands are hydrologically dynamic systems, with expanding and contracting water levels," the map did not depict a specific water level. Tr. 80-81; Ex. 3. The letter explicitly advised Mast that the protected areas could not be drained without FWS's permission, noting that any "draining . . . of wetlands depicted on the

wetland easement map without a permit issued by [FWS] is a violation of the provisions of the easement." Tr. 82; Ex. 3. The letter directed that it was Mast's "responsibility to contact [FWS] if there are any questions concerning mapped wetlands." Tr. 82, 183; Ex. 3. Finally, the letter requested that Mast notify FWS "at least 3 days prior" to excavation when the tiling contractors had flagged the locations where tile would be installed. Tr. 84, 186; Ex. 3. No evidence was submitted that Mast contacted FWS after receiving the letter. *See* Tr. 187. Mast also did not provide FWS the requested three-day notice that he was going to begin installation of drain tile on his property. *Id.*

In the original NRCS letter from 2010, NRCS notified Mast that once he received a response from FWS he was to contact NRCS so the agency would know "whether or not [the landowner] wished the NRCS to proceed with [the] AD-1026 request." Tr. 228-29; Ex. 27. Forbes testified that typically when a producer receives a letter back from FWS telling them that their proposed drainage plan will impact an easement, the producer then cancels their AD-1026 request with NRCS. Tr. 229-30. If they do not, however, NRCS must proceed forward with the request. Tr. 230. Thus, because Mast did not cancel his original AD-1026 request with NRCS, NRCS sent Mast a second letter on June 11, 2012. Tr. 225-27, 229-30, 245-46; Ex. 28. The two-year delay was caused by a backlog of requests with the agency. Tr. 227, 248.

The 2012 NRCS letter informed Mast that Craig Veldkamp, an area soil scientist with NRCS, had made a preliminary certified wetland determination based on Mast's 2010 AD-1026 request for Farm Bill Program Benefits. Tr.

243-45; Ex. 28. The letter stated that it was not a permit and advised Mast in bold font that Mast was "responsible for complying with other Federal, state, and local regulations as they apply to altering wetlands and drainage flows." Tr. 249, 252; Ex. 28. The letter also advised Mast that it was Mast's "responsibility to ensure that [his] actions do not impact wetlands protected by a [FWS] or any other conservation easement." Tr. 251; Ex. 28. The letter provided the phone number and contact information of FWS. Tr. 251; Ex. 28. Mast did not contact NRCS or FWS after receiving the letter. Tr. 256, 385-86. After receiving these letters, Mast went forward with his drain tile project. Tr. 270-71.

Mast maintains that he believed he was acting in compliance with the FWS and NRCS letters. Docket 112 at 19. Mast relies on the fact that the 2012 letter from NRCS enclosed maps that differed from the 2010 FWS map in identified wetlands. *Id.* Mast argues that it was reasonable for him to believe that the two agencies were cooperating and that the 2012 NRCS map was "compatible with FWS's requirements." *Id.* at 21. Even if the maps differed, however, the 2012 NRCS letter explicitly warned Mast that it was his responsibility to contact FWS. *See* Ex. 28. No evidence was submitted that Mast contacted FWS after receiving the 2012 NRCS map. The letter also informed Mast to contact NRCS before installing the drain tile. *See id.* Mast failed to contact NRCS or FWS or provide the three-day notice FWS requested. Tr. 187. Instead, the evidence introduced at trial showed Mast ignored the instructions in the three letters, did not contact FWS or NRCS prior to starting the project, and did not tell either contractor about the easement. Tr. 256, 284,

305; Ex. 3, 27-28. Based on this evidence, the court finds that Mast knew that his actions would "violate[] or fail[] to comply with any of the provisions of th[e] Act or any regulations issued thereunder[.]" *Mast*, 938 F.3d at 977 (internal quotation marks omitted).

Even if Mast did not know, the United States has established beyond a reasonable doubt Mast was negligent and should have known "that there was a substantial risk that his actions would violate[] or fail[] to comply with any of the provisions of th[e] Act or any regulations issued thereunder[.]" *Id.* (internal quotation marks omitted). On remand, the Eighth Circuit noted that "the lesser offense requires proof of the defendant's negligence. In our view, the evidence presented at trial would have been sufficient to allow a reasonable juror to convict Mast under the proper formulation of the lesser offense." *Id.* at 978. "Negligence requires only that the defendant should have been aware of a substantial and unjustifiable risk[.]" *Id.* at 977 (internal quotation omitted). Based on the above summarized evidence and the explicit advisements made in the 2010 and 2012 letters, Mast *should have known* that there was a substantial risk that carrying out the tile project on his land would violate the 1973 easement or fail to comply with any of the provisions of the Act or any regulations. *See id.* at 978; *see also* Ex. 3, 27-28. Mast ignored the instructions and requests made by both agencies and proceeded with his project without contacting FWS or NRCS. Mast was aware of a "substantial and unjustifiable risk." *Mast*, 938 F.3d at 977 (internal quotation omitted). Although he was aware of the risk, Mask proceeded forward with his project without a permit

from FWS, without providing a three-day notice to FWS, and in a manner that differed from FWS's proposed drain tile locations. This was negligent. Thus, under either *mens rea*, the United States has met its burden of proof on this element.

### D. Element 4: Mast engaged in prohibited activity by disturbing, injuring, or destroying one or more of the wetlands at issues.

The fourth element the United States must prove beyond a reasonable doubt is that Mast engaged in prohibited activity by disturbing, injuring, or destroying one or more of the wetlands at issue. *Peterson*, 2008 WL 4922413, at *1. The evidence presented at trial establishes beyond a reasonable doubt that Mast engaged in prohibited activity by disturbing, injuring, cutting, burning, removing, or destroying 6 of the 7 wetlands.

At the jury trial, the United States presented evidence that Mast's contractors installed drain tile on and around each of the 7 wetlands. *See* Tr. 62-69, 72-77, 268-84. 294-306; Ex. 7-20, 50. Hope and Warne described at great length how drain tile was installed on Mast's property and how the ground is excavated to complete the project. Drain tile tubing is installed at an angle to direct the flow of water in a designated direction and is inserted three to four feet below the surface of the ground with a plow. Tr. 273-75, 277-78. Where drain tile is installed, the plow must cut through the surface of the earth to install the plastic tubing. Tr. 278, 303. The plow acts "like a knife." Tr. 303. After the lines are installed, a backhoe must be used each place where two lines are to connect, digging into the ground and excavating so that the contractor can properly connect the lines. Tr. 278, 282, 302-04.

31

Mast failed to provide either contractor the 2010 map or tell them about the FWS easement. Tr. 284-85, 305. Hope testified that he spoke to Mast about where Mast, as the landowner, would like the tile placed. Tr. 271. As discussed earlier, Hope also testified that he installed more drain tile in areas that he believed were "wet." Tr. 281-82. Warne testified that a main tile line was installed to divert water in the northwest corner of Mast's property from the adjacent property to the west. Tr. 300; Ex. 20. Warne also testified that he connected lateral lines to the main tile line in identified "problem area[s]," which were the same areas identified by FWS to be wetland areas 1 and 2. Tr. 300-01. Both Hope and Meyer Excavating gave FWS officers tile maps that indicated where they placed tile on the property. Tr. 72-75; Ex. 18-20. For example, everywhere there was a yellow line depicted on Hope's map, the tile plow cut into the ground, and anywhere there was a connection between the two yellow lines, a backhoe dug into the ground to make the connection. Tr. 282; *see* Ex. 19. FWS then created a map combining the tile maps made by Warne and Hope. Tr. 76; Ex. 50. The tile contractors installed drain tile on approximately 15,800 feet of land. Tr. 77.

Following the installation of the drain tile, on April 11, 2014, FWS officers observed and photographed disturbed soil consistent with the installation of tile on Mast's property while conducting routine aerial compliance flights. Tr. 49-54; Ex. 4-6. FWS officers then conducted a follow-up ground check on April 14, 2014. Tr. 62-69; Ex. 7-17. The ground check confirmed where drain tile was installed and the soil was disturbed. Tr. 62-69.

32

At trial, FWS Officer Brian Keller indicated where tile was installed and where the officers found disturbed soil by placing the photographs from the 2014 ground check over the 2010 wetland map. Tr. 62-69; Ex. 2, 7-17. Keller testified that based on his experience he determined where the tile had been placed on Mast's property by looking at the grooves in the ground made from the tiling machines. Tr. 91.

Mast specifically contests that drain tile was installed in protected wetland area 5. Docket 112 at 21. Mast argues that there was no tile installed in wetland area 5 and there are no tile connections in wetland area 5. *Id.* After reviewing the photographs and maps, the court agrees that the United States put forth no evidence that tile was installed within wetland area 5. Although evidence showed that tubing lines curved around wetland area 5 and extended east to west to connect to a tile line near wetland area 7, reasonable doubt exists that wetland area 5 was disturbed, removed, injured, cut, or destroyed. *See* Ex. 50. Thus, the court finds the United States has not shown beyond a reasonable doubt that Mast engaged in prohibited activity in wetland area 5.

Excluding wetland area 5, however, Mast engaged in prohibited activity by disturbing, injuring, or destroying 6 of the wetland areas on his property. Everywhere Warne and Hope installed drain tile, the plows cut the surface of the earth to install the tubing. Tr. 278, 303; *see also* Ex. 18-20, 50. Every area where lines were connected, a backhoe dug into the ground and excavated the earth so the lines could be connected. Tr. 278, 282, 302-04. A 2014 ground check showed drain tile installed on the property resulting in the drainage of

33

the wetland areas and disturbed soil. Tr. 62-69; Ex. 4-17. Thus, based on the

testimony at trial and the photographs and maps, the United States has proven

beyond a reasonable doubt that Mast engaged in prohibited activity by

disturbing, injuring, or destroying 6 wetland areas protected under the

easement, excluding wetland area 5.

> **E.    Element 5: Mast's actions caused surface and/or subsurface damage that injured, disturbed, or destroyed one or more of the wetlands.**

In conjunction with element 4, the United States must next prove beyond

a reasonable doubt that Mast's actions caused surface and/or subsurface

damage that injured, disturbed, or destroyed one or more of the wetlands.

*Peterson*, 2008 WL 4922413, at *1. Mast argues that the United States did not

present evidence comparing the wetlands water levels and conditions in 1973

to when the protected areas were drained. Docket 112 at 21-23. As discussed

above, the United States met its burden to identify the wetlands, and courts

have found that the United States is not required to prove the precise water

levels as they existed in 1973. *See Peterson*, 2008 WL 4922413, at *7 (finding

that the defendant's actions damaged the wetlands and that the United States

did not have to put forth evidence as to the precise water levels in existence at

the time of conveyance in 1966).

Here, the United States has proven beyond a reasonable doubt that

Mast's actions damaged the surface or subsurface of each of the 7 wetlands.

The undeniable purpose of installing drain tile below ground is to drain the

water collecting above the surface. Tr. 273, 305-06. As discussed above, the

United States put forth testimony and evidence that showed beyond a reasonable doubt that 6 of the wetlands had surface damage by the installation of drain tile. Hope and Warne both testified as to how the tile was installed beneath the surface with tile plows, backhoes, and shovels that break the surface and the depth of the tile installed. Tr. 276-80, 296, 302-04. Keller testified that about 6 to 8 inches of the depth of the earth had been disturbed. Tr. 68-69; *see also* Ex. 16. Hope explained that the drain tile installed is designed to draw away excess moisture held in the soil in the subsurface of the ground. Tr. 292. Hope also testified that after installing the drain tile he observed water flowing out of the tubing while on site. *Id.* Similarly, Warne testified that after installing the tile he observed water flowing through the drain tile "pretty much right away." Tr. 305-06.

In addition to the evidence discussed in element 4 and the damage caused by the installation of the drain tile by the contractors and observed by FWS officers in 2014, the United States also presented evidence on the effects draining one wetland area can have on another wetland's surface or subsurface area. For example, Loesch testified at length that draining the surface water of one wetland area not only eliminates that specific area's suitability for waterfowl production, but can reduce the suitability of the waterfowl production of other wetlands within the wetland complex as a whole. Tr. 372-73. Loesch explained that when a small wetland area is drained of water artificially, like when an area is drained with drain tile, the wetland area may no longer have waterfowl production value. *Id.* Thus, based on the testimony

35

and photographic evidence presented at trial, evidence of surface or subsurface damage on each of the 7 protected wetland areas was established beyond a reasonable doubt.

Mast argues that the water removed by the drain tile is not naturally occurring water, but is instead water from neighboring properties. Docket 112 at 22. Mast points to Boll's conclusion that "Mast's property exhibited the same indicators and wet signatures in 2014, after the tile was installed, as it did in 1972, just months before the [e]asement was conveyed." *Id.* (citing Tr. 457-59). But this argument ignores the evidence of surface water and recurring water that was in existence before 1973 and was demonstrated in the photographic evidence prior to the easement conveyance. Mast has put forth no evidence that the drain tile removed water exclusively transferred onto his property from neighboring property. Instead, the tile contractors testified that the drain tile removes all water from the areas, and expert testimony described how moving water from other wetlands destroys surrounding protected wetland areas. *See* Tr. 268-306, 359-373. For example, Hope testified that the tile is designed to draw out extra moisture held in the soil that has gotten down to the depth of the tile, as opposed to neighboring water. Tr. 292. Thus, the court does not agree that the water drained from Mast's property was solely water from surrounding property, and instead was surface, subsurface, and recurring water on his property. Based on this evidence, the United States has shown beyond a reasonable doubt evidence of surface or subsurface damage on each of the 7 protected wetlands.

### F.    Element 6: Mast's activity was not permitted or otherwise authorized.

Finally, the United States must prove beyond a reasonable doubt that Mast's activity was not permitted or otherwise authorized. *See Peterson*, 2008 WL 4922413, at *1. Mast argues that the United States has failed to prove beyond a reasonable doubt that his activity was not permitted or otherwise authorized, arguing entrapment by estoppel as a defense. Docket 112 at 23-25.

As outlined in the final jury instructions at trial, "Entrapment by estoppel is a defense based on advice from a government official that certain conduct is legal." Docket 40 at 8. Mast has the burden to prove by the greater weight of the evidence:

> One, that government agents or officials took it upon themselves to define for Mast the scope of his legal obligation—in this case, the legality of installing tile on a parcel of land subject to an easement held by the United States;

> And two, that Mast reasonably relied upon the government agent or official's advice in conducting his affairs.

*Id.*; *see generally* 8th Cir. Model Jury Instructions Criminal, § 9.01A (2018). Entrapment by estoppel most often is available when the government official "committed affirmative misconduct," for the defense "applies only when an official assures a defendant that certain conduct is legal, and the defendant reasonably relies on that advice and continues or initiates the conduct." *United States v. Hullette*, 525 F.3d 610, 612 (8th Cir. 2008) (internal quotation omitted). Mast relies on the 2012 NRCS letter, arguing that he did not need to

contact FWS after receiving the letter because he had already contacted FWS in 2010 and believed the agencies were working together. Docket 112 at 24.

Mast's reliance on the NRCS letter is misplaced. The 2012 NRCS letter makes general statements about Mast's rights as a landowner and his obligations. *See* Ex. 28. The letter specifically references Mast's "responsibility to ensure that [his] actions do not impact wetlands protected by the [FWS] or any other conservation easement." Tr. 223, 251; Ex. 28. There is no evidence that FWS granted Mast permission for the excavation or tiling project he arranged. Instead, evidence in the record shows that permission was specifically denied by FWS. As discussed in detail in element three, Mast never contacted FWS after 2010, never received a permit from FWS, and failed to provide three-day notice to FWS that he was moving forward with his tiling project. *See* Tr. 187. There is no evidence that Mast received permission or authority by FWS to install drain tile on his property in the manner he did.

Even if Mast relied on the 2012 NRCS letter, Mast must also show that the reliance was reasonable. *See Hullette*, 525 F.3d at 612. Mast has failed to show that reliance on the 2012 NRCS letter was reasonable under the circumstances. The 2012 letter explicitly advised Mast that it was his responsibility to make sure that his actions did not affect the FWS easement. *See* Ex. 28. The letter never stated that the agencies were working together or that the NRCS map was an updated version of the FWS map. Instead, the letter instructed Mast to contact FWS and provided the contact information to do so. *See id.* Mast did not contact either agency to ensure that his actions would not

disturb protected areas. This was not reasonable. His entrapment by estoppel defense fails.

Mast also argues that Tornow highlighted protected wetland areas 1 and 2 in red on the tiling photograph as areas that tile would be allowed. Docket 112 at 23 (citing Ex. 3). After reviewing the tiling photograph, the court disagrees that Tornow highlighted wetland areas 1 and 2 as acceptable areas to disturb. Instead, the photograph clearly shows arrows that Tornow highlighted outside and away from the boundaries of the wetlands identified by FWS. *See* Ex. 3. Comparing the aerial photographs of Mast's property and the FWS map created by Fischer with the tiling photograph with red highlighted arrows, there is no evidence that Mast's activity on areas 1 and 2 was permitted or authorized.

Instead, FWS never authorized or gave Mast permission to drain any of the protected wetland areas on his property. As summarized above, the FWS letter explicitly told Mast that the wetland areas could not be drained without permission from FWS. *See id.* The letter noted that "[a]ny burning, draining, filling, or leveling of wetlands depicted on the wetland easement map without a permit issued by FWS is a violation of the provisions of the easement." Tr. 82; Ex. 3. Mast never received a permit or contacted either agency to provide notice of installing drain tile on his property or to seek authorization. Tr. 228, 256, 385-86. Mast also failed to provide FWS the requested three-day notice prior to installation of drain tile on his property. Tr. 186-87; Ex. 3. Thus, based on this

evidence in the record, the United States has proven beyond a reasonable

doubt that Mast's actions were not permitted or otherwise authorized.

## CONCLUSION

The United States has established by proof beyond a reasonable doubt

each of the essential elements for 6 of the 7 protected wetlands. Thus, it is

ORDERED that for the reasons contained in this order, the verdict in this

case is that the defendant, Kevin Jay Mast, is guilty of the sole count in the

superseding information.

Dated May 21, 2020.

BY THE COURT:

/s/ *Karen E. Schreier*

KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE



# United States Department of the Interior



FISH AND WILDLIFE SERVICE
134 Union Blvd
Lakewood, Colorado 80228

In Reply Refer to:
FWS/IR05/IR07/NWRS

July 9, 2020

Kale E. Van Bruggen                                    LaMoure 69X
Rinke Noonan Law Firm
Suite 300 US Bank Plaza
1015 W. Germain St.
P.O. Box 1497
St. Cloud, Minnesota 56032

Dear Mr. Van Bruggen:

This letter is in response to the May 28, 2020 appeal you filed on behalf of your clients, Leonard, Patty and
Cody Peterson. Thank you and Mr. Peterson for taking the time to join me by phone on July 1, 2020 and for
making me aware of your clients' concerns regarding a revised wetland map received from the U.S. Fish and
Wildlife Service (FWS) for the following property:

T. 136 N., R. 61 W., 5th P.M.
Section 2, W1/2

The Petersons submitted an objection to the Refuge Manager regarding the original wetland map which was
provided in a FWS correspondence dated February 18, 2020. After a comprehensive review, the Refuge
Manager agreed to revise the original wetland map by removing three areas. The Refuge Manager provided
the revised map and outlined this decision in a letter dated April 30, 2020. This letter is my response to your
clients' appeal of the Refuge Manager's decision letter. I have reviewed your clients' areas of concern which
you outlined in your appeal letter including 1) the lack of a discussion or meeting with the Refuge Manager
prior to the issuance of the decision letter, 2) the use of certain aerial images to map wetland areas, 3) the use
of the *FWS Administrative and Enforcement Procedures for FWS Easements* manual (manual) as guidance
for mapping wetland areas, 4) the inclusion of several wetland areas depicted on the map, and 5) the sizes of
several wetland areas depicted on the map.

The first concern you raised pertained to the lack of opportunity to "discuss and/or meet" with the Refuge
Manager regarding the wetland map prior to the issuance of the decision letter. One of your clients, Cody
Peterson, did have two telephonic meetings with the FWS to discuss the original map. The FWS received
the objection letter 40 days after the date the clients received the map. Initially, there was uncertainty as to
whether there were 40 days allowed to resolve any disagreements with landowners regarding the map, or 70
days (40 days + an additional 30 days). This particular Refuge Manager was also unsure whether or not it
was proper to discuss legal matters with landowners and their attorneys without having the government's
legal representation also present. Both of these issues have been resolved and the FWS has provided

INTERIOR REGION 5                                    INTERIOR REGION 7
MISSOURI BASIN                                       UPPER COLORADO RIVER BASIN

KANSAS, MONTANA*, NEBRASKA, NORTH DAKOTA,            COLORADO, NEW MEXICO, UTAH, WYOMING
SOUTH DAKOTA
*PARTIAL

JUL 14 2020

additional guidance to Refuge Managers that clarifies the process. Unfortunately, the uncertainty led to a missed opportunity for the Refuge Manager to meet with you and your clients; however, I did have a listening session on July 1, 2020 with you to hear your clients' concerns. I am willing to offer your clients another opportunity to work with the Refuge Manager and restart the objection and appeal process. If your clients are interested in this offer, please email me at RD_Appeals@fws.gov within seven days of receipt of this letter.

The second concern related to the use of aerial imagery taken after the easement was conveyed to help determine the locations and sizes of wetland areas protected by the easement. I disagree, in part, with your interpretation of applicable case law. The key inquiry when determining what is protected by the terms of the easement is to determine what wetland areas 1) existed at the time the easement was conveyed, and 2) are included in the acres for which the original landowner was paid. The term "existed" does not refer to the water levels in the wetland areas on the day the easement was signed. Wetland areas are hydrologically dynamic systems with naturally fluctuating water levels. The FWS uses a variety of resources to determine the locations and boundaries of wetland areas and is not limited to aerial photos taken before easement acquisition. Courts have concluded that comparing photographs of the landscape from before and after conveyance of an easement is an acceptable and reliable method of establishing the existence of wetland areas at a certain moment in time (see *U.S. v. Mast; U.S. v. Peterson*).

Third, you opposed the use of the *FWS Administrative and Enforcement Procedures for FWS Easements* manual to map wetland areas protected by the easement and suggest the FWS considers the manual to be part of the agreement with the landowner. This is inaccurate. The manual sets forth and provides current procedures and standards for the administration of the easement program in order to be compliant with applicable statutes, regulations and policies while adhering to case law. You also misinterpret the specific guidance to mapping technicians who interpret aerial photography for wetland area indicators such as "basins," "saturated conditions," and "isolated areas that are not farmed." The mapping technician reviews photography for such things because these are all indicators of recurring surface water; which, as you note, the easement does protect. Additionally, the contractual language of the easement uses several terms to define small wetland areas whose meaning is clear (see *U.S. v. Vesterso*). The court in *U.S. v. Schoenborn* used the term "basins" specifically to refer to ponds and potholes that were protected by a FWS easement.

Your clients objected to and are now appealing the Refuge Manager's decision to include several wetland areas that the clients believe do not show conclusive evidence of inundation or marsh vegetation on photos taken close to the time of easement conveyance. The absence of surface water or marsh vegetation on photos taken near the time of easement conveyance does not provide evidence that a wetland area did not exist. Small, and even larger wetland areas during dry periods, are often dry by late spring and summer and may not display surface water or marsh vegetation on an aerial photo. The FWS easement contract states that wetland areas "...now existing or *reoccurring*..." (emphasis added) are intended to be protected. Wetland areas persist over time. When there is no contemporaneously-filed map identifying the protected wetland areas, the courts will look at all evidence to determine whether identifiable wetland areas existed at the time the easement was conveyed, not merely photographs taken from near the time of easement conveyance (see *U.S. v. Mast; U.S. v. Peterson*). I find the wetland areas in question existed at the time of easement conveyance and meet the wetland area definition as defined in the easement contract which includes "...any surface water including lakes, ponds, marshes, sloughs, swales, swamps or potholes, now existing or reoccurring..."

Lastly, your clients dispute the sizes of several wetland areas depicted on the map. During the listening session on July 1, 2020, Mr. Peterson specifically brought up concerns about wetland areas identified as B, I, L, M, V, and U on the maps you provided in the appeal letter. First, Mr. Peterson believes that wetland areas

L, M, V, and U are larger due to the blocking of culverts off-easement. Second, Mr. Peterson believes the depictions of wetland areas B and I should be resized. After further consideration of Mr. Peterson's concerns and a review of wetland areas B, I, L, M, V and U, the sizes of these wetland areas have been revised. Upon careful review of the remaining wetland areas referenced in the appeal letter, I find the wetland map accurately depicts the approximate sizes, shapes and locations of wetland areas that are suitable for use as waterfowl production areas as stated in the easement contract.

I appreciate you bringing your clients' concerns to my attention. Upon review, it is my decision not to grant your clients' appeal in full. As stated above, some modifications were made to address your clients' concerns. Included with this letter is a map titled "Enclosure 1" which depicts the wetland area boundaries that were modified. Also included is an updated map of wetland areas covered by the easement titled "Enclosure 2" and dated July 7, 2020. If you do not agree, you may appeal my decision by following the instructions below.

- o  Submit your appeal to the Director of the U.S. Fish and Wildlife Service. Submit your appeal and any supporting materials or explanation in writing within 30 calendar days of the date of the decision from the Regional Director to the Director of the U.S. Fish and Wildlife Service at the address listed below. Include a detailed explanation of why you are appealing the map.

    Director
    C/O: Map Appeal
    U.S. Fish and Wildlife Service
    U.S. Department of the Interior
    1849 C Street, NW
    Washington, DC 20240

- o  The Director of the U.S. Fish and Wildlife Service will review and make a decision on your appeal within 45 calendar days of receipt of your letter. If the Director grants your appeal, the wetland map will be revised and a new copy of the map, with an explanation of the decision, will be sent to you and the local U.S. Fish and Wildlife Service office.

If your appeal is not granted, a copy of the final wetland map and an explanation of the decision will be sent to you and the local U.S. Fish and Wildlife Service office. The decision of the Director will be considered the final agency action on the determination and, at this point, your administrative appeals will have been deemed exhausted.

Sincerely,

Noreen E. Walsh

Regional Director

Enclosures

Enclosure 1

69X
T 136 N. R 61 W.
SECTION 2, W1/2

LaMoure County, North Dakota



Scale: 1:10,560

The U.S. Fish & Wildlife Service (Service) has purchased and owns a perpetual easement which restricts the rights to drain, burn, fill or level any wetland areas depicted on this map. This map represents the Service's effort to depict the approximate sizes, shapes, and locations of all protected wetland areas and is not intended to depict water levels in wetland areas for any given year. Wetland area acre estimates are provided to demonstrate that mapped wetland areas are consistent with the acres for which the Service paid. Any other interpretation of the estimated wetland area acreages may lead to a mischaracterization of the easement conveyance. A permit is required from the Service before conducting activities that result in the draining, burning, filling or leveling of wetland areas identified on this map.

☐ Section Boundary
☐ Boundary of Easement Description
▨ Wetland Areas Covered by Provisions of the Easement
○ Wetland Areas Modified

*Data Sources: Farm Service Agency: NAIP Imagery 2019, USFWS: Easement Boundary, BLM: Public Land Survey System (Sections). Map Date: 5/01/2020*

Enclosure 2

LaMoure County, North Dakota

69X
T 136 N. R 61 W.
SECTION 2, W1/2



Scale: 1:10,560

0    0.1    0.2    0.4    0.6    0.8    1
Miles

The U.S. Fish & Wildlife Service (Service) has purchased and owns a
perpetual easement which restricts the rights to drain, burn, fill or level
any wetland areas depicted on this map.  This map represents the
Service's effort to depict the approximate sizes, shapes, and locations
of all protected wetland areas and is not intended to depict water levels
in wetland areas for any given year.  Wetland area acre estimates are
provided to demonstrate that mapped wetland areas are consistent with
the acres for which the Service paid.  Any other interpretation of the
estimated wetland area acreages may lead to a mischaracterization of
the easement conveyance.  A permit is required from the Service before
conducting activities that result in the draining, burning, filling or leveling
of wetland areas identified on this map.

☐  Section Boundary

☐  Boundary of Easement Description

▨  Wetland Areas Covered by Provisions
    of the Easement

*Data Sources: Farm Service Agency: NAIP Imagery 2019, USFWS: Easement Boundary, BLM: Public Land Survey System (Sections). Map Date: 7/07/2020*



May 28, 2020

Direct Dial:  320-656-3522<br>Kvanbruggen@RinkeNoonan.com

Regional Director
c/o: Map Appeal
Ms. Noreen Walsh
U.S. Fish and Wildlife Service
P.O. Box 25486
Denver, Colorado 80225

**SENT VIA EMAIL TO:  RD_APPEAL@FWS.GOV & NOREEN_WALSH@FWS.GOV**

**Re:     Petersons:  Map Appeal**
**Our File No. 29364-0001**

Dear Ms. Walsh:

I write this letter on behalf of my clients, Leonard, Patty, and Cody Peterson (the "Petersons"), with objections to the new map of U.S. Fish and Wildlife Service Easement 69X in LaMoure County, North Dakota. My clients submitted their objections to the new map of Easement 69X to Kulm Wetland Management Director Michael Erickson within 40 days after receiving the new map. Mr. Erickson issued his decision on the objections in a letter dated April 30, 2020.  The appeal rights outlined in the initial letter the Petersons received provide landowners 30 calendar days from the date they receive the Refuge Manager's decision to appeal the map to the Regional Director. This letter with objections to the map of Easement 69X is therefore timely.

*Applicable Law*

Easements are contractual nonpossessory property interests that give the easement holder the right to use property owned by another in a certain manner. Pursuant to N.D. Cent. Code § 47-05-07, "[t]he extent of a servitude is determined by the terms of the grant . . . ."

The language of the grant of FWS waterfowl production area easements, like Easement 69X, specifically restrict the landowner from "draining or permitting the draining, through the transfer of appurtenant water rights or otherwise, of any surface water . . . now existing or recurring due to natural causes on the above-described tract by ditching or any other means; . . . filling in with earth or any other material or leveling any part or portion of the above-described tract on which surface water or marsh vegetation is now existing or hereafter recurs due to natural causes; and . . . burning any areas covered with marsh vegetation." The easement gives examples of naturally-existing or

Suite 300 US Bank Plaza
1015 W. St. Germain St.
P.O. Box 1497
St. Cloud, MN  56302
320.251.6700

www.rinkenoonan.com

U.S. Fish and Wildlife Service
May 28, 2020
Page 2

recurring surface water as "including lakes, ponds, marshes, sloughs, swales, swamps, or potholes . . . ."

Case law holds that restrictions contained in these FWS waterfowl production area easements only apply to wetland areas on the property at the time the easement was conveyed and do not apply to fluctuating, after-expanded or after-developed wetland areas. *U.S. v. Johansen*, 93 F.3d 459, 465-66 (8th Cir. 1996) (citing *North Dakota v. U.S.*, 460 U.S. 300 (1983)). The key inquiry when interpreting contracts that convey an interest in real property "is to ascertain and effectuate intent of the grantor." *Id.* at 463 (citing *Malloy v. Boettcher*, 334 N.W.2d 8, 9 (N.D. 1983)). Accordingly, and absent a negotiated and agreed-upon map between the grantor and FWS showing areas subject to the easement's restrictions, the location and boundaries of wetland areas on the property that were in existence at the time the easement was conveyed are protected by the easement because those are the areas that the grantor knew were present on the landscape and intended to be subject to the easement's restrictions. *Id.* at 467.

Restrictions contained in FWS waterfowl production area easements are also limited, at a maximum, to the number of acres that FWS noted it paid the landowner for in the summary record. *Id.* at 465-66. The court in *Johansen* found that interpreting the easement's restrictions as covering fluctuating, after-expanded, or after-developed wetland areas violates the easement program's enabling statutes because the number of protected acres would constantly fluctuate and could thereby exceed the gubernatorial consent limitation. *Id.*

Easement 69X does not have a negotiated and agreed-upon map between FWS and the grantor, or any other landowner, showing the areas that are subject to the easement's restrictions. In accordance with the terms of the easement and applicable law, any areas with surface water existing or occurring on the property due to natural causes at the time the easement was conveyed cannot be drained or filled.

### *History of Easement 69X*

Easement 69X was conveyed by previous landowners, Lyle and Vivian Trapp, to the U.S. Fish and Wildlife Service ("FWS") on November 15, 1963. FWS's summary record for Easement 69X notes the following information:

> Easement Consideration: $630.00; Tract Acreage: 327.73; Cost per acre: $1.92; Wetland Acreage 42.00; Wetland cost per acre: $15.00; Estimate of Value: $630.00

According to my client's records and the records we have received from FWS, it appears Easement 69X was first mapped by FWS in 2015, which was sent to my clients by letters dated February 18, 2016. The historical record of Easement 69X indicates FWS mapped 42 acres of wetlands and "deleted 27 acres." The files we received from FWS do not contain any additional information pertaining to these 27 deleted acres.

U.S. Fish and Wildlife Service
May 28, 2020
Page 3

***Objections to 2020 Mapping***

In a letter dated April 3, 2020 to Kulm Wetland Management District, the Petersons submitted the following objections to the 2020 map of Easement 69X that covers their land in the W ½ of 2-136-61:

> First, the Easement Mapping References checklist indicates the aerial photos taken in the following years were utilized to create the map: 1957, 1964, mid-1990s, 2002, 2003, 2004, 2005, 2006, 2008, 2009, and 2012. Only two of these eleven photos were taken prior-to or relatively close in time to when the Easement was conveyed in 1963. The remaining nine photos used to create the map were taken approximately 32 to 49 years after the easement was conveyed. As discussed above, the key inquiry when determining the scope of pre-1976 FWS easements is to determine the location and boundaries of wetland areas present on the property at the time the easement was conveyed. Photos taken over three decades after Easement 69X was conveyed do not represent the condition of the property at the time and, as such, are not an accurate representation of the contracting parties' intent and agreement.

> Second, the FWS map indicates numerous, small 0.2, 0.1 and <0.1-acre wetland areas are protected by the Easement. These areas are identified as A, G, K, N, O, P, Q, R, S, T, and U on the enclosed map in the Wenck report. These areas are almost always cropped straight through and do not have evidence of surface water on images prior to 1969, as is specifically protected by the Easement. Accordingly, under the terms of the Easement, we do not believe FWS purchased the right to protect these areas.

> Third, the FWS map indicates one large 12.9-acre wetland along the eastern portion of the property. This area is identified as area L on the enclosed map. This area actually consists of two, smaller wetland areas – totaling 8.3 and 1.8 acres respectively. Area L is not one continuous wetland because there is higher ground in the middle that is consistently been farmed through and does not pond water.

> Fourth, the FWS map indicates a 6.8-acre wetland in the northeastern portion of the property. This area is identified as area B on the enclosed map. The inundation and marsh vegetation in this area is much larger than the area drawn by FWS. Accordingly, we believe this area to approximately 14.9 acres, not 6.8.

> Fifth, the FWS map indicates five medium sized wetlands of 2.5 acres, 2.8 acres, 0.6 acres, 1.3 acres, and 5.2 acres. These acres are identified as H, I, J, M, and V on the enclosed map. The actual inundation and marsh vegetation in these areas at the time the easement was conveyed is much smaller, however. We determined the inundation and marsh vegetation in these areas to be 1.64 acres, total.

Enclosed with the Petersons' April 3rd objection letter was a report from Matt Retka that further details their objections. This objection letter and Mr. Retka's report are enclosed with this letter for your reference.

U.S. Fish and Wildlife Service
May 28, 2020
Page 4

### *Refuge Manager's Decision on Objections to Easement 69X*

Refuge Manager Michael Erickson issued his decision on my client's objections in a letter dated April 30, 2020, which is enclosed with this letter.

In response to the first objection, Mr. Erickson said that FWS uses "all available resources" to determine the protected wetland areas, and the "[m]aping resources that we use are not limited to aerial photos taken before the easement acquisition."

In response to the second objection, Mr. Erickson stated:

> "The presence of surface water in photography near the time of acquisition is not a requirement for mapping of wetland areas. Wetlands do not cease being protected when they [sic] naturally dry or devoid of marsh vegetation."

In response to the third and fifth objection, Mr. Erickson removed wetland areas N, Q, and T. In regards to wetland L, Mr. Erickson "agree[d] that there is likely higher ground that reappears during drier periods" but that it "often appears as one continuous wetland as mapped" and therefore did not reshape area L.

In response to the fourth objection, Mr. Erickson did not make any adjustments to the size of wetland B and stated that "FWS utilized and adhered to all four criteria" the agency follows "[i]n situations where more wetland area is present than the purchased summary acreage."

### *Objections to Refuge Manager's Decision on Easement 69X*

The Petersons reiterate and reincorporate their objections above to FWS's initial map of Easement 69X and have the following specific objections to Mr. Erickson's response letter:

> First, we understand that the mapping and appeal process set forth in the Department of Interior's December 23, 2019 Memorandum and the initial letter they received from FWS with the new easement maps guarantee them the right to "discuss and/or meet" with the refuge manager to "review . . . concerns and correct any errors." In my clients' objection letter to Mr. Erickson, they specifically requested a conference call to discuss their objections to the map. Neither Mr. Erickson, nor anyone else at the wetland management district office, contacted me or my clients to set up a call to discuss the objections. Mr. Erickson simply issued his decision without any further notice or discussion. We object to the agency's failure to follow the procedural process and hereby request a meeting to discuss our concerns with the map.

> Second, the Petersons disagree with the agency's use of aerial photos taken years or decades after the easement was conveyed to determine the location and size of areas protected by the easement. As discussed in the applicable law section above, the key inquiry when determining the scope of pre-1976 FWS easements is to determine the location and boundaries of wetland areas present on the property at the time the easement was conveyed. Mr. Erickson acknowledged in his response letter that the agency uses all imagery available to it at the time of mapping and conceded the agency believes that areas,

U.S. Fish and Wildlife Service
May 28, 2020
Page 5

which are "devoid" of surface water and marsh vegetation in aerial photos close in time to the easement's acquisition, can still be protected by the easement if they show up on later aerial images. The contracting parties, however, could not have known that such areas would appear wet much further into the future and thus, could not have intended or agreed that the easement would protect these after-occurring or after-expanded areas. These are acres that the parties to the contract had not, in their lifetimes, experienced as containing surface water or reoccurring surface water. These are acres the parties to the contract had farmed and had not, in their lifetimes, observed as constituting the characteristics of existing or reoccurring "lakes, ponds, marshes, sloughs, swales, swamps, or potholes." We therefore object to the agency's use of photos taken after the easement was conveyed as evidence to determine the areas protected by the easement.

Third, we understand from conversations with other refuge managers that the agency uses the instructions and procedures in the 2016 Prairie Pothole Region Easement Manual (the "Manual") to map areas protected by the easement. My clients disagree with the agency's use of the Manual to map the areas protected by the easement. As a matter of contract law, the Manual itself was created decades after the easement was conveyed and is not a part of the agreement with the landowner. In addition, even if the Manual is applicable, the Manual contains instructions that are inconsistent with case law and with the specific contractual language of the easement agreement. Without stating all of these, we give as an example the following on page 89-90 of the Manual:

> "The U.S. Attorney's February 4th 1998 letter to Judge Webb emphasizes this point in notation #2, second paragraph: 'The Eighth Circuit has always recognized the inherent expansion and contraction of prairie potholes. …There is no requirement anywhere that a pothole have water in it when the easement is acquired. Wetlands are defined by many factors other than the presence or absence of standing water on a particular day. Most North Dakota potholes are essentially dry by fall in a normal year.'"

The U.S. Attorney's letter to Judge Webb is simply not the law and has no legal binding authority. The Eighth Circuit in *Johansen* specifically rejected the government's interpretation of after-expanded or "future wetlands" and "easement restrictions [] fluctuat[ing] with the amount of rainfall." 93 F.3d at 466. The Eighth Circuit explained that such an interpretation is inconsistent with "traditional norms of real property conveyance," which "require[e] definiteness" and also inconsistent with FWS's notation of the wetland acres in its easement summary record and "the gubernatorial-consent component of the program's authorizing statute." *Id*. The Eighth Circuit therefore found that the easements only protect "identifiable, covered wetlands as existing at the time of the easement's conveyance and described in the easement summary." *Id*. at 467.

The Manual also provides the following on page 93:

> "The mapping technician will prepare a wetland map of all naturally-occurring wetland basins utilizing all off-site mapping tools available (Exhibit XI-5). The

U.S. Fish and Wildlife Service
May 28, 2020
Page 6

> map will include those basins which have historically been present over time; i.e., present on historical aerial photos. The mapper will use all wetland photographic signatures to help determine the presence or absence of wetlands basins. Wetland indicators may include hydrophytic vegetation, surface water, saturated conditions, mud flats, flooded or drowned-out crops, unharvested crops, isolated areas that are not farmed with the rest of the field, areas of greener vegetation (especially during dry years), mature upland tree rings, and recurring cropping patterns that avoid wet areas."

The contractual language of the easement does not cover "basins," "saturated conditions," "mud flats," "flooded or drowned-out crops," "unharvested crops," "isolated areas that are not farmed," "areas of greener vegetation," "mature upland tree rings," or "recurring cropping patterns." The easement protects areas with "surface water" (i.e., inundated areas with water at or above the surface of the ground) and "marsh vegetation" (hydrophytic vegetation) that is "now existing" (existing at the time the easement was conveyed) or "reoccurring" (it occurred and reoccurred prior to when the easement was conveyed; reoccurring is commonly known to mean occurring and then occurring again periodically or repeatedly over time) "due to natural causes" (due to normal precipitation and not due to artificial or manmade drainage or other manipulation of the landscape). Pursuant to the terms of the easement, we do not believe the above-quoted mapping instruction in the Manual accurately leads to identifying areas that the contracting parties intended and agreed to be protected by the easement.

Fourth, the Petersons disagree that areas identified as A, G, K, O, P, R, S and U on the enclosed report from Mr. Retka are protected by the terms of the easement. Historical aerial photos close in time to when the easement was conveyed do not show conclusive evidence of inundation and marsh vegetation in these areas. Pursuant to the terms of the easement, which protects areas with naturally-existing and reoccurring surface water and marsh vegetation, we do not believe these areas are protected by the terms of the easement, and they should therefore be removed from the map.

Fifth, the Petersons disagree with size and boundaries of the areas identified as B, H, I, J, L, M and V on the enclosed report from Mr. Retka. In area B, historical aerial images show evidence of surface water and marsh vegetation in a larger area than that mapped by FWS. We accordingly believe area B should be mapped at approximately 14.9 acres, not 6.8 acres. In area L, historic aerial photos near the time of the easement's acquisition show conclusive evidence of inundation and marsh vegetation in two separate areas, not one continuous area. We accordingly believe area L should be mapped as two separate 8.3 and 1.8-acre areas, rather than one, continuous 12.9-acre area. In areas H, I, J, M, and V, historic aerial photos show conclusive evidence of inundation and marsh vegetation in substantially smaller areas than that mapped by FWS. As such, we believe area H should be mapped as two separate <0.1 acre areas; area I should be mapped as two separate 0.5 and 0.7 acre areas; area J should be mapped as a <0.1 acre area; area M should be mapped as a 0.1 acre area, and area V should be mapped as a 0.2 acre area.

U.S. Fish and Wildlife Service
May 28, 2020
Page 7

We reserve the right to supplement the above objections as this matter progresses.

In accordance with the above, we respectfully request a meeting with you to discuss and review the concerns addressed in this letter. Please contact me (or my paralegal Kat Bundy) to let us know your availability for a meeting. We ask that you please keep us informed of any decision on this matter or any alteration to the 2020 map of Easement 69X that your office may make.

Thank you for your attention to this matter. If you have any questions or need any additional information, please do not hesitate to contact me.

Sincerely,


*/s/ Kale R. Van Bruggen*

Kale R. Van Bruggen
KRV/JEE/ksb

Attachments

cc:    Leonard & Patty Peterson (w/atts.)
       Cody Peterson (via email only w/atts.)



# United States Department of the Interior



**FISH AND WILDLIFE SERVICE**
1 First Street SW; P.O. Box E
Kulm, North Dakota 58456

In Reply Refer to:
FWS/IR05/IR07

February 18, 2020

Certified Letter #7015 3010 0000 6958 3598                    LaMoure County 69X
Return Receipt requested

Cody Peterson
6685 98th Ave SE
Lamoure, ND 58458

Dear Mr. Peterson:

Since the early 1960's, the U.S. Fish and Wildlife Service has been purchasing wetland
easements to conserve wetland areas that are important to migratory birds. Wetland easements
are perpetual and restrict the rights to drain, burn, fill or level protected wetland areas. Public
records indicate that you own property that is covered by a U.S. Fish and Wildlife Service
wetland easement. The property is described as:

> T.136N., R.61W., 5th P.M. (Sheridan Township)
> Section 2

The enclosed map represents the U.S. Fish and Wildlife Service's effort to depict the
approximate sizes, shapes and locations of all wetland areas protected by the provisions of the
easement. It does not, and is not intended to depict the water level of any wetland area in any
given year. Any draining, burning, filling or leveling of the wetland areas depicted on the map
without a permit issued by the Service is a violation of the easement provisions.

Please review the enclosed contract and map carefully. You may contact me at the address listed
above within the next 40 calendar days from the date you received this letter via certified mail if
you have objections with the map. I am willing to discuss and/or meet with you and review your
concerns and correct any errors. If we cannot agree on the boundaries and location depicted on
the map within 30 calendar days of our initial contact, you may appeal the map as follows:

o   Submit your appeal and any supporting materials or explanation in writing within 30
    calendar days of the date of the decision from the Refuge Manager to the Regional
    Director at the address listed below. Include a detailed explanation of why you are
    appealing the map.

Regional Director
C/O:  Map Appeal

| INTERIOR REGION 5 | INTERIOR REGION 7 |
|---|---|
| MISSOURI BASIN | UPPER COLORADO RIVER BASIN |
| KANSAS, MONTANA*, NEBRASKA, NORTH DAKOTA, SOUTH DAKOTA | COLORADO, NEW MEXICO, UTAH, WYOMING |
| *PARTIAL | |

> U.S. Fish and Wildlife Service
> P.O. Box 25486
> Denver, Colorado 80225

o   The Regional Director will review and make a decision on your appeal within 45 calendar days from the receipt of your letter.  The Regional Director is willing to discuss and/or meet with you and review your concerns.  If the Regional Director grants your appeal, the wetland map will be revised and a new copy of the map, with an explanation of the decision, will be sent to you and the local U.S. Fish and Wildlife Service office.

o   If your appeal is not granted, you may submit your appeal to the Director of the U.S. Fish and Wildlife Service.  Submit your appeal and any supporting materials or explanation in writing within 30 calendar days of the date of the decision from the Regional Director to the Director of the U.S. Fish and Wildlife Service at the address listed below.  Include a detailed explanation of why you are appealing the map.

> Director
> C/O:  Map Appeal
> U.S. Fish and Wildlife Service
> U.S. Department of the Interior
> 1849 C Street, NW
> Washington, DC 20240

o   The Director of the U.S. Fish and Wildlife Service will review and make a decision on your appeal within 45 calendar days of receipt of your letter.  If the Director grants your appeal, the wetland map will be revised and a new copy of the map, with an explanation of the decision, will be sent to you and the local U.S. Fish and Wildlife Service office.

o   If your appeal is not granted, a copy of the final wetland map and an explanation of the decision will be sent to you and the local U.S. Fish and Wildlife Service office.  The decision of the Director will be considered the final agency action on the determination and, and this point, your administrative appeals will have been deemed exhausted.

Please be advised that if you choose to appeal your wetland easement map, no action will be taken against you, based on the map, until you have exhausted your appeal within the FWS.  If you have any questions about the enclosed easement contract or the map, including what is and is not allowed on protected wetland areas, please contact me at (701)647-2866.

Sincerely,

Wayne A. Henderson
Wetland District Manager

Enclosure

cc:  {easement folder}



69X
T. 136 N., R. 61 W.
SECTION 2, W1/2

LaMoure County, North Dakota

Scale: 1:10,560

| 0 | 0.1 | 0.2 | 0.4 | 0.6 | 0.8 | 1 |
Miles

The U.S. Fish & Wildlife Service (Service) has purchased and owns a perpetual easement which restricts the rights to drain, burn, fill or level any wetland areas depicted on this map. This map represents the Service's effort to depict the approximate sizes, shapes, and locations of all protected wetland areas and is not intended to depict water levels in wetland areas for any given year. Wetland area acre estimates are provided to demonstrate that mapped wetland areas are consistent with the acres for which the Service paid. Any other interpretation of the estimated wetland area acreages may lead to a mischaracterization of the easement conveyance. A permit is required from the Service before conducting activities that result in the draining, burning, filling or leveling of wetland areas identified on this map.

☐ Section Boundary

☐ Boundary of Easement Description

⬭ Wetland Areas Covered by Provisions of the Easement

*Data Sources: Farm Service Agency; NAIP Imagery 2019, USFWS: Easement Boundary, BLM: Public Land Survey System (Sections). Map Date: 2/11/2020*



April 3, 2020

Direct Dial:  320-656-3522
Kvanbruggen@RinkeNoonan.com

Wayne A. Henderson
Fish and Wildlife Service
1 First Street SW; P.O. Box E
Kulm, North Dakota 58456

**SENT VIA EMAIL ONLY TO:  WAYNE_HENDERSON@FWS.GOV**

**Re:    Objection to Revised US FWS Easement Map – 69X**
**Our File No. 29364-0001**

Dear Mr. Henderson:

I write this letter on behalf of my clients, Leonard, Patty, and Cody Peterson (the "Petersons"), with objections to the new map of U.S. Fish and Wildlife Service Easement 69X in LaMoure County, North Dakota that my clients received by certified mail on February 24, 2020. Easement 69X covers West ½ of Section 2, Township 136N, Range 61W. The letter dated February 18, 2020 enclosing the new map of Easement 69X provides landowners 40 calendar days from the date they receive the new map to contact the Refuge Manager with any objections to the map. This letter and objections to the map are therefore timely.

*History and Previous Mapping*

Easement 69X was conveyed by previous landowners, Lyle and Vivian Trapp, to the U.S. Fish and Wildlife Service ("FWS") on November 15, 1963.  FWS's summary record for Easement 69X notes the following information:

> Easement Consideration: $630.00; Tract Acreage: 327.73; Cost per acre: $1.92; Wetland Acreage 42.00; Wetland cost per acre: $15.00; Estimate of Value: $630.00

According to my client's records and the records we have received from your office thus far, it appears Easement 69X was first mapped by FWS in 2015, which was sent to my clients by letters dated February 18, 2016. The historical record of Easement 69X indicates FWS mapped 42 acres of wetlands and "deleted 27 acres." The files we received from your office do not contain any additional information pertaining to these 27 deleted acres.

Suite 300 US Bank Plaza
1015 W. St. Germain St.
P.O. Box 1497
St. Cloud, MN  56302
320.251.6700

www.rinkenoonan.com

Mr. Wayne Henderson
April 3, 2020
Page 2

***Applicable Law***

Easements are contractual nonpossessory property interests that give the easement holder the right to use property owned by another in a certain manner. Pursuant to N.D. Cent. Code § 47-05-07, "[t]he extent of a servitude is determined by the terms of the grant . . . ."

The language of the grant of FWS waterfowl production area easements, like Easement 69X, specifically restrict the landowner from "draining or permitting the draining, through the transfer of appurtenant water rights or otherwise, of any surface water . . . now existing or recurring due to natural causes on the above-described tract by ditching or any other means; . . . filling in with earth or any other material or leveling any part or portion of the above-described tract on which surface water or marsh vegetation is now existing or hereafter recurs due to natural causes; and . . . burning any areas covered with marsh vegetation." The easement gives examples of naturally-existing or recurring surface water as "including lakes, ponds, marshes, sloughs, swales, swamps, or potholes . . . ."

Case law holds that restrictions contained in these FWS waterfowl production area easements only apply to wetland areas on the property at the time the easement was conveyed and do not apply to fluctuating, after-expanded or after-developed wetland areas. *U.S. v. Johansen*, 93 F.3d 459, 465-66 (8th Cir. 1996) (citing *North Dakota v. U.S.*, 460 U.S. 300 (1983)). The key inquiry when interpreting contracts that convey an interest in real property "is to ascertain and effectuate intent of the grantor." *Id*. at 463 (citing *Malloy v. Boettcher*, 334 N.W.2d 8, 9 (N.D. 1983)). Accordingly, and absent a negotiated and agreed-upon map between the grantor and FWS showing areas subject to the easement's restrictions, the location and boundaries of wetland areas on the property that were in existence at the time the easement was conveyed are protected by the easement because those are the areas that the grantor knew were present on the landscape and intended to be subject to the easement's restrictions. *Id*. at 467.

Restrictions contained in FWS waterfowl production area easements are also limited, at a maximum, to the number of acres that FWS noted it paid the landowner for in the summary record. *Id*. at 465-66. The court in *Johansen* found that interpreting the easement's restrictions as covering fluctuating, after-expanded, or after-developed wetland areas violates the easement program's enabling statutes because the number of protected acres would constantly fluctuate and could thereby exceed the gubernatorial consent limitation. *Id*.

Easement 69X does not have a negotiated and agreed-upon map between FWS and the grantor, or any other landowner, showing the areas that are subject to the easement's restrictions. In accordance with the terms of the easement and applicable law, any areas with surface water existing or occurring on the property due to natural causes at the time the easement was conveyed cannot be drained or filled.

***Objections to 2020 Mapping***

The Petersons have the following objections to the 2020 map of Easement 69X that covers their land in the W ½ of 2-136-61:

[29364-0001/3723688/1]

Mr. Wayne Henderson
April 3, 2020
Page 3

First, the Easement Mapping References checklist indicates the aerial photos taken in the following years were utilized to create the map: 1957, 1964, mid-1990s, 2002, 2003, 2004, 2005, 2006, 2008, 2009, and 2012. Only two of these eleven photos were taken prior-to or relatively close in time to when the Easement was conveyed in 1963. The remaining nine photos used to create the map were taken approximately 32 to 49 years after the easement was conveyed. As discussed above, the key inquiry when determining the scope of pre-1976 FWS easements is to determine the location and boundaries of wetland areas present on the property at the time the easement was conveyed. Photos taken over three decades after Easement 69X was conveyed do not represent the condition of the property at the time and, as such, are not an accurate representation of the contracting parties' intent and agreement.

Second, the FWS map indicates numerous, small 0.2, 0.1 and <0.1-acre wetland areas are protected by the Easement. These areas are identified as A, G, K, N, O, P, Q, R, S, T, and U on the enclosed map in the Wenck report. These areas are almost always cropped straight through and do not have evidence of surface water on images prior to 1969, as is specifically protected by the Easement. Accordingly, under the terms of the Easement, we do not believe FWS purchased the right to protect these areas.

Third, the FWS map indicates one large 12.9-acre wetland along the eastern portion of the property. This area is identified as area L on the enclosed map. This area actually consists of two, smaller wetland areas – totaling 8.3 and 1.8 acres respectively. Area L is not one continuous wetland because there is higher ground in the middle that is consistently been farmed through and does not pond water.

Fourth, the FWS map indicates a 6.8-acre wetland in the northeastern portion of the property. This area is identified as area B on the enclosed map. The inundation and marsh vegetation in this area is much larger than the area drawn by FWS. Accordingly, we believe this area to approximately 14.9 acres, not 6.8.

Fifth, the FWS map indicates five medium sized wetlands of 2.5 acres, 2.8 acres, 0.6 acres, 1.3 acres, and 5.2 acres. These acres are identified as H, I, J, M, and V on the enclosed map. The actual inundation and marsh vegetation in these areas at the time the easement was conveyed is much smaller, however. We determined the inundation and marsh vegetation in these areas to be 1.64 acres, total.

Please see the enclosed report from Matt Retka that further details the above objections. Upon review, we do not object to the acres mapped for the sites labeled in the Wenck Report as C, D, E, & F. We reserve the right to supplement these objections as this matter progresses.

In accordance with the above, we respectfully request a meeting with you to discuss and review the concerns addressed in this letter. Please contact me (or my paralegal Kat Bundy) to let us know your availability for a meeting. Our office has videoconference technology, and we would be happy to arrange a meeting by such means if it is convenient for you. We ask that you please keep us informed of any decision on this matter or any alteration to the 2020 map of Easement 69X that your office may make.

[29364-0001/3723688/1]

Mr. Wayne Henderson
April 3, 2020
Page 4

Thank you for your attention to this matter. If you have any questions or need any additional information, please do not hesitate to contact me.

Sincerely,


*/s/ Kale R. Van Bruggen*
Kale R. Van Bruggen
KRV/JEE

Enclosure

cc:    Leonard & Patty Peterson (w/encls.)
       Cody Peterson (via email only w/encls.)
       Mr. Mick Ericson (via email only – michael_erickson@fws.gov w/encls.)



# Wetland Easement Review

**WENCK**

Responsive partner.
Exceptional outcomes.

**To:**      Cody Peterson

**Copy:**   Kale Van Bruggen, Rinke Noonan
             Jayne E. Esch, Rinke Noonan

**From:**   Matt Retka, Wenck Associates, Inc.

**Date:**   April 3rd, 2020

**Subject:** Wetland Easement Review: USFWS Easement 69X, LaMoure Co., ND

Wenck Associates, Inc. (Wenck) was retained by Mr. Cody Peterson to review selected mapped wetland areas recently provided by the USFWS in the West ½ of Section 2, Township 136 North, Range 61 West. This review focused on the "Wetland Areas Covered by the Provisions of the Easement" as identified on the attached USFWS map (See Attachment 1).

Wenck conducted a desktop review of the locations identified as "Wetland Areas Covered by Provisions of the Easement" by USFWS within the West half of Section 2 and created unique identification labels for each of these areas (i.e., A-V, see Attachment 1). Note that Wenck's investigation focused on areas requested for review by the landowner. The easement conveyance was completed in November 1963, and thus, the focus of the historic aerial review was on photographs near or prior to the date of the easement. To obtain a reasonable size subset from the time-period of the easement conveyance, review of all available site images through and including 1969 were included. These photos were geo-referenced using GIS software for the desktop analysis. Obtained historical aerial images from 1969 and prior are provided as Attachment 2. A summary of the results is provided as Attachment 3.

### Areas A, G, H, I, J, K, M, N, O, P, Q, R, S, T, U, and V.
Wenck reviewed Areas A, G, H, I, J, K, M, N, O, P, Q, R, S, T, U, V (16 in total) for indications of inundation. Areas A, G, K, N, O, P, Q, R, S, T and U (11 in total) revealed no indications of inundation on obtained images prior to 1969. Inundation was observed at areas H, I, J, M, and V (5 in total) at least once on the obtained historic photos. These areas of observed inundation were delineated using GIS, and found to be smaller than identified by the USFWS mapped boundaries. In some cases, the interpretation of inundation included what appeared to be areas of marsh vegetation potentially obscuring a more direct observation of inundation. The areas showing historically observable inundation corresponding to basins H, I, J, M, and V total 1.64 acres.

### Area B
Wenck reviewed historic aerial photos of Area B for the maximum signatures of wetness. These wetness signatures showing the likely maximum historic size of wetland at Area B was delineated, and totals 14.9 acres.

**Cody Peterson**
April 3, 2020



WENCK

Responsive partner.
Exceptional outcomes.

**Area L**

Wenck was requested to review area L and delineate the wetness signatures prevalent outside of cropped portions of this area. Wenck delineated a total of 9.9 acres, specifically focusing on signatures of wetness observed on the 1960 aerial photograph.

**Enclosures:**

Attachment 1: USFWS Wetland Easement Map (and Unique IDs)
Attachment 2: Pre-1969 Aerial Photographs
Attachment 3: Summary of Desktop Review

Attachment 1

69X
T. 136 N., R. 61 W.
SECTION 2, W1/2

LaMoure County, North Dakota



Scale: 1:10,560

0    0.1    0.2    0.4    0.6    0.8    1

Miles

The U.S. Fish & Wildlife Service (Service) has purchased and owns a perpetual easement which restricts the rights to drain, burn, fill or level any wetland areas depicted on this map. This map represents the Service's effort to depict the approximate sizes, shapes, and locations of all protected wetland areas and is not intended to depict water levels in wetland areas for any given year. Wetland area acre estimates are provided to demonstrate that mapped wetland areas are consistent with the acres for which the Service paid. Any other interpretation of the estimated wetland area acreages may lead to a mischaracterization of the easement conveyance. A permit is required from the Service before conducting activities that result in the draining, burning, filling or leveling of wetland areas identified on this map.

☐ Section Boundary

☐ Boundary of Easement Description

▨ Wetland Areas Covered by Provisions of the Easement

*Data Sources: Farm Service Agency; NAIP Imagery 2019, USFWS: Easement Boundary, BLM: Public Land Survey System (Sections). Map Date: 2/11/2020*

69X
T. 136 N., R. 61 W.
SECTION 2, W1/2

LaMoure County, North Dakota



Scale: 1:10,560

The U.S. Fish & Wildlife Service (Service) has purchased and owns a
perpetual easement which restricts the rights to drain, burn, fill or level
any wetland areas depicted on this map. This map represents the
Service's effort to depict the approximate sizes, shapes, and locations
of all protected wetland areas and is not intended to depict water levels
in wetland areas for any given year. Wetland area acre estimates are
provided to demonstrate that mapped wetland areas are consistent with
the acres for which the Service paid. Any other interpretation of the
estimated wetland area acreages may lead to a mischaracterization of
the easement conveyance. A permit is required from the Service before
conducting activities that result in the draining, burning, filling or leveling
of wetland areas identified on this map.

☐ Section Boundary

☐ Boundary of Easement Description

⬭ Wetland Areas Covered by Provisions
of the Easement

*Data Sources: Farm Service Agency: NAIP Imagery 2019, USFWS: Easement Boundary, BLM: Public Land Survey System (Sections). Map Date: 2/11/2020*

# Attachment 2



USFWS Identified Wetland Areas

W 1/2 Section 2

700    350    0    700    Feet

CODY A. PETERSON

October 24, 1941

WENCK
Responsive partner. Exceptional outcomes.

MAR 2020



USFWS Identified Wetland Areas
W 1/2 Section 2

700    350    0    700
Feet

CODY A. PETERSON
July 28, 1952

WENCK
Responsive partner. Exceptional outcomes.

MAR 2020



CODY A. PETERSON

August 13, 1957

MAR 2020



CODY A. PETERSON

August 8, 1964

WENCK
Responsive partner. Exceptional outcomes.

APR 2020



USFWS Identified Wetland Areas
W 1/2 Section 2

700   350   0   700
Feet
N

CODY A. PETERSON
June 3, 1969

WENCK
Responsive partner. Exceptional outcomes.

MAR 2020

Attachment 3



14.9 ac.
6.2 ac.
<0.1. ac.
0.5 ac.
0.7 ac.
<0.1ac.
<0.1 ac.
8.3 ac.
1.8 ac.
0.1 ac.
0.2 ac.

1969 & Prior Inundated Areas-1.64 ac.
Area B
Wet Areas (L)
Easement_Boundary

June 3, 1969 Image, USGS
700    350    0    700
Feet
N

CODY A. PETERSON
Summary of Desktop Review

WENCK
Responsive partner. Exceptional outcomes.

APR 2020



14.9 ac.
6.2 ac.
8.3 ac.
<0.1. ac.
0.5 ac.
<0.1ac.
0.7 ac.
<0.1 ac.
1.8 ac.
0.1 ac.
0.2 ac.

| | 1969 & Prior Inundated Areas-1.64 ac. |
| | Area B |
| | Wet Areas (L) |
| | Easement_Boundary |
| | USFWS_Wetland_Areas |

June 3, 1969 Image, USGS

700    350    0         700
Feet

N

Path: U:\GIS\0742\0001\Pro\Peterson_USFWS\Peterson_USFWS.aprx
4/3/2020 2:15 PM  RevMH0005  Layout: Historic Aerial Maps

| CODY A. PETERSON |  | APR 2020 |
| Summary of Desktop Review with USFWS Areas | Responsive partner. Exceptional outcomes. | |



# United States Department of the Interior



FISH AND WILDLIFE SERVICE
1 First Street; P.O. Box E
Kulm, North Dakota  58456

In Reply Refer to:
LaMoure 69X

April 30, 2020

Kale Van Bruggen
Suite 300 U.S. Bank Plaza
1015 West German St.
P.O. Box 1497
St. Cloud, MN.  56302

Dear Mr. Van Bruggen:

This letter serves as a written decision to your objection letter written on behalf of Leonard,
Patty, and Cody Peterson dated April 3, 2020.  The map objection is in reference to LaMoure
County 69X (T.136 N., R. 61 W., Section 2, W 1/2).

**Responses to your specific *Objections to 2020 mapping***

Objection 1 – The USFWS determines the presence of and the approximate size, shape and
location of wetland areas using all available resources.  Mapping resources that we use are not
limited to aerial photos taken before the easement acquisition.  Resources used to determine the
presence of and the approximate size, shape and location of wetland areas may include, but are
not limited to, all available aerial imagery, soils information, topographic data and field visits.

Objection 2 – The presence of surface water in photography near the time of acquisition is not a
requirement for mapping wetland areas.  Wetlands do not cease being protected when they
naturally dry or are devoid of marsh vegetation.  Cropping of wetland areas is common and
allowed by the terms of the easement.  The easement language states the following: "any surface
water including lakes, ponds, marshes, sloughs, swales, swamps, or potholes now existing or
reoccurring due to natural causes" and "surface water or marsh vegetation is now existing or
hereafter reoccurs due to natural causes" and "this indenture imposes no other obligations or
restrictions…in any way be restricted from carrying on farming practices such as grazing, hay
cutting, plowing, working and cropping wetlands when the same are dry of natural causes…"

Objection 3 & 5 – Wetland areas are hydrologically dynamic systems with expanding and
contracting water levels.  The map represents the FWS effort to depict the approximate size,
shapes and locations of all protected wetland areas, and is not intended to depict water levels in
wetland areas in any given year.  We have reviewed all available photography and made

| INTERIOR REGION 5 | INTERIOR REGION 7 |
|---|---|
| MISSOURI BASIN | UPPER COLORADO RIVER BASIN |
| KANSAS, MONTANA*, NEBRASKA, NORTH DAKOTA, SOUTH DAKOTA | COLORADO. NEW MEXICO. UTAH. WYOMING |

*PARTIAL

adjustments where deemed appropriate. When referencing the attached map, wetland areas N, Q and T have been removed. We also reviewed many years of photography and determined that Wetland L often appears as one continuous wetland as mapped. I do agree that there is likely higher ground that reappears during drier periods and this higher ground is able to be farmed which is allowed by the terms of the easement contract.

Objection 4 – Wetland B. In situations where more wetland area is present than the purchased summary acreage, the FWS will first remove areas with weak signatures on older imagery. Second, the FWS will then remove wetland areas with potential health and safety issues and non-typical wetlands. Third, the FWS will then consider biological factors and remove wetland areas that were not the focus of the Small Wetlands Acquisition Program. This includes ephemeral, lacustrine and semi-permanent wetlands. Temporary and seasonal wetlands are the last wetland areas to be removed from the map. Fourth, to produce the map to the summary acreage, semi-permanent wetlands were mapped at definable lobes within the larger basins that would likely hold water as the water level in the basins decrease. The FWS utilized and adhered to all four criteria to produce this map.

Based on a review of the aerial imagery available for this easement, I have determined that the easement map represents the approximate size, shape and locations of all protected wetland areas. It is important to note that the polygons will not always align perfectly with the underlying imagery due to annual fluctuations in water levels and the time of year the images were taken. The total mapped area is within the easement summary acreage and all mapped areas were determined to be wetland areas suitable for use as waterfowl production areas. This map is considered final unless your clients exercise their appeal rights as outlined in the original certified letter previously sent.

Sincerely,

Mick Erickson
Refuge Manager
Kulm Wetland Management District

69X
T. 136 N., R. 61 W.
SECTION 2, W1/2

LaMoure County, North Dakota



Scale: 1:10,560

| 0 | 0.1 | 0.2 | 0.4 | 0.6 | 0.8 | 1 |

Miles

The U.S. Fish & Wildlife Service (Service) has purchased and owns a perpetual easement which restricts the rights to drain, burn, fill or level any wetland areas depicted on this map. This map represents the Service's effort to depict the approximate sizes, shapes, and locations of all protected wetland areas and is not intended to depict water levels in wetland areas for any given year. Wetland area acre estimates are provided to demonstrate that mapped wetland areas are consistent with the acres for which the Service paid. Any other interpretation of the estimated wetland area acreages may lead to a mischaracterization of the easement conveyance. A permit is required from the Service before conducting activities that result in the draining, burning, filling or leveling of wetland areas identified on this map.

☐ Section Boundary

☐ Boundary of Easement Description

⬭ Wetland Areas Covered by Provisions of the Easement

*Data Sources: Farm Service Agency: NAIP Imagery 2019, USFWS: Easement Boundary, BLM: Public Land Survey System (Sections). Map Date: 5/1/2020*