**Administrative Record Index, *Peterson v. United States* , Case No. 3:25-cv-00078**
**Drain Tile Rule**

| *Bates No.* | *Date* | *Document* | *Document Name* |
|---|---|---|---|
| **Applicable Laws, Regulations, Policies** | | | |
| AR000065 | 2/26/2020 | Guidance | Guidance Memo Drain Tile Setbacks Wetland Easements |
| AR000002 | 2022 | Webpage | Advanced Notice of Proposed Rule Making or other Fed Reg Notices |
| AR000004 | 11/29/2022 | Document | Categorical Exclusion Checklist for NEPA Compliance_Drain Tile Setback Rule |
| AR000006 | 4/28/2023 | Document | National Wildlife Refuge System; Drain Tile Setback Proposed Rule, Draft to Federal Register |
| AR000023 | 4/28/2023 | Federal Re | National Wildlife Refuge System; Drain Tile Setback Proposed Rule, Federal Register Notice |
| AR000078 | 2/6/2024 | Document | Standard Operating Procedures for the Computation of Agriculture Drain Tile Setback Recommendations on U.S. Fish and Wildlife S |
| AR000003 | 4/22/2024 | Document | Drain Tile Setback Distances on Wetland Easements Memo |
| AR000028 | 5/13/2024 | Document | National Wildlife Refuge System; Drain Tile Setback Final Rule, Draft to Federal Register |
| AR000067 | 5/13/2024 | Federal Re | National Wildlife Refuge System; Drain Tile Setback Final Rule, Federal Register |
| | | | |
| **Public Comments** | | | |
| AR000085 | 6/9/2023 | Public Com | Public Comment FWS-HQ-NWRS-2022-0092-0002 |
| AR000090 | 6/26/2023 | Public Com | Public Comment FWS-HQ-NWRS-2022-0092-0005 |
| AR000092 | 6/26/2023 | Public Com | Public Comment FWS-HQ-NWRS-2022-0092-0006 |
| AR000094 | 6/26/2023 | Public Com | Public Comment FWS-HQ-NWRS-2022-0092-0007 |
| AR000096 | 6/26/2023 | Public Com | Public Comment FWS-HQ-NWRS-2022-0092-0008 |
| AR000087 | 6/27/2023 | Public Com | Public Comment FWS-HQ-NWRS-2022-0092-0004 |
| AR000111 | 6/27/2023 | Public Com | Public Comment FWS-HQ-NWRS-2022-0092-0009 |
| **References** | | | |
| AR000116 | May-22 | Guidance | NRCS National Engineering Handbook: Title 210 Part 650 Chapter 19 |

**Administrative Record Index, *Peterson v. United States* , Case No. 3:25-cv-00078**
**Peterson Wetland Easement**

| *Bates No.* | *Date* | *Document* | *Document Name* |
|---|---|---|---|
| **Applicable Laws, Regulations, Policies** | | | |
| AR000178 | 2010 | Memo | 2010 Easement Manual Cover Memo |
| AR000180 | 2010 | Document | 2010 Region 6 Easement Manual |
| AR000834 | Jan-15 | Document | 2015 USFWS Manual, Chapter 6, Administration of National Wildlife Refuge System Conservation Easements (601 FW 6) |
| AR000853 | 2016 | Document | 2016 R3 R6 PPR Easement Manual |
| AR001341 | 12/23/2019 | Memo | 2019 Memo Template for a Revised Format for Pre-1976 Wetland Easement Maps |
| AR001344 | 7/13/2021 | Guidance | 2021 Chief Signed Memo Updated Guidance |
| AR001345 | Oct-22 | Document | Conservation Easement Handbook |
| AR001375 | Oct-22 | Document | 2022 USFWS Manual, Chapter 6, Administration of National Wildlife Refuge System Conservation Easements (601 FW 6) |
| **Easement Documents** | | | |
| AR001614 | 4/22/1964 | Document | LA 69X - Contract |
| AR001668 | 4/22/1964 | Docment | LA 69X - Easement Summary |
| AR001669 | 2/10/2015 | Map | LA 69X - 2015 Easement Map |
| AR001670 | 2/10/2015 | Document | LA 69X - Easement Mapping References |
| AR001671 | 2/19/2016 | Document | LA 69X - Wetland Easement Mapping Progress Form |
| AR001673 | 2/11/2020 | Map | LA 69X - Supplemental Map |
| AR001672 | 2/11/2020 | Map | LA 69X - Revised Supplemental Map |
| AR001674 | 5/1/2020 | Map | LA 69X - V2 Supplemental Map |
| AR001675 | 7/9/2020 | Map | LA 69X - V2 Revised Supplemental Map Final |
| AR001675 | 7/9/2020 | Map | LA 69X - V3 Supplemental Map Final |
| **Communications with Landowner** | | | |
| AR001405 | 1/5/2012 | Letter | 2012 Peterson Notification Letter |
| AR001407 | 2/18/2016 | Letter | 2016 Peterson Mapping Letter |
| AR001411 | 1/4/2018 | Letter | 2018 Peterson Notification Letter |
| AR001414 | 2/24/2020 | Memo | Memo to File 2_24_20 |
| AR001415 | 3/18/2020 | Email | Appeal Timeline Email |
| AR001419 | 3/18/2020 | Memo | Memo to File 3_18_20 |
| AR001420 | 3/23/2020 | Email | Records Request Email |
| AR001422 | 3/23/2020 | Documents | Records Request Attachments Folder |
| AR001425 | 4/3/2020 | Email | Manager Objection Email |
| AR001426 | 4/3/2020 | Letter | Van Bruggen letter to Refuge Manager (easement objections) |
| AR001430 | 4/3/2020 | Document | Wenck_Wetland Easement Review |
| AR001445 | 5/1/2020 | Email | Manager Determination Letter_Email |
| AR001450 | 5/28/2020 | Letter | Van Bruggen letter to Regional Director (Appeal) |
| AR001481 | 7/1/2020 | Document | RD Listening Session Notes |
| AR001486 | 7/9/2020 | Letter | Regional Director Statement of Finding |
| AR001490 | 8/7/2020 | Letter | Van Bruggen letter to Director (Appeal) |
| AR001599 | 3/25/2021 | Letter | Director Statement of Finding |
| AR001602 | 5/23/2023 | Photocopy | Call Memo - Setback Request LA 69X, 113X |
| AR001603 | 6/13/2023 | Map | LA 69X - Recommended Setback Map |
| AR001604 | 6/14/2023 | Email | LA 69X - Email Recommended Setback Map |
| **General References/Literature** | | | |
| | | Photograph | NW LaMoure (all pdfs) |
| | | Photograph | SW LaMoure (all pdfs) |

Case 3:25-cv-00078-PDW-ARS Document 21-1 Filed 05/21/26 Page 2 of 506

# RIN Data

**DOI/FWS** **RIN:** 1018-BG80 **Publication ID:** Spring 2022

**Title:** ●Drain Tile Setback Rule

**Abstract:**

This rulemaking action would create new regulations pertaining to wetland easements to bring consistency, transparency, and clarity for both easement landowners and the agency in the administration of conservation easements. The regulations will better protect encumbered wetland areas and provide greater transparency and certainty to landowners by codifying the process by which the Service establishes drain tile setbacks to protect wetland easement contracts.

**Agency:** Department of the Interior(DOI)

**Priority:** Substantive, Nonsignificant

**RIN Status:** First time published in the Unified Agenda

**Agenda Stage of Rulemaking:** Proposed Rule Stage

**Major:** No

**Unfunded Mandates:** No

**CFR Citation:** 50 CFR 25

**Legal Authority:** 16 U.S.C. 460k to 460k-4 16 U.S.C. 661 to 667e 16 U.S.C. 667b to 667d 16 U.S.C. 668dd to 668ee 16 U.S.C. 715k-3 to 715k-5 16 U.S.C. 718d 16 U.S.C. 742a to 754d 16 U.S.C. 1531 to 1543 16 U.S.C. 1601 to 1624 16 U.S.C. 3901 16 U.S.C. 4401 to 4412

**Legal Deadline:** None

**Timetable:**

| Action | Date | FR Cite |
|---|---|---|
| NPRM | 09/00/2022 | |

**Regulatory Flexibility Analysis Required:** No

**Government Levels Affected:** Federal

**Federalism:** No

**Included in the Regulatory Plan:** No

**RIN Data Printed in the FR:** No

**Agency Contact:**

Debbie L. DeVore
Deputy Chief, Division of Natural Resources and Conservation Planning
Department of the Interior
United States Fish and Wildlife Service
5275 Leesburg Pike, MS: NWRS,
Falls Church, VA 22041
Phone:251 604-1383
Email: debbie_devore@fws.gov

Give Feedback

# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Midwest Region
Mountain-Prairie Region

IN REPLY REFER TO:
FWS/R3/NWRS
FWS/R6/NWRS

**DATE:** April 22, 2024

**TO:** Refuge Managers, National Wildlife Refuge System, Region 3 and Region 6

**FROM:** Assistant Regional Director, National Wildlife Refuge System, Region 3 CHRISTOPHER JENSEN Digitally signed by CHRISTOPHER JENSEN Date: 2024.05.08 11:05:44 -05'00'
Assistant Regional Director, National Wildlife Refuge System, Region 6 Digitally signed by STACY ARMITAGE Date: 2024.05.08 10:20:36 -06'00'

**SUBJECT:** Drain Tile Setback Distances on Wetland Easements

The U.S. Fish & Wildlife Service's (Service) procedures for providing drain tile setback recommendations on wetland easements are described in the attached *Standard Operating Procedures for the Computation of Agriculture Drain Tile Setback Recommendations on U.S. Fish and Wildlife Service Wetland Easements in Regions 3 and 6, version 02/06/2024*. The methodology outlined here is based upon the best available science and ensures that tile installations on wetland easement tracts remain compliant with the easement provisions by ensuring that no protected wetland areas are drained. These procedures will be updated as necessary and accordingly should improved science or methodology become available.

If you have questions or need further guidance, please contact your regional drain tile lead.

Region 3 Lead: Josh Eash
Region 6 Lead: Mark Larson

**ATTACHMENT:** Standard Operating Procedures for the Computation of Agriculture Drain Tile Setback Recommendations on U.S. Fish and Wildlife Service Wetland Easements in Regions 3 and 6, version 02/06/2024

## CATEGORICAL EXCLUSION CHECKLIST FOR NEPA COMPLIANCE

**Proposed Action:**

This rulemaking action would create new regulations pertaining to easement lands protected by a U.S. Fish and Wildlife Service (Service) Easement for Waterfowl Management Rights (commonly referred to as a Wetland Easement) in the Prairie Pothole Region of Iowa, Minnesota, Montana, North Dakota, and South Dakota. The regulations clarify that drain tile may be installed on lands encumbered by a wetland easement provided protected wetland areas are not drained, directly or indirectly. Upon the request of a landowner, the Service will provide setback distances for the placement of drain tile on lands covered by wetland easements. Additionally, the regulations provide assurance to landowners by clarifying that landowners who adhere to the setback distances prescribed by the Service will not be required to remove drain tile that is later found to have an adverse effect on protected wetland areas.

**This proposed action is covered by the following categorical exclusion:**

(i) Policies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the National Environmental Policy Act (NEPA) process, either collectively or case-by-case.

The regulations memorialize existing Service practice in administering minimally restrictive wetland easements.

**Extraordinary Circumstances (43 CFR 46.215) :**
**Could This Proposed Action** *(check ( ✓ ) yes or no for each item below)*:

| Yes | No | |
|---|---|---|
| ☐ | ☒ | a. Have significant adverse effects on public health or safety? |
| ☐ | ☒ | b. Have significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands (EO 11990); floodplains (EO 11988); national monuments; migratory birds; and other ecologically significant or critical areas? |
| ☐ | ☒ | c. Have highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources [NEPA section 102(2)(E)]? |
| ☐ | ☒ | d. Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks? |
| ☐ | ☒ | e. Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects? |
| ☐ | ☒ | f. Have a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects? |
| ☐ | ☒ | g. Have significant impacts on properties listed, or eligible for listing, on the National Register of Historic Places as determined by the bureau? |

☐ ☒ h. Have adverse effects on species listed or proposed to be listed on the List of Endangered or Threatened Species, or have significant impacts on designated Critical Habitat for these species?

☐ ☒ i. Violate a Federal law, or a State, local, or tribal law or requirement imposed for the protection of the environment?

☐ ☒ j. Have a disproportionately high and adverse effect on low income or minority populations (EO 12898).

☐ ☒ k. Limit access to and ceremonial use of Indian sacred sites on Federal lands by Indian religious practitioners or significantly adversely affect the physical integrity of such sacred sites (EO 13007).

☐ ☒ l. Contribute to the introduction, continued existence, or spread of noxious weeds or non-native invasive species known to occur in the area or actions that may promote the introduction, growth, or expansion of the range of such species (Federal Noxious Weed Control Act and EO 13112).

☐ ☒ m. Have material adverse effects on resources requiring compliance with Executive Order 11988 (Floodplain Management), Executive Order 11990 (Protection of Wetlands), or the Fish and Wildlife Coordination Act?

*(If any of the above exceptions receive a "Yes" check (✓) , an EA/EIS must be prepared.)*

---

*Within the spirit and intent of the Council of Environmental Quality's regulations for implementing the National Environmental Policy Act (NEPA) and other statutes, orders, and policies that protect fish and wildlife resources, I have established the following administrative record and have determined:*

☒ **The proposed action is covered by a categorical exclusion as provided by 43 CFR §46.210 or 516 DM 8.5. No further NEPA documentation will therefore be made.**

☐ **An Extraordinary Circumstance could exist for the proposed action and, so an EA/EIS must be prepared.**

**Service signature approval:**

Signature: DEBBIE DEVORE Digitally signed by DEBBIE DEVORE Date: 2022.11.22 13:04:48 -05'00' Date: ______________

Title: Deputy Chief, Division of Natural Resources and Conservation Planning

Signature: SHAUN SANCHEZ Digitally signed by SHAUN SANCHEZ Date: 2022.11.29 09:49:10 -05'00' Date: ______________

Title: Chief, National Wildlife Refuge System

**Billing Code 4333-15**

**DEPARTMENT OF THE INTERIOR**

**Fish and Wildlife Service**

**50 CFR Part 25**

**[Docket No. FWS-HQ-NWRS-2022-0092; FXRS12610900000-212-FF09R20000]**

**RIN 1018–BG80**

**National Wildlife Refuge System; Drain Tile Setbacks**

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Proposed rule.

**SUMMARY:** We, the U.S. Fish and Wildlife Service (Service), propose new regulations pertaining to wetland easements to bring consistency, transparency, and clarity for both easement landowners and the Service in the administration of conservation easements, pursuant to the National Wildlife Refuge Administration Act of 1966, as amended by the National Wildlife Refuge System Improvement Act of 1997. The proposed regulations would codify the process by which the Service establishes drain tile setbacks in wetland easement contracts. Setback distances would be calculated based upon the best available science considering soil characteristics, tile diameter, the depth of the tile below the surface, and/or topography sufficient to the easement contract's standard of protection that ensures no drainage of adjacent protected wetland areas. The proposed regulations would apply only to setbacks provided by the Service beginning on the effective date of the final rule.

**DATES:** *Written comments:* We will accept comments received or postmarked on or before [INSERT DATE 60 DAYS AFTER DATE OF PUBLICATION IN THE *FEDERAL REGISTER*].

*Information collection requirements:* If you wish to comment on the information collection requirements in this proposed rule, please note that the Office of Management and Budget (OMB) is required to make a decision concerning the collection of information contained in this proposed rule between 30 and 60 days after publication of this proposed rule in the *Federal Register*. Therefore, comments should be submitted to OMB by [INSERT DATE 60 DAYS AFTER DATE OF PUBLICATION IN THE *FEDERAL REGISTER*].

**ADDRESSES:** *Written comments:* You may submit comments by one of the following methods:

- *Electronically*: Go to the Federal eRulemaking Portal: *https://www.regulations.gov.* In the Search box, type in FWS-HQ-NWRS-2022-0092, which is the docket number for this rulemaking. Then, click on the Search button. On the resulting screen, find the correct document and submit a comment by clicking on "Comment."

- *By hard copy*: Submit by U.S. mail or hand delivery: Public Comments Processing, Attn: FWS-HQ-NWRS-2022-0092; U.S. Fish and Wildlife Service; 5275 Leesburg Pike, MS: PRB (JAO/3W); Falls Church, VA 22041–3803.

We will not accept e-mail or faxes. We will post all comments on *https://www.regulations.gov.* This generally means that we will post any personal information you provide us (see **Request for Comments**, below, for more information).

*Information collection requirements*: Written comments and suggestions on the information collection requirements should be submitted by the date specified above in **DATES** to *https://www.reginfo.gov/public/do/PRAMain*. Find this particular information collection by selecting "Currently under Review – Open for Public Comments" or by using the search function. Please provide a copy of your comments to the Service Information Collection Clearance Officer, U.S. Fish and Wildlife Service, 5275 Leesburg Pike, MS: PRB (JAO/3W),

Falls Church, VA 22041–3803 (mail); or Info_Coll@fws.gov (email). Please reference "OMB Control Number 1018–New Drain Tile Setbacks" in the subject line of your comments.

**FOR FURTHER INFORMATION CONTACT:** Debbie DeVore, (251) 604–1383. Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:**

**Background**

Wetland habitat in the Prairie Pothole Region (PPR) of Iowa, Minnesota, Montana, North Dakota, and South Dakota is critically important to waterfowl and other migratory bird populations. The unique topography of the PPR includes the numerous small wetlands and potholes typical of the PPR that were formed through glaciation thousands of years ago. Prairie potholes are freshwater depressions and marshes, often less than 2 feet deep and 1 acre in size, that are a permanent feature of these landscapes barring deliberate alteration of the topography or hydrology. What makes the PPR so biologically important to waterfowl is the seasonal fluctuation of surface water through these permanent wetlands basins. The PPR is responsible for producing approximately 50 to 75 percent of the primary species of ducks on the North American continent, providing habitat for more than 60 percent of the breeding population. Waterfowl fledged in the PPR are a significant natural resource that supports waterfowl hunting and an associated industry that creates an estimated 30,000 jobs and nearly $1 billion in economic benefit.

Congress, recognizing the impact that widespread drainage was having on wetlands and waterfowl populations in the PPR, officially created the Small Wetlands Acquisition Program on

August 1, 1958, by amending the 1934 Migratory Bird Hunting Stamp Act (commonly referred to as the “Duck Stamp Act”). The amendment allowed proceeds from the sale of Federal Duck Stamps to be used to conserve and protect “small wetland and pothole areas” through the acquisition and establishment of areas designated as Waterfowl Production Areas (WPAs). The Service purchased the first fee-title WPA in South Dakota in 1959 and began to purchase wetland easements soon thereafter. The acquisition of wetland easements accelerated across the PPR following the passage of the 1961 Wetlands Loan Act (Public Law 87–383), which authorized appropriations to advance funding for the purchase of wetland easements. Wetland easements are part of the National Wildlife Refuge System, governed by the National Wildlife Refuge System Administration Act (hereafter, “the Administration Act”; 16 U.S.C. 668dd, et seq.).

**Wetland Easements**

This proposed rulemaking action would create new regulations pertaining to easement lands protected by a Service easement for waterfowl management rights (commonly referred to as a “wetland easement”) in the PPR. The easements are areas of land or water acquired and administered by the Service with a less than fee interest for the purpose of maintaining small wetland or pothole areas suitable for use as WPAs.

A wetland easement is a voluntary legal agreement with the Service that pays landowners to permanently protect wetlands. The easement contains restrictions on the use or development of the land to protect its conservation values. The Service’s wetland easements are minimally restrictive conservation easements, meaning that they have a minimal impact on the property value and limit the landowner’s use and enjoyment of the property to a minor degree. Landowners who sell a wetland easement to the Service agree that wetlands protected by an

easement cannot be drained, filled, leveled, or burned. If these wetlands dry up naturally, they can be farmed, grazed, or hayed.

**Drain Tiles**

Traditionally, the purpose of subsurface agricultural drainage has been to lower the water table of poorly drained soils with the goal of improving soil aeration. Recently, advanced drainage systems have been promoted as a way to manipulate soil water content during the growing season. Subsurface drainage systems typically remove water through perforated pipe (commonly referred to as drain tile) placed below the soil surface.

Drain tile positioned adjacent to wetland areas can result in reduced hydroperiods (periods of inundation) depending on several factors, such as the depth of tile in relation to the wetland area. The amount and timing of precipitation intercepted by subsurface drainage systems will vary depending on soil properties, topography (low/high topographic relief), placement of tile relative to the wetland area (horizontal distance, elevation), and the relation between the wetland area and groundwater (i.e., recharge, discharge). Direct drainage of a wetland area by placing perforated tile and surface inlet pipes through (beneath) the wetland area would have a detrimental effect on wetland hydrology regardless of other factors.

Drainage systems positioned adjacent to a wetland area in low-relief terrain have the potential to indirectly affect the wetland area through lateral drainage (lateral effect). The lateral effect is defined as the perpendicular distance on either side of a tile pipe where soil water can be drained by the tile. Drainage systems positioned to encircle a wetland area completely or partially in high-relief terrain can intercept groundwater and precipitation runoff to the wetland area depending on the previously mentioned factors.

**This Proposed Rule**

The proposed regulations in this document clarify that drain tile may be installed on lands encumbered by a wetland easement provided that protected wetland areas are not drained, directly or indirectly. This proposed rule distinguishes Service wetland easements from the "Swampbuster" provisions of the Food Security Act of 1985 (also known as the "Farm Bill"; Pub. L. 99–198), which allow drain tile to have a "minimal effect" to wetlands. Service wetland easement agreements with landowners include provisions that allow for no effect; hence, the proposed regulations would clarify that tile may be installed on a wetland easement tract provided that the tile does not drain a protected wetland area.

Because the impact of a given drainage system on wetland areas varies greatly depending on site conditions, the Service will provide individual drain tile setback distances to landowners. The proposed regulations would require the Service to establish drain tile setback distances based upon the best available science, considering soil characteristics, tile diameter, the depth of the tile below the surface, and/or topography that ensure protected wetland areas are not drained. Furthermore, the Service will provide these setback distances to landowners upon request.

Additionally, we propose that landowners who adhere to the setback distances prescribed by the Service, including the tile diameters and tile depths below the surface that were used to calculate the Service-provided drain tile setback distances, will not be required to remove drain tile that is later found to have an adverse effect on protected wetland areas. These proposed regulations recognize that our understanding of the effects that drain tile may have on wetland hydrology is an evolving science. Service-provided drain tile setback distances may prove inadequate to fully protect easement wetland areas from drainage. However, landowners who coordinate their tiling plans with the Service and adhere to the Service-determined setback distances would not later be held criminally responsible or civilly liable for disturbing, injuring,

or destroying a unit of the National Wildlife Refuge System (i.e., draining a protected wetland area) provided the subsurface drainage system is not modified, enhanced, or replaced.

**Proposed Amendments to Existing Regulations**

This document proposes to codify in the Code of Federal Regulations the following provisions:

(1) Within a Service-provided timeframe, the Service will provide setback distances for the placement of drain tile on lands covered by wetland easements in Iowa, Minnesota, Montana, North Dakota, and South Dakota;

(2) the Service will provide guidance to landowners about what materials should be submitted as part of a request; and

(3) when a landowner coordinates tile planning with the Service in accordance with this guidance and adheres to the Service-provided drain tile setback distances, including the tile diameters and tile depths below the surface that were used to calculate the Service-provided drain tile setback distances, the Service will not seek legal redress if it is later determined that the Service-provided drain tile setback distances failed to protect the wetland areas from drainage, provided that the drain tile has not been modified, enhanced, or replaced.

The regulations would apply only to setbacks provided by the Service beginning on the effective date of the final rule.

**Statutory Authority**

The Administration Act, as amended by the National Wildlife Refuge System Improvement Act of 1997 (hereafter, "the Improvement Act"; Pub. L. 105–57), governs the administration and public use of refuges.

Amendments enacted by the Improvement Act were built upon the Administration Act in a manner that provides an "organic act" for the Refuge System, similar to organic acts that exist

for other public Federal lands. The Improvement Act serves to ensure that we effectively manage the Refuge System as a national network of lands, waters, and interests for the protection and conservation of our Nation's wildlife resources. The Administration Act states first and foremost that we focus our Refuge System mission on the conservation of fish, wildlife, and plant resources and their habitats. The Act contains 14 directives to the Secretary, one of which states that, in administering the Refuge System, the Secretary shall ensure effective coordination, interaction, and cooperation with owners of land adjoining refuges. The Administration Act also authorizes the Secretary to issue regulations to carry out the purposes of the Act.

**Request for Comments**

You may submit comments and materials on this proposed rule by any one of the methods listed in **ADDRESSES**. We will not accept comments sent by e-mail or fax or to an address not listed in **ADDRESSES**. We will not consider hand-delivered comments that we do not receive, or mailed comments that are not postmarked, by the date specified in **DATES**.

We will post your entire comment on *https://www.regulations.gov.* Before including personal identifying information in your comment, you should be aware that we may make your entire comment—including your personal identifying information—publicly available at any time. While you can ask us in your comment to withhold your personal identifying information from public review, we cannot guarantee that we will be able to do so. We will post all hardcopy comments on *https://www.regulations.gov.*

**Required Determinations**

*Clarity of This Proposed Rule*

Executive Orders 12866 and 12988 and the Presidential Memorandum of June 1, 1998, require us to write all rules in plain language. This means that each rule we publish must:

(a) Be logically organized;

(b) Use the active voice to address readers directly;

(c) Use clear language rather than jargon;

(d) Be divided into short sections and sentences; and

(e) Use lists and tables wherever possible.

If you feel that we have not met these requirements, send us comments by one of the methods listed in **ADDRESSES**. To better help us revise the rule, your comments should be as specific as possible. For example, you should tell us the numbers of the sections or paragraphs that are unclearly written, which sections or sentences are too long, the sections where you feel lists or tables would be useful, etc.

*Regulatory Planning and Review (Executive Orders 12866 and 13563)*

Executive Order 12866 provides that the Office of Information and Regulatory Affairs (OIRA) will review all significant rules. OIRA has determined that this rulemaking is not significant.

Executive Order (E.O.) 13563 reaffirms the principles of E.O. 12866 while calling for improvements in the nation's regulatory system to promote predictability, to reduce uncertainty, and to use the best, most innovative, and least burdensome tools for achieving regulatory ends. The executive order directs agencies to consider regulatory approaches that reduce burdens and maintain flexibility and freedom of choice for the public where these approaches are relevant, feasible, and consistent with regulatory objectives. E.O. 13563 emphasizes further that regulations must be based on the best available science and that the rulemaking process must allow for public participation and an open exchange of ideas. We have developed this rule in a manner consistent with these requirements.

*Regulatory Flexibility Act*

Under the Regulatory Flexibility Act (RFA; 5 U.S.C. 601 et seq., as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA) of 1996)), whenever an agency must publish a notice of rulemaking for any proposed or final rule, it must prepare and make available for public comment a regulatory flexibility analysis that describes the effects of the rule on small entities. However, no regulatory flexibility analysis is required if the head of the agency certifies the rule will not have a significant economic impact on a substantial number of small entities. SBREFA amended the RFA to require Federal agencies to provide a statement of the factual basis for certifying that the rule will not have a significant economic impact on a substantial number of small entities. Thus, for a regulatory flexibility analysis to be required, impacts must exceed a threshold for "significant impact" and a threshold for a "substantial number of small entities." See 5 U.S.C. 605(b).

Within the Prairie Pothole Region (comprising Iowa, Minnesota, North Dakota, South Dakota, and Montana), there are approximately 28,000 wetland easements, of which the majority are located on privately owned farmland. Thus, small businesses within the crop production industry (North American Industry Classification System 111) may be impacted by the proposed rule. One aspect of the proposed rule codifies the Service's existing drain tile setback practices; therefore, the effect of this regulatory provision on small businesses would be negligible. The proposed rule also provides legal certainty for landowners who adhere to the setback distances prescribed by the Service. The information collection form to request the setback distances is estimated to take 15 minutes, which would be negligible for small businesses. Currently, approximately 20 landowners annually (less than 0.01 percent) must remove drain tile systems because they do not adhere to the contract that granted the easement. As a result of the added benefit of legal certainty, the proposed rule may provide the incentive to these landowners to adhere to the contract and, thus, reduce the costs of removing drain tile systems. The average

annual number of small businesses (20) potentially impacted by this rulemaking is not substantial.

Therefore, we certify that this rule, as proposed, would not have a significant economic effect on a substantial number of small entities as defined under the Regulatory Flexibility Act (5 U.S.C. 601 et seq.). An initial regulatory flexibility analysis is not required. Accordingly, a small entity compliance guide is not required.

*Congressional Review Act*

The proposed rule is not a major rule under 5 U.S.C. 804(2), the Congressional Review Act. We anticipate no significant employment or small business effects. This proposed rule:

a. Would not have an annual effect on the economy of $100 million or more. The minimal impact would be scattered across five States and would most likely not be significant in any local area.

b. Would not cause a major increase in costs or prices for consumers; individual industries; Federal, State, or local government agencies; or geographic regions.

c. Would not have significant adverse effects on competition, employment, investment, productivity, innovation, or the ability of U.S.-based enterprises to compete with foreign-based enterprises.

*Unfunded Mandates Reform Act*

This proposed rule would not impose an unfunded mandate on State, local, or Tribal governments or the private sector of more than $100 million per year. The proposed rule would not have a significant or unique effect on State, local, or Tribal governments or the private sector. A statement containing the information required by the Unfunded Mandates Reform Act (2 U.S.C. 1531 et seq.) is not required.

*Takings (E.O. 12630)*

In accordance with E.O. 12630, this proposed rule would not have significant takings implications. A takings implication assessment is not required. The proposed rule does not have any takings implications because it would not impact protected property rights. The proposed rule provides clarity and standardization of the Service's existing process for providing drain tile setback distances to landowners and provides landowners with legal protection when they choose to follow the Service's setback distances. The proposed rule would not require landowners to consult the Service regarding setback distances, nor would it require landowners to follow the Service's setback distances if they are provided.

*Federalism (E.O. 13132)*

Under the criteria in section 1 of Executive Order 13132, this proposed rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement. A federalism summary impact statement is not required.

*Civil Justice Reform (E.O. 12988)*

In accordance with E.O. 12988, the Department of the Interior has determined that this proposed rule would not unduly burden the judicial system and that it meets the requirements of sections 3(a) and 3(b)(2) of the Order.

*Energy Supply, Distribution or Use (E.O. 13211)*

This proposed rule is not a significant energy action under the definition in Executive Order 13211. A statement of energy effects is not required.

*Consultation and Coordination with Indian Tribal Governments (E.O. 13175)*

The Department of the Interior strives to strengthen its government-to-government relationship with Indian Tribes through a commitment to consultation with Indian Tribes and recognition of their right to self-governance and Tribal sovereignty. We have evaluated this

proposed rule under Executive Order 13175 and have determined that it has no substantial direct effects on federally recognized Indian Tribes.

*Paperwork Reduction Act (PRA)*

This proposed rule contains new information collections. All information collections require approval under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 et seq.). We may not conduct or sponsor and you are not required to respond to a collection of information unless it displays a currently valid Office of Management and Budget (OMB) control number. The new reporting and/or recordkeeping requirement associated with requests for drain tile setbacks described below requires approval by OMB:

**Requests for Drain Tile Setbacks (FWS Form 3–2554)**

Upon the request of a landowner (via submission of FWS Form 3–2554), the Service will provide setback distances for the placement of drain tile on lands covered by wetland easements. The setback distances will be based on best available science and must be adequate to ensure protected wetland areas are not drained. Information collected via FWS Form 3–2554 includes basic contact information for the landowner, along with the easement number(s) for the specific land covered by the wetland easement.

The Service will provide guidance to landowners about what materials should be submitted as part of a request and will provide setback distances to landowners within a Service-provided timeframe. When a landowner coordinates their tile planning with the Service in accordance with this guidance and adheres to the Service-provided drain tile setback distances, the Service will not seek legal redress if it is later determined that Service-provided drain tile setback distance failed to protect the wetland areas from drainage, provided that drain tile has not been modified, enhanced, or replaced.

Title of Collection: Requests for Drain Tile Setback (50 CFR part 25).

OMB Control Number: 1018–NEW.

Form Number: FWS Form 3–2554.

Type of Review: New.

Respondents/Affected Public: Individuals/households, businesses, and State/local/Tribal governments.

Total Estimated Number of Annual Respondents: 150.

Total Estimated Number of Annual Responses: 150.

Estimated Completion Time per Response: 5 minutes for reporting and 10 minutes for recordkeeping requirements.

Total Estimated Number of Annual Burden Hours: 39.

Respondent's Obligation: Required to obtain or retain a benefit.

Frequency of Collection: On occasion.

Total Estimated Annual Nonhour Burden Cost: None.

As part of our continuing effort to reduce paperwork and respondent burdens, we invite the public and other Federal agencies to comment on any aspect of this information collection, including:

(1) Whether or not the collection of information is necessary for the proper performance of the functions of the agency, including whether or not the information will have practical utility;

(2) The accuracy of our estimate of the burden for this collection of information, including the validity of the methodology and assumptions used;

(3) Ways to enhance the quality, utility, and clarity of the information to be collected; and

(4) Ways to minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, e.g., permitting electronic submission of response.

Send your written comments and suggestions on this information collection by the date indicated in **DATES** to OMB, with a copy to the Service Information Collection Clearance Officer, U.S. Fish and Wildlife Service, 5275 Leesburg Pike, MS: PRB (JAO/3W), Falls Church, VA 22041–3803 (mail); or Info_Coll@fws.gov (email). Please reference "OMB Control Number 1018–New Drain Tile Setbacks" in the subject line of your comments.

*National Environmental Policy Act*

We are required under the National Environmental Policy Act (NEPA; 42 U.S.C. 4321 et seq.) to assess the impact of any Federal action significantly affecting the quality of the human environment, health, and safety. We have determined that the proposed rule falls under the class of actions covered by the following Department of the Interior categorical exclusion: "Policies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case." (43 CFR 46.210(i)). The proposed regulations would codify existing Service practice in administering minimally restrictive wetland easements.

**Primary Author**

Debbie DeVore, Division of Natural Resources and Conservation Planning, National Wildlife Refuge System, is the primary author of this rulemaking document.

**List of Subjects**

*50 CFR Part 25*

Administrative practice and procedure, Concessions, Reporting and recordkeeping requirements, Safety, Wildlife refuges.

**Proposed Regulation Promulgation**

For the reasons set forth in the preamble, we propose to amend title 50, chapter I, subchapter C of the Code of Federal Regulations as set forth below:

**PART 25—ADMINISTRATIVE PROVISIONS**

1. The authority citation for part 25 continues to read as follows:

AUTHORITY: 5 U.S.C. 301; 16 U.S.C. 460k, 664, 668dd, and 715i, 3901 et seq.; and Pub. L. 102-402, 106 Stat. 1961.

**Subpart B—Administrative Provisions**

2. In subpart B, revise § 25.23, including the section heading, to read as follows:

**§ 25.23 Information collection requirements.**

The Office of Management and Budget (OMB) has approved the information collection requirements contained in part 25 and assigned OMB Control Numbers 1018–0102, 1018–0140, 1018–0181, or 1018–#### (unless otherwise indicated). Federal agencies may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. Direct comments regarding the burden estimates or any other aspect of the information collection to the Service's Information Collection Clearance Officer at the address provided at 50 CFR 2.1(b).

3. In subpart B, add § 25.24 to read as follows:

**§ 25.24 Drain tile setbacks.**

(a) *Applicability.* The regulations in this section apply to any easement lands protected by a U.S. Fish and Wildlife Service easement for waterfowl management rights (commonly referred to as a wetland easement) that were acquired through the Small Wetlands Acquisition Program in

the Prairie Pothole Region of Iowa, Minnesota, Montana, North Dakota, and South Dakota. The regulations in this section apply only to setbacks provided by the Service beginning on [EFFECTIVE DATE OF THE FINAL RULE].

(b) *Drainage tile setbacks.* Upon the request of a landowner, the Service will provide setback distances for the placement of drain tile on lands covered by wetland easements. The setback distances will be based on the best available science and must be adequate to ensure that protected wetland areas are not drained. Contact your local U.S. Fish and Wildlife Service station to obtain further information. You can obtain contact information for your local Service station by contacting one of the Service regional offices; addresses for these offices are at 50 CFR 2.2.

(c) *Protection from legal redress.* The Service will provide guidance to landowners about what materials should be submitted as part of a request and will provide setback distances to landowners within a Service-provided timeframe. When a landowner coordinates tile planning with the Service in accordance with the regulations in this section and adheres to the Service-provided drain tile setback distances, including the tile diameters and tile depths below the surface that were used to calculate the Service-provided drain tile setback distances, the Service will not seek legal redress if it is later determined that the drain tile setback distances provided by the Service failed to protect the wetland areas from drainage, provided that the drain tile has not been modified, enhanced, or replaced.

**Shannon Estenoz,**

*Assistant Secretary for Fish and Wildlife and Parks.*

whether to rescind the determination and provide the company, its primary financial regulatory agency or home country supervisor, and the primary financial regulatory agency of its significant subsidiaries with a notice explaining the primary basis for any decision not to rescind the determination. If the Council does not rescind the determination, the written notice provided to the company will address the most material factors raised by the company in its submissions to the Council contesting the determination during the annual reevaluation. The written notice from the Council will also explain why the Council did not find that the company no longer met the standard for a determination under section 113 of the Dodd-Frank Act. In general, due to the sensitive, company-specific nature of its analyses in annual reevaluations, the Council generally would not publicly release the written findings that it provides to the company, although the Council does not expect to restrict a company's ability to disclose such information.

Finally, the Council will provide each nonbank financial company subject to a Council determination an opportunity for an oral hearing before the Council once every five years at which the company can contest the determination.

**Kayla Arslanian,**

*Executive Secretary.*

[FR Doc. 2023–08964 Filed 4–27–23; 8:45 am]

BILLING CODE 4810–AK–P–P

---

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

### 50 CFR Part 25

**[Docket No. FWS–HQ–NWRS–2022–0092; FXRS12610900000–212–FF09R20000]**

**RIN 1018–BG80**

## National Wildlife Refuge System; Drain Tile Setbacks

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Proposed rule.

**SUMMARY:** We, the U.S. Fish and Wildlife Service (Service), propose new regulations pertaining to wetland easements to bring consistency, transparency, and clarity for both easement landowners and the Service in the administration of conservation easements, pursuant to the National Wildlife Refuge Administration Act of 1966, as amended by the National Wildlife Refuge System Improvement Act of 1997. The proposed regulations would codify the process by which the Service establishes drain tile setbacks in wetland easement contracts. Setback distances would be calculated based upon the best available science considering soil characteristics, tile diameter, the depth of the tile below the surface, and/or topography sufficient to the easement contract's standard of protection that ensures no drainage of adjacent protected wetland areas. The proposed regulations would apply only to setbacks provided by the Service beginning on the effective date of the final rule.

**DATES:**

*Written comments:* We will accept comments received or postmarked on or before June 27, 2023.

*Information collection requirements:* If you wish to comment on the information collection requirements in this proposed rule, please note that the Office of Management and Budget (OMB) is required to make a decision concerning the collection of information contained in this proposed rule between 30 and 60 days after publication of this proposed rule in the **Federal Register**. Therefore, comments should be submitted to OMB by June 27, 2023.

**ADDRESSES:**

*Written comments:* You may submit comments by one of the following methods:

• *Electronically:* Go to the Federal eRulemaking Portal: *https://www.regulations.gov.* In the Search box, type in FWS–HQ–NWRS–2022–0092, which is the docket number for this rulemaking. Then, click on the Search button. On the resulting screen, find the correct document and submit a comment by clicking on ''Comment.''

• *By hard copy:* Submit by U.S. mail or hand delivery: Public Comments Processing, Attn: FWS–HQ–NWRS–2022–0092; U.S. Fish and Wildlife Service; 5275 Leesburg Pike, MS: PRB (JAO/3W); Falls Church, VA 22041–3803.

We will not accept email or faxes. We will post all comments on *https://www.regulations.gov.* This generally means that we will post any personal information you provide us (see Request for Comments, below, for more information).

*Information collection requirements:* Written comments and suggestions on the information collection requirements should be submitted by the date specified above in **DATES** to *https://www.reginfo.gov/public/do/PRAMain.* Find this particular information collection by selecting ''Currently under Review—Open for Public Comments'' or by using the search function. Please provide a copy of your comments to the Service Information Collection Clearance Officer, U.S. Fish and Wildlife Service, 5275 Leesburg Pike, MS: PRB (JAO/3W), Falls Church, VA 22041–3803 (mail); or *Info_Coll@fws.gov* (email). Please reference ''OMB Control Number 1018–New Drain Tile Setbacks'' in the subject line of your comments.

**FOR FURTHER INFORMATION CONTACT:** Debbie DeVore, (251) 604–1383. Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:**

### Background

Wetland habitat in the Prairie Pothole Region (PPR) of Iowa, Minnesota, Montana, North Dakota, and South Dakota is critically important to waterfowl and other migratory bird populations. The unique topography of the PPR includes the numerous small wetlands and potholes typical of the PPR that were formed through glaciation thousands of years ago. Prairie potholes are freshwater depressions and marshes, often less than 2 feet deep and 1 acre in size, that are a permanent feature of these landscapes barring deliberate alteration of the topography or hydrology. What makes the PPR so biologically important to waterfowl is the seasonal fluctuation of surface water through these permanent wetlands basins. The PPR is responsible for producing approximately 50 to 75 percent of the primary species of ducks on the North American continent, providing habitat for more than 60 percent of the breeding population. Waterfowl fledged in the PPR are a significant natural resource that supports waterfowl hunting and an associated industry that creates an estimated 30,000 jobs and nearly $1 billion in economic benefit.

Congress, recognizing the impact that widespread drainage was having on wetlands and waterfowl populations in the PPR, officially created the Small Wetlands Acquisition Program on August 1, 1958, by amending the 1934 Migratory Bird Hunting Stamp Act (commonly referred to as the ''Duck Stamp Act''). The amendment allowed proceeds from the sale of Federal Duck Stamps to be used to conserve and protect ''small wetland and pothole areas'' through the acquisition and establishment of areas designated as Waterfowl Production Areas (WPAs). The Service purchased the first fee-title WPA in South Dakota in 1959 and began to purchase wetland easements

soon thereafter. The acquisition of wetland easements accelerated across the PPR following the passage of the 1961 Wetlands Loan Act (Pub. L. 87–383), which authorized appropriations to advance funding for the purchase of wetland easements. Wetland easements are part of the National Wildlife Refuge System, governed by the National Wildlife Refuge System Administration Act (hereafter, ''the Administration Act''; 16 U.S.C. 668dd, *et seq.*).

## Wetland Easements

This proposed rulemaking action would create new regulations pertaining to easement lands protected by a Service easement for waterfowl management rights (commonly referred to as a ''wetland easement'') in the PPR. The easements are areas of land or water acquired and administered by the Service with a less than fee interest for the purpose of maintaining small wetland or pothole areas suitable for use as WPAs.

A wetland easement is a voluntary legal agreement with the Service that pays landowners to permanently protect wetlands. The easement contains restrictions on the use or development of the land to protect its conservation values. The Service's wetland easements are minimally restrictive conservation easements, meaning that they have a minimal impact on the property value and limit the landowner's use and enjoyment of the property to a minor degree. Landowners who sell a wetland easement to the Service agree that wetlands protected by an easement cannot be drained, filled, leveled, or burned. If these wetlands dry up naturally, they can be farmed, grazed, or hayed.

## Drain Tiles

Traditionally, the purpose of subsurface agricultural drainage has been to lower the water table of poorly drained soils with the goal of improving soil aeration. Recently, advanced drainage systems have been promoted as a way to manipulate soil water content during the growing season. Subsurface drainage systems typically remove water through perforated pipe (commonly referred to as drain tile) placed below the soil surface.

Drain tile positioned adjacent to wetland areas can result in reduced hydroperiods (periods of inundation) depending on several factors, such as the depth of tile in relation to the wetland area. The amount and timing of precipitation intercepted by subsurface drainage systems will vary depending on soil properties, topography (low/high topographic relief), placement of tile relative to the wetland area (horizontal distance, elevation), and the relation between the wetland area and groundwater (*i.e.,* recharge, discharge). Direct drainage of a wetland area by placing perforated tile and surface inlet pipes through (beneath) the wetland area would have a detrimental effect on wetland hydrology regardless of other factors.

Drainage systems positioned adjacent to a wetland area in low-relief terrain have the potential to indirectly affect the wetland area through lateral drainage (lateral effect). The lateral effect is defined as the perpendicular distance on either side of a tile pipe where soil water can be drained by the tile. Drainage systems positioned to encircle a wetland area completely or partially in high-relief terrain can intercept groundwater and precipitation runoff to the wetland area depending on the previously mentioned factors.

## This Proposed Rule

The proposed regulations in this document clarify that drain tile may be installed on lands encumbered by a wetland easement provided that protected wetland areas are not drained, directly or indirectly. This proposed rule distinguishes Service wetland easements from the ''Swampbuster'' provisions of the Food Security Act of 1985 (also known as the ''Farm Bill''; Pub. L. 99–198), which allow drain tile to have a ''minimal effect'' to wetlands. Service wetland easement agreements with landowners include provisions that allow for no effect; hence, the proposed regulations would clarify that tile may be installed on a wetland easement tract provided that the tile does not drain a protected wetland area.

Because the impact of a given drainage system on wetland areas varies greatly depending on site conditions, the Service will provide individual drain tile setback distances to landowners. The proposed regulations would require the Service to establish drain tile setback distances based upon the best available science, considering soil characteristics, tile diameter, the depth of the tile below the surface, and/or topography that ensure protected wetland areas are not drained. Furthermore, the Service will provide these setback distances to landowners upon request.

Additionally, we propose that landowners who adhere to the setback distances prescribed by the Service, including the tile diameters and tile depths below the surface that were used to calculate the Service-provided drain tile setback distances, will not be required to remove drain tile that is later found to have an adverse effect on protected wetland areas. These proposed regulations recognize that our understanding of the effects that drain tile may have on wetland hydrology is an evolving science. Service-provided drain tile setback distances may prove inadequate to fully protect easement wetland areas from drainage. However, landowners who coordinate their tiling plans with the Service and adhere to the Service-determined setback distances would not later be held criminally responsible or civilly liable for disturbing, injuring, or destroying a unit of the National Wildlife Refuge System (*i.e.,* draining a protected wetland area) provided the subsurface drainage system is not modified, enhanced, or replaced.

## Proposed Amendments to Existing Regulations

This document proposes to codify in the Code of Federal Regulations the following provisions:

(1) Within a Service-provided timeframe, the Service will provide setback distances for the placement of drain tile on lands covered by wetland easements in Iowa, Minnesota, Montana, North Dakota, and South Dakota;

(2) the Service will provide guidance to landowners about what materials should be submitted as part of a request; and

(3) when a landowner coordinates tile planning with the Service in accordance with this guidance and adheres to the Service-provided drain tile setback distances, including the tile diameters and tile depths below the surface that were used to calculate the Service-provided drain tile setback distances, the Service will not seek legal redress if it is later determined that the Service-provided drain tile setback distances failed to protect the wetland areas from drainage, provided that the drain tile has not been modified, enhanced, or replaced.

The regulations would apply only to setbacks provided by the Service beginning on the effective date of the final rule.

## Statutory Authority

The Administration Act, as amended by the National Wildlife Refuge System Improvement Act of 1997 (hereafter, ''the Improvement Act''; Pub. L. 105–57), governs the administration and public use of refuges.

Amendments enacted by the Improvement Act were built upon the Administration Act in a manner that provides an ''organic act'' for the Refuge System, similar to organic acts that exist

for other public Federal lands. The Improvement Act serves to ensure that we effectively manage the Refuge System as a national network of lands, waters, and interests for the protection and conservation of our Nation's wildlife resources. The Administration Act states first and foremost that we focus our Refuge System mission on the conservation of fish, wildlife, and plant resources and their habitats. The Act contains 14 directives to the Secretary, one of which states that, in administering the Refuge System, the Secretary shall ensure effective coordination, interaction, and cooperation with owners of land adjoining refuges. The Administration Act also authorizes the Secretary to issue regulations to carry out the purposes of the Act.

**Request for Comments**

You may submit comments and materials on this proposed rule by any one of the methods listed in **ADDRESSES**. We will not accept comments sent by email or fax or to an address not listed in **ADDRESSES**. We will not consider hand-delivered comments that we do not receive, or mailed comments that are not postmarked, by the date specified in **DATES**.

We will post your entire comment on *https://www.regulations.gov.* Before including personal identifying information in your comment, you should be aware that we may make your entire comment—including your personal identifying information—publicly available at any time. While you can ask us in your comment to withhold your personal identifying information from public review, we cannot guarantee that we will be able to do so. We will post all hardcopy comments on *https://www.regulations.gov.*

**Required Determinations**

*Clarity of This Proposed Rule*

Executive Orders 12866 and 12988 and the Presidential Memorandum of June 1, 1998, require us to write all rules in plain language. This means that each rule we publish must:

(a) Be logically organized;

(b) Use the active voice to address readers directly;

(c) Use clear language rather than jargon;

(d) Be divided into short sections and sentences; and

(e) Use lists and tables wherever possible.

If you feel that we have not met these requirements, send us comments by one of the methods listed in **ADDRESSES**. To better help us revise the rule, your comments should be as specific as possible. For example, you should tell us the numbers of the sections or paragraphs that are unclearly written, which sections or sentences are too long, the sections where you feel lists or tables would be useful, etc.

*Regulatory Planning and Review (Executive Orders 12866 and 13563)*

Executive Order 12866 provides that the Office of Information and Regulatory Affairs (OIRA) will review all significant rules. OIRA has determined that this rulemaking is not significant.

Executive Order (E.O.) 13563 reaffirms the principles of E.O. 12866 while calling for improvements in the nation's regulatory system to promote predictability, to reduce uncertainty, and to use the best, most innovative, and least burdensome tools for achieving regulatory ends. The executive order directs agencies to consider regulatory approaches that reduce burdens and maintain flexibility and freedom of choice for the public where these approaches are relevant, feasible, and consistent with regulatory objectives. E.O. 13563 emphasizes further that regulations must be based on the best available science and that the rulemaking process must allow for public participation and an open exchange of ideas. We have developed this rule in a manner consistent with these requirements.

*Regulatory Flexibility Act*

Under the Regulatory Flexibility Act (RFA; 5 U.S.C. 601 *et seq.,* as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA) of 1996)), whenever an agency must publish a notice of rulemaking for any proposed or final rule, it must prepare and make available for public comment a regulatory flexibility analysis that describes the effects of the rule on small entities. However, no regulatory flexibility analysis is required if the head of the agency certifies the rule will not have a significant economic impact on a substantial number of small entities. SBREFA amended the RFA to require Federal agencies to provide a statement of the factual basis for certifying that the rule will not have a significant economic impact on a substantial number of small entities. Thus, for a regulatory flexibility analysis to be required, impacts must exceed a threshold for ''significant impact'' and a threshold for a ''substantial number of small entities.'' See 5 U.S.C. 605(b).

Within the Prairie Pothole Region (comprising Iowa, Minnesota, North Dakota, South Dakota, and Montana), there are approximately 28,000 wetland easements, of which the majority are located on privately owned farmland. Thus, small businesses within the crop production industry (North American Industry Classification System 111) may be impacted by the proposed rule. One aspect of the proposed rule codifies the Service's existing drain tile setback practices; therefore, the effect of this regulatory provision on small businesses would be negligible. The proposed rule also provides legal certainty for landowners who adhere to the setback distances prescribed by the Service. The information collection form to request the setback distances is estimated to take 15 minutes, which would be negligible for small businesses. Currently, approximately 20 landowners annually (less than 0.01 percent) must remove drain tile systems because they do not adhere to the contract that granted the easement. As a result of the added benefit of legal certainty, the proposed rule may provide the incentive to these landowners to adhere to the contract and, thus, reduce the costs of removing drain tile systems. The average annual number of small businesses (20) potentially impacted by this rulemaking is not substantial.

Therefore, we certify that this rule, as proposed, would not have a significant economic effect on a substantial number of small entities as defined under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*). An initial regulatory flexibility analysis is not required. Accordingly, a small entity compliance guide is not required.

*Congressional Review Act*

The proposed rule is not a major rule under 5 U.S.C. 804(2), the Congressional Review Act. We anticipate no significant employment or small business effects. This proposed rule:

a. Would not have an annual effect on the economy of $100 million or more. The minimal impact would be scattered across five States and would most likely not be significant in any local area.

b. Would not cause a major increase in costs or prices for consumers; individual industries; Federal, State, or local government agencies; or geographic regions.

c. Would not have significant adverse effects on competition, employment, investment, productivity, innovation, or the ability of U.S.-based enterprises to compete with foreign-based enterprises.

*Unfunded Mandates Reform Act*

This proposed rule would not impose an unfunded mandate on State, local, or Tribal governments or the private sector

of more than $100 million per year. The proposed rule would not have a significant or unique effect on State, local, or Tribal governments or the private sector. A statement containing the information required by the Unfunded Mandates Reform Act (2 U.S.C. 1531 *et seq.*) is not required.

*Takings (E.O. 12630)*

In accordance with E.O. 12630, this proposed rule would not have significant takings implications. A takings implication assessment is not required. The proposed rule does not have any takings implications because it would not impact protected property rights. The proposed rule provides clarity and standardization of the Service's existing process for providing drain tile setback distances to landowners and provides landowners with legal protection when they choose to follow the Service's setback distances. The proposed rule would not require landowners to consult the Service regarding setback distances, nor would it require landowners to follow the Service's setback distances if they are provided.

*Federalism (E.O. 13132)*

Under the criteria in section 1 of Executive Order 13132, this proposed rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement. A federalism summary impact statement is not required.

*Civil Justice Reform (E.O. 12988)*

In accordance with E.O. 12988, the Department of the Interior has determined that this proposed rule would not unduly burden the judicial system and that it meets the requirements of sections 3(a) and 3(b)(2) of the Order.

*Energy Supply, Distribution or Use (E.O. 13211)*

This proposed rule is not a significant energy action under the definition in Executive Order 13211. A statement of energy effects is not required.

*Consultation and Coordination With Indian Tribal Governments (E.O. 13175)*

The Department of the Interior strives to strengthen its government-to-government relationship with Indian Tribes through a commitment to consultation with Indian Tribes and recognition of their right to self-governance and Tribal sovereignty. We have evaluated this proposed rule under Executive Order 13175 and have determined that it has no substantial direct effects on federally recognized Indian Tribes.

*Paperwork Reduction Act (PRA)*

This proposed rule contains new information collections. All information collections require approval under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*). We may not conduct or sponsor and you are not required to respond to a collection of information unless it displays a currently valid Office of Management and Budget (OMB) control number. The new reporting and/or recordkeeping requirement associated with requests for drain tile setbacks described below requires approval by OMB:

**Requests for Drain Tile Setbacks (FWS Form 3–2554)**

Upon the request of a landowner (via submission of FWS Form 3–2554), the Service will provide setback distances for the placement of drain tile on lands covered by wetland easements. The setback distances will be based on best available science and must be adequate to ensure protected wetland areas are not drained. Information collected via FWS Form 3–2554 includes basic contact information for the landowner, along with the easement number(s) for the specific land covered by the wetland easement.

The Service will provide guidance to landowners about what materials should be submitted as part of a request and will provide setback distances to landowners within a Service-provided timeframe. When a landowner coordinates their tile planning with the Service in accordance with this guidance and adheres to the Service-provided drain tile setback distances, the Service will not seek legal redress if it is later determined that Service-provided drain tile setback distance failed to protect the wetland areas from drainage, provided that drain tile has not been modified, enhanced, or replaced.

*Title of Collection:* Requests for Drain Tile Setback (50 CFR part 25).
*OMB Control Number:* 1018–NEW.
*Form Number:* FWS Form 3–2554.
*Type of Review:* New.
*Respondents/Affected Public:* Individuals/households, businesses, and State/local/Tribal governments.
*Total Estimated Number of Annual Respondents:* 150.
*Total Estimated Number of Annual Responses:* 150.
*Estimated Completion Time per Response:* 5 minutes for reporting and 10 minutes for recordkeeping requirements.
*Total Estimated Number of Annual Burden Hours:* 39.
*Respondent's Obligation:* Required to obtain or retain a benefit.
*Frequency of Collection:* On occasion.
*Total Estimated Annual Nonhour Burden Cost:* None.

As part of our continuing effort to reduce paperwork and respondent burdens, we invite the public and other Federal agencies to comment on any aspect of this information collection, including:

(1) Whether or not the collection of information is necessary for the proper performance of the functions of the agency, including whether or not the information will have practical utility;

(2) The accuracy of our estimate of the burden for this collection of information, including the validity of the methodology and assumptions used;

(3) Ways to enhance the quality, utility, and clarity of the information to be collected; and

(4) Ways to minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of response.

Send your written comments and suggestions on this information collection by the date indicated in **DATES** to OMB, with a copy to the Service Information Collection Clearance Officer, U.S. Fish and Wildlife Service, 5275 Leesburg Pike, MS: PRB (JAO/3W), Falls Church, VA 22041–3803 (mail); or *Info_Coll@fws.gov* (email). Please reference ''OMB Control Number 1018–New Drain Tile Setbacks'' in the subject line of your comments.

*National Environmental Policy Act*

We are required under the National Environmental Policy Act (NEPA; 42 U.S.C. 4321 *et seq.*) to assess the impact of any Federal action significantly affecting the quality of the human environment, health, and safety. We have determined that the proposed rule falls under the class of actions covered by the following Department of the Interior categorical exclusion: ''Policies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case.'' (43 CFR 46.210(i)). The proposed regulations would codify existing Service practice in administering

minimally restrictive wetland easements.

**Primary Author**

Debbie DeVore, Division of Natural Resources and Conservation Planning, National Wildlife Refuge System, is the primary author of this rulemaking document.

**List of Subjects in 50 CFR Part 25**

Administrative practice and procedure, Concessions, Reporting and recordkeeping requirements, Safety, Wildlife refuges.

**Proposed Regulation Promulgation**

For the reasons set forth in the preamble, we propose to amend title 50, chapter I, subchapter C of the Code of Federal Regulations as set forth below:

## PART 25—ADMINISTRATIVE PROVISIONS

■ 1. The authority citation for part 25 continues to read as follows:

**Authority:** 5 U.S.C. 301; 16 U.S.C. 460k, 664, 668dd, and 715i, 3901 *et seq.;* and Pub. L. 102–402, 106 Stat. 1961.

### Subpart B—Administrative Provisions

■ 2. Revise § 25.23 to read as follows:

**§ 25.23 Information collection requirements.**

The Office of Management and Budget (OMB) has approved the information collection requirements contained in part 25 and assigned OMB Control Numbers 1018–0102, 1018–0140, 1018–0181, or 1018–#### (unless otherwise indicated). Federal agencies may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. Direct comments regarding the burden estimates or any other aspect of the information collection to the Service's Information Collection Clearance Officer at the address provided at 50 CFR 2.1(b).

■ 3. Add § 25.24 to read as follows:

**§ 25.24 Drain tile setbacks.**

(a) *Applicability.* The regulations in this section apply to any easement lands protected by a U.S. Fish and Wildlife Service easement for waterfowl management rights (commonly referred to as a wetland easement) that were acquired through the Small Wetlands Acquisition Program in the Prairie Pothole Region of Iowa, Minnesota, Montana, North Dakota, and South Dakota. The regulations in this section apply only to setbacks provided by the Service beginning on [EFFECTIVE DATE OF THE FINAL RULE].

(b) *Drainage tile setbacks.* Upon the request of a landowner, the Service will provide setback distances for the placement of drain tile on lands covered by wetland easements. The setback distances will be based on the best available science and must be adequate to ensure that protected wetland areas are not drained. Contact your local U.S. Fish and Wildlife Service station to obtain further information. You can obtain contact information for your local Service station by contacting one of the Service regional offices; addresses for these offices are at 50 CFR 2.2.

(c) *Protection from legal redress.* The Service will provide guidance to landowners about what materials should be submitted as part of a request and will provide setback distances to landowners within a Service-provided timeframe. When a landowner coordinates tile planning with the Service in accordance with the regulations in this section and adheres to the Service-provided drain tile setback distances, including the tile diameters and tile depths below the surface that were used to calculate the Service-provided drain tile setback distances, the Service will not seek legal redress if it is later determined that the drain tile setback distances provided by the Service failed to protect the wetland areas from drainage, provided that the drain tile has not been modified, enhanced, or replaced.

**Shannon Estenoz,**

*Assistant Secretary for Fish and Wildlife and Parks.*

[FR Doc. 2023–08998 Filed 4–27–23; 8:45 am]

BILLING CODE 4333–15–P

**Billing Code 4333- 15**

**DEPARTMENT OF THE INTERIOR**

**Fish and Wildlife Service**

**50 CFR Part 25**

**[Docket No. FWSQH9 QNWRSQ2022Q0; 2XF6 RS12] 10; 00000Q45QFF0; R250008**

**RIN 101–- BG–0**

**National Wildlife Refuge SystemXDrain Tile Setbacks**

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Final rule.

**SUMMARY:** We, the U.S. Fish and Wildlife Service (Service), promulgate new regulations pertaining to wetland easements to bring consistency, transparency, and clarity for both easement landowners and the Service in the administration of conservation easements, pursuant to the National Wildlife Refuge Administration Act of 1966, as amended by the National Wildlife Refuge System Improvement Act of 1997. These regulations codify the process by which landowners can request and the Service will provide drain tile setbacks under wetland easement contracts. Under these regulations, if landowners fully comply with Service-provided setbacks when installing drain tile and do not later replace or modify the drain tile, the Service grants the landowners a safe harbor from legal action in the event that the setback drain tile nevertheless results in the draining of an easement wetland. Setback distances are calculated based upon the best available science considering soil characteristics, tile diameter, the depth of the tile below the surface, and/or topography sufficient to the easement contract's standard of protection that ensures no drainage of adjacent protected wetland areas. The regulations apply only to setbacks provided by the Service beginning on the effective date of this final rule.

**DATES:** This rule is effective [INSERT DATE 30 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER].

*Information Collection Requirements:* If you wish to comment on the information collection requirements in this rule, please note that the Office of Management and Budget (OMB) is required to make a decision concerning the collection of information contained in this rule between 30 and 60 days after the date of publication of this rule in the Federal Register. Therefore, comments should be submitted to OMB by [INSERT DATE 30 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER].

**ADDRESSES:**

*Information Collection Requirements*: Written comments and suggestions on the information collection requirements should be submitted within 30 days of publication of this document to *https://www.reginfo.gov/public/do/PRAMain*. Find this particular information collection by selecting "Currently under Review - Open for Public Comments" or by using the search function. Please provide a copy of your comments to the Service Information Collection Clearance Officer, U.S. Fish and Wildlife Service, 5275 Leesburg Pike, MS: PRB (JAO/3W), Falls Church, VA 22041–3803 (mail); or Info_Coll@fws.gov (email). Please reference OMB Control Number 1018–0196 in the subject line of your comments.

**FOR FURTHER INFORMATION CONTACT:** Debbie DeVore, (251) 604–1383. Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPqEMENTARY INFORMATION:**

**Background**

Wetland habitat in the Prairie Pothole Region (PPR) of Iowa, Minnesota, Montana, North Dakota, and South Dakota is critically important to waterfowl and other migratory bird populations. The unique topography of the PPR includes numerous small wetlands and potholes that were formed through glaciation thousands of years ago. Prairie potholes are freshwater depressions and marshes, often less than 2 feet deep and 1 acre in size, that are a permanent feature of these landscapes barring deliberate alteration of the topography or hydrology. What makes the PPR so biologically important to waterfowl is the seasonal fluctuation of surface water through these permanent wetlands basins. The PPR is responsible for producing approximately 50 to 75 percent of the primary species of ducks on the North American continent, providing habitat for more than 60 percent of the breeding population. Waterfowl fledged in the PPR are a significant natural resource. Waterfowl are a diverse group of birds that are important to many aquatic and wetland ecosystems throughout the country. Additionally, waterfowl hunting and associated industries support thousands of jobs and in 2016 produced an estimated $2.9 billion in economic benefit.

Congress, recognizing the impact that widespread drainage was having on wetlands and waterfowl populations in the PPR, officially created the Small Wetlands Acquisition Program on August 1, 1958, by amending the 1934 Migratory Bird Hunting Stamp Act (commonly referred to as the "Duck Stamp Act"). The amendment allowed proceeds from the sale of Federal Duck Stamps to be used to conserve and protect "small wetland and pothole areas" through the acquisition and establishment of areas designated as Waterfowl Production Areas (WPAs). The Service purchased the first fee-title WPA in South Dakota in 1959, and began to purchase wetland easements soon thereafter. The acquisition of wetland easements accelerated across the PPR following the passage of the 1961 Wetlands Loan Act (Pub. L. 87–383), which authorized appropriations to advance funding for the purchase of wetland easements. Wetland easements are

part of the National Wildlife Refuge System, governed by the National Wildlife Refuge System Administration Act (hereafter, "the Administration Act"; 16 U.S.C. 668dd *et seq*.).

**Wetland Easements**

This rulemaking action codifies new regulations pertaining to easement lands protected by a Service easement for waterfowl management rights (commonly referred to as a "wetland easement") in the PPR. The easements are areas of land or water acquired and administered by the Service with a less than fee interest for the purpose of maintaining small wetland or pothole areas suitable for use as WPAs.

A wetland easement is a voluntary legal agreement with the Service that pays landowners to permanently protect wetlands. The easement contains restrictions on the use or development of the land to protect its conservation values. The Service's wetland easements are minimally restrictive conservation easements, meaning that they have a minimal impact on the property value and limit the landowner's use and enjoyment of the property to a minor degree. Landowners who sell a wetland easement to the Service agree that wetlands protected by an easement cannot be drained, filled, leveled, or burned. If these wetlands dry up naturally, they can be farmed, grazed, or hayed.

**Drain Tiles**

Traditionally, the purpose of subsurface agricultural drainage has been to lower the water table of poorly drained soils with the goal of improving soil aeration. Recently, advanced drainage systems have been promoted as a way to manipulate soil water content during the growing season. Subsurface drainage systems typically remove water through perforated pipe (commonly referred to as drain tile) placed below the soil surface.

Drain tile positioned adjacent to wetland areas can result in reduced hydroperiods (periods of inundation) depending on several factors, such as the depth of tile in relation to the

wetland area. The amount and timing of precipitation intercepted by subsurface drainage systems will vary depending on soil properties, topography (low/high topographic relief), placement of tile relative to the wetland area (horizontal distance, elevation), and the relation between the wetland area and groundwater (i.e., recharge, discharge). Direct drainage of a wetland area by placing perforated tile and surface inlet pipes through (beneath) the wetland area would have a detrimental effect on wetland hydrology regardless of other factors.

Drainage systems positioned adjacent to a wetland area in low-relief terrain have the potential to indirectly affect the wetland area through lateral drainage (lateral effect). The lateral effect is defined as the perpendicular distance on either side of a tile pipe where soil water can be drained by the tile. Drainage systems positioned to encircle a wetland area completely or partially in high-relief terrain can intercept groundwater and precipitation runoff to the wetland area depending on the previously mentioned factors.

**Internal Guidance for Calculating Drain Tile Setbacks**

Three years ago, the Service developed basic guidance for administering a drain tile setback request process and calculating drain tile setback distances using the best available science. This guidance was captured in a published Director's Memo, which is available at *https://www.fws.gov/sites/default/files/documents/Guidance-Memo-Drain-Tile-Setbacks-Wetland-Easements.pdf* or in hard copy from your local U.S. Fish and Wildlife Service station. If you need help identifying and contacting your local station, see 50 CFR 2.2 for the contact information of the nearest Regional Office. We refer to this document as the "guidance memo" in the remainder of this document. The guidance memo sets out the basics of the calculation processes for the Service to use when determining drain tile setback distances, including use of the van Shilfgaarde equation, and it establishes that the Service will not pursue legal redress should it later be determined that setback distances provided by the Service were inadequate to

protect adjacent wetland areas from drainage. This final rule codifies the key aspects of the guidance memo, such as the use of the best available science and the legal safe harbor for landowners who fully comply with Service-provided setback distances. The guidance memo remains in full effect because it has been incorporated as part of the broader internal guidance. The Service recently finalized the broader internal guidance developed to implement the voluntary drain tile setback program that is codified in this rule. We refer to this as the "internal guidance" or "internal setback guidance" in the remainder of this document. The internal guidance provides Service personnel with direction in administering the drain tile setback process program, which includes guidance on the timeframes for and calculation of Service-provided drain tile setback distances. The internal guidance is consistent with both this rule and the guidance memo, which as noted above is itself part of the internal guidance. The purpose of the internal guidance is to provide more detail than the guidance memo or this rule, particularly elaborating on calculation processes and providing guidelines for internal processes. The internal guidance is available to the public; for a copy, please contact your local U.S. Fish and Wildlife Service station (you can search by zip code, under Refine Your Search, or by map here: https://fws.gov/our-facilities). If you need help identifying and contacting your local station, see 50 CFR 2.2 for the contact information of the nearest Regional Office. Landowners who want to better understand the internal guidance or who have questions about the context of the guidance are encouraged to contact your local station.

**This Final Rule**

The regulations we are adopting in this final rule provide clarity and certainty to landowners that drain tile may be installed on lands encumbered by a wetland easement provided that protected wetland areas are not drained, directly or indirectly. This rule distinguishes Service wetland easements from the "Swampbuster" provisions of the Food Security Act of 1985 (also

known as the "Farm Bill"; Pub. L. 99–198), which allow drain tile to have a "minimal effect" to wetlands. Service wetland easement agreements with landowners include provisions that allow for no effect; hence, drain tile may be installed on a wetland easement tract, but it is a violation of the easement contract if the result is that the tile drains a protected wetland area.

Because the impact of a given drainage system on wetland areas varies greatly depending on site conditions, there are no one-size-fits-all specifications to prevent drain tile installation from draining wetlands and individualized calculations are needed for each drain tile installation. Therefore, on wetland easement lands, landowners will be able to voluntarily request that the Service provide them with individual drain tile setback distances. These regulations require the Service to establish drain tile setback distances based upon the best available science and with due consideration of soil characteristics, tile diameter, the depth of the tile below the surface, and/or topography that ensure protected wetland areas are not drained.

Additionally, these regulations ensure that landowners who adhere to the setback distances prescribed by the Service, including the tile diameters and tile depths below the surface that were used to calculate the Service-provided drain tile setback distances, will not be required to remove drain tile that is later found to have an adverse effect on protected wetland areas. In this way, these regulations recognize that our understanding of the effects that drain tile may have on wetland hydrology is an evolving science. Service-provided drain tile setback distances may prove inadequate to fully protect easement wetland areas from drainage. However, landowners who coordinate their tiling plans with the Service and adhere to the Service-determined setback distances will not later be held criminally responsible or civilly liable for disturbing, injuring, or destroying a unit of the National Wildlife Refuge System (i.e., draining a protected wetland area) provided the subsurface drainage system is not modified, enhanced, or

replaced. These regulations thus provide greater certainty and clarity for both landowners and the Service and encourage communication and collaboration.

**Amendments to EListing Regulations**

This rule codifies in the Code of Federal Regulations the following provisions:

(1) Within a Service-provided timeframe, the Service will provide setback distances for the placement of drain tile on lands covered by wetland easements in Iowa, Minnesota, Montana, North Dakota, and South Dakota;

(2) The Service will provide guidance to landowners about what materials should be submitted as part of a request; and

(3) When a landowner coordinates tile planning with the Service in accordance with this guidance and adheres to the Service-provided drain tile setback distances, including the tile diameters and tile depths below the surface that were used to calculate the Service-provided drain tile setback distances, the Service will not seek legal redress if it is later determined that the Service-provided drain tile setback distances failed to protect the wetland areas from drainage, provided that the drain tile has not been modified, enhanced, or replaced.

The regulations will apply only to setbacks provided by the Service beginning on the effective date of this final rule (see **DATES**, above).

**Statutory Authority**

The Administration Act, as amended by the National Wildlife Refuge System Improvement Act of 1997 (hereafter, “the Improvement Act”; Pub. L. 105–57), governs the administration and public use of refuges.

Amendments enacted by the Improvement Act built upon the Administration Act in a manner that provides an “organic act” for the Refuge System, similar to organic acts that exist for other public Federal lands. The Improvement Act serves to ensure that we effectively manage

the Refuge System as a national network of lands, waters, and interests for the protection and conservation of our Nation's wildlife resources. The Administration Act states first and foremost that we focus our Refuge System mission on the conservation of fish, wildlife, and plant resources and their habitats. The Administration Act, as amended, contains 14 directives to the Secretary of the Interior (Secretary), one of which states that, in administering the Refuge System, the Secretary shall ensure effective coordination, interaction, and cooperation with owners of land adjoining refuges. The Administration Act also authorizes the Secretary to issue regulations to carry out the purposes of the Act.

**Summary of Comments and Responses**

On April 28, 2023, we published in the *Federal Register* (88 FR 26244) a proposed rule to establish new regulations for wetland easements that would bring consistency, transparency, and clarity for both easement landowners and the Service in the administration of conservation easements, pursuant to the Administration Act, as amended by the Improvement Act. We accepted public comments on the proposed rule for 60 days, ending June 27, 2023. By that date, we received comments from eight commenters on the proposed rule. One commenter's comment was unrelated to the proposed rule. We discuss the remaining substantive topics raised by commenters below.

*Comment (1)*: Five comments expressed general support for the proposed rule. These comments expressed support for drain tile setbacks as a "good idea" to protect wetlands while providing transparency and clarity for landowners whose land is encumbered with an easement for waterfowl management rights (commonly referred to as a wetland easement).

*Our Response (1)*: We appreciate this general support. We designed this rule to make the drain tile setback process more open and transparent, and to simplify and clarify wetland easement responsibilities for both landowners and the Service.

We did not make any changes to the rule as a result of these comments.

*Comment (2)*: Two comments asked the Service to withdraw the proposed rule in its entirety.

*Our Response (2)*: The Service carefully considered the concerns and reasons presented in each of these comments underlying the request to withdraw the proposed rule and not issue a final rule. These concerns, which are addressed below, do not individually or cumulatively provide a persuasive rationale for the Service to withdraw the proposed rule, nor to postpone the issuance of this final rule for further consideration.

Notably, each of these comments expressed support for the Service's guidance memo for wetland easements (see **Internal Guidance for Calculating Drain Tile Setbacks**, above). The commenters also implied that a part of their reasoning for requesting that the Service withdraw the proposed rule was grounded in the belief that a final rule would supersede the guidance memo; both commenters stated a preference for the guidance memo. As discussed further below in our response to *Comment (14)*, this rule is consistent with the guidance memo, and that guidance memo remains in effect with the publication of this final rule.

We did not make any changes to the rule as a result of these comments.

*Comment (3)*: One comment urged general caution with this rule, given that it allows drain tile into an area with wetland easements.

*Our Response (3)*: The Service acknowledges the concerns underlying this comment and is committed to protecting the wetlands under our easements. At the same time, the Service cannot constrain a landowner's rights without the appropriate agreement and compensation. Through a wetland easement, the Service buys minimally restrictive rights, so the landowner may not drain, burn, fill, or level wetland areas, but we do not purchase rights specifically concerning the installation of drain tile. In some cases, it is possible for landowners to install tile

within the boundaries of wetland easements without draining wetland areas, and they have the right to do so in such cases.

The Service's solution to balancing our right to prohibit draining of wetlands under the easement and a landowner's right to install drain tile within the easement boundary, as long as it does not drain those wetlands, is the Service-provided setback process codified by this rulemaking. The need for caution and care in the installation of tile near wetlands is met when landowners coordinate with the Service and are provided with setbacks that adequately protect easement wetlands.

We did not make any changes to the rule as a result of this comment.

*Comment (4)*: Two commenters requested that we ensure the rule considers or is consistent with other drainage and water laws in Iowa, Minnesota, and North Dakota.

*Our Response (4)*: The Service routinely works and coordinates with State agency partners on various aspects of our conservation mission, including water rights and wetland management. The Service works with State agencies, landowners, drainage districts, and water boards regarding efforts to maintain, repair, and replace drain tile and ditches so that drainage of non-easement protected wetlands can continue when in compliance with State and local laws and regulations and when that work will not infringe on the terms of the easement agreement or on the Service's authorities under the Improvement Act or the Migratory Bird Conservation Act (16 U.S.C. 715–715d). We also work with and share resources with States, landowners, drainage districts, and water boards on actions that protect or otherwise benefit fens and other wetlands where we have the jurisdiction and authority to do so.

In shaping this rule, the Service did fully consider existing State laws. This rule does not conflict with any State law, and the same is true for our wetland easement agreements, but in application to specific drain tile projects, this rule and the specific easement agreement may

impose different requirements and limitations than those under State law. This is because the Service must protect the legal property interest that was paid for in the wetland easement agreement. The rights acquired protect wetland areas from being drained, burned, filled, or leveled. If these easements could not protect wetlands beyond the baseline protections under applicable State laws, they would have no value to the Service.

In cases where easement agreement requirements impose limitations beyond State law, the easement agreement, and the Service's authority to enforce its terms under the Improvement Act and Migratory Bird Conservation Act, typically supersede the applicable State law. In the *United States* v. *Vesterso* (828 F.2d 1234 (8th Cir. 1987)), the Eighth Circuit Court of Appeals upheld that the digging of ditches that damaged Federal easement wetlands in North Dakota was a violation of law and of the easement agreement, even though the digging was permissible under State law. The court found that, under the Administration Act, differences in requirements between Federal easements and State law are to be resolved on a case-by-case basis, so neither overrides the other in all cases. The Federal interest in the natural state of wetlands under an easement must be balanced against the State interest in and authority over State waters. On this point, the Court's opinion stated that while the Service was correct in this case and the easement agreement controlled, the Service does not have a general, absolute right to prohibit alteration of a wetland or interference of the natural flow of water under an easement.

We did not make any changes to the rule as a result of these comments.

*Comment (5)*: Three comments referenced other permitting agencies and/or drainage laws and encouraged the Service to notify landowners receiving Service drain tile setbacks that other agencies, including Federal, State, and local governments, local watersheds and water boards, and other permitting authorities, will need to be consulted to ensure landowners' drain tile projects comply with other permitting entities.

*Our Response (5)*: As part of our standard process, the Service notifies landowners that the drain tile setback received from the Service only addresses the Service's wetland easement on their property and that they will need to coordinate with State and local governments, watersheds, water boards, and other permitting authorities when installing drain tile on their land to ensure their project complies with all Federal, State, local, and other laws, statutes, codes, and policies.

We did not make any changes to the rule as a result of these comments.

*Comment (6)*: Three comments requested that the Service specifically state in the regulation what the "Service-provided timeframe" is for processing a drain tile setback.

*Our Response (6)*: The Service understands the concern of landowners and other stakeholders for timely delivery of setback decisions. We are committed to timely communication and delivery of setback distances. Our aim is to provide landowners with an estimate of the setback calculation timeline for their specific case within 2 business weeks of receiving their request on FWS Form 3-2554. We also anticipate that, in most cases, we will be able to provide drain tile setback distances within 60 calendar days. However, there are various factors that prevent the Service from specifying a uniform deadline for this process. This includes logistical factors, such as the availability of expert personnel and scheduling of on-site assessments, and factors that are a part of the actual calculations, such as the unique physical features of a given wetland. Several of these factors are noted in our publicly available internal guidance for calculating setbacks (see **Internal Guidance for Calculating Drain Tile Setbacks**, above). In that internal setback guidance, we provide the guiding principles for what constitutes a reasonable timeframe for Service employees calculating setback distances.

We did not make any changes to the rule as a result of these comments.

*Comment (7)*: One commenter asked what was meant by the term "best available science" and questioned the absence of a definition in the proposed rule.

*Our Response (7)*: The term "best available science" is a well-defined and long-established legal standard for the actions of science-driven Federal government agencies. For example, the Endangered Species Act of 1973 (16 U.S.C. 1531 *et seq*.), as amended, requires species listings to be based on the "best scientific and commercial data available." As the use of the term in this final rule does not depart from its established legal meaning, which itself is consistent with the plain meaning of the phrase, providing a definition in this rule is not necessary.

The Service will ensure that our policy for, our guidance on, and our implementation of the wetland easement program are all based on scientific data and information. We will also ensure that, of the sources of relevant scientific information available to us, we make use of the "best" science by considering objective indicators of scientific quality such as peer review, replication, quality and calibration of equipment, robustness of models, and so forth, when determining which information should carry the most weight in our processes.

We did not make any changes to the rule as a result of this comment.

*Comment (8)*: Two comments expressly noted that the provisions of the proposed rule would have no retroactive effect, but seemed to have different understandings of the implications of this fact and differing opinions as to whether the rule should have retroactive effect.

*Our Response (8)*: Clarification on the point of retroactivity should resolve the concerns of both of these commenters and any other members of the public on this point.

The regulations in this rulemaking will not have retroactive effect; they will apply only to setbacks provided by the Service beginning on the effective date of this final rule (see **DATES**, above). This rule creates a voluntary process for landowners to request drain tile setback

distances. There is no requirement to request or to make use of Service-provided setback distances, but the rule does provide a legal safe harbor for those landowners who do both. Thus, those landowners who have never before requested setback distances from the Service are in the same position regardless of whether or not the rule has retroactive effect. This is why the absence of retroactive effect could only be relevant to those landowners who received Service-provided setback distances under our guidance memo on drain tile setbacks (see **Internal Guidance for Calculating Drain Tile Setbacks**, above). In that case, however, the position of those landowners is also unchanged, since the guidance memo remains in full effect and will guide refuge personnel in implementing these new regulations. This rule merely codifies the key principles of our guidance memo.

In summary, the rule only has prospective effect, but this does not change the status of either (1) landowners who have never requested setback distances and thus have no legal safe harbor should they install tile that drains an easement wetland; or (2) landowners who requested and complied with setback distances and thus do have a legal safe harbor should their drain tile nevertheless drain an easement wetland. What the prospective effect does mean is that the voluntary process for setback requests and receiving legal safe harbor is further solidified by inclusion in our regulations and that landowners who request and fully comply with setback distances from the Service in the future can be assured of legal safe harbor.

We did not make any changes to the rule as a result of these comments.

*Comment (9)*: Two commenters requested that the Service offer assurance that a landowner who follows the Service-provided setback will be afforded a legal safe harbor regardless of whether the Service-provided setback distances do or do not protect the wetland from drainage.

*Our Response (9)*: The Service understands the importance for landowners of our commitment not to seek legal redress against landowners who coordinate with the Service and fully cooperate with the Service's setback determinations. In fact, providing assurance on this point is one of the Service's primary reasons for pursuing this rulemaking. This rule codifies exactly this type of assurance for landowners, as directly stated in the regulatory provisions at 50 CFR 25.24(c) (see **Regulation Promulgation**, below). Regarding this protection from legal redress, the regulations we are adopting in this rule specifically state that when a landowner coordinates tile planning with the Service in accordance with the regulations and adheres to the Service-provided drain tile setback distances, then the Service will not seek legal redress if it is later determined that the drain tile setback distances provided by the Service failed to protect the wetland areas from drainage, provided that the drain tile has not been modified, enhanced, or replaced.

We did not make any changes to the rule as a result of these comments.

*Comment (10)*: One comment requested that the regulations clarify that maintenance and repairs of drain tile systems installed in accordance with Service guidance or coordination are permissible without any further agency involvement.

*Our Response (10)*: Landowners with wetland easements on their property are always allowed to install and to maintain drain tile systems, but if the tile drains wetlands in violation of the Service's easement, then the landowner may face legal action. In the interest of both parties, the Service offers a voluntary process for landowners to request a Service-provided setback; landowners who fully comply with the Service-provided setback distances when installing or maintaining a drain tile system are shielded from legal action. In the case of a landowner's actions to maintain or repair a drain tile system, remaining within this legal safe harbor requires that the landowner's maintenance or repair actions do not amount to a modification,

enhancement, or replacement of the system. This requirement is provided in the regulatory provision at 50 CFR 25.24(c) (see **Regulation Promulgation**, below), where it clearly states that drainage of an easement wetland, after installation of a drain tile system in accordance with a Service-provided setback, will not result in the Service taking legal action provided that the drain tile has not been modified, enhanced, or replaced.

Drain tile systems installed in accordance with Service guidance or coordination should not drain easement-protected wetland areas. Therefore, routine maintenance and repair actions that do not amount to modification, enhancement, or replacement, whether or not coordinated with the Service, would not invalidate the safe harbor protections provided to landowners who install drain tile systems in accordance with Service-provided setbacks and other guidance. A true maintenance or repair action should not change the tile system in a way that impacts the Service's setback distances. For example, substituting one 4-inch tile for another 4-inch tile at the same location and depth would be a routine repair that does not invalidate the landowner's legal safe harbor. This difference between a routine maintenance and repair action and an action to modify or enhance the drain tile system, or to replace it with another system altogether, is commonly understood for those landowners who employ and those service providers who install drain tile systems, so further clarification in the regulatory provision is not necessary.

At the same time, a wetland easement agreement is a commitment to shared responsibility for the designated wetlands and an important piece of that shared responsibility is effective communication between landowners and the Service. The Service encourages landowners to be generally communicative about all aspects of wetland easement agreements and is committed to helpful communication in return. Specific to maintenance and repair of a drain tile system installed in accordance with Service-provided setback distances, continued communication is as mutually beneficial as the setback process. In fact, the only way for a

landowner to be truly certain whether the maintenance or repair actions they wish to take would constitute a modification, enhancement, or replacement, and thus whether they remain within the legal safe harbor regulatory provision, is to coordinate the maintenance or repair with the Service.

We did not make any changes to the rule as a result of this comment.

*Comment (11)*: One comment stated that there should be no need for any later assessments or determinations of whether the setback distances provided the desired wetland protection where a landowner installs drain tile based on Service-provided setback distances, given the legal safe harbor for the landowner in the event the wetland is drained.

*Our Response (11)*: The Service periodically monitors all of our wetland easements using a variety of nonintensive methods, such as aerial photography. In the interest of both landowners and minimal disturbance to wetlands, we seek to not monitor more often or more intensively than necessary. Our existing publicly available policy on wetland easements requires periodic monitoring and sets out the monitoring methods that our personnel may use (see Service Manual at 601 FW 6 at *https://www.fws.gov/policy-library/601fw6*).

In the specific situation of a landowner installing drain tile according to Service-provided setbacks, we will continue to monitor the wetlands on that property in the same manner as any other property subject to an easement. We will do this for three reasons. First, as noted above, our policy requires monitoring all of our wetland easement interests. Second, we need to monitor these wetlands in the interest of our overall migratory bird and waterfowl wildlife management responsibilities and wildlife conservation mission, which constitute the purpose for obtaining and maintaining these easements. Third, while the landowner may have complied with Service-provided setbacks at the time of drain tile installation, full compliance with the Service's setbacks under these regulations, and thus securing the legal safe harbor for the landowner, also

requires that a landowner does not subsequently modify, enhance, or replace the drain tile system. This means that we need to continue monitoring to identify when an easement wetland has been drained. If an easement wetland has been drained, we determine whether the landowner has modified, enhanced, or replaced the drain tile system in order to determine whether or not the legal safe harbor applies and the Service should or should not seek legal redress. Moreover, monitoring for this purpose is critical because identifying when an easement wetland has been drained may be the best, or even the only, signal for us that a landowner has modified, enhanced, or replaced the drain tile system after the initial installation.

We did not make any changes to the rule as a result of this comment.

*Comment (12)*: One comment urged that the Service should not seek legal redress against a landowner in cases where a drainage district acts in a manner inconsistent with the provisions in the proposed rule, and that this should be stated in the regulations.

*Our Response (12)*: It is unclear how a drainage district could act inconsistently with the provisions in this rule, as this rule provides a process for landowners to request and obtain setback distances from the Service and, if they fully comply with those setback distances, be assured of a legal safe harbor in the event a wetland is drained. Assuming that the commenter is referring to actions taken by a drainage district that could violate the terms of a wetland easement, such as draining an easement-protected wetland, then our response is that we cannot provide any such provision in the regulations.

The Service will determine an appropriate response in this type of situation on a case-by-case basis, and accordingly will not commit to any blanket limitation on our options for legal redress merely because a drainage district is involved and may bear more responsibility than the landowner for the easement violation. Unless the legal safe harbor for landowners codified by this rule applies, the Service reserves the right to seek legal redress against any and all

responsible parties in the event of drainage of a wetland in violation of a wetland easement, or any other violation of the terms of a wetland easement, to the full extent of applicable law.

We did not make any changes to the rule as a result of this comment.

*Comment (13)*: One comment expressed the concern that due to the distribution of small easement wetlands throughout a landowner's property and the setback distances provided by the Service, there might not be any location on the property where the landowner can install drain tile that complies with the Service's setbacks. This commenter was also concerned that in this case the rule prevents the landowner from installing drain tile.

*Our Response (13)*: This rule does not prevent any landowner from installing drain tile. As discussed above under our response to *Comment (10)*, landowners with wetland easements on their property are always allowed to install drain tile systems, but if the tile drains wetlands in violation of the Service's easement, then the landowner may face legal action.

The situation described by this commenter is possible. The locations and measurements of the overall property, the protected wetland areas, and the calculated setback distances may in some cases be such that there is no location within the borders of the overall property where drain tile can be placed that is setback from all easement wetlands at the distances determined by the Service's calculations. In such a case, the landowner may nevertheless choose to install drain tile, but they would do so at the risk of draining one or more easement wetlands and without the assurance of a legal safe harbor.

Conversely, other landowners may find that they are able to install drain tile on a wetland easement and setback from all wetlands in full compliance with the setback distances calculated by the Service, and thus ensure a legal safe harbor for the installation. Where a landowner's property fits along the continuum bounded by these two situations depends on the size and

distribution of the wetlands, the hydrology of the wetlands, and other factors unique to each property.

We did not make any changes to the rule as a result of this comment.

*Comment (14)*: Two comments expressed support for the Service's guidance memo on calculating drain tile setbacks, finalized in 2020. Both of the comments urged the Service to revise the proposed rule to explicitly reference the guidance memo, and one also urged codifying the setback calculation content from the existing Service guidance.

*Our Response (14)*: The guidance memo remains in full effect (see **Internal Guidance for Calculating Drain Tile Setbacks**, above). The guidance memo, as well as our internal guidance more generally and any future updated guidance, need not be expressly referenced in the regulations in order to guide Service administration of wetland easements (see **Internal Guidance for Calculating Drain Tile Setbacks**, above). There is nothing incongruent between the guidance memo and this rule. The guidance memo was developed based on the best science available at that time. It also assures landowners that the Service will not pursue legal redress should it later be determined that setback distances were inadequate to protect adjacent wetland areas from drainage. This regulation codifies these two principles, ensuring that Service calculations will be based on the best available science to prevent protected wetland areas from drainage and that landowners who fully cooperate with Service-provided setbacks will have a legal safe harbor.

Including the calculation processes of the Service's guidance memo in the regulations, however, would not be in the interest of the Service or landowners. In order for setback calculations to be based on the best available science, the Service needs to be able to update our processes as empirical experience and new scientific studies provide new information. Updating those processes through rulemaking is inefficient and unnecessary. As the Service and other

agencies routinely do, the Service has codified our obligation to use the best available science in regulation and will then keep our publicly available, detailed internal guidance up-to-date and effective. This will allow us to best protect wetlands while also providing accurate, no-farther-than-necessary setback distances to landowners.

We did not make any changes to the rule as a result of these comments.

*Comment (15)*: One comment included a request that the Service make the methodology for determining a drain tile setback publicly available, and that the Service invite public comments any time the Service proposes to change the methodology.

*Our Response (15)*: The Service's internal setback guidance documents containing the methodology for determining a drain tile setback are publicly available (see **Internal Guidance for Calculating Drain Tile Setbacks**, above). Landowners retain the right to challenge the Service's methodology if they believe there was an error in our methodology or in our application of the methodology to their case. This provides an efficient, reasonable, and open process for setback determinations.

The Service's methodology was established using the best available science and the expertise and best professional judgment of Service personnel to provide adequate protection for wetland easement areas.

We did not make any changes to the rule as a result of this comment.

*Comment (16)*: Two comments called for the Service to establish an administrative appeal process that is independent of the direction and control of the Service.

*Our Response (16)*: Administrative appeals processes are a common feature of good government throughout Federal agencies. These processes allow agency subject-matter expertise to form the administrative hearing record and inform the decision reached on appeal. They also allow the agency to double-check its initial decision so that it can identify, and thereby more

quickly address, any errors that were made. Regulated parties, in this case landowners, always have the option of appealing the ultimate agency decision to a judicial branch court after exhausting the administrative appeals process, which is sufficient to address any potential errors in the administrative appeal process that could harm their interests.

In the U.S. Federal Government, no administrative appeals process external to the agency whose final decision is being challenged exists. Quasi-independent administrative tribunals and review boards do exist, such as the Environmental Appeals Board, a body that hears appeals of Environmental Protection Agency (EPA) final decisions and reports directly to the EPA Administrator outside of the regular EPA line authority. The commenters presented no compelling evidence that the current administrative appeals process is inherently flawed or not reaching appropriate determinations concerning wetland easements. The Service is also not otherwise aware of any reasons the existing appeals process is inadequate. We do not see any need at this time to devote considerable resources toward the creation of a quasi-independent body to hear appeals of Service decisions concerning wetland easements.

Landowners who disagree with a Service-provided setback distance, or another final decision concerning wetland easements, may appeal to the appropriate Regional Director in accordance with the procedure established by 50 CFR 25.45.

We did not make any changes to the rule as a result of these comments.

*Comment (17)*: One comment questioned how landowners will be notified of the responsibility to request a setback to protect the wetlands on their land that are subject to a wetland easement.

*Our Response (17)*: This rule does not obligate or require any landowner to request a drain tile setback. We have created a voluntary process for landowners to request and receive a Service-provided drain tile setback to facilitate coordination between landowners and the Service

and to improve landowner compliance with the requirements of the Service's wetland easements. This process benefits landowners in that it provides a legal safe harbor for landowners who fully comply with the Service's setback determination, as the Service will not seek legal redress in the event that the wetland drains despite the landowner's adherence to the Service's setback determination. Landowners have the right to install drain tile on their land without requesting a Service-provided setback, but in that case, they are legally obligated to ensure by their own efforts that the drain tile does not violate any wetland easement agreement with the Service by draining protected wetlands.

While the setback request process is voluntary, the Service will make efforts to notify landowners about this mutually beneficial opportunity. The Service intends to publicize the opportunity through various communication channels. In fact, our existing internal guidance provides strategies, and our process includes steps for communication with landowners concerning their ability to request a Service-provided setback. The publication of this rule and the regulations that we are codifying in the Code of Federal Regulations will also serve as public notice of this opportunity for landowners with wetland easement agreements.

We did not make any changes to the rule as a result of this comment.

*Comment (18)*: One comment expressed concern that the rule does not clearly tell the landowner what lands are subject to the easement or provide adequate notice as to the reasonable parameters of the easement.

*Our Response (18)*: This rule provides a general framework for the Service in regulating all of our wetland easement interests, so it is not the appropriate place to delineate individual easement boundaries in detail. The appropriate place to clarify the boundaries of the Service's wetland easement is in each wetland easement agreement document itself. That is why each easement document includes a clear legal description of the lands that are subject to the

easement. In fact, multiple courts have found the parameters in individual easement documents to be clear (see, e.g., *United States* v. *Albrecht*, 496 F.2d 906 (8th Cir. 1974) (using the phrase "precise draftsmanship" in reference to the terms of the easement agreement), and *United States* v. *Seest*, 631 F.2d 107 (8th Cir. 1980)).

For the same reasons, this rule is not the appropriate means of notifying landowners of the parameters of wetland easements. Landowners are adequately notified of the easement and the extent to which it encumbers their property either when signing the wetland easement agreement with the Service or when performing due diligence before obtaining land subject to an existing wetland easement from another private landowner. Every easement document is registered and publicly available in the applicable State or county land records, and landowners can also obtain a copy by contacting their local U.S. Fish and Wildlife Service station. (If you need help identifying and contacting your local station, see 50 CFR 2.2 for the contact information of the nearest Regional Office.) Review of the easement document provides a landowner with the necessary details of the boundaries of the easement. Thus, landowners should know of all the reasonable parameters. Landowners who are nevertheless unsure of the parameters of an easement are welcome to consult the Service by contacting their local U.S. Fish and Wildlife Service station. (If you need help identifying and contacting your local station, see 50 CFR 2.2 for the contact information of the nearest Regional Office.)

We did not make any changes to the rule as a result of this comment.

*Comment (19)*: One comment requested that, for newly acquired wetland easements, the Service ensure landowners agreeing to the easements understand what limitations are associated with drain tile installation.

*Our Response (19)*: The Service takes steps to ensure that new landowners are aware of the limitations on drain tile installation that wetland easements require. The Service's Realty

Specialists working with new landowners who are enrolling their land in wetland conservation easements inform landowners of what rights the Service acquires or restricts during the easement agreement process. This ensures landowners are aware of what a wetland easement will mean for them before they sign an easement document. Most importantly, the Service clearly articulates that no wetlands protected by the easement can be drained. If a landowner wants to retain the ability to drain a given wetland area, they can choose to not include that individual wetland area in the wetland easement.

We did not make any changes to the rule as a result of this comment.

*Comment (20)*: Two comments requested that the regulations be revised to inform landowners exactly what information and materials will be required from them when they request a drain tile setback.

*Our Response (20)*: The Service recognizes that landowners are rightfully cautious about their private information. The Service developed FWS Form 3-2554 for landowners to use to request a drain tile setback from the Service. The form was available for public comment in our Information Collection Request on OMB's website at *https://www.reginfo.gov/public/*. In response to these comments, this final rule now directly references the form. FWS Form 3-2554 requests basic contact information for the landowner, along with the easement number(s) for the specific land covered by the wetland easement. In response to these comments, we have revised the form to also request desired tile depths and diameters, as well as attachment of relevant installation plans, to facilitate our setback calculations.

It would be inefficient to specify in our regulations the exact information requested by the form, especially as this could change over time. Instead, the Service is specifying the form in the regulations, has ensured the form contains all currently needed information, and will ensure the form remains updated in the future. The Service is following processes established by the

Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq*.) for FWS Form 3-2554. This includes ensuring that the information collection is reasonable, that no more information is collected than necessary, and that the form is renewed every 3 years so that it remains updated and compliant with the other requirements. The Privacy Act of 1974 (5 U.S.C. 552a) also ensures that private information provided on the form is protected.

We made changes to the rule as a result of these comments. Specifically, we added a direct reference to FWS Form 3-2554 and added additional fields to the form. This provides greater clarity on what information and materials landowners must provide when requesting a drain tile setback.

*Comment (21)*: One comment expressed concern that the proposed rule does not include any assurances that information provided by landowners will be confidential and not subject to the Freedom of Information Act (FOIA; 5 U.S.C. 552, as amended by Pub. L. 104–231, 110 Stat. 3048).

*Our Response (21)*: The Service, like all other agencies in the Executive Branch, must comply with FOIA. FOIA requires that any person may request access to records of the Executive Branch of the United States, and copies of the records must be provided in full, except to the extent that all or specific portions of the record fall under one or more of the exempt categories. Among these exempt categories are information that would violate an individual's right to privacy and information that constitutes trade secrets or other confidential commercial or financial information (see 5 U.S.C. 552(b)). Thus, the Service may be compelled to turn over redacted copies of certain records concerning wetland easements, but the personally identifiable information of landowners and any proprietary commercial information in the records, including the information collected on FWS Form 3-2554, are exempt from FOIA and not disclosed. As this is a general exemption to FOIA applicable across the Federal Government, it need not be

specified in our regulations. We did, however, add a standard FOIA statement to the form that helps to clarify the point that business information is FOIA exempt and directs landowners to label the information that they consider to be business information when submitting the form.

We did not make any changes to the rule as a result of this comment, but we did modify the associated setback request form to add a standard FOIA statement on business information.

**Changes from the Proposed Rule**

As discussed above under **Summary of Comments and Responses**, based on comments we received on the April 28, 2023, proposed rule (88 FR 26244), we made changes in this final rule and to the associated setback request form. In this final rule, we added a direct reference to FWS Form 3-2554 in the regulation at 50 CFR 25.24(b) (see **Regulation Promulgation**, below). In the FWS Form 3-2554, we added three fields pertaining to technical information: one requesting the desired depths of the drain tile installation, if known; one requesting the desired diameters of the drain tile installation, if known; and one requesting that the landowner attach their drain tile installation plan, if available. We also added a standard FOIA statement to the form that clarifies business information is FOIA exempt and directs landowners to label the information that they consider to be business information when submitting the form. These changes were made in response to comments requesting that we provide more specificity as to what information and materials landowners will be asked to include when requesting a Service-provided setback.

**Rexuired Determinations**

*Regulatory Planning and Review (Executive Orders 12866, 13563, and 14094)*

Executive Order 14094 reaffirms the principles of E.O. 12866 and E.O. 13563 and states that regulatory analysis should facilitate agency efforts to develop regulations that serve the public interest, advance statutory objectives, and are consistent with E.O. 12866, E.O. 13563,

and the Presidential Memorandum of January 20, 2021 (Modernizing Regulatory Review). Regulatory analysis, as practicable and appropriate, shall recognize distributive impacts and equity, to the extent permitted by law. We have developed this rule in a manner consistent with these requirements.

E.O. 12866, as reaffirmed by E.O. 13563 and E.O. 14094, provides that the Office of Information and Regulatory Affairs (OIRA) in the Office of Management and Budget (OMB) will review all significant rules. OIRA has determined that this rulemaking action is not significant.

*Regulatory Flexibility Act*

Under the Regulatory Flexibility Act (RFA; 5 U.S.C. 601 *et seq*., as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA) of 1996), whenever an agency must publish a notice of rulemaking for any proposed or final rule, it must prepare and make available for public comment a regulatory flexibility analysis that describes the effects of the rule on small entities. However, no regulatory flexibility analysis is required if the head of the agency certifies the rule will not have a significant economic impact on a substantial number of small entities. SBREFA amended the RFA to require Federal agencies to provide a statement of the factual basis for certifying that the rule will not have a significant economic impact on a substantial number of small entities. Thus, for a regulatory flexibility analysis to be required, impacts must exceed a threshold for "significant impact" and a threshold for a "substantial number of small entities." See 5 U.S.C. 605(b).

Within the Prairie Pothole Region (comprising Iowa, Minnesota, North Dakota, South Dakota, and Montana), there are approximately 28,000 wetland easements, of which the majority are located on privately owned farmland. Thus, small businesses within the crop production industry (North American Industry Classification System 111) may be impacted by the rule. One

aspect of the rule codifies the Service's existing drain tile setback practices; therefore, the effect of this regulatory provision on small businesses will be negligible. The rule also provides legal certainty for landowners who adhere to the setback distances prescribed by the Service. The information collection form to request the setback distances is estimated to take 25 minutes, which will be negligible for small businesses. Currently, approximately 20 landowners annually (less than 0.01 percent) must remove drain tile systems because they do not adhere to the contract that granted the easement. As a result of the added benefit of legal certainty, the rule may provide the incentive to these landowners to adhere to the contract and, thus, reduce the costs of removing drain tile systems. The average annual number of small businesses (20) potentially impacted by this rulemaking is not substantial.

Therefore, we certify that this rule will not have a significant economic effect on a substantial number of small entities as defined under the RFA. A regulatory flexibility analysis is not required. Accordingly, a small entity compliance guide is not required.

*Congressional Review Act*

This rule is not a major rule under 5 U.S.C. 804(2) of the Congressional Review Act. We anticipate no significant employment or small business effects. This rule:

a. Will not have an annual effect on the economy of $100 million or more. The minimal impact will be scattered across five States and will most likely not be significant in any local area.

b. Will not cause a major increase in costs or prices for consumers; individual industries; Federal, State, or local government agencies; or geographic regions.

c. Will not have significant adverse effects on competition, employment, investment, productivity, innovation, or the ability of U.S.-based enterprises to compete with foreign-based enterprises.

*Unfunded Mandates Reform Act*

This rule will not impose an unfunded mandate on State, local, or Tribal governments or the private sector of more than $100 million per year. The rule will not have a significant or unique effect on State, local, or Tribal governments or the private sector. A statement containing the information required by the Unfunded Mandates Reform Act (2 U.S.C. 1531 *et seq*.) is not required.

*Takings (E.O. 12630)*

In accordance with E.O. 12630, this rule will not have significant takings implications. A takings implication assessment is not required. The rule does not have any takings implications because it will not impact protected property rights. The rule provides clarity and standardization of the Service's existing process for providing drain tile setback distances to landowners and provides landowners with legal protection when they choose to follow the Service's setback distances. The rule does not require landowners to consult the Service regarding setback distances, nor does it require landowners to follow the Service's setback distances if they are provided.

*Federalism (E.O. 13132)*

Under the criteria in section 1 of Executive Order 13132, this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement. A federalism summary impact statement is not required.

*Civil Justice Reform (E.O. 12988)*

In accordance with E.O. 12988, the Department of the Interior has determined that this rule will not unduly burden the judicial system and that it meets the requirements of sections 3(a) and 3(b)(2) of the Order.

*Energy Supply, Distribution or Use (E.O. 13211)*

This rule is not a significant energy action under the definition in Executive Order 13211. A statement of energy effects is not required.

*Consultation and Coordination with Indian Tribal Governments (E.O. 13175)*

The Department of the Interior strives to strengthen its government-to-government relationship with Indian Tribes through a commitment to consultation with Indian Tribes and recognition of their right to self-governance and Tribal sovereignty. We have evaluated this rule under Executive Order 13175 and have determined that it has no substantial direct effects on federally recognized Indian Tribes.

*Paperwork Reduction Act (PRA)*

This rule contains new information collections. All information collections require approval under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*). We may not conduct or sponsor and you are not required to respond to a collection of information unless it displays a currently valid Office of Management and Budget (OMB) control number. The OMB reviewed the information collection requirements associated with requesting individualized drain tile setback distances for wetland easements in the PPR and assigned the placeholder OMB Control Number 1018–0196, pending final review and approval of the following:

**Rexuests for Drain Tile Setbacks (FWS Form 3- 2554)**

Upon the request of a landowner (via submission of FWS Form 3–2554), the Service will provide setback distances for the placement of drain tile on lands covered by wetland easements. The setback distances will be based on best available science and must be adequate to ensure protected wetland areas are not drained. Information collected via FWS Form 3–2554 includes basic contact information for the landowner, along with the easement number(s) for the specific land covered by the wetland easement.

*Revisions to Form Since Proposed Rule Phase*: In response to public comments, we revised the form to also collect technical information about the contemplated drain tile installation, specifically the desired drain tile depths and diameters, and request that the landowner attach any plans they have prepared for the installation (e.g., a geographic information system (GIS) Shapefile). We also updated the reporting and recordkeeping time burden estimates to be 10 minutes for reporting and 15 minutes for recordkeeping. Finally, we added a standard FOIA statement to the form that clarifies business information is FOIA-exempt and directs landowners to label the information that they consider to be business information when submitting the form.

The Service will provide guidance to landowners about what materials should be submitted as part of a request and will provide setback distances to landowners within a Service-provided timeframe. When a landowner coordinates their tile planning with the Service in accordance with this guidance and adheres to the Service-provided drain tile setback distances, the Service will not seek legal redress if it is later determined that Service-provided drain tile setback distance failed to protect the wetland areas from drainage, provided that drain tile has not been modified, enhanced, or replaced.

*Title of Collection*: Requests for Drain Tile Setback (50 CFR part 25).

*OMB Control Number*: 1018–0196.

*Form Number*: FWS Form 3–2554.

*Type of Review*: New.

*Respondents/Affected Public*: Individuals/households, businesses, and State/local/Tribal governments.

*Total Estimated Number of Annual Respondents*: 150.

*Total Estimated Number of Annual Responses*: 150.

*Estimated Completion Time per Response*: 5 minutes for reporting and 10 minutes for recordkeeping requirements.

*Total Estimated Number of Annual Burden Hours*: 63.

*Respondent's Obligation*: Required to obtain or retain a benefit.

*Frequency of Collection*: On occasion.

*Total Estimated Annual Nonhour Burden Cost*: None.

On April 28, 2023, we published in the *Federal Register* (88 FR 26244) a proposed rule (RIN 1018–BG80) that announced our intention to request OMB approval of the information collections identified in the rule. In that proposed rule, we solicited comments for 60 days on the information collections in this submission, ending on June 27, 2023. Summaries of comments addressing the information collections contained in this rule, as well as the agency response to those comments, can be found above under **Summary of Comments and Responses**, as well as in the information collection request submitted to OMB on the RegInfo.gov website at *https://www.reginfo.gov/public/*.

As part of our continuing effort to reduce paperwork and respondent burdens, we invite the public and other Federal agencies to comment on any aspect of this information collection, including:

(1) Whether or not the collection of information is necessary for the proper performance of the functions of the agency, including whether or not the information will have practical utility;

(2) The accuracy of our estimate of the burden for this collection of information, including the validity of the methodology and assumptions used;

(3) Ways to enhance the quality, utility, and clarity of the information to be collected; and

(4) Ways to minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, e.g., permitting electronic submission of response.

Send your written comments and suggestions on this information collection by the date indicated in **DATES** to OMB, with a copy to the Service Information Collection Clearance Officer, U.S. Fish and Wildlife Service, 5275 Leesburg Pike, MS: PRB (JAO/3W), Falls Church, VA 22041–3803 (mail); or Info_Coll@fws.gov (email). Please reference "OMB Control Number 1018–0196 Drain Tile Setbacks" in the subject line of your comments.

*National Environmental Policy Act*

We are required under the National Environmental Policy Act (NEPA; 42 U.S.C. 4321 *et seq*.) to assess the impact of any Federal action significantly affecting the quality of the human environment, health, and safety. We have determined that the rule falls under the class of actions covered by the following Department of the Interior categorical exclusion: Policies, directives, regulations, and guidelines that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case (43 CFR 46.210(i)). The regulations codify existing Service practice in administering minimally restrictive wetland easements.

**Primary Author**

Debbie DeVore, Division of Natural Resources and Conservation Planning, National Wildlife Refuge System, is the primary author of this rulemaking document.

**qist of Subjects in 50 CFR Part 25**

Administrative practice and procedure, Concessions, Reporting and recordkeeping requirements, Safety, Wildlife refuges.

**Regulation Promulgation**

For the reasons set forth in the preamble, we amend title 50, chapter I, subchapter C of the Code of Federal Regulations as set forth below:

**PART 25—ADMINISTRATIVE PROVISIONS**

1. The authority citation for part 25 continues to read as follows:

AUTHORITY: 5 U.S.C. 301; 16 U.S.C. 460k, 664, 668dd, and 715i, 3901 *et seq*.; and Pub. L. 102-402, 106 Stat. 1961.

**Subpart B—Administrative Provisions**

2. Revise § 25.23 to read as follows:

**§ 25.23 Information collection rexuirements.**

The Office of Management and Budget (OMB) has approved the information collection requirements contained in part 25 and assigned OMB Control Numbers 1018–0102, 1018–0140, 1018–0181, and 1018–0196 (unless otherwise indicated). Federal agencies may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. Direct comments regarding the burden estimates or any other aspect of the information collection to the Service's Information Collection Clearance Officer at the address provided at 50 CFR 2.1(b).

3. Add § 25.24 to read as follows:

**§ 25.24 Drain tile setbacks.**

(a) *Applicability.* The regulations in this section apply to any easement lands protected by a U.S. Fish and Wildlife Service easement for waterfowl management rights (commonly referred to as a wetland easement) that were acquired through the Small Wetlands Acquisition Program in

the Prairie Pothole Region of Iowa, Minnesota, Montana, North Dakota, and South Dakota. The regulations in this section apply only to setbacks provided by the Service beginning on [INSERT DATE 30 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER].

(b) *Drainage tile setbacks.* Upon the request of a landowner, using FWS Form 3-2554, the Service will provide setback distances for the placement of drain tile on lands covered by wetland easements. The setback distances will be based on the best available science and must be adequate to ensure that protected wetland areas are not drained. Contact your local U.S. Fish and Wildlife Service station to obtain further information. You can obtain contact information for your local Service station by contacting one of the Service regional offices; addresses for these offices are at 50 CFR 2.2.

(c) *Protection from legal redress.* The Service will provide guidance to landowners about what materials should be submitted as part of a request and will provide setback distances to landowners within a Service-provided timeframe. When a landowner coordinates tile planning with the Service in accordance with the regulations in this section and adheres to the Service-provided drain tile setback distances, including the tile diameters and tile depths below the surface that were used to calculate the Service-provided drain tile setback distances, the Service will not seek legal redress if it is later determined that the drain tile setback distances provided by the Service failed to protect the wetland areas from drainage, provided that the drain tile has not been modified, enhanced, or replaced.

**Shannon Estenoz,**
*Assistant Secretary for Fish and Wildlife and Parks.*

# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

FEB 2 6 2020

Memorandum

To: Regional Directors, Interior Regions 3, 4 & 5

From: Director

Subject: Drain Tile Setbacks and Legal Action on U.S. Fish and Wildlife Service Wetland Easements

The U.S. Fish and Wildlife Service's (Service) methodology for providing tile setback recommendations on wetland easement tracts is outlined below and utilizes the van Schilfgaarde equation to compute lateral effect distances of drain tile.

Specifically, if the setback distance calculated using the van Schilfgaarde equation lies beyond the up-gradient catchment boundary of a wetland area, the Service sets the drain tile setback for that wetland area at the catchment boundary (rather than applying the calculated distance – see attached Figure). In instances where the calculated setback distance lies within the up-gradient catchment boundary of a wetland area, the setback distance is applied. The distance calculated using the van Schilfgaarde equation is applied for areas down-gradient from the wetland area as the lower elevation and direction of groundwater flow makes the potential for enhanced subsurface drainage more pronounced (see attached Figure). When an easement is purchased, the Service must advise landowners that placement of any structure that diverts surface or subsurface water away from the purchased easement wetland area and results in water starvation of that wetland, essentially drainage, would violate the provisions of the wetland easement.

Once an easement is purchased owners of lands encumbered by Service wetland easements often seek clarity and certainty before investing in tile drainage systems. When the Service works with a landowner to design a tile installation plan, our actions should aim to protect the wetland areas from drainage without needlessly restricting activities on the remainder of the easement. In those situations where the landowner coordinates their tile planning with the Service, and adheres to Service-provided setback distances, the Service will not pursue legal action if it is later determined that the distances are inadequate to protect wetland areas from drainage.

If a landowner does not follow Service-provided setback distances, or changes the tiling parameters on which setback calculations are based, and drainage of the protected wetland occurs, the Service will request that tile within the setback distances be removed to restore the affected wetland area. If the landowner does not voluntarily provide wetland restoration, the Service will review its legal obligations, which includes seeking redress via legal action.

However, no legal action will be pursued until after the landowner is given the opportunity for administrative appeal.

The continued success of the wetland easement program requires the Service to diligently monitor easements for compliance and to pursue legal remedies when appropriate. At the same time, it also requires the Service to work with landowners in good faith and to adopt reasonable policies, which gives landowners greater certainty that placement of their drain tile will not result in draining protected wetland areas. The procedure outlined here achieves that standard.

[FR Doc. C1–2024–06956 Filed 5–10–24; 8:45 am]

BILLING CODE 0099–10–C

**DEPARTMENT OF THE INTERIOR**

**Fish and Wildlife Service**

**50 CFR Part 25**

**[Docket No. FWS–HQ–NWRS–2022–0092; FXRS12610900000–245–FF09R25000]**

**RIN 1018–BG80**

## National Wildlife Refuge System; Drain Tile Setbacks

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Final rule.

**SUMMARY:** We, the U.S. Fish and Wildlife Service (Service), promulgate new regulations pertaining to wetland easements to bring consistency, transparency, and clarity for both easement landowners and the Service in the administration of conservation easements, pursuant to the National Wildlife Refuge Administration Act of 1966, as amended by the National Wildlife Refuge System Improvement Act of 1997. These regulations codify the process by which landowners can request and the Service will provide drain tile setbacks under wetland easement contracts. Under these regulations, if landowners fully comply with Service-provided setbacks when installing drain tile and do not later replace or modify the drain tile, the Service grants the landowners a safe harbor from legal action in the event that the setback drain tile nevertheless results in the draining of an easement wetland. Setback distances are calculated based upon the best available science considering soil characteristics, tile diameter, the depth of the tile below the surface, and/or topography sufficient to the easement contract's standard of protection that ensures no drainage of adjacent protected wetland areas. The regulations apply only to setbacks provided by the Service beginning on the effective date of this final rule.

**DATES:** This rule is effective June 12, 2024.

*Information collection requirements:* If you wish to comment on the information collection requirements in this rule, please note that the Office of Management and Budget (OMB) is required to make a decision concerning the collection of information contained in this rule between 30 and 60 days after the date of publication of this rule in the **Federal Register**. Therefore, comments should be submitted to OMB by June 12, 2024.

**ADDRESSES:** *Information collection requirements:* Written comments and suggestions on the information collection requirements should be submitted within 30 days of publication of this document to *https://www.reginfo.gov/public/do/PRAMain.* Find this particular information collection by selecting ''Currently under Review—Open for Public Comments'' or by using the search function. Please provide a copy of your comments to the Service Information Collection Clearance Officer, U.S. Fish and Wildlife Service, 5275 Leesburg Pike, MS: PRB (JAO/3W), Falls Church, VA 22041–3803 (mail); or *Info_Coll@fws.gov* (email). Please reference OMB Control Number 1018–0196 in the subject line of your comments.

**FOR FURTHER INFORMATION CONTACT:** Debbie DeVore, (251) 604–1383. Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:**

### Background

Wetland habitat in the Prairie Pothole Region (PPR) of Iowa, Minnesota, Montana, North Dakota, and South Dakota is critically important to waterfowl and other migratory bird populations. The unique topography of the PPR includes numerous small wetlands and potholes that were formed through glaciation thousands of years ago. Prairie potholes are freshwater depressions and marshes, often less than 2 feet deep and 1 acre in size, that are a permanent feature of these landscapes barring deliberate alteration of the topography or hydrology. What makes the PPR so biologically important to waterfowl is the seasonal fluctuation of surface water through these permanent wetlands basins. The PPR is responsible for producing approximately 50 to 75 percent of the primary species of ducks on the North American continent, providing habitat for more than 60 percent of the breeding population. Waterfowl fledged in the PPR are a significant natural resource. Waterfowl are a diverse group of birds that are important to many aquatic and wetland ecosystems throughout the country. Additionally, waterfowl hunting and associated industries support thousands of jobs and in 2016 produced an estimated $2.9 billion in economic benefit.

Congress, recognizing the impact that widespread drainage was having on wetlands and waterfowl populations in the PPR, officially created the Small Wetlands Acquisition Program on August 1, 1958, by amending the 1934 Migratory Bird Hunting Stamp Act (commonly referred to as the ''Duck Stamp Act''). The amendment allowed proceeds from the sale of Federal Duck Stamps to be used to conserve and protect ''small wetland and pothole areas'' through the acquisition and establishment of areas designated as Waterfowl Production Areas (WPAs). The Service purchased the first fee-title WPA in South Dakota in 1959, and began to purchase wetland easements soon thereafter. The acquisition of wetland easements accelerated across the PPR following the passage of the 1961 Wetlands Loan Act (Pub. L. 87–383), which authorized appropriations to advance funding for the purchase of wetland easements. Wetland easements are part of the National Wildlife Refuge System, governed by the National Wildlife Refuge System Administration Act (hereafter, ''the Administration Act''; 16 U.S.C. 668dd *et seq.*).

### Wetland Easements

This rulemaking action codifies new regulations pertaining to easement lands protected by a Service easement for waterfowl management rights (commonly referred to as a ''wetland easement'') in the PPR. The easements are areas of land or water acquired and administered by the Service with a less than fee interest for the purpose of maintaining small wetland or pothole areas suitable for use as WPAs.

A wetland easement is a voluntary legal agreement with the Service that pays landowners to permanently protect wetlands. The easement contains restrictions on the use or development of the land to protect its conservation values. The Service's wetland easements are minimally restrictive conservation easements, meaning that they have a minimal impact on the property value and limit the landowner's use and enjoyment of the property to a minor degree. Landowners who sell a wetland easement to the Service agree that wetlands protected by an easement cannot be drained, filled, leveled, or burned. If these wetlands dry up naturally, they can be farmed, grazed, or hayed.

### Drain Tiles

Traditionally, the purpose of subsurface agricultural drainage has

been to lower the water table of poorly drained soils with the goal of improving soil aeration. Recently, advanced drainage systems have been promoted as a way to manipulate soil water content during the growing season. Subsurface drainage systems typically remove water through perforated pipe (commonly referred to as drain tile) placed below the soil surface.

Drain tile positioned adjacent to wetland areas can result in reduced hydroperiods (periods of inundation) depending on several factors, such as the depth of tile in relation to the wetland area. The amount and timing of precipitation intercepted by subsurface drainage systems will vary depending on soil properties, topography (low/high topographic relief), placement of tile relative to the wetland area (horizontal distance, elevation), and the relation between the wetland area and groundwater (*i.e.,* recharge, discharge). Direct drainage of a wetland area by placing perforated tile and surface inlet pipes through (beneath) the wetland area would have a detrimental effect on wetland hydrology regardless of other factors.

Drainage systems positioned adjacent to a wetland area in low-relief terrain have the potential to indirectly affect the wetland area through lateral drainage (lateral effect). The lateral effect is defined as the perpendicular distance on either side of a tile pipe where soil water can be drained by the tile. Drainage systems positioned to encircle a wetland area completely or partially in high-relief terrain can intercept groundwater and precipitation runoff to the wetland area depending on the previously mentioned factors.

**Internal Guidance for Calculating Drain Tile Setbacks**

Three years ago, the Service developed basic guidance for administering a drain tile setback request process and calculating drain tile setback distances using the best available science. This guidance was captured in a published Director's Memo, which is available at *https://www.fws.gov/sites/default/files/documents/Guidance-Memo-Drain-Tile-Setbacks-Wetland-Easements.pdf* or in hard copy from your local U.S. Fish and Wildlife Service station. If you need help identifying and contacting your local station, see 50 CFR 2.2 for the contact information of the nearest Regional Office. We refer to this document as the ''guidance memo'' in the remainder of this document. The guidance memo sets out the basics of the calculation processes for the Service to use when determining drain tile setback distances, including use of the van Shilfgaarde equation, and it establishes that the Service will not pursue legal redress should it later be determined that setback distances provided by the Service were inadequate to protect adjacent wetland areas from drainage. This final rule codifies the key aspects of the guidance memo, such as the use of the best available science and the legal safe harbor for landowners who fully comply with Service-provided setback distances. The guidance memo remains in full effect because it has been incorporated as part of the broader internal guidance. The Service recently finalized the broader internal guidance developed to implement the voluntary drain tile setback program that is codified in this rule. We refer to this as the ''internal guidance'' or ''internal setback guidance'' in the remainder of this document. The internal guidance provides Service personnel with direction in administering the drain tile setback process program, which includes guidance on the timeframes for and calculation of Service-provided drain tile setback distances. The internal guidance is consistent with both this rule and the guidance memo, which as noted above is itself part of the internal guidance. The purpose of the internal guidance is to provide more detail than the guidance memo or this rule, particularly elaborating on calculation processes and providing guidelines for internal processes. The internal guidance is available to the public; for a copy, please contact your local U.S. Fish and Wildlife Service station (you can search by zip code, under Refine Your Search, or by map here: *https://fws.gov/our-facilities*). If you need help identifying and contacting your local station, see 50 CFR 2.2 for the contact information of the nearest Regional Office. Landowners who want to better understand the internal guidance or who have questions about the context of the guidance are encouraged to contact your local station.

**This Final Rule**

The regulations we are adopting in this final rule provide clarity and certainty to landowners that drain tile may be installed on lands encumbered by a wetland easement provided that protected wetland areas are not drained, directly or indirectly. This rule distinguishes Service wetland easements from the ''Swampbuster'' provisions of the Food Security Act of 1985 (also known as the ''Farm Bill''; Pub. L. 99–198), which allow drain tile to have a ''minimal effect'' to wetlands. Service wetland easement agreements with landowners include provisions that allow for no effect; hence, drain tile may be installed on a wetland easement tract, but it is a violation of the easement contract if the result is that the tile drains a protected wetland area.

Because the impact of a given drainage system on wetland areas varies greatly depending on site conditions, there are no one-size-fits-all specifications to prevent drain tile installation from draining wetlands and individualized calculations are needed for each drain tile installation. Therefore, on wetland easement lands, landowners will be able to voluntarily request that the Service provide them with individual drain tile setback distances. These regulations require the Service to establish drain tile setback distances based upon the best available science and with due consideration of soil characteristics, tile diameter, the depth of the tile below the surface, and/or topography that ensure protected wetland areas are not drained.

Additionally, these regulations ensure that landowners who adhere to the setback distances prescribed by the Service, including the tile diameters and tile depths below the surface that were used to calculate the Service-provided drain tile setback distances, will not be required to remove drain tile that is later found to have an adverse effect on protected wetland areas. In this way, these regulations recognize that our understanding of the effects that drain tile may have on wetland hydrology is an evolving science. Service-provided drain tile setback distances may prove inadequate to fully protect easement wetland areas from drainage. However, landowners who coordinate their tiling plans with the Service and adhere to the Service-determined setback distances will not later be held criminally responsible or civilly liable for disturbing, injuring, or destroying a unit of the National Wildlife Refuge System (*i.e.,* draining a protected wetland area) provided the subsurface drainage system is not modified, enhanced, or replaced. These regulations thus provide greater certainty and clarity for both landowners and the Service and encourage communication and collaboration.

**Amendments to Existing Regulations**

This rule codifies in the Code of Federal Regulations the following provisions:

(1) Within a Service-provided timeframe, the Service will provide setback distances for the placement of drain tile on lands covered by wetland easements in Iowa, Minnesota,

Montana, North Dakota, and South Dakota;

(2) The Service will provide guidance to landowners about what materials should be submitted as part of a request; and

(3) When a landowner coordinates tile planning with the Service in accordance with this guidance and adheres to the Service-provided drain tile setback distances, including the tile diameters and tile depths below the surface that were used to calculate the Service-provided drain tile setback distances, the Service will not seek legal redress if it is later determined that the Service-provided drain tile setback distances failed to protect the wetland areas from drainage, provided that the drain tile has not been modified, enhanced, or replaced.

The regulations will apply only to setbacks provided by the Service beginning on the effective date of this final rule (see **DATES**, above).

**Statutory Authority**

The Administration Act, as amended by the National Wildlife Refuge System Improvement Act of 1997 (hereafter, ''the Improvement Act''; Pub. L. 105–57), governs the administration and public use of refuges.

Amendments enacted by the Improvement Act built upon the Administration Act in a manner that provides an ''organic act'' for the Refuge System, similar to organic acts that exist for other public Federal lands. The Improvement Act serves to ensure that we effectively manage the Refuge System as a national network of lands, waters, and interests for the protection and conservation of our Nation's wildlife resources. The Administration Act states first and foremost that we focus our Refuge System mission on the conservation of fish, wildlife, and plant resources and their habitats. The Administration Act, as amended, contains 14 directives to the Secretary of the Interior (Secretary), one of which states that, in administering the Refuge System, the Secretary shall ensure effective coordination, interaction, and cooperation with owners of land adjoining refuges. The Administration Act also authorizes the Secretary to issue regulations to carry out the purposes of the Act.

**Summary of Comments and Responses**

On April 28, 2023, we published in the **Federal Register** (88 FR 26244) a proposed rule to establish new regulations for wetland easements that would bring consistency, transparency, and clarity for both easement landowners and the Service in the administration of conservation easements, pursuant to the Administration Act, as amended by the Improvement Act. We accepted public comments on the proposed rule for 60 days, ending June 27, 2023. By that date, we received comments from eight commenters on the proposed rule. One commenter's comment was unrelated to the proposed rule. We discuss the remaining substantive topics raised by commenters below.

*Comment (1):* Five comments expressed general support for the proposed rule. These comments expressed support for drain tile setbacks as a ''good idea'' to protect wetlands while providing transparency and clarity for landowners whose land is encumbered with an easement for waterfowl management rights (commonly referred to as a wetland easement).

*Our Response (1):* We appreciate this general support. We designed this rule to make the drain tile setback process more open and transparent, and to simplify and clarify wetland easement responsibilities for both landowners and the Service.

We did not make any changes to the rule as a result of these comments.

*Comment (2):* Two comments asked the Service to withdraw the proposed rule in its entirety.

*Our Response (2):* The Service carefully considered the concerns and reasons presented in each of these comments underlying the request to withdraw the proposed rule and not issue a final rule. These concerns, which are addressed below, do not individually or cumulatively provide a persuasive rationale for the Service to withdraw the proposed rule, nor to postpone the issuance of this final rule for further consideration.

Notably, each of these comments expressed support for the Service's guidance memo for wetland easements (see Internal Guidance for Calculating Drain Tile Setbacks, above). The commenters also implied that a part of their reasoning for requesting that the Service withdraw the proposed rule was grounded in the belief that a final rule would supersede the guidance memo; both commenters stated a preference for the guidance memo. As discussed further below in our response to *Comment (14),* this rule is consistent with the guidance memo, and that guidance memo remains in effect with the publication of this final rule.

We did not make any changes to the rule as a result of these comments.

*Comment (3):* One comment urged general caution with this rule, given that it allows drain tile into an area with wetland easements.

*Our Response (3):* The Service acknowledges the concerns underlying this comment and is committed to protecting the wetlands under our easements. At the same time, the Service cannot constrain a landowner's rights without the appropriate agreement and compensation. Through a wetland easement, the Service buys minimally restrictive rights, so the landowner may not drain, burn, fill, or level wetland areas, but we do not purchase rights specifically concerning the installation of drain tile. In some cases, it is possible for landowners to install tile within the boundaries of wetland easements without draining wetland areas, and they have the right to do so in such cases.

The Service's solution to balancing our right to prohibit draining of wetlands under the easement and a landowner's right to install drain tile within the easement boundary, as long as it does not drain those wetlands, is the Service-provided setback process codified by this rulemaking. The need for caution and care in the installation of tile near wetlands is met when landowners coordinate with the Service and are provided with setbacks that adequately protect easement wetlands.

We did not make any changes to the rule as a result of this comment.

*Comment (4):* Two commenters requested that we ensure the rule considers or is consistent with other drainage and water laws in Iowa, Minnesota, and North Dakota.

*Our Response (4):* The Service routinely works and coordinates with State agency partners on various aspects of our conservation mission, including water rights and wetland management. The Service works with State agencies, landowners, drainage districts, and water boards regarding efforts to maintain, repair, and replace drain tile and ditches so that drainage of non-easement protected wetlands can continue when in compliance with State and local laws and regulations and when that work will not infringe on the terms of the easement agreement or on the Service's authorities under the Improvement Act or the Migratory Bird Conservation Act (16 U.S.C. 715–715d). We also work with and share resources with States, landowners, drainage districts, and water boards on actions that protect or otherwise benefit fens and other wetlands where we have the jurisdiction and authority to do so.

In shaping this rule, the Service did fully consider existing State laws. This rule does not conflict with any State law, and the same is true for our

wetland easement agreements, but in application to specific drain tile projects, this rule and the specific easement agreement may impose different requirements and limitations than those under State law. This is because the Service must protect the legal property interest that was paid for in the wetland easement agreement. The rights acquired protect wetland areas from being drained, burned, filled, or leveled. If these easements could not protect wetlands beyond the baseline protections under applicable State laws, they would have no value to the Service.

In cases where easement agreement requirements impose limitations beyond State law, the easement agreement, and the Service's authority to enforce its terms under the Improvement Act and Migratory Bird Conservation Act, typically supersede the applicable State law. In the *United States* v. *Vesterso* (828 F.2d 1234 (8th Cir. 1987)), the Eighth Circuit Court of Appeals upheld that the digging of ditches that damaged Federal easement wetlands in North Dakota was a violation of law and of the easement agreement, even though the digging was permissible under State law. The court found that, under the Administration Act, differences in requirements between Federal easements and State law are to be resolved on a case-by-case basis, so neither overrides the other in all cases. The Federal interest in the natural state of wetlands under an easement must be balanced against the State interest in and authority over State waters. On this point, the Court's opinion stated that while the Service was correct in this case and the easement agreement controlled, the Service does not have a general, absolute right to prohibit alteration of a wetland or interference of the natural flow of water under an easement.

We did not make any changes to the rule as a result of these comments.

*Comment (5):* Three comments referenced other permitting agencies and/or drainage laws and encouraged the Service to notify landowners receiving Service drain tile setbacks that other agencies, including Federal, State, and local governments, local watersheds and water boards, and other permitting authorities, will need to be consulted to ensure landowners' drain tile projects comply with other permitting entities.

*Our Response (5):* As part of our standard process, the Service notifies landowners that the drain tile setback received from the Service only addresses the Service's wetland easement on their property and that they will need to coordinate with State and local governments, watersheds, water boards, and other permitting authorities when installing drain tile on their land to ensure their project complies with all Federal, State, local, and other laws, statutes, codes, and policies.

We did not make any changes to the rule as a result of these comments.

*Comment (6):* Three comments requested that the Service specifically state in the regulation what the ''Service-provided timeframe'' is for processing a drain tile setback.

*Our Response (6):* The Service understands the concern of landowners and other stakeholders for timely delivery of setback decisions. We are committed to timely communication and delivery of setback distances. Our aim is to provide landowners with an estimate of the setback calculation timeline for their specific case within 2 business weeks of receiving their request on FWS Form 3–2554. We also anticipate that, in most cases, we will be able to provide drain tile setback distances within 60 calendar days. However, there are various factors that prevent the Service from specifying a uniform deadline for this process. This includes logistical factors, such as the availability of expert personnel and scheduling of on-site assessments, and factors that are a part of the actual calculations, such as the unique physical features of a given wetland. Several of these factors are noted in our publicly available internal guidance for calculating setbacks (see Internal Guidance for Calculating Drain Tile Setbacks, above). In that internal setback guidance, we provide the guiding principles for what constitutes a reasonable timeframe for Service employees calculating setback distances.

We did not make any changes to the rule as a result of these comments.

*Comment (7):* One commenter asked what was meant by the term ''best available science'' and questioned the absence of a definition in the proposed rule.

*Our Response (7):* The term ''best available science'' is a well-defined and long-established legal standard for the actions of science-driven Federal Government agencies. For example, the Endangered Species Act of 1973 (16 U.S.C. 1531 *et seq.*), as amended, requires species listings to be based on the ''best scientific and commercial data available.'' As the use of the term in this final rule does not depart from its established legal meaning, which itself is consistent with the plain meaning of the phrase, providing a definition in this rule is not necessary.

The Service will ensure that our policy for, our guidance on, and our implementation of the wetland easement program are all based on scientific data and information. We will also ensure that, of the sources of relevant scientific information available to us, we make use of the ''best'' science by considering objective indicators of scientific quality such as peer review, replication, quality and calibration of equipment, robustness of models, and so forth, when determining which information should carry the most weight in our processes.

We did not make any changes to the rule as a result of this comment.

*Comment (8):* Two comments expressly noted that the provisions of the proposed rule would have no retroactive effect, but seemed to have different understandings of the implications of this fact and differing opinions as to whether the rule should have retroactive effect.

*Our Response (8):* Clarification on the point of retroactivity should resolve the concerns of both of these commenters and any other members of the public on this point.

The regulations in this rulemaking will not have retroactive effect; they will apply only to setbacks provided by the Service beginning on the effective date of this final rule (see **DATES**, above). This rule creates a voluntary process for landowners to request drain tile setback distances. There is no requirement to request or to make use of Service-provided setback distances, but the rule does provide a legal safe harbor for those landowners who do both. Thus, those landowners who have never before requested setback distances from the Service are in the same position regardless of whether or not the rule has retroactive effect. This is why the absence of retroactive effect could only be relevant to those landowners who received Service-provided setback distances under our guidance memo on drain tile setbacks (see Internal Guidance for Calculating Drain Tile Setbacks, above). In that case, however, the position of those landowners is also unchanged, since the guidance memo remains in full effect and will guide refuge personnel in implementing these new regulations. This rule merely codifies the key principles of our guidance memo.

In summary, the rule only has prospective effect, but this does not change the status of either (1) landowners who have never requested setback distances and thus have no legal safe harbor should they install tile that drains an easement wetland; or (2) landowners who requested and

complied with setback distances and thus do have a legal safe harbor should their drain tile nevertheless drain an easement wetland. What the prospective effect does mean is that the voluntary process for setback requests and receiving legal safe harbor is further solidified by inclusion in our regulations and that landowners who request and fully comply with setback distances from the Service in the future can be assured of legal safe harbor.

We did not make any changes to the rule as a result of these comments.

*Comment (9):* Two commenters requested that the Service offer assurance that a landowner who follows the Service-provided setback will be afforded a legal safe harbor regardless of whether the Service-provided setback distances do or do not protect the wetland from drainage.

*Our Response (9):* The Service understands the importance for landowners of our commitment not to seek legal redress against landowners who coordinate with the Service and fully cooperate with the Service's setback determinations. In fact, providing assurance on this point is one of the Service's primary reasons for pursuing this rulemaking. This rule codifies exactly this type of assurance for landowners, as directly stated in the regulatory provisions at 50 CFR 25.24(c) (see Regulation Promulgation, below). Regarding this protection from legal redress, the regulations we are adopting in this rule specifically state that when a landowner coordinates tile planning with the Service in accordance with the regulations and adheres to the Service-provided drain tile setback distances, then the Service will not seek legal redress if it is later determined that the drain tile setback distances provided by the Service failed to protect the wetland areas from drainage, provided that the drain tile has not been modified, enhanced, or replaced.

We did not make any changes to the rule as a result of these comments.

*Comment (10):* One comment requested that the regulations clarify that maintenance and repairs of drain tile systems installed in accordance with Service guidance or coordination are permissible without any further agency involvement.

*Our Response (10):* Landowners with wetland easements on their property are always allowed to install and to maintain drain tile systems, but if the tile drains wetlands in violation of the Service's easement, then the landowner may face legal action. In the interest of both parties, the Service offers a voluntary process for landowners to request a Service-provided setback; landowners who fully comply with the Service-provided setback distances when installing or maintaining a drain tile system are shielded from legal action. In the case of a landowner's actions to maintain or repair a drain tile system, remaining within this legal safe harbor requires that the landowner's maintenance or repair actions do not amount to a modification, enhancement, or replacement of the system. This requirement is provided in the regulatory provision at 50 CFR 25.24(c) (see Regulation Promulgation, below), where it clearly states that drainage of an easement wetland, after installation of a drain tile system in accordance with a Service-provided setback, will not result in the Service taking legal action provided that the drain tile has not been modified, enhanced, or replaced.

Drain tile systems installed in accordance with Service guidance or coordination should not drain easement-protected wetland areas. Therefore, routine maintenance and repair actions that do not amount to modification, enhancement, or replacement, whether or not coordinated with the Service, would not invalidate the safe harbor protections provided to landowners who install drain tile systems in accordance with Service-provided setbacks and other guidance. A true maintenance or repair action should not change the tile system in a way that impacts the Service's setback distances. For example, substituting one 4-inch tile for another 4-inch tile at the same location and depth would be a routine repair that does not invalidate the landowner's legal safe harbor. This difference between a routine maintenance and repair action and an action to modify or enhance the drain tile system, or to replace it with another system altogether, is commonly understood for those landowners who employ and those service providers who install drain tile systems, so further clarification in the regulatory provision is not necessary.

At the same time, a wetland easement agreement is a commitment to shared responsibility for the designated wetlands and an important piece of that shared responsibility is effective communication between landowners and the Service. The Service encourages landowners to be generally communicative about all aspects of wetland easement agreements and is committed to helpful communication in return. Specific to maintenance and repair of a drain tile system installed in accordance with Service-provided setback distances, continued communication is as mutually beneficial as the setback process. In fact, the only way for a landowner to be truly certain whether the maintenance or repair actions they wish to take would constitute a modification, enhancement, or replacement, and thus whether they remain within the legal safe harbor regulatory provision, is to coordinate the maintenance or repair with the Service.

We did not make any changes to the rule as a result of this comment.

*Comment (11):* One comment stated that there should be no need for any later assessments or determinations of whether the setback distances provided the desired wetland protection where a landowner installs drain tile based on Service-provided setback distances, given the legal safe harbor for the landowner in the event the wetland is drained.

*Our Response (11):* The Service periodically monitors all of our wetland easements using a variety of nonintensive methods, such as aerial photography. In the interest of both landowners and minimal disturbance to wetlands, we seek to not monitor more often or more intensively than necessary. Our existing publicly available policy on wetland easements requires periodic monitoring and sets out the monitoring methods that our personnel may use (see Service Manual at 601 FW 6 at *https://www.fws.gov/policy-library/601fw6*).

In the specific situation of a landowner installing drain tile according to Service-provided setbacks, we will continue to monitor the wetlands on that property in the same manner as any other property subject to an easement. We will do this for three reasons. First, as noted above, our policy requires monitoring all of our wetland easement interests. Second, we need to monitor these wetlands in the interest of our overall migratory bird and waterfowl wildlife management responsibilities and wildlife conservation mission, which constitute the purpose for obtaining and maintaining these easements. Third, while the landowner may have complied with Service-provided setbacks at the time of drain tile installation, full compliance with the Service's setbacks under these regulations, and thus securing the legal safe harbor for the landowner, also requires that a landowner does not subsequently modify, enhance, or replace the drain tile system. This means that we need to continue monitoring to identify when an easement wetland has been drained. If an easement wetland has been drained, we determine whether the landowner

has modified, enhanced, or replaced the drain tile system in order to determine whether or not the legal safe harbor applies and the Service should or should not seek legal redress. Moreover, monitoring for this purpose is critical because identifying when an easement wetland has been drained may be the best, or even the only, signal for us that a landowner has modified, enhanced, or replaced the drain tile system after the initial installation.

We did not make any changes to the rule as a result of this comment.

*Comment (12):* One comment urged that the Service should not seek legal redress against a landowner in cases where a drainage district acts in a manner inconsistent with the provisions in the proposed rule, and that this should be stated in the regulations.

*Our Response (12):* It is unclear how a drainage district could act inconsistently with the provisions in this rule, as this rule provides a process for landowners to request and obtain setback distances from the Service and, if they fully comply with those setback distances, be assured of a legal safe harbor in the event a wetland is drained. Assuming that the commenter is referring to actions taken by a drainage district that could violate the terms of a wetland easement, such as draining an easement-protected wetland, then our response is that we cannot provide any such provision in the regulations.

The Service will determine an appropriate response in this type of situation on a case-by-case basis, and accordingly will not commit to any blanket limitation on our options for legal redress merely because a drainage district is involved and may bear more responsibility than the landowner for the easement violation. Unless the legal safe harbor for landowners codified by this rule applies, the Service reserves the right to seek legal redress against any and all responsible parties in the event of drainage of a wetland in violation of a wetland easement, or any other violation of the terms of a wetland easement, to the full extent of applicable law.

We did not make any changes to the rule as a result of this comment.

*Comment (13):* One comment expressed the concern that due to the distribution of small easement wetlands throughout a landowner's property and the setback distances provided by the Service, there might not be any location on the property where the landowner can install drain tile that complies with the Service's setbacks. This commenter was also concerned that in this case the rule prevents the landowner from installing drain tile.

*Our Response (13):* This rule does not prevent any landowner from installing drain tile. As discussed above under our response to *Comment (10)*, landowners with wetland easements on their property are always allowed to install drain tile systems, but if the tile drains wetlands in violation of the Service's easement, then the landowner may face legal action.

The situation described by this commenter is possible. The locations and measurements of the overall property, the protected wetland areas, and the calculated setback distances may in some cases be such that there is no location within the borders of the overall property where drain tile can be placed that is setback from all easement wetlands at the distances determined by the Service's calculations. In such a case, the landowner may nevertheless choose to install drain tile, but they would do so at the risk of draining one or more easement wetlands and without the assurance of a legal safe harbor.

Conversely, other landowners may find that they are able to install drain tile on a wetland easement and setback from all wetlands in full compliance with the setback distances calculated by the Service, and thus ensure a legal safe harbor for the installation. Where a landowner's property fits along the continuum bounded by these two situations depends on the size and distribution of the wetlands, the hydrology of the wetlands, and other factors unique to each property.

We did not make any changes to the rule as a result of this comment.

*Comment (14):* Two comments expressed support for the Service's guidance memo on calculating drain tile setbacks, finalized in 2020. Both of the comments urged the Service to revise the proposed rule to explicitly reference the guidance memo, and one also urged codifying the setback calculation content from the existing Service guidance.

*Our Response (14):* The guidance memo remains in full effect (see Internal Guidance for Calculating Drain Tile Setbacks, above). The guidance memo, as well as our internal guidance more generally and any future updated guidance, need not be expressly referenced in the regulations in order to guide Service administration of wetland easements (see Internal Guidance for Calculating Drain Tile Setbacks, above). There is nothing incongruent between the guidance memo and this rule. The guidance memo was developed based on the best science available at that time. It also assures landowners that the Service will not pursue legal redress should it later be determined that setback distances were inadequate to protect adjacent wetland areas from drainage. This regulation codifies these two principles, ensuring that Service calculations will be based on the best available science to prevent protected wetland areas from drainage and that landowners who fully cooperate with Service-provided setbacks will have a legal safe harbor.

Including the calculation processes of the Service's guidance memo in the regulations, however, would not be in the interest of the Service or landowners. In order for setback calculations to be based on the best available science, the Service needs to be able to update our processes as empirical experience and new scientific studies provide new information. Updating those processes through rulemaking is inefficient and unnecessary. As the Service and other agencies routinely do, the Service has codified our obligation to use the best available science in regulation and will then keep our publicly available, detailed internal guidance up-to-date and effective. This will allow us to best protect wetlands while also providing accurate, no-farther-than-necessary setback distances to landowners.

We did not make any changes to the rule as a result of these comments.

*Comment (15):* One comment included a request that the Service make the methodology for determining a drain tile setback publicly available, and that the Service invite public comments any time the Service proposes to change the methodology.

*Our Response (15):* The Service's internal setback guidance documents containing the methodology for determining a drain tile setback are publicly available (see Internal Guidance for Calculating Drain Tile Setbacks, above). Landowners retain the right to challenge the Service's methodology if they believe there was an error in our methodology or in our application of the methodology to their case. This provides an efficient, reasonable, and open process for setback determinations.

The Service's methodology was established using the best available science and the expertise and best professional judgment of Service personnel to provide adequate protection for wetland easement areas.

We did not make any changes to the rule as a result of this comment.

*Comment (16):* Two comments called for the Service to establish an administrative appeal process that is independent of the direction and control of the Service.

*Our Response (16):* Administrative appeals processes are a common feature of good government throughout Federal agencies. These processes allow agency subject-matter expertise to form the administrative hearing record and inform the decision reached on appeal. They also allow the agency to double-check its initial decision so that it can identify, and thereby more quickly address, any errors that were made. Regulated parties, in this case landowners, always have the option of appealing the ultimate agency decision to a judicial branch court after exhausting the administrative appeals process, which is sufficient to address any potential errors in the administrative appeal process that could harm their interests.

In the U.S. Federal Government, no administrative appeals process external to the agency whose final decision is being challenged exists. Quasi-independent administrative tribunals and review boards do exist, such as the Environmental Appeals Board, a body that hears appeals of Environmental Protection Agency (EPA) final decisions and reports directly to the EPA Administrator outside of the regular EPA line authority. The commenters presented no compelling evidence that the current administrative appeals process is inherently flawed or not reaching appropriate determinations concerning wetland easements. The Service is also not otherwise aware of any reasons the existing appeals process is inadequate. We do not see any need at this time to devote considerable resources toward the creation of a quasi-independent body to hear appeals of Service decisions concerning wetland easements.

Landowners who disagree with a Service-provided setback distance, or another final decision concerning wetland easements, may appeal to the appropriate Regional Director in accordance with the procedure established by 50 CFR 25.45.

We did not make any changes to the rule as a result of these comments.

*Comment (17):* One comment questioned how landowners will be notified of the responsibility to request a setback to protect the wetlands on their land that are subject to a wetland easement.

*Our Response (17):* This rule does not obligate or require any landowner to request a drain tile setback. We have created a voluntary process for landowners to request and receive a Service-provided drain tile setback to facilitate coordination between landowners and the Service and to improve landowner compliance with the requirements of the Service's wetland easements. This process benefits landowners in that it provides a legal safe harbor for landowners who fully comply with the Service's setback determination, as the Service will not seek legal redress in the event that the wetland drains despite the landowner's adherence to the Service's setback determination. Landowners have the right to install drain tile on their land without requesting a Service-provided setback, but in that case, they are legally obligated to ensure by their own efforts that the drain tile does not violate any wetland easement agreement with the Service by draining protected wetlands.

While the setback request process is voluntary, the Service will make efforts to notify landowners about this mutually beneficial opportunity. The Service intends to publicize the opportunity through various communication channels. In fact, our existing internal guidance provides strategies, and our process includes steps for communication with landowners concerning their ability to request a Service-provided setback. The publication of this rule and the regulations that we are codifying in the Code of Federal Regulations will also serve as public notice of this opportunity for landowners with wetland easement agreements.

We did not make any changes to the rule as a result of this comment.

*Comment (18):* One comment expressed concern that the rule does not clearly tell the landowner what lands are subject to the easement or provide adequate notice as to the reasonable parameters of the easement.

*Our Response (18):* This rule provides a general framework for the Service in regulating all of our wetland easement interests, so it is not the appropriate place to delineate individual easement boundaries in detail. The appropriate place to clarify the boundaries of the Service's wetland easement is in each wetland easement agreement document itself. That is why each easement document includes a clear legal description of the lands that are subject to the easement. In fact, multiple courts have found the parameters in individual easement documents to be clear (see, *e.g., United States* v. *Albrecht,* 496 F.2d 906 (8th Cir. 1974) (using the phrase ''precise draftsmanship'' in reference to the terms of the easement agreement), and *United States* v. *Seest,* 631 F.2d 107 (8th Cir. 1980)).

For the same reasons, this rule is not the appropriate means of notifying landowners of the parameters of wetland easements. Landowners are adequately notified of the easement and the extent to which it encumbers their property either when signing the wetland easement agreement with the Service or when performing due diligence before obtaining land subject to an existing wetland easement from another private landowner. Every easement document is registered and publicly available in the applicable State or county land records, and landowners can also obtain a copy by contacting their local U.S. Fish and Wildlife Service station. (If you need help identifying and contacting your local station, see 50 CFR 2.2 for the contact information of the nearest Regional Office.) Review of the easement document provides a landowner with the necessary details of the boundaries of the easement. Thus, landowners should know of all the reasonable parameters. Landowners who are nevertheless unsure of the parameters of an easement are welcome to consult the Service by contacting their local U.S. Fish and Wildlife Service station. (If you need help identifying and contacting your local station, see 50 CFR 2.2 for the contact information of the nearest Regional Office.)

We did not make any changes to the rule as a result of this comment.

*Comment (19):* One comment requested that, for newly acquired wetland easements, the Service ensure landowners agreeing to the easements understand what limitations are associated with drain tile installation.

*Our Response (19):* The Service takes steps to ensure that new landowners are aware of the limitations on drain tile installation that wetland easements require. The Service's Realty Specialists working with new landowners who are enrolling their land in wetland conservation easements inform landowners of what rights the Service acquires or restricts during the easement agreement process. This ensures landowners are aware of what a wetland easement will mean for them before they sign an easement document. Most importantly, the Service clearly articulates that no wetlands protected by the easement can be drained. If a landowner wants to retain the ability to drain a given wetland area, they can choose to not include that individual wetland area in the wetland easement.

We did not make any changes to the rule as a result of this comment.

*Comment (20):* Two comments requested that the regulations be revised to inform landowners exactly what information and materials will be required from them when they request a drain tile setback.

*Our Response (20):* The Service recognizes that landowners are rightfully cautious about their private information. The Service developed FWS Form 3–2554 for landowners to use to request a drain tile setback from the Service. The form was available for public comment in our Information Collection Request on OMB's website at *https://www.reginfo.gov/public/*. In response to these comments, this final rule now directly references the form. FWS Form 3–2554 requests basic contact information for the landowner, along with the easement number(s) for the specific land covered by the wetland easement. In response to these comments, we have revised the form to also request desired tile depths and diameters, as well as attachment of relevant installation plans, to facilitate our setback calculations.

It would be inefficient to specify in our regulations the exact information requested by the form, especially as this could change over time. Instead, the Service is specifying the form in the regulations, has ensured the form contains all currently needed information, and will ensure the form remains updated in the future. The Service is following processes established by the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*) for FWS Form 3–2554. This includes ensuring that the information collection is reasonable, that no more information is collected than necessary, and that the form is renewed every 3 years so that it remains updated and compliant with the other requirements. The Privacy Act of 1974 (5 U.S.C. 552a) also ensures that private information provided on the form is protected.

We made changes to the rule as a result of these comments. Specifically, we added a direct reference to FWS Form 3–2554 and added additional fields to the form. This provides greater clarity on what information and materials landowners must provide when requesting a drain tile setback.

*Comment (21):* One comment expressed concern that the proposed rule does not include any assurances that information provided by landowners will be confidential and not subject to the Freedom of Information Act (FOIA; 5 U.S.C. 552, as amended by Pub. L. 104–231, 110 Stat. 3048).

*Our Response (21):* The Service, like all other agencies in the Executive Branch, must comply with FOIA. FOIA requires that any person may request access to records of the Executive Branch of the United States, and copies of the records must be provided in full, except to the extent that all or specific portions of the record fall under one or more of the exempt categories. Among these exempt categories are information that would violate an individual's right to privacy and information that constitutes trade secrets or other confidential commercial or financial information (see 5 U.S.C. 552(b)). Thus, the Service may be compelled to turn over redacted copies of certain records concerning wetland easements, but the personally identifiable information of landowners and any proprietary commercial information in the records, including the information collected on FWS Form 3–2554, are exempt from FOIA and not disclosed. As this is a general exemption to FOIA applicable across the Federal Government, it need not be specified in our regulations. We did, however, add a standard FOIA statement to the form that helps to clarify the point that business information is FOIA exempt and directs landowners to label the information that they consider to be business information when submitting the form.

We did not make any changes to the rule as a result of this comment, but we did modify the associated setback request form to add a standard FOIA statement on business information.

## Changes From the Proposed Rule

As discussed above under Summary of Comments and Responses, based on comments we received on the April 28, 2023, proposed rule (88 FR 26244), we made changes in this final rule and to the associated setback request form. In this final rule, we added a direct reference to FWS Form 3–2554 in the regulation at 50 CFR 25.24(b) (see Regulation Promulgation, below). In the FWS Form 3–2554, we added three fields pertaining to technical information: one requesting the desired depths of the drain tile installation, if known; one requesting the desired diameters of the drain tile installation, if known; and one requesting that the landowner attach their drain tile installation plan, if available. We also added a standard FOIA statement to the form that clarifies business information is FOIA exempt and directs landowners to label the information that they consider to be business information when submitting the form. These changes were made in response to comments requesting that we provide more specificity as to what information and materials landowners will be asked to include when requesting a Service-provided setback.

## Required Determinations

### *Regulatory Planning and Review (Executive Orders 12866, 13563, and 14094)*

Executive Order 14094 reaffirms the principles of E.O. 12866 and E.O. 13563 and states that regulatory analysis should facilitate agency efforts to develop regulations that serve the public interest, advance statutory objectives, and are consistent with E.O. 12866, E.O. 13563, and the Presidential Memorandum of January 20, 2021 (Modernizing Regulatory Review). Regulatory analysis, as practicable and appropriate, shall recognize distributive impacts and equity, to the extent permitted by law. We have developed this rule in a manner consistent with these requirements.

E.O. 12866, as reaffirmed by E.O. 13563 and E.O. 14094, provides that the Office of Information and Regulatory Affairs (OIRA) in the Office of Management and Budget (OMB) will review all significant rules. OIRA has determined that this rulemaking action is not significant.

### *Regulatory Flexibility Act*

Under the Regulatory Flexibility Act (RFA; 5 U.S.C. 601 *et seq.,* as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA) of 1996), whenever an agency must publish a notice of rulemaking for any proposed or final rule, it must prepare and make available for public comment a regulatory flexibility analysis that describes the effects of the rule on small entities. However, no regulatory flexibility analysis is required if the head of the agency certifies the rule will not have a significant economic impact on a substantial number of small entities. SBREFA amended the RFA to require Federal agencies to provide a statement of the factual basis for certifying that the rule will not have a significant economic impact on a substantial number of small entities. Thus, for a regulatory flexibility analysis to be required, impacts must exceed a threshold for ''significant impact'' and a threshold for a ''substantial number of small entities.'' See 5 U.S.C. 605(b).

Within the Prairie Pothole Region (comprising Iowa, Minnesota, North Dakota, South Dakota, and Montana), there are approximately 28,000 wetland easements, of which the majority are located on privately owned farmland. Thus, small businesses within the crop production industry (North American Industry Classification System 111) may be impacted by the rule. One aspect of the rule codifies the Service's existing drain tile setback practices; therefore,

the effect of this regulatory provision on small businesses will be negligible. The rule also provides legal certainty for landowners who adhere to the setback distances prescribed by the Service. The information collection form to request the setback distances is estimated to take 25 minutes, which will be negligible for small businesses. Currently, approximately 20 landowners annually (less than 0.01 percent) must remove drain tile systems because they do not adhere to the contract that granted the easement. As a result of the added benefit of legal certainty, the rule may provide the incentive to these landowners to adhere to the contract and, thus, reduce the costs of removing drain tile systems. The average annual number of small businesses (20) potentially impacted by this rulemaking is not substantial.

Therefore, we certify that this rule will not have a significant economic effect on a substantial number of small entities as defined under the RFA. A regulatory flexibility analysis is not required. Accordingly, a small entity compliance guide is not required.

*Congressional Review Act*

This rule is not a major rule under 5 U.S.C. 804(2) of the Congressional Review Act. We anticipate no significant employment or small business effects. This rule:

a. Will not have an annual effect on the economy of $100 million or more. The minimal impact will be scattered across five States and will most likely not be significant in any local area.

b. Will not cause a major increase in costs or prices for consumers; individual industries; Federal, State, or local government agencies; or geographic regions.

c. Will not have significant adverse effects on competition, employment, investment, productivity, innovation, or the ability of U.S.-based enterprises to compete with foreign-based enterprises.

*Unfunded Mandates Reform Act*

This rule will not impose an unfunded mandate on State, local, or Tribal governments or the private sector of more than $100 million per year. The rule will not have a significant or unique effect on State, local, or Tribal governments or the private sector. A statement containing the information required by the Unfunded Mandates Reform Act (2 U.S.C. 1531 *et seq.*) is not required.

*Takings (E.O. 12630)*

In accordance with E.O. 12630, this rule will not have significant takings implications. A takings implication assessment is not required. The rule does not have any takings implications because it will not impact protected property rights. The rule provides clarity and standardization of the Service's existing process for providing drain tile setback distances to landowners and provides landowners with legal protection when they choose to follow the Service's setback distances. The rule does not require landowners to consult the Service regarding setback distances, nor does it require landowners to follow the Service's setback distances if they are provided.

*Federalism (E.O. 13132)*

Under the criteria in section 1 of Executive Order 13132, this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement. A federalism summary impact statement is not required.

*Civil Justice Reform (E.O. 12988)*

In accordance with E.O. 12988, the Department of the Interior has determined that this rule will not unduly burden the judicial system and that it meets the requirements of sections 3(a) and 3(b)(2) of the Order.

*Energy Supply, Distribution or Use (E.O. 13211)*

This rule is not a significant energy action under the definition in Executive Order 13211. A statement of energy effects is not required.

*Consultation and Coordination With Indian Tribal Governments (E.O. 13175)*

The Department of the Interior strives to strengthen its government-to-government relationship with Indian Tribes through a commitment to consultation with Indian Tribes and recognition of their right to self-governance and Tribal sovereignty. We have evaluated this rule under Executive Order 13175 and have determined that it has no substantial direct effects on federally recognized Indian Tribes.

*Paperwork Reduction Act (PRA)*

This rule contains new information collections. All information collections require approval under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*). We may not conduct or sponsor and you are not required to respond to a collection of information unless it displays a currently valid Office of Management and Budget (OMB) control number. The OMB reviewed the information collection requirements associated with requesting individualized drain tile setback distances for wetland easements in the PPR and assigned the placeholder OMB Control Number 1018–0196, pending final review and approval of the following:

**Requests for Drain Tile Setbacks (FWS Form 3–2554)**

Upon the request of a landowner (via submission of FWS Form 3–2554), the Service will provide setback distances for the placement of drain tile on lands covered by wetland easements. The setback distances will be based on best available science and must be adequate to ensure protected wetland areas are not drained. Information collected via FWS Form 3–2554 includes basic contact information for the landowner, along with the easement number(s) for the specific land covered by the wetland easement.

*Revisions to Form Since Proposed Rule Phase:* In response to public comments, we revised the form to also collect technical information about the contemplated drain tile installation, specifically the desired drain tile depths and diameters, and request that the landowner attach any plans they have prepared for the installation (*e.g.,* a geographic information system (GIS) Shapefile). We also updated the reporting and recordkeeping time burden estimates to be 10 minutes for reporting and 15 minutes for recordkeeping. Finally, we added a standard FOIA statement to the form that clarifies business information is FOIA-exempt and directs landowners to label the information that they consider to be business information when submitting the form.

The Service will provide guidance to landowners about what materials should be submitted as part of a request and will provide setback distances to landowners within a Service-provided timeframe. When a landowner coordinates their tile planning with the Service in accordance with this guidance and adheres to the Service-provided drain tile setback distances, the Service will not seek legal redress if it is later determined that Service-provided drain tile setback distance failed to protect the wetland areas from drainage, provided that drain tile has not been modified, enhanced, or replaced.

*Title of Collection:* Requests for Drain Tile Setback (50 CFR part 25).

*OMB Control Number:* 1018–0196.

*Form Number:* FWS Form 3–2554.

*Type of Review:* New.

*Respondents/Affected Public:* Individuals/households, businesses, and State/local/Tribal governments.

*Total Estimated Number of Annual Respondents:* 150.

*Total Estimated Number of Annual Responses:* 150.

*Estimated Completion Time per Response:* 5 minutes for reporting and 10 minutes for recordkeeping requirements.

*Total Estimated Number of Annual Burden Hours:* 63.

*Respondent's Obligation:* Required to obtain or retain a benefit.

*Frequency of Collection:* On occasion.

*Total Estimated Annual Nonhour Burden Cost:* None.

On April 28, 2023, we published in the **Federal Register** (88 FR 26244) a proposed rule (RIN 1018–BG80) that announced our intention to request OMB approval of the information collections identified in the rule. In that proposed rule, we solicited comments for 60 days on the information collections in this submission, ending on June 27, 2023. Summaries of comments addressing the information collections contained in this rule, as well as the agency response to those comments, can be found above under Summary of Comments and Responses, as well as in the information collection request submitted to OMB on the *RegInfo.gov* website at *https://www.reginfo.gov/public/.*

As part of our continuing effort to reduce paperwork and respondent burdens, we invite the public and other Federal agencies to comment on any aspect of this information collection, including:

(1) Whether or not the collection of information is necessary for the proper performance of the functions of the agency, including whether or not the information will have practical utility;

(2) The accuracy of our estimate of the burden for this collection of information, including the validity of the methodology and assumptions used;

(3) Ways to enhance the quality, utility, and clarity of the information to be collected; and

(4) Ways to minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of response.

Send your written comments and suggestions on this information collection by the date indicated in **DATES** to OMB, with a copy to the Service Information Collection Clearance Officer, U.S. Fish and Wildlife Service, 5275 Leesburg Pike, MS: PRB (JAO/3W), Falls Church, VA 22041–3803 (mail); or *Info_Coll@fws.gov* (email). Please reference ''OMB Control Number 1018–0196 Drain Tile Setbacks'' in the subject line of your comments.

*National Environmental Policy Act*

We are required under the National Environmental Policy Act (NEPA; 42 U.S.C. 4321 *et seq.*) to assess the impact of any Federal action significantly affecting the quality of the human environment, health, and safety. We have determined that the rule falls under the class of actions covered by the following Department of the Interior categorical exclusion: Policies, directives, regulations, and guidelines that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case (43 CFR 46.210(i)). The regulations codify existing Service practice in administering minimally restrictive wetland easements.

**Primary Author**

Debbie DeVore, Division of Natural Resources and Conservation Planning, National Wildlife Refuge System, is the primary author of this rulemaking document.

**List of Subjects in 50 CFR Part 25**

Administrative practice and procedure, Concessions, Reporting and recordkeeping requirements, Safety, Wildlife refuges.

**Regulation Promulgation**

For the reasons set forth in the preamble, we amend title 50, chapter I, subchapter C of the Code of Federal Regulations as set forth below:

## PART 25—ADMINISTRATIVE PROVISIONS

■ 1. The authority citation for part 25 continues to read as follows:

**Authority:** 5 U.S.C. 301; 16 U.S.C. 460k, 664, 668dd, and 715i, 3901 *et seq.;* and Pub. L. 102–402, 106 Stat. 1961.

## Subpart B—Administrative Provisions

■ 2. Revise § 25.23 to read as follows:

### § 25.23 Information collection requirements.

The Office of Management and Budget (OMB) has approved the information collection requirements contained in this part and assigned OMB Control Numbers 1018–0102, 1018–0140, 1018–0181, and 1018–0196 (unless otherwise indicated). Federal agencies may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. Direct comments regarding the burden estimates or any other aspect of the information collection to the Service's Information Collection Clearance Officer at the address provided at 50 CFR 2.1(b).

■ 3. Add § 25.24 to read as follows:

### § 25.24 Drain tile setbacks.

(a) *Applicability.* The regulations in this section apply to any easement lands protected by a U.S. Fish and Wildlife Service easement for waterfowl management rights (commonly referred to as a wetland easement) that were acquired through the Small Wetlands Acquisition Program in the Prairie Pothole Region of Iowa, Minnesota, Montana, North Dakota, and South Dakota. The regulations in this section apply only to setbacks provided by the Service beginning on June 12, 2024.

(b) *Drainage tile setbacks.* Upon the request of a landowner, using FWS Form 3–2554, the Service will provide setback distances for the placement of drain tile on lands covered by wetland easements. The setback distances will be based on the best available science and must be adequate to ensure that protected wetland areas are not drained. Contact your local U.S. Fish and Wildlife Service station to obtain further information. You can obtain contact information for your local Service station by contacting one of the Service regional offices; addresses for these offices are at 50 CFR 2.2.

(c) *Protection from legal redress.* The Service will provide guidance to landowners about what materials should be submitted as part of a request and will provide setback distances to landowners within a Service-provided timeframe. When a landowner coordinates tile planning with the Service in accordance with the regulations in this section and adheres to the Service-provided drain tile setback distances, including the tile diameters and tile depths below the surface that were used to calculate the Service-provided drain tile setback distances, the Service will not seek legal redress if it is later determined that the drain tile setback distances provided by the Service failed to protect the wetland areas from drainage, provided that the

drain tile has not been modified, enhanced, or replaced.

**Shannon Estenoz,**

*Assistant Secretary for Fish and Wildlife and Parks.*

[FR Doc. 2024–10242 Filed 5–10–24; 8:45 am]

**BILLING CODE 4333–15–P**

**Standard Operating Procedures for the Computation of Agriculture Drain Tile Setback Recommendations on U.S. Fish and Wildlife Service Wetland Easements in Regions 3 and 6.**

Version 02/06/2024

U.S. Fish and Wildlife Service (Service) Wetland Easements are areas of land or water acquired and administered by the Service with a less than fee interest, for the purpose of maintaining small wetland or pothole areas suitable for use as Waterfowl Production Areas. Landowners who grant a wetland easement (or acquire lands already encumbered with an easement) to the Service agree that wetland areas protected by a wetland easement cannot be drained, filled, leveled, or burned, in perpetuity.

Direct drainage of a wetland area by placing perforated tile and surface inlet pipes through (beneath) the wetland area would have a detrimental effect on wetland hydrology regardless of other factors. However, drain tile may be installed on lands encumbered by a Service wetland easement provided that protected wetland areas are not drained, directly or indirectly. The impact of a given drainage system on wetland areas varies greatly depending on site conditions. Upon request, the Service will recommend drain tile setback distances that ensure protected wetland areas are not drained.

This document outlines the Service's procedures for computing tile setback recommendations in response to requests for drain tile installation on lands protected by Service wetland easements. The methods and data outlined here are based on the best available science, including procedures used by other agencies (see citations below) that have been adapted to Service wetland easement provisions (i.e., no wetland drainage permitted). This document will be periodically updated as scientific data and methods improve.

**Standard Operating Procedures**

1. **Upon the Request of a Landowner via Submission of FWS Form 3-2554 for a Tile Setback.**

   Field station staff will work with the landowner to provide needed materials to Service hydrologists. Minimum information includes:

   - Easement number and location.
   - Form 3-2554 completed by landowner.
   - Exhibit A, Supplemental Map, or wetland area map.
   - Verify ArcGIS Online (AGOL) layers for easement and wetland areas are accurate and up to date. If wetland area layers are not on AGOL, field station staff should provide a shapefile of wetland areas to the hydrologist.

   Other helpful information that should be included, if available:

   - Proposed tile plan, including depth and diameter of tile, if available.
   - Existing water infrastructure (tile, culverts, etc.).

   Once sufficient information is available/provided, field station staff will email a formal request for setback recommendations to the designated hydrologist within their region. The request will include the minimum easement information, any additional information, a station contact and a desired timeframe, if available.

Hydrologist will confirm receipt of request and will provide an estimated date of completion. If needed, hydrologist will meet with field station staff to gain clarity on site or project specific details.

2. **Acquire and Develop Map Layers.**

Distinguish the easement associated with request from any adjacent easements on the Service Easement Boundary layer.

Easement Boundary layers are maintained by the Service's Realty program and will be used to identify the area associated with each request. Tile setback recommendations will be provided only for wetland areas associated with the requested easement.

Hydrologist will develop the following map layers and store them on local network drives:

- Add layer of wetland areas protected by the Service easement to the map. Create a separate, modified wetland area layer as necessary to accurately represent wetland areas, watershed boundaries and hydrologic conditions.
    i. Number the wetland areas so that soils and setbacks can be associated with individual wetland areas.
- Add United States Department of Agriculture (USDA) County soil data as of May 2021 with Map Soil Units (MSU). May 2021 USDA map layers will be saved on local network drives for use in tile setback computations.
    i. While county soils data are periodically updated, the Service is unable to continually update the model used for computing lateral effect distances. Therefore, the Service will reference county soils data as of May 2021 which is consistent with the approach used by the Natural Resource Conservation Service (NRCS).
- Use *NRCS Engineering Tools Pro,* or equivalent method, along with a Digital Elevation Model (DEM) based on the most current and best quality available Light Detection and Range (LiDAR) data to create the following map layers:
    i. 2-foot elevation contours
    ii. Streamflow network
    iii. Watershed catchments
        - Watershed catchments will be computed from the most downstream wetland area on the easement.
- Add proposed tile locations, if provided. If a proposed tile map is provided, include tile locations on the base map. This information will be used to determine potential wetland area impacts and document the proposed tile installation associated with the request. If changes are made to the proposed tile installation, setback distances and maps may need to be recomputed/reproduced.

3. **Determine Setback Distances**

Hydrologist will determine setback distances:

- Select predominant MSU surrounding wetland areas on the easement to determine MSU to be used for lateral effect distance calculations.

- Methods used for determining lateral effect distances are based on the NRCS Title 210 – National Engineering Handbook (PPR210-650-H, May 2022) PPR650-19.1 Part 650 – Engineering Field Handbook Chapter 19 – Hydrology Tools for Wetland Identification and Analysis Prairie Pothole Region States of Iowa, Minnesota, North Dakota, and South Dakota with minor adaptations to comply with Service wetland easement provisions.
    - The van Schilfgaarde equation is used for computation of lateral effect distances as outlined in section *"I. Drainage Equation and Parameters."* with the following adaptations to comply with Service wetland easement provisions:
        - Surface Storage: As outlined in PPR210-650-H, May 2022, surface storage for discharge and flow through DEPRESSIONAL wetland areas is not applicable. As such, the PPR210-650-H, May 2022, uses a 0.00 inch surface storage value for discharge and flow through depressional wetland areas. However, the Service has adapted these methods to use a 0.01-inch surface storage value. The 0.01 surface storage value produces a shorter, more reasonable lateral effect distance when computed with the Service's drawdown depth, while still protecting these types of wetland areas from drawdown.
            - Surface storage applied to MINERAL FLAT, ORGANIC FLAT, AND recharge DEPRESSIONAL wetland areas will remain consistent with PPR210-650-H, May 2022 (0.12 inches).
        - Drawdown Depth: The depth of drawdown from normal conditions is 0.1 foot. This adaptation to PPR210-650-H, May 2022 is necessary to comply with Service wetland easement provisions requiring no drainage.
- Lateral effect distances will be computed based on the tile depth and diameter of the proposed tile plan. If proposed tile depth and diameter are unknown, a tile diameter of 5 inches and depth of 4 feet will be used to compute lateral effect distances.
- Typically, for areas upstream of the protected wetland areas, the tile setback recommendations will be the lateral effect distance or the wetland watershed boundary, whichever is closer to the wetland area. For watersheds that encompass multiple wetland areas, the watershed boundary will be delineated from the most downstream wetland area on the easement. Additional protections may be necessary upstream of wetland areas supplied by groundwater and/or wetland areas with very small watersheds. For lands downstream of the wetland areas, drain tile may be placed no closer than the recommended setback distance to prevent down-gradient tile from draining water out of the wetland area.
- Certain types of soils (i.e., solid stone, gravel, peat, etc.), as well as complex sites with more soil map units within wetland area extents or within proposed tile extents, may require site specific evaluations by Service staff before setback distances can be computed.

**4. Create Maps.**

Hydrologist will create the Recommended Setback map:

The purpose of the map is to show the recommended setback distance in relationship to other map elements, such as protected wetland areas, watersheds, etc. The map will be created by adding the map layers described in Section 1 to a standardized map template. The standardized map template includes, National Wildlife Refuge System logo, title, legend, north arrow, map scale data source, and Service disclaimer (see example below). Templates, layers and maps will be created with ArcGIS Pro and stored on a local network drive.

The Recommended Setback map will include:

- The Recommended Setback Map will display the recommended tile setback distance layers and labels, overlaid with easement boundary, numbered protected wetland areas with setback distance labeled, watershed catchments, stream network, hillshade, and imagery.

Additional maps/information available upon request include:

- Soils Map – will display the MSU overlaid with easement boundary, numbered protected wetland areas, recommended setback distance layers and labels, hillshade, and imagery.
- 2-ft Elevation Contour Map – will display 2-foot elevation contours overlaid with easement boundary, numbered protected wetland areas, recommended setback distance layers and labels, watershed catchments, stream network, and a DEM relative to protected wetland areas and easement boundary.
- Tile Plan with Recommended Setbacks - will display the proposed tile plan overlaid with easement boundary, numbered protected wetland areas, recommended setback distance layers and labels, hillshade, and imagery.
- The county soil lateral effect table (stored on regional server).




| | |
|---|---|
| Notes:<br>Setback distances are calculated using a 5-inch tile diameter at a depth of 4.0 feet.<br>Please be advised that deviation from the plan or installed depth will require recalculation by WMD staff. LiDAR Technology is used to create stream flow network and watershed delineations. Maps are intended as guidance and may not reflect specific site conditions. | Source: FSA NAIP Imagery,<br>USDA Soils 2019,<br>MnTOPO LiDAR<br>Datum: NAD 1983, NAVD 88<br>Map Created: Date |

**5. Send Maps and Cover Letter.**

Hydrologist will send tile setback files to field station contact via email along with example cover letter.

- Email and file names will have the following naming convention: Date(YYYYMMDD)_State_County_Easement#_mapname (e.g. 20230606_SD_BR_123X_RecommendedSetback.pdf)
  - Easement numbers with a comma will not be included in the file name. Easement numbers with a dash will be included in the file name as an underscore.
- Attach the following files within the email to the station contact:
  - Maps will be attached to the email as .pdf files.
  - Attach the recommended tile setback shapefile in .zip format.
- Email will include any observations or special considerations field station staff should be aware of when communicating with the landowner.
- An email should be sent from the field station staff to the landowner (see example below) and will include the following:
  - *Recommended Setback Map –displays the recommended tile setback distance layers and labels, overlaid with easement boundary, numbered protected wetland areas with setback distance labeled, watershed catchments, stream network, hill shade imagery, and proposed tile locations (if available).*
  - *General considerations (see example letter below) and special considerations that should be conveyed to the landowner.*
  - *(Include description of any other maps requested - The recommended setback map should be provided to the landowner. Field staff can use their discretion as to whether any additional maps are provided. Please put all maps in the easement folder for future reference.)*

*Below is an example letter of information that may be communicated to the landowner. Field station staff should include any additional details or considerations relevant to the request:*

> *Thank you for coordinating your potential drain tile installation with the U.S. Fish and Wildlife Service (Service). The attached map and tile setback recommendations apply to the wetland areas protected by a Service wetland easement(s). Per the terms of your easement, protected wetland areas cannot be drained, filled, leveled, or burned. If these wetland areas dry up naturally, they can be farmed, grazed, or hayed.*
>
> *Landowners who coordinate their tiling plans with the Service and adhere to the Service-determined setback distances would not later be held criminally responsible or civilly liable for disturbing, injuring, or destroying a unit of the National Wildlife Refuge System (i.e., draining a protected wetland area) provided the subsurface drainage system is not modified, enhanced, or replaced. (88 FR 26244)*

*The attached setback calculations were completed assuming a X-foot tile depth and X-inch diameter for all perforated tiles. If the proposed tile installation differs from these dimensions, a subsequent setback request will need to be submitted. As stated above, if a subsequent setback determination is not requested and drain tile is installed at different parameters than those stated above, there will not be protection from legal redress.*

*Remember, per terms of the recorded easement, no ditching or tiling, including non-perforated tile, can occur within the protected wetland areas.*

*Watershed catchments for protected wetland areas were delineated and identified on the attached map. In general, any drainage activity within a given watershed should outlet the water into the wetland area immediately downstream.*

*Keep in mind these restrictions are related to this specific Service easement.* ***Drain tile determinations or approvals of other agencies (e.g., NRCS) are not a substitute for the requirement for Service review and approval of drain tile plans on Service wetland easements.*** *Local, state, Tribal laws, regulations and policies, and/or wetland regulations of other federal agencies, do not change the terms of the wetland easement. We encourage you to contact your local, state, Tribal and other regulatory agencies in addition to Service to confirm your plans also comply with the laws, regulations and policies of those agencies. These wetland easements are deeded and recorded at the courthouse.*

*Drainage can be complex and nuanced. Please contact Refuge Manager XXX at, XXX if you have any further questions, as you plan and implement your project.*

6. **Communicate with Landowner, Sign and Store Final Maps.**

Field station staff will communicate with the landowner and discuss any site- specific considerations. Note: any changes to the proposed and/or assumed tile depth and diameter will necessitate an additional tile setback request and Service determination before tile can be installed to ensure protection from legal redress. Once the final setback recommendations have been delivered to the landowner, the final tile setback map and other relevant information will be filed and saved by field station staff for future reference.

An official website of the United States Government.

Back to Document Comments (/document/FWS-HQ-NWRS-2022-0092-0001/comment)

Share

PUBLIC SUBMISSION

# Comment from Anonymous

Posted by the **Fish and Wildlife Service** on Jun 9, 2023

Docket (/docket/FWS-HQ-NWRS-2022-0092)
/ Document (FWS-HQ-NWRS-2022-0092-0001) (/document/FWS-HQ-NWRS-2022-0092-0001) / Comment

Comment

Please continue with your plan. Drain Tile Setbacks are a good idea.

**Comment ID**

FWS-HQ-NWRS-2022-0092-0002

**Tracking Number**

lin-3waz-sevy

**Comment Details** | **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Jun 8, 2023

**Page Count**

1

Give Feedback

Your Voice in Federal Decision Making

About (/about) | Bulk Data Download (/bulkdownload) | Agencies (/agencies) | Learn (/learn) | Reports (/dotreports) | FAQ (/faq) | Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) |
Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

IOWA FARM BUREAU
PEOPLE. PROGRESS. PRIDE.™

June 27, 2023

*Submitted via www.regulations.gov*
**Docket ID No. FWS-HQ-NWRS-2022-0092**

Public Comments Processing, Attn: FWS-HQ-NWRS-2022-0092
U.S. Fish and Wildlife Service
5275 Leesburg Pike, MS: PRB (JAO/3W)
Falls Church, VA 22041-3803

**RE: National Wildlife Refuge System; Drain Tile Setbacks**

The Iowa Farm Bureau Federation (IFBF) appreciates the opportunity to submit comments to the U.S. Fish and Wildlife Service (USFWS) in response to the April 28, 2023 proposed rule for establishing drain tile setbacks. IFBF is the largest general farm organization in Iowa representing over 150,000 member families, and we offer the following comments and recommendations on the proposed rule to help ensure that the USFWS goals of providing consistency, transparency, and clarity for landowners and USFWS are achieved.

**Drainage Tile Setbacks**

We support the provision that drainage tile setbacks would apply only to new tile installations within USFWS easement boundaries and shall not apply to existing or new drainage tile installations on lands outside of USFWS easements. We also support the provision that this rule shall only apply from the effective date of the final rule going forward and shall not apply retroactively.

We recommend that the information required from landowners for determining tile setback distances be included in the rule to provide clarity and transparency regarding what materials they will need to produce as well as to provide consistency in what information is utilized in making tile setback determinations across the five states that this rule applies to.

We strongly encourage USFWS to provide more certainty to landowners by setting a specific and reasonable time limit for providing responses to landowner requests. Without a time period within which USFWS must respond to requests, landowners will have no means to determine when their requests need to be submitted to ensure decisions are provided in time for them to efficiently plan tile drainage installations. This is especially critical for agricultural lands that may be impacted.

We agree that the best available science should be utilized by USFWS to determine tile setback distances, but the proposed rule lacks any information on what the best available science is, how it is determined, or by whom. We strongly encourage USFWS to publicly provide specific information on the science and processes they plan to utilize for determining tile setbacks with ample opportunity for comments and input from the regulated community prior

to finalizing this rule. Proceeding with the adoption of this rule without first having publicly vetted how tile drain setbacks will be determined would be extremely premature.

As it relates to how drain tile setbacks could impact agricultural lands, especially within new easements, we strongly encourage USFWS to provide up front information to landowners regarding what drain tile setback limitations could be imposed on future tile installations since the changes proposed by this rule could easily create more than “minimally restrictive” easement provisions that have a greater than minimal impact on cropland productivity and property value - which is counter to the stated goals of USFWS conservation easements.

In Iowa, there are over 3,700 drainage districts (local government subdivisions) encompassing over 7,000,000 acres of land. These districts levy financial assessments on landowners for the benefits provided to them by having access to drainage outlets for their field tile. We are concerned that this rule could impose upon the vested benefits of landowners within drainage districts by creating drainage restrictions on benefitted lands preventing them from obtaining the full benefit they are paying for and entitled to by law. Further, the rule should hold landowners harmless if a drainage district complies with their statutory mandate in a manner inconsistent with this rule. We encourage USFWS to ensure that this rule is consistent and compatible with Iowa drainage laws.

**Protection From Legal Redress**

Regarding the protection from legal redress offered by USFWS to landowners that coordinate their tile planning with USFWS and adhere to USFWS provided drain tile setback distances, we are supportive of the concept as proposed but recommend additional certainty be provided by simply stating that USFWS provided drain tile setback distances remain valid even in the event that they are somehow later determined to have failed to protect wetland areas from drainage. Landowners that continue to adhere to the drain tile setback distances as provided by USFWS should remain in compliance without fear of legal redress, especially since they are adhering to USFWS provided guidance. USFWS should bear all responsibility as to whether the tile setback distances they prescribe achieve their goals.

This provision raises the question of how compliance with drain tile setbacks will be monitored and how it could later be determined that a USFWS provided drain tile setback distance failed to protect wetlands given that the setback determinations can only be provided upon landowner request. The rule does not identify how landowners or future landowners of the property will be notified of the responsibility to request a setback. Furthermore, since the apparent intent of USFWS is that landowners simply adhere to the USFWS provided drain tile setbacks and in exchange will not be penalized if the USFWS provided setback distances fail to protect wetlands from drainage, there should be no need for any later assessments or determinations of whether the setback distances provided the desired wetland protection. Rather, the work to ensure that drain tile setback distances achieve the desired outcomes should happen at the time of a landowner request and not be revisited later unless a landowner requests it.

Thank you for this opportunity to provide input on the proposed drain tile setbacks. We hope that you find our input useful and incorporate it into this rule.

Sincerely,

Shawn Richmond
Conservation & Natural Resources Policy Advisor
Iowa Farm Bureau Federation

An official website of the United States Government.

Back to Document Comments (/document/FWS-HQ-NWRS-2022-0092-0001/comment)

Share

PUBLIC SUBMISSION

# Comment from Anonymous

Posted by the **Fish and Wildlife Service** on Jun 26, 2023

Docket (/docket/FWS-HQ-NWRS-2022-0092)
/ Document (FWS-HQ-NWRS-2022-0092-0001) (/document/FWS-HQ-NWRS-2022-0092-0001) / Comment

Comment

Please don't allow the hunting of waterfowls anymore. Please protect the waterfowls and other animals from intentional killing.

**Comment ID**
FWS-HQ-NWRS-2022-0092-0005

**Tracking Number**
ljc-l628-e3l3

Give Feedback

**Comment Details** | **Submitter Info**

**Document Subtype**
Comment(s)

**Received Date**
Jun 26, 2023

**Page Count**
1

Your Voice in Federal Decision Making

DEPARTMENT OF NATURAL RESOURCES

June 26, 2023

Public Comments Processing, Attn: FWS–HQ–NWRS–2022–0092
U.S. Fish and Wildlife Service
5275 Leesburg Pike, MS: PRB (JAO/3W)
Falls Church, VA 22041–3803

RE: Proposed Rule 88 FR 26244, Pages 26244-26248
CFR: 50 CFR 25
Agency/Docket Numbers: FWS-HQ-NWRS-2022-0092, FXRS12610900000-212-FF09R20000
RIN: 1018-BG80
Document Number: 2023-08988

To Whom It May Concern,

Thank you for the opportunity to comment on the proposed rule referenced above. The Minnesota Department of Natural Resources (DNR) offers the following comments for consideration by the U.S. Fish and Wildlife Service (USFWS).

Minnesota's Prairie Pothole Region (PPR) is an essential resource area providing critical fish and wildlife habitat. The PPR is home to many game and non-game species and unique habitats and provides vital water storage and groundwater infiltration benefits. The PPR has experienced extensive agricultural drainage, and there is a growing concern about water quality and quantity impacts on the region's receiving rivers, streams, wetlands, and lakes.

The USFWS's proposed wetland setback rules state that drain tile installation on lands with USFWS wetland easements is permissible only if it does not drain protected wetland areas, directly or indirectly. The DNR acknowledges that the USFWS rule change proposal intends to provide landowners with individual setback distances for drain tile. The proposed rules mandate that the USFWS establish drain tile setback distances based on the best available scientific data, considering soil characteristics, tile diameter, depth of the tile below the surface, and topography to ensure that protected wetland areas are not drained.

The DNR encourages the USFWS to consider public water wetlands and calcareous fens that fall under the regulation of DNR, and non-public wetlands regulated by Local Government Units under Minnesota's Wetland Conservation Act (WCA) when developing appropriate resource setbacks. Landowners often assume that federal approval is the only regulatory approval they need to move forward with a project. In these cases, landowners may fail to take the additional steps required to ensure compliance with WCA and public water regulations. The DNR has experienced considerable problems with unintended wetland impacts due to the approval of drainage projects under the National Resource Conservation Service and Farm Service Agency.

The DNR would like to work with the USFWS to create new guidance and screening information for the proposed wetland setback considerations. The goal of this coordination would be to prevent potential violations and minimize negative impacts on sensitive areas like calcareous fens and shallow groundwater-fed wetlands. These resources rely on specific surface water infiltration areas that are often located up to five miles away and may not be considered in the USFWS proposed decision-making process regarding appropriate setbacks for drain tile installation. Protection of these infiltration areas is essential to ensure there is no reduced infiltration or diverted groundwater hydrology from these important wetland resources.

Sincerely,

Katie Smith Digitally signed by Katie Smith Date: 2023.06.26 09:21:23 -05'00'

Katie Smith
Division Director

CC: Sarah Strommen, DNR Commissioner

*Equal Opportunity Employer*

June 26, 2023

Attn: FWS–HQ–NWRS–2022–0092

U.S. Fish and Wildlife Service
5275 Leesburg Pike
MS: PRB (JAO/3W)
Falls Church, VA 22041–3803.

The Izaak Walton League of America (League) appreciates the opportunity to comment on the U.S. Fish and Wildlife Service's (FWS) proposed new regulations on drain tile setbacks on wetland easements. The League has over 42,000 members across the country. Our members care about water quality and enjoy a wide variety of outdoor recreation.

*Background*
The proposed regulations would codify how the FWS establishes drain tile setbacks in wetland easement contracts acquired through the Small Wetlands Acquisition Program. The proposal states the setback would be based on the best available science and consider soil, diameter and depth of the tile, and the topography of the area. The proposal only applies to setbacks provided by the FWS on the date of the final rule.

The proposed regulations would permit drain tile to be installed on land that has a FWS wetland easement, provided the protected wetland is not directly or indirectly drained. The FWS would establish setback distances and provide that to the landowner. The proposal states that the FWS will not seek legal redress if the setback fails to protect the wetland areas from drainage, provided that the installed tile has not been modified, enhanced, or replaced.

*League comments*
The League urges extreme caution on this proposal. Wetland easements are acquired with Duck Stamp dollars through the Small Wetlands Acquisition Program. The intent of a wetland easement is to provide permanent protection of a wetland's functions and values. Allowing drain tile into an area with a wetland easement seems counterproductive to us.

The Prairie Pothole Region (PPR) is the most important area for waterfowl and other migratory birds on the continent. The PPR produces up to 75 percent of the ducks in North America. Waterfowl raised in the PPR support hunting activities across the country. This results in an estimated 30,000 jobs and $1 billion in annual economic benefits.

The PPR is a unique landscape. Thousands of small, isolated wetlands were created by glaciers more than ten thousand years ago. The seasonal fluctuation of these isolated wetlands is what makes them productive and important to waterfowl and other wildlife. These small wetlands are critical to improving water quality by filtering pollutants and sediment from runoff from rains and snowmelt.

Wetland easements are a voluntary legal agreement between the FWS and a willing landowner. Wetlands in a FWS easement, specifically for waterfowl management, cannot be drained, filled, leveled, or burned. If the protected wetland naturally dries out it can be farmed, grazed, or hayed. Current FWS wetland easements include provisions that prohibit any effects to protected wetland areas. The League urges continuation of this critical provision.

The U.S. Supreme Court's recent *Sackett* ruling puts America's small, isolated wetlands at even greater risk. Expansion of tile drainage in the PPR has resulted in the loss of hundreds of seasonal and temporary wetlands. The League urges the FWS to do everything possible to protect every wetland currently under a permanent wetland easement. By doing so, these wetlands will continue to provide habitat for waterfowl and wildlife, improve water quality, help reduce flooding and increase recreational opportunities.

The League has a long history of fighting to protect America's wetlands. This is from the League's 2022 Conservation Policies: https://www.iwla.org/docs/default-source/about-iwla/2022-policy-book-final.pdf?sfvrsn=cb779d0d_2 (Section Y, Page 87)
*The League urges local entities, individual states, and the U.S. Congress to strengthen and/or pass legislation to protect all of America's valuable wetlands, including isolated wetlands. Furthermore, the League urges these same governing bodies to pass legislation that would strengthen and implement new conservation programs to bolster support by producers for wetland and water protection in their management plans.*

The Izaak Walton League of America thanks you for the opportunity to comment on this proposal and ask that we be kept informed on all future developments regarding this proposal.

Sincerely,

Paul Lepisto
Regional Conservation Coordinator
Izaak Walton League of America
1115 South Cleveland Avenue
Pierre, SD 57501
plepisto@iwla.org
605-220-1219

June 26, 2023

The Honorable Shannon Estenoz
Assistant Secretary for Fish & Wildlife and Parks
Department of the Interior
1849 C Street NW
Washington, DC 20240

Public Comments Processing
Attn: FWS-HQ-NWRS-2022-0092
U.S. Fish & Wildlife Service
5275 Leesburg Pike
MS: PRB (JAO/3W)
Falls Church, VA 22041-3803

**SUBMITTED VIA FEDERAL ERULEMAKING PORTAL**

**Re: Comments on New Drain Tile Setbacks**
**Docket ID No. FWS-HQ-NWRS-2022-0092**
**OMB Control Number 1018-New Drain Tile Setbacks**

Dear Assistant Secretary Estenoz:

The organizations and persons listed at the end of this comment appreciate the opportunity to provide comment on the U.S. Fish and Wildlife Service's ("Service") proposed new regulation, as published in the Federal Register on April 28, 2023, regarding drain tile setbacks for wetland easement contract compliance.[1]

The meaningful notice and comment process of this proposed regulation presents an opportunity to significantly improve the coordination, interaction, and cooperation between the Service and the landowners affected by the interpretation and enforcement of wetland easements.

In North Dakota and Minnesota, various stakeholders, including landowners, farmers, businesses, state and local governments, road authorities, and rural communities, consistently face regulatory restrictions on water management practices. These restrictions require coordination with agencies implementing the Clean Water Act, the wetland conservation compliance provisions for farm program participants and federal crop insurance policyholders under the Food Security Act of 1985,[2] property rights issues related to the federal government's ownership of waterfowl production area easements managed by the Service,[3] and state and local regulations regarding water management systems.

Effective water and land management is crucial for the success of agriculture and maintenance of local infrastructure. However, the Service's historical mismanagement of wetland easements and the National Wildlife Refuge System Act (the "NWRSA") has had highly significant negative

[1] 88 Fed. Reg. 26244.
[2] *See* 16 U.S.C. §§ 3801 et seq. (commonly known as "Swampbuster").
[3] National Wildlife Refuge System Administration Act, Pub. L. No. 89-669, §§ 4 and 5, 80 Stat. 927 (codified at 17 U.S.C. §§ 668d-668ee, *as amended* Pub. L. No. 105-57).

impacts on the agricultural industry, highways, roads, infrastructure, rural communities, and upon taxpayers and private landowners in the Prairie Pothole Region (PPR).[4]

The proposed new regulation represents a substantial step backward in addressing the valid concerns raised by landowners burdened by the Service's interpretation and enforcement of wetland easements. It is crucial to establish and maintain clear and reasonable guidelines for the scope of the Service's wetland easements and the activities that may or may not damage protected wetland acres. Clarity regarding the protected wetland acres is essential for effective water management in the agricultural industry and rural communities.

Landowners, farmers, state and local governments, and land improvement contractors have long sought regulatory certainty from Congress, the courts, and the Service regarding the scope of wetland acres protected by the Service's easements. Unfortunately, the process for mapping protected wetland acres for easements granted before 1976 has been woefully inadequate, often violating established legal court precedents. Appeals processes have provided little meaningful relief for landowners with legitimate disputes over the Service's claims of authority under its easements.

These concerns are compounded by the criminal and civil enforcement authority granted to the Service for easement violations.[5] The threat of criminal prosecution instills fear in landowners and discourages the exercise of lawful property rights due to a lack of clarity regarding the scope of wetland easements.

The undersigned organizations have a long history of stalwartly advocating for equitable relief from the Service's practice of asserting unbridled jurisdiction over any property subject to or even potentially subject to a wetland easement. We are very concerned that the proposed regulation for calculating setback distances for drain tile will further exacerbate the ongoing justifiable frustration that landowners hold in relation to the Service.

---

[4] The Prairie Pothole Region (PPR) is an expansive area of the northern Great Plains that contains thousands of shallow wetlands known as potholes. These potholes are the result of glacier activity in the Wisconsin glaciation, which ended about 10,000 years ago. The decaying ice sheet left behind sporadic depressions formed by the uneven deposition of till in ground moraines. These depressions are called potholes, glacial potholes, kettles, or kettle lakes. They fill with water in the spring, creating wetlands, which may range in duration from highly ephemeral to semi-permanent. The region covers an area of about 800,000 sq. km and expands across five U.S. states (Minnesota, Iowa, North and South Dakota, and Montana) and three Canadian provinces (Saskatchewan, Manitoba, and Alberta).

[5] *See, e.g.*, 16 U.S. Code § 668dd(f) (providing for fines united U.S. Code title 18 or imprisonment for up to one year, or both, for knowingly violating or failing to comply with any provisions of the National Wildlife Refuge System Act).

These wetland easements negatively impact land values throughout the PPR. Notwithstanding, these impacts could be significantly mitigated by the Service and landowners jointly implementing a much more reasonable approach to wetland mapping and drain tile setbacks.

Additionally, drain tile offers substantial conservation benefits when used responsibly as a water management tool. We seek to work cooperatively with the Service to either maintain the existing 2020 policy or to develop an even better, more transparent, and objective policy for calculating drain tile setbacks. This policy should be understandable by ordinary landowners, providing them regulatory certainty and confidence.

Finally, based on recent experiences with the Service's mapping of wetland easements, we consequently possess serious reservations about the implementation of this new regulation.

## I. EASEMENT IMPACTS TO LAND VALUES

We respectfully disagree with the preamble to the new regulation, which asserts that "the Service's wetland easements have a minimal impact on property value and limit the landowner's use and enjoyment of the property to a minor degree."[6] These impacts and limitations are not minimal.

### A. Legal uncertainty over protected wetland acres has a serious impact on property value and limits the landowner's use and enjoyment of property.

The legal uncertainty surrounding the identification of protected wetland acres negatively affects property value. Easement terms prohibit activities such as draining, filling, leveling, or burning wetlands located on the easement acres; however, easements granted before 1976 lack agreed upon maps indicating the location, boundary, and acreage of the protected wetland acres.

According to the Service's estimates, pre-1976 easements protect 758,645 wetland acres out of approximately 4.8 million easement acres. Since the easements describe the entire parcel as subject to the easement's restrictions, it remains unclear which 758,645 acres are protected wetlands.

The Service claims that the easement summaries associated with each contract describe the number of purchased acres, but these summaries often apply to multiple parcels and do not assign acreages to specific parcels within the easement contract. This lack of clarity has led to needless disputes between landowners and local refuge managers over the location, boundaries, and acreage of protected wetlands.

In an attempt to address these many disputes, Service Director Aurelia Skipwith issued helpful and structured guidance on December 23, 2019 regarding the mapping of all pre-1976 waterfowl production area perpetual easements. Maps were developed and sent to landowners, representing a unilateral decision by the Service over the disputed scope of easement contracts. Landowners objecting to the location, boundary, or acreage of the new maps were allowed to

[6] 88 Fed. Reg. 26245.

appeal the map back to the same Service employees involved in issuing the first map. Disagreements not resolved at the local refuge manager level could be appealed to the Service Regional Director. The Regional Director's decision could be appealed to the Service Director in Washington, D.C.

Nonetheless, landowners reported negative interactions with Service employees over their arbitrary pre-1976 wetland easement mapping and administrative review process. In mapping, the Service excessively claimed protection over acres that showed evidence of wetness during only one or two years of extreme, precipitation conditions. Many of the mapped acres appeared wet for the first time several decades after the easement was negotiated and granted. Landowners were sent maps from the Service containing protected acres of less than one-tenth of an acre, sometimes delineated on maps as being less than one one-hundredth of an acre. Applying a setback distance to numerous protected wetland acres less than one-tenth of an acre would effectively expand the Service's jurisdiction to cover nearly the entire parcel of land subject to the easement's terms.

It is against this backdrop that we remain especially concerned about the Service's new regulation. This new regulation likely will result in the Service attempting to unilaterally decide which drain tile setbacks violate the easement terms, without providing transparent and reasonable methodologies for calculating setback distances.

Considering these many legitimate concerns, we remind the Service of the Eighth Circuit Court of Appeals ruling in United States v. Johansen[7], which ruled that wetland easements are strictly limited to the acreage provided in easement summaries and do not cover every wetland that may develop on an encumbered tract or fluctuating acreages due to increased rainfall.

**B. The Service's short-sighted approach against drain tile water management on easements lands deprives landowners of a highly useful tool to protect land values from soil salinity impacts.**

Saline soils are detrimental to agricultural production, wetland functions, as well as waterfowl. Cropland with saline soils is less valuable than cropland where the salinity has been managed by drain tile. Agricultural land within the PPR is at risk for salinization due to poor drainage and fluctuations of high precipitation with extended dry periods which leads to waterlogged conditions, subsequent evaporation, and accumulation of water-soluble salts. Wetland ponds are especially capable of developing increase in salinity which can be removed from the ponds to surrounding basins by overland flow as the pond level reaches its spill point. Wetlands have also been known to leach salts from their pond to surrounding shallow ground water during dryer periods.

The Service's muscled approach against installation of drain tile as a water management tool on easement tracts deprives landowners of an effective method to manage salinity. Responsible design and construction of drain tile can maintain the hydrology of the protected wetland acres

[7] 93 F.3d 459 (8th Cir. 1996).

while safeguarding the non-protected acres from accumulating water-soluble salts. The Service's short-signed approach against installation of drain tile as a water management tool on easement tracts deprives landowners of a highly effective method to manage water.

## II. RESPONSIBLE USE OF DRAIN TILE AS WATER MANAGEMENT & CONSERVATION TOOL

We support reasonable, subsurface management of water on cropland to reduce the saturation of soil, thereby reducing surface run-off, soil erosion, sediment transfer, and sorbed phosphorus to downstream waterbodies. Subsurface water management systems, like drain tile, reduce erosion in cropland by about 40 to 60 percent.[8] Sloan et al. (2017) showed that drainage may increase low flows but decrease intermediate flows while having minimal impact on the larger floods.

Filtering stormwater runoff through the soil profile reduces phosphorus and turbidity dramatically. The promotion of subsurface water management increases production on current farmland, allowing non-cropland to be reserved for other uses such as habitat, hunting, and recreation.

Subsurface drainage increases storage capacity in the soil by continually removing excess, or "loose" water, which otherwise leads to saturated conditions, from the soil profile. This loose water is not available for use by plant roots. It fills the soil pore normally occupied by air and leads to drowning of crops. Plant roots use "capillary" water, which is held to soil particles by surface tension.

Under drained conditions, it should take the water table three to four days to fall to drainage depth. In contrast, undrained fields may take several weeks for evaporation alone, risking salt accumulations, to lower the water table to a similar depth. If there is an intervening rain, it will take longer.

Moreover, some soils drained with tiles may have a higher capacity to store water because tile drainage improves soil structure. Better soil structure means that the soil is more porous and is therefore better able to store water.[9] In short, drain tiles remain an excellent water management tool and should not be unreasonably restricted.

---

[8] *See* Environmental Benefits of Tile Drainage by Heather Fraser & Ron Fleming (Oct. 2001) (citing Baker J.L. and Johnson, H.P. 1976. Impact of subsurface drainage on water quality. Proceedings from the 3rd National Drainage Symposium, Chicago, Ill.; Hill, A.R. 1976. The environmental impacts of agricultural land drainage. Journal of Environmental Management. 4:251-274; Irwin, R.W. and Whiteley, H.R. 1983. Effects of land drainage on stream flow. Canadian Water Resources Journal. 8(2):88-103; Belcher, H.W. and Fogiel, A. 1991. Research literature review of water table management impacts on water quality. Agricultural Engineering Department, Michigan State University; and Thomas et al. Agricultural drainage effects on water quality in Southeastern U.S. Journal of Irrigation and Drainage Engineering. 121(4):277-282. 1995).

[9] *See* Fraser & Fleming at Section 4.0.

## III. EXISTING SERVICE POLICY ON DRAIN TILE SETBACKS

The new regulation does not mention the existing Service-issued guidance on drain tile setbacks for wetland easements. This is unacceptable. Our organizations worked very closely with the Service to address drain tile setbacks for wetland easements, which productively resulted in the February 26, 2020 guidance from Service Director Aurelia Skipwith regarding drain tile setbacks and legal action on easements. This 2020 consensus guidance should not simply be cavalierly dismissed by the Service.

The proposed new regulation must not replace the transparent, reasonable, and objective guidance issued by Director Skipwith in 2020. We strongly oppose any such efforts to do so.

The 2020 guidance outlines the Service's methodology for providing drain tile setback recommendations on wetland easement tracts, utilizing the van Schilfgaarde equation to compute lateral effect distances of drain tile. This guidance specifies that if the setback distance calculated using the van Schilfgaarde equation lies beyond the up-gradient catchment boundary of a wetland area, the Service sets the drain tile setback for that wetland area at the catchment boundary. If the calculated setback distance lies within the up-gradient catchment boundary, the 2020 guidance instructs the use of the van Schilfgaarde-calculated setback distance. The van Schilfgaarde equation is applied for areas down-gradient from the wetland area.

The 2020 guidance is clear and enables ordinary people from the regulated community to easily understand and calculate the setback distance for perforated drain tile. It establishes what conduct is prohibited without requiring a Service case-by-case analysis, ensuring transparency to prevent arbitrary and discriminatory enforcement of easement terms and prohibitions in the NWRSA. We support and strongly recommend that the Service continues to recognize and fairly implement the sensible and balanced 2020 guidance.

> **We fully support the 2020 guidance on calculating drain tile setbacks and urge the Service to revise the proposed regulation to implement the existing Service guidance.**

In the preamble, the comments regarding "minimal effect" versus no effect suggest that the Service intends to discontinue the existing 2020 guidance on calculating drain tile setbacks. The preamble compares "Swampbuster" provisions of the Food Security Act of 1985, allowing drain tile with "minimal effect" on wetlands, to the Service's wetland easement agreement provisions that allow for no effect to protected wetlands. Additionally, the preamble acknowledges that the understanding of the effects that drain tile on wetland hydrology is an evolving science.

The question at issue revolves around the acceptable negligible hydrologic effect of drain tile on wetlands. Various lateral effect or scope and effect equations have been developed to estimate the degree to which drain tile will lower adjacent hydrology.

To ensure full transparency and allow the regulated community to provide meaningful feedback, the Service should publish the methodologies it proposes to determine drain tile setback

distances. This would enable stakeholders to materially comment on the application of those methodologies to their property rights.

Without this transparency, the new regulation will likely result in a system of vague rules dependent on locally developed practices and parochial beliefs of refuge managers in local offices, as was the case prior to the issuance of the 2020 guidance. This could improperly lead to setback distances calculated by local refuge managers that apply arbitrary multipliers, such as three to seven times or more, compared to the setback distances calculated by the NRCS using the van Schilfgaarde equation.

## IV. SPECIFIC CONCERNS WITH PROPOSED NEW REGULATION

The proposed regulation introduces the requirement of individual drain tile setback distances determined by the Service based on site-specific factors. This imposes an additional layer of unnecessary bureaucracy, complexity, and uncertainty for landowners, who would need to coordinate with the Service and adhere to these setback distances to avoid legal repercussions.

### A. The Service's new regulation raises concerns regarding Due Process related to criminal and civil enforcement of the National Wildlife Refuge System Act.

Damaging wetlands protected by the Service's wetland easement carries serious criminal and civil consequences. The Service's new regulation fails to sufficiently consider constitutional Due Process considerations, a similar concern highlighted recently by the U.S. Supreme Court case in Sackett v. Environmental Protection Agency. Penal statutes must be clearly defined so that ordinary people can understand what actions are prohibited, and enforcement must not be arbitrary or discriminatory.[10] Unfortunately, the Service's regulation entirely disregards these central Constitutional principles.

One of the major issues with the new regulation is that the Service determines individual setback distances for drain tile on a case-by-case basis, making it exceedingly difficult for ordinary people to understand what conduct on their private lands is prohibited. By not providing a baseline methodology for calculating setback distances, the rules lack transparency and opens the door for arbitrary and discriminatory enforcement. This lack of clarity also fails to notify landowners of their obligations under the easement terms or the NWRSA.

The Service's new proposed rule puts landowners in an untenable position. If a landowner disagrees with the drain tile setback distance determined by the Service, the landowner or the landowner's land-improvement contractor may not confidently proceed with drain tile construction at a much more reasonable setback since the previous setback distance provided

[10] Sackett v. Env'tl Prot. Agency, 2023 WL 3632751, at *15 (U.S. May 25, 2023) (citing Skilling v. U.S., 561 U.S. 358, 402-03 (U.S. 2010)).

by the Service might form evidence of culpability in a prosecution or civil action alleging a violation of the Service's wetland easement terms.

To correct this inherent procedural ambiguity, the Service should establish a bona fide expeditious administrative appeal process for drain tile setback distances. The appeals process must be through an agency that is independent from the direction and control of the Service and should provide a full and fair opportunity for a landowner to present the landowner's case before an impartial hearing officer.

Another concern is whether landowners may challenge the Service's drain tile setback distance in court. Even if the answer is yes, landowners know the uphill battle faced under deferential standards of review that the agencies enjoy. Consequently, many landowners who disagree with the drain tile setback distance calculated by the local refuge manager, when faced with this array of poor options only, will choose to do nothing.

Accordingly, landowners should be placed on a much more level playing field with the Service. The Service must consistently be more responsive, accommodating, and respectful of landowners' private property rights. Landowners must be able to meaningfully challenge a Service-determined drain tile setback distance both administratively and judicially.

**B. The Service's lack of transparency in its methodologies for calculating drain tile setbacks prevents ordinary people from understanding which drain tile conduct is permissible and which conduct is criminally prohibited.**

The Service's present lack of transparency in the methodologies used to calculate drain tile setbacks further hinders understanding of permissible conduct. The new regulation should provide clarity and transparency on the resources used for calculating drain tile setback distances.

The new regulation requires the Service to establish drain tile setback distances based upon the best available science, considering soil characteristics, tile diameter, the depth of the tile below the surface, and/or topography that ensure protected wetland areas are not drained. The new regulation notes that the Service will provide these setback distances to landowners upon request. However, the Service does not commit itself to provide these setback distances within a specific or reasonable timeframe, nor does it say that it will detail to the landowner how it has technically determined these distances.

There is already widespread disagreement between landowners and the Service as to which acres of an easement meet the easement's terms as protected waterfowl production areas. Landowners are reporting that the Service mapped as protected acres some of their land that showed only minimal evidence of wetness and marsh vegetation for just one or two years in the entire history of available aerial imagery. Despite there being no evidence that these acres were wet at the time the easement contracts were negotiated, the Service brazenly claimed jurisdiction.

Now, with this new proposed regulation, the Service seeks to make another unilateral decision – asserting that additional acres outside of its claimed wetlands are restricted from drain tile because the tile might affect the acres claimed as protected wetlands by the Service.

The Service proposes, within a few years, that it may unilaterally determine which wetlands are subject to the easements restrictions and what drainage activities will and will not impact those wetlands. This readily appears to be an interim Service measure only. Unfortunately, landowners are all too familiar with what will likely come next from the Service – a complete prohibition on drain tile on their entire property.

In this vein, the Service proposal is entirely unacceptable. The Service may not unilaterally determine which wetlands are subject to the easements restrictions and what drainage activities will and will not impact those wetlands. Any Service determination must acknowledge private property rights and intently recognize landowner input. It must be timely, scientifically sound, reasonable, and be fully reviewable by an objective third-party.

**C. If the Service issues a final rule requiring a case-by-case analysis of drain tile setbacks, which it should not do, the Service should require setback distances to be provided within a reasonable period, not to exceed two weeks.**

The proposed rule would allow the Service to provide setback distances within a Service-provided timeframe. Numerous past negative experiences by landowners in the PPR, who have dealt with the Service in regard to determining setback distances, clearly evidence that this unilateral Service-determined timeframe is likewise unacceptable. Accountability dictates that timeframes must be specified and certain.

Additionally, clear guidance should be provided to Service employees regarding calculation methodologies to ensure consistency and prevent the development of local or discriminatory standards. The calculation of a drain tile setback distance should be a quick process, taking minutes rather than days, months, or years.

The proposed regulation requires landowners to submit materials and follow specific procedures to request drain tile setback distances from the Service. This simply adds administrative burden and potential delays for landowners who may need to proceed with water management activities in a timely manner. Once again, the Service must be a better partner. It must be more reasonable and accommodating to landowners.

**D. The Service should revise the proposed regulation to make clear that maintenance and repairs of drain tile installed in conformance with Service guidance or in coordination with the Service is permissible without further agency coordination.**

The preamble to the new regulation notes that landowners who coordinate their tiling plans with the Service and adhere to Service-determined setback distances will not later be held criminally responsible or civilly liable for disturbing, injuring, or destroying a unit of the National Wildlife

Refuge System (i.e., draining a protected wetland area) provided the subsurface drainage system is not modified, enhanced, or replaced.

To avoid unnecessary coordination with the Service, the proposed regulation should clarify that maintenance and repairs of drain tile systems installed in accordance with Service guidance or coordination are permissible without any further agency involvement.

Landowners who adhere to Service-determined setbacks should not be held criminally or civilly responsible for disturbing or destroying protected wetland areas, if the subsurface drainage system is not modified, enhanced, or replaced in a way that increases hydraulic efficiency to impact protected wetlands.

**E. The Service should make clear that drain tile systems installed in reliance upon, and conformance with, the 2020 Service guidance for drain tile setbacks will not be required to remove drain tile even if it is later found to have an adverse effect on protected wetland areas.**

The preamble to the new regulation contains contradictory and ambiguous statements asserting that the proposed rule codifies the Service's existing drain tile setback practices, but that the new regulations apply only to setbacks provided by the Service beginning on the effective date of the final rule.

As previously noted, the Service has a current effective and reasonable policy for determining drain tile setback distances. The published methodology allows landowners burdened by Service wetland easements to readily determine and calculate for themselves setback distances compliant with the Service's policy. Landowners do not need to unnecessarily wait in a long line for a Service-conducted case-by-case analysis on a unilaterally determined Service-provided timeframe.

The current 2020 policy is in effect and significantly differs from the Service's new proposed regulation. Accordingly, we dispute the Service's assertion that the new regulation codifies the Service's existing drain tile setback practices. Existing drain tile setback practices provide a clear methodology using the van Schilfgaarde equation that can be calculated by landowners and their land-improvement contractors. The new regulation does not.

Landowners and their land-improvement contractors have relied on the effective and reasonable 2020 policy. Landowners who have already installed drain tile systems on their properties may face substantial financial loss and loss of significant water management tools if the Service unilaterally and arbitrarily determines that the tile has adverse effects on protected wetland areas. The proposed regulation does not provide any guarantees or compensation for landowners who have followed the Service's provided setback distances but later find themselves required to remove or modify the drain tile systems. This simply is not good governance.

The Service should offer solid assurances that landowners who followed agency's policies will be afforded protection from any criminal or civil responsibility. This should be so even if the agency later rescinds or revises its policies on drain tile setbacks.

**F. The Service should make clear that information collected from landowners to calculate drain tile setbacks is confidential.**

Finally, the new regulation provides no assurances that data collected from landowners by the Service to conduct the case-by-case evaluation will be confidential. We are concerned that some of the data, such as drain tile design plans, will contain proprietary information and information that landowners understandably view as highly sensitive.

Accordingly, information submitted by landowners to the Service must not be subject to disclosure under the Freedom of Information Act. The Service should make this clear to facilitate ongoing cooperative efforts between the Service and landowners.

## V. CONCLUSION

Overall, we are highly concerned that the Service's new proposed regulation, if promulgated, will have significant negative impacts on landowners in the PPR, including unlawful limitations on property rights, decreased land value, unnecessary and unreasonable restrictions on agricultural activities, compliance burdens, and financial loss.

**We respectfully but strongly recommend the Service withdraw the proposed regulation in its entirety and continue to follow the existing effective and reasonable 2020 guidance on calculating drain tile setbacks for the Service's wetland easements and enforcement.**

Sincerely,

**Iowa Corn Growers Association**
Greg Wandrey, Director of Sustainability
gwandrey@iowacorn.org

**Land Association of North Dakota**
Kent Kensmoe, Executive Director
kent.kensmoe@gmail.com

**Minnesota Corn Growers Association**
Adam Birr, Executive Director
abirr@mncorn.org

**Minnesota Soybean Growers Association**
Bob Worth, President
worthfarms@hotmail.com

**Minnesota Wheat Growers Association**
Charlie Vogel, Executive Director
cvogel@mnwheat.com

**North Dakota Farm Bureau**
Pete F. Hanebutt, Director of Policy
pete@ndfb.org

**North Dakota Farmers Union**
Matt Perdue, Government Relations Director
mperdue@ndfu.org

**Northern Canola Growers Association**
Barry Coleman, Executive Director
coleman@ndpci.com

**North Dakota Corn Growers Association**
Brenda Elmer, Executive Director
brenda@ndcorn.org

**North Dakota Grain Growers Association**
Ed Kessel, President
edk@ndgga.com

**Northland Potato Growers Association**
Donavon Johnson, President
djohnson@nppga.org

**North Dakota Soybean Growers Association**
Kasey J. Bitz, President
Kasey.bitz@ndsga.com

**North Dakota Stockmen's Association**
Jason Leiseth, President
jpleiseth@gmail.com

**South Dakota Corn Growers Association**
Danita Murray, Executive Director
danitam@sdcorn.org

**South Dakota Farmers Union**
Doug Sombke, President
dsombke@sdfu.org

**Agriculture Drainage Management Coalition**
Keegan Kult, Executive Director
kkult@admcoalition.com

**Associated General Contractors of North Dakota**
Russ Hanson, Executive Vice President
rhanson@agcnd.org

**Greater North Dakota Chamber of Commerce**
Andrea Pfennig, Director of Government Affairs
andrea@ndchamber.com

**Midwest Council on Agriculture**
Allison Stock, Executive Director
allison@petersongrp.com

**North Dakota Township Officers Association**
Larry Syverson, Executive Director
Larry.ndtoa@gmail.com

**Ellingson**
Levi Otis, Director of Government Affairs
lotis@ellingsoncompanies.com

**Prinsco**
Jamie Duininck, CEO
jamied@prinsco.com

**Devils Lake Basin Joint Water Resource Board**
Jeff Frith, Manager
manager@dlbasin.com

**North Dakota Water Resource Districts Association**
Dennis Reep, President
dennis.reep@hrdinc.com

**Red River Joint Water Resource District**
Josh Ihry, Chairman
joshihry@yahoo.com

**Senator Todd Beard, District 23**
North Dakota State Senate
tbeard@ndlegis.gov

**Senator Brad Bekkedahl, District 1**
North Dakota State Senate
bbekkedahl@ndlegis.gov

**Senator Cole Conley, District 12**
North Dakota State Senate
cconley@ndlegis.gov

**Senator Dick Dever, District 32**
North Dakota State Senate
ddever@ndlegis.gov

**Senator Robert Erbele, District 28**
North Dakota State Senate
rerbele@ndlegis.gov

**Senator Jordan Kannianen, District 4**
North Dakota State Senate
jkannianen@ndlegis.gov

**Senator Karen Krebsbach, District 40**
North Dakota State Senate
kkrebsbach@ndlegis.gov

**Senator Diane Larson, District 30**
North Dakota State Senate
dlarson@ndlegis.gov

**Senator Larry E. Luick, District 25**
North Dakota State Senate
lluick@ndlegis.gov

**Senator Janne Myrdal, District 19**
North Dakota State Senate
jmyrdal@ndlegis.gov

**Senator Bob L. Paulson, District 3**
North Dakota State Senate
bpaulson@ndlegis.gov

**Senator David Clemens, District 16**
North Dakota State Senate
dclemens@ndlegis.gov

**Senator Kyle Davison, District 41**
North Dakota State Senate
kdavison@ndlegis.gov

**Senator Jay Elkin, District 36**
North Dakota State Senate
jayelkin@ndlegis.gov

**Senator David J. Hogue, District 38**
North Dakota State Senate
dhogue@ndlegis.gov

**Senator Jerry J. Klein, District 14**
North Dakota State Senate
jklein@ndlegis.gov

**Senator Greg Kessel, District 39**
North Dakota State Senate
gkessel@ndlegis.gov

**Senator Randy Lemm, District 20**
North Dakota State Senate
rlemm@ndlegis.gov

**Senator Scott Meyer, District 18**
North Dakota State Senate
scottmeyer@ndlegis.gov

**Senator Dale Patten, District 26**
North Dakota State Senate
dpatten@ndlegis.gov

**Senator Jim P. Roers, District 46**
North Dakota State Senate
jroers@ndlegis.gov

**Senator David Rust, District 2**
North Dakota State Senate
drust@ndlegis.gov

**Senator Don Schaible, District 31**
North Dakota State Senate
dgschaible@ndlegis.gov

**Senator Jonathan Sickler, District 17**
North Dakota State Senate
jlsickler@ndlegis.gov

**Senator Ron Sorvaag, District 45**
North Dakota State Senate
rsorvaag@ndlegis.gov

**Senator Shawn A. Vedaa, District 6**
North Dakota State Senate
svedaa@ndlegis.gov

**Senator Terry M. Wanzek, District 29**
North Dakota State Senate
tmwanzek@ndlegis.gov

**Senator Mark Weber, District 22**
North Dakota State Senate
markweber@ndlegis.gov

**Senator Kent Weston, District 9**
North Dakota State Senate
kweston@ndlegis.gov

**Senator Michael A. Wobbema, District 24**
North Dakota State Senate
mwobbema@ndlegis.gov

**Rep. Mike Brandenburg, District 28**
North Dakota House of Representatives
mbrandenburg@ndlegis.gov

**Rep. Craig Headland, District 29**
North Dakota House of Representatives
cheadland@ndlegis.gov

**Rep. Claire Cory, District 42**
North Dakota House of Representatives
clairecory@ndlegis.gov

**Rep. Jared Hagert, District 20**
North Dakota House of Representatives
jhagert@ndlegis.gov

**Rep. Dawson Holle, District 31**
North Dakota House of Representatives
dholle@ndlegis.gov

**Rep. Dwight Kiefert, District 24**
North Dakota House of Representatives
dhkiefert@ndlegis.gov

**Rep. Andrew Marschall, District 16**
North Dakota House of Representatives
amarschall@ndlegis.gov

**Rep. SuAnn Olson, District 8**
North Dakota House of Representatives
solson@ndlegis.gov

**Rep. Emily O'Brien, District 42**
North Dakota House of Representatives
eobrien@ndlegis.gov

**Rep. Emily O'Brien, District 42**
North Dakota House of Representatives
eobrien@ndlegis.gov

**Rep. Bernie Satrom, District 12**
North Dakota House of Representatives
blsatrom@ndlegis.gov

**Rep. Austen Schauer, District 13**
North Dakota House of Representatives
aschauer@ndlegis.gov

**Rep. Cynthia Schreiber-Beck, District 25**
North Dakota House of Representatives
cschreiberbeck@ndlegis.gov

**Rep. Paul Thomas, District 6**
North Dakota House of Representatives
paulthomas@ndlegis.gov

cc: The Honorable Thomas Vilsack, U.S. Secretary of Agriculture
The Honorable Deb Haaland, U.S. Secretary of the Interior
The Honorable Martha Williams, Director of the U.S. Fish and Wildlife Service
The Honorable Kevin Cramer, U.S. Senator
The Honorable John Hoeven, U.S. Senator
The Honorable Kelly Armstrong, U.S. Representative
The Honorable Tina Smith, U.S. Senator
The Honorable Amy Klobuchar, U.S. Senator
The Honorable Brad Finstad, U.S. Representative
The Honorable Angie Craig, U.S. Representative
The Honorable Dean Phillips, U.S. Representative
The Honorable Betty McCollum, U.S. Representative
The Honorable Ilhan Omar, U.S. Representative
The Honorable Tom Emmer, U.S. Representative
The Honorable Michelle Fischbach, U.S. Representative
The Honorable Pete Stauber, U.S. Representative
The Honorable Charles Grassley, U.S. Senator
The Honorable Joni Ernst, U.S. Senator
The Honorable Mariannette Miller-Meeks, U.S. Representative
The Honorable Ashley Hinson, U.S. Representative
The Honorable Zachary Nunn, U.S. Representative
The Honorable Randy Feenstra, U.S. Representative

COMMISSIONER
DOUG GOEHRING

ndda@nd.gov
www.agdepartment.com

NORTH DAKOTA
DEPARTMENT OF AGRICULTURE
STATE CAPITOL
600 E. BOULEVARD AVE. – DEPT. 602
BISMARCK, ND 58505-0020

June 27, 2023

The Honorable Shannon Estenoz
Assistant Secretary for Fish & Wildlife and Parks
Department of the Interior
1849 C Street NW
Washington, DC 20240

Public Comments Processing
Attn: FWS-HQ-NWRS-2022-0092
U.S. Fish & Wildlife Service
5275 Leesburg Pike
MS: PRB (JAO/3W)
Falls Church, VA 22041-3803

**SUBMITTED VIA FEDERAL E-RULEMAKING PORTAL**

**Re: Comments on New Drain Tile Setbacks**
**Docket ID No. FWS-HQ-NWRS-2022-0092**
**OMB Control Number 1018-New Drain Tile Setbacks**

Dear Assistant Secretary Estenoz:

I strongly recommend and respectfully request that the United States Fish and Wildlife Service (USFWS) withdraw, in its entirety, its proposed new overly broad and vague regulation, as published in the Federal Register on April 28, 2023, regarding drain tile setbacks for wetland easement contract compliance.[1]

In the interests of effective wetland easement management, regulatory certainty, and good governance, USFWS should simply continue its standing February 26, 2020 policy[2] of utilizing the van Schilfgaarde equation to compute lateral effect distances of drain tile. Regrettably, the proposed new regulation does not reference, nor continue to implement this current scientifically based wetland protection tool.

In wetland easement enforcement, no statute or regulation judiciously binds USFWS to a particular definition or method of determining the extent of a wetland within an area. Notwithstanding, as an accountable federal agency, USFWS must transparently and responsibly work in good faith with private landowners in reasonably enforcing wetland easements upon private lands. USFWS must do so consistently in a fair manner that is nonpartisan and even-handed. The February 26, 2020 memo does that.

---

[1] 88 Fed. Reg. 26244.
[2] Memorandum, USFWS Director Aurelia Skipwith, "Drain Tile Setbacks and Legal Acton on U.S. Fish and Wildlife Service Wetland Easements", February 26, 2020 (attached).

However, the new proposed administrative regulation, if promulgated, will negatively impact North Dakota private landowners and agricultural producers.[3] This proposed regulation does not properly recognize nor respect private property rights and it does not serve to foster conscientious and effective water management.

In its new proposed rule, USFWS rather indifferently says: *"[w]ithin a Service-provided timeframe*, the Service will provide setback distances for the place of drain tile on lands covered by wetland easements in Iowa, Minnesota, Montana, North Dakota, and South Dakota." (emphasis added). The proposed rule without an explicit expeditious timeframe for USFWS to make future setback determinations is entirely unacceptable.

To effectively plan drain tile installation and constructively minimize impact upon agricultural lands, landowners are fully entitled to know *in rule* the specific punctual timeframe in which USFWS will provide definitive setback determinations. In any legitimate policy or proposed rule regarding USFWS setback determinations, USFWS must provide sufficient regulatory certainty to landowners by imposing a specific and reasonable time limit for USFWS to respond to landowner requests.

Moreover, in its new proposed rule, USFWS cavalierly says that at some time of its choosing in the future, it "will provide guidance to landowners about what materials should be submitted as part of a request." This lack of immediate specificity is likewise unacceptable. Instead, the proposed rule should straightforwardly say: "the Service recommends landowners provide the following materials as part of a request: …"

To best inform the landowner properly and proactively, any USFWS proposed rule must be fully transparent and specifically state all the relevant science-based materials from the landowner the USFWS may require in making a fair and impartial setback determination. Furthermore, the rule must clearly state the landowner has the right to appeal any such USFWS determination before a neutral third-party either administratively or judicially.

In short, in its new proposed rule, USFWS misses the mark. USFWS works for the American people, not the other way around. The proposed new rule completely lacks the minimal clarity and specificity required of any legitimate administrative regulation. Here, the rule does not even clearly tell the landowner what lands are subject to the easement.[4]

---

[3] North Dakota agriculture contributes considerably over 30 billion dollars in economic activity annually to the state. As a prime exporter of agricultural products, North Dakota is often cited as the "breadbasket of the world." North Dakota is the country's 10th largest agricultural exporting state. North Dakota produces over 50 different commodities. North Dakota farmers and ranchers lead the nation in the production of more than a dozen important commodities, among them spring and durum wheat, rye, food grains, assorted beans, barley, flaxseed, canola, honey, sunflowers, pulse crops and more. Of North Dakota's approximately 780,000 residents, only about three percent are farmers and ranchers. Nonetheless, agriculture comprises and broadly supports nearly 25 percent of the state's workforce, which is higher than the national average of 19 percent. Agriculture steadfastly remains the leading industry in North Dakota.

[4] A law, such as the proposed USFWS administrative rule, violates Constitutional requirements of due process when it "either forbids or requires the doing of an act in terms so vague that men of common

Accordingly, the proposed rule violates Constitutional due process in that it does not provide a landowner adequate notice as to what USFWS may deem are the reasonable parameters of a wetland easement encumbering that landowner's land.

Once again, I strongly recommend that USFWS withdraws its new proposed regulation in its entirety and continues to follow the existing effective and reasonable 2020 guidance on calculating drain tile setbacks for USFWS wetland easements**.**

Sincerely,

Doug Goehring
North Dakota Agriculture Commissioner

cc:
The Honorable Thomas J. Vilsack, U.S. Secretary of Agriculture
The Honorable Debra A. Haaland, U.S. Secretary of the Interior
The Honorable Martha M. Williams, Director of the U.S. Fish and Wildlife Service
The Honorable John H. Hoeven, U.S. Senator
The Honorable Kevin J. Cramer, U.S. Senator
The Honorable Kelly M. Armstrong, U.S. Representative
The Honorable Douglas J. Burgum, Governor of North Dakota
The Honorable Drew H. Wrigley, Attorney General of North Dakota
The Honorable Dennis E. Johnson, Speaker of the ND State House of Representatives
The Honorable Michael Lefor, ND State Legislature House Majority Leader
The Honorable Joshua A. Boschee, ND State Legislature House Minority Leader
The Honorable Donald G. Schaible, President Pro Tempore of the ND State Senate
The Honorable David J. Hogue, ND State Legislature Senate Majority Leader
The Honorable Kathy L. Hogan, ND State Legislature Senate Minority Leader
Jeb R. Williams, Director of the North Dakota Game and Fish Department

---

intelligence must necessarily guess at its meaning and differ as to its application. *Connally v. Gen.Const. Co*, 269 U.S. 385, 391 (1926).

# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

FEB 2 6 2020

Memorandum

To: Regional Directors, Interior Regions 3, 4 & 5

From: Director

Subject: Drain Tile Setbacks and Legal Action on U.S. Fish and Wildlife Service Wetland Easements

The U.S. Fish and Wildlife Service's (Service) methodology for providing tile setback recommendations on wetland easement tracts is outlined below and utilizes the van Schilfgaarde equation to compute lateral effect distances of drain tile.

Specifically, if the setback distance calculated using the van Schilfgaarde equation lies beyond the up-gradient catchment boundary of a wetland area, the Service sets the drain tile setback for that wetland area at the catchment boundary (rather than applying the calculated distance – see attached Figure). In instances where the calculated setback distance lies within the up-gradient catchment boundary of a wetland area, the setback distance is applied. The distance calculated using the van Schilfgaarde equation is applied for areas down-gradient from the wetland area as the lower elevation and direction of groundwater flow makes the potential for enhanced subsurface drainage more pronounced (see attached Figure). When an easement is purchased, the Service must advise landowners that placement of any structure that diverts surface or subsurface water away from the purchased easement wetland area and results in water starvation of that wetland, essentially drainage, would violate the provisions of the wetland easement.

Once an easement is purchased owners of lands encumbered by Service wetland easements often seek clarity and certainty before investing in tile drainage systems. When the Service works with a landowner to design a tile installation plan, our actions should aim to protect the wetland areas from drainage without needlessly restricting activities on the remainder of the easement. In those situations where the landowner coordinates their tile planning with the Service, and adheres to Service-provided setback distances, the Service will not pursue legal action if it is later determined that the distances are inadequate to protect wetland areas from drainage.

If a landowner does not follow Service-provided setback distances, or changes the tiling parameters on which setback calculations are based, and drainage of the protected wetland occurs, the Service will request that tile within the setback distances be removed to restore the affected wetland area. If the landowner does not voluntarily provide wetland restoration, the Service will review its legal obligations, which includes seeking redress via legal action.

However, no legal action will be pursued until after the landowner is given the opportunity for administrative appeal.

The continued success of the wetland easement program requires the Service to diligently monitor easements for compliance and to pursue legal remedies when appropriate. At the same time, it also requires the Service to work with landowners in good faith and to adopt reasonable policies, which gives landowners greater certainty that placement of their drain tile will not result in draining protected wetland areas. The procedure outlined here achieves that standard.

# Part 650 – Engineering Field Handbook

## Chapter 19 – Hydrology Tools for Wetland Identification and Analysis

## Prairie Pothole Region

## States of Iowa, Minnesota, North Dakota, and South Dakota

### PPR650.1900 Introduction

The purpose of this supplement is to document the procedures that were utilized to generate lateral effect distance recommendations in the Prairie Pothole Region (PPR) States of Iowa, Minnesota, North Dakota, and South Dakota. A report was developed using structured query language (SQL) to query and format data from the National Soil Information System (NASIS). The report results for soils in the PPR are made available to the public on the Web Soil Survey. The SQL report is designed to assign a hydrogeomorphic (HGM) classification, and subclass if appropriate, to hydric soil components and the assigned classification is then used to calculate lateral effect. The report was run on the official soil survey data as of November 2021, and the resulting lateral effect calculations database is intended to be static. Any future changes will occur only when the four State Conservationists agree results should be refreshed to reflect updates to the official Soil Survey.

## PPR650.1903 Assigning the Hydrogeomorphic Wetland Classes to PPR soils

A. Introduction to Hydrogeomorphic Wetland Classification

HGM wetland classes are based on landscape position, dominant water source, and hydrodynamics (direction and hydraulic head of water movement). The foundations of HGM wetland classification are provided in Brinson (1993) and Smith et al. (1995). Technical Note 190-8-76, "Hydrogeomorphic Wetland Classification" (TN-190-8-76) slightly modified the original concepts to ensure consistent classification by NRCS. There are seven HGM wetland classes defined in TN-190-8-76 and identified in Title 210, National Engineering Handbook, Part 650, Chapter 19 "Hydrology Tools for Wetland Identification" (210-NEH-650.19). There are three subclasses of the DEPRESSIONAL class (210-NEH-650.19) and one subclass of SLOPE that are important for drainage equation application that are also listed below.

(i) RIVERINE
(ii) ESTUARINE FRINGE
(iii) LACUSTRINE FRINGE
(iv) SLOPE
- Fen

(v) ORGANIC SOIL FLATS
(vi) MINERAL SOIL FLATS
(vii) DEPRESSIONAL
- Recharge
- Discharge and Flow through

C. Soil Survey Definitions

(6) The following official soil survey definitions and criteria are important in assigning HGM wetland classes and subclasses:

(i) Flooding: The annual probability of a flood event (inundation by flowing water), expressed as a class. (SSM).

- Where the flooding frequency is:
  - Very frequent: Flooding is likely to occur very often under usual weather conditions; more than 50 percent chance in all months of any year;
  - Frequent: Flooding is likely to occur often under usual weather conditions; more than 50 percent chance of flooding in any year or more than 50 times in 100 years, but less than a 50 percent chance of flooding in all months in any year;
  - Occasional: Flooding is expected infrequently, 5 to 50 percent chance in any year, (5 to 50 times in 100 years);
  - Rare: Flooding is unlikely but possible under unusual weather conditions; 1 to 5 percent chance in any year (1 to 5 times in 100 years);
  - Very rare: Flooding is very unlikely but is possible under unusual weather conditions; less than 1 percent chance in any year (less than 1 time in 100 years, but more than 1 time in 500 years); or
  - None: No reasonable possibility of flooding; near 0 percent chance of flooding in any year or less than 1 time in 500 years; and
- Where the flooding duration is the average duration of inundation per flood occurrence expressed as a class is:
  - Very long: More than 30 days;
  - Long: 7 days to 30 days;
  - Brief: 2 days to 7 days;
  - Very brief: 4 hours to 48 hours; or
  - Extremely brief: 0.1 to 4 hours; and

- Where landform position (components on flooded landforms). Soils with a very rare flooding frequency are often not on the hydric soil list. Landforms that are subject to flooding include bars, channels, drainageways, flood plains, flood-plain steps, and oxbows.

(ii) Ponding: The annual probability of a ponding event (inundation by standing water), expressed as a class.

- Where the ponding frequency is:
  - Frequent: Ponding is likely to occur under usual weather conditions; more than 50 percent chance in any year, or more than 50 times in 100 years;
  - Occasional: Ponding is expected infrequently under usual weather conditions; 5 to 50 percent chance of ponding in any year, or 5 to 50 times in 100 years;
  - Rare: Ponding unlikely but possible under unusual weather conditions; from nearly 0 to 5 percent chance of ponding in any year, or nearly 0 to 5 times in 100 years; or
  - None: No reasonable possibility of ponding, near 0 percent chance on ponding in any year; and
- Where ponding duration is the average duration, or length of time, of the ponding occurrence expressed as a class is:
  - Very long: More than 30 days;
  - Long: 7 days to 30 days;
  - Brief: 2 days to 7 days; or
  - Very brief: 4 hours to 48 hours.

(iii) Histic Epipedon: The histic epipedon is a layer (one or more horizons) that is characterized by saturation (for 30 days or more, cumulative) and reduction for some time during normal years (or is artificially drained) and either:

- Consists of organic soil material that:
  - Is 20 to 60 cm thick and either contains 75 percent or more (by volume) Sphagnum fibers or has a bulk density, moist, of less than 0.1 g/cm3; or
  - Is 20 to 40 cm thick; or
  - Is an Ap horizon that, when mixed to a depth of 25 cm, has an organic-carbon content (by weight) of:
    - 16 percent or more if the mineral fraction contains 60 percent or more clay; or
    - 8 percent or more if the mineral fraction contains no clay; or
    - 8 + (clay percentage divided by 7.5) percent or more if the mineral fraction contains less than 60 percent clay.
- Most histic epipedons consist of organic soil material (defined in Chapter 2: Soil Survey Staff, 2014). Item ii provides for a histic epipedon that is an Ap horizon consisting of mineral soil material. A histic epipedon consisting of mineral soil material can also be part of a mollic or umbric epipedon.

(iv) Discharge or Recharge: Presence of secondary soluble salts within 50 cm of the soil surface is used to indicate the presence of discharge conditions. A calcium carbonate equivalence greater than or equal to 1 percent; a gypsum content greater than or equal to 1 percent; or an electrical conductivity greater than 4 ds/m is considered evidence that the hydric soil functions in a discharge capacity. Likewise, the absence of said secondary salts within 50 cm of the soil surface is used to indicate that the soil functions in a recharge capacity. Soils have an inherent, net negative charge obtained from the clay sized particles. Vegetation that is not salt tolerant exhibits osmotic stress from the presence of salts when the electrical conductivity is greater than 4 ds/m.

(v) Sodicity: Soils affected by sodium salts are separated from those affected by other soluble salts because sodium dispersion alters the soil hydrology. This dispersion negatively affects the water infiltration. Sodium is known to affect soil physical properties when the sodium adsorption ratio is 5 or greater.

(7) Hydric Soils List Criteria: Wetland conditions require the presence of hydric soils. The USDA-NRCS Soil and Plant Sciences Division uses the following criteria to designate soil components as hydric in the NASIS database. Soil components must meet one or more of these criteria to be considered a member of a HGM wetland class. Any soils meeting one or more of the criteria below are considered to be a member of an HGM wetland class:

(i) All Histels except Folistels and Histosols except Folists; or

(ii) Map unit components in Aquic suborders, great groups, or subgroups, Albolls suborder, Historthels great group, Histoturbels great group, or Andic, Cumulic, Pachic, or Vitrandic subgroups that:

- Based on the range of characteristics for the soil series, will at least in part meet one or more Field Indicators of Hydric Soils in the United States, or
- Show evidence that the soil meets the definition of a hydric soil;

(iii) Map unit components that are frequently ponded for long duration or very long duration during the growing season that:

- Based on the range of characteristics for the soil series, will at least in part meet one or more Field Indicators of Hydric Soils in the United States or
- Show evidence that the soil meets the definition of a hydric soil; or

(iv) Map unit components that are frequently flooded for long duration or very long duration during the growing season that:

- Based on the range of characteristics for the soil series, will at least in part, meet one or more Field Indicators of Hydric Soils in the United States , or
- Show evidence that the soils meet the definition of a hydric soil.

E. Hierarchical Approach to Assigning HGM Class

(1) The script used soil properties and qualities to differentiate and assign HGM wetland classes and subclasses including hydric rating, flooding frequency, presence of soluble salts (electrical conductivity, sodium adsorption ratio, calcium carbonate equivalent, and gypsum), presence of a histic epipedon, and landform. These properties and qualities are described in-depth in section PPR650.1903C. Only soil components that have a hydric rating of "yes" were assigned an HGM wetland class (see section PPR650.190C(7) for hydric screening criteria used for the procedure). Soil components on the hydric soil list met one or more of the criteria documented in Federal Register Document 2012-4733, filed February 29, 2012.

(2) The script assigned wetland classes in a hierarchical manner, which is listed in numbered bullets below. Wetland classes ESTUARINE FRINGE, LACUSTRINE FRINGE, and Flow through DEPRESSIONAL were not included in this approach because there is not enough information on soil properties or qualities in the National Soil Information System (NASIS) to make these classifications using offsite methods. Soil properties and qualities do not identify proximity to cyclic action of ocean tides, lake levels, or precisely equal groundwater inflow compared to outflow. Furthermore, there are no oceans near the PPR states, which excludes ESTUARINE FRINGE wetland from consideration. LACUSTRINE FRINGE wetlands should be identified on a case-by-case basis when lake levels influence wetland hydrology. Flow through DEPRESSIONAL require equal groundwater inflow to groundwater outflow and can include a combination of recharge and discharge characteristics. Flow through DEPRESSIONAL wetland classes cannot be ascertained solely using the official soil survey data; instead, assignments differentiate as either recharge DEPRESSIONAL or discharge DEPRESSIONAL.

(3) Assignment started at the lowest part of the landscape and moved to the highest part. This process ensured that once a component was assigned a wetland class, the component was not considered a member of any other wetland class. The exception to this hierarchical approach is the fen SLOPE, which are unique. They are typically higher on the landscape and have a histic epipedon that results from very nearly permanent saturation. A summary of assignments is listed below, and the NASIS script utilized is included in section PPR650.1916A.

(i) Members of the fen SLOPE subclass were distinguished by the presence of a histic epipedon greater than or equal to 20 cm thick and were assigned the landform "fen."

(ii) Members of the ORGANIC SOILS FLAT wetland class are not a member of a previously defined class and were distinguished by the presence of a histic epipedon greater than or equal to 20 cm thick.

(iii) A component was considered a member of the RIVERINE wetland class if it was not a member of a previously defined class and the flooding frequency was very frequent, frequent, occasional, or rare; it is on a flooded landform; a histic epipedon was not present; and the sodium adsorption ratio was less than 5 within 50 cm of the soil surface. Landforms that are subject to flooding include channels, drainageways, flood plains, flood plain steps, and oxbows.

(iv) A component was considered a member of the RIVERINE, sodic, wetland class and subclass if it was not a member of a previously defined class and the flooding frequency was very frequent, frequent, occasional, or rare; it was on a flooded landform; a histic epipedon was not present; and the sodium adsorption ratio was greater than or equal to 5 within 50 cm of the soil surface. Landforms that are subject to flooding include channels, drainageways, flood plains, flood plain steps, and oxbows.

(v) A component was considered a member of the MINERAL SOILS FLAT wetland class if it was not a member of a previously defined class, a histic epipedon was not present, the sodium adsorption ratio was less than 5 within 50 cm of the soil surface, the component was not subject to flooding, and the landform character was typically broad and flat.

(vi) A component was considered a member of the MINERAL SOILS FLAT, sodic wetland class and subclass if it was not a member of a previously defined class, a histic epipedon was not present, the sodium adsorption ratio was greater than or equal to 5 within 50 cm of the soil surface, the component was not subject to flooding, and the landform character was typically broad and flat.

(vii) Members of the discharge DEPRESSIONAL are not a member of a previously defined class, do not have a histic epipedon, have secondary salts within 50 cm of the soil surface, and have a sodium adsorption ratio of less than 5 within 50 cm of the soil surface.

(viii) Members of the sodic discharge DEPRESSIONAL are not a member of a previously defined class, do not have a histic epipedon, have secondary salts within 50 cm of the soil surface, and have a sodium adsorption ratio of 5 or greater within 50 cm of the soil surface.

(ix) Members of the SLOPE wetland class are not a member of a previously defined class, do not have a histic epipedon, have a sodium adsorption ratio of less than 5 within 50 cm of the soil surface, and are not subject to flooding.

(x) Members of the SLOPE, sodic wetland class are not a member of a previously defined class, do not have a histic epipedon, have a sodium adsorption ratio of greater than or equal to 5 within 50 cm of the soil surface, and are not subject to flooding.

(xi) Members of the recharge DEPRESSIONAL are not a member of a previously defined class, do not have a histic epipedon, do not have secondary salts within 50 cm of the soil surface, and have a sodium adsorption ratio of less than 5 within 50 cm of the soil surface.

(xii) Hydric soil components on geomorphic positions that are anthropogenic (affected by people) were not assigned a wetland class and were considered ARTIFICIAL.

## PPR650.1909 Drainage Equations for Lateral Effect Determination

B. Applicability to HGM Classes

(3) Drainage equations have been considered applicable only to MINERAL FLAT, ORGANIC FLAT, AND recharge DEPRESSIONAL wetland classes due to hydrodynamics being vertical (210-NEH-650.19). Surface storage is an applicable variable to vertical movement of water starting as rainfall, filling depressional storage created by surface micro-relief, then infiltrating, or running off along the surface to these wetland classes for ponding. Overland flow and snowmelt supply these wetland classes with relatively fresh water that recharges the groundwater with vertical movement of water leaching salts and leaving the upper layers considered non-saline. After this water infiltrates and "…flows in long groundwater flow paths, wetlands in the low areas receive substantial amounts of dissolved ions and other solutes from the higher areas" (Richardson, 2001); these wetlands receiving this high ionic strength water are considered discharge and flow through DEPRESSIONAL wetlands as well as SLOPE wetlands.

**Figure PPR19-1**: Landscape flow paths including depressional wetlands

*Hydrology of Wetland and Related Soils* 81




**FIGURE 3.36**
In subhumid landscapes, the groundwater divide is often in a depression. These landscapes often have flowthrough and discharge wetlands as well as recharge wetlands.

(4) SLOPE, discharge and flow through DEPRESSIONAL wetlands have strong effervescence and identify as alkaline or saline due to accumulation of ions and solutes from groundwater inflows. This hydrology provides unique soil taxonomy and habitat for plants, organisms, and animals that rely on alkalinity and salinity. SLOPE, discharge and flow through DEPRESSIONAL wetlands also vary in size and hydroperiod from recharge DEPRESSIONAL wetlands, which is typically larger in size with later and longer periods of saturation. To maintain these unique functions, drainage equation variables specifically related to SLOPE, discharge and flow through DEPRESSIONAL wetlands were adjusted.

(5) Drainage phenomenon still applicable to SLOPE, discharge and flow through DEPRESSIONAL wetlands using van Schilfgaarde equation include an initial saturated soil profile and water table fall applicable to soil conductivity and drain depth and size. Furthermore, the impermeable layer must be lower than the typical subsurface drain depth of 2-5 feet, in order not to intercept major flow path along an aquitard. In cases where hydraulic conductivity in the drain vicinity, considered depth of 2-5 feet, is one-tenth or less of the hydraulic conductivity above the drain a site-specific analysis is required to evaluate major diversion along an aquitard. For instances where hydraulic conductivity below the drain is greater than one-tenth of the hydraulic conductivity above the drain, drainage equations including van Schilfgaarde are applicable.

(6) The Corps of Engineers Wetlands Delineation Manual (USACE, 1987) defines ponded conditions where water stands and saturated conditions as voids filled with water to the soil surface. The manual describes wetlands with ground-water seepage as seldom, if ever, flooded, but soils saturated for a sufficient portion of the growing season. Adjusted drainable porosity is due to water "stored on the surface in depressions, so movement overland toward the drains may be restricted" (USDA, 1980). Since SLOPE, discharge and flow through DEPRESSIONAL wetlands are result of groundwater seepage, there is rarely ponded conditions resulting in water stored on the surface. In the same reference where surface storage value was adopted for MINERAL FLAT, ORGANIC FLAT, AND recharge DEPRESSIONAL wetland classes, surface storage was described as "Surface detention will temporarily sustain runoff when rainfall has ended" (Gilley, 2018). Both references highlight surface storage resulting from precipitation and overland runoff resulting in ponded conditions.

(7) Pali (2013) found the van Schilfgaarde equation to be applicable for saline and waterlogged soils, which describes discharge and flow-through wetlands. The Pali case study did not include surface storage adjustment, nor did the original van Schilfgaarde equation. Numerous hydrogeomorphic assessment approaches distinguish ~500 feet as ideal buffer zone for maintaining wetland functions. The USDA-NRCS functional assessment for Lake Dakota Sand Plains (USDA, 1999) "Hydrology Alterations" variable is optimized at a distance greater than 500 feet. Similarly, two USACE hydrogeomorphic guidebooks (USACE, 2011 & USACE, 2013) for applicable wetland classes also include an ideal buffer distance of 150 meters (492 feet). Therefore, the maximum lateral effect distant was capped at 500 feet in the PPR database.

(8) SLOPE, discharge and flow through DEPRESSIONAL wetlands endosaturation from groundwater and not from overland runoff. Since discharge and flow through DEPRESSIONAL wetlands predominant hydrology is from groundwater; water ponded or trapped on the surface within the wetland and surrounding the wetland by soil roughness seldomly occurs. Therefore, surface storage is not applicable and not recommended to be used in applying drainage equations, including van Schilfgaarde, to discharge and flow through DEPRESSIONAL wetlands. Application of drainage equations, including van Schilfgaarde without surface storage, was found to have appropriate setbacks for discharge and flow through DEPRESSIONAL wetlands analyzed with over twenty-five site specific analysis the NRCS has completed in the past. This association analysis found the most ideal correlation for discharge and flow through DEPRESSIONAL wetlands was with the original van Schilfgaarde equation, which was not modified with surface storage parameter.

(9) RIVERINE and LACUSTRINE FRINGE wetland classes require site specific analysis using appropriate field data as described in 210-NEH-650.19.

(10) Lateral effect distances were calculated with a Python script developed from ND-Drain computer program, as described in 210-NEH-650.19. Rosetta model version 1.3 is used for processing soils data. Supplemental information is provided for processing of organic soils data, and adoption of drainage equation and required parameters.

H. Processing of Organic Soils Data

(1) Organic soils are common in the PPR and are often found in hydric settings and are either coincident or proximal to wetlands. These organic soils are also often located on adjacent agricultural lands subject to agricultural drainage practices and thus it is important that lateral effect distances for these soils be accurately determined. However, the Pedo-Transfer Functions (PTF) used to derive the hydraulic parameters necessary for analytically producing lateral effect distances for mineral soils are not capable of predicting these properties for soils containing significant amounts of organic matter (Schapp et al., 2001). This is in part due to soil organic matter generally not having a granular textural composition like sand or silt, but rather have in lieu textural compositions that are fibrous to mucky. Thus, the PTFs that are calibrated to mineral, that is granular materials, are not calibrated to, or accurate for soils comprised of materials having fibrous or mucky in lieu textures. Furthermore, due to regional and legacy inconsistencies in the analyses and methods used to populate NASIS data for organic soils within the PPR, data contained in the database for these soils are continually in the process of being updated. However, at the time of this writing there are still some areas that contain anomalies and thus using these data from the database outright will produce inconsistencies in lateral effect distances. For these reasons, an alternate approach for determining the values of hydraulic properties and bulk densities for organic soils within the PPR was developed.

(2) This method is primarily based upon the representative in lieu texture of the organic material. The in lieu texture of an organic soil represents the decomposition and weathering of the at once plant material of which they were derived. Three in lieu texture classifications frequently used in NASIS to characterize soil horizons designated as organic are used: Peat, Mucky Peat, and Muck. These in lieu textures represent organic matter on a scale of presumed decomposition from Peat, slightly decomposed; to Mucky Peat, moderately decomposed; to Muck, highly decomposed. It is well documented that hydraulic properties and bulk densities of organic soils follow predictive trends as decomposition ranges from slight to high through these classifications. Soils containing more peat, or fibric, material are more porous, permeable, and less dense than soils containing more highly decomposed mucky, or sapric materials (Verry et al., 2011). Thus, it is often reasonable to assign properties to organic soils based on their level of decomposition (Verry et al., 2011; Soil Survey Staff, 2021; S.P.P. Grover, J.A. Baldock, 2013).

**Figure PPR19-2:** Primary organic textures and associated properties and descriptive information from NASIS (Soil Survey Staff, 2021).

| Organic Texture | Decomposition | Common NASIS Texture Label | Common NASIS Horizon Label | Horizon Description |
|---|---|---|---|---|
| **Peat** | Slight | PEAT | Oi | Slightly decomposed organic material. The fiber content of these materials is 40 percent or more (by volume) after rubbing. |
| **Mucky Peat** | Intermediate | MPT | Oe | Organic material of intermediate decomposition. The fiber content of these materials is 17 to 40 percent (by volume) after rubbing. |
| **Muck** | Heavy | MUCK | Oa | Highly decomposed organic matter. Highly decomposed organic materials, which have a fiber content of less than 17 percent (by volume) after rubbing. |

(3) To determine appropriate values of the hydraulic parameters required to calculate lateral effect distances in the PPR for these organic soils (saturated hydraulic conductivity, saturated water content, residual water content, and bulk densities), analysis and statistics of these

parameters as they are contained within the NASIS were performed on all organic horizons throughout the PPR (Soil Survey Staff, 2021). . The analysis and subsequent determination were done by querying these data for all organic horizons contained within soil components occupying greater than 10% of their respective map units within the states of IA, MN, ND, and SD (section PPR650.1916B). Note: minor components occupying less than 10% of the map unit area are not included in the determination of lateral effect distance for that map unit.

(4) Next an analysis of these results was performed to assess the distribution of horizon and in lieu textural classifications across the region. The analysis consisted of determining unique in lieu texture values, their frequency of occurrence throughout the PPR and among all organic soils (figure PPR19-2). This resulted in 16 unique in lieu texture identifiers among all the data, many of which were associated with relatively few horizons throughout the region. These 16 texture identifiers were then assigned into one of the three previously mentioned in lieu textures: peat, mucky-peat, muck; based on simple majority of the horizon name field. In lieu textures having most horizon names designated as slightly degraded organic material, or Oi, were assigned to peat. In lieu textures having most of the horizon names being designated as moderately degraded were assigned to mucky peat. Lastly, in lieu textures having most horizon names indicating heavily decomposed material, Oa, were assigned muck (figure PPR19-3).

**Figure PPR19-3**: Texture classes found in organic soils, the states they are contained within, horizon names, the frequency and percentage of all organic horizons, the associated primary texture class, and whether a texture was used to calculate mean property values of soil properties.

| NASIS Texture | States w/ Texture | Horizon Names | Majority Horizon Name | States Containing Horizons | Number of Horizons | Percent of All Organic Horizons | Reclassified Texture | Used for Mean |
|---|---|---|---|---|---|---|---|---|
| CE | MN | Oa2 | Oa | ALL | 1 | 0.0% | MUCK | N |
| FLV- | MN | Oe | Oe | ALL | 26 | 0.6% | MPT | N |
| HB-M | IA | Oa3 | Oa | ALL | 5 | 0.1% | MUCK | N |
| HPM | MN, SD | Oa | Oa | ALL | 9 | 0.2% | MUCK | N |
| MARL | MN | Oma | Oa | ALL | 1 | 0.0% | MUCK | N |
| MK-P | MN | Oe*1,2,3 | Oe | MAJORITY | 8 | 0.2% | MPT | N |
| MK-S | MN | Oa2 | Oa | ALL | 1 | 0.0% | MUCK | N |
| MPM | MN, ND, SD | O, Oi, Oe | Oe | MAJORITY | 123 | 2.9% | MPT | **Y** |
| MPT | ALL | Oe*1,2,3 | Oe | MAJORITY | 1173 | 27.2% | MPT | **Y** |
| MUCK | ALL | Oe, Oa*1,2,3 | Oa | MAJORITY | 2237 | 51.9% | MUCK | **Y** |
| PEAT | MN, ND | Oi, Oe | Oi | MAJORITY | 272 | 6.3% | PEAT | **Y** |
| S | MN | Oe, A | Oe | ALL | 4 | 0.1% | MPT | N |
| SP | MN | Oa2 | Oa | ALL | 2 | 0.0% | MUCK | N |
| SPM | ND, SD | Oi, Oe, Oa | Oi | MAJORITY | 440 | 10.2% | PEAT | **Y** |
| SR- | MN | Oa, C, Cg | Oa | MAJORITY | 2 | 0.0% | MUCK | N |
| STX- | MN | Oe | Oe | ALL | 7 | 0.2% | MPT | N |

(5) The next step consisted of determining values of each hydraulic parameter to assign to each designated in lieu texture class. To accomplish this the mean values from a subset of horizons consisting only of those with in lieu texture classifications representing more than 1% of the

organic soils were used (figure PPR19-3). The mean values for each in lieu texture class and soil property combination are given in figure PPR19-4.

**Figure PPR19-4:** Average hydraulic soil parameters and bulk density for each primary organic textural class.

| Texture Class | Saturated Hydraulic Conductivity | Bulk Density | Saturated Water Content | Residual Water Content |
|---|---|---|---|---|
| | (um/s) | (g/cm3) | (-) | (-) |
| MUCK | 24.9 | 0.26 | 0.64 | 0.17 |
| MPT | 92.8 | 0.16 | 0.65 | 0.14 |
| PEAT | 295.5 | 0.11 | 0.67 | 0.09 |

(6) Lastly, the calculation of lateral effect distances requires the input of a value for drainable porosity. Values of this quantity are not stored in NASIS and are typically calculated using a soil water retention relationship. The van Genuchten (VG) relationship is commonly employed to calculate drainable porosity (van Genuchten, 1980). However, the Maualem-van Genuchten (VGM) model is better suited for high organic matter soils and requires derivation of two parameters, alpha and n, for this calculation (Liu and Lennertz, 2019). For mineral soils the values of these parameters are generated while running the texture based PTFs. Likewise, a similar approach may be used to derive the values of these two parameters for organic soils. Liu and Lennartz (2019) published PTFs for organic soils that require the primary input of bulk density and in the case of the alpha parameter mean horizon depth (equations 2 3). Drainable porosity can then be calculated for organic soils using equation 1 and the derived VGM parameters in conjunction with the previously mentioned mean class properties of saturated and residual water contents.

**Equation 1:** van Genuchten equation for soil water retention relationship (van Genuchten, 1980).

$$\theta(\psi) = \theta_r + \frac{\theta_s - \theta_r}{[1 + (\alpha|\psi|)^n]^{(1-\frac{1}{n})}}$$

*Where:*

$\theta(\psi)$*: drainable porosity at the drawdown head (-)*

$\theta_r$*: Residual water content (-)*

$\theta_s$*: Saturated water content (-)*

$\alpha$*: VG alpha parameter (1/cm)*

$\psi$*: drawdown head (cm)*

$n$*: VG n parameter (-)*

**Equation 2:** Calculation of VGM alpha parameter as proposed by Liu and Lennartz, 2018

$$\alpha = 0.326 - 9.315\rho_b + 10.42{\rho_b}^2 - 0.014\bar{d}$$

*Where:*

$\alpha$: *VG alpha parameter (1/cm)*

$\rho_b$: *bulk density (g/cm³)*

$\bar{d}$: *mean horizon depth (cm)*

**Equation 3:** Calculation of VGM n parameter as proposed by Liu and Lennartz, 2018

$$n = 0.153 - 0.422\rho_b + 0.45{\rho_b}^2$$

*Where:*

$n$: *VG n parameter (-)*

$\rho_b$: *bulk density (g/cm³)*

(7) In summary, when calculating a lateral effect distance for a soil component having one or more organic horizons the texture associated with each horizon was mapped to one of the primary classes as shown in Figure PPR19-3. Then hydraulic properties and bulk densities were assigned based on the primary texture class values in figure PPR19-4. The bulk density and mean horizon depth are then used to calculate the VGM parameters (equations 2, 3) and subsequently the drainable porosity (equation 1). After this, all the necessary inputs are available to calculate the lateral effect distance in the same manner as mineral soils.

I. Drainage Equation and Parameters.

(1) van Schilfgaarde equation (VS) was used for computation of lateral effects in the PPR. The primary reason for choosing this equation is that it is nonsteady and due to assumptions based on more sporadic than constant rainfall, which is relevant to PPR. Critical parameter assumptions are listed in bullets below.

(i) Surface Storage: As discussed previously in this document, surface storage for discharge and flow through DEPRESSIONAL wetlands is not applicable and therefore 0.0 inches. Surface storage experiments found average value in agricultural settings to be 0.12 inches (Gilley, 2018); which is applied to MINERAL FLAT, ORGANIC FLAT, AND recharge DEPRESSIONAL wetlands.

(ii) Drawdown Depth: The depth of drawdown from normal conditions is 12 inches, based on wetland hydrology indicators in USACE Regional Supplement (USACE, 2010).

(iii) Drawdown Time: The time of drawdown from normal conditions is 14 days, based on wetland hydrology indicators in USACE Regional Supplement (USACE, 2010).

(iv) Depth to Impermeable Layer: The depth to impermeable layer is 10 feet below the soil surface, based on typical conditions in PPR like national guidance that states, "The impermeable layer is generally assumed to occur at 10 feet below the soil surface" (210-NEH-650.19). This assumption is considered valid due to lack of roots and earthworm channels at this depth, as well as weight of soil compressing lower layers to reduce permeability. Fifty-five field and lab samples completed in PPR glacial till sites validated the 10-foot depth selection, as there is a slope change and order of magnitude drop in hydraulic conductivity at depths between 9 and 14 feet (van der Kamp, 2009).

(v) Hydraulic Conductivity below 2 meters: NASIS soil data exists between the ground surface and 2 meters (6.5 feet) of depth. Since the impermeable layer is 10 feet and calculations rely on the whole depth, hydraulic conductivity needs to be estimated. Soil conditions in the deepest NASIS layer, typically 1.5-2.0 feet, showed very consistent

values through PPR soils. Therefore, the deepest soil horizon hydraulic conductivity was extrapolated, with no modification, to depth of 10 feet.

(vi) Drain Sizes: Typical drain size diameters range from 3-inches to 12-inches. Open ditches are also common near wetlands. Sensitivity to drain diameters is small, which means large increase in diameter has small increase in lateral effect distance. Drain tile manufacturers have varying available sizes. Therefore, the common agricultural drain sizes of 3, 4, 5, 6, 8, 10, 12-inch, and open ditch are available to choose from for evaluation. If the proposed drain diameter doesn't match one of the depths included in the database, users are advised to choose the next larger size.

(vii) Drain Depths: Precise planned drain depths can be used directly. If a range of depths are planned for an area, users of the database are advised to enter the deepest depth in the range. The available drain depths to choose from are even foot increments including 2, 3, 4, 5, 6, 7, and 8 feet deep.

(viii) Components Composition in Soil Map Units: Each soil map unit includes multiple components, which vary in percent composition soil properties and qualities, and position on the landforms in the landscape. The soil map unit can be identified for the entire PPR using Web Soil Survey at https://websoilsurvey.nrcs.usda.gov/ (210-NEH-650.19). Components with less than 10 percent composition are not considered in LE calculations. All soil components equal or greater than 10% composition are considered. The highest value of these components is the calculated LE for the soil map unit.

(ix) Soil Map Unit Choice Considering multiple options: Calculate the lateral effect value for the wetland soil map unit, the soil map unit where the tile will be placed, and the soil map unit of the soil between the tile and the wetland boundary (if applicable). Apply the highest lateral effect value calculated and draw drain tile exclusion zone following buffered distance and soil map unit boundaries. If drain tile is only on one side of wetland, the opposite side does not need to be calculated or considered. Two example wetland lateral effect exclusion zones are shown in figure 3, for respective side a drain tile is planned. The stand-alone distance can be used, or spatial drawing with exclusion zone if producer has that capability. West wetland has three distinct lateral effect distances, i.e., 140, 180, and 260 feet. East wetland has two distinct lateral effect distances, i.e., 180 and 340 feet. Sharp transitions can occur at soil map unit lines that replicate "sawtooths", which include area outside lateral effect exclusion zone. Installing drains in these sawtooths can slightly short circuit the longer lateral effect. Therefore, caution should be exercised installing drainage in these sawtooths.

(2) For more complex sites, with more soil map units within wetland extents or within tile extents, request assistance from NRCS wetland compliance or engineering staff.

**Figure PPR19-5:** Example Wetland Lateral Effect Exclusion Zones




(PPR210-650-H, Mar 2022)

**PPR650.1914 References**

Z. Brinson, M.M. 1993. A hydrogeomorphic classification for wetlands. Technical Report WRP–DE–4. U.S. Army Corps of Engineers Waterways Experiment Station, Vicksburg, MS.

AA. Gilley, J.E., 2018. Surface Detention on Cropland, Rangeland, and Conservation Reserve Program Areas. Biological Systems Engineering: Papers and Publications. 562. http://digitalcommons.unl.edu/biosysengfacpub/562.

BB. Grover, S.P.P., Baldock, J.A., 2013. The link between peat hydrology and decomposition: Beyond von Post, Journal of Hydrology, Volume 479, 2013, Pages 130-138, ISSN 0022-1694,https://doi.org/10.1016/j.jhydrol.2012.11.049.

CC. Liu H. and Lennartz B., 2019. Hydraulic properties of peat soils along a bulk density gradient – A meta study. Hydrologic Process. 2019; 33:101-144. https://doi.org/10.1002/hyp.13314

DD. Schaap, M.G., Leij, F.J., van Genuchten, M.T., 2001. rosetta: a computer program for estimating soil hydraulic parameters with hierarchical pedotransfer functions, Journal of Hydrology, Volume 251, Issues 3–4, 2001, Pages 163-176, ISSN 0022-1694, https://doi.org/10.1016/S0022-1694(01)00466-8.

EE. Pali, A.K., 2013. Evaluation of Non Steady Subsurface Drainage Equations for Heterogeneous Saline Soils: A Case Study, IOSR-JAVS e-ISSN: 2319-2380, p-ISSN: 2319-2372. Volume 6, Issue 5 (Nov. - Dec. 2013), PP 45-52.

FF. Richardson, J.L. and Vepraskas, M.J. 2001. Wetland Soils, Genesis, Hydrology, Landscapes, and Classification.

GG. Smith, R.D., A. Ammann, C. Bartoldus, and M.M. Brinson. 1995. An approach for assessing wetland functions using hydrogeomorphic classification, reference wetlands, and functional indices. U.S. Army Engineer Waterways Experiment Station Technical Report WRP-DE-9, Vicksburg, MS.

HH. United States Army Corps of Engineers, 1987. Corps of Engineers Wetlands Delineation Manual, Technical Report Y-87-1, U.S. Army Engineer Waterways Experiment Station, Vicksburg, MS.

II. United States Army Corps of Engineers, 2010. Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Great Plains Region (Version 2.0), U.S. Army Engineer Waterways Experiment Station, Vicksburg, MS.

JJ. United States Army Corps of Engineers, 2011. Regional Guidebook for Applying the Hydrogeomorphic Approach to Assessing the Functions of Headwater Slope Wetlands on the South Carolina Coastal Plain, ERDC/EL TR-11-11, September 2011.

KK. United States Army Corps of Engineers, 2013. Regional Guidebook for Applying the Hydrogeomorphic Approach to Assessing the Functions of Flat and Seasonally Inundated Depression Wetlands on the Highland Rim, ERDC/EL TR-13-12, June 2013.

LL. United States Department of Agriculture, Natural Resources Conservation Service. 1980. DRAINMOD Reference Report, Chapter 2.

MM. United States Department of Agriculture, Natural Resources Conservation Service. 1999. Interim Functional Assessment Model for Lake Dakota Sand Plains, Version 2.2, Prairie Pothole Wetland Team, Jamestown, ND, February 28, 1999.

NN. United States Department of Agriculture, Natural Resources Conservation Service. 2008. Hydrogeomorphic wetland classification system: An overview and modification to better meet the needs of the Natural Resources Conservation Service. Technical Note No. 190–8–76.

OO. U.S. Department of Agriculture, Natural Resources Conservation Service., 2012. 77 FR 12234: Changes In Hydric Soils Database Selection Criteria. pp. 12,234–12,235.

PP. United States Department of Agriculture, Natural Resources Conservation Service., 2014. Keys To Soil Taxonomy, 12th Edition. USDA–NRCS, Washington, DC.

QQ. United States Department of Agriculture, Natural Resources Conservation Service. 2018. Field Indicators of Hydric Soils in the United States, Version 8.2. L.M. Vasilas, G.W. Hurt, and J.F. Berkowitz (eds.). USDA, NRCS in cooperation with the National Technical Committee for Hydric Soils.

RR. United States Department of Agriculture, Natural Resources Conservation Service., 2021. Hydrology Tools For Wetland Identification And Analysis, Title 210, National Engineering Handbook, Part 650, Chapter 19, February 2021.

SS. United States Department of Agriculture, Natural Resources Conservation Service, 2021. National Soil Survey Handbook, Title 430, Amendment 39, May 2021.

TT. United States Department of Agriculture, Natural Resources Conservation Service., 2021. Web Soil Survey. Available online at the following link: https://websoilsurvey.sc.egov.usda.gov/. Accessed [3/4/2021].

UU. Van der Kamp, G., Hayashi, M., 2009. Groundwater-Wetland Ecosystem Interaction In The Semiarid Glaciated Plains Of North America, Hydrogeology Journal 17, 203-214.

VV. van Genuchten, M. Th., 1980. A Closed-Form Equation For Predicting The Hydraulic Conductivity Of Unsaturated Soils. Soil Sci. Soc. Am. J. 44:892-898.

WW. Vepraskas, M.J. and Craft, C.B., 2016. Wetland Soils, Genesis, Hydrology, Landscapes, and Classification Second Edition.

XX. Verry, Elon S.; Boelter, Don H.; Paivanen, J.; Nichols, Dale S.; Malterer, T.; Gafni, A., 2011. Physical Properties Of Organic Soils. In: Kolka, Randall K.; Sebestyen, Stephen D.; Verry, Elon S.; Brooks, Kenneth N., eds. Peatland Biogeochemistry And Watershed Hydrology At The Marcell Experimental Forest. Boca Raton, FL: CRC Press: 135-176.

## PPR650.1916 Exhibits

A. HGM Wetland Class Scripts used in NASIS

HGM Wetland Class - Prairie Pothole Region

```
PARAMETER variable1 CHARACTER PROMPT "Area Symbol (e.g. ND001 OR ND*)".
BASE TABLE component.
EXEC SQL
SELECT areasymbol, liid, nationalmusym, musym, muiid, mustatus, lmapunitiid mukey, dmuiid,
    coiid, compname, localphase, comppct_r, hydricrating
FROM REAL area, REAL legend, lmapunit, REAL mapunit, correlation, REAL datamapunit,
    component
WHERE
areasymbol IMATCHES variable1 AND
JOIN area TO legend AND
JOIN legend TO lmapunit AND
JOIN lmapunit TO mapunit AND
JOIN mapunit TO correlation AND
JOIN correlation TO datamapunit AND
JOIN datamapunit TO component AND

#Option to remove the "PARAMETER" for single execution of this report on the 4 target PPR
    states.
#   (area.areasymbol IMATCHES "ND*" OR
#   area.areasymbol IMATCHES "SD*" OR
#   area.areasymbol IMATCHES "MN*" OR
#   area.areasymbol IMATCHES "IA*") AND

    legend.legendsuituse IN ("current wherever mapped") AND
    correlation.repdmu IN ("yes") AND
    lmapunit.mustatus IN ("correlated") AND
    component.hydricrating IN ("yes");
    SORT BY liid, musym SYM, comppct_r DESC, compname LEX.

EXEC SQL
SELECT lsgd.geomfeatid, lsft.geomftname, lsgf.geomfnamep
FROM component, OUTER (cogeomordesc lsgd), REAL geomorfeattype lsft, REAL geomorfeat
    lsgf
WHERE
JOIN component TO lsgd AND
JOIN lsgd TO lsgf AND
JOIN lsft TO lsgf AND
    lsft.geomftname IN ("Landscape") AND
    lsgd.rvindicator IN ("yes");
SORT BY lsgd.geomfeatid DESC
AGGREGATE COLUMN lsft.geomftname LAST, lsgf.geomfnamep LAST.

EXEC SQL
SELECT lfgd.geomfeatid, lfft.geomftname, lfgf.geomfnamep, shapeacross, shapedown
```

```
FROM component, OUTER (cogeomordesc lfgd), REAL geomorfeattype lfft, REAL geomorfeat
    lfgf, cosurfmorphss
WHERE
JOIN component TO lfgd AND
JOIN lfgd TO lfgf AND
JOIN lfft TO lfgf AND
JOIN lfgd TO cosurfmorphss AND
    lfft.geomftname IN ("Landform") AND
    lfgd.rvindicator IN ("yes");
SORT BY lfgd.geomfeatid DESC
AGGREGATE COLUMN lfft.geomftname LAST, lfgf.geomfnamep LAST.

DERIVE sodium1          FROM low USING "MLRA10_StPaul" : "SAR MAX IN
    DEPTH 0-50 CM BELOW DUFF, ABOVE RESTRICTION (ND)".
DERIVE gyp              FROM low USING "MLRA10_StPaul" : "GYP MAX IN
    DEPTH 0-50 CM BELOW DUFF, ABOVE RESTRICTION (ND)".
DERIVE charge           FROM low USING "MLRA10_StPaul" : "EC MAX IN DEPTH
    0-50 CM BELOW DUFF, ABOVE RESTRICTION (ND)".
DERIVE lime        FROM low USING "MLRA10_StPaul" : "CaCO3 MAX IN DEPTH 0-
    50 CM BELOW DUFF, ABOVE RESTRICT (ND)".
DERIVE flood1      FROM rv USING "MLRA10_StPaul" : "FLOODING FREQUENCY
    MAX GROWING SEASON (ND)".
DERIVE histic1          FROM rv USING "MLRA10_StPaul" : "HISTIC EPIPEDON
    THICKNESS (ND)".

DEFINE cname       ISNULL (localphase) THEN compname ELSE cname||", "||localphase.
ASSIGN hydricrating CODENAME(hydricrating).

#Sodium.
DEFINE sodium                 IF (sodium1 >= 5) THEN "sodic" ELSE "not sodic".

#Histic epipedon.
DEFINE histic           IF (histic1 >= 20) THEN "organic" ELSE "mineral".

#Carbonates, gypsum, and other soluable salts.
DEFINE salt                   IF (((lime >= 1) OR (gyp >= 1) OR (charge >= 4.001))
                              OR (localphase IMATCHES "*saline*") OR (compname
    MATCHES "Salt flats")) THEN "present" ELSE "absent".

#Floods during growing season and on flooded landform.
DEFINE flood            IF (((flood1 MATCHES "very frequent") OR (flood1
    MATCHES "frequent") OR (flood1 MATCHES "occasional") OR (flood1 MATCHES
    "rare")) AND
                              ((lfgf.geomfnamep MATCHES "flood plains") OR
    (lfgf.geomfnamep MATCHES "flood-plain steps") OR (lfgf.geomfnamep MATCHES
    "oxbows") OR
                              (lfgf.geomfnamep MATCHES "drainageways") OR
    (lfgf.geomfnamep MATCHES "channels"))) THEN "yes" ELSE "no".

#Define fen HGM wetland class.
```

```
DEFINE wetland_class IF ((sodium MATCHES "not sodic") AND (histic MATCHES "organic")
    AND (flood MATCHES "no") AND (lfgf.geomfnamep MATCHES "fens")) THEN "fen"
    ELSE "".

#Define organic flat HGM wetland class.
ASSIGN wetland_class IF (((wetland_class == "") AND (wetland_class != "fen")) AND (sodium
    MATCHES "not sodic") AND (histic MATCHES "organic") AND (flood MATCHES "no"))
                                THEN "organic flat" ELSE wetland_class.

#Define riverine HGM wetland class.
ASSIGN wetland_class IF ((((wetland_class == "") AND (wetland_class != "fen") AND
    (wetland_class != "organic_flat")) AND
                                (sodium MATCHES "not sodic") AND (histic
    MATCHES "mineral") AND (flood MATCHES "yes")) AND
                                ((lfgf.geomfnamep MATCHES "flood plains") OR
                                (lfgf.geomfnamep MATCHES "flood-plain steps") OR
                                (lfgf.geomfnamep MATCHES "oxbows") OR
                                (lfgf.geomfnamep MATCHES "abandoned channels")
    OR
                                (lfgf.geomfnamep MATCHES "drainageways") OR
                                (lfgf.geomfnamep MATCHES "channels")))
                                THEN "riverine" ELSE wetland_class.


#Define mineral flat HGM wetland class.
ASSIGN wetland_class IF ((((wetland_class == "") AND (wetland_class != "fen") AND
    (wetland_class != "organic_flat") AND (wetland_class != "riverine")) AND
                                (sodium MATCHES "not sodic") AND (histic
    MATCHES "mineral") AND (salt MATCHES "absent") AND (flood MATCHES "no"))
    AND
                                (lfgf.geomfnamep MATCHES "flats"))
#                               (lfgf.geomfnamep MATCHES "lake plains") OR
#                               (lfgf.geomfnamep MATCHES "deltas") OR
#                               (lfgf.geomfnamep MATCHES "till-floored lake plains")
    OR
#                               (lfgf.geomfnamep MATCHES "collapsed ice-walled
    lakebeds")))
                                THEN "mineral flat" ELSE wetland_class.

#Define recharge HGM wetland class.
ASSIGN wetland_class IF ((((wetland_class == "") AND (wetland_class != "fen") AND
    (wetland_class != "organic_flat") AND (wetland_class != "riverine") AND
                                (wetland_class != "mineral_flat")) AND
                                (sodium MATCHES "not sodic") AND (histic
    MATCHES "mineral") AND (salt MATCHES "absent") AND (flood MATCHES "no"))
    AND
                                ((lfgf.geomfnamep MATCHES "depressions") OR
#                               (lfgf.geomfnamep MATCHES "stream terraces") OR
                                (lfgf.geomfnamep MATCHES "sand sheets") OR
#                               (lfgf.geomfnamep MATCHES "moraines") OR
                                (lfgf.geomfnamep MATCHES "potholes") OR
```

```
                                    (lfgf.geomfnamep MATCHES "playas") OR
                                    (lfgf.geomfnamep MATCHES "drainageways")))
                                    THEN "recharge" ELSE wetland_class.

#Define discharge HGM wetland class.
ASSIGN wetland_class IF (((((wetland_class == "") AND (wetland_class != "fen") AND
    (wetland_class != "organic_flat") AND (wetland_class != "riverine") AND
                                    (wetland_class != "mineral_flat") AND (wetland_class
    != "recharge")) AND
                                    (sodium MATCHES "not sodic") AND (histic
    MATCHES "mineral") AND (salt MATCHES "present") AND (flood MATCHES "no"))
    AND
                                    ((lfgf.geomfnamep MATCHES "depressions") OR
                                    (lfgf.geomfnamep MATCHES "rims") OR
#                                   (lfgf.geomfnamep MATCHES "terraces") OR
                                    (lfgf.geomfnamep MATCHES "playas") OR
                                    (lfgf.geomfnamep MATCHES "potholes") OR
                                    (lfgf.geomfnamep MATCHES "marshes") OR
#                                   (lfgf.geomfnamep MATCHES "deltas") OR
#                                   (lfgf.geomfnamep MATCHES "delta plains") OR
#                                   (lfgf.geomfnamep MATCHES "outwash plains") OR
#                                   (lfgf.geomfnamep MATCHES "lakeshores") OR
#                                   (lfgf.geomfnamep MATCHES "lake plains") OR
#                                   (lfgf.geomfnamep MATCHES "till-floored lake plains")
    OR
#                                   (lfgf.geomfnamep MATCHES "collapsed ice-walled
    lakebeds") OR
#                                   (lfgf.geomfnamep MATCHES "beaches") OR
                                    (lfgf.geomfnamep MATCHES "drainageways") OR
                                    (lfgf.geomfnamep MATCHES "flats"))) OR (compname
    MATCHES "Salt flats"))
                                    THEN "discharge" ELSE wetland_class.

#Define slope HGM wetland class.
ASSIGN shapeacross          CODENAME(shapeacross).
ASSIGN shapedown            CODENAME(shapedown).
ASSIGN wetland_class IF ((((wetland_class == "") AND (wetland_class != "fen") AND
    (wetland_class != "organic_flat") AND (wetland_class != "riverine") AND
                                    (wetland_class != "mineral_flat") AND (wetland_class
    != "recharge") AND (wetland_class != "discharge")) AND
                                    (sodium MATCHES "not sodic") AND (histic
    MATCHES "mineral") AND (salt MATCHES "present") AND (flood MATCHES "no"))
    AND
                                    (((shapedown MATCHES "concave") AND
    (shapeacross MATCHES "concave") OR
                                    (shapedown MATCHES "concave") AND (shapeacross
    MATCHES "linear") OR
                                    (shapedown MATCHES "concave") AND (shapeacross
    MATCHES "convex") OR
                                    (shapedown MATCHES "convex") AND (shapeacross
    MATCHES "concave") OR
```

```
                    (shapedown MATCHES "linear") AND (shapeacross
    MATCHES "concave")) OR
                    (lfgf.geomfnamep MATCHES "seeps")))
                    THEN "slope" ELSE wetland_class.

#Exclude sodium affected soils. Sodium alters the hydrology via dispersion and its affects on
    water infiltration require an on-site investigation.
ASSIGN wetland_class IF (((wetland_class == "") AND (wetland_class != "fen") AND
    (wetland_class != "organic_flat") AND (wetland_class != "riverine") AND
                    (wetland_class != "mineral_flat") AND (wetland_class
    != "recharge") AND (wetland_class != "discharge") AND (wetland_class != "slope")) AND
                    (sodium MATCHES "sodic")) THEN "sodic" ELSE
    wetland_class.

PAGE WIDTH UNLIMITED LENGTH UNLIMITED.

TEMPLATE alpha SEPARATOR "|"
    AT LEFT
            FIELD WIDTH UNLIMITED SEPARATOR "",
            FIELD WIDTH UNLIMITED,
            FIELD WIDTH UNLIMITED,
            FIELD WIDTH UNLIMITED,
            FIELD WIDTH UNLIMITED,
            FIELD WIDTH UNLIMITED,
            FIELD WIDTH UNLIMITED,
            FIELD WIDTH UNLIMITED,
            FIELD WIDTH UNLIMITED,
            FIELD WIDTH UNLIMITED,
            FIELD WIDTH UNLIMITED,
            FIELD WIDTH UNLIMITED,
            FIELD WIDTH UNLIMITED,
            FIELD WIDTH UNLIMITED,
            FIELD WIDTH UNLIMITED,
            FIELD WIDTH UNLIMITED,
            FIELD WIDTH UNLIMITED,
            FIELD WIDTH UNLIMITED.

SECTION A
    HEADING
    USING alpha
        "areasymbol",
        "nationalmusym",
        "musym",
        "compname",
        "localphase",
        "comppct",
        "hydric",
        "LSgeomorfeattype",
        "LSgeomfnamep",
        "LFgeomorfeattype",
        "LFgeomfnamep",
```

```
        "sodium",
        "histic",
        "salts",
        "floods?",
        "wetland_class",
        "coiid",
        "mukey".
END SECTION.

SECTION B
    DATA
    USING alpha
        areasymbol,
        nationalmusym,
        musym,
        compname,
        localphase,
        comppct_r,
        hydricrating,
        lsft.geomftname,
        lsgf.geomfnamep,
        lfft.geomftname,
        lfgf.geomfnamep,
        sodium,
        histic,
        salt,
        flood,
        wetland_class,
        coiid NO COMMA ,
        mukey NO COMMA .

END SECTION.
```

SAR MAX IN DEPTH 0-50 CM BELOW DUFF, ABOVE RESTRICTION (ND)

```
BASE TABLE component.

# Get maximum SAR in any horizon in 0-50 cm range below organic duff and above restriction.
EXEC SQL
SELECT hzdept_r, sar_l, sar_r, sar_h
FROM  component, chorizon
WHERE
JOIN component TO chorizon;
SORT BY hzdept_r
AGGREGATE COLUMN hzdept_r NONE, sar_l NONE, sar_r NONE, sar_h NONE.

#Determine the thickness of organic duff and depth to RESTRICTIVE LAYER.
DERIVE o_thickness  FROM rv USING "MLRA10_StPaul":"SURFACE ORGANIC DUFF
    HORIZONS THICKNESS (ND)".
DERIVE depth        FROM rv USING "NSSC Pangaea":"DEPTH TO FIRST
    RESTRICTIVE LAYER".

ASSIGN sar_l IF hzdept_r > o_thickness + 50 OR hzdept_r < o_thickness THEN NULL ELSE
    sar_l.
ASSIGN sar_h IF hzdept_r > o_thickness + 50 OR hzdept_r < o_thickness THEN NULL ELSE
    sar_h.
ASSIGN sar_r IF hzdept_r > o_thickness + 50 OR hzdept_r < o_thickness THEN NULL ELSE
    sar_r.

#Find minimum of restriction depth and 50cm
DEFINE min_depth    depth < 51 AND NOT ISNULL(depth)? depth : 51.
DEFINE in_range     ISNULL(hzdept_r)? hzdept_r : ((hzdept_r < min_depth)? 1 : 0).

#Find the sodium adsorption ratio values in the min_depth.
DEFINE low          ARRAYMAX(LOOKUP(1, in_range, sar_l)).
DEFINE high         ARRAYMAX(LOOKUP(1, in_range, sar_h)).
DEFINE rv           ARRAYMAX(LOOKUP(1, in_range, sar_r)).
```

GYP MAX IN DEPTH 0-50 CM BELOW DUFF, ABOVE RESTRICTION (ND)

```
BASE TABLE component.

# Get maximum gypsum in any horizon in 0-50 cm range below organic duff and above
    restriction.
EXEC SQL
SELECT hzdept_r, gypsum_l, gypsum_r, gypsum_h
FROM  component, chorizon
WHERE
JOIN component TO chorizon;
SORT BY hzdept_r
AGGREGATE COLUMN hzdept_r NONE, gypsum_l NONE, gypsum_r NONE, gypsum_h
    NONE.

#Determine the thickness of organic duff and depth to RESTRICTIVE LAYER.
DERIVE o_thickness  FROM rv USING "MLRA10_StPaul":"SURFACE ORGANIC DUFF
    HORIZONS THICKNESS (ND)".
DERIVE depth          FROM rv USING "NSSC Pangaea":"DEPTH TO FIRST
    RESTRICTIVE LAYER".

ASSIGN gypsum_l IF hzdept_r > o_thickness + 50 OR hzdept_r < o_thickness THEN NULL
    ELSE gypsum_l.
ASSIGN gypsum_h IF hzdept_r > o_thickness + 50 OR hzdept_r < o_thickness THEN NULL
    ELSE gypsum_h.
ASSIGN gypsum_r IF hzdept_r > o_thickness + 50 OR hzdept_r < o_thickness THEN NULL
    ELSE gypsum_r.

#Find minimum of restriction depth and 50cm
DEFINE min_depth      depth < 51 AND NOT ISNULL(depth)? depth : 51.
DEFINE in_range       ISNULL(hzdept_r)? hzdept_r : ((hzdept_r < min_depth)? 1 : 0).

#Find the gypsum values in the min_depth.
DEFINE low                    ARRAYMAX(LOOKUP(1, in_range, gypsum_l)).
DEFINE high           ARRAYMAX(LOOKUP(1, in_range, gypsum_h)).
DEFINE rv             ARRAYMAX(LOOKUP(1, in_range, gypsum_r))
```

EC MAX IN DEPTH 0-50 CM BELOW DUFF, ABOVE RESTRICTION (ND)

```
BASE TABLE component.

# Get maximum EC in any horizon in 0-50 cm range below organic duff and above restriction.
EXEC SQL
SELECT hzdept_r, ec_l, ec_r, ec_h
FROM  component, chorizon
WHERE
JOIN component TO chorizon;
SORT BY hzdept_r
AGGREGATE COLUMN hzdept_r NONE, ec_l NONE, ec_r NONE, ec_h NONE.

#Determine the thickness of organic duff and depth to RESTRICTIVE LAYER.
DERIVE o_thickness  FROM rv USING "MLRA10_StPaul":"SURFACE ORGANIC DUFF
    HORIZONS THICKNESS (ND)".
DERIVE depth        FROM rv USING "NSSC Pangaea":"DEPTH TO FIRST
    RESTRICTIVE LAYER".

ASSIGN ec_l IF hzdept_r > o_thickness + 50 OR hzdept_r < o_thickness THEN NULL ELSE
    ec_l.
ASSIGN ec_h IF hzdept_r > o_thickness + 50 OR hzdept_r < o_thickness THEN NULL ELSE
    ec_h.
ASSIGN ec_r IF hzdept_r > o_thickness + 50 OR hzdept_r < o_thickness THEN NULL ELSE
    ec_r.

#Find minimum of restriction depth and 50cm
DEFINE min_depth    depth < 51 AND NOT ISNULL(depth)? depth : 51.
DEFINE in_range     ISNULL(hzdept_r)? hzdept_r : ((hzdept_r < min_depth)? 1 : 0).

#Find the electrical conductivity values in the min_depth.
DEFINE low              ARRAYMAX(LOOKUP(1, in_range, ec_l)).
DEFINE high         ARRAYMAX(LOOKUP(1, in_range, ec_h)).
DEFINE rv           ARRAYMAX(LOOKUP(1, in_range, ec_r)).
```

CaCO3 MAX IN DEPTH 0-50 CM BELOW DUFF, ABOVE RESTRICT (ND)

```
BASE TABLE component.

# Get maximum CaCO3 in any horizon in 0-50 cm range below organic duff and above
    restriction.
EXEC SQL
SELECT hzdept_r, CaCO3_l, CaCO3_r, CaCO3_h
FROM  component, chorizon
WHERE
JOIN component TO chorizon;
SORT BY hzdept_r
AGGREGATE COLUMN hzdept_r NONE, CaCO3_l NONE, CaCO3_r NONE, CaCO3_h
    NONE.

#Determine the thickness of organic duff and depth to RESTRICTIVE LAYER.
DERIVE o_thickness  FROM rv USING "MLRA10_StPaul":"SURFACE ORGANIC DUFF
    HORIZONS THICKNESS (ND)".
DERIVE depth            FROM rv USING "NSSC Pangaea":"DEPTH TO FIRST
    RESTRICTIVE LAYER."

ASSIGN CaCO3_l IF hzdept_r > o_thickness + 50 OR hzdept_r < o_thickness THEN NULL
    ELSE CaCO3_l.
ASSIGN CaCO3_h IF hzdept_r > o_thickness + 50 OR hzdept_r < o_thickness THEN NULL
    ELSE CaCO3_h.
ASSIGN CaCO3_r IF hzdept_r > o_thickness + 50 OR hzdept_r < o_thickness THEN NULL
    ELSE CaCO3_r.

#Find minimum of restriction depth and 50cm
DEFINE min_depth      depth < 51 AND NOT ISNULL(depth)? depth : 51.
DEFINE in_range       ISNULL(hzdept_r)? hzdept_r : ((hzdept_r < min_depth)? 1 : 0).

#Find the calcium carbonate equivalent values in the min_depth.
DEFINE low                    ARRAYMAX(LOOKUP(1, in_range, CaCO3_l)).
DEFINE high           ARRAYMAX(LOOKUP(1, in_range, CaCO3_h)).
DEFINE rv             ARRAYMAX(LOOKUP(1, in_range, CaCO3_r)).
```

FLOODING FREQUENCY MAX GROWING SEASON (ND)

```
BASE TABLE component.

# Get the longest flooding frequency class.
EXEC SQL
SELECT flodfreqcl
FROM component, comonth
WHERE
JOIN component TO comonth AND
(flodfreqcl NOT IN("none")) AND
((taxtempregime IN ("mesic") AND
    comonth.month IN("mar", "apr", "may", "jun", "jul", "aug", "sep", "oct")) OR
(taxtempregime IN("frigid") AND
    comonth.month IN("apr", "may", "jun", "jul", "aug", "sep")));
AGGREGATE COLUMN flodfreqcl UNIQUE.

DEFINE flooding CODENAME(flodfreqcl).
DEFINE duration flooding MATCHES "very frequent" ? 1 : flooding MATCHES "frequent" ? .8
    : flooding MATCHES "occasional" ? .6 : flooding MATCHES "rare" ? .4 : flooding
    MATCHES "very rare" ? .2 : flooding MATCHES "none" ? .1 : 1/0.
DEFINE longest ARRAYMAX(duration).
DEFINE rv LOOKUP (longest, duration, flooding).
```

Case 3:25-cv-00078-PDW-ARS Document 21-1 Filed 05/21/26 Page 143 of 506



HISTIC EPIPEDON THICKNESS (ND)

```
BASE TABLE component.
EXEC SQL
SELECT hzdepb_l low, hzdepb_r rv, hzdepb_h high
FROM component
INNER JOIN chorizon ON chorizon.coiidref=component.coiid
INNER JOIN chtexturegrp ON chtexturegrp.chiidref=chorizon.chiid AND
    chtexturegrp.rvindicator = 1
INNER JOIN chtexture ON chtexture.chtgiidref=chtexturegrp.chtgiid
AND ((desgnmaster IN ("O", "O'", "O''")) OR (hzname IN ("O*"))) AND
((lieutex IN ("mpm")) OR
(lieutex IN ("mpt")) OR
(lieutex IN ("muck")) OR
(lieutex IN ("peat")) OR
(lieutex IN ("spm")) OR
(lieutex IN ("udom")) OR
(lieutex IN ("pdom")) OR
(lieutex IN ("hpm")));

AGGREGATE COLUMN low MAX, rv MAX, high MAX.

ASSIGN low IF ISNULL(low) THEN 0 ELSE low.
ASSIGN rv IF ISNULL(rv) THEN 0 ELSE rv.
ASSIGN high IF ISNULL(high) THEN 0 ELSE high.
```



AR000143

B. NASIS Query used to Acquire Organic Soil Properties

Data acquired from: https://SDMDataAccess.sc.egov.usda.gov/Tabular/post.rest on 3/4/2021

```
SELECT legend.areasymbol, mapunit.mukey, mapunit.musym, component.cokey,
component.compname, component.comppct_r, chorizon.chkey, chorizon.hzname,
chtexturegrp.texture,
chorizon.hzdept_r, chorizon.hzdepb_r,
ISNULL(chorizon.ksat_r, -9.9) as 'ksat_r',
ISNULL(chorizon.om_r, -9.9) as 'om_r',
ISNULL(chorizon.dbthirdbar_r, -9.9) as 'dbthirdbar_r',
ISNULL(chorizon.wsatiated_r, -9.9)/100.0 as 'wsatiated_r',
ISNULL(chorizon.wthirdbar_r, -9.9)/100.0 as 'wthirdbar_r',
ISNULL(chorizon.wfifteenbar_r, -9.9)/100.0 as 'wfifteenbar_r'
FROM (legend INNER JOIN (mapunit
INNER JOIN component ON mapunit.mukey = component.mukey)
ON legend.lkey = mapunit.lkey)
INNER JOIN chorizon ON component.cokey = chorizon.cokey
INNER JOIN chtexturegrp ON chorizon.chkey = chtexturegrp.chkey
WHERE ((legend.areasymbol like 'IA%') OR (legend.areasymbol like 'MN%')
OR (legend.areasymbol like 'ND%') OR (legend.areasymbol like 'SD%')
AND (component.comppct_r>=10)
AND (chtexturegrp.rvindicator = 'Yes') AND (mapunit.musym <> 'W')
AND (chorizon.hzname LIKE 'Oi'))
ORDER BY mapunit.mukey, component.cokey, chorizon.hzdept_r
```

C. Lateral Effect Calculation Script

```
# -*- coding: utf-8 -*-
"""
Created on Tue Dec 15 12:48:34 2020

@author: Jason.Roth
@title: Environmental Engineer WQQT
@affiliation: USDA-NRCS WNTSC
@email:jason.roth@usda.gov


DESC: Script containing suite of functions and calls to produce
a lateral effect distance for the purposes of wetlands conservation

"""
import os
import requests as req
import numpy as np
import math
import sys


def make_file_hdr(names, units=0, delim=","):
    """
    reads in a tab delimited data file

    Parameters
    ----------
    names : list, list of strings of header names
    units : units, list of strings of corresponding units
    delim : str, delimeter character

    Returns
    -------
    h : str, containing file header.
```

```
    """

    h = str(names[0])
    names.pop(0)
    for n in names:
        h+="{0} {1}".format(delim, n)
    if len(units)>=len(names):
        h+="\n{0}".format(str(units[0]))
        units.pop(0)
        for u in units:
            h+="{0} {1}".format(delim, u)
    return h

def read_data_file(file_path, skp_lin=0):
    """
    reads in a tab delimited data file

    Parameters
    ----------
    file_path : str, path to data file
    skp_lin : int, number of lines to skip at the beginning of the file

    Returns
    -------
    d : list, list containing contents of file

    """
    with open(file_path, 'r') as f:
        i=0
        d = []
        for l in f.readlines():
            if i >= skp_lin:
                d.append(l.split("\t"))
            i+=1
```

```
    return d


def calc_run_count(comp_count, run_data):
    """
    Calculates the number of lateral effect calculations for this batch.

    Parameters
    ----------
    comp_count : int, number of components
    run_data : dict, dictionary of lists of parameters to run calcs for

    Returns
    -------
    rf : int, number of run permutations

    """
    rf = 1
    for k in run_data.keys():
        if k != "states":
            rf *= len(run_data[k])
    rf*=comp_count
    return rf

def read_run_info(run_file):
    """
    Reads set of inputs for which to calculate lateral effects for.

    Parameters
    ----------
    run_file : str, path to properly formatted text file with input parameters


    Returns
    -------
```

```
run_par : dict, all runfile parameters



"""
with open(run_file) as f:
    lines = f.readlines()
## dictionary for raw run data
run_par = {}
## dictionary for unique permuations of run data
runs = {}
## temporary storage for run data
x=[]
## integer key for dictionary of run unique run parameters
i = 0
for l in lines:
    l = l.strip()
    if l[0] != "#":
        p, d = l.split(":")
        d = d.strip().split(",")
        if p == "states":
            x = [s.strip() for s in d]
        else:
            x = [float(f.strip()) for f in d]
        ## ensure only unique values in each parameter set
        run_par[p] = list(set(x))

for ddn_i in run_par['drawdown_init']:
    for ddn_f in run_par['drawdown_final']:
        for d_dia in run_par['drain_diam']:
            for d_dep in run_par['drain_depth']:
                for b_dep in run_par['barrier_depth']:
                    for ss in run_par['surf_storage']:
                        for t in run_par['drawdown_time']:
                            ## enforce physical constraints.
                            ## consider adding ratio of d_dep:b_dep
```

```
                if ((0 <= ddn_i < ddn_f < d_dep < b_dep < 15)\
                    and t > 0)\
                    and ((ss == 0 and ddn_i >0) or\
                     (ss >=0 and ddn_i == 0)):
                        runs[i]={'drawdown_init': ddn_i,
                                'drawdown_final': ddn_f,
                                'drain_diam': d_dia,
                                'drain_depth': d_dep,
                                'barrier_depth': b_dep,
                                'surf_storage': ss,
                                'drawdown_time': t}
                        i+=1
                else:
                    print("no go")
    return run_par['states'], runs

def qry_sda(sql):
    """
    requests soil data from sda web service
    For documentation of using web services for SDA see
    https://sdmdataaccess.nrcs.usda.gov/WebServiceHelp.aspx#RunQuery

    Parameters
    ----------
    sql : str, sql string for sda web service

    Returns
    -------
    sda_data : list, returned soil data from sda

    """
    ## sda webservice url
    url = "https://SDMDataAccess.sc.egov.usda.gov/Tabular/post.rest"

    ## data formate
```

```
    tab_fmt = "JSON+COLUMNNAME"

    ## parameter dictionary to pass with post request
    params = {"QUERY":sql, "FORMAT":tab_fmt}

    ## execute the post request
    x = req.post(url, data=params)

    ## extract rows of data row from request
    sda_data = x.json()['Table'][1:]

    return sda_data

def qry_rosetta(r_input, r_version):
    """
    request to retrieve rosetta estimates of soil properties
    from Todd Skaggs' (ARS) web-service'
    For documentation of using web services for ROSETTA see
    https://www.handbook60.org/home/

    Parameters
    ----------
    r_input : list, horizon level texture information for ROSETTA

    r_version:, int, rosetta version to use
                1: original schaap version
                2: nrcs version
                3: zhang n schaap 2017
    Returns
    -------
    r : list, returned soil hydraulic properties for all horizons

    """
    rosetta_url = f"http://www.handbook60.org/api/v1/rosetta/{r_version}"
    print("Requesting Rosetta estimates ...")
```

```
    r = req.post(rosetta_url, json={"X": r_input})
    if not r.ok:
        print(f"Error!\nStatus code: {r.status_code}\nMessage:\n{r.text}")
        sys.exit()
    r.json()["van_genuchten_params"]
    return r.json()["van_genuchten_params"]


def organic_ptf(dat):
    """
    @author- Jason Roth WME NRCS-MN. jason.roth@usda.gov
    This function populates soil hydraulic parameters necassary for
    calculation of lateral effects in organic soils.

    Saturated hydraulic conductivity, saturated and residual water contents,
    and bulk densities are populated using a lookup table of these values
    based on soil texture. Values were calcualated from analyses of these
    parameters by texture across the PPR.

    PTFs to generate VG hydraulic parameters for organic soils
    adapted from Liu and Lennartz, 2018
    https://onlinelibrary.wiley.com/doi/abs/10.1002/hyp.13314
    All organic PTFs require bulk density

    Future Dev: consider adding refinement based on bulk density as
            shown in original publication

    Parameters
    ----------
    data- numpy array containing soil data

    Returns
    -------
    dat - numpy array containing soil data
    """
```

```
## dictionary to crosswalk database textures to assignments
org_txt_map = {"CE":"MUCK","FLV-":"MPT","FL-":"MPT","HB-M":"MUCK",
        "HPM":"MUCK","MARL":"MUCK","MK-P":"MPT",
        "MK-S":"MUCK", "MPM":"MPT","MPT":"MPT",
        "MUCK":"MUCK","PEAT":"PEAT",
        "SP":"MUCK", "SPM":"PEAT", "SR-":"MUCK",
        "STX-":"MPT", "SR- MUCK FS":"MUCK", "COP-":"MUCK"}

## dictionary to reference hydraulic paramters to assign to ea.
## designated texture class
## Ks in log([cm/d]), RhoB in [g/cm^3], water contents in [cm3/cm3]
org_prams = {"MUCK":{"Ks":2.33, "ThetaS":0.64, "ThetaR":0.17, "RhoB":0.26},
       "MPT":{"Ks":2.90, "ThetaS":0.65, "ThetaR":0.14, "RhoB":0.16},
       "PEAT":{"Ks":3.41, "ThetaS":0.67, "ThetaR":0.09, "RhoB":0.11}
       }

## conversion factor for um/s -> cm/d
ums2cmd = 24.*3600/10**4

## get the names of horizons that we want to populate in this process
org_key = org_txt_map.keys()

## iterate over all horizons
for i in range(dat.shape[0]):
  ## check if the texture is contained in textures to re-assign
  t = dat[i]['texture']
  if t in org_key:
    ## get the re-assignment value
    txt = org_txt_map[t]
    ## calculate average horizon depth to be used in VG n param calc
    d = (dat[i]['hzdepb_r'] + dat[i]['hzdept_r'])/2.

    ## store bulk density in var. for readibility
    if dat[i]['dbthirdbar_r'] < 0:
```

```
            dat[i]['dbthirdbar_r'] = org_prams[txt]['RhoB']
        bd = dat[i]['dbthirdbar_r']

        ## assign hydraulic conductivity to this soil
        if dat[i]['ksat_r'] < 0:
            ## NOTE Value in lookup dictionary is already log x-formed
            dat[i]['Ks'] = org_prams[txt]['Ks']
        else:
            ## convert NASIS value  from um/s to cm/d, log xform and store
            dat[i]['Ks'] = math.log10(dat[i]['ksat_r']*ums2cmd)

        ## assign saturated water content to this soil
        if dat[i]['wsatiated_r'] < 0:
            dat[i]['ThetaS'] = org_prams[txt]['ThetaS']
        else:
            dat[i]['ThetaS'] = dat[i]['wsatiated_r']

        ## assign residual water content to this soil
        if dat[i]['wthirdbar_r'] < 0:
            dat[i]['ThetaR'] = org_prams[txt]['ThetaR']
        else:
            dat[i]['ThetaR'] = dat[i]['wthirdbar_r']

        ## Van Genuchten parameters need to be generated for all organics
        ## calculate and store VG log('alpha') parameter for this soil
        ## from Liu and Lennartz, 2018 Table 4
        dat[i]['alpha'] = (0.326-9.315*bd+10.420*bd**2-0.014*d)
        ## calculate and store VG log('n') to this soil
        ## from Liu and Lennartz, 2018 Table 4
        dat[i]['n'] = (0.153-0.422*bd+0.45*bd**2)

    return dat

def calc_soil_conductivity_nrcs(sol_arr, drn_dep, bar_dep, top_dep=0.0):
    """
```

```
calculated hydraulic conductivity above and below drain

assumes soil horizon depths are in cm, hydraulic conductivity log(cm/d)

    Parameters
----------
soll_arr: np recarray, containing depth (cm) and Ks log(cm/d) data for
            a soil component. Array must have named
            fields ['hzdepb_r', 'Ks' ]

drn_dep: float, drain depth (cm)

bar_dep: float, barrier depth (cm)

Returns
-------
ka: float, hydraulic conductivity (cm/d) above drain depth
kb: float, hydraulic conductivity (cm/d) below drain depth

"""

if drn_dep >= bar_dep:
    bar_dep = drn_dep + 1.0

old_bot_dep = top_dep

## state variable for calculating above (1) or below (2) drain
lyr = 1
ksat = 0
lyr_lst = range(sol_arr.shape[0])

sol_arr.sort(order='hzdepb_r')
## figure out what horizon we start in
i = 0
while top_dep > sol_arr['hzdepb_r'][i]:
```

```
    i+=1

for i in range(i, sol_arr.shape[0]):
    bot_dep = sol_arr['hzdepb_r'][i]
    k = sol_arr['Ks'][i]

    # determine if new bottom depth is greater than drain depth and
    # need to increment to conductivity below drain and or this is the
    # last depth entry for this component and need to extrapolate values
    # downward to confining layer.

    ## this catches condition where horizon intersects drain depth or
    ## process runs out of soils data and needs to be extrapolated down
    ## to the barrier depth.
    if (bot_dep >= drn_dep and lyr == 1) or i == lyr_lst[-1]:
        ## Both of these ifs can trigger sequentially if drain depth
        ## is below the bottom depth of the deepest soil horizon
        ## case - horizon intersects drain depth
        if lyr == 1:
            ## incremental layer thickness
            thk = (drn_dep - old_bot_dep)
            ## calculate total layer thickness down to drain depth
            lyr_thk = drn_dep
            ## undo log-xform and multiply by incremental thickness and
            ## add to the running sum of products
            ## std_dev = k_u = 0
            ksat += thk * 10**(k)
            ## divide total sum product by total layer thickness to get
            ## depth weighted average of horizontal conductivity
            ka = ksat/lyr_thk
            ## increment the layer counter and calculate for first
            ## increment below drain and
            lyr = 2
            ## incremental layer thickness
            thk = (bot_dep - drn_dep)
```

```
                ## undo log-xform and multiply by incremental thickness and
                ## add to the running sum of products
                ## std_dev = k_u = 0
                ksat = thk * 10**(k)
                old_bot_dep = bot_dep
            ## case - ran out of soils data
            if i == lyr_lst[-1]:
                ## check if last soils increment is less than the barrier depth
                ## in this case we need to extrapolate downward to the
                ## barrier depth. There has been discussion of using a decay
                ## factor based on the assumption that conductivity is reduced
                ## at depth due to consolidation
                if bot_dep < bar_dep:
                    bot_dep = bar_dep
                ksat += (bot_dep - old_bot_dep)*10**(k)
                lyr_thk = (bot_dep - drn_dep)
                kb = ksat/lyr_thk
                old_bot_dep = 0
        else:
            thk = (bot_dep - old_bot_dep)
            ## undo log-xform and multiply by incremental thickness

            ksat += thk * 10**(k)
            old_bot_dep = bot_dep

    return ka, kb



def calc_soil_porosity_nrcs(sol_arr, wtb_ini=0.0, wtb_fin=1.0, inc=1.0):
    """
    NRCS-EFH Ch 19-60
    calculate drainable porosity as function of head between 2 drawdown depths
    i.e. water retention drawdown curve using Van Genuchten relationships.

    Parameters
```

```
----------
soll_arr: np recarray, containing depth (cm) and Ks log(cm/d) data for
        a soil component. Array must have named
        fields ['hzdepb_r', 'ThetaS', 'ThetaR', 'alpha', 'n' ]

wtb_ini: float, initial water table depth (cm)

wtb_fin: float, final water table depth (cm)

Returns
-------
f: float, drainable porosity (in/in) between drawdown depths

"""

wtb = wtb_ini

hed = 0

## initialize drainable porosity at 0
f = 0
## set soil horizon index variable to 0
a = 0
## ensure soil values are sorted.
sol_arr.sort(order='hzdepb_r')

## make sure calculation begins in horizon containing the intitial
## water table depth
while sol_arr['hzdepb_r'][a] < wtb_ini and a < sol_arr.shape[0]-1:
  a += 1
## set initial temp value of bot to get into loop...sloppy.
bot = 1.0

## iterate over depth btwn initial and final water table in 1cm increments
while wtb <= wtb_fin:
```

```
        if (wtb > bot and a < sol_arr.shape[0]-1) or wtb==wtb_ini:
            ## if this depth is greater than the horizon depth increment "a"
            ## so functions reference corect soil parameters for this depth
            if a < sol_arr.shape[0]-1 and wtb >= bot:
                a += 1
            ## populate parameters for VG equation for this horizon
            bot = min(sol_arr['hzdepb_r'][a], wtb_fin)
            ths = sol_arr['ThetaS'][a]
            thr = sol_arr['ThetaR'][a]
            enn = sol_arr['n'][a]
            alfa = sol_arr['alpha'][a]
            ## tranform from log values
            enn = 10**enn
            alfa = 10**alfa
            emm = 1.-1./enn
        ## calculate total water drained to this depth
        ## theta_s minus VG water retention at this depth : ch 19, eqn 19-4
        if wtb + inc < wtb_fin:
            hed = wtb_fin - (wtb+inc/2.)
        else:
            hed = (wtb_fin - wtb)/2.

        if (ths - (thr + (ths - thr)) <= 0 or \
            (1.0 + abs(alfa*hed)**enn)**emm) <= 0:
            print("halt")

        f += ths - (thr + (ths - thr) /
                    (1.0 + abs(alfa*hed)**enn)**emm)

        wtb+=inc
    ## normalize drainable porosity to depth drained to get average
    ## cm/cm drained for the drawdown depth
    f/=(wtb_fin-wtb_ini)
```

```
    # if drainable porosity is greater than 0.5 this method is not appropriate
    if f > 0.5:
        f = -9.9
    if np.isnan(f):
        f = -9.9

    return f

def calc_vansch(wtb_ini, wtb_fin, drn_dep, drn_dia, bar_dep,
                hcn_abv, hcn_bel, drn_por, sur_str, tim_per):
    """
    DESC : calculate a lateral effect using the VanS method for a specified
    time period. adapted from:
    https://www.nrcs.usda.gov/Internet/FSE_DOCUMENTS/nrcs142p2_024926.pdf
    Parameters
    ----------
    wtb_ini: float, initial water table depth below grade (ft)

    wtb_fin: float, final water table depth below grade (ft)

    drn_dep: float, drain depth below grade (ft)

    drn_dia: float, drain diam (in)

    bar_dep: float, depth below grade to impervious barrier (ft)

    hcn_abv: float, hydraulic conductivity above drain (ft/d)

    hcn_bel: float, hydraulic conductivity below drain (ft/d)

    drn_por: float, drainable porosity (-/-)

    sur_str: float, surface storage of water (ft)

    tim_per: float, hydraulic conductivity above drain (ft/d)
```

```
Returns
-------
le: float, lateral effect, half the drain spacing that results in specified
        drawdown over the specified time period (ft).
"""
## assign some constants
pie = 3.1416
tol = 0.01
eff_dep = bar_dep - drn_dep
## get effective radius from function
eff_rad = get_eff_rad(drn_dia)
## set some interim variables
aye = bar_dep - drn_dep
emm_ini = drn_dep - wtb_ini
emm_fin = drn_dep - wtb_fin
eff_por = drn_por + (sur_str /(12.*(emm_ini - emm_fin)))
## calculate representative hcon
eff_hcn = ((hcn_abv * emm_ini) + (hcn_bel * eff_dep)) / (emm_ini + eff_dep)
## get initial ess_pri using the actual depth of drain
num = 9. * eff_hcn * tim_per * eff_dep
den = eff_por * (math.log(emm_ini * (2. * aye + emm_fin)) -
            math.log(emm_fin * (2. * aye + emm_ini)))
ess = 1000
if num > 0 and den > 0:
  ess_pri = math.sqrt(num / den)
  ## initialize 'err'>'tol' so we commit to while loop atleast 1x
  err = tol * 1.1
  ## initialize 'err'>'tol' so we commit to while loop atleast 1x
  ess = 0
  ## loop while error is greater than
  ## specified tolerance (NRCS recommends 10% tolerance)
  while (err > tol):
    ## determine eff_dep
    if aye / ess_pri <= 0.3:
```

```
                eff_dep = aye / (1. + (aye / ess_pri) *
                        ((8. / pie) * math.log(aye / eff_rad) - 3.4))
            else:
                eff_dep = ess_pri * pie /\
                        (8. * (math.log(ess_pri / eff_rad) - 1.15))
            ## calculate new spacing for this iteration
            num = 9. * eff_hcn * tim_per * eff_dep
            den = eff_por * (math.log(emm_ini * (2. * eff_dep + emm_fin)) -
                        math.log(emm_fin * (2. * eff_dep + emm_ini)))
            if num > 0 and den > 0:
                ess_pri = math.sqrt(num / den)
            else:
                print(drn_por, hcn_abv, hcn_bel)
            err = abs(ess - ess_pri) / ess_pri
            ess = ess_pri
    return ess / 2.0

def get_eff_rad(in_dia):
    """
    DESC: simple lookup of effective radius for a drain based on diameter

    Parameters
    ----------
    in_dia : int, diameter of drain

    Returns
    -------
    Re : float, effective radius of drain

    """
    if in_dia <= 3:
        Re = 0.0115
    elif in_dia > 3 and in_dia <= 4:
        Re = 0.0167
    elif in_dia > 4 and in_dia <= 5:
```

```
        Re = 0.034
    elif in_dia > 5 and in_dia <= 6:
        Re = 0.048
    elif in_dia > 6 and in_dia <= 8:
        Re = 0.08
    elif in_dia > 8 and in_dia <= 10:
        Re = 0.111
    elif in_dia > 10 and in_dia <= 12:
        Re = 0.142
    elif in_dia > 12 and in_dia <= 16:
        Re = 0.25
    else:
        Re = 1.0
    return Re

def check_soils(ptf_data, min_pct=15, maxmin_dep=10., minmax_dep=120.,
                nul_val=-9.9):
    """
    run through soils and make sure that theres enough data and if
    not explain how

    Parameters
    ----------
    ptf_data : numpy recarray, processed soils data needed to calculated
                    lateral effects. Expects

    min_pct : int, min component percent for mapunit to be valid

    maxmin_dep : int, maximum minimum depth at which a horizon data are needed
                 to produce a value for this component

    maxmin_dep : int, minimum maximum depth at which a horizon data are needed
                 to produce a value for this component

    nul_val : float, the value for missing data
```

```
Returns
-------
mky_chk : numpy recarray, mukeys indicating whether enough data
        is present for lateral effect determination

cky_chk : numpy recarray, cokeys indicating whether enough data
        is present for lateral effect determination
"""

mky_type = ['U6', 'U8', 'U8', 'i4']

mky_cols = ['asym', 'mukey', 'musym', 'code']

mky_dt = list(zip(mky_cols, mky_type))

cky_type = ['U6', 'U8', 'U8', 'U8', 'U20', 'i4']

cky_cols = ['asym', 'mukey', 'musym', 'cokey', 'compname', 'code']

cky_dt = list(zip(cky_cols, cky_type))

## container for mapunit designations based on analysis
mky_lst = []

cky_lst = []

## get unique mukeys to iterate over
mukeys = np.unique(ptf_data['mukey'])

## get rid of all null data
ptf_data = ptf_data[np.where(
            np.logical_and(ptf_data['Ks'] != nul_val,
            np.logical_and(ptf_data['ThetaR'] != nul_val,
            np.logical_and(ptf_data['ThetaS'] != nul_val,
```

```
            np.logical_and(ptf_data['alpha'] != nul_val,
            ptf_data['n'] != nul_val)))))]


## now compare components for each mukey
for mkey in mukeys:
    pct = 0
    # get unique components for this map unit
    mkey_data = ptf_data[np.where(ptf_data['mukey']==mkey)]

    if mkey_data.shape[0] > 0:
        asym = mkey_data['areasymbol'][0]
        msym = mkey_data["musym"][0]
        mkey = mkey_data["mukey"][0]
        ## is there any data for the mapunit

        ## iterate over unique components in mapunts and store max result
        cokeys = np.unique(mkey_data['cokey'])
        for ckey in cokeys:
            ## store component soil data
            comp_data = mkey_data[mkey_data['cokey']==ckey]
            ## is there any data for this component
            if comp_data.shape[0] >= 0:
                cnam = comp_data['compname'][0]
                ckey = comp_data["cokey"][0]
                cpct = comp_data["comppct_r"][0]
                ## sort existing component data by depth
                ## determine if there's top and bottom soil data
                #print("max depth {0}, {1}".format(
                #                         comp_data['hzdepb_r'].max(),
                #                          cpct))
                if comp_data['hzdept_r'].min() <= maxmin_dep and \
                    comp_data['hzdepb_r'].max() > minmax_dep:
                    pct += cpct
                else:
```

```
                cky_lst.append([asym, mkey, msym, ckey, cnam, -2])
            else:
                cky_lst.append([asym, mkey, msym, ckey, cnam, -1])

        ## is there enough of all components to satisfy a lateral
        ## effect calculation for this mapunit
        if pct < min_pct:
            mky_lst.append([asym, mkey, msym, 0])
        else:
            mky_lst.append([asym, mkey, msym, 1])
    else:
        mky_lst.append([asym, mkey, msym, 0])

    cky_chk = np.array([tuple(c) for c in cky_lst], dtype=cky_dt)
    mky_chk = np.array([tuple(m) for m in mky_lst], dtype=mky_dt)
    return mky_chk, cky_chk


def calc_lateral_effects(ptf_data, run_data):
    """
    DESC: calculates lateral effect for unique soil mapunits
    contained in ptf_data using parameters from run_data and stores the
    results in led_data.

    Parameters
    ----------
    ptf_data : numpy recarray
        processed soils data needed to calculated lateral effects. Expects
        column headers of
    led_data : numpy recarray
        calculated lateral effect distance for each mapunit/run parameter
        permutation
    run_data : Dict
        Dictionary containing all permutations of unique input parameters.
    Returns
```

```
-------
led_data : list
    calculated lateral effect distance for each mapunit/run parameter
    permutation
    [['areasymbol', 'mukey', 'musym', 'cokey', 'compname', 'comppct',
            'drain_depth', 'drain_diam', "surf_storage", "barrier_depth",
            "drawdown_init", "drawdown_final", "drawdown_time",
            "Kh_abv", "Kh_bel", "eff_por", "leff_dist"]]

no_led_data : list
    counties, mapunits and components that didn't have sufficient data for
    lateral effect calculations
     [['areasymbol', 'mukey', 'musym', 'cokey', 'compname', 'comppct']]
"""
i = 0

ft2cm = 12.0*2.54
min_pct = 50.0
## get number of unique components
rukeys = run_data.keys()
pct_inc = 5
rc = 0
rpct = 5
prog_msg = "{0}% done with calculations for {1}"
st = ptf_data['areasymbol'][0][0:2]

null_mkey = []
led_data = []

### check soils for complete data
mky_chk, cky_chk = check_soils(ptf_data, min_pct=50,
                        maxmin_dep=10.,
                        minmax_dep=120.,
                        nul_val=-9.9)
```

```
mukeys = np.unique(ptf_data['mukey'])

rcnt = mukeys.shape[0]*len(rukeys)
print("calculating lateral effects for {0}".format(st))
print("total run count is {0}".format(rcnt))



## determine which components for this mapunit
## have sufficient data for LE cal
for r in rukeys:
    rd = run_data[r]
    ddn_i = rd['drawdown_init']
    ddn_f = rd['drawdown_final']
    d_dia = rd['drain_diam']
    d_dep = rd['drain_depth']
    b_dep = rd['barrier_depth']
    ss = rd['surf_storage']
    t = rd['drawdown_time']

    for mk in mukeys:
        code = mky_chk[np.where(mky_chk['mukey']==mk)]['code'][0]
        rc += 1
        if rc/rcnt*100.0 > rpct:
            print(prog_msg.format(rpct, st))
            print(rc, rcnt)
            rpct+=pct_inc
        mu_data = ptf_data[np.where(ptf_data['mukey']==mk)]
        asym = mu_data['areasymbol'][0]
        msym = mu_data["musym"][0]
        mkey = mu_data["mukey"][0]
        if code > 0:
            ## set initial lateral effect for this mapunit to zero
            max_now = 0
            ## iterate over unique map units in data
            ## make sure this is sorted
```

```
tot_pct = 0
cokeys = np.unique(mu_data['cokey'])
for ck in cokeys:
    comp_data = ptf_data[np.where(ptf_data['cokey']==ck)]
    comp_data.sort(order="hzdept_r")
    cnam = comp_data['compname'][0]
    ckey = comp_data["cokey"][0]
    cpct = comp_data["comppct_r"][0]
    ## convert values to cm in f(x) call
    f = calc_soil_porosity_nrcs(comp_data, ddn_i*ft2cm,
                               ddn_f*ft2cm, inc=1.0)
    ## functions expects values in cm
    hka, hkb = calc_soil_conductivity_nrcs(comp_data,
                                          d_dep*ft2cm,
                                          b_dep*ft2cm)
    ## convert values to ft/d
    hka/=ft2cm
    hkb/=ft2cm
    ## final check on data and need for run
    if f > 0.0 and hka > 0.0 and hkb > 0.0:
    ## function expects values in ft and days.
    ## assume constant barrier depth and
    ## initial water table for now
        le = calc_vansch(ddn_i, ddn_f, d_dep, d_dia,
                         b_dep, hka, hkb, f, ss, t)

        le = (int(le/10.)+1)*10.
        tot_pct += cpct
        ## check if this lateral effect is larger than
        ## the previous max for this mapunit
        if le > max_now:
            max_now = le

if tot_pct >= min_pct:
```

```
            dat = [asym, mkey, msym, ckey, cnam, cpct,
                   d_dep, d_dia, ss, b_dep, ddn_i, ddn_f,
                   t, hka, hkb, f, max_now]

        else:
            dat = [asym, mkey, msym,  99999999, "unknown", 0,
                   d_dep, d_dia, ss, b_dep, ddn_i, ddn_f,
                   t, -9.9, -9.9, -9.9, -2]

    else:
        dat = [asym, mkey, msym,  99999999, "unknown", 0,
               d_dep, d_dia, ss, b_dep, ddn_i, ddn_f,
               t, -9.9, -9.9, -9.9, -1]

    led_data.append(dat)
    i+=1

print("finsished calculating lateral effects for {0}".format(st))
return led_data, null_mkey

### MAIN FUNCTION
def main():
    """
    DESC: main control loop

    Parameters
    ----------
    none

    Returns
    -------
    none

    """
```

```
run_file_name = "input.txt"
output_dir = "leff_data"

## formattable strings for state specific data files
sda_file = "{0}_sda_qry.txt"
ptf_file = "{0}_rout.txt"
led_file = "{0}_led.txt"
no_led_file = "{0}_no_led.txt"

delim="\t"

## query text
sql_compsWithData = '''
SELECT legend.areasymbol, mapunit.mukey, mapunit.musym,
component.cokey, component.compname,component.comppct_r,
chorizon.chkey, chtexturegrp.texture,
ISNULL(chorizon.ksat_r, -9.9) as 'ksat_r',
ISNULL(chorizon.wsatiated_r, -9.9)/100.0 as 'wsatiated_r',
chorizon.hzdept_r, chorizon.hzdepb_r,
ISNULL(chorizon.sandtotal_r, -9.9) as 'sandtotal_r',
ISNULL(chorizon.silttotal_r, -9.9) as 'silttotal_r',
ISNULL(chorizon.claytotal_r, -9.9) as 'claytotal_r',
ISNULL(chorizon.dbthirdbar_r, -9.9) as 'dbthirdbar_r',
ISNULL(chorizon.wthirdbar_r, -9.9)/100.0 as 'wthirdbar_r',
ISNULL(chorizon.wfifteenbar_r, -9.9)/100.0 as 'wfifteenbar_r'
FROM (legend LEFT JOIN
        (mapunit LEFT JOIN
        (component LEFT JOIN
        (chorizon LEFT JOIN chtexturegrp ON chorizon.chkey = chtexturegrp.chkey)
        ON component.cokey = chorizon.cokey)
        ON mapunit.mukey = component.mukey)
        ON legend.lkey = mapunit.lkey)
WHERE legend.areasymbol like '{0}%' AND component.comppct_r>=10
AND chtexturegrp.rvindicator = 'Yes' AND mapunit.musym <> 'W'
AND (chorizon.hzname NOT LIKE 'Cr%')
```

```
ORDER BY mapunit.mukey, component.cokey, chorizon.hzdepb_r
'''

sql_allComps = '''
    SELECT legend.areasymbol, mapunit.mukey, mapunit.musym,
    component.cokey, component.compname,component.comppct_r,
    chorizon.chkey
    FROM (legend LEFT JOIN
                (mapunit LEFT JOIN
                (component LEFT JOIN chorizon ON component.cokey = chorizon.cokey)
                ON mapunit.mukey = component.mukey)
                ON legend.lkey = mapunit.lkey)
    WHERE legend.areasymbol like '{0}%' AND component.comppct_r>=10
    AND mapunit.musym <> 'W'
    ORDER BY mapunit.mukey, component.cokey
    '''

## header and dataype for sda query results
sda_data_cols = ['areasymbol', 'mukey', 'musym', 'cokey', 'compname',
        'comppct_r', 'chkey', 'texture', 'ksat_r', 'wsatiated_r',
        'hzdept_r', 'hzdepb_r', 'sandtotal_r', 'silttotal_r',
        'claytotal_r', 'dbthirdbar_r','wthirdbar_r', 'wfifteenbar_r']

sda_data_type = ["U8", "U8", "U10", "U8", "U32",
        "i2", "U8", "U8", "f4", "f4",
        "i2", "i2", "f4", "f4",
        "f4", "f4", "f4", "f4"]

sda_data_unit = ["sta_fip", "key", "name", "key", "name",
        "%", "key", "txt", "um/s", "cm3/cm3",
        "cm", "cm", "%", "%",
        "%", "g/cm3", "cm3/cm3", "cm3/cm3"]

sda_hdr = make_file_hdr(sda_data_cols.copy(), sda_data_unit.copy(), delim)
```

```
sda_comp_cols = sda_data_cols[0:6]
sda_comp_type = sda_data_cols[0:6]

## this is the order that data will come back
ptf_cols = ['areasymbol', 'mukey', 'musym', 'cokey', 'compname',
        'comppct_r', 'chkey', 'texture', 'hzdept_r', 'hzdepb_r',
        "ThetaR", "ThetaS", "alpha", "n", "Ks"]

ptf_type = ["U8", "U8", "U10", "U8", "U32",
        "i2", "U8", "U8", "i2", "i2",
        "f4", "f4", "f4", "f4", "f4"]

ptf_unit = ["sta_fip", "key", "name", "key", "name",
        "%", "key", "txt", "cm", "cm",
        "cm3/cm3", "cm3/cm3", "log(cm/d)", "log(1/cm)", "log(cm/d)"]

ptf_hdr = make_file_hdr(ptf_cols.copy(), ptf_unit.copy(), delim)

led_cols = ['areasymbol', 'mukey', 'musym', 'cokey', 'compname', 'comppct',
        'drain_depth', 'drain_diam', "surf_storage", "barrier_depth",
        "drawdown_init", "drawdown_final", "drawdown_time",
        "Kh_abv", "Kh_bel", "eff_por", "leff_dist"]

led_type = ["U8", "U8", "U8", "U8", "U32", "i2",
        "f4", "f4", "f4", "f4",
        "f4", "f4", "f4",
        "f4", "f4", "f4","i4"]

led_unit = ["sta_fip", "key", "name", "key", "name", "%",
        "ft", "in", "in", "ft",
        "ft", "ft", "d",
        "ft/d", "ft/d", "ft/ft", "ft"]

led_hdr = make_file_hdr(led_cols.copy(), led_unit.copy(), delim)
```

```
## make a subdirectory to store data in
data_dir = os.path.join(os.getcwd(), output_dir)
if not os.path.exists(data_dir):
    os.mkdir(data_dir)

run_file_path = os.path.join(os.getcwd(), run_file_name)

if os.path.exists(run_file_path):
    states, run_data = read_run_info(run_file_path)

## iterate over each state in the list of states specified in run_file
## tried querying more than one state at a time but POST request fails
for s in states:
    run_type = 0
    ## determine if any of the data exist for this state
    if os.path.exists(os.path.join(data_dir, led_file.format(s))):
        run_type = 3
    elif os.path.exists(os.path.join(data_dir, ptf_file.format(s))):
        run_type = 2
    elif os.path.exists(os.path.join(data_dir, sda_file.format(s))):
        run_type = 1
    else:
        run_type = 0

    ## if run type < 3 some work needs to be done.
    if run_type < 3:
        ## if there is no soil query in data directory need to query
        ## soil data for this state from SDA
        if run_type <= 1:
            ## if soil data already exists import it to run through rosetta
            sda_file_pth = os.path.join(data_dir,sda_file.format(s))
            sda_dt = list(zip(sda_data_cols,sda_data_type))
            if run_type == 1:
                print("Local SDA data found for {0}".format(s))
                print("Importing soil data from " + sda_file.format(s))
```

```
    sda_data = read_data_file(sda_file_pth, skp_lin=2)
    for i in range(len(sda_data)):
        for j in range(8,18):
            sda_data[i][j] = float(sda_data[i][j])

else:
    # query SDA using web service
    print("Soil data not found for {0}".format(s))
    print("Querying soil data from SDA")
    sda_data = qry_sda(sql_compsWithData.format(s))

    ## construct a record array from the query results.
    ## rec arrays are much quicker in execution than dataframes
    ## need to convert to tuple so sequential fields of same
    ## data type aren't combined
    arr = np.array([tuple(sd) for sd in sda_data],
                   dtype=sda_dt)

    ## replace all values in ksat_r, wsatiated_r, sandtotal_r
    ## silttotal_r, claytotal_r, dbthirdbar_r, wthirdbar_r
    ## wfifteenbar_r

    for f in ["ksat_r", "wsatiated_r", "sandtotal_r",
            "silttotal_r", "claytotal_r", "dbthirdbar_r",
            "wthirdbar_r", "wfifteenbar_r"]:

        arr[f][np.where(arr[f]<0.0)] = -9.9000



    ## add placeholder entries for soil map units that
    ## didn't return any data from SDA
    ## get all the comps in the state and compare them to
    ## to those with data and fill in the comps that don't
```

```
        ## have data with null
        print("Querying component data from SDA")
        sda_comp_data = qry_sda(sql_allComps.format(s))
        #comp_dt = list(zip(sda_comp_cols,sda_comp_type))

        no_hzn = []

        sda_comp_data = qry_sda(sql_allComps.format(s))

        ## make
        for scd in sda_comp_data:
            if scd[-1] == None:
                x = scd[0:6]+['99999999']+['UKN']+2*[-9.9] +\
                    [0, 10] + 6*[-9.9]
                no_hzn.append(x)
                sda_data.append(x)

        cmp_arr = np.array([tuple(cd) for cd in no_hzn],
                        dtype=sda_dt)

        arr = np.append(arr, cmp_arr)

        ## save a copy of the sda query to a file for future ref
        np.savetxt(sda_file_pth, arr , fmt="%s", delimiter=delim,
                   header=sda_hdr, comments="")
        del arr
if run_type <= 2:
    ## soils data for this state has already been processed
    ptf_file_pth = os.path.join(data_dir,ptf_file.format(s))
    if run_type == 2:
        print("Local PTF data found for {0}".format(s))
        print("Importing PTF data from " +ptf_file.format(s))
        ptf_data = read_data_file(ptf_file_pth, skp_lin=2)
        dt = list(zip(ptf_cols, ptf_type))
        ptf_data = [tuple(i) for i in ptf_data]
```

```
    ptf_data = np.array(ptf_data, dtype=dt)
else:
    print("PTFs data not found for {0}".format(s))
    print("Processing soils through PTFs")
    ptf_data = qry_rosetta([sd[12:] for sd in sda_data], 2)

    ## need to convert to tuple so sequential fields of same
    ## data type aren't combined

    ## merge sda_data and rosetta output
    temp = []
    for i,j in zip(sda_data, ptf_data):
        temp.append(tuple(i+j))
    dt = list(zip(sda_data_cols+ptf_cols[-5:],
                  sda_data_type+ptf_type[-5:]))
    temp = np.array(temp, dtype=dt)
    temp= organic_ptf(temp)

    ptf_data = temp
    del temp

    ptf_data['Ks'][np.isnan(ptf_data['Ks'])] = -9.9
    ptf_data['ThetaR'][np.isnan(ptf_data['ThetaR'])] = -9.9
    ptf_data['ThetaS'][np.isnan(ptf_data['ThetaS'])] = -9.9
    ptf_data['alpha'][np.isnan(ptf_data['alpha'])] = -9.9
    ptf_data['n'][np.isnan(ptf_data['n'])] = -9.9


    np.savetxt(ptf_file_pth,
               ptf_data[[c for c in ptf_cols]],
               fmt="%s",
               delimiter=delim,
               header=ptf_hdr,
               comments="")
```

```
        if run_type <= 3:
            led_file_pth = os.path.join(data_dir,led_file.format(s))
            no_led_file_pth = os.path.join(data_dir,no_led_file.format(s))
            led_dt = list(zip(led_cols,led_type))

            #no_led_file_pth = os.path.join(data_dir, no_led_file.format(s))
            if run_type == 3:
                print("Lateral Effect Distances for {0} exist".format(s))
            else:
                print("Lateral Effect not found for {0}".format(s))
                print("Processing Lateral Effects")

                ## calculate lateral effects
                led_data, mky_chk = calc_lateral_effects(ptf_data,
                                                         run_data)

                arr = np.array([tuple(le) for le in led_data],dtype=led_dt)

                arr.sort(order=['surf_storage','mukey','drain_depth',
                                'drain_diam'])
                np.savetxt(led_file_pth, arr, fmt="%s",
                           delimiter=delim, header=led_hdr, comments="")

                np.savetxt(no_led_file_pth,
                           mky_chk[np.where(mky_chk['code']<=0)],fmt="%s",
                           delimiter=delim, comments="")

if __name__ == "__main__":
    main()
```

United States Department of the Interior

FISH AND WILDLIFE SERVICE
Mountain-Prairie Region

IN REPLY REFER TO:

MAILING ADDRESS:
P.O. Box 25486, DFC
Denver, Colorado 80225-0486

STREET LOCATION:
134 Union Boulevard
Lakewood, Colorado 80228-1807

December 08, 2010

Memorandum

From: Assistant Regional Director, National Wildlife Refuge System, Region 6

Subject: U.S. Fish and Wildlife Service Easement Enforcement Administrative and Enforcement Manual

Attached to this memorandum is a compact disk that contains the Region 6, Second Edition of the Administrative and Enforcement Procedures for U.S. Fish and Wildlife Service Easements within the Prairie Pothole States (hereafter referred to as the "Easement Manual" or "Manual"). This Manual will also be made available on-line. These procedures are mandatory and effective immediately. They remain in effect until changed or modified, which can only occur with the review and recommendation of the Manual Committee and concurrence of the ARD-Refuges, Region 6.

The Second Edition of the Easement Manual was initiated in 2007 and supersedes the 2005 Easement Manual, which was a joint effort between Regions 3 & 6. The 2010 Manual is Region 6-specific, and the revisions are based on the feedback and suggestions from wetland district managers, supervisors, law enforcement and realty personnel that have worked under the 2005 guidance. The intent of these revised procedures is to continue to refine and standardize how Service personnel collect and maintain documents, records and information and make decisions in order to effectively enforce the terms and conditions of conservation easements in the Prairie Pothole Region.

In addition to enforcing the easement agreements, these guidelines also provide information on how the Service's Appropriate Uses and Compatibility Policies relate to the administration of "less than fee title" interests. The guidelines describe the determinations and decisions Wetland District Managers must make when evaluating requests from landowners, municipalities, utility companies, and public service entities that have the potential to affect Service easement interests. The procedures described in the guidelines are written to provide managers with a process that is flexible and adaptable for varied and unique situations. Managers should be able to use the guidance to determine if requests to use or modify Service easement properties are reasonable, and can be accomplished in compliance with Appropriate Use and Compatibility Policies as well as other National Wildlife Refuge System (NWRS) governing requirements.

These guidelines establish a process for evaluating ALL proposed uses of properties encumbered by easements. The flowchart in Chapter XII and the accompanying narrative will guide managers through a systematic and consistent process for evaluating proposed uses. Wetland District Managers will be expected to follow the guidance in the Manual and make decisions accordingly. It should be recognized that there will be requests where managers can make a case for pursuing a course of action that is different or contrary to the manual guidance. As with any NWRS field decision that does not track closely to guidance, managers should discuss their preferred course of action with the Regional Easement Coordinator as well as their Refuge Zone Supervisor.

While designed to be adaptable to a wide range of requests, there will be requests for easement uses that will need more detailed discussion than can be found in the current guidance. For example, the 2010 Manual includes guidance for Region 6 wind energy development requests that was not included in the 2005 version. In addition, the Service is considering NWRS policy for managers regarding outstanding mineral extraction that may apply to service easements. A new Service national policy may necessitate a Manual change.

A Manual Committee has been established to consider any proposed Manual changes. The Manual Committee is informal and consists of wetland district managers, supervisors, law enforcement and realty personnel that are interested working collaboratively in order to develop easement procedures designed to help all Service decision makers. The Committee will meet as needed to consider matters that may merit additional guidance in the Manual and will provide recommendations for any Manual change. Future changes and/or amendments to this guidance will be recommended by the committee and released under the signature of the NWRS Assistant Regional Director.

U.S. Department of the Interior

Fish and Wildlife Service

Mountain-Prairie Region (6)

# Second Edition
of the
# ADMINISTRATIVE AND ENFORCEMENT PROCEDURES
for
# FWS EASEMENTS
(Wetland, Grassland, Tallgrass, and FmHA)



within the

PRAIRIE POTHOLE STATES

Denver, Colorado

November, 2010

# Table of Contents

## Regions 6 Easement Manual


| Chapter | | Page |
|---|---|---|
| I. | PURPOSE, NEED, AND BACKGROUND | |
| | The Region 6 Easement Program | I-3 |
| | Easement Manual Background | I-6 |
| | Approval Signature | I-7 |
| II. | COMPATIBILITY AND OTHER REGULATORY REQUIREMENTS | |
| | NWRS Mission Statement | II-3 |
| | Wetland Management District Purposes | II-3 |
| | General NEPA Guidance | II-5 |
| | General Cultural Resource Guidance for Easements | II-7 |
| III. | EASEMENT TERMS AND ACQUIRED PROPERTY INTERESTS | |
| | Wetland Easements for Region 6 | III-1 |
| | Region 6 Grassland Easements and TGP Easements | III-3 |
| | FmHA Deed-Restricted Easements | III-4 |
| IV. | ACQUISITION OF EASEMENTS | |
| | Criteria for Acquisition | IV-1 |
| | The Acquisition Process | IV-2 |
| | Official Easement Records | IV-3 |
| V. | EASEMENT ADMINISTRATION | |
| | Permanent Field Station Files | V-1 |
| | New Easement Inspection & Posting for Mgmt Purposes | V-2 |
| | Actions to Help Prevent Future Violations | V-5 |
| | Permitted Activities | V-7 |
| | Activities Allowed Without a Permit | V-8 |
| | Noxious Weed Control | V-8 |
| | Burying or Dumping Rocks | V-8 |
| | Early Mowing of Road Rights-of-Way | V-8 |
| | Exemption to July 15 Mow Date | V-8 |
| | Burning of Upland Vegetation | V-9 |
| | Tree Cutting | V-9 |
| | Subsurface Resources and Minerals | V-9 |
| | Region 6 Subsurface Resources Administration | V-10 |
| | Cultural Resource Issues related to Minerals | V-11 |
| | Easement Enforcement Training Protocol | V-11 |

**Chapter** **Page**

VI. EASEMENT SURVEILLANCE
Aerial Inspection---------------------------------------------------------- VI-1
Pre-Flight Preparations---------------------------------------- VI-1
Wetland Easement Flights----------------------------------- VI-4
Grassland Easement Flights---------------------------------- VI-4
Flight Activities------------------------------------------------ VI-5
Follow-up (Second) Flights---------------------------------- VI-7
Ground Inspections--------------------------------------------------- VI-9
Easement Violation Tracking System-------------------------------- VI-12

VII. COMPLIANCE CONTACTS
Pre-contact Preparation------------------------------------------------ VII-1
Landowner and Tenant Contact---------------------------------------- VII-2
The Interview----------------------------------------------------------------- VII-2
Compliance Requirements---------------------------------------------- VII-4
Post-interview Procedures----------------------------------------------- VII-6
Compliance Checks----------------------------------------------------- VII-7

VIII. PROSECUTION
General Discussion---------------------------------------------------- VIII-1
Issuing Violation Notices----------------------------------------------- VIII-1
Drainage Violations------------------------------------------- VIII-2
Burning Violations-------------------------------------------- VIII-2
Fill and Level Violations------------------------------------- VIII-3
Sheetwater--------------------------------------------------------- VIII-3
Pumping------------------------------------------------------------ VIII-3
"Topping off" wetlands--------------------------------------- VIII-4
Co-owned Wetlands------------------------------------------ VIII-5
Maintenance of Non-DFM Ditches-------------------------- VIII-5
Farming and Cultivation Violations------------------------- VIII-6
Haying Violations-------------------------------------------- VIII-8
Seed Harvest-------------------------------------------------- VIII-8
Coulee Clean-outs-------------------------------------------- VIII-9
Plow furrows and Dead furrows---------------------------- VIII-10
Placement of Culverts----------------------------------------- VIII-10
Easement File Review Requirements------------------------------- VIII-11
Responsibilities of the Wetland Manager and the Regional
Easement Coordinator------------------------------------------------- VIII-12
Case Brief Preparation, General-------------------------------------- VIII-13
Case Briefs for Wetland Easements---------------------------------- VIII-15
Department of Justice Involvement---------------------------------- VIII-17
Other Legal Aspects
General Definitions----------------------------------------------------- VIII-17
Easement Authorities-------------------------------------------------- VIII-18

| Chapter | | Page |
|---|---|---|
| VIII (continued)…… | | |
| | Enforcement Authorities | VIII-19 |
| | Burden of Proof-Criminal Proceedings | VIII-19 |
| | Burden of Proof-Civil Proceedings | VIII-19 |
| | Statute of Limitations-Civil and Criminal | VIII-20 |
| IX. | RELEVANT COURT DECISIONS | |
| | General and Historical Discussion | IX-1 |
| | Federal Magistrate Decisions | IX-1 |
| | Federal District Court Decisions | IX-4 |
| | Appellate Court Decisions | IX-6 |
| | U. S. Supreme Court Decisions | IX-10 |
| X. | FARMERS HOME ADMINISTRATION (FmHA) CONSERVATION EASEMENTS | |
| | Introduction and Background | X-1 |
| | State-Specific Guidance | X-2 |
| | Quitclaim Deed Reservations | X-2 |
| | Monitoring FmHA Easements | X-2 |
| | Resolving Possible Violations | X-3 |
| | FWS Authority | X-3 |
| | Exchange Policy | X-3 |
| | Service Responsibility | X-3 |
| | Conservation Easement Reservations | X-4 |
| | Description of the Easement Area | X-4 |
| | Covenants by the Landowner | X-5 |
| | Rights Reserved in the United States | X-6 |
| | Easement Management and Administration | X-7 |
| | General Provisions | X-7 |
| XI. | MAPPING OF PRE-1976 WETLAND EASEMENTS | |
| | Mapping Overview | XI-3 |
| | Mapping Priorities | XI-5 |
| | Mapping Process | XI-6 |
| | Specific Mapping Steps | XI-7 |
| | Revising Easement Maps | XI-11 |
| XII. | DEALING WITH REQUESTS FOR USE AND MODIFICATION OF EASEMENT PROPERTIES | |
| | General Discussion | XII-1 |
| | Issuance of Permit and/or Letters of Authorization | XII-2 |
| | Concept of Threshold Levels of Easement Impact | XII-5 |
| | The Region 6 Flowchart | XII-8 |

**Chapter** **Page**

XII. (continued)……
Process for Evaluating Requests--------------------------------------- XII-9
Authority to Regulate Proposed Uses------------------------ XII-9
Refuge Management Activity for Habitat Improvement-- XII-9
Refuge Management Economic Uses--------------- XII-12
8 acres/contract vs. 8 acres/quarter section--------- XII-13
Determining the Type of Request---------------------------- XII-15
Health and/or Safety Issues----------------------------------- XII-16
Public Service, Governmental, or Corporate Issues-------- XII-17
Other Requests---------------------------------------------- XII-21
Associated or Secondary Impacts------------------------------------- XII-24

XIII. ADMINISTRATION OF REQUESTS FOR RIGHTS-OF-WAY
50 CFR, Part 29 for guidance on ROW's---------------------------- XIII-1
ROW Evaluation Process----------------------------------------------- XIII-1
Use of the Exchange Option ------------------------------------------ XIII-5
Cultural Resource Issues and Rights-of-Ways---------------------- XIII-5
Cultural Resource Issues and Relinquished Property Interests---- XIII-6

XIV. WIND ENERGY DEVELOPMENT AND EASEMENT PROPERTIES
Initial Contact with Wind Energy Companies and Consultants -- XIV-2
Information Gathering ------------------------------------------------ XIV-3
Permitting Requirements --------------------------------------------- XIV-6
NEPA Decision Tree ------------------------------------------ XIV-7
Bird Mortality Guidelines ------------------------------------ XIV-18
Wind Energy Coordination Summary ------------------------------- XIV-19

XV. EASEMENT EXCHANGE PROCEDURES & FORMAT
Service and Regional Policies ---------------------------------------- XV-1
Exchange Request Submission---------------------------------------- XV-2
Exchange Request Format--------------------------------------------- XV-2
Property Divestiture Requirements------------------------------------ XV-3
Release of Easement Rights------------------------------------------- XV-4

# EASEMENT MANUAL

# EXHIBITS
## by
## CHAPTER

---


| | |
|---|---|
| **CHAPTER II** | **Compatibility and How it Relates to Easement Interests** |
| Exhibit II-1 | Standard Form Used for Compatibility Determinations |
| Exhibit II-2 | Compatibility Determination Flowchart |
| Exhibit II-3 | Goals for the Easement Program for the Prairie Pothole Region |
| Exhibit II-4 | How to Contact Regional NEPA and Cultural Resources Coordinators |
| Exhibit II-5 | NEPA Guidance for Region 6 (DOI and FWS Categorical Exclusions and Extraordinary Circumstances; NEPA Compliance Checklist) |
| Exhibit II-8b | NEPA Environmental Action Statement |
| Exhibit II-9 | Guidance for Implementation of Appropriate Refuge Uses Policy |
| Exhibit II-10 | FWS Form 3-2319 – Finding of Appropriateness of a Refuge Use |
| Exhibit II-11 | Cultural Resource Review Procedures for Region 6 |
| **CHAPTER III** | **Easement Terms and Acquired Rights** |
| Exhibit III-1 | Pre-64 Wetland Easement Document and map (document <u>with</u> connecting language within document) |
| Exhibit III-2 | Pre-64 Wetland Easement Document and map (document <u>without</u> connecting language within document) |
| Exhibit III-3 | Pre-76 Wetland Easement Document, and Drainage Referral Map (DFM) |
| Exhibit III-4 | Post-76 Wetland Easement Document and Exhibit "A" |
| Exhibit III-5 | Post-76 Wetland Easement Document referencing Wetland Restorations |
| Exhibit III-6 | Post-76 Wetland Easement Referencing Wetland Restorations with MSL Elevations Established. |
| Exhibit III-7a | Grassland Easement Document and Exhibit "A" |
| Exhibit III-7b | 1999 Grassland Easement Document |

**CHAPTER IV** **Acquisition of Easement Properties**

Exhibit IV-1 Introduction to New Easement Acquisition Decision Trees, Priority Maps, and Worksheets for Region 6
Exhibit IV-2
a Wetland Easement Acquisition Decision Tree
b ND Wetland Easement Priority Zone
c SD Wetland Easement Priority Zone
d Wetland Easement Evaluation Form
e Grassland Easement Acquisition Decision Tree
f ND Grassland Easement Priority Zones
g SD Grassland Easement Priority Zones
h Grassland Easement Evaluation Form

**CHAPTER V** **Easement Administration**

Exhibit V-1 "Events" log for Recording Easement Visits and other Information
Exhibit V-2 Photo-documentation Format
Exhibit V-3 Information on the Use of Digital Photography for Law Enforcement Purposes
Exhibit V-4 Sample Notification Letter for Use in Notifying Landowners with Easements on Their Property (new owners of easement properties)
Exhibit V-5 Example of an "Easement Summary Sheet" used to map Pre-76 Easement Wetlands
Exhibit V-6 Recommended Conditions/Stipulations for Use in Authorizing Certain Requests for Use and/or Habitat Management Activities (including a sample seeding agreement to be used in conjunction with uplands)
Exhibit V-7 Guidance on the Use and Distribution of Digital Easement and Fee Boundary Information Developed, Updated, and Managed by the HAPET Office
Exhibit V-8 Region 6 Policy on Sand, Gravel, and Clay Extraction on Easements

**CHAPTER VI** **Easement Surveillance**

Exhibit VI-1 Waterfowl Management Easement Data Sheet
Exhibit VI-2 Electronic Easement Violation Tracking Form
Exhibit VI-3 Navigation and Surveillance Technology Flight Equipment

**CHAPTER VII** **Compliance Contacts**

Exhibit VII-1 Easement Violation Interview Checklist
Exhibit VII-2 Example of a Memo to the file documenting an Easement Contact
Exhibit VII-3 Example of a Certified Letter to Landowner Documenting Needed Compliance for an Easement Violation

**CHAPTER VII (continued)**

Exhibit VII-4 Example of a Map showing Landowner What Compliance will be Necessary for Compliance
Exhibit VII-5 Example of a Letter Documenting that Required Compliance was Acceptable
Exhibit VII-6 Example of a Certified Letter Documenting That Compliance was NOT Acceptable and What Further Action Would Be Necessary

**CHAPTER VIII Prosecution**

Exhibit VIII-1 Criteria to Consider When Confronted with a Request to Provide Relief for a Pre-76 Easement-protected Wetland.
Exhibit VIII-2 Solicitor letter from 1981 regarding coordination of criminal cases with the AUSA.
Exhibit VIII-3 U.S. Attorney's Office Discovery Policy

**CHAPTER X Administration of FmHA Conservation Easements**

Exhibit X-1 North Dakota FmHA Guidance
Exhibit X-2 South Dakota FmHA Guidance

**CHAPTER XI Procedures for Mapping Wetland Easements**

Exhibit XI-1 A Copy of a "Difficulty to Drain" Map (two versions)
Exhibit XI-2 An Example of a Drainage Facility Map
Exhibit XI-3 An Example of a "Renegotiation Map"
Exhibit XI-4 An Example of an Easement Map on Mylar Sheet
Exhibit XI-6 Example of an Easement Map Reference Form
Exhibit XI-7 Sample of a Letter Transmitting Map to a Landowner
Exhibit XI-8 Sample of a Letter Responding to a Landowner's Questions about Mapping
Exhibit XI-9 Sample of a Letter Transmitting a Revised Map to a Landowner
Exhibit XI-10 Documentation for the Standard Range of Error Involved with Mapping Pre-76 Wetland Easements.
Exhibit XI-11 Offsite Mapping Tools - Possible Photographic and Mapping Resources

**CHAPTER XII Dealing with Requests for Use or Modification of Easement Properties**

Exhibit XII-1 August 14, 1980 Solicitor's Opinion Citing Authority to Issue Special Use Permits
Exhibit XII-2 Copy of a Special Use Permit Form
Exhibit XII-3 Easement Use Evaluation Form to be Used in Conjunction with the Flowchart

**CHAPTER XII (continued)**

Exhibit XII-4a-g — Programmatic Compatibility Determinations for Use in Conjunction with Easement Properties
Exhibit XII-5 — Moved to Chapter XV – Exhibit XV-1
Exhibit XII-6 — Moved to Chapter XV – Exhibit XV-2
Exhibit XII-7 — Copy of Policy Authorizing PLs to Issue Special Use Permits for Certain ROW requests
Exhibit XII-8 — Example Letter of Authorization for food plots on grass easements

**CHAPTER XIII — Administration of Rights-of-Way**

Exhibit XIII-1 — Regional Guidelines for Formal Rights-of-Way
Exhibit XIII-2 — Compatibility Determination and Completed Environmental Evaluation Checklist for a "Minor Expansion" of an Existing ROW

**CHAPTER XIV — Wind Energy Development and Easement Properties**

Exhibit XIV-1 — Wind Energy and Region 6 Grassland Easements – Recommendations for Administering Wind Development Requests (Three Scenarios).
Exhibit XIV-2 — NEPA Definitions
Exhibit XIV-3 — Example MOU
Exhibit XIV-4 — Partial Term Relinquishment and Release of Waterfowl Habitat Protection Easement (Reversionary Clause)
Exhibit XIV-5 — Example letter to Realty acknowledging and outstanding wind lease
Exhibit XIV-6 — Example "Consent to Easement" form

**Chapter XV — Easement Exchange Procedures & Format**

Exhibit XV-1 — Process for Exchanging Land Interests and the Concept of Biological Equivalency
Exhibit XV-2 — Exchange Checklist

# CHAPTER I

# PURPOSE, NEED, AND BACKGROUND

The North American prairie once formed the largest expanse of grassland in the world and the glaciated northern part of the North American prairie, the Prairie Pothole Region, was covered with millions of small, shallow wetlands. Originally, wetland densities in this area averaged an astonishing 83 "potholes" per square mile. These wetlands, and their associated grassland habitats, are vitally important to hundreds of migratory bird species for breeding and migration. In any given year, up to 50% of North America's waterfowl production takes place here.

Unfortunately, the Prairie Pothole Region has suffered severe habitat loss. North Dakota has only 50% of its wetlands remaining, Minnesota only 10% and the Northern Tall Grass Prairie is some of the most threatened habitat in all of North America. The conversion and destruction of habitat within the Prairie Pothole Region has long been recognized as a major factor in the decline of waterfowl populations. The 1938 Yearbook of Agriculture drew attention to the loss of waterfowl habitat back then by stating, "Drainage of the most productive waterfowl breeding places in the Northern Great Plains was one of the prime factors in reducing the continental populations of waterfowl."

Wetland drainage and conversion of grassland acres have taken their tolls, and waterfowl and other grassland nesting migratory birds have been forced into what remains of the once vast areas of grassland and wetlands. By the late 1950's, the need to act, the need to preserve some of what was left, was overwhelmingly apparent! As a result, the Small Wetlands Acquisition Program (SWAP) was authorized by Congress in 1958 by an amendment to the Migratory Bird Hunting and Conservation Stamp Act. The purpose of this important program is to ensure long-term protection of breeding habitat for waterfowl and other migratory bird species located primarily within the Prairie Pothole Region of North America.

While the program was initiated in the 1950's, the legislative foundation upon which the program was built dates back over 75 years. Prior to 1929, the United States entered into treaties and enacted legislation to protect migratory birds by limiting the numbers and methods of taking migratory birds and providing for the enforcement of the provisions of the treaties and legislation. The Migratory Bird Conservation Act of February 18, 1929 was the first piece of legislation that gave what is now the U.S. Fish and Wildlife Service the ability to acquire land without a special act from Congress. The Act also established a Migratory Bird Conservation Commission to approve areas recommended by the Secretary of the Interior for acquisition. The Migratory Bird Conservation Act authorized the acquisition of inviolate migratory bird sanctuaries and was later amended in November 8, 1978 to authorize the acquisition of land for purposes other than inviolate sanctuaries. This Act was the legislative precursor to the Migratory Bird Hunting and Conservation Stamp Act of March 16, 1934, better known as the "Duck Stamp Act."

The Duck Stamp Act was a significant piece of legislation for the Service's early acquisition efforts because it provided a means to generate funds for land acquisition by requiring each waterfowl hunter 16 years of age or older to posses a valid Federal hunting stamp. The receipts from the sale of the Federal hunting stamps, which we now call "Duck Stamps," were deposited in a special Treasury Department account known as the "Migratory Bird Conservation Fund" and were used to acquire migratory bird sanctuaries which we now refer to as refuges. On August 1, 1958, the Duck Stamp Act was amended by the passage of Public Law 85-585 which provided for the acquisition of "Waterfowl Production Areas" and "Easements for Waterfowl Management Rights" which we also know as "wetland easements."

On October 4, 1961 the "Wetlands Loan Act" (P.L. 87-383) was passed. This legislation allowed the Service to develop a significant migratory waterfowl habitat protection effort known as the "Small Wetlands Acquisition Program." The Wetlands Loan Act authorized the advance of funds against future revenues from the sale of Duck Stamps as a means of accelerating the acquisition of migratory waterfowl habitat. This Act also contained the stipulation that "no land shall be acquired with moneys from the Migratory Bird Conservation Fund unless the acquisition has been approved by the Governor of the State or appropriate State agency." Appropriations under the Wetlands Loan Act were to be merged with duck stamp receipts for a 15 year period beginning in 1962 and the total appropriations were not to exceed $105 million. Public Law 94-215 passed February 18, 1976, increased the loan ceiling to $200 million and extended the loan period to September 30, 1983. Two other extensions were granted in 1983 and 1984 that moved the repayment of the loan back to September 30, 1986. In November 1986, Public Law 99-645 forgave the advances made to the Migratory Bird Conservation Fund through the Wetlands Loan Act.

Acquisition of the first Waterfowl Production Area took place on January 19, 1959 when McCarlson WPA was purchased in Day County, South Dakota. After the 1961 Wetlands Loan Act was passed, approvals were sought by the Service for fee and easement acquisition from States within the Prairie Pothole Region with varying degrees of success. Service acquisitions varied from state to state and ranged from statewide blanket approval of easements to case by case approvals for both fee and easement acquisitions. Eventually the Service obtained authority to acquire Waterfowl Production Areas and/or wetland easements in 198 counties within the Prairie Pothole Region.

From 1958 through 1962, all wetland easements acquired by the Service were for a term of 20 years. Since that time the perpetual easement has become the standard wetland easement offered by the Service. In 1991, the Service began to purchase perpetual grassland easements in consort with existing or new wetland easements.

Wetlands Management Districts (WMD) were created in 1962 as the SWAP accelerated due to the appropriations made available through the Wetlands Loan Act. Today, 37 WMDs throughout the Prairie Pothole Region administer and manage fee title Waterfowl Production Areas and wetland and grassland easements acquired as part of the SWAP. Approximately 95 percent of these fee and easement lands are located within the prairie pothole states of Minnesota, Montana, North Dakota and South Dakota. The long term landscape level habitat

preservation efforts of the SWAP are of national significance and must be continued. Since the beginning of the program in the late 1950's, over 3 million acres of wetlands and grasslands have been protected, over 2 million acres of which is protected with easements.

## A. The Region 6 Easement Program:

Conservation easements used in the Prairie Pothole Region emanated from the conservation philosophy of protecting large landscapes for wildlife resources, particularly waterfowl. The pothole region has been and continues to be the most important landscape within the continental U.S. for breeding waterfowl.

The Service first implemented this landscape approach by acquiring "no burn, drain, fill, or level" easements on wetlands and acquiring fee title interests in wetlands and uplands. The programmatic guidance for the program was designed to protect large complexes of a diversity of wetlands with easements and provide waterfowl brood habitat and upland nesting cover with fee acquisition. The concept behind this approach was protection of landscapes for waterfowl production while minimally affecting the farming and ranching economy.

In late 1991, the Migratory Bird Conservation Commission approved a proposal by Region 6 for the purchase of easements designed to protect grassland habitat, while minimally affecting the farming and ranching operation. The grassland easement document further advanced the philosophy of protecting working landscapes in the agricultural environment. Region 6 developed a grassland easement that prohibited conversion of grassland to cropland, limited cutting of hay from grassland until after the prime nesting season (July 15th), but did not limit livestock grazing practices. The refuge managers, biologists, and realty specialists who devised the easement made a clear choice to minimally restrict agricultural practices on large blocks of grassland, while clearly prohibiting the conversion of such grassland to cropland. The biological foundation for this policy decision was found in data revealing the importance of upland grasslands to successful nesting of waterfowl.

The first grassland easement manual, approved in 1992, further advanced the underlying philosophy that grassland easements would protect larger blocks of habitat while (1) allowing "normal" agricultural activities (i.e., working farms and ranches), (2) allowing non-cropland related agricultural development, (3) restricting urban subdivision and development, and (4) not restricting mineral rights such as sand and gravel rights by the easement. The Service wanted to tightly control any conversion of grassland to cropland, but wanted flexibility to allow small and minor changes the landscape that related to agriculture uses.

The 1992 and 1997 versions of the grassland easement manual reinforced this approach of flexibility by providing specific guidelines for easement managers to permit small foodplots, small shelter belts/tree rows, construction of stock-watering facilities, reseeding of grasslands, and early mowing. In addition the policy recognized that the easement did not encumber any minerals, including sand and gravel. However, the easement manager was advised to treat mineral development similar to subsurface outstanding oil and gas rights; i.e., issue a permit for site occupancy with conditions for disturbance and restoration, but not prohibiting the extraction.

The founders of the document and writers of policy declared their intent on managing this rather restrictive phrase by incorporating into the 1992 and 1997 policy the flexibility to allow "minor changes" in the easement up to 5% of an easement. Their intent was to apply flexibility to the easement by allowing many agricultural structures and other surface disturbances using flexibility via an easement permit.

The Service intended the grassland easement and management policy to reflect a partnership between the Service and the surface owner of the property. It was the desire of the founders of the program to apply reasonable flexibility in managing the large number of easements across large landscapes.

The Service has a long and contentious history in the Prairie Pothole Region, notably North Dakota. The basis for any of this controversy is rooted in the conflicting uses of land for agricultural versus land for wildlife habitat. For example, in the 1950's through the 1960's, there were government agricultural programs subsidizing wetland drainage, while another federal agency, the Service, was trying to develop programs to save wetlands.

The prairie states lead the nation in the production of several agricultural commodities such as small grains; but also these same states, this same region, lead the country in migratory bird production, very importantly – waterfowl, more specifically ducks. These realities pose the challenge to protect important migratory bird habitat with programs that have the potential to be effective, and be successful on a landscape basis within the context of a competing land use. Operating a functional and effective program within the framework of conflict and staying operational through legal challenges which reached the United States Supreme Court, through state and congressional political interference including that of local agricultural groups and individual protests, has demonstrated the program's viability.

In light of these many and varied challenges, the Service has been successful on the front of wetland and grassland conservation, protecting nearly 3 million acres of critical migratory bird habitat with perpetual agreements. This particular program has passed the test of time with a recent anniversary of 50 years.

However, the total challenge is far from being reached, and the Service has defined a Conservation Strategy that calls for approximately an additional 1 million acres of wetlands and 10 million acres of grasslands yet to be protected to sustain current levels of breeding waterfowl. It could be best phrased as "what we have protected is important - what is left to protect is critical." The need to continue to have a functional and effective grassland and wetland protection program cannot be overstated. The Service's easement program is the only game in town relative saving wetlands and grass, notably on a landscape basis.

A program direction that has led to the success of the past and will no doubt play a critical role into the future is how administration, the delivery of the program on the ground, is handled. Can the program continue, as it has for 50 years, within the onslaught of opposition forces and dodge the political and special interest efforts to stop or curtail the program?

What has proven successful can be best defined as "reasonable accommodation," this in term of how the Service manages the program in relation to requests for the modification of easement interests. For example, the current easement program has such a large footprint on the landscape, that basically any road, pipeline, transmission line, etc. has a good chance of intersecting a wetland or grassland easement. Most recently, the advent of wind development has posed the challenge of how the administration of easements is addressed. Then there are individual landowner issues with flooded driveways or a coral for ranching purposes which all lead to the question of how the program allows or does not allow these uses. The premise, or management direction, is reasonable accommodation. That management direction is the central theme of this Manual and is succinctly described within the flowchart in Chapter XII.

The word "reasonable" is included within this direction to ensure that the purpose and value of the easement is not sacrificed in any accommodation of a request. Because the easement does protect wetland and grassland resources that benefit migratory birds, those values must be a primary consideration. One of several filters included within the flowchart requires an evaluation of a requested use as it relates to the integrity of the easement. If a determination is such that the very integrity of the easement would be sacrificed, then the requested use will not be allowed.

The foundation for this "reasonable accommodation" direction is multi-faceted. First, and most importantly, the protection to grass and wetlands afforded by the easement program has broad-based public benefits. Obviously to the intended purpose of the program as it relates to breeding migratory birds, but also to those ancillary values of landscape health which are also significant. There is a "public good" benefit to the program, and with those values comes public interest and support. Carrying forth that general concept, the easement program is not only great for duck hunters, but also good for clean water for drinking, for keeping water on the landscape and not in someone's basement, and for maintaining erodible soil in grass rather than silt in natural waterways. In management of the program, we must consider both the public values provided by the program and the values of requests for uses. We do want to consider that public good benefits are provided through a water distribution line that needs to cross a grassland easement or a wind project that produces and delivers clean energy. Those activities are in the interest of the greater public good, and need to be considered within that context in the Service's evaluation process.

Additionally, the easement agreement is not an extensively encumbering document. The Service has, with a wetland easement, acquired only the rights from the landowner to drain, burn, fill or level wetlands and with a grassland easement, to basically keep grass "green side up" with only a limitation on when the landowner can hay. The easement was never intended to control or limit traditional farming and ranching activities, or the ability of a landowner to make modifications or potentially access additional income (e.g., as is possible with wind development). To exercise a more absolute limitation on requested uses would be extending beyond the basic context of the easement agreement.

Another basic concept of the easement agreement is the direction of cooperation as specifically noted in the agreement; i.e., the landowner will cooperate. The Service has always recognized the inherent need to address such an extensive program as a partnership or cooperative venture with the landowner. Formal agreements with past Governors of North Dakota, for example, reference specific actions with easements that will facilitate a partnership to protect wetland and grassland resources. Obviously taking a more restrictive approach to considering requested uses would be counter to specific efforts to build a foundation of the program as a conservation effort that is willing to work with farming and ranching interests. Private landowners hold the majority of wetland and grassland resources within their management and control. Resource managers need to recognize this reality and consider this fact in developing management programs and policies.

As noted above, the current program has a large footprint on the landscape and with the Conservation Strategy's additional goals, it is intended that the scope of the program will continue to increase. With this extensive nature of the program, basically all development type activities such as roads, waterlines, utility projects, etc. come into contact with easements. This reality has to be recognized and considered into management direction, as it has with "reasonable accommodation." The Service does not want to be the reason that "progress," in the eyes of landowners and the public, comes to a halt. To do so would quickly result in very active, and no doubt successful, political effort to curtail or stop the future viability of the program.

In summary, the Service has a very well-defined, biologically-based strategy that calls for the additional protection of wetland and grassland habitats essential for the future of migratory birds; most-notably waterfowl in the Prairie Pothole Region of the U.S. The Service's easement program provides the most feasible and proven vehicle to accomplish those habitat protection needs; and, there are no current or foreseen alternative habitat protection efforts or programs that are long-term or extensive in nature. The continued success, viability and critical need of the easement program are apparent, but it has to be recognized somewhat precarious as political or special interest opposition, or landowner interest in the program, could de-rail protection opportunities. The "reasonable accommodation" approach to administration of the easement program is necessary to provide the best opportunity for continue success of the most successful landscape based conservation effort in North America.

## B. <u>Easement Manual Background:</u>

At the beginning of the Program over 50 years ago, the Service believed that easements would require little or no maintenance or enforcement efforts. However, it soon became apparent that in order to protect the government's interest in these easements, a more systematic approach was necessary for easement administration and enforcement. A number of manuals have been developed to help guide Refuge Managers with this responsibility. These guidelines provide that approach for Region 6. This manual is a revision of the 2005 Region 3/Region 6 "Administrative and Enforcement Procedures for FWS Easements" and replaces previous versions of the following manuals:

- The 1987 Easement Enforcement Guidelines (wetland) developed for Region 6.

- The 1992 (revised in 1997) Administrative and Enforcement Guidelines and Procedures for Perpetual Grassland Easements for Region 6.

- The non-formalized guidance issued for administration of Farmer's Home Administration (FmHA) easements and deed-restricted properties, and

- Various policy letters and memos issued by each Region addressing specific easement issues.

The intent of these revised procedures is to standardize how Service personnel collect and preserve information and make decisions in order to effectively enforce the terms and conditions of the easements. Given a set of circumstances, wetland managers in all three Prairie Pothole states in Region 6 should follow similar processes for making decisions regarding easement administration and enforcement. In addition to enforcing the easement agreements, these guidelines also provide information on how the Service's Compatibility Policy relates to the administration of "less than fee title" interests. These guidelines allow individual wetland managers some flexibility to adapt the procedures to unique situations. These Administrative and Enforcement Procedures are mandatory. They are effective immediately and are considered a minimum requirement.

This manual establishes procedures that managers must use to guide the administration of easement interests. Some activities are expressly prohibited; others are authorized under specific circumstances. Where a requested activity is authorized, that request must be honored within the limits of the guidelines, unless the manager can articulate why the request should be denied. This is required to insure consistent application among field stations and states.

This manual should be viewed as a "living document" and will therefore need to be revised or amended as new information or issues arise. Region 6 has established a standing "Easement Manual Committee" which meets as needed to consider necessary changes or amendments to what is represented in this manual. Future changes and/or amendments to this guidance recommended by the Easement Manual Committee will be sent out under the signature of the Regional Chief of Refuges.

**APPROVED:**

Richard A. Coleman 3/25/10

Richard A. Coleman, Region 6 Date
Chief of Refuges

# CHAPTER II

# REFUGE COMPATIBILITY
and how it relates to
# EASEMENT INTERESTS
and
# OTHER REGULATORY REQUIREMENTS

The concept of Refuge Compatibility existed prior to1920, but the National Wildlife Refuge System Administration Act of 1966 really brought compatibility issues to the forefront, and required managers to consider and evaluate compatibility every time they were confronted with a proposed "use" of the refuge, or the refuge area, including Service land interests known as Easements. The 1966 Act established that "any use of the refuge **must** be compatible with the purposes for which the area was established."

The passage of the Refuge Improvement Act in 1997 strengthened Compatibility directly, but also resulted in a new Service policy on Compatibility that was developed and finalized in 2000. This policy included some major changes for managers evaluating whether proposed uses are compatible.

In addition to refuge or unit purposes, the "fulfillment of the MISSION of the National Wildlife Refuge System (NWRS)" was added as criteria under which to evaluate compatibility. The public is now afforded a due process provision, and must be provided an opportunity to comment on compatibility issues. Probably the most significant change is that compensatory mitigation can no longer be used to achieve compatibility, except under very limited circumstances, which are discussed later. Under the 1992 policy on Compatibility, mitigation was authorized to offset long term and unavoidable impacts to Service lands. This practice was used for many years to accommodate requested uses of refuge system lands for projects such as highway improvements.

The 2000 policy on Compatibility does not allow compensatory mitigation to make a proposed use compatible, **except** that a process of "replacement of lost habitat values" may be used for minor expansions or realignments of **existing** Rights-of-Way. This is the only circumstance under which a form of mitigation can still be used to achieve compatibility (see Chapter XIII). ALL other proposed uses or requests for use on National Wildlife Refuge System lands **MUST** be compatible, with or without stipulations, or the use must be denied.

Wetland managers are often confronted with an array of issues and proposed projects, including: highway improvement projects, utility line crossings, rural water system installations, oil and gas exploration, and farm site expansions; and now there are new uses on the horizon such as wind energy developments which will continue to challenge wetland managers for many years to come. The purpose of this chapter is to provide guidance on how to make decisions as these issues arise, consistent with Compatibility policy requirements.

In general, Compatibility applies anytime Wetland Management District (WMD) personnel are required to evaluate a proposed use of a "refuge" or Service land interest. Personnel should always ask: "Does the Service have the jurisdiction or authority to permit or deny the proposed use?" If the answer is Yes, then Compatibility always applies, and a Compatibility Determination (CD) should be completed to determine if a proposed activity is compatible.

Requests can, however, be denied without completing a CD. In 2006, the Service adopted the Appropriate Use (AU) Policy (603 FW 1). This policy clarifies and expands on the compatibility policy which describes when managers should deny a proposed use without determining compatibility. The AU policy describes the initial decision process a refuge or district manager must follow when first considering whether or not to allow a proposed use on refuge lands, including easements. The manager must find a use is appropriate before undertaking a compatibility review of the use. If a proposed use is found not appropriate, then the use will not be allowed and a compatibility determination will not be prepared. By screening out proposed uses not appropriate to the refuge, the refuge manager avoids unnecessary compatibility reviews. Exhibit II-9 contains complete guidance on the implementation of the AU policy. Exhibit II-10 contains Form 3-2319 which is used to determine the appropriateness of a proposed use.

A copy of the current CD format can be found in Exhibit II-1. The tendency for most managers is to come to a quick mental compatibility decision when initially evaluating an issue, but the CD form is a stepped, systematic process that must be completed to: (1) come to a logical and justifiable conclusion on compatibility, (2) document the decision, and (3) obtain Regional Office concurrence with the decision on refuge compatibility. The September, 2000 Refuge Compatibility Training Manual has more detail on how to complete a CD, starting on page 30.

Activities determined to be "refuge management activities" whether conducted by the Service or by cooperators, contractors, etc. are exempt from the compatibility process. However, "refuge economic uses," even though they may qualify as a "refuge management activity," are NOT exempt from compatibility. In fact, these activities must meet a higher standard of compatibility. Refuge Management Economic Uses are described more fully below in this Chapter, and in Chapter XII. See the Compatibility Manual and Chapter XII of this manual for further information on these activities.

Under the 2000 Compatibility Policy, managers must now consider how a proposed use will affect the purposes for which the area was acquired and how a proposed use may impact the Mission of the National Wildlife Refuge System. For limited real property interests (e.g., wetland and grassland easements), the specific rights acquired by the Service also relate to compatibility. Specifically, the policy states: "Compatible use means a wildlife-dependent recreational use or any other use of a refuge that, in the sound professional judgment of the Director [Wetlands Manager], will not materially interfere with or detract from the fulfillment of the mission of the NWRS or the purposes of the refuge." [The terms used in this section are defined in the Refuge Compatibility Manual and in the Compatibility Policy].

**Purposes** and/or acquired rights for the various land categories administered by the Service may vary, but the **mission** of the NWRS remains the same:

> **"The mission of the System is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans."**

There are listed **Purposes** for Waterfowl Production Areas and Easements. They are as follows:

> "...as Waterfowl Production Areas" subject to "...all of the provisions of such Act [Migratory Bird Conservation Act] ...except the inviolate sanctuary provisions..." 16 USC 718(c) (Migratory Bird Hunting and Conservation Stamp);
>
> "...for any other management purpose, for migratory birds." 16 USC 715d (Migratory Bird Conservation Act);
>
> "...for conservation purposes..." 7 USC 2002 (Consolidated Farm and Rural Development Act).

These purposes are derived from the legislation authorizing the Small Wetlands Acquisition Program. Following is an excerpt from the 1958 amendment to the Migratory Bird Hunting and Conservation Stamp Act of 1934:

> "The Secretary of Interior is authorized to utilize funds made available under subsection (b) of this section for the purposes of such subsection, and such other funds as may be appropriated for the purposes of such subsection, or of this subsection, to acquire, or defray the expense incident to the acquisition by gift, devise, lease, purchase or exchange of, small wetland and pothole areas, interests therein, and rights of way to provide access thereto. Such small areas, to be designated as 'Waterfowl Production Areas' may be acquired without regard to the limitations and requirements of the Migratory Bird Conservation Act, but all the provisions of such Act which govern the administration and protection of lands acquired thereunder, except the inviolate sanctuary provisions of such Act, shall be applicable to areas acquired pursuant to this subsection."

Equally important, however, when dealing with the limited real property interests administered by the Service, are the acquired rights or the land interests which contribute to the definition of the "refuge" or "refuge area." These are discussed in detail in the next chapter. The above-cited purposes refer to "waterfowl production areas" whether the Service interest is fee-title or easement, purchased under the authority of the Migratory Bird Conservation Act. It may be more accurate to say that these **Purposes** refer more to the entire Small Wetlands Program, authorized by the 1958 Amendment, rather than individual WPA's. However, to determine if Compatibility applies, one must evaluate whether the proposed use may affect a specific right acquired by the Service. Any proposed use of easements must be evaluated according to the criteria of not materially interfering with or detracting from the Purposes, but only to the extent that the proposed use affects an **acquired interest**. In essence then, what is actually being evaluated under compatibility for less-than-fee-title interests are potential impacts to the interests acquired with the easement. The Compatibility Determination flow chart (Exhibit II-2) screens

out potential issues which do not impact rights acquired by the Service early in the process. The discussion found in **50 CFR 25.44** is also very helpful for guidance on compatibility issues involving limited property interests, as well as when Rights-of-Way and other permits are required.

As will be observed on the Appropriate Use Form 2319 and the Compatibility Flowchart, there are several areas where wetland managers can deny proposed uses without completing a compatibility determination. One is if the proposed use conflicts with any station goal or objective as found in an approved refuge management plan. Another is if the proposed use conflicts with other resource or management objectives. This provision allows managers to deny proposed uses, without having to complete a CD. The easement program goals for the Prairie Pothole Region are listed in Exhibit II-3. Managers must also evaluate Associated or Secondary Impacts as part of the evaluation process. These are defined more fully in the 2000 Compatibility Policy [Section 2.11 B(3)], and in Chapter XII-Section B7 of this Manual.

There is great variability among all the easement documents administered by the Service within the Prairie Pothole Region in terms of the acquired interests. There is also considerable variation among the programs administered by various regions. For example, the interests acquired by a Region 6 Grassland Easement are very different from the interests acquired by a Region 3 Wildlife Habitat Easement, even though the program intents are nearly identical. The interests acquired by various Conservation Easements are very different from the other easement instruments, and the interests retained by the FmHA deed restriction program are not only different among regions, but also different among states of the same region! Even though different interests are acquired under virtually every easement program document, refuge compatibility relates to them all in essentially the same way. Managers must begin decisions with the following question:

- Determine if the requested use or activity will impact one of the interests acquired by the Service. In other words, does the Service have the legal authority to permit or deny the proposed activity?

- If the answer is yes, then the Appropriate Use and Compatibility Policies probably apply, and a Compatibility Determination must be made, unless the use is denied without the benefit of a CD.

The 2000 Compatibility Policy also changed the way managers must evaluate <u>economic</u> <u>uses</u> of refuge areas; the threshold of not materially interfering with or detracting from has been elevated, and now we must determine that a use "contributes to the achievement of the national wildlife refuge purposes or the National Wildlife Refuge System mission." Again, the only way this new threshold will apply to easement areas is if the Service has purchased the rights to restrict any of the defined (or other) economic uses, and there is consideration of permitting the restricted activity.

Any authorized economic use of refuge areas (including easements) must benefit the refuge area and not just result in a "non-material" impact. This is discussed in the more recent editions (post-2001) of 50CFR, Part 29.1. Economic uses are defined in this citation as: "grazing

livestock, harvesting hay, and stock feed, removing timber, firewood or other natural products of the soil, removing shell, sand or gravel, cultivating areas, or engaging in operations that facilitate approved programs on national wildlife refuges" [or refuge areas].

All easement documents also have a "subject to" section which provides exceptions to the acquired interests. These include statutory rights-of-way for road maintenance, and/or reserved or excepted rights which pre-date the easement. The government's interests, then, are acquired subject to outstanding rights which may be held in third party. Managers should be familiar with the exceptions to acquired interests. These reservations are generally not itemized on individual easements. Managers can find them in the servicing Realty Office by reviewing the title insurance retained in the title file of each easement agreement; however, there are some easement agreements without title insurance. Proposed activities or uses which are authorized as a result of a reservation or an assignment in the easement agreement are not subject to compatibility requirements.

## GENERAL NEPA GUIDANCE:

In 2009, Region 6 released guidance to field staffs regarding NEPA and how it relates to the American Recovery and Reinvestment Act of 2009. This guidance has proven very helpful and contains many of the same resources that were included as exhibits in the 2005 version of the Easement Manual. Therefore, it has been included as the new Exhibit II-5 in this Manual, which replaces Exhibits II-5 through II-8a from the 2005 Manual.

The following guidance was provided in 2005 by Region 3 Environmental Coordinator, Jeff Gosse, with a few additions from then-Region 6 NEPA Coordinator Connie Young-Dubovsky:

It is difficult to summarize the National Environmental Policy Act (NEPA) in a few paragraphs, so the best advice that can be provided is to contact your Regional Environmental Coordinator (REC) whenever managers are in doubt. Their names and phone numbers are included in Exhibit II-4. There are a few basic generalities that can help guide managers. Along with the concept of "calling" NEPA specialists, is the concept, "call early." NEPA and other compliance requirements are to be started early so adjustments can be made easily if necessary. Any project will be more difficult to complete when done at the last minute. Three basic premises of NEPA are: 1) It is a planning process for environmentally sound decisions; 2) The Service must inform public officials and citizens prior to making decisions or taking action; 3) The Service must fully disclose our actions and impacts. At the categorical exclusion level of action, we don't always accomplish item 2. It should be remembered that determining that an action should be categorically excluded still falls under the NEPA umbrella and while a categorical exclusion may not have impacts to disclose, we should document that we have considered all potential impacts. In cases where there may be some doubt whether a categorical exclusion is appropriate, or if the action potentially could generate public controversy, we do sometimes include public disclosure and seek comment. In all cases, we are to complete NEPA and other compliance prior to taking action.

**When does NEPA apply?**

The simplistic answer is that NEPA applies to every action that the agency takes (with a Federal nexus). However, the Service obviously doesn't do NEPA documentation every time a light switch is turned on. Most basic actions including operating an office and personnel actions are covered under the Departmental categorical exclusions (Exhibit II-5, page 8), and, typically, these are not documented. When an action is contemplated that is beyond these very routine duties, particularly where there is a possibility of having environmental impacts, it is best to document that NEPA and other appropriate compliance has been addressed. Actions that probably should be documented include, but are not limited to: granting permits for special uses, granting of rights-of-way (ROWs), creation and reclaiming of wetlands, earth disturbing activities, any activity that has a potential to impact a listed species or migratory birds, changes in public use, and most actions that would require a compatibility determination. In order to address repetitive actions, some stations will combine a list of similar actions to cover a year's activities and have them covered with a single categorical exclusion form. Region 6 currently addresses each action separately but is working towards streamlining NEPA activities which could mean combining projects under one categorical exclusion in the future.

**What are the levels of NEPA compliance?**

Basically, there are only three levels of NEPA review that are available to cover Federal actions from building an interstate freeway to breaking a drainage tile. An action may be categorically excluded if it is listed as a categorical exclusion in either the Departmental categorical exclusions (Exhibit II-5, page 8) or the Service's categorical exclusions (Exhibit II-5, page 10). In order to utilize one of these categorical exclusions, the Departmental Extraordinary Circumstances (Exhibit II-5, page 14) must be reviewed to ensure that none of them apply (revised Departmental Categorical Exclusions were published in the *Federal Register* on Monday, March 8, 2004. At the same time, the Department's "Exceptions to Categorical Exclusions" were revised, published, and renamed to "Categorical Exclusions: Extraordinary Circumstances." The concept remains the same. If any of the Extraordinary Circumstances apply, a categorical exclusion cannot be used for a proposed action). Service actions can qualify under either Service categorical exclusions or Departmental categorical exclusions, although the former tend to be more applicable to our actions than the latter. The Departmental Extraordinary Circumstances must be considered for any categorical exclusion that is being proposed. Interpretation of categorical exclusions is not always straight forward, and consulting with the Regional Environmental Coordinator (REC) is advised for confirmation. If a categorical exclusion does not apply to the proposed action, or if one of the Extraordinary Circumstances negates the categorical exclusion, then an Environmental Assessment (EA) needs to be prepared. Most Service actions are covered by categorical exclusions and the vast majority of Service actions will be covered by either a categorical exclusion or an EA. For less than 1% of our actions, an Environmental Impact Statement (EIS) may be required. Most Service personnel will never need to assist in preparing an EIS. A very few Service actions relating to the listing, de-listing, and developing recovery plans under the Endangered Species Act don't undergo NEPA review as a result of court decisions. If an action is already covered by an existing EA (e.g. the action was covered in the EA for the CCP), it is still best to document that the action has already been addressed in an existing NEPA document. Contrary to popular belief, addressing a specific

action in an EA doesn't convert the action to a categorical exclusion; it simply is an action that has already been addressed in an existing NEPA document.

**How is compliance documented?**

If managers want nice specific answers, then just skip this paragraph. The method of documentation is going to vary by Region, by Division, by action, and over time. However, to paraphrase a mechanic's saying that, "any oil is better than no oil," any written documentation is better than no documentation. While there are specific forms for specific circumstances, the fact that stations have something written in their files is far more important than which form was utilized. The NEPA Compliance Checklist (Exhibit II-5, page 17) is a good form to document any categorical exclusion and can also be used to document that an action is covered by an existing EA. The Environmental Action Statement (Exhibit II-8b) is used for approval of a new EA and can be used to document compliance with a categorical exclusion or existing EA. There are other various forms that are used within Refuges to document compliance with categorical exclusions. If the documentation needs to go into the Regional Office for approval, it will get the additional required signatures there. For projects that do not need Regional Office (RO) approval (this varies too widely to document here), ensure that the form is signed by the Wetland Manager and kept in the files. It should be noted that Departmental Order (DO) 127 requires the REC's signature for grants unless special provisions have been made. All EAs and EISs require a signature by the Regional Environmental Coordinator (REC) and ultimately from the RD. For many actions, a Section 7 (listed species) form will also be required and Section 106 (archeological review) documentation may also be necessary.

The FWS website http://www.fws.gov/r9esnepa/ provides very useful information about NEPA and general managerial responsibilities when evaluating potential impacts associated with proposed uses.

## GENERAL CULTURAL RESOURCE (CR) GUIDANCE FOR EASEMENT INTERESTS:

Federal agency responsibilities under the Archaeological Resource Protection Act (ARPA) and the National Historic Preservation Act (NHPA) for limited property interests (easements) are not the same as for the fee-owned properties. The Fish and Wildlife Service acquires easements from private landowners to protect wetland and grassland habitats, not for the cultural resources which may or may not be on the property encumbered by the easement interest.

Activities normally associated with easement properties are not usually considered "undertakings" under Federal cultural resource laws. Private landowners may do what is necessary to manage their property without the need to comply with Federal cultural resource laws. These laws, however, do come into play for easement properties when either a project is completed with Federal funding, or for which there has been a permit issued authorizing the work, or both. Therefore, projects federally funded on private lands (i.e., Partners for Fish and Wildlife Program) are subject to NHPA requirements and need to be evaluated. Also, any activity for which managers issue a Permit will also be subject to Section 106 of NHPA. These activities are generally restricted to ground surface disturbance-type activities (permits for dugouts, shelterbelt establishment, wind generators, highway improvement projects, utility line

crossings, etc.). When a request is received, managers must evaluate whether the Service has jurisdiction. If we have no jurisdiction, then no permit is needed, and no CR compliance is necessary. An example would be a landowner who wants to build a house on an upland site where the land is encumbered with only a wetland easement.

Many of the projects requested by other entities (DOT, utility companies) will have CR evaluations already considered, but managers must insure that these issues are addressed before issuing a permit, and should be reviewed for sufficiency by your regional CR staff.

Further guidance on the procedures for cultural resource reviews was prepared by Region 6 Archaeologist, Meg Van Ness, in 2008 and can be found in Exhibit II-11. The following synopsis was gleaned from this guidance and is printed here for convenience:

*"Legally, if a project is determined to be an undertaking on easement lands all of the provisions of NHPA are potentially applicable. In the case of easement lands, emphasis should be placed on undertakings that:*

1. *Have the potential to harm historic properties.*

   *To find out about known cultural resources in the project area contact one of the three cultural resource staff and they will review their records and possibly request a file search through the SHPO. They will know if there is a previously recorded historic property or if there has already been a survey of the area. Information on the age and eligibility of many cultural resources can also be found in RPI. They will also have some insights about the need for a survey if there is a potential for cultural resources.*

2. *Are large in size.*

   *Although this is difficult to define, if a project is going to disturb more than about five acres or if the project components are going to cover more than about ¼ mile (wind towers, pipelines, roads, ditches, etc.) it is probably in the large category. If in doubt whether the project needs review please call the cultural resource person for that state.*

3. *Have a high public profile or are potentially controversial.*

   *If there are members of the public or other agencies who are concerned about the project we may do a survey even if the chances of affecting a cultural resource are very slim."*

Consult with your regional Cultural Resources staff about CR responsibilities. They are ultimately responsible for compliance with these laws and policies. Their addresses and phone numbers are found in Exhibit II-4. The FWS website: http://refuges.fws.gov/cultural/links.html also provides useful information about Cultural Resource responsibilities.

It is important to remember that Refuge Appropriate Use, Compatibility and NEPA apply to limited real property interests (generally termed as "easements") just as strongly as fee title lands (national wildlife refuges and WPAs). Cultural Resource responsibilities are somewhat less for easement interests, but may also apply under certain circumstances. When confronted with a

requested use of an easement area under your administration, and these regulatory requirements need to be evaluated, consider the following recommendations:

- Review the Refuge Compatibility handbook, including the Policy on Refuge Compatibility finalized in 2000. Website: http://www.fws.gov/policy/603fw2.html

- Compatibility must be evaluated against the Apurposes@ for which the area was established/acquired as well as the Mission statement for the NWRS. For easement interests, the Arights@ acquired or transferred to the Service may be more useful.
- Review the easement document to determine the property interests acquired by the easement, particularly for FmHA Conservation Easements.

- Call your servicing Realty Office to inquire about outstanding rights or reservations which will be delineated in the title insurance for each document.

- Use the "Finding of Appropriateness" (Form 3-2319, Exhibit II-10) and Compatibility Flowchart (Exhibit II-2) to help in the process.

- If a requested use impacts a property interest held by the Service, then a Finding of Appropriateness and Compatibility Determination will need to be developed to evaluate the use and to determine whether it is appropriate and compatible. Programmatic CDs are available in each region for use, if they apply. Denials for other reasons do not require a CD.

- The requested use must be compatible on its own, or through stipulations.

- Compensatory mitigation can no longer be used to achieve compatibility, except in cases of minor expansions or realignments of existing ROWs.

- For permitted economic uses, the compatibility threshold has been elevated from a "non-material" impact to the need to "contribute" to the Mission of the NWRS, and the purposes of the refuge area. Review 50CFR, Part 29.1 for more specific information.

- Consider NEPA requirements, Section 7 (Endangered Species Act) requirements, and Cultural Resource issues associated with Section 106 of the National Historic Preservation Act.

- Consult with your regional resource specialists for NEPA, Cultural Resources, Endangered Species, and Compatibility.

- Allow sufficient time for Regional review and approval.

The specific property interests acquired by the Service for each type of easement document are discussed in Chapter III, Easement Terms and Acquired Property Interests.

# CHAPTER III

# EASEMENT TERMS
# and
# ACQUIRED PROPERTY INTEREST

This chapter will discuss the terms and acquired rights for the following easement documents:

- Wetland Easements
- Grassland Easements
- FmHA deed restricted easements

## Wetland Easements:

The Wetland Easement program began in the early 1960's. Over the history of the program, there have been multiple Wetland Easement documents, but they generally fall into three categories:

- **Pre-1964 Documents** - These are among the oldest of the perpetual easement agreements. Most, if not all, have a map showing the wetlands and existing drainage facilities. There are generally two versions of these older easements. Some of the easement documents have a paragraph that refers to the map showing "areas of existing marsh vegetation and depressions which may hold water during certain periods..." as well as the presence of "existing drainage facilities..." on the described land, while other contracts do not have this connecting language to the maps. The maps are often referred to as "Difficulty to Drain Maps" as wetlands on these maps have cross-hatching indicating whether they are easy, moderate or difficult to drain.

  **Documents Containing Connecting Language to the Map:** The protected wetlands are those shown on the map. If a wetland is on the ground, and not on the map, it is not a protected wetland. See Exhibit III-1 for an example of this type of wetland easement and map.

  **Documents Without Connecting Language:** The protected wetlands include ALL wetlands, including those that may have been missed when the map was drawn. There may be instances where a Drainage Facility Map (DFM) is appended to this type of easement document; if so, then the wetlands exhibited on the DFM are not subject to the terms of the easement agreement. See Exhibit III-2 for an example of this type of easement and map.

  See Chapter XI, Specific Mapping Instructions, for additional discussion on Pre-1964 maps. The wetlands which are protected by the easement will need to be mapped according to the instructions found in Chapter XI of this manual. After the wetlands are

mapped, then only the wetlands occurring on the map are protected by this category of easement.

- **Pre-1976 Documents -** These documents protect ALL wetlands "occurring or reoccurring due to natural causes" on the described property, except those which may be illustrated on an attached map known as a Drainage Facility Map (DFM). The DFM illustrates wetlands that are either already drained, or are intact, but deleted from the provisions of the easement agreement. There are two types of DFMs that were used to show which wetlands were not protected in an easement contract. The first type of DFM has dashed-line circles with arrows extending from the circles. The second type of DFM includes maps indicating open ditches with solid arrows, where there are no dashed lines identifying the wetlands deleted from the easement. These DFMs are a compilation of arrows identifying locations with open ditches, which may be maintained. Variations of this DFM include wetlands shown in dashed lines with no arrows and wetlands shown in dashed lines with the letter "D" inside the shape. All wetlands shown on the DFM are deleted from the provisions of the easement whether drained or deleted. If there is no DFM attached to the Pre-76 document, and no "exception" language in the document, then there are NO deleted wetlands, unless specific wetlands have been administratively deleted and documented as such in the file. See Exhibit III-3 for an example of a Pre-76 easement and accompanying drainage facility map.

  Case law resulting from a 1997decision in North Dakota (Johansen), and upheld by the 8th U.S. Circuit Court of Appeals, now requires that the Service is entitled to protect the wetland acreage which appears on the Easement Summary sheet. Additional guidance on this issue and the resulting "mapping" requirements are found in Chapter XI of this manual. This 8th Circuit decision applies both in North Dakota and South Dakota of Region 6. This decision also applies to Pre-76 wetland easements in Minnesota. Even though Montana is not officially within the 8th Circuit decision, they will also abide by the "mapping requirements." Mapping of Pre-76 easements needs to be completed for law enforcement issues and landowner requests.

- **Post-1976 Documents -** These wetland easements have an attached Exhibit A, which shows the wetlands protected by the easement. The Johansen decision does not apply to Post-76 easements. A statement printed on the Exhibit A states that "lands covered by the conveyance include any enlargement of the delineated wetland areas resulting from normal or abnormal increased water." Therefore, on Post-76 easements, the wetlands shown on the Exhibit A, and any enlargements thereof, are protected by the easement. See Exhibit III-4 for an example of a Post-76 easement document and the attached Exhibit A. The language in the easement document and the statement just above the landowner's signature on the Exhibit A provide for normal fluctuations in water levels in protected wetlands. Under ordinary circumstances, the Service is entitled to protect the entire wetland basin. If a request is made to reduce water levels strictly for farming or convenience, then the request must be evaluated under the "extraordinary circumstances" part of Chapter VII-C.6, "Topping-Off Protected Wetlands."

- **Post-1976 Documents with Wetland Restorations-** Where wetland restorations are involved, the Post-76 Easement Document can have a statement added which references the restorations and the Government's rights relative to the restored wetlands. The restored wetlands may or may not have mean sea level elevations established for them. If MSL elevations are established, they will be identified on the Exhibit A. The following language is incorporated into the easement document when there are restored wetlands included on the Exhibit A: "The United States and its authorized representatives shall have the right to construct, reconstruct, and maintain all wetland restorations structures shown on Exhibit A," and if MSL elevations are established, then the additional statement is added "including the right to maintain structure outlets at the mean sea level (MSL) elevations specified."

  Exhibit III-5 is an example of a Post-76 Easement document with restored wetlands. Exhibit III-6 is an example of an Exhibit A with the MSL elevation information added.

  In addition, common to ALL wetland easement documents (past as well as current versions) is the right of access by authorized Service personnel to inspect, conduct investigations, and determine compliance with the terms of the easement agreement. See Chapter VI-B for more specific property access guidance.

**Acquired Property Interests:** Wetland Easement **purposes** relate to the protection and maintenance of protected basins. Specifically, the property interests acquired from the landowner are their rights to burn, drain, level or fill the wetlands. As a rule of thumb, any proposed use which may drain, burn, level, or fill a protected wetland will need to be pursued as a potential violation or evaluated under appropriate use and compatibility standards. Activities which would occur on the uplands without involvement of protected wetlands are generally not subject to appropriate use or compatibility requirements.

As indicated by the descriptions of the different documents above, when confronted with an issue (either a potential violation or a requested use related to Compatibility) the wetland manager must be sure that the potentially impacted wetland is a protected wetland. If it is a pre-76 easement, managers may have to have the easement mapped (See Chapter XI for further information). If a post-76, then verify the wetland is identified on the Exhibit A.

## Grassland Easements:

The intent of the Region 6 grassland easement is to protect (not manage) grasslands (uplands) encumbered by the easement. In almost all cases, wetlands are protected under a separate Wetland Easement on the same property. The easement does not grant the Service management capabilities in the same sense as owning the land in fee title. The landowner retains the majority of the property rights and is paid only for those rights specified in the easement contract and itemized below. The grassland easement:

1. is perpetual, i.e., runs with the land and is binding on all successors in title;

2. provides a one -time, lump sum payment;

3. protects only those lands legally described in the easement document and described and depicted on the Exhibit A map(s);

4. prohibits any alteration of permanent vegetative cover, including grasses, forbs, and low-growing shrubs except those alterations approved in writing by the District Manager;

5. prohibits agricultural crop production except when approved in writing by the District Manager;

6. prohibits haying or mowing for any reason, including mowing for noxious weed control, until after July 15 without prior written approval by the District Manager;

.

7. authorizes representatives of the United States the right of ingress and egress for purposes of inspecting and enforcing the terms of the easement;

The Grassland Easement document currently in use (Exhibit III-7b) has minor word changes from the document used previously (Exhibit III-7a).

Management rights, such as rotational grazing or other grazing methods, considered desirable to better manage grasslands for wildlife, should be encouraged through an additional contract with the landowner, i.e., a short-term agreement through the Service's Partners for Wildlife program.

Tall Grass Prairie (TGP) easements are acquired using the same easement document, acquiring the same rights. The only difference is the source of funding, Land and Water Conservation Funds and, in some cases, North American Conservation Act (NAWCA) funds are used for the TGP easements. Land and Water Conservation funds are used for these easements and the purpose for acquiring these easements is broader than just "waterfowl."

In addition, common to ALL grassland easement documents (past as well as current versions) is the right of access by authorized Service personnel to inspect, conduct investigations, and determine compliance with the terms of the easement agreement. See Chapter VI-B for more specific property access guidance.

## FmHA Deed-Restricted Easements:

The **Purposes** of FmHA Conservation Easements are as follows:

> "...for conservation purposes..." 7 USC 2002 (Consolidated Farm and Rural Development Act)

Additional **Purposes** are derived from the Memoranda of Understanding with various State Farm Service Agency (FSA) offices, and the 1985 Farm Bill (Food Security Act).

There is probably more variation among FmHA Conservation Easements than any of the other easements administered by the Service. In a few instances, direct fee title transfers to the Service occurred, but generally, only certain rights were conveyed to the Service through deed restrictions granted by the FmHA. These range from full "boiler plate" coverage, where practically all land management rights are retained, to easements where only the wetlands are encumbered, or only the uplands are protected from farming. FmHA Conservation Easements, like the other Service easements, become part of the NWRS after they are recorded; they are subject to the appropriate use policy and compatibility regulations, and must be administered according to the provisions of this manual.

Because of the high degree of variability associated with FmHA easements, when evaluating a compatibility issue or a potential violation associated with an FmHA easement, it is recommended that managers first review the document to determine if the potential violation or requested use may affect a property interest held by the Service. If a property interest has been or will be affected, then proceed as with other perpetual easements.

Common to ALL FmHA easements is the right for authorized Service personnel to access the easement area as described in the document (agreement). See Chapter X for additional information.

Because of this high degree of variability among states and regions, it was decided to provide a general overview of the FmHA program and WMD responsibilities in a separate chapter (Chapter X) and state-specific guidance as an insert for each state. These have been prepared for the states of North Dakota, South Dakota, and Montana.

# CHAPTER IV

# ACQUISITION OF EASEMENT PROPERTIES

## A. Criteria for Acquisition:

Over the course of the Small Wetlands Acquisition Program (SWAP), different criteria have been used to guide the acquisition process. However, the quality of the habitat has always been the major criterion used. The best waterfowl breeding habitat in the Prairie Pothole Region includes wetland complexes and quality upland nesting habitat in close proximity to one another. Generally, the higher the number of wetlands, the higher the number of waterfowl breeding pairs; and the larger the tract of wetlands and quality upland cover, the better the nest success. These two elements, large numbers of wetlands and large tracts of quality upland habitat, are the cornerstones of the habitat preservation program. Easements represent a means to preserve this habitat.

This program to preserve migratory bird breeding habitat within the upper Great Plains has always been a partnership effort with realty personnel acquiring the easement habitat and WMD personnel administering and enforcing the easement agreements after the acquisition process has been completed. It has been, and will continue to be, critically important for management personnel to communicate with realty personnel acquiring habitat within individual wetland management districts. Managers and realty specialists should continue to work together to ensure that only quality habitats are purchased as easements. For wetland easements, care should be taken to eliminate areas from the easement purchase that do not qualify for the program; e.g. sewage lagoons, stock dams, fish ponds, reservoirs, intermittent streams, coulees, levees, created wetlands and other artificial impoundments. Also, prudence suggests that managers and realty specialists think twice before purchasing wetland easements in areas that will likely be problematic in the future. Examples include wetland basins within curtilage, industrial parks, near airports, or where zoning ordinances foretell of imminent development. For grassland easements, active farm residences (i.e. houses, out buildings, feedlots, etc.) and facilities should obviously be excluded from the easement. Gravel pits, on the other hand, may pose more of a challenge. Certainly, active pits with little to no habitat value should be excluded. However, remnant pits, especially when their boundary is ill-defined, might be included in the easement offer. Realize, though, that the Service in Region 6 does not exercise jurisdiction over the extraction of gravel or other minerals. See Chapter V and Exhibit V-8 for further guidance.

To guide Region 6 WMD Managers and Realty acquisition staff through the process of selecting and prioritizing the best habitats being offered for easement, "decision trees" for grassland and wetland easement acquisition have been developed. These tools are a compilation of different waterfowl, shorebird, and grassland bird surveys. The results of these surveys have been modeled by the Habitat and Population Evaluation Team in Bismarck to predict where the most suitable habitats are located.

Background information regarding the development of these new tools is contained in Exhibit IV-1; the decision trees, priority maps, and new Grassland and Wetland Easement Evaluation Worksheets are included in Exhibits IV-2 a through h. WMD staff must use the decision trees to

evaluate the tract(s) being offered by the landowner. The ranking process used in the decision trees will assign a priority ranking to the tract(s) and this ranking will determine if the parcel is eligible for an easement.

## B. <u>The Acquisition Process</u>:

After the property proposed for easement has been evaluated by Wetland Management District personnel and determined to be eligible for the type of easement to be acquired, the evaluation is passed on to the appropriate Wetland Acquisition Office (WAO).

Once received at the WAO, the evaluation is logged into the regional land acquisition tracking system (LANDS for Region 6). The evaluation is then passed on to one of the WAO Realty Specialists to begin the acquisition process.

The Realty Specialist will contact the landowner and make arrangements to inspect the property for contaminants and finalize the legal description to be included in the easement area. At the same time, the Realty Specialist will explain the easement program and answer any questions posed by the landowner.

The Realty Specialist will then visit the county courthouse to: 1) conduct an abstract of the title to ascertain ownership of the property being proposed for easement; 2) determine if the property taxes are current or if unpaid taxes pose a lien on the property; 3) determine if a court has ordered a judgment against the landowner that involves the property proposed for easement; and 4) determine if a lien has been filed against the property proposed for easement.

Service policy 341 FW 6 on Minimally Restrictive Conservation Easement Acquisition has authorized the use of the Adjusted Assessed Land Value (AALV) administrative calculation. The AALV replaces the easement appraisal process for determining both wetland and grassland easement payments. The AALV administrative calculation is also employed when easement rights are donated or exchanged.

Once the payment for the easement rights has been determined, an offer is either sent or delivered to the landowner. The offer consists of a copy of the easement document, Exhibit A maps of the easement area, and a formal letter with the legal description of the easement area and the rights being acquired and the amount being offered for the easement rights. In addition, a separate document required by Public Law 91-646, known as a Statement of Just Compensation, is included with the offer and contains similar information as the formal offer letter.

If the landowner agrees to accept the offer, the Realty Specialist prepares the easement conveyance document and has the landowner(s) sign it. The case file is prepared at the WAO, title insurance is obtained from the county title company and the case file is sent to the Regional Division of Realty for processing. The Regional Division of Realty prepares additional documents for the case file and sends the file to the Office of the Solicitor for a preliminary opinion of title.

If the Solicitor finds that the information contained in the case file will result in the title to the easement rights being vested in the United States, he will return the case file to the Regional

Division of Realty with no objections and the Chief, Division of Realty for the Region will accept the case on behalf of the Secretary of the Interior.

After the easement has been accepted, the Regional Division of Realty will send the landowner a notice that the easement has been accepted by the United States. A check is then ordered or an electronic transfer of funds will be arranged for the easement payment.

The case file will be returned to the WAO and the easement document along with any documents necessary to transfer the easement rights to the United States will be recorded in the Office of the County Recorder at the county court house. Once these documents are recorded at the court house and returned by the County Recorder to the WAO, title insurance is ordered in an amount equivalent to the payment to the landowner for the easement rights.

When the county title company sends the title insurance for the easement to the WAO, the case file is reviewed by the Supervisory Realty Specialist and approved for payment. Payment is then made to the landowner.

After the landowner has been paid, the case file is sent back to the Regional Division of Realty and then to the Solicitor's office for a final title opinion that officially vests title to the easement rights in favor of the United States.

A microfiche is made of the easement document(s) and Exhibit A map(s) at the Regional Division of Realty Office. The original easement and Exhibit A maps are sent to the Wetland Management District.

The WAO maintains a copy of the easement document and Exhibit A maps in its files. In addition, the WAO will have a copy of the Easement Summary sheet, appraisal or easement calculation sheet, and acceptance letter.

## C. **Official Easement Records**:

The Division of Realty is responsible for the maintenance of all real property records within the Service, and is also responsible for land status records. Although field stations (realty and management offices) may have duplicate files, the official land records are maintained by Realty at the Regional Office level.

These files and records consist of: (1) the statistical record for each parcel of land acquired or interest acquired therein, (2) a status map for each parcel, and (3) the original case file for each parcel. Ultimately, the original documents are forwarded to field stations after a period of time has elapsed and the case file has been permanently recorded on microfiche.

Managers should know what is available in the Realty records in case they have a future need. The statistical records include information such as: type of real estate interest maintained by the Service (fee, easement, etc.), name of the vendor, date of the transfer, acres, dollars, legal description, county recording information, etc. These data are used to compile periodic reports

on the status of lands and interests maintained by the Service. The Real Property Management Information System (RPMIS) is the database that contains this information.

The official case file for each parcel of land is converted to microfiche and the microfiche is maintained by the Regional Realty offices. This file includes: the original easement document; title insurance documents; Solicitor's title opinion; original maps, including DFMs, Exhibit As, and maps associated with Grassland Easements; cadastral survey reports if applicable; and other documents collected during the acquisition process. Appraisal reports are maintained for a period of 5 years, and then purged from the files; the approving memo for the appraisal and the summary page are retained, however.

The original easement case files are generally no longer available at the Regional Realty offices, due to storage space limitations. Starting in 1984, with work being finalized in 1985, all land acquisition case files are now on microfiche within each Regional Realty Office. Copies of the microfiche for any parcel of land can be obtained from your servicing Regional Realty Office.

It is now the policy that once the data have been placed on microfiche by the Regional Office, the original case file will be sent to the management district for final disposition. The case file sometimes contains documentation of discussions between the landowner and realty representative which may serve a useful purpose in the future. Even though the official record is retained in the Regional Office, it is strongly recommended that management offices maintain these case files, or at a minimum, go through them to retain any pertinent information not necessarily part of the official easement file.

# CHAPTER V

# EASEMENT ADMINISTRATION

## A. Permanent Field Station Files:

### 1. Realty-provided records:

Following acquisition of an easement, the Wetland Management District office will receive the following documents from the Regional Office, Realty:

- copy of acceptance letter
- title vesting memorandum
- copy of the easement document that includes the:
    - Exhibit A map (included for all acquired easements)
    - the original evaluation worksheets containing management office approvals
    - any pertinent information regarding survey data, or MSL elevations on wetlands

When this package arrives at the wetland management district office, the area will be administered as a Waterfowl Production Area Easement. The rights have been conveyed to the United States; the area is now part of the NWRS; the landowner has been paid; and the easement has been recorded in the courthouse. Technically, the terms of the easement are binding on the part of the landowner as soon as they sign the option (easement agreement). There are administrative exceptions to this, however, for Grassland Easements as discussed is Chapter V, Section G-4. Grasslands hayed before July 15, or wetland vegetation burned during this "option" period may be acceptable, but any permanent alteration of the landscape such as converting grassland, or wetland filling or draining will be treated as violations of the agreement, even if conducted during this "option" period.

The Wetland Manager will set up a permanent field station file for each easement. It is recommended that these files be stored in fire-proof cabinets. Because of the Privacy Act, easement files should be titled by tract number as opposed to landowner name. On one side of the file should be fastened the easement document, acceptance letter, Exhibit "A" and/or wetland easement map, and all other correspondence, notes, letters, etc. relevant to the easement. This file will be the official field office record and must contain all material about the easement.

On the other side of the file folder, the "Chronological List of Events" form (Exhibit V-1) should be attached. This form should be used to maintain a chronological list of events, notes, observations, conversations, etc. concerning the easement. Suspected violations should be noted as well as the final disposition. Visits to the easement area and such observations such as wildlife usage, water conditions, land use practices, and other items of interest about the easement can also to be documented and noted on the form.

2. **WMD Documentation**:

It is not expected nor required that every casual observation for every easement be recorded in the file; but, using their best judgment, managers should record observations related to issues which may come up in the future. Experience has taught managers an important rule to remember in easement administration: DOCUMENT, DOCUMENT, DOCUMENT. Record in memo format every conversation, every phone call, and every map given out. **Never give out a map or aerial photo without a legend on the same page**. A map without a legend can be misinterpreted at a later time, and weaken a case. If things are indicated on the map by certain colors, make sure the file copy is also in color. These easements are perpetual; your documentation will be needed for a hundred years or more, and if wetland managers do not record conversations, etc., future enforcement efforts may be compromised. In some cases a certified letter to the owner and/or tenant may be necessary to document conversations. If a landowner requests permission to do something which will violate the terms of the easement, then managers should document conversations in writing so there is no misunderstanding. Copies of such letters with the returned receipt should be kept in the easement file.

B. **New Easement Inspection**:

**WETLAND EASEMENTS -** Up to this point, the landowner has dealt primarily with a Realty Specialist, but now the emphasis shifts to management and compliance. The Wetland Manager is responsible for ensuring compliance with the agreement and should meet with the landowner or tenant to explain what will be expected in the future. On-the-ground inspections of all new easements are sometimes impractical. At a minimum, an aerial inspection of all new easements should be accomplished sometime during the first year, in the spring if possible, to document the presence of wetlands when they are holding water.

**PRE-EXISTING DRAINAGE FACILITIES -** Region 6 policy requires that wetlands with pre-existing drainage facilities either be restored or deleted from the easement agreement, except in certain situations of backing water onto a neighbor, or impacting a road, building site, etc. Acquiring easements on partially-drained wetlands under the pretense that the ditch will eventually fill in is no longer acceptable. If a new wetland easement protects wetlands with drainage facilities present (according to the criteria established above), then it is **mandatory** that the easement be visited on the ground and the facilities documented. In some instances, benchmarks may need to be established to document the condition of the drainage facilities at the time of acquisition. It is also mandatory to discuss the easement and the terms and conditions with the landowner, with emphasis on the partially-drained wetlands.

**GRASSLAND and HABITAT EASEMENTS -** New grassland easements should be aerially photographed to document existing grass areas and any areas not in grass when the easement was acquired. The photographs should also be labeled similarly to the discussion under "General Photo-documentation" below. It is also a good idea to obtain an 8-inch Farm Service Agency (FSA) map of the area; outline the easement boundary on the map, and keep the map in the easement file for future reference.

Many of the field stations resolve potential problem areas before acquisition is pursued; some do not. If, after an initial review of the new easement file, there seem to be unusual circumstances such as drainage facilities present, alfalfa included in the easement area, a questionable boundary, or something that just doesn't correspond with the easement document, then a field inspection accompanied with the landowner should be conducted to resolve any misunderstandings or misconceptions.

**Posting Grassland Easement Boundaries for Management Purposes:**

All FWS grassland easements should have Exhibit A maps prepared at the time the easement was purchased or accepted depicting protected tracts. These maps were prepared based on legally defined tracts and are recorded based on the appropriate legal description. Unlike FWS wetland easements, these easements delineate an exact area that must be protected. Because of this, and because these areas may be adjacent to other permanent vegetative cover that may make the boundary difficult to discern without FWS assistance, it may be necessary to post the boundaries as accurately as possible to prevent disturbance from operations on adjoining land. A combination of GIS techniques and field work are necessary to identify and mark the grassland easement boundary.

The following procedures were developed to post grassland easement boundaries in an accurate, repeatable, and most importantly, fair and defendable, manner.

- Verify the fact that you intend to post the easement as depicted in the Exhibit A maps and ensure that the legal description is appropriate.
- Use a spatial representation (polygon) of the easement boundary developed with standardized procedures that accurately represent the location, size, and configuration of the easement. In Region 6 this is provided by the HAPET office.
- From the information provided by in the HAPET easement layer; use GIS techniques to identify target marker locations, and generate a list of coordinates to consider marker placement in the field (UTM, local zone, NAD 83).
- Utilize a GPS capable of ≤ 1-meter horizontal accuracy and input the target marker locations created in the previous step.
- Prepare a field map if necessary.
- In the field, use the GPS to navigate to the target coordinates and place/install carsonite markers or fence posts that identify to the landowner/operator the protected area(s) that cannot be disturbed.
- Markers should be placed as needed to provide line-of-sight from marker to marker. Document the marker locations (coordinates) so future managers will be able to use this information should it be necessary to return to the field and re-post areas that have been disturbed. Actual marker placement in the field may be a subset of the target marker locations identified earlier in the process.
- Once posting is completed, the permanent easement file should contain:
    1. A list of the coordinates of all markers or posts.
    2. Documentation describing the equipment used and the associate projection information (coordinate system and datum).
    3. A map with the following elements: Image backdrop; Easement boundary;

Marker locations; Legend; Scale; North arrow; Developer; File location(pdf); Easement contract number; General legal description; Date; and the following disclaimer: "This map is only a representation of the easement boundary for management purposes. It is not a legal survey."

- Finally, obtain the landowner's signature on the map and provide them with a copy, retaining the original for the easement folder.

**General Photo-documentation:**

There have been efforts in the past to photo-document all new easements with high altitude vertical photography. The value is for future possible need to illustrate what was present on the land at or near the time the Service acquired an interest in the property. Even though this practice has not been accomplished consistently in recent years, management districts are required to continue this program of obtaining background photography of all new easements. The photographs can be obtained from sources such as FSA.

**IMPORTANT:** As a result of the Johansen Decision, the Courts now require the Service to prove the wetland(s) that have been negatively impacted through a prohibited activity, existed at the time the Service acquired the wetland easement. The Service must also demonstrate the Pre-76 wetland(s) have existed over the period of time the Service has retained the easement. To aid in this Court requirement, officers may document the existence of the wetlands through the interpretation of historical aerial photographs, both at or near the time of the easement being acquired. One dark spot on an aerial photograph does not fulfill the Service's obligation in this matter and an expert witness may need to be contracted to interpret aerial photographs. The Service has the obligation and responsibility to review as many aerial photographs as is reasonably necessary to develop an aerial photograph time line for each wetland that has a violation.

Even though the Johansen Decision does not apply to Post-76 wetland easements, it is still a good idea to photo-document the wetlands for future reference and/or need. Managers should use a common form to describe the easement photos. Exhibit V-2 can be used as is, or modified to document the photos.

**Use of Digital Equipment:**

Digital equipment can be used to photo-document easement properties, including for law enforcement and case preparation needs. Exhibit V-3 is a Standard Operating Procedure developed by the National Fish and Wildlife Forensics Center which has very useful information related to the use of digital technology as an evidentiary tool. For general photo-documentation needs, normal photographic procedures should be acceptable. For evidence photographs and case preparation, see Chapters VI and VII.

**FmHA CONSERVATION EASEMENTS-** Although some fee title transfers are still occurring within this program, not many, if any, deed-restricted conservation easement properties are currently being assigned to the Service where the Service functions as the easement manager. If, however, new easement properties are received from FSA State offices, managers should use the guidance above for inspections and photo-documentation of the new properties.

## C. Actions to Help Prevent Future Violations:

There are many opportunities for management offices to reduce the number of easement violations by maintaining an effective and proactive program which informs the public of easement programs and notifies property owners with lands encumbered by easements.

### 1. Land Ownership Notifications:

New landowner notification is practice that was accomplished in the past, but has since been discontinued in some states. **This important practice was reinstated and is required of every Wetland Management District annually.** The value of notifying new landowners of protective easements (wetland, grassland, and FmHA) that are on their land is in proactively informing the new owner about the easement and its conditions and avoiding an inadvertent violation, as well as proving the "knowledge" element in case a violation occurs. Easement notification letters may be sent certified mail, return receipt, at the discretion of the Project Leader.

#### a. New landowners (Region 6 only):

Each district office will annually notify new owners of property with existing FWS easements. New owners will be contacted and provided a copy of the easement document. The terms and conditions of the easement and who to contact within the management office must be explained. This should be accomplished either in person or by mail. For the reasons cited above, new owners must be made aware of the easement and what it means. A sample of this "courtesy letter" is found in Exhibit V-4.

#### b. Easement Mapping Associated with Landowner Notifications:

As a result of the Johansen case in North Dakota, the Service's Pre-76 wetland easements are limited to the wetland acreages identified on the Easement Summary sheets (Exhibit V-5) prepared by Realty at the time the easements were acquired. Whenever the Service has contact with a landowner regarding the conditions and terms of the easement and the wetlands encumbered or protected by the easement, the wetland manager must be prepared to have a map made of the easement protected wetlands. Mapping of pre-76 wetland easements is described in detail in Chapter XI of this manual. Although not a requirement, it is suggested that landowner notifications associated with pre-76 easements be mapped prior to sending out the notifications, including a copy of the map. If an approved map has been completed for the pre-76 easement, it should be included with the landowner notification. If the easement is a post-1976 easement, the Exhibit "A" map serves as the easement map. Montana WMDs must also comply with this procedure.

**2. <u>Inter-Agency Notifications</u>:**

**a. FSA-USDA:**

Each county FSA office should be provided annually an up-to-date listing of **<u>new</u>** easement or fee lands within their county. The information sent to FSA can be added to what the FSA already has and can be referenced by their personnel when talking to landowners and operators to determine if any action proposed by a landowner may affect Service interests. It is acceptable to send them paper copies of county maps with FWS holdings on them. **Do not send digital data, nor should you send a copy of the entire district to each county**. Send only what they need for their county's records. Exhibit V-7 has additional information on the distribution of digital data. FSA personnel that have questions should be encouraged to contact the FWS station that manages Service lands in their county and that many questions can be answered with a phone call. FSA county offices are also in the process of digitizing all lands in their counties. It may be possible in the near future to share digital data and FSA will be able to identify or label FWS easements on their aerial photos that are given to landowners and operators. Each County FSA office also publishes and sends out a newsletter to landowners. Many FSA offices are willing to include Service information about wetland and grassland easements, permit requirements, and cost share programs.

**b. NRCS-USDA:**

The same information provided to FSA should also be sent to the county NRCS offices with the same admonitions about sending digital data. NRCS offices answer all questions regarding wetland determinations and approve ditch maintenance requests with landowners and operators that participate in the USDA Farm Program. NRCS personnel should be encouraged to reference the FWS land holding information to determine if FWS has any interest in the property being reviewed and to contact the Service station if questions develop over protected wetlands. Many NRCS offices are also labeling their wetland maps with "FWS easement" if an easement is present.

**3. <u>County & State (DOT) Road Department Notification</u>:**

Annually, near the beginning of each year, managers should contact each County Road Supervisor regarding planned road work. Offer assistance to the engineer planning the road work to minimize wetland impacts and prevent easement wetlands from being filled or drained along the road right-of-way. This effort goes a long way, as the training in reducing wetland impacts stays with the engineer, and also provides a positive working relationship. Also, this prevents adversarial confrontations in correcting an easement violation with the county road department.

Working proactively with the state Department of Transportation (DOT) is also an effective way to avoid impacts to protected Service interests. The following is a process which has been working well for the Devils Lake WMD in North Dakota and is offered

here as an example that can be followed:

- The ND DOT typically contacts Ecological Services to determine if a proposed borrow site(s) is under easement; if it is, then they will send a map to the appropriated WMD office.
- Upon review of the borrow site map, the Wetland Manager maps the easement if necessary (see Chapter XI), and sets up an appointment with DOT for a site visit.
- During the site visit, the Wetland Manager identifies the protected wetlands and their respective watersheds where the contractors must avoid. The watersheds are typically recorded with GPS and staked.
- Shortly thereafter, a map showing the wetlands and GPS points is sent to the DOT

As with most things, effective communication prior to activities taking place on the ground is a key element to avoiding impacts to protected habitats. It also is an underlying tenet to fostering cooperative relationships with other government entities.

#### 4. Issue Complete and Accurate Special Use Permits:

When issuing a permit to a landowner for an approved activity, managers need to include sufficient detail in the permit to ensure the requester is aware of all the easement provisions and receives a copy of the easement document. Details in the permit can prevent violations incidental to the activity requested. Requests such as dugout construction, tree or fence line removal, if not explained in detail in the permit could end up as a violation. Dugout spoil that is leveled in a basin; or trees, old fence, and rocks that are buried in an easement wetland are violations that can be prevented with sufficient detail in a permit.

### D. Requests for Rights-of-Way:

Requests for rights-of-way are an important part of the easement administration program. The manual guidance and requirements associated with rights-of-way administration are addressed in Chapter XIII of this manual.

### E. Easement Exchanges and Amendments:

Although a part of the Easement Administration program, this section is discussed in more detail in Chapters XV and in Exhibit XV-1 of this manual.

### F. Permitted Activities:

**ALL** requests for uses of easement properties must first be evaluated under the guidelines found in Chapter XII. This chapter contains the information managers will need to evaluate requests for use of easement properties.

The old manuals previously used in Region 6 for wetland easements and grassland easements contained specific guidance for "permitted activities." Some of these can be found in Exhibit V-

6 and can be used by managers to help develop conditions or stipulations IF the activity is to be approved. These activities are not pre-authorized; they must still be evaluated through the flowchart in Chapter XII, but if they pass successfully, the write-ups in Exhibit V-6 may be helpful for issuing the permit or Letters of Authorization. These activities are merely a carryover from the previous manual guidance in Region 6; their inclusion is not intended to imply that these are the only activities which may be considered through the flowchart process.

## G. Allowable Activities Without the Need for a Permit:

Activities which relate to the operation of the land which are outside the rights acquired by the Service are allowable without the need for a permit. Examples are grazing on grassland easements, or farming on wetland easements. In addition, there are activities which do not interfere with the acquired rights which should be mentioned under this sub-chapter.

### 1. Noxious Weed Control:

For **Grassland Easements**, weed control is solely the responsibility of the landowner. Landowners may control noxious weeds on their lands without a permit or even without notification of district personnel, except under the following circumstances: Mowing of weeds on Grassland Easements prior to July 15 must be approved in advance by the wetland manager in writing.

### 2. Burying or Dumping Rock Piles:

Burying or dumping of rocks on upland sites can generally be accommodated as long as it's minor and in conjunction with normal practices. Burying in protected wetlands or native prairie will require advanced approval, however, and will generally **NOT** be approved. Debris burying should be restricted to previously-disturbed sites if possible.

If damage or harm to the upland sites under easement can be demonstrated or articulated as a result of the deposition of large amounts of concrete, asphalt, building materials or dead trees, an easement violation may have been committed. Document the circumstances and consult with the Regional Easement Coordinator to see if legal action is appropriate.

### 3. Early Mowing of Rights-of-Way:

Mowing of road rights-of-way prior to July 15, adjacent to easement properties is allowable without a permit or prior approval from the wetland manager.

### 4. Exemption to the July 15 Mow Date:

July 15 prohibition date for haying or mowing restrictions shall take effect in the calendar year following the year of easement acceptance by the Regional Director. The lag time between acceptance and the next calendar year will protect the landowner from an unintentional violation because of confusion over the effective date of the easement provisions.

**5. Burning of Upland Vegetation:**

Burning of uplands on grassland easements is permissible. If possible, intentional burns should be timed to enhance grassland health and vigor, comparable to the Service's prescribed burning program. Most landowners do not have the experience to use prescribed burning as a grassland management technique. The Service does not expect intentional burning to be a major conflict with grassland easement program goals. If protected wetlands are going to be burned as part of the upland prescribed burning, then a Special Use Permit will be necessary, and issued according to the guidelines found in Chapter XII-A, Section B-2.

**6. Tree Cutting:**

Tree cutting on Grassland Easements (MBCF-acquired) is not restricted. Vegetative cover in the easement is described as "grasses, forbs or low-growing shrubs." Trees are not included. However, the lack of protection on tree cutting or removal does not alleviate the landowner's/operator's responsibility to act in accordance with NRCS or other agency regulations regarding trees.

## H. Subsurface Resources and Minerals:

Easement rights for both grassland and wetland easements had respective intent to protect grass and wetlands. There are situations, however, where interest and requests to extract subsurface resources on easements occur that will have an impact on these surface rights. It therefore is important that a clear and consistent policy exist that identifies the extent of Service jurisdiction over these subsurface resources.

The following policy will clarify the Service's position on subsurface resources relative to wetland and grassland easements. This policy may or may not be consistent with existing state definitions or regulations, but it will be the position of the Service in administration and jurisdiction relative to subsurface resources on wetland and grassland easements.

Easement contracts state that the easement is acquired subject to "all mineral rights." These minerals are the clearly defined resources of oil, gas and coal. As such, the Service, because all easements both wetland and grassland are acquired subject to these resources, does not encumber these minerals nor exercise jurisdiction over extraction activities. The Service's surface rights of grass and wetlands are subject to impact as a result of extraction activities to recover these minerals. The Service will need to work with reclamation regulations and efforts to restore impacted surface rights to the extent possible, should extraction occur.

There are, however, other subsurface resources such as sand, gravel, clay, scoria, rock-like material, black soil and general soil with a wide range of classifications. It is in this area of subsurface resources that the Service will exercise select jurisdiction. The explanation and extent of this jurisdiction will be defined below.

**1. <u>Region 6 Subsurface Resources Administration</u>:**

Region 6 has determined jurisdictional positions for both wetland and grassland easements for various subsurface resources. This jurisdictional position will be applicable to the states of Montana, North Dakota, and South Dakota and is intended to be consistent with the program intents for both the wetland easement and grassland easement preservation programs since the programs' inception.

In summary, the approach for Region 6 requires that wetland and grassland easements be handled differently because they are different agreements which encumber different rights. The Region 6 policy for wetland easements is that the Service will exercise jurisdiction over <u>all</u> subsurface resources (sand, gravel, clay, scoria, black soil, other soils, fill, rock like materials, etc.). This jurisdiction does not include however, as noted above, the traditional minerals (gas, oil, coal) as they were exempted by the easement document wording. It needs to be emphasized that this jurisdiction relates only to the protected wetlands. If any of the subsurface resource extraction activities can be accomplished on upland sites without affecting protected wetlands either directly or indirectly (watershed interference), then the easement does not preclude such activities. There is no easement jurisdiction in these situations.

For grassland easements, the policy will be to exercise jurisdiction over limited subsurface resources such as clay, fill, black soil, or other soils but by policy, **we will not exercise jurisdiction over sand and gravel**. This jurisdictional policy does not include however, as noted above, the traditional minerals (gas, oil, coal). This policy is consistent with existing grassland easement program administrative guidance, and that which has been used by and realty and management staffs, as well as portrayed by easement vendors to landowners in the past.

FmHA easement-encumbered properties will be administered according to the above criteria. Encumbered wetlands will be administered similarly as traditional wetland easements; easement-encumbered uplands will be administered similarly as the position specified for grassland easements above.

When it is stated that the Region will not exercise jurisdiction over certain subsurface exploration or extraction practices (as presented above with sand and gravel on grassland easements) the intent is that NO jurisdiction is expressed nor implied. Managers may, however, suggest reclamation procedures or work with the extraction entity or the landowner to minimize surface disturbances; but managers cannot <u>require</u> specific conditions of people or entities exercising their subsurface resource rights.

Recommendations can include sending a letter with a map showing the location of proposed facilities and natural resource features in order to minimize disturbance to protected resources and to avoid impacts to easement interests. In almost all cases, tame grass sites would be preferred over native prairie sites.

**At the time of this writing, the Service is investigating the extent of its jurisdiction and authority to protect the surface rights it has acquired with easements. Consult**

**with the Regional Easement Coordinator and/or Refuge Supervisor for the most current guidance. The following is retained from earlier easement manuals.**

The mineral estate owner has a legal obligation to take reasonable measures to protect the surface estate under laws in most states. The Service's involvement is necessary in order to protect and minimize impacts to the wetland and grassland resources. The best situation is for the Service, the mineral company and the landowner to discuss the alternatives and options prior to any agreements between two of the three parties. The Service's role should be limited to those aspects that affect our easement interests and are reasonable. Any recommendations from the Service should be provided to the energy/mineral company and the landowner in writing, and if possible signed by all three parties. Written, and hopefully agreed to, recommendations can be retained and passed on to various entities within the mineral company, and will protect the Service's and future landowner's surface interests in case the land or the company is sold.

There are situations on easements related to oil and gas production where the Service has the authority to permit or deny the use and where compatibility will apply. Examples include crossing easement lands with pipelines or roads to access oil and gas production on lands not encumbered with a Service easement.

Some field stations in northeastern Montana have experience with minerals management on easement properties, particularly for oil and gas. Consider contacting them for specific recommendations on how to informally get involved.

**2. Cultural Resource Issues related to the Mineral Estate:**

Generally speaking, the Service does not have the authority to insist that persons or companies exercising valid rights to explore for or develop minerals on easement properties operate under the regulatory requirements of a Special Use Permit. That being the case, cultural resource issues will not need to be considered before ground disturbing activities take place. If the Service has no jurisdiction, then CR compliance is not required; if the Service has jurisdiction, **and if a permit is issued**, then CR compliance is required. Activities not directly related to the exploration or production of minerals beneath the easement tract (e.g. crossing an easement tract with a pipeline to access development off easement) may be subject to Service authorization and require issuance of a Special Use Permit, possibly even a formal ROW permit.

For those situations, follow the Cultural Resource guidance outlined in Chapter II.

## I. Easement Enforcement Training Protocol:

A Refuge Officer conducting easement law enforcement carries out a multitude of responsibilities and field activities. Enforcement efforts are aimed at prevention and early detection of violations. All work affecting wetland easements must be performed with the knowledge that legal action may be required in the future. To be proficient in easement enforcement, a Refuge Officer must be able to conduct surveillance of wetland and conservation easements, participate in aerial reconnaissance and aerial transects of suspected violations,

initiate file and record reviews, analyze aerial photography, prepare draft easement maps, perform case documentation, interview and question potential suspects, search for physical evidence of easement violations, utilize surveying techniques, develop evidence, prepare case reports, and eventually testify in court.

Evidence obtained from easement investigations can be extremely fragile and fragmentary in nature. The Refuge Officer must be able to establish a link between suspects and other violators by piecing together bits of evidence uncovered from a variety of sources. This requires a Refuge Officer to analyze and evaluate investigative progress to reassess priorities, leads, and direction. To be successful the Refuge Officer must proceed with separate investigations that lead through intermediaries to principal violators.

The Refuge Officer conducting easement law enforcement must effectively communicate with landowners and other public entities by providing information about easement contracts. The Refuge Officer must initiate proactive and preventative law enforcement measures within their district to reduce the frequency of violations of easement contracts. This includes sending out compliance and closure letters to landowners.

To attain all of these aforementioned attributes of a good easement investigator/officer, the candidate must receive the training and possess a willingness to learn.

Newly hired Refuge Officers attend the Natural Resources Police Training Program at the Federal Law Enforcement Training Center. Upon completion of this training program, the graduate trainee is placed in the USFWS Field Training and Evaluation Program (FTEP). The FTEP is a nationally-recognized training program. The 10 week FTEP is designed to help the trainee make the transition from the classroom environment of the law enforcement academy to the practical application of skills in actual on-duty situations. It is recommended that the trainee be placed at a training site that will provide easement enforcement experience for a portion of the FTEP. For example, if the trainee is to be stationed at a Wetland Management District, they should be assigned to a Field Training Officer who is engaged in easement law enforcement. This would provide the trainee with several weeks of training with an experienced easement enforcement officer.

Veteran Refuge Officers who are selected for an easement law enforcement position at a Wetland Management District must be given the opportunity to acquire the required skills and training to be successful in easement enforcement. At a minimum, the Refuge Officer should receive familiarization and instruction in easement enforcement issues and work with an experienced easement enforcement officer (Refuge Officer with easement experience). The familiarization for new and veteran officers should include many subjects including easement contract language, wetland types and descriptions, soil science, aerial photography interpretation, flight map preparation, aerial reconnaissance and transects of suspected violations, aerial photography, file and record reviews, draft easement maps, case documentation, physical evidence of easement violations, interviews/interrogations of suspected violators, surveying techniques, case reports, and instruction on sending out compliance and closure letters. After completion of the familiarization, the individual should be paired with a Refuge Officer who is experienced in easement law enforcement. The training should run the whole course of an active easement investigation from start to finish. In addition to classroom and on the job training, role

playing should be used to prepare the new easement investigator/officer for easement enforcement work.

Easement refresher training is recommended to stay current with changing case law and new technology and may contain topics such as interviewing and "verbal judo." This information can be presented at either the 40-hour annual in-service training or at the summer re-qualification, or in a separate training session or workshop if necessary. The length of the refresher training may very depending on the topics to be presented.

# CHAPTER VI

# EASEMENT SURVEILLANCE

Easement enforcement work is vitally important to the continued success of the Fish and Wildlife Service program to preserve migratory bird habitat within the Prairie Pothole Region. The procedures used for enforcing easements have been tested over time and developed with the concurrence and support of law enforcement and, in some cases, the U.S. Attorney's Office. The procedures have evolved over time and have been expanded to include the relatively new grassland easements, wildlife habitat easements, and FmHA properties. The following two chapters will discuss these procedures in detail which represent a stepped sequence of events starting with aerial inspections of easement properties, followed by second flights if necessary, case preparation, ground inspections, landowner contacts, and compliance requirements. Some manager flexibility is permitted within these guidelines, but mostly, these procedures are required of every wetland management district to ensure consistent application and enduring maintenance of the easement program. A violation tracking system has been implemented for all districts to report and track easement violations.

## A. Aerial Inspection:

All easements will be aerially checked for compliance at least once each year. Because of the timing of the aerial inspections, discussed under "Flight Scheduling" below, both wetland and grassland easements can be checked two times each year; however, the July survey is primarily for grassland easements, and wetland-altering violations generally are not visible during this time of the year. The objective of the aerial inspections is to detect any activities which may constitute a violation, whether it is drainage, leveling, filling or burning of wetlands, or early haying, or grassland altering violations for grassland easements. The following suggestions are provided:

### 1. Pre-flight preparations:

In 2006, new techniques were developed for the use of in-flight navigation and surveillance equipment. Specifically, the use of GPS and laptop computers to track the progress of the plane and display the locations of easements on-screen is now common. This technology replaces the use of a paper map as a means for navigating and recording violations from the plane. Exhibit VI-3 contains a complete tutorial on the use of in-flight navigation and surveillance technology.

Some managers may still prefer to produce and use traditional paper maps to navigate and document suspected violations. For those managers, the following guidance from the 2005 version of the Easement Manual on creating flight maps with GIS is retained:

a. Begin by obtaining all relevant GIS data from the appropriate Habitat and Population Evaluation Team (HAPET). Features such as roads, section lines, township boundaries, and wetlands are universally available. In North Dakota, anything depicted on the 1/2-inch/mile county maps is also available in digital

format. In South Dakota, the only *structures* currently available in digital format are occupied houses, vacant houses, and abandoned houses. Other potential sources of GIS data include the Departments of Transportation and the SD Department of Environment and Natural Resources.

The Bismarck HAPET office has been designated by the Realty Division and the regional office as “stewards” of the digital easement and fee-title data. Currently, HAPET is responsible for updating station-specific GIS data of all easements and WPAs on an annual basis. Current protocol precludes stations in Region 6 from creating or editing these data. This ensures that appropriate quality-control measures are followed which result in the most accurate data possible. As field use of this technology increases, future policies may allow for the stations to update and maintain these data.

b. Once the raw data are obtained, flight maps can be made by displaying the data in a GIS. Some experimenting with font and symbol shapes and sizes to create a map that is readable and informative in the air will be necessary. The following are some tips to get started; however, managers will undoubtedly find ways to customize maps to better suit your needs:

1) Choose a map size approximately 34" wide x 22" high. This allows the map to be folded into quarters and is of a size that is easily handled in the confines of a small plane.

2) It is not necessary to label every easement; however, be sure to include on the map every section number and the townships and ranges in large print around the edges. Easement tract numbers can be determined later.

3) “Stack” the data layers in the order displayed below. This maximizes the visibility of information map. For instance, the roads are viewable when displayed over the township boundaries, houses and other structures will not be “covered up” by easements or WPAs, etc.




c. As previously mentioned, HAPET has been designated stewards of the digital data to preserve the integrity of our GIS products. Currently, HAPET only updates the easement data once a year. This creates problems for stations that are currently buying easements and wish to use these data to create flight maps. For now, the best remedy is to add colored polygons to the easement maps either by hand with a marker, or by adding a "graphic" to the map in GIS. Adding a graphic in GIS is akin to coloring a polygon by hand with a marker; i.e. no data are assigned to the graphic, it is merely a shape on a map. Work directly with the appropriate HAPET office which serves your district to establish a process for individual field stations to obtain updated data that is relevant to your station.

**2. Wetland Easement Flight Scheduling (fall and spring):**

Fall flights (after crops are harvested and before snow fall) are preferred for detection of wetland-impacting activities on wet easements provide the best timing to detect and record suspected violations with a follow-up ground check.

Due to the limited number of Service pilots and aircraft, combined with fewer vendors, managers should schedule flights as early as possible. Stations requiring fall flights (Devils Lake, Arrowood, Valley City, JCS and Madison Districts) should schedule for late October or early November-prior to the season's first snow fall but after ditching activities have ceased for the year. If snow cover precludes completion of the survey, schedule another flight in the spring after the snow cover melts, but before crops are planted.

Spring flights for wetland easements, which should assist in detection of older, previously missed ditches, should be considered at least every 3 years. Alternatively, the manager should consider flying one-third of the district each spring. The primary drawback of spring flights is the reduced time available for ground checks, file review, and landowner contacts prior to the start of the field season. The primary benefit is the increased visibility of all ditching activity due to spring runoff.

**3. Grassland Easement Flight Scheduling:**

The mid-summer flight is primarily to check grassland/habitat easements and upland-restricted versions of FmHA easements which, due to the type of grassland and latitude, are most likely to be hayed or burned prior to July 15. Some districts may not have grassland/habitat easement densities that would either require transects and/or second flights. If managers can accomplish required surveillance by flying from easement to easement, can evaluate the easements adequately with only one flight, and/or can adequately and safely accomplish the monitoring with only one observer (in addition to the pilot), then it is acceptable to do so. Some Districts may experience limited or no haying violation issues, and in this case may choose to combine the annual grassland surveillance flight with the fall wetland easement surveillance flight, resulting in a single combined all-inclusive fall easement surveillance flight. The use of a single all-inclusive fall flight is the discretion of the Project Leader, and is dependent primarily on the district's violation history. Otherwise, managers should schedule the July flight close to July 15 (July 1-12), but early enough to ground check, document, and measure the extent of any violation prior to the July 16 release date.

**4. Flight Activities:**

(a) Aircraft and Pilots:

- High-wing aircraft offer better visibility and photographical capabilities than low wing aircraft.
- Vendor (contract) aircraft and pilots approved by the regional office in cooperation with Aviation Management Directorate (AMD) vary annually. Contact the RAM for a current list.
- Zone aircraft are equipped with belly-mounted camera holes and high definition cameras, if needed. Additionally, both Zone aircraft are equipped with tablet computers and ArcPad software interfaced with GPS upon request.

(b) Aviation Safety Policy Pertinent to Easement Monitoring:

- For flight profiles (the majority of the mission other than take-off, enroute and landing) less than 500', special pilot and aircraft qualifications as well as equipment requirements apply; contact the RAM for additional guidance.
- Prior to each flight, passengers will receive a safety briefing by the pilot.
- Flight plans and flight following are required for all flights.
- Managers should review the Regional Aviation Plan (Jan 2008) for additional policy guidance.

(c) Miscellaneous Procedural Items and Tips

- Stations with historically high violation rates should arrange for two flights (one flight may be sufficient in those areas with widely scattered easements). If flown only once, all violations or suspected violations must be photographed concurrently.

- In general, easement monitoring should include two observers, neither of which is required to be law enforcement officers. Project Leaders must insure all observers are properly trained (flight safety training and wetland ID training) and are familiar with the mission. New observers will fly initially only with another experienced observer.

- Fly counties or blocks of easements at alternate directions every other year or 1 out of every 3 years. This will enable better coverage of violations which may occur immediately adjacent to the transect being flown; violations near the flight path are difficult to detect because they are directly under the plane.

- On windy days the plane may need to 'crab' to stay over the established transect, forcing the observer to look ahead or behind in order to observe areas beneath the plane.

- A technique of following the progress of the plane on the maps with a pencil may be useful. Also, at the end of a county or block of easements, mark the direction of flight and the return transect to help continually monitor the location, as well as for future

reference in determining the direction easements were observed. If using the tablet computers interfaced with GPS, be sure to activate the flight log prior to the flight.

- Due to the limited number of Service pilots and aircraft, combined with the narrow windows of opportunity for flying easements, it is crucial all flight- and air-crewmembers (observers) maximize the amount of flight time each day as well as availability (including weekends). However, duty day limitations for the pilot will not be exceeded under any circumstance.

- Most observers photograph all suspected violations with a 35mm camera with a zoom lens (optimum range of this lens is about 50 - 100 mm). They later review these photographs, compare them to the maps in the easement files, and determine if suspected activities are violations of the easement. At least one photo should be taken that will orient the viewer to the location and direction of the photographs. Another method is to document any activity suspected as a violation on the plastic overlay map or the photograph of the easement.

- All suspected violations should be documented, including older activities which may have been missed in previous years. The potential exists to miss violations that occur after surveillance flights, are located directly under the plane, that have been made difficult to observe due to farming practices, purposeful activity, etc. These violations in future years may not have fresh activity and will appear as established or old activities. Observes should note all suspected activity including those without fresh work and document with aerial photographs. Old activities should be treated as a current violation until a ground check, file review or the mapping process verifies the activity is allowed.

- If the activity is allowed, the photograph should be labeled and placed in the easement file. If an old activity is not allowed, it should be treated as a current violation. Old violations may present a challenge in obtaining restoration and/or prosecution because of a lack of evidence, landowner/operator changes, etc. Nevertheless, the Officer should try and collect as much evidence as possible.

- U. S. Department of Agriculture slides and photographs may be helpful to establish when the violation occurred. Utilizing a soil expert may aid in collecting evidence on the ground and interviewing the landowner/operator may also provide additional evidence. It is also recommended to discuss the case with the Regional Easement Coordinator especially if evidence is lacking.

- Known older activities that experienced observers have documented in previous years as allowed do not have to be documented each year. These situations should be rare. When in doubt, photograph the activity from the air and initiate further investigation.

- Digital photographs are permissible for documenting suspected violations. Exhibit V-3 is a procedure developed by the National Fish and Wildlife Forensics Lab for use of digital photographic equipment.

- Keep written notes for each suspected violation and reference them to the proper photograph and easement. Abbreviations should be used to speed up note taking: (PF) for plow furrow drainage, (SD) for scraper ditch drainage, (F) for filling activity and (B) for burning. These symbols are also helpful in aiding the observer on the follow-up flight to know what type of activity to look for.

- Summer flights can be flown either in transects or from tract to tract, depending on the density of easements. During the summer flight, look for indications of early haying/burning, cropland areas that should be in grass, encroachment of crops onto the grassland easement, and any suspicious looking wetland activities even though fall flights are better for observing wetland violations.

(d) Aviation Safety Training

For all observers, the following modules (available at https://www.iat.gov) must be taken every three years:

A-101 Aviation Safety
A-105 Aviation Life Support Equipment
A-106 Aviation Mishap Reporting
A-108 Pre-Flight Checklist and Briefing/Debriefing,
A-113 Crash Survival
A-200 Annual Mishap Review (annual refresher training required)

*In addition, for those who will carry hazardous materials (ammunition and pepper spray) aboard the aircraft, A-110 (Transport of Hazardous Material) is required every three years.

These modules are available on-line or are presented occasionally by the RAM and other AMD-approved trainers upon request. It should be noted that in June, 2007 Mike Grant (Service Aviation Manager) approved initial B-3 training on-line (as opposed to instructor-led). The RAM has access to AMD's training database and should be contacted regarding inquiries of training currency.

In addition to the modules above, supervisors of observers and/or those who are responsible and accountable for using aviation resources to accomplish bureau programs are required to attend Aviation Management for Supervisors (M-3) training with on-line refresher training every 3 years.

**5. Follow-up Flights:**

When monitoring wetland easements in the fall, some managers prefer to conduct second flights to screen out suspected violations before conducting ground checks; others prefer to do all the aerial documentation on the first flight. It is suggested that two flights be performed for stations with historically high easement violation rates

For those stations that conduct second flights in the fall, the following are additional guidance:

(a) Pre-flight Preparation:

- Assemble aerial photographs (8-inch FSA aerial copies work very well) that contain the easement areas with potential violations. Outline the area protected by the easement and, if it is a pre-76 easement, identify DFM-deleted wetlands and, if a post-76 easement, identify wetlands in blue. Arrange the photographs numerically by county for easy retrieval during the flight.

- Compare aerial photos taken during the first flight (if applicable) to the FSA map to determine whether the suspected violation is a deleted (DFM) wetland. If there is any doubt, include this possible violation for second flight photography.

- Write the aerial photograph numbers that correspond to each suspected violation on your flight map so the corresponding photos can be retrieved as each suspected violation is inspected.

- Two observers are desirable; but, if necessary, one observer can handle the task. It depends on the volume of suspected violations.

- Assemble the camera, film, and note taking supplies needed. For digital cameras, be sure to bring extra media disks and batteries.

(b) Flight Parameters:

Fly low and slow enough to get a good view and photographs without compromising safety. Keep in mind sustained flights below 500 feet AGL require additional safety and administrative requirements.

(c) Flight Activities:

The purpose of second flights is to screen out suspected violations before performing ground checks and to obtain good photo and written documentation of suspected violations from the air.

- Assist the pilot with navigation between suspected violations.
- Identify ditching and other suspected violation activities on base photographs to aid ground inspection.
- If more than one type of violation is present, each should be identified and described on the photograph.
- Record notes for each suspected violation.

(d) Video Equipment:

The use of video equipment should be considered, especially in cases of serious or second time violations. If the case is expected to go to court, videotape the entire violation. This would include aerial and ground coverage that would show the violation, actual work, wetland vegetation, etc. Video documentation is in addition to, not a substitute for, good 35 mm photos.

(e) Grassland/Habitat Easements:

Use the general guidelines above for documenting suspected violations from the air. Since follow-up flights are normally not conducted during summer evaluation flights, make sure the photo documentation is sufficient during the first flight for any suspected violations.

## B. Ground Inspections:

On-the-ground inspection of suspected violations must be completed as soon as possible. If early snow cover prevents fall flights and/or ground inspections, complete as early as possible the following spring (within two weeks after snow melt). Spring ground inspections need to be completed within one month after detection from the air or before landowners begin field work, whichever comes first.

### 1. Pre-Ground Inspection Requirements:

Before actual inspection, initiate an Easement Enforcement Checklist (Exhibit VII-1). Symbols are used in conjunction with colors because color photocopy machines may not be available, and officers may be working with a person who is color blind. If second flights were completed, then use the map from that as your ground check guide. If wetland easement second flights were not conducted, then complete the following:

(a) Include on the Easement Data Sheet a photocopy of the section of the aerial photograph where the alleged violation is located or transpose a copy of the Exhibit A onto the Easement Data Sheet.

(b) Plot the boundary of the easement with a black outline.

(c) If a drainage facility map exists for the easement in question, plot the allowable facilities in green.

(d) Plot all alleged illegal activities as follows:

- Scraper ditches, single plow furrow, double plow furrow, dozer ditches, etc. with a solid red line.
- Filling of any type material (rocks, earth, trees) are plotted with a red x.
- Tiling is shown by a dotted red line.

- Any stock pond, level ditch or donut that may be in violation is plotted with a small red rectangle.

(e) Show section numbers in black and label and locate buildings or farmsteads with a small black triangle.

(f) Identify all distinct coulees or natural drainages with black dash-dot lines and label. Coulees can be difficult to define. Those found on USGS 7½ minute topographic maps can be used as a guide. Be aware that these maps may not show all bona fide coulees.

(g) For **grassland easements**, plot the suspected violations on the map and indicate the concern–early haying, cultivation, etc.

Set up case folder to include:

- Entire easement file
- Complete Waterfowl Management Easement Data Sheet (Exhibit VI-1)
- Verified identity of the landowner and/or tenant (use courthouse, or other records)
- All memorandums, letters, maps, etc., which apply to the case.

**2. <u>Ground Investigation</u>:**

An actual ground check is required prior to a landowner contact to verify that a violation of the terms of the easement has actually taken place. This applies to suspected violations of all easement types; e.g., wetland, grassland, and FmHA. Aerial photographs will not, by themselves, be adequate for a case. They can only complement the ground inspection and photographs.

Although all easement documents contain language granting the right of access for authorized Service personnel to investigate a potential violation. The Service recognizes that vehicle use to access easements can be a sensitive issue for some landowners. If contacted by a landowner, officers should consider a property owner's access requests and if the requests are reasonable, they should be honored. Service personnel should avoid entering standing crops or utilizing a vehicle when field conditions are too wet. The Service also recognizes that we cannot honor every access request by a landowner. There may be a past history with a landowner involving threats or other behavior that would make the request unreasonable or unacceptable due to officer safety concerns. Use of a vehicle while conducting easement ground inspections or compliance checks can greatly aid in the efficiency of the work; and for transporting cameras, surveying equipment, LE equipment, or file and photo information. In addition, a vehicle provides radio communication and cover in case of a threatening situation. If a specific issue or concern surfaces about vehicle access, contact your appropriate Zone Law Enforcement Officer (ZLEO) for guidance.

Because of the real chance of impromptu landowner contacts, which could be unfriendly, all ground checks should be made with at least two people and both must have law enforcement authority. However, Project Leaders may authorize ground checks to be completed by one person with LE authority, but it is strongly recommended that two officers conduct the ground investigations. Non-LE personnel will NOT participate in ground checks unless accompanied by two officers. Expert witnesses can be escorted by two officers to obtain information and evidence. The carrying of a weapon and use of other law enforcement-related safety equipment is required. See Chapter VII, B.1 for more information on enforcement requirements.

Assume the evidence being collected will be presented in court. Most cases will not go that way, but a thorough documentation of the violation is necessary and required. Some guidelines which will help prosecution in court include:

- Record the size and extent of the violation.
- Record the cover type: grass, forb, or shrub species in the area, cropland, etc.
- Record the actual activity in terms that describe the violation of the provisions of the easement – protected wetland drained or filled; grassland hayed prior to July 15th, etc. Note anything else which might be pertinent (implement used to violate the provisions, any loss of wildlife species, dead nesting hens, disturbed nests observed during the ground check).
- Other aspects of the violation and wetland should also be documented. These include excavated materials dumped in the wetland or near the ditch. Tan or light brown clay soils may be present in the excavated material which generally demonstrates excavation beyond any sedimentation that may have occurred. It may be helpful to document evidence of the wetland prior to the violation. This includes verifying the existence of any aquatic plants or soils in the wetland as well as signs of previously standing water (e.g., crop residue washed up showing a high water line).

Compile photographic evidence of all aspects of the alleged violation. Good quality photographs will likely be your best evidence. For wetlands:

- Use color print film or digital photography. It may be necessary to take more than one photograph from each viewpoint, especially on more serious violations.
- The photograph should depict whether a wetland is burned, drained or filled. Photograph ditches from both directions.
- Photograph the most serious aspect of the alleged violation. The use of red and white poles (range poles) is recommended. These poles show one-foot increments and are used to prove the width and depth of ditches.
- Photograph those areas where arguments may later be anticipated concerning compliance. Try to show the general contour of the land so adequate compliance can be easier to achieve.
- In cases of fill that might not constitute a violation or require restoration, documentation with photographs is still needed. Future accumulation of the fill can then be documented and enforcement action taken at a later time. For

example, photographs of a rock pile can be used for enforcement if the rock pile grows in the future.

- Record all pertinent data concerning each photograph taken. After the photographs are developed or printed, each must be labeled with the necessary information. A small tape recorder is handy to record information such as time of day, weather conditions, and other factors that may influence the interpretation of the photo. Be sure to include the officer's full name.
- Prepare a map showing photo points and direction from which all photographs were taken.
- Easement mapping: To reiterate, once a potential violation has been observed from the air and verified by a ground check, pre-76 (including pre-64 documents) easements must be mapped to see if a violation of the wetlands covered by the easement occurred. There is no violation until the Wetland Manager has compared the map and acreage of the protected wetlands and verified that the potential violation has occurred on a protected wetland. See Chapter XI on mapping procedures.

By the end of the ground inspection, if not before, officers should be in a position to determine whether or not a violation has taken place. If a violation has taken place, then the following tracking system will provide an orderly method for recording pertinent information and reporting the progression of the enforcement process to the appropriate ZLEO.

**The need to conduct a thorough investigation and complete the necessary documentation cannot be overstated. All phone calls, meetings, and/or casual conversations concerning violations must be documented. All subsequent on-site visits to the violation site should be documented with photos, survey notes, etc. This documentation could be the difference between winning and losing a case.**

## C. Easement Tracking:

Tracking easement violations is critical to the integrity of the entire easement program. Beginning in October 2005, stations were required to use a centralized tracking system. Region 6 developed and has been using an electronic easement register developed by the Devils Lake WMD (Exhibit VI-2). This system provides the consistency needed throughout the easement enforcement program and contain all of the pertinent information needed to successfully conduct easement investigations.

Upon completion of the electronic easement register, the information will be exported and sent to a master file for tracking. The master file will be maintained by the appropriate Zone Law Enforcement Officer. A hard copy of the electronic easement register shall be included as part of the permanent easement file.

The Service is currently developing a Law Enforcement Incident Management System. This case incident reporting system will track all law enforcement incidents that occur within the realm of the National Wildlife Refuge System. Easement investigations will also be incorporated into this

reporting system. Until the incident reporting system is operational, it is imperative to export the data to the ZLEO as described above.

After confirming an easement violation, the investigating Refuge Officer or person responsible for oversight of the specific easement should complete the applicable information fields within the electronic easement register within seven days. Within 14 days after documented completion of an easement investigation (e.g., compliance or court adjudication), the Refuge Officer or person responsible for the specific easement will complete the applicable information fields within the Easement Register.

To further augment the tracking process of easement violations, a semi-annual reporting requirement will be instituted. Stations shall provide a “fall outlook report” for easement violations. This report will be submitted to the appropriate ZLEO by December 15 each year. Stations shall also provide a “spring progress report” for easement violations identified in the fall and continued from previous years. The respective ZLEO will provide an electronic version of the easement register to all field stations. This report will be submitted to the appropriate ZLEO by May 15 of each year.

# CHAPTER VII

# COMPLIANCE CONTACTS

Once a violation has been discovered, confirmed, and documented according to the criteria outlined in the previous chapter, it is time for the compliance contact with the landowner and/or tenant. Because of the high potential of encountering adversarial situations, officers should be thoroughly prepared for a frank discussion of the violation, and be able to explain the terms of the required compliance.

## A. Pre-contact Preparation:

1. Verify the landowner and/or tenant. Verification can be accomplished by using station records, courthouse records, FSA records, plat books, etc.

2. Review the case file to become completely familiar with it. This is essential when discussing the case with the landowner or tenant. An interview can take many unexpected turns, so be prepared for any eventuality.

   On some easements with a known history of confrontation, managers might want to "red flag" the easement file to alert future easement managers of potential problems with ground checks and contacts. Information in the file indicating previous confrontational contacts, derogatory statements made by the landowner or a landowner that demonstrated unstable, highly emotional, or a vindictive type attitude would be basis for "red flagging" a particular file. Managers may also want to check with county sheriff offices for potential problem landowners or pay particular attention to foreclosure actions or actions of individuals or groups of landowners who are objecting to taxing systems or government intervention in the farm community. Tax protest groups (such as Posse Comitatus) are an example of a group that should concern managers. "Red flag" these cases and use special precautions in continuing with a case that has been "flagged." Contact your appropriate Zone Law Enforcement Officer for assistance prior to contacting people with a known history of instability or violence.

   Be cautious when "red flagging" a file. Do not include statements that are derogatory, highly opinionated, or reflect a dislike for the landowner. Remember, if the case ever results in court action, the entire easement file may be viewed by the defense. Inappropriate statements could jeopardize the case and make Service employees appear to be unprofessional or vindictive. However, the officer should accurately document statements even if the words utilized by the individual are vulgar.

3. Assemble the entire file, county atlas, etc. to take along on the interview for reference if needed.

4. Assemble all note-taking materials for documentation of interviews. This will include note paper for writing memos to the file or a tape recorder for dictated accounts that should be typed later in memorandum form. ***Before a conversation may be recorded without the knowledge of the person being interviewed, approval must be granted by the Regional Chief of Refuge Law Enforcement.*** This should be requested only where justified by unique circumstances.

## B. Landowner and/or Tenant Contact:

### 1. Interview Phase:

It is strongly recommended that two Refuge Officers make landowner contacts; however, the Project Leader may approve, in advance, the use of only one officer for landowner contacts, and the Project Leader may authorize officers to handle chance encounters if they occur. Chance encounters are not predictable in advance, but the Project Leader may authorize officers to make landowner contacts if they occur. There is no justification for non-LE personnel to participate in or take part in landowner contacts, particularly in a field setting. Contacts made within the WMD office may be conducted by only one officer, and non-LE personnel may participate if absolutely necessary.

If there are known special circumstances with the case at hand, ask the appropriate Zone Law Enforcement Officer (ZLEO) to accompany managers when conducting the interview, but realize that ZLEO's cannot accompany managers on very many interviews. This phase of the investigation could very well determine the success of having an easement violation resolved satisfactorily. Therefore, officers should conduct themselves in a highly professional and businesslike manner. A condescending and arrogant attitude must not be displayed. Be firm, but, at the same time, listen to and consider the landowner's point of view. The objective is to obtain a resolution to the violation. Most interviews will be accomplished with few problems, but managers always need to be prepared for the ones that become violent and out of control. To help control interviews, it may be advisable for employees who work with easements to have training such as Managing Human Behavior, Assertiveness and Management Conflict, Reed's School of Interviewing and Interrogation, and other similar courses.

The carrying of a weapon and use of other law enforcement and related safety equipment is required. Officers are required to wear the full complement of web gear while conducting landowner contacts; however, concealed weapons may be worn at the discretion and approval of the Project Leader. If officers are approved to wear non-conventional gear (pancake or shoulder options), then the officers should train with these non-conventional options during re-qualification exercises.

During the interview:

- Officers should immediately identify themselves, stating where they are from, and why they are there. Refuge Officers will always wear uniforms and will drive marked vehicles unless the Project Leader determines that there are compelling reasons for an "incognito" approach. The landowner/tenant must know who is confronting them. This becomes extremely important if an officer is assaulted.

- Verify the identity of the individual being interviewed. Initially, this may be the landowner or tenant. Verify the individual's address. With the name and date of birth or the individual's vehicle license plate number, this information may be obtained from the Sheriff's Office before making a contact.

- Always be aware of the subject's description. Note the sex, race, approximate age, height, weight, eyes, hair, and any distinguishing features (beard, scars, etc.). This information is especially important if the subject refuses to identify himself.

- It is important to verify who is the operator or the individual that farms the land in question.

- Before discussing the violation, establish whether or not the subject is aware of the Service Easement for Waterfowl Management Rights on the land in question. This is necessary even if the current landowner is the original seller of the easement. If the subject is a second or subsequent owner, knowledge of the easement becomes very important. The extent of the landowner's knowledge will help to determine whether the case will be handled as a criminal or a civil matter if voluntary compliance is not accomplished.

- Try to establish who is responsible for the activity that is considered a violation. Who did the actual work? Was the wetland drained by a contractor? Who hayed the area prior to July 16? It may also be possible to establish who ordered the work done and whether it was done by an employee or through contract.

- Identify all persons involved. An interview with each may be necessary.

- Do not take the entire easement file into the actual contact. Take only the information necessary to conduct the interview leaving the file itself in the vehicle. During the interview, do not show the individual the contents of the easement file. Sometimes, it is advisable to show the subject some of the evidence photos, the contract, and field sketches. By doing this, the subject may be convinced that he is unlikely to win in court. Closely control how much of the file the subject is allowed to see. If the subject requests to see the entire file, explain that the file is not available at that time. An appointment may be made to have the file reviewed at a later time at the Wetland Management District office.

- If, at any point during the conversation, issues arise that may weaken or destroy the case, advise the subject that additional investigative work will be conducted and he will be re-contacted upon completion of the investigation. Take the time to make a solid case. Contact the Regional Easement Coordinator and/or a ZLEO before making any demands.

**2. Compliance Requirements:**

Based on all the evidence which has been collected from the aerial and ground inspections, officers should have a good idea what will be required for compliance in terms of restoration. In some cases, the landowner's explanation of events may change some of the pre-determined compliance requirements, but plan on going to the landowner contact with a reasonably firm and well thought out restoration plan, be it wetland-related or upland-related. In any event, officers must discuss compliance requirements with the landowner and obtain their verbal commitment to complete the necessary restoration if possible. A follow-up certified letter will also be sent to the landowner as discussed below.

Some violations, such as early haying of a grassland easement, will not require a compliance and restoration requirement. Others, like protected grasslands that have been converted to crop, or wetland draining or filling, will require restoration to be performed and a firm date set for the restoration. At some point during the interview, the officer should establish a date for which all restoration work must be completed. Also ask for the landowner's acknowledgment that they understand and will comply with the requirements. Ask if he has any questions about the restoration requirements, or what will be needed to bring the easement back into compliance.

Key points to remember about establishing compliance requirements:

- Explain in detail what is expected of the subject in the way of compliance requirements. If a ditch is to be filled, require 10 percent overfill to allow for settling. In cases of filling violations, all fill must be removed. A visit to the site with the subject may be helpful and should be made, if possible. Sometimes, marking out the restoration requirements with stakes or flags is advisable to prevent misunderstandings. It is a good practice for officers to be present during restoration to resolve any shortcomings. Officers should make arrangements to be present for all but the very minor restoration needs if at all possible.

- For an upland site violation requiring restoration (such as converting grass to cropland), the restoration will need to incorporate commonly accepted seeding practices. Depending upon when the violation is discovered, officers may have to wait until the following spring. The compliance requirement should specify seed mixtures and seeding rates. Use the seeding guidelines listed in the back of Exhibit V-6 of this manual. The quality of the restored grassland must be at least as good as it was before the violation took place.

- Establish a deadline by which the subject must have all compliance requirements completed. If fall contacts are made and conditions allow, a fall deadline should be made. Under these conditions, a 48-hour or short deadline is appropriate. If a spring deadline is necessary, require that the landowner complete the work as soon as conditions allow, but not later than a set date such as May 1 or May 15. Request that the landowner call when the work is completed. In some instances, it might be necessary for a Service representative to be present during the restoration work to ensure proper compliance. It is extremely difficult to get landowners to go back and do a small amount of additional work if the initial work is not satisfactory. If it becomes necessary to extend the deadline, call or write the landowner as a reminder of the deadline. If extending a deadline by a phone contact with the landowner, make a note of the conversation for the easement file. Mitigating circumstances such as weather, high water levels, or illness should be taken into consideration. Seeding the crop or other work excuses are not extenuating circumstances. However, avoiding the destruction of already-planted crops would be considered as an extenuating circumstance in most cases. Plan to complete the needed restoration prior to spring seeding.

- The following restoration guidelines, related to wetland violations, should be considered when setting deadlines for landowners or tenants:

  1st deadline: Within 30 days after the first contact advising the owner or tenant of a violation.

  2nd deadline: Two weeks after the first deadline.

  3rd deadline: Two weeks after the second deadline.

  These deadlines may be extended at the discretion of the Wetland Manager.

- Explain to the landowner/tenant that non-compliance will result in the matter being referred to the U.S. Attorney's office or Regional Solicitor's office for possible legal action. Do not make threats that are unfounded, such as stating that the case will be processed through the criminal court system. The U. S. Attorney makes this decision, and an unfounded threat could ultimately jeopardize the case.

- General Time Line Guidelines:

  *Ground checks......................................within 30 days after 2nd flights*
  *Contacts..............................................within 30 days after ground check*
  *Contact follow-up.................................within 7 days after contact*
  *Compliance check.................................1-3 days after compliance date*
  *Contact for inadequate compliance...........1-3 days after compliance check*
  *Letter for unsatisfactory compliance..........7 days after compliance date*
  *Closure letter (satisfactory compliance)....within 14 days after compliance check*

### 3. <u>Post-interview Procedures</u>:

As soon as the officers have departed from the subject's location, pull off the road so that **<u>a thorough job of documenting all evidence obtained during the interview can be accomplished</u>**. Important evidence may be lost if trusted only to memory. Considerable time can pass between the interview and the time when the information may be needed in court. Therefore, the officers should immediately prepare written notes or a tape recording of all issues discussed during the interview. The importance of this cannot be overstated.

a. Complete the Easement Violation Interview Checklist (Exhibit VII-1).

b. Prepare a memo to the file.

- Use the format as shown in Exhibit VII-2.
- Include the name, DOB (if necessary), and address and a complete description of the subject. A subject's DOB will be necessary for the new IMAGS reporting system.
- Include a reference to the tract of land (legal description and easement number) covered by easement.
- Officers may include comments on the attitude and cooperativeness of the subject, but do not use derogatory statements. Remember that in court cases, the defendant will have access to <u>everything</u> in the easement file, not just in the case file. Do not write anything that you would not like to have seen by the subject's attorney.
- Above all else, record direct quotes that the subject made, either voluntarily or in response to specific questions. Do not be afraid to record profanity in direct quotes that the individual may have made during the interview. The individual's choice of words reflects that person's attitude.
- Send certified letter (Exhibit VII-3). In the letter, reiterate what was told to the individual about compliance requirements and restate the deadline date. Attach a map, showing where compliance is needed and how much (Exhibit VII-4). <u>This letter must be sent certified</u> with return receipt requested. The receipt is the only evidence that will show later in court that the individual received the letter. Some people will not accept a certified letter. If a letter is refused, the post office will return it. They will include documentation with the letter that was refused. Save the letter and documentation for possible use in court. Follow up a refused certified letter with either a personal hand-delivered letter by an officer or a letter in a plain envelope. This letter should contain a valid return address. Make copies of this letter and the envelope addressed to the individual. Document how this plain letter was sent by recording who mailed it, the date and time it was mailed, and from where it was mailed. Have the post office date stamp the envelope by hand and, if possible, make a copy of the envelope containing the date stamp. If this letter does not come back to the return address, your documentation and photocopies will provide

evidence that the landowner received the letter. Inform the individual that if compliance is not obtained, the case will be referred to the U.S. Attorney for possible prosecution. In the initial letter, it may not be necessary to mention prosecution in order to keep a positive tone to the communication. In any follow-up letters, it should be mentioned if restoration is not obtained.

4. **Compliance Check:**

Follow-up inspections must be completed **within three days** after the restoration deadline to insure that the restoration is satisfactory.

In many cases, Service representatives will have been at the site during the compliance work. Ensure that a filled ditch has been packed and 10-percent overfill added, that all fill material has been removed from the basin, and there is no depression where the ditch was. This may be the hardest part of easement enforcement work. If the work is unsatisfactory, officers must be prepared to require total restoration.

Compliance requirements for upland sites will not be as definitive as with wetland compliance work. If a seeding is required to bring a violation back into compliance, the determination of achievement of compliance may take a year or more to assure that a satisfactory stand has been re-established. Wetland District personnel may have to work with the landowner over an extended period of time and require additional interim steps (e.g. clipping weeds) before a satisfactory restoration has been completed. Make sure the compliance requirement(s) are clearly explained and understood by the landowner. The case will be considered "open" for the entire restoration period. The case can be closed only when satisfactory compliance has been achieved.

When the subject has complied, send a letter (Exhibit VII-5) notifying the individual that the Service is satisfied with the compliance and that the U.S. Government will close the case. Thank the subject for his compliance, but also remind him that future violations may be referred to the U.S. Attorney's office for possible legal action. Letters sent as a result of satisfactory compliance do not need to be sent certified, but managers may do so if they wish.

Officers should also photo-document that compliance has been satisfactorily completed. These photos prove invaluable later if/when the same violation occurs.

If the individual does not comply with any of the deadlines given, notify the individual by certified letter of their failure to comply, and that the case is being sent to the Regional Easement Coordinator (Exhibit VII-6) for follow up and possible referral to the U.S. Attorney's office.

If tenants or renters are the primary contact for the violation, managers must also send copies of all correspondence to the landowner.

**5. <u>Assume Every Case Will Go to Court</u>:**

Compliance is the ultimate goal of the Service's easement programs. The Service realizes that through enforcement of its easement program, conflicts will arise between landowners and the Service. If the conflicts cannot be solved through contacts with the landowners, the final method of dispute resolution is through the court system. The Service must, at all times, maintain its professionalism when speaking to landowners and in documenting contacts and violations. The Officers must keep and maintain each easement file, realizing that all of the contents could one day be used for trial purposes. With the understanding that each easement violation has the potential to be settled in court, the Service must be pro-actively prepared to present its Case-in-Chief to the U.S. Attorney's Office and ultimately, the courts.

# CHAPTER VIII

# PROSECUTION

## A. General Discussion:

Before any action toward prosecution may begin, the Service must recognize the difference between violations and violations that have prosecutorial appeal. Hard decisions must be made based on reality, not ideals. The Service must assess investigations and potential violations from a neutral perspective. The Service must be able to prove that the action "destroyed or injured real property of the United States." The Service must be able to show biological damage, and not just physical damage.

The Service's role in easement enforcement is in the investigation, documentation, and presentation of the violation to the United States Attorney's Office (Exhibit VIII-2 is a letter drafted in 1981 which established the protocol for the Service to work directly with Department of Justice on easement cases). The United States Attorney's Office makes the decision on whether to prosecute, and whom to prosecute for a violation of federal law. Civilly speaking, the decision as to whether or not to proceed with a civil easement case referred to the United States Attorney's Office by the Solicitor ultimately belongs to the United States Attorney's Office. Once the United States Attorney's Office accepts the case, the Service is then responsible for preparation of the case for trial. This section addresses situations in which the Service has determined that there is need for further action and the United States Attorney's Office has tentatively accepted review of the case.

## B. Determining Prosecutable Violations and Issuing Violation Notices:

As defined in pertinent part, by the Code of Federal Regulations (50 CFR 25.11), the National Wildlife Refuge System, applies to "areas of land and water held by the United States in fee title and to property interests in such land and water in less than fee, including but not limited to easements." Holistically, this includes wetland easements for waterfowl management rights, grassland easements for waterfowl habitat protection, and FmHA easements for conservation purposes. This being said, it has always been the intent of the Service's easement enforcement program to gain compliance through wetland and/or grassland restoration. The issuance of a violation notice in lieu of restoration will gain the Service nothing, as the habitat will be lost forever without full restoration.

There will be instances when compliance only will not remedy the situation and the issuance of a Violation Notice may be in order for violations of the easement contract. Violation Notices **will not** be issued until the Officer has conducted an easement file review, and has coordinated with the Regional Easement Coordinator for consistency and the possible need to coordinate with the US Attorney's Office. The Service has sole discretion on whether to issue a Violation Notice for any violation of federal law for which the Service has been entrusted by Congress to enforce. However, in the case of easement violations, the Service will have additional requirements which must be satisfied before the issuance of any Violation Notice. The credibility and effectiveness of the easement program require a uniform and consistent policy for dealing with easement

violations. When in compliance with this policy, the issuance of Violation Notices will act as a future deterrent, and help to achieve compliance in other cases.

The following procedures provide general guidelines for the issuance of Violation Notices and are categorized by violation type, realizing a violation may encompass more than one category type of violation.

**1. Drainage Violations:**

Drainage violations represent one of the most common and complex violations of the wetland and FmHA easement programs and can be very destructive to the wetland on a long-term basis. Violation Notices may be warranted when the following conditions exist and are properly documented.

a. The landowner must have knowledge of the easement and subsequently drain or cause to be drained, one or more of the easement-protected wetlands. Prior knowledge must be properly documented in the easement file. Examples of what may be considered prior knowledge include, but are not limited to, an easement map having already been mailed to the landowner, previous easement violations on the same easement tract by the same landowner, documented phone or personal conversations regarding the easement in question, or any other documented form of knowledge.

b. First-time offenders of a serious violation involving a scraper ditch, backhoe, or other activity having an effect on a wetland or series of wetlands usually involving seasonal, semipermanent, and/or permanent wetlands.

c. Repeat violations of any type, including plow furrow violations.

Once again, violation notices will not be issued until restoration work has been completed.

**2. Burning Violations:**

A Violation Notice may be issued based upon case history and easement file documentation. Violation Notices and Warning Letters related to burn violations must be sent via certified mail. Letters issued merely as a warning about the burning will not require mapping of pre-76 easements, however, if managers are going to pursue the burning as a violation, then all investigative protocols must be followed, including mapping of pre-76 easements (See Mapping Requirements in Chapter XI). In cases of roadside burning or insignificant burning without clear intent or culpability, notification is not necessary. Burn violations require the same in-depth documentation as would be required for drain, fill, and level violations. Knowledge of the easement by the landowner is essential and documentation of the repeat violation is necessary. If repeat violations occur, preparation of an easement file review may be warranted.

### 3. **Fill and Level Violations:**

Serious fill or level violations may constitute grounds for the issuance of a Violation Notice. Fill and level violations must cause significant harm and detriment to the wetland basin thus impairing the wetland functions. One small rock pile in a five-acre wetland would not constitute significant harm. All efforts should be made to have this type of violation corrected, but this example in and of itself would not be considered an instance to issue a Violation Notice.

In cases of fill that do not constitute a violation or require restoration, photographic documentation is mandatory. Any accumulation or increase in fill over time can then be documented and measured. If necessary, enforcement action may then be taken. Adding rocks to an existing rock pile is an example where documentation will aid in future action if the rock pile continues to grow. As a minimum, notification to the landowner that continual dumping of rocks in the wetland could result in a violation is mandatory.

### 4. **Sheet water:**

Sheet water is yet another difficult issue. Sheet water, as defined by this manual, is a non-depressional area covered by shallow water that is generally moving off the land. A Violation Notice may be issued if a depressional area protected under the provisions of the easement is drained by a landowner provided the proper documentation has been collected. However, sole drainage of sheet water under this definition is not considered an easement violation and action is not required.

Landowners should be encouraged to obtain written consent from the Wetland Manager prior to drainage of any sheet water. In doing so, the Service can help prevent the accidental drainage of protected wetland basins.

Officers should review all pertinent information such as photographs and soil surveys and complete a ground inspection before a sheet water drainage determination is made. If a sheet water drainage determination is made, officers should work with the landowner to insure that the impact will not adversely affect easement protected wetland basins. Pumping of sheet water is preferred to ditching or any other type of earth moving activity.

### 5. **Pumping:**

Pumping is a problem in certain areas usually under high water conditions. Pumping is considered drainage and a violation of the wetland and FmHA easement contracts. Pumping can be a violation where issuance of a Violation Notice is warranted, provided the landowner had previous knowledge of the wetland or FmHA easement and the violation resulted in a significant impact to the wetland basin.

6. **<u>Enlargements and "Topping Off" of Wetlands</u>:**

Enlargements of easement-protected wetland basins are an issue in wet years or successive years of high annual precipitation. Enlarged wetlands may expand onto areas that have been previously farmed, hayed, or grazed, thus causing the farmer, rancher, or tenant to want to reduce the size of a wetland to its "normal" size. All requests for this activity will be evaluated individually.

**<u>Pre-76 Easements</u>:** As a result of the Johansen court decision in ND, as well as a decision by the 8th Circuit Court of Appeals, wetland easements purchased before 1976 are limited by the easement summary sheet which was developed at the time the easement was acquired.

Water levels within wetland basins periodically change. During dry years, there may be fewer acres of water within the basins than in wet years. In wet years, there may, indeed, be more wet acres on the ground than what are mapped. However, it is the Service's position that water levels within wetlands protected by the easement contract are allowed to naturally increase and decrease. A normal fluctuation of water levels is expected and is protected by the easement. If a specific wetland in question is depicted on the easement map, then it is protected. If the landowner believes the wetland contains an abnormally high amount of water and wishes to be given relief, then the wetland manager will evaluate the situation on a case-by-case basis. Relief may or may not be granted. Relief will not be granted if the fluctuation is determined by the manager to be within a normal fluctuation. Relief may be granted if extraordinary circumstances apply which go beyond what is considered to be a normal hydrological fluctuation. Exhibit VIII-1 provides some guidelines for managers to consider if a request to provide relief for pre-76 easements is received.

Any relief granted under this provision is NOT considered to be a flowchart issue for either region, as discussed in Chapter XII, because the water extending beyond the mapped basin which is determined to be a result of "extraordinary circumstances" is not protected by the easement; the request is thereby removed from the flowchart process by the second block on the flowchart (*Jurisdiction*). Additional information and guidance can be found in the chapter on Easement Mapping, Chapter XI.

**<u>Post-76 Easements</u>:** These easements have an Exhibit A map which shows the approximate location, size, and shape of protected wetland basins. The easement contract for post-76 easements has wording which describes the fluctuation of water levels resulting from natural or man-made causes, and states that enlargements from normal or abnormal water levels is still covered. However, Refuge Managers must be reasonable in their interpretation of what water levels are protected. Three wetlands which are now over filled and combined into "one" wetland, or a wetland flooded outside the "tree ring," or above any recent historical (last 50 years) records or memories, should receive temporary relief through a Special Use Permit, with conditions and stipulations for maintaining more normal water levels. The manager should discuss this issue with the Regional Easement Coordinator for concurrence and consistency.

A difference may exist on certain FmHA easements with enlarged wetlands. Specifically, the "B" covenant which protects some wetlands and an associated grass buffer does not afford protection outside the buffer strip. A landowner may not remove the "enlarged" portion of an expanded wetland as long as the expansion does not increase beyond the buffer strip (presuming one is present) identified around the wetland basin on the Exhibit A map. In other words, the Service is allowed to have the wetland expand to the outside edge of the buffer strip without granting relief. However, if the "enlarged" wetland expands beyond the buffer strip, the Service would lack jurisdiction on that portion outside the buffer strip; therefore, the provisions of the easement would not apply to this expanded area.

**7. Co-owned Wetlands:**

Co-owned wetlands or partially protected wetlands on easement lands present a difficult enforcement situation if drained. That being said, there are certain situations that may warrant the issuance of a Violation Notice provided the elements of the violation are supported through proper documentation. Possible situations that may warrant the issuance of a Violation Notice include but are not limited to:

a. Situations where the majority of the co-owned wetland is protected by the easement. The larger the percent protected by easement, the more likely it will be to initiate an enforcement action.
b. If the easement portion of the wetland is owned by the same landowner or family as the non-easement portion, the drainage of such a wetland may be grounds for enforcement action.
c. If the easement landowner participated in or encouraged the drainage from the non-easement portion of the co-owned wetland, enforcement action may be warranted.

**8. Unauthorized Maintenance of non-DFM Ditches:**

During the negotiation process between the Service Realty Specialist and the landowner, the landowner had the opportunity to identify ditches on their property which they wanted to maintain. The wetlands and their ditches were identified by the landowner and were drawn on a Drainage Facility Map (DFM). The DFM was ultimately incorporated into the easement contract. Any other ditched wetland not identified by the landowner on the DFM can not be maintained. The rationale, at that time, was if a non-DFM wetland had an existing drainage ditch, the ditch would fill in over time and the full function and value of the wetland would be restored. Time has shown that this is generally not the case, and furthermore, easement landowners will occasionally clean out old ditches in an effort to maintain the drain and/or further drain a protected wetland basin.

The Service can only require restoration to the condition prior to the recent work constituting the violation. In other words, what just came out must go back in, but this is a very difficult and subjective decision. For guidance, consider these factors:

- Determine, if possible, from older photographs, the history and extent of the original drainage. The time the drain was constructed and its effectiveness is important. Review of the FSA annual photographs may be useful. Examine recent aerial photographs and the remaining wetland vegetation at the site to help establish the wetland's normal high water mark prior to the ditch cleanout.
- Attempt to ascertain the amount of fill removed. If possible document and measure spoil piles or look for a vegetative line disturbance which may help to establish the historical ditch depth.
- Negotiate with the landowner to have that which was removed replaced. The extent of restoration that will be requested will be based on the amount of background information collected on the old drain. Without specific information or obvious spoil piles remaining after restoration, the Service may have to live with the negotiated fill amount. Whatever the result, document to the extent possible the elevation of the drain for future reference. Survey work is mandatory to have a basis for future enforcement action.

The clean-out of a non-DFM ditch is considered a drainage violation. A Violation Notice may be warranted when the elements listed in the Drainage Violations subsection have been met and documented.

**9. Farming/Breaking/Cultivation Violations:**

Farming, breaking, and cultivation violations may come in many forms and mean something different depending upon which easement program applies. The following is a brief overview of some issues officers may consider when viewing a potential violation:

**a.** **Wetland Easements**- Officers who observe potential wetland easement violations should always ask themselves what the intent of the earth moving activity was. Landowners who are farming by normal or routine farming practices that incidentally reduce the water holding capacity of a wetland may not have violated the terms of the wetland easement. However, a landowner using a farming practice with the intent to drain a wetland would be doing so in violation of the easement. The officer must be able to "ferret out" what the intent of any drainage activity is. Obvious plow furrows which enter easement protected wetlands or plow furrows that are unusually deep, would be two examples of earth moving activity which would be deemed a violation. Remember, the Service must prove the landowner's intent was to drain the wetland basin. Violation Notices may be warranted if the landowner had previous knowledge of the easement, and their intent was to drain protected easement wetlands.

**b.** **Grassland Easements-** Officers are faced with more varied types of violations when dealing with grassland easements. Officers may observe blatant violations of the grassland easement, which range from breaking of native prairie and

cultivation of large tracts of tame grass to cultivation of the edges of the grassland easement tracts. Officers should attempt to communicate with the landowner to establish whether they had prior knowledge of the easement, and to determine why the activity was conducted. As with wetland easements, the goal is for the landowner to comply and restore any damage that may have been done. Officers may, out of necessity, have to place posts at the boundaries to form a visual barrier for the landowner to see in the future. When this is done, the Officer should photograph the posts and draw a map with Global Positioning System (GPS) coordinates indicating the locations of the posts. Landowners with knowledge of the easement, who violate the easement conditions for a second or subsequent time, may be issued a Violation Notice after restoration has been completed.

c. **FmHA Easements-** These offer a blend of wetland and grassland easement issues. Officers may be faced with drainage through farming practices in protected wetland areas and loss of upland habitats through the breaking or cultivation of prairie, pasture, or previously farmed land that is encumbered by the easement. FmHA easements are further compounded by having different rules which apply to the easement based upon the time it was acquired and the state it was acquired in (See FmHA Easement discussion in Chapter X). Because of this, each FmHA easement file should be thoroughly reviewed by the officer before any contact is made with the landowner. As with wetland and grassland easements, officers should attempt to answer why the activity was conducted by the landowner. Officers should attempt to communicate with the landowner, establishing knowledge of the easement. Officers should attempt to have the landowner comply with and restore any damage that may have been done. Officers may, out of necessity, have to place Carsonite posts at the boundaries to form a visual indication for the landowner to see when farming around the easement protected areas. When this is done, the officer should photograph the posts and draw a map with GPS coordinates indicating the locations of the posts. Landowners with knowledge of the easement, who violate for a second or subsequent time, may be issued a Violation Notice after restoration has been completed.

Restitution or restoration of tame grass, CRP or seeded natives should be done to pre-violation grass and plant species compositions. The restoration will include reseeding and a period of idleness to allow reestablishment. Restoration is not complete until establishment of the grassland is satisfactory. The Natural Resource Conservation Service, county agent or others may be able to assist the Service in this evaluation process.

Cultivation or plowing of native prairie grasslands represents the loss of an irreplaceable habitat. If the violation was knowingly committed, the Service will consider it an aggravated violation and seek a court-developed penalty plus value (wildlife resources and habitat) and restoration to a prescribed condition. The prescribed restoration will be based on an evaluation of soils, condition of the tract after alteration or cultivation and may include forb and shrub plantings as well as reseeding of native grasses.

**10. <u>Haying Violations</u>:**

Haying violations may occur on grassland and FmHA Easements. Haying is regulated in different ways depending upon the type of easement. The following is a brief overview of some issues officers may consider when viewing a potential haying violation.

**a**. **<u>Grassland Easements</u>-** Landowners who have knowledge of the easement and who hay or harvest grasslands on or before July 15 of each year, without prior approval, may be subject to a Violation Notice. The Officer must look at the severity and extent of the haying and figure out why the landowner hayed the easement. Factors that could minimize a first time violation could include haying or mowing to control noxious weeds or for the creation of a firebreak. Officers should educate the landowner about the easement restrictions and document the extent of the damage. Officers may have to place posts at the boundaries to form a visual barrier for the landowner to see in the future. When this is done, the officer should photograph the posts and draw a map with GPS coordinates indicating the locations of the posts.

**b.** **<u>FmHA Easements</u>-** Some FmHA easements prohibit the mowing or haying of upland areas; others do not. Again with FmHA easement issues, officers must review the document thoroughly to determine if any of the rights held by the Service have been violated. With any potential violation, the officer should attempt to answer why the activity was conducted by the landowner. Officers should attempt to communicate with the landowner, establishing knowledge of the easement. Officers may have to place carsonite posts at the boundaries to form a visual barrier for the landowner to see when haying around the easement protected areas. When this is done, the officer should photograph the posts and prepare a map with GPS coordinates indicating the locations of the posts.

Both civil and criminal penalties could be considered if the landowner/operator had knowledge of the wildlife habitat easement. If knowledge of the wildlife habitat easement and the violation activity cannot be proven, only civil penalties are available. A civil penalty of 3% of the value of the hay per day prior to July 16 is recommended.

Refuge/District personnel should confer with the Regional Easement Coordinator in regard to prosecuting repeat violators. It is recommended that repeat violations result in a 100% fine in the amount of the hay's value. A repeat violation may be considered as an aggravated violation, subject to a greater criminal penalty (such as $500 plus hay value and restoration). The Service will use a court-developed bond schedule for criminal penalties and restitutions.

**11. <u>Seed Harvest</u>:**

Seed harvesting is an issue that the officer must be aware of when dealing with grassland and FmHA easements. Seed harvest may be allowed if the time and location within the easement are correct.

a. **Grassland Easements-** Seed harvest is viewed in the same vein as haying and mowing. Seed harvest may be completed without a permit, after July 15 of any calendar year. Any seed harvesting undertaken by a landowner on or before July 15 of a calendar year would be considered a violation, unless authorized in advance. Like haying and mowing, landowners who have knowledge of the easement and who gather seed on or before July 15 of each year, without prior approval, may be subject to receiving a Violation Notice.

The authorized harvesting of seed on a Grassland Easement prior to July 15 would be considered an economic use, and therefore, be subject to the higher standard of compatibility requirements of having to Acontribute@ to the refuge area.

b. **FmHA Easements-** Generally speaking, FmHA easements treat seed gathering the same as haying or mowing. Seed gathering is prohibited in all of the easement areas, except for some of the protected wetlands and some of the Adiscretionary@ easement areas. Like haying and mowing, any seed gathering completed outside of these two areas of the easement would be considered a violation of the easement contract.

**12. Other Grassland Altering Practices:**

Grassland may be altered in any number of ways and by any number of methods. Officers should attempt to determine why an alteration has taken place and specifically apply what has happened to the terms of the specific easement contract. All of the Service easements have specific prohibited activities. Many of the early FmHA easements (deed restrictions) prohibit grazing unless authorized by the Service as the easement manager. Unauthorized grazing of these areas will be treated similarly to other violations of the easement agreements. Any activity not specifically prohibited by the contract is allowed. When a question arises regarding the legality of a specific action, consult with the Regional Easement Coordinator and possibly other Project Leaders for consistency. See Section D.2 below.

**13. Other Violations:**

Other violations encountered by officers that do not fit logically into one of the previous categories are addressed here. Listed below are some of the more common violations that an officer may encounter along with general guidance on how to handle the situation.

a. **Coulee clean outs -** Coulee clean outs are a difficult issue to address, but some direction can aid in enforcement of easement-protected wetlands. Wetlands within a coulee are protected by the wetland easement unless deleted on the Drainage Facility Map (pre-1976 easements); however, third party interests (viable legal drains) may have prior rights. In situations where a violation has already occurred, handle case documentation as with any other violation and if deemed appropriate, prepare a file review and contact the Regional Easement Coordinator.

Maintenance or clean out of a natural waterway can be addressed in some situations by allowing clean out to the upstream edge of the wetland basin. A no-maintenance/no clean out buffer is then left untouched for 200-500 feet downstream of each wetland basin in the waterway. At the end of the last buffer, maintenance or clean out may continue. Officers should encourage the landowner to leave the buffer strip in place without manipulation. The Service does not have a legal nexus to allow protection of the buffer strip. The landowner should be advised that compromise of the buffer strip could facilitate the wetland sill to blow out and it would be the landowner's responsibility to repair and maintain the wetland. Managers who encounter these kinds of potential easement issues are encouraged to contact the Regional Easement Coordinator for advice.

b. **Plow furrows/dead furrows -** Plow furrows and dead furrows constructed as part of a normal or routine farming practice that incidentally reduce the water holding capacity of a wetland are not an easement violation. However, a furrow that is unusually wide or deep, or one that meanders from wetland to wetland is a violation. The Service must prove the intent was to drain the wetland basin.

c. **Culverts**- Culverts in existing township-, county-, or state-owned roads generally are located on a transportation easement or right-of-way that usually pre-dates the easement. In most cases, the local governing entity can do what is necessary within the road easement or right-of-way for transportation purposes and public safety. The Service may have little legal role in setting culvert elevations within road rights-of-way unless federal funds or permits are involved. A Service representative should recommend that the culverts are only set to a level to improve the safety of the road and not to accommodate drainage to wetlands protected by the easement. Culverts set lower than necessary to accommodate wetland drainage may warrant a violation of the easement, but once again the Service must be able to prove the intent to drain a protected wetland. When dealing with these state and local entities, negotiation skills may be the best tool to protect or minimize adverse wetland basin impacts.

d. **Subsurface Tile Installation** – Drain tile that is installed to directly drain a protected wetland should be treated as any other violation (prepare a file review and contact ZLEO if appropriate). Drain tile installation within the boundary of a wetland easement that does not directly intersect with a protected wetland can be a more difficult issue to address since the Service's jurisdiction is limited to the draining, burning, filling, and leveling of protected wetland basins. Of particular concern is the installation of tile that could potentially adversely affect a protected wetland basin by diverting water from its watershed. ***At the time of this writing, the Service is crafting comprehensive guidance and procedures for working with landowners on the installation of drain tile. Consult with the Regional Easement Coordinator for current guidance pertaining to drain tile.***

## C. <u>Easement File Review Preparation</u>:

Given the aforementioned guidance, officers will usually conduct easement file reviews when a repeat violation has occurred dealing with the same person and that person has specific knowledge of the easement. An easement file review must be prepared by the officer before any Violation Notice will be issued. The officer must conduct a thorough easement file review to identify any problems that may exist within the file which may bar the issuance of the Violation Notice. The officer must be able to sort through large easement files and determine what information is germane to the current case. The Service will not, under any circumstance hide, destroy, or alter any evidence in the easement file, which is exculpatory in nature or that may bar the issuance of a Violation Notice. The officer should be mindful of the "De minimus" and "Laches" Doctrines when reviewing the file. These doctrines are defined later in this Chapter. Once the easement file review has been completed, the officer may contact the Regional Easement Coordinator for assistance or expertise with reviewing the easement file. The officer must be prepared to point out the strengths and weaknesses of the case to the Regional Easement Coordinator, when discussing the file review.

Typically, easement file reviews are organized in a chronological format, paying particular attention to prior violations, prosecutions, and the violator's knowledge of the easement. The officer will prepare an individual summary by easement number and legal description for each easement violation. This will be relatively simple for a single violation, but can become significantly more complex in cases of extensive historical violations and/or multiple violations within the same easement. The following is a minimum of information that must be documented when conducting an easement file review.

- The officer will need to obtain and review copies of the specific Service Realty Easement files which, depending upon the location of the easement, will be located at the Service's local WMD office and the servicing Realty Office: Minot and Bismarck for North Dakota, Aberdeen and Huron for South Dakota, and Benton Lake NWR for Montana. Additional realty records may be obtained in the Regional Realty offices. See Chapter IV for a discussion of what can be found in the Regional Realty Offices.
- In the case of Pre-76 wetland easements, the officer must have measured the easement wetlands in their entirety to assure the Service has not mapped more than the easement summary acreage. The officer must list the easement mapping references which document what resources were used to prepare the map. See Chapter XI, Easement Mapping, for additional information.
- If questions arise concerning the map and any protected basins or other areas within the easement, the officer will ground-proof the map(s).
- The officer must have on-the-ground survey information which demonstrates the violation(s). Photographs and survey notes will typically suffice to document the violation(s).
- The officer must identify the current landowner and possible tenants.

## D. Responsibilities of the Wetland Manager and the Regional Easement Coordinator

When the file review has been completed by the officer, and the officer is convinced a violation has occurred, they should begin processing the incident as a violation of the easement contract. The Regional Easement Coordinator is available to help refuge officers with easement violation decisions if necessary. At an absolute minimum, the Regional Easement Coordinator will be kept informed through the easement violation tracking system (See Chapter VI-C). Each violation will be reviewed and evaluated on its own merits realizing that not all violations are created equally. The Regional Easement Coordinator can review the easement file documentation with the officer who prepared the file. Questions or requests for additional information will be handled directly between the Regional Easement Coordinator and the officer who prepared the file review. A file review may be completed at anytime when an easement violation has occurred.

As previously stated, Violation Notices <u>will not</u> be issued until the officer has conducted an easement file review, and has coordinated with the Regional Easement Coordinator for consistency and the possible need to coordinate with the US Attorney's Office. **It is the responsibility of the Regional Easement Coordinator to communicate with the United States Attorney's Office to ensure support if the defendant chooses to contest the Violation Notice**. In each instance where a Violation Notice is issued, the facts must be documented, prepared, and readied for potential United States Attorney's Office review. **Violation Notices will only be issued after satisfactory restoration of the easement has been accomplished and the officer has verified the restoration.**

The National Wildlife Refuge System Administration Act (16 U.S.C. 668dd) contains <u>only</u> criminal penalties within the wording of the Statute. The National Wildlife Refuge System Administration Act as of 10/28/1998 established two penalties based upon the culpability of the violator. The most stringent penalty, a Class A Misdemeanor, states in part, "Any person who **knowingly** violates or fails to comply with any of the provisions of this Act [16 U.S.C. '' 668aa et seq.] or any regulation issued thereunder shall be fined under title 18, United States Code, or imprisoned for not more than one year, or both." [See 16 U.S.C. 668dd(f)(1)]. The second and least stringent penalty, a Class B Misdemeanor, states in part, "Any person who otherwise violates or fails to comply with any of the provisions of this Act (including a regulation issued under this Act) shall be fined under title 18, United States Code, or imprisoned not more than 180 days, or both." [See 16 U.S.C. 668dd(f)(2)].

Violations that <u>occurred before 10/28/1998</u> are still considered Class "A" Misdemeanors and must be cited in the Offense Charged Box of the Violation Notice as 16 U.S.C. 668dd(c) and 16 U.S.C. 668dd(f)(1).

The following verbiage will be used in the Offense Description box of the Violation Notice for a Class "A" Misdemeanor:

> "Subject did knowingly disturb or injure, real or personal property of the United States, to wit; drain or cause to be drained a wetland protected by Ramsey County Easement 199x-1, without being permitted to do so."

The following citation will be used in the Offense Charged Box of the Violation Notice for a Class "B" Misdemeanor: 16 U.S.C. 668dd(c) and 16 U.S.C. 668dd(f)(2). The last citation is imperative in order that the violation be charged under a Class "B" Misdemeanor. The last citation may only be used for a violation that occurred on or after 10/28/1998.

The following verbiage will be used in the Offense Description box of the Violation Notice for a Class "B" Misdemeanor:

> "Subject did disturb or injure real or personal property of the United States, to wit; plow or cause to be plowed land protected by Burleigh County Easement 16G, without being permitted to do so."

The two major differences between these charges lie in the level of awareness by the violator ("knowingly" for a Class "A" and "strict liability" for a Class "B") and in the trial itself (option of a jury trial for Class "A" and only a bench trial for Class "B"). It is ultimately up to the U.S. Attorney's Office to decide on whether to charge a Class "A" misdemeanor or a Class "B" misdemeanor. To date, most easement violations that have resulted in Violation Notices have been charged as Class "B" misdemeanors.

Once issued, Violation Notices will be tracked through the Central Violations Bureau by the respective ZLEO for that area. In the event that a Violation Notice is contested, the ZLEO will contact the Regional Easement Coordinator and the refuge officer. The Regional Easement Coordinator, with the assistance of the refuge officer, will be responsible for presentation of the case to the U.S. Attorney's Office and preparation for trial in Federal Court. Trial preparation is further discussed in Chapter VII. Officers are also responsible for completing the Easement Violation Tracking System requirements found in Chapter VI-C.

Undoubtedly, there will be occasional incidents which are either uncommon, sensitive, or outside the "normal" run of easement issues. When these situations are encountered, project leaders should feel free to collaborate with other refuge and law enforcement interests before taking any action. The Regional Easement Coordinator will also be available to assist with these "special-case" situations. This is obviously a judgment issue, and the station project leader will decide whether to consult or handle the easement issue alone.

## E. General Case Brief Preparation:

Having previously conducted an easement file review, the process to prepare the case brief should be easier, and there should be a minimum of questions arising at this time. The primary purpose of a case brief, like that of an easement file review, is to completely and adequately address a multitude of issues that may present hurdles for potential prosecution or identify problems which may preclude prosecution. The difference between a case brief and easement file review is that a case brief is the first formal process that is undertaken in the process of preparing for litigation. When the officer and Regional Easement Coordinator believe a violation has prosecutorial appeal and the violation has been thoroughly researched and documented through the preparation of a case brief by the refuge officer, a formal Report of

Investigation incorporating the case brief and its attachments will be prepared by the Regional Easement Coordinator.

The case brief should be treated as attorney-client privileged information and labeled as such. The brief, prepared by the officer, should chronologically document the current violation, and include any and all information germane to the investigation to include exculpatory information. The officer should remember briefs are just that, BRIEF, and should not include extraneous information, personal bias, or anything that is not necessary to understand the events surrounding the current violation and the history of the easement and landowner. The case brief can be prepared in several different ways and may include all or several of the following headings:

Synopsis
Narrative
Predication
Details of Investigation
Description of Subjects
Prior Violations
Witnesses with Testimony Summaries
Laws Violated
Evidence (list of all photographs and documents germane to the case)
Attachments - may include Reports of Investigation, select photographs, Chain of Title, Easement Map(s) marked with locations of violations.
Restoration Plan - a short detailed plan that explains exactly what the Service expects to restore the drained wetland basins. Specific information to include is the amount of fill (inches) to be removed from the wetland, length of ditch to be filled, amount of clay needed in the ditch bottom, amount of tile to be removed, etc. The restoration plan is very beneficial to the AUSA when dealing with a defense attorney during any plea agreement processes.

In addition to and included with the aforementioned outline, the Service must ensure the case brief includes good evidence and documentation. The Service has the burden of establishing sound, credible evidence in a criminal prosecution and/or civil action. The Service must be able to document the damage that has taken place with an easement violation. Documentation can be in the form of, but is not limited to, ground and aerial photographs, ground surveillance documentation, and timely interviews of the potential violator and his/her accomplices, his/her neighbors and other state and federal agencies. Remember, the United States Attorney’s Office, a judge, or jury does not have the ability to visit the easement site. It is the Service’s responsibility to portray, through documentation, the easement violation in the courtroom.

The Service must be ready to gather original documents or certified original documents in a timely fashion upon notification from the United States Attorney’s Office of acceptance of the case for prosecution. Examples of documentation include, but are not limited to, certified copies of the easement and deed showing current land ownership in criminal case. Civil cases will require the Service to produce certified copies of the easement and a Chain of Title from the filing of the easement, which documents the current landowner (proposed defendant) along with certified copies of the deeds. In civil cases, the Chain of Title should include all entries except utility and road rights-of-way easements.

The Service will be required to produce witness lists of the individuals who may be called upon to testify on behalf of the prosecution. Witnesses are generally broken down into two categories of witnesses:

- **Fact witnesses**- include all witnesses to be called by the government except expert and rebuttal witnesses. Fact witnesses could include but are not limited to refuge officers, ZLEO's, Service employees, neighbors, prior landowners/tenants, and contractors. When drafting the fact witness list, the officer or ZLEO must include the fact witness's name, work address, phone #, and a brief statement of his or her expected testimony.

- **Expert witnesses**- include all witnesses who may be called by the government to provide expert testimony in a given field. The list prepared by the Service must include the expert witness' names, field of expertise - (i.e., Wetlands Biologist, Photo-interpreter, Soil Scientist, Hydrologist, etc.), and the expected testimony of the expert witness - (i.e. impact of drainage on a semipermanent wetland, impact on waterbird production, soil type and wetland classification). Expert witnesses will be necessary when identifying wetland basins and a host of other topics in which the average Service employee is not trained and has not received the appropriate certification. The Service must be prepared to pay for the expert witnesses' travel and field review time before trial preparation begins. Many times, the Department of Justice will pay for these costs.

If deemed appropriate and necessary, Project Leaders may authorize potentially needed expert witnesses to accompany refuge officers during the investigation phase, or to help prepare a case which is likely to be headed for the judicial system. These experts must be escorted by two refuge officers onto the easement property to assist with documentation and data collection such as wetland soils determination, etc.

**U.S. Attorney's Office Discovery Policy – Amended June 16, 2010**

Discovery of both inculpatory and exculpatory evidence to the defense has become an issue across the country and within the District of North Dakota. As a result, we've been directed by North Dakota's U.S. Attorney's Office to ensure that investigative reports, witnesses statements, photographs, etc. are compiled in a timely manner by the case agents and that they are shared with the assigned AUSA in a timely manner. Exhibit VIII-3 contains specific guidance and a form letter that must be completed and submitted for any case brought forward in North Dakota.

## F. Wetland Easement Case Briefs:

In addition to the previous section dealing with case briefs, wetland easements add additional elements that the courts have identified that the Service needs to prove. Those additional elements should be covered in the case brief and include:

1. **Proof That Wetland(s) Have Existed Over Time**- As a result of the Johansen decision, the courts now require the Service to prove the wetland(s) that have been negatively impacted through a prohibited activity, existed at the time the Service acquired the wetland easement. The Service must also demonstrate the wetland(s) have existed

over the period of time the Service has retained the easement. To aid in this requirement, officers may document the existence of the wetlands through the interpretation of historical aerial photographs, both at or near the time of the easement being acquired. One dark spot on an aerial photograph does not fulfill the Service's obligation in this matter and an expert witness may need to be contracted to interpret aerial photographs. The Service has the obligation and responsibility to review as many aerial photographs as is reasonably necessary to develop an aerial photograph timeline for each wetland that has a violation.

Additional photographs may be accessible through other agencies' resources. Remember, just because a ditch has been documented on the easement doesn't mean an identifiable and defendable wetland exists and that the wetland has been drained. Officers should also obtain documentation of the existence of hydric soils, aquatic plants and hydrology (evidence of previously standing water) as confirmation that a wetland existed.

**2. <u>Protected Wetland Statement</u>**- Again as a result of the Johansen decision, the courts have established that on pre-76 wetland easements, the Service is <u>only</u> entitled to the wetland acres purchased and documented on the Easement Summary sheet. There have been cases where a Realty Specialist acquired a wetland easement tract that had more wetland acres than the Service had originally paid for and documented on the Easement Summary sheet. The officer must check to ensure that the Service has not protected more wetland acres than what was initially acquired. Unless previously mapped, a thorough case brief must be completed before the officer may determine what wetland(s) the Service meant to identify and protect. In order to document to the court's satisfaction, the Service must demonstrate that they have only laid claim to the wetland acres the Service purchased, the Service must provide a Protected Wetland Summary Acreage Statement in easement cases. This statement should be included in both referrals to U.S. Attorney's Office and the Solicitor's Office. The written statement should be completed by the Wetland Manager or officer, and should include that the wetland is part of the Easement Summary Acreage. Wetlands that will receive protection include, but are not limited to:

- Wetlands that the Service has identified to the landowner/tenant as being protected. This includes historical wetlands that the Service has protected.
- Any co-owned wetlands that the Service has previously protected referencing other wetland easement owners and/or easement files.
- Any wetlands that have been previously involved in any criminal or civil litigation.
- Service identified wetlands, as identified by the Easement Summary sheet, which are not listed above, do not exceed the Easement Summary sheet, and remain protected.

Again, officers should be familiar with the chapter on Easement Mapping (Chapter XI) which provides more information on mapping requirements.

## G. Department of Justice Acceptance of Easement Case:

Using the case brief, the Regional Easement Coordinator and the officer will determine whether the case warrants referral for criminal prosecution or a civil action. The Regional Easement Coordinator and the officer will present the easement case to the U.S. Attorney's Office. If the case fails to meet the standards for criminal prosecution, the Regional Easement Coordinator will transmit the case report to the Regional Solicitor's Office for civil action.

Once a case is accepted by the United States Attorney's Office or the Regional Solicitor's Office, the Service must be prepared to devote 100% of its time to the case. The United States Attorney's Office may request additional materials be gathered and submitted, and the Service will need to respond with the requested information quickly. The Service, when engaged in trial preparation, will treat all requests from the United States Attorney's Office or Field Solicitor as top priority and will delay whatever activities were being completed before the request.

All inquiries about the ongoing case from defense attorneys, the media, or the general public **will be referred without comment** to the U.S. Attorney, or Field Solicitor, whichever is appropriate. Copies of all related correspondence concerning easement violations, including congressional inquiries and letters, will immediately be forwarded to the Regional Easement Coordinator.

Once a civil case has been forwarded to the Solicitor, further communications concerning that case can be directed between the Solicitor, Regional Easement Coordinator, and the U.S. Attorney's Office. It is the responsibility of the appropriate Regional Easement Coordinator to track the case through the judicial system, and inquiries concerning the status of the case will be directed to the Regional Easement Coordinator. **Unless otherwise authorized, communications with the U.S. Attorney's Office or Solicitor will be through the Regional Easement Coordinator.** The Regional Easement Coordinator will keep the respective WMD and officers involved and abreast of the investigation's development.

When a case is closed, and restoration of the protected habitats has been completed, the Wetland Management District will send the violator a notification that the case has been closed. See Exhibit VII-5 for an example of this communication. All original documentation gathered throughout the investigation will ultimately remain in the specific easement file stored at the respective WMD.

## H. Other Legal Aspects:

### 1. General Definitions:

Easement- a right, created by an expressed agreement, of one owner of land to make lawful and beneficial use of the land of another.

Wetland Easement- the United States acquired the right to maintain wetlands on a described tract of property as Waterfowl Production Areas by not draining, burning, filling or leveling those wetlands.

Grassland Easement- the United States acquired the right to maintain identified upland tracts as wildlife management areas through the control of haying, mowing, and seed harvesting; and through the prohibition of crop production, digging, plowing, discing, or otherwise destroying vegetative cover within the identified tracts.

FmHA Easement- The United States retained the right to maintain and enhance wetland and upland habitats as Conservation Easements by prohibiting the construction of structures, the cutting or mowing, cultivation, harvesting of wood products, burning, placing of refuse, wastes, sewage, or other debris, draining, dredging, channeling, filling, discing, pumping, diking, impounding, and related activities, or diverting or affecting the natural flow of surface or underground water into, within, and out of the easement area. There is great variability among FmHA Conservation Easements in terms of what rights were retained.

Enforcement- The act of putting something such as a law into effect; the execution of a law, the carrying out of a mandate or command.

Prosecute- To follow up; to carry on an action or other judicial proceeding. To "prosecute" an action is not merely to commence it, but includes following it to an ultimate conclusion.

*De minimus* doctrine- The law does not care for or take notice of very small or trivial matters, the law does not concern itself about trifles. (Black's Law Dictionary)

*Laches* doctrine- defined as neglect to assert right or claim which, taken together with lapse of time and other circumstances causing prejudice to adverse party, operates as bar in court of equity (civil litigation). A failure to do something which should be done or to claim or enforce a right at a proper time. (Black's Law Dictionary)

**2. Easement Authority:**

**Wetland and Grassland Easements**- The authority for the Secretary of the Interior (i.e., U.S. Fish and Wildlife Service), to acquire Easements for Waterfowl Management Rights is granted under the Hunting Stamp Tax Act, 16 U.S.C. 718d(c), the Fish and Wildlife Act of 1956, (16 U.S.C. 742a-742j), the Emergency Wetlands Resources Act of 1986, (16 U.S.C. 3901), the Land and Water Conservation Fund Act [16 U.S.C. 4601-9(a)(1)], and the North American Wetlands Conservation Act (16 U.S.C. 4401 - 4412).

**FmHA Easement-** The authority for the Secretary of the Agriculture (i.e., Farm Service Agency), to acquire Conservation Easements is granted under the Consolidated Farm and Rural Act of 1981 and 1985 (7 U.S.C. 331 and 335), Executive Orders 11990 and 11988, and Section 1314 of the 1985 Food Security Act. The Food Security Act of 1985, Section 1314 and 1318 stipulates the role of the Service to assist the FmHA in the enforcement of the Conservation Easement. This role is further defined in a Memorandum of Understanding between the FmHA and the Service, signed in 1987, which addresses interagency coordination. The Service is authorized to enforce

Conservation Easements through the National Wildlife Refuge System Administrative Act (16 U.S.C. 668dd et. seq.).

**3. Applicable Easement Enforcement Authorities:**

The National Wildlife Refuge System Administration Act, specifically, 16 U.S.C. 668dd and the accompanying regulations found in 50 CFR Part 25, 26, and 27, are not binding to the general operation of the land identified by the easement contract and the landowner's actions. As an example, the right of the landowner to allow or prohibit such activities as trapping, snowmobiling, and hunting is not encumbered so long as these activities do not result in one of the prohibited activities specifically listed within the easement contract attached to the land. A 1986 revision of 50 CFR, Subchapter C, clarified the Service authority on easements. For additional information regarding this change, review **50 CFR 25.11, 25.12, and 25.44.**

**4. Burden of Proof (Criminal):**

In order to proceed against the violator in a criminal case, the Government must be able to prove that the person violated the provisions of the easement contract and in all cases, the Government should strive to prove that the violator had knowledge of the easement's existence. **"Knowingly"** means that the person had knowledge of the facts involved. Otherwise stated, the violator knew that the area was protected by an "easement" and, for wetland easements, this means that the same person had some influence on draining, filling, leveling, or burning the protected wetlands. A recent change in the law [16 USC 668dd (f2)] now allows individuals to be charged "criminally" without having to satisfy the "knowingly" part, but refuge officers will still be required to meet this burden before proceeding criminally. If in doubt, consult with the Regional Easement Coordinator.

The Government must prove its case to the Court **"beyond a reasonable doubt."** It is important during the investigation and documentation phases of these cases to establish who did the actual draining, filling, leveling, or burning and if the landowner(s) or other violator were aware of the easement provisions. If the Government proves its case, the U.S. Attorney will recommend to the judge that the violator restore the habitats in accordance with Service specifications. In addition, the judge may assess other penalties as he or she deems necessary under the Statute.

**5. Burden of Proof (Civil):**

In a civil action, the Government does not need to prove that the defendant "knowingly" violated, only that he or she actually caused the damage to the easement. Knowledge of the easement or its provisions is not a necessary element. The Service must be prepared to show the Court that measurable damage did occur (draining, filling, leveling, burning, etc.), that restoration is necessary, and that monetary damages for permanent loss of wetlands would not be adequate compensation. The degree of proof required in a civil case is a **"preponderance of the evidence."** This is a lesser standard of proof than required in criminal cases. However, the investigation and documentation of the violation must be done with the same quality and completeness as in criminal cases.

**6. Statute of Limitations (Civil and Criminal):**

There is no statute of limitations barring a civil action where the United States is seeking only equitable relief, and it is a well-established rule of law that the United States is not subject to any statute of limitations in enforcing its rights unless Congress explicitly provides otherwise. Civil penalties are not specifically provided for in the Statute. However, a civil action requiring restoration of the affected wetlands or grasslands, and in some cases a settlement for damages, may be undertaken by the U.S. Solicitor's Office. Civil actions are handled in conjunction with the U.S. Attorney's Office.

With respect to criminal cases, in United States v. Lhotka, CR. 4-84-116, slip. op. (D. Minn. August 5, 1985), Judge Cudd found that the criminal prosecution of an easement violation was not barred by the five-year statute of limitations set forth at 18 U.S.C. '' 3282, because the violation was continuing in nature. However, the Service is obligated in any judicial process (criminal or civil) to have investigated an easement violation without unnecessary delay. Delay in investigating an easement violation or placing a known violation back into a file could result in a U.S. Attorney's Office declination or Laches Motion made by the defense.

# CHAPTER IX

# RELEVANT COURT DECISIONS

## A. General Discussion (Historical):

The easement document itself, the purchasing procedure used to secure the easement, and the enforcement of the easement by the Service have all been sources of arguments in individual court cases decided from 1971 to present. In addition, the State of North Dakota appealed to the Supreme Court of the United States in 1981 in an effort to overturn a judgment entered by the U.S. Court of Appeals for the Eighth Circuit, dated June 3, 1981. That Court of Appeals decision held that several North Dakota State Statutes unconstitutionally interfered with the acquisition of land by the United States for "Waterfowl Production Areas" and that the North Dakota Governor's consent is not required for such acquisitions.

The Supreme Court ruling reads as follows:

> "In the absence of federal legislation to the contrary, the United States unquestionably has the power to acquire wetlands for waterfowl production areas, by purchase or condemnation, without state consent. *Paul v. United States, 371 U.S. 245, 264 (1963); Kohl v. United States, 367, 371-372 (1875).* Here, however, Congress has conditioned any such acquisitions upon the United States obtaining the consent of the Governor of the State in which the land is located."

As a result of these court challenges, the easement document and its administration by the Service have become well defined and have become "stronger" in its use as a tool in protecting wetlands. It is important to remember that easement enforcement is, by nature, controversial and that restoration of protected habitats is the primary goal. However, a strong enforcement posture is mandatory in order to provide a deterrent to those who would be inclined to destroy the habitats protected by the Service easements. It is imperative that Service personnel conduct their assigned easement duties so as not to weaken the strong posture assigned to the easement by the courts. The following represents some of the easement decisions, decided by the courts, and that have defined the Service's easement program.

## B. Federal Magistrate Decisions:

### 1. U.S. v. Earl P. Morehouse [CIV No. 86-1034, U.S.D.C., D. S.D. (1986)]

Morehouse was charged by information with a violation of 16 U.S.C. 668dd(c) by draining and burning off wetland basins which were subject to protection by Easement for Waterfowl Management Rights. Trial was held before U.S. Magistrate at Aberdeen, South Dakota on December 9, 1986. As a defense, Morehouse contended that the Service Realty Specialist misrepresented the easement and that an attached drainage facility map was not a part of the parties' contract, nor was the drainage facility map an accurate reflection of his (Morehouse) understanding of the contract. Morehouse

maintained that the wetlands that he had drained were erroneously placed under protection by the easement, and he was not properly notified of their inclusion in the contract by the Service.

The Magistrate found that the Service proved beyond a reasonable doubt that proper letters of notification and a valid drainage facility map were sent to Morehouse for his inspection and acceptance. Thus a binding easement was executed on the face of the written agreement and both parties are bound by its execution. Morehouse was found guilty, fined $500.00 plus court costs, and a stipulation for restoration of the wetlands was filed by the U.S. Attorney. Morehouse appealed to the Eighth District Court of Appeals.

**2. U.S. V. Myron D. Lhotka [CR No. 4-84-116 U.S.D.C. D. Minn (1985)]**

Lhotka was charged in a single count criminal information with knowingly violating the easement document protecting wetlands. Lhotka had executed the easement with the Service in June 1964, and on November 27, 1968, the first of several easement violations was observed by Service personnel. Additional contacts with Lhotka took place between 1968 and 1984. By 1984, a total of 96 wetland basins on one section and 61 wetland basins on another section had been drained or filled by Lhotka.

The court found that all of the non-exempted (by drainage facility map) ditches on defendant's property in Sections 14 and 24 had been created and maintained by the defendant. It was also found that the conveyance of easement is a valid, enforceable contract supported by consideration under which the defendant is prohibited from draining or filling wetland areas. The Service's repeated warnings and contact with the defendant, coupled with the numerous attempts to get him to restore the property, demonstrates without doubt that the defendant knowingly violated the Statute. As to the claim by defendant that the statute of limitations bars prosecution, the court found that, based upon the evidence presented by the Service, the offense charged is considered to be a continuing offense. Lhotka was found guilty of violating 16 U.S.C. 668dd from on or about November 27, 1968, to the date of his conviction, August 5, 1985.

**3. U.S. v. Alvin Peterson, [Case No. 2:08-mj-16 (2008), U.S. Dist. Court, Dist. Of ND]**

Alvin Peterson was charged with draining four wetlands covered by the provisions of Walsh County Easements 124X and 56X-2. Three of these wetlands were restored by U.S. District Court order {U.S. v. Alvin Peterson [2:04-cr-102 (2005)] [05-4248(8th Circuit)]} in September 2006. A two-day bench trial was held and Peterson was found guilty a second time.

Magistrate Judge Alice Senechal presided over both of Mr. Peterson’s trials. Her post-trial memorandum filed for the 2008 trial found that the government met its burden of proof beyond a reasonable doubt as to all the elements described in U.S. v. Johansen. These elements are 1) that the United States holds a property interest, established through a properly recorded and accepted easement, 2) that identifiable wetlands existed at the

time the easement was taken, 3) that Peterson knew that the wetlands at issue were subject to an easement, 4) that Peterson engaged in prohibited activity by disturbing, injuring, cutting, burning, removing, or destroying the wetlands at issue, 5) that the activity was not permitted or otherwise authorized, and 6) that Peterson's actions caused surface and/or subsurface damage which injured, disturbed, or destroyed the wetlands.

Peterson did not argue that the U.S. holds a property interest in the wetlands. He did argue that the government must prove that there was water in the wetlands when the easement was taken. Judge Senechal said that the absence of water does not mean that the areas were not wetlands in existence when the easement was created. Regarding Element 3, Peterson argued that he did not own the property covered by Easement 124X when he signed a renegotiated map, thus he had no legal authority to sign it. The court stated that his signature on the renegotiated map was not necessary to establish the easement. The map merely established Peterson's knowledge that the wetlands were subject to the easement.

The government established Element 4 by proving that Peterson directed a contractor to perform the prohibited activity. Peterson argued that the ditching was authorized by North Dakota law in that he was maintaining natural waterways (Element 5). The court disagreed with Peterson's interpretation and stated that there is no credible evidence that he was granted permission for the excavations. As to Element 6, Peterson alleged that the government did not present evidence comparing the current condition of the wetlands to their condition when the easement was established. Magistrate Senechal stated that the government was not required to prove the precise water levels as they existed at the time the easement was purchased.

**4. <u>U.S. v. Kurt A. Skinnemoen [CR No. 03-268 U.S.D.C.: D. Minn (2004)]</u>**

Skinnemoen was charged by information with a violation of 16 U.S.C. 668dd(c), 668dd(f)(1) and Title 18 USC, Section 2 by knowingly ditching, draining, filling, removing and otherwise inuring and destroying real property covered by the United States Fish and Wildlife Service Wetland Easement Contract G-49x in Grant County, MN. On May 18,2004 Mr. Skinnemoen plead guilty to the charge (Class A Misdemeanor) and agreed to restore the wetlands accordance with the USFWS "Restoration Plan" agreed to by the parties and that a U.S. Fish and Wildlife Service employee will be present during restoration.

This violation involved a wetland that was half on and half off the easement description with the ditch draining the wetland located outside of the easement description. Mr. Skinnemoen owned both the easement and non-easement portions of the wetland as well as the entire drainage ditch and was ordered to restore the wetland. Mr. Skinnemoen restored the drained wetland off the easement and the case was closed September 22, 2004. This was the first successful prosecution of a wetland basin located both on and off the easement where the drainage violation was off the easement description.

## C. Federal District Court Decisions:

### 1. U.S. v. Jerome J. Schoenborn [CIV No. 3-84-1662 U.S.D.C.: D. Minn (1986)]

The primary issues in this action were the validity and enforceability of a wetland easement signed by Schoenborn's parents in 1965 and passed to him as a successor. Schoenborn claimed that the easement was invalid and unenforceable and that he had not violated it. His counterclaims alleged unconstitutional taking, quiet title, negligence, and abuse of due process.

Schoenborn claimed that the Service Realty Officer made oral misrepresentations to Edward Schoenborn (Jerome's father), that the easement entitled the Schoenborns and their successors to maintain all ditches then existing, regardless of whether or not the ditches were then functioning, and all basins affected by those ditches. He also claims that he and his father justifiably relied on these representations and never consented to the scope of the easement as shown on the drainage facility map.

The court held that the written easement and drainage facility map had been available for examination before the Schoenborns were bound by it, and they accepted the document by affixing their signature and receiving payment. The neglect displayed by the Schoenborns in not becoming cognizant with the terms of the written contract was unjustifiable as a defense. The easement is valid and enforceable. The defendant was directed to restore the wetlands and was permanently enjoined from draining or permitting the draining of any wetlands protected by the terms of the easement. Memorandum and Order entered by Judge Edward J. Devitt, District of Minnesota, October 16, 1986.

### 2. U.S. v. Vesterso et. al. [CR No. 2-86-1 U.S.D.C.: D. N.D. (1986)]

Warren Anderson, David Leas, and Kent Vesterso, acting as the Towner County Water Board, contracted for two drainage projects. The projects were termed "watercourse maintenance" projects and went through seven sections of land. Located within the projects were several wetlands covered by three separate Service easements.

Investigation showed that the members of the water board knew of the Service easements when the projects were designed and prior to any of the drainage work being done. The investigation also showed that the projects would directly benefit two of the board members by draining wetlands on lands farmed by them. The investigation further showed that the water board was prepared to use this case as a Atest case@ on State Water Rights versus Service Easement Rights.

The decision was made by the U.S. Attorney's office to charge the members as individuals with a criminal violation of 16 U.S.C. 668dd(c). The U.S. Attorney's Office felt that it was proper to charge them as individuals in that an individual cannot use his status as a board member to violate State or Federal laws. The water board, through the State's attorney, raised the following issues:

a. That the State has a reserved right to the watercourses within the State, and the Service cannot prevent the State from cleaning out such watercourses;
b. That a landowner could not grant an easement to the Service for wetlands found on a watercourse as the State maintained control of watercourses;
c. That easements "taken" by the Service are subject to easements for existing "canals and laterals" which include servitude of drains held by the State;
d. That the projects were not "drainage projects" but were simply cleanouts of old natural watercourses that had filled in during the past 50 years; and
e. The wetlands found along the watercourses were not "natural" wetlands but instead were created as a result of farming practices which plugged the natural watercourses.

Judge Benson, in an unwritten opinion, ruled that the State Interest argument is not valid stating that interest of the State is an interest in the water, not an interest in the property itself. The easements as purchased by the Service are valid and the United States has a real property interest which was damaged. Wetlands were present along the watercourse, and those wetlands were adversely affected by the projects. The court further held that the subjects acted as individuals and did not have the authority as board members to do what they did. Ruling entered by Judge Paul Benson, District of North Dakota, April 3, 1986.

**3. U.S. v. Conrad Rostvet [Civil No. A2-01-007, U.S.D.C.: D.N.D.-NE Div. (2001)]**

In 1996, Mr. Rostvet reported, to the Service, three ditches draining three wetlands on this property. Rostvet was in the process of purchasing the property when he reported the ditches to the Service. An investigation confirmed that these ditches were constructed in the mid-1970s, unbeknown to the Service. The investigation also revealed that the construction of the ditches was partially funded by the U.S. Department of Agriculture.

The Service offered Rostvet the opportunity to fill the ditches. He refused. On January 4, 2001, a civil complaint was filed in U.S. District Court for the District of North Dakota Northeastern Division against Conrad Rostvet for the restoration of three drained wetlands on his property covered by the provisions of Walsh County Easement 109X.

Rostvet again refused to fill the ditches, citing the fact that he had no part in constructing the ditches. The government agreed to restore the wetlands at no cost to Rostvet. The Service hired a private contractor to close the ditches in October 2001. The complaint was then dismissed.

## D. Appellate Court Decisions:

### 1. U.S. v. Albrecht [496 F.2d 906 (1974)] [CIV No. 4758, D. North Dakota, C.A. 8, No.73-1814]

Appeal by defendants, Mr. and Mrs. Robert Albrecht, from U.S. District Court for District of North Dakota. Defendants were ordered by District Court in a civil case, to restore the area to the conditions which existed prior to ditching. In addition, the Court permanently enjoined the defendants from draining or permitting the draining of wetlands under easement. (See 362 P. Supp. 13419 [1973]). In its decision, the Eighth Circuit made the following points:

a. “Robert Albrecht complained during trial and as a legal argument on appeal that the defendants herein had been discriminated against, and singled out by the Government concerning the enforcement of the easement. The claimed discrimination does not affect the plaintiff’s easement and is not defense to the plaintiff’s right to have the easement observed and respected by the dominant fee owner.”

b. “Defendants' major argument is that North Dakota Statutory Law does not specifically allow the type of easement, servitude, or right to property conveyed by the Herbels to the Government . . . (NOTE: Reinhard and Mary Herbel sold the easement to the Service. The Albrechts later purchased the land from the Herbels). . . . We fully recognize that laws of real property are usually governed by the particular states; yet, the reasonable property right conveyed to the U.S. in this case effectuates an important rational concern, the acquisition of necessary land for Waterfowl Production Areas, and should not be defeated by any possible North Dakota law barring the conveyance of this property right . . . to hold otherwise would be to permit laws to defeat the acquisition of reasonable rights to their citizens' property pursuant to 16 U.S.C. 718d(c) and to destroy a national program of acquiring property to aid in the breeding of migratory birds. We, therefore, specifically hold that the property right conveyed to the United States in this case, whether or not deemed a valid easement or other property right under North Dakota law, was a valid conveyance under Federal law and vested in the United States the rights as stated herein. Section 718d(c) specifically allows the United States to acquire wetland and pothole areas and the Interest therein.”

c. “It was well within the power of the Secretary of the Interior to acquire the reasonable easement conveyed in this case. The Albrechts and their successors are not restricted from farming the land, when such land is dry due to natural causes.”

**2. <u>Werner et. al. v. U.S. Department of the Interior, Fish and Wildlife Service, Bureau of Sport Fisheries and Wildlife [581 F.2d 168 (1978)] (No. 77-1958 8th Cir. Ct.)</u>**

Edwin Werner and 34 other North Dakota landowners, who entered into wetland easement agreements with the Service, brought an action in Federal District Court seeking injunctive relief against enforcement of the easements and damages. The appellants claimed that they were induced to sell the easements by the false oral representations of two Service Realty Specialists. The Eighth Circuit Court of Appeals upheld the dismissal of the appellants' claim for damages and the finding that the District Court had no jurisdiction over the appellants' equitable claims. The Eighth Circuit Court held: . . . "It is undisputed that the oral representations of Fish and Wildlife Service negotiators Brasch and Resman were contrary to the express written terms of the wetlands easements. Further, the District Court found that the oral representations of Brasch and Resman were unauthorized. We are satisfied that this finding is clearly erroneous."

"It is well established that the U.S. is not bound by the unauthorized acts or representations of its agents . . . appellants took this risk when they signed written easements containing express terms contrary to their oral understandings. We therefore find that the dismissal of the appellants' claim for damages was proper."

**3. <u>U.S. v. Seest [631 F2d 107 (1980)] (No. 80-1348 8th Cir. Ct.)</u>**

Appeal by defendant Donald Seest from the District Court, District of Minnesota. Seest was convicted of violating the National Wildlife Refuge Act, by constructing a subsurface drainage system and making other alterations to an area under easement which he owned. The Court sentenced Seest to six months imprisonment and ordered him to pay a fine of $500. The sentence of imprisonment was suspended and Seest was placed on probation provided he pay the fine and . . . "restore the wetlands to their natural state."

The Eighth Circuit Court affirmed the conviction and remanded the terms of probation for review and clarification. Seest subsequently restored the area. In its decision, the court made the following points:

a. "We think it is clear that the ditching and trenching and use of drain tile altered the flow of natural waters, both surface and subsurface. Accordingly, we reject the appellant's claim that the Government has not established a violation of law in this case."

b. In a petty offense matter, the defendant is not entitled to a jury trial.

c. In a criminal trial, the District Court Judge is vested with discretion to determine where, within the District, a trial will be held.

d. Under probation, the offender may be required to make restitution or reparation to aggrieved parties.

**4. U.S. v. Welte [696 F.2d 999 (1982)] (No. 82-1340 8th Cir. Ct.)**

Defendant Peter Welte appealed a decision by the District Court, District of North Dakota, which affirmed his conviction before a U.S. Magistrate for draining a pothole which was subject to wetlands easement. The Eighth Circuit Court of Appeals affirmed Welte's conviction and cited the following facts: On March 21, 1966, the U.S. Fish and Wildlife Service purchased an easement from John Lunney covering a quarter section of land which Lunney owned in Grand Forks County, North Dakota. This quarter section was subsequently transferred to Welte by contract for deed which reflected the easement in perpetuity. Upon the transfer of this land, the Government sent Welte a courtesy letter reminding him that such land was subject to a wetlands easement. In November of 1979, the Government observed a fresh scraper ditch out of one of the potholes covered by the easement. Recognizing that Welte was a new owner, the Government agreed with Welte that if he would restore the area to its former condition, no legal action would be taken against him. The area was later checked and the restoration work was approved by the Government. The Government, acting on an anonymous phone tip, returned to the area and discovered that when the ditch had been filled, drain tiles had been placed in the same location where the ditch had previously been scraped. Thereafter, the Government issued a violation notice. Welte was tried and convicted before a U.S. Magistrate.

On appeal to the District Court, his conviction was affirmed. The District Court held that Welte's act of draining a pothole which was subject to a wetlands easement was clearly a violation of Section 668dd(c). The District Court then affirmed the judgment of conviction entered by the U.S. Magistrate.

**5. U.S. v. Kerry Johansen, 93 F.3d 459 (8th Cir. 1996)**

Defendants Kerry and Michael Johansen (Johansens) entered a conditional plea of guilty to the North Dakota District Court with appeal to Eighth Circuit due to the District Court’s refusal to hear Johansen’s argument. Johansen’s defense argued that during the wet years, wetland acreage size had increased above the easement summary acreage that was initially acquired by the Service in the 1960's from Johansen’s predecessors. Involved in the argument were three separate easement tracts totaling 105 wetland acres owned by the Johansen’s. The Johansens contended that even with unauthorized drainage of the “excess” water, there still remained more acres of wetlands on the three easement tracts than was allowed by the Easement Summary sheet. The Government’s stance was that all wetlands on the described tract or parcel were protected and that the draining activity negatively impacted individual wetlands covered by the easement conveyance. The North Dakota District Court’s contention was that all wetland acreage on a described easement tract was subject to protection as provided through prior precedence.

The Eighth Circuit reversed the District Court's refusal to hear the Johansens' argument and conditional guilty plea and remanded the District Court for action consistent with the Eighth Circuit opinion. The Eighth Circuit largely based its opinion on the U.S. Supreme Court decision of North Dakota v. United States (U.S., 1983 103 S. CT. 1095) and the North Dakota District Court decision of United States v. Vesterso, 828 F.2d 1234 (8th Circuit, 1987). The Eighth Circuit held that the Service acquired an easement and paid the landowner based upon the Easement Summary sheet acreage. Further, the defendant must have had knowledge that the parcel was encumbered by a wetland easement, and that the drained wetlands must be part of the Easement Summary.

The Eight Circuit, interpreting the Vesterso decision also noted "the United States must prove beyond a reasonable doubt that identifiable, covered wetlands (as existing at the time of the easement's conveyance and described in the Easement Summary) were damaged and that the defendant knew that the parcel was subject to a federal easement."

### 6. U.S. v. Alvin Peterson [2:04-cr-102 (2005)][05-4248(8th Circuit)]

Defendant Alvin Peterson, Lawton, ND, appealed the decisions of the U.S. District Court, District of North Dakota, which affirmed his conviction by a U.S. Magistrate Judge of draining four wetlands protected by the provisions of a Fish and Wildlife Service Easement for Waterfowl Management Rights, specifically, Walsh County Easement 124X, 1-3. The Eighth Circuit affirmed the judgment of the district court.

In 1966, Peterson's parents granted wetlands easements to the United States. Peterson later inherited the land subject to the easement. Peterson disputed the easement many times. In 1973, to resolve these disputes, Peterson and the Service signed a map that clearly shows, among other things, four wetlands that were not to be drained. Nevertheless, in 1999 and 2003, Peterson hired contractors to dig dozer ditches that drained these four wetlands.

The magistrate judge held a bench trial in which Peterson presented evidence and the testimony of an expert witness. Peterson did not dispute the fact that he hired contractors to dig the ditches. Instead, he argued that the ditches were permissible. In particular, he argued that by digging the ditches, he merely cleaned out areas that were existing watercourses excluded from the easement. He also argued that the government failed to prove beyond a reasonable doubt that the wetlands he allegedly damaged were in existence prior to, and therefore subject to, the easement. Finally, he argued that evidence he introduced at trial proved that none of his activities actually damaged the wetlands. The government presented evidence including expert testimony as to the impact that Peterson's actions had on the wetlands. In a thorough and well-reasoned opinion, the magistrate judge rejected Peterson's arguments and found that Peterson's actions were in violation of the easement and in violation of 16 USC 668dd(c) and (f)(2). The district court affirmed.

The first and second issues that Peterson raised were related to the extent of the easements. The admissions, testimony, maps, and photographic evidence provided more

than adequate support for the district court's ruling as to the extent of the easement. The Eighth Circuit noted in particular that, even if the 1966 easements and older materials left room for doubt, the 1973 map clearly identifies that the areas subject to Peterson's actions fall within the easement. As to the third issue, the district court found the government witness more credible on the issue of damage to the wetlands than Peterson's expert.

The four wetlands were restored by U.S. Magistrate Judge Senechal's order on September 6, 2006. The Service supervised a local contractor as they constructed the four ditch plugs. Mr. Peterson bore the costs of the restorations.

All four of the wetlands involved in the above-described proceedings were drained again in 2007. As a result, the government charged Peterson with two counts of draining easement wetlands. In addition, a fifth wetland, covered by the provisions of Walsh County Easement 56X, 1 was also drained. A bench trial in U.S. District Court was held in July 2008, with U.S. Magistrate Judge Senechal presiding. The details of that trial are outlined here in the "Federal Magistrate Decisions" section of this chapter.

## E. **U.S. Supreme Court Decisions**:

### 1. **North Dakota v. United States [U.S.. 1983 103 S. CT. 1095]**

This case arose out of a longstanding dispute between the State of North Dakota and the Fish and Wildlife Service. In brief summary, the Federal Migratory Bird Hunting Stamp Act authorizes the Secretary of the Interior to acquire easements over wetland areas suitable for migratory waterfowl breeding and nesting grounds. Section 3 of the Wetlands Act of 1961 (Loan Act) provides that no land suitable for waterfowl habitats can be acquired with money from the fund established for such acquisitions unless the acquisition "has been approved" by the Governor or an appropriate agency of the State in which the land is located. Between 1961 and 1977, successive Governors of North Dakota consented to the acquisition of easements covering approximately 1.5 million acres of wetlands in that State. By 1977, the United States had obtained easements covering about half of this acreage. In the 1970's however, cooperation between North Dakota and the United States began to break down, and in 1977, North Dakota enacted statutes restricting the United States' ability to acquire easements over wetlands. These statutes set out certain conditions that must be met "prior to final approval" of the acquisition of the easements, permitted a landowner to drain any after-expanded wetland in excess of the legal description in the easement, and limited all easements to a maximum term of 99 years. The United States brought suit in Federal District Court, seeking a declaratory judgment that, *inter alia*, the 1977 North Dakota Statutes were hostile to Federal law and could not be applied and any easement acquired in violation of such Statutes would nevertheless be valid. The District Court granted summary Judgment for the United States, and the Court of Appeals affirmed.

North Dakota then appealed to the Supreme Court of the United States. The Supreme Court subsequently upheld the Government's right to secure wetland areas by deciding the following two issues:

a. The consent required by Section 3 of the Wetlands Loan Act cannot be revoked at the will of an incumbent Governor. To hold otherwise would be inconsistent with the Loan Act's purpose of facilitating the acquisition of wetlands. Here, the acquisition in question clearly "has been approved" by North Dakota's Governors as Section 3's language provides. Nothing in the statute authorizes the withdrawal of approval previously given. Nor does Section 3's legislative history suggest that Congress intended to permit Governors to revoke their consent.

b. Since Section 3 of the Loan Act does not permit North Dakota to revoke its consent outright, the State may not revoke its consent based on noncompliance with the conditions set forth in the 1977 legislation. And to the extent that such legislation authorizes landowners to drain after expanded wetlands contrary to the terms of their easement agreements, it is hostile to Federal interest and may not be applied. For the same reason, the statute limiting easements to a maximum term of 99 years may not be applied to wetlands acquired by the United States pursuant to previously given consents.

The Court also stated that: "North Dakota [the State] must yield to the overriding national interest in protecting migratory birds."

# CHAPTER X

# ADMINISTRATION OF FmHA CONSERVATION EASEMENTS

Because of the high degree of variability among states with regard to the administration of FmHA easements, and with regard to individual protected interests, State-specific handbooks have been developed in addition to this chapter. The state-specific books have been prepared for North Dakota and South Dakota, and are included as Exhibits X-1 and 2, respectively.

## A. Introduction and Background:

For purposes of this chapter, Farmers Home Administration Conservation Easements are also know as FmHA Conservation Easements, RECD Easements, FSA AG-Credit Easements, and USDA Conservation Easements, depending on the status of the USDA program responsible for these properties at the time they were in inventory.

The passage of the 1985 Farm Bill "Consolidated Farm and Rural Development Act (CON ACT)" provided a rare opportunity to reverse the trend of agricultural conversion of wetlands. The Service, in coordination with the Department of Agriculture, was to take positive steps in protecting and restoring wetlands on Farmers Home Inventory Lands, Conservation Reserve Program lands, and other lands subject to the Swampbuster provisions of the Farm bill. Farmers Home Administration (FmHA) was given the Farm Debt Restructure and Conservation Set-aside provision: Title XIII - CREDIT, Section 1318, Farm Debt Restructure and Conservation Set-aside Conservation Easements. This provision provided FmHA the authority to establish easements for conservation, recreational, and wildlife purposes for a term of not less than 50 years on properties that were foreclosed on by the Federal government, otherwise known as "inventory properties." (Note: All recorded FmHA Conservation Easements in the Prairie Pothole areas of Region 6 and managed by the FWS are perpetual easements). Appropriate lands for easements could be wetlands, floodplains, and other important natural resources, including associated uplands necessary to adequately protect these lands. Statutory and regulatory criteria for recommending and applying FmHA conservation easements have changed with each consecutive Farm Bill. Each Farm Bill reduced the protection of wetlands. However, the majority of FmHA conservation easements were established and recorded under criteria of the 1985 and 1990 Farm Bills. The most recent procedure (2002 Farm Bill) specifies that only wetlands that do not have a history of agricultural use during the five years prior to the property entering inventory, and including cropping, grazing, haying, and vegetable farms, will be eligible for easement protection. According to policy, the Service will be the designated easement manager only on easements worthy of inclusion into the National Wildlife Refuge System; otherwise, the Farm Services Agency (FSA) or other entity approved by FSA will be the designated easement manager.

FmHA inventory lands were inspected for wetlands and identified similarly as if the FWS were to accept wetlands for its Small Wetlands Acquisition Program. However, protection of wetlands, floodplains, and their watersheds, along with historical and cultural resources (i.e.,

Native Tree Claims) protection required a variety of conservation easement provisions and restrictions that varied in each state. Also, numerous Administrative Notices developed after passage of each new Farm Bill changed the provisions of easements for new and existing inventory properties, creating numerous easement restrictions and multiple protections to be considered for each inventory farm.

**B. <u>State-Specific Guidance</u>:**

It is not practicable, nor is it possible to have one chapter that captures all of the easement provisions that can be enforced in each state. Each state will be responsible for developing a techniques guide to assist managers and law enforcement officers in the continuous implementation of the FmHA Conservation Easements. This Chapter briefly identifies the commonalities of the easements in each state and provides general direction on how to monitor and what to look at in the easement documents in determining levels of protection. Each state in the Prairie Pothole Region (Montana, North Dakota, South Dakota) has developed an FmHA conservation easement state-specific manual (included as Exhibits) that will further describe in detail the particular easements that are recorded in each state and any unique conservation provisions.

**C. <u>Quitclaim Deed Reservations</u>:**

All FmHA inventory lands were sold with a Quitclaim Deed. The early "no drain, burn, fill" type of restrictions were stated right on the front of page of the quitclaim deed and referenced in an attached Exhibit 1 map showing the locations of the wetlands. All wording was very similar to the Service wetland easement. As the complexity of the easement documents increased, the front page of the Quitclaim Deed was modified to state "Subject to Conservation Easement Reservation in the United States attached to this deed."

A copy of the recorded easement Quitclaim Deed that includes the conservation easement and exhibits is recommended for the file. Make sure that the pages of the recorded document include all of the pages with the exhibits. On a few rare occasions, when the landowner purchased the property from FmHA, the landowner may have been responsible for recording the Quitclaim Deed and easement document. If you discover that the easement document was not recorded with the deed, you will need to contact a realty specialist on how to get a copy of the easement document recorded.

**D. <u>Monitoring FmHA Easements</u>:**

Monitoring the FmHA conservation easements can be accomplished at the same time as the monitoring of wetland and grassland easements or by conducting drive-by or ground inspections. To determine if the owner is complying with the easement provisions, the manager will need to be able to determine what the "Covenants by the Landowner" state in the easement document. This is not readily apparent on some of the multiple protection type of easements. The Covenants by the Landowner lists activities that are prohibited on the easement areas. If a particular activity is occurring and this activity is not expressly prohibited in the covenants, then the activity is acceptable. If conducting aerial surveys, it may be easier to take a picture of the

FmHA conservation easement and review the covenants with the photo in-hand. If conducting drive-by or ground inspections, bring the conservation easement file along for the inspection.

## E. **Resolving Possible Violations**:

Violations to look for would be similar to wetland and grassland easements. Make sure protected grasslands are not being farmed; determine if haying and grazing are allowed and being conducted in accordance with the easement; determine that the protected wetlands have not been drained, filled or burned or if water is being diverted in the watersheds. Law enforcement procedures for violations are handled in a similar manner as a violation of wetland and grassland easements. Rights Reserved in the United States are listed after the Covenants by Landowner. Easement Management and Administration is assigned in the easement document; therefore, the new landowner knows who the easement administrator is.

**FWS Authority:** The authority for enforcement is granted through the National Wildlife Refuge Administration Act, 16 U.S.C. 668dd et. seq. The U.S. Fish and Wildlife Service may enforce all the terms and conditions of this easement, along with exercising all rights and powers reserved in this easement through such general or specific regulations or orders as have been or may be, from time to time, promulgated under the authority of the Secretary of the Interior.

## F. **Exchange Policy for Non-Wetland Areas Encumbered by FmHA Easement**:

The Service may grant relief from easement restrictions for areas considered to be wetland and protected and recorded by FmHA easement that are later determined to be non-wetland. The level of relief from easement restrictions depends on the type of easement restrictions in place and the time period in which the easement was prescribed. For further guidance, see the ND Appendix, which contains a FmHA easement exchange policy approved for that state, and the Easement Exchange Policy (Exhibit XV-1).

## G. **Service Responsibility**:

Each station is responsible for verifying FmHA conservation easement acres as recorded by the Regional Realty Office. The Regional Realty Office can query their database and provide acres by county and tract. Acres of easement should not be duplicated even though some areas may have over lapping easement protection. Any discrepancies should be corrected and reported to the Regional Realty Office.

The "Covenants by the Landowner" determine the level of protection on each FmHA conservation easement. Some conservation easements may have additional discretionary protection to protect such resources as native tree claims, native sod, or even grass that had been established on a highly erodible location. The key to managing and enforcing FmHA conservation easements is to become fully aware of each individual easement and the covenants. FmHA conservation easements are not as standardized in the level of protection such as the FWS wetland and grassland easements.

## H. Conservation Easement Reservations:

The following is an example of a conservation easement that has both the most restrictive provisions and also an example of the least restrictive provisions on wetland protection involving the no drain, burn, fill type covenants by the landowner. Each state may have a certain alpha designation such as "A, B, C" that will not be listed in this example, but instead will be listed as "**Most Restrictive**" and "**Least Restrictive**."

**Conservation Easement Reservations in the United States**

By this instrument there is reserved in the UNITED STATES OF AMERICA, its successors and assigns, a perpetual conservation easement on the property conveyed by this deed. The United States in the conservation easement refers to the United States of America, Farmers Home Administration, United States Department of Agriculture, as defined in the quitclaim deed to which this easement is attached and incorporated herein. This easement is under the authority and in furtherance of the provisions of Federal law, including sections 331 and 335 of the Consolidated Farm and Rural Development Act (7 U.S.C. 1981, 1985), Executive Order 11990 providing for the protection of wetlands, and Executive Order 11988 providing for the management of floodplains. The restrictions and covenants contained in this easement constitute a perpetual servitude on and run with the property. The Grantee and all successors and assigns ("landowner") of the property described below covenants with the United States to do or refrain from doing, severally and collectively, the various acts mentioned later in this easement. The United States is reserved the rights enumerated in this easement for itself and its successors, agents, and assigns.

### 1. Description of the Easement Area:

The lands, waters and access rights covered by this easement are located within the following described legal subdivisions in _________________ County, State of South Dakota. The easement boundaries are further delineated on the map(s) attached hereto as Exhibit "A." Wetland Areas shall include any enlargements of said wetland areas resulting from normal or abnormal increases in water.

T. N., R. W., 5th P.M.

Section ____:___________and access across the ________________________.

Easement Areas, as depicted on Exhibit "A," are further described as:

T. N., R. W., 5th P.M.

Section __:______and access across the ____________.

This easement is subject to all existing rights-of-way for highways, roads, railroads, pipelines, canals, laterals, electric transmission lines, telegraph and telephone lines, cable lines, and all mineral rights.

2. **Covenants by the Landowner:**

A. No dwellings, barns, outbuildings, or other structures shall be built within the easement area.

(Region 6 has determined a jurisdictional position for the enforcement of this covenant on grassland areas protected by FmHA easements. This position is applicable to the states of Montana, North Dakota, and South Dakota and is intended achieve consistency in the way FmHA and grassland easements are enforced. The Region 6 policy for evaluating proposed modifications of easement areas protected by this provision is to use the Permit Flowchart process outlined in Chapter XII. In other words, we will treat FmHA-protected grasslands the same as grasslands protected by the Service's grassland easement with respect to proposed modifications – the Flowchart will be used to "screen out" proposals that do not meet all the criteria, and these proposals will not be allowed. However, if a proposal does meet all the criteria, then the proposal may be accepted. Again, see Chapter XII for detailed information on evaluating proposed modifications of easement areas.)

B.1. For "**Most Restrictive**" Easement Areas of the easement which include permanent grassland vegetation and the wetland area, the vegetation or hydrology of the described easement area will not be altered in any way or by any means or activity on the property conveyed by this deed, or property owned or under the control of the landowner, including: (1) cutting or mowing; (2) cultivation; (3) grazing; (4) harvesting wood products; (5) burning; (6) placing of refuse, wastes, sewage, or other debris; (7) draining, dredging, channeling, filling, discing, pumping, diking, impounding, and related activities; or (8) diverting or affecting the natural flow of surface or underground waters into, within, and out of the easement areas.

B.2. For "**Least Restrictive**" Wetland Areas of the easement, either by an activity on the property conveyed by this deed, or on property owned or under the control of the landowner, the vegetation or hydrology will not be altered through: (1) burning; (2) placing of refuse, wastes, sewage, or other debris, (3) draining, dredging, channeling, leveling, filling, pumping, diking, impounding and related activities; or (4) diverting or affecting the natural flow of surface or underground waters into, within, and out of "**Least Restrictive**" Wetland Areas. The landowner shall have the right to carry on farming practices such as grazing, hay cutting, plowing, working and cropping "**Least Restrictive**" Wetland Areas when they are dry of natural causes. "**Least Restrictive**" Wetland Areas shall include any enlargements of said wetland areas resulting from normal or abnormal increases in water.

C. Notwithstanding the provisions of B.1. and B.2. above, the landowner shall be responsible for compliance with all Federal, State, and local laws for the control of noxious or other undesirable plants on the easement area. For "**Most Restrictive**" Easement Areas, the responsibility for such plant control may be assumed in writing by and at the option of the easement manager where control or manipulation of such plants is deemed by the manager to affect easement management programs or policies.

D. Cattle or other stock shall not be permitted on "**Most Restrictive**" Easement Areas, except that the easement manager shall permit access to and use of waters within the area necessary for stock watering under such terms and conditions as the easement manager deems necessary to protect and further the purposes of this easement, provided:

(1) the easement manager bears the costs of building and maintaining fencing or other facilities reasonably necessary to preclude stock from entering the easement area; and

(2) access for stock watering need not be permitted where other waters are reasonably available from other sources outside the easement area.

**3. Rights Reserved in the United States:**

The United States, on behalf of itself, its successors or assigns, reserves and retains the right, at its sole discretion, to manage the easement area, including the following authorities (rights reserved for "**Most Restrictive**" Easement Areas are described in A, B, C, D, E, and F.; rights reserved for "**Least Restrictive**" Wetland Areas are described in A.):

A. The right of ingress and egress to conduct management, monitoring, and easement enforcement activities. The easement manager may utilize any reasonably convenient route of access to the easement area(s), across Section __, T.__ N, R. W, 5th P.M., ______ County, ______________. However, the landowner may provide a designated route to and from the easement area so that damage to farm operations can be reasonably avoided.

B. For "**Most Restrictive**" Easement Areas, the right to install, operate, and maintain structures for the purpose of reestablishing, protecting, and enhancing wetlands functional values including the taking of construction materials to and from said sites.

C. For "**Most Restrictive**" Easement Areas, the right to establish or reestablish vegetation through seedings, plantings, or natural succession.

D. For "**Most Restrictive**" Easement Areas, the right to manipulate vegetation topography and hydrology on the easement areas through diking, pumping, water

management, excavating, island construction, burning, cutting, pesticide application, fertilizing, and other appropriate practices.

E. For "**Most Restrictive**" Easement Areas, the right to conduct predator management activities.

F. For "**Most Restrictive**" Easement Areas, the right to construct and maintain fences in order to prevent grazing or other types of encroachment on the easement area.

**4. <u>Easement Management and Administration</u>:**

A. All right, title, and interests of the United States in this easement are assigned to the Secretary of the Interior for administration by the United States Fish and Wildlife Service as part of the National Wildlife Refuge System pursuant to the National Wildlife Refuge System Administration Act, 16 U.S.C. 668dd et. seq. The U.S. Fish and Wildlife Service may enforce all the terms and conditions of this easement, along with exercising all rights and powers reserved in this easement through such general or specific regulations or orders as have been or may be, from time to time, promulgated under the authority of the Secretary of the Interior. Notwithstanding the above rights in paragraphs II and III retained by the United States, the U.S. Fish and Wildlife Service may permit the landowner to pursue such activities on said sites as would be consistent with preservation and enhancement of floodplain and wetland functional values.

B. As used in this easement, the term "easement manager" shall refer to the authorized official of the U.S. Fish and Wildlife Service.

**5. <u>General Provisions</u>:**

A. The agreed upon purposes of this easement are the preservation and maintenance of the wetland and floodplain areas existing as of the date of this conveyance as well as protection and enhancement of plant and animal habitat and populations. Such purposes shall constitute the dominant estate within the easement area. Wetland Areas are defined by reference 7(c) of Executive Order 11990 and a "floodplain" is defined by reference to section 6(c) of Executive Order 11988. Any ambiguities in this easement shall be construed in a manner which best effectuates wetland and plant preservation, and fish and wildlife purposes.

B. Any subsequent amendment to or repeal of any Federal law or order which authorizes this reservation shall not affect the rights reserved by the United States or subsequently held by its successors or assigns.

C. For purposes of this easement, wetland management rights reserved by the United States include, but are not limited to, inspection for compliance with the terms of this easement; research regarding water, wetlands, fish and wildlife and associated

ecology; and any other activity consistent with the preservation and enhancement of wetland functional values.

D. The United States, its successors and assigns, including the easement manager, shall have the right to make surveys, take photographs, and prepare such other documentation as may be necessary or desirable to administer the provisions of this easement. Any such map, plat, or other suitable document may be recorded in the land records of the respective county in which the property is located.

E. The easement reservation does not authorize public entry upon or use of land. Unless the easement manager prohibits public entry to "**Most Restrictive**" Easement Areas, the landowner may permit it at the landowner's discretion.

F. The landowner and invitees may hunt and fish on the easement area in accordance with all Federal, State, and local game and fishery regulations.

G. This easement shall be binding on the landowner, and the landowner's heirs, successors or assigns. The landowner covenants to warrant and defend unto the United States, its successors or assigns, the quiet and peaceable use and enjoyment of the land and interests in the land constituting this reservation against all claims and demands.

H. The easement manager shall be the agent of the United States or its successors and assigns. The manager shall have discretionary powers of the United States under this easement. In performance of any rights of the United States under this easement, the manager may permit, contract, or otherwise provide for action by employees, agents, or assigns which may include the landowner.

# CHAPTER XI

# MAPPING PROCEDURES for WETLAND EASEMENTS

In response to the Eighth Circuit Court of Appeals ruling in the 1997 Johansen wetland easement case, the Service has implemented a policy and guidelines regarding wetland mapping for pre-1976 wetland easements. Although Montana is not within the 8th Circuit, WMDs within the Prairie Pothole Region portion of Montana will follow these wetland mapping procedures. Post-1976 easements are already mapped in Exhibit A maps and do not have to be re-mapped. Whether responding to a landowner's request for assistance in dealing with a water problem, a request specifically for a map, or prior to determining whether an actual violation of the easement contract has occurred, Service personnel must have a map prepared of the subject wetland easement.

The following guidelines and procedures are based on the Eighth Circuit Court of Appeals ruling. However, pre-1976 easement contracts were clear in identifying that all wetlands "now existing or reoccurring due to natural causes on the above-entitled land" are covered by the terms of the agreement and are not limited by that acreage in the easement summary. The Circuit Court even recognized a U.S. Supreme Court ruling in North Dakota v. United States 460 U.S. 300 (1983) that stated in part "…it (easement contract) did not explicitly limit the wetland easement to the Summary Acreage." However, the Circuit Court has specifically addressed easement summaries and held that the agreement is limited to those acres. Until the Circuit Court ruling is overturned, modified or changed in some fashion, this Manual will use the Circuit Court language as guidance to mapping pre-1976 easements.

These procedures are consistent with the guidance from the U.S. Attorney's Office in North Dakota. According to the February 4, 1998 letter to the Honorable Rodney S. Webb (Chief Judge, U.S. District Court), Lynn Crooks (First Assistant United States Attorney) stated:

> "It is accepted by everyone, following the Eighth Circuit opinion that in future easement enforcement actions, the U.S. Fish and Wildlife Service will be required to prove which potholes were present at the time of the easement acquisition and thus included in the Total Wetland Acres notation on the Easement Summaries."

In simpler language, these new elements of proof require the Service to show two things: 1) the protected wetland existed at the time the easement was purchased, and 2) that the mapped acreage of the wetland basins is included in the Easement summary Acres. The first element requires the Service to prove which wetland basins were intended to be included in the "total wetland acres" figure on the Easement Summary Sheets. This is a task of location. The second element requires the government to prove that the total acreage of mapped wetlands so located does not exceed the "Summary Acreage" figure for that tract.

The Eighth Circuit Court has also affirmed that the Service's wetland easements are valid and our law enforcement efforts are legal. The Service, however, upon a qualified request, and in order to determine if a violation of an easement has occurred, must determine which wetlands are protected and the approximate size and location of the wetlands. The Service's policy is to map

pre-1976 easement upon qualified request or when a potential violation is discovered. The form of a request will be liberally interpreted. For example, if a landowner or renter calls or comes into a Service office with a question concerning protected wetlands, the Service will interpret that to mean he/she wants a map showing which wetlands are protected.

The easement summary acre figure, calculated by the Service Realty Specialists at the time of easement acquisition, plays an important role in the mapping exercise. The Easement Summary acreage figure was calculated in order to make a fair market offer to the prospective seller. The easement summary acreage figure was also reported to each State.

It is important to note that wetlands are hydrologically dynamic systems. Water levels within those systems expand and contract due to annual precipitation levels, ground water or soil interaction, runoff patterns and evaporation. The U.S. Attorney's February 4th 1998 letter to Judge Webb addresses this question in notation #2, second paragraph:

> "The Eighth Circuit has always recognized the inherent expansion and contraction of prairie potholes. A pothole does not cease being a pothole just because it dries up. When it dries up it can be farmed, not ditched. There is no requirement anywhere that a pothole have water in it when the easement is acquired. Wetlands are defined by many factors other than the presence or absence of standing water on a particular day. Most North Dakota potholes are essentially dry by fall in a normal year."

In addition, the inherent fluctuating nature of wetlands was upheld in the North Dakota v. United States, in the Supreme Court 81-773 – Opinion on March 7, 1983, page 19 lines 10-15:

> "To respond to the inherently fluctuating nature of wetlands, the Secretary has chosen to negotiate easement agreements imposing restrictions on after-expanded wetlands as well as those described in the easement itself. As long as North Dakota landowners are willing to negotiate such agreements, the agreements may not be abrogated by state law."

The easement map will represent the Service's effort to depict the approximate location, size and shape of all protected wetland basins based on information and photography available at the time the map is prepared. <u>This map is not meant to depict water levels in the basin in any given year.</u>

The following points summarize the Service's position on mapping issues brought up by the Johansen case:

- Mapping will be completed with off-site resources.
- There are NO acreages set for individual wetlands. Summary acreage is for the entire easement.
- The Johansen case did not require the Service to set specific acreage for individual wetland basins.
- The wetland easement map only shows which wetland basins are protected and only provides approximate size, location, and shape of protected basins.
- Each question brought up on the size of an individual wetland will have to be evaluated on a case-by-case basis.
- The map identifies protected wetland basins, not water levels in individual wetlands.

A. Mapping Overview:

**Starting in FY11, mapping of pre-76 easements shifted from the field to a centralized mapping team located in the Habitat and Population Evaluation Team (HAPET) in Bismarck, North Dakota. The mapping of pre-1976 easements will no longer be completed at the field station level.**

We are required to provide a map anytime a landowner, operator, local government entity, or the Governor requests one. We are not required to map easements in response to third party request; e.g. from a wind company. However, we should strive to map an easement whenever the potential exists to impact a protected wetland basin. Be somewhat liberal in your interpretation of a map request. Anytime a landowner or tenant inquires about a particular wetland, or what about what can and cannot be done on a wetland easement, consider this a request for a map of protected basins.

Upon qualified request, the Service is required to provide a map of protected wetlands. In this process, the Service is mapping, not delineating wetlands. The map will become part of the easement file(s). It will not be an Exhibit A map. The prepared easement map(s) should be sent to the requestor or alleged/potential violator on or shortly after the first landowner contact.

Determine if the easement is a pre- or post-1976 easement. In post-1976 easements, mapping is already done on Exhibit A maps and is part of the contract. No additional mapping will be necessary for post-1976 contracts. If it is a pre-1976 easement, consult easement files for renegotiated maps, Drainage Facility Maps, Difficulty to Drain maps, or any other partial maps, or complete mapping that may already be done.

Some of the early (pre-1976) easement contracts refer to maps that were prepared and given to both parties at the time the easement was purchased. These maps have connecting language in the contract and will be treated as the official easement map. Some of the easement files have Difficulty to Drain map(s) (Exhibit XI-1). In other situations, Wetland Enhancement Biologists with the Acquisition Program made maps of a number of the early easements, often with field notes describing wetland type, vegetation or waterfowl observations. All wetlands were protected in pre-1976 easements, unless wetlands were specifically excluded on a Drainage Facility Map (see below), including those that may have been missed when these maps were drawn. These are not official easement maps, but should be used as a reference when drawing the easement map. Before any maps are given to a requestor, calculate the basin acres on the map and compare it to the Summary Acres. If the summary acres figure is encompassed within the mapped wetland basin acres Standard Range of Error or the mapped acre figure is less than the summary acre figure, send a copy of the map to the landowner. The Standard Range of Error for mapping easement is defined as plus or minus 10% of the measured mapped wetland basin acre figure. See Exhibit XI-10 for Standard Range of Error details.

If the summary acre figure is not encompassed within the mapped wetland basin acres Standard Range of Error (i.e. the lower end of the mapped acreage range of error exceeds the summary acres), wetland basins will be deleted from the map according to the mapping policy criteria until the summary acre figure is encompassed within the Standard Range of Error, or is less than the summary acre figure. Existing wetland size and shape cannot be adjusted on these maps.

Prepare a new map of the protected wetland basins and provide it to the requestor. All maps will be sent out using the standard easement map format.

**Drainage Facility Maps (DFM):** Include deleted wetlands and ditches on the new map. These features can be found on the DFM is such a map exists for the easement (Exhibit XI-2). Trace the drained wetland(s) and ditch(es) on to the new map. The DFM serves as a reference point and identifies the wetland(s) not protected in the easement.

The Service and the landowner negotiated which wetlands were to be considered for deletion on a DFM. There are two types of DFMs that were used to show which wetlands were not protected in an easement contract. The first type of DFM has dashed-line circles with arrows extending from the circles. These wetlands are not protected. Once the new map is drafted and the dashed-line circles are drawn on the map, mappers may observe the line with an arrow extending from the dashed-line circle though a non-DFM wetland. The non-DFM wetland should be considered protected because the arrow is not referencing that particular wetland. The arrow extending from a dashed-line wetland applies to the deleted wetland only. The arrow does not represent the actual length or location of the ditch draining the deleted wetland.

The second type of DFM includes maps indicating open ditches with solid arrowed lines where there are no dashed-lines identifying the wetlands deleted from the easement. These DFMs are a compilation of arrowed lines identifying specific locations of open ditches which may be maintained. These DFM-mapped arrows will be traced on to the map. If these arrowed lines intersect mapped wetlands, these wetlands are not protected.

**Renegotiation Maps:** In the late 1960's and early 1970's, several Service Realty Specialists in the Devils Lake WMD told landowners that annual fall drainage of wetlands by plow furrows was an acceptable farm practice. As a result, the Service offered to renegotiate these wetland easements with the landowners and certain wetlands were deleted from the easement(s). The renegotiation period ended in 1975. If the renegotiated map (Exhibit XI-3) depicts the protect wetland basins, as well as the deleted basins, it represent the Easement Summary Acres and should be considered the official easement map. These renegotiated maps can be photocopied and sent to the requesting entity if the map includes all the protected wetlands. A standard cover letter should be sent with the map. Often times the renegotiated maps only have deleted wetlands. In this case, use the mapping procedures to map protected wetlands and then trace deleted wetlands on the official map. Renegotiated easements will have a new Easement Summary Acre figure. The wetland acres that may have been deleted through renegotiation were subtracted from the original summary acres.

**Draft maps, easement information sheet maps, maps that have been mailed to landowners that depict wetlands and all other maps that may be in the file:** These maps can be used as tools when drawing the easement maps. If an easement map has been drafted and/or approved but has not been provided to the landowner and/or other requestor, it should be reviewed before it is distributed.

**Mapping Priorities:** - easements within these priorities will be mapped on a first-come, first served basis.

a. Violations – The mapping of known violations will always be the first priority of the mapping team. For the enforcement process to work, field stations must receive their maps in a timely fashion. Therefore, it will be necessary to manage this workload as efficiently as possible. To that end, managers are requested to ground check potential easement violations *before* sending a mapping request to the team. This will prevent the expenditure of staff time on maps for easements where the violation falls out after a ground check. More importantly, it promotes timely ground visits of potential violations before evidence is lost.

b. Landowner Requests – A landowner request should be liberally interpreted as described above. Any time a landowner is asking questions about an easement, including what is and is not allowed, it should be viewed as a landowner request and mapping should be initiated. Requests to install drain tile or any other request to impact wetlands on a wetland easement, when the status of wetlands is uncertain (protected or not protected), will fall under this category.

c. Special Projects - In most cases, it is not necessary to map easements in response to wind energy development, pipeline construction, etc. In these cases, wetland managers should first attempt to work with the company to avoid all wetland impacts. If it is determined that wetland impacts are unavoidable, and a Special Use Permit is necessary, the SUP can still be issued without the wetlands being mapped as long as the manager can reasonably ascertain that the affected wetland(s) are protected by the easement. For example, if a cursory review and summarization of the wetland acreage on the easement is well within the Easement Summary Sheet, then it can be concluded that all wetlands are protected and a final map is not presently necessary. A request for a map should only be sent to the mapping team when the protection status of a particular basin cannot be determined.

d. Proactive Maps – When the mapping team has mapped all potential violations and has fulfilled all landowner requests, then easements will be mapped proactively. Mapping technicians will be assigned a specific WMD until all the pre-76 easements for that WMD have been completed. Use all available off-site resources to map the protected wetlands. A ground check or aerial validation is valuable and encouraged, but not required in order to prepare an easement map. The lack of time to do a ground check or weather conditions should not prevent a response to the request for a map in a timely manner.

If mapping is done proactively (there has not been a request or there is no potential violation), do not distribute maps until they are validated. Aerial or ground validation is preferred; however, some stations may have a year of exceptional aerial photography which can also serve as a validation tool. If there is any doubt as to the existence of a wetland while using aerial photography to validate a map, a ground visit will be required.

**B.** **Mapping Process:** Once the determination to map an easement has been made, then:

1. The field station will send a mapping request to HAPET via email. This request should include the tract number(s), the purpose for the map (violation, landowner request, etc.), and copies of DFMs if applicable. If the required imagery has not been sent to HAPET by the field station, it should also be done at this time.

   **[*Note: The easement Summary Acre figure is for the entire easement contract. If your request is for a portion of the original easement, mappers must map the entire easement and managers will have to compare the acreage for the entire easement contract with the Summary Acre figure. There is no way to compare the wetland acreage for only a portion of the easement with the Easement Summary Acres.*]**

2. Mapping technicians will geo-reference the imagery, if necessary; and produce a draft map(s) based solely on off-site resources.

3. The mapping technician will then send the draft map(s), along with a copy of the easement summary, a list of the imagery used (e.g., NWI map and NRCS photo #CWO 2HH 128, date 8-8-67), and an initiated Wetland Easement Mapping Progress Form (Exhibit XI-6) to the field station. Other data may include shapefiles or field maps depending on the station's request. However, *the mapping technician is the only one allowed to edit the shapefiles. Similar to HAPET's boundary files, wetland shapefiles are not to be edited by the field.*

4. For draft maps prepared in response to a violation or landowner request, the field station will have 14 days to review the draft map in light of the easement summary, ground visit information (if available), and file history. For proactively-created maps, the 14 day limit will not apply.

5. If the total acres mapped *is not* consistent with the Easement Summary Sheet, then the manager must make corrections based on the steps outlined later in this Chapter.

6. There are a couple options for transmitting the necessary corrections to HAPET. For example, corrections can simply be noted on the draft maps, scanned, and sent back to HAPET along with the updated Wetland Easement Mapping Progress Form. Alternatively, managers can work directly with HAPET through WebX to make corrections. For more information on WebX, contact HAPET.

7. If no corrections are necessary, then final maps will be printed on Mylar (Exhibit XI-4), signed by the mapping technician, and sent to the field station where the wetland manager will also sign.

8. The original signed copies along with the Wetland Easement Mapping Progress Form and list of resources used will reside in the easement folder at the field station. It will be the responsibility of the wetland manager to scan and distribute final maps to HAPET and the appropriate state Realty office.

C. **Specific Mapping Steps:**

***These steps originally applied to managers mapping wetland easements at the field station level. They no longer apply to those managers, but are applicable to the wetland mappers working out of the HAPET office. Procedures for reviewing draft maps are still applicable to the reviewing manager in the field.***

1. Prepare a wetland map of all naturally-occurring wetland basins utilizing all off-site mapping tools available (Exhibit XI-11). Map those basins which have historically been present over time; i.e., present on historical aerial photos. Use all wetland photographic signatures to help determine the presence or absence of wetlands basins. Look for hydrophytic vegetation, surface water, saturated conditions, mud flats, flooded or drowned-out crops, unharvested crops, isolated areas that are not farmed with the rest of the field, areas of greener vegetation (especially during dry years), mature uplands tree rings, and recurring cropping patterns that avoid wet areas. Each wetland basin will be mapped over time as accurately as possible utilizing all available off-site resources. The objective is to make our best effort to define wetland basins at the interface of hydric soils, hydrology, hydrophytic vegetation and upland soils using representative signatures of off-site tools. This will be done by interpreting wetland signatures on aerial photographic resources understanding that there is inherent error in photo-interpretation. Photo-interpretation error is explained in Exhibit XI-10. The draft mapper should identify all areas that appear to be wetland basins and depict the approximate size, shape and location based on all available resources.

2. The draft maps will be sent to the field station where a thorough review of the easement file(s) will occur to ensure that current mapping efforts undertaken are as consistent as possible with any historical information in the easement file. It is the map approver/reviewer's responsibility to conduct a thorough file review of the easement contract, paying close attention to any wetlands with past violations, wetlands that may have been compromised administratively, ditches that were allowed to be maintained or any other pertinent information. Wetland with a violation history should remain on the map if possible. The person who reviews the file should have extensive experience in enforcing/administering wetland easement compliance. The reviewer should also verify basin identification, approximate size, shape and location of all drafted basins. The easement map will be completed utilizing off-site tools and field inspections will be conducted as the need arises.

3. Compare the acreage of the draft map wetland basins to the easement summary acres. Do not write acreage figures on the map or aerial photos. Managers are only making a comparison between the easement map and Summary Sheet acreage for the wetlands on the entire easement contract. One of two conditions will exist:

   **Scenario One:** The wetland draft mapper makes a preliminary map, then the approver/reviewer compares it to the Easement Summary Acre figure and finds that the estimated mapped wetland basin acre figure is less than or equal to the Easement Summary Acre figure. In this case, prepare a final map according to the mapping guidelines.

**Scenario Two:** After completing the preliminary map and comparing it to the Easement Summary Acre figure, the estimated mapped wetland basin acre figure for the draft map is greater than the Easement Summary Acre figure. The court has made it clear that the mapped wetland acres must be consistent with the Summary Acre figure. In this case, the wetland map approver/reviewer must use the following process to assure the easement map will be consistent with the summary acres:

a) The map approver will reevaluate mapped wetland basins and/or portions of basins. Basins that have inconclusive signatures such as basins that only show up on one or two aerial photo resources may be removed if warranted.

   Basin boundaries may be redrawn only if evidence from a ground check and/or consultation with a second map approver/review warrants modification of the basin size or shape. **Modifications will only be made to better define the wetland basin, not to save acres or to fit the summary acres.** If modifications are made, compare the newly-estimated mapped acre figure to the summary acre figure for the easement. If the estimated mapped acre figure is still over the summary acre figure, go to step two.

b) If the estimated mapped acre figure is still over the summary acre figure, then it must be determined if the summary acre figure is encompassed within the Standard Range of Error for the mapped wetland basin acres. The Standard Range of Error for mapping easement is defined as +/-10% of the estimated mapped wetland basin acre figure. See Exhibit XI-10 for reference information on the Standard Range of Error for mapped wetland basins acres. If it is, then the map may be approved and finalized. The Standard Range of Error must be calculated as shown in the following example:

   Mapped acres = 50
   Summary acres = 46
   Error Range = Mapped acres +/- Standard Range of Error
   Error Range = From (50 – [50 x 10%]) to (50 + [50 x 10%])
   Error Range = 45 to 55

   In this example, the summary acres falls within the Standard Range of Error for the mapped wetland basins, so the map can be finalized. If the summary acre figure does not fall within the Standard Range of Error, as in the next example, then go to step 3.

   Mapped acres = 50
   Summary Acres = 44
   Error Range = Mapped acres +/- Standard Range of Error
   Error Range = From (50 – ([50 x 10%]) to (50 + [50 x 10%])
   Error Range = 45 to 55

c) If the summary acre figure is below the Standard Range of Error for the estimated mapped wetland basin acres, entire wetland basins must be removed from the map

according to the wetland basin elimination criteria below. Basins will be removed until the error range (as calculated above) encompasses the summary acre figure or is less than the summary acre figure. **Each time a basin is removed, a new standard range of error must be calculated.** Once the summary acre figure falls within the range of error for the estimated mapped basin acre figure or is less, then the map will be finalized and approved.

The wetland elimination criteria are divided into 3 categories: 1) Potential Health and Safety Issues and Non-typical Wetlands; 2) Biological Factors; 3) Last Resort Considerations. These categories are in priority order, but criteria within category “1)” are not in priority order.

**1) Potential Health and Safety Issues and Non-typical Wetlands**

Remove wetlands that are not typically included in wetland easements purchased today and/or wetlands that may cause health and safety issues. The following criteria are not in priority order, so the manager has some flexibility in removing wetlands that may be of highest concern on the particular easement being mapped:

- Wetlands within the landowner’s curtilage
- Co-owned wetlands
- Wetlands that impact well-traveled access roads and have potential to cause flooding
- Degraded wetlands (contaminated, in feedlots, not fully functional, silt-laden or partially-drained wetlands)
- Wetlands close to a town or city that are subject to development
- Wetlands lying in well-defined intermittent or permanent stream beds
- Intermittent streams, coulees, and impoundments
- Inconclusive signatures, such as wetlands that do not show up on two or more usually reliable photographs

**2) Biological Factors**

The next criterion to be used to identify wetlands protected by the Easement Summary Acres is wetland type/classification. Wetlands that were not the primary focus of the Small Wetlands Acquisition Program (SWAP) prior to 1976 will be the next to be eliminated. This includes ephemeral wetlands (See Steward and Kantrud, 1971) as these wetland basins would not likely have been identified from photographic evidence available to the Service Realty Specialists. If the draft map is still over the Easement Summary Acres, begin to eliminate lacustrine and semi-permanent wetlands. Consistent with the focus of the SWAP, temporary and seasonal wetlands are the last wetlands to be eliminated from a draft map.

**3) Last Resort Consideration:**

If wetland acres still need to be removed to make the map consistent with the Easement Summary Acres, consider the following:

- Protect definable lobes within the larger basin that would likely still hold water as the water level in the basin decreases.
- Protect the lowest part of a larger basin by setting a mean sea level (MSL) elevation.

In order to consider either of these two options, surveying will be necessary to determine the overflow MSL elevation.

When eliminating basins on a draft map in order to remain consistent with the Easement Summary Acres, "consistent" is defined as the summary acres falling within the Standard Range of Error for the mapped wetland basins or the mapped acres are less than the summary acres.

The easement map will contain the following paragraph: "The U.S. Fish and Wildlife Service (Service) has purchased and owns perpetual rights which will restrict or prohibit the right to drain, burn, level, and fill any wetland basin depicted on this map. This map represents the Service's effort to depict the approximate location, size and shape of all protected wetland basins based on information and maps available at the time this map was prepared. However, wetlands are hydrologically dynamic systems, with expanding and contracting water levels. This map is not meant to depict water levels in the wetlands in any given year. The Service reserves the right to correct this map, provided the resulting mapped acreage remains consistent with the easement's Summary Acres." Also include this statement in the text of the cover letter transmitting the wetland map to the requestor.

The Exhibits in this chapter contain examples of three different letters to the landowners or others who have requested wetland easement maps. Exhibit XI-7 transmits the map to the landowner via certified mail in a non-violation situation. It states the map is an approximation of the wetland conditions and if the landowner or operators have questions, it is their responsibility to contact the Service. Exhibit XI-8 responds to a landowner's questions about the mapping process or about the size of individual wetlands. Exhibit XI-9 transmits a revised easement map with an explanation of the revision.

Send a copy of the final map to the requestor by certified mail with a standard cover memo and retain the original map(s) in the easement acquisition file and staple a copy in the easement folder. If the map was completed as a result of a violation, a copy of the map(s) should be sent to all parties involved including landowner, operator/renter and government entities (e.g., NRCS). A copy of the map will also be sent to the appropriate Wetland Acquisition Office (WAO), which in turn will send a copy to the Regional Realty Office where it will be converted to microfilm.

The time frame for responding to a request for an easement map should not be more than 60 days. If you are unable to complete the map within 60 days, respond to the requestor and

landowner in writing with an explanation. In no case should the Service allow a map request to go unanswered for longer than 60 days.

There is Wetlands "Mapper" Utility Tool (WMUT) that the FWS has made available to the public on the internet. Anyone can pick an area anywhere in the U.S. and find NWI wetlands on that location. If a wetland is selected with the identity tool, the WMUT has a data table that reveals characteristics of the wetland including acres. The WMUT has potential to conflict with easement maps that the Service provides to landowners. It is well known that NWI does not capture all wetlands, especially in the Drift Prairie, and the wetlands depicted on NWI maps are determined from one year of aerial photography. Several years of aerial photography, oblique photographs, and possibly ground truth visits are used in making easement maps. The Service needs to be able to explain the difference in the Easement Maps compared to the wetland maps generated by the WMUT.

## D. Revising Easement Maps that have been Finalized and Distributed:

It may become necessary to make changes to maps that have been distributed to landowners, operators, and WAOs. For instance, mapped wetland basins are not present when conducting later field work and/or an existing wetland was missed. The Service may correct previously prepared maps as long as they revised acreage remains consistent with the Easement Summary Acres. The purpose for revising maps is to maintain as accurate a map as possible to help eliminate potential wetland basins jurisdiction issues.

When correcting an easement map, attach a signed and dated memo to the map describing the reasons for the change(s). Also, type a note on the revised map referencing the dated memo. Place the original revised map and the memo in the acquisition file and a copy of both in the easement file. Do not just put another new map in the file without a signed and dated memo explaining why the previous map was amended.

On a revised map with fewer wetland basins, create a new map with the newly-deleted wetlands removed; do not merely cross out the deleted wetlands and re-date the old map. Keep both the old and revised map in the file, as they are both part of the permanent history of the easement. Send a copy of the new map (and memo describing the changes) to the appropriate WAO, which in turn will send it to the Regional Realty Office. Both maps will remain part of the permanent record in the Regional Office microfiche files. Send a copy of the amended map to the requestor as well as any landowners or other parties that received the previous map. Follow the procedures outlined earlier. Exhibit XI-9 transmits a revised easement map with an explanation.

# CHAPTER XII

# REQUESTS for USE or MODIFICATION of EASEMENT PROPERTIES

## A. General Discussion

When wetland and grassland easements are purchased, the Service acquires certain rights in the described property. All of these documents are perpetual (except for a very few 50-year agreements within the Devils Lake WMD), and the intent is that wetland managers will enforce the provisions of every easement according to the rights acquired. When easements are acquired, consideration needs to be given to future uses of the property that may conflict with the easement purposes. Measures should be taken during acquisition to eliminate future conflicts if possible. However, circumstances may arise from time to time when an easement may cause undue hardship to a landowner, public service entity, or a municipality that may need to improve its public service facilities; all of which may result in the need to modify a Service-held easement. In these cases, managers are encouraged to work with these entities when possible to alleviate or help minimize the hardship which may be created by the easement. This chapter outlines the procedures that must be followed when considering the modification of lands protected by Service easements. It is not the intent of this chapter to allow for the exchange or amendment of easements for matters of convenience or just because landowners don't like the easement on their property.

The criteria which may justify either temporary relief or an exchange of easement rights involve issues surrounding health, safety, or major threats to private or public property; issues associated with units of local government or other public entities; or certain issues surrounding farm/ranch operations. If the request is justified, based on the manager's experience and best judgment, then the following process should be pursued in an effort to resolve the issue.

This process and accompanying flowchart are designed to help managers evaluate requested uses regardless of whether it is related to health and safety, a right-of-way request, or a proposal from a private landowner concerning his private farm operation. Much thought and preparation has gone into this process; and while it is not fool-proof, it does provide managers a systematic and consistent way of looking at and dealing with the myriad of issues associated with administering easement properties. This process is intended to be used for **ALL** requested uses of easement properties, including the authorized activities listed in the "old" manual guidance known as "permitted activities." Managers **must** use the flowchart to evaluate proposed uses of easement properties. As discussed earlier, it is intended to provide a systematic thought process when evaluating proposals. Part of this thought process is determining whether the proposal is reasonable and whether there are alternatives to accommodating the request on easement property. Managers should try to accommodate the request off easement property if possible. The "Easement Use Evaluation Form" (Exhibit XII-3) is to be used to aid the evaluation, and to serve as a permanent record of the decision for the easement file.

If any pre-76 wetland easements are involved with the request, then the easement wetlands must be mapped according to the policies found in Chapter XI.

Needless to say, activities which do not impact the rights acquired by the Service are allowable without the need for a permit. This process for evaluating proposed uses is NOT intended to apply to commonly-accepted operational practices which go along with normal farming/ranching operations. Activities like fencing needs, corrals, vehicle and equipment access trails, temporary hay storage, and other operational necessities are allowed on easement properties WITHOUT the need for a permit or advanced approval from the Wetland Management District office.

**Issuance of Permits and/or Letters of Authorization:**

The permit application (use request) may be either in writing or verbal. In all cases, however, the manager must know exactly what is being requested. Even though use requests can be made verbally, in no case will the authorization be verbal. It must be on a Special Use Permit (SUP) or through a Letter of Authorization (LoA), with stipulations and a map if necessary. If a request is received from a 3rd party (e.g., a utility company, highway department, etc.), then it must be in writing. Managers must visit the site of any proposed activity prior to issuing authorization to impact any easement area. If the request is to resolve an emergency, authorization can be granted prior to visiting the site, but the manager must visit the site as soon as practicable.

All permits must be issued before acts of burning, draining, filling, and leveling in wetlands, or cultivation or alteration of grasslands or other protected habitats are allowed. **No "after-the-fact" permits shall be issued.** All non-permitted acts of burning, draining, filling, and leveling of wetlands, or cultivation or alteration of grassland vegetation will be treated as easement violations and referred to the U. S. Attorney, through the Regional Easement Coordinator, if necessary, for resolution.

Permits can only be issued when the requested activity successfully passes the flowchart (see stepped process below) and 1) approval of Appropriate Use and Compatibility Determinations (use Programmatic CD if appropriate; authorized habitat management activities excluded), and 2) documentation of NEPA compliance, Cultural Resource compliance, and Endangered Species Act compliance. Current regional guidelines, policies, and delegations of authority apply to the preparation and processing of NEPA and Endangered Species documentation as well as Appropriate Use and Compatibility Determinations. Except for emergency situations and authorized refuge habitat management activities as discussed in this chapter, and recognizing that the applicant is not relieved from complying with other local, state, or federal regulations, all activities within easement protected habitats require preparation of Appropriate Use and Compatibility Determinations (use Programmatic CD if it applies) as well as NEPA and Endangered Species Act (Section 7) documentation prior to issuance of a permit. Permits issued for any request involving economic activities **must** meet the higher standard of compatibility by "contributing" to the refuge area. See 50CFR, 29.1 for definitions and examples of "economic activities."

In some situations, field stations have an approved Comprehensive Conservation Plan that describes the permitted activities and includes programmatic compatibility determinations, environmental assessments, and intra-Service Section 7 Biological Consultations. These

documents should meet the above requirements. At other stations where no generic documents exist to meet the requirements of Appropriate Use, Compatibility, NEPA, and the Endangered Species Act, Appropriate Use and Compatibility Determinations will need to be prepared (or use Programmatic CD if applicable), as well as NEPA compliance, and consideration of Endangered Species Act requirements.

Where the Service has purchased or acquired an easement interest to preserve wetland, grassland or other habitats, certain acts of draining, burning, filling, and leveling of a limited nature may be allowed in protected wetland(s) or cultivation or alteration of grasslands by issuance of a permit. The Regional Director, or his designee, may issue a permit when such activities will not detract from or impair the basic purposes for which the easement was acquired. The Solicitor's opinion of August 14, 1980 (Exhibit XII-1) further discusses the legal aspects of permitting limited acts of draining, burning, filling, or leveling in wetlands under easement. While this opinion is specifically for wetland easements, the intent applies to other types of easement interests.

Exhibit XII-2 is an example of a permit with the standard wording that is to be used in the Statement of Effect and Compatibility section to the permit. This statement will be used on all Special Use Permits issued (except emergencies and authorized habitat management activities as discussed below in this chapter).

Authorized burning is considered a habitat management activity and will not require a compatibility statement. For authorized activities, other than habitat management activities, the statement to be used on the Statement of Effect and Compatibility section of the permit will read as follows:

> "The activity described and allowed by this permit is hereby determined to be compatible with the purposes for which the easement interest was acquired."

This statement represents only the **decision** made on compatibility and does not represent a determination of compatibility.

Special Use Permits are issued at the field level for a period of 1 to 5 years and with Regional Office approval, for up to 10 years. Stipulations can be added to the permit to require any type of restoration, reseeding, packing, returning the soil profile, etc. Generally, this permit is for activities with temporary impacts or to authorize the construction period for activities that will later be covered by a Right of Way permit. The SUP can be used for example, to authorize crossing a wetland with a buried pipeline or crossing a grassland easement with a chiseled in waterline. These types of activities generally have limited and quick recovery impacts. The limitation however, is that if future maintenance is required for example with a broken line after the SUP has expired, another SUP would be needed to authorize the additional work.

A Letter of Authorization can also be issued at the field level and is for the duration of time as indicated in the letter. Generally LoA's are used to authorize a long term or permanent use on easement lands; e.g., a request to lower a wetland that is flooding a driveway. If it's a short term, one-time need, the SUP would best meet the authorization need. However, if it is expected that the relief being provided will be long term or permanent, that is where a LoA is most applicable.

The LoA basically goes to the landowner and into the files and can be a permanent authorization of that requested use.

The third method of authorizing an activity is through the granting of a Right of Way (ROW) permit as the result of an application from the project sponsor. This application process is identified in CFR Subpart B – Rights-of Way General Regulations, 50 CFR 29.21. ROW permits can be granted for as long as it is used for the purpose granted, generally up to 50 years or lesser where appropriate. ROW applications are to be provided to the state Realty Supervisor. Any descriptive information or background should be provided by the field managers to this Realty office as well. The advantage of authorizing a use with a ROW permit is that current and future construction and maintenance would be allowed without any further administrative action, for the term of the ROW and within any limitations or stipulations within the permit. For example, if a ROW were granted for a buried waterline on a grassland easement and the line broke 20 years later, maintenance activity would be already approved under the ROW and no additional permit or authorization would be needed. However, the requestor may not want to apply for a ROW permit due to cost or application requirements. They may determine that the need for future maintenance is limited and if needed, they may assume another SUP would be granted to cover that activity. Again, the decision to apply for a ROW or not, is a decision for the requestor.

Discussions have occurred relative ROW's on the extent of information needed to describe the location of the ROW area. The CFR (29.21-2 Application procedures.) clearly states the intent of information needed as being sufficient to "show the right-of-way in such detail that the right-of-way can be accurately located on the ground." The CFR references that maps, sketches or a plat provided by the applicant are sufficient and provides direction on specific location information. In the 50 year administration of the program, there has never been an identified need by field managers to require a legal survey completed by registered surveyors in order to locate any ROW boundary. For example, field managers have the ability to accurately locate and relocate FmHA easement boundaries using GPS technology and very basic maps. Therefore, finding a ROW boundary for compliance purposes with GPS coordinates would be a similar, accurate and easy task.

In a ROW application, at a minimum, the requestor needs to provide a level of point information that can be accurately duplicated by field managers, such as GPS coordinates. A legal survey of the ROW is not required. However, if the project sponsor is surveying other features of the project, off easement, they should be encouraged to provide survey data for the ROW as well.

In the advent that the project requestor applies for a ROW permit, it is their choice to do so, there may be a time delay before the ROW permit is actually granted. At the discretion of the field manager, the project sponsor can be issued a SUP to cover the initial construction while the ROW permit is being processed.

Depending on the outcome of a flowchart review, there may also be an option to use an exchange. This is not however, authorizing a use on an easement, an exchange is removing that defined area from the system and therefore no permit or authorization is needed. Exchanges are discussed in Chapter XV and exchanges with a reversionary clause as is used in wind projects can be found in Chapter XIV.

If the requested activity passes the flowchart process and is approved, the requesting entity will receive the original of the SUP or Letter of Authorization. The issuing office will retain copies in the appropriate easement file. NEPA compliance documents, cultural resource compliance documents, and any other documents requiring approval must be forwarded to the RO for approval/concurrence prior to issuing the permit/letter of authorization; however, it is no longer necessary to send copies of the signed SUP into the Regional Office.

To provide as much consistency as possible among Wetland Management Districts, managers **must** authorize requested uses of easement properties if the proposal passes the flowchart and can be accomplished within the guidelines presented in this section and with the guidelines contained in Exhibit V-6 (if they apply), unless they can justify a denial of the request to the Standing Easement Review Committee. Proposals which fail to pass the flowchart, but involve special circumstances associated with the proposed use, may also be appealed to the Committee.

If circumstances apply, requesters may also need a formal ROW permit from the Regional Office-Realty. See Chapter XIII for guidance on the right-of-way permit process.

**Concept of Threshold Levels of Disturbance:** One of the major components of the flowchart process is the concept of threshold levels of disturbance. Section 2.11 B-1 of the 2000 Compatibility Policy states that compatibility is, in fact, a "threshold issue" and that proposed uses must pass a "threshold test."

Region 6 has developed several programmatic compatibility determinations (CD) (Exhibits XII-4a-g) authorizing managers to accommodate certain requested uses or activities on easements. These CDs are not intended to cover any activities or proposed uses of any Service-administered fee lands (refuges and WPA's, except Exhibit XII-4e and 4g which may apply to WPA's). The requested activity must first successfully pass the flowchart process for it to be considered a compatible use. Appropriate Use and Compatibility must be addressed in every case, unless an Exchange of Interests is being considered or the use qualifies as a non-economic habitat management activity. For managers to use one of the programmatic CDs, the situation at hand must fit the discussion in the programmatic CD exactly. Otherwise, an individual CD will be required. Assurances have been incorporated into the process to protect the integrity of the NWRS, and to comply with policy requirements governing the System. As part of the compatibility evaluation process, managers must also address any associated or secondary impacts. This is further explained in Section B-7 of this chapter.

Only two of the programmatic CDs involve the use of threshold levels; the others involve temporary impacts only to easement interests. Region 6 has defined "threshold" levels of impact which may occur as a result of authorizing a requested use, but will not materially interfere with or detract from the purposes for which the easement interest was acquired. These levels of impact are defined more fully in the programmatic CD on curtilage expansion (Exhibit XII-4a ) for threshold levels associated with uplands, and in the programmatic CD on Health and Safety wetland issues (Exhibit XII-4b) for threshold levels associated with protected wetlands. They are based on years of scientific evaluation of prairie pothole habitat and how habitat impacts affect waterfowl populations.

These threshold levels of impact have been established at 0.4 acres of wetland, and not to exceed 25% of the wetland basin, and/or 8 acres of easement-protected upland. These levels have been established based on biological models developed by the Habitat and Population Evaluation Team (HAPET) in Bismarck, ND. The justification for these levels is also found in the previously-mentioned programmatic CD's.

If the requested use passes the flowchart's screens and filters, is found to be appropriate and compatible, and results in a permanent impact to the Service's easement interests at or below the threshold levels, then the use can be approved, meaning that the impact will not result in a "material" interference or detraction from the purposes for which the easement area was acquired.

Threshold levels should not be viewed as an automatic "allowance" or "manager's discretion" for easement properties. Each proposal must pass all the screens and filters in the flowchart and be appropriate and compatible to be approved. The following guidelines will apply to authorized uses, WHICH HAVE SUCCESSFULLY PASSED <u>ALL</u> steps of the flowchart, relative to the concept of threshold levels:

- Each easement contract will be authorized up to one threshold level of impact in total, whether it occurs all at one time, or in different authorizations for wetlands and/or uplands.

- The Easement Use Evaluation form (Exhibit XII-3) will serve as the official record for each easement contract.

- Authorized third party requests (road improvement projects, utility projects, water lines, etc.) will <u>NOT</u> count against the landowner's aggregate potential threshold.

- Easement contracts which are sub-divided by sale or which are less than 160 acres to begin with will be capped at an aggregate total which is pro-rated based on the threshold level of 8 acres (i.e., an 80 acre parcel will be capped at 4 acres, etc.). This requirement applies to upland acres only. The established threshold levels for wetlands (0.4 acres) will apply even to subdivided wetland easement contracts.

- If an easement contract has received past authorizations amounting to a fraction of the potential total, and subsequently the land is subdivided through sale, then the balance of future potential authorization will also be pro-rated, based on what was previously authorized, but will not exceed the total of potential authorization for the easement contract.

- In the unlikely event that the threshold levels for a given easement contract have been reached through past authorizations, and another requested use meets the authorization criteria (flowchart process), the manager may appeal the case to the Standing Easement Review Committee for a decision.

- If the appeal is denied, the only option at this point is an exchange of interests, even for below-threshold levels of impact.

- Proposals which are authorized and result in ABOVE-threshold levels of impact must be accommodated through an exchange of interests (Exhibit XV-1).

Region 6 has adopted a process to replace values for **any** impact to refuge system interests, however slight. This process will be accomplished independently of compatibility requirements associated with such uses, and will not enter into, nor affect, any decisions made relative to Compatibility Policy requirements.

The biological values for any habitat impacted below-threshold levels will preferably be replaced on-site. An informal replacement of lost values may be an option. It is anticipated some events will involve miniscule acreage for Health/Safety or Farm/Ranch-related impacts. For example, a landowner wishes to use fill in part of a co-owned easement wetland basin in order to construct a fence on the property line. The fill may come from the "shoulder" of the wetland or from a spoil pile in the basin created by a previously-constructed livestock dugout. The end result in this case is no net loss of easement wetland acreage.

Another option is to replace lost values on or off site with use of grant monies (Health/Safety and Farm/Ranch impacts only). In those cases where there is Public Service, Government, or Corporate involvement, cash receipts will be generated by the requestor which will be used to replace lost values on or off site. A good example for these scenarios would be restoration of a previously-drained wetland.

The third option is the Madison Contributed Funds Account in those cases where revenues are generated by Public Service, Government, or Corporate requests – OR – use of Madison NAWCA grant money when replacement of lost values is associated with Health/Safety or Farm/Ranch impacts. Currently, there is ample opportunity on the Madison WMD to do wetland/upland restoration work.

Authorizations for Health and Safety (green blocks on Easement Permit Flowchart) or from the "Other Request" category (orange blocks on the Easement Permit Flowchart) will not include a cash payment obligation for any below-threshold habitat restoration work; grant monies will be used as necessary for these entities for below threshold impacts.

For any exchange process involving above-threshold acreage (NOTE: exchange agreements to accommodate wind energy infrastructure now involve a reversionary clause – see the Wind Energy chapter for more information), the exchange will be based upon the current market value of easement interest to be relinquished. Cash payments will be required of the requestors. Replacement acreage priorities to be followed as part of an exchange are:

Priority 1 - restorable acres/replace lost values on site.
Priority 2 - restorable acres/replace lost values in project area.
Priority 3 - restorable acres/replace lost values in State.

Any exchange will be consistent with USFWS policy (Exhibit XV-1).

# Region 6 Flowchart



## B. Process for Evaluating Requests for Use or Modification of Easement Properties:

This process is designed as a "screen-out" mechanism, meaning that a proposal must meet ALL the criteria (except bona fide health and safety issues) rather than any single criterion in the process to be considered.

Managers will use the Special Use Permit Flowchart to help guide the proposal (requested use) to a logical conclusion and decision. Exhibit XII-3 contains a form which follows the flow diagram, and this may also be helpful for managers to use in evaluating requested uses. A copy of this form must be retained in the permanent easement file as a record of your decision, and to provide a record of authorized uses for the easement area.

While the decision criteria used to evaluate a request for an easement use or modification are presented in a linear stepped process on the flow chart, the actual consideration of a request should be made with the majority of the steps in mind. If a request is likely to be found incompatible due to the loss of endangered species, such as the loss of prairie fringed orchids for stock water development, or the loss of a water bird nesting colony for farmstead expansion, discussion with the requestor should likely focus around avoiding those impacts. When evaluating an exchange which does not require compatibility, unique or rare values would be considered as part of the Environmental Site Assessment. Managers should keep in mind that some easements will protect unique or rare wildlife and habitats which the Service should maintain regardless of how well the request may fit the remainder of the criteria in the flow chart.

### 1. Authority to Regulate the Proposed Use:

First, the wetland manager must determine if the Service has the authority to administer the proposed use. Does the Service have jurisdiction under the terms of the easement? If the answer is "NO," then, while there may be other laws that regulate the use, the Service has no authority under the terms of the easement. The wetland manager should inform the requester that, although the Service does not have the authority under the easement, this does not exempt them from other laws and/or regulations which may regulate the request.

The Service occasionally receives requests from USDA Wildlife Services to spray cattails for the purpose of eliminating blackbird roosting habitat. When this request is on land protected by a wetland easement only, then the Service has no jurisdiction to restrict the use since the activity does not constitute a "drain, burn, fill, or level." However, the Service would have jurisdiction when that same request is made on land protected by a grassland easement since the activity would effectively be "destroying the vegetative cover."

### 2. Refuge Management Activity for Habitat Improvement:

If the Service has jurisdiction, then determine if the request can be considered a "refuge management activity," defined as an activity that could be conducted by the Service or a

Service-authorized agent to fulfill one or more purposes of the national wildlife refuge (area), or NWRS mission. Service-authorized agents may include state or federal agencies, educational institutions, contractors, private organizations or individuals. Qualifying refuge management activities are exempt from the compatibility process.

These activities must benefit wildlife populations or easement habitat, they must further the purposes and goals of the Wetland Management District and the mission of the NWRS, and they must be commonly-accepted as practices which are normally accomplished by natural resource agencies to promote wildlife populations. Examples include, but are not limited to, prescribed burning of upland or wetland vegetation to enhance vigor or provide better breeding pair habitats in wetland, planting food plots for use by wintering wildlife, planted shelterbelts for cover and winter protection, interseeding upland areas to introduce more resilient or diverse native grasses and/or forbs, and restoration of previously-drained wetlands. Authorized refuge management activities are exempt from compatibility requirements, EXCEPT for Refuge Management Economic Activities which are NOT exempt from compatibility and must meet a higher standard as defined below. Refuge management activities which are also economic uses (e.g., early haying of a grassland easement) can be approved at this level without the need for using the rest of the flowchart, but managers must still develop Appropriate Use (AU) and Compatibility Determinations (CD) before the request is authorized (see discussion below for more detail). If, in the judgment of the wetland manager, requests do not fit logically within a refuge management activity category, then the request must be evaluated using the rest of the flowchart, including economic uses which do not qualify as refuge management activities. An example would be a request to mine top soil from a grassland easement or borrowing fill material to facilitate road construction. These are not refuge management activities as defined in this section, but are economic uses as defined in 50 CFR 29.1, so the proposals would have to be evaluated through the remainder of the flowchart.

In general, any authorized upland habitat management activity, or combination of activities, must not exceed 8 acres per 160 acres of easement. Some activities, such as interseeding or reseeding upland areas or burning, will not be limited to the 8 acres per 160 acres. These activities will generally also be limited in terms of length of time. A Special Use Permit can be issued for up to 5 years. Activities like native shrub plantings and authorized wildlife dugouts, however, will be more permanent modifications to the landscape than the 5 year permit limitation. In these cases, issue a Letter of Authorization rather than a Special Use Permit.

There are also specific requirements associated with some of the Habitat Management Activities. See also Exhibit V-6 for additional conditions on other Habitat Management Activities.

- Shelterbelts - to qualify as a habitat management activity, shelterbelts must be of native shrub species and be planted on non-native grassland areas; other requested tree/shrub plantings, such as field or farmstead windbreaks, will not fit this category, and must be evaluated with the remainder of the flowchart. Limited to no more than 8 acres/160 acres of easement.

- Foodplots - positively **NO foodplots** will be authorized on native prairie grasslands protected by easement. Previously, Special Use Permits were limited to 5 years for non-native uplands. This time limit is no longer applicable, and a Letter of Authorization should now be used to permit food plots rather than an SUP; the LOA should consider the following conditions:

  a. no food plots to be planted in wetlands;
  c. specify the type of crop, or crop rotation;
  d. no harvesting or grazing except after March 31, and prior to spring planting;
  e. must include a plan for re-establishment of grass after the food plot is terminated;
  f. limited to no more than 8 acres per quarter section;
  g. the use of insecticides is discouraged on the food plots; and
  h. NO native prairie shall be broken for food plots.

  The LOA can be revoked by either party at any time. Exhibit XII-8 contains an example of an LOA to use for food plots.

- Burning of wetlands - will not be authorized more than once in every 3 years, or not to exceed 1/3 of the wetland easement acres annually, with individual permits issued each year. See Exhibit V-6 for additional required conditions.

- Wildlife ponds- which are constructed in accordance with NRCS specs for a wildlife development are permitted under this category. Dugouts for stockwater only are covered by the Programmatic CD (Exhibit XII 4-g).

- Farming/Seeding of Wetlands - protected wetlands which are overlaid by a grassland easement are protected against farming and/or cultivation just the same as upland acres. As a general policy, requests for farming them will not be authorized. However, managers may authorize farming of wetlands with a permit and justification for the improvement of the area, the same way they are authorized to farm upland acres for the improvement of the area. This practice will be considered a habitat management activity if it results in an improvement of the area. It may be considered as a "refuge economic use" if removal and or harvesting of products is part of the authorization. Economic use activities require an individual CD written to the higher standard (see below). If the seeded wetland is grazed (anytime) or hayed after July 15, then it is NOT an economic use; if the area is cropped, and the crop harvested, then it IS an economic use. Non-economic uses considered to be habitat management activities do not require a compatibility determination.

  Food plots are NOT authorized in wetland basins as stated above. Wetlands within native prairie will NOT be farmed, seeded, or manipulated under any circumstances. Wetlands protected by only a wetland easement may be farmed when dry of natural causes without permission from the WMD.

- Interseeding- Grassland improvement must be the goal of any authorized interseeding. This practice can be authorized under this category if, in the judgment of the wetland manager, a net improvement for wildlife will occur. Practices for the benefit of the landowner's

operation must be evaluated under the remainder of the flowchart.

Interseeding is a habitat management activity and exempt from compatibility determinations unless the use of glyphosate or any other contact herbicide on native prairie is being requested. **Native prairie is defined as:** Grasslands that do not have and never had a cropping history or any other type of modification to the original prairie excluding burning, haying, grazing or grass tolerant herbicide application. The request shall identify the species composition of the original planting in non native grasslands or re-established native grasslands prior to any approval for interseeding.

Interseeding into native prairie must be with native grasses and forbs only. The use of glyphosate or any contact herbicide to eliminate certain exotic grasses (crested wheatgrass, smooth brome, or Kentucky bluegrass) can have detrimental effects on native grasses and forbs especially cool season native grasses and will require a compatibility determination. If permitted, this practice should occur in the early spring prior to any warm season grass or warm season forb emergence. Wetland managers must inspect the proposed native prairie tract and identify any cool season native grasses or forbs that could be affected prior to completion of the compatibility determination or any approvals. Interseeding is not limited to the 8 acre per 160 acres requirement. Additionally, an easement use evaluation form must be filled out and placed in the easement file for **any** interseeding activity.

- Wetland Restorations - are authorized on easement properties. They can be either permanent, which requires either another easement agreement or an amendment, or under a term agreement, such as a Partners for Fish and Wildlife Agreement, or in conjunction with a USDA or CRP requirement. See Exhibit V-6 (11) for additional information.

If the proposed activity qualifies under any of these criteria, then issue a Special Use Permit or Letter of Authorization. A compatibility determination is not required for practices implemented under this category, except for those that are determined to be economic uses.

**Refuge Management Economic Activities:**

If the requested use is considered to be a "refuge management economic activity," then it must meet a higher standard of compatibility by "contributing to the achievement of the national wildlife refuge purposes or the National Wildlife Refuge System mission." If the request is approved, the wetland manager must describe how the economic use contributes to the achievement of the purposes and mission statement and explain such in the CD. The "normal" compatibility standard of not "interfering with or detracting from" the purposes or mission will not suffice for economic use requests. As an example using the scenario cited above, if the manager could obtain a better quality of reestablished grassland after the fill is removed to facilitate road construction, then a connection could be made that the use resulted in "contributing to the purposes or mission."

Economic Uses are defined in 50 CFR 29.1 as "including, but not limited to grazing livestock, harvesting hay and stock feed, removing timber, firewood or other natural products of the soil, removing shell, sand, or gravel, cultivating areas, or engaging in operations that facilitate

approved programs on national wildlife refuges." Another way of defining an economic use is if the activity results in the "harvest of the interest" the Service acquired in the easement.

A differentiation is made between refuge economic uses and potential commercial uses. Authorizing a communications cable to cross easement properties is a use request from a commercial entity, but it does not fit the definition of "economic use" for this section. Other examples of commercial uses which do not meet the definition of a "refuge economic use" include: buried water pipelines completed by incorporated rural water companies, electric utility cables, television cable crossings. Another way of looking at this is if the use results in only an "occupation" of the easement property, then it is probably not an economic use. If the use results in a "withdrawal" of a product, then it probably is an economic use.

If the request falls under the category of a "refuge management economic use," then the manager must complete a CD, evaluated on the higher standard, for RO approval. After approval, issue a Special Use Permit or letter of authorization. If the use request is for early haying of a grassland easement for management purposes, there is a programmatic CD which can be used if it fits the exact circumstances of the request at hand. (Exhibit XII-4c)

**"8 acres per contract" vs. "8 acres per quarter"**

Since the release of the first edition of the Easement Administrative and Enforcement Manual in December 2005, confusion and disagreements over the proper applications of the "8 acre per contract" and "8 acre per quarter" standards have surfaced. An attempt is made here to clarify these two standards, including an explanation of their genesis and their intended applications as they relate to administering proposed modifications of easement properties.

"Eight acres per contract" refers to a threshold value that Region 6 defined as a *material interference or detraction*, and is used to assist in the determination of whether or not a proposed impact to a grassland easement is compatible. The Compatibility Policy of 2000 defines a compatible use as a wildlife-dependent recreational use or any other use of a refuge that, based on sound professional judgment, will not materially interfere with or detract from the fulfillment of the mission of the NWRS or the purpose of the refuge.

Making this determination is a *threshold issue*. By way of programmatic compatibility determinations completed in 2005, Region 6 defined the threshold levels of impact for not only grassland easements (8 acres), but also for wetland easements (0.4 acres, not to exceed 25% of the total wetland basin). These levels of impact are more fully defined in the Justification sections of the CDs, and are based on years of scientific data which suggest these levels of impact will not result in the destruction of habitats capable of supporting one pair of ducks. In other words, impacts exceeding these levels could diminish an easement's capacity for providing habitat for nesting waterfowl (i.e., one pair of ducks) which Region 6 has determined constitutes a "material interference or detraction from" the easement's purpose.

Neither the Easement Manual, nor the programmatic CD defining the 8 acres per contract, precludes a wetland manager from drafting a compatibility determination which finds levels of impact exceeding 8 acres compatible. However, the onus is on the manager to successfully argue that the level of impact does not materially interfere with or detract from the NWRS

mission or purpose of the easement; and, given the background and justifications included in the existing programmatic CDs, this argument would be difficult, if not impossible, to uphold.

"Eight acres per quarter" refers to the amount of impact that will generally be tolerated on grassland easements for those modifications that can be considered *habitat or refuge management activities* (the terms "habitat" and "refuge" are used interchangeably for this discussion). Unless also an economic use, habitat management activities are exempt from compatibility requirements; thus, no CD is necessary for their approval.

Habitat management activities are defined as those that could be conducted by the Service or a Service-authorized agent to fulfill one or more purposes of the easement area or the NWRS mission. Examples could include shelterbelts, food plots, wildlife ponds, wetland restorations, and interseeding. Most habitat management activities are *generally* limited to 8 acres per 160 acres, but not all are. Interseeding and burning, for example, are not limited to this acreage. The foundation for 8 acres per 160 acres likely came from previous easement manuals which contained flexibility to allow "minor changes" in the easement up to 5% of the easement area. Five percent of 160 acres is 8 acres.

The fact that habitat management activities are generally allowed on up to 8 acres per quarter (or 5% of the easement area), and that the Region 6-defined level of impact deemed less than a material interference or detraction is 8 acres (per contract of at least 160 acres), is merely coincidental. One had absolutely no influence on the establishment of the other.

Further discussion on both standards can be found elsewhere in the Manual. Specifically, discussions, rationale, and justifications for the 8 acres per contract standard as it relates to Compatibility can be found elsewhere in Chapter XII-a, and in programmatic CDs included as Exhibits XII 4-a and XII 4-b. Text pertaining to the 8 acres per quarter standard as it relates to habitat management activities can also be found elsewhere in Chapter XII-a, and background information concerning the intent to incorporate flexibility in easement administration is well covered in Chapter I.

Finally, extreme diligence and care must be exercised by all individuals when discussing easement restrictions with landowners, especially during the negotiation phase of acquisition. Prior to the sale of the easement, landowners must be made to understand the terms of the easement contract exactly, and should have no expectation of being allowed to negatively impact the protected easement interests in the future. While the Service wishes to maintain flexibility to address legitimate needs to modify easement areas, the landowner must not be given the impression that any modification is guaranteed. In other words, the ability and decision on whether or not to allow an impact grassland easement contract belongs solely to the Service, and may only be exercised after an exhaustive review process through the flowchart. It is not the landowner's "allowance," nor is it at the landowner's discretion to impact those acres whenever he/she sees fit. In other words, the *landowner has no flexibility* to impact a grass easement in a way that is restricted by the easement contract. Rather, the *Service has limited flexibility* to permit legitimate needs to modify easement lands when the impacts are deemed less than material.

3. **<u>Determining the Type of Requested Use of Easement Property</u>:**

If the request is not a Habitat Management Activity, then managers must categorize the type of request. The request can be one of three alternatives:

- Health, Safety, or Major Threat to Public or Private Property - Use Green-colored blocks through the center of the Easement Request Flow Chart

- Public Service, Government-sponsored or supported, or Corporate-type requests - Use the blue-colored blocks on the left side of the Flowchart

- All Other Requests - Use the orange-colored blocks on the right side of the Flowchart
If the requested use successfully passes the flowchart, then managers should review Exhibit V-6 to check for conditions and/or stipulations for some of the more commonly requested uses of easement properties. This exhibit also contains conditions and/or stipulations for commonly requested habitat management activities. Region 6 has developed seven programmatic CD's which can be used to address compatibility if the circumstances fit the description in the CD. If not, then an individual CD will need to be developed.

The seven programmatic compatibility determinations are:

- a CD (Exhibit XII-4a) to address necessary expansions of building sites, etc. involving established threshold levels for upland habitats.

- a CD (Exhibit XII-4b) to address resolving chronic Health and Safety issues involving "non-material" impacts to protected wetlands (below threshold levels).

- a CD (Exhibit XII-4c) covering authorized early haying of grassland easements for management purposes. This activity represents an economic use, so the CD is written to achieve the higher standard.

- a CD (Exhibit XII-4d) to address temporary impacts (only) to protected wetlands to resolve Health and Safety issues.

- a CD (Exhibit XII-4e) to evaluate proposed uses which are consistent with the Region 6 policy letter of April 5, 2002 (Exhibit XII-7) involving impacts to easement interests resulting in only temporary and minor impacts.

- a CD (Exhibit XII-4f) to be used in conjunction with pipelines for livestock water crossing grassland easements. (Previously completed).

- a CD (Exhibit XII-4g) to be used for dugouts for livestock water on easements and WPAs (completed in 2008).

Region 6 has a long standing policy that activities which may impact native prairie will not be authorized. While, in general, this is still the case, impacts which may result to native prairie from legitimate activities which pass the flowchart may be acceptable. However, ALL other alternatives must be exhausted before authorization is given to impact native prairie. An example would be the need to reroute a driveway access to a residence as a result of flooding, and there is no alternative but to route the new access through native prairie.

**4. Health and Safety or Major Threat to Personal or Public Property:**

Situations involving health, safety, or major threats to buildings, roads, and infrastructure- Examples: Basement flooding caused by high water in a nearby wetland, barnyard or feedlot flooding, driveway or other road flooding, or threat to domestic water supply or sewer system. Most health and safety issues will likely involve protected wetlands, but could also occur with protected uplands such as tall, dry, easement-protected grasslands adjacent to farm buildings constituting a fire hazard.

A landowner's inability to hay or farm wetlands during wet periods or in high water years, will **not** be considered as health or safety issues.

For situations which involve health, safety, or major threats to landowner appurtenances which cannot be resolved without violating the easement and for which no reasonable alternative exists, the wetland manager, upon verification of the circumstances, is authorized to allow alteration of a wetland(s) or grasslands under easement under the following guidelines (continue to evaluate the proposal under the "Health and Safety" provisions of the flowchart [green-colored boxes through the center]).

**A.** If the needed relief can be accomplished within 30 days, then issue a Special Use Permit with stipulations and restoration requirements (if necessary). This action is considered a temporary action, and a Compatibility Determination is not required if resolution can be achieved in under 30 days. See next paragraph.

**Emergencies Defined under Compatibility:** The Refuge Administration Act states that the Secretary may temporarily suspend, allow, or initiate any use in a refuge if the Secretary determines it is necessary to immediately act in order to protect the health and safety of the public or any fish or wildlife population. Authority to make decisions under this emergency power is delegated to the refuge manager. Temporary actions should not exceed 30 days and will usually be of shorter duration. Such emergency actions are not subject to the compatibility determination process. When using this authority, the refuge manager will notify the Regional Chief in advance of the action, or in cases where the nature of the emergency requires immediate response, as soon as possible afterwards, and typically no later than the start of business on the first normal workday following the emergency action. The refuge manager will create a written record (see Exhibit XII-3) of the decision, the reasons supporting it, and why it was necessary to protect the health and safety of the public or any fish or wildlife population.

**B.** If the situation requires longer than 30 days to remedy, then an AU & CD will also be required. Determine if one of the programmatic CD's will fit; if not, then an individual

CD will be necessary. This action is also considered a temporary action and can be authorized with a Special Use Permit. If the situation is still unresolved at the end of 1 year, the manager may issue another one-year permit. If it is apparent and obvious that temporary actions will not satisfactorily resolve the issue, then consider a more permanent solution.

**C.** If a permanent impact to an easement interest will likely result, determine the least amount of impact required to resolve the H&S problem. If the request can be accomplished within the specified threshold levels (see Flowchart and Exhibit XII-4a or b for defined threshold levels for wetland and upland impacts), then the action can be considered compatible if either of these two programmatic CDs fit the circumstances of the issue at hand. As an alternative, managers may need to develop an individual CD.

**D.** If the required level of impact exceeds the threshold levels, then an exchange of rights or interests will be necessary in order to accommodate the request. If an exchange is necessary in order to accommodate the request, the exchange will be based upon the current market value of the easement interest that will be relinquished. The Easement Exchange process is detailed in Exhibit XV-1. A CD will not be required for the exchange, but NEPA compliance must be addressed. A Land or Interest Exchange Checklist (Exhibit XV-2) will also be required. It will be completed jointly by the management office requesting the exchange and the servicing Realty Office, and a biological analysis of the property to be relinquished must be completed as part of the Exchange proposal.

In very rare instances, health and safety issues may involve "economic uses" of easement properties as defined in 50 CFR 29.1. An example would be allowing a county or township to remove clay from a grassland easement to build up the road through a flooded wetland. The extraction of the clay material, even though deemed to be a temporary impact, and necessary to avert a Health and Safety issue would still have to meet the higher compatibility standard of benefiting the refuge area.

The Service would have no jurisdiction, however, if fill material was borrowed from an upland site on a wetland easement (only) with no involvement of the protected wetlands.

**5. <u>Public Service, Government-supported, and/or Corporate Requests</u>:**

Does the proposal qualify as a Public Service request such as a highway improvement project, rural water system, electric transmission lines, fiber optic cables, and other area-wide projects which promote the greater public good? Is the proposal related to a request from a local, State, or other Federal unit of government, or a proposal which is sponsored or supported by a unit of government? Generally, these are requests by municipalities, other governmental entities, or utility companies to extend city boundaries, build relay towers, relocate sewage lagoons, relocate landfills, etc. The third category of possible requests to be evaluated under this part of the flowchart are requests which may be received from corporate entities such as an ethanol production plant, a major pipeline crossing, a manufacturing plant, or wind energy development proposals. Requests which fall under this heading will be evaluated under the blue boxes on the flowchart.

**A.** First, the manager must ascertain and the requester must be able to demonstrate that there are **no reasonable alternatives** off easement property which will accommodate the requester's need. For example, can the activity be accomplished on non-easement property without causing undue economic hardship or has there been a past precedent for an alternative being proposed and used? Alternatives to the request should be thoroughly explored with the goal of developing an acceptable alternative that will not result in the development of any portion of the Service's easement interest. If the requester's needs can be met on nearby or adjacent non-easement land, then reasonable alternatives are deemed to exist and the proposal must be denied. The manager should always try to determine if the requester can work around the easement interest. In some cases the project can be modified, the change is not significant and the easement interest is not affected. If the development can take place on non-easement lands, there is no need for further consultation.

Determining a reasonable alternative is a collaborative process with the requestor. Often, during this discussion cumulative impacts may be reduced, but not eliminated. For example, during discussions regarding a wind development site, a manager may reduce the proposed miles of service roads and the number of towers on grassland easements; or during discussions on a pipeline project, a manger may reduce the number of easement tract crossings or successfully route the line around individual easement wetlands. At a point in these discussions, a manager can develop a feel for what may be a reasonable alternative. The reasonable alternative may include some easement impacts, but they have been reduced and minimized through discussion with a requestor. This discussion also helps the manager develop a feel for the nature of the request and whether it fits the category of essential need.

If there seems to be no reasonable alternative to the proposed action **on** easement property, then move down to the next block. If there are reasonable alternatives, then the proposal is denied.

**B.** The next evaluation is to determine whether the proposal is essential. This area requires the proposal to be an **essential** need. Is it necessary for the greater public benefit? Is it essential to promote the general public welfare? Convenience requests are generally not essential. A rural water system installation which cannot be rerouted to avoid Service interests would be an example of an essential need in this category of requested uses. The proposal must meet a level of importance beyond mere convenience and be absolutely necessary or indispensable. If the proposal is determined not essential or absolutely necessary, then it will not be authorized.

**C.** If the proposed use of the easement area is essential to the project, and there are no reasonable alternatives to accomplishing the proposal on easement property, then evaluate whether the project will seriously affect the **integrity of the easement**. If the proposal will destroy the very nature or integrity of the easement, defined as affecting a high proportion of the easement area, or seriously degrading the quality of the easement through fragmentation, then the project will be denied. Proposals which result in only a corridor or ROW request or an expansion of an existing right-of-way are likely not of the

magnitude that will destroy the integrity of the easement area. Proposals resulting in the destruction of an easement area that extends beyond a corridor or the destruction of a significant proportion of the easement interest should be determined to violate the integrity of the easement area, and should be denied. When considering proposals for wind projects, pipelines, etc. involving several easement contracts, the "easement area" is the total area protected by the easements, rather than each easement contract independent of one another.

If the proposal passes the previous three filters, then it will likely be authorized, but must still be evaluated by the remainder of the dark blue blocks on the flowchart to determine how the proposal will be authorized.

**At this point, if the request is related to Wind Energy Development, go to Chapter XIV for further guidance.**

**D.** Determine if the project can be accommodated under the specifications of a "Minor Disturbance Project." See Exhibit XII-7 for the regional policy on minor disturbance-type projects.

If impacts are determined to be only temporary and minimal, then a formal right-of-way permit from the Regional Office may not be necessary. This policy now allows managers to forego the formal ROW process, and instead, issue a Special Use Permit directly from their office if the following conditions and circumstances apply:

- Impacts to Service-acquired interests are determined to be temporary and minor or less. Examples are cited in the policy.
- The ROW requester must understand that the permit is for the installation or initial construction only, and any subsequent need to complete work on the easement property will necessitate another permit process, which will be evaluated individually in each case.
- If permanent impacts occur, however, slight, appropriate use and compatibility determinations must be completed, and determinations of "appropriate" and "compatible" must be obtained for this process to be used. See Exhibit XII-4e for a copy of the Programmatic CD which may cover this issue. If none of the acquired rights are impacted, then a CD will not be necessary, but managers should document the fact that compatibility was considered and evaluated during the process.

If the proposal meets these criteria, then issue a Special Use Permit with stipulations for site restoration, etc. and use the Programmatic CD developed for this situation (Exhibit XII-4e). The requester may desire a ROW permit to allow for future needed maintenance. If so, then pursue a formal ROW as discussed in Chapter XIII.

**E.** If the proposal will not qualify under the minor disturbance guidelines, then determine if the proposal will qualify as a "minor expansion of an <u>existing</u> right-of-way." This category of requests is the <u>ONLY</u> place where "mitigation" can be used to offset impacts

to Service interests as a result of the project. See Chapter XIII-C and Exhibit XIII-2 for additional guidance.

Managers are encouraged to use the "minor expansion" category whenever possible to avoid the need for an exchange. Some guidelines are available in the 2000 Compatibility Policy on what constitutes a "minor expansion." If the request will qualify under this category, then individual appropriate use and compatibility determinations must be prepared referencing the required mitigation and stipulations to achieve compatibility. A Special Use Permit with site restoration requirements, and, at a minimum, a completed NEPA Compliance Checklist (Exhibit II-8) should also be prepared. A formal ROW permit will also probably be needed. Check with your ROW specialist in the Regional Realty Office for guidance, and also review the guidelines found in Chapter XIII.

**F.** If the request will not qualify under either of the two previously-discussed scenarios (paragraphs D and E above), next consider if the project can be accomplished within the established threshold levels for protected wetland and upland habitats. If not, then managers must consider an exchange option according to the criteria found in Exhibit XV-1.

**G.** If the request will result in an impact to easement interests at or below threshold levels, then managers must address Appropriate Use and Compatibility with either one of the Programmatic CD's (if the circumstances fit the situation) or an individual CD. Other compliance requirements must also be satisfied (NEPA, CR, Endangered Species, etc).

If the proposal is determined to be not compatible because of secondary or associated impacts, then the request must be denied. It is expected that secondary or associated impacts will be evident much earlier in the process. Rarely will a proposal pass all the screens and filters, *and then* be denied at this level. When secondary impacts that will render a proposal not compatible are known, there is no need to proceed through the flowchart since the use will not be allowed anyway. Furthermore, because an exchange of easement rights requires the preparation of a Biological Analysis wherein the manager must ensure no impacts to critical habitat or special emphasis species (basically secondary or associated impacts), these impacts would preclude an exchange as well. These proposals must be denied. Section B-7 below has more information on Associated Impacts.

If a request passes all the previous filters and decision points, but is not compatible because it cannot meet the higher standard required of economic uses (shown as "29.1 criteria" on the flowchart, meaning related to the economic use discussion in 50 CFR 29.1), then an exchange may likely be the most logical choice.

**H.** If the proposal is determined to be compatible, then managers will issue a permit or a letter of authorization. In addition, a right-of-way permit from the Regional Office may be required. See Chapter XIII for guidance on ROW permits.

Requesters which are approved under this category will be required to replace the values of any resulting "below-threshold" level of impact which may result from authorizing the

activity. See the earlier discussion and flowchart on the replacement of lost values for more guidance.

**6. Other Requests:**

Other requests are those which do not fit logically within either the Health and Safety category, or the Public Service Request category. (Orange-colored Blocks of the Flowchart).

As discussed in Chapter I, the Service has a history of recognizing the inherent need for landscape-level easement programs to be partnerships or cooperative ventures with landowners. For example, formal agreements with past Governors of North Dakota reference specific Service efforts with easement enforcement and administration that were developed to facilitate a working relationship between the Service and easement landowners that protects wetland and grassland resources. Throughout the 50 year history of the program, the Service has made clear that the foundation of the program is a conservation effort that "fits" with farming and ranching interests. Farmers and ranchers hold the majority of wetland and grassland resources within their management and control. Service managers have historically recognized and considered this fact in past management guidance, policies and procedures used to evaluate proposed uses of easement interests.

**A.** Is the proposal related to a bona-fide farm/ranch operation?

In most cases, it will be obvious whether or not a request is related to a bona-fide farm/ranch operation. For evaluating these requests bona-fide is defined as an operation that meets the IRS definition of a farm or ranch. The easement holder making the request must be eligible to file estimated tax payments as defined in the IRS Farmer's Tax Guide (publication 225). If there is any doubt, then the manager should request to see copies of tax forms.

Requests involving new buildings or structures on an existing building site (encumbered by the easement) or proximal to a former building site that are not related to a bona fide farm/ranch operation are no longer permitted to pass this block.

The Service has approached farmstead expansion types of requests in a variety of ways in the past. The 1992 and 1997 revised Administration and Enforcement Guidelines and Procedures for Perpetual Grassland Easements and 1998 Grassland Easement Administration - 5 Percent Rule memo authorized the development of 5% or 20 acres (whichever was less) per section on grassland easement tracts. This policy changed again with the release of the 2005 Administration and Enforcement Manual, which under certain conditions, authorized development of .4 acres of wetland not to exceed 25% of a basin, and/or 8 acres of easement protected upland.

If there is historical file documentation that authorizes an easement development request based on past policy, or a landowner is specific about their understanding that 5 % of a grassland easement could be developed on an easement that was purchased between 1992 and 2005, those requests should be honored.

Potentially-authorized impacts to wetlands must be necessary to implement an operational improvement or to accommodate a request in support of the owner's operation. Requests to impact protected wetlands strictly for the gain in crop production, etc. will obviously be denied.

**B.** Next, ascertain, and the requester must be able to demonstrate, that there are no **reasonable alternatives** off easement property which will accommodate the requestor's need. For example, can the activity be accomplished on non-easement property without causing undue economic hardship, or has there been a past precedent for an alternative being proposed and used? It is the responsibility of the wetland manager to determine if the request can be met on land where the Service does not have an easement interest. Alternatives must be thoroughly explored with the goal of developing an acceptable alternative that will not impact the Service's easement interest. If the landowner's needs can be met on non-easement property such as adjacent cropland, then filling of a protected wetland for a grain bin or digging up protected grassland to plant a food plot, while maybe preferable to a landowner, should not be authorized. As is the case with the other flowchart categories, the wetland manager should always try to determine if the requester can work around the easement interest. In some cases the project can be modified, the change is not significant, and the easement interest is not affected. If the development can take place on non-easement lands there is no need for further consultation.

As stated earlier, determining a reasonable alternative is a collaborative process with the requestor. Often, during this discussion cumulative impacts may be reduced, but not eliminated. For example, during discussions regarding a wind development site a manager may reduce the proposed miles of service roads and the number of towers on grassland easements, or during discussions on a pipeline project a manger may reduce the number of easement tract crossings or successfully route the line around individual easement wetlands. At a point in these discussions a manager can develop a feel for what may be a reasonable alternative. The reasonable alternative may include some easement impacts, but they have been reduced and minimized through discussion with a requestor. This discussion also helps the manager develop a feel for the nature of the request and whether it fits the category of essential need.

If there seems to be no reasonable alternative to the proposed action **on** easement property, then move down to the next block. If there are reasonable alternatives, then the proposal must be denied.

**C.** This area requires the proposal to be an **essential** need. Is it necessary to the operation of the farm, or an essential need for operational viability? Convenience requests are generally not essential. The proposal must meet a level of importance beyond mere convenience and be absolutely necessary or indispensable. If the proposal is deemed to be not essential or absolutely necessary, then it must be denied.

As an example, a landowner needing to build a vehicle and equipment crossing through a protected wetland to gain access to a previously inaccessible piece of property should be evaluated as follows: If the inaccessible land is 2 acres, then it probably not an essential

need, but if it is 60 or 70 acres, then it may be essential that the landowner be able to access this land. Proposals related to the need to make substantial economic improvements in farm and ranch operations will likely be considered essential.

**D.** Can the proposal be accomplished with only temporary and minor impacts?

If the proposal can be accomplished with only a temporary impact to Service interests, then issue a Special Use Permit with needed stipulations and conditions. Managers will also need to address Appropriate Use, Compatibility, and NEPA Compliance. Examples of the NEPA Compliance Checklist are found in Exhibit II-8. Also consult your Regional Cultural Resources staff. Managers need to remember that if the activity qualifies as an "economic use," then the CD must be written to the higher standard of "contributing to the achievement of the mission and the purposes of the refuge area."

**E.** If the proposal will result in an impact that is not temporary and minor, then next consider whether the resulting impact can be completed within the designated threshold levels as described in Exhibits XII-4a and 4b.

**F.** If the resulting impacts are at or BELOW threshold levels, then managers must address Appropriate Use and Compatibility, with either a programmatic (if they apply) or with an individual CD. An individual CD will need to be approved at the regional level before proceeding with the request. Also consult the General NEPA guidance found in Chapter II to evaluate the proposal under these standards. Issue a Letter of Authorization.

If the proposal is determined to be not compatible because of secondary or associated impacts, then the request must be denied. It is expected that secondary or associated impacts will be evident much earlier in the process. Rarely will a proposal pass all the screens and filters, *and then* be denied at this level. When secondary impacts that will render a proposal not compatible are known, there is no need to proceed through the flowchart since the use will not be allowed anyway. Furthermore, because an exchange of easement rights requires the preparation of a Biological Analysis wherein the manager must ensure no impacts to critical habitat or special emphasis species (basically secondary or associated impacts), these impacts would preclude an exchange as well. These proposals must be denied. Section B-7 below has more information on Associated Impacts.

If a request passes all the previous filters and decision points, but is not compatible because it cannot meet the higher standard required of economic uses (shown as "29.1 criteria" on the flowchart, meaning related to the economic use discussion in 50 CFR 29.1), then an exchange may likely be the most logical choice.

In some cases, landowners may not be comfortable with just a Letter of Authorization from the wetlands manager. If the landowner will not accept a Letter of Authorization, and requests that the below-threshold impacted area be exchanged, then his request can be accommodated. However, he will have to wait until Realty can schedule a review of the involved properties, and he will have to pay for the released interests, or offer an exchange acceptable to the wetlands manager.

**G.** If the proposal meets all the criteria listed in the flowchart (an approved expansion or related to a bona-fide farm/ranch operation, no reasonable alternatives, is essential), and the level of impact is ABOVE the approved threshold levels, then the request can be considered for an exchange. Follow the procedure outlined in Exhibit XV-1, including the "replacement of habitat value" concept. A biological analysis of the property to be exchanged must be completed as part of the exchange proposal.

Although a CD will not be required when an exchange of interests is used, compliance with NEPA must be addressed and a biological analysis of the property to be relinquished must be completed. See General Guidance in Chapter II for NEPA guidance.

**7. ASSOCIATED or SECONDARY IMPACTS:**

Associated Impacts are defined as impacts not directly caused by the proposed activity, but which may result because of the proposed activity. When managers evaluate potential impacts under the compatibility process, managers use their "sound professional judgment" to determine whether direct impacts are compatible or not. Managers must also evaluate whether allowing a proposed project to go forward will result in additional impacts occurring to resources intended to be protected under these preservation programs (See Exhibit II-3 for Easement Program Goals).

The 2000 Compatibility Policy states that managers must consider not only direct impacts of a use, but also the indirect impacts associated with the use and the cumulative impacts of the use when conducted in conjunction with other existing or planned uses of the refuge area. Some potential associated impacts can be resolved through stipulations; others may not be able to be resolved and will render the proposal "Not Authorized" if the documented associated impacts cannot be resolved with stipulations.

As the flowchart indicates, every effort should be made to resolve the issue/problem with temporary measures, whether an emergency action or not. If the issue cannot be resolved satisfactorily with temporary measures, and the resulting impact is above the threshold levels, then an exchange may be necessary. An exchange of rights is virtually the last option to consider. All other options to resolve the issue must be evaluated before an exchange is considered, including avoiding the easement property all together.

# CHAPTER XIII

# ADMINISTRATION OF RIGHTS-OF-WAY on EASEMENT PROPERTIES

An important part of administering FWS Easement properties is the process of evaluating and acting upon requests for rights-of-way (ROW). These can take the form of highway improvement projects, buried pipelines, utility crossings, and rural water system developments. While it is important to work with the requester to grant rights-of-way, particularly for non-invasive or minimal impact-type projects, it is also expected that the ROW requesters will do their part by trying to avoid impacting Service lands or interests to the extent possible and reasonable.

## A. 50 CFR, Part 29 for Rights-of-Way:

The procedures governing formal rights-of-way with regard to FWS land interests are discussed in 50 CFR, Part 29. As this citation is reviewed, managers will notice the discussion in 29.1 describing the need for "economic uses" to meet a higher standard of compatibility than other proposed uses. This new standard is not intended to cover the uses associated with rights-of-way. Therefore, the general standard of not "materially interfering with or detracting from" the purposes or acquired rights will apply when evaluating ROW requests rather than the need to "contribute to" the refuge area.

After the request is received from the applicant, along with project maps and a description of what work is actually required, managers will evaluate the proposal in terms of alternatives, reasonableness, and potential impacts to Service interests. Once the project's potential impact to Service interests has been determined, managers should use the following procedures based on Regional guidelines:

**Evaluation Process:**

**Requested Work within Existing ROW's -** If the requested work can be accomplished within the context of an existing ROW (statutory, reserved, or prior-granted), then a ROW permit is not needed. Work with the applicant for site restoration, etc., but an appropriate use determination, compatibility determination, EA, ROW permit, and station-generated permit are unnecessary. If a ROW expansion goes beyond the existing ROW, but no Service interests are impacted (i.e., a ROW expands into a wetland easement property, but impacts only uplands with no involvement of protected wetlands) then the Service has no jurisdiction to regulate the activity. NOTE: This represents a change of interpretation of 50 CFR 29.21-1(b) which states, in summary, that the Regional Director may respond, via letter, to applications for ROW across lands in which the Service only owns an easement interest, where the ROW will not adversely affect the United States' interest. The change of interpretation centers on the definition of "land." Previously, the Service interpreted "land" to be the entire wetland easement tract as described on the contract (e.g. the SW1/4 of section 23). However, we now define "land" as those interests the Service

has protected. In the case of a wetland easement, the Service owns the rights to "drain, burn, fill or level" certain wetland basins. If a proposed ROW crosses an easement tract, but does cross an "interest" (protected basin), then the Service lacks jurisdiction to regulate the use.

Easement-protected wetlands within existing rights-of-way, whether statutory or not, represent an area where managers need to evaluate the potential impacts as a result of a proposed road maintenance or improvement project. Easements are acquired "subject to valid existing and/or statutory" rights-of-way. If protected wetlands are impacted within ROWs established prior to the Service's easement interest, and for purposes specifically authorized by the ROW, then the Service has no jurisdiction. Managers should satisfy themselves that projects proposed within existing ROWs, which may impact protected wetlands, are legitimate, and not part of a guise or ruse just to drain wetlands which may occur within a ROW. If Federal monies are involved with the road project, including most county road projects, then additional requirements may apply, such as compliance with EO 11990, or Federal Highway Administration Section 4(f) criteria. These issues are not related to the provisions of the easement, however.

Wetland impacts which may extend beyond the existing or statutory right-of-way are a different matter. The Service does have the right to enforce easement-protected wetlands outside the existing ROW. Proposals which may affect wetlands, or portions thereof, outside an existing ROW must be evaluated by the Public Service/Government/Corporate section (blue-colored blocks) of the flowchart.

Easement-protected uplands within existing or statutory rights-of-way are generally not an issue when evaluating proposals. However, as is the case with protected wetlands, the use proposed within an existing ROW must be the use authorized by the ROW.

If the requested work cannot be accomplished within the confines or boundaries of an existing ROW, then the project must be evaluated by the flowchart and write-up found in Chapter XII.

Right-of-way requests will likely involve more than one easement because of the linear distance associated with highway improvement projects or rural water system installations. Each easement must be evaluated for potential impacts when evaluating compatibility, but only one CD will be required to evaluate the project in total. The proposal will be evaluated under the Public Service/ Corporate/ Governmental (Blue) part of the flowchart. The proposal must be determined to be appropriate and compatible; otherwise, an exchange of interests will be necessary. If impacts are only temporary, then managers have other options as discussed below.

**Minor Disturbance-Type Projects -** If the proposed work cannot be accomplished under an existing ROW, then next consider whether it can be accomplished as a minor disturbance-type project, authorized by Region 6 Policy Memo, dated April 5, 2002 (Exhibit XII-7).

If impacts are determined to be only temporary and minor, then a formal right-of-way permit from the Regional Office may not be necessary. This policy now allows managers to forego the formal ROW process, and instead, issue a Special Use Permit directly from their office if the following conditions and circumstances apply:

- Impacts to Service-acquired interests are determined to be temporary and minor or less. Examples are cited in the policy.
- The ROW requester must understand that the permit is for the installation or initial construction only, and any subsequent need to complete work on the easement property will necessitate another permit process, which will be evaluated individually in each case.
- If impacts occur, however slight, appropriate use and compatibility determinations must be completed, and a determinations of "appropriate" and "compatible" must be obtained for this process to be used. See Exhibit XII-4e for a copy of the Programmatic CD covering this situation. If the circumstances at hand are different than what is evaluated under this programmatic, then an individual CD will be required.

The requester may desire a formal ROW permit to allow for future needed maintenance. If so, then pursue a formal ROW as discussed below.

**Minor Expansion or Realignment of Existing ROW's -** The 2000 Compatibility Policy prohibits the use of compensatory mitigation to achieve compatibility, **except for minor expansions or realignments of EXISTING rights-of-way.** If the right-of-way request falls under this category, and unavoidable impacts occur to Service lands or interests, then managers are permitted to use mitigation to offset these impacts, but only under this specific circumstance. The Compatibility Policy further requires that:

- the project design must specify measures to avoid as much impact as possible
- the results are a "no net loss of habitat quality and quantity" to the NWRS
- the mitigation area(s) must be protected under the NWRS
- the mitigation be completed prior to the project taking place

Individual appropriate use and compatibility determinations will be required, and the CD must reflect the "mitigation" and indicate that the project has been found to be compatible, only with the replacement habitat in place and according to stipulations specified in the CD. Exhibit XIII-2 is an example of a CD that was prepared for a road right-of-way expansion in South Dakota. This project fell within the criteria of a "minor expansion of an existing ROW," so mitigation was used to offset impacts to Service easement interests. Managers can review the discussion in Chapter XIIA-Section B,5,E for additional information. A formal ROW permit will also likely be required, even if the proposed work qualifies as a "minor expansion of an existing ROW."

**Formal Right-of-Way Permit -** The guidance found in Exhibit XIII-1 will help managers gather all the material for a formal ROW application. The process required of the applicant and of the wetland manager is described in 50 CFR, Part 29. Again, the proposal will first have to pass the flowchart for consideration, and not be able to be accomplished under either of the other options discussed above.

Managers must realize that NO right-of-way request will be granted unless it has been found to be appropriate and compatible with the purposes (acquired rights) of the refuge area and the mission of the NWRS. If an exchange option is used (discussed below) then no AU or CD will be necessary.

As soon as the requester has informed the wetland manager of the project, and that project has been successfully evaluated it under the flowchart criteria, then the ROW specialist in the RO-Realty should be contacted. Formal ROW permits take considerable time to obtain, so allow plenty of lead time. Managers should also discuss the project with the Regional NEPA coordinator and the Regional Cultural Resources staff for guidance on these two compliance requirements.

**General Information -** If only temporary impacts occur, managers should be able to use the guidance found in Exhibit XII-7. Appropriate Use and Compatibility requirements must be addressed. The programmatic CD (Exhibit XII-4e) will likely be used. If not, then an individual CD will be prepared.

If the proposed project passes through the flowchart and it does not qualify under the "minor and temporary impacts" criteria, start the formal ROW process with the Regional Office, Realty. Exhibit XIII-1 describes what will be needed by field stations as well as the applicant so that RO Realty can process the ROW application, including environmental documentation. The proposed project may or may not be "categorically excluded." Exhibits II-5 and II-6 provide guidance on categorical exclusions, but managers should also discuss this with the Regional NEPA coordinator.

If permanent impacts to easement interests result, then managers need to determine if the allowance in the 2000 Compatibility Policy regarding "minor expansions or realignments" of existing ROW's will apply. In this case, managers may "mitigate" the impacts according to the criteria above; however, a formal ROW permit will also be necessary. An individual CD, citing the "mitigation," will also be necessary.

If permanent impacts result which go beyond the definition of a "minor expansion of an existing ROW," then managers must determine if the proposal can be accomplished within the established threshold levels as discussed in XIIA- Section B,5,F. When evaluating the potential impact, threshold levels are defined on a "per easement contract" basis.

For example, if a highway improvement project results in potentially impacting 8 different wetland easements, and results in impacting 0.1 acres on each easement, while the cumulative total of wetland impacts would be 0.8 acres (above the 0.4 acre threshold), none of the individual threshold levels have been exceeded; therefore, this project is within the established threshold levels for each affected easement. The same philosophy applies to upland habitat threshold levels.

If any of the individual easements are impacted above threshold levels, then an exchange would be necessary. Managers, in conjunction with their servicing Realty office, should discuss whether to exchange all the impacted areas, or just those which may exceed threshold levels. If an exchange option is used to accommodate the project, no CD will be required, a formal ROW will not be required, but a "Relinquished Interest" Checklist (Exhibit XV-2) will be necessary.

If only the areas which exceed threshold levels are exchanged, then a CD would be necessary for the other impacted areas, and a formal ROW permit would also be required.

Discussions have occurred relative ROW's on the extent of information needed to describe the location of the ROW area. The CFR (29.21-2 Application procedures.) clearly states the intent of information needed as being sufficient to "show the right-of-way in such detail that the right-of-way can be accurately located on the ground." The CFR references that maps, sketches or a plat provided by the applicant are sufficient and provides direction on specific location information. In the 50 year administration of the program, there has never been an identified need by field managers to require a legal survey completed by registered surveyors in order to locate any ROW boundary. For example, field managers have the ability to accurately locate and relocate FmHA easement boundaries using GPS technology and very basic maps. Therefore, finding a ROW boundary for compliance purposes with GPS coordinates would be a similar, accurate and easy task.

In a ROW application, at a minimum, the requestor needs to provide a level of point information that can be accurately duplicated by field managers, such as GPS coordinates. A legal survey of the ROW is not required. However, if the project sponsor is surveying other features of the project, off easement, they should be encouraged to provide survey data for the ROW as well.

## B. Exchange Option:

If the requested right-of-way is beyond a "minor expansion" of an existing ROW or is a new right-of-way request, then managers may NOT use mitigation to offset any impacts resulting from the project. It must either be compatible as proposed, or the use must be denied. Another option is to exchange the impacted Service interests.

Most buried pipelines can be found to be compatible with stipulations for site restoration, but highway improvement projects which need to extend beyond the existing ROW and cannot be classified as "minor expansions" present problems where refuge system lands are very numerous in some areas. If situations are encountered where "the greater publics benefit demands," and just saying "no" is not a practical alternative, then an exchange of rights and interests is an option. The exchange process is explained in Exhibit XV-1. Again, the use of the flowchart will assist managers to a decision as to when an exchange may be necessary.

If the project passes the flowchart, does not qualify as either a "minor disturbance-type" project, or as a "minor expansion of an existing ROW," and there is concern that it may not be compatible, then the exchange is the option of last resort.

If the exchange option is employed, then a CD will not be necessary, and a formal ROW will also not be required. Follow the procedure in Exhibit XV-1. As with formal ROW permit processing, the Division of Realty will need to be involved with the exchange process.

## C. Cultural Resource Issues Associated with Rights-of-Way:

Proposed activities associated with rights-of-way also need to be reviewed under laws protecting cultural resources. Under the National Historic Preservation Act, projects on Federal lands, with Federal funding, or those permitted, licensed, or approved by a Federal agency are subject to the provisions of the Act. Unless a Programmatic Agreement has been implemented with the SHPO (State Historic Preservation Officer)/THPO (Tribal Historic Preservation Officer), and the

Advisory Council on Historic Preservation (ACHP), all ROW projects need to be reviewed by the appropriate FWS CR staff.

Many projects that are under the purview of other Federal agencies will have cultural resource surveys already completed as part of the project compliance needs. These include projects such as highway improvements, rural water system installations, utility line installations, etc. Wetland managers can obtain the CR reports from the ROW applicant, and submit the reports along with any compliance documentation to the appropriate regional cultural resource staff for review. Any time Federal funding is associated with a ROW project, cultural resource issues should be addressed.

Proposed projects like a township road improvement that may exceed the existing ROW, although uncommon, do occur, and if they require a formal ROW permit, CR issues will still need to be addressed. If managers encounter a situation like this, discuss the project with your appropriate CR staff. The CR staff will complete necessary consultation with the SHPO, THPO, and ACHP.

## D. <u>Cultural Resource Issues Associated with Divested Property as a Result of an Exchange</u>:

Easement exchanges are not usually considered "undertakings" under Federal cultural resource laws. If the protection of cultural resources is a stipulation of an easement, then an easement exchange would be subject to cultural resource laws. Several years ago the Service exchanged fee land with a private landowner. To avoid major mitigation costs for archaeological resources on the divested land, a grassland easement was instituted. An easement exchange of that parcel would be an "undertaking" under the National Historic Preservation Act.

If uncertain about CR issues associated with rights-of-way and/or exchanges, contact your Regional Cultural Resource Staff for guidance.

There are additional administrative requirements associated with property divestiture or interest relinquishment which are addressed elsewhere in this manual.

# CHAPTER XIV

# WIND ENERGY DEVELOPMENT AND EASEMENT PROPERTIES

*(If you've been directed to this Chapter by the flowchart in Chapter XII, you may choose to skip to paragraph C below)*

The concern over global climate change will intensify society's focus on renewable sources of energy that emit little, if any, greenhouse gases. We can easily predict these sources of energy, such as wind power, to be looked upon by the majority of people as favorable to the environment; and their development will only increase as technology improves and production and distribution become more cost effective and efficient.

Commercial wind energy development has grown from almost nothing in the early 1980's to over 11,603 megawatts (MW) in 2006 in the United States and over 60,000 MW globally. Electricity is generated from wind in 36 states, including Alaska and Hawaii. Much of this growth has occurred in the past five years and some predict the industry's installed generating capacity will continue to grow exponentially. Much of this new development is occurring in and around the largest intact tracts of grasslands and lands with the highest wetland densities in the Prairie Pothole Region of North America. As of 2009, North Dakota had seven wind farms (446 turbines; 671 MW) in operation and 25 project proposed (4,533 turbines; 7,505 MW). South Dakota had four wind projects in operation (156 turbines; 233.5 MW) and 23 projects in the planning phase (3,074 turbines; 8,061 MW).

The accelerated pace of wind energy development is largely attributed to the production tax credit that Congress has extended multiple times, and to the establishment of state renewable energy portfolio standards. The National Renewable Energy Lab ranks North Dakota and South Dakota as #1 and #4, respectively, in wind generation potential. It is therefore expected that wind energy development will continue to grow in these two states. This creates challenges for the Refuge Program on two fronts. First, the landscape-level nature of the Service's easement program in the Dakotas and eastern Montana make it virtually impossible for wind companies to avoid impacting Service easements. Therefore, the Service must decide if and when development can occur on lands protected by easement. Secondly, the Service's wetland and grassland easement acquisition program must take into account not only current wind development, but also the potential for future development. Exhibit XIV-1 details the approach adopted by Region 6 in 2006 to address several possible scenarios related to wind development and easement acquisition.

This chapter is devoted to: 1) outlining the necessary steps a manager must take when considering the possibility of wind turbine construction (including associated facilities) on lands protected by Service easements, and 2) detailing the process for permitting a wind project on Service lands once all regulatory and permitting requirements have been met.

## A. Initial Contact with Wind Energy Companies and Consultants

It is becoming increasingly common for wetland management district staffs to receive questions from wind energy companies, consultants, land acquisition specialists and landowners about wind energy proposals. This guidance is intended to assist managers in fostering positive working relationships with wind developers while providing a consistent message when responding to contacts from the wind industry or their designated representatives. This section is not intended to direct managers on how to evaluate proposed wind developments or when to either approve or deny a request. It is simply a template to assist managers in addressing similar requests in a consistent fashion.

In order to become better prepared to work with the wind industry, some understanding of the steps involved to successfully construct a wind farm is helpful. The following is a simplified overview of the process a wind developer may go through in developing a wind project. Much of this information was gathered from the American Wind Energy Association Siting Handbook **(www.awea.org).**

- **Analyze the wind resource.** Before much time or money is invested in development, some measure of the wind resource is necessary. Companies will review available wind data to determine the wind speed and reliability within the proposed project site. This is generally gathered by installing meteorological towers (MET towers) within or in close proximity to the project site. If these data are not available, these towers may be in place for one to three years. These towers are usually very plain in nature, can be made of steel tubing or lattice construction, and can be free-standing or supported by guy wires. These towers can either be temporary if they are only used to measure wind speed and direction; or they can be more permanent if they assist in operation of the facility by transmitting information about wind speed and direction to each wind turbine and to the control facility. These MET towers may be the first indication that someone is interested in putting turbines in your area.

- **Establish the economics of the project.** The developer will identify all the variables that may need to be considered when determining the potential for financial success of a proposed project. This step is very dependent on the developer and/or business model used to develop the wind project. These considerations include: cost of land leases/agreements, environmental reviews and permits, transmission costs, power purchase agreements, and project investors and financing.

- Once a company is satisfied that an adequate wind resource exists, they will often approach the landowners and have them sign a “show of interest” contract or a “cooperation agreement.” These agreements typically give the wind company permission to further analyze the terrain for its potential to host turbines. It may also serve as a “development easement” in which the company gains the “right to first refusal” for any development. Basically, they are securing the rights to build turbines on that land for a specified period of time; e.g., 5- 20 yrs or more.

- At the same time the agreements are being signed, the company will likely have initiated a transmission capacity analysis to determine if the existing transmission system will be able to support the proposed project. The developer will work with the local independent system operator (ISO), regional transmission operator (RSO), or utility company to conduct a transmission capacity analysis. This interconnection study is needed to request access to "get into the queue" (i.e., get a place in line to put their power onto the grid).

- Once these steps have been taken, the company may then look for someone to purchase the power at a negotiated price. A "power purchase agreement" (PPA) is signed with someone like Montana Dakota Utilities (MDU), Ottertail Electric, or Basin Electric or the Western Area Power Administration (WAPA). However, more and more "merchant plans" are being pursued in which there is no PPA. In these instances, the developer is just planning to sell the power at the current market price, betting that the market price will exceed what can be negotiated.

- At some point, the company will initiate the necessary environmental review. Regulatory requirements vary from project to project depending on the location and the size of the project. The developer must identify early on in the process the federal, state, and local regulatory issues that will influence the project. This may be the first time they contact you or the Service. Often times, this initial contact is in the form of a phone call or a letter requesting information. This contact may come from the company itself, or an environmental consulting or engineering firm contracted to do the pre-work for them. These requests typically include solicitations for information pertaining to wetlands, rare or endangered species, conservation easements, cultural resources, or other sensitive environmental data within a defined area. You may even be presented with a map of "proposed" towers and asked to participate in a field review of the project area or comment on whether or not you have concerns about any of the locations. This initial tower layout may or may not represent the developer's true intentions and may simply be what they call a "fatal flaw analysis." In other words, they are looking early in the process for sensitive areas or conditions that would preclude a tower from being constructed on a particular site. Even after an actual turbine array has been drafted on paper, including all infrastructures (roads, collection lines, etc.), there is a very good chance that the final tower layout will change. During this initial contact, you will likely be asked to provide a map showing any lands the Service owns or encumbers with conservation easements.

- The results of the critical environmental issues analysis often provides the developer with a better understanding of the site and the key issues that may require further investigation due to identified concerns or regulations. Detailed environmental and land use studies to identify potential impacts and develop avoidance and mitigation strategies are often needed to comply with regulatory or permitting requirements.

**B. <u>Information Gathering</u>**

Now that you know some of the basic requirements a wind developer needs to secure and consider in order to have a successful project, the initial meeting is a great opportunity to gain specific project information by asking many questions and sharing information. It also a great

time to explain various USFWS program roles and responsibilities, specific land interests and their associated requirements, and the steps they need to satisfy to acquire necessary permits and approvals. This communication will help build rapport and trust between you and the developer that may pay dividends later during the process. Remember, the developers come in contact with many landowners throughout the planning, construction and operation phase of a wind development project. They also communicate with other wind developers all over the country about common issues they face when developing wind energy projects. If a refuge manager can foster a good working relationship with the developer and he/she then relates this positive relationship to landowners and other developers, the Service stands to greatly benefit in the future.

Following are recommended steps and associated questions you can ask developers that will help you determine how likely a wind project will be constructed and/or additional coordination will need to take place.

**1.** Gather specific information of the proposed project. There are numerous questions you can ask in order to determine the company's actual stage of development or how likely the proposed wind project will be completed. Probably the most-telling question to ask is whether or not the company has a customer for their power. Ask if they have a signed power purchase agreement with a company like Montana Dakota Utilities (MDU), Basin Electric, Otter Tail Power Co. or the Western Area Power Administration (WAPA), etc. If the answer is yes, this is an indication that they are serious. You can also ask things like whether or not they've secured development easements with the landowners, and how they intend to transmit the power out of the area. Don't be surprised, however, if they initially offer little information in return. The wind energy business is moving rapidly. Company officials are very reluctant to share information due to the fear that other wind companies may learn of their project area, their marketing strategies, their interconnection proposals and other information. Some questions you can ask in an attempt to gain some information include:

- *Do you have a purchase power agreement or a merchant agreement in place?*
- *How do you propose transmitting the electricity produced?*
- *Are you connecting to a WAPA line or a Rural Utility Service (RUS) line?*
- *Do you have financing in place?*
- *Do you have turbine components secured?*
- *New transmission lines proposed?*
- *Is there room on existing transmission line for the power?*
- *Project area finalized?*
- *Proposed project schedule?*
- *Construction methods*

**2.** Bring Ecological Services into the discussions early. Do this by referring questions pertaining to rare or endangered species, migratory birds, and other sensitive environmental conditions occurring on or off of easement lands. However, impress upon the company that you wish to be their first contact for the Service. Even for issues most often handled by E.S., you will likely have the local knowledge needed to help the company avoid sensitive areas; e.g., nesting colonies, known avian corridors, cultural

resources, etc. Building rapport and trust with the company early in the process will make working out any problems much easier later on. Giving the company a consistent contact person goes a long ways towards building this trust. If possible, it is recommended to meet with the wind developer in person to better explain policies, environmental issues, NEPA, land interests, construction methods, and other features. A face-to-face meeting between the wind developer, E.S., and you is a great opportunity to establish a clear understanding of what is expected between all of you.

**3.** If requested to provide digital data, refer to existing policy: "Guidance on the Use and Distribution of Digital Easement and Fee Boundary Information Developed, Updated, and Managed by the HAPET Office" dated March 10, 2005 (Exhibit V-7). Before providing the company a map of your easements, encourage them to meet with you in person so that you can explain the different types of easements and their provisions. The company may resist at first, but you're better off insisting upon a face-to-face meeting rather than risk that your map will be misinterpreted. This meeting is also an ideal time to explain the process for evaluating proposed modifications of easement properties (the flowchart). It is recommended to send written correspondence after the meeting to reemphasize and summarize key points of the meeting and prevent any misunderstandings.

**4.** Assure the company that just because a particular tract of land is encumbered by a Service easement, it does not necessarily mean wind turbines cannot be constructed there. This is especially true of wetland easements. The future of the Service's easement program and our ability to preserve additional valuable habitat for nesting grassland birds may depend on our administration of these requests to construct wind turbines. Our easement acquisition program could be in jeopardy if there is a real, *or perceived*, reluctance on the part of the Service to consider the limited construction of turbines. Currently, the Service has identified an additional 10.4 million acres of grass and 1.4 million acres of wetlands in need of protection. Local support is critical for us to realize these goals and public opposition to our programs will effectively limit them. This is not intended to be justification to allow wind development on easements. It is mentioned merely to point out the complex nature of this issue and to highlight the need for the Service to enact sound procedures.

**5.** You may be offered a chance to comment on proposed turbine arrays. At this point, your input may help guide developers away from sensitive environmental areas. For example, the people in charge of staking the roads and routes for collection lines are probably not familiar with the landscape of the Prairie Pothole Region. A seasonal or temporary wetland in the middle of a soybean field during a dry August is not readily apparent to someone not experienced in wetland identification. So for lands encumbered by a wetland easement, offer your services in assisting their crews in identifying routes that avoid impacting protected wetlands. If impacts to Service easement interests are unavoidable, then use the flowchart (Chapter XII) to assess whether or not the impacts can be allowed.

Other suggestions you might make include the use of larger turbines (thus fewer needed), minimal road construction (especially in grasslands), underground collection and

transmission lines, and use of existing prairie trails without disturbing the sod. It is also helpful if the construction crew waits as long as feasible before putting stakes in the ground. As mentioned earlier, the final turbine layout is usually not final until the holes are dug and the foundations poured. Final adjustment of turbine sites may occur literally days before the concrete is poured; unfortunately, once landowners see flags and stakes on their land, they tend to assume they are getting turbines. If a turbine site is moved, and especially if it is moved because of your input, you may have a very unhappy landowner with whom to contend.

You may be asked for your input on proposed turbine arrays on lands not encumbered by easements. Caution is warranted in this situation. Ensure that the company knows that you do not have jurisdiction on these lands, and that they should be in contact with E.S. If input is offered, for example, on proposed turbine sites near wetlands, near a known avian use corridor, or even a known eagle nest, frame your response in a way that lets the company know you are merely offering your professional opinion.

Because variability exists in the ways different wind developers may choose to proceed through the process, drafting this guidance that will meet all situations is difficult, if not impossible. Our knowledge and experience will continue to grow and we will undoubtedly learn more and better methods of addressing the wind turbine issue in the future. Therefore, it is recommended that this section be revisited frequently for revision. One thing, though, is for certain. It only takes 6 to 8 months from the time a company orders turbine parts to the completion of a wind development. Waiting until turbine arrays are "finalized" and turbine parts ordered before becoming involved is a mistake. Being proactive and engaging developers early in the process is essential to ensuring a responsible wind energy development.

## C. PERMITING REQUIREMENTS

The majority of the time, managers will receive a phone call from a wind developer or environmental consultant explaining that they are considering building a wind project in their wetland management district. The developer or consultant may or may not be familiar with the various land interests the Service has, particularly the number and the locations of conservation easements or fee-title land the Service owns in their proposed project area.

In addition, they may or may not know the specific responsibilities held by Ecological Services and Refuges relative to proposed wind energy development. The National Environmental Protection Act (NEPA) is probably the most important policy that Service personnel and developers need to understand and comply with when reviewing a wind project. Service personnel involved in making and implementing decisions on an action or request are to establish an appropriate administrative record of the Service's decision. Close coordination with your local Ecological Services field office will help to ensure the proper documents and procedures are correctly followed and completed to satisfy NEPA. For more detailed information on NEPA, refer to Fish and Wildlife Service Manual (550 FW 3).

NEPA review is required for all wind development projects. In most cases, the amount of time, expense and permits required for wind projects will depend on whether or not there is a federal

nexus, or connection, to a proposed wind project. A federal nexus is any activity that is conducted, funded, licensed or permitted by a federal agency. Below is a flowchart that provides refuge managers with a better understanding of the NEPA process when it comes to wind energy proposals. It also helps managers explain the permitting process to wind developers and consultants depending on whether or not a federal nexus exists and/or when USFWS easements are involved.




If a proposed wind project involves Service conservation easements, all proposed modifications of easement properties must be first evaluated using the flowchart in Chapter XII. **Therefore, the following guidance *only* applies once a manager has considered the impacts of wind development through the flowchart, and has concluded that there are no reasonable alternatives to the development, that the development is essential, and that the impacts will not compromise the integrity of the easement area.** It is also expected that all reasonable measures will have been taken to avoid, reduce or minimize the impacts to the extent possible. Once these steps have been completed, the following illustration will help guide managers through the remainder of the permitting process:

## FWS Procedures Regarding Wind Projects on Easements




**STEP 1: USFWS is the federal action agency due to activity on or use of USFWS conservation easement.**

Once a manager has reviewed the proposed wind development plan and negotiated with company to avoid and/or minimize impacts to the conservation easement(s), the company needs to understand that their proposed wind project has triggered a federal nexus and therefore, considerable environmental reviews and administrative requirements will be necessary.

**STEP 2: USFWS Ecological Services Requirements**

It is very important to make sure managers contact and coordinate with their local Ecological Services field office and share information about the proposed project. It is also imperative that a clear and consistent response be provided to a wind developer regarding their proposed project. In fact, it is recommended that both the Refuge Manager and Ecological Services Biologist together meet in person with the wind developer or consultant to discuss the various issues, regulations and permit requirements needed for their proposed project to proceed. It is also suggested a combined follow-up letter be prepared that reiterates the important requirements, policies, and information discussed during the meeting. If a personal meeting is not feasible, a letter explaining both programs' responsibilities and requirements should be sent to the company.

**NEPA Compliance:**

If a wind developer still proposes to construct turbines or infrastructure on FWS conservation easements and there are impacts to a service-protected interest, managers will need to review the proposed request and consult with Ecological Services for NEPA compliance. The proposed action on Service easements and the potential for impacts to listed species or designated critical habitat will determine what kind of consultations are required.

**Consultation(s) -** meetings, phone calls, e-mail, written documents, etc. as it relates to ESA (MBTA, MMPA, etc.) regarding a proposed action. May occur as an informal or formal consultation (see below) and may occur within (intra-agency) or between (inter-agency) Federal agencies related to a proposed action. Example of an intra-agency consultation would be Division of Refuges consulting informally with Ecological Services regarding a proposed wind project at a specific location. Such informal consultations may be elevated to the formal status if "the proposed action may affect a listed species or designated critical habitat."

**Formal Consultation-** a process between the Services and a Federal agency or applicant that:

- Determines whether a proposed Federal action is likely to jeopardize the continued existence of listed species or destroy or adversely modify designated critical habitat.
- Begins with a Federal agency's written request and submittal of a complete initiation package.
- Concludes with the issuance of a biological opinion and incidental take statement by either of the Services. If a proposed Federal action may affect a listed species or designated critical habitat, formal consultation is required (except when the Services concur, in writing, that a proposed action "is not likely to adversely affect" listed species or designated critical habitat). See 50 CFR §402.02 and 50 CFR §402.14…

http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?c=ecfr&sid=6bcb184a214bc12704bdde099b2e9cd1&rgn=div8&view=text&node=50:7.0.3.11.2.2.33.5&idno=50

**Informal Consultation-** an optional process that includes all discussions and correspondence between the Services and a Federal agency or designated non-Federal representative, prior to formal consultation, to determine whether a proposed Federal action may affect listed species or critical habitat. This process allows the Federal agency to utilize the Service's expertise to evaluate the agency's assessment of potential effects or to suggest possible modifications to the proposed action which could avoid potentially adverse effects. If a proposed Federal action may affect a listed species or designated critical habitat, formal consultation is required (except when the Services concur, in

writing, that a proposed action "is not likely to adversely affect" listed species or designated critical habitat). See 50 CFR §402.02 and 50 CFR §402.13…

http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?c=ecfr&sid=6bcb184a214bc12704bdde099b2e9cd1&rgn=div8&view=text&node=50:7.0.3.11.2.2.33.4&idno=50

**Intra-Service Consultation -** may be formal or informal consultation(s) within the USFWS such as discussed above.

**Inter-Agency Consultation -** typically takes the form of a formal consultation between the action agency and the USFWS (or NMFS), particularly if the proposed action may affect either a listed species or designated critical habitat.

**Biological Opinion (BO) -** document which includes: (1) the opinion of the U.S. Fish and Wildlife Service or the National Marine Fisheries Service as to whether or not a Federal action is likely to jeopardize the continued existence of listed species, or result in the destruction or adverse modification of designated critical habitat; (2) a summary of the information on which the opinion is based; and (3) a detailed discussion of the effects of the action on listed species or designated critical habitat. See 50 CFR §402.02 and 50 CFR §402.14(h)…

http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?c=ecfr&sid=6bcb184a214bc12704bdde099b2e9cd1&rgn=div8&view=text&node=50:7.0.3.11.2.2.33.5&idno=50

**Biological Assessment (BA) -** information prepared by, or under the direction of, a Federal agency to determine whether a proposed action is likely to: (1) adversely affect listed species or designated critical habitat; (2) jeopardize the continued existence of species that are proposed for listing; or (3) adversely modify proposed critical habitat. Biological assessments must be prepared for "major construction activities." See 50 CFR §402.02. The outcome of this biological assessment determines whether formal consultation or a conference is necessary. See 50 CFR §402.02 and 50 CFR §402.12…

http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?c=ecfr&sid=6bcb184a214bc12704bdde099b2e9cd1&rgn=div8&view=text&node=50:7.0.3.11.2.2.33.3&idno=50

For more information on NEPA and the various requirements wind developers may need to comply with can be found in Exhibit XIV-2.

**<u>STEP 3:</u> National Wildlife Refuge System Requirements**

If wind energy development activities are proposed on USFWS conservation easements, refuge managers will spend a significant amount of time and work in reviewing proposed plans, negotiating to reduce or eliminate impacts, ground checking construction activities and ensuring all administrative requirements are completed. Listed below are some of the permit requirements

the Refuge Program currently requires of wind companies if Service easements are involved with wind projects.

**A. Easement Manual Flowchart:**

If a proposed wind project involves Service conservation easements, all proposed modifications of easement properties must be first evaluated using the flowchart in Chapter XII. Section B; Part 5, A-C explains how managers should review proposed wind energy development proposals and investigate all reasonable alternatives, determine whether the proposal is essential, and evaluate whether the proposed use will significantly affect the integrity of the easement.

Inevitably, once managers explain that by building and installing wind turbines and roads, "crane walk" routes, energy collection cables, transmission lines, MET towers, sub-stations or other infrastructure on FWS conservation easements, a federal nexus will trigger NEPA requirements, some wind developers will design their projects to avoid Service easements due to the extensive time and expense required to go through the NEPA process. However, in cases where the Service has been very successful in acquiring thousands of acres of grassland easements in large blocks, and especially if this location exhibits excellent wind resources, wind companies may be willing to go through the NEPA process. In any case, this is an opportunity to review their proposed wind project and suggest changes to reduce or eliminate impacts. Some suggestions managers could provide developers to avoid or reduce impacts include:

- If possible, avoid building roads/turbines on native prairie grasslands. Impress upon developers that reclamation time and expenses are considerable when trying to restore native grasses/forbs on steep slopes with little available topsoil. The time to establish native grasses/forbs, erosion areas, cattle grazing, steep slopes, proper seeding equipment and proper seeding dates are all examples they need to consider when building on native grassland sites. Alternatively, building turbines and roads in cropland or tame grass require much less reclamation costs.

- Place turbines near existing roads and trails near section lines.

- Bury collection cables within road shoulders. Most roads are approximately 35-40 feet wide. After turbine construction, service roads are approximately 16 feet wide leaving 10-15 foot road shoulders that will be re-seeded to grass. Collection cables can be placed in these disturbed road shoulders rather than causing more disturbance across native prairie grasslands.

- Bury all transmission lines if possible. If not, developers should be encouraged to mark all transmission lines to reduce bird strikes.

**B. Construction Plans:**

There are many activities involved with the construction of a wind farm than just constructing turbines and access roads that could involve FWS conservation easements. Land must be temporarily cleared and graded for construction trailers, parking lots, turbine component laydown areas, equipment staging areas, concrete mixing operations, construction of permanent

operation and maintenance facilities, and other infrastructure. A list of common construction activities and issues to consider when evaluating a proposed wind project include:

- Improvements to township roads and section line trails to handle heavy construction equipment and widening of these roads to accommodate oversized equipment. This is especially important to consider on wetland easements where road improvements could extend outside of the road right-of-way.
- Clearing and grading of each turbine location for assembly and installation of each turbine. Typically, each turbine requires approximately a diameter of 150-250 feet around the tower site.
- Installation of miles of underground and/or overhead electrical collection lines to connect turbines to collection substations.
- Clearing and grading of sites for substations.
- Creation of transmission lines to connect the project to other transmission lines or power grid, including building access roads and laydown areas for transmission line construction.
- Construction of an operations and maintenance building(s), which could require clearing and grading, construction of roads and parking lots, septic systems, water systems and delivery lines.
- Construction of "Crane Walks." The large cranes needed to install turbines are not capable of crossing land with slopes greater than approximately 10 percent. Therefore, crane paths between turbines need to sloped, graded and approximately 40 feet wide to allow crane transportation. They also move very slowly so planning a time-efficient route from turbine to turbine may include crossing FWS easements. During initial discussions with wind developers, ask to see their construction plans including proposed crane walks.
- Construction of turbine access roads. Construction companies may use different construction equipment and methods to build access roads. Some use dozers and clear approximately a 40-foot wide area to construct roads. Some purchase a wider right of way (100+ feet wide) and may use chisel plows or discs to break up sod and clear the path with road graders. These areas are seeded back to grass after construction activities are completed, but this method disturbs much more area than necessary.

**C. <u>Restoration plans:</u>**

If wind energy projects occur on grassland easements, it is important that managers clearly explain to the developers that all grassland impacts need to be restored back to FWS standards and manager satisfaction. If construction activities temporarily disturb native prairie grasslands, brome/alfalfa hay land, CRP grasslands or cropland, managers need to make sure wind companies understand that these disturbed areas need to be seeded to the appropriate grass varieties and at appropriate rates. Managers need to explain that disturbed areas in native prairie grasslands need to be seeded to an approved native prairie mix; alfalfa hay land needs to be reseeded to alfalfa; CRP brome fields seeded to similar grass species. We want to make sure that wind companies or their contractors do not accidentally seed one grass mix across all lands regardless of their current use (brome/alfalfa mix across all hayfields, native grasslands and CRP

fields). Wind companies should provide the manager with a restoration plan that describes the grass varieties and mixtures they propose to seed on each type of land use, proposed seeding dates, grass seeding equipment, erosion control methods and locations, and other details associated with establishing a grass stand on disturbed areas. Managers should review and approve these plans before construction begins.

**D. <u>Memorandum of Understanding:</u>**

Discussions with wind developers can sometimes cover numerous topics, requirements and agreements by both FWS officials and wind energy companies and their associated contractors and sub-contractors. In most cases, these discussions will occur over many months to many years. Instead of relying on verbal agreements, phone and electronic messages and other correspondence over a long period of time, it is suggested to develop a memorandum of understanding that outlines in detail particular activities each party will agree to when developing a wind project. An MOU helps clarify what each party is responsible for and may prevent costly time delays, project expenses and last minute surprises. Exhibit XIV- 3 is an example of an MOU.

**<u>STEP 4:</u> Cultural Resource Protection Requirements**

The Region 6 Archeologist has provided comprehensive guidance to follow when considering a wind proposal on Service conservation easements. Refer to Exhibit II-11 for detailed information on cultural resource review procedures in Region 6.

**<u>STEP 5:</u> USFWS Realty Requirements**

If wind energy development activities are proposed and allowed to occur on USFWS conservation easements managers will need to carefully review all easement contract acquisition dates to determine if the Service holds the primary right to these lands. In other words, did the USFWS purchase the easement before a landowner signed a wind option or agreement? (Exhibit XIV-1 "Wind Energy & Region 6 Grassland Easements" covers three scenarios managers may be confronted with when dealing with wind energy proposals on grassland easements)

The following is a detailed explanation of how the Realty Program will handle impacts to easements depending on which scenario applies.

**A. <u>Proposed development on existing grassland easements</u>**

Once it has been determined by the manager that wind development on an existing grassland easement will occur, a Partial Term Relinquishment and Release of Waterfowl Habitat Protection Easement in The United States will be required. A copy of this document is at Exhibit XIV-4. This Realty transaction allows the development on the grassland easement to occur while the permanently affected easement acres are transferred to the wind company for the life of the project. After the project is decommissioned and the grassland restored, the grassland easement rights return to the Service. The wind company is also responsible for replacing the same amount of affected acres on a new grassland easement.

In order for Realty to complete the Partial Term Relinquishment and Release, a legal description of the surveyed wind power facilities or legal subdivision of the project site is required. Through an AALV calculation, Realty will determine the grassland easement value of the acres to be partially released. Since the value and size of the acres to be released is minimal, additional easement funding is required along with additional acres. Therefore, the replacement value will be combined with traditional easement funding to purchase a new grassland easement.

The manager will determine which parcel of property to purchase for the replacement acres. A biological evaluation will be completed and forwarded to Realty. Realty will calculate the easement consideration and make an offer to the landowner. The landowner will be made aware that replacement acres for wind development are being purchased on his property and a statement will be added to the easement contract. The statement will identify the vendor, who the payment is from, how much each is being paid, and how many acres are associated with each funding source. **Replacement acres are not to be used for grant match purposes, so it is imperative that this statement is on the easement document.** The easement case will be processed as usual. Realty will request a check from the contributors made payable to the vendor after the easement has been accepted. Once the easement is recorded and title policy is issued, the checks will be delivered to the vendor. Title vesting, FSA notification and final policy procedures will continue.

***Partial Term Relinquishment and Release Document:***

The partial term relinquishment document was developed to provide wind energy developers and FWS managers a method to address unavoidable impacts associated with the construction of the wind facilities on easement encumbered lands. This process partially releases and relinquishes, for only the term and use specified, the waterfowl habitat protection and management easement interests. This instrument releases and relinquishes only those waterfowl habitat protection and management rights of the Service in the specific released lands described in the release document and do not in any way affect those perpetual easement rights acquired by the Service on the other lands described in the original landowner's easement. This document only releases the waterfowl habitat protection and management rights of the Service in the released lands for the duration of time that the lands are used for wind energy purposes. See Exhibit XIV-4 for a sample of the document.

There are many conditions included in the partial term relinquishment document that needs to be explained and understood by refuge managers and wind developers. **In some cases, wind companies may request to begin construction activities on FWS easements while they negotiate and finalize the details of the Partial Term Relinquishment and Release Document. It is important that managers understand that Special Use Permits will not be issued until all details of the Partial Term Relinquishment and Release Document, including a Letter of Credit, Decommission Plans, Purchase of Replacement Acres, and NEPA documents.** Some of these conditions include:

- ***Decommission Plan:*** If turbines and access roads are allowed on conservation easements, one of the conditions of the partial term relinquishment document is that the wind developer agrees that all turbines, roads and all infrastructure are removed and grasslands are restored to FWS requirements once the wind project easements expires or

are no longer valid. The company will usually have up to 18-30 months or more after wind energy operations cease to remove the infrastructure and properly restore grasslands to FWS specifications.

One main point to remember is that most wind agreements between wind companies and landowners state that wind companies have a specified amount of time to remove any and all equipment, improvements, fixtures and other property above-ground, and owned or installed by the wind company. In general, they include met towers, turbines, transmission lines/poles, operation buildings, and any other property on the property. Failure to remove this property within a specified amount of time shall deemed an abandonment of this property and the landowner shall have the right to remove, or to cause the removal of, any property deemed abandoned by the company.

An area of concern is that the access roads must also be removed and reseeded to grassland. Habitat fragmentation and its effects on wildlife are one of the major indirect impact concerns wind energy development has on wildlife populations. Wind companies and landowners will need to understand that all access roads will be required to be removed and restored back to grassland habitat. Refuge managers should expect some reluctance by wind companies and landowners who do not want to remove the roads due to the time and expense involved with reclaiming road sites. It is assumed that landowners will want to keep the gravel road in their pastures to check on their livestock.

- ***Letter of Credit:*** Prior to the execution of this partial release document, the wind company shall furnish a continuing financial surety in the form of an irrevocable letter of credit (ILC) or a cash deposit from a federally-insured financial institution rated investment-grade or higher. This letter of credit or cash deposit is insurance to cover the estimated cost of removing structures and facilities associated with the wind development project and restore those impacted acres back to grassland habitat. The account will act as an escrow account and will be adjusted annually to reflect the percent change for inflation to cover the estimated removal surface restoration costs.

- ***Replacement Acres:*** Another condition of the partial term relinquishment document that wind companies need to understand and agree to is the requirement that all permanent impacts to conservation easement lands must be replaced with lands of **similar or greater biological and financial value.** The wind company will be responsible for paying all the real estate expenses of purchasing an easement on these replacement acres. If the wind project is abandoned or terminated and all wind development equipment and infrastructure removed and all impacted areas restored, the replacement acres remain as perpetual easements with the Service. In other words, the replacement acres will be an addition to the National Wildlife Refuge System. Refuge manages will need to coordinate closely with their realty office and wind company representatives on this process.

Determining the amount of replacement acres wind companies are going to need to purchase will most likely require a formal survey of all permanently impacted acres. It may be difficult for wind companies to give you a definite acreage total until construction of all turbines and roads are completed. Wind companies should be able to give

managers and realtors a close estimate of anticipated impacts but will have to follow up with solid impact acres once "as-built" surveys and drawings are completed.

**B. <u>Proposed easement acquisition on lands encumbered by a wind lease or option</u>**

Due to the landscape-level scope of the Service's easement program, there will be instances when a tract that is proposed for acquisition will already be encumbered by a wind lease agreement. When the refuge staff is making landowner contacts it is recommended that they ask interested landowners if there is currently a wind lease agreement on their property. If there is, then the refuge staff needs to decide if the presence of a wind lease agreement becomes a deterrent to the acquisition. If the staff determines that the wind lease is not a deterrent, then a biological evaluation is submitted to Realty with the comment that a wind lease agreement exists on the property.

There will be instances when either a wind lease agreement is signed after a biological evaluation is completed, or a landowner may not be direct with the Service on whether they have a wind lease agreement. At the time of acquisition, the Realty Specialist will meet with the landowner to review the property, discuss the easement program and answer any questions the landowner may have. At this time the Realty Specialist will either confirm with the landowner that there is a wind lease agreement, based on the comments on the evaluation, or ask if there is a wind lease agreement on the parcel to be acquired. The Realty Specialist will confirm any encumbrance associated with wind development when a review of the title is completed in the county courthouse records. Wind companies typically record a several page Notice of Wind Farm Easement Agreement instead of the entire wind lease document.

The Realty Specialist will make a copy of the notice filed by the wind company and any other associated documents. The Realty Specialist will obtain a copy of the wind lease agreement from the landowner and will send a copy to the refuge who will then review the agreement. Upon refuge review of the wind lease agreement a recommendation letter will be sent to the Realty Specialist from the manager stating that they are aware of the wind lease agreement on the property and they are in support of the easement acquisition, see Exhibit XIV-5. Once the Realty Specialist receives the approval letter from the manager, then valuation of the easement can begin. ***This applies to both wetland and grassland easement acquisitions.***

The Realty Specialist will complete the offer and explain to the landowner how the offer was calculated utilizing the discount procedure. Once the landowner accepts the offer the easement document is signed and title commitment is requested. Depending on the wording of the recorded documents, the Realty Specialist may be required to obtain Consent to Easement from the wind company, see Exhibit XIV-6. The Realty Specialist will prepare the case package to be submitted to the Regional Office and include the original letter from the manager approving the acquisition. After the title curative requirements are completed, the case will proceed in accordance to standard operating procedures.

**C. <u>Proposed grassland easement on lands with turbines already constructed</u>**

In the case where a landowner is interested in a grassland easement on his property that already has wind turbines, the following procedures will be used.

The refuge staff will submit an easement evaluation with a comment that there are wind turbines on the proposed acquisition parcel. Managers should consider excluding developed areas from the easement if doing so will not result in a hard-to-define (spider web of impact) easement area. In other words, if a turbine and associated facilities exists near the edge of a parcel, and the area to be excluded can be easily defined, by either metes or bounds or rectangular survey (i.e., NW1/4NW1/4NW1/4), the manager should consider this as an option.

At the time of acquisition, the Realty Specialist will meet with the landowner to review the property evaluated, discuss the easement program and answer any questions the landowner may have. The Realty Specialist will obtain a copy of the wind lease agreement from the landowner and will send a copy to the manager. Upon review of the wind lease agreement for provisions associated with decommissioning and restoration of the site, a recommendation letter will be sent to the Realty Specialist from the manager stating that they have reviewed the wind lease agreement, are aware of the development on the property and are in support of the easement acquisition which would be subject to the existing towers, access roads and related facilities. Once the Realty Specialist receives the approval letter from the manager, then valuation of the grassland easement can begin.

The Realty Specialist will complete the offer and if no developed areas are excluded by a metes and bounds or rectangular survey description, then a discount will be applied to the acres actually impacted by the existing wind towers, access roads and other related facilities by 85%.

Once the landowner accepts the offer the easement document is signed and title commitment is requested. Depending on the wording of the recorded documents, the Realty Specialist may be required to obtain "Consent to Easement" from the wind company, see Exhibit XIV-6. The Realty Specialist will prepare the case package to be submitted to the Regional Office and include the original letter from the manager approving the acquisition. After the title curative requirements are completed, the case will proceed in accordance to standard operating procedures.

**STEP 6: USFWS Division of Law Enforcement**

Most wind development companies claim that mortality surveys are standard operating procedures for wind companies. If this is the case, managers should ask for annual survey results from these companies. At the same time, it is important to collect and review mortality data from wind projects to learn and understand if there is certain topography, habitat, turbine location or construction designs, or other factors that may cause bird mortality.

The Service, specifically the Division of Law Enforcement, is responsible for enforcing the Migratory Bird Treat Act and other laws. It is important that the wind industry have one contact or person to communicate with and the Office of Law Enforcement is the Service's voice on migratory bird mortalities. Following are guidelines designed to assist wind developers and their employees on the proper actions and activities required to manage bird mortality incidents. These guidelines may need updating or alteration as more wind turbines are constructed and become operational. These guidelines are similar to those requirements currently in use for the

rural utility service industry, businesses or industries that are a cooperating partner with the Service.

## Bird Mortality Guidelines

1. Any migratory bird mortality will be reported immediately by the person who first locates the bird. The notification may be directly to this office or to a designated person within the wind company, who will then immediately notify this office. Notification will be via telephone to the Special Agents office and/or cell phone. In the event that contact with the Special Agent is not possible, a message will be left on one or both phone numbers with the necessary information for a return call. **The Service is the only entity which can have the on-site employee move the migratory bird. Please make sure wind company employees understand that they must leave the dead birds in place until they are directed by the USFWS to move the bird.**

2. The employee, who is on-scene, will photograph the bird and document its location (township/range coordinates or preferably GPS coordinates). Additionally, the employee should document other information including:
   - specific tower number near bird location
   - weather conditions experienced since last inspection (e.g., last 24 hours)
   - estimated/actual distance from nearest turbine

3. The employee, who is on-scene or the designated person within the company will send (via postal service or electronically) a copy of the picture documenting the migratory bird mortality along with a brief narrative which documents the facts (who, what, when, where aspect surrounding the migratory bird mortality).

4. Some of the migratory birds and all of the threatened and endangered species and eagles will be kept by the USFWS. The Service, after being notified, may arrange for the company to transport the migratory bird to the nearest National Wildlife Refuge or Wetland Management District office, other Service office or the North Dakota Game and Fish Department office. I will arrange for the migratory birds to be transported to the Office.

5. The Special Agent will forward/copy the information he/she receives to the appropriate Refuge/WMD and/or Ecological Services for their records.

Contact: Rich Grosz- Special Agent-USFWS
Phone: 701-255-0593
Cell Phone: 701-400-8433

***WIND ENERGY COORDINATION SUMMARY***

1. GATHER PROJECT INFORMATION FROM WIND DEVELOPER OR CONSULTANTS
   - Project Size/Location
   - Number/Size of Turbines
   - Transmission Lines?
   - Power Agreement Secured?
   - Turbine components acquired?
   - Proposed Construction Schedule
   - Connecting to WAPA, MISO or RUS line?
   - Financing secured?

2. COMMUNICATE WITH USFWS ECOLOGICAL SERVICES EARLY
   - Discuss NEPA requirements on or off easements lands

3. REVIEW PROJECT AREA AND DETERMINE IMPACTS TO FWS EASEMENTS
   - Determine wetland, grassland and FmHA easements in proposed project area
   - Prepare Exhibit A maps for wetland easements if necessary
   - Negotiate with developer to avoid and/or minimize impacts
   - Check acquisition dates of wetland easements versus landowner wind leases/agreements. (3 scenario document)
   - Review construction plans
   - Develop and/or review restoration plan
   - Develop Memorandum of Understanding

4. CONTACT REGIONAL ARCHEOLOGIST
   - Section 106 of the National Historic Preservation Act

5. CONTACT REALTY OFFICE
   - Partial Term Relinquishment Document
   - Replacement of permanent impact acres
   - Official Surveys of impacted acres
   - Letter of credit/decommissioning plans

6. COMMUNICATE WITH DIVISION OF LAW ENFORCEMENT
   - Proper procedures in handling direct mortality of migratory birds

# CHAPTER XV

# EASEMENT EXCHANGE PROCEDURES & FORMAT

A formal exchange of easement rights or interests will be necessary to accommodate authorizations that may affect easement interests which are above the established threshold levels. This process is described in Exhibit XV-1. This is a two step process which involves a formal exchange, in compliance with the Service requirements governing exchanges, and a concept of biological equivalency, which will replace habitat values which may be lost as a result of the authorized use.

Following are some general guidelines which may be helpful for managers involved with exchanging easement interests:

## A. **Service Policy**:

Fish and Wildlife Service policy governing property or property interest exchanges is detailed in the Fish and Wildlife Service Manual, Part 342 FW § 5.7. Exchange authorities are provided in 340 FW 1.

Regional Directors have the authority to exchange easement interests of any size or value acquired as part of the WPA program, subject to the limitations discussed below. WPA program easement interests are those acquired with Migratory Bird Conservation Act funds, North American Wetland Conservation Act funds, or funds donated by a third party, such as a private individual(s) or private non-profit conservation organization(s).

Exchanges of non-WPA easement interests such as those acquired with Land and Water Conservation Funds (LWCF) can be approved by the Regional Director, when the size of the easement interest is 40 acres or less. Exchanges of non-WPA easement interests larger than 40 acres must be approved by the Director.

Exchanges of non-WPA easement interests valued at $500,000 or more, regardless of the size of the interest, require Congressional approval. The $500,000 threshold is the combined value of the easement interest to be divested plus the interest to be acquired.

## B. **Regional Policy**:

Once wetland managers have determined that the requested use qualifies for an exchange of easement interests, the proposed exchange should be discussed with the State Refuge Supervisor prior to submitting the exchange request in writing.

By policy, Region 6 requires that the exchange proposal be submitted in writing to the Zone Refuge Supervisor. The exchange proposal must be co-signed by the Zone Refuge Supervisor and the Chief, Division of Realty for conceptual approval of the exchange. Final approval of

exchanges within the Waterfowl Production Area (WPA) program has been delegated by the Regional Director to the Chief, Division of Realty.

**NOTE**: Within the States of North Dakota and South Dakota, some grassland easements have been acquired with LWCF funds and in North Dakota, some wetland easements in Ward County have been acquired with LWCF funds. Exchanges involving wetland and grassland easements acquired with LWCF funds over 40 acres in size require approval by the Director. Both wetland and grassland easements acquired with LWCF funds can be identified by the letter "C" following the tract number.

## C. Exchange Request Submission:

To facilitate the administrative process of performing the exchange functions within the Division of Realty, it is necessary to submit requests for exchange using the following guidelines.

1. **Consider the number of requesters** - If there is one requester such as a landowner, a corporation or a government entity involved, submit one request for exchange. If there are two requesters (two different landowners, corporations etc.), submit a separate exchange request for each requester. Also include legible maps to illustrate the area being considered for an exchange.

2. **Consider the location of the easement interests to be divested -** Identify the state, county or counties and tract number(s) in which the easement interests to be divested are located. A request for exchange involving more than one county should have the easement interests impacted broken down by the number of easement acres impacted for each tract in each county.

3. **Consider the type(s) of easement interests to be divested -** Wetland easement interests impacted should be quantified on a wetland acre basis to the nearest whole acre and identified by tract number and county. Grassland easement interests should be quantified on an acre basis to the nearest whole acre and identified by tract number and county.

## D. Exchange Request Format:

The request for exchange should be submitted in the form of a memorandum to the state refuge supervisor from the project leader of the refuge or wetland management district. The subject title of the memorandum should be "Request for Exchange of Wetland(s)/Grassland(s) Easement(s), Tract Number(s), County, State."

Each request should include the following information in a narrative format.

1. Briefly described the history of the situation that has resulted in the request for exchange. Include as part of this section a brief "biological analysis" of the property to be relinquished to evaluate any special values to the property which would interfere with the reason to propose the exchange. Managers can review Exhibit XV-1 for more information.
2. Explain why the situation meets the criteria for an exchange.

**3.** Explain how the exchange will benefit the Service.

**4.** Briefly describe the request for exchange.

- **a.** Party(ies) with whom the Service is exchanging interests
- **b.** Interests to be divested
  - **1)** State, county, tract number and number of wetland acres to be divested
  - **2)** State, county, tract number and number of grassland acres, tame or native, to be divested
- **c.** Interests to be acquired:
  - **1)** State, county, number of replacement wetland acres, existing or restored, to be acquired.
  - **2)** State, county, number of replacement grassland acres, tame or native, to be acquired.
  - **3)** On the last page of the memorandum, provide an approval signature line for the "Refuge Supervisor" and a concurrence signature line for the "Chief Division of Realty, Region 6."
  - **4)** Attach copies of aerial photographs to the request for exchange.
    - **a)** Delineate the wetland(s) or grassland(s) to be divested on the copy(ies) of the aerial photograph(s) and at the top of the aerial photograph(s) identify the interest being divested "Wetland(s) to be Divested," "Grassland to be Divested."
    - **b)** Delineate the wetland(s) or grassland(s) to be acquired on a separate copy(ies) of the aerial photograph(s) and at the top of the aerial photograph(s) identify the interest to be acquired, "Wetland(s) to be Acquired," "Grasslands to be Acquired."

If acceptable replacement lands cannot be identified, then Realty may apply the money provided by the requester, paying the current market value of the relinquished interest, to another easement simultaneously with relinquishing the interest.

## E. <u>Property or Interest Divestiture Requirements</u>:

The following is a procedural requirement of the need to consider many aspects associated with land or interest divestiture. Exhibit XV-2 contains a checklist developed by the Washington Office-Realty to help with this process. The information needed to complete this form will require input from both Realty and wetland management district offices.

Before divesting any lands of the United States, compliance with the National Historic Preservation Act of 1966 (16 U.S.C. 470 et seq.); the Archeological and Historic Preservation Act of 1974 (16 U.S.C. 469 et seq.); the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (94 Stat. 2767 et seq.); the Resource Conservation and Recovery Act (98 Stat. 3221 et seq.) and Executive Orders (EO) 11988 (Floodplains Management) and 11990 (Protection of Wetlands) is required.

Service policy is included in **<u>613 FW 1 and 2</u>** (Natural Resources Protection). As to lands or interests in lands being conveyed out of United States ownership by exchange, the Regional Director must make a determination whether or not the lands are within a floodplain or wetlands within the scope of EO 11988 and EO 11990. The conveyance of land identified as being

restricted by either of these orders must contain appropriate restrictive language. Any restrictive language to be used in the deed must also be included in the exchange agreement. The exchange agreement in such cases cannot be accepted until the procedures for public notices have been completed.

## F. <u>Release of Easement Rights</u>:

Once accepted, easements become part of the National Wildlife Refuge System. The National Wildlife Refuge Administration Act of 1966, as amended, limits disposition of lands in the NWRS. The Act states that no acquired lands or interest in lands which are part of the NWRS may be transferred or otherwise disposed of (except by exchange) unless the Secretary of the Interior determines, with the approval of the Migratory Bird Conservation Commission (MBCC), that such land or interest in lands is no longer needed for the purposes for which the NWRS was established**.**

If MBCA funding was used to acquire the area (interest), then approval from the MBCC would be required to release easement rights. If other authorities and money were involved in a parcel to be divested, then an act of Congress is required to divest the interest outside of an exchange.

**Compatibility Determination Format**

**Exhibit II-1**

**Use:**

**Refuge Name:**

**Establishing and Acquisition Authorities:**

**Refuge Purpose(s):**

**National Wildlife Refuge System Mission:**

**Description of Use:**

**Availability of Resources:**

**Anticipated Impacts of the Use:**

**Public Review and Comment:**

**Determination (check one below):**

________ **Use is not compatible**

________ **Use is Compatible with the Following Stipulations**

**Stipulations Necessary to Ensure Compatibility:**

**Justification:**

**Signature:** **Refuge Manager:**___________________________________
**(Signature and Date)**

**Concurrence:** **Regional Refuge Chief:**_______________________________
**(Signature and Date)**

**Mandatory 10- or 15-year Reevaluation Date:** _________________________

# Compatibility Determination Flowchart



Exhibit II-3

# PROGRAM GOALS of the SMALL WETLANDS PROGRAM especially EASEMENTS

The Service's Small Wetlands Acquisition Program is to provide for the long-term viability of the breeding waterfowl population and production through the preservation of existing habitats, while considering the needs of other migratory birds, threatened and endangered species, and other wildlife. More specifically the program goals are:

1. To preserve, restore, enhance, and protect in perpetuity, wetland and grassland habitats for waterfowl productivity;

2. to insure that such lands shall be maintained to provide cover and food for a variety of aquatic, terrestrial, and avian wildlife, particularly waterfowl;

3. to maintain upland nesting habitat for all for waterfowl and other upland nesting birds, and to enhance nesting success on private lands;

4. to preserve, in perpetuity, prairie wetland resources, and protect them from conversion associated with agriculture, commercial development, and other decimating factors and influences;

5. for the development, advancement, management, conservation, and protection of fish and wildlife resources;

6. to contribute to the goals and objectives of the North American Waterfowl Management Plan and the Prairie Pothole Joint Venture by working collaboratively with individuals, private landowners, conservation organizations, and other agencies, to conserve migratory birds and their habitats;

7. to provide an alternative to the purchase of uplands in fee title, thus maintaining land in private ownership;

8. to improve and protect the water quality of wetlands by reducing soil erosion and the use of agricultural chemicals and fertilizers on surrounding uplands.

**Exhibit II-4**

# Regional Coordinators
# for
# Questions Related to NEPA
# and/or
# Cultural Resources

---

National Environmental
Policy Act:

Dave Carlson
USFWS
P.O. Box 25486, DFC
Denver, CO 80225
(303) 236-4254

Cultural Resources:

North/South Dakota:
Barry Williams
USFWS
3425 Miriam Avenue
Bismarck, ND 58501
(710) 355-8577

Colorado, Kansas, Nebraska:
Meg Van Ness
USFWS
P.O. Box 25486, DFC
Denver, CO 80225
(303) 236-8103

Montana, Wyoming, Utah:
Brant Loflin
423 Hatchery Circle
Spearfish, SD 57783
(605) 642-7730, ext. 209

# NEPA Guidance for Region 6 Fish and Wildlife Service Field Staff

# As it relates to the American Recovery and Reinvestment Act 2009

## Distinguishing between Categorical Exclusions and Environmental Assessments

U.S. Fish and Wildlife Service

May 2009

| Section | Subject | Page No. |
|---|---|---|
| 1.0 | Background | 3 |
| 2.0 | Categorical Exclusion, Extraordinary Circumstances, and Environmental Action Statement | 3 |
| | Categorical Exclusion (CX) | 3 |
| | Extraordinary Circumstances | 4 |
| | Environmental Action Statement (EAS) | 4 |
| | Public Involvement, Signing, Timing of Implementation, and Administrative Record | 5 |
| 3.0 | Environmental Assessment and Finding of No Significant Impact | 5 |
| | Environmental Assessment (EA) | 5 |
| | Finding of No Significant Impact (FONSI) | 5 |
| | Public Involvement, Signing, Timing of Implementation, and Administrative Record | 6 |
| Attachments | | |
| 1 | Major NEPA References | 7 |
| 2 | DOI Categorical Exclusions | 8 |
| 3 | FWS Categorical Exclusions | 10 |
| 4 | Extraordinary Circumstances | 14 |
| 5 | U.S. Fish and Wildlife Service, Environmental Action Statement for Categorical Exclusion | 16 |

## 1.0 Background

The National Environmental Policy Act of 1969, as amended (NEPA, 42 U.S.C. 4321-4347), requires that, prior to implementing a proposed action, Federal agencies consider a range of reasonable alternatives, and evaluate the effects of their proposed action and the alternatives. Based on the magnitude of the action and, especially, on the significance of the anticipated effects, different processes and associated documentation are required to satisfy NEPA requirements. The two most common NEPA documents are environmental assessments (EAs) and environmental impact statements (EISs). There is another subset of Federal actions which satisfies specific criteria and for which no NEPA documentation is required. These actions are referred to as categorical exclusions (CXs), that is, they are categorically excluded from NEPA documentation requirements.

The purpose of this write up is to provide Fish and Wildlife Service (FWS) personnel with guidance for determining whether NEPA documentation is required for a particular proposed action and, if so, what type of documentation. Guidance for implementation of the procedural and substantive requirements of NEPA by the FWS is included in the Council on Environmental Quality's (CEQ's) regulations, Department of the Interior's (DOI's) manual, and Fish and Wildlife Service's policies. Full citations for key NEPA references, including those noted herein, are included at the end of this document (see Attachment No. 1, "Major NEPA References").

---

## 2.0 Categorical Exclusion, Extraordinary Circumstances, and Environmental Action Statement

<u>Categorical Exclusion (CX)</u>

Categorical exclusions lie at the near end of the Federal action spectrum. NEPA documentation is not normally required for CXs. If they do not trigger "extraordinary circumstances" (see discussion below), the following actions qualify as CXs:

- Those which would individually or cumulatively not have a significant effect on the quality of the human environment (40 C.F.R. 1508.4, and 516 DM 2.3 A. and 8.5), and
- Those which have already been adequately addressed in an appropriate NEPA document (516 DM 3.2 A.).

Attachment Nos. 2 and 3 to this document ("DOI Categorical Exclusions" and "FWS Categorical Exclusions") include two lists of CXs. The list in Attachment No. 2 applies to proposed actions by any DOI bureau (516 DM 2, Appendix 1). The list in Attachment No. 3 applies only to FWS actions (516 DM 8.5). Action proponents should search both of these lists to determine if one or more CXs apply to their proposed action.

Extraordinary Circumstances

Attachment No. 4 ("Extraordinary Circumstances," from 516 DM 2, Appendix 2) to this document includes a list of extraordinary circumstances (formerly called "exceptions" to the categorical exclusions). If a proposed action triggers any of these extraordinary circumstances, a CX cannot be used and an EA or EIS must be developed. It is critical to review the extraordinary circumstances and ensure that they do not apply prior to assuming that a normally excluded action qualifies as a CX.

Environmental Action Statement (EAS)

An EAS is a brief statement developed to document use of a CX, to document some other NEPA compliance or NEPA decision, or whenever else it is determined to be useful (see 550 FW 3.3 C). EAS statements are have been recommended for CX's related to ARRA projects. For example, an EAS can be used:

- To document use of a CX in a borderline case; or
- At any other time, to provide an administrative record of NEPA compliance or a NEPA decision for future managers, higher-level management personnel, or outside parties.
- Service guidelines request that an EAS be completed for all ARRA projects

Attachment No. 5 ("United States Fish and Wildlife Service, Environmental Action Statement for Categorical Exclusion") includes the recommended format and contents for an EAS developed to document a CX. EASs developed for other purposes may be formatted as appropriate to the situation (see 550 FW 3, Exhibit 4).

If the proposed action has already been adequately addressed in a previous NEPA document, yet use of an EAS is desirable, a shortened version which includes the following may be used:

- A brief description of the proposed action,
- A statement that previous NEPA coverage (along with any other related compliance) already exists,
- A statement that the proposed action falls within the bounds of that previous NEPA documentation,
- A statement that circumstances relevant to the proposed action and its effects have not changed substantially since that previous coverage was provided (see 40 C.F.R. 1502.9 regarding EIS supplementing requirements),
- Citation of the relevant document(s), and
- Signature and date.

Public Involvement, Signing, Timing of Implementation, and Administrative Record

There are often good reasons to involve the public in planning for proposed Federal actions, however, by itself, a CX does not have any public involvement or public notification requirements. An EAS shall be provided to the public upon request.

With the exception of land acquisition actions, an environmental action statement for a categorical exclusion can be signed by a project leader/manager.

A categorically excluded action may be initiated immediately following the determination that it is categorically excluded or an EAS is signed, whichever is later.

Once an EAS is completed, it should be maintained in office files as part of the official administrative record.

## 3.0 Environmental Assessment and Finding of No Significant Impact

Environmental Assessment (EA)

Environmental assessments can be found in the middle of the Federal action spectrum. An EA must be developed for all proposed actions which are not categorically excluded or for which an EIS will not be prepared. The purpose of an EA is to determine whether the proposed action is a major Federal action whose implementation would result in significant effects on the quality of the human environment. Policy states that the following FWS proposals normally require development of an EA (516 DM 8.6).

- Proposals to establish most new refuges and fish hatcheries; and most additions and rehabilitations to existing installations.
- Any habitat conservation plan that does not meet the definition of "low-effect" in the Section 10(a)(1)(B) Handbook.

There are no specific format requirements for EAs. Contents must include brief discussions of at least the following (40 C.F.R. 1508.9, 516 DM 3.4):

- The need for the proposal,
- A brief description of the proposal and a range of reasonable alternatives,
- The environmental effects of the proposed action and alternatives, and
- A listing of agencies and persons consulted.
- EA's were not intended to be complex documents as is intended in an Environmental Impact Statement. CEQ guidance suggested that and EA was originally intended as an in-house document not to exceed 10 to 15 pages.

Finding of No Significant Impact (FONSI)

A FONSI is developed to document an agency determination that a proposed action is not a major Federal action significantly affecting the quality of the human environment (NEPA sec. 102 (2) (C)) and, therefore, does not require development of an EIS. Information and analyses included in the EA, and EIS-relevant definitions and criteria (see discussion below) are used to make the decision regarding whether or not development of an EIS is warranted for a particular Federal proposal. A determination to proceed with development of an EIS can be made at any point in the process of developing an EA. Once that determination is made it should be documented with an EAS (see references above) and all efforts should be redirected toward the EIS process and document. If, on the other hand, the EA process and document are finalized and an evaluation reveals that an EIS is not likely warranted, development of a FONSI is required. Procedural and substantive guidance for FONSIs is included in CEQ regulations (40 C.F.R.

1501.4 and 1508.13); DOI manual (516 DM 2.3C. and 3.4 D.); and FWS policy (550 FW 3.3 B. and 30 AM 3.9 B.(3)).

Public Involvement, Signing, Timing of Implementation, and Administrative Record

There are often good reasons to involve the public in planning for proposed Federal actions, however, by itself, an EA does not have any public involvement requirements. If the proposed action is to occur in a wetland or 100-year floodplain (see EO 11990 and EO 11988), public review and comment requirements are triggered. In addition, because CEQ has defined EAs and FONSIs as "environmental documents" (40 C.F.R. 1506.6 and 1508.10), the public must be notified of their availability.

An EA is not a decision document, therefore, it does not require a signature and a proposed action may not be implemented based solely upon completion of an EA. Instead (assuming an EIS is not warranted), a FONSI must be developed and signed. FWS assistant regional directors, including the Regional Chief of the NWRS, have been delegated authority to sign FONSIs.

In most cases, a proposed action may be implemented immediately following public notification of the availability of the EA and FONSI. In some unusual situations, however, a FONSI must be made available for a 30-calendar-day public review period prior to being signed and prior to implementation of a proposed action. Those unusual situations are as follows (40 C.F.R. 1501.4 and 550 FW 3.3 B.).

- A proposed action is, or is closely similar to, one which normally requires an EIS; or a reasonable argument can be made that an EIS is required.
- A proposed action is new or unusual, or its implementation would be precedent setting.
- There is scientific or public controversy regarding implementation of the proposed action.

Final EAs and signed FONSIs are important legal documents and should be maintained in office files as part of the official administrative record.

Attachment No. 1

## Major NEPA References

Following are the principal documents containing guidance for implementation of the National Environmental Policy Act (NEPA). Additional guidance is provided in Federal court decisions.

National Environmental Policy Act of 1969, as amended (42 USC 4321-4347; January 1, 1970) - http://www.nepa.gov/nepa/regs/nepa/nepaeqia.htm.

National Wildlife Refuge System Manual, NEPA Compliance (4 RM 5; March 12, 1982).

President's Council on Environmental Quality, Forty Most Asked Questions Concerning CEQ's NEPA Regulations (March 23, 1981) - http://www.nepa.gov/nepa/regs/40/40p3.htm.

President's Council on Environmental Quality, Guidance Regarding NEPA Regulations (48 FR 34263; July 28, 1983) - http://www.nepa.gov/nepa/regs/1983/1983guid.htm.

President's Council on Environmental Quality, NEPAnet - http://www.nepa.gov/nepa/nepanet.htm.

President's Council on Environmental Quality, Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act (40 CFR Parts 1500-1508; November 28, 1978) - http://www.nepa.gov/nepa/regs/ceq/toc_ceq.htm.
Region 1 Redelegation of Authority - Signatory on Finding of No Significant Impact (Regional Policy Order No. 96-08 [Jul 16, 1996]).

U.S. Department of the Interior Manual, National Environmental Policy Act of 1969 (516 DM; May 27, 2004) - http://elips.doi.gov/app_dm/index.cfm?fuseaction=home.

U.S. Fish and Wildlife Service Manual, Environmental Review (505 FW 1-5; June 28, 1994) - http://www.fws.gov/policy/manuals/part.cfm?series=500&seriestitle=INTERAGENCY,%20INTERGOVERNMENTAL%20AND%20INTERNATIONAL%20ACTIVITIES,%20ENVIRONMENTAL%20QUALITY%20SERIES#505.

U.S. Fish and Wildlife Service Manual, National Environmental Policy Act - Documenting and Implementing Decisions (550 FW 3; March 29, 1996) http://www.fws.gov/policy/manuals/part.cfm?series=500&seriestitle=INTERAGENCY,%20INTERGOVERNMENTAL%20AND%20INTERNATIONAL%20ACTIVITIES,%20ENVIRONMENTAL%20QUALITY%20SERIES#505.

U.S. Fish and Wildlife Service, NEPA Reference Handbook (undated) - http://www.fws.gov/r9esnepa/.

Attachment No. 2

## DOI Categorical Exclusions

The following actions are CXs pursuant to the DOI Manual (516 DM 2.3 A.). However, environmental documents (e.g., an EA or EIS) must be prepared for individual actions within these CXs if any of the extraordinary circumstances listed in 516 DM 2, Appendix 2 apply.

1. Personnel actions and investigations and personnel services contracts.

2. Internal organizational changes and facility and office reductions and closings.

3. Routine financial transactions including such things as salaries and expenses, procurement contracts (in accordance with applicable procedures and Executive Orders for sustainable or green procurement), guarantees, financial assistance, income transfers, audits, fees, bonds, and royalties.

4. Departmental legal activities including, but not limited to, such things as arrests, investigations, patents, claims, and legal opinions. This does not include bringing judicial or administrative civil or criminal enforcement actions which are outside the scope of NEPA in accordance with 40 CFR 1508.18(a).

5. Nondestructive data collection, inventory (including field, aerial, and satellite surveying and mapping), study, research, and monitoring activities.

6. Routine and continuing government business, including such things as supervision, administration, operations, maintenance, renovations, and replacement activities having limited context and intensity (e.g., limited size and magnitude or short-term effects).

7. Management, formulation, allocation, transfer, and reprogramming of the Department's budget at all levels. (This does not exclude the preparation of environmental documents for proposals included in the budget when otherwise required.)

8. Legislative proposals of an administrative or technical nature (including such things as changes in authorizations for appropriations and minor boundary changes and land title transactions) or having primarily economic, social, individual, or institutional effects; and comments and reports on referrals of legislative proposals.

9. Policies, directives, regulations, and guidelines that are of an administrative, financial, legal, technical, or procedural nature and whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case.

10. Activities which are educational, informational, advisory, or consultative to other agencies, public and private entities, visitors, individuals, or the general public.

11. Hazardous fuels reduction activities using prescribed fire not to exceed 4,500 acres, and mechanical methods for crushing, piling, thinning, pruning, cutting, chipping, mulching, and mowing, not to exceed 1,000 acres. Such activities: Shall be limited to areas (1) in wildland-urban interface and (2) Condition Classes 2 or 3 in Fire Regime Groups I, II, or III, outside the wildland-urban interface; Shall be identified through a collaborative framework as described in ``A Collaborative Approach for Reducing Wildland Fire Risks to Communities and the Environment 10-Year Comprehensive Strategy Implementation Plan;" Shall be conducted consistent with agency and Departmental procedures and applicable land and resource management plans; Shall not be conducted in wilderness areas or impair the suitability of wilderness study areas for preservation as wilderness; Shall not include the use of herbicides or pesticides or the construction of new permanent roads or other new permanent infrastructure; and may include the sale of vegetative material if the primary purpose of the activity is hazardous fuels reduction. [Refer to the Environmental Statement Memoranda Series for additional, required guidance.]

12. Post-fire rehabilitation activities not to exceed 4,200 acres (such as tree planting, fence replacement, habitat restoration, heritage site restoration, repair of roads and trails, and repair of damage to minor facilities such as campgrounds) to repair or improve lands unlikely to recover to a management approved condition from wildland fire damage, or to repair or replace minor facilities damaged by fire. Such activities: Shall be conducted consistent with agency and Departmental procedures and applicable land and resource management plans; Shall not include the use of herbicides or pesticides or the construction of new permanent roads or other new permanent infrastructure; and Shall be completed within three years following a wildland fire.

Attachment No. 3

## FWS Categorical Exclusions

The following actions are CXs pursuant to the DOI Manual (516 DM 2.3 A. and 516 DM 8.5) and FWS Manual (30 AM 3.9). However, environmental documents (e.g., an EA or EIS) must be prepared for individual actions within these CXs if any of the extraordinary circumstances listed in 516 DM 2, Appendix 2 apply.

A. General.

(1) Changes or amendments to an approved action when such changes have no or minor potential environmental impact.

(2) Personnel training, environmental interpretation, public safety efforts, and other educational activities, which do not involve new construction or major additions to existing facilities.

(3) The issuance and modification of procedures, including manuals, orders, guidelines, and field instructions, when the impacts are limited to administrative effects.

(4) The acquisition of real property obtained either through discretionary acts or when acquired by law, whether by way of condemnation, donation, escheat, right-of-entry, escrow, exchange, lapses, purchase, or transfer and that will be under the jurisdiction or control of the United States. Such acquisition of real property shall be in accordance with 602 DM 2 and the Service's procedures, when the acquisition is from a willing seller, continuance of or minor modification to the existing land use is planned, and the acquisition planning process has been performed in coordination with the affected public.

B. Resource Management. Prior to carrying out these actions, the Service should coordinate with affected Federal agencies and State, tribal, and local governments.

(1) Research, inventory, and information collection activities directly related to the conservation of fish and wildlife resources which involve negligible animal mortality or habitat destruction, no introduction of contaminants, or no introduction of organisms not indigenous to the affected ecosystem.

(2) The operation, maintenance, and management of existing facilities and routine recurring management activities and improvements, including renovations and replacements which result in no or only minor changes in the use, and have no or negligible environmental effects on-site or in the vicinity of the site.

(3) The construction of new, or the addition of, small structures or improvements, including structures and improvements for the restoration of wetland, riparian, instream, or native habitats, which result in no or only minor changes in the use of the affected local area. The following are examples of activities that may be included.

(a) The installation of fences.

(b) The construction of small water control structure

(c) The planting of seeds or seedlings and other minor revegetation actions.

(d) The construction of small berms or dikes.

(e) The development of limited access for routine maintenance and management purposes.

(4) The use of prescribed burning for habitat improvement purposes, when conducted in accordance with local and State ordinances and laws.

(5) Fire management activities, including prevention and restoration measures, when conducted in accordance with Departmental and Service procedures.

(6) The reintroduction or supplementation (e.g., stocking) of native, formerly native, or established species into suitable habitat within their historic or established range, where no or negligible environmental disturbances are anticipated.

(7) Minor changes in the amounts or types of public use on Service or State-managed lands, in accordance with existing regulations, management plans, and procedures.

(8) Consultation and technical assistance activities directly related to the conservation of fish and wildlife resources.

(9) Minor changes in existing master plans, comprehensive conservation plans, or operations, when no or minor effects are anticipated. Examples could include minor changes in the type and location of compatible public use activities and land management practices.

(10) The issuance of new or revised site, unit, or activity-specific management plans for public use, land use, or other management activities when only minor changes are planned. Examples could include an amended public use plan or fire management plan.

(11) Natural resource damage assessment restoration plans, prepared under sections 107, 111, and 122(j) of the Comprehensive Environmental Response Compensation and Liability Act (CERCLA); section 311(f)(4) of the Clean Water Act; and the Oil Pollution Act; when only minor or negligible change in the use of the affected areas is planned.

C. Permit and Regulatory Functions.

(1) The issuance, denial, suspension, and revocation of permits for activities involving fish, wildlife, or plants regulated under 50 CFR Chapter 1, Subsection B, when such permits cause no or negligible environmental disturbance. These permits involve endangered and threatened species, species listed under the Convention on International Trade in

Endangered Species of Wild Fauna and Flora (CITES), marine mammals, exotic birds, migratory birds, eagles, and injurious wildlife.

(2) The issuance of ESA section 10(a)(1)(B) "low-effect" incidental take permits that, individually or cumulatively, have a minor or negligible effect on the species covered in the habitat conservation plan.

(3) The issuance of special regulations for public use of Service-managed land, which maintain essentially the permitted level of use and do not continue a level of use that has resulted in adverse environmental effects.

(4) The issuance or reissuance of permits for limited additional use of an existing right-of-way for underground or above ground power, telephone, or pipelines, where no new structures (i.e., facilities) or major improvement to those facilities are required; and for permitting a new right-of-way, where no or negligible environmental disturbances are anticipated.

(5) The issuance or reissuance of special use permits for the administration of specialized uses, including agricultural uses, or other economic uses for management purposes, when such uses are compatible, contribute to the purposes of the refuge system unit, and result in no or negligible environmental effects.

(6) The denial of special use permit applications, either initially or when permits are reviewed for renewal, when the proposed action is determined not compatible with the purposes of the refuge system unit.

(7) Activities directly related to the enforcement of fish and wildlife laws, not included in 516 DM 2, Appendix 1.4. These activities include:

(a) Assessment of civil penalties.

(b) Forfeiture of property seized or subject to forfeiture.

(c) The issuance or reissuance of rules, procedures, standards, and permits for the designation of ports, inspection, clearance, marking, and license requirements pertaining to wildlife and wildlife products, and for the humane and healthful transportation of wildlife.

(8) Actions where the Service has concurrence or coapproval with another agency and the action is a categorical exclusion for that agency. This would normally involve one Federal action or connected actions where the Service is a cooperating agency.

D. Recovery Plans. Issuance of recovery plans under section 4(f) of the ESA.

E. Financial Assistance.

(1) State, local, or private financial assistance (grants and/or cooperative agreements), including State planning grants and private land restorations, where the environmental effects are minor or negligible.

(2) Grants for categorically excluded actions in paragraphs A, B, and C, above; and categorically excluded actions in Appendix 1 of 516 DM 2.

Attachment No. 4

## Extraordinary Circumstances

Following is a list of extraordinary circumstances (from 516 DM 2, Appendix 2) which, if triggered by a proposed action, preclude categorically excluding that action from NEPA documentation requirements. Therefore, an EA or EIS must be developed prior to implementation of the proposed action. Extraordinary circumstances exist for individual actions within CXs which may:

1. Have significant impacts on public health or safety.

2. Have significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands (Executive Order 11990); floodplains (Executive Order 11988); national monuments; migratory birds; and other ecologically significant or critical areas.

3. Have highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources [NEPA Section 102(2)(E)].

4. Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks.

5. Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects.

6. Have a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects.

7. Have significant impacts on properties listed, or eligible for listing, on the National Register of Historic Places as determined by either the bureau or office.

8. Have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species, or have significant impacts on designated Critical Habitat for these species.

9. Violate a Federal law, or a State, local, or tribal law or requirement imposed for the protection of the environment.

10. Have a disproportionately high and adverse effect on low income or minority populations (Executive Order 12898).

11. Limit access to and ceremonial use of Indian sacred sites on Federal lands by Indian religious practitioners or significantly adversely affect the physical integrity of such sacred sites (Executive Order 13007).

12. Contribute to the introduction, continued existence, or spread of noxious weeds or non-native invasive species known to occur in the area or actions that may promote the introduction, growth, or expansion of the range of such species (Federal Noxious Weed Control Act and Executive Order 13112).

Attachment No. 5

U.S. FISH AND WILDLIFE SERVICE

## ENVIRONMENTAL ACTION STATEMENT FOR CATEGORICAL EXCLUSION

Within the spirit and intent of the Council on Environmental Quality's regulations for implementing the National Environmental Policy Act (NEPA; 40 CFR 1500-1508), and other statutes, orders, and policies that protect fish and wildlife resources, I have established the following administrative record and determined that the following proposed action is categorically excluded from NEPA documentation requirements.

Proposed Action and Alternatives
[Briefly describe the proposed action and any reasonable alternatives considered. Briefly explain why the proposed action was selected for implementation and/or why the other alternatives were not selected.]

Categorical Exclusion(s)
[Quote and include the citation of (category and number) the specific categorical exclusion(s) that apply to implementation of the proposed action. If necessary, briefly explain why the proposed action fits each of the selected categorical exclusions.

Review the extraordinary circumstances and ensure that none are triggered by implementation of the proposed action. If extraordinary circumstances are (or appear to be) triggered by the proposed action, briefly explain why the action is still categorically excluded.]

Permits/Approvals
[Briefly describe any additional permits/consultations/approvals needed before the proposed action can be implemented and the status of those permits/consultations/approvals (examples include: CWA sec 404 wetlands permit, ESA sec 7 consultation, NHPA sec 106 cultural resources clearance, and appropriateness finding and compatibility determination).]

Public Involvement/Interagency Coordination
[Briefly describe past and proposed consultation and coordination with the public, other agencies, and/or Tribes relative to the proposed action, any significant comments these parties had, and how we've responded.]

Supporting Documents
Support documents for this determination include relevant office file material and the following key references. [List full citations.]

________________________________ _______________
(Project Leader) (Date)

# NEPA COMPLIANCE CHECKLIST

Project Title: ______________________________ Project No: ______________
Unit/Facility: ______________________________ State: ______________

This proposal ___ is; ___ is not completely covered by categorical exclusion 516 DM 8 No(s) _____; and/or 516 DM 2, Appendix 1 No(s) _____.

Brief Project Description Justifying Categorical Exclusion Claimed: ______________________________

______________________________

______________________________

______________________________

______________________________

______________________________

______________________________

Exceptions (DM 2, Appendix 2, Extraordinary Circumstances 6/21/05 #3675):

Will This Proposal (*check yes or no for each item below*):

Yes No

__ __ 1. Have significant impacts on public health or safety.

__ __ 2. Have significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands (Executive Order 11990); floodplains (Executive Order 11988); national monuments; migratory birds; and other ecologically significant or critical areas.

__ __ 3. Have highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources [NEPA Section 102(2)(E)].

__ __ 4. Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks.

__ __ 5. Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects.

__ __ 6. Have a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects.

__ __ 7. Have significant impacts on properties listed, or eligible for listing, on the National Register of Historic Places as determined by either the bureau or office.

__ __ 8. Have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species, or have significant impacts on designated Critical Habitat for these species.

__ __ 9. Violate a Federal law, or a State, local, or tribal law or requirement imposed for the protection of the environment.

__ __ 10. Have a disproportionately high and adverse effect on low income or minority populations (Executive Order 12898).

__ __ 11. Limit access to and ceremonial use of Indian sacred sites on Federal lands by Indian religious practitioners or significantly adversely affect the physical integrity of such sacred sites (Executive Order 13007).

__ __ 12. Contribute to the introduction, continued existence, or spread of noxious weeds or non-native invasive species known to occur in the area or actions that may promote the introduction, growth, or expansion of the range of such species (Federal Noxious Weed Control Act and Executive Order 13112).

**If any of the above exceptions receive a "Yes", an EA must be prepared.**

**Prepared By:** ______________________ Date: ______________

*Within the spirit and intent of the Council of Environmental Quality's regulations for implementing the National Environmental Policy Act (NEPA) and other statutes, orders, and policies that protect fish and wildlife resources, I have established the following administrative record and have determined that the project:*

__ **is a categorical exclusion as provided by 516 DM 8 and/or 516 DM 2, Appendix 1. No further NEPA documentation will therefore be made.**

__ **is not completely covered by the categorical exclusion as provided by 516 DM 8 and/or 516 DM 2, Appendix 1. An EA must be prepared.**

**Service signature approval:**

FWS Project Leader: ______________________ Date: ______________

— EXAMPLE —
ONLY

# NEPA COMPLIANCE CHECKLIST

Project Title: Replace non-functional New Ditch Dam  Project No: 89110247
Unit/Facility: Alamosa NWR  State: CO

This proposal X is; ___ is not completely covered by categorical exclusion 516 DM 8 No(s) B2; and/or 516 DM 2, Appendix 1 No(s) _____.

Brief Project Description Justifying Categorical Exclusion Claimed: Replacement of the new Ditch Dam is necessary for the maintenance and management of existing facilities. The Dam is being replaced because it failed. The replacement structure will result in no change in use. The replacement structure will have beneficial effects on site and less environmental effects than the existing structure. Actual replacement activities have no or negligible environmental effects.

Exceptions (DM 2, Appendix 2, Extraordinary Circumstances 6/21/05 #3675):

Will This Proposal (*check yes or no for each item below*):

| Yes | No | |
|---|---|---|
| __ | X | 1. Have significant impacts on public health or safety. |
| __ | X | 2. Have significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands (Executive Order 11990); floodplains (Executive Order 11988); national monuments; migratory birds; and other ecologically significant or critical areas. |
| __ | X | 3. Have highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources [NEPA Section 102(2)(E)]. |
| __ | X | 4. Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks. |
| __ | X | 5. Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects. |
| __ | X | 6. Have a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects. |
| __ | X | 7. Have significant impacts on properties listed, or eligible for listing, on the National Register of Historic Places as determined by either the bureau or office. |
| __ | X | 8. Have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species, or have significant impacts on designated Critical Habitat for these species. |
| __ | X | 9. Violate a Federal law, or a State, local, or tribal law or requirement imposed for the protection of the environment. |
| __ | X | 10. Have a disproportionately high and adverse effect on low income or minority populations (Executive Order 12898). |
| __ | X | 11. Limit access to and ceremonial use of Indian sacred sites on Federal lands by Indian religious practitioners or significantly adversely affect the physical integrity of such sacred sites (Executive Order 13007). |
| __ | X | 12. Contribute to the introduction, continued existence, or spread of noxious weeds or non-native invasive species known to occur in the area or actions that may promote the introduction, growth, or expansion of the range of such species (Federal Noxious Weed Control Act and Executive Order 13112). |

If any of the above exceptions receive a "Yes", an EA must be prepared.

Prepared By: Deborah Pierce  Date: 3/30/09

*Within the spirit and intent of the Council of Environmental Quality's regulations for implementing the National Environmental Policy Act (NEPA) and other statutes, orders, and policies that protect fish and wildlife resources, I have established the following administrative record and have determined that the project:*

__ is a categorical exclusion as provided by 516 DM 8 and/or 516 DM 2, Appendix 1. No further NEPA documentation will therefore be made.

__ is not completely covered by the categorical exclusion as provided by 516 DM 8 and/or 516 DM 2, Appendix 1. An EA must be prepared.

Service signature approval:
FWS Project Leader: [signature] Deborah Pierce  Date: 3/30/09

****Cultural Resources Sign Off:** **All Projects requiring sign off MUST submit location information and a photo of site.**
Need Data (1) = need RPI# and the building/structure plotted on a topo map
Need Data (2) = need to know extend of ground disturbance and plotted on topo map
Need Data (3) = before any actual changes are made to buildings over 50 years old we need to get the RPI#, a plot on a topo map, and a description of what is proposed. Changes to eligible buildings may require consultation with the states before the work is done.

| | | | |
|---|---|---|---|
| ***NEPA CATEGORICAL EXCLUSION CODES*** **516 DM 2, Appendix 1 = Department Categorical Exclusions** No further NEPA paperwork required (may need coordination with cultural resources) | 1.1-1.13 | 1.1 | Personnel actions and investigations and personnel services contracts. |
| | | 1.3 | Routine financial transactions including such things as salaries and expenses, procurement contracts (in accordance with applicable procedures and Executive Orders for sustainable or green procurement), guarantees, financial assistance, income transfers, audits, fees, bonds, and royalties. |
| | | 1.7 | Routine and continuing government business, including such things as supervision, administration, operations, maintenance, renovations, and replacement activities having limited context and intensity (e.g. limited size and magnitude or short-term effects). [note: refers to routine building maintenance] |
| **516 DM 8 = Service Categorical Exclusions** | A 1-4 | A 2 | Personnel training, environmental interpretation, public safety efforts, and other educational activities, which do not involve new construction or major additions to existing facilities. |
| Must complete NEPA complience checklist and coordinate with Cultural Resources | B 1-11 | B 1 | Research, inventory, and information collection activities directly related to the conservation of fish and wildlife resources which involve negligible animal mortality or habitat destruction, no introduction of contaminants, or no introduction of organisms not indigenous to the affected ecosystem. |
| | | B 2 | The operation, maintenance, and management of existing facilities and routine recurring management activities and improvements, including renovations and replacements which result in no or only minor changes in the use, and have no or negligible environmental effects on-site or in the vicinity of the site. |
| | | B 3 | The construction of new, or the addition of, small structures or improvements, including structures and improvements for the restoration of wetland, riparian, instream, or native habitats, which result in no or only minor changes in the use of the affected area. The following are examples of activities that may be included: (a) the installation of fences; (b) the construction of small water structures; (c) the planning of seeds or seedlings or other minor revegetation actions; (d) the construction of small berms or dikes; and (e) the development of limited access for routine maintenance and management. |
| | | B 8 | Consultation and technical assistance activities directly related to the conservation of fish and wildlife resources. |
| | E 1-2 | E 2 | Grants for categorically excluded actions. |

UNITED STATES FISH & WILDLIFE SERVICE

**ENVIRONMENTAL ACTION STATEMENT**

Within the spirit and intent of the Council of Environmental Quality's regulations for implementing the National Environmental Policy Act (NEPA) and other statutes, orders, and policies that protect fish and wildlife resources, I have established the following administrative record and have determined that the action of (describe

____ is a categorical exclusion as provided by 516 DM 6, Appendix 1 and 516 DM 2, Appendix 1. No further documentation will therefore be made.

____ is found not to have significant environmental effects as determined by the attached Environmental Assessment and Finding of No Significant Impact.

____ is found to have significant effects, and therefore further consideration of this action will require a notice of intent to be published in the Federal Register announcing the decision to prepare an EIS.

____ is not approved because of unacceptable environmental damage, or violation of Fish and Wildlife Service mandates, policy, regulations, or procedures.

____ is an emergency action within the context of 40 CFR 1506.11. Only those actions necessary to control the immediate impacts of the emergency will be taken. Other related actions remain subject to NEPA review.

Other supporting documents

____ Environmental Assessment and FONSI

____ Public comments

________________________________ (1) Initiator Date

________________________________ (2) RHPO Date

________________________________ (3) REC Date

________________________________ (4) ARD Date

________________________________ (5) RD Date

Exhibit II-9

U.S. FISH & WILDLIFE SERVICE

# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

In Reply Refer To:
FWS/ANRS-NR/030695

JUN 0 3 2008

Memorandum

To: Regional Directors, Regions 1-8

From: Director H Dale Hall

Subject: Guidance for Implementation of Appropriate Refuge Uses Policy (603 FW 1)

The purpose of this memorandum is to: 1) provide guidance to the Regions and refuge managers in implementing the Appropriate Refuge Uses Policy (603 FW 1); and 2) provide additional background information further describing the policy's function and applicability.

The National Wildlife Refuge System Improvement Act of 1997 (Improvement Act) amends and builds on the National Wildlife Refuge System Administration Act, providing an "organic act" for the Refuge System. It clearly establishes that conservation and management of fish, wildlife, and plants and their habitats is the fundamental mission of the Refuge System. The Improvement Act defines six refuge public uses as wildlife-dependent recreational uses (hunting, fishing, wildlife observation and photography, and environmental education and interpretation) and directs the Service to give priority consideration to and facilitate these uses when they are compatible. To fulfill our statutory responsibility, the Service provides compatible wildlife-dependent recreational uses priority consideration over other general public uses in refuge planning and management.

The Appropriate Refuge Uses Policy outlines the process that the Service uses to determine when other general public uses on refuges can be considered. Additionally, the Service applies this policy to specialized uses that require a permit. In essence, the appropriate use policy provides refuge managers with a consistent procedure to first screen and then document decisions concerning a proposed use. When a use is found appropriate, refuge managers must determine if the use is compatible before allowing it on a refuge. The policy also requires review of existing refuge uses for appropriateness.

Major elements of the Appropriate Refuge Uses Policy and questions arising out of regional review of previous drafts are addressed in the Implementation Guidelines (Attachment 1). In addition, we have included a Refuge Supervisor Concurrence Process flowchart to assist in the

TAKE PRIDE IN AMERICA

implementation of this policy (Attachment 2). Finally, we have attached a list of uses for which an appropriate use finding is not required under the policy (Attachment 3). This information should assist the Regions in the implementation of the Appropriate Refuge Uses Policy.

Please contact Mr. Andy Loranger, Wildlife Resources Branch Chief, at (703)358-1821 should you have questions.

Attachments

**Attachment 1**

# Implementation Guidelines
# Appropriate Refuge Uses Policy 603 FW 1
# May 20, 2008

## Introduction

The major components of this guidance are as follows:

(1) Refuge uses for which an appropriate use finding is not required
(2) Supervisory responsibilities
(3) Coordination on complex appropriate use findings
(4) Incorporating appropriate use findings into CCPs
(5) Review of proposed and existing refuge uses for appropriateness
(6) Conducting the appropriate use finding
(7) Administering Special Use Permits following appropriate use findings
(8) National database of appropriate use findings
(9) Coordination with State fish and wildlife agencies
(10) Appropriate Refuge Uses Policy and conservation easements

The following information provides specific guidelines for addressing each of these components.

## Clarification of Terms

The following terms as used in the policy need additional clarification. These terms are as follows:

*Addressed.* As used in section 1.2 B. (2) of the policy, the term "addressed" refers to process in which an issue was thoroughly reviewed and examined and for which a decision was reached. Only a passing mention of an issue in a memorandum of understanding or a comprehensive conservation plan does not reach the threshold of how we define "addressed" in this policy.

*National policy.* As used in section 1.2 B. (3) of the policy, "national policy" refers to any policy developed to provide a national framework for administering units of the National Wildlife Refuge System. Examples of national policy include Compatibility 602 FW3; General Guidelines for Wildlife-Dependent Recreation 602 FW1; and Comprehensive Conservation Planning Process 602 FW3.

*Involves.* As used in section 1.6 A. (3) of the policy, the term "involves" is narrowly defined and only pertains to the actual take of fish and wildlife under State regulations. Refuge uses in support of the take of fish and wildlife under State regulations such as camping or the use of off-road vehicles are not automatically determined to be appropriate under this section of the policy.

*Refuge management plan.* As used in section 1.6 A. (2) of the policy and other sections, a "refuge management plan" is defined as a refuge comprehensive conservation plan or a step-down plan such as a visitor services plan or a habitat management plan.

*Review and Concurrence.* As used in section 1.7 D. (1) of the policy, "review" is simply defined as the process that refuge supervisors undertake in examining, assessing, and evaluating the appropriate use findings of refuge managers under his or her supervision. Concurrence is defined as documenting agreement in writing through the refuge supervisor's signature. Clarification on which appropriate use findings require refuge supervisor concurrence is provided below and in Attachment 2.

**(1) Refuge uses for which an appropriate use finding is not required**

The Appropriate Refuge Uses policy does not apply to uses which the Service does not have authority to control (603 FW 1, Sections 1.2, 1.11 A. (3) (a), 1.11 B., and FWS Form 3-2319).

Appropriate use findings are not required for uses that have been administratively determined appropriate under the policy. These are the six wildlife-dependent uses and take of fish and wildlife under State regulations (603 FW 1, Sections 1.3 A. and B.).

Appropriate use findings are also not required for existing uses which have been reviewed or described in post-1997 CCPs (603 FW 1, Section 1.11 D. and FWS Form 3-2319) and uses which contribute to fulfilling refuge purposes or the Refuge System mission, or goals and objectives described in a refuge management plan approved after October 9, 1997 (603 FW 1, Sections 1.6 A. (2) and 1.11 A. (2)). We are clarifying these sections of the policy by specifying that appropriateness findings are not required for existing refuge uses which have been reviewed and found compatible in a post-1997 CCP.

A complete list of uses identified within the policy which do not require an appropriateness use finding is found in Attachment 3.

**(2) Supervisory responsibilities**

Regional refuge supervisors will annually review all appropriate use findings on proposed and existing uses for each field station under their administration (603 FW 1, Section 1.7 D. (5)). We encourage these reviews to be completed concurrent with the performance appraisal of refuge managers of those units. Only new findings, i.e. those that occurred the previous fiscal year, are subject to this annual review. Refuge supervisors must annually submit all appropriate use findings to Refuge Headquarters.

For the purposes of this policy, the term "concurrence" is defined as the refuge supervisor's signature on FWS Form 3-2319. Refuge supervisor concurrence is required for findings of appropriate on proposed uses and for findings of appropriate and not appropriate for existing refuge uses conducted outside the CCP process. Refuge supervisor concurrence is not required for not appropriate findings for proposed uses. Refuge supervisor concurrence is also not required for appropriate findings for proposed uses and appropriate or not appropriate findings for existing uses when these finding are completed within the CCP process. This is because

concurrence by the refuge supervisor, regional refuge chief, and regional director on the final actions proposed in a CCP is inherent within the CCP approval process.

**(3) Coordination on complex appropriate use findings**

While refuge supervisor concurrence is not required for all appropriate use findings, this does not imply that the refuge manager should not communicate with higher level administrators on complex findings. **Complex and/or potentially controversial appropriateness findings on proposed or existing uses must be brought to the attention of the refuge supervisor, regional refuge chief and regional director at the initial stage of the process, prior to the start of information gathering that will become part of the administrative record for the decision.** Early coordination will enhance decision making by ensuring a comprehensive review of pertinent issues and by setting the stage for a thorough review of applicable laws, policies and regulations and full consideration of all other criteria upon which the appropriateness finding will be based.

Consensus on the appropriate use finding between the refuge manager and regional office administrators may not always be reached. Refuge managers have been delegated the authority to complete the appropriate use finding under this policy, but as with all delegations to the field, a regional director maintains the prerogative to withdraw this authority on a case by case basis. In these circumstances, the authority to make the initial appropriate use finding may be re-delegated to the regional refuge chief or refuge supervisor, or maintained by the regional director. In cases where the delegation of authority is withdrawn, the appropriate use finding must be completed consistent with all other directives in the policy.

**(4) Incorporating appropriate use findings into CCPs**

The CCP and its associated National Environmental Policy Act (NEPA) process serves as an ideal mechanism for addressing actions taken to administer refuge uses. For example, when continuation of or modification/elimination of an existing use or allowing a proposed use is addressed in the CCP and its NEPA document, the action being taken is fully described in one or more of the alternatives and then analyzed. The ultimate decision-making benefits from this analysis of environmental consequences and the public involvement process.

It is important to note that evaluating and taking action on existing or proposed uses outside of a CCP process may require compliance with NEPA. In such cases, if the federal action taken to administer the use is not categorically excluded (516 DM 8), completion of an environmental assessment or environmental impact statement is required.

If conducted as part of the CCP process, documentation for appropriate use findings (FWS Form 3-2319 and attached justifications) for existing and proposed uses must be included in the CCP (603 FW 1, Section 1.9 A.).

**(5) Review of proposed and existing refuge uses for appropriateness**

Appropriate use findings must be completed for all proposed uses. If a proposed use is found appropriate, the refuge manager must complete a compatibility determination before the use can be allowed. Refuge managers are often presented with informal proposals to allow new uses.

Often, determining the appropriateness of proposed uses is very straightforward. Other proposed uses involve complex issues and require careful analyses. Completing an appropriateness finding for all proposed uses is important. By considering all requests for uses in a standardized and systematic manner across the Refuge System and documenting our findings, we will demonstrate due diligence in our decision making. In addition, the inclusion of the appropriate use findings in a national database will provide a valuable resource for refuge managers and increase consistency in administering uses across the Refuge System.

The policy calls for a review of existing refuge uses within 1 year of the policy's adoption, i.e. July 26, 2007. As directed in section 1.11 D. of the policy, any existing use found not appropriate must be modified so it is appropriate or terminated or phased out as expeditiously as practicable.

For those refuges with completed CCPs or for which draft CCPs have been released for public comment, all existing uses should have been reviewed and compatibility determinations completed within the CCP process if the Service is proposing to continue the use. Existing uses reviewed and found compatible in a post-1997 CCP do not need to be reviewed for appropriateness.

Existing refuge uses are being or will soon be reviewed in CCPs that are currently in the early stages of development or about to be initiated. Refuge managers with upcoming CCPs will have one year from the date of issuance of these guidelines to either conduct appropriateness findings for existing uses outside of their CCP process, or certify with their respective Regions that all existing uses will be reviewed in their upcoming CCPs.

In the future, appropriate use findings for existing refuge uses must be conducted at least with each successive CCP (at least every 15 years). Appropriate use findings for existing uses can be evaluated at any time if circumstances change and the refuge manager determines that a new appropriateness review is warranted.

**(6) Conducting the appropriateness finding**

The policy provides procedures and criteria to determine if an existing or proposed use is appropriate on a specific refuge. Section 1.11 of the policy outlines the steps that a refuge manager should take when conducting an appropriate use finding.

The refuge manager must first determine whether the Service has jurisdiction over the use (603 FW 1, Section 1.11 A. (3) (a)). If the Service does not have jurisdiction over the use, the refuge manager would not proceed with the appropriate use finding since the use cannot be controlled (603 FW 1, Section 1.11 B.).

A finding that a use is not appropriate is definitive based on answering no to any one of the next three criteria (603 FW 1, Section 1.11 A. (3) (b), (c) and (d)) (603 FW 1, Section 1.11 B.). These criteria include whether the use: 1) complies with applicable laws and regulations; 2) is consistent with applicable Executive Orders and Department or Service policies; and 3) is consistent with public safety.

If the refuge manager answers "no" to any of the remaining six criteria (or determines that a use has been previously analyzed and denied through a refuge planning process or an appropriateness finding conducted under this policy in the case of one of these criteria), the use generally will not be allowed (603 FW 1, Section 1.11 B.). For four of these criteria (specifically 603 FW 1, Section 1.11 A. (3) (e) (g) (i) and (j)), the refuge manager must determine whether the use: 1) is consistent with refuge goals and objectives in an approved management plan or other document; 2) is manageable within available budget and staff; 3) contributes to the public's understanding of natural and cultural resources; and 4) can be accommodated without impairing existing recreational uses or reducing the potential to provide quality recreation in the future. These criteria state that a use is "generally" not appropriate or that we "generally" do not consider the use further if we answer "no" to the questions posed.

For the two remaining criteria, conditions under which a use will be found be not appropriate or will not be further considered are described, and specific guidance is provided defining circumstances under which a use may be further considered:

> 601 FW 3 Section 1.11 A. (3) (f) states that a use should not be considered further if it has been previously considered through a refuge planning process or under this policy and found to be not appropriate and denied. This section allows that a use may be further considered if circumstances or conditions have changed significantly. [To provide clarification on this section of the policy, if a use has been considered and analyzed in an approved pre- or post-1997 refuge planning process and denied based on this analysis, the use need not be further considered. If a use has been determined not appropriate under this policy or not compatible (and documentation exists) outside of a refuge planning process, the use need not be further considered.]
>
> 601 FW 3 Section 1.11 A. (3) (h) states that a use which leads to recurring requests for the same or similar activities that will be difficult to manage in the future is not appropriate. This criterion also provides that if a use can be managed such that impacts to natural and cultural resources are minimal or inconsequential, or if clearly defined limits can be established, then the use may be further considered.

While it is clear that we must carefully consider each of these six criteria when evaluating a use, the refuge manager does have discretion and flexibility in making the ultimate decision on appropriateness, and unique circumstances may result in a decision to further consider the use through the compatibility process (an example is provided in 603 FW 1, Section 1.11 B.).

FWS Form 3-2319 provides a simple format for documenting that we considered each factor listed on the form in relation to the use. When filling out the form, be very specific concerning the description of the proposed use (use an additional attachment as needed). For relatively simple and non-controversial appropriateness findings, completing FWS Form 3-2319 can suffice as the finding's justification. **For complex and potentially controversial findings, a sound written justification of the appropriateness finding must be included with FWS Form 3-2319.**

**(7) Administering Special Use Permits following appropriate use findings**

A refuge manager's finding that a specialized use is not appropriate would result in a denial of a Special Use Permit by the refuge manager if one had been requested. A Special Use Permit applicant may appeal the refuge manager's permit denial decision to the regional director as per 50 CFR 25.45, and for national wildlife refuges in Alaska, as per 50 CFR 36.41.

Upon appeal of a permit denial, the refuge manager's appropriate use finding will be reviewed by the refuge supervisor and/or regional refuge chief, and, if elevated, by the regional director as part of the appeals process. The regional director's decision is final on appeals of Special Use Permit denials. In cases where a refuge manager's original appropriate use finding is found to have factual errors or omissions, a new appropriate use finding must be prepared. In other cases, unique circumstances may require that a use be further evaluated.

In those cases where consensus on the appropriateness finding between the refuge manager and regional office administrators is not reached, the regional director maintains the prerogative to withdraw the delegation of authority to the refuge manager to complete the appropriate use finding. In these circumstances, the refuge supervisor, regional refuge chief, or the regional director may complete the new appropriate use finding. In such cases, the appropriate use finding must be completed according to the policy and reasons for the revised decision documented for the administrative record. A regional director's decision on an appeal of a Special Use Permit denial based on a negative appropriateness finding may result in a use being further considered before final action, but it does not result in permit issuance. A specialized use cannot be allowed and a Special Use Permit issued until the use has been determined to be compatible (603 FW 2).

**(8) National database of appropriate use findings**

Refuge System Headquarters will maintain a database of refuge appropriate use findings. As directed in the policy, refuge supervisors will annually forward electronic copies of all appropriateness findings that were completed during the previous fiscal year to Refuge Headquarters for inclusion in the database. All appropriate use findings for proposed and existing refuge uses, whether positive or negative and whether conducted as part of or outside of a CCP process, must be submitted. Electronic copies should be .pdf scanned files of the original signed findings. Findings for a fiscal year should be forwarded by December 1 following the close of the previous fiscal year. Original signed hardcopies should be kept on file in the respective regions.

The components of the database will include a .pdf file of all reviews and findings, including supporting information and justifications. The system will be very similar to our existing Compatibility Determination database which allows users to search for findings by a number of attributes including specific use, location, and date. The database will be accessible to all Refuge System staff and it will include a refuge-by-refuge listing of all uses refuge managers have found either appropriate or not appropriate. This database, in combination with the national Compatibility Determination database, will provide valuable information sources for refuge managers and staff. This information will help strengthen the Refuge System by reinforcing consistency and integrity in the way refuge uses are administered.

Additional instructions will be provided to the Regions once the database is up and running.

**(9) Coordination with State fish and wildlife agencies**

When making an appropriate use finding outside of the CCP process, refuge managers must consult with State fish and wildlife agencies when an appropriateness finding on a proposed or existing use which could affect State-managed fish, wildlife or other resources (603 FW 1, Sections 1.7 E. (3), 1.11 D. and 1.12). Coordination should also occur on findings which could affect uses such as hunting, fishing or trapping. Refuge managers must remain sensitive to the urgency or sensitivity of the use and the potential decisions regarding the appropriateness of that use. Refuge managers should coordinate with the State at the organizational level appropriate for their position and normal practice. Appropriate use findings made and included as part of a CCP process should already have ongoing consultation with the State(s).

FWS Form 3-2319 requires that the refuge manager note if State fish and wildlife agencies were consulted, if indicated (applicable). The answer is only "no" if consultation is indicated (applicable) and has not taken place. Since this portion of Form 3-2319 is confusing, Refuge Headquarters will modify the form in the near future, and will include space for documenting the consultation.

**(10) Appropriate Refuge Uses Policy and conservation easements**

This policy applies to conservation easements when the property interest(s) held by the Service is (are) affected by the proposed use. The policy does not apply to uses associated with property rights which have been retained by the landowner in selling an easement to the Service. There are many different kinds of easements in the Refuge System. Managers must be aware of which property interest(s) have been purchased and are held by the United States. This information is critical to answering the first question which determines whether or not to proceed with the appropriateness finding, i.e., "do we have jurisdiction over the use?"

Attachment 2

# Refuge Supervisor Appropriate Use Concurrence Process



Attachment 3

**Refuge Uses Which Do Not Require an Appropriateness Finding under the Refuge Appropriate Use Policy (603 FW 1).**

**The policy does not apply to the following uses:**

1. Situations where the Service does not have adequate jurisdiction to control a use (Sections 1.2, 1.11 A. (3) (a), 1.11 B., and FWS Form 3-2319).

2. Exercise of reserved rights, treaty rights by Native Americans, or other situations where legal mandates require that the Service allow certain uses (Section 1.2 A.). This includes uses which are properly ordered by the Courts.

3. Refuge management activities (Section 1.2 B.) These include fish and wildlife population or habitat management actions. They also include:

   A. State fish and wildlife agency activities which have been documented to directly contribute to achievement of refuge purpose(s), goals, and the NWRS mission as determined by the refuge manager in writing; are addressed in a CCP or formal agreement; or are approved under national policy (Sections 1.2 B. (1) , (2), (3).
   B. Authorized military activities that directly benefit refuge purposes (Section 1.10 D. (3) (b)). These are considered refuge management activities.

**Administratively determined to be appropriate uses by the policy:**

4. Wildlife-dependent public uses: hunting, fishing, wildlife observation and photography, and environmental education and interpretation (Sections 1.3 A., 1.6 A. (1), 1.11 A. (1), and Exhibit 1 or FWS Form 3-2319).

5. Take of fish and wildlife regulated by a State (e.g., through fishing, hunting, and trapping) (Sections 1.3 B,1.6 A. (3), and FWS Form 3-2319).

**Appropriate use findings are also not required for:**

6. Uses which contribute to fulfilling the NWRS mission; or refuge purpose(s), goals, or objectives which are described in a refuge management plan approved after October 9, 1997 (Sections 1.6 A. (2) and 1.11 A. (2)).
7. Uses which have already been described in a refuge CCP or step-down management plan approved after October 9, 1997 (Section 1.7. D. (1), FWS Form 3-2319). For all refuge uses, "described in a refuge CCP or step-down management plan" means that the use has been described and analyzed in sufficient detail in the CCP or step-down management plan and has been determined compatible.

**FINDING OF APPROPRIATENESS OF A REFUGE USE**

Refuge Name: ______________________________

Use: ______________________________

This form is not required for wildlife-dependent recreational uses, take regulated by the State, or uses already described in a refuge CCP or step-down management plan approved after October 9, 1997.

| Decision Criteria: | YES | NO |
|---|---|---|
| (a) Do we have jurisdiction over the use? | | |
| (b) Does the use comply with applicable laws and regulations (Federal, State, tribal, and local)? | | |
| (c) Is the use consistent with applicable Executive orders and Department and Service policies? | | |
| (d) Is the use consistent with public safety? | | |
| (e) Is the use consistent with goals and objectives in an approved management plan or other document? | | |
| (f) Has an earlier documented analysis not denied the use or is this the first time the use has been proposed? | | |
| (g) Is the use manageable within available budget and staff? | | |
| (h) Will this be manageable in the future within existing resources? | | |
| (i) Does the use contribute to the public's understanding and appreciation of the refuge's natural or cultural resources, or is the use beneficial to the refuge's natural or cultural resources? | | |
| (j) Can the use be accommodated without impairing existing wildlife-dependent recreational uses or reducing the potential to provide quality (see section 1.6D, 603 FW 1, for description), compatible, wildlife-dependent recreation into the future? | | |

Where we do not have jurisdiction over the use ("no" to (a)), there is no need to evaluate it further as we cannot control the use. Uses that are illegal, inconsistent with existing policy, or unsafe ("no" to (b), (c), or (d)) may not be found appropriate. If the answer is "no" to any of the other questions above, we will **generally** not allow the use.

If indicated, the refuge manager has consulted with State fish and wildlife agencies. Yes ____ No ____

When the refuge manager finds the use appropriate based on sound professional judgment, the refuge manager must justify the use in writing on an attached sheet and obtain the refuge supervisor's concurrence.

Based on an overall assessment of these factors, my summary conclusion is that the proposed use is:

**Not Appropriate** _____ **Appropriate** _____

Refuge Manager: ______________________________ Date: ______________

If found to be **Not Appropriate**, the refuge supervisor does not need to sign concurrence if the use is a new use.

If an existing use is found **Not Appropriate** outside the CCP process, the refuge supervisor must sign concurrence.

If found to be **Appropriate**, the refuge supervisor must sign concurrence.

Refuge Supervisor: ______________________________ Date: ______________

**A compatibility determination is required before the use may be allowed.**

**FWS Form 3-2319**
**02/06**

**Exhibit II-11**

## Cultural Resource Review Procedures for Projects in Region 6

20 August 2007 (22 March 2008 revision)

Purpose and Legal Framework

The following is an outline of procedures for the cultural resource review of projects in Region 6. The primary purpose of this process is to ensure that historic properties are identified and, if possible, protected. The process is also intended to promote compliance with Federal laws and regulations, in addition to FWS regulations and policies, concerning historic preservation. This is largely accomplished through Section 106 of the National Historic Preservation Act (NHPA), although a suite of laws govern Federal agency responsibilities concerning cultural resources. Please see attached summary of some of the applicable cultural resource laws, regulations, and policies.

If there are any questions concerning these procedures, whether a project needs review or has already undergone review, or any other aspect of the cultural resource program, please contact any of the staff listed below:

| | | |
|---|---|---|
| Brant Loflin | Montana, Wyoming, Utah | 605.642.7730, X209 (D.C. Booth) |
| Meg Van Ness | Colorado, Kansas, Nebraska | 303.236.8103 (Regional Office) |
| Barry Williams | South Dakota, North Dakota | 701-355-8577 (Bismarck) |

Definitions

Below are three key definitions for terms used in the process:

Cultural resources

Cultural Resources are sites, buildings, structures and objects that are the result of human activities and are over 50 years old. They include prehistoric, historic, and architectural sites, artifacts, historic records, and traditional cultural properties - including traditional use areas for Native Americans - that may or may not have material evidence.

Historic Properties

Historic properties are cultural resources (historic or prehistoric) that are listed on, or are eligible to be listed on, the National Register of Historic Places.

Undertaking (16 U.S.C. 470w, Section 301(7)

"Undertaking" means a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including —

(A) those carried out by or on behalf of the agency;
(B) those carried out with Federal financial assistance;
(C) those requiring a Federal permit, license, or approval; and
(D) those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency.

Projects Needing Cultural Resource Review

All projects with the potential to affect structures older than 50 years or cause ground disturbance should be evaluated for their potential to impact cultural resources. Section 106 of

NHPA applies to projects on fee-title and easement lands and on projects that FWS is involved with on private land if that project is considered an undertaking (see definition noted above).

Easement Lands

Legally, if a project is determined to be an undertaking on easement lands all of the provisions of NHPA are potentially applicable. In the case of easement lands, emphasis should be placed on undertakings that:

1. Have the potential to harm historic properties.
   To find out about known cultural resources in the project area contact one of the three cultural resource staff and they will review their records and possibly request a file search through the SHPO. They will know if there is a previously recorded historic property or if there has already been a survey of the area. Information on the age and eligibility of many cultural resources can also be found in RPI. They will also have some insights about the need for a survey if there is a potential for cultural resources.

2. Are large in size.
   Although this is difficult to define, if a project is going to disturb more than about five acres or if the project components are going to cover more than about ¼ mile (wind towers, pipelines, roads, ditches, etc.) it is probably in the large category. If in doubt whether the project needs review please call the cultural resource person for that state.

3. Have a high public profile or are potentially controversial.
   If there are members of the public or other agencies who are concerned about the project we may do a survey even if the chances of affecting a cultural resource are very slim.

Cultural Resource Review Procedures

The following six steps summarize the general procedure for cultural resource review. A flow chart diagramming these steps is located on page 5. The exact application of these procedures will vary from project to project depending on the nature, size, location of the project, and the cultural resources involved. Additional information and details can be found in the Section 106 regulations (36 CFR 800).

Cultural Resource staff should be notified as early in the planning process as possible – even if the project is still in the conceptual phase. This process can take just a few days or can extend over many months. Completion of the report is important, but it is possible for Steps 5 and 6 to take several months after the initial report is done. If a project is an undertaking it should not proceed until the cultural resource review has been completed.

1. Information sent to cultural resource staff
   Information including project location, description, current land condition, and time schedule should be provided along with a map of the location and any other information that might help with the review (photographs, drawings, air photos, other agencies or organizations involved, Special Use Permits, etc.). A lead contact person for FWS should be identified – especially for large projects. Also let us know if this is part of a larger project and if other agencies/organizations are involved. There is a short two page form that can be used to summarize this information for most projects

(see attached – also available as a WORD document). The information can be mailed, faxed, or emailed.

2. Initial review of the project

The cultural resource staff will decide if further review of the project is necessary. If the project does not qualify as an undertaking, or if it is determined that the undertaking has no potential to affect historic properties, the review process will be over, the project lead will be contacted, and the project may proceed.

If it is determined that the project is an undertaking with the potential to affect historic properties additional review will be necessary. The project lead will be contacted and the status of the review and plans for additional work will be discussed. Consultation with the State Historic Preservation Officer (SHPO), Tribal Historic Preservation Officers (THPOs), and other interested parties may be initiated at this point.

If you do not hear back from the cultural resource staff when you need to please contact us and remind us that the project is waiting for review – do not assume there are no cultural resource concerns. At certain times of the year we get extremely busy and reminding us of your schedule is a great help in prioritizing reviews.

3. Gather information and conduct field work

Depending on the nature, size, and timing of the project, FWS staff will continue the review process or it will be done by consultants. Most refuge, fire, and PFW projects are done by the cultural resource staff. The staff will collect the necessary information, from existing records or in the field, to determine if historic properties will be affected.

If the project involves a commercial company (pipelines, wind towers, railroads, oil and gas development, etc.), or if the project involves another agency (Department of Transportation, County, etc.) that company or agency will be asked to hire a consultant to do the work. The consultant needs to contact the cultural resource staff and obtain an ARPA permit before they do any field work.

4. Report Preparation and findings recommendation

A report will be prepared summarizing the project, the results of the information gathering and the field work, and findings recommendations. There are two primary recommendations that are possible (although others are also possible):

No Historic Properties Affected: there are no historic properties present (no effect) or there are historic properties present but the undertaking will have no effect upon them (no adverse effect). It will be recommended that the project proceed with no further review. Concurrence on this recommendation is still needed – see Step 5.

Historic Properties Affected: there are historic properties which may be affected by the undertaking (adverse effect). It will be recommended that additional consultation and planning take place.

5. Consultation on findings

   The report will be sent to the SHPO by the cultural resource staff along with a letter requesting their concurrence with the findings. It may also be sent to the appropriate THPOs or other interested parties for their concurrence or comments. Consulting parties have 30 days to comment.

   If the finding is that no historic properties will be affected (no adverse effect) and the consulting parties concur with those findings then the project may proceed with no further review after the letter(s) of concurrence is received.

   If the finding is that no historic properties will be affected (no adverse effect) and a consulting party disagrees additional consultation may be necessary.

   If the finding is that historic properties will be affected (adverse effect) then the cultural resource staff will continue consultation in coordination with the project manager to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize or mitigate adverse effects on historic properties. In this case, the Advisory Council on Historic Preservation (ACHP) will also become a consulting party.

6. Resolution of Adverse Effects

   In consultation with the SHPO, possibly the ACHP or THPOs, and other interested parties, a Memorandum of Agreement (MOA) will be executed and implemented outlining the plans to resolve the adverse effects. The activities outlined in the MOA need to be completed, a report prepared, and consultation concerning the findings completed prior to the start of the project unless other arrangements have been made.

<u>Special Considerations</u>

Human Remains

If human remains are possibly present (looks like a grave site, local residents believe there is a burial, etc.) or if human remains are found during project construction stop work in that area immediately and call the cultural resource staff for that state. Do not remove anything and close-off public access. This holds true for all projects regardless of land status and for all states. Because of looting problems, do not discuss the matter with anyone until the cultural resource staff has a chance to respond.

Unanticipated Discoveries

If you find any cultural resource or paleontological remains please let us know as soon as possible. If it is in danger (in a road, eroding out, in a place where public might pick it up, etc.) take photos, GPS it in, and collect it. Otherwise leave it in place but take photos and GPS the location. In any case, contact the FWS cultural resource staff for your state as soon as possible. If there is any chance there are human remains or anything associated with a burial, don't remove anything, stop work in that area, and contact us immediately.

Educational and Training Opportunities

Let us know if there is anything we can do (training, workshops, presentations, etc.), for the staff or the public that would be of help. Also let us know if you need information on the cultural resource work that has been done in your area.

## Cultural Resource Review for Projects in Region 6

Please see procedure narrative for details



**Key Cultural Resource Legislation, Regulations and Policies: Summary Information**

NOTE: This is a summary of some of the laws and regulations concerning USFWS responsibilities for cultural resources. It is not intended to be comprehensive and additional information is available on the USFWS web page (www.fws.gov/historicPreservation/crp/authorities.html)

## National Laws

1. Antiquities Act of 1906 as amended
(PL 59-209; 34 Stat. 225; 16 USC 431-433)
This is the earliest and most basic legislation for protecting cultural resources on Federal lands. It provides misdemeanor-level criminal penalties to control unauthorized uses. Appropriate scientific uses may be authorized through permits, and materials removed under a permit must be permanently preserved in a public museum. The 1906 Act is broader in scope than the 1979 Archaeological Resources Protection Act, which partially supersedes it. Uniform regulations at 43 CFR Part 3 implement the Act.

2. American Indian Religious Freedom Act of 1978 as amended
(PL 95-431; 92 Stat. 469; 42 USC 1996)
This Act (AIRFA) resolves that it shall be the policy of the United States to protect and preserve for the American Indian, Eskimo, Aleut, and Native Hawaiian the inherent right of freedom to believe, express, and exercise their traditional religions, including access to religious sites, use and possession of sacred objects, and freedom to worship through ceremonial and traditional rites. Federal agencies are directed to evaluate their policies and procedures to determine if changes are needed to protect such rights and freedoms from agency practices. The act is a specific expression of First Amendment guarantees of religious freedom. It is not implemented by regulations.

3. Archeological and Historic Preservation Act of 1974 amended Reservoir Salvage Act 1960
(PL 86-523; 74 Stat. 220, 221; 16 USC 469; PL 93-291; 88 Stat. 174; 16 USC 469)
This Act provides for the preservation of historical and archaeological data that might otherwise be lost as the result of Federal construction projects or Federally-licensed or assisted programs. The act provides that up to one percent of congressionally authorized funds for a project may be spent from appropriated project funds to recover, preserve, and protect archaeological and historical data.

4. Archaeological Resources Protection Act of 1979 as amended
(PL 96-95; 93 Stat. 721; 16 USC 47Oaa et seq.)
Often referred to as ARPA, this act is primarily a permitting and law-enforcement law that has felony-level penalties for excavating, removing, damaging, altering, or defacing any archaeological resource more than 100 years of age, on public or Indian lands, unless authorized by a permit. It prohibits the sale, purchase, exchange, transportation, receipt, or offering of any archaeological resource obtained in violation of any regulation or permit under the act or under any Federal, State, or local law. The Act's definitions, permit requirements, and criminal and civil penalties augment the Antiquities Act, which it partially supersedes. It is implemented by uniform regulations and Interior-specific regulations, both noted in 43 CFR Part 7.

5. Historic Sites Act of 1935 as amended
(PL 74-292; 49 Stat. 666; 16 USC 461)
The Historic Sites Act declares national policy to identify and preserve nationally significant "historic sites, buildings, objects and antiquities." It authorizes the National Historic Landmarks program and provides the foundation for the National Register of Historic Places authorized in the National Historic Preservation Act of 1966. Regulations implementing the National Historic Landmarks Program are at 36 CFR Part 65.

6. National Environmental Policy Act of 1969, as amended
(42 USC 4321, and 4331 - 4335)
NEPA states it is the Federal government's continuing responsibility to use all practicable means to preserve important historic, cultural, and natural aspects of our national heritage. It also instructs Federal agencies to prepare environmental impact statements for each major Federal action having an effect on the environment.

NEPA and NHPA Coordination (Sec. 101 [42 USC § 4331]
(b) In order to carry out the policy set forth in this Act, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may --
(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity, and variety of individual choice;

7. National Historic Preservation Act of 1966 as amended
(PL 89-665; 80 Stat. 915; 16 USC 470),
NHPA is perhaps the premier legislation that governs cultural resource work on USFWS lands. The Act creates the National Register of Historic Places and extends protection to historic places of State and local as well as national significance. It establishes the Advisory Council on Historic Preservation, State Historic Preservation Officers, Tribal Preservation Officers, and a preservation grants-in-aid program. Section 106 directs Federal agencies to take into account effects of their actions ("undertakings") on properties in or eligible for the National Register, and Section 110(a) sets inventory, nomination, protection, and preservation responsibilities for Federally-owned cultural properties. Section 110(c) requires each Federal agency to designate a Preservation Officer to coordinate activities under the act. Section 106 of the act is implemented by regulations of the Advisory Council on Historic Preservation, 36 CFR Part 800. The Department of the Interior criteria and procedures for evaluating a property's eligibility for inclusion in the National Register are at 36 CFR Part 60.

A. Section 106 Purpose (36 CFR 800.1)
The section 106 process seeks to accommodate historic preservation concerns with the needs of Federal undertakings through consultation among the agency official and other parties with an interest in the effects of the undertaking on historic properties, commencing at the early stages of project planning.

B. Historic Property Defined (36 CFR 800.16(l))
Historic Property means any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places maintained by the Secretary of the Interior. This term includes artifacts, records, and remains that are related to and located within such properties. The term includes properties of traditional religious and cultural importance to an Indian tribe or Native Hawaiian organization and that meet the National Register criteria.

C. Federal Agency Responsibility - Section 106 (16 U.S.C. 470f)
The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under Title II of this Act a reasonable opportunity to comment with regard to such undertaking.

D. Federal Agency Responsibility – Section 106 Regulations (36 CFR 800.2(a)).
It is the statutory obligation of the Federal agency to fulfill requirements of section 106 and to ensure that an agency official with jurisdiction over an undertaking takes legal and financial responsibility for section 106 compliance in accordance with subpart B of this part.

E. Timing of the Section 106 Process (36 CFR 800 A (c))
The agency official must complete the section 106 process "prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license." This does not prohibit agency official from conducting or authorizing non destructive project planning activities before completing compliance with section 106, provided that such actions do not restrict the subsequent consideration of alternatives to avoid, minimize or mitigate the undertaking's adverse effects on historic properties. The agency official shall ensure that the section 106 process is initiated early in the undertaking's planning, so that abroad range of alternatives may be considered during the planning process or the undertaking.

F. NHPA and NEPA Coordination (36 CFR 800.8)
(a.1) Early coordination.
Federal agencies are encouraged to coordinate compliance with section 106 and the procedures in this part with any steps taken to meet the requirements of the National Environmental Policy Act (NEPA). Agencies should consider their section 106 responsibilities as early as possible in the NEPA process, and plan their public participation, analysis, and review in such a way that they can meet the purposes and requirements of both statutes in a timely and efficient manner. The determination of whether an undertaking is a "major Federal action significantly affecting the quality of the human environment," and therefore requires preparation of an environmental impact statement (EIS) under NEPA, should

include consideration of the undertaking's likely effects on historic properties. A finding of adverse effect on a historic property does not necessarily require an EIS under NEPA.

(a.2) Consulting party roles.
SHPO/THPOs, Indian tribes and Native Hawaiian organizations, other consulting parties, and organizations and individuals who may be concerned with the possible effects of an agency action on historic properties should be prepared to consult with agencies early in the NEPA process, when the purpose of and need for the proposed action as well as the widest possible range of alternatives are under consideration.

(a.3) Inclusion of historic preservation issues.
Agency officials should ensure that preparation of an environmental assessment (EA) and finding of no significant impact (FONSI) or an EIS and record of decision (ROD) includes appropriate scoping, identification of historic properties, assessment of effects upon them, and consultation leading to resolution of any adverse effects.

(b) Actions categorically excluded under NEPA.
If a project, activity, or program is categorically excluded from NEPA review under an agency's NEPA procedures, the agency official shall determine if it still qualifies as an undertaking requiring review under section 106 pursuant to § 800.3(a). If so, the agency official shall proceed with section 106 review in accordance with the procedures in this subpart.

(c) Use of the NEPA process for section 106 purposes.
An agency official may use the process and documentation required for the preparation of an EA/FONSI or an EIS/ROD to comply with section 106 in lieu of the procedures set forth in §§ 800.3 through800.6 if the agency official has notified in advance the SHPO/THPO and the Council that it intends to do so and the following standards are met.

8. Native American Graves Protection and Repatriation Act of 1990, as amended
(PL 101-601; 104 Stat. 3048; 25 USC 3001 et esq.)
NAGPRA establishes rights of Indian tribes and Native Hawaiian organizations to claim ownership of certain cultural items, including human remains, funerary objects, sacred objects, and objects of cultural patrimony, held or controlled by Federal agencies and museums that receive Federal funds. It requires agencies and museums to identify holdings of such remains and objects, and to work with appropriate Native Americans toward their repatriation. Permits for the excavation and/or removal of cultural items protected by the act require Native American consultation, as do discoveries of cultural items made during Federal land use activities. The Secretary of the Interior's implementing regulations are at 43 CFR Part 10.

**Laws, Policies and Guidelines Specific to USFWS and/or Region 6**

1. National Wildlife Refuge System Improvement Act of 1997

   This Act outlines general management goals for the Refuge system including protection and interpretation of cultural resources.

2. Reservoir Salvage Act of 1960, as amended (16 USC 469-469c)

   This extended the Historic Sites Act of 1935. It gave the Department of the Interior, through the National Park Service, major responsibility for preservation of archaeological data that might be lost specifically through dam construction.

3. Fulfilling the Promise

   [Refuges] are places where the people of today can renew the ties to their cultural heritage by viewing ancient and historic sites. These ties, delivered through the System's public use programs, strengthen the connection between wildlife and people.

4. USFWS Cultural Resources Management Policy 1992, 614 FW 1, Policy, Responsibilities and Definitions

   This establishes, in section I.4, that "It is the policy of the Service to identify, protect, and manage cultural resources located on Service lands and affected by Service undertakings, in a spirit of stewardship, for future generations". Undertaking is defined in Section I.7(M) as "Any Federal, federally assisted, or federally licensed project, activity, or program that can result in changes in the character or use of known or unknown historic properties, if any such properties are located in the area of potential effects. These may include new and continuing projects, activities, or programs and any of their elements not previously considered under the provisions of 36 CFR 800.

5. Administrative and Enforcement Procedures for FWS Easements within the Prairie Pothole States (Regions 3 and 6) 2005: Pages 12-13

   Activities normally associated with easement properties are not usually considered "undertakings" under Federal cultural resource laws. Private landowners may do what is necessary to manage their property without the need to comply with Federal cultural resource laws. These laws, however, do come into play for easement properties when either the project is completed with Federal funding, or for which there has been a permit issued authorizing the work, or both.

   Therefore, projects federally funded on private lands (ie Partners for Fish and Wildlife Program) are subject to NHPA requirements and need to be evaluated. Also, any activity for which managers issue a Permit will also be subject to Section 106 of NHPA. These activities are generally restricted to ground surface disturbance-type activities (permits for dugouts, shelterbelt establishment, wind generators, highway improvement projects, utility line crossings, etc.). When a request is received, managers must evaluate whether the Service has jurisdiction. If we have no jurisdiction, then no permit is needed, and no CR compliance is necessary. An example would be a landowner who wants to build a house on an upland site where the land is encumbered with only a wetland easement.

Many of the projects requested by other entities (DOT, utility companies) will have CR evaluations already considered, but managers must insure that these issues are addressed before issuing a permit, and should be reviewed for sufficiency by your regional CR staff.

Consult with your regional Cultural Resources staff about CR responsibilities. They are ultimately responsible for compliance with these laws and policies. Their addresses and phone numbers are found in Exhibit II-4. The FWS website provides useful information about Cultural Resource responsibilities: www.refuges.fws.gov/cultural/links

## REQUEST FOR CULTURAL RESOURCE REVIEW

Please complete this form and send it to one of the following individuals:

| | | |
|---|---|---|
| Brant Loflin | Montana, Wyoming, Utah | 605.642.7730, X209 (D.C. Booth) |
| Meg Van Ness | Colorado, Kansas, Nebraska | 303.236.8103 (Regional Office) |
| Barry Williams | South Dakota, North Dakota | 701-355-8577 (Bismarck) |

Project Name: ______________________________

USFWS Unit: ______________________________

Is this a NAWCA Project? Yes ____ No ____

If yes, give name of NAWCA grant: ______________________________

Date of Request: ______________________________

Date you want to start the project: ______________________________

Comments: ______________________________

______________________________

Location

State: ______________________________

County: ______________________________

Nearest Town: ______________________________

Township ________ Range ________ Section (s) ______ ______ ______ ______

Quad. Map ______________________________

Project acres: ____________

**NOTE**: The follow must be attached to this request

A project map showing the project area (Area of Potential Effect) with locations of specific activities.

An image of a USGS quad clearly indicating the project area

Air photos showing and project overview photos are also very helpful

Comments: ______________________________

______________________________

USFWS Contact: ______________________________ Phone: ______________

Address: ______________________________

**REQUEST FOR CULTURAL RESOURCE REVIEW (CONTINUED)**

Project Name: ______________________________

Describe the Undertaking: *describe the proposed project including approximate sizes or lengths*

______________________________
______________________________
______________________________
______________________________
______________________________
______________________________
______________________________
______________________________

Describe the Type and Extent of Ground or Building / Structure Disturbance: *both direct and indirect impacts, include areas of actual ground disturbance, areas that will be inundated, borrow pits, modifications to a building or structure, tools or equipment to be used, etc.*

______________________________
______________________________
______________________________
______________________________
______________________________
______________________________
______________________________
______________________________

Describe the Environmental Setting: What was the natural habitat (grassland, floodplain, etc.) and what is the nature and extent of modifications including grazing, cultivation, earth moving, etc.

______________________________
______________________________
______________________________
______________________________
______________________________
______________________________

Do you or anyone else know of cultural resources in or near the project area? Yes _____ No _____

If yes, please describe ______________________________

______________________________

Accounts

3-1916
July 1960

# UNITED STATES DEPARTMENT OF THE INTERIOR

## U. S. FISH AND WILDLIFE SERVICE
## BUREAU OF SPORT FISHERIES AND WILDLIFE

### CONVEYANCE OF EASEMENT FOR WATERFOWL MANAGEMENT RIGHTS

THIS INDENTURE, by and between________________ **,** residing at ***Ipswich, South Dakota***

parties of **the first part, and** the UNITED STATES OF AMERICA, acting by and through the Secretary of the Interior or his authorized representative, party of the second part.

WITNESSE

WHEREAS, section 4 of the Migratory Bird Hunting Stamp Act of March 16, 1934, as amended by section 3 of the Act of August 1, 1958 (72 Stat. 486, 16 U.S.C., see, 718d (c)), authorizes the Secretary of the Interior to acquire small wetland and pothole areas, and interests therein; and

WHEREAS, the lands described below contain or include small wetland or pothole areas suitable in their present condition for use as waterfowl production areas:

NOW THEREFORE, for and in consideration of the sum of eight **hundred** fifty dollars ;, the parties of the first part hereby convey to the United States, for a term commencing with the acceptance of this indenture by Secretary of the Interior or his authorized representative which acceptance must be made within_____months of the execution of this Indenture

by the parties of the first part a perpetual easement or right of use for the maintenance of the land described below as a waterfowl production area, including the right of access thereto by authorized representatives of the United States:

**SOUTH DAKOTA, EDMUNDS COUNTY,**
**T. 123 N., R. 69 W., 5th P.M.**
**Sec. 1, S½**
**T. 124 N., R. 69 W., 5th P.M.**
**Sec. 27, SE¼**
**Sec. 34, N½, SE¼**

Subject, however, to all existing rights-of-way for highways, roads, railroads, canals, laterals, electrical transmission lines, telegraph and telephone lines and all outstanding mineral rights.

The parties of the first part, for themselves and for their successors and assigns, covenant and agree that they will cooperate in the maintenance of the aforesaid land as a waterfowl production area by not draining or permitting the draining, through the transfer of appurtenant water rights or otherwise, of any of the wetlands, including lakes, ponds, above-described sloughs, swales, swamps, or potholes, now existing or hereafter occurring on the above-described tract, by ditching or any other means; by not filling in with earth or any other material, any low areas or wetlands, Including lakes, ponds, marshes, sloughs, swales, swamps,or potholes, and by not burning any areas covered with marsh vegetation. It is understood and agreed that this indenture imposes no other obligations or restrictions upon the parties of the first part and that neither they nor their successors,. **assigns, lessees, licensees, or any other person** or party claiming under them shall in any way be restricted from carrying on farming practices such as grazing, hay cutting, plowing, working and cropping wetlands when the same are dry of natural causes, and that they may utilize all of the subject lands in the customary manner except for the draining, filling, and burning provisions mentioned above.

Areas of existing marsh vegetation and depressions which may hold water during certain periods, as well as existing drainage facilities, including drainage ditches, tiles, outlets, and pumps, are shown on a map of the above-described property, a copy of which has been filed with a copy of this document in the files of both of the parties hereto.

SPECIAL PROVISIONS

1. This indenture shall be of no force or effect until accepted on behalf of the United States by the Secretary of the Interior or his authorized representative.

2, In the event the use of the land covered by this indenture is required by a body possessing the power of eminent domain for public purposes other than draining the land, the Secretary. of the Interior or his **authorized representative may release the rights** of the United States under this indenture upon the payment of the pro rata amount of the consideration for the unexpired term of this indenture.

3, Notice of acceptance of this agreement shall be given the parties of the first part by certified mail addressed to **Henry Schneider** at ***Ipswich, South Dakota*** and such notice shall be binding upon a11 of the parties of the first part without sending a separate notice to each.

4. The parties of the first part warrant that no person or selling agency has been employed or retained to solicit or secure this contract upon agreement or understanding for a commission , percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the vendors for the purpose of securing business. For breach or violation of this warranty the United States shall have the right to annul this contract without liability or in its discretion to deduct from the contract price or consideration the full amount of such commission, percentage, brokerage, or contingent fee.

5. It is further mutually agreed that m Member of or Delegate to Congress, or Resident Commissioner, shall be admitted to any share or part of this contract, or to any benefit to arise thereupon. Nothing, however, herein contained shall be construed to extend to any incorporated company, where such contract is made for the general benefit of such incorporation or company.

6. Payment of the consideration will be made by Disbursing Officer's check after acceptance of this indenture by the Secretary of the Interior or his authorized representative, and processing of the usual Government voucher.

IN WITNESS WHEREOF the parties of the first part have hereunto set their hands and seals this day of , 19 .

/s/ Henry Schneider (L.S.)

/s/ Olga Schneider (L.S.)
Olga Schneider

/s/ Esther K. Schneider (L.S.)
Esther K. Schneider

/s/ Julius Schneider (L.S.)

ACKNOWLEDGMENT

STATE OF South Dakota )
) ss:
COUNTY . Edmunds )

On this day of , in the year personally appeared Schneider, his wife
Esther K. Schneider, single, , his wife, known to me to be th persons described in and who executed the foregoing instrument and acknowledged to me that they (lie) executed the same as their (hi ) free act and deed.

/s/ Gerald C. Pearson

Gerald C. Pearson
Notary Public
(Official Title)

(SEAL)

My commission expires May 8, 1970

ACCEPTANCE

This indenture is accepted on behalf of the United States this day of , 19 , under the authority contained in section 4 of the Migratory Bird Hunting Stamp Act, as amended, and pursuant to authority delegated by 210 DM 1.3, Commissioner of Fish and Wildlife Order No. 4, and 4 AM 4,5D(1).

THE UNITED STATES OF AMERICA

By /s/ R. W. Burwell

(Title) Regional Director
Bureau of Sport Fisheries and Wildlife

#11.61

United States Department of the Interior
Fish And Wildlife Service

Bureau of Sport Fisheries and Wildlife
Branch of Realty

DESCRIPTION

Schneider ET AL, HENRY

Edmunds COUNTY South Dakota

WATERFOWL PRODUCTION AREA

EASEMENT AUTHORIZED BY' MIGRATORY BIRD *HUNTING STAMP ACT OF MARCH 16,* 1934, AS AMENDED DESCRIPTION: FIFTH PRINCIPAL MERIDIAN
R 69 W T. 123 N. Sec 1 S 1/2




Wetlands Areas

Scale – 4" = 1 mile

Tracing Compiled by: Date 3/15/63 Checked by: ________ Date ________

United States Department of the
Interior Fish and Wildlife Service
Bureau of Sport Fisheries and Wildlife
Branch of Realty

*DESCRIPTION*

*Schneider, HENRY TRACT (21X-1 1)* 640.00 ACRES

WATERFOWL PRODUCTION AREA EDMUNDS COUNTY, SOUTH DAKOTA

EASEMENT AUTHORIZED BY MIGRATORY BIRD *HUNTING STAMP* ACT OF MARCH 16, 1934, AS AMENDED

DESCRIPTION: FIFTH PRINCIPAL

R, 69 *W* *T. 124 N*

*sec. 27,SE 1/4*

Sec 34, N ½, SE ¼



*Wetlands Areas*

*Scale - 4" = 1 mile*

*Tracing Compiled by:* AIM *Date:* *Checked by:* *Date*

UNITED STATES DEPARTMENT OF THE INT E IOR
FISH AND WILDLIFE SERVICE BUREAU OF SPORT
FISHERIES AND WILDLIFE

Easement Summary

State . South Dakota

Day

Location T. 123 N., R. 55 W., 5th P.M. Sec. 30, SW 1/4

T. 123 N., R. 56 W., 5th P.M.

sec. 11, SE¼SE¼ exc. Highway R/W
sec. 12, E½SW¼, SW¼SW¼ exc. Highway R/W, SE¼

Tract Name . [redacted]

(92X-1-2)

Easement Dated 8/27/63 OCT -9 1963

Easement Option Expires: 2/26/64

Term of Easement: Perpetual

Easement Consideration: $400.00

Tract Acreage , 477.32 Cost per acre: $0.84

Wetland Acreage: 66.00 Wetland cost per acre: $6.06

$400.00

Accounting Number 14-16-0003-5866

Authorization to acquire easements in Day County, South Dakota, given by Walter J. Fillmore, Director S.D. Dept. of Game, Fish, & Parks in letter dated 1/12/62.

3-1916
Rev.

UNITED STATES DEPARTMENT OF THE INTERIOR

ABERDEEN AAO

U. S. FISH AND WILDLIFE SERVICE

BUREAU OF SPORT FISHERIES AND WILDLIFE

## CONVEYANCE OF EASEMENT FOR WATERFOWL MANAGEMENT RIGHTS

THIS INDENTURE, by and between *, a widower residing at* Webster, ***South Dakota***

parties of the first part, and the UNITED STATES OF AMERICA, acting by and through the Secretary of the Interior or his authorized representative, party of the second part.

WITNESSE

WHEREAS, section 4 of the Migratory Bird Hunting Stamp Act of March 16, 1934, as amended by section 3 of the Act of August 1, 1958 (72 Stat. 486, 16 U.S.C., sec. 718d (c)), authorizes the Secretary of the Interior to acquire small wetland or pothole areas suitable for, use as waterfowl production areas:

WHEREAS, the lands described below contain or include small wetland or pothole areas suitable for use as waterfowl production areas:

NOW, THEREFORE, for and in consideration of the sum of *Four Hundred - - -* Dollars *($400.00 ),* the parties of the first part hereby convey to the United States, commencing with the acceptance of this indenture by the Secretary of the Interior or his authorized representative which acceptance must be made within ____ months of the execution of this indenture by the parties of the first part, or any subsequent date as may be mutually agreed upon during the term of this option, an easement or right of use for the maintenance of the land described below as a waterfowl production area in perpetuity, including the right of access thereto by authorized representatives of the United States:

*T. M N., R» 55 W., 5th PM* ***Day County South Dakota 11"» 30, SW1/4***
**T. 123 N., R » 56 Ti., MUM**

Subject, however, to all existing rights-of-way for highways, roads; railroads, pipelines, canals, laterals, electrical transmission lines, telegraph and telephone lines, and all outstanding mineral rights.

The parties of the first part, for themselves and for their heirs, successors and assigns, covenant and agree that they will cooperate in the maintenance of the aforesaid lands as a waterfowl production area by not draining or permitting the draining, through the transfer of appurtenant water rights or otherwise, of any surface water including lakes, ponds, marshes, sloughs, swales, swamps, or potholes, now existing or reoccurring due to natural causes on the above-described tract, by ditching or any other means; by not filling in with earth or any other material or leveling, any part or portion of the above-described tract on which surface water or marsh vegetation 1s now existing or hereafter reoccurs due to natural causes; and by not burning any areas covered with marsh vegetation. It is understood and agreed that this indenture imposes no other obligations or restrictions upon the parties of the first part and that neither they nor their successors, assigns, lessees, or any other person or party claiming under them shall in any way be restricted from carrying on farming practices such as grazing, hay cutting, plowing, working and cropping wetlands when the same are dry of natural causes, and that they may utilize all of the subject lands in the customary manner except for the draining, filling, leveling, and burning provisions mentioned above.

Existing drainage facilities are shown on a map in the files of both parties.

SPECIAL

1. This indenture shall not be binding upon the UNITED STATES OF AMERICA until accepted on behalf of the United States by the Secretary of the Interior or his authorized representative, although this indenture is acknowledged by the parties of the first part to be presently binding upon the parties of the first part and to remain so until the expiration of said period for acceptance, as hereinabove described, by virtue of the payment to parties of the first part, by the UNITED STATES OF AMERICA, of the sum of One Dollar, the receipt of which is hereby expressly acknowledged by parties of the first part.

2. Notice of acceptance of this_ agreement shall be given the parties of the first part by certified mail addressed to at Webster, SD, and such notice shall be binding upon all the parties of the first part without sending a separate notice to each.

3. The parties of the first part warrant that no person or selling agency has been employed or retained to solicit or secure this contract upon agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the vendors for the purpose of securing business. For breach or violation of this warranty the United States shall have the right to annul this contract without liability or in its discretion to deduct from the contract price or consideration the full amount of such commission, percentage, brokerage; or contingent fee.

4. It is further mutually agreed that no Member of or Delegate to Congress, or Resident Commissioner, shall be admitted to any share or part of this contract, or to any benefit to arise thereupon. Nothing, however, herein contained shall be construed to extend to any incorporated company, where such contract is made for the general benefit of such incorporation or company.

5. Payment of the consideration will be made by Disbursing Officers check after acceptance of this indenture by the Secretary of the Interior or his authorized representative, and after the Attorney General or in appropriate cases, the Field Solicitor of the Department of the Interior shall have approved the easement interest thus vested in the United States.

IN WITNESS WHEREOF the parties of the first part have hereunto set their hands and seals this 27th day of August, 1963.

/s/

(L.S

Witness (L.S.)

(L.S.

ACKNOWLEDGE

STATE S^outh -ROM

COUNTY OF Day

On this 27th day of a W , in the year 1963 , before me appeared W= ,)==[A known to me to

e persons described in an xecuted the foregoing instrument and acknowledged to me that *#(he) executed the same as" (his) free act and deed.

**/a/ Gerald C.**

(SEAL) So"

**Notary Public**
(Official Title)

My commission expires May 8,

ACCEPTA

This indenture is accepted on behalf of the United States this day of , 19 , under the authority contained in section 4 of the Migratory Bird Hunting Stamp Act, as amended, and pursuant to authority delegated by 210 DM 1.3, Commissioner of-Fish and Wildlife Order No. 4, and 4 AM 4.5D(1).

THE UNITED STATES OF

By /s/ R. W.

(Title) Regional Director

Bureau of Sport Fisheries and Wildlife24,,,

United States Department of the Interior

Fish and Wildlife Service

Bureau of Sport Fisheries and Wildlife
Branch of Realty

DESCRIPTION

GAIKOWSKI, IGNATZ TRACT -2) 477.32 ACRES

WATERFOWL PRODUCTION AREA DAY COUNTY **SOUTH DAKOTA**

**EASEMENT** AUTHORIZED BY MIGRATORY BIRD HUNTING STAMP ACT OF MARCH 16, 1934, AS AMENDED
DESCRIPTION: FIFTH PRINCIPAL MERIDIAN

R. 55 W., T. 123 N., 5th P.M.
Sec. 30,
R. 56 W.,: T. 123 N., 5th P. M. **sec. 11,**
**SE1/4SE1/4 exc highway r/w sec.** 12,
E1/2SW1/4, SW1/4SW1/4 exc highway r/w,




Easily Drainable Wetlands Areas

Scale - 4" = 1 mile

Moderately drainable

Difficult to drain

Drained Wetlands

Tracing Compiled by: GCP Date: 9-6 -63 Checked by: Date: 9-9-63

UNITED STATES DEPARTMENT OF THE INTERIOR
FISH AND WILDLIFE SERVICE BUREAU OF
SPORT FISHERIES AND WILDLIFE

Easement

State . South Dakota

County . P!7

Location: T. 123 N., R. 56 W., 5th P.M.

sec. 1, SW¼ exc. Hwy. R/W
sec. 12, NE¼NW¼

Tract Name . [redacted]

Tract (91x)

Easement Dated 7/31/63 Easement Option Expires: 1/30/64

OCT -9 1963 Term of Easement: Perpetual

Easement Consideration: $280.00 Tract Acreage: 197.47
Cost per acre: $1.42 Wetland Acreage: 51.00
Wetland cost per acre: $5.49

Estimate of Value: $

Accounting Number

Authorization to acquire easements in "DAY County,

South Dakota , given by Walter J. Fillmore, DIrector

SD Dept of Game, Fish, Parks in letter dated 1/12/62

REFUGE MANAGER

3-1916
Rev. 1963

# UNITED STATES DEPARTMENT OF THE INTERIOR U. S.
# FISH AND WILDLIFE SERVICE
# BUREAU OF SPORT FISHERIES AND WILDLIFE

THIS INDENTURE, bv and between **a widower, residina at Webster, South Dakot**

parties of the first part, and the UNITED STATES OF AMERICA, acting_ by and through the Secretary of the Interior or his authorized representative, party of the second part.

WITNESSE

/ WHEREAS, section 4 of the Migratory Bird Hunting Stamp Act of March 16, 1934, as amended by section 3 of the Act of August 1, 1958 (72 Stat. 486, 16 U.S.C., sec. 718d (c)); authorizes the' Secretary of the Interior to acquire small wetland or pothole areas suitable for, use as waterfowl produ ion areas:

In

WHEREAS, the lands described below contain or include small wetland or pothole areas suitable for use as waterfowl production areas:

NOW, THEREFORE, for and in consideration of the sum of two **hundred eighty** Dollars the parties of the first part hereby convey to the United States, commencing with the acceptance of this indenture by the Secretary of the Interior or his authorized representative which acceptance must be made within Six months of the execution of this indenture by the parties of the first part, or any subsequent date as may be mutually agreed upon during the term of this option, an easement or right of use for the maintenance of the land described below as a waterfowl production area in perpetuity, including the right of access thereto by authorized representatives o£ the United States:

**T. 123 N., R. 56 W., 5th P.M.** **Day County South Dakota**
**sec. 1, SW¼ exc. Hwy. R/W**
**sec. 12, NE¼NW¼**
**Subject to flowage easement unto above described land to Norman W. Monson as recorded in Book B-49 Misc., page 91.**

Subject, however, to all existing rights-of-way for highways, roads; railroads, pipelines, canals, laterals, electrical transmission lines, telegraph and telephone lines, and all outstanding mineral rights.

The parties of the first part, for themselves and for their heirs, successors and assigns, covenant and agree that they will cooperate in the maintenance of the aforesaid lands as a waterfowl production area by not draining or permitting the draining, through the transfer of appurtenant water rights or otherwise, of any surface water including lakes, ponds, marshes, sloughs, swales, swamps, or potholes, now existing or reoccurring due to natural causes on the above-described tract, by ditching or any other means; by not filling in with earth or any other material or leveling, any part or portion of the above-described tract on which surface water or marsh vegetation is now existing or hereafter reoccurs due to natural causes; and by not burning any areas covered with marsh vegetation. It is understood and agreed that this indenture imposes no other obligations or restrictions upon the parties o£ the first part and that neither they nor their successors, assigns, lessees, or any other person or party claiming under them shall in any way be restricted from carrying on farming practices such as grazing, hay cutting, plowing, working and cropping wetlands when the same are dry of natural causes, and that they may utilize all of the subject lands in the customary manner except for the draining, filling, leveling, and burning provisions mentioned above.

SPECIAL

I. This indenture shall not be binding upon the UNITED STATES OF AMERICA until accepted on behalf of the United States by the Secretary of the Interior or his authorized representative, although this indenture is acknowledged by the parties of the first part to be presently binding upon the parties of the first part and to remain so until the expiration of said period for acceptance, as hereinabove described, by virtue of the payment to parties of the first part, by the UNITED STATES OF AMERICA, of the sum of One Dollar, the receipt of which is hereby expressly acknowledged by parties of the first part.

2. Notice of acceptance of this agreement shall be given the parties of the first part by certified mail addressed to at **Webster, South Dakota** and such notice shall be binding upon all the p of the first part w thout sen ing a separate notice to

3. The parties of the first part warrant that no person or selling agency has been employed or retained to solicit or secure this contract upon agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bone fide employees or bona fide established commercial or selling agencies maintained by the vendors for the purpose of securing business. For breach or violation of this warranty the United States shall have the right to annul this contract without 'liability or in its discretion to deduct from the contract price or consideration the full amount of such commission, percentage, brokerage, or contingent fee.

3a. **Vendor agrees** to **pay the administrative fee** of **the Federal Land Bank.**

4: It is further mutually agreed that no Member of or Delegate to Congress, or Resident Commissioner, shall be admitted to any share or part of this contract, or to any benefit to arise the r upon. Nothing, however, herein contained shall be construed to extend to any incorporated company, where such contract is made for the general benefit of such incorporation or company.

5• Payment of the consideration will be made by Disbursing Officers check after acceptance of this indenture by the Secretary of the Interior or his authorized representative, and after the Attorney General or in appropriate cases, the Field Solicitor of the Department of the Interior shall have approved the easement interest thus vested in the United States.

IN WITNESS WHEREOF the parties of the first part have hereunto set their hands and seals this **31st** day of **July** 19 63.

/s/ [redacted] (L.S.)
[redacted]

(L.S.)

(L.S.)

(L.S.)

/a/ Gerald C. Pearson (L.S.)
(Witness)

(L.S.)

ACKNOWLEDGE

STATE S o u th Dam- )
ss COUNTY OF
ha

On this **31st** day of **July** , in the year **1963** , before me personally appeared known to me to be the persons described in and who executed the foregoing instrument and acknowledged to me that X*= (he) executed the same as their (his) free act and deed.

/s/ Gerald C. Pearson
Gerald C. Pearson

Notary Public
(Official Title)

(SEAL

goal Affixed My commission **May 8, 1470**

ACCEPTA

This indenture is accepted on behalf of the United States this day of , 19 , under the authority contained in section 4 of the Migratory Bird Hunting Stamp Act, as amended, and pursuant to authority delegated by 210 DM 1.3, Commissioner of-Fish and Wildlife Order No. 4, and 4 AM 4•5D(1).

THE UNITED STATES OF

/s/ R. W. Burwell
B

, (Title) Regional Director
Bureau of Sport Fisheries and Wildlife 180

United States Department of the
Interior Fish and Wildlife Service
Bureau of Sport Fisheries and Wildlife
Branch of Realty

DESCRIPTION

197.47 ACRES

WATERFOWL PRODUCTION AREA COUNTY SOUTH DAKOTA
EASEMENT AUTHORIZED BY MIGRATORY BIRD HUNTING STAMP ACT OF MARCH 16, 1934, As
AMENDED DESCRIPTION: FIFTH PRINCIPAL MERIDIAN

R. 56 W., T. 123 N.
sec. 1, SW¼ exc. Hwy. R/W
sec. 12, NE¼NW¼




Easily Drainable Wetlands Areas

Moderately drainable

Difficult to Drain

Scale - 4' = 1 mile

Tracing Compiled by: Date: Checked by:

LA - ABERDEEN AAO

3-1916
Rev.

# UNITED STATES DEPARTMENT OF THE INTERIOR U. S.
# FISH AND WILDLIFE SERVICE
# BUREAU OF SPORT FISHERIES AND WILDLIFE
## CONVEYANCE OF EASEMENT FOR WATERFOWL MANAGEMENT RIGHTS

THIS INDENTURE, by and , *a widow, of Roslyn, South*

parties of the first part, and the UNITED STATES OF AMERICA, acting by and-through the Secretary o£ the Interior or his authorized representative, party of the second part.

WITNESSE

WHEREAS, section 4 of the Migratory Bird Hunting Stamp Act of March 16, 1934, as amended by, section 3 of the Act of August 1, 1958 (72 Stat. 486, 16 U.S.C., sec. 718d (c)), authorizes the Secretary of the Interior to acquire small wetland or pothole areas suitable for, use as waterfowl production areas:

WHEREAS, the lands described below contain or include small wetland or pothole areas suitable for use as waterfowl production areas:

NOW, THEREFORE, for and in consideration of the sum of *two* hundred / *thirty* Dollars the parties of the first part hereby convey to the United States, commencing with the acceptance of this indenture by the Secretary of the Interior or his authorized representative which acceptance must be made within six months of the execution of this indenture by the parties of the first part, or any subsequent date as may be mutually agreed upon during the term of this option, an easement or right of use for the maintenance o£ the land described below as a waterfowl production area in perpetuity, including the right of access thereto by authorized representatives of the United States:

T. 124 N., R. 56 W., 5th P.M. Day County, South Dakota
sec. 14, W½SW¼,W½SE¼SW¼.
sec. 15, SE¼.

Subject, however, to all existing rights-of-way for highways, roads, railroads, pipelines, canals, laterals, electrical transmission lines, telegraph and telephone lines, and all outstanding mineral rights.

The parties of the first part, for themselves and for their heirs, successors and assigns, covenant and agree that they will cooperate in the maintenance of the aforesaid lands as a waterfowl production area by not draining or permitting the draining, through the transfer of appurtenant water rights or otherwise, of any surface water including lakes, ponds, marshes, sloughs, swales, swamps, or potholes, now existing or reoccurring due to natural causes on the above-described tract, by ditching or any other means; by not filling in with earth or any other material or leveling, any part or portion of the above-described tract on which surface water or marsh vegetation is now existing or hereafter reoccurs due to natural causes; and by not burning any areas covered with marsh vegetation. It is understood and agreed that this indenture imposes no other obligations or restrictions upon the parties of the first part and that neither they nor their successors, assigns, lessees, or any other person or party claiming under them shall in any way be restricted from carrying on farming practices such as grazing, hay cutting, plowing, working and cropping wetlands when the same are dry of natural causes, and that they may utilize all of the subject lands in the customary manner except for the draining, filling, leveling, and burning provisions mentioned above. **Excepted are certain drainage ditches which the parties of the first part may maintain and/or wetlands which are deleted from the provisions of this easement. The above exceptions are shown on a map certified by the Regional Director at the time of acceptance.**

SPECIAL

1. This indenture shall not be binding upon the UNITED STATES OF AMERICA until accepted on behalf of the United States by the Secretary of the Interior or his authorized representative, although this indenture is acknowledged by the parties of the first part to be presently binding upon the parties of the first part and to remain so until the expiration o£ said period for acceptance, as hereinabove described, by virtue of the payment to parties of the first part, by the UNITED STATES OF AMERICA, o£ the sum of One Dollar, the receipt of which is hereby expressly acknowledged by parties of the first part.

2. Notice of acceptance of this agreement shall be given the parties of the first part by certified mail addressed to at Roslyn, *South Dakota 57261,* and such notice shall be binding upon all the parties of the first part without sending a separate notice to each.

3. The parties of the first part warrant that no person or selling agency has been employed or retained to solicit or secure this contract upon agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the vendors for the purpose of securing business. For breach or violation of this warranty the United States shall have the right to annul this contract without liability or in its discretion to deduct from the contract price or consideration the full amount of such commission, percentage, brokerage, or contingent fee.

4. It is further mutually agreed that no Member of or Delegate to Congress, or Resident Commissioner, shall be admitted to any share or part of this contract, or to any benefit to arise thereupon. Nothing, however, herein contained shall be construed to extend to any incorporated company, where such contract is made for the general benefit of such incorporation or company.

5. Payment of the consideration will be made by Disbursing Officers check after acceptance of this indenture by the Secretary of the Interior or his authorized representative, and after the Attorney General or in appropriate cases, the Field Solicitor of the Department of the Interior shall have approved the easement interest thus vested in the United States.

IN WITNESS WHEREOF the parties of the first part have hereunto set their hands and seals

this 26 day of **October** , 19

/s/ _______________ (L.S.)

_______________ (L.S.

_______________ (L.S.)

_______________ (L.S.)

(Witness (L.S.)

(L.S.)

ACKNOWLEDGE

STATE South Dakota

COUNTY OF Day

On this 26 day of **October** , in the year **1967** , before me personally

appeared **g widow** known to me to be the person described in and who executed the foregoing instrument and acknowledged to me that ( he) executed the same as their (his) free act and deed.

*ha/* **Alfred John Pavne**

**Alfred John Payne**

(SEAL) (Official Title)

*SEAL AFFIXED*

My commission expires January **30. 1975**

ACCEPTA

This indenture is accepted on behalf of the United States this day

DEC 27 1967 19 , under the authority contained in section 4 of the Migratory Bird Hunting Stamp Act, as amended and pursuant to authority delegated by 210 DM 1.3, Commissioner of Fish and Wildlife Order No. O. and 4 AM 4.5D(1)

THE UNITED STATES OF

By /s/ W. P. Schaefer
W. P. Schaefer
Acting Regional Director

(Title) _______________
Bureau of Sport Fisheries and Wildlife

United States Department of the
Interior Fish and Wildlife Service
Bureau of Sport Fisheries and Wildlife
Branch of Realtv

DRAINAGE FACILITY

TRAC [1]00.00 ACRES

WATERFOWL PRODUCTION AREA DAY COUNTY SOUTH

EASEMENT AUTHORIZED BY MIGRATORY BIRD HUNTING STAMP ACT OF MARCH 16, 1934 AS

DESCRIPTION: FIFTH PRINCIPAL

sec. 14, W1/2SW 1/4, W




I hereby certify that this map represents the excepted drainage ditches and/or deleted wetlands referred to in the easement agreement executed 10/26/67 and accepted .

/s{ •. P. Schaefer

Acting Regional Director




Wetlands deleted from the Provisions of the Easement

Wetlands Drained

Open ditch Scale: 4" = 1 mile

Map drawn a g p Date: **10-31-67**

(Revised Sept. 1976)

MAR 25 1987

# UNITED STATES DEPARTMENT OF THE INTERIOR U, S. FISH AND WILDLIFE SERVICE CONVEYANCE OF EASEMENT FOR WATERFOWL MANAGEMENT RIGHTS

THIS INDENTURE, by and between r
and his wife, of Ipswich, South Dakota

parties of the first part, and the UNITED STATES OF AMERICA, acting by and through the Secretary of the Interior or his authorized representative, party of the second part.

W ITNESSETH:

WHEREAS, section 4 of the Migratory Bird Hunting Stamp Act of March 16, 1934, as amended by section 3 of the Act of August 1, 1958 (72 Stat. 486, 16 U.S.C., sec. 718d (c)), authorizes the Secretary of the Interior to acquire small wetland or pothole areas suitable for use as waterfowl production areas:

WHEREAS, the lands described below contain or include small wetland or pothole areas suitable for use as waterfowl production areas:

NOW, THEREFORE, for and in consideration of the sum of ($ 2, 500.00 )

Two Thousand Five Hundred--- Dollars, the parties of the first part do hereby convey to the United States, commencing with the acceptance of this indenture by the Secretary of the Interior or his authorized representative which acceptance must be made within 12 months of the execution of this indenture by the parties of the first part, or any subsequent date as may be mutually agreed upon during the term of this option, a permanent easement (in perpetuity) or right of use for the maintenance of the land described below as

The lands covered by this conveyance are those wetland areas, including lakes, ponds, marshes, sloughs, swales, swamps, potholes, and other wholly or partially water-covered areas, now existing or subject to recurrence through natural or man-made causes, delineated on the map(s) attached hereto as Exhibit A and incorporated herein by this reference; provided, always, that the lands covered by this conveyance shall include any enlargements of said wetland areas resulting from normal or abnormal increased water. Said lands are located within, and the aforementioned right of access extends over all lands within the following

described legal subdivision(s) in Edmunds County, State of South Dakota to wit.

T. 123 N., R, 68 W., 5th P.M.
sec. 20, SW1/4

Subject, however, to all existing rights-of-way for highways, roads, railroads, pipelines, canals, laterals, electrical transmission lines, telegraph and telephone lines, cable lines, and all mineral rights.

The parties of the first part, for themselves, their heirs, successors and assigns, covenant and agree that they will cooperate in the maintenance of the aforesaid lands as a waterfowl production area by not draining, causing or permitting the draining by construction of ditches, or by any means, direct or indirect, whether through the transfer of appurtenant water rights or otherwise, of any surface waters in or appurtenant to these wetland areas delineated on Exhibit A; by not filling in with earth or any other material or leveling any part or portion of said delineated wetland areas; and by not burning any marsh vegetation on any part or portion of said delineated wetland areas. It is understood and agreed that this indenture imposes no other obligations or restrictions upon the parties of the first part and that neither they nor their successors, assigns, lessees, or any other person or party claiming under them shall in any way be restricted from carrying on farming practices such as grazing at any time, hay cutting, plowing, working and cropping wetlands when the same are dry of natural causes, and that they may utilize all of the subject lands in the customary manner except for the draining, filling, leveling, and burning provisions mentioned above.

Copies of the above-referenced map(s), being Exhibit A, are on file in the Office of the Regional Director, U.S. Fish and Wildlife Service.

SPECIAL PROVISIONS

I. This indenture shall not be binding upon the UNITED STATES OF AMERICA until accepted on behalf of the United States by the Secretary of the Interior or his authorized representative, although this indenture is acknowledged by the parties of the first part to be presently binding upon the parties of the first part and to remain so until the expiration of said period for acceptance, as hereinabove described, by virtue of the payment to parties of the first part, by the UNITED STATES OF AMERICA, of the sum of One Dollar, the receipt of which is hereby expressly acknowledged by parties of the first part.

14-16-0006

2. Notice of acceptance of this agreement shall be given the parties of the first part by certified mail addressed to

at Ipswich, SD 5 /451

1. It is further mutually agreed that no Member of or Delegate to Congress, or Resident Commissioner, shall be admitted to any share or part of this contract, or to any benefit to arise thereupon. Nothing, however, herein contained shall be construed to extend to any incorporated company, where such contract is made for the general benefit of such incorporation or company.

4. Payment of the consideration will be made by a United States Treasury check after acceptance of this indenture by the Secretary of the Interior or his authorized representative and after the Attorney General, or in appropriate cases, the Solicitor of the Department of the Interior shall have approved the easement interest thus vested in the United States.

_____ day of _____, 17 _____

______________________ ______________________

______________________ ______________________

______________________ (L. ______________________

ACKNOWLEDGMENT

STATE South Dakota

COUNTY OF McPherson ss

On this 19 day of February, in the year 1987, before me Personally appeared John M, Schumacher and Mariann M. Schumacher

, his wife, known to me to

Melvin M Geist

(Notary Public)

MELVIN M. GEIST
Notary Public, South Dakota

(SEAL)

My commission expires My Commission Expires 3-9-93

ACCEPTANCE

This Secretary of the Interior, acting by and through his authorized representative, has executed this agreement on behalf of the United States this day of

In consideration of payment which is determined to be adequate from the standpoint of the FHA as mortgagee, for the foregoing easement as provided in paragraph thereof, the United States of America acting through FHA hereby subordinates its mortgage

dated 06-18-86 recorded in Book 132 page 269 of the records of Edmunds County, State of South Dakota to

THE UNITED STATES OF AMERICA

BY ______________________

U. S. Fish and Wildlife Service

THE UNITED TATES Or AMERICA

______________________ 8 ______________________
Dat FHA County Supervisor

78-782-

UNITED STATES DEPARTMENT OF THE INTERIOR U.S. FISH AND WILDLIFE SERVICE EXHIBIT "A" Map 1 of 1

TRAC 575

WATERFOWL PRODUCTION AREA Edmunds COUNTY, STATE OF South Dakota EASEMENT AUTHORIZED BY MIGRATORY BIRD HUNTING STAMP ACT OF MARCH 16, 1934, AS AMENDED. T. 123 N., R. 68 - W. , 5th -- PRINCIPAL MERIDIAN

Sec.20 SW1/4




Scale: 4 Inches = 1 Mile

This map delineates wetlands referred to in the easement conveyance dated 2/19/87 *which* the parties of the first part agree to maintain as a waterfowl production area. The lands covered by this conveyance include any enlargement of the delineated wetland areas resulting from normal or abnormal increased water.

LEGEND

Landowner Signature

Boundary of Easement

Wetlands covered by provisions of the easement

Nonfunctional drainage facilities which the landowner agrees NOT to repair or clean out

Prepared by: Betty Kuckelburg Date 2/3/87

K&F 10 1153 5-77

Form 3-1916

Revised October 1989

UNITED STATES DEPARTMENT OF THE INTERIOR U.S. FISH AND WILDLIFE SERVICE CONVEYANCE OF EASEMENT FOR WATERFOWL MANAGEMENT RIGHTS

THIS INDENTURE, by and between Eugene P. Mack and Carol L. Mack, his wife, of Watertown, South Dakota and Kevin N. Mack, a single person, of Castlewood South Dakota

parties of the first part, and the UNITED STATES OF AMERICA. acting by and through the Secretary of the Interior or his authorized representative party of 'he second part

WITNESSETH:

WHEREAS, the Migratory Bird Hunting and Conservation Stamp Act,16 U.S.C. 718d(c); the Fish and Wildlife Act of 1956, 16 U.S.C. 742a-742; the Emergency Wetlands Resources Act of 1986, 16 U.S.C. 3901; and the Land and Water Conservation Fund Act, 16 U.S.C. 4061-9(a)(1), authorize the Secretary of the Interior to acquire small wetland or pothole areas suitable for use as waterfowl production areas:

WHEREAS, the lands described below contain or include small wetland or pothole areas suitable for use as waterfowl production

NOW, THEREFORE, for and in consideration of the sum of Seven Thousand Seven Hundred Fifty -

Dollars (S 7,750.00 ),the parties of the first part do hereby convey to the United States, commencing with the acceptance of this indenture by

the Secretary of the Interior or his authorized representative which acceptance must be made within 12 months of the execution of this

The lands covered by this conveyance are those wetland areas, including lakes, ponds, marshes, sloughs, swales, swamps, potholes, and other wholly or partially water-covered areas, now existing or subject to recurrence through natural or manmade causes. delineated on the map(s) attached : hereto as Exhibit A and incorporated herein by this reference; provided, always, that the lands covered by this conveyance shall include any enlargements of said wetland areas resulting from normal or abnormal increased water. The lands described on Exhibit A, and the aforementioned right of ingress to and egress extends on, over, across and through any and all lands within the following described legal

subdivision(s) in Deuel County, State of South Dakota , to-wit: T. 116 M„ R, 48 W., 5th P.M.
sec. 36, E except the N 52 rods, E1/2W1/2 except the N 52 rods.

Vendors, successors and assigns relinquish all interest in vested drainage rights recorded in Book 1992 on page 3508, Book 1992 on page 3510, Book 1992 on page 3511 and Book 1992 on Page 3509, which are appurtenant to wetlands on attached Exhibit A's.

Subject, however, to all valid existing rights-of-way for highways, roads, railroads, pipelines, canals, laterals, electrical transmission lines, telegraph and telephone !Ines, cable lines, and all mineral rights.

The parties of the first part, for themselves, their heirs, successors and assigns, covenant and agree that they will cooperate in the maintenance of the aforesaid lands as a waterfowl production area by not draining, causing or permitting the draining by construction of ditches, or by any means, direct or indirect, whether through the transfer of appurtenant water rights or otherwise of any surface waters in or appurtenant to these wetland areas delineated on Exhibit A; by not filling, causing or permitting the filling in with earth or any other material or leveling, causing or permitting the leveling of any par or portion of said delineated wetland areas; and by not burning, causing or permitting the burning of any wetland vegetation on any part or portion of said delineated wetland areas. It is understood and agreed that this indenture imposes no other obligations or restrictions upon the parties

of the first part and that neither they nor their successors, assigns, lessees, or any other person or party claiming under them shall in any way be restricted from carrying on farming practices such as grazing at any time, hay cutting, plowing, working and cropping wetlands when the same are dry of natural causes, and that they may utilize all of the subject lands in the customary manner except for the draining, filling, leveling, and burning provisions mentioned above.

Copies of the above-referenced map(s), being Exhibit A, are on file in the Office of the Regional Director, U.S. Fish and Wildlife Service.

1a. The United States and its authorized representatives shall have the right to construct, reconstruct, and maintain all wetland restoration structures shown on Exhibit A.

SPECIAL PROVISIONS

1 This indenture shall not be binding upon the UNITED STATES OF AMERICA until accepted on behalf of the United Sates by the Secretary of the Interior of his authorized representative, although this indenture is acknowledged by the parties of the first part to be presently binding upon the parties of the first part and to remain so until the expiration of said period for acceptance, as herein above described, by virtue of the payment to parties of the first part, by the UNITED STATES OF AMERICA. of the sum of One Dollar, the receipt of which is hereby expressly acknowledged by parties of the first part.

This for- was electronically produced by Elite Federal Form Inc.

2. Notice of acceptance of this agreement shall be given the parties of the first part by certified mail addressed
Eugene P. Mack, 59 Sunrise Drive, Watertown, SD 57201
and such notice shall be binding upon all the parties of the first part without sending a separate notice to

3. It is further mutually agreed that no Member of or Delegate to Congress, or Resident Commisioner shall be admitted to any share or part of this contract, or to any benefit to arise thereupon. Nothing, however, herein contained shall be construed to extend to any incorporated company, where such contract is made for the general benefit of such incorporation or company.

4. Payment of the consideration will be made by a United States Treasury check after acceptance of this indenture by the Secretary of the Interior or his authorized representative and after the Attorney General, or in appropriate cases, the Solicitor of the Department of the Interior shall have approved the easement interest thus vested in the United States.

IN WITNESS WHEREOF the parties of the first part have hereunto set their hands and seals ______ day September 2000

Eugene P. Mack (L.S.) Carol L. Mack (L.S.)
Eugene P. Mack Carol L. Mack

Kevin N. Mack (L.S.) ______ (L.S.)
Kevin N. Mack

______ (L.S.) ______ (L.S.)

______ (L.S.) ______ (L.S.)

______ (L.S.) ______ (L.S.)

______ (L.S.) ______ (L.S.)

ACKNOWLEDGMENT

STATE South Dakota )
)ss
COUNTY OF Codington )

On this 7th day of Sept 2000 before ma personally appeared . Eugene P. Mack
Carol L. Mack, his wife
, known to me to be the person(s) described in

(SEAL)

WM. J. KURTENBACH
SEAL NOTARY PUBLIC SEAL
SOUTH DAKOTA
My Commission expires 8-30-04

Wm. J. Kurtenbach
Notary Public
My commission 8-30-04

ACCEPTANCE

The Secretary of the Interior, acting by and through his authorized representative, has executed this agreement on behalf of

this DEC 19 2000 day 2000.

DEC 19 2000

THE UNITED STATES OF AMERICA
By [signature]
Title: CHIEF, DIVISION OF REALTY
U.S. Fish and Wildlife Service

UNITED STATES DEPARTMENT OF THE
INTERIOR FISH AND WILDLIFE SERVICE
EXHIBIT "A"

TRACT 198X MAP 1 of 1

WATERFOWL PRODUCTION AREA Deuel COUNTY, STATE OF South Dakota EASEMENT AUTHORIZED BY MIGRATORY BIRD HUNTING STAMP ACT OF MARCH 16, 1934, AS AMENDED.
T. 116 N., R. 4$ W., 5th PRINCIPAL




Scale: 4 Inches = 1 Mile

This map delineates wetlands referred to in the easement conveyance dated 9-7-00 which the parties of the first part agree to maintain as a waterfowl production area.

The lands covered by this conveyance include any enlargement of the delineated wetland areas resulting from normal or abnormal increased water.

Kevin M Mack
Landowner Signature

Landowner Signature

Eugene P. Mack
Landowner Signature

Landowner Signature

Carol L. Mack
Landowner Signature

Landowner Signature

LEGEN

Boundary of Easement Description

Wetland Restoration Structure

Wetlands covered by provisions of the easement

Prepared Wm. J. Kurtenbach Date: 9-6-00

UNITED STATES DEPARTMENT OF THE INTERIOR U. S. FISH AND WILDLIFE SERVICE EXHIBIT "A" Map of

TRACT

WATERFOWL PRODUCTION AREA________________ COUNTY, STATE OF_________________

EASEMENT AUTHORIZED BY MIGRATORY BIRD HUNTING STAMP ACT OF MARCH 16, 1934, AS AMENDED. T. N., R. W., PRINCIPAL MERIDIAN

Structure Elevation
No-______ (MSL)



The parties of the first part concur with the structure outlet elevations specified above.

________________________________

Landowner Signature

Date______________________

Scale: 4 inches - 1 mile

This map delineates wetlands referred to in the easement conveyance dated_______________which the parties of the first part agree to maintain as a waterfowl production area. The lands covered by this conveyance include any enlargement of the delineated wetland resulting from normal to abnormal increased water.

LEGEN

Boundary of easement description

Wetlands covered by provisions of the easement

*Nonfunctional* drainage facilities which the landowner agrees not to repair or clean

Wetland restoration structure

________________________________

Landowner Signature

Prepared by:_________________ Date:_

Grassland Easement
November 1989

UNITED STATES DEPARTMENT OF THE INTERIOR U.S. FISH AND WILDLIFE SERVICE GRANT OF EASEMENT FOR WATERFOWL HABITAT PROTECTION

THIS INDENTURE, by and between ,/his wife, of Britton, SD

also known as

hereinafter referred to as Grantors, and the UNITED STATES OF AMERICA, acting by and through the Secretary of the Interior or his authorized representative.

WITNESSETH

WHEREAS, the Migratory Bird Hunting and Conservation Stamp Act, 16 U.S.C. 718d(c); the Fish and Wildlife Act of 1956, 16 U.S.C. 742a-742j; the Emergency Wetlands Resources Act of 1986, 16 U.S.C. 3901; and the Land and Water Conservation Fund Act, 16 U.S.C. 4601-9(a)(1), authorize the Secretary of the Interior to acquire lands and waters or interests therein for the development, advancement, management, conservation, and protection of fish and wildlife resources. The purpose of this easement is to protect the habitat quality of the lands described on Exhibit A and such lands shall be maintained to provide cover, especially nesting cover, and food for a varied array of aquatic, terrestrial, and avian wildlife, particularly waterfowl, and threatened and endangered species. The lands described on Exhibit A are hereinafter referred to as a wildlife management area, and

WHEREAS, the lands described below contain habitat suitable for use as wildlife management areas.

NOW, THEREFORE, for and in consideration of the sun of *Sixteen Thousand Five Hundred Eighty*

Dollars (E 16,580.00 ), the Grantors hereby grant to the United States, commencing with the acceptance of this Indenture by the Secretary of the interior or his authorized representative, an easement which includes a right of use for the maintenance of the lands described on Exhibit A, as wildlife management areas, in perpetuity, including the right of ingress to and egress on, over, across the through any and all lands of the Grantors, as described below, by authorized representatives of the United States. No rights herein are granted to the general public for access to or entry upon the land subject to this grant of easement for any purpose. The lands described on Exhibit A are located within, and the aforementioned right of ingress and egress extends on, over, across and through any and all lands within the following-described legal subdivision(s) in Marshall County, State of *South Dakota* , to-wit:

*T. 127 N., R. 56 W., 5th P.M.*
*sec. 1, SW¼, W½NW¼SE¼, W½E½NW¼SE¼, N½N½SW¼SE¼, SE¼NE¼SW¼SE¼, NE¼SE¼SW¼SE¼, S½S½SW¼SE¼, W½W½SE¼SE¼*
*sec. 2, E½NE¼SE¼, E½W½NE¼SE¼, N½NE¼SE¼SE¼, the S 1240' of the E 620' of the W 1150' of the SW¼SE¼*
*sec. 12, SE¼NW¼, S½S½NE¼NW¼, NW¼SW¼NE¼NW¼, W½NW¼NE¼NW¼, S½S½NW¼NE¼, SW¼SW¼NE¼NE¼, E½W½NE¼NE¼, E½NE¼NE¼*

Subject, however, to all valid existing rights-of-way for highways, roads, railroads, pipelines, canals, laterals, electrical transmission lines, telegraph and telephone lines, cable lines, and all mineral rights.

The conveyance hereunder shall be effective on the date of the execution of this Indenture by the Secretary of the interior or his authorized representative; provided, however, that such acceptance must be made within 9 calendar months from the date of the execution of this Indenture by the Grantors, or any subsequent date as may be mutually agreed upon in writing by the parties hereto prior to the expiration of such date; and provided further, however, that in the event such acceptance is not made by such date, this Indenture shall be null and void.

The Grantors, for themselves and for their heirs, successors, and assigns, lessees, and any other person claiming under them, covenant and agree that they will cooperate in the maintenance and protection of the habitat areas, delineated on the map(s) attached hereto as Exhibit A, as wildlife management areas for the protection of fish and wildlife resources and to maintain the quality of these lands to provide cover for wildlife, especially nesting cover, and food for a varied array of aquatic, terrestrial, and avian wildlife, particularly waterfowl and threatened and endangered species. To that end and for the purpose of accomplishing the intent of this Indenture, the Grantors, for themselves and for their heirs, successors, assigns, lessees, and any other person claiming under them, covenant and agree as follows:

1. Grantors will cooperate in maintenance of the wildlife management area by maintaining permanent vegetative cover, consisting of grasses, forbs and low-growing shrubs, on said habitat areas, as follows: There shall be no haying or mowing until after July 15 in any calendar year, no alteration of grassland, wildlife habitat or other natural features, and no agricultural crop production upon the habitat areas delineated on Exhibit A, unless prior approval in writing is granted by the U.S. Fish and Wildlife Service; except that grazing the aforesaid lands is permitted at any time throughout the calendar year without approval in writing.

2. Grantors will pay taxes and assessments, if any, which may be levied against the land.

3. Noxious weed control and emergency control of pests necessary to protect the public good are allowed and will be the responsibility of the Grantors, subject to Federal and State Statutes and Regulations.

4. This easement and the covenants and agreements contained herein shall run with the land, shall be binding on alt persons and entities who shall come into ownership or possession of the lands subject to this easement. The Grantors, successors and assigns shall notify the Regional Director, U.S. Fish and Wildlife Service in writing of any sate or transfer at least 30 days following the sale or transfer of any portion of the lands subject to this easement.

Copies of the above-referenced map(s), Exhibit A, are on file in the Office of the Regional Director, U.S. Fish and Wildlife Service.

it is understood that this indenture imposes no other obligations or restrictions upon the Grantors and that neither they nor their successors, assigns, lessees, nor any other person or party claiming under them shall, in any way, be restricted from utilizing all of the subject lands in the customary manner for agricultural purposes except as provided herein.

It is further understood that the rights and interests granted to the United States of America herein shall become part of the National Wildlife Refuge System and shall be administered by the U.S. Fish and Wildlife Service, pursuant to the National Wildlife Refuge System Administration Act, 16 U.S.C. 668dd.

SPECIAL

1. This Indenture shall not be binding upon the UNITED STATES OF AMERICA until accepted on behalf of the United States by the Secretary of the Interior of his authorized representative, although this Indenture is acknowledged by the Grantors to be presently binding upon them and to remain so until the expiration of said period for acceptance, as hereinabove described, by virtue of the payment to the Grantors, by the UNITED STATES OF AMERICA, of sum of One Dollar, the receipt of which is hereby expressly acknowledged by Grantors.

2. Notice of acceptance of this Indenture shall be given the Grantors by certified mail addressed addressed to

Britton, SD 57430

shall be effective upon the date of mailing, and such notice shall be binding upon all Grantors without sending a separate notice to each.

3. Payment of the consideration will be made by a United States Treasury check after acceptance of this Indenture by the Secretary of the Interior or his authorized representative, arid after the Attorney General, or in appropriate cases, the Solicitor of the Department of the Interior shall have approved the easement interest thus vested in the United States.
Check shall be drawn in favor _-r

United States

IN WITNESS WHEREOF, the Grantors have hereunto set their hands and seals this 10th day of March, 1992.

_(L.S.) _(L.S.)

_____(L.S.) _____(L.S.)

_____(L.S.) _____(L.S.)

_____(L.S.) _____(L.S.)

ACKNOWLEDGMENT

State South Dakota )
)ss
County of Marshall )

On this 10th day of March, in the year 1992, before me personally appeared
and , also known as
, his wife, known to me to be the person(s) described in and who executed the foregoing instrument and acknowledged to me that they (he/she) executed the same as their (his/her) free act and deed.

Robert Sorenson
Notary Public

(SEAL)

MY commission expires 12-6-93

ACCEPTANCE

The Secretary of the interior, acting by and through his authorized representative, has executed this agreement on behalf of the United States this day of , 19

THE UNITED STATES OF AMERICA
DEPARTMENT OF THE INTERIOR

By _____

Title _____
U.S. Fish and Wildlife Service

Grassland Easement
November, 1988

UNITED STATES DEPARTMENT OF THE INTERIOR
U.S. FISH AND WILDLIFE SERVICE
EXHIBIT "A"

Mop 1 Of 3

TRACT 300G,1

Wildlife E MANAGEMENT AREA *Marshall* COUNTY, STATE OF *South Dakota*

*127* N., R, 56 W. 5th PRINCIPAL MERIDIAN

sec. 1, SW¼, W½NW¼SE¼, W½E½NW¼SE¼, N½N½SW¼SE¼, SE¼NE¼SW¼SE¼, NE¼SE¼SW¼SE¼, S½S½SW¼SE¼, W½W½SE¼SE¼



Scale: 4 Inches = 7 Mile

This map delineates lands referred to in the easement conveyance dated 3-10-92 which the parties of the first pert agree to maintain as a Wildlife Management Area.

LEGEN

Landowner Signature

Boundary of Easement Description

Lands covered by provisions of the easement

Prepared by. *Robert Severson* Date 3/9/9

Grassland Easement
November 1989

UNITED STATES DEPARTMENT OF THE INTERIOR U.S. FISH AND WILDLIFE SERVICE GRANT OF EASEMENT FOR WATERFOWL HABITAT PROTECTION

THIS INDENTURE, by and between ,/*his wife, of Britton, SD*

*also* known *as*

hereinafter referred to as Grantors, and the UNITED STATES OF AMERICA, acting by and through the Secretary of the Interior or his authorized representative.

WITNESSETH

WHEREAS, the Migratory Bird Hunting and Conservation Stamp Act, 16 U.S.C. 718d(c); the Fish and Wildlife Act of 1956, 16 U.S.C. 742a-742j; the Emergency Wetlands Resources Act of 1986, 16 U.S.C. 3901; and the land and Water Conservation Fund Act, 16 U.S.C. 4601-9(a)(1), authorize the Secretary of the Interior to acquire lands and waters or interests therein for the development, advancement, management, conservation, and protection of fish and wildlife resources. The purpose of this easement is to protect the habitat quality of the lands described on Exhibit A and such lands shall be maintained to provide cover, especially nesting cover, and food for a varied array of aquatic, terrestrial, and avian wildlife, particularly waterfowl, and threatened and endangered species. The lands described on Exhibit A are hereinafter referred to as a wildlife management area, and

WHEREAS, the lands described below contain habitat suitable for use as wildlife management areas.

NOW, THEREFORE, for and in consideration of the sun of *Sixteen Thousand Five Hundred Eighty*

Dollars (E 16,580.00 ), the Grantors hereby grant to the United States, commencing with the acceptance of this Indenture by the Secretary of the interior or his authorized representative, an easement which includes a right of use for the maintenance of the lands described on Exhibit A, as wildlife management areas, in perpetuity, including the right of ingress to and egress on, over, across the through any and all lands of the Grantors, as described below, by authorized representatives of the United States. No rights herein are granted to the general public for access to or entry upon the land subject to this grant of easement for any purpose. The lands described on Exhibit A are located within, and the aforementioned right of ingress and egress extends on, over, across and through any and all lands within the following-described legal subdivision(s) in Marshall County, State of *South Dakota* , to-wit:

*T. 127 N., R. 56 W., 5th P.M.*
*sec. 1, SW¼, W½NW¼SE¼, W½E½NW¼SE¼, N½N½SW¼SE¼, SE¼NE¼SW¼SE¼, NE¼SE¼SW¼SE¼, S½S½SW¼SE¼, W½W½SE¼SE¼*
*sec. 2, E½NE¼SE¼, E½W½NE¼SE¼, N½NE¼SE¼SE¼, the S 1240' of the E 620' of the W 1150' of the SW¼SE¼*
*sec. 12, SE¼NW¼, S½S½NE¼NW¼, NW¼SW¼NE¼NW¼, W½NW¼NE¼NW¼, S½S½NW¼NE¼, SW¼SW¼NE¼NE¼, E½W½NE¼NE¼, E½NE¼NE¼*

Subject, however, to all valid existing rights-of-way for highways, roads, railroads, pipelines, canals, laterals, electrical transmission lines, telegraph and telephone lines, cable lines, and all mineral rights.

The conveyance hereunder shall be effective on the date of the execution of this Indenture by the Secretary of the interior or his authorized representative; provided, however, that such acceptance must be made within 9 calendar months from the date of the execution of this Indenture by the Grantors, or any subsequent date as may be mutually agreed upon in writing by the parties hereto prior to the expiration of such date; and provided further, however, that in the event such acceptance is not made by such date, this Indenture shall be null and void.

The Grantors, for themselves and for their heirs, successors, and assigns, lessees, and any other person claiming under them, covenant and agree that they will cooperate in the maintenance and protection of the habitat areas, delineated on the map(s) attached hereto as Exhibit A, as wildlife management areas for the protection of fish and wildlife resources and to maintain the quality of these lands to provide cover for wildlife, especially nesting cover, and food for a varied array of aquatic, terrestrial, and avian wildlife, particularly waterfowl and threatened and endangered species. To that end and for the purpose of accomplishing the intent of this Indenture, the Grantors, for themselves and for their heirs, successors, assigns, lessees, and any other person claiming under them, covenant and agree as follows:

1. Grantors will cooperate in maintenance of the wildlife management area by maintaining permanent vegetative cover, consisting of grasses, forbs and low-growing shrubs, on said habitat areas, as follows: There shall be no haying or mowing until after July 15 in any calendar year, no alteration of grassland, wildlife habitat or other natural features, and no agricultural crop production upon the habitat areas delineated on Exhibit A, unless prior approval in writing is granted by the U.S. Fish and Wildlife Service; except that grazing the aforesaid lands is permitted at any time throughout the calendar year without approval in writing.

2. Grantors will pay taxes and assessments, if any, which may be levied against the land.

3. Noxious weed control and emergency control of pests necessary to protect the public good are allowed and will be the responsibility of the Grantors, subject to Federal and State Statutes and Regulations.

4. This easement and the covenants and agreements contained herein shall run with the land, shall be binding on alt persons and entities who shall come into ownership or possession of the lands subject to this easement. The Grantors, successors and assigns shall notify the Regional Director, U.S. Fish and Wildlife Service in writing of any sate or transfer at least 30 days following the sale or transfer of any portion of the lands subject to this easement.

Copies of the above-referenced map(s), Exhibit A, are on file in the Office of the Regional Director, U.S. Fish and Wildlife Service.

it is understood that this indenture imposes no other obligations or restrictions upon the Grantors and that neither they nor their successors, assigns, lessees, nor any other person or party claiming under them shall, in any way, be restricted from utilizing all of the subject lands in the customary manner for agricultural purposes except as provided herein.

It is further understood that the rights and interests granted to the United States of America herein shall become part of the National Wildlife Refuge System and shall be administered by the U.S. Fish and Wildlife Service, pursuant to the National Wildlife Refuge System Administration Act, 16 U.S.C. 668dd.

SPECIAL

1. This Indenture shall not be binding upon the UNITED STATES OF AMERICA until accepted on behalf of the United States by the Secretary of the Interior of his authorized representative, although this Indenture is acknowledged by the Grantors to be presently binding upon them and to remain so until the expiration of said period for acceptance, as hereinabove described, by virtue of the payment to the Grantors, by the UNITED STATES OF AMERICA, of sum of One Dollar, the receipt of which is hereby expressly acknowledged by Grantors.

2. Notice of acceptance of this Indenture shall be given the Grantors by certified mail addressed addressed to

Britton, SD 57430

shall be effective upon the date of mailing, and such notice shall be binding upon all Grantors without sending a separate notice to each.

3. Payment of the consideration will be made by a United States Treasury check after acceptance of this Indenture by the Secretary of the Interior or his authorized representative, arid after the Attorney General, or in appropriate cases, the Solicitor of the Department of the Interior shall have approved the easement interest thus vested in the United States.
Check shall be drawn in favor _-r

United States

IN WITNESS WHEREOF, the Grantors have hereunto set their hands and seals this 10th day of March, 1992.

_(L.S.) _(L.S.)

_(L.S.) _(L.S.)

_(L.S.) _(L.S.)

_(L.S.) _(L.S.)

ACKNOWLEDGMENT

State South Dakota )
)ss
County of Marshall )

On this 10th day of March, in the year 1992, before me personally appeared
and 1, also known as
, his wife, known to me to be the person(s) described in and who executed the foregoing instrument and acknowledged to me that they (he/she) executed the same as their (his/her) free act and deed.

Robert Severson
Notary Public

(SEAL)

MY commission expires 12-6-93

ACCEPTANCE

The Secretary of the interior, acting by and through his authorized representative, has executed this agreement on behalf of the United States this day of , 19

THE UNITED STATES OF AMERICA
DEPARTMENT OF THE INTERIOR

By ______________________

Title ______________________
U.S. Fish and Wildlife Service

Grassland Easement

' November, 1988

UNITED STATES DEPARTMENT OF THE INTERIOR
U.S. FISH AND WILDLIFE SERVICE
EXHIBIT "A"

Mop 1 Of 3

TRACT 300G,1

Wildlife E MANAGEMENT AREA Marshall COUNTY, STATE OF South Dakota

127 N., R, 56 W. 5th PRINCIPAL MERIDIAN

sec. 1, SW$\frac{1}{4}$, W$\frac{1}{2}$NW$\frac{1}{4}$SE$\frac{1}{4}$, W$\frac{1}{2}$E$\frac{1}{2}$NW$\frac{1}{4}$SE$\frac{1}{4}$, N$\frac{1}{2}$N$\frac{1}{2}$SW$\frac{1}{4}$SE$\frac{1}{4}$, SE$\frac{1}{4}$NE$\frac{1}{4}$SW$\frac{1}{4}$SE$\frac{1}{4}$, NE$\frac{1}{4}$SE$\frac{1}{4}$SW$\frac{1}{4}$SE$\frac{1}{4}$, S$\frac{1}{2}$S$\frac{1}{2}$SW$\frac{1}{4}$SE$\frac{1}{4}$, W$\frac{1}{2}$W$\frac{1}{2}$SE$\frac{1}{4}$SE$\frac{1}{4}$



Scale: 4 Inches = 7 Mile

This map delineates lands referred to in the easement conveyance dated 3-10-92 which the parties of the first pert agree to maintain as a Wildlife Management Area.

LEGEN

Landowner Signature

Boundary of Easement Description



Lands covered by provisions of the easement

Prepared by. Robert Severson Date 3/9/9

**North Dakota**
**Grassland Easement**
(Revised June 1999)

UNITED STATES DEPARTMENT OF THE INTERIOR
U.S. FISH AND WILDLIFE SERVICE
GRANT OF EASEMENT FOR WATERFOWL HABITAT PROTECTION

THIS INDENTURE, by and between
hereinafter referred to as Grantors, and the UNITED STATES OF AMERICA, hereinafter referred to as United States, acting by and through the Secretary of the Interior or his authorized representative.

WITNESSETH:

WHEREAS, the North American Wetlands Conservation Act, 16 U.S.C. 4401-4412; the Migratory Bird Conservation Act, 16 U.S.C. § § 715-715s, the Migratory Bird Hunting and Conservation Stamp Act, 16 U.S.C. § § 718-718j, the Fish and Wildlife Act of 1956, 16 U.S.C. § § 742a-742j, the Emergency Wetlands Resources Act of 1986, 16 U.S.C. § § 3901-3932, and the Land and Water Conservation Fund Act, 16 U.S.C. § 460*l*-4 to 460*l*-11, authorize the Secretary of the Interior to acquire lands and waters or interests therein for the development, advancement, management, conservation, and protection of fish and wildlife resources. The purpose of this easement is to protect the habitat quality of the lands described on Exhibit A and such lands shall be maintained to provide cover, especially nesting cover, and food for a varied array of aquatic, terrestrial, and avian wildlife, particularly waterfowl and threatened and endangered species. The lands described on Exhibit A are hereinafter referred to as a wildlife management area, and

WHEREAS, the lands described below contain habitat suitable for use as wildlife management areas.

NOW, THEREFORE, for and in consideration of the sum of ** ** Dollars ($ ), the Grantors hereby grant to the United States, commencing with the acceptance of this indenture by the Secretary of the Interior or his authorized representative, an easement which includes a right of use for the maintenance of the lands described on Exhibit A, as wildlife management areas, in perpetuity, including the right of ingress to and egress on, over, across and through any and all lands of the Grantors, as described below, by authorized representatives of the United States. No rights herein are granted to the general public for access to or entry upon the land subject to this grant of easement for any purpose. The lands described on Exhibit A are located within, and the aforementioned right of ingress and egress extends on, over, across and through any and all lands within the following-described legal subdivision(s) in ____________County, State of______________, to-wit:

SUBJECT, however, to all statutory rights-of-way and other valid existing rights-of-way for highways, roads, railroads, pipelines, canals, laterals, electrical transmission lines, telegraph and telephone lines, cable lines, and all mineral rights.

The conveyance hereunder shall be effective on the date of the execution of this Indenture by the Secretary of the Interior or his authorized representative; provided, however, that such acceptance must be made within **12** calendar months from date of the execution of this Indenture by the Grantors, or any subsequent date as may be mutually agreed upon in writing by the parties hereto prior to the expiration of such date; and provided further, however, that in the event such acceptance is not made by such date, this Indenture shall be null and void.

The Grantors, for themselves, and for their heirs, successors and assigns, lessees, and any other person claiming under them, covenant and agree that they will cooperate in the maintenance and protection of the habitat areas, delineated on the map(s) attached hereto as Exhibit A, as wildlife management areas for the protection of fish and wildlife resources and to maintain the quality of these lands to provide cover for wildlife, especially nesting cover, and food for a varied array of aquatic, terrestrial, and avian wildlife, particularly waterfowl, and threatened and endangered species. To that end and for the purpose of accomplishing the intent of this Indenture, the Grantors, for themselves or for their heirs, successors, and assigns, lessees, or any other person or person claiming under them covenant and agree as follows:

1. Grantors will cooperate in maintenance of the wildlife management area by maintaining permanent vegetative cover, consisting of grasses, forbs and low-growing shrubs, on said habitat areas, as follows: There shall be no haying or mowing or seed harvesting for any reason until after July 15 in any calendar year, no alteration of grassland, wildlife habitat or other natural features by digging, plowing, disking or otherwise destroying the vegetative cover, and no agricultural crop production upon the habitat areas delineated on Exhibit A, unless prior approval in writing is granted by the U.S. Fish and Wildlife Service; except that grazing the aforesaid lands is permitted at any time throughout the calendar year without approval in writing.

2. Grantors will pay taxes and assessments, if any, which may be levied against the land.

3. Noxious weed control and emergency control of pests necessary to protect the public good are allowed and will be the responsibility of the Grantors, subject to Federal and State Statutes and Regulations. However, mowing/haying noxious weed is prohibited in accordance with the easement terms stated above.

4. This easement and the covenants and agreements contained herein shall run with the land and shall be binding on all persons and entities who shall come into ownership or possession of the lands subject to this easement. The Grantors, successors and assigns shall notify the Regional Director, U.S. Fish and Wildlife Service in writing of any sale or transfer at least 30 days following the sale or transfer of any portion of the lands subject to this easement.

Copies of the above-referenced map(s), Exhibit A, are on file in the Office of the Regional Director, U.S. Fish and Wildlife Service.

It is understood that this Indenture imposes no other obligations or restrictions upon the Grantors and that neither they nor their successors, assigns, lessees, nor any other person or party claiming under them shall, in any way, be restricted from utilizing all of the subject lands in the customary manner for agricultural purposes except as provided herein.

It is further understood that the rights and interests granted to the United States herein shall become part of the National Wildlife Refuge System and shall be administered by the U.S. Fish and Wildlife Service, pursuant to the National Wildlife Refuge System Administration Act, 16 U.S.C. 668dd.

## SPECIAL PROVISIONS

1. This indenture shall not be binding upon the United States until accepted on behalf of the United States by the Secretary of the Interior or his authorized representative, although this indenture is acknowledged by the Grantors to be presently binding upon them and to remain so until the expiration of said period for acceptance, as hereinabove described, by virtue of the payment to the Grantors, by the United States, of the sum of One Dollar, the receipt of which is hereby expressly acknowledged by Grantors.

2. Notice of acceptance of this Indenture shall be given the Grantors by certified mail addressed to

   shall be effective upon the date of mailing, and such notice shall be binding upon all Grantors without sending a separate notice to each.

3. Payment of the consideration will be made by a United States Treasury check or a check from a private conservation organization after acceptance of this indenture by the Secretary of the Interior or his authorized representative and after the Attorney General, or in appropriate cases, the Solicitor of the Department of the Interior shall have approved the easement interest thus vested in the United States.

IN WITNESS WHEREOF the Grantors have hereunto set their hands and seals on this _____ day of_________________ in the year 20___.

______________________________________(L.S.)

## ACKNOWLEDGMENT

STATE______________________)
)ss
COUNTY ____________________)

On this ______ day of_______________ in the year 20____ before me personally appeared _________ known to me to be the person described in and who executed the foregoing instrument and acknowledged to me that he executed the same as his free act and deed.

Notary Public:_____________________________________

(SEAL)

My commission expires: ____________________________

## ACCEPTANCE

The Secretary of the Interior, acting by and through his authorized representative, has executed this agreement on behalf of the United States this _____day of ____________________, 20____.

THE UNITED STATES OF AMERICA

By:__________________________________________

Title:_________________________________________

U.S. Fish and Wildlife Service

**Exhibit IV-1**

## INTRODUCTION

The Prairie Pothole Region (PPR) of the United States supports some of the highest breeding duck populations in the nation and is particularly important to upland nesting species such as mallard, northern pintail, gadwall, blue-winged teal, and northern shoveler. The PPR of the Dakotas comprises approximately 7% of the principal breeding area for ducks in North America, yet supported >20% of all breeding ducks in the traditional survey area during 1996-2005. In addition to the importance of the PPR to duck populations, the region also provides critical breeding and migration habitat for many species of shorebirds, waterbirds, and grassland birds.

The Small Wetlands Acquisition Program (SWAP) was created to perpetuate migratory bird populations, particularly waterfowl, by acquiring and maintaining critical breeding habitat in the PPR. Waterfowl Production Areas, comprised of fee-title lands and grassland and wetland easements, are acquired to fulfill the goals of this program. During 2004, in order to guide the acquisition of grassland and wetland easements in the PPR of Region 6, the Dakota Working Group (DWG) developed and adopted a conservation strategy focusing on the 5 primary upland nesting duck species which provided for the consideration for other trust species benefits. This strategy applies an adaptive approach for integrating biological priorities with current socio-economic threats to habitat to target the acquisition of SWAP grassland and wetland easements in the PPR of Region 6. The goal of this strategy is to permanently protect adequate grassland and wetland habitat to support >90% of the breeding duck carrying capacity and productivity observed in the region between the years 1987-1998. These goals would equate to an average of approximately 3.6 million breeding duck pairs, and a recruitment rate of 0.6. This conservation strategy consists of two primary elements: 1) Protection of the capacity of the landscape to attract breeding ducks through the acquisition of wetland easements, and 2) Protection of the productivity by these breeding ducks through the acquisition of wetland and grassland easements. Models developed by the Bismarck HAPET office were used to identify the extent and location of grasslands and wetlands required to meet these goals. These models indicated that protection of all grasslands and wetlands within areas accessible to >25 pairs of ducks (i.e., areas that support > 25 duck pairs/square mile), plus a one mile buffer, would meet the conservation goal of protecting adequate habitat to support >90% of the duck productivity from the region. It is currently estimated that approximately 1.4 million additional high priority wetland acres and 10.4 - 16 million additional grassland acres are needed to meet the goal . This strategy is based on the knowledge that breeding duck distribution is determined primarily by the wetland community, while reproductive success is determined by the characteristics of surrounding wetlands and uplands and is positively related to the amount of perennial grass cover in the landscape. Due to the willingness of hens to travel some distance from core wetlands to nesting cover, grassland protection is most effective when applied to areas accessible to the greatest number of hens. HAPET models indicated that if all grasslands accessible to >25 duck pairs were protected, >90% of the breeding duck population would benefit. Due to the landscape influences of surrounding grassland on

duck nest success, a 1 mile buffer was added to the >25 duck pair zone. It is assumed that protection of grasslands accessible to >25 duck pairs, plus supporting grassland within 1 mile of these areas, will maintain adequate nesting habitat, while protection of wetlands within this same area will maintain adequate breeding pair and brood habitat for >90% of the duck population.

## GRASSLAND EASEMENT PRIORITIZATION

**Decision tree**
Acknowledging that in addition to ducks, many other trust species benefit from grassland protection, and that risk of grassland loss is high throughout the PPR, a decision tree was adopted for integrating multiple trust species benefits and risk factors into the grassland easement prioritization process. The decision tree identifies hierarchical priorities that incorporates risk of loss and allows for consideration of benefits to other priority trust species while preventing lower priorities from inappropriately influencing higher-level priorities. The attached decision tree is intended to describe the structure of the decision-making process, while the associated maps depict the spatial distribution of conservation opportunities resulting from application of spatial models driven by the decision making process.

Ducks
Grasslands accessible to the greatest number of breeding duck pairs will be the primary determinant for prioritizing grassland easements. Although the long term goal for grassland protection includes all grasslands accessible to >25 duck pairs, plus a 1 mile buffer, shorter-term objectives were developed. These objectives were set to prioritize grasslands accessible to the greatest number of breeding ducks. Grasslands were divided into the three categories: 1) accessible to >60 duck pairs 2) accessible to 40-60 duck pairs 3) accessible to 25-40 duck pairs.

Threats/Risk
Due to the pervasive and dynamic nature of grassland loss resulting from changes in landowner demographics; farm implement size, efficiency, and capability; crop genetics, and types; and markets for agricultural commodities, threats to grasslands are extremely high throughout the Prairie Pothole Region. In addition to these risk factors, waterfowl distribution varies spatially and temporally due to variations in precipitation. Because of the high degree and broad distribution of risks, and the spatial and temporal variation in habitat conditions in the PPR, it is believed the best strategy for grassland protection is to apply the above prioritization within each WMD, thereby focusing protection on the best areas within each WMD rather than focusing efforts on any particular WMD. In order to allow a reasonable level of flexibility to accommodate local opportunities and needs, maximize acquisition of the highest priority grasslands, and remain consistent with biological priorities, short-term objectives for new grassland easement acquisitions were adopted. Three priority levels were selected based on the risk of grassland conversion and the accessibility of grasslands to nesting ducks. Within these priority levels annual

targets were set to ensure that new grassland easements were accessible to the greatest number of duck pairs.

Priority 1: ≥80% of new acres will be acquired in areas accessible to >60 duck pairs per square mile.
Priority 2: ≤20% of new acres will be acquired in areas accessible to 40-60 duck pairs per square mile.
Priority 3: ≤5% of new acres will be acquired in areas accessible to 25-40 duck pairs per square mile.

Endangered Species and other Migratory Birds
It was decided that secondary priorities will focus on listed species (endangered or threatened) for which grassland easements would benefit recovery efforts (noted as A or B in the decision tree). Migratory birds (excluding the 5 primary upland nesting duck species) for which grassland easements would be appropriate conservation actions were identified as the third highest priority (noted as C or D in the decision tree). Managers will determine when and which species to incorporate into the prioritization process for their respective areas of responsibility, and the HAPET Office will provide assistance with model development and integration of these additional species. Pending incorporation of endangered species and/or other migratory bird priorities, grassland easement prioritization will occur based solely on current duck prioritization criteria. Inclusion of endangered species and other migratory birds is intended to further refine selections within, but not between, Priority 1-3 grassland tracts (e.g. Priority 2 or 3 tracts with endangered species or other migratory bird benefits do not rise to a higher priority than Priority 1 tracts without these additional species benefits).

Note:
Priority areas will be identified by HAPET models and updated periodically as new information becomes available. It is understood that shorter term objectives will also be updated periodically to reflect changes in opportunities and risks. Opportunities for new protection will decrease through time as more of the remaining habitat is either protected or converted to cropland.

## ADDITIONAL GRASSLAND PRIORITIZATION CRITERIA

After using the decision tree to identify the biological priority zone for a tract, the following criteria should be applied prior to final acceptance of a tract for easement purchase. These criteria are designed to provide additional guidance on current policies, and logistical and economic considerations relevant to grassland easement acquisition.

**Highest Habitat Value per Dollar Spent:** For tracts within the same biological priority zone, preference will be given to parcels where the Service can acquire the best habitat at the lowest financial and administrative cost. The GAO Report of September 2007, page 31 stated that "analysis indicate that an important opportunity for gains in efficiency would be for the Service to target the lowest cost easements in the high priority zone." In

addition to biological prioritization, the following guidance is provided to further aid in attaining our acquisition goals as quickly and efficiently as possible:

1. When funds are limiting, emphasis will be placed on acquiring tracts that are the lowest cost per acre.
2. When personnel needed to complete the required evaluations, site visits, document preparation, etc. are limiting, emphasis will be placed on acquiring larger tracts.

**Vegetation Type:** For tracts within the same biological priority zone, preference will be given to unbroken prairie. In order to meet the conservation strategy goals, protection of all grassland habitat within priority areas is necessary. Tame grass is not precluded from acquisition, however preference will be given to unbroken prairie for the following reasons:

1. The biological diversity and ecological functions associated with native prairie habitats are of value to numerous trust species. Although some of the diversity and functionality can be restored, it is unlikely that the full functionality of native prairie ecosystems can ever be fully restored once lost.
2. Planted grass requires greater long term management input by landowners and therefore increased support and enforcement efforts by the Service
3. Conservation of unbroken prairie is politically more acceptable to state and local governments, and therefore receives greater support than conservation of planted grass. Conservation of unbroken prairie is viewed by many as being supportive of the ranching industry, while conservation of planted grass is often viewed as conflicting with the farming industry. It is believed that sensitivity to these views will enable the Service to more effectively acquire grassland easements.

**Other Funding Sources:** If individual WMDs have secured partners and additional funding, **and** the proposed acquisitions lie in one of our biological priority areas, there may be considerations given to meet the terms of the partner's contribution (e.g. if a tract would be excluded based on "lower habitat value per dollar" criteria, but partners are willing to contribute adequate support to overcome the deficit, then the tract should be acquired).

1. Circumstances in a particular WMD may require the easement acquisition be completed using NAWCA grants, Ducks Unlimited contributions, Pheasants Forever monies or any other special funds that may become available. Acquisitions of this type need to be coordinated with the Realty Chief so they are aware of the special monies available.

## WETLAND EASEMENT PRIORITIZATION

**Decision tree**

Acknowledging that in addition to ducks, many other trust species benefit from wetland protection, and that risk of wetland drainage varies among wetlands, a decision tree was adopted for integrating multiple trust species benefits and risk factors into the wetland

easement prioritization process. The decision tree identifies hierarchical priorities that incorporate risk of drainage and allow for consideration of benefits to other priority trust species while preventing lower priorities from inappropriately influencing higher-level priorities. The attached decision tree is intended to describe the structure of the decision-making process, while the associated maps depict the spatial distribution of conservation opportunities resulting from application of spatial models driven by the decision making process.

Ducks

Protection of wetlands in areas accessible to >25 duck pairs, plus a 1 mile buffer, is the primary determinant for prioritizing wetland easements. In order for areas identified as high priority for acquisition of grassland easements (nesting habitat) to continue to be productive, the associated high priority wetlands, which attract and support breeding duck pairs to an area, also must be protected. Protection of these wetlands is necessary regardless of the habitat within which they occur. Although all associated wetlands contribute to attracting duck pairs, temporary wetlands, seasonal wetlands, and small (<1 ac.) semipermanent wetlands attract higher densities of ducks than more permanent and larger wetlands. Shorter-term objectives were set to prioritize wetlands supporting the highest densities of breeding pairs. These wetlands were divided into the following three categories: 1) temporary, seasonal, and ≤1 acre semipermanent wetlands 2) semipermanent wetlands >1-25 acres and 3) semipermanent wetlands >25 acres and lakes.

Threats/Risk

Because the risk of wetland drainage differs among wetlands, risk criteria were incorporated into the prioritization process. These risk criteria considered size and class of the wetland, and surrounding land use. Drainage history in the PPR, as well as numerous past efforts to modify/remove Swampbuster Provisions of the Farm Bill, demonstrate that the risk of wetland drainage is highest and more immediate for smaller, less permanent wetlands embedded in cropland. Current information suggests that about 70% of all breeding waterfowl pairs in the Prairie Pothole Region occur on wetlands in crop fields. In order to allow a reasonable level of flexibility to accommodate local opportunities and needs, maximize acquisition of the highest priority wetlands, and remain consistent with biological priorities, short term objectives for new wetland easement acquisitions were adopted. These short term objectives apply 5 priority levels to wetlands within priority waterfowl areas, based on the risk of wetlands being drained and the capacity of wetlands to attract duck pairs.

Wetlands embedded in cropland:
Priority 1: Temporary wetlands, seasonal wetlands, or ≤1 acre semipermanent.
Priority 2: Semipermanent or lake wetlands ≤25 acres.

Wetlands embedded in grassland:
Priority 3: Temporary wetlands, seasonal wetlands, or <1 acre semipermanent.
Priority 4: Semipermanent or lake wetlands ≤25 acres.

Wetlands embedded in cropland or grassland
Priority 5: >25 acre wetlands.

The above priority levels are applied to potential easement tracts based on the highest priority (1-5) wetland associated with a tract. Wetland easement offers being considered should be prioritized to acquire the highest priority tracts available for priorities 1-4. Although acquisition of some Priority 5 wetlands may be necessary in order to acquire higher priority wetlands, this should be minimized when possible. Priority 5 wetlands are generally at low risk of drainage due to their large size and water permanency.

Endangered Species and other Migratory Birds
It was decided that secondary priorities will focus on listed species (endangered or threatened) for which wetland easements would benefit recovery efforts (noted as A or B in the decision tree). Migratory birds (excluding the 5 primary upland nesting duck species) for which wetland easements would be appropriate conservation actions were identified as the third highest priority (noted as C or D in the decision tree). Managers will determine when and which species to incorporate into the prioritization process for their respective areas of responsibility, and the HAPET Office will provide assistance with model development and integration of these additional species. Pending incorporation of endangered species and/or other migratory bird priorities, wetland easement prioritization will occur based solely on current duck prioritization criterion. Inclusion of endangered species and other migratory birds is intended to further refine selections within, but not between, Priority 1-5 wetland tracts (e.g. Priority 2-5 tracts with endangered species or other migratory bird benefits do not rise to a higher priority than Priority 1 tracts without these additional species benefits).

Note:
Priority areas will be identified by HAPET models and updated periodically as new information becomes available. It is understood that shorter term objectives will also be updated periodically to reflect changes in opportunities and risks. Opportunities for new protection will decrease through time as more of the remaining habitat is either protected or converted to cropland.

## ADDITIONAL WETLAND PRIORITIZATION CRITERIA

After using the decision tree to identify the priority zone for a tract, the below criteria should be applied prior to final acceptance of a tract for easement purchase. These criteria are designed to provide additional guidance on current policies, and logistical and economic considerations relevant to wetland easement acquisition.

**Highest Habitat Value per Dollar Spent:** For tracts within the same biological priority zone, preference will be given to parcels where the Service can acquire the best habitat at the lowest financial and administrative cost. The GAO Report of September 2007, page 31 stated that "analysis indicate that an important opportunity for gains in efficiency would be for the Service to target the lowest cost easements in the high priority zone." In

addition to biological prioritization, the following guidance is provided to further aid in attaining our acquisition goals as quickly and efficiently as possible:

1. When funds are limiting, emphasis will be placed on acquiring tracts that are the lowest cost per acre.
2. When personnel needed to complete the required evaluations, site visits, document preparation, etc. are limiting, emphasis will be placed on acquiring larger tracts.

**Other Funding Sources:** If individual WMDs have secured partners and additional funding, and the proposed acquisitions lie in one of our biological priority areas, there may be considerations given to meet the terms of the partner's contribution (e.g. if a tract would be excluded based on "highest habitat value per dollar" criteria, but partners are willing to contribute adequate support to overcome the deficit, then the tract should be acquired).

1. Circumstances in a particular WMD may require the easement acquisition be completed using NAWCA grants, Ducks Unlimited contributions, Pheasants Forever monies or any other special funds that may become available. Acquisitions of this type need to be coordinated with the Realty Chief so they are aware of the special monies available.

**Funding Restrictions:** In North Dakota, the Service's ability to acquire wetland easements is limited by an agreement with the Governor of ND. This agreement places a county-level cap on the number of wetland acres that can be acquired under easement using MBCF funds. As a result, MBCF funds should be used only for the highest risk wetlands (priority 1 and 2) in ND, and that other funding sources should be used for acquisition of lower risk wetlands (priority 3 and 4).

Exhibit IV-2a

# Field Evaluation For Wetland Easement Offers



U.S. Fish & Wildlife Service

Exhibit IV-2b

## Priority Zones for USFWS Wetland Easement Acquisition
### North Dakota Portion of the Prairie Pothole Region




Waterfowl pair density information was generated using GIS modeling techniques utilizing USFWS National Wetland Inventory digital data, the USFWS-Region 6 Four Square Mile Breeding Waterfowl Survey results, and regression equations predicting duck pair/wetland relationships developed by the USFWS Habitat and Population Evaluation Team and USGS Northern Prairie Wildlife Research Center. The information presented represents the priority zone for USFWS Wetland Easements and all small, shallow wetlands that are currently not protected within the zone are considered priority. The zone is based on the accessibility of 37.58 acre landscape units to the combined predicted breeding pairs for mallard, blue-winged teal, gadwall, pintail, and shoveler.

For more information contact the HAPET Office, USFWS, Bismarck, North Dakota.

Produced by the Region 6 HAPET Office, Bismarck, ND
Current to: 2008
File: home31\projects\tstorm_08\nd grass priority areas 2008 8x11.mxd

U.S. Fish & Wildlife Service

Exhibit IV-2c

# *Priority Zones for USFWS Grassland Easement Acquisition*

## *South Dakota Portion of the Prairie Pothole Region*




**Legend**

Wetland Management District Boundary

County Boundary

Wetland Priority Zone

Waterfowl pair density information was generated using GIS modeling techniques utilizing USFWS National Wetland Inventory digital data, the USFWS-Region 6 Four Square Mile Breeding Waterfowl Survey results, and regression equations predicting duck pair/wetland relationships developed by the USFWS Habitat and Population Evaluation Team and USGS Northern Prairie Wildlife Research Center. The information presented represents the priority zone for USFWS Wetland Easements and all small, shallow wetlands that are currently not protected within the zone are considered priority. The zone is based on the accessibility of 37.58 acre landscape units to the combined predicted breeding pairs for mallard, blue-winged teal, gadwall, pintail, and shoveler.

For more information contact the HAPET Office, USFWS, Bismarck, North Dakota.

Map Location




South Dakota Wetland Management Districts

Produced by the Region 6 HAPET Office, Bismarck, ND
Current to: 2008
File: home31\projects\tstorm_08\sd grass priority areas 2008 8x11.mxd

Exhibit IV-2d

# Wetland Easement Acquisition Evaluation Form

Acquisition # ____________ Acquisition Biologist ____________ Date ____________

| | | | | | |
|---|---|---|---|---|---|
| Landowner | | County | | Total Acres | |
| Address | | Township | | Wetland Acres | |
| | | Range | | Restoration Needed | |
| Phone | | Section | | | |
| Cell Phone | | | | | |
| Email | | | | | |

Comments




**Endangered Species Priority List**

- ______ Piping Plover
- ______ Whooping Crane
- ______ Least Tern
- ______ W.P. Fringed Orchid
- ______

**Wetland Dependant Migratory Bird Priority List**

- ______ Willet
- ______ Marbled Godwit
- ______ Wilsons Phalarope
- ______ Black Tern
- ______ Sora
- ______ American Bittern
- ______ Northern Harrier

Recommendation: ______ Approved ______ Not Approved

Acquisition Biologist: ______________________ Project Leader: ______________________

Exhibit IV-2e

# Evaluation For Grassland Easement Offers



U.S. Fish & Wildlife Service

Exhibit IV-2 f

# Priority Zones for USFWS Grassland Easement Acquisition

## North Dakota Portion of the Prairie Pothole Region




DUCK PAIRS

Waterfowl pair density information was generated using GIS modeling techniques utilizing USFWS National Wetland Inventory digital data, the USFWS-Region 6 Four Square Mile Breeding Waterfowl Survey results, and regression equations predicting duck pair/wetland relationships developed by the USFWS Habitat and Population Evaluation Team and USGS Northern Prairie Wildlife Research Center. The information presented represents the priority zones for USFWS Grassland Easements and colors match Evaluation For Grassland easement Offers form. Zones are based on the accessibility of 37.58 acre landscape units to the combined predicted breeding pairs for mallard, blue-winged teal, gadwall, pintail, and shoveler.

PRIORITY ZONES

Priority Zones were derived from the Thunderstorm Map. However, pair value polygons were buffered an additional 1 mile to prioiritize grassland in the landscape surrounding a target location to retain the value of the supporting grass to nest success.

Priority Zone 1 = areas with > 60 breeding duck pairs
Priority Zone 2 = areas with 40-60 breeding duck pairs
Priority Zone 3 = areas with 25-40 breeding duck pairs

For more information contact the HAPET Office, USFWS, Bismarck, North Dakota.

Produced by the Region 6 HAPET Office, Bismarck, ND
Current to: 2008
File: home31\projects\tstorm_08\nd grass priority areas 2008 8x11.mxd

Map Location



North Dakota Wetland Management Districts

Exhibit IV-2g

U.S. Fish & Wildlife Service

# *Priority Zones for USFWS Grassland Easement Acquisition*

## *South Dakota Portion of the Prairie Pothole Region*




DUCK PAIRS

Waterfowl pair density information was generated using GIS modeling techniques utilizing USFWS National Wetland Inventory digital data, the USFWS-Region 6 Four Square Mile Breeding Waterfowl Survey results, and regression equations predicting duck pair/wetland relationships developed by the USFWS Habitat and Population Evaluation Team and USGS Northern Prairie Wildlife Research Center. The information presented represents the priority zones for USFWS Grassland Easements and colors match Evaluation For Grassland easement Offers form. Zones are based on the accessibility of 37.58 acre landscape units to the combined predicted breeding pairs for mallard, blue-winged teal, gadwall, pintail, and shoveler.

PRIORITY ZONES

Priority Zones were derived from the Thunderstorm Map. However, pair value polygons were buffered an additional 1 mile to prioritize grassland in the landscape surrounding a target location to retain the value of the supporting grass to nest success.

Priority Zone 1 = areas with > 60 breeding duck pairs
Priority Zone 2 = areas with 40-60 breeding duck pairs
Priority Zone 3 = areas with 25-40 breeding duck pairs

For more information contact the HAPET Office, USFWS, Bismarck, North Dakota.

Produced by the Region 6 HAPET Office, Bismarck, ND
Current to: 2008
File: home31\projects\tstorm_08\sd grass priority areas 2008 8x11.mxd



South Dakota Counties

Exhibit IV-2h

# Grassland Easement Acquisition Evaluation Form

**Acquisition #** **Acquisition Biologist** **Date**

**Landowner** ______ **County** ______ **Total Acres Considered for Easement** ______

**Address** ______ **Township** ______

**Range** ______ **Wetland Acres** ______

**Phone** ______ **Section** ______ **Restoration Needed** ______

**Cell Phone** ______

**Email** ______

**Comments**




**Endangered Species Priority List**

- ____ Piping Plover
- ____ Whooping Crane
- ____ Least Tern
- ____ W.P. Fringed Orchid
- ____

Recommendation: ____ Approved ____ Not Approved

Acquisition Biologist: ______ Project Leader: ______

WATERFOWL MANAGEMENT
EASEMENT CHRONOLOGICAL LIST

Easement No. 100X
County Mahnomen

| Date | Remarks-Comments-Event-Etc. | Signature |
|---|---|---|
| 8/10/6b | Easement granted 5/10/66 by George L. and Mary Griest for $850.00. Easement totals 320 acres with 59 acres of wetlands. Donald J. Bread (RE) negotiated easement. | |
| 9/5/66 | On ground inspection by Manager Jones. Contacted the Griest's and discussed easement terms. Took several photos of wetlands and existing drainage facilities. | |
| 11/2/66 | Aerial inspection--No suspected violations noted. Type IIIs dry. Type IVs with low water. | |
| 10-26 67 | aerial surveillance –No violations noted | |
| 04-30-69 | Landowner says no ducks on the pond. LLC | – |
| 6/12/71 | On ground inspection by Assistant Manager Smith. Several mallard broods noted on the Type IV SE of farm site. | . |
| 11/1/71 | Aerial inspection--No violations. Water conditions extremely high due to high rainfall. | |
| | | |
| | | |
| | | |
| | | |
| | | |

Form R3-463
(9/80)

EXHIBIT V-2

Example *of* Label to be Attached to the Back *of*
Photographs Taken to Document Evidence

*Roll #* *Pic #* *Film Type* *Date*

*Time* *Easement #* *County* ___

*T.* *R.* *Sec.* *Camera Height*

*Token 8y* *Camera Location*

*Direction of Photo*
*Remarks:*

(Actual Label Size is 3" x 3 1/2")

Exhibit V-3

# Procedure for Digital Imagery

**Introduction:**

The use of technology for forensic examination of images has increased in recent years. Changes in technology have allowed both law enforcement and criminals to move from using traditional photographic methods to utilizing digital technology to capture and process photographic images.

This document describes the standard operating procedures and guidelines by which the examiners of the National Fish and Wildlife Forensics Laboratory, U.S. Fish and Wildlife Service, will handle, capture, process, and preserve evidence related digital images. The types of materials covered by this procedure include, but are not limited to, conventional negatives, positives and prints; digital photographs; and other printed materials.

Evidentiary items will be handled as stipulated in the Quality Assurance Quality Control manual of the Laboratory.

**Definitions:**

Archival Media - Any media used to store electronic data for long periods of time. In this document, archival media is either writable CD's or writable DVD's.

Analog Image - An image created using conventional photographic methodologies, for example: a photographic negative, photographic positive, or Polaroid print.

Clarified Image - A reproduction of the original image processed via computer software to visually clarify the content of the image and maintain a fair and accurate representation of the scene or object as it was at the time the image was captured.

Color Calibration - The process of adjusting the monitor, input device, and output device to compensate for color conversions.

Digital Image - An image captured by an electronic imaging device, such as a scanner, digital camera, or frame grabber and displayed or stored on electronic media.

Digital image processing - is the science of processing pictorial information with a computer system. The goal of image processing is to clarify the quality of the image.

Duplicate Image - The Laboratory uses the definition of an original consistent with Federal Rules of Evidence Article X, "Content of Writings, recordings, and Photographs", Rule 1001, which states: "**Duplicate**. A "duplicate" is a counterpart produced by the same impression as the original, or from the same matrix, or by means of photography, including enlargements and miniatures, or by mechanical or electronic re-recording, or by chemical reproduction, or by other equivalent techniques which accurately reproduces the original."

ICC Profile - A color space description as defined by the International Color Consortium.

Image - A graphical representation of a scene or object.

Lossless Compression - Compression technique that does not result in image data loss when the image is saved and the image can be retrieved with the same data content.

Lossy Compression - Compression technique that results in the lose of image data when the image is saved and the image cannot be retrieved with the same data content that it contained before it was saved.

Original Image - The Laboratory uses the definition of an original consistent with Federal Rules of Evidence Article X, "Content of Writings, recordings, and Photographs", Rule 1001, which states: "**Original.** An "original" of a writing or recording is the writing or recording itself or any counterpart intended to have the same effect by a person executing or issuing it. An "original" of a photograph includes the negative or any print therefrom. If data are stored in a computer or similar device, any printout or other output readable by sight, shown to reflect the data accurately, is an "original"."

**Equipment:** The equipment listed below is used in digital imagery clarification procedures. The equipment identified may not be used in every case, but is available to the examiners to use at their discretion. The list is not meant to be all inclusive, but is current as to the time of the signature of this document. The list will be updated yearly when the procedure is reviewed.

Adobe Photoshop
Digital Camera
Flatbed Scanner
IBM compatible computer
Monitor capable of displaying resolution equal to or higher than

the digital resolution.
PCMCIA Card Reader
Positive Slide/Negative Scanner
Photographic Quality Printer
Wide Format Printer
TWAIN Drivers appropriate for device
U-Lead Software any version
Video Card capable of displaying resolution equal to or higher than the digital resolution.
Writeable CD-Rom Drive
Picture Information Extractor

**Color Calibration:** Computer monitor should be color calibrated according to the manufacturer recommendations. The Fijix Pictrography 3000 will be calibrated whenever the donor or receiver paper is changed. The HP DesignJet 1055CM printer has a manufacturer's color profile which will be used when printing to this printer. A log will be kept of the calibration preformed for each piece of equipment. If an ICC profile is available from the manufacturer, it is to be used.

**Maintenance**: All maintenance completed on a input or output device shall be recorded in a log.

**Procedure:**

1. All devices shall be color calibrated in accordance with the procedure documented in the color calibration section above.

2. Photographic images captured with a digital camera, scanner, video capture device, or other digital imagery devices will follow the same evidentiary rules as photographic film.

3. All digital images will include the information regarding their creation either as part of the image file or in the examiner's bench notes. This information is to include the capture device's make, model, settings (if different then the capture device's default settings), and date of capture.

4. The resolution of the adjusted image should be retained at the level standard for the analytical examination being performed. If no analytical examination standard has been established, the original capture resolution should be retained.

5. Some cameras store captured images using a lossy compression. The use of these cameras is acceptable. The digital images are to be preserved

in their captured format.

6. Any clarification of a digital image is to be conducted on a copy of the digital image. The clarification procedures to be used for digital imagery files are to increase visual clarity of the image. Upon completion of the processing, the clarified image is to be saved using a distinct file name using a lossless compression. Acceptable lossless compression file formats are BMP, PSD, or TIF.

7. All digital image(s) are to be preserved on archival media and retained in the designated storage area. All digital images are to be saved, even those with little or no forensic value or poor quality.

**Notes and Reports:** Each page of an examiner notes should include case number, item number, date, initials, and page number. The make and model of the capture device and the software and version used to clarified images will be documented in examiner's notes. All clarification of the digital image is to be documented in the examiner's notes with sufficient detail to allow the clarification to be repeatable by a qualified examiner. When available in the software being used to clarify the image, a electronically stored or printed log file will be used to document the clarification procedure. All digital images are to be written to a archival media and stored in the designated storage area.

# Procedure for Digital Imagery
**Approved**

Verlin K. Cross
Technical Support Branch Chief

Ed Espinoza
Deputy Laboratory Director

Ken Goddard
Laboratory Director

U.S. Department of Justice
Federal Bureau of Investigation

January 2000 Volume 2 Number 1

# Guidelines for Field Applications of Imaging Technologies

## Scientific Working Group on Imaging Technologies (SWGIT)

**(Version 2.0, June 8, 1999)**

***Read about ...***

Letter From Unit Chief, Special Photographic Unit, FBI Laboratory

Instructions for Submitting Comments

Introduction

Advantages and Disadvantages of Major Image Capture Technologies in Field Applications

- Silver-Based Film Cameras
- Digital Cameras
- Video Cameras
- Hybrid Imaging Systems

Guidelines For Standard Operating Procedures

- Crime Scene Photography SOP
- First Responder: SOP A and SOP B
- Surveillance Photography SOP
- Tactical Survey SOP
- HAZMAT Scene Photography SOP
- Aerial Photography SOP
- Accident Scene Photography SOPs (A and B)
- Miscellaneous SOPs

---

Washington, D. C. 20535
December 1, 1999

Dear Colleague,

The Scientific Working Group on Imaging Technologies (SWGIT) includes approximately 25 representatives from law enforcement agencies at the federal, state, and local levels, as well as imaging scientists from academia. In April of this year, the SWGIT issued a preliminary set of general guidelines and recommendations for the use of various imaging technologies by law enforcement professionals. This draft document, "Definitions and Guidelines for the Use of Imaging Technologies in the Criminal Justice System," was released on the Internet on the FBI Home Page as part of the inaugural issue of the FBI Laboratory's electronic journal, *Forensic Science Communications (FSC)*. Readers were asked to provide feedback so that we could be sure that the guidelines address the needs of the entire law enforcement imaging community. Based on this feedback, a revised edition was published in the October 1999 issue of *FSC*.

While the draft guidelines document addresses law enforcement imaging applications in very general terms, the SWGIT is also preparing additional documents that focus more specifically on different law enforcement applications. The first of these documents, "Guidelines for Field Applications of Imaging," has been prepared and is being released in this edition of the *FSC* for general comment. It provides general guidelines for the preparation of agency-specific Standard Operating Procedures (SOPs) for various situations encountered by law enforcement personnel in field settings. It also includes brief descriptions of some of the advantages and disadvantages of each major image capture technology: silver-based film cameras, digital still cameras, and full-motion video cameras, along with some equipment recommendations.

This communication is intended not only to inform you of these documents, but also to request your assistance in the dissemination and revision of them. To view the documents at the FBI home page go to www.fbi.gov, click on "FBI Library," and then select *Forensic Science Communications*. Individuals with access to Law Enforcement On-line (LEO) can also find these documents via links at the SWGIT special interest group location.

Your feedback is important. If you are interested in contributing comments, please respond prior to June 1, 2000. Instructions for submitting comments are attached. The SWGIT will incorporate the responses generated by these drafts prior to issuing final versions of them.

Thank you for your assistance in this matter.

Sincerely,

SSA Athena Varounis
Unit Chief, Special Photographic Unit
Laboratory Division

Back to the top

### Instructions for Submitting Comments on

# "Guidelines for Field Applications of Imaging"

If you wish to submit comments to the Scientific Working Group on Imaging Technologies (SWGIT), you may do so via E-mail or surface mail.

When submitting your comments, include the following:

1. Your name;
2. Your job title;
3. Name and address of your agency;
4. Telephone number; and
5. E-mail address.

When commenting on specific parts or sections of the draft guidelines, please indicate the document and section title to which you are referring, as well as any specific wording that is in question.

If replying via E-mail, include the previously requested information (1–5, above) in the body of your E-mail and enter "SWGIT Documents Review" as your subject line. You may include your comments in the body of your E-mail or as an attachment in either WordPerfect or Microsoft Word.

Forward your comments to either of the following addresses: ddavies@leo.gov or rvorderb@leo.gov.

If replying via surface mail, include the previously requested information (1–5, above) in a cover letter, followed by your comments, and forward them to the following address:

Richard W. Vorder Bruegge
Federal Bureau of Investigation
Laboratory Division Room 3449
935 Pennsylvania Avenue NW
Washington DC 20535

Back to the top

## Introduction

The purpose of this document is

- To provide specific recommendations and guidelines for the use of imaging technologies in law enforcement field applications;
- To provide the advantages and disadvantages of silver-based film cameras, digital cameras, video cameras, and hybrid imaging systems in law enforcement field applications;
- To provide general guidelines for preparing agency-specific imaging technologies standard operating procedures (SOPs) for law

enforcement field applications; and

- To provide imaging equipment recommendations.

This document addresses the photographic documentation of events or subjects that are not in a controlled environment (e.g., studio or laboratory). These field applications include the following:

- General crime scene photography.
- First responder (FR) photography.
  - When crime scene photography personnel will not be called
  - Prior to arrival of crime scene photography personnel
- Surveillance photography.
- Tactical surveys.
- Hazardous materials (HAZMAT) crime scene photography.
- Aerial photography.
- Accident scenes.
- Arson photography.
- Autopsy photography.
- Bombing photography.
- Mass disaster photography.
- Search warrant photography.
- Gang-related graffiti photography (FR).
  - When agency policy does not require that crime scene photography personnel respond.
  - When agency policy requires that crime scene photography personnel respond.
- Field mug shots and tattoos (FR).
- Victim photography.
- Administrative evidence and property documentation.

*Back to the top*

## Advantages and Disadvantages of Major Image Capture Technologies in Field Applications

The selection of an acquisition device (camera) is driven by the purpose and requirements of the end product. Therefore, the final use of the image should determine the choice of the camera.

**Silver-Based Film Cameras**

It is strongly recommended that conventional silver-based film be the primary capture media for evidentiary photography or imaging in field applications.

*Advantages of Silver-Based Film Cameras in Field Applications:*

- Highest resolution.
- Highest dynamic range.
- Best color range.
- Most flexibility of currently available image options.
- Most durable storage medium.
- More readily available in the field than video or digital storage media.

*Resolution* is the amount of sharpness or detail in the image and is dependent on the amount of pixels or grain in an image. Generally, the quality of the final image is determined by the amount of grain or pixels contained in the primary image.

In digital imaging, resolution is a function of the number of pixels across the width and the height of the charge coupled device (CCD). The pixel count is established by multiplying these numbers:

camera resolution of 640 x 480 = 307,200 total pixels.

Pixels must be capable of recording three colors to make a traditional color photograph. Each color is typically recorded as a byte of information. To determine the file size of a 640 x 480 pixel image, multiply 640 x 480 x 3 (3 colors) = 921,600 bytes or 900k.

Two hundred pixels per inch (ppi) are generally used as the divisor to determine the acceptable printing size from a given image resolution. (This value is considered to be conservative by some.) In general, dividing the number of pixels by 200 ppi will provide the optimum printing size for an image captured by a digital camera.

For example, a camera with a resolution of 640 x 480 pixels would be calculated:

640 pixels/200 ppi = 3.2 inches and 480 pixels/200 ppi = 2.4 inches.

Therefore, the best photographic result produced by this camera would be a 2.4 x 3.2-inch image which is approximately a wallet-sized photograph. Although it is possible to print an 8 x 10-inch photograph from an image captured by this camera, the quality of the photograph will be degraded. In order to produce an acceptable 5 x 7-inch photograph, a digital camera with a resolution of 1280 x 960 pixels is required, and a resolution of 2000 x 1600 pixels for an 8 x 10-inch photograph is required.

Due to the extremely small size of the silver crystals used to make a film

image, the resolution of film is dramatically higher than images produced with digital cameras. The average 35-mm negative has an approximate resolution of 5500 x 3600 pixels. This number changes with the ISO of the film because faster film uses larger silver crystals. By comparison, a digital camera with a resolution of 640 x 480 contains only 1.6 percent of the information capable of being recorded on a 35-mm negative.

*Additional Comparisons*

| Sensor | 35-mm film | High-end digital cameras (at least 1500 x 1000 pixels) | Low-end digital cameras (fewer than 1500 x 1000 pixels) |
|---|---|---|---|
| Pixel count | 5500 x 3600 | 3000 x 2000 | 1280 x 960 |
| Print size | 27.5 x 18 | 15 x 10 | 6.4 x 4.8 |
| Average cost (at press) | | $20,000 | $1,000 |

*Dynamic range*: The difference between the brightest highlight and darkest value that a sensor (film or CCD) can detect and record in a single image. Negative film provides from two to four more f-stops than most digital cameras. This increased dynamic range allows capture of both shadow detail and highlight detail in a single frame of film. These details may require several different images (at different capture settings) when recorded with a digital camera.

*Color range*: The range of colors that can be detected by a sensor compared to normal human vision. Negative film has a color range that is superior to CCDs.

*Flexibility*: Silver-based photography provides a wider selection of film speeds and types than digital cameras. Film can be selected for specific applications in the field, and the film speed or type can be changed on-site to meet specific needs.

*Disadvantages of Silver-Based Film Cameras in Field Applications:*

- Need for separate processing and printing facilities.
- Relatively long processing time.
- Environmental hazards generated by processing byproducts.
- Preprocessing fragility (e.g., temperature, humidity, X-ray effects).
- No means of immediate image evaluation (with the exception of instant film).

Back to the top

**Digital Cameras**

*Advantages of Digital Cameras in Field Applications:*

- Immediacy of image (instant viewing and verification of image).

- Ability to transmit and disseminate image with minimum of intermediate steps.
- On-site image management.
- On-site image printing.
- Operational security (all processing is in-house).
- More environmentally friendly than film.

*Disadvantages of Digital Cameras in Field Applications:*

- Battery or power supplies (environmental impact, availability, power conversion).
- Limited availability of storage media (available only from specialized stores).
- Storage media subject to damage from electromagnetic fields.
- Image acquisition subject to electromagnetic interference.
- Automatic compression in some digital cameras.
- Hardware and software frequently proprietary and incompatible between manufacturers.
- Requires increased technical support compared to film-only systems.
- Legacy file problem (evolution of technology, including hardware and software, may impact ability to access archived images over time).

*Notes on Digital Cameras:*

- High-end digital cameras are designed for the *professional* market and typically have sensors with at least 1500 x 1000 pixels. These cameras have imaging versatility including interchangeable lenses, macro-to-telephoto capabilities, off-camera flash, full-manual override, focus override, and through-the-lens (TTL) viewing and focus.
- Low-end digital cameras are designed for the *consumer* market and typically have sensors with less than 1500 x 1000 pixels. These cameras do not have the versatility of high-end cameras and may be referred to as point-and-shoot cameras.

Back to the top

**Video Cameras**

*Advantages of Video Cameras in Field Applications:*

- Real-time motion record capability.
- Immediacy of image (instant viewing and verification of image).

- Ability to transmit and disseminate image with minimum intermediate steps.
- More environmentally friendly than film.
- Ability to print in the field.
- Ability to synchronize and capture audio.

*Disadvantages of Video Cameras in Field Applications:*

- Battery or power supplies (environmental impact, availability, power conversion).
- Limited availability of high-quality storage media (all formats available only from specialized stores).
- Storage media subject to damage from electromagnetic fields.
- Image acquisition highly subject to electromagnetic interference.
- Resolution of still images is less than that of digital or silver-based capture media.
- Limited color fidelity.
- Reduced media lifetime.
- Hand-held video frequently lacks image stability.
- Automatic compression in some formats.
- Weight and portability of equipment may be a problem.

*Notes on Video Formats:*

- VHS and 8-mm formats are the most commonly available formats but have the worst signal-to-noise ratio of any video format (greatest amount of noise).
- Super VHS and Hi-8 formats are the second most commonly available formats and have somewhat better signal-to-noise ratio than VHS.
- Beta SP and MII formats are professional broadcast quality and are the best analog format available.
- Digital video quality varies, and the high-end is better than analog systems.

Back to the top

**Hybrid Imaging Systems**

A hybrid imaging system is a combination of silver-based photography and

digital imaging technology that typically involves the conversion of silver-based film or print images to digital images through the use of scanners. Hybrid imaging systems incorporate some of the benefits of both film and digital image technologies and are recommended for agencies and organizations seeking to add digital imaging technologies to their photographic resources.

*Advantages of Hybrid Imaging Systems in Field Applications:*

- Shortened darkroom time for producing prints.
- Maintains high-quality original film images.
- Flexibility of digital image processing.
- Enables easy electronic transmission of images.
- Enables image analysis.
- Simplifies case-file management.
- Ability to use a variety of output devices.

*Disadvantages of Hybrid Imaging Systems in Field Applications:*

- Separate processing and printing facilities.
- Relatively long processing time.
- Environmental hazards generated by processing byproducts.
- Preprocessing fragility (e.g., temperature, humidity, X-ray effects).
- No means of immediate image evaluation (with the exception of instant film).
- Requires increased technical support compared to film-only systems.

Back to the top

## Guidelines For Standard Operating Procedures (SOPs)

**General Guidelines for a Crime Scene Photography SOP**
*Title*: Crime Scene Photography SOP.

*Purpose*: To permanently document, by qualified personnel, evidence and other details at a crime scene for future reference.

*Note*: Crime scene photography generally requires the ability:

- To record information that crime scene personnel may not know was important at the time the images were captured,
- To deal with varying lighting and physical conditions,
- To accurately represent the details and colors at a crime scene, and

- To get close-up and wide-angle images with accurate spatial relationships.

Crime scene photography is usually a time-limited activity in which there is only one opportunity to correctly complete the task. Depending on the nature of the crime or incident, conditions at a crime scene may dictate the selection and use of equipment and techniques.

*Equipment*: (Image Capture Devices)

- Silver-based film cameras are recommended for use as the primary image capture device. The minimum recommendation is a 35-mm (SLR) camera capable of manual override, interchangeable lenses, off-camera flash, and tripod mount.

- Digital still imaging can be used in a supplementary capacity. (See Digital Cameras.) Digital still imaging can be used when the performance of the equipment can be shown to meet anticipated needs.

- Video imaging can be used in a supplementary capacity. S-VHS, Hi-8, or better quality formats are recommended. It is suggested that cameras have the ability to incorporate external or wireless audio, to disable on-camera audio, and to incorporate in-camera image stabilization. (See Video Cameras.)

- Other standard photographic equipment as necessary.

*Procedures*: Agency-specific step-by-step instructions for documenting crime scene evidence.

*Calibration*: If considered necessary, agencies should develop procedures specific to their needs.

*Calculations*: If considered necessary, agencies should develop procedures specific to their needs.

*Limitations*: See Advantages and Disadvantages of Major Image Capture Technologies in Field Applications.

*Safety*: Agencies should develop procedures specific to their needs.

*References*: Agency-specific documentation and manufacturers' manuals.

*Back to the top*

**General Guidelines for a First Responder SOP (A)**
(A) The only images taken are those by the first responding officer(s).

*Title*: First Responder Photography SOP.

*Purpose*: To document conditions found at an incident by the first law enforcement officer(s) on the scene where a crime scene photography unit or specialist will not be requested.

*Note*: Examples may include domestic violence incidents, traffic accidents, minor property crimes, and other incidents as defined by agency-specific

policies. Photography generally is not the first responder's primary responsibility, and the first responder may have only a minimal amount of photography training.

*Equipment*: (Image Capture Devices)

- Silver-based media film camera. The minimum recommendation is a 35-mm camera with flash and close-up capability.
- Digital still imaging. The minimum recommendation is for a camera with more than 640 x 480 pixels, on-camera viewer, close-up capability, flash, and removable storage media.
- Video imaging can be used in a supplementary capacity. S-VHS, Hi-8, or better quality formats are recommended. It is suggested that cameras have the ability to incorporate external or wireless audio, to disable on-camera audio, and to incorporate in-camera image stabilization. (See Video Cameras.)
- Other standard photographic equipment as necessary.

*Procedures*: Agency-specific step-by-step instructions for documenting the scene.

*Note*: Images from separate incidents should be clearly delineated through a change of storage media or through proper documentation.

*Calibration*: If considered necessary, agencies should develop procedures specific to their needs.

*Calculations*: If considered necessary, agencies should develop procedures specific to their needs.

*Limitations*: Successful capture of close-up images will require adhering to manufacturers' specifications. Images captured digitally typically have a limited enlargement capability that is less than those captured using 35-mm film. (See Advantages and Disadvantages of Major Image Capture Technologies in Field Applications.) Successful capture of images also requires using fresh media (e.g., film that is not past expiration and has been stored properly) and well-maintained equipment .

*Safety*: Agencies should develop procedures specific to their needs.

*References*: Agency-specific documentation and manufacturers' manuals.

*Back to the top*

**General Guidelines for a First Responder SOP (B)**
(B) Images taken by the first responding officer(s) prior to arrival of a crime scene photographer.

*Title*: First Responder Photography SOP.

*Purpose*: To document conditions found at an incident by the first law enforcement officer(s) on the scene prior to the arrival of a crime scene photographer.

*Note*: This guideline is directed toward documenting transient conditions that might be lost prior to the arrival of crime scene photographers. Examples

include situations in which evidence must or might be moved, lost, or altered. Photography generally is not the first responder's primary responsibility, and the first responder may have only a minimal amount of photography training.

*Equipment*: (Image Capture Devices)

- Silver-based media film camera. The minimum recommendation is a 35-mm camera with flash and close-up capability.
- Digital still imaging. The minimum recommendation is for a camera with more than 640 x 480 pixels, on-camera viewer, close-up capability, flash, and removable storage media.
- Video imaging can be used in a supplementary capacity. S-VHS, Hi-8, or better quality formats are recommended. It is suggested that cameras have the ability to incorporate external or wireless audio, to disable on-camera audio, and to incorporate in-camera image stabilization. (See Video Cameras.)
- Other standard photographic equipment as necessary.

*Procedures*: Agency-specific step-by-step instructions for documenting the scene.

*Note*: Images from separate incidents should be clearly delineated through a change of storage media or proper documentation.

*Calibration*: If considered necessary, agencies should develop procedures specific to their needs.

*Calculations*: If considered necessary, agencies should develop procedures specific to their needs.

*Limitations*: The successful capture of close-up images will require adhering to the manufacturers' specifications. Images captured digitally or with video typically have a limited enlargement capability that is less than those captured using 35-mm film. (See Advantages and Disadvantages of Major Image Capture Technologies in Field Applications.) Successful capture of images also requires using fresh media (film that is not past expiration and has been stored properly and new, unused videotapes) and well-maintained equipment.

*Safety*: Agencies should develop procedures specific to their needs.

*References*: Agency-specific documentation and manufacturers' manuals.

*Back to the top*

**General Guidelines for a Surveillance Photography SOP**
*Title*: Surveillance Photography SOP.

*Purpose*: To document acts and individuals engaged in those acts as they occur.

*Note*: Surveillance activities may involve highly specialized techniques and equipment that require technical training and knowledge and are best accomplished by trained specialists.

*Equipment*: (Image Capture Devices)

- Silver-based media film camera. The minimum recommendation is a 35-mm camera with capability to disable the flash and infrared auto-focus transmitter.
- Digital still imaging. The minimum recommendation is for a camera with a minimum pixel resolution of 1500 x 1000 pixels, capability to accommodate long telephoto lenses, and to disable the flash and infrared auto-focus transmitter. In covert surveillance situations, illumination of the photographer by the LCD screen may compromise safety.
- Video imaging can be used in a supplementary capacity. S-VHS, Hi-8, or better quality formats are recommended. It is suggested that cameras have the ability to incorporate external or wireless audio, to disable on-camera audio, and to incorporate in-camera image stabilization. (See Video Cameras.)
- Other standard photographic equipment as necessary.

*Note*: State laws may limit the legality of audiotaping. Check local statutes for the legality of all surveillance activities.

*Specialized equipment*: Night vision and thermal imaging equipment.

*Procedures*: Agency-specific step-by-step instructions for surveillance activities. If audio is used, simultaneous recording of audio with video on the same media and testing of the system prior to use is strongly recommended.

*Calibration*: If considered necessary, agencies should develop procedures specific to their needs.

*Calculations*: If considered necessary, agencies should develop procedures specific to their needs.

*Limitations*: The successful capture of images sufficient for identification of depicted individuals and/or objects (e.g, license plates) will require close attention to the selection and appropriate use of equipment.

Images captured digitally or with video typically have a limited enlargement capability that is less than those captured using 35-mm film. (See Advantages and Disadvantages of Major Image Capture Technologies in Field Applications.) The successful capture of images also requires using fresh media (e.g., film that is not past expiration and has been stored properly; new, unused videotapes) and well-maintained equipment.

*Safety*: Agencies should develop procedures specific to their needs.

*References*: Agency-specific documentation, manufacturers' manuals, and local statutes.

*Back to the top*

**General Guidelines for a Tactical Survey SOP**
*Title*: Tactical Survey SOP.

*Purpose*: To document conditions at a location so that plans can be made for future law enforcement activities.

*Note*: Tactical photography is directed at obtaining general information regarding the physical layout and major contents of a location in preparation for law enforcement activities.

*Equipment*: (Image Capture Devices)

- Silver-based media film camera. The minimum recommendation is a 35-mm camera.
- Digital still imaging. Minimum recommendation is for a camera with more than 640 x 480 pixels.
- Video imaging. S-VHS, Hi-8, or better quality formats are recommended. It is suggested that cameras have the ability to incorporate external or wireless audio, to disable on-camera audio, and to incorporate in-camera image stabilization. (See Video Cameras.)
- Other standard photographic equipment as necessary.

*Procedures*: Agency-specific step-by-step instructions for documenting locations.

*Calibration*: If considered necessary, agencies should develop procedures specific to their needs.

*Calculations*: If considered necessary, agencies should develop procedures specific to their needs.

*Limitations*: Location-specific limitations may apply.

*Safety*: Agencies should develop procedures specific to their needs.

*References*: Agency-specific documentation and manufacturers' manuals.

*Back to the top*

**General Guidelines for a HAZMAT Scene Photography SOP**
*Title*: HAZMAT Scene Photography SOP.

*Purpose*: To permanently document, by qualified personnel, evidence and other details at a crime scene that may contain biological, chemical, and/or radiological hazards.

*Note*: A careful assessment of each HAZMAT scene is necessary prior to committing personnel and equipment. The means for inserting, removing, and sanitizing personnel and equipment from a scene should be planned prior to initial entry. HAZMAT scene photography generally requires the ability

- To record information that crime scene personnel may not realize was important at the time the images were captured,
- To deal with varying lighting conditions,
- To accurately represent all of the details and colors at a crime scene, and
- To get close-up and wide-angle images with accurate spatial

relationships.

HAZMAT crime scene photography is usually a time-limited activity in which there is only one opportunity to correctly complete the task. This type of photography usually involves the use of protective clothing and gear that makes the operation of photographic equipment more difficult.

*Equipment*: (Image Capture Devices)

- Silver-based film cameras are recommended for use as the primary image capture device. The minimum recommendation is a 35-mm (SLR) camera capable of manual override, interchangeable lenses, off-camera flash, and tripod mount. If protective housings are not available but needed, disposable, water-proof 35-mm cameras may be necessary for some HAZMAT scene photography.

- Digital still imaging can be used as the primary means when the performance of the equipment can be shown to meet anticipated needs or when contamination issues may preclude the use of silver-based media. Otherwise, digital still imaging can be used in a supplementary capacity. (See Digital Cameras.) The minimum recommendation is for a high-end camera.

- Video imaging can be used in a supplementary capacity. S-VHS, Hi-8, or better quality formats are recommended. It is suggested that cameras have the ability to incorporate external or wireless audio, to disable on-camera audio, and to incorporate in-camera image stabilization. (See Video Cameras.)

- Other standard photographic equipment as necessary.

*Specialized equipment*: Equipment for protecting personnel and camera systems.

*Procedures*: Agency-specific step-by-step instructions for documenting crime scene evidence.

*Calibration*: If necessary, agencies should develop procedures specific to their needs.

*Calculations*: If considered necessary, agencies should develop procedures specific to their needs.

*Limitations*: See Advantages and Disadvantages of Major Image Capture Technologies in Field Applications.

Protective equipment will hamper the use of some equipment, and conditions may not permit the use of other equipment (e.g., flash, film).

*Safety*: Agencies should develop procedures specific to their needs.

*References*: Agency-specific documentation and manufacturers' manuals.

*Back to the top*

**General Guidelines for an Aerial Photography SOP**
*Title*: Aerial Photography SOP.

*Purpose*: To document locations, activities, and geographical relationships using aircraft as a platform.

*Note*: Aerial photography may involve highly specialized techniques and equipment that require technical training and knowledge and is best accomplished by trained specialists.

*Equipment*: (Image Capture Devices)

- Silver-based media film camera. The minimum recommendation is a 35-mm camera capable of manual operation.
- Digital still imaging. The minimum recommendation is for a camera with a pixel resolution of 3000 x 2000 pixels or higher.
- Video imaging can be used in a supplementary capacity. S-VHS, Hi-8, or better quality formats are recommended. It is suggested that cameras have the ability to incorporate external or wireless audio, to disable on-camera audio, and to incorporate in-camera image stabilization. (See Video Cameras.)
- Other standard photographic equipment as necessary.

*Specialized equipment*: Night vision or thermal imaging equipment.

*Procedures*: Agency-specific step-by-step instructions for aerial photography activities.

*Calibration*: If necessary, agencies should develop procedures specific to their needs.

*Calculations*: If necessary, agencies should develop procedures specific to their needs.

*Limitations*: Check local statutes for legality of all surveillance activities.

Images captured digitally or with video typically have a limited enlargement capability that is less than those captured using 35-mm film. (See Advantages and Disadvantages of Major Image Capture Technologies in Field Applications.) Successful capture of images also requires using fresh media (e.g., film that is not past expiration and has been stored properly and new, unused videotapes) and well-maintained equipment.

*Safety*: Agencies should develop procedures specific to their needs.

*References*: Agency-specific documentation, manufacturers' manuals, and local statutes.

*Back to the top*

**General Guidelines for an Accident Scene Photography SOP (A)**
When agency policy does not require that crime scene photography personnel respond.

See General Guidelines for a First Responder SOP (A).

**General Guidelines for an Accident Scene Photography SOP (B)**
When agency policy requires that crime scene photography personnel respond.

Case 3:25-cv-00078-PDW-ARS Document 21-1 Filed 05/21/26 Page 504 of 506

See General Guidelines for a Crime Scene Photography SOP.

**General Guidelines for an Arson Scene Photography SOP**
See General Guidelines for a Crime Scene Photography SOP.

**General Guidelines for Autopsy Photography SOP**
See General Guidelines for a Crime Scene Photography SOP.

**General Guidelines for a Bombing Scene Photography SOP**
See General Guidelines for a Crime Scene Photography SOP.

**General Guidelines for a Mass Disaster Scene Photography SOP**
See General Guidelines for a Crime Scene Photography SOP.

**General Guidelines for a Search Warrant Photography SOP**
See General Guidelines for a Crime Scene Photography SOP.

**General Guidelines for a Gang-Related Graffiti Photography SOP**
See General Guidelines for a First Responder SOP.

**General Guidelines for a Field Mug Shots and Tattoos Photography SOP**
See General Guidelines for a First Responder SOP.

**General Guidelines for a Victim Photography SOP**
See General Guidelines for a Crime Scene Photography SOP.

*Back to the top*

FORENSIC SCIENCE COMMUNICATIONS JANUARY 2000 VOLUME 2 NUMBER 1

| | | | | |
|---|---|---|---|---|
| CURRENT ISSUE | BACK ISSUES | SEARCH ALL ISSUES | JOURNAL DESCRIPTION | EDITORS |
| INSTRUCTIONS FOR AUTHORS | LINKS | HANDBOOK OF FORENSIC SERVICES | LAB HOME | FBI PUBLICATIONS |

United States Department of the Interior

FISH AND WILDLIFE

Madison Wetland Management District On
Hwy. 19, 3/4 Mile South of Hwy 34 Junction
P.O. Box 48, Madison, SD 57042 Telephone:
(605) 256-2974 Fax(605)256-9432

Email Address R6RW MDW@FWS.GOV

February 4, 1985

Mr. Landowner 28X-1 RR 1
Box 111
Salem, SD 57058

Dear Mr. Landowner:

Our records indicate you are one of hundreds of landowners or renters in South Dakota who have been cooperating with the U.S. Fish and Wildlife Service's effort to preserve wetlands. These wetlands are vital to waterfowl, pheasants, deer, furbearers and other wildlife. Wetlands also provide benefits to agriculture in that they help groundwater recharge and slow down the run-off, thus reducing soil erosion and stream flooding.

Over the past forty years approximately 10,000,000 acres of wetlands have been lost in the United States. South Dakota is estimated to have lost 35% of its original wetlands. The future of the remaining wetlands and the values they provide is dependent upon the continued cooperation of individuals like yourself and your participation in our small wetlands program.

We have from time to time received questions concerning these easements, i.e., what wetlands are under easement and what restrictions does the easement place on the use of the wetlands. In order to clarify these questions, we are contacting all landowners and renters in South Dakota who are recorded as having a perpetual easement on lands they own or operate.

Perpetual easements prohibit the draining, filling, leveling or burning of wetlands under easement. The wetlands covered by your easement are circled on a map that is attached to the easement document. Any wetlands not circled are not covered by the easement. The easement document along with any maps are on file with the Register of Deeds. You might want to check your own records or those in the Register of Deeds office to see the exact terms of your easement.

The following lands you own or operate are under

T. 105 N., R. 54 W., 5t''    Lake County, South Dakota
Section 20.

We appreciate the interest and continued cooperation in this important program. If you should have questions or desire additional information on the easement program, you contact this office at the above address or phone number.

Sincerely,

Wetland

Note: Paragraph four above may not apply to other easement land you may operate. Older easements had somewhat different provisions.