UNITED STATES DEPARTMENT OF THE INTERIOR
FISH AND WILDLIFE SERVICE
BUREAU OF SPORT FISHERIES AND WILDLIFE

Easement Summary

State : South Dakota

County : Day

Location: T. 123 N., R. 56 W., 5th P.M.
sec. 9, NW¼, N½SW¼.

Tract Name : Anderson, Maggie

Tract Number: (109x)

Easement Dated : 6/12/64 Easement Option Expires: 12/11/64

Easement Accepted: OCT 16 1964 Term of Easement: Perpetual

Easement Consideration: $660.00

Tract Acreage : 240 Cost per acre: $2.75

Wetland Acreage: 51 Wetland cost per acre: $12.94

Estimate of Value: $660.00

Accounting Number 14-16-0003-8578

Authorization to acquire easements in Day County, South Dakota, given by Walter J. Fillmore, Director, S. Dak. Dept. Game, Fish & Parks in letter dated 1/12/62.

**Exhibit V-6**

**This Exhibit contains conditions/stipulations which may be helpful for issuing permits for any of the following activities. This list is merely a carryover from previous manual guidance, and is not intended to imply that these are the only requests which may be authorized on easement properties through use of the flowchart process.**

**1. Irrigation Travelways:**

a. Prerequisites: Before a permit is granted, the landowner must demonstrate that:

(1) Equipment and/or topography modifications cannot be accomplished to avoid wetlands.

(2) Equipment is incapable of traversing wetlands in their natural condition.

(3) There will be no ground water impacts to protected easement wetlands: If there are concerns over ground water related to easement wetlands, the Service will not issue an easement permit for travelways.

b. The term of the Permit is ten (10) years. The travelway permit is assignable to subsequent landowners and allows maintenance of the permitted facilities only under Service supervision. All permits for irrigation travelways shall be issued by the Regional Director. Permit distribution: original to landowner, copy to Project Leader, copy to Regional Office.

c. Examples of travelways that can be permitted to accommodate sprinkler irrigation equipment are:

(1) Placement of 4-foot to 5-foot wide wooden beams "laced" together with cable in a "railroad track" style. The use of creosote- penta- or "green"-treated lumber will be authorized.

(2) placement of 4-foot to 5-foot wide metal mats made of corrugated, expanded or punched metal,

(3) removal of the muck layer not to exceed 10 feet in width in the bottom of the wetland and replacing it with sand or gravel to the natural bottom contour of the wetland,

(4) exposure of the hard substrate by removal of muck layer not to exceed 10 feet width in the bottom of the wetland (only permitted in high water table wetlands). In both cases (3) and (4) the spoil material must be placed

outside the basin. In larger marshes where spoil deposition outside the marsh is impractical, use other approved travelway types.

d. Stipulations necessary to insure Compatibility:

(1) Travelway construction shall be permitted during times of low wildlife use, ie., when wetland is naturally dry or in late summer after mating and nesting season (August 1),

(2) the Service may request to be present during construction, and will have to approve any maintenance or modification of travelways.

With the above pre-requisites and stipulations, impacts from this permitted use will be temporary during the construction phase and little to none during the operation. This use will not diminish the long-term productivity of the easement wetland(s) for waterfowl production or other migratory bird values. Thus, the use will not materially interfere with the waterfowl production or conservation purpose of the easement.

**2. Dugouts:**

Dugout construction in wetlands under easement may be permitted, provided the landowner can show a need, such as for stock watering and fire protection, and there are no other practical alternatives. Issuance of a permit shall not preclude requirements for obtaining other approvals from the Corps of Engineers, State, etc.

Permits for dugouts will be issued upon request for easements purchased prior to April 1, 1981, provided the dugout is constructed according to State NRCS specifications. Permits for dugouts on easements, purchased after April 1, 1981, may be issued in accordance with the following conditions or stipulations:

a. Dugouts will not be permitted in wetlands 1 acre or smaller unless determined that there is no other suitable site or other source of water. All spoil will be removed from the wetland.

b. Dugouts may be allowed in wetlands larger than one (1) acre, provided they are constructed on the perimeter of the wetland in the seasonally flooded zone. Every effort should be made to minimize the amount of spoil placed in the wetland. Spoil placed within the basin shall be piled adjacent to the dugout on either side of the excavation. Spoil placed outside the wetland may be leveled so long as it is not used to fill other wetlands. If the uplands are protected under a grassland easement, then the manager must evaluate the value of leveling the spoil piles, particularly on native grasslands.

c. Permits for dugout construction are issued by the Project Leader for a period not

to exceed 12 months and are not assignable to subsequent landowners. No maintenance is allowed without another permit. Permit distribution: original to landowner, copy for station files. Copies to the RO are no longer required.

**3. Level Ditching:**

All level ditching shall be prohibited in wetland basins under easement except when the landowner can prove that he, personally, was told at the time the easement was negotiated that level ditching was permissible. Landowners who sold easements prior to April 1, 1981, may have been told that level ditching was permissible.

**4. Nesting Islands (Habitat Management Activity):**

In some situations, nesting islands may be permitted in wetlands under easement. Issuance of a Service permit will not subordinate the approvals that may be required from other agencies such as the Corps of Engineers, State, and local units of government. Criteria for issuing permits for nesting islands are:

a. Benefit to waterfowl production should be the major consideration, and avoidance or reduction of predation is a necessary requirement. Islands can be good waterfowl nesting sites in the following situation:

(1) In large, brackish marshes (Type IV) or open water lakes (Type V); the minimum basin size must be 50 acres. The island must be separated from the nearest shoreline by 600 feet to deter mammalian predators. If more than one island is constructed in a single wetland, a minimum of 600 feet shall be between islands. Minimum island size should be 50 feet by 100 feet. Islands over 1 acre in size are necessary to support dense aggregations of duck nests (100 nests or more). Wetlands for island placement must have a surface of at least 80 percent open water.

b. Islands must be constructed of rock or other non-erodible base. They should be of irregular shape or resemble other natural islands in the vicinity. Tops must be leveled and covered with a minimum of 1 foot of soil capable of supporting good stands of vegetation. Usually, volunteer vegetation will be adequate for nesting requirements. The top of the island must be at least 1 foot above the highest expected water level, but not more than 3 feet above such a level.

c. Permits for nesting island construction are issued by the Project Leader for a period of 12 months. No maintenance is allowed without another permit. This construction permit is not assignable to subsequent landowners. Permit distribution: original to landowner, copy for station files.

5. **Burning (Habitat Management Activity):**

The Project Leader may permit the burning of vegetation within wetland basins under easement. Conditions or stipulations for issuing burning permits are:

a. No more than one-third of the wetlands may be burned in any 1 year, or all the wetlands may not be burned more than once every 3 years.

b. As a general rule, cattail and bulrush marshes will not be burned so that nesting habitat for divers can be maintained, unless a determination is made that such management is necessary.

c. Burning permits will be restricted to the following periods: September 1 to December 31, and March 15 to April 30. To save winter wildlife habitat, spring burning is preferred.

d. The Project Leader will issue burning permits and they cannot be assigned to subsequent landowners. Permit distribution: original to landowner, copy to Project Leader.

6. **Beaver Dams:**

Beaver dams may be removed from existing ditches or natural outlets without a permit, provided that no soil is removed from the bottom of the ditch or outlet.

7. **Culverts:**

Culverts may be an effective tool in resolving certain conflicts. **However, if not properly used, they can be very damaging to easement wetlands.**

Extreme caution should be used in agreeing to culvert placement where none previously existed. If a culvert is needed to protect a road, the elevation must be such that it protects the integrity of any easement wetland involved.

Culverts that are replaced for any reason must be placed at the old or previous elevation, no lower. The elevation of the bottom of the culvert is critical, regardless of how large the culvert is.

In setting elevations for wetlands that will be lowered for health, safety, or endangerment of property, it may be useful to use culverts to set permanent elevations at the outlet. This may better ensure that the established elevation will be maintained.

Managers should be observant when road improvement projects encounter easement-protected wetlands. Even though county or state highway departments may have

statutory authority or a specific road easement which pre-dates our protective easement, they are not entitled to drain wetlands which may not be necessary for road maintenance purposes. They can do what is reasonably needed to maintain the road, but when plans call for drainage beyond what is reasonable, then managers must get involved to protect the property interests acquired by the easement. Obviously, this is a judgment issue, but managers need to be aware of wetland drainage which goes beyond what is necessary for road maintenance. If federal funding is involved with the road project, then other requirements need evaluation, such as Cultural Resource issues, NEPA, and Section 4f of Federal Highway Administration regulations.

**8. Commercial Bait Operations:**

Easement holders often inquire about commercial bait operations. This is not restricted under the terms of the easement contract, and the Service has no authority to prevent it on easement properties.

**9. Impoundments:**

In post-1976 Wetland easements there is an Exhibit "A" map that identifies all protected wetlands. By Realty policy, the Service did not acquire easements on artificial wetlands or impoundments. As a rule, draining, burning, filling, or leveling of an artificial wetland will not be a violation of the easement contract. The only exception may be a rare case in which a post-1976 Exhibit "A" map depicts an artificial wetland. In this case, the artificial wetland is protected.

When considering dugouts or stockpond construction on Grassland, Habitat or FmHA easements, the Project Leader/Manager must adhere to the following conditions or stipulations:

a. must follow NRCS and/or PFW specifications,

b. may not dewater any easement protected wetlands on the easement, and,

c. all other federal, state, or county permits must be applied for and received before pond construction may begin.

**10. Wetland Restorations and Enhancements:**

Wetland Restorations which are subject to the terms of the easement are addressed in the Section 11.

**11. Partners for Wildlife or CRP Wetland Restorations:**

Occasions may arise when a landowner offers to restore a drained wetland or wetlands under the Service's Partners for Wildlife program, the USDA's Conservation Reserve Program (CRP), or a similar program. In these cases, the Wetland Manager should consult the easement files and photographs to determine if a potential violation has occurred, but was undetected. Following are the types of scenarios that may be encountered when dealing with wetland restorations after easement acquisition:

1. Pre-1976 Easement without DFM:

   These easements protect all wetlands included within the Summary Sheet acreage.

   Drained wetlands should not be encountered on these easements except in a few cases where the easement contract states that the existing ditches cannot be maintained. If drained wetlands are found, it will be necessary to determine if the drainage occurred after the easement was purchased, in which case it may be a violation. Contact the ZLEO and the state Private Lands Coordinator before taking any action. If it is determined that the drainage is not a violation, work with the landowner and USDA to restore the wetland according to NRCS specifications. After the CRP or PFW agreement, the wetland can be drained to the scope and effect it was drained at the time of enrollment in the conservation program.

2. Pre-1976 easement with a DFM:

   These easements include a map(s) showing wetlands excluded from the terms of the easement. Wetlands identified by the DFM may be drained and the ditches may be maintained. These DFM wetlands may be restored under the CRP, PFW, or a similar program for the length of the appropriate contract. At the end of the conservation agreement, the wetland(s) may again be drained under the terms of the easement agreement. The landowner must check with FSA/NRCS about their regulations.

3. Post-1976 Easements with Exhibit "A" Maps:

   Any wetland not identified on a post-1976 easement map is excluded from the easement and may be restored under the various conservation agreements. Such drainage is not a violation of the Service's easement and the wetland(s) may be re-drained at the end of the conservation agreement. However, if the drained wetland is shown as a protected wetland on the Exhibit "A" map, it may be a violation of the easement.

   If a landowner has an easement wetland that is partially drained that is NOT a

violation of the easement contract (ie protected by a non-functional drainage facilities which the landowner agrees not to repair or clean out) and wants to permanently restore the wetland to pre-drainage conditions, a second easement should be acquired. There may be some doubt as to what portion of the basin had been acquired when the easement was first negotiated, the entire basin or only the functional part of the basin. If the entire basin was acquired under the presumption that the ditch would fill in over time, then a secondary easement should not be acquired. The Project Leader should contact Realty and the Service should acquire the additional rights to construct and maintain a wetland restoration structure (ditch plug, tile riser) to a specific MSL, if appropriate.

**12. Weed Control:**

a. For **grassland easements**, weed control is the sole responsibility of the landowner. A permit will be required for any weed control by mowing which is to commence prior to July 15 in any year. A permit will not be required for weed control by mowing **after** July 15, nor is it required for herbicide applications.

b. For **wetland easements,** weed control is solely the responsibility of the landowner. Prior approval is not necessary, unless the landowner wants to control weeds through burning of the wetlands.

**13. Mowing or Haying:**

a. Pre-requisites : Before a permit to hay prior to July 16 is issued, the landowner/operator must demonstrate that:

(1) Haying or mowing is necessary to preserve or enhance the stand of grass (such as mowing CRP or a newly planted grass stand for weed control or to rejuvenate a decadent stand of grass).

(2) The haying or mowing will be in accordance with management restrictions developed by the Project Leader.

(3) The haying or mowing will result in a positive impact on protected grasslands, or

(4) the mowing is to meet noxious weed laws.

b. The term of the permit is from the commencement date prior to July 16 until December 31 of the same calendar year. The ending date may be shortened if necessary.

**14. Seeding, Reseeding, or Interseeding (Habitat Management Activity):**

**Pre-requisites for Grassland Easements:** Before a permit is issued, the landowner/operator must:

(1) describe in writing the need for the seeding, reseeding, or re-establishment of the grass stand;

(2) designate the native species/varieties, or the reason why not to plant native species,

(3) agree to follow stand establishment requirements, seeding rates, and seedbed preparation as set forth by the FWS. (See Attachment appended to this exhibit for Requirements)

Native species to be reseeded should provide for protection of fish and wildlife resources and to maintain the quality of these lands to provide cover for wildlife, especially nesting cover, and food for a varied array of aquatic, terrestrial, and avian wildlife, particularly waterfowl and threatened and endangered species.

The term of the permit shall be one growing season, spring to fall to allow for a spring, summer, or late season dormant seeding. No other seeding permit shall be issued until the results of the permitted seeding are evaluated in accordance with NRCS and FSA requirements. Interseeding shall NOT be permitted on native prairie.

**15. Annually Planted Food Plots (Habitat Management Activity):**

The Project Leader can approve permits for planting wildlife food plots within grassland easements provided the landowner/operator agrees to leave the entire crop for wildlife. The easement permit shall include the following stipulations:

a. not to exceed 5 years in duration with one possible renewal,
b. no food plots to be planted in wetlands protected by grassland easements,
c. specify the type of crop to be planted for the 5 years,
d. no harvesting or grazing of the crop is permitted except after March 31,
e. must include a plan for the re-establishment of grass after the food plot is terminated,
f. limited to no more than 8 acres per quarter section of Grassland Easement,
g. the use of insecticides is discouraged on food plots,
h. no food plots will be permitted on native prairie.

OUTDATED REFER TO CHAPTER XII

**16. Tree or Shrub Plantings as a Habitat Management Activity:**

The Project Leader may permit planting of **native** trees and shrubs on Grassland Easements as a Habitat Management activity. Other requests for plantings must be evaluated by the flowchart. If either are approved, the following guidelines are applicable:

a. not to exceed 5 years with possible renewal (permit is for establishment and cultivation of tree rows, not the presence of the tree planting);
b. specify the type of trees to be planted;
c. be no larger than 8 acres per quarter section of grassland easement
d. no tree or shrub plantings will be permitted on native prairie tracts; and,
e. the easement does not prohibit the harvest of planted trees.

**17. Chaining:**

Chaining of sage brush or related brush species will be permitted only if the landowner/operator can demonstrate in writing that it will not be detrimental to the grassland and the wildlife habitat in accordance with the easement purpose, “for the protection of fish and wildlife resources and to maintain the quality of these lands to provide cover for wildlife, especially nesting cover, and food for a varied array of aquatic, terrestrial, and avian wildlife, particularly waterfowl and endangered and threatened species.”

**18. Chemical Control of Buckbrush:**

Any chemical control of woody plants that are not noxious weeds (e.g. buckbrush) will be addressed a on case-by-case basis by the Project Leader to determine if the control is compatible with the purpose of the easement.

**20. Grazing (Habitat Management Activity):**

Grazing is restricted only on some of the FmHA documents. If grazing is authorized, it must benefit the refuge area (economic use requires a higher standard of compatibility)

**21. Seed Harvest:**

For Grassland Easements, seed harvest is restricted until after July 15 each year. There is little or no legitimate reason to allow seed harvest before July 15.

**22. Wind Energy Developments:** OUTDATED - REFER TO CHAPTERS XII & XIV

The following guidelines direct the consideration of siting potential wind turbines on

various Service easements. These guidelines were first released by Region 6 in July 23, 2001 as an interim policy. While developed specifically for Grassland easements, they are also applicable to FmHA Conservation Easements. Placement of wind turbines or roads to maintain wind turbines may be allowed without permit on Service wetland easements provided the wind facilities avoid any construction in or placement of fill in easement protected wetlands. According to 50 CFR, Part 29.21-1 (b), the Regional Director must issue a Letter of Authorization stating that the interests of the United States will not be affected.

OUTDATED - REFER TO CHAPTERS XII & XIV

Grassland easements are acquired to protect native and planted grasslands essential for grassland dependent migratory birds and other wildlife. Healthy grasslands provide both nesting and migration habitat necessary to maintain these important populations. Wind energy could severely impact this important program if not developed carefully with as little impact to migratory birds as possible.

The following guidelines are to be used when making compatibility determinations for the siting of wind turbines and associated facilities on lands encumbered by U.S. Fish and Wildlife Service (Service) grassland easements and FmHA conservation easements administered by the Service in North Dakota, South Dakota, and Montana. These guidelines are intended to provide guidance for considering compatibility determinations during the period while the Service and the wind power industry monitor potential impacts to migratory birds as a result of turbine construction, maintenance, and operation. The following guidelines will be incorporated into rights-of-way permits issued for the construction of turbines, access roads and other associated activities necessary to make the turbines operational. The intention of these guidelines is to minimize impacts to migratory birds and protect the habitat covered by the easement. The guidelines pertain only to permits issued for the alteration or destruction of grassland habitat as a result of turbine and other associated construction on lands encumbered by Service easements.

Refuge Managers and Wetland District Managers shall use these guidelines for site-by-site consideration of compatibility determinations for individual right-of-way requests for wind turbines on easement lands. These guidelines may be incorporated as needed as right-of-way or permit stipulations.

These guidelines may be revised and modified as a result of the findings of research and monitoring conducted in the future. Wind turbine rights-of-way applications will be reviewed according to these guidelines in conjunction with the Service's compatibility policy. Future rights-of-way applications will be reviewed using the guidelines in effect at the time of application. The Service will not make changes to previously issued rights-of -way or easement permits issued under these guidelines.

(1) The Service **may** permit up to one turbine per 160 acres on an individual

easement tract. No more than one turbine may be allowed on an individual easement tract of less than 160 acres. Current biological information (See attachment to this Exhibit) indicates that this density would not have any significant impact to grassland habitat and its value to migratory birds or other wildlife. This is the upper limit for the density of turbines on easements. However, consideration may be given to clump or consolidate towers within an easement tract(s) to minimize the disturbance to the remaining habitat, i.e., two turbines may be clumped on a tract of 320 acres. Information available at this time indicates that turbine densities at this level will not materially interfere with or detract from the purposes of the easement. Wind power industry turbine spacing recommendations are 2,000 feet between wind turbines and 2,000 feet from an occupied building. This constraint may limit the ability to clump turbines.

OUTDATED - REFER TO CHAPTERS XII & XIV

(2) Turbines shall not be constructed in wetlands, including lakes, ponds, marshes, sloughs, swales, swamps or potholes. Similarly turbine locations should avoid obvious "duck passes" between large (20 acres or greater), semi-permanent (type 4, or cattail/bulrush) wetlands or sloughs. In addition, known migratory bird corridors or flight paths and environmentally sensitive areas such as colonial bird nesting areas or upland game bird leks, should be avoided.

(3) Siting recommendations made by the Service for turbines and access roads and turbine lighting recommendations shall be consistent with all general siting and mitigating measures for tower and transmission line construction (Director's September 14, 2000 memorandum, APLIC 1996, and APLIC 1994).

(4) Priority should be given to siting turbines on cropland, or tame, planted or seeded grasslands in preference to unbroken native prairie when such options are available on a given easement tract.

(5) Spoil material from the excavated turbine pad shall be stored or deposited off easement lands using established roads to transport the material off site.

(6) Turbines shall be sited as close to existing roads or the edge of the grassland tract as practical. Disturbance of grassland to construct and maintain a wind turbine shall be done in such a manner as to minimize the destruction or alteration of the habitat. Use of existing roads as a means of accessing a turbine within protected habitats is strongly encouraged. Conservation measures shall be used to avoid the impacts of erosion and sedimentation in order to protect grasslands and wetlands during the construction of the access road. Buried transmission lines, electric lines and other cables shall be co-located on the access road when practical. Turbine construction should be encouraged to occur outside the breeding season for migratory birds when practical.

(7) Regardless of a Service permit the developer is responsible for adhering to all local, state, and federal regulations in siting turbine location and construction. In the event that location and construction criteria conflict between the various levels of government, the criteria providing the maximum protection to the habitat shall be the criteria used during turbine location and construction.

(8) In the event that a turbine is no longer utilized for power generation and has been abandoned for that purpose, the turbine owner shall remove the turbine at their own expense from the easement tract. The turbine site and associated facilities shall be reclaimed by the turbine owner by planting these areas to a grass mixture consistent with the surrounding grassland or such mixture as is mutually agreed upon by the Service and the turbine owner.

(9) The turbine owner must update bird strike avoidance equipment on turbines and implement techniques that reduce disturbance to nesting birds at turbine sites as future research and evaluation by the Service and the industry indicate.

These guidelines provide flexibility for the Service Refuge Manager in evaluating compatibility determinations and to negotiate with the energy company and the easement landowner to allow wind turbine development consistent with the purposes of the conservation easements. Where development is found to be compatible with easement purposes the guidelines will be used to negotiate siting, lighting, and other restrictions to grant rights-of-way and easement permits for wind turbines.

OUTDATED - REFER TO CHAPTERS XII & XIV

Exhibit V-6b

# VEGETATION ESTABLISHMENT AGREEMENT

This agreement, dated Z - 1?, 19 95 by and between

Lynn Meyer and Guynell Meyer, husband and wife, hereinafter referred to as "landowner(s)", and the Fish and Wildlife Service, Department of the Interior, for and on behalf of the United States of America, hereinafter referred to as "Service", is entered into as required by the "Administrative and Enforcement Guidelines and Procedures for Perpetual Grassland Easements Manual" dated April 1, 1992.

Landowner(s) hereby agree(s) to conduct certain vegetation establishment practices on the land owned by (him) (them_ in Ward County, State of North Dakota, described as follows:

T. 155 N., R. 87 W., 5th P.M.

Section 27, SE1/4

containing 160 acres, more or less.

Landowner(s) and Service must agree to the conditions to be set forth under "Special Provisions" of this agreement before execution of a grassland easement on the above described property and landowner(s) agree to carry out those terms and conditions as set forth. The agreement may be modified at any time by written mutual consent of the landowner(s) and Service.

## SPECIAL PROVISIONS

The following vegetative seed mixtures and seeding rates will be established on the described agricultural land.

| | Vegetative Seed Species | | Pounds of Live Seed per Acre |
|---|---|---|---|
| 1. | Western Wheatgrass | (ND common) | 4.0 |
| 2. | Slender Wheatgrass | (Prinar) | 0.54 |
| 3. | Green Needlegrass | (Lodorm) | 1.8 |
| 4. | Blue Grama | (SD common) | 0.13 |
| S. | Side Oats Grama | (Killdeer) | 1.14 |
| 6. | Big Bluestem | (MN common) | 4.0 |

The following method and -schedules will be used to establish the required vegetative cover. (Specify ground preparation, planned seeding dates, and shortterm land use.)

SEE ATTACHED

Dat 2 - 17 - 95 ____________ Landowner

Date 2/20/95 Michael W. Goos
U.S. Fish and Wildlife Service Department of the

ACKNOWLEDGEMENT

STATE OF NORTH
COUNTY OF TOWNER ) SS

On this 17th day of uar , 19,95 , before me personally appeared
(he) executed the same.

(Seal) LAURENCE R. VEIKLEY NOTARY PUBLIC STATE OF NORTH DAKOTA

Laurence R. Veikley, Notary Public Ward County, North Dakota My commission expires March 2, 1999

ACKNOWLEDGEMENT

STATE OF NORTH DAKOTA )
COUNTY OF WARD ) SS

On this 21st day of 19 95 , before me personally appeared

Michael W. Goos . known to me to be the same person(s) described in

(Seal) LAURENCE R. VEIKLEY NOTARY PUBLIC STATE OF NORTH DAKOTA

Laurence R. Veikley, Notary Publi
Ward County, Nor h Dakotaa

EXHIBIT A

SPECIAL PROVISIONS

PLANNED WORK:

Mr. Meyer agrees to plant 45.30 acres of cropland to Native Grass.This tract is being placed under a grassland easement which will protect the grass planting in perpetuity, and this agreement is contingent on the acceptance of said grassland easement *by* the United States of America. Mr. Meyer agrees to allow FWS personnel access to the area to monitor the success of the project.

Mr. Meyer agrees to prepare the seedbed and plant the grass by May 30, 1995 using a grass drill . Seeding depth shall be at an optimum 4 to ~k"

The seed shall *be* planted in a firmly packed, clean seedbed. A properly compacted seedbed shall be firmed in a manner so that adult footprints are hardly visible.

The seeded site shall not be grazed for 2 full growing seasons, or until the native grasses are adequately established.

Mr. Meyer may hay the native grass planting after July 15th of each year, or when weed control is necessary, and he agrees to leave 10 to 12 " of stubble during the first 2 years if mechanical weed control is necessary.

Mr. Meyer agrees to plant the native grass species, improved varieties and mixtures as shown on the foregoing "Vegetation Establishment Agreement."

EXHIBIT Native Grass Establishment Requirements

Dear Landowner,

You have made a perpetual decision to protect the grasslands on your property. You have requested to seed, reseed, or re- establish prior cropland to grassland. Depending on available funds and grants you may be able to receive cost share assistance for native grass seed. Since this is a perpetual grass stand we recommend that you plant native grass and forb species. There are several conditions that are required for you to receive a permit, such as seed bed preparation, seeding dates, seeding rates, clippings and no grazing the first two years.

If you want to seed existing cropland back to native grass, the best seed bed is to drill directly into soybean stubble the spring after harvest. Round-up ready soybeans would be best if drilled and not cultivated. Do not disturb the field after harvest, ie do not fall or spring till. A combination of chemicals could be used prior to seeding if necessary to control weed growth. If soybeans are not an option for your property, a chemically treated seedbed may be another option. The County Conservation District has a native grass drill that can be used for planting the native grass seed or a list of contractors can be provided.

If you want to re-establish native grass on a field that had been previously planted to tame grass such as smooth bromegrass, we recommend fall breaking and planting the field for two consecutive years to round-up ready soybeans. Then follow the same guidelines as above. Again if soybeans are not an option on your property, a treatment of haying, discing, chemically treating and planting may be another option.

If you want to inter-seed a monotypic stand or a weak stand of native grass, we recommend that you hay the field in September. Try to remove all of the top litter by raking, this will result in exposing areas of soil for the inter-seeding the following spring.
Native grass plantings generally have their greatest success when seeded in the spring from May 1 to July 1. You will be required to plant during this time frame or receive approval to deviate from these dates.

You may choose a variety of native grasses and forbs. When selecting native species to be planted, identify the prairie zone and the soil types of where your land is located. We recommend a minimum mixture of at least 5 species whether you are in the tall grass prairie, mixed grass prairie, or the short grass prairie zones. We also recommend a minimum of 8 pounds of Pure Live Seed be planted per acre.

Example of mixtures:

**Tall Grass Seeding**

| | |
|---|---|
| Big bluestem - | 2 lbs. PLS (Pure Live Seed) |
| Switch grass - | 2 lbs. PLS |
| Indian grass - | 2 lbs. PLS |
| Sideoats gramma - | 1 lbs. PLS |
| Western wheatgrass - | 1 lbs. PLS |

**Mixed Grass Seeding**

| | |
|---|---|
| Slender wheatgrass - | 1.30 lbs. PLS (Pure Live Seed) |
| Western wheatgrass - | 3.57 lbs. |
| Sideoats gramma - | 1.70 lbs. |
| Green needlegrass - | 1.95 lbs. |
| Little bluestem - | 1.25 lbs. |
| Blue gramma - | 0.23 lbs. |

Try to insure that the seed you buy has at least 80% purity and 80% germination. The origin of the seed should be locally within 100 miles of your field. If seed is not available of local origin, purchasing seed originating further than 100 miles east or west longitude or further north is acceptable. Do not purchase any seed over 100 miles south in latitude, as this seed will not be adapted to the shorter growing season. You can purchase the seed from any dealer you want to, or **the FWS** can give you the names of vendors that sell native grass seed.

After you get the native grass seed planted, you will need to monitor the annual weed growth. It is critical that the new native grass seedlings receive sun light and do not have to compete for moisture with annual weeds. You will be authorized in the easement permit to conduct clippings or hayings of the annual weeds the first two growing seasons prior to July 15 to get an established stand of native grass. We recommend no herbicide treatments the first growing season. You may apply a herbicide during the second growing season to control noxious weeds.

During the first two growing seasons, it is critical that the native grass gets a well established root system. This means that you will not be able to graze on the seeded area during the first two growing seasons because cows grazing can actually pull out new plants that haven't established a deep root system.

No matter what type of grassland restoration you are attempting, an easement permit is required. The permit will allow enough time for seedbed preparation, planting the native grass seed, and to conduct weed clippings the first two growing seasons. No other additional easement permits will be issued for the same field, until after the results of the permitted planting are evaluated in accordance with the above requirements.

**Exhibit V-7**

**Guidance on the Use and Distribution of Digital Easement and Fee Boundary Information Developed, Updated, and Managed by the HAPET Office**

Developed by: Ron Reynolds, HAPET, and Chuck Loesch, HAPET 12/04 and Adopted by DWG
Revised by - Ron Reynolds, HAPET, Chuck Loesch, HAPET and Susan Kvas, HAPET 03/07

Background: In 1997 the HAPET Office initiated a project to develop digital representations of the boundaries of USFWS NWRS fee lands and areas described in easement contracts. The need for this information for internal use was widespread and ranged from the development of simple maps using GIS, to complete risk assessments of grassland and wetland resources and the prioritization of their protection. The initial project was completed in 2001 and updates to include new purchases is conducted annually by the HAPET Office. Currently, a copy of the Districts digital fee and easement boundaries reside at the respective Field Station.

Purpose: As more Field Stations use GIS in day to day operations, the value and use of the digital fee and easement data becomes obvious. As a result, it is displayed on numerous maps that are used both internally as well as externally. As more individuals outside of the USFWS become aware that digital fee and easement boundary data exists, requests come from a variety of sources and directions to use the digital data primarily for planning purposes. The sensitive nature of easement information coupled with the ease of misrepresentation and misinterpretation of the data warrants a standardized approach to dealing with data display, requests, and sharing.

Safeguarding Personally Identifiable Information:

We are charged with safeguarding sensitive information including, personally identifiable information, and proprietary information we collect or use in the course of our business. This responsibility is expected of all DOI employees, contractors, volunteers, and others, who collect, access, maintain, use or make decisions using this information. We must keep in mind the importance of our responsibility of maintaining and safeguarding this information.

Two documents which should be reviewed for guidance regarding security policies and rules related to USFWS information technology are; USFWS 270 FWS 7: Information Technology Security (http://irm.fws.gov/manual/270fw7.html) and a memorandum to "all employees" from Secretary Kempthorne, dated June 20, 2006, Subject: Important Notice on Safeguarding Personally Identifiable Information.

Authorities for USFWS policies are:

The Office of Management and Budget Circular A-130

The Privacy Act of 1974, Public Law 930579, December 31, 1974, as amended

The Computer Security Act of 1987, Public Law 100-235, January 8, 1988

The following information comes from the documents above:

Sensitive information is any information which requires protection due to the risk and magnitude of loss or harm that could result from unauthorized disclosure, alteration, or destruction of data. Personally identifiable information identifies an individual or can be used to identify, contact, or locate an individual to whom such information pertains. This can include: personal contact or location information, online contact or location information, government-issued identifier, or information about an individual's finances.

Noncompliance with Government information safeguarding use requirements is a serious offense. The Department can be assessed penalties for mismanagement of information, particularly intentional and willful violations of the Privacy Act that harm an individual. Individual employees may also face criminal penalties for knowingly releasing records to someone not entitled to receive it.

The following recommendations are restricted to the easement digital data set. Distribution of the fee-title information is unrestricted however, it is suggested that any distribution of the fee data be accompanied by information that explains how the data was created.

Recommendations for Easement Data:

1. Digital files of easement data should generally not be provided to non-FWS personnel or organizations.
2. Electronic transfer of information requires encryption by a FWS approved process.
3. Protection: Easement files should be protected using "user ID and password" and only those with a need should have access to these files.
4. Avoid having files copied on portable computers and removed from the office. This is most critical with the files that have landowner attribute data.
5. Easement data shared should be in a map/hardcopy format only and the display should be restricted to the immediate area of need. An example would be a buffered area along a proposed pipeline rather than all of a county that the proposed pipeline transects.
6. Recipients of easement data in any format should be informed that they are not allowed to share (copy or reproduce in any manner) the information with others or use the information for uses other than the intended purpose.

7. The first point of contact for easement information should be the WMD Office that coincides with the geographic location of the data request.
8. The WMD Office should request assistance from the HAPET Office in preparing the map if resources to do so are not currently available at the Field Station.
9. A disclaimer prepared and provided by the HAPET Office should be included in the map layout (Attachment 1).
10. Easement date request that are larger in scale than a WMD should be forwarded to the HAPET Office who will ensure that all WMDs affected are informed.
11. Request from other FWS Divisions should be directed to the HAPET Office.
12. Request from other Federal Agencies should be directed to the HAPET Office.
13. Easement data is a valuable layer for internal use, field maps, tours, etc. Ensure that the disclaimer prepared and include by the HAPET Office is included on any maps.

Recommendations for Fee-Title Data:

1. There is no need at present to restrict the distribution of the fee boundaries.
2. A disclaimer prepared and provide by the HAPET Office should be include and the request must be asked to include the disclaimer on any maps products.
3. The metadata created and provided by the HAPET Office should accompany any distribution of the fee data. (Provided on CD)

Attachment 1

Development of digital U.S. Fish and Wildlife Service (USFWS) National Wildlife Refuge System (NWRS) boundary data is a joint effort between the Habitat and Population Evaluation Team Office (HAPET), Bismarck, ND, and the USFWS Region 6 Division of Realty. Ducks Unlimited Great Plains Regional Office, Bismarck, ND assisted in data collection and processing.

METHODS:
Digital boundaries of the USFWS NWRS fee-title lands were derived from the interpretation of survey information where available. Boundaries for the remaining units were developed from a combination of global positioning system (GPS) positions (<5m acceptable horizontal error) collected during field visits, USFWS National Wetland Inventory digital wetland acres (1:24000), and/or general cartographic data developed by the U.S. Geological Survey (1:100000 and 1:24000).

Detailed methods for producing fee-title boundary data are available in USFWS SOP 97-01 Process for Creating and Managing Service Lands Boundary Digital Data: Standard Operating Procedures for Using Global Positioning System Technology for Collecting Fee-title Boundary Information (Draft).

Digital public land survey section data for North Dakota (1:100000), South Dakota (1:24000), and Montana (1:24000) were used to create boundaries of USFWS NWRS easement areas. Individual sections were subdivided into approximately 40 acre units which were then recombined to match the legal description for the easement area identified within the easement contract. For easement area that deviated from simple legal descriptions, further division of section data was conducted. USFWS National Wetland Inventory digital wetland arcs and general cartographic data developed by the U.S. Geological Survey were used as necessary to complete digital boundaries of easements that did not conform to an aliquot part description.

DISCLAIMER:
The USFWS makes no claim as to the accuracy or completeness of the displayed information. Shaded areas depicting USFWS NWRS fee and easement lands are for illustrative purposes only and do not represent legal boundaries or in the case of easements, the acreage of wetland or grassland resources included in the easement contract. The quality of the data used to develop digital boundaries is variable, consequently, the digital representation of all boundary information is subject to change as higher quality data becomes available. All fee-title and easement arcs are attributed to allow for replacement. For more detailed information on the boundaries of fee-title land or easement areas, please contact one of the USFWS Realty Offices located in Bismarck and Minot, North Dakota, or Aberdeen and Huron, South Dakota.

Exhibit V-8

NWRS/RE
LA-WA Easement
Acquisition Policy and
Procedure
Mail Stop 60135

Memorandum

To: Realty Supervisors, Region 6

From: Chief, Division of Realty, Region 6

Subject: Sand, Gravel, and Clay Extraction on Lands Encumbered by Grassland Easements -- Background and Policy

In 2001, the Solicitor's Office reviewed and provided an opinion (June 29, 2001) on a specific wetland easement enforcement case in North Dakota. This opinion revolved around the right to remove certain minerals, i.e., sand, gravel, and clay from land encumbered by a wetland easement. From that opinion, Region 6 developed an interim policy (April 12, 2002) relative to all wetland and grassland easements acquired in Montana, North Dakota, and South Dakota. The intent of the interim policy was to provide field offices guidance on extraction of sand, clay, and gravel for personnel who acquire and manage easements until such time as a long-term policy could be developed.

This memorandum articulates Region 6's policy regarding the mining of sand, gravel, and clay underlying grassland easements in the Prairie Pothole Region. This policy is being formally incorporated into the administrative and enforcement manual.

In April 1992, Region 6 issued administrative policy on management of grassland easements. That policy was the culmination of over 3 years work on developing a grassland easement document and associated policy. It was reviewed by refuge field staff and approved by the Assistant Regional Director, National Wildlife Refuge System. The 1992 policy stated on page 14: *"subsurface mineral rights are not encumbered by the easement; however the owner of the mineral estate should notify the Refuge Project Leader of the intent to develop. The Refuge Project Leader should issue a permit for surface disturbance and follow procedures similar to those followed for Waterfowl Production Areas and other Service fee-owned lands."*

The 1992 policy went on to declare guidance on how to accommodate extraction of sand and gravel and other surface disturbance by stating on page 14: *"Managers are encouraged to cooperate with landowners to modify easement areas up to this limitation to accommodate feed lots; buildings and corral construction; sand, gravel, coal and other development of subsurface rights . . . ."* It was clear from this approved policy how the original drafters of the grassland easement intended to address the sand and gravel issue and interpret the easement.

The first grassland easement was acquired in 1991 in South Dakota and the program rapidly accelerated, particularly in northeastern South Dakota. The Region decided to review the program and accompanying policy in 1996. The 1992 policy was reviewed by field and regional office staff resulting in minor changes and clarification to the policy. In a memorandum dated May 12, 1997, the Region officially revised the grassland easement policy and provided the revised policy to all Montana, North Dakota, and South Dakota field stations. The revised policy added clarification to the mineral rights issue on page 14 by stating: *"Subsurface mineral rights including coal, oil, gas, sand, or gravel are not encumbered by the easement. Clay for fill or road projects is not a mineral and the easement does not allow clay excavation as a preexisting mineral exclusion. However, the owner of the mineral estate should notify the Refuge Project Leader of the intent to develop. The Refuge Project Leader should issue a permit for surface disturbances and follow procedures similar to those followed for Waterfowl Production Areas and other Service fee owned lands."*

The original 1992 policy did not define 'subsurface minerals' in the first reference on what rights were encumbered by the easement; however, the second reference revealed the policy intent when discussing permit issuance by stating "sand, gravel, coal and other development of subsurface rights." The policy update team in 1996-1997 clarified this statement by adding the further reference to sand and gravel in the first paragraph and specifically stating that clay was not a mineral and was, therefore, encumbered by the easement.

These additional policy statements were based upon discussions with legal counsel at the time and clearly indicate both a legal interpretation of the easement language and policy approach to easement management. The drafters and reviewers of the easement did not provide any guidance to refuge or realty staff to consider sand and gravel values when preparing appraisals, which have clear commercial value, when appraising, acquiring, or enforcing the grassland easement. Furthermore, the understanding at the time was that the word 'minerals' in the legal document included 'subsurface' sand and gravel. While the understanding of the legal definition of 'surface' and 'subsurface' may be blurred in the articulation of policy, the understanding of Fish and Wildlife Service (Service) intent regarding sand and gravel was not blurred.

Subsequently, a 2001 Solicitor's opinion concerning the Service's wetland easement indicated that, in North Dakota, gravel and clay are not considered minerals and, therefore, were not reserved by the landowner via the easement reference to "all minerals." This opinion did not apply to Montana or South Dakota. It followed that

because sand, gravel, and clay were not reserved, encumbrance of the surface by the grassland easement also encumbers, i.e., prohibits, removal of clay, sand, and gravel. (The Service grassland easement aims to protect wildlife habitat by precluding surface disturbance.) That being said, if an easement is disputed in court, judges will look for evidence of intent, that is, what did the grantor intend to reserve or except from the conveyance document, such as the right to remove gravel, sand, and clay from the property. If the conveyance document itself does not indicate the grantor's intent, that is, specifically, by name, reserve these materials thereby retaining the landowner's right to extract these materials, courts may conclude that such materials were intended to transfer to the grantee. However, courts, in order to determine intent, often will go beyond the four corners of the document and bring in ancillary evidence to make such determinations, particularly if the document is ambiguous. Such evidence would include any documents shedding light on the intent of the respective parties, e.g., current and former agency policy, agency memoranda of guidance, negotiation notes, and other documentation. The encumbrance of sand and gravel, when viewed in light of all documentation, would indicate the buyer (Service) did not intend to prohibit the extraction of the sand and gravel interests and articulated this intent in both policy and negotiations.

Furthermore, the Service did not acquire the fee estate, which, if acquired, would better serve the implications rendered by the 2001 opinion. The court cases referenced in the 2001 Solicitor's opinion involved two parties, one owning the fee estate and one owning the 'mineral' estate. Any legal case involving a grassland easement would involve the fee estate (surface owner), easement estate (Service), and possibly third parties claiming any or all minerals. Conservation easements require specificity regarding intended encumbrances. Lacking the specificity found in other conservation easements on this right, the likelihood is great that additional evidence would be presented in court reflecting that it was not the intent of the Service to prevent sand and gravel extraction because the easement document does not specifically define that right. In other words, the easement does not explicitly prohibit extraction of sand and gravel. This lack of express prohibition, combined with Service policy, suggests the Service intended to allow sand and gravel extraction after the land was encumbered by a Service grassland easement.

The Service's perspective and intent regarding sand and gravel was clear from both the 1992 and 1997 versions of the approved policy guidance. We did not intend, nor did we desire, to preclude sand and gravel extraction via the grassland easement. In addition, while there is very often a market for those aggregates there was no guidance provided to appraisers to value these materials for the purposes of acquiring the easement. We intended to manage sand and gravel removal the same way we manage oil and gas rights. We would issue permits for site occupancy to minimize damage to our grassland interests, but could not preclude such development.

To date, we have acquired over 900,000 acres of grassland easements with the same easement document. All such easements will be enforced and managed under the understanding that sand and gravel are owned by the fee title estate and the Service grassland easement does not impede the right to remove such materials.

The updated wetland and grassland easement administrative manual currently being reviewed for signature in the Regional Office will reflect in policy this view of sand and gravel rights for grassland easement administration.

If you have any questions regarding this clarification, please contact me at 303-236-8130.

cc: Audubon NWR/Lloyd Jones
Sand Lake NWR/Gene Williams
ARD/NWRS, R6
Deputy ARD/NWRS, R6
Refuge Supervisors, R6

bcc: HWittmier, MMazel, BAdler
RE file, RE rf, NWRS rf

RE:HWittmier:cg:9/14/05/I:\Secty\HARVEY\Sand-Gravel Policy Revised.doc

Exhibit VI-2

**Easement Tracking:** Tracking easement violations is critical to the integrity of the entire easement program. Currently individual stations are tracking their own easement violations. A centralized tracking system is needed to maintain consistency and uniformity in the easement program. Instituting a central tracking system will allow individuals with oversight responsibility, the ability to monitor the progress of easement violations.

The Devils Lake Wetland Management District has been using an electronic easement register that they developed. This register is also being used by several stations in North and South Dakota. By adopting this electronic easement register as the standard it will provide the consistency needed throughout the easement enforcement program. The electronic easement register contains all of the pertinent information needed to successfully conduct easement investigations.

Upon completion of this electronic easement register, the information will be exported and sent to a master file for tracking. The master file will be maintained by the appropriate Zone Law Enforcement Officer. A hard copy of the electronic easement register shall be included as part of the permanent easement file.

The service is currently developing a Law Enforcement Incident Management System. This case incident reporting system will track all law enforcement incidents that occur within the realm of the National Wildlife Refuge System. Easement investigations will also be incorporated into this reporting system.

Until the aforementioned case incident reporting system is operational, it is imperative to export the data as described above.

After confirming an easement violation the investigating Refuge Officer or person responsible for oversight of the specific easement must complete the applicable information fields within the electronic easement register within seven days. Within fourteen days after documented completion of an easement investigation, (ie: compliance or court adjudication) the Refuge Officer or person responsible for the specific easement will complete the applicable information fields within the Easement Register.

To further augment the tracking process of easement violations a semi-annual reporting requirement will be instituted. 1.) Stations shall provide a “fall outlook report” for easement violations. This report will be submitted to the appropriate Zone Law Enforcement Officer or by December 15 each year. 2.) Stations shall provide a “spring progress report” for easement violations identified in the fall and continued from previous years. This report will be submitted to the appropriate Zone Law Enforcement Officer by May 15 of each year. The aforementioned reports will be submitted electronically or by disc sent via mail.

The following example of the electronic easement register illustrates the format.

WETLAND EASEMENT INVESTIGATIONS

Case number ______ Year initiated FY - ______ Modification date 03/31/2003

State ______ County ______ WMD ______

Easement number ______ Township ______ Range ______ Section ______ Tract ______

First flight date ______ Second flight date ______ Ground check date ______

File review date ______ Violation confirmed ______ Case Officer ______

Description of violation/activity ______

Description of violation/activity ______

Additional comments regarding violation/activity ______

Date map requested/initiated ______ Draft map completed ______ Final map completed ______

Date of final map ______ Date final map sent ______ Copy to Bismarck? ______

Easement summary acres ______ Did draft map exceed summary acres? ______

Has this map been sent out previously? ______ FSA records check date ______

Landowner (Last name, First name) ______ ID# ______

Operator (Last name, First name) ______ ID# ______

Landowner Address and Phone Number(s) ______

Operator Address and Phone Number(s) ______

Responsible party or map requestor ______ ID# ______

Responsible party address and phone number ______

First contact date | Individual contacted

Compliance date set | Date follow-up letter sent | Return receipt

Date map sent | Compliance check date

Second contact date | Individual contacted

Compliance date set | Date follow-up letter sent | Return receipt

Compliance check date

Third contact date | Individual contacted

Compliance date set | Date follow-up letter sent | Return receipt

Compliance check date

General status

Detailed status as of modification date

Date case closed | VN issued (Y/N) | Date of VN

Other Information

# Navigation and Surveillance Technology Flight Equipment









ArcPad™

U.S. FISH & WILDLIFE SERVICE
DEPARTMENT OF THE INTERIOR





## U.S. Fish and Wildlife Service

## Mountain Prairie Region
## Dakota Working Group



## Developed by Scott Ralston



*Last Modified October 17, 2006*

# Table of Contents

Making a Flight Map ....................2

Using the Pre-Made maps ....................2

Making your Own Maps ....................4

Tablet Laptop Basics ....................9

Using the Wireless GPS ....................13

ArcPad Navigation During Observation Flights ....................15

Using your Data After the Flight ....................21

Preparing Maps for Photography Flights ....................23

Canon 5D Basics ....................25

Webcam Basics ....................33

Performing Photography Flights ....................35

Combining Observation & Photography Flights ....................42

Taking Oblique Photos ....................43

Low Distortion or Special Use Aerial Photography ....................44

Post Processing Photos ....................46

Troubleshooting Data Check In ....................49

Legend for Flight Map ....................51

Photographic Examples ....................52

Quick Start Check List ....................55

**Sources for Help**

Most Recent Online Tutorial, Announcements, Downloadable ND & SD Pre-made flight maps and any other related information can be found at http://www.fws.gov/devilslake/Flights/

**System Designer**

Scott Ralston
USFWS
Devils Lake Wetland Management District
Office: 701-662-8611 #322
Scott_Ralston@fws.gov

# Flight Map

**Making Your Flight Map (Before the Flight!)**

You will need to prepare a flight map using ArcGIS 9x before your surveillance flights. This map will then be exported and transferred to the navigation equipment in the plane. There are two methods of preparing your flight map. Either use the pre-made data and map or create your own map using data available at your station.

1. **Using the pre-made data and flight map for ND or SD.**
   a. This Pre-made map includes USFWS easements, WPA's, NWR's, Roads, Cultural Points, Ponds & Lakes, Counties, Violations layer with drop down pick lists for violation type and flight lines.
   b. If you haven't done so already, download the data from the web at: http://www.fws.gov.gov/devilslake/Flights/ or request a CD copy from Scott_Ralston@fws.gov
   c. If you downloaded it then unzip the file and store it on your computer or network or if you received the CD, then copy the CD contents to your computer or network.
   d. Open the file named NDFlightMap.mxd or SDFlightMap.mxd in ArcGIS 9
   e. Zoom to the area that you will be flying (your district). Make sure the entire flight area is visible on screen because only what you see will be exported to the final map
   f. If there is specific data you need in your map that is not included in the pre-made map data you can add it.
   g. If the symbology or other data properties do not suite your needs you can also change them.
   h. Optionally, use the editing function to edit the Flight Lines layer.
      i. This can be used if you have specific flight paths you want to follow. Most often you would draw a flight path that runs the full length of your flight area (N-S or E-W alternating by year) and would run every other mile (2 miles between flight lines to observe a mile out each side of the plane).
      ii. By editing the attributes for those flight lines you can number and label them accordingly such as if you want to keep track of where you have been. (Example: "We flew flight lines 15-24 today so tomorrow you can do 25-48")
      iii. In the Pre-made data there are 2 sets of flight lines. The first is for observation flights and the second is for photography flights. For those that combine the two flights you will only use one of the flight lines layers.
   i. If the ArcPad toolbar is not visible you can turn it on under the menu: View>Toolbars>ArcPad
   j. Once the map is the way you want it you must export the map to an ArcPad Project to be used on the laptops in the plane.
      i. The export or "Check out" command will dump all the files in your view into a new folder and will also create an ArcPad map file (*.apm) that you will open in ArcPad and your map will appear the same as it was in ArcGIS.
      ii. Any files that come from a "Geodatabase" such as the pre-made violations points layer will also be able to be "Checked In". This means you check out the data, conduct your surveys and when done you check the data in which will automatically merge any new information into the original dataset in ArcGIS. This works great for multiple observers using different laptops.




k. First press the "Get Data For ArcPad" Button

l. Select all the layers you want to export.
(Basically select everything except the second flight lines)




m. Next select the layers you want to be able to merge back in with the original dataset after your flight. Only geodatabase layers will be available for Check In.
(Normaly just the Violations points layer unless you plan on making changes to the flight lines during the flight then check that as well)




n. Select the location you want all the exported files to be placed and give it a **<u>Unique</u>** name. This will create a folder with all your GIS layers stored in at the place you specify with the folder name you specify. Each time you do a checkout the folder name must be unique because when you go to check in the data, if you have multiple check in's with the same name, only the first one will be able to be checked back in. The others with the same name will NOT check in. For this reason if you will have more

than one observer (thus working on more than one laptop in the plane) you must do a separate checkout for each laptop. Once the data is checked in you need to create a new Checkout before collecting more data because you will not be able to check in the same data twice.




o. Once the checkout is finished you should get a confirmation screen. Check that the total layers equals the total number succeeded.




p. Make sure to **SAVE YOUR MAP** in ArcGIS. If you do not save the program will not keep a record of your Check Out and will not be able to check it back in.

q. You now need to copy your data to a CD, DVD or USB Flash drive to transfer it to the laptop in the plane. A USB Flash drive is the best method of transfer and you should have a minimum of ½ a Gigabyte (512MB) of storage space. A 2 gigabyte flash drive would be optimal for transferring both maps and aerial photos you may take during your flight. This is the recommended drive http://www.cdwg.com/shop/products/default.aspx?EDC=956607

r. Leave a copy of your Check Out folder in its original location on the computer from which you checked out from.

**2. Using your own Data and Maps.**

a. If you have your own GIS data and want to create your own custom flight map, use ArcGIS to create your layout the way you want it.

b. Recommended layers are: USFWS easements, WPA's, NWR's, Roads, Cultural Points, (houses, farms, etc) Ponds & Lakes, Counties, Violations layer with drop down pick lists for violation type and flight lines.
c. You can load aerial photos but it is not recommended for several reasons:
   i. It requires more storage space and you may be limited in size you can transfer on your media such as a CD can only hold 700MB
   ii. These larger image files will be slower to redraw when your map refreshed as you travel
   iii. Experience and test runs have shown aerial photos provide too much detail and observers spend more time comparing features on screen to what they see out the window. Example: instead of just confirming that the farmstead you see out your window is the same one you see on your screen represented by just a cultural point dot, you may, with the aerial photo, try to count the number of grain bins on the property to be sure of what you see and start questioning yourself if items don't match exactly.
d. You will need to create a new layer to mark violations with. A geodatabase feature class file is recommended over a standard shapefile because you can use the check in option and also create dropdown pick lists for violation type to save yourself time when marking violations in flight. You can either copy the geodatabase from the pre-made data mentioned above or create a new one
e. To create a Geodatabase and new feature class:
   i. Open ArcCatalog and navigate to the location you want to store the new file.
   ii. Right Click and Choose New>Personal Geodatabase and name it whatever you want




   iii. Right Click on the new geodatabase and choose properties
   iv. Under the Domain tab fill in a field name under the Domain Name Colum such as "Violation Type"
   v. Under "Domain Properties" and "Field Type" choose "Text"

vi. Under Coded Values fill in a code and a description. The description can be the same as the code or different but keep it short. These coded values will be the items in the drop down list for Violation Type when you mark a new point.




vii. Hit OK when done

viii. Double Click on the new geodatabase to open it then right click and choose New>Feature Class. A feature class is synonymous to a shapefile but is just located within a geodatabase




ix. Give the feature class a name such as “Violations” and hit Next

x. Leave the storage configuration as default and hit next

xi. Highlight “Geometry” under “Data Type” (see screen-shot below)

xii. In "Field Properties" and "Geometry Type" choose "Point"




xiii. Under "Spatial Reference" click the box with 3 dots …

1. Before doing this you may need to find or create a shapefile from existing data that includes your flight area such as district counties or even the whole state and make sure that shapefile has a coordinate system defined appropriate to your area such as NAD 1983, Zone 14N for the east half of ND & SD (should be the same coordinate system for all layer in map). If you already have this type of file then continue on.

xiv. In the Spatial Reference screen, choose "Import" and point to a shapefile or feature class on your computer that covers your entire flight area as mentioned above. Then Click OK. This step is very important because it defines the area that you can draw points in within the map. If no spatial reference is defined or the wrong area is defined, when you try to place a point on your map you will get an error saying "Coordinates are out of bounds" and will not place the point.



xv. Create a new field by clicking in the blank space below "SHAPE" and type in a name such as "Type" and under "Data Type" Choose Text

xvi. Under "Field Properties" and "Domain" choose "Violation Type" or whatever you named your domain in the Geodatabase earlier. This now linked the drop down list you created earlier to this field in the attribute table




xvii. You may also wan to create a new field called "Notes" with type being text and length being 100. This will give you a place to type additional notes about a violation point if you wish

xviii. Some may also want to make a field name "Observer" if you want to keep track of who recorded the violation.

xix. Click finish when done setting up this feature class and add it to your map.

xx. Create any other editable layers in the same way such as creating a line type feature class to draw out your flight lines.

f. Once your custom map is created, zoom so you can see the whole map in your window

g. Follow the steps (1i-1r) outlined above for exporting your map to ArcPad and the laptops on the plane.

# IMPORTANT: if using ArcGIS/ArcMap on the Tablet Laptop!

ArcGIS has software security features. If you need to use ArcGIS/ArcMap on the tablet laptop you will need to PLUG IN THE YELLOW USB SENTINEL KEY BEFORE YOU STARTUP THE COMPUTER. Without the key plugged in the program will not run. The key should be in the laptop carrying case. Each key is specific to that computer and will not work in other computers so do not exchange between laptops. This key is not needed to run ArcPad or any other features on the laptop except ArcGIS which includes ArcMap and ArcCatalog.



# Tablet Laptop Basics

The laptops used with the plane are designed to have the mobile processing power needed for any GIS applications and the convertible tablet provides a reduction in dexterity issues often found with mouse touch pads. These laptops also include wireless connectivity for the GPS units and CD/DVD burners for transferring data.

1. The laptop can be used as a standard style laptop with the keyboard and mouse pad.
2. Alternatively you can turn the screen (counter clockwise – follow the arrow on the hinge) and lay it flat to use as a tablet.
3. The screen is only touch sensitive to the stylus pen provided with the unit. Do not touch the screen with any other hard object that may scratch the screen. Resting your hand on the screen is fine and will not affect your mouse/cursor. The stylus is located on the front left side of the computer and can be released using the switch on the bottom left side of the unit, below the pen.
4. Having the pen near the screen will move the mouse around
5. Tapping the screen serves as a left click of a mouse.
6. Tap and drag works the same as a left click and drag
7. Press and hold on the screen until an icon appears then release will serve as a right click. You can also hold the button down on the side of the pen and tap the screen once which will also serve as a right click
8. The orientation of the screen can be changed so you can hold the tablet in different positions to suit your needs. Press the first (most left-hand) button on the bottom of the screen to rotate. **Notice** when using the software associated with the photography equipment the screen must be in a landscape mode. You will get an error about screen resolution if the screen is in a portrait orientation. When just using ArcPad for navigation the orientation does not matter.



9. Without the keyboard in tablet mode you will use the handwriting options instead of typing test. When your cursor/stylus is in a text box or anywhere text can be placed a little keyboard icon will appear.




10. Tap the icon and a writing window will appear. You can write in this window and it will automatically recognize the text. The letter recognition works fairly well and should recognize cursive but to reduce errors I recommend printing as clearly as possible. When you have written what you want or if you run out of room in the window hit the "Insert" button to insert the text into the text box or document your are working in. If you prefer a keyboard style you can hit the keyboard button located at the bottom left side of the writing window and tap keys to type.




11. When using the stylus it is recommended to watch the cursor not the tip of the pen because sometimes they don't line up perfect. However if the stylus is poorly aligned

with the cursor you can calibrate it by double clicking on the tablet setting icon located next to the clock and choose calibrate. Follow on screen directions.




12. The laptop is also equipped with a CD and DVD burner. If you need to transfer data from the computer, insert a blank disk and if "Nero SmartStart" does not start automatically you can open the program from the desktop. Choose the Data Icon (looks like a piece of paper) and "Make a Data CD". Follow the on screen directions to add your data to the disk and finish the burning process. A CD will hold 700MB and a DVD will hold 4.7 Gigabytes. If you have an extreme amount of data you can purchase a dual layer DVD which will hold about 9Gigabytes or just burn on multiple disks.




13. Instead of having a computer and a notepad on your lap you can also take notes on the computer if needed. Either open Microsoft word and use the handwriting recognition as described above or use "Windows Journal"

a. Windows journal can be opened either on the desktop or hit the Journal button on the screen.



b. Windows journal looks like a piece of paper and you draw on it the same as you would a piece of paper. It does not recognize handwriting but simply saves what you scribble down. You can also draw sketches or whatever else you need.




c. Don't forget to save your journal document and transfer it along with any of your other files when you leave the plane. You can also choose print and print to the Adobe Acrobat Distiller which will make a pdf document out of your journal entry, then you can save that with the rest of your data.

d. If you don't already have it on your office computer you will have to download and install Windows Journal Viewer to view the journal you created on the tablet. Go to Microsoft.com and search for Windows Journal Viewer and you can download and install it for free.

e. Aside from the navigation and camera software that will be described later the tablet laptop for the plane also has Adobe Photoshop, ArcGIS and Microsoft Office

# GPS

The GPS units in the plane use a wireless technology called Bluetooth. Bluetooth is simply a short range wireless connection between your computer and the GPS unit. Bluetooth is only a one-on-one communication so for each laptop or PDA used you must have an associated GPS unit.

1. Make sure the batteries are charged before use with the battery charger provided. The unit can be charged while running if needed and has both an outlet adapter and a 12Volt adapter as well as can be charged from the USB port on the computer. The batteries should last for about 10 hours on a full charge.
2. There are 2 styles of GPS units but the both work the same.
3. With the silver unit the On-Off switch and power plug port is located on the side
4. With the Black unit the power button is the white plastic button on the top which you need to hold down for a few seconds to turn on or off.
5. On both units the blue light will blink when it is connected to your computer and the Orange or green light will blink when it has a satellite position fix.
6. To connect to your computer, turn the GPS and the computer on.
7. On the Desktop, Double click the “My Bluetooth Places Icon”




8. If Bluetooth GPS Units you are using match the shortcut icons listed (Property numbers) double click one to connect.
9. If the Bluetooth GPS you need to connect to is not listed, double click the “Find Bluetooth Devices” and then double click to connect to one once found. If there are multiple devices listed and you are not sure which one is right use trial and error to attempt to connect to each one in the list until the a connection is found.
10. While connecting to either unit your computer may ask for a pass key or security key. A notification bubble will pop up near the clock which you click/tap on to enter the key code. The Key for any grey unit is “6268” for any of the black units it will be “0000”.



11. If you are running more than one laptop and GPS, you may get an error message saying you can not connect to the device if one of the other laptops has already connected to that GPS unit. Just cancel and connect to a different GPS listed in your available connections.




12. Once connected it should list your connection and COM Port Number. Usually it will be COM5 but if it is different, remember it so you can set ArcPad to look for the GPS in the correct location.



# ArcPad Navigation During Observation Flights

It is **highly** recommended that before using ArcPad in the plane that you practice using the basic features of ArcPad in your office. ArcPad 7 is a fairly simple user interface and is easy to learn but you should be familiar before surveying in the plane. ArcPad 7 can be installed on your desktop or laptop computer. It is also used on Trimble GeoXT GPS units where you could practice using it with a GPS. Major things to know are opening maps, enabling a GPS, toggling on or off layers if needed or changing the color or symbology of layers as needed, standard navigation such as pan and zoom, editing a layer, placing points and populating a field in the attribute table. For more general information on using ArcPad 7 and specifically with a Trimble GPS see the tutorial http://www.fws.gov/devilslake/Storage/Trimble_GeoXT_with_ArcPad7.pdf

1. If you will be conducting a short flight and the laptop battery is full you don't have to plug it in. A fully charged battery should last at least 3 to 4 hours. However if you are doing a longer flight, plug the laptop in using the provided power cord and the power inverter in the plane. The computer performance will be a little faster when plugged in. **Caution:** DO NOT leave the power inverter plugged in or running if the plane's engine is not running. Aircraft batteries are light duty and will easily die without the alternator recharging it!
2. Transfer the folder containing the flight maps that you created to the desktop of the computer.
3. Make sure the GPS is connected as described above using the "My Bluetooth Places"
4. Open ArcPad 7 by clicking on the ArcPad icon on your desktop or in the start menu.




5. Use the custom toolbar with oversized buttons for most tasks you will perform. The button order will also remind you of the setups to using your map from left to right.




6. Hit the folder icon to open your map from the location you saved to onto the computer (Desktop) 
7. Hit the GPS button to activate the GPS in AcPad.  If you have a signal a target should appear on screen at the location you are at. 
   a. If the GPS is not working:
   b. Check that the GPS unit is on.

c. Check that the "My Bluetooth Places" shows that you are connected to the GPS serial port. And the Bluetooth icon by your clock is blue with a green center instead of a white center. This means it is connected. If not then reconnect.

d. If it is connected to the computer fine (Bluetooth works) but ArcPad can't find the signal then check GPS Preferences by hitting the drop down arrow next to the GPS Icon




e. The Protocol should be NMEA, The port should be COM5 Bluetooth unless when you connected to the Bluetooth serial port it said a different COM number, Baud should be 4800




f. If the GPS is connected to your computer fine and it is just a poor reception problem try repositioning the GPS unit in the dash of the airplane to get the most possible access to the sky. Often the signal will come back shortly as the aircraft moves in location.

8. Your map should appear approximately the same as it was on your ArcGIS screen. If you need to make any changes such as turning certain layers on or off or changing the colors or symbology then do that now. The layers can be accessed by hitting the layer properties icon 

9. This will bring up the table of contents where you can toggle on or off certain layers or change the legend properties if needed




10. You may want to setup a GPS Tracklog to keep track of where you have flown. If so, double click/tap the "GPS Tracklog" in the table of contents. The track log will be a shapefile with a point taken at every time interval you specify. Choose where to save the shapefile to (preferably in the same folder as the rest of your data so you will remember to take it with you when you leave the plane. Also set the time interval. Every 20-30 seconds is sufficient unless you want higher detail of your flight path. Hit OK when done. You can choose whether you want the track log to be visible on screen or not in the table of contents window.




11. The Tracklog can be turned on or off by hitting the GPS Tracklog option in the dropdown list next to the Satellite Icon.



12. Use the navigation tools to zoom to the scale you want for your map. A good scale to start with is approximately 1:30,000. Scale is displayed in the status bar on the bottom right side of the window.

13. Turn on the Automatic Map Rotation so direction of travel will be up on the screen. 
    a. IMPORTANT!: Before turning on the rotation make sure your map scale is the size you want it. The rotation tool sent with ArcPad has a bug in the program that causes the map to zoom out every time it rotates. A patch was programmed into the custom toolbar that

will keep your map scale the same. However in order for this patch to work it is set to save the map scale that was set when the rotation is turned on and will reset to this saved value if the scale changes. Therefore you will not be able to zoom in or out while the rotation is on.

i. If you need to change scales, turn off the rotation, zoom to the new scale and turn the rotation back on.

b. Without the rotation tool you may be disoriented if North is always up.
c. Use the map rotation button on the custom oversized toolbar NOT the rotation tool built into ArcPad 7. This is a custom version of the tool that will refresh faster than the built in version and give you options to change settings.
d. When you hit the Rotation button a dialog box will pop up to change any settings. Default settings are fine. The only setting some may want to change is how often the screen refreshes. If you are changing direction often you may want a faster.
e. Hit OK when done with the settings **NOT** the X and the map should begin to rotate as long as you have a GPS fix.
f. If you need to turn off the rotation (Such as to zoom in or out) hit the Stop Rotation button
g. You can also toggle the North Arrow on which will place an arrow on your map pointing North to help orient yourself.



14. At this point the navigation with ArcPad should be working. You can prepare to collect data points by starting editing mode.
15. Press the drop down arrow next to the pencil icon and choose the layer from that list that you want to edit such as the "Violations" layer.



16. The editor toolbar will appear but unless you need a specific task you can ignore that toolbar because the basic tools you need are on the oversized custom toolbar
17. To mark a point:
    a. Make sure the point icon is highlighted




    b. Identify the location on the map that coincides with the land feature you see out the window of your airplane.
    c. Tap on the screen where you want to mark your point. Mark at least within the appropriate quarter section and if possible within the ¼ of the ¼. Marking the correct location is important because this is the point you will fly over to take the aerial photo. If a violation covers more than 1 quarter section, place a point in each of the affected quarters.
    d. Once you mark the location a red star (or whatever symbol you designated) will appear on your map and a window will pop up to populate any fields you created for your points. Choose the violation type from the drop down list.




    e. If you have time or a reason you can fill in any additional comments or notes or any other fields that you have created.
    f. When finished with that point, hit **OK**. DO NOT HIT THE **X** BUTTON to close. The **X** will close the window and NOT save your point.

18. To modify any of the points you have taken:
    a. First select it (click on it) with the selection tool (Black cursor icon) and a dotted box will appear around it. The last point you took should already be selected so you don't have to re-select it if that is the point you want to modify
    b. To delete it press the red  on the toolbar
    c. To Change the attributes such as the violation type or add or remove notes and comments, hit the Properties button on the toolbar (box with hand pointing)



19. When you are done with your flight, stop editing and save your edits by hitting the pencil icon so it is un-highlighted 
20. Save your map by hitting the disk icon, then close ArcPad. Close ArcPad before copying files or you may get an error stating the file can not be copied because it is still in use.
21. Transfer your files From the laptop back to your office using either a USB flash drive or burn a CD or DVD (you must provide your own blank disks) using the NERO burner software on the computer (Choose Data disk option and follow on screen directions). Do this for all the laptops used during your flight to collect information.
22. If you are conducting photography flights see the section below called "Preparing for Photography Flights" and "Performing Photography Flights".
23. Be courteous to the next user and or the pilot by:
    a. Delete any maps, journal or note files, photographs or any other data you put on any of the laptop computers after you have saved it to your own disk and remove all disks from the drive.
    b. Return the stylus pen to the port in the front side of the laptop.
    c. Wipe any grease or smudges from the tablet screen using the blue cloth provided in the laptop case.
    d. Shutdown the laptops and turn the screen so the writing side is facing down
    e. Inform the pilot of any batteries that need to be charged such as GPS batteries or if you ran the laptop on battery power.
    f. Put the equipment away in their appropriate places. Laptops have their own carrying cases in which the laptop, its cords and one GPS unit with power cords go in the laptop case.

# Using the data after your flight

1. Upon returning to the office with your data, copy the flight map folder back to the original computer location it came from. When asked if you want to overwrite the old information choose Yes.
2. Open ArcMap and the original flight map you had exported from.
3. Make sure the ArcPad toolbar is visible. If not then turn it on from the View>Toolbars menu
4. From the Editor toolbar (or the x-tools start editing button ) start editing the Violations geodatabase file (or whatever you named your points file).
5. Once in editing mode the "Check in Data from ArcPad" button should light up. Press that button.




6. Check the boxes next to the data you want to check in. If you checked out more than one set of data (i.e. to multiple laptops) all checked out geodatabase files will be displayed. Therefore only select items with the "Check Out Name" column appropriate to the folders that you know are ready to be checked in. You can check in multiple sessions at once but be careful not to check in data that is not ready yet (information from a laptop that has not been copied back to it's original location) because once you check in the data you can not check in the same folder again.
7. If you accidentally checked in data that wasn't ready yet, failed to save the map when you check out, checked out only 1 set of data but used it on multiple laptops or for any other reason you have data checked out but it won't let you check it back in, refer to the "Troubleshooting Data Check In" section.
8. Once the necessary layers are selected hit "Check in"
9. After the check in is complete stop your editing session and save your edits.
10. Repeat this for all checked out data. You can check in your work at the end of each day (and then check out a new session for the next day if you are doing a multiple day survey) or keep collecting data on the checked out map until you complete your flights, then do one check in at the end.
11. When you check in you should notice that any new points gathered during your flights will be merged into the original data so if you check in a session from each of two laptops the information from both will appear in the flight map.
12. If you used the track log option the Tracklog shapefile was created in ArcPad, thus not part of the original data and therefore will not be checked in with the rest of your data. You will have to copy that data from the checkout folder (or other location if you stored it outside the original folder), store it where ever you want on your computer, then add it to your map. You can merge multiple Tracklog files together using ArcToolbox>Data Management Tools>General>Merge or Append (Merge combines 2 or more files in a NEW file, Append combines 1 or more files into an EXISTING file).
13. Once you have checked in your data and copied any other miscellaneous files you needed from that folder you can delete the checkout folder. Don't forget to save any journal or note files that you may have placed into that data folder from the laptop!

14. For all the violation points you have recorded you can easily obtain the easement information on which the violation occurred and have that information show up in the attribute table for each point.

    a. In ArcMap or ArcCatalog open ArcToolbox 
    b. Navigate to Analysis Tools>Overlay and double click on Identity
    c. For "Input Features" choose the point layers used to collect all your violations
    d. For "Identity Features" choose your easements layer
    e. Under Output Feature Class choose a location and filename for the shapefile or geodatabase feature class that will be formed from the identity.
    f. Press OK
    g. The result will be a new file with all your points that will look identical to the original point file. However if you open the attribute table you will see each point contains the fields that were originally in the point such as violation type, but will also contain all the attributes from the easement that it coincided with such as tract number. Using x-tools extension you can export your attribute table to excel and format and print it if you wan t a hardcopy list.
    h. You can also use this intersect tool with the PLS sections layer to obtain legal descriptions of the violation points.
    i. If there are any fields that were imported during the Identity process that you do not what cluttering up the attribute table simply open the attribute table for your points layer and right click on the column heading of the field you wan to remove and hit Delete Field.

# Preparing Maps for Photography Flights

One method of conducting easement violation flights is to have a first flight (observation flight) as described above where you will record the location of all violations. Once all violations have been recorded you will conduct a second flight to photograph all your violations. In some situations only one flight will be conducted where violations found and are immediately photographed. For this scenario refer to the section below called "Combining Observation and Photography Flights"

1. In preparation for your photography flight you must first have points captured using the methods described above.
2. Open your flight map in ArcMap as you had in the initial flight map creation process. You will once again create a similar map but the flight path will connect your violation points.
3. If you are using the pre-made data and maps you can use the FlightLine2 feature class file already made. If you are creating your own data you will have to create a new shapefile or feature class. Follow the directions used above for creating the point file but under shape type or shape geometry choose line or polyline instead of point. The only field necessary for this file is optionally a label field or something to specify information about the flight such as photographer for that portion of the flight path.
4. Start editing the FlightLines2 layer.
5. Draw a path that connects all the violation points on your map. Keep in mind a few things as you draw your flight path.
    a. You will be taking belly mount pictures vertical with the ground so there will be only one flight over the target then move to the next location. No circling around the target.
    b. The target image size is a ¼ section with a little overlap so design your flight path to photograph the entire quarter section that the point is marked in.
    c. Attempt to approach and over fly your target in a cardinal direction. This will make orientation of the photo later on easier and will maximize the frame since most land boundaries are laid out in cardinal directions.
    d. Remember the planes performance characteristics and the speed you will be traveling when designing turns.
        i. Using this photography method the flight will go much faster than the old circling method and in test flight with the Cessna 206 flight speed was up to about 180mph agl. Prepare for longer reaction times when turning.
        ii. When 2 locations are very close together (within a mile or two) it is often better to go over one target, then fly past it a few miles before looping back for the other one.
        iii. Since the camera facing out the bottom of the plane the aircraft must be perfectly level in flight to take a good picture.
        iv. If you design too sharp of a turn the plane will have to bank hard to make the turn and may not be level in time to take the picture over the target.
    e. You may want more than one flight path or involve an airport stop location in your flight plan for fuel if you will be flying for extended time periods.
    f. Again remember your flight time using this method will drastically decrease (by 2X or more) compared to circling around each target so don't underestimate what you can get done in a day. It is better to plan more than what you think you can get done it a day than not enough so you can best utilize your time with the pilot.
    g. Double check when done drawing that you did not miss any points.
6. Once the flight path is made stop editing and save your edits

7. Make any changes to the rest of your map. Since you are flying to GPS locations you no longer need as many landmarks to orient yourself on the map and may want to include less detail and clutter on your map such as farmsteads and other buildings or ponds, lakes, rivers and streams All those are optional and is up to the preferences of the navigator/photographer.
8. Once the map is the way you want it zoom so the whole flight path is in your view and you can export your map to ArcPad the same way you did for the first flights.
9. If you do not plan on collecting any new information during this flight that you will need to check back in you can just make one checkout session that you can copy to all the laptops in the plane (Photographer, Pilot and Navigator/Note taker if needed)
10. Copy the folder you exported to a USB flash drive, CD or DVD to transfer to the plane. Remember to give the pilot a copy of the map to put on their laptop or PDA so they can follow the flight path you set for them.

# Canon EOS 5D Camera Basics

1. Camera Specs:
    a. 12.8 Megapixels
    b. Full frame (35mm) sensor
    c. 3 frames per second shooting speed.
    d. Over $3,000 replacement cost for camera body alone so please be gentle!
2. Lens Specs
    a. Canon 14mm, F2.8 super wide angle lens with Ultrasonic (for high speed) auto focus)
    b. Canon 28-105mm, F3.5-4.5 zoom lens with Ultrasonic auto focus and UV Haze filter.
3. The following is from the Canon user Manual. See the manual found with the photo gear for more information or download it from the canon website.

## Shutter Button

The shutter button has two steps. You can press the shutter button halfway. Then you can further press the shutter button completely.



### Pressing halfway

This activates autofocusing (AF) and automatic exposure (AE) that sets the shutter speed and aperture.
The exposure setting (shutter speed and aperture) is displayed on the top LCD panel and in the viewfinder. (⏱4)



### Pressing completely

This releases the shutter and takes the picture.

Nomenclature

**Mode Dial**



- C : Camera user setting (p.148)
- B : Bulb (p.96)
- M : Manual exposure (p.90)
- Av : Aperture-priority AE (p.88)
- Tv : Shutter-priority AE (p.86)
- P : Program AE (p.84)
- □ : **Full Auto** (p.46)

# Quick Start Guide

**1**




**Insert the battery.** (p.24)

To recharge the battery, see page 22.

**2**




**Attach the lens.** (p.27)

Align the red dot.

**3**




**Set the lens focus mode switch to <AF>.** (p.27)

**4**




**Open the cover and insert a CF card.** (p.28)

Face the label side toward you and insert the end with the small holes into the camera.

**5**




**Set the power switch to <ON>.** (p.30)

6



**Set the Mode Dial to <□> (Full Auto).** (p.46)

All the necessary camera settings will be set automatically.

7



**Focus the subject.** (p.30)

Aim the AF point over the subject and press the shutter button halfway to autofocus.

8



**Take the picture.** (p.30)

Press the shutter button fully to take the picture.

9




**Review the picture on the LCD monitor.** (p.104)

The captured image will be displayed for about 2 sec. on the LCD monitor.

- To view images captured so far, see “Image Playback” (p.107).
- To delete an image, see “Erasing Images” (p.118).

# Mounting and Detaching a Lens

## Mounting a Lens



**1 Remove the caps.**

- Remove the rear lens cap and the body cap by turning them as shown by the arrow.




**2 Attach the lens.**

- Align the red dots on the lens and camera and turn the lens as shown by the arrow until it snaps in place.




**3 On the lens, set the focus mode switch to <AF>.**

- If it is set to <**MF**>, autofocus will not be possible.

**4 Remove the front lens cap.**

## Detaching the Lens




**While pressing the lens release button, turn the lens as shown by the arrow.**

- Turn the lens until it stops, then detach it.

When attaching or detaching the lens, take care to prevent dust from entering the camera through the lens mount.

# Nomenclature

For detailed information, reference page numbers are provided in parentheses (p.**).




Dioptric adjustment knob (p.44)
Eyecup (p.98)
Viewfinder eyepiece
<⎙> Direct print button (p.138)
<MENU> Menu button (p.33)
<INFO.> Info/ Trimming orientation button (p.72,107/136)
<JUMP> Jump button (p.114)
<▶> Playback button (p.107)
<🗑> Erase button (p.118)
LCD monitor (p.36)
Tripod socket
Power/Quick Control Dial switch (p.30)
<SET> Setting button (p.33)
Multi-controller (p.32)
AE lock/ FE lock button/Index/ Reduce button (p.95/100/110/111,136)
AF point selection/ Enlarge button (p.77/111,136)
Strap mount (p.21)
CF card slot cover (p.28)
Battery compartment cover release lever (p.24)
Battery compartment cover (p.24)
Access lamp (p.29)
Quick Control Dial (p.32)
CF card slot (p.28)
CF card eject button (p.28)
Canon
ON
OFF

## LCD Panel




The actual display will show only the applicable items.

# Installing and Removing the Battery

## Installing the Battery

Load a fully charged BP-511A battery pack into the camera.




### 1 Open the battery compartment cover.

- Slide the lever as shown by the arrow and open the cover.



### 2 Insert the battery.

- Point the battery contacts downward.
- Insert the battery until it locks into place.



### 3 Close the cover.

- Press the cover until it snaps shut.

## Erasing All Images

### 1 Display the image.

- Press the <▶> button.




### 2 Display the erase menu.

- Press the <🗑> button.
- ▶ The Erase menu will appear at the bottom of the screen.




### 3 Select [All].

- Turn the <dial> dial to select **[All]**, then press <SET>.
- ▶ The confirmation dialog will appear.




### 4 Erase the images.

- Turn the <dial> dial to select **[OK]**, then press <SET>.
- ▶ All unprotected images will be erased.
- While the images are being erased, you can cancel the erasure by pressing <SET>.

# Webcam Basics

The webcam used is a Logitech Quickcam and is the same type you may use on your personal computer. This webcam has been mounted to an eyepiece that fits on the camera to enable a live preview through the viewfinder since that is not an option built into SLR cameras. There have been a few modifications.

1. To open the webcam, click the Logitech QuickCam icon on the desktop or on the start menu.




2. The Logitech toolbar will appear. To open the camera window click on the top icon called QuickCapture. 

3. If you want a larger view of the video window you can increase the size where it is labeled “Select Image Size” However the 320X240 is a convenient size to allow you to still fit the ArcPad window and Canon Remote capture window on your screen.




4. The view area of the webcam is much greater than the view through the viewfinder of the camera so the webcam is set to zoom in so all you see in the webcam window is the viewfinder instead of the viewfinder with a bunch of black all around. If it is not set to properly zoom in and crop out the black area around the viewfinder click on the Settings button  on the Logitech toolbar. You can adjust the Zoom or the Pan and Tilt to crop out as much black area on the screen as possible and center your image




5. The webcam has an auto exposure setting that will automatically adjust the white balance or exposure as lighting conditions change. Because about half of what the webcam sees is black (even though that is not what you see because you zoom the webcam in to crop out the black) the exposure is often over corrected and results in a washed out or very bright image that is hard to see. You can manually adjust the exposure. **You should do this at the beginning of your flight before you reach your first target.**

   a. To do a manual adjustment click on the Settings icon 
   b. On the Webcam Settings window Uncheck the "Auto" box next to the White Balance (seen above).
   c. Click on the advanced Settings Button (Owl icon)
   d. Uncheck the box labeled "Use Automatic Settings"
   e. Move the Exposure until you find the appropriate setting that looks the best in your web cam window.



# Performing Photography Flights

1. If you will be conducting a short flight and the laptop battery is full you don't have to plug it in. A fully charged battery should last at least 3 to 4 hours. However if you are doing a longer flight plug the laptop in using the provided power cord and the power inverter in the plane. The screen will be brighter and computer performance will be a little faster when plugged in. **Caution:** DO NOT leave the power inverter plugged in or running if the plane's engine is not running. Aircraft batteries are light duty and will easily die without the alternator recharging it.
2. Make sure you have a flight map prepared as described above, in which flight paths connecting all photo locations are defined. Also provide a digital copy of the flight map to the pilot which they will use to guide the plane along the flight path.
3. Load all flight maps onto the needed tablet laptops in the plane.
4. Make sure the wide angle 14mm lens is installed on the camera and remove the lens cover (Make sure the lens is fully locked on, we don't need to send an $1,800 lens flying at 2,000 feet)
5. Attach the web cam to the eyepiece of the camera




6. Make sure a fully charged batter is in the camera
7. If you will be storing the images on the camera instead of the laptop hard drive:
    a. Make sure a blank CF card (preferably the 2 gig card) is installed in the camera
    b. Plug the remote cable release into the port located on the left side of the camera under the rubber covers.



c. You will not have to plug the camera itself into the laptop or open the remote shutter release program on the laptop as will be described below for taking pictures from the laptop.
d. You will still need to use the webcam from the laptop to view throught the viewfinder.

8. The pilot will have to gain access to the camera port hole before the camera can be installed.
   a. In the Cessna 206 it is located under the second row pilot's side seat The seat can be removed or just slide it all the way forward. An alternative hole can be found farther back in the luggage compartment. The camera will not be physically accessible during the flight when using this hole so it should be used if the second row pilots-side seat will be occupied by an observer.
   b. In the Cessna 182 it is located under the second row seat. Because of this plane's configuration The rear seat will need to be removed for belly mount photography, thus only the pilot and one observer will be in the plane. If more observers are needed you will need to revert to oblique photography.
9. Place the camera on the camera mount.
   a. Make sure the camera lens is as straight as possible (perpendicular to the ground)
   b. Make sure the bolt that holds the camera on is tight so the camera will not move



10. Plug in the USB/mini USB data cord, connecting the camera (port under the rubber cover on the left side of the camera) to the laptop



11. Plug the webcam USB cord into the laptop
12. Turn on the webcam from the laptop by hitting the Logitech quick cam icon on the desktop, then hit the Quick capture button to open the camera window. Make any needed changes to webcam settings as described in the Webcam Basics section.




13. Place the camera mount over the hole with the camera as straight as possible. When moving the camera mount, handle it by the metal or wood frame. **Do NOT move it by pulling on the camera, webcam or cords!**
14. Turn the power switch on the camera to ON and turn the setting dial to full auto (the green rectangle) unless you need specific camera settings and understand shutter speed, aperture and ISO settings.
15. Lower the camera down into the port hole by loosening the adjustment screws on the sliding bar. Position the camera so the lens is barely inside the hole. (Use the webcam to see through the viewfinder to make sure the edges of the hole are not seen in the viewfinder.
16. Make sure the adjustment screws are tight. (Do not over tighten and strip the screws!)



17. Put the camera neck strap over the metal frame of the mount and make sure any slack in the strap or USB cords are not dangling in the hole or tangled where they will be pulled on or pinched.
18. To start the camera remote shutter release option on the laptop:
    a. The tablet laptop must be in landscape display mode for the photography program so if the windows screen is screen is portrait (taller than wide) press the rotate button on the corner of the tablet screen to rotate it to landscape.
    b. On the desktop of the computer right click (hold the button on the pen down and tap the screen if in tablet mode) and choose New>Folder, and name the folder something like Photos-*Date* (Photos-11-2-2006) or something intuitive for future record keeping.
    c. Open the "Zoom Browser" program icon on the desktop.
    d. Choose "Acquire & Camera Settings"



e. Choose "Remote Shooting" and click the "Starts Remote Shooting" Icon




f. You will be prompted where to save the photos. Choose the location of the folder you just created.

g. The remote shooting window should appear and show the settings for the camera. The blue camera button is the button you will press to take a picture. You may want to test this function before you leave the ground.




19. Turn on the GPS units and connect to it using Bluetooth as you did in the first flights described above
20. Open your flight map and initiate the GPS as you had in the first flight map described above.
21. You should have three programs open on your computer now (ArcPad for navigation, Logitech QuickCapture for viewing the webcam, and EOS 5D Remote Capture for taking pictures). There may be a few associated programs up as well including ZoomBrowser and the Logitech toolbar but they can be left in the background. You may also have windows journal open in the background if you need it for taking notes. Arrange your screen so all three important programs can be seen at the same time as is seen in this example:




22. The pilot should follow the flight line laid out. Be sure to communicate when a photo target is approaching to be sure you are heading in a cardinal direction and the plane is as level as possible. The pilot should not alter their course during the photography of a point.
23. To determine the height you need to fly you can use the Photo Scale Estimation Calculator Excel spreadsheet provided on the desktop of the laptop or download from http://www.fws.gov/devilslake/Flights . To capture a quarter section (recommended) an average altitude above ground is 1,800-2,000 ft. It is recommended you provide some overlap in your target area (1/4 section plus some).
24. Monitor your GPS position in ArcPad and check features such as roads or section lines in the webcam window as you pass over them to determine the correlation between the GPS position and what is seen in the camera viewfinder. Normally the center of the webcam should be very close to the GPS position.
25. When you come upon a point, monitor the webcam window as you get close to the quarter section you want to photograph to see when the quarter section comes into view.
26. When the quarter section is in view hit the remote shutter release button on the laptop to take the picture. You may want to take multiple pictures starting just as the desired location is coming into view and continuing until it is leaving the view. Since it is all digital it does not hurt to have extra pictures but you may regret it if you do not capture the area you needed. If you are not using the remote shutter release program on the laptop then press the shutter release on the cable release connected to the camera.
27. Notify the pilot when you have completed taking the pictures of that location so they can alter their course to the next location.
28. Proceed to photograph all points in your flight map.
29. If you are flying in windy conditions the plane may "Crab" which means the plane will fly slightly at an angle from the true direction of travel. If this is the case or the approach angel for a target is not quite in a cardinal direction you can correct by slightly turning the camera mount in the hole to compensate for the angle. Remember to turn the mount using the metal or wood frame and not pull on the camera or cords.

30. Depending on the lighting conditions the web cam may need to be adjusted. If the image seems washed out, follow the direction above in the Webcam Basics section to adjust the brightness, exposure or contrast.
31. Periodically or if the images seem a little blurry or smudged, check the camera lens. The exhaust from the plane is released near the camera port hole and oil can get splattered on the lens. If there is anything on the lens, wipe it off with a clean soft cloth or tissue.
32. The camera may turn itself off to save power if left alone for awhile without any action. It should turn back on when the shutter button is pressed halfway or flip the power switch off then back on. If the camera is connected to the laptop it will not normally go into power save mode but if it does you can turn it back on by pressing the shutter release button or turning the camera on and off.
33. During long flights, occasionally check the power level of the battery on the LCD display on the top of the camera. If the battery is getting low, replace it with a fully charged battery. Do not wait until it goes dead or it may happen while you are flying over a target. There should be 3 batteries for the unit.
34. If you do not have the camera connected to the laptop and thus are storing pictures directly on the CF card, check the LCD display on the top of the camera periodically to see when the card is full. The LCD will count down the number of pictures remaining. On the 2gig card you should get approximately 350 photos. On the spare 1gig card you will get about half as many. If you run out of space switch with the spare card in the camera case or download the pictures to the laptop using the CF card reader provided in the camera case then put the card back in the camera and reformat it (see the Using the Camera section).
35. When finished with all photos, transfer all images to the laptop using the CF card reader if you took any directly on the camera. Use a USB jump drive or a blank CD or DVD (Use NERO Burner Smart Start on the desktop and choose data disk) to transfer the images from the plane back to the office.
36. If you collected any new information on your map you can transfer that as well or if not then the map can be deleted from the computer
37. Be courteous to the next user and or the pilot by:
    a. Delete any maps, journal or note files, photographs or any other data you put on any of the laptop computers after you have saved it to your own disk and remove all disks from the drive.
    b. Return the stylus pen to the port in the front side of the laptop.
    c. Wipe any grease or smudges from the tablet screen using the blue cloth provided in the laptop case.
    d. Shutdown the laptops and turn the screen so the writing side is facing down
    e. Inform the pilot of any batteries that need to be charged such as used camera batteries or if you ran the laptop on battery power.
    f. Delete anything on the CF card of the camera and leave the 2gig card and a full battery (if available) in the camera.
    g. Make sure the lens cap is on and the power is off on the camera.
    h. Put the equipment away in their appropriate places. Laptops have their own carrying cases in which the laptop, its cords and one GPS unit with power cord all go in the laptop case. The camera and it's associated equipment go in the pelican carrying case.

# Combining Observation and Photography Flights

For smaller flight areas or areas with very few violations it is often not worth the time to separate flights into two parts (observation and photography). If this is the case:

1. Follow the directions above for creating and using your flight map.
2. Set up the photography equipment in the plane as was as described above with some modifications to the positioning.
    a. If dealing with two observers in the Cessna 206 the preferred camera port is located under the second row pilots side seat, thus that seat must be removed or slid all the way forward so an observer can not use that seat.
    b. To still observer out the left side of the plane either the left observer has to sit in the third row seat with the camera in front of them (which the space is fine but the back window gets smaller to see out of) OR
    c. Leave the second row seats intact and remove the third row seats to access the camera port near the rear of the plane. You will have to use the USB extension cables provided to connect the camera and webcam to the laptop and make sure the battery is fully charged on the camera because the camera will be difficult to access in flight.
3. Once you mark a violation, fly past the location by about two miles before turning around (far enough to make a U turn and straighten back out) and make a pass over your target, taking pictures as described above in the Photography Flight section.
4. Then U turn again to get back on the original flight course.
5. Altitude for photographing a quarter section with some overlap is the same as the altitude for easement observations (about 1,000-1,500 ft above ground)

# Taking Oblique Photos

Oblique photos are those images taken out the window of the airplane, closer to parallel with the ground. This type of photography may be useful when you are trying to capture a landscape view. However for easement violations it is highly recommended to use the belly mount or vertical photography for several reasons:

1. Minimal distortion so objects and land features are proportional
2. Vertical images can be imported into GIS and georeferenced to be used in mapping or measurement.
3. Better resolution and less atmospheric haze because the distance between lens and ground is minimized
4. No glare on the lens from the sun or reflections on the window.
5. Can be taken with one flight over target, reducing observer fatigue and airsickness caused by circling around the target.
6. Easy to orient the photo (N, S, E, W) and compare to other aerial photography such as FSA.

If you do take oblique photos:

1. Create your flight map and flight lines as needed as described above to navigate to the locations.
2. You will not use the camera mount or connect the camera to the computer for this type of photography.
3. Make sure a blank Compact Flash (CF) card is in the camera because unlike the belly mount photography the images will be stored in the camera instead of on the computer hard drive.
4. Use the zoom lens (28-105mm) provided with the camera instead of the wide angle (14mm).
5. Unless you need a specific setting for your application the auto mode should work fine. Turn the setting knob on the top left of the camera body to the green square for full auto.
6. Use your flight map as needed as described above. Circle your target and take photos out the window of the airplane.
7. Make sure to record direction of photography and attempt to get distinguishing landmarks in the frame to use for orientation.
8. Do not touch the camera or lens to the window as the vibration will transfer to the camera and blur your image.
9. When finished use the CF card reader to transfer the photos to the laptop where they can then be saved to a USB flash drive, a CD, or a DVD.

# Low Distortion or Special Use Aerial Photography

The super wide angle lens used for easement flights was chosen because you will be able to fly relatively low (<2,000 feet) and still capture a ¼ section or more. This low altitude is convenient for several reasons:

1. Easement flights often conducted in fall or spring often coincided with sporadic weather and low clouds. Lower flights allow you to fly under a lot of cloud cover and still be able to take pictures
2. Lower flights provide more clear images due to less atmospheric haze to shoot through
3. Many stations combine observation and photography flights into one flight and the altitude used for observation flights is conveniently about he same as that used for photography with the wide angle lens.
4. Lower flights allow observers to see their targets easier.

Conventional aerial photography uses a less wide lens due mainly to distortion issues. Wide angle lenses often produce distortion around the edges of the image that will make straight lines appear curved (often referred to as the fish-eye effect). The 14mm lens uses with the airplane is one of the highest quality wide angle lenses available on the consumer market and therefore has corrected for the distortion as much as possible. However some distortion is still present. Another issue you may notice is less light is gathered around the edges of the lens so in some cases you will see a darkening as you get away from the center of the image (minimal in test runs with this lens).

If you have a need for very high quality aerial photography that has as little or no distortion as possible and has even lighting, these are a few options you may consider.

1. Fly using the standard methods described above but leave plenty of overlap so the target or important part of the image is in the center of the frame.
2. Switch to the zoom lens and set it to 50mm or greater.
    a. A higher mm lens will produce a better image. However you will have to consider that the altitude you fly will be much greater.
    b. Example: To photograph approximately a ¼ section you need 1,800 feet with a 14mm lens and over 6,000 feet with a 50mm lens.
    c. The higher the altitude the more you will have to deal with low level clouds, atmospheric haze and oxygen above 10,000-12,000 feet.
    d. When the zoom lens is faced downward the weight of the lens elements may cause the zoom ring on the lens to rotate and drop which works the zoom mechanism.
        i. To counter act this your may need to set the lens to 50mm (or other setting for your needs) and use masking tape or electrical tape to hold the zoom ring in place.
        ii. Do not use duck tape or other tape that will leave a sticky residue on the lens and may damage the lens.
        iii. Do not place the tape over the focus ring or your pictures may not be in focus.
3. If you will be conducting a lot of low distortion aerial photography you may consider submitting a proposal to purchase a fixed 50mm lens for the current camera equipment.
    a. A fixed lens as opposed to the zoom lens currently provided for the camera will provide better quality and more consistency.
    b. Canon EF compatible lens is required to work with this equipment.

4. Other camera settings that will improve image quality include
    a. Lower ISO (film speed) provides a better quality image but requires longer shutter exposures
    b. Smaller aperture (higher number) makes a greater depth of field so more of the subject is in focus but the smaller the aperture the less light and the slower the shutter speed. Depth of field is not a big issue in relatively flat terrain.
    c. Any time you have a slower shutter speed (long exposure) you have to be careful about image blur due to movement. If objects in the frame move perceptibly (more than the length of one pixel) in the time the shutter opens and closes it will appear as a blur. A standard rule for handheld photography is the shutter speed (in tenth's of a second) must be higher than the lens focal length (measured in mm); so a 14mm lens must have a shutter speed of greater than 1/14 of a second. However with the fast movement and vibrations in and airplane it is suggested to not go under 1/60th of a second and use even faster minimums if using the zoom lens.
    d. Shooting RAW format instead of the standard JPG high quality. Using the RAW mode you have no image compression and no quality loss but you must post process each image (like a digital darkroom) which takes a lot of time and Photoshop skill.
5. Another option to remove distortion form your images is use the current equipment but import the image into ArcGIS and georeference it against an orthorectified images such as the FSA county mosaics. You will need as many points as possible spread out throughout the image and choose 2nd or 3rd order polynomial correction. This will warp the image to remove distortion.

# Post Processing Your Photos if Needed

Post process is not necessary but may improve some images. The most changes needed will be in brightness and contrast. Adobe Photoshop is the program of choice for enhancing your images although there are other programs on the market that can do well also. Almost any version of Photoshop have some of the basic options. For more advanced tasks such as batch processing you may need more than a Photoshop elements version. This tutorial is based off of Photoshop CS.

**Original**



**Enhanced**



1. If you are only modifying a few images you can do each one individually.
    a. Open Adobe Photoshop and then open the image(s) you want.
    b. Under the Image>Adjustments menu choose Auto Levels or use the shortcut key Shift+Ctrl+L. Most often this will be all the adjustment you need and automatically balances contrast, brightness and white balance.
    c. For more precise control over brightness and contrast choose the Levels option (Ctrl+L) from the Image>Adjustments menu. You will see a histogram of the image with three sliding arrows at the bottom. Adjusting the outer two arrows adjusts the light and dark contrast. Adjusting the center arrow changes the brightness.
    d. The Hue/Saturation tool can be chosen from the Image>Adjustments menu or use Ctrl+U. In this menu all you really may want to adjust is Saturation which will boost the intensity of the color to help bring out some features. This can easily be overdone so do not adjust more than 10 or 15 points.
    e. The shadow/highlight tool is also available on the adjustments menu and can be used to only brighten dark areas or darken light areas. This may be helpful if you have shadowy images.
    f. The last tool you may want to use is the Sharpen tool found under the filter menu. This tool sharpens lines and edges of objects in the image and may make some features stand out more. Using the standard "Sharpen" command will automatically sharpen. If you want to have some control over the sharpening intensity use the "Unsharp Mask" Option.

2. If you are dealing with many photos you may want to create a batch process.
    a. First you have to create a set of actions.
    b. Open a single photo you want to use as the test run for your processing.
    c. Select "Actions" from the "Window" menu
    d. At the bottom of the actions window click on the folder icon to create a folder to store your batch process in and name it something like Batch Process.
    e. Once the folder is created click on the "Create New Action" button. Give the set of actions (batch process) a name such as Air Photo Enhance, and under "Set" choose the folder you created. When done hit "Record".
    f. Do whatever image processing you want on the photo and the program will record those actions so you can later apply the same process to all images.
    g. For example a standard simple processing action would be: Once you start recording. Choose Auto Levels from the Image>Adjustments menu, then use the Hue/Saturation option and increase the Saturation to 12, then use the Shadow/Highlight tool and set the Shadows level to 13.
    h. When done with the actions you want hit the Red Stop square icon at the bottom of the Actions window.
    i. Close but don't save the sample photo you had open. If you save it then run it as part of the batch process it will be processed twice.
    j. To run a batch process choose File>Automate>Batch
    k. Under Set choose the folder you created and from the Action List choose the action you created.
    l. Under the Source set it to folder and click on the Choose button to choose the folder that all your photos are stored in. The process will go through all the photos in the folder and it can also look in subfolders if you check the "Include All Subfolders" box.

m. Under Destination choose “Save and Close” if you want to just enhance and overwrite the original files or you can choose to save the enhanced version to a different folder by choosing the “Folder” option.
n. Hit OK when done and the Batch process will run
o. In some cases (especially if it is the first time the jpg image has been modified and saved) the process may stop each time it needs to save the image and ask what quality to save at. This is a little annoying and would be nice if the same quality could be chosen for all but a solution has not been found yet. Just choose maximum quality each time or if it is already set to maximum just hit the enter key each time the window pops up.

3. To preserve data integrity, especially since many of the photographs taken represent possible evidence in legal investigations it is recommended you keep an original unaltered version of the photograph in case the integrity of any enhancements to the image ever come into question. For that reason it is also discouraged that you use any other tools other that those that simply enhance the histogram of the image. Tools that alter the pixels such as brushes, pens, patch or eraser tools should not be used.
4. Also keep in mind that each time you save a “Lossey Compression” image such as a JPG format image it will re-compress the image and you will loose some quality. For this reason it is recommended you do all post processing you will need in one session instead of doing an adjustment and then resaving multiple times. Alternatively you can save the image into a RAW or Lossless format such as a TIFF file in which there is no compression or quality loss but the file size is larger. Just opening a image to view will not result in loss of quality. Only resaving in a compressed format will reduce the quality.

# Troubleshooting Data Check In

When you checkout your data to ArcPad, ArcGIS maintains a record of that checkout and stores it with the map document (*.mxd). Therefore when you want to check the data back in and have it merge any new changes back into the original file it must refer to the record of the checkout. Once the data has been checked back in the record of the checkout is automatically erased.

**Common problems with data check in include:**

1. The check in option only is available if you are in editing mode for one of the geodatabase files in the dataset. If the check in option is not highlighted start editing the geodatabase layer such as the violations layer and the check in button should be highlighted.
2. The map was not saved after the checkout therefore no record of the checkout was saved.
3. Only files that come from a geodatabase (feature classes) can have data merged back into the original dataset, so if you checked out a shapefile, don't expect to be able to check it back in.
4. During the checkout process you were first asked which files you want to export, then you were asked, of those files, which of the geodatabase files do you want to be able to check back in? If you did not check off those files at that time they will not be checked back in.
5. There is an option on the ArcPad toolbar in ArcMap to delete records of a checkout. If the record was deleted it can not be retrieved.
6. A data set to be checked out was not given a unique name. If two checkouts where done with the same name there is only 1 record of a checkout with that name so you can check in one of the datasets but the second one won't check in.
7. The changed data (set of data you collected while in the plane) must be placed back in the exact original location on the computer where it was put when you checked out the data. You must overwrite the original copy of the data with the changed copy.
8. If you had 2 records of checked out data (Example: Laptop1 & Laptop2) and you only brought back Laptop1 data from the plane and went to check it in but during the check in you chose to check in the data from both Laptop1 and Laptop2. It will check in both sets of data and erase the record of the checkouts. Therefore when later the Laptop2 data comes back from the plane and you attempt to check it in it will fail because there is no record of the checkout.

**Solutions**

1. The easiest way to check in data when a record of the checkout is lost or missing is to create a false checkout.
    a. For this example we will call the data set that you what to check in but can't the "GoldenData"
    b. In ArcGIS open your original map and perform a checkout with all the data that is in the "GoldenData" set.
    c. During this new checkout make sure you check the boxes when asked which of the geodatabase layers you want to be able to check back in (2nd window during checkout).
    d. Choose a location to store this checkout such as your desktop and name it "FalseCheckout"
    e. Save your map in ArcGIS
    f. Using Windows Explorer or the My Computer window open the "GoldenData" folder and copy all the files in the folder.
    g. Past the "GoldenData" files into the "FalseCheckout" folder and overwrite any files in that folder.
    h. Return to ArcMap and your saved map.

i. Start editing one of the geodatabase layers such as the violations layer.
j. The ArcPad check in button should appear highlighted. Hit that button.
k. Choose the FalseCheckout data to check back in and continue with the check in.
l. Save the edits and stop editing.
m. Your data should now be checked back in and you can delete both the GoldenData folder and the FalseCheckout folder

2. If the above method does not work or you are trying to check in data such a shapefile or newly created data layers that were not part of the original checkout you can append or merge the data from the checkout data to the original data. However using this method it will not recognize new versus old data so if you have features that appear in both the checkout and original datasets then in the merged output there will be 2 points instead of one for each overlapping feature.
    a. Open either ArcMap or ArcCatalog and open the ArcToolbox window 
    b. Under Data Management Tools>General choose Append or Merge
        i. **Append** will combine data from one or more data layers and put it into an EXISTING layer that you specify. Using Append you must choose the "No Test" option if the attribute tables of the two files do not have the same exact fields. Also notice if they don't have the same fields the non-matching fields won't import into the exiting layer. You will transfer the points but may loose the attributes.
        ii. **Merge** will combine two or more data layers and put it into a NEW layer that you specify. The attributes from all input files will be merged into the output so you don't have to worry about matching fields.
3. One final option for getting checkout data back into the original geodatabase is to open ArcCatalog and navigate to the geodatabase that contains your data. Right click on the feature class that you want to put data back into such as the points layer. Choose the "Load Data" option and follow the on-screen wizard.

# Legend for Flight Map

Below is the general legend for the pre-made flight map if you choose to use it. There may be some slight variations if you have made any changes to the data. For consistency as well as to assist the pilots that may be using maps you provide them it would be helpful is general color and symbol schemes remain the same or similar even if you design your own maps.



# Photographic Examples:

These images were taken with the photographic equipment supplied with the plane. They were then imported into ArcMap and georeferenced so scale could be compared. The images were from an easement restoration project. The red line is one square mile.

**Photo Scale Comparison:**

1 square mile taken at 3,500ft AGL



¼ section taken at 1,900ft AGL



¼ section wide taken at 1,300ft AGL



Low Level taken at 500ft AGL



**Resolution Comparison:**



2005 FSA Imagery 1m Resolution



3,500FT AGL – 26.2 Inch Resolution



1,900FT AGL – 13.7 Inch Resolution



1,300FT AGL – 8.5 Inch Resolution



500FT AGL – 2.6 Inch Resolution

# Quick Start Checklist

**At your Office**

1. Prepare your flight map in ArcMap and save the map.
2. Export the flight map using the ArcPad Checkout feature (Export once for each laptop/observer you will use).
3. Copy the exported folder to a CD or a USB flash drive

**In the Plane**

1. Take out the laptop you will use and place the GPS in the dash of the plane and turn on the GPS.
2. Copy the Flight Map from the CD or USB flash drive to the desktop of the computer
3. Connect to the GPS using the "My Bluetooth Places"
4. Open ArcPad and hit the folder icon to open the map you just copied onto the laptop.
5. In ArcPad activate the GPS (Click on the GPS/satellite icon)
6. Setup your GPS Tracklog if desired (Located in the layers menu, double click on the track log, place the location in the flightmap folder you created, give it a name, select an interval)
7. Zoom to your desired scale using the zoom tools.
8. Turn on the Automatic Map Rotation (Hit the Map rotation button on the oversized toolbar, default values will be fine, hit ok to start rotation)
9. Start editing your violations layer (Hit the drop down arrow next to the pencil icon and choose violations layer).
10. Mark violations on screen as you see them (use the point button on the oversized toolbar and tap on the screen to place a point, choose from the drop down list to select a violation type and hit OK to place the point).
11. Close Arcpad and copy the Flight map folder from the computer back to the USB flash drive or burn a CD or DVD.

**Back at the Office**

1. Copy the flight map folder from the USB flash drive or disk back to the original location, overwriting the original files.
2. Open the original flightmap you had checked out data from in ArcMap
3. Start editing the violations layer
4. Use the ArcPad check in button to check in the contents of the folder you had collected your data from.
5. Once checked in save the edits and save your map
6. Repeat for all data checked out (each laptop/observer)

**Photography Flights**

1. Prepare your flight map as you had done before but include a flight line connecting all points you wish to photograph.
2. Export the flight map using the ArcPad checkout feature as you had done before and transfer the maps to the plane laptop.
3. Secure the camera in the mount and attach the webcam to the eyepiece.
4. Position the camera in the belly hole.
5. Connect USB cords from webcam to laptop and from camera to laptop.
6. Create a folder on the desktop of the laptop to store your photos in
7. Start the Bluetooth GPS, ArcPad flight map, GPS Activation in ArcPad, Tracklog, and Map rotation as was done before.
8. Open the Logitech webcam window and adjust exposure if needed.
9. Open the Zoombrowser application and start the remote shooting option.
10. Position the windows so ArcPad, Webcam viewer and remote shooting tool are all visible on the screen.
11. The pilot must follow the flight lines and when you fly over the target confirm the target location by using the GPS position and what you see in the webcam window, then hit the remote capture button to take photographs.
12. When finished, transfer the folder containing the photos to a USB flash drive or a CD or DVD to transfer back to your office.

# EASEMENT ENFORCEMENT CHECKLIST

COUNTY AND
EASEMENT #____________________

YEAR INITIATED____________________
YEAR CLOSED____________________

OWNER____________________
ADDRESS____________________ PHONE__________
ORIGINAL OWNER (Y/N)________ DATE PURCHASED BY CURRENT OWNER__________
OPERATOR____________________ YEARS OPERATED________
ADDRESS____________________ PHONE__________
LEGAL DESCRIPTION OF VIOLATION: T.________ R.________ S________ FRACTION________
VIOLATION #1 (type) ____________________
VIOLATION #2 (type) ____________________
VIOLATION #3 (type) ____________________
DATE OF AERIAL PHOTO(S)__________ PHOTO NUMBER(S)__________
DATE OF GROUND CHECK__________ PHOTO NUMBER(S)__________
INSPECTORS____________________
DATE OF FIRST OWNER/OPERATOR CONTACT__________ METHOD__________
DATE OF FIRST CERTIFIED FOLLOW-UP LETTER____________________
DATE OF SECOND OWNER/OPERATOR CONTACT__________ METHOD__________
DATE OF SECOND CERTIFIED FOLLOW-UP LETTER____________________
DATE OF THIRD OWNER/OPERATOR CONTACT__________ METHOD__________
DATE OF THIRD CERTIFIED FOLLOW-UP LETTER____________________
NEGOTIATED DATE OF COMPLIANCE (1st) __________ (2nd) __________ (3rd) __________
DATE RESTORATION COMPLETED__________ DATE INSPECTED__________
DATE OF LETTER ACKNOWLEDGING RESTORATION____________________
FINE____________________ STATUS__________
REMARKS____________________
______________________________

| INTERVIEW CHECKLIST | yes | no |
|---|---|---|
| EXPLAINED EASEMENT CONTRACT | | |
| AWARE OF EASEMENT | | |
| COMMITTED VIOLATION | | |
| SHOWED VIOLATION ON MAP | | |
| ISSUED COPY OF MAP | | |
| EXPLAINED RESTORATION REQUIRED | | |
| SET COMPLIANCE DATE; if "yes", when: | | |
| EXPLAINED CONSEQUENCES OF NON-COMPLIANCE | | |
| WANTS COPY OF EASEMENT CONTRACT | | |
| FOLLOW-UP CERTIFIED LETTER SENT | | |

Notes:

NORTH



Exhibit VII-2

**U.S. Department of the Interior**
**U.S. FISH AND WILDLIFE SERVICE**
**KULM WETLAND MANAGEMENT DISTRICT**
**1 FIRST STREET SW, P.O. BOX E**
**KULM, NORTH DAKOTA 58456**
**PH. 701/647-2866**
**FAX 701/647-2221**

16 December 2002

NOTE TO FILE
To: Dickey 40x
From: Dave Azure, Deputy Refuge Manager

At about 11:00 am this morning, I contacted Mr. Brent Klipfel by cell phone from Ellendale concerning the wetland easement protecting the SE1/4 of section 15, T. 130 N., R. 64. Officer Ed Meendering and I just finished meeting with the District Conservationist in Ellendale's NRCS office on an unrelated easement; I told Mr. Klipfel that we were passing through town and needed to briefly meet with him. Mr. Klipfel said that he was leaving in a few minutes, but would wait for us. A few minutes later, Officer Ed Meendering and I met Mr. Klipfel at his residence at 708 3rd Ave. North in Ellendale.

Mr. Klipfel met Officer Meendering and me at the door of his house. I introduced ourselves and asked him if he farmed the tract of land described above. He said that he did. I then explained that this piece of land was protected by a FWS wetland easement which was purchased in 1964. I further explained that the wetland easement prohibited the draining, burning, filling, and leveling of protected basins. I asked Mr. Klipfel if he was aware of the easement, he said that he was not. I asked if he was the one who created the scraper ditch in the NE portion of the quarter. At first, Mr. Klipfel said that there was no scraper ditch there. I then took out the aerial and ground photos that I took and showed them to Mr. Klipfel. He then admitted that, yes, he had removed a little dirt from that area, but that it didn't do any good. I acknowledged that I did not know if water had ever run through the ditch, but that it was nonetheless, a violation of the easement provisions. I explained that to be in compliance, the ditch would have to be filled in. After visiting about what could be done, we agreed that Mr. Klipfel would use a loader to fill the ditch and would pack it with a tractor tire. We agreed that the work would be done by 05/01/03, conditions permitting. Mr. Klipfel said that he may even try to get out there yet this winter since the top was still soft. I told Mr. Klipfel that I would send him a copy of the map and easement contract. Mr. Klipfel was friendly and cooperative. Officer Meendering and I left the residence approximately 10 minutes after arriving.

Mr. Klipfel is a white male, approximately 40 years old, with short black hair. He is about 5'8"

and approximately 185 lbs. He was wearing blue jeans, a sweatshirt, and an orange "Arizona" clothing brand ball cap.

Exhibit VII-3

**U.S. Department of the Interior**
**U.S. FISH AND WILDLIFE SERVICE**
**KULM WETLAND MANAGEMENT DISTRICT**
**1 FIRST STREET SW, P.O. BOX E**
**KULM, NORTH DAKOTA 58456**
**PH. 701/647-2866**
**FAX 701/647-2221**

16 December 2002

Certified Letter #7099 3400 0002 5299 3266 Dickey County 40x
Return Receipt requested

Mr. Brent Klipfel
708 3rd Ave. N
Ellendale, ND 58436

Dear Mr. Klipfel:

This letter is to recount the conversation you had with Officer Ed Meendering and myself this morning at your residence.

In June of 1964, the U.S. Fish and Wildlife Service purchased a wetland easement and owns perpetual rights which restrict or prohibit the right to drain, burn, level or fill wetland basins in the SE1/4 of section 5, T. 130 N., R. 64 W. in Dickey County, North Dakota.

The attached map represents the Service's effort to depict, at the 4"/square mile scale, the approximate location of all wetland basins protected by the provisions of the easement contract based on information and photos available at the time the map was prepared. However, because climatological and other natural conditions may cause the shape, size, and location of wetland basins to change over time and from time to time, the map may or may not show wetlands as they appear in any given year. The map will not and is not intended to provide the exact size of the wetlands protected by the provisions of the easement. Also attached is a copy of the easement contract for your files.

During routine compliance flights in the fall of 2001, drainage activity which violates the easement provisions was discovered on a protected wetland basin. Specifically, a ditch was created to drain a protected basin in the northeast corner of the tract described above (see attached map). You acknowledged that you created the ditch with a small scraper, but that you were unaware of the wetland easement. We discussed what would need to be done to restore the wetland and agreed that you would put dirt back into the ditch, probably with a loader, and pack

it down with the tractor tire. We further agreed that if the conditions permitted, the work would be done by May 1st, 2003.

It is important to note that in the unlikely event that the ditch should happen to wash out in the future, it will need to be filled in again for the easement provisions to be satisfied. Also, since future violations may result in the issuance of a Violation Notice including a fine, please call me if you have any questions about the map or easement contract, including what is and is not allowed. Both Officer Meendering and I can be reached at 647-2866.

Thank you, Mr. Klipfel, for your courtesy during our visit and your attention to this matter.

Sincerely,

David A. Azure
Deputy Refuge Manager

att. wetland map
easement contract

cc: WMD easement folder, Dickey 40x (less contract)
Bismarck Realty office (less contract)

Exhibit VII-4

UNITED STATES DEPARTMENT OF THE INTERIOR
FISH AND WILDLIFE SERVICE

TRACT 336x MAP 1 of 3

WATERFOWL PRODUCTION AREA Dickey COUNTY, STATE OF North Dakota
EASEMENT AUTHORIZED BY MIGRATORY BIRD HUNTING STAMP ACT OF MARCH 16, 1934, AS AMENDED.
T. 130 N., R. 62 W., 5th PRINCIPAL MERIDIAN

Section 16, W1/2




Scale: 4 Inches = 1 Mile

The U.S. Fish and Wildlife Service (Service) has purchased and owns perpetual rights which restrict or prohibit the right to drain, burn, level, and fill any wetland basin on the ownership represented by this map. This map represents the Service's effort to depict the approximate location of all protected wetland basins based on information and maps available at the time this map was prepared. However, because climatological and other natural conditions may cause the shape and location of wetland basins to change over time and from time to time, this map may or may not show wetlands as they appear in any given year.

LEGEND

Boundary of Easement Description

Wetlands covered by provisions of the easement

Wetland deleted from easement by Drainage Facility Map prepared when the easement was purchased.

Prepared by: Ed Meendering Date: 3-10-04

Concur: David A. Azure Date: 3-10-04

Exhibit VII-5

**U.S. Department of the Interior**
**U.S. FISH AND WILDLIFE SERVICE**
**KULM WETLAND MANAGEMENT DISTRICT**
**1 FIRST STREET SW, P.O. BOX E**
**KULM, NORTH DAKOTA 58456**
**PH. 701/647-2866**
**FAX 701/647-2221**

9 May 2002

Certified Mail: 7099 3400 0002 5299 4256 Dickey 295x, 2-3
Return Receipt requested

Mr. Clifford Pahl
9252 101 St. SE
Ellendale, ND 58436

Dear Mr. Pahl:

I had a chance to check the wetland restorations in section 33, T. 129 N., R. 62 W. that were required to satisfy the wetland easement contract (Dickey 295x, 2-3) that protects this tract. I am happy to inform you that the work you completed is satisfactory and this case is now considered closed. Please keep in mind, that should the ditch plugs wash out, restoration will again be required to comply with the easement provisions.

Thank you, Mr. Pahl, for your prompt attention to this matter. As always, if you have any questions about the easement contract, the maps depicting protected basins, or activities that are allowed/prohibited on protected basins, please don't hesitate to call me.

Sincerely,

David A. Azure
Deputy Refuge Manager

cc: WMD easement folder

Exhibit VII-6

**U.S. Department of the Interior**
**U.S. FISH AND WILDLIFE SERVICE**
**KULM WETLAND MANAGEMENT DISTRICT**
**1 FIRST STREET SW, P.O. BOX E**
**KULM, NORTH DAKOTA 58456**
**PH. 701/647-2866**
**FAX 701/647-2221**

9 May 2003

Certified Mail: 7002 2410 0006 2393 5059
Return Receipt requested

Logan County
310x, 1

Mr. Conrad Jangula
6142 40th Ave.
Napoleon, ND 58561

Dear Mr. Jangula:

This letter is to follow up the phone conversation we had yesterday. I called to discuss the wetland easement violations in the N1/2 of section 35, T. 136 N., R. 73 W. During our December 20th, 2002 meeting, we had agreed to a May 1st compliance date to have rocks removed from protected wetlands.

Officer Ed Meendering and I visited the site on Wednesday, May 7th and documented that the rocks have not been moved. You mentioned that you had asked Mrs. Jangula to call our office; however, we were not notified that you were unable to move the rocks by May 1st. You mentioned that you had looked at the areas before we received this last shot of rain and that it was still too wet. Finally, you had requested that we allow you to wait until this fall to complete the work.

I explained that, though it's a little wet now after this rain, I'd still like for you to try to at least move the two rock piles to the west this spring. You agreed and we set a second compliance date of May 23rd, 2003. Again, please call me if you are unable to complete this work by the compliance date. Failure to comply with the May 23rd, 2003 restoration date without notification, or future violations of the easement contract may result in the issuance of a Violation Notice including a fine. If you have any questions, please contact me at 647-2866.

Sincerely,

David A. Azure, Deputy Refuge Manager

cc: WMD easement file

# Exhibit VIII-1 (revised 2008)

Guidelines for Questions about Potentially Enlarged Wetlands on Pre-76 Easements:

Normally, the landowner has an issue with one wetland that seems larger than it has ever been before, although they may ask about several or all wetlands on an easement tract. Each expanded wetland (flooded beyond the wetland boundary) question will be evaluated on a case-by-case basis. The first step will be to map the easement (if it was purchased prior to 1976) according to the Service's mapping policy, and then follow the question process below to determine whether relief is warranted. Consider all relevant information in developing justification for granting or denying relief:

- Look at the wetland in question on the ground.

  Health and Safety:
  - Is the wetland impacting curtilage and/or roads? If it does, then the wetland will be evaluated as a "Health and Safety" situation (See Chapter XII).
- Historical Information:
  - Is the wetland flooded beyond existing tree rings? Keep in mind the size of the trees (15 inches in diameter vs. 2 inches). Size can relate to the length of time they have been growing – which could relate to the historic high water line when looking at large, fully mature trees. This criterion is not an absolute marker of where the wetland edge is located, but it can indicate historic high water levels.

    **Yes** – Consider Relief; **No** – no relief considered

  - Has flood water inundated two or more wetlands that were mapped separately and now show one large body of water? Keep in mind that just because 2 or 3 wetlands were mapped separately and are now one large wetland doesn't mean the requester is automatically entitled to relief. Some additional questions/tasks include:
    - Is the land in between the wetlands hydric or upland soils?
    - Have someone with soils skills determine if any upland is being flooded.

    **Yes** – Consider Relief; **No** – no relief considered

  - Has the water line increased beyond that shown in historical aerial photography?

    **Yes** – Consider Relief; **No** – no relief considered

  Scientific Information:
  - Has the water level increased beyond the [1]hydric soil boundary on a semi-permanent wetland?

    **Yes** – Consider Relief; **No** – no relief considered

---

- Has the water level increased beyond the occurrence of hydrophitic vegetation and is upland vegetation being flooded?

  **Yes** – Consider Relief; **No** – no relief considered

- Reasonableness: The manager will also have to use a reasonable test in making a determination to grant or deny relief. Review the accuracy of the map.
  - Look at the shape of the wetland on the ground; i.e., extra lobes of water that are not showing on the easement map and historic aerial photography. Is there an exaggerated/significant departure in shape on the ground as compared to what is depicted on the easement map and historical aerial photography?

    **Yes** – Consider Relief; **No** – no relief considered

  - Does the wetland footprint on the ground look substantially larger then the circle on the map and the footprint in historical aerial photography?

    **Yes** – Consider Relief; **No** – no relief considered

  - The wetland is significantly larger than mapped on the easement map and what is shown in historic aerial photography and has cut off the only access to the landowner's field.

    **Yes** – Consider Relief; **No** – no relief considered

In summary, use biology. The Service shouldn't be faulted if we use good sound biology.

1 The hydric soil boundary is formed over thousands of years based on the hydrological fluctuations brought on by climatic and geological factors. This is referred to as the "static storage" portion of the wetland. The portion of the wetland above the historic hydric soil boundary is known as the "dynamic storage" or natural overflow portion of the wetland. This is the actual wetland boundary and in extended wet cycles the water may overflow onto adjacent lands. A semi-permanent wetland could potentially function properly at the hydric soil boundary as much of its hydrology is dependent on ground water discharge. When an "expanded or enlarged" wetland question is asked, we are talking about a wetland that has been flooded beyond its scientific boundary (hydric soils for a Semi-permanent and natural overflow for a temporary or seasonal wetland).

Prepared for Easement Manual by: Jim Alfonso, Devils Lake WMD

UNITED STATES
DEPARTMENT OF THE INTERIOR
OFFICE OF THE SOLICITOR
WASHINGTON, D.C. 20240

Exhibit VIII-2

DEC 23 1981

LE
cc: all SRA's
return this to me
JB

Memorandum

To: Assistant Secretary for Fish and Wildlife and Parks
Assistant Secretary - Land and Water Resources
Assistant Secretary - Energy and Minerals
Assistant Secretary for Territorial & International Affairs
Assistant Secretary for Indian Affairs
Assistant Secretary - Policy, Budget, and Administration

From: Solicitor William H. Coldiron

Subject: Bureau and Office Relationships with United States Attorneys

The Solicitor's Office is responsible for coordinating and handling, as the case may be, litigation regarding the programs and activities of this Department, regardless of whether the litigation is brought against or initiated by the Department. Control over litigation is essential for the proper implementation of the programs and policies of the Secretary of the Interior.

In this context we are concerned over the existing procedures used by the various Bureaus and Offices for direct access by agency personnel to the Justice Department and more specifically to the various United States Attorneys Offices regarding law enforcement activities. The purpose of this memorandum is to request that the various Assistant Secretaries coordinate with their respective Associate Solicitors the "ground rules" by which the Solicitor's Office will coordinate legal matters involving law enforcement and referral of criminal matters to the U.S. Attorneys.

While we recognize that there is no need for the Solicitor's Office to be involved in certain agency activities, such as the Park Service writing a traffic ticket for speeding in Yellowstone, a criminal referral to a United States Attorney

RECEIVED
FEB 03 '82
DIV. LAW ENFORCEMENT

could raise in a litigation context significant legal issues which affect the programs and policies of the Secretary. A strategy must be devised by which these types of criminal cases are effectively and timely coordinated with the Solicitor's Office.

We would appreciate your office giving this matter immediate attention in order that the program objectives and coordination can be achieve during the month of January. It is essential, in my judgment, that these issues be resolved in fashion that is cost effective, but nonetheless provides the Solicitor's Office with appropriate control over criminal litigation.

Your immediate attention to this matter would be appreicated.

cc:
All Associate Solicitors
All Regional Solicitors

United States Department of the Interior

OFFICE OF THE SOLICITOR

DENVER REGION
P.O. BOX 25007
DENVER FEDERAL CENTER
DENVER, COLORADO 80225

NOV 13 1981

SOLICITORS DOCKET

November 6, 1981

Memorandum 16436 DCW

To: Associate Solicitor, Conservation and Wildlife, Washington

From: Regional Solicitor, Rocky Mountain Region

Subject: Direct Access to U.S. Attorneys by Law Enforcement Personnel - Fish and Wildlife Service, National Park Service, Bureau of Land Management, and Office of Surface Mining

We have been concerned for some time about existing procedures concerning direct access of agency personnel to the Justice Department and specifically to the U.S. Attorneys' Offices as to allegedly routine misdemeanor law enforcement actions.

As we understand the existing rules, if a misdemeanor citation is issued (for example under 36 C.F.R. or 50 C.F.R. for a violation of park or fish and wildlife regulations for speeding, improper camping, hunting out of season, hunting in a closed area, or the like) and it is anticipated that the matter will be handled by a U.S. Magistrate without an appearance of the private attorney representing the party to whom the citation was issued, agency personnel are authorized to refer the matter directly to the U.S. Attorney's Office. Over the years, this practice has spread to a number of other types of misdemeanor violations. A specific example is the violation of a fish and wildlife easement acquired under the Duck Stamp Act. Technically, this is regarded as a violation of 16 U.S.C. 668dd(c) and has been generally regarded over the years as being covered by the existing policy.

Where substantial legal or policy issues are involved even in a criminal misdemeanor case, the matter is supposed to go through the Solicitor's Office. Where felonies are involved, normally agency personnel do not carry the principal load of investigation, that being done by the FBI with the assistance of NPS, FWS, or BLM personnel. The Solicitor's Office is not usually involved with felonies. If, however, it is desired to bring a civil action against a party arising out of the same or similar conduct, existing rules require that the matter go through the Solicitor's Office and that the matter be referred to the

Justice Department over the signature of the Solicitor in most cases. Exceptions would be those permitted by § I.5.1 of the Solicitor's Regulation Manual, which also currently requires the advance approval of the Solicitor before direct referral by a Regional or Field Solicitor.

These procedures concerning misdemeanor referral have proven to have some undesirable consequences. First of all, the agency law enforcement personnel in a locality tend to build up a considerable amount of rapport with their local U.S. Attorney's Office and have exhibited the tendency to look to the U.S. Attorney's Office for general legal advice rather than to the Solicitor's Office.

Secondly, there is a pronounced and developing tendency by agency personnel to "shop" for legal advice by trying both the Solicitor's Office and the local U.S. Attorney's Office to see which will give advice more nearly acceptable to the preconceived ideas of the local agency law enforcement personnel.

A third major problem is that in some instances, local law enforcement agency personnel have not exhibited sensitivity to the identification and need for clearance of significant policy issues raised by misdemeanor citations. The typical result is that neither the Solicitor's Office nor the responsible agency regional officials are consulted about such matters and that decisions affecting significant agency and departmental policy issues are made simply by the local law enforcement personnel and an Assistant U.S. Attorney.

In the past several months, we have had several incidents in this region which tend to suggest that the time has come for re-examination of these existing policies. The first series of events surrounded the establishment of two camps by dissident members of the Pine Ridge Sioux Reservation at Wind Cave National Park and Devils Tower National Monument. Both of these occurrences were recognized quite early by local agency officials to present serious policy problems, and they were referred to both the Solicitor's Office and to the Director for guidance as to their handling. The problems came, however, in communications with the local U.S. Attorney's Offices. Experience suggests that in similar instances in the past, one of the difficulties is in obtaining accurate information about the various parties involved. In this instance, these included among others, the State of South Dakota, local state law enforcement personnel, Indian tribal officials, and leaders of several other Indian groups (e.g., AIM splinter groups). The

situation became very confused and because of the many channels of communication which were open, including those between local agency law enforcement personnel and the Justice Department, it was extremely difficult to accurately follow events, to assimilate and evaluate intelligence information, and to coordinate the positions of the Justice Department and the Department of Interior. We do not fault the regional officials of the Park Service with whom we dealt in this instance. They tried very hard to provide us with accurate information and to involve our office at all signficant points. However, communications with the Justice Department, particularly the U.S. Attorney's Office in South Dakota, became impossible to manage because of the many parties who ultimately became involved and who attempted in one way or another to "run" the matter.

A second more serious problem also developed in South Dakota. Some time back, the Yankton Sioux Tribe brought an action in Federal District Court against the State of South Dakota and several adjoining landowners to adjudicate the ownership of the bed of Lake Andes in South Dakota. The United States was not named as a party. Only recently we have been advised that the Fish and Wildlife Service has an interest in the matter because it manages the Lake Andes National Wildlife Refuge which encompasses lands adjacent to and within the bed of the Lake. Specifically, FWS holds interests below a Congressionally established high water mark of the Lake which were acquired from adjacent landowners and the State of South Dakota. These lands form a considerable portion of the Refuge.

On September 9, 1981, Judge Nichol entered a memorandum decision holding that the bed of the Lake belongs to the Yankton Sioux Tribe. We were advised of the entry of this decision by FWS about October 1. Some time later, after FWS had asked us for advice about the potential implications of this decision on the Refuge, we also learned that a senior resident agent had apparently seen fit, on his own initiative, to approach the Court to ask for clarification of the decision and to determine how it might impact the Refuge. Upon inquiry, we were told that such a meeting did occur between the senior resident agent and Judge Nichol. Apparently Judge Nichol was not visibly offended by this obviously improper inquiry but did, in fact, briefly discuss the decision with the SRA.

Naturally, when we heard about this conversation, we were very concerned because of the obvious impropriety involved. We have subsequently made it clear to the Fish and Wildlife Service that no such activity should occur in the future.

The last significant occurrence was a recent trial in a case entitled U.S. v. Welte as to an alleged violation of a Duck Stamp waterfowl production area easement. This matter was tried to the U.S. Magistrate by an Assistant U.S. Attorney. This matter was appealed to the Court by the defendant.

As you know, the subject of enforcement of alleged waterfowl easement violations via the criminal route has been a very controversial subject recently in the State of North Dakota. Nevertheless, it has been accepted practice for such matters to be handled by the local FWS law enforcement personnel and the U.S. Attorney's Office in Bismarck, N.D. without involvement of either the Regional Office of the FWS or the Solicitor's Office.

There were two significant occurrences in the course of the Welte proceeding. The first was that the attorney for the defendant challenged the enforceability of the easement because of the lack of definition of the covered area. In particular, we have heard that the Fish and Wildlife Service agent stated in response to questions from the defense attorney that the easement purported to cover the entire farm of the defendant, that the wetlands embraced a much lesser part of the farm acreage (22 acres), but that he could not identify the specific 22 acres. Enforcement of easements under this description format where the actual wetlands are not specifically identified has been a major concern of this office for some time, particularly where the wetlands are intermittent or substantially fluctuate in size.

The second difficulty in Welte occurred at the pre-sentencing hearing. For reasons that we do not understand, this hearing was held on Columbus Day, October 12, 1981. The Assistant U.S. Attorney who had prosecuted the case was not present and only the Fish and Wildlife Service's resident agent (SRA) was there. We are advised by FWS that the Magistrate asked the SRA for his recommendation as to the proposed sentence, and he suggested a 6-month jail term with all but a small portion of it suspended on the condition that a $500 fine be paid and a requirement that the easement violation be corrected. The Court apparently did not impose a jail sentence but imposed a fine, a portion to be suspended if the easement area was restored. We have subsequently ascertained that the suggestion by the local FWS agent had been discussed and approved in advance by the Assistant U.S. Attorney who had tried the case. It had not been discussed with the Regional Office of the FWS nor submitted to this office for consideration. We have

requested a transcript of both hearings. From what we understand of the facts and the evidence that may have been adduced, we are concerned about this case and now wonder whether it should be pursued before the District Court. We will fully consider these issues when we receive the transcript.

As we see it, the suggestion of the imposition of a jail sentence in this instance raised serious policy implications, particularly in view of the widespread controversy involving the Duck Stamp easement enforcement program in North Dakota. FWS defends the request for a jail sentence on the theory that North Dakota farmers consider that being caught and punished for violation of a Duck Stamp easement is a "normal risk of doing business."

These and similar matters are valid considerations in arriving at an appropriate recommendation to U.S. Attorneys, but we are concerned that here they were made directly to the Court by the FWS SRA. We are even more troubled to learn from both FWS and Justice that such appearances by SRA's without an Assistant U.S. Attorney being present are common in easement violation cases in North Dakota and perhaps elsewhere. These facts also suggest that initiating a misdemeanor proceeding not only has its limitations but that there may often be serious policy questions involved in such matters which have not heretofore been seriously considered by the agency or by Solicitor Office personnel.

In contrast to these troubling situations, we would also point out one recent occasion in this region where proper procedures were followed. This involved the proposal to initiate legal action against unlicensed, outside-park canoe outfitters at Ozarks National Riverway pursuant to <u>United States</u> v. <u>Richards</u>, 636 F.2d 236 (8th Cir. 1980). It was early recognized that there were policy issues involved as to whether any legal action should be taken and as to whether the civil or criminal route should be followed. With the concurrence of NPS, we referred the matter to you by memorandum of August 14, 1981 and the Solicitor asked Justice to act by letter of September 28, 1981 in which the Solicitor's Office preference for initiation of an injunction action was stated but in which it was also indicated that we would not object to criminal proceedings.

We recently discussed misdemeanor referral procedures with the Solicitor when he visited this office and suggested that perhaps the time had come for a reconsideration of the entire

situation. Obviously, the Solicitor's Office does not have sufficient personnel to involve itself in every petty offense, including speeding tickets, illegal parking, hunting out of season, possession of more game than permitted, or a multitude of similar minor violations. On the other hand, we think it is apparent that the overly friendly relationship which has grown up between local agency law enforcement personnel and the Justice Department has led to decisionmaking on matters which are obviously policy in nature without consideration of its impact by either agency policy personnel or the Solicitor's Office in disregard of at least our understanding of proper procedure. Secondly, it manifests a potentially serious misunderstanding of lines of authority so that the agency law enforcement personnel in the field has come to regard the local U.S. Attorney's staff as "our lawyers" in disregard of either the Solicitor's Office or the regional agency policy personnel.

We have attempted to work closely with the U.S. Attorneys' Offices and agency regional offices in our region to bring these difficulties to their attention and to point out the risks involved to both their offices and to the Solicitor's Office if agency field personnel "shop" for legal advice. Still, considerable confusion remains. The several incidents set out above point up the confusion and the potential mischief which can result to departmental programs. Assuming continuation of these practices, we request that you consider the issues and advise us with respect to the appropriate procedures that should be followed. In this regard, we propose the following procedures for your consideration:

1. Repeal the exception that all misdemeanors are referred directly by the agency to the U.S. Attorney and institute a selective policy. For example, we suggest that the Solicitor's Office refer all alleged wetland easement violations and all proposed prosecutions arising out of demonstrations, occupations, sit-ins, or the like to the Justice Department. There may be others that should also be included in this list. Traffic matters, or other citation issues which obviously will not involve serious legal consequences, should continue to be handled as in the past, by direct referral by the agency to the U.S. Attorney.

2. The policy regarding referrals of misdemeanor matters through the Solicitor's Office where legal or policy issues are involved should be reemphasized to all agency law

enforcement personnel and closer communication had with the Solicitor's Office where there is a question that such an issue exists.

We have supplied copies of this memorandum to the Associate Solicitor for Energy and Resources and the Associate Solicitor for Surface Mining, because both the BLM and OSM have recently obtained law enforcement capabilities. While our experience with law enforcement personnel of these two agencies has been limited, nevertheless, it appears that the same problems of communication and roles may be developing with respect to those two agencies as exists with the NPS and FWS. We are also supplying a copy of this memorandum to the Solicitor as a follow-up to our conversation when he visited the office last month.

If we can be of further assistance, please advise.

John R. Little, Jr.
Regional Solicitor

cc: Associate Solicitor, Energy and Resources, Washington
Associate Solicitor, Division of Surface Mining, Washington

Exhibit VIII-3

**U. S. Department of Justice**

*United States Attorney*
*District of North Dakota*

*Quentin N. Burdick United States Courthouse* *701-297-7400*
*655 First Avenue North - Suite 250* *FAX: 701-297-7405*
*Fargo, ND 58102-4932* *ADMIN FAX: 701-297-7425*
*FLU FAX: 701-297-7435*
*TOLL FREE: 1-888-716-7395*

TO: LAW ENFORCEMENT AGENCY HEADS
FROM: LYNN C. JORDHEIM, Acting United States Attorney
DATE: June 14, 2010
RE: United States Attorney's Office Discovery Policy

Due largely to several recent high-profile cases, disclosure of both inculpatory and exculpatory evidence to the defense has become a hot button topic around the country. It has also become an issue within the District of North Dakota, including in a very recent case in which the Indictment was dismissed and the presiding judge wrote a letter criticizing the investigators for failure to turn over materials to the AUSA handling the case. I note that this failure was not the stated reason for the dismissal, but we are of the view that it likely influenced the judge and, perhaps more importantly, prevented this office from accurately assessing the strengths and weaknesses of the case when making the decision to indict.

We believe that it is necessary for this office and yours to make a more concerted effort to ensure that investigative reports, witnesses statements, photographs, and the like, are compiled in a timely manner by the case agents, and that they are shared with the assigned AUSA(s) in a timely manner. To that end, I have prepared the attached document, styled in the form of a letter to our office, to be prepared by the case agent in each case which is to be presented to the grand jury.

It is a simple form letter which in itself will require minimal effort on the part of your agents to complete and send. It serves two essential purposes: 1) it forces your agents to review their case file at key moments to ensure that their investigation is thorough and complete; and, 2) it documents, for the benefit of your agent and our office, good faith efforts to ensure that all relevant information has been shared in a timely manner.

As you will see, each case agent is responsible for making this certification before presentation of the case to the grand jury. If we do not have the certification, we will not present the case to the grand jury. A second certification is required for cases going to trial. It must be presented to us two weeks before trial. Note that this is not "at least" two weeks, but two weeks - this will enable us to know that the information is complete as we enter that critical window of pretrial preparation for both the prosecution and the defense.

It is very important that the agents realize that this is not meant to be in lieu of their obligation to continually collect and share information with us as it is gathered in every case.

Our hope that no one is offended by this policy that we have adopted. It is not meant to be a negative reflection on the agents with whom we work, as we believe them to be the finest kind, with whom we are proud to be associated. It is meant to be a tool for case agent and prosecutor alike to help ensure that all of our cases are as strong as they can be.

Please, if you have any questions or concerns, let me know right away so that we can discuss them; I value your input. Meanwhile, this policy takes effect immediately and therefore applies to any cases that are to be presented at the July grand jury, for which the indictment deadline is June 28. It also applies to any currently charged cases awaiting trial.

LCJ:tla
Attachment

## INVESTIGATIVE DISCLOSURE CERTIFICATION

Recent developments in criminal cases throughout the United States, including in the District of North Dakota, have emphasized and enhanced the obligation of the government to make timely disclosure of certain investigative materials to the defense. Failure to make timely disclosure has resulted in the exclusion of such evidence at trial, and, in some cases, the outright dismissal of cases, even cases which have resulted in guilty verdicts. To ensure compliance with statutory and constitutional disclosure requirements, the United States Attorney's Office for the District of North Dakota has developed the policies described in this letter.

You are receiving this letter because you are either the case agent in charge of an investigation of a matter that may result in a federal prosecution in the District of North Dakota or are assisting in conducting such an investigation. The agency case number is

______________________.

Every law enforcement officer, whether federal, state, local or tribal, assisting in the investigation of this matter has a separate obligation to ensure that all items of evidence and information gathered in the course of the investigation are disclosed in a timely manner to the Assistant United States Attorney (AUSA) assigned responsibility for the case in the United States Attorney's Office. It is the responsibility of the case agent to ensure that all individuals assisting in the investigation understand their responsibilities in this regard and comply with the directives of this letter.

It is the policy of the United States Attorney's Office for the District of North Dakota that all items collected (including, but not limited to, physical items, documents, photographs, sketches, hand-written statements of subjects and witnesses, audio and video recordings), all interviews conducted, as well as all reports generated in the course of the investigation, be provided to the assigned AUSA before the case is scheduled for presentation to the Grand Jury for indictment so that the AUSA can fully evaluate the strengths and weaknesses of the case and begin the process of identifying material which must ultimately be disclosed to the defense. The case agent will certify below that all necessary steps have been undertaken to ensure compliance with this requirement.

Because it is not uncommon for additional investigative materials to be generated or collected after indictment, the case agent will again certify two weeks before the scheduled date for trial of the matter that all necessary steps have been taken to identify and acquire such materials and that the same have been disclosed to the assigned AUSA.

Finally, the obligations of the case agent and those assisting the case agent with respect to the disclosures described above are ongoing, meaning that, even after the certifications below have been executed, they are required to take all necessary steps to

ensure that ALL investigative materials are discovered and disclosed to the assigned AUSA as soon as possible after their discovery or creation.

Lynn C. Jordheim
Acting United States Attorney
District of North Dakota

**PRE-INDICTMENT CERTIFICATION**

I, ______________________________, am the case agent/assisting in the investigation identified above and certify that I have taken all necessary steps to identify and collect all items discussed above and that I have disclosed their existence to the AUSA assigned to the case. If I am the case agent, I further certify that I have identified and disclosed to the assigned AUSA all those individuals who assisted in the investigation of this matter and have further ensured that they executed a separate INVESTIGATIVE DISCLOSURE CERTIFICATION and have provided the same to the assigned AUSA.

______________________________ ____________________
Certifying Officer's signature Date

**PRE-TRIAL CERTIFICATION**

I, ______________________________, am the case agent/assisting in the investigation identified above and certify that I have taken all necessary steps to identify and collect all items discussed above and that I have disclosed their existence to the AUSA assigned to the case. If I am the case agent, I further certify that I have identified and disclosed to the assigned AUSA all those individuals who assisted in the investigation of this matter and have further ensured that they executed a separate INVESTIGATIVE DISCLOSURE CERTIFICATION and have provided the same to the assigned AUSA.

______________________________ ____________________
Certifying Officer's signature Date

# ND FmHA

# CONSERVATION EASEMENT

# GUIDELINES

ND FmHA CONSERVATION EASEMENTS RESTRICTIONS

Various restrictions apply to FmHA Conservation Easements. These restrictions are described in the easement document under Section II., Covenants by the Landowner (Lessee, when property is under lease by FmHA). Restrictions are delineated on Exhibit "A" maps attached to the easement as "A", "B", "C", and/or "D" Easement Areas. Restrictions are as follows:

**"A" Easement Areas**

For "A" Easement Areas of the easement which include permanent grassland vegetation and the wetland area, the vegetation or hydrology of the described easement area will not be altered in any way or by any means or activity on the property conveyed by this deed, or property owned or under the control of the landowner, including: (1) cutting or mowing; (2) cultivation; (3) grazing; (4) harvesting wood products; (5) burning; (6) placing of refuse, wastes, sewage, or other debris; (7) draining, dredging, channeling, filling, discing, pumping, diking, impounding, and related activities; or (8) diverting or affecting the natural flow of surface or underground water into, within, and out of the easement area.

" FULLY " RESTRICTED

Note: In this case, grazing restrictions are only enforceable after FWS constructs a fence to keep cattle off the easement area.

**"B" Easement Areas**

For "B" Easement Areas of the easement which include permanent grassland vegetation and the wetland area, the vegetation or hydrology of the described easement area will not be altered in any way or by any means or activity on the property conveyed by this deed, or property owned or under the control of landowner, including: (1) cutting or mowing; (2) cultivation; (3) harvesting wood products; (4) burning; (5) placing of refuse, wastes, sewage, or other debris; (6) draining, dredging, channeling, filling, discing, pumping, diking, impounding, and related activities; or (7) diverting or affecting the natural flow of surface or underground water into, within, and out of the easement area.

" GRAZING " ALLOWED

**"C" Easement Areas**

For "C" Wetland Areas of the easement, either by an activity on the property conveyed by this deed, or on property owned or under control of the landowner, the vegetation or hydrology will not be altered through: (1) burning; (2) placing of refuse, wastes, sewage, or other debris; (3) draining, dredging, channeling, leveling, filling, pumping, diking, impounding, and related activities; or (4) diverting or affecting the natural flow of surface or underground waters into, within, and out of "C" Wetland Areas. The landowner shall have the right to carry on farming practices such as grazing, hay cutting, plowing, working, and cropping "C" Wetland Areas when they are dry of natural causes. "C" Wetland Areas shall include any enlargements of said wetland areas resulting from normal or abnormal increases in water.

" NO BURN, " DRAIN, FILL

**"D" Easement Areas**

"GRASS/TREE" PROTECTION

For "D" Easement Areas of the easement, which consist of perennial grassland/tree vegetation, the grasslands and trees within the easement shall be maintained in vegetation consisting of grasses, grass-like plants, trees, and/or forbs. This vegetation is to be maintained without any disturbance to the soil surface other than that caused by burning, grazing, or haying. The harvest and/or removal of live trees is prohibited, unless permitted by the easement manager. The planting or seeding of any crop, grass, legume, forb, shrub, vine, or tree is prohibited, unless permitted by the easement manager.

A few County Supervisors and producers are confused by the use of "G" to delineate grassland/trees within easement boundaries. "G" is not a separate restriction. It merely denotes the non-wetland portions of an easement area that are restricted in the same way as the wetlands, under either "A" or "B" restrictions.

Earlier FmHA Conservation Easements were placed on several properties already encumbered by a FWS Wetland Easement. Greater restrictions ("A" & "B" Easement restrictions) were placed on many wetlands in this case. These wetlands are delineated on Exhibit "A" maps of the FmHA Conservation Easement.

However, in these cases many wetlands that would normally be restricted to burning, draining, filling and leveling ("C" Wetland Areas) under an FmHA Conservation Easement were deleted from the FmHA Easement because these wetlands were already protected in the same way by the FWS Wetland Easement. FmHA Easements written from this point forward will contain all wetlands, whether or not they are already covered by a FWS Easement.

The FWS Wetland Easement will remain in force on these properties, and violations of burning, draining, filling, and leveling should be enforced under this easement rather than the FmHA Easement due to our long-standing track record in enforcing FWS easements. Of course, violations of FmHA easement restrictions different from those of the FWS easement will be enforced under the FmHA easement. Coordinate enforcement activities in these particular situations with the Zone Law Enforcement Officer.

In cases where a property is encumbered by both a FWS Wetland Easement and a FmHA Conservation Easement, field personnel should make a special effort to discuss both easements with a new landowner.

ND FmHA CONSERVATION EASEMENTS SAMPLE LETTER OF INTRODUCTION

It is important to contact the landowner or lessee of a property personally as soon as possible after the Conservation Easement is approved, and again when the property is sold or the easement is recorded. Because this is not always possible, a letter of introduction may be used until such time that you can make a personal contact. The letter is not to be used in lieu of personal contact.

CERTIFIED MAIL
Return Receipt Requested

Mr. F. Armer
RR # 1
Plowdown, North Dakota

Dear Mr. Armer:

You have recently leased/purchased (choose one) Farmers Home Administration (FmHA) property containing a FmHA Conservation Easement. This is a perpetual easement which has been attached to the lease/quitclaim deed (choose one). The Fish and Wildlife Service has agreed to manage and enforce the provisions of the easement for FmHA.

I am sure that the FmHA County Supervisor for your county has discussed the provisions of the FmHA Conservation Easement with you. I would like to meet personally with you on the property as soon as possible. I will be contacting you sometime in the next two months to set up a meeting time that is most convenient with you.

Until then, please be sure that you have read and understand the provisions of the FmHA Conservation Easement. If you have any questions concerning the easement, please call me at (phone number), Monday through Friday, from 8 a.m. to 5 p.m.

Because of the late date that FmHA released the easements, you are authorized to crop easement areas surrounding wetlands, if the easement area is currently tilled cropland and only if grain crops are planted. Wetland basins located in "A" and "B" Easement Areas should not be cropped, however. Fall tillage is prohibited on "A" and "B" Easement Areas.

Cutting, mowing, and haying are not authorized without permit on "A" and "B" Easement Areas.

After meeting with you to discuss the provisions of the FmHA Conservation Easement, we hope to mark the easement boundaries this fall and seed down grass in "A" and "B" Easement Areas next spring.
I look forward to meeting you. Again, please call me if you have any questions or concerns.

Sincerely,

Joe Mallard
Wetland Manager

Administration of FmHA Conservation Easements will be handled similarly to FWS Waterfowl Management Easements (see Administrative and Enforcement Procedures for FWS Easements, Chapter V), with the following additions and/or revisions:

**A. Permanent Field Office File**

Handled the same as FWS Easements.

**B. New Easement Inspection**

Handled the same as FWS Easements, except that it is imperative that field station representatives meet with the County Supervisor and the landowner or lessee to discuss provisions of the easement, tentative schedule of field activities, etc., prior to conducting any field work on the property.

**C. Activities Permitted in Wetlands under Easement**

Handled the same as FWS Easements with the following additions:

1. Cutting or Mowing - Cutting or mowing of vegetation within "A" or "B" Easement Areas is permissible by permit issued by the Wetland Manager.

A permit will always be issued when the landowner or lessee provides justification for control of existing noxious weeds. The cut or mowed vegetation may be removed as hay in these instances at the Wetland Manager's discretion. All other cases of cutting, mowing, and hay removal may be permitted at the discretion of the Wetland Manager. However, in this instance the permitted activity should not be allowed until after the primary nesting season for waterfowl, generally August 1 or later. Permits for cutting or mowing shall not be assignable to subsequent landowners.

2. Cultivation - Cultivation of "A", "B", or "D" Easement Areas is permissible by permit issued by the Wetland Manager. Cultivation is authorized generally for rejuvenation or seedbed preparation for reseeding of easement areas as deemed necessary by the Wetland Manager.

3. Harvest of Wood Products - Removal of live timber in "A", "B", or "D" Easement Areas is permissible by permit issued by the Wetland Manager. Permits for this activity should only be issued for maintaining or enhancing wildlife habitat. Removal of willows choking a wetland would be a good example. Replacing Chinese Elm in a shelterbelt with ash or other more permanent trees is another example. However, in a case like this, the activity should only be permitted if tree replacement is assured.

4. Grazing - Grazing is restricted only in "A" Easement Areas. Grazing is permissible by permit issued by the Wetland Manager.

Prior to field delineation of easement boundaries, field stations should discuss locations and marking thoroughly with the FmHA County Supervisor and the landowner or lessee.

There are two types of easement boundaries: straight-line (blocks), and meandering (basin contour).

**Straight-Line (Blocks)**

FmHA has normally agreed to this type of boundary only when the easement area was in grass at the time it was reviewed, or when it affects cropland little more than a meandering boundary. For this reason, straight-line buffers are usually located in grassed areas, tree areas, or along the edges of crop fields. **Straight-line boundaries should be marked according to the procedures outlined below, or according to the procedures outlined in Chapter V of the Easement Manual for "Posting Grassland Easements for Management Purposes," whichever is most appropriate given the deed restrictions and availability of spatial data.**

Nearly all "D" Easement Areas have straight-line boundaries, and normally are not applicable to prior owners. "D" Easement Areas should be marked only when the prior owner/operator has relinquished all rights to buy back the property. Check with the County FmHA Supervisor on prior-owner status when "D" Easement areas are involved.

**Meandering (Basin Contour)**

FmHA requested this type of boundary in the majority of cases because it places restrictions on the minimum amount of upland. For this reason, meandering boundaries are far more common on wetlands located in cropland.

Meandering boundaries follow the contour of a wetland or watercourse at a set distance from the basin edge; normally at 33, 66, or 100 foot widths. **Meandered boundaries should be marked according to the procedures outlined below.**

Marking meandered boundaries in crop fields should only be done after crops are harvested and/or near the time that the easement area will be planted to grass. In cropland, we expect land use lines to become fairly well established within one year of planting.

When meandering boundaries are located in existing grass, (i.e., tame pastures, native prairie, CRP), flagging will not be necessary until such time that the landowner may wish to break out the adjacent lands for crops or rejuvenation of the stand. Each new landowner should be asked to contact the appropriate field station prior to breaking adjacent lands. Document this by letter.

***Boundary Marking Procedures:***

Though "Meandering (basin contour)" type boundaries are described with Exhibit A maps, similar to wetlands protected by the FWS wetland easement program, it is important to realize and understand the inherent differences in protection afforded wetlands under these two programs.

All FWS wetland easement purchased after 1976 have Exhibit A maps depicting protected wetland basins that were prepared at the time the easement was purchased. Those purchased prior to 1996 did not have Exhibit A maps prepared at the time of purchase; rather, wetland district personnel are responsible for mapping the protected wetlands. Regardless, once these wetlands are mapped, the FWS contends that

"because climatological and other natural conditions may cause the shape and location of wetland basins to change over time and from time to time, this map (Exhibit A) may or may not show wetlands as they appear in any given year." Therefore, it is possible under wet conditions for the actual wetland acreage on the ground to temporarily exceed that which was mapped or reported on the acreage summary sheet. That being said, the FWS does have procedures to allow landowners to drain or partially drain wetlands that flood beyond reasonableness, or when health or human safety is at risk. However, the FWS maintains that once a basin is delineated on an Exhibit A map, it is protected, regardless of shape or size.

Wetlands protected by the "B" provision of a FmHA conservation easement cannot be treated similarly. Unlike FWS wetland easements, the FmHA conservation easement delineates an exact area that must be protected. Recently in some counties, this area was calculated by county FSA offices, and the resulting acres were removed from the producers' farm bases that were eligible for farm program benefits. Because of this, and because these areas are planted back to permanent grass cover, it is necessary to mark the boundaries as accurately as possible prior to grass establishment. We will not get a second chance to return, should water levels rise, and move the boundaries of the protected areas. Nor will we return to move the boundaries when the wetlands are dry.

With these thoughts in mind, the following procedures were developed by a field station in North Dakota to post "B" easement meandered boundaries in an accurate, repeatable, and most importantly, fair and defendable, manner (these procedures can also be used to mark straight line boundaries).

- As previously mentioned, the first step in posting protected areas of an FmHA conservation easement should be a visit with the county FSA office. These offices were directed by their state office to remove from producers' bases, any lands not eligible to be farmed (such as areas protected by the "B" easement provisions of an FmHA easement). However, FSA will not take this action until they are notified that the FWS will enforce the easement. When visiting with the FSA, explain the easement provisions if necessary, and ask them how they are determining the acres encumbered by the easement. Some counties are using the acreage figure contained in the easement document, others are calculating the acres from the Exhibit A maps with a planimeter. Verify the fact that you intend to post the easement as depicted in the Exhibit A maps, and ensure that the acres will be similar to those removed from the farm program. Ensuring that the actions FSA and FWS take are consistent will add credibility and validity in the eyes of the landowners.

- Caronsite markers in the field serve two purposes: 1) they identify to the landowner/operator the protected areas that cannot be cultivated, and 2) they identify to the FWS personnel, or its designee, the protected areas for the purposes of re-seeding grass. Prior to entering the field to post the buffered wetlands, make copies of all Exhibit A maps to use in the field. On these maps, measure cross-sections of easy-to-identify features of each protected area. For example, the cross-sections of the long and short axis across an "egg-shaped" wetland and buffer. For oddly-shaped wetlands/buffers, more cross-sections will be needed and more carsonite markers will be needed in the field to adequately identify the area. Diagram the cross-sections right on the Exhibit A map and indicate the distances. Laminate these maps for use in the field.

- Two crew members, preferably both experienced in wetland identification, are needed to post wetlands/buffers in the field. One crew member should be equipped with a digital range finder, the second with a GPS unit. The crew members position themselves along a previously measured cross-section of a protected area, equidistant from the wetland edge (33', 66' or 100', depending on the Exhibit A). The crew member with the digital range finder "shoots" the distance to the ND FmHA

other crew member. Depending on the reading, the two crew members simultaneously move an equal distant towards or away from each other until the target distance is reached (portable radios aid this process tremendously). Once reached, they both pound a carsonite marker.

- The locations of these markers are recorded with a GPS unit capable of assigning unique identifiers to each. For example, each post will have an X-Y coordinate, usually a UTM, along with a unique label. It is recommended that the posts of the protected areas be labeled "1A, 2A, 3A....," "1B, 2B, 3B...," and so forth. Where the number indicates a unique post location and the letter indicates a unique protected area. A record of these locations, which includes the identifier and the coordinate, should be prepared and included in the permanent easement file. Also, it is essential to document how the GPS data was collected; i.e. what equipment was used and in what projection datum the data were collected (assuming UTM coordinates are used). Future managers will be able to use this information should it be necessary to return to the field and re-post areas that have been disturbed.

- Upon completion of the posting of protected areas, the GPS data can be downloaded and displayed in a GIS. The protected areas can then be estimated by "connecting the dots" and producing a polygon. These polygons can be qualitatively assessed to ensure they resemble the general shapes of protected areas as depicted on the Exhibit A maps, and they can be quantitatively assessed by adding up the acres. It is imperative that this acre figure be compared to that recorded in the easement documents to ensure that you do not post more land than is protected. It is better to be at, or just under, the acres recorded in the easement documents.

- Once posting is completed, the permanent easement file should contain:
  1. The laminated Exhibit A maps containing cross-section measurements of protected areas used to place the carsonite markers,
  2. A list of the coordinates and unique identifiers of all carsonite posts,
  3. Documentation describing the equipment used, and the projection datum of GIS data.
  4. A photograph (Digital ortho-quad, geo-referenced satellite imagery or infra-red photograph, etc) with the carsonite post locations and estimated protected areas depicted.

- Alternative methods that can be used are to scan and geo-reference the Exhibit A maps and download the spatial data to a GPS unit. The GPS unit can then be used exclusively to locate the edges of the protected areas. This removes the need to use rangefinders.

- Finally, have the landowner sign the map depicting the protected areas if possible; provide copies of the signed map to the landowner and the FSA office and retain the original for the file.

It is the Service's responsibility in all cases to plant vegetation in "A" and "B" Easement Areas. This means planting the "buffer" areas around wetlands to grass or a grass/legume mixture.

Field stations can choose the grass varieties that they believe will work best for the particular situation. Native grass varieties are recommended because of their permanency. FWS Special Scientific Report No. 234 (H. Duebbert) titled "Establishment of Seeded Grasslands for Wildlife Habitat in the Prairie Pothole Region" is an excellent source of information to use for this purpose.

Choosing grass varieties should be based on a thorough field review to determine what variety or mix of varieties will work best. Consideration has to be given to such things as soil alkalinity, expected extent of flooding period, and grass permanency. Protective of the wetland from agricultural runoff and erosion is the primary objective.

Many FmHA properties have been idled or poorly managed in the past, and seedbed preparation will be a necessity. This may be accomplished by allowing the landowner/lessee to plant a grain crop in the easement areas.

Easement areas can be planted by contract or by field station. In either case, planting equipment must be compatible with the grass variety being planted, i.e., don't use a grain drill to plant bluestem.

Weed control should be performed similar to that for establishment of grass on refuge lands.

The Service is authorized to restore wetlands that are marked Exhibit "A" maps with the letter "R." Some important considerations have to be made first.

- In every case, FmHA has agreed to restoration of drained wetlands (marked "R" on Exhibit "A") only to the extent and size delineated on Exhibit "A." In some cases this may be smaller than the original wetland basin. Restoration in these instances can only be done in a way which makes it possible for excess water to runoff. This can be accomplished by constructing an earthen dam with an earthen spillway or culvert set at the proper elevation.

- Some wetlands given restorable status on Exhibit "A" maps may be tied into extensive drainage systems or may, when restored, inundate lands under different ownership. A formal survey will be necessary with these cases to determine if restoration is in fact feasible and to what extent, if any, the restoration(s) will affect lands under different ownership. Every attempt will be made to obtain flowage easements where necessary, or to restore the wetland so that it doesn't affect lands under different ownership. If after these attempts it is still not feasible to restore, the wetland maintains its restorable status until such time that it is feasible to restore.

- Once the Conservation Easement is approved by FmHA, maintenance of drainage facilities for restorable wetlands must cease immediately in order for the landowner/lessee to comply w/terms of the easement.

Wetlands can be restored by contract or by field stations. Contracting with the landowner has worked with good results under the Wildlife Extension Program. Contracting with the landowner will, of course, depend on his disposition and may not be practical in some cases. However, it may provide the landowner with a greater appreciation of the easement when he's doing the work himself, and increase compliance.

When restoring wetlands, ditches should be plugged or filled a minimum distance of 150 feet from the restored basin to increase its permanency. Tile and pipe drains will be removed entirely from the wetland basin, plus an additional 100 feet from the basin edge. At that point the drain should be plugged or destroyed so that it cannot pass water.

Restorations should be well documented with photos, maps showing locations of plugs, and narrative describing the work, date, and signature of field personnel.

There may be a few instances where a drained wetland is now protected by a FmHA Easement but is not marked as restorable. This is due to one of two reasons. First, the lessee/landowner may have initiated drainage since we field reviewed the property. In this instance, the drain is treated as a violation of the easement. Contact the Zone LEO before taking action. Report the drainage as a potential Swampbuster violation to the NRCS.

It may be a case where the drain was inadvertently missed during the field review. If the wetland is drained, covered by the FmHA easement, and not marked restorable, we may not restore the wetland. However, maintenance of the drain must cease from this point forward, and the drain allowed to fill naturally. This must be explained to the lessee/landowner.

There may be situations where the lessee/landowner strongly disputes the existence of a wetland, our determination or wetland basins, and/or the location of easement boundaries. The following guidelines may be used in resolving disputes:

1. Easement Boundaries - Disputes will probably arise for delineation of straight-line boundaries in cropland more than any other case. A formal survey is the best way to solve these disputes. The Service will be responsible for conducting the survey. Formal surveys should be based primarily on locating the easement boundary delineated on Exhibit "A" of the easement, rather than the measurements established on Exhibit "A." Formal surveys shall be requested through the RO.

2. If a landowner disputes the actual existence of a wetland, then refer to the "FmHA Easements and Disputed Wetland Status" at the end of these Guidelines.

3. Wetland Basin Edge - This is expected to be the most common dispute. The vast majority of basin edges will usually be easily determined by an experienced wetland manager. Every attempt should be made to resolve this dispute at that time. If the dispute cannot be resolved, advise the landowner to request a determination from the NRCS while coordinating with the NRCS at the same time.

ND FmHA CONSERVATION EASEMENTS PHOTODOCUMENTATION

To adequately enforce the provisions of the FmHA Easements it is important that the easement property and management of them are properly documented. The following list serves as a minimum guideline for photo-documentation of FmHA Easements:

1. Aerial photos of entire property before and after grass in easement areas is established. These should be scheduled in the spring to better show wetlands. All drainage facilities should be photographed during the initial flight.

2. Take before and after photos of wetland restoration plugs in a way to show the wetland basin as well.

3. Photograph drains that are not identified as "Restorable" but cannot be maintained as soon as possible.

4. Photograph subsequent violations from the same point that initial photos were taken.

5. Less important for enforcement but necessary to document program successes, photograph resource enhancement (i.e., ducks using a restored wetland, wildlife in easement areas, build-up of eroded soil outside an easement area, etc.).

6. Photograph at least one post/boundary.

**A. Aerial Inspections**

All easements will be checked aerially for compliance at lease once each year. The objective is to detect all activities which may constitute a violation. Easement surveillance will be conducted similar to that for FWS Wetland Easements, (see "Administrative and Enforcement Procedures for FWS Easements, Chapter VI"). FmHA Easements should be colored differently on maps prepared for the flight. Wetland Management Districts with fewer FmHA Conservation Easements may find it possible to conduct annual surveillance in conjunction with their regular easement flights. Wetland Management Districts with several FmHA Conservation Easements may find it necessary to schedule separate surveillance flights to cover those easements alone. In this case, surveillance flights can be handled the same as a follow-up flight for waterfowl management easements.

**B. Ground Inspection**

See "Administrative and Enforcement Procedures for FWS Easements, Chapter VI" for procedures. Waterfowl Management Easement Data Sheets can be used for this purpose with alterations to fit the situation.

FmHA Conservation Easements should be ground checked at least every two years to monitor encroachment and other problems that may not be readily visible from the air.

The following compliance actions will be handled the same as for Waterfowl Management Easements as described in the "Administrative and Enforcement Procedures for FWS Easements, Chapter VII."

A. Pre-contact Preparation

B. Landowner and/or Tenant Contact

1. Interview Phase
2. Compliance Deadline
3. Post-interview Procedures
4. Compliance Check

Easements will be enforced the same way whether under lease from FmHA or under private ownership.

Many actions under this heading are exactly the same as for Waterfowl Management Easements. (*denotes that the procedure is taken directly from the "Administrative and Enforcement Procedures for FWS Easements, Chapter VIII".) It is imperative that the Zone LEO be contacted in all cases.

**1. Drainage Violations***

a. Issue Violation Notices when any of the following conditions are met.

(1) The landowner had knowledge of the easement.

(2) First-time offenders of a serious violation involving a scraper ditch, backhoe, or activity having a major effect on a wetland or series of wetlands. Generally, this will only involve seasonal and semi-permanent wetlands.

(3) Repeat violations of any type, including subsequent plow furrow violations.

b. Before the decision to issue a violation notice is made, it must be in coordination with the Zone LEO

c. Do not issue the violation notice until the restoration work has been completed.

**2. Burning Violations***

a. Certified letters must be sent to the landowner on burning violations. In cases of roadside burning or insignificant burning without clear intent, no notification is necessary.

b. If repeat violations occur, consult with the Zone LEO.

(1) Knowledge of the easement by the landowner is essential.
(2) Documentation of repeat violations is necessary.

c. A violation notice may be issued based on the case history and consultation with the Zone LEO.

**3. Fill and Level Violations***

Serious violations of fill or level can constitute issuance of a violation notice.

a. The violation must be determined to be of significant harm. One small rock pile in a 5-acre wetland would not constitute significant harm. All efforts should be made to have this type of violation corrected but it would not be considered a case to issue a violation notice. Notification to the landowner that a continual practice of dumping rocks in the wetland could result in a violation may be advisable.

b. In cases of fill that do not constitute a violation or require restoration, documentation with photographs is needed. Accumulation of the fill activity can then be documented and enforcement action taken at a later time. Adding rocks to existing rock piles is an example where documentation will aid in future action if the rock pile continues to grow. Efforts to document existing rock piles or fill would be useful information for dealing with possible problems in the future.

**4. Construction Violations**

New construction of dwellings, barns, outbuildings, or other structures within an easement area is a violation. However, it is a difficult enforcement situation. Contact the Zone LEO in all cases prior to taking action.

**5. Cutting or Mowing Violations ("A" & "B" Easement Areas Only)**

a. Certified letters must be sent to the landowner on cutting or mowing violations. In cases where it appears the action was taken to control noxious weeds, i.e., cutting or mowing was used as a method to control existing noxious weeds and it does not appear to be a case of removing vegetation for hay, notify landowner that an easement permit is necessary and available for this action.

b. If repeat violations occur, consult with the Zone LEO.

(1) Knowledge of the easement by the landowner is essential.

(2) Documentation of repeat violations is necessary.

c. A violation notice may be issued based on the case history and consultation with the Zone LEO.

**6. Cultivation Violations ("A," "B," and "D" Easements Areas Only)**

Serious violations of breaking or cultivation of easement areas can constitute issuance of a violation notice.

a. The violation must be determined to be of significant harm. Encroachment by a few feet would not constitute significant harm. All efforts should be made to have this type of violation corrected but it would not be considered a case to issue a violation notice. The violation should be documented and the landowner notified that a continual practice of encroachment in the easement area could result in a violation.

b. Before the decision is made to issue a violation notice for a more serious violation, it must be in coordination with the Zone LEO.

**7. Grazing Violations ("A" Easement Areas Only)**

a. Certified letters must be sent to the landowner on grazing violations.

b. If repeat violations occur, consult with the Zone LEO.

(1) Knowledge of the easement by the landowner is essential.

(2) Documentation of repeat violations is necessary.

c. A violation notice may be issued based on the case history and consultation with the Zone LEO.

**8. Harvesting Wood Products ("A," "B," & "D" Easement Areas Only)**

For these easement areas, but particularly in the case of "D" Easement Areas, this restriction has been prescribed to protect stands of trees from mass destruction (e.g., dozing a shelterbelt to clear land for farming).

a. The violation must be determined to be of significant harm. Removal of one or two trees from a multi-row shelterbelt would not constitute significant harm. Removal of one or two trees from a multi-row shelterbelt would not constitute significant harm. The landowner should be notified of the provisions of the easement, but it would not be considered a case to issue a violation notice.

b. Before the decision is made to issue a violation notice for a more serious violation, it must be in coordination with the appropriate Zone LEO.

**9. Other Possible Violations***

a. **Coulee cleanout** represents a difficult issue to address but some direction can aid in enforcement of easement protected wetlands.

(1) Wetlands within a coulee are covered by the easement unless deleted on the drainage facility map (pre-1976 easements); however, third party interests (viable legal drains) may have prior rights.

(2) Maintenance or cleanout of a natural waterway can be addressed in some situations by allowing cleanout upstream of wetlands to the upstream edge of the wetlands. A 200 to 500 foot no-maintenance should be allowed in the wetland basin or on the downstream portion of the no-maintenance buffer.

b. **Sheetwater** is yet another difficult issue. Sheetwater is defined by this handbook as a nondepressional area covered by shallow water that is generally moving off the land. Any depressional area, regardless how temporary, is considered a wetland. Contact appropriate Zone LEO in all cases prior to taking action.

c. **Pumping** is a problem in certain areas usually under high water conditions. Pumping is considered drainage and thus is a violation of the easement. Pumping can be a violation where issuance of a violation notice is warranted.

(1) Knowledge of the easement by the landowner is a requirement.

(2) The violation must be of a serious nature resulting in a significant impact to the wetland.

(3) Coordinate any violations of this nature with the appropriate Zone LEO before the violation notice is issued.

d. **Enlargements** of the easement protected wetlands are an issue in high run-off years. Unauthorized drainage to reduce the size of a wetland to its "normal" size does occur. The easement document does address this issue and does not allow for the drainage of "enlarged" wetlands. In most cases, the enlarged wetlands are the result of upstream drainage and the landowner should be directed to the appropriate water board.

e. **Co-owned Wetlands** or wetlands partially on easement lands present a difficult enforcement situation if they are drained. No precedent for enforcing drainage of co-owned wetlands has occurred. However, there may be certain situations that warrant documentation and possible enforcement action. These include:

(1) Situations where the majority of the co-owned wetland is covered by easement, the larger the percentage covered by easement, the easier it will be to litigate if necessary.

(2) Ownership of co-owned wetlands is important to determine. If the co-owned wetland is owned by the same landowner or family member with the only difference being that only part is covered by easement, the drainage of such a wetland may be grounds for enforcement action.

(3) The involvement of the easement landowner is also an important issue. If the easement landowner participated in or encouraged the non-easement drainage, this could be useful.

(4) If any co-owned drainage involves the above criteria, contact the appropriate Zone LEO for coordination and how or if to proceed.

f. Any **plow furrow** that removes water is a violation.

g. **Culverts** may be an effective tool in resolving certain easement conflicts. However, if not properly used, they can be very damaging to easement protected wetlands. For basic guidance, consider the following:

(1) Extreme caution should be used in agreeing to culvert placement where none previously existed. If a culvert is needed, for example, to protect a road, the

elevation must be such that it protects the integrity of any easement wetland involved.

(2) Culverts that are replaced for any reason must be placed at the old or previous elevation, no lower. The elevation of the bottom of the culvert is critical, regardless of how large the culvert is.

(3) In setting elevations for wetlands that will be lowered for health, safety, or endangerment of property, it may be useful to use culverts to set permanent elevations at the outlet. This may better ensure that the set elevation will be maintained.

Prosecution will be handled similar to prosecution of other FWS Easements. Appropriate Zone LEO is to be contacted in all instances. Consult the "Administrative and Enforcement Procedures for FWS Easements, Chapter VIII" for more details.

# FmHA Easements[1] and Disputed Wetland Status

PURPOSE: This document establishes policy and procedures for situations and disputes in which an area considered to be wetland and protected and recorded by FmHA easement is later determined to be non-wetland.

**SCOPE:** The policy and procedures outlined here apply only to FmHA easements recorded in the State of North Dakota and managed by the U.S. Fish and Wildlife Service.

**POLICY:** The U.S. Fish and Wildlife Service may grant relief from easement restrictions for areas considered to be wetland and protected and recorded by FmHA easement that are later determined to be non-wetland. By law, the Service may not divest itself of an area protected by FmHA easement, because the area is considered to be an interest in the National Wildlife Refuge System. Therefore, when an area is determined to be non-wetland, the Service may only exchange the easement area for another, unprotected wetland, or reduce the level of easement restriction on the easement area. The level of relief from easement restrictions depends on the type of easement restrictions in place and the time period in which the easement was prescribed.

**PROCEDURE:**

**Applicable to all Cases:**

- USFWS WPA wetland easement takes precedence if such easement also encumbers the property.

- Exchanges and revisions are subject to review and approval of the ND Refuges Coordinator. Managers shall involve the ND Refuges Coordinator as early as possible in the process.

- An area may be determined to be non-wetland only if the area was not considered to be cropland, per FSA definition, on the date of the field review performed to prescribe the easement, and,

    1. It is an obvious mistake such as rockpile or hilltop, or error by NRCS using off-site tools to determine wetland, or

    2. The area is not depressional, and an NRCS-Certified Soil Scientist determines that the area does not contain hydric soils.

- When exchanges or revisions are prescribed, the ND Refuges Coordinator shall, in coordination with the Bismarck Realty Office, prepare an amended Exhibit "A" easement map indicating the change in easement restriction or with the non-wetland area removed,

[1] FmHA easements are also known as RECD easements, FSA Ag-Credit Easements, and USDA Conservation Easements depending on the status of the USDA program responsible for these properties at the time.

depending on the specific situation. In certain cases, for example when a "B"[2] easement restriction is changed to a "C"[3] easement restriction and no "C" easement restrictions were part of the original easement, it may be necessary to prepare an amended easement and Exhibit "A" easement map. The Bismarck Realty Office will then submit an easement amendment package to the Regional Realty Office. The Regional Realty Chief is responsible for final approval and recording of the amendment of the FmHA easement. The District Manager will forward the amended Exhibit "A" easement map to the landowner via certified mail, with a copy placed in the easement file, and will also forward a copy to the county USDA Service Center, with an explanation of the changes in the easement.

**Easements prescribed under 1985 Farm Bill:**

**Procedure:** Areas determined to be non-wetland will be reduced to "C" easement restrictions that allow cropping and cutting or mowing.

**Discussion:** During this period, wetlands were identified by USFWS only, and all easement areas were field reviewed. Any and all wetlands and other important resources were subject to encumbrance, and the "C" easement restriction was authorized for use. While obvious wetlands were normally encumbered with "B" easement restrictions, ephemeral and other small, isolated wetlands were encumbered with "C" easement restrictions in most cases. "C" easement restrictions allow cropping, cutting or mowing (haying) when the area is dry from natural causes. If an area considered to be wetland and protected and restored by FmHA easement, as prescribed under the 1985 Farm Bill, is later determined to be non-wetland, it will in nearly all cases have been encumbered with "C" easement restrictions.

**Easements prescribed under 1990 Farm Bill:**

**Procedure:** Areas determined to be non-wetland may be exchanged for wetlands located on the original inventory property and not protected by FmHA easement at a recommended 1:1 acreage ratio of non-wetland acreage to replacement wetland acreage. Total easement encumbrance cannot exceed 10% of prior converted cropland or 20% of other cropland that existed on the original inventory property at the time the easement was prescribed.

Wetlands considered to replace non-wetland must have been identified in the wetland determination prepared by NRCS at the time the easement was prescribed. Replacement wetland(s) will be encumbered with "C" easement restrictions that allow cropping and cutting or mowing.

If there are no wetlands identified in the wetland determination prepared by NRCS at the time the easement was prescribed and located on the original inventory property and not protected by FmHA easement, or if the acreage of one or more unprotected wetlands considered for exchange

---

2 "B" easement area is defined as an easement area containing a narrow band of grass that follows the contour of a wetland or watercourse at a set distance from the basin edge, normally 33, 66, or 100 feet in width, or the buffer is delineated in straight lines or "blocks" surrounding the wetland.

3 "C" easement area is defined as an easement area that encumbers the wetland basin only. The easement allows cropping and cutting or mowing. It is normally prescribed for small, isolated temporary wetlands less than 1 acre in size.

exceeds 10% of the acreage being replaced, easement restrictions for the area determined to be non-wetland will be reduced to "C" easement restrictions that allow cropping and cutting or mowing.

If the area determined to be non-wetland is protected with a Straight Line/Block buffer[4], it is subject to change or revision only if all wetlands located within the straight line/block buffer are determined to be non-wetland. If this proves to be the case, the non-wetland area will be considered for exchange or a change in easement restriction as described in the above two paragraphs.

NRCS was responsible for determining all wetlands encumbered by FmHA easements under the 1990 Farm Bill. Therefore, NRCS is also responsible for determining wetland status of the disputed easement area as well as wetlands not protected by FmHA easement and considered for exchange. In nearly all cases, the landowner must file an NRCS-CPA-038 Request for Certified Wetland Determination before NRCS can access the property to determine wetland status.

The current landowner shall be given the option to determine which wetland(s) will be used for replacement acreage. Managers have the discretion to forego this option if the landowner has a history of violations. Easement areas determined to be non-wetland must be exchanged with unprotected wetland acreage when it exists.

**Discussion:** Under 1990 Farm Bill criteria, FmHA easements could encumber no more than 10% of prior converted wetland, 20% of other cropland, and 50% of forage land (with a forage management plan applied). Therefore, in most cases the property contains wetlands that were not protected by FmHA easement that may be available for exchange. "C" easements were not applicable. Wetlands were encumbered with a "B" easement including a contour strip buffer or straight line/block buffer. NRCS was given responsibility to determine all wetlands on the inventory property. In nearly every case, NRCS used off-site tools (FSA slides, NWI, etc.) and did not perform a field certification of wetlands. Since NRCS was originally responsible for determining wetlands on FmHA inventory lands, they must also be responsible for determining non-wetland status.

**Easements prescribed under 1996 Farm Bill:**

Easement restrictions for the area determined to be non-wetland will be reduced to "C" easement restrictions that allow cropping and cutting or mowing.

An easement area is not subject to change or revision due to disputes involving its farm history.

---

[4] Straight Line/Block buffer is defined as an easement area containing straight-lined boundaries. This type of easement area normally contains more than 1 wetland.

# Farmers Home Administration Conservation Easements in South Dakota

The following guidelines are designed to provide South Dakota easement managers dealing with Farmers Home Administration conservation easements with guidance on how to proceed when encountering requests with potential impacts to easements interests or by a potential easement violation. This document is divided into two sections which encompass the administration and management procedures related to FmHA easements. Managers are reminded that this document is designed to interact closely with the wetland and grassland easement manual and that guidance related to specific topics such as easement enforcement, are addressed in greater detail in other sections of the main easement manual. Secondly, this document makes numerous references directing easement managers to thoroughly review the easement documents and attached Exhibits whenever faced with making a decision related to FmHA easements. This step in the process cannot be overstated.

The key to managing and enforcing FmHA easements is to become fully aware of each individual easement and the covenants by the landowner. FmHA conservation easements are not as standardized in the level of protection such as the FWS wetland and grassland easements. FmHA easements are extremely variable in the degree of protection described in each specific contract therefore, it is imperative that each easement file be thoroughly reviewed prior to making any decisions regarding the easement.

Various restrictions apply to FmHA conservation easements. In many cases, multiple restrictions are identified on the same property. These restrictions are defined in detail in Section II of the easement document; Covenants by the Landowner. Restrictions outlined on Exhibit maps as part of the legislation of the 1985 Farm Bill are denoted using the alpha designators B, B1, C, D and E. During this time frame, the “E” easement restriction was primarily used to address special situations primarily specific to individual field stations. Definitions for restrictions associated with “E” easements may vary from station to station. Definitions for these restrictions are listed below and referenced as pre 1992.

Changes in the administration of FmHA easements resulted from the passing of the 1990 FarmBill legislation. These administrative changes primarily focused on a restructuring of the conservation easement restrictions listed in Section II of the easement document; Covenants by the Landowner. In October 1992, five new conservation restrictions were developed which replaced those developed under the guidelines of the 1985 Farm Bill. These restrictions correspond with the following alpha designators: A, A1, B, C and D. Eventually, an “E” easement and a Discretionary easement were also added. The Discretionary easement was used to protect unique or important habitats which did not fit criteria for protection under other restrictions such as native tree claims.

In certain instances, alpha designators used to define conservation easement restrictions for easements sold prior to October 1992, have been used to define a differing set of restrictions for easements recorded after this time frame. Therefore, it is very important to not only understand the type of easement restriction you are dealing with, but also the definition that accompanies

that restriction. For example, the "B" easement prior to 1992 was the "most restrictive" allowing management related uses by permit only. However after October 1992, the "A" easement became the "most restrictive" and the "B" easement permitted haying and grazing with an approved management plan.

It is also important to note that the easement restrictions are determined by the date the easement is recorded. Therefore, easements recorded prior to October 1992 will continue to be managed and administered according to the restrictions defined by the parameters of the 1985 Farm Bill.

Although the following provides a general description of the easement restrictions, it is recommended that managers consult Section II; Covenants by the Landowner and Section III; Rights Reserved by the United States, of the FmHA conservation easement document.

**"A" Easement Areas**

No dwellings, barns, outbuildings, or other structures shall be built within the easement area.

The existing vegetation and hydrology described in this easement area will not be altered in any way or by any means or activity conveyed by this deed or property owned by or under the control of the landowner. Activities **restricted** by this easement include: (1) cutting or mowing; (2) cultivation; (3) grazing; (4) harvesting wood products; (5) burning; (6) placing of refuse, wastes, sewage, or other debris; (7) draining, dredging, channeling, filling, discing, pumping, diking, impounding and related activities; (8) diverting or affecting the natural flow of surface or underground waters into, within, or out of the easement area.

Cattle grazing and other types of encroachment are only restricted if the FWS constructs and maintains the fence on the easement area (section III F). The FWS is also responsible for initial re-establishment of vegetation on the easement area. The FWS has the right to install, operate and maintain structures for the purpose of re-establishing, protecting and enhancing functional wetland values. The FWS also has the right to manipulate existing vegetation, topography and hydrology in consultation with the existing landowner (section III D).

**"A1" Easement Areas**

No dwellings, barns, outbuildings, or other structures shall be built within the easement area.

The existing vegetation and hydrology described in this easement area will not be altered in any way or by any means or activity conveyed on the deed or property owned by or under the control of the landowner. Activities **restricted** by this easement include: (1) cutting or mowing; (2) cultivation; (3) harvesting wood products; (4) burning; (5) placing of refuse, wastes, sewage, or other debris; (6) draining, dredging, channeling, filling, discing, pumping, diking, impounding and related activities; or (7) diverting or affecting

the natural flow of surface or underground waters into, within, or out of the easement area.

**"B" Easement Areas**

Pre 1992

No dwellings, barns, outbuildings, or other structures shall be built within the easement area.

For "B" easement areas which include permanent grassland vegetation and the wetland area, the vegetation or hydrology of the described easement area will not be altered in any way or by any means or activity on the property conveyed by this deed, or on the property owned or under the control of the landowner, including; (1) cutting or mowing; (2) cultivating; (3) grazing; (4) harvesting wood products; (5) burning; (6) placing of refuse, wastes, sewage, or other debris; (7) draining, dredging, channeling, filling, discing, pumping or affecting the natural flow of surface or underground waters into, within, or out of the easement area.

Post 1992

No dwellings, barns, outbuildings, or other structures shall be built within the easement area.

The vegetation or hydrology of the described easement area will not be altered in any way or by any means or activity on the property conveyed by this deed, or property owned by or under the control of the landowner, including; (1) cultivation; (2) harvesting wood products; (3) burning; (4) placing of refuse, wastes, sewage, or other debris; (5) draining, dredging, channeling, filling, discing, pumping, diking, impounding and related activities; or (6) diverting or affecting the natural flow of surface or underground waters into, within, or out of the easement area. The landowner shall have the right to graze domestic livestock and harvest hay by cutting or mowing, in accordance with a management plan jointly developed and agreed to by the U.S. Fish and Wildlife Service and the Natural Resources Conservation Service (SCS) (prior to the disposal of the property from inventory), provided:

(1) hay cutting or mowing is provided for in the management plan and is limited to once annually between July 15 and September 1 with the actual scheduled date set to ensure that there is adequate regrowth or vegetation to provide winter cover and early spring nesting cover;

(2) grazing is provided for in a management plan and does not exceed 25 percent Harvest Efficiency in any given year and ensures adequate regrowth of vegetation to provide winter cover and early spring nesting cover.

(3) the timing and intensity of hay cutting or mowing, and of grazing shall provide for the protection and restoration or wetlands functions and values as the overriding easement

purpose and the purpose of the management plan including the prohibition of both where woody vegetation is to be maintained or established; and,

(4) any subsequent changes to the timing and intensity of hay cutting or mowing and of grazing provided for in the management plan at the (time of property disposal from inventory) shall require the joint approval of the U.S. Fish and Wildlife Service of the U.S. Department of the Interior, Natural Resources Conservation Service (SCS) of the U.S. Department of Agriculture, and the landowner.

**"B1" Easement Areas**

Pre 1992

No dwellings, barns, outbuildings, or other structures shall be built within the easement area.

For "B1" easement areas which include permanent grassland vegetation and the wetland area, the vegetation or hydrology of the described easement area will not be altered in any way or by any means or activity on the property conveyed by this deed or on property owned or under the control of the landowner, including; (1) cutting or mowing; (2) cultivating; (3) harvesting wood products; (4) burning; (5) placing of refuse, wastes, sewage, or other debris; (6) draining, dredging, channeling, filling, discing, pumping or affecting the natural flow of surface or underground waters into, within, or out of the easement area.

**"C" Easement Areas**

Pre 1992

No dwellings, barns, outbuildings, or other structures shall be built within the easement area.

For "C" wetland areas of the easement, either by an activity on the property conveyed by this deed, or on property owned or under the control of the landowner, the vegetation or hydrology will not be altered through: (1) burning; (2) placing of refuse, wastes, sewage, or other debris; (3) draining, dredging, channeling, leveling, filling, diking, pumping, impounding and related activities; or (4) diverting or affecting the natural flow of surface or underground waters into, within, or out of "C" wetland areas. The landowner shall have the right to carry on farming practices such as grazing, hay cutting, plowing, working and cropping "C" wetland areas when they are dry of natural causes. "C" wetland areas shall include any enlargements of said wetland areas resulting from normal or abnormal increases in water.

Post 1992

No dwellings, barns, outbuildings, or other structures shall be built within the easement area.

The vegetation or hydrology of the described easement area will not be altered in any

way or by any means or activity on the property conveyed by this deed, or property owned by or under the control of the landowner, including: (1) harvesting wood products: (2) burning; (3) placing of refuse, wastes, sewage, or other debris; (4) draining, dredging, channeling, filling, pumping, diking, impounding and related activities; or (5) diverting or affecting the natural flow of surface or underground waters into, within, or out of the easement area. The landowner shall have the right to use the easement area for the production of agricultural crops to the extent that present wetland conditions are not damaged.

**"D" Easement Areas**

Pre 1992

No dwellings, barns, outbuildings, or other structures shall be built within the easement area.

For "D" easement areas of the easement, which consist of perennial grassland/tree vegetation, the grasslands and trees within the easement area shall be maintained in vegetation consisting of grasses, grass-like plants and forbs native to the State of South Dakota, as listed by the United States Department of Agriculture, Natural Resources Conservation Service. This vegetation is to be maintained without any disturbances to the soil surface other than that caused by grazing, haying or burning. The planting or seeding of any crop, grass, legume, forb, shrub, vine, or tree is prohibited, unless permitted by the easement manager.

Post 1992

No dwellings, barns, outbuildings, or other structures shall be built within the easement area.

The existing vegetation and hydrology described in this easement areas will not be altered in any way or by any means or activity conveyed on the deed or property owned by or under the control of the landowner. Activities **restricted** by this easement include: (1) cutting or mowing; (2) cultivation; (3) grazing; (4) harvesting wood products; (5) burning; (6) placing of refuse, wastes, sewage, or other debris; (7) draining, dredging, channeling, filling, discing, pumping, diking, impounding and related activities; (8) diverting or affecting the natural flow of surface or underground waters into, within, or out of the easement area. Manager may permit access to water through the easement area for domestic animals if no other water sources are available.

The FWS may maintain fences and re-establish vegetation through seeding planting or natural succession.

**"E" Easement Areas**

Pre1992

No dwellings, barns, outbuildings, or other structures shall be built within the easement area.

For "E" easement areas of the easement, the vegetation or hydrology of the described easement area will not be altered in any way or by any means or activity on the property conveyed by this deed or on property owned or under the control of the landowner, including; (1) cultivating; (2) grazing; (3) harvesting wood products; (4) burning; (5) placing of refuse, wastes, sewage, or other debris; (6) draining, dredging, channeling, filling, leveling, discing, pumping, diking, impounding, and related activities; or (7) diverting or affecting the natural flow of surface or underground waters into, within, and out of the easement area. Haying within the easement area can occur no more frequently than every other year and hay cutting/mowing can not begin prior to August 10 in the year of harvest and all harvested hay must be removed from the easement area by October 15 of the year of harvest.

Post 1992

No dwellings, barns, outbuildings, or other structures shall be built within the easement area unless prior approval in writing is granted by the FWS.

The existing vegetation and hydrology described in this easement areas will not be altered in any way or by any means or activity conveyed on the deed or property owned by or under the control of the landowner. Activities **restricted** by this easement include: (1) placing of refuse, wastes, sewage, or other debris; (2) draining, dredging, channeling, filling, discing, pumping, diking, impounding and related activities; (3) diverting or affecting the natural flow of surface or underground waters into, within, or out of the easement area.

No alteration of grassland areas, wildlife habitat or other natural features is permitted. Agricultural crop production is not permitted on grassland areas. Existing cropland areas depicted on the Exhibit "A" map(s) can be maintained in a manner consistent with normal farming practices such as grazing, haying, cultivation. Managers should monitor these areas to make sure that existing grassland areas depicted on the Exhibit "A" map(s) are not converted to cropland especially if existing fence lines are changed or moved. Cropland may also be converted to grassland if desired.

In some cases, the use of "G" to delineate grassland and "C" for cropland within the easement boundary, has caused confusion on the part of landowners and easement managers. The alpha designators associated with "E" easements ("G" and "C") are not separate restrictions, they merely denote the non-wetland (grassland or cropland) easement areas.

**Discretionary Easement Areas**

The discretionary easement is used to protect unique or important habitats which did not fit the criteria for protection under other restrictions such as native tree claims.

No dwellings, barns, outbuildings, or other structures shall be built within the easement area unless prior approval in writing is granted by the FWS.

The existing vegetation and hydrology described in this easement area will not be altered in any way or by any means or activity conveyed on the deed or property owned by or under the control of the landowner. Activities **restricted** by this easement include: (1) cutting or mowing; (2) cultivation; (3) grazing; (4) harvesting wood products; (5) burning; (6) placing of refuse, wastes, sewage, or other debris; (7) draining, dredging, channeling, filling, discing, pumping, diking, impounding and related activities; or (8) diverting or affecting the natural flow of surface or underground waters into, within, or out of the easement area.

## Conservation Easement Administration

The administration of FmHA conservation easements is similar in many aspects to that required for wetland and grassland easements. As such, many of the procedures followed when conducting administrative activities associated with FmHA easements will be discussed in detail within chapters of the main body of the wetland and grassland easement manual. When encountered by a particular issue, land managers should review the language in the FmHA manual as well as the counterpart section in the wetland or grassland easement manual if applicable. This step is particularly important when evaluating permit requests.

A. New Easement Inspection

The transfer of new tracts from Farmers Home Administration has dramatically slowed since the mid 1990's. Inspection of any newly transferred tracts will be handled in the same manner as Fish and Wildlife Service easements with the exception that a field station representative must meet with the County FHA Supervisor and the landowner and/or tenant to discuss provisions of the easement. Any proposed work including restoration activities, and a tentative schedule of field activities, should also be discussed prior to conducting any field work on the property.

B. Permanent Field Office File

The permanent field office file will follow the same procedures as those outlined for wetland and grassland easements. Field offices should include at a minimum a recorded copy of the QuitClaim Deed and/or Easement document including an Exhibit “A” map, acceptance letter and all pertinent notes and correspondence.

Tract surveys or those completed as part of a wetland restoration should be kept for future references.

It is recommended that managers review existing permanent field office files and discard materials that are no longer applicable to the administration or management of the easement. Such items would include documents used by Service employees to make recommendations to FHA on lands to be encumbered by conservation easements. These documents appear at face value, to be very similar to the recorded easement document and
can be very confusing when trying to interpret the restrictions of the easement.

Easement contracts often have multiple restrictions and exhibit maps which indicate protection for specific resources on the same tract such as "A", "B" or "B1"easements. Under this scenario, the easement manager may wish to develop a "master map" that incorporates all of the restrictions for that tract onto one color coded map. This will permit the easement manager to quickly reference all of the easement restrictions that are on a particular parcel of land. **Exhibit 1**, is an example of a “master map” drawn on an FSA map however, GIS based maps may offer another alternative. Because this map is a reproduction of the original exhibit documents, always double check the easement document before making any management decisions.

Easement managers may also find it helpful to develop a tracking system in spread sheet format, which delineates the county, tract number, and acres of each type of easement for the entire Complex. Another option is to provide this information in each easement file as depicted on the Easement Cover Sheet, **Exhibit 2.** Both of these systems would provide a quick reference for reporting purposes or when visiting with landowner regarding a particular tract.

C. Photograph Documentation

To adequately enforce the provisions of FmHA easements, it is important that the easement property and management are properly documented. The following list serves as a minimal guideline for photo documentation of FmHA easements.

1. During the first year following transfer of a new easement, vertical aerial photographs will be taken for each new easement. It is generally recommended that these photographs be taken when water conditions are optimum for easy identification of wetland basins. New vertical photographs should be taken of all easements at least every five years or as needed.

2. Aerial photos of the entire property should be taken before and after permanent vegetation in easement areas is established. These should be scheduled in the spring to better show wetlands. All drainage facilities (whether marked as

nonfunctional or not) should be photographed during the initial flight.

3. During the initial on-the-ground inspection, take photographs to document boundaries, especially those that are irregular and other significant features of facilities to be maintained in the future.

4. Take photos of wetland restoration ditch plugs and fills in a way to show the wetland basin as well. Conversely, drains that are not restorable but cannot be maintained, should be photographed as soon as possible.

5. Less important for enforcement but necessary to document program successes, photograph resource enhancement (i.e., ducks using a restored wetland, wildlife in easement areas, build-up of eroded soil outside an easement area, etc.).

D. Landowner Certification Letters

Landowner certification letters for FmHA conservation easements will be handled in a manner similar to other FWS easements. New owners will be contacted in person if possible, and provided a copy of the easement document confirmed by a certified return-receipt letter. If personal contact is not possible, the Manager should send a certified return-receipt letter to the new owner to inform them about the easement

E. Permitted Activities and Compatibility

Activities permitted within the framework of FmHA conservation easements and their relationship to FWS compatibility guidelines is addressed under the permitted activities and compatibility sections of the wetland and grassland easement manual.

Requests for the evaluation of certain activities should be addressed by first reviewing the restriction language in the FmHA easement document to determine if the FWS has jurisdiction. This step is necessary, due to the fact that FmHA easements are often more restrictive in nature, than FWS easements. Once jurisdiction is established, easement managers should treat requests in a manner identical to the administration of FWS wetland or grassland easements.

F. Rights-of-Way Requests

Right-of-Way requests with the potential to impact FmHA easement interests should be carefully evaluated by first thoroughly reviewing the FmHA easement document to determine FWS jurisdiction. Once it is determined that the Service has a vested interested in the location of the proposed right-of-way, Easement Managers should follow the guidelines established in the Right-of-Way section of the wetland and

grassland easement manual.

G. Resolving Disputes

Situations may occur where the landowner/tenant strongly disputes the existence of a wetland, our determination of wetland basins, and/or the location of easement boundaries. The following guidelines may be used in resolving disputes.

1. Easement Boundaries - Disputes will probably arise for delineation of straight-line boundaries in cropland more than any other case. A formal survey is the best way to solve these disputes. The Service or its designees will be responsible for conducting the survey. Formal surveys should be based primarily on locating the easement boundary delineated on the Exhibit "A" of the easement and the legal subdivision description. Removal of easement boundary markers by the landowner or tenant should also be treated as an easement violation. Under certain circumstances the landowner may be responsible for reimbursement to the Service for survey costs.

2. A landowner/tenant may dispute the actual existence of a wetland. The existence of wetlands has already been substantiated through field review, NWI photography, and in some cases, SCS wetland determinations and FSA slides. FmHA has concurred that the wetland exists and it is established on a legally-binding easement document. There will be no process by which a producer can appeal the existence of a wetland. However, if the Service determines that the easement area is not a wetland, relief may be granted depending on the level of protect provided by the individual easement restriction. Keep in mind that for tracts also encumbered by U.S. Fish and Wildlife Service wetland easements, the wetland easement will always take precedence in these situations. For further guidance, see the exchange policy for FmHA easements.

H. FmHA & FWS Easements on the Same Property

FmHA conservation easements may have been placed on properties already encumbered by a FWS wetland easement. In such cases, greater restrictions were placed on wetlands which may preclude grazing, haying, cultivation as well as other restrictions in addition to those already imposed by the FWS wetland easement. These wetlands are delineated on the Exhibit "A" maps of the FmHA conservation easement.

In some instances, wetlands that would normally restrict burning, draining, filling and leveling ("C" wetland areas) under a FmHA conservation easement were deleted from the FmHA easement contract during the property evaluation phase and prior to resale of the property back into private ownership. This was done because these wetlands were already protected in the same manner under the FWS wetland easement.

The FWS wetland easement will remain in force on these properties and violations of burning, draining, filling and leveling should be enforced under this easement rather that the FmHA easement, due to our long-standing track record in enforcing FWS easements. Of course, violations of FmHA easement restrictions different from those of the FWS easement will be enforced under the FmHA easement.

In cases where a property is encumbered by both a FWS wetland easement and A FmHA conservation easement, field personnel should make a special effort to discuss both easements with a new landowner.

I. Easement Monitoring and Compliance

FmHA easement monitoring will be conducted similar to that for FWS wetland and grassland easements. FmHA easements should be color-coded differently on easement flight maps. However, easement managers may wish to color-code FmHA tracts with restrictions that protect resources similar to the FWS wetland or grassland easements. For example, FmHA easements with "C" type restrictions (no draining, filling or burning of protected wetland basins) may choose to color-code these easements the same color as that used for wetland easements.

Wetland Management Districts with fewer FmHA easements may find it possible to conduct annual surveillance in conjunction with their normal easement flights. Those Districts with several FmHA easements may find it necessary to schedule separate surveillance flights to cover those easements alone. Easement managers may also find that taking a simple photograph of all FmHA easements during the normal easement flights will provide adequate documentation to determine compliance.

All compliance protocol for FmHA easements will be handled in the same manner as FWS wetland and grassland easements.

## Conservation Easement Management

Habitat management on conservation easements varies depending on the type of easement restriction encumbering the tract. Under certain easement restrictions, easement managers may prescribe management treatments ranging from no intervention of the natural process (rest)to intensive manipulation or restoration of soil, water or vegetative cover. Whatever the level of management, it must be consistent with the terms of the conservation easement document and conform to the policies governing the NWRS. Special attention must also be given to endangered species or species of special concern. Procedures for implementing common management activities are outlined below.

A. Surveys, Posting and Fencing

1. Surveys of "Blocked" Boundaries

These boundaries should be surveyed and marked using "informal" procedures by FWS field personnel whenever feasible. If the WMD manager believes that there are justifiable circumstances which would warrant a certified survey on a tract, forward a request to the Regional Surveyor with responsibilities for your geographic area. In South Dakota, most tracts of this nature were defined by legally describable 2.5 acre blocks. The majority of these tracts had a certified survey completed and were marked after the property was sold from FHA's inventory. A copy of the certified survey should be located in the permanent easement file. If one is not present, a survey was likely not completed on that property.

Surveys of Meandered Boundaries (floodplains)

FmHA has agreed to complete these surveys if they will not agree with "blocking" the easement area into 2.5 acre blocks and a meets and bounds survey is required to legally register the deed to the property. In these instances the WMD Manager and the FmHA County Supervisor should reach an agreement that FmHA will complete the survey. If this is not possible, then the FWS should complete an informal survey and mark the boundaries above ground.

2. Posting/Signing of Easements

The Service field office responsible for managing the conservation easement is also responsible for coordinating the posting and permanent marking of the easement boundaries. Likewise, this office is responsible for regular maintenance of these boundary markers.

Easement signs should be placed in a manner to clearly inform the landowner/tenant of the easement boundary. Boundary markers, consisting of 6" carsonite posts, should be driven into the ground at each corner of the conservation easement. In addition, boundary posts shall be placed within three feet of each corner (two per corner) to properly identify converging boundaries of the easement. Where easement boundaries correspond to permanent existing use lines, posting at 1/4 mile intervals is sufficient. Conservation easements with irregular boundaries should be marked with boundary posts at a maximum of 1/10 mile intervals or as needed along the length of an irregular boundary or in areas where the landowner habitually encroaches.

All conservation easement boundary signs are required to be the standard 3" x 4

½" metal or vinyl stick on type (**Exhibit 3**). Easement boundary signs may be affixed to the carsonite posts at the discretion of the easement manager. Whenever possible, signs should not be placed along roads, etc., where the general public could misinterpret the signs as allowing public access.

3. Fencing

Under certain circumstances, more restrictive conservation easements may include the construction and maintenance of fences in order to prevent grazing or other types of encroachment on the easement area. Landowners, however, can be permitted access to water within these areas when deemed necessary for stock watering. The Service is responsible for any expense involved for the construction and/or maintenance of such fences. All fences constructed should be designed, depending upon their intended usage, for individual easement requirements (i.e.: the control of cattle, sheep, pigs or human trespass). Construction may be handled by force account, Easement Permit or with a contract. Refuge Managers may also want to review state fencing laws. Adoption of state law requirements may help avoid a tort claim or provide a better legal position should a claim be filed.

B. Habitat Manipulation

Rights conveyed to the Service via FmHA conservation easements may include the right to prescribe management treatments similar to the implementation of management activities on Waterfowl Production Areas. The planning and implementation of management treatments should be completed in close coordination with the existing landowner. Easement managers have the discretion to implement practices such as grazing, haying, water management, prescribed burning, and selective timber management techniques when deemed necessary. The following briefly describes three basic areas of habitat management for conservation easements.

1. Wetland Management

In wetland areas that are being restored, created or manipulated, water control may be desired but not always possible. The following should be considered prior to implementing the use of a water control structure.

- water depth, for fish or vegetation control
- seasonal flooding
- drainage facility downstream
- flows into wetland
- soils
- watershed
- surrounding wetland complex

All applicable Federal, state and local permits governing wetland restoration, creation or manipulation need to be followed.

2. Grassland Management

Management of grasslands involves striking a balance between manipulation and letting nature take its course. Desirable management replaces certain natural influences with periodic manipulation to promote vigorous grassland communities. Some common techniques for manipulating grassland areas are grazing, haying and prescribed burning. Implementation of these techniques on conservation easements should follow approved and established procedures and guidelines outlined in policy governing Waterfowl Production Area management activities.

Establishment of a unit management plan is recommended. Grassland management activities on conservation easements can often times be handled by Easement Permit or through Cooperative Agreements.

Grazing and haying management plans were required and developed for FmHA easement tracts with "B" easement restrictions recorded after October 1992. These plans were developed in concert between the Soil Conservation Service (NRCS) and U.S. Fish and Wildlife Service personnel and attached to the easement document prior to transfer of the land back into private ownership. Plans were very similar in content and generally contained the following points:

1. Grazing is not to exceed 25% Harvest Efficiency on an annual basis.

2. Haying is permitted once annually after August 1.

3. Grazing and haying during the same growing season are not permitted.

3. Forest Management

Forest management on FmHA conservation easements in South Dakota will likely be limited to discretionary and other types of easements, protecting native tree claims or riparian areas. Cutting and harvesting of wood products is also restricted on easements that allow grazing. Easement managers should always review the Covenants by the Landowner section of the easement document to determine if tree harvest is permitted. Managers may permit the harvest of wood products or the establishment of new tree plantings provided FWS grassland easement policy permitting new trees is followed. Cutting and harvesting of wood in native tree claims, or in riparian areas should not be permitted under most circumstances.

C. Wetland Restoration

It is the policy of the Service to propose conservation easements to protect all wetlands (this includes drained wetlands) on FmHA Inventory Land. Once the easement has been recorded, the Service should initiate wetland restoration activities.

The Service is authorized to restore wetlands that are marked on Exhibit "A" maps with the letter "R or RW". Some important considerations have to be made first.

1. In every case, FmHA has agreed to restoration of drained wetlands (marked "R or RW" on Exhibit "A") only to the extent and size delineated on the Exhibit "A". In some cases this may be smaller than the original wetland basin. Restoration in these instances can only be completed in a way which makes it possible for excess water to runoff. If only a partial restoration can be accomplished, a benchmark for elevation should be established using a permanently fixed object such as an existing USGS survey benchmark. In the case of partially restored wetlands, detailed survey notes should be well documented in the easement file including photographs of the restoration work. Easements managers are encouraged to monitor these sites frequently to ensure compliance.

   Earthen embankments constructed to fully restore drained wetlands should be constructed in a manner that fills the drainage ditch back to the natural contour of the land for a minimum distance of 200 feet downstream of the wetland. A distance of less than 200 feet is acceptable providing that soils are suitable for construction purposes. An informal survey of the wetland and surrounding landscape is highly recommended to ensure that the restored wetland will not impact lands which are not encumbered by FmHA easement.

2. Some wetlands given restorable status on Exhibit "A" maps may be tied into extensive drainage systems or may, when restored, inundate lands under different ownership. A formal survey will be necessary with these cases to determine if restoration is in fact feasible and to what extent, if any, the restoration(s) will affect lands under different ownership. Every attempt will be made to obtain flowage easements where necessary, or to restore the wetland so that it doesn't affect lands under different ownership.

3. Once the conservation easement is approved by FmHA, maintenance of drainage facilities for restorable wetlands must cease immediately in order for the landowner/tenant to comply with the terms of the easement.

4. Wetland restorations will follow policy and guidelines outlined in the wetland easement manual. Easement managers should keep in mind that these restorations are of a permanent nature and should be designed and constructed

accordingly.

A few instances may exist where a drained wetland is now protected by a FmHA easement but is not marked as restorable. This is due to one of two reasons. First, the tenant or landowner may have initiated drainage since we field reviewed the property. In this instance, the drain is treated as a violation of the easement. Easement managers should handle this in the same manner as a wetland easement violation.

Secondly, it may be a case where the drain was inadvertently missed during the field review. If the wetland is drained, covered by the FmHA easement, and not marked restorable, we may not restore the wetland. However, maintenance of the drain must cease from this point forward, and the drain allowed to fill naturally.

Restorations should be well documented with photos, maps indicating the locations of plugs and narrative describing the work, date and field personnel involved. Managers should also periodically monitor all restored wetlands on conservation easements to evaluate vegetative response, wildlife usage, and to assess damage to water management structures.

D. Grassland Establishment (Seeding)

Once an easement has been recorded or a conservation easement deed has been signed, the establishment of vegetation on easement areas must be addressed. It is the Service's responsibility in some cases to establish vegetation according to the conditions of the easement contract. In South Dakota the Service agreed to establish grass in the most restrictive "A" and "B" easements, but did not agree to do so on the "B1" or "B" easements which permit grazing or haying. Easement managers should review the "Rights Reserved in the United States" section of the easement document to determine if the Service has the authority to reestablish upland cover/grass in the easement area. Field stations may choose the grass/legume varieties they believe will work best for the particular situation. If the landowner wishes to interseed into existing grassland cover with a previous farming history, this may be accomplished by issuing an easement permit. Interseeding into native sod is not permitted.

Special objectives to consider include providing a cover type which meets the needs of wildlife species indigenous to the easement area and the protection of water quality and soils from erosion. Choosing grass varieties and ecotypes should be based on a thorough field review to determine what variety or mix will work best. Consideration has to be given to such things as soil alkalinity, anticipated use (grazing -v- haying) and grass permanency.

Under the provisions of the most restrictive "A" and "B" easements, cropland areas can be planted by contract or by the field station. Seed bed preparation may be necessary prior to completing the grass planting. This may be accomplished by permitting the

landowner/tenant to plant soybeans or other suitable crop in the easement area. Weed control should be performed similar to that for establishment of grass on refuge system lands.

E. Weed Control

In accordance with the conservation easement document, the landowner is responsible for the control of all noxious weeds as stipulated by local, State and Federal law. Service involvement in this area is handled identically to the administration of grassland easement contracts. Under certain circumstances, easement managers may permit landowners/tenants to cut or mow vegetation for the control of noxious weeds on easement areas that restrict cutting, mowing or haying prior to July 15 or whatever date was established in the Covenants by the Landowner section of the easement document. Easement managers should evaluate these requests on a case by case basis to determine if cutting or mowing is justified and to determine an approximate acreage to be cut. Easement managers should add the requirement that a fall herbicide be applied to all areas where mowing was permitted in an effort to gain control of the weed infestation. Mowing or cutting of weedy areas is preferred to haying to reduce the potential for erroneous requests.

F. Predator Management

Predator management activities are conveyed to the Service under Part III, "Rights Reserved in the United States", on all easements except those limited to protection of "C" wetland basins and those defined as No Drain, Burn or Fill easements. This management strategy may be conducted at the discretion of the Refuge Manager. Predator management activities must be conducted according to current Service policy and should be reviewed with landowners prior to implementation.

G. Public Use

Landowners will retain the rights of access for hunting, fishing and other recreational uses on conservation easement properties.

**Exhibit 1**, FmHA Easement File Master Map



**Exhibit 2**, FmHA Easement Cover Sheet

## CONSERVATION EASEMENT OR FEE TITLE TRANSFER COVER SHEET

*TRACT NUMBER ________

INVENTORY PROPERTY __
VOLUNTARY CONVEYANCE __

FEE TITLE TRANSFER __
CONSERVATION EASEMENT __

FORMER LANDOWNER'S NAME____________________

COUNTY_________ STATE__

LEGAL DESCRIPTION (SECTION, TOWNSHIP, RANGE)

CONSERVATION EASEMENT ACRES: APPROXIMATE ACRES TO SURVEY:

| CONSERVATION EASEMENT ACRES | | APPROXIMATE ACRES TO SURVEY | | | | | |
|---|---|---|---|---|---|---|---|
| A | _____ | A | _____ | | | | |
| A1 | _____ | A1 | _____ | | | | |
| B | _____ | B | _____ | | | | |
| C | _____ | C | _____ | | | | |
| D | _____ | D | _____ | DISCRETIONARY | _____ | DISCRETIONARY | _____ |

TOTAL EASEMENT ACRES REQUESTED _____ TOTAL APPROXIMATE ACRES TO SURVEY _____

FEE TITLE:

TOTAL FEE TITLE ACRES REQUESTED _____

RESTORED WETLAND BASINS ___ RESTORED WETLAND ACRES ___OTHER WETLAND BASINS ___ OTHER WETLAND ACRES __

TOTAL WETLAND BASINS ___ TOTAL WETLAND ACRES ___

MANAGED BY ___________
RECORDED DATE __________
ACCEPTANCE DATE _________

* Assign numbers consecutively in each county, beginning with tract (10C), using the suffix (C) in all cases to identify FmHA conservation easements.

**Exhibit 3,** FmHA Easement Boundary Sign




| | |
|---|---|
| Size: | 3" X 4½" |
| Color: | White with FWS blue letters |
| Lettering: | Large = ¼" helvetica medium<br>Small = 1/3" |
| Materials: | Type 1 = aluminum, painted<br>Type 2 = stick-on vinyl |

United States Department of the
Interior Fish and Wildlife Service
Bureau of Sport Fisheries and Wildlife
Branch of Realty

DESCRIPTION

FAHEY, EDWARD TRACT (52X-1 ) 160,00
ACRES WATERFOWL PRODUCTION AREA RAMSEY COUNTY NORTH
DAKOTA EASEMENT AUTHORIZED BY MIGRATORY BIRD HUNTING STAMP ACT OF MARCH 16, 1934,
AS AMENDED DESCRIPTION: FIFTH PRINCIPAL MERIDIAN

R. 61 W. , T. 153 N., SEC. 36, SE1/4




Wetland Areas Easily

Wetland Areas Moderately Scale - 4" = 1 mile

Wetland Areas Difficult to

Tracing Compiled by: R.S.B. Date: 1014/63 Checked by: W.A.R. Date: 10/4/63

CERTIFICATE OF INSPECTION AND POSSESSION
(Lands other than Federal Building

I, **Harold F. Duebbert**

a **Wetland Manager** of the Department of the Interior, Bureau of Sport Fisheries and Wildlife, hereby certify that on the 16th day of **January**, 19 *6 4*, I made a personal examination and inspection of that certain tract or parcel of land situated in the County of **Ramsey**, State of **North Dakota**, designated as Tract (32X, 1) and containing •' acres, (proposed to be) acquired by the United States of America for **Waterfowl Management Rights**,

1, That I am fully informed as to the boundaries, lines and corners of said tract; that I found no evidence of any work or labor having been performed or any materials having been furnished in connection with the making if any repairs or improvements on said land; and that I made careful inquiry of the above-named vendor .. ) and ascert ai ned that nothing had been done on or about said premises within the past six months that would entitle any person to a lien upon said premises

2. That I also made inquiry of the above-named vendor a XME s to (his) (XXXXX) rights of possession and the rights of possession of any person or persons known to (him) **(XXXX)** and neither found any evidence nor obtained any information showing or tending to show that any person had any rights of possession or other interest in said premises adverse to the rights of the above-named vendor or the

3. That I was informed by the above-named vendor (

xxxxxxx) that to the best of (his) (xxxxx) knowledge and belief there is no outstanding unrecorded deed, mortgage, lease, contract or other instrument adversely affecting the title to said premises.

' 4. That to the best of my information and belief after actual and diligent inquiry and physical inspection of said premises there is no evidence whatever of any vested or accrued water rights for mining, agricultural, manufacturing or other purposes; nor any ditches or canals constructed by or being used thereon under authority of the United States, nor any exploration or operations whatever for the development of coal, oil, gas, or other minerals on said lands; and that there are no possessory rights now in existence owned or being actively exercised by any third party under any reservation contained in any patent or patents heretofore issued by the United States for said land.

5. That to the best of my knowledge and belief based upon actual and diligent inquiry made there is no outstanding right whatsoever in any person to the possession of said premises nor any outstanding right, title, interest, lien or estate, existing or being asserted in or to said premises except such as are disclosed and evidenced by the public records.

6. That said premises are now wholly unoccupied and vacant except for the occupancy of
as tenant (s) at will, from whom disclaimer (s) of all right, title and interest in and to said premises, executed on the day of ,

Dated this

day of **January**, **1964**

Harold F. Duebbert

Approved

United States Department of the
Interior Fish and Wildlife Service
Bureau of Sport Fisheries and Wildlife
Branch of Realty

DESCRIPTION

RYSAVY, ADOLPH TRACT (21X-1) 480,00
ACRES WATERFOWL PRODUCTION AREA RA^MSEY COUNTY
NORTH DAKOTA EASEMENT AUTHORIZED BY MIGRATORY
BIRD HUNTING STAMP ACT OF MARCH 16, 1934, AS AMENDED DESCRIPTION: FIFTH
PRINCIPAL MERIDIAN

R. 60 W. , T. 156 N., SEC. 25, SE1/4




Wetlands Scale - 4" = 1

Tracing Compile^d by: W.A.R. Date: 2/26/63 Checked by: R.S.B.




**We hereby certify U**



bert . ea S e



**Wetlands Deleted from the** *Provisions* of the Easement

*Wetlands Drained*

**Open Ditch**

May 19, 1965 ..

# UNITED STATES DEPARTMENT OF THE INTERIOR
## FISH and WILDLIFE SERVICE
## BUREAU OF SPORT FISHERIES and WILDLIFE
## DIVISION OF LAND MANAGEMENT

JAGOW, WALLACE TRACT (69X, 1) 60.00
ACRES

EASEMENT AUTHORIZED BY MIGRATORY BIRD HUNTING STAMP ACT OF MARCH 16, 1934 AS AMENDED

DESCRIPTION: FIFTH PRINCIPAL MERIDIAN

T, 159 N R, 63 W Section 17, SE1/4




HEREBY CERTIFY THAT THIS SKETCH REPRESENTS THE FUNCTIONAL TILE OR OPEN DITCH )RAINS, INCLUDED IN THE EASEMENT AGREEMENT AMENDED 9/15/75 , IT IS UNDERSTOOD AND AGREED THAT THESE DRAINS CAN BE DEEPENED OR MAINTAINED AS DRAINAGE

WALLACE for RALPH F. FRIES, WETLAND SCALE: 4 inches = I MILE

 WETLANDS INCLUDED IN THE PROVISIONS OF THE EASEMENT.

DRAINAGE FACILITY NOT TO BE MAINTAINED

 DRAINAGE FACILITIES THAT CAN BE MAINTAINED

MAP DRAWN BY: DATE: 9/15/75

UNITED STATES DEPARTMENT OF THE INTERIOR
FISH AND WILDLIFE SERVICE

Tract: XXXX                                                                                                   Map 1 of X

WATERFOWL PRODUCTION AREA XXXXXX COUNTY, STATE OF NORTH DAKOTA
EASEMENT AUTHORIZED BY MIGRATORY BIRD HUNTING STAMP ACT OF MARCH 16, 1934, AS AMENDED.
T. XXXN., R. XXW., 5th PRINCIPAL MERIDIAN

SECTION XXXXXXX







1 inch equals 0.25 miles

The U.S. Fish and Wildlife Service (Service) has purchased and owns perpetual rights which restrict or prohibit the right to drain, burn, level, and fill any wetland basins depicted on this map. This map represents the Service's effort to depict the approximate location, size and shape of all protected wetlands based on information and maps available at the time this map was prepared. However, wetlands are hydrologically dynamic systems, with expanding and contracting water levels. This map is not meant to depict water levels in the wetland in any given year. The Service reserves the right to revise this map, provided the mapped acreage remains consistent with the Easement's Summary Acres.

Prepared by: ______________________________

Approved by: ______________________________

Date: ______________________________

LEGEND

- Section Boundary
- Boundary of Easement Description
- Wetlands Covered by Provisions of the Easement
- Wetlands Deleted from the Easement
- Approved Drainage Facility

# Wetland Easement Mapping Progress Form

Easement County & Number:______________________________Map Initiation Date:_________________

Wetland District:___________________________Initiated By:______________________________________

Purpose (check one): ☐ Violation ☐ Request ☐ Proactive

Drafted By:_________________________Date(s) draft(s) sent to field office:__________________________

Reviewed By:_______________________Date(s) draft(s) sent back to HAPET:_________________________

Verified (check one): ☐ Ground ☐ Aerial Date:________________

Easement Summary Acres___________________Estimated Mapped Acres___________________________

(*Notice: mapped acres listed here are only an estimate and are not meant to depict exact values. There is known error associated with off-site mapping and approvers use all available tools to ensure the error range (±10%) associated with the mapped acres listed does not exceed summary acres derived during the purchasing of the easement.)*

If originally over acres, estimate of acres deleted from the draft map(s):____________________________

Date digital wetland files merged and secured:______________________

Date final map printed to archival-quality paper:_____________________

Final Map(s) Approved By:_______________________________________Date:_______________________

Date copy of map(s) sent to requesting landowner:________________________________

# Easement Mapping References

Easement Number ______________________ County __________________________________

| REFERENCE USED | FILE NUMBER\NAME (S) | |
|---|---|---|
| ASCS Aerial Photo 195__ | | |
| ASCS Aerial Photo 196__ | | |
| ASCS Aerial Photo 197__ | | |
| ASCS Aerial Photo 198__ | | |
| ASCS Aerial Photo 199__ | | |
| National Wetland Inventory Slide Film | | |
| USGS DEM Topology (Quadrangle Name) | | |
| APFO B & W Mid 1990's | ☐ Yes | ☐ No |
| FSA 2003 True Color | ☐ Yes | ☐ No |
| FSA 2004 True Color | ☐ Yes | ☐ No |
| FSA 2005 True Color | ☐ Yes | ☐ No |
| FSA 2006 True Color | ☐ Yes | ☐ No |
| FSA 2008 True Color | ☐ Yes | ☐ No |
| FSA 2009 True Color | ☐ Yes | ☐ No |
| FSA 2010 True Color | ☐ Yes | ☐ No |
| Digital Raster Graphics (Topo map) | ☐ Yes | ☐ No |
| NWI Point, Line & Polygon Data | ☐ Yes | ☐ No |
| Soils Maps | ☐ Yes | ☐ No |
| Landcover Maps | ☐ Yes | ☐ No |
| Other: | | |
| Other: | | |
| Other: | | |
| Other: | | |
| Other: | | |

Notes:

Exhibit XI-7 Example of letter that transmits easement map requested by a landowner.

Certified Mail #

County

Easement #000

John Landowner
Address
Town, ND 00000

Dear Mr. Landowner:

On March 3, 2001, you requested that the U.S. Fish and Wildlife Service (Service) provide you with map of protected wetlands located in the SW1/4 Section 1, T. 148 N., R. 85 W., County, North Dakota. Attached is the map as you requested.

The Service has purchased and owns perpetual rights which restrict or prohibit the right to drain, burn, level or fill any wetland basin depicted on the attached map. This map represents the Service's effort to depict the approximate location, size and shape of all protected wetlands based on information, maps and aerial photographs available at the time this map was prepared. However, wetlands are hydrologically dynamic systems, with expanding and contracting water levels. This map is not meant to depict water levels in the wetland in any given year. The Service reserves the right to correct this map provided the mapped acreage remains consistent with the Easement's Summary Acres.

The water levels of these wetlands naturally increase and decrease depending on the natural water cycle. The Service has procedures which allow landowners to remove sheet water or water from wetlands that are affecting roads and buildings. If issues arise concerning individual wetland basins represented on the map, each will be looked at on a case by case basis. It is the landowner's responsibility to contact the Service if there are any questions concerning the burning, draining, filling, and/or leveling of wetlands depicted on the easement wetland map you are being provided.

In summary there are three points to remember about this wetland easement map:

1. The map does not and is not intended to provide the exact size or configuration of the wetlands protected by the provisions of the easement.

2. Any burning, draining, filling or leveling of wetlands depicted on the wetland easement map without a permit issued by the Service is a violation of the provisions of the easement.

3. It is the landowner's responsibility to contact the Service if there are any questions concerning mapped wetlands.

If you have any questions about this map or the easement contract, please contact this office at phone number (701)

Sincerely,

Refuge Officer

Att: map; County Easement OOOOx

Cc: U.S. Fish & Wildlife Service (RE), Bismarck,

Exhibit XI-8 Example of letter responding to landowner questions regarding the mapping process.

Certified Mail #

County

John Landowner
Address
Town, ND 00000

Easement #000

Dear Mr. Landowner:

On April 7, 1998, the U.S. Fish and Wildlife Service (Service) completed a map of wetlands located in the SW1/4 Section 1, T. 148 N., R. 85 W., protected by Service wetland easement OOOx County, North Dakota. The Service has purchased and owns perpetual rights which restrict or prohibit the right to drain, burn, level or fill any wetland basin that is shown on the map.

The Service purchased the County OOOx easement in 1967. To arrive at a payment figure for the easement, the Service realtor would have circled those areas he would have identified as wetlands on a black and white aerial photograph. These photos were not maintained as permanent file records and were used for many other purposes. There was no on the ground identification or inventory of the wetlands. The realtor then would have dot counted the circles to arrive at one approximate acreage figure, which is referred to as the "Summary Acreage", for the entire easement. Dot gridding is not a measurement of the exact size of individual wetlands. Each dot on the grid corresponded to a 0.4 acre area. Dots that overlaid wetlands were counted and the resultant number of dots, times 0.4 acres gave an approximation of the wetland acreage on the entire easement tract. The Service does not have acreage figures of individual wetland basins protected by the provisions of the County OOOx easement contract. A per acre monetary value was then applied to the "Summary Acreage" figure to obtain a payment value. Our records indicate that the Service Realtor based payment to the landowner for estimated - acres ("Summary Acreage" figure) for this easement.

The attached map(s) provided to you represents the Service's effort to depict the approximate location, size and shape of all wetland basins protected by the provisions of the easement contract using the "Summary Acreage" figure information, maps and aerial photographs available at the time this map was prepared. However, wetlands are hydrologically dynamic systems, with expanding and contracting water levels. This map is not meant to depict water levels in the wetland in any given year. The Service reserves the right to correct this map provided the mapped acreage remains consistent with the Easement's Summary Acres.

The water levels of these wetlands naturally increase and decrease depending on the natural water cycle. The Service has procedures which allow landowners to remove sheet water or water from wetlands that are affecting roads and buildings. If issues arise concerning individual

wetland basins represented on the map, each will be looked at on a case by case basis. It is the landowner's responsibility to contact the Service if there are any questions concerning the burning, draining, filling, and/or leveling of wetlands depicted on the easement wetland map you are being provided.

In summary there are three points to remember about this wetland easement map:

1. The map does not and is not intended to provide the exact size or configuration of the wetlands protected by the provisions of the easement.

2. Any burning, draining, filling or leveling of wetlands depicted on the wetland easement map without a permit issued by the Service is a violation of the provisions of the easement.
3. It is the landowner's responsibility to contact the Service if there are any questions concerning mapped wetlands.

If you have any questions about this map or the easement contract, please contact this office at phone number (701)

Sincerely,

Refuge Officer

Att: map; County Easement OOOOx

Cc: U.S. Fish & Wildlife Service (RE), Bismarck, ND WMD Easement File

Exhibit XI-9 Example of letter transmitting revised map to landowner.

Certified Mail #

County

John Landowner
Address
Town, ND 00000

Dear Mr. Landowner:

On March 3, 2001, the U.S. Fish and Wildlife Service (Service) provided you with a map of protected wetlands located in the SW1/4 Section 1, T. 148 N., R. 85 W., County, North Dakota. The Service has purchased and owns perpetual rights, which restrict or prohibit the right to drain, burn, level or fill any wetland basin that is shown on the map. [While conducting routine surveys of the wetland easement, on your land, it was noticed that a circle that had been drawn on the map indicating a wetland was, in actuality, a hill. Hills are not protected by the easement contract and the Service is sending you a revised map to reflect this change. - Or - While conducting routine surveys of the wetland easement on your land, it was noticed that a wetland had been missed during the mapping process. This is not unusual as easement maps are drawn with off-site tools such as, information, maps and aerial photographs available at the time the maps are prepared and are rarely ground checked, due to time constraints. The mapped acreage remains consistent with the wetland easement summary acres, with the addition of this wetland.] The attached wetland easement map is a revision of the map sent to you on March 3, 2001, to reflect the above change(s).

The attached map represents the Service's effort to depict the approximate location, size and shape of all protected wetland basins based on information, maps and aerial photographs available at the time this map was prepared. However, wetlands are hydrologically dynamic systems, with expanding and contracting water levels. This map is not meant to depict water levels in the wetlands in any given year. The Service reserves the right to correct this map provided the mapped acreage remains consistent with the Easement's Summary Acres.

The water levels of these wetlands naturally increase and decrease depending on the natural water cycle. The Service has procedures which allow landowners to remove sheet water or water from wetlands that are affecting roads and buildings. If issues arise concerning individual wetland basins represented on the map, each will be looked at on a case by case basis. It is the landowner's responsibility to contact the Service if there are any questions concerning the burning, draining, filling, and/or leveling of wetlands depicted on the easement wetland map you are being provided.

In summary there are three points to remember about this wetland easement map:

1. The map does not and is not intended to provide the exact size or configuration of the

wetlands protected by the provisions of the easement.

2. Any burning, draining, filling or leveling of wetlands depicted on the wetland easement map without a permit issued by the Service is a violation of the provisions of the easement.
3. It is the landowner's responsibility to contact the Service if there are any questions concerning mapped wetlands.

If you have any questions about this map or the easement contract, please contact this office at phone number (701)

Sincerely,

Refuge Officer

Att: map; County Easement OOOOx

Cc: U.S. Fish & Wildlife Service (RE), Bismarck, ND WMD Easement File

Exhibit XI-10

**US Fish and Wildlife, Easement Mapping Error Estimations.**

Scott Ralston
Jim Alfonso
Paul Halko

July 2005

## Introduction

The USFWS uses two methods for mapping wetlands. Both methods use all available aerial photographs as tools to obtain the best possible representation of wetland basins. In most locations at least one historical image is available for each decade dating back to the 1950's. Wetlands are dynamic systems and will expand or contract based on available precipitation. Using all available tools and images, wetland basin boundaries are drawn by defining landscape signatures through aerial photo interpretation. The conventional mapping method uses Mylar overlaid on 1:15,840 scale photographs to draw wetland boundaries. Wetland boundaries are normally drawn on the best photograph available and the other photographs are used as a reference. Wetland size is either determined by dot counting or by digitizing into a GIS program.

A newer digital method of wetland mapping has also been used. The computerized digital method involves scanning in photographs or using digital media in aerial photography and placing a spatial reference with the image file. This type of digital image is called orthorectified aerial photography which indicates the computer has a reference of where the image belongs on the earth's surface and how big the image is. The photos are overlaid in a Geographic Information System (GIS) program and drafters map basin boundaries based on visual signatures of landscape differences. Within the GIS program, images can be toggled on or off as well as can be turned semi-transparent to compare different years of photographs. Since all images are

orthorectified, the images line up no matter what scale the view is at. Other tools such as topographic elevation can also be overlaid to gain greater knowledge of the landscape.

There is inherent error in remote sensing due to the offsite mapping process. This error can be found in both conventional and digital methods. Conventional methods involve visibility error due to the restriction of viewing the image at a single scale. Conventional mapping also has a line error caused by the width of the line used to draw the boundaries. Dot counting is a crude estimate of wetland area and must be used with some caution because results may vary based on interpretation of a dot's location near a wetland boundary. Digitizing involves error in tracing lines that already have been drawn. With each replication of a line the chance of deviating from the original line increases as well as location of the trace within the thickness of the original line may vary. Digital mapping methods involve less sources of error than conventional mapping. Most error is limited to the quality of the original image that was scanned and the resolution of the scan itself.

With conventional and digital mapping, redundancy is built into the process. A drafter will draw the wetland boundaries to the best of their abilities. Another experienced individual will review, and modify if needed, every draft before it is approved and sent out. Even with known error, remote sensing still has advantages. Funding and staff limitations, prohibit all easement sites from being ground surveyed. Quantification of the error value in the mapping techniques is needed for justification of procedures.

**Methods**

In conventional mapping, many sources of error are not easily quantifiable. One type of error that can be quantified is line width. It is reasonable to assume a drafter may vary above and below the actual wetland basin boundary visible on the photograph due to the thickness of the

pen or pencil line being drawn. A standard 0.05cm line drawn on a 1:15,840 scale photograph will equal 7.92 meters (about 26 feet) on the ground.

Line error for digital mapping can not be calculated in the same way as conventional mapping. Line width in digital systems is effectively zero. Most aerial photos the USFWS uses that are digitized and orthorectified have an approximate spatial resolution of 1 square meter. This means that each pixel represents an average color of all features within that 1x1 meter block on the earth surface (Figure 1b). Color change from one landcover type to another is often represented by a gradation of pixels instead of a sharp line (Figure 1b). This gradation is determined by the focus of the camera in the original image, the degree of contrast between different landcover types and pixel size resulting from the resolution of the original scan. According to a report by Nelson (1996), error in digital aerial photo mapping is estimated to be at least plus or minus 3 meters (about 10 feet). By taking a sample of wetlands, the USFWS staff found an average of a 6 meter pixel color gradation along wetland basin boundaries. This

Figure 1. Wetland Mapping Example

A. (Top Right) Wetland basin with boundary drawn (blue)
B. (Lower Left) Enlargement of fig. 1b (Yellow box) showing pixilation of image and color gradation
C. Three meter buffer of mapping variation area.








information confirmed the findings from the Nelson (1996) study. The gradation zone is similar to the line width error in conventional mapping (Figure 1c).

Data from a study done by Ralston et al. (NDSU 2004) were used to gain wetland characteristics of the region. In that study 128 four square mile sample sites were randomly selected in the Prairie Pothole Region of North Dakota (Stewart and Kantrud 1972). All wetland basins within those sample sites were identified and mapped using a combination of high resolution aerial photography and topographic elevation layers in GIS. Average basin size was calculated from all basins. Wetlands were removed from further analysis if they were located on the edge of the sample site and thus had a smaller wetland size than the true value. Lacustrine wetlands were also removed from further analysis since easement mapping primarily deals with Palustrine systems. With in the GIS program, a 8 meter and a 3 meter buffer were created on each side of the mapped wetland boundaries to simulate the area that an experienced wetland mapper may reasonably be expected to vary in both conventional or digital mapping methods. Area for the buffers were calculated and averaged for all wetland basins.

**Results**

In all sample sites, 14,724 wetlands were identified. Wetland density was about 31 wetlands per square mile. Mean wetland size was 1.85 acres. Average wetland basin size including the 8 meter buffer above the true wetland basin was 2.47 acres and 1.35 acres when the 8 meter buffer below the true wetland basin boundary was subtracted. Average wetland basin size including the 3 meter buffer above the true wetland basin was 2.07 acres and 1.65 acres when the 3 meter buffer below the true wetland basin boundary was subtracted. Error range is calculated by dividing the buffer area by the wetland size. Average error for digital mapping with an 8 meter buffer is 33.28% above the true size and 27.00% below the true basin size. Average

error for digital mapping with a 3 meter buffer is 11.86% above the true size and 11.06% below the true basin size.

Table 1. Estimated line error for wetland mapping in the PPR of North Dakota.

| Buffer Treatment | Average Wetland Size (Acres) | Percent Error from True Size | Average Percent Error from True Size |
|---|---|---|---|
| True Wetland Size | 1.85 | 0.0% | 0.0% |
| Plus 8 Meter Buffer | 2.47 | 33.28% | |
| Minus 8 Meter Buffer | 1.35 | 27.00% | 30.14% |
| Plus 3 Meter Buffer | 2.07 | 11.86% | |
| Minus 3 Meter Buffer | 1.65 | 11.06% | 11.46% |

**Discussion**

The results from this study suggest that under the assumption that all drafters map basin boundaries based on the same visual signatures the variation on where they draw the basin boundaries may vary by 16 meters in conventional mapping and 6 meters within the pixel gradation when digitally mapping. This variance may result in a difference of up to 33% and 12% respectively above or below the true wetland area in conventional and digital mapping methods.

It is important to recognize that because of mathematical rules, when the diameter of a polygon increases, the area increases greater than if the same distance were subtracted from the diameter of the polygon. Thus, in wetland mapping it is reasonable to assume a mapper may waiver above and below the true wetland boundary, but when the line is above the true boundary it will be adding more acres to the wetland than if the line is drawn below the true boundary for the same distance. This paradox results in a slight overestimation bias of wetland size. The degree of the bias increases with a greater error buffer zone. As seen in the data from this study, when a 3 meter buffer was applied there was only a 0.80% difference between the plus and minus buffers. When an 8 meter error buffer was applied the difference in area of plus and minus buffers increased to 6.28%. Estimates for digital mapping error may be lower in reality than

those calculated because values were based on a 1x1 meter pixel size which is representative of several of the photographic resources used. However, some of the images used in the digital mapping process, have a resolution as low as 0.6x0.6 meters. A smaller resolution allows for greater photo detail and thus more accuracy in mapping.

Digital mapping error is primarily limited to the size of the pixel gradation and the resolution of the image itself. Conventional mapping methods include the error values calculated in this study but also include other error that is not quantified. The inability to zoom in to features on the photograph limits the ability to see detail and draw as accurately as digital methods. Overlaying photos on top of each other to compare size and shape of features is also more difficult in conventional methods which may create more error. As mentioned earlier other errors are inherent in dot counting or digitizing for area estimates. Both conventional and digital methods have a human error associated with them. This human error is reduced as much as possible by using experienced and trained personal to draft the maps as well as an approval stage where maps are reviewed by a separate individual.

**Implications and Management**

The USFWS has been given a court mandate to map easements to be consistent with the summary acres described by the realty information (Summary Acres). Since remote sensing mapping is not exact, as described above by the mapping error, maps must come as close as possible to summary acres as the error allows. The USFWS holds their mapping to a higher standard than the calculated error describes. Both conventional and digital mapping are held to an error within 10% of the calculated acreage regardless of the known error of as much as 33% for conventional mapping and 12% in digital mapping. The summary acres are known to have great error from the true wetland acreage on the easement property because they were derived

from crude estimations not involving any exact survey methods. However, due to court adjudication the summary acres must be treated as a single value without error. Mapping error only applies to those maps produced by the USFWS for determining what wetlands on the property that will be protected under the contract. Because there is a known error, the exact acreage value derived during the mapping process must be used only as an approximation of the size of a protected wetland and not as the exact value. Only the range of numbers from plus to minus 10% of the derived value has true meaning. Every value between that range (±10% of mapped acres) has a probability of being the true acreage of the wetlands on the ground. For the purpose of maintaining compliance with court orders the summary acres will be treated as the target to which maps must fit. When mapping, the error range (± 10% of mapped acreage) must encompass the summary acres. As long as the summary acres fall within the mapped error range there is an equal probability of the mapped acreage equaling the summary acres as not equaling the summary acres. Because off-site mapping is not exact, being within the error range is as close as possible to the true value. One exception to this mapping rule is if the mapping error range (entire ±10%) is below the summary acres. In this case the error range does not encompass the summary acres but the court system does not have issues with under acred easements.

Map drafters and approvers should map wetlands on an easement with all available tools to the best of their ability. In order to remove potential mental bias, summary acres should not be known to the drafter until all wetlands have been drawn and finalized. Once all wetlands have been drawn as accurately as possible, total acreage should be determined for the easement. If mapped acres is equal to or less than the summary acres the map may be approved and finalized (Example 1). If the mapped acres are over the summary acres then the map should be re-evaluated for any questionable basins. Questionable basin boundaries may be re-evaluated and

redrawn only if evidence from ground checks and / or consultation with a second approver warrants the modification of basin size or shape. Caution must be taken to not make modifications based on the need to fit into the summary acres or a sampling bias will be formed. Once all questionable features are finalized the mapped acres are again compared to the summary acres. If the mapped acres are at or under summary acres then the map will be approved and finalized. If the mapped acres are still over the summary acres then the error range must be calculated as following (Example 2):

*Error Range* = From *(Mapped Acres – (Mapped Acres * 10%))* to

*(Mapped Acres + (Mapped Acres * 10%))* to

If the summary acres fall within the error range the map may be approved and finalized. If the entire error range is still over the summary acres then entire wetland basins should be removed based on the wetland elimination criteria in the easement manual (Example 3). Basins will be removed until the error range (as calculated above) encompasses the summary acres or are below the summary acres. Once the summary acreage is satisfactorily within the error range of the basin acres, the map will be approved and finalized.

Map drafters will map to the best of their ability with all available tools at hand. However, it should be recognized that a degree of error is inherent in the remote sensing process. Time and funding intensive processes would be needed to do soil, hydrology and vegetation surveys to determine exact wetland basin boundaries. Off-site mapping will continue to be an important tool in the USFWS easement program but results will be used with the knowledge of present error.

*Error Range* = From *(Mapped Acres – (Mapped Acres * 10%))* to
*(Mapped Acres + (Mapped Acres * 10%))* to

Example 1: Map was drawn and acres = 45

Summary Acres = 50

Mapped acres are less than summary acres so approve and finalize map

Example 2: Map was drawn and acres = 54

Summary Acres = 50

Mapped acres are over summary acres so questionable basins are re-evaluated.

After evaluation the total acres still = 54

Error range must be calculated.

Error Range = From (54-(54 X 0.10)) to (54+(54 X 0.10))

Error Range = From (54-5.4) to (54+5.4)

Error Range = From 48.6 to 59.4

Summary Acres are between 48.6 and 59.4 so map can be approved and finalized

Example 3: Map was drawn and acres = 60

Summary Acres = 50

Mapped acres are over summary acres so questionable basins are re-evaluated.

After evaluation the total acres still = 60

Error range must be calculated.

Error Range = From (60-(60 X 0.10)) to (60+(60 X 0.10))

Error Range = From (60-6) to (60+6)

Error Range = From 54 to 66

Summary acres are NOT between 54 and 66 so basins must be removed from easement protection.

Based on removal criteria, a 2 acre wetland and a 4 acre are removed.

Total mapped acres now = 54

Mapped acres are still over summary acres so error range must be calculated.

Error Range = From (54-(54 X 0.10)) to(54+(54 X 0.10))

Error Range = From (54-5.4) to (54+5.4)

Error Range = From 48.6 to 59.4

Summary Acres are between 48.6 and 59.4 so map can be approved and finalized

**References**

Nelson, S. A. 1996. Advances in wetland status and trends monitoring – Cumulative error comparison. Wetlands Program Technical Report 96-6. Gloucester Point, Virgina.

Ralston, S. T., G. M. Linz, and W. J. Bleier. 2005. Characterization of wetlands and cattail (Typha spp.) vegetation in the Prairie Pothole Region of North Dakota. North Dakota State University, Fargo, North Dakota. Unpublished Data.

Stewart, R. E. and H. A. Kantrud. 1972. Population estimates of breeding birds in North Dakota. The Auk 89:766-788.

Exhibit XI-11 Mapping Resources

**Offsite Mapping Tools - Possible Photographic and Mapping Resources**:

USDA Black and White Photography, possible sources include:

- USDA Photography Lab in Utah
- USDA NRCS Field Stations,
- USDI National Wetland Inventory Maps (NWI), Possible Sources: NWI Office, in Florida
- USGS High Altitude Photography, Possible sources include: EROS, Sioux Falls, SD
- USDA Annual High Altitude Photography (Farm Services Agency compliance slides)
- National Archives Photography
- Color infrared aerial photography
- Digital orthoquads (DOQQ) imagery
- USGS topographic maps
- Landsat imagery

**Offsite Mapping Signatures**:

- Hydrphytic vegetation
- Surface water
- Saturated conditions
- Mud flats
- Flooded or drowned-out crops
- Stressed crops due to wetness
- Differences in vegetation due to different planting dates
- Unharvested crops
- Isolated areas that are not farmed with the rest of the field
- Areas of greener vegetation (especially during dry years)
- Recurring Cropping patterns that avoid wet areas

UNITED STATES
DEPARTMENT OF THE
INTERIOR OFFICE OF THE
SOLICITOR WASHINGTON D.C. 20246



Memorandum

To: Associate Director, Wildlife Resources, FWS

From: Assistant Solicitor, Fish and Wildlife

Subject: Proposed Guidelines for Wetland Easement Enforcement

We have reviewed the draft administrative guidelines for wetland easement enforcement jointly submitted by Regions 3 and 6. Although the sole legal question raised by the transmittal memorandum is the authority of the Service to allow certain activities pursuant to a permitting system, we feel that certain implications of the proposal for the easement program in general require a wider discussion.

It must first be understood that through the easement agreement, the government has received, and therefore has a proprietary interest in, only the rights of draining, filling, burning and leveling. 1/

1/ The government has also acquired the right of access to the subject property, but this is not important for purposes of the instant discussion.

' The landowner has retained all other normal incidents of ownership in fee. 2/

This has two important implications: (1) The landowner can undertake all activities other than "filling, draining, burning or leveling" whether or not the activities destroy the wetland or impair its value as a waterfowl production area; 3/ and (2)

2/ This conclusion conflicts with a memorandum dated November 30,-1977 from the Minneapolis Field Solicitor to the Regional Director. The Field Solicitor concluded that the property rights received through the easement agreement were 1) the right to maintain the land as a waterfowl production area, and 2) the concomitant right to expect from the owner of the servient estate certain specific kinds of cooperation in this effort (not to fill, drain, burn or level). However, the estate received by the government is commensurate with that relinquished by the servient estate. See Restatement of' Property, § 452 (1944); Thompson, Real Property, 427 (1961). In this case, the landowner specifically relinquishes only the rights to drain, fill, level and burn. U.S. Gov. Form 3-1916 (1970). This language surely defines the ambiguous "easement . . . or right of use for the maintenance of the land . . . as a waterfowl production area." Restatement of Property supra, §4F83. In this we agree with the U.S. Attorney's appraisal of the Minneapolis Field Solicitor's opinion. Letter from U.S. Attorney,.North Dakota, to Minneapolis Field Solicitor, April 21, 1978.

3/ The landowner could, for example, build a structure adjacent to the easement area which would eliminate the wetland's attractiveness to nesting waterfowl.

. . .
the **landowner may allow** third parties to undertake such activities. 4/_.

Since the Service holds a proprietary interest only in the rights to drain, fill, level and burn, its authority as an owner of property to regulate the use of its property extends only to those activities. In the instant context, therefore, the Service can regulate only those activities that can fairly be said to have been contemplated within the pertinent terms of the easements, 5/ since this was the extent of rights bargained and paid for. 6% .

4/ It is in this context that the opinions discussed in Note 2 supra, were issued. The Field Solicitor concluded that the estate held by the Service vis-a-vis third parties was larger than that held vis-a-vis the landowner. The Service could then regulate acts of third parties, in this case a power line right-of-way applicant, which it could not regulate if undertaken by the landowner. The U.S. Attorney concluded that since the activities could be undertaken by the landowner, third parties could be allowed to undertake the same . activities. We subscribe to the opinion of the U.S. Attorney: See Restatement of Property, § 510, comment a, (1944).

5/ This conclusion requires a modification of the present regulations pertaining to the National wildlife Refuge System. 50 CFR Subchapter C. Under the pertinent definitions, Waterfowl Production Area Easements are defined as part of the wildlife Refuge System. 50 CFR § 25.12(a). Management of the Refuge System includes restriction on access, 50 CFR Part 26, land use, 50 *CFR* Part 29, hunting and fishing, 50 CFR Part 30, and other miscellaneous actions, 50 CFR Part 27. Since the Service holds only a limited property right in a Waterfowl Production Area easement, it has no authority to regulate activities such as hunting, fishing, sightseeing, snowmobiling, etc., which are not in conflict with the terms of the acquired estate; the regulation of those types 'of activities remains the prerogative of the fee owner and his or her licensees. Serious consideration should be given, therefore, to delineating those provisions of the general refuge regulations which do not apply to wetland easement areas.

6/ The Chief of the Realty Division in Washington, D.C. has confirmed that our analysis coincides with Realty's understanding of its bargaining position when negotiating wetland easements. This is an important factor in determining the content and scope of the easements.

If it is determined that contemplated activities fall within the scope of the Service's property interest (ie., involve filling, draining, leveling or burning), the Service is still authorized to permit the activities if it is determined that they are "compatible with the purposes for which the area was established." 16 U.S.C. § 668dd(d)(1)(8). Present regulations provide authority to the Service to issue permits allowing burning, 50 CFR § 27.95, filling, 50 CFR § 27.94, and leveling and draining, SO CFR §27.51. 7/

A landowner operating pursuant to, and in compliance with, a permit issued by the Service may undertake the activities without violating the terms of the easement agreement. The permit acts as a license authorizing activities otherwise forbidden by the easement agreement.

The draft administrative guidelines submitted by Regions 3 and 6 contemplate the regulation of six activities: pivot irrigation systems, dugouts, level ditching, construction of nesting islands, burning, and emergency draining. The above analysis has demonstrated that the Service may only purport to regulate these activities if they can be considered draining, filling, burning or leveling. Of these activities, only construction of pivot irrigation systems poses problems of definition. 8/

7/ We advise adoption of the following amendment to 50 CFR Subchapter C to clarify this authority:

Section 29.4 Waterfowl Production Area Easement

> Where the Service owns an easement interest to preserve potholes or other wetland habitat, certain acts such as draining, burning, filling or leveling of a limited nature may be allowed by permit issuedby the Regional Director or the Regional Director's designee, when in that person's judgment, such activities are compatible with the basic purposes of waterfowl production for which such easement interest was acquired.

8/ Dugouts and level ditches serve to reduce the water area of the wetland by concentrating available water and thus can be considered draining. Nesting islands require accumulation of material in the wetland basin and therefore may be considered filling. Burning and emergency draining are contemplated activities by their terms.

The irrigation construction options outlined in the proposed administrative guidelines all require placing some material In the wetland basin (ie., wire mesh, trench-fill material, pilings). It is our opinion that the placing of such material in the wetland basin constitutes "filling" within the terms of the easement agreement. 9/

The Service has previously had occasion to apply such an inclusive definition.. **Letter, Minnesota Field** Solicitor to Mr. John A. Eidsmore, May 17, 1979. The Service has also attempted to define "filling" in terms of gradation. Memorandum from the Acting Regional Director, Region 6, to Wetland Acquisition Offices and Wetland **Management Districts**, February 7, 1975, ("spreading" manure **in wetland basins** is not "filling", but "dumping" manure is; placing a few rocks in a wetland is not "filling", but moving a rock pile to the wetland is).. It is our opinion that this position is untenable because it is **vague** and ambiguous and therefore open to uneven application. It also overlooks the fact that the same volume of material is 'being deposited in the wetland regardless of whether it is dumped or spread; over a sufficient period of time, the impact

9/ We note that other agencies struggling with the proper definition of "filling" have tended toward very inclusive definitions. See, eg. the definition promulgated by the Corps of Engineers pursuant to § 404 of the Federal Water Pollution Control Act, 33 USC § 1344:

> -"fill material" means any material used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of a waterbody. 33 *CFR* § 323(m)
>
> "discharge of fill material" means the addition of fill material into waters of the United States. The term generally includes, without limitation, the following activities. Placement of fill that is necessary to the construction of any structure in the water of the United States. . . . 33 CFR § 323(n)

Because undertaking the activities outlined in the draft administrative guidelines constitutes draining, filling, leveling or burning, it is within the Service's proprietary authority to regulate these activities and to allow them to occur. In regulating these activities, however, the Service must keep in mind two potentially conflicting considerations: (1) The easement agreement guarantees to the landowner the somewhat limited right to undertake farming practices and to utilize the lands in the "customary manner." 10/ (2) The contemplated activities may only be allowed if '•compatible with the purposes for which the area was established." 16 U.S.C. § 668dd(d)(1)(B).

The compatibility finding must take into account the nature of the interest held by the Service. "Use" provisions in easements, such as that in the instant agreement allowing for limited farming activities in "the customary manner", tend to expand with technological developments. Thompson, 2 Real Property § 385 (1961). The development of standards, as in the drpt administrative guidelines, is a proper technique for factoring the "customary use" rights allowed to the landowner into the compatibility finding. -

10/ "It is understood and agreed that this indenture imposes no other obligations or restrictions upon the parties of the first part and that neither they nor their successors, assigns, lessees, or any person claiming under them shall in any way be restricted from carrying on farming practices such as grazing at any time, hay cutting, plowing, working and cropping wetlands when the same are dry of natural causes, and that they may utilize all of the subject lands in the customary manner except for the draining, filling, leveling and burning provisions mentioned above." U.S. Gov. Form 3-1916 (1970) (emphasis added).

We caution, however, against use of the guidelines as a per se test of compatibility. -A comprehensive administrative record would be necessary to support a compatibility *finding* on a generic basis for all irrigation construction proposals for all wetlands. In fact, a- good argument can be made that the Service should adopt a rebuttable presumption against finding proposed "filling" activities to be compatible with the purposes for which a wetland easement area was established. In acquiring wetland easements, the government has paid considerable sums of money to prevent "draining, filling, burning and leveling" from occurring, since these activities have been deemed to be inimical to the preservation of -wetlands. For the Service then to turn around and routinely approve the very type of activity that compensation was paid to prevent, without an affirmative showing that in each particular case the impact would be minimal and compatible, would be contrary to the requirements of the Refuge- System Administration Act. '

In addition, violation of easement agreements has been prosecuted as an "injury" to government property under 18 U.S.C. § 1361. Determination of compatibility on a case-by-case basis precludes an argument, if a prosecution were to be brought for failure to obtain a permit, that simple failure to obtain a permit cannot be a basis for "injury" of government property.

It is the opinion of this office, therefore, that the Service has acquired, through Waterfowl Production Area easements, a proprietary interest in, and therefore the ability to regulate, only draining, filling, leveling and burning. Since the activities outlined in the draft administrative guidelines all involve either draining, filling, leveling or burning, *they* are within the Service's regulatory authority. A landowner may be allowed to undertake these activities by permit only after an affirmative finding has been made by the Service that the contemplated activities *will* be compatible with the purposes for which the area was established, i.e., maintenance of the particular area for waterfowl production.

We recognize that this is a. very complex area of the law and that it may be difficult to strike a proper balance between the requirement of allowing only compatible irrigation systems to be developed and the rights of "customary" use accorded the landowner in the easement agreement. We are, therefore, quite willing to answer any additional questions that you may have concerning this issue.

Please contact David Fisher (343-2172) for additional information.

David Fisher for
Donald J. Barry

UNITED STATES DEPARTMENT OF THE INTERIOR
FISH AND WILDLIFE SERVICE

Sand Lake National Wildlife Refuge
39650 Sand Lake Drive
Columbia, South Dakota 57433

# SPECIAL USE PERMIT

Station No. To be Credited: Sand Lake WMD

Permit Number: 04-014

Date: March 19, 2004

Period of Use (inclusive)

From: March 15, 2004
To: April 30, 2004

Permittee Name:

Larry Wipf

Permittee Address:

18212 SD HWY 37
Frankfurt, SD 57440

Purpose (specify in detail privilege requested, or units of products involved)

To burn wetland vegetation.

Description

Spink County Wetland Easement 137x
T. 115 N., R. 61 W., SE1/4 of Section 34

Amount of fee $ N/A if not a fixed payment, specify rate and unit of charge: $ N/A .

☐ Payment Exempt - Justification:

☐ Full Payment

☐ Partial Payment - Balance of payments to be made as follows:

Special Conditions

1. Wetland areas cannot be burned more than once every three years or no more than 1/3 of the wetlands burned in any one year.
2. The Fish and Wildlife Service shall not be responsible for any accidents, injury or liability for any portion of the fire.
3. Permittee must obtain any other necessary county, state or federal permits necessary to burn.

This permit is issued by the U.S. Fish and Wildlife Service and accepted by the undersigned, subjected to the terms, covenants, obligations, and reservations, expressed or implied herein, and to the conditions and requirements appearing on the reverse side

Permittee Signature

Issuing Officer Signature and Title

Don Soderlund, Refuge Officer

Form 3-1383 (Rv. 6/85)

## General Conditions

1. *Payments*
All payments shall be made on or before the due date to the local representative of the U.S. Fish and Wildlife Service by a postal money order or check made payable to the U.S. fish and Wildlife service.

2. *Use limitations*
The permitee's use of the described premises is limited to the purposes herein specified; does not unless provided for in this permit allow him/her to restrict other authorized entry on to his/her area; and permits the Service to carry on whatever activities are necessary for (1) protection and maintenance of the premises and adjacent lands administered by the Service and (2) the management of wildlife and fish using the premises and other Service lands.

3. *Damages*
The United States shall not be responsible for any loss or damage to property including but not limited to growing crops, animals, and machinery; or injury to the permittee, or his/her relatives, or to the officers, agents, employees, or any others who are on the premises from instructions or by the sufferance of the permittee or his/her associates, or for damages or interference caused by wildlife or employees or representatives of the Government carrying out their official responsibilities. The permittee agrees to save the United States or any of its agencies harmless from any and all claims for damages or losses that may arise or be incident to the flooding of the premises resulting from any associated Government rive and harbor, flood control, reclamation, or Tennessee Valley Authority activity.

4. *Operating Rules and Laws*
The permittee shall keep the premises in a neat and orderly condition at all times, and shall comply with all municipal, county, and State laws applicable to the operations under the permit as well as all Federal laws, rules, and regulations governing National Wildlife Refuges and the area described in this permit. The permittee shall comply with all instructions applicable to this permit issued by the refuge officer in charge. The permittee shall take all reasonable precautions to prevent the escape of fires and to suppress fires and shall render all reasonable assistance in the suppression of refuge fires.

5. *Responsibility of Permittee*
The permittee, by operating on the premises, shall be considered to have accepted these premises with all the facilities, fixtures, or improvements in their existing conditions as of the date of this permit. At the end of the period specified or upon earlier termination, the permittee shall give up the premises in as good order and condition as when received except for reasonable wear, tear, or damage occurring without fault or negligence. The permittee will fully repay the Service for any and all damage directly or indirectly resulting from negligence or failure on his/her part, or the part of anyone of his/her associates, to use reasonable care.

6. *Revocation Policy*
This permit may be revoked by the Regional director of the Service without notice for noncompliance with the terms hereof or for violation of general and or specific laws or regulations governing National Wildlife Refuges or for nonuse. It is at all times subject to discretionary revocation by the Director of the Service. Upon such revocation the Service, by and through any authorized representative, may take possession of the said premises for its own and sole use, or may enter and posses the premises as the agent of the permittee and his/her account.

7. *Compliance*
Failure of the Service to insist upon a strict compliance with any of this permits terms, conditions, and requirements shall not constitute a waiver or be considered as a giving up of the Service's right to thereafter enforce any of the permits terms, conditions, or requirements.

8. *Termination Policy*
At the termination of this permit the permittee shall immediately give up possession to the Service representative reserving, however, the rights specified in paragraph 9. If he/she fails to do se, he/she will pay the Government, as liquidated damages, in amount double the rate specified in this permit for the entire time possession is withheld. Upon yielding possession, the permittee will still be allowed the reenter as needed to remove his/her property as stated in paragraph 9. The acceptance of any fee for liquidated damages or any other act of administration relating to the continued tenancy is not to be considered as an affirmance of the permittees action nor shall it operate as a waiver of the Governments right to terminate or cancel the permit for the breach of any specified condition or requirement.

9. *Removal of Permittee's Property*
Upon the expiration or termination of this permit, if all rental charges and or damage claims due to the Government have been paid, the permittee may within a reasonable period as stated in the permit or as determined by the refuge office in charge but not to exceed 60 days, remove all structures, machinery, and/or other equipment, etc., from the premises for which he/she is responsible. Within this period the permittee must also remove any other of his/her property including his/her acknowledged share of production or crops grown, cut harvested, store, or stacked on the premises. Upon failure to remove any of the above items within the aforesaid period, they shall become the property of the United States.

10. *Transfer of Privileges*
This permit is not transferable, and no privileges herein mentioned may be sublet or made available to any person or interest not mentioned in this permit. No interest hereunder may accrue through lien or be transferred to a third party without the approval of the Regional Director of the U.S. Fish and Wildlife Service and the permit shall not be used for speculative purposes.

11. *Conditions of Permit not Fulfilled*
If the permittee fails to fulfill any of the conditions and requirements set forth herein, all money paid under this permit shall be retained by the Government to be used to satisfy as much of the permittee's obligation as possible.

12. *Official Barred from Participating*
No Member of Congress or Resident Commissioner shall participate in any part of this contract or to any benefit that may arise from it, but this provision shall not pertain to this contract if made with a corporation for its general benefit.

13. *Nondiscrimination Employment*
The permittee agrees to be bound by the equal opportunity clause of Executive Order 11246, as amended.

## Privacy Act Statement--Special Use Permit

**NOTICE: In accordance with the Privacy Act of 1974, 5 U.S.C. 552a, please be advised that:**

1. The issuance of a permit and collection of fees on lands of the National Wildlife Refuge System is authorized by the National Wildlife Refuge System Administration Act (16 U.S.C. 6688dd - 668ee), and the Refuge Recreation Act, (16 U.S.C. 460k-3); implemented by regulations in 50 CFR 25-36.

2. Information collected in issuing a permit may be used to evaluate and conclude eligibility of, or merely document, permit applicants.

3. Routine use disclosures may also be made (1) to the U.S. Department of Justice when related to litigation or anticipated litigation; (2) of information indicating a violation or potential violation of a statute, regulation, rule, order or license, to appropriate Federal, State, local or foreign agencies responsible for investigating or prosecuting the violation or for enforcing or implementing the stature, rule, regulation, order or license; (3) from the record of the individual in response to an inquiry from a Congressional office made at the request of that individual; (4) to provide addresses obtained from the Internal Revenue Service to debt collection agencies for purposes of locating a debtor to collect or compromise a Federal claim against the debtor, or to consumer reporting agencies to prepare a commercial credit report for use by the Department (48FR 54716; December 6, 1983).

4. Any information requested is required to receive this permit. Failure to answer questions may jeopardize the eligibility of individuals to receive permits.

# Easement Use Evaluation Form
# to be used with
# the Flowchart

**EVALUATION OF THE PROPOSAL:**

**Request:**______________________________________________________________

**Station:**______________________________ **Wetland Manager:**____________________

**This is a Permanent Easement File Record for Easement No.**______________(county and number)

**Date of Request:**________________ **This request was (approved/denied):**___________

**Impact is: (permanent / temporary). If temporary, authorization expires on:**_____________

**Special Use Permit No.** __________ **was issued to authorize this request. OR**

**A Letter of Authorization dated** ______________ **was used to authorize this request. OR**

**An Exchange of Interests was recommended to resolve this proposal** ______(check if applicable) **OR**

**This request was denied for the following reason(s):** ________________________________

________________________________________________________________________________

________________________________________________________________________________

**COUNTABLE ACRES:**_______________ **(resulting from authorized permanent impacts)**
***(Habitat Management Activities excluded – see below)***

**ACCUMULATIVE TOTAL FOR THIS EASEMENT CONTRACT:**___________________
***(Must not exceed 8 acres of upland or 0.4 acres of wetland – will be the same as "COUNTABLE ACRES" if this is the first authorization of permanent impacts for this easement.***

**I. Type of Request:___________________**

**A. Refuge Management Activity (Use II. below)**
**B. Emergency or Health and Safety or Major Threat to Property(Use III. below)**
**C. Public Service, Government, or Corporate Request (Use IV. below)**
**D. Other requests not qualifying for any of the above (Use V. below)**

**II. Refuge Management Activity for Habitat Improvement:**

**Definitions are found in the manual text, Chapter XII-A, Section B-2. If the proposal qualifies as a Refuge Management Activity and is NOT an economic use, then issue either a Special Use Permit (SUP) or Letter of Authorization (LoA) depending on the nature of the impact (SUP for temporary impacts, LoA for food plots or permanent impacts). A Compatibility Determination (CD) is not required.** ***Some Refuge Management Activities are limited to no more than 8 acres of upland for every 160 acres of grassland easement.***

**If the proposal is both a Refuge Management Activity and an economic use, then you must complete an Appropriateness Finding (AF) and CD, written to the higher standard, before the activity can be approved. The proposal does not have to be evaluated through the balance of the flowchart.** ***Explain the authorized Refuge Management Activities below:***

____________________________________________________________

____________________________________________________________

**III. Emergency (Health/Safety) or Major Threat to Personal or Public Property:**

**It is expected that most requests under this category can be resolved with the issuance of a temporary SUP. If not, then decide whether a permanent modification will be needed to resolve the situation. On a separate document, managers should explain the reasoning or justification for the decision.**

**A. Can the situation be resolved with temporary measures?____________(yes/no)**

**If yes, and if needed relief can be accomplished in less than 30 days, then notify the Regional Chief in advance of the action and issue the SUP without completing a CD. If immediate action is necessary, notify Regional Chief as soon as possible afterwards. Complete Evaluation of Proposal on page 1.**

**If yes, and if the situation requires longer than 30 days to remedy, then complete an AF and CD and issue SUP if appropriate and compatible. Complete Evaluation of Proposal on page 1.**

**If no, then a more permanent solution may be considered. Go to B.**

**B. Complete an AF and CD and comply with all other mandates (NEPA, Cultural Resources, Section 7). Can the situation be resolved with impacts under the threshold?___________________(yes/no)**

**If yes, and pending approval of the AF and CD, issue a LoA and document the information in the Evaluation of Proposal on page 1.**

**If no, then follow the EXCHANGE procedures as discussed in Chapter XV and Exhibit XV-1. If an exchange of interests is used, then Compatibility does not have to be addressed, but NEPA still needs to be addressed and a "biological analysis" statement must be completed as discussed in Exhibit XV-1. Document the information in the Evaluation of Proposal on page 1.**

**IV. Public Service, Government, or Corporate Request:**

**Category description found in the manual text Chapter XII-A, Section B-5. In addition to completing the Evaluation of Proposal on page 1, on a separate document, managers should explain the reasoning or justification for the decision.**

**A. Is there a REASONABLE alternative to accomplish the request OFF of easement property?___________(yes/no). If yes, deny request and complete page 1. If no reasonable alternative exists, continue to B.**

**B. Is the project ESSENTIAL to the benefit of the greater public or to promote the general public welfare?_____________(yes/no). If no, deny request and complete page 1. If yes, continue to C.**

**C. Will the proposed use compromise the INTEGRITY of the easement and the purposes for which it was acquired?________(yes/no). If yes, deny the request and complete page 1. If no, then continue to D.**

**D. Is the request related to Wind Energy Development?______________(yes/no). If yes, then proceed to Chapter XIV for further guidance. If no, then continue to E.**

**E. Can the request be accommodated with a temporary authorization as per Region 6 guidance dated April 5, 2002 (see Exhibit XII-7)?___________(yes/no). If yes, then issue SUP. Applicant must realize that future maintenance needs will require another authorization. *There should be NO permanent impacts under this category.* If no, then continue to F.**

**F. Does the request fit the criteria as a "minor expansion of an existing right-of-way?" _____________(yes/no). If yes, follow instructions in text of manual. *Impacts to Service interests can and must be mitigated.* See 2000 Compatibility Policy (Section 2.11-D) for requirements for authorization under this category. If no, then continue to G.**

**G. Is the permanent impact under the threshold?_____________(yes/no). If yes, then follow the instructions in the text of the manual regarding Compatibility, NEPA, etc. including the evaluation of associated impacts*. If there are associated impacts, then deny the request and complete page 1. If there are no associated impacts, and all mandates are addressed (Compatibility, NEPA, etc.) then issue SUP.**

**If impact is above threshold, or cannot be allowed because a CD prepared to the economic use standard cannot be made, then consider an exchange of easement interests. See Chapter XV.**

**V. <u>All Other Requests:</u>**

**This is "catch-all" category for requests which are not related to "Refuge Management," "Emergency/Health and Safety or Major Threats," or "Public Service, Government, Corporate" needs. Category description found in the manual text Chapter XII-A, Section B-6. In addition to completing the Evaluation of Proposal on page 1, on a separate document, managers should explain the reasoning or justification for the decision.**

**A. Is the proposal related to a bona fide farm/ranch operation?________(yes/no). If no, deny the request and complete page 1. If yes, then continue to B.**

**B. Is there a REASONABLE alternative to accomplish the request OFF of easement property?___________(yes/no). If yes, deny request and complete page 1. If no reasonable alternative exists, continue to C.**

**C. Is the project ESSENTIAL to the operational vitality of the farm/ranch, or is it necessary for substantially improving the efficiency of the operation? _______(yes/no). If no, deny the request and complete page 1. If yes, then continue to D.**

**D. Can the request be accommodated with a temporary permit?_______(yes/no). If yes, address Compatibility and other mandates (AU, NEPA, CR, etc.). Once approvals are obtained, issue temporary permit and complete page 1. If no, then continue to E.**

**E. If temporary authorization will not resolve the issue, determine the least amount of impact that will satisfy the need. Is the impact below threshold?____(yes/no). If yes, then follow the instructions in the text of the manual regarding Compatibility, NEPA, etc. including the evaluation of associated impacts*. If there are associated impacts, then deny the request and complete page 1. If there are no associated impacts, and all mandates are addressed (Compatibility, NEPA, etc.) then issue LoA.**

**If impact is above threshold, or cannot be allowed because a CD prepared to the economic use standard cannot be made, then consider an exchange of easement interests. See Chapter XV.**

***Associated Impacts are discussed in Chapter XII and must be evaluated as part of the Compatibility Determination process. If, in your professional opinion, there are associated impacts which are likely to occur as a result of authorizing the request, then the request must be denied. Some associated impacts may be resolved through stipulations; if not, the request must be denied.**

**<u>DECISION:</u> Based on the documentation contained above, I have determined that this request should be: _____________Approved _____________Denied**

| | |
|---|---|
| **Wetland Manager Date** | **Project Leader Date**<br>**(concurrence)** |

# COMPATIBILITY DETERMINATION
# for
# Authorized Curtilage Expansion or Structural Additions on Grassland Easements

**Use:** Authorized expansion or construction of additional buildings or structures on a grassland or FmHA easement. Examples of proposed uses include additions to farmstead buildings, livestock facilities, storage sheds, or the planting of farmstead windbreaks.

**Station Names:**

**South Dakota Wetland Management Districts:**

Lake Andes WMD, SD
Madison WMD, SD
Huron WMD, SD
Waubay WMD, SD
Sand Lake WMD, SD
Lacreek NWR, SD

**North Dakota Wetland Management Districts:**

Tewaukon WMD, ND
Kulm WMD, ND
Arrowwood WMD, ND
Valley City WMD, ND
Chase Lake WMD, ND
Audubon WMD, ND
Long Lake WMD, ND
J Clark Salyer WMD, ND
Devils Lake WMD, ND
Lostwood WMD, ND
Crosby WMD, ND

**Montana Wetland Management Districts:**

Northeast Montana WMD, MT
Bowdoin WMD, MT
Benton Lake WMD, MT

Northwest Montana WMD, MT
Charles M. Russell WMD, MT

**Establishing and Acquisition Authorities:**

Waterfowl Production Areas, Wetland Easements, Grassland Easements - The Migratory Bird Hunting and Conservation Stamp Act, March 16, 1934, (16 USC Sec. 718-718h, 48 Stat. 452) as amended August 1, 1958, (PL 85-585; 72 Stat. 486) for acquisition of "Waterfowl Production Areas"; the Wetlands Loan Act, October 4, 1961, as amended (16 USC 715k-3 - 715k-5, Stat. 813), funds appropriated under the Wetlands Loan Act are merged with duck stamp receipts in the fund and appropriated to the Secretary for the acquisition of migratory bird refuges under the provisions of the Migratory Bird Conservation Act, February 18, 1929, (16 USC Sec. 715, 715d - 715r, as amended.

FmHA deed restricted properties - Consolidated Farm and Rural Development Act - (7 USC Para. 2002).

Tall Grass Prairie Tracts - Land and Water Conservation Fund Act of 1965, as amended (16 U.S.C. 460*l*-4 through 460*l*-11)

**Refuge Purpose(s):**

"...as Waterfowl Production Areas" subject to "...all of the provisions of such Act [Migratory Bird Conservation Act] ...except the inviolate sanctuary provisions..." 16 USC 718(c) (Migratory Bird Hunting and Conservation Stamp)

"...for any other management purpose, for migratory birds." 16 USC 715d (Migratory Bird Conservation Act)

"...for conservation purposes..." 7 USC 2002 (Consolidated Farm and Rural Development Act)

**National Wildlife Refuge System Mission:**

"The Mission of the National Wildlife Refuge System is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans" (National Wildlife Refuge System Administration Act of 1966, as amended) [16 USC 668(dd)-668(ee)].

**Description of Use:**

A landowner may have need to increase the size of his/her home and increase the size or number of buildings and facilities on the farm or ranch operation in order to more efficiently continue the agricultural operation of the property, or to plant and develop a windbreak planting of trees to protect the farm house or livestock facilities. Such an expansion may be requested on upland areas adjacent to the existing farmstead, the base of operations for the farm/ranch, or on a former building site where buildings are no longer present, on lands that are included within a grassland or FmHA conservation easement. In order to be permitted, such a request must be shown to be consistent with existing agricultural uses or practices on the property, have no other reasonable location or alternative, essential to the farm/ranch operation, not be able to be accommodated by a temporary (less than one year) permit, and be judged not to materially interfere with or detract from the easement or the purpose and mission of the NWRS.

**Availability of Resources:**

Financial and staff resources are determined to be sufficient at each field station to administer these requests. Staff time will be needed to evaluate the proposed use, to prepare the site-specific permits, and to insure compliance with the permit authorization and stipulations necessary to insure compatibility.

**Anticipated Impacts of the Use:**

Authorized use of easement protected grasslands for expanded farmstead, farm or ranch facilities, or a farmstead windbreak, will result in a loss or destruction of the grassland where the facilities are built. The remainder of the easement tract will not be affected. The disturbance caused by the expanded farmstead, additional buildings or facilities, new or expanded windbreak, on an existing building site or a former building site is not expected to be significantly greater than that caused by the previous structures, and will not contribute to the fragmentation of existing habitats.

The impacts associated with this authorized use will be minimal due to the relatively small size or acreage of the proposed facilities. If multiple requests are received from the same landowner, or for the same easement by different or subsequent landowners, they will each be evaluated on its own merits. Each grassland easement may be authorized up to a threshold level of 8 acres of total impact, whether it occurs at one time or through different approved requests. Therefore, only up to 8 acres of potential grassland impact may be authorized for each grassland easement for authorized expansion or construction of additional buildings or structures, or a proposed tree planting for farmstead windbreak purposes.

In addition, there will be no secondary impacts allowed within this Compatibility Determination. Fragmentation of grasslands habitats is minimized by allowing curtilage expansion only on existing or former building sites, or for farm/ranch operations. If the

potentially affected grassland provides habitat for wildlife species with management concerns, such as a grouse lek or burrowing owl nesting site, or some unique feature, the use may not be allowed, or it may be permitted only with stipulations that would eliminate the secondary or indirect impact. The Region 6 states of South Dakota, North Dakota, and Montana have over 500,000 acres of grasslands protected by Service easements. It is anticipated that between five and ten requests annually may be received to allow curtilage expansion. Under this scenario, a maximum of between 40 and 80 acres annually could be affected. This is an immaterial impact to the acreage included within the grassland easement program.

If multiple requests are received from the same landowner, or on the same easement, each will be evaluated on its own merits. Each grassland easement contract may be authorized up to one threshold level (8.0 acres) of total impact, whether it occurs at one time or in different request authorizations. Therefore, only up to 8.0 acres of encumbered grassland per easement contract (regardless of it's size), may be authorized for curtilage expansion or other authorized uses.

## Public Review and Comment:

The period of public review and comment began April 10, 2005 and ended April 17, 2005.

Posted notices were made in public places for each of the field stations listed on this Compatibility Determination. This method was selected because the proposed activity is considered minor, incidental, infrequent, with only minimal impacts. No comments were received as a result of the posted notices.

## Determination:

**Compatibility Threshold**: In order to be compatible, this use must not exceed the upper threshold limit of 8 acres on grassland. To achieve compatibility, the proposed use must not interfere with nor detract from the mission or the purposed for which the easement areas were established.

__________ Use is Not Compatible

__XXX____Use is Compatible with the Following Stipulations

## Stipulations Necessary to Ensure Compatibility:

1. Issuance of a permit does not preclude the requirements for obtaining necessary permits and/or approvals from other County, State, or Federal Agencies and from local landowners.

2. The permit is issued subject to the revocation and appeals procedure contained in Title 50, Part 25 of the Code of Federal Regulations.

3. Storage of building materials or disposal of fill material from the construction project will not be allowed on easement protected grassland areas.

4. Additional stipulations may be added or included to address specific concerns with individual projects or requests or to address any secondary impacts which may occur as a result of the proposed use.

**Justification:**

The expansion of curtilage or the construction of additional structures for agricultural or farmstead use is expected to be permitted only rarely, perhaps five to ten times per year for ALL the stations listed within this CD.

Data from the Habitat and Population Evaluation Team (HAPET) in the Bismarck FWS office can be used to predict the waterfowl response to the permitted upland changes. Evaluating grassland loss from a waterfowl population perspective is not precise, because we are estimating the loss of productivity of a hen that may or may not nest on a grassland site because of a disturbance or a slightly smaller size. HAPET used the Mallard Model to evaluate the change in the productivity of the affected grassland habitat. The land cover composition of a grassland easement (160 acres) and 1990 acres of cropland within a four-square mile landscape (2,560 acres), was incrementally reduced by the amount of grassland necessary to cause a production decline of two ducks (one pair). This size grassland easement was chosen because it represents the smallest individual tract to be considered for a stand-alone easement purchase, and the impact of grassland loss is proportionally greater on a smaller tract. The loss of two ducks produced equates to a replacement pair of ducks for the following breeding season. The average decrease in native grassland required to achieve a one pair reduction was 10 acres.

In a second modeling analysis, Breeding Bird Survey data were used to estimate the average breeding bird population on 160 acres of native grassland. A modeled loss of 5 acres of 160 acres of grassland showed no discernable change (positive or negative) in the breeding bird population of the 160 acre easement tract.

The working group proposes that the threshold level of grassland impact is 8 acres, in order to build in a margin of safety. The 8-acre figure (80 % of the actual determination made by HAPET for nesting ducks) corresponds with the 80% value developed for the wetland threshold. In conclusion, a proposed use that passes all the filters in the flowchart, and results in a grassland impact of 8 acres or less, may be determined to be less than a "material impact" which would interfere with or detract from the Mission or the purpose

for which the grassland easement was purchased.

**<u>Mandatory 10-Year Reevaluation Date</u>:** 10 years from the date of APPROVAL signature

Enter Re-evaluation date: May 15th, 2015.

**Signatures:**

**Submitted:**

Michael Bryant, Project Leader
Lake Andes WMD
Date 4/26/05

Tom Tornow, Project Leader
Madison WMD
Date 4-26-05

Harris Hoistad, Project Leader
Huron WMD
Date 4-26-05

Larry Martin, Project Leader
Waubay WMD
Date 26 April 2005

Gene Williams, Project Leader
Sand Lake WMD
Date 4-26-05

Tom Koerner, Project Leader
Lacreek NWR
Date 4-26-05

Jack Lalor, Acting Project Leader
Tewaukon WMD
Date 4/26/05

Dave Azure, Acting Project Leader
Kulm WMD
Date 4/26/05

Kim D. Hanson, Project Leader
Arrowwood WMD
Chase Lake WMD
Valley City WMD
Date 4/26/05

Gary Williams, Acting Project Leader
Audubon WMD
Date 4/26/05

Paul Van Ningen, Project Leader — Date 4/26/05
Long Lake WMD

Tedd Gutzke, Project Leader — Date April 26, 2005
J Clark Salyer WMD

Roger Hollevoet, Project Leader — Date 4/26/05
Devils Lake WMD

Fred G. Giese, Project Leader — Date 04/26/05
Lostwood WMD
Crosby WMD

Michael Rabenberg, Acting Project Leader — Date 04/26/05
Medicine Lake WMD

Carmen Luna, Project Leader — Date 4/26/05
Bowdoin WMD

David Gillund, Project Leader — Date 4/26/05
Benton Lake WMD

Steve Kallan, Project Leader — Date 4/26/05
NW Montana WMD

**Review:** Lloyd Jones — Date 4.27.05
Regional Compatibility Coordinator

Rodney F. Krey — 4/28/05
Rodney Krey, Refuge Supervisor

**Approval:** Ronald D. Shupe, Region 6 — Date May 5, 2005
Acting Chief of Refuges

Exhibit XII-4b

# COMPATIBILITY DETERMINATION
# for
# Authorized Health and Safety Requests Associated with FWS Wetland Easements Resulting in only Minor Impacts to the Easement Interest

**Use**: Requests to resolve a Health and Safety issue which cannot be resolved by temporary authorization, and which results in only a minor impact to the Service's wetland easement interest. The use, if authorized, will result in non-material impacts to protected wetlands involving partial drainage and/or filling, both of which are acquired interests in the easement wetland.

**Station Names**:

**South Dakota Wetland Management Districts**:

Lake Andes WMD, SD
Madison WMD, SD
Huron WMD, SD
Waubay WMD, SD
Sand Lake WMD, SD
LaCreek NWR, SD

**North Dakota Wetland Management Districts**:

Tewaukon WMD, ND
Kulm WMD, ND
Arrowwood WMD, ND
Valley City WMD, ND
Chase Lake WMD, ND
Audubon WMD, ND
Long Lake WMD, ND
J Clark Salyer WMD, ND
Devils Lake WMD, ND
Lostwood WMD, ND
Crosby WMD, ND

**Montana Wetland Management Districts**:

Northeast Montana WMD, MT

Bowdoin WMD, MT
Benton Lake WMD, MT
Northwest Montana WMD, MT
Charles M. Russell WMD, MT

**Establishing and Acquisition Authorities:**

Waterfowl Production Areas, Wetland Easements, Grassland Easements - The Migratory Bird Hunting and Conservation Stamp Act, March 16, 1934, (16 USC Sec. 718-718h, 48 Stat. 452) as amended August 1, 1958, (PL 85-585; 72 Stat. 486) for acquisition of "Waterfowl Production Areas"; the Wetlands Loan Act, October 4, 1961, as amended (16 USC 715k-3 - 715k-5, Stat. 813), funds appropriated under the Wetlands Loan Act are merged with duck stamp receipts in the fund and appropriated to the Secretary for the acquisition of migratory bird refuges under the provisions of the Migratory Bird Conservation Act, February 18, 1929, (16 USC Sec. 715, 715d - 715r, as amended.

FmHA deed restricted properties - Consolidated Farm and Rural Development Act - (7 USC Para. 2002).

Tall Grass Prairie Tracts - Land and Water Conservation Fund Act of 1965, as amended (16 U.S.C. 460*l*-4 through 460*l*-11)

**Refuge Purpose(s):**

"...as Waterfowl Production Areas" subject to "...all of the provisions of such Act [Migratory Bird Conservation Act] ...except the inviolate sanctuary provisions..." 16 USC 718(c) (Migratory Bird Hunting and Conservation Stamp)

"...for any other management purpose, for migratory birds." 16 USC 715d (Migratory Bird Conservation Act)

"...for conservation purposes..." 7 USC 2002 (Consolidated Farm and Rural Development Act)

**National Wildlife Refuge System Mission:**

"The Mission of the National Wildlife Refuge System is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans" (National Wildlife Refuge System Administration Act of 1966, as amended) [16 USC 668(dd)-668(ee)].

**Description of Use:**

Wetland Management Districts frequently receive requests for use or modification of wetlands protected by easement which may affect the Service interest acquired in private property. The uses authorized under this CD are related to actions necessary to avert or resolve a health and safety issue involving a Service-protected wetland. Requests may be received by WMD's primarily from private property owners whom are experiencing difficulties associated with easement-protected wetlands. The Service has wetland easements in every county within the Prairie Pothole Region in the states of ND, SD, and MT.

Examples of the kinds of requests anticipated under this category include: the possible need to establish a sill elevation on a wetland to lower it slightly to avoid flooding a domestic sanitary system, building, basement, or existing private road; or the need to place fill material in a protected wetland to widen a driveway or farm approach to more safely transport equipment and/or loaded grain trucks, or to protect a foundation or footing for existing building or grain bins.

Lowering a wetland or adding fill to a wetland to remove water from cropland or hayland is not included in this CD.

All requested uses under this category will be evaluated using the right side of the Easement Permit Flowchart (Health and Safety) to evaluate the requested activity. If the proposal passes through the flowchart as a legitimate H&S issue, then it becomes a request that the Service will try to honor as a necessary resolution to a hardship which may be caused by the easement wetland.

At times, the requested use may impact Service easement interests. Managers will always try to resolve the issue or situation with temporary measures, meaning that the impact to Service interests will be only a temporary disturbance. If temporary relief measures will not resolve the issue, then a more permanent impact to Service lands or interests will likely result.

Region 6 has defined a "threshold" level of impact which may occur as a result of permitting the requested use, but will not materially interfere with, nor detract from, the purposes for which the easement interest was acquired. These levels of impact are defined more fully in the Justification section of this CD, and are based on years of scientific evaluation of prairie pothole-type habitat and how habitat impacts affect migratory bird populations. These threshold levels of potential impact for protected wetlands have been established at 0.4 acres of wetland, not to exceed 25% of the wetland basin. These levels have been established based on biological models developed by the Habitat and Population Evaluation Team (HAPET) in Bismarck, ND.

Threshold levels are NOT used in conjunction with highway improvement projects or

any other activity evaluated by the left side of the flowchart (Public Service, Government or Corporate), so impacts which may result from this category of request will not be evaluated under this CD.

In order for this Compatibility Determination to be used, the use must: (1) be an action necessary to avert a threat to human health and safety or a major threat to public or private property not related to a public service or government-type request, and (2) result in an impact which is at or below the established threshold levels for protected wetlands habitats (see discussion in "Anticipated Impacts" and "Justification" sections below).

**Availability of Resources:**

Financial and staff resources are sufficient at each field station to administer these requests. Staff time will be needed to evaluate the proposed use, to prepare the site-specific permits, and to insure compliance with the permit authorization and stipulations, as well as checking for satisfactory restoration of any disturbed sites as necessary.

No specialized equipment will be necessary, as the work requirement associated with these projects is monitoring and compliance checking only. Actual work, including restoration needs if applicable, will be completed by the applicant.

**Anticipated Impacts of the Use:**

Most of the impacts will result from filling or partially draining parts of protected wetlands, the right to "fill" wetland areas protected by the easement being one of the acquired rights. Partial drainage, another acquired right, may also be authorized to resolve certain health and safety issues, it they cannot be resolved by temporary means.

If the only way to resolve the Health and Safety issue is to permit a portion of the wetland to be either filled or by lowering the wetland elevation by establishing an overflow sill, then there will be a long term impact to the wetland. However, the impact would be determined to be below a "material" impact or interference with the purposes of the unit or the mission of the NWRS as described in the Justification. These impacts are considered minor with respect to the entire scope of the small wetlands program within the Prairie Pothole Region of Region 6.

Within this Compatibility Determination, there are no secondary impacts, or at least none which cannot be resolved with stipulations. No complete wetlands are drained or filled (the 25 percent condition), so although potentially reduced in size by 25 percent, or by up to 0.4 acres, the wetland still exists as the same type wetland that originally existed. If the potentially affected wetland contains a colonial bird nesting site or some unique feature, the use may not be allowed, or it may be allowed with stipulations that would eliminate the secondary or indirect impact.

The Region 6 states of North Dakota, South Dakota and Montana have over 15,000 wetland easement contracts comprising over 1.2 million acres of wetlands. It is anticipated that between five and ten requests annually may be received to allow partial drainage or filling of protected wetlands. Cumulative impacts under this scenario may include up to 4.0 acres of impact annually out of 1.2 million acres of protected wetlands.

If multiple requests are received from the same landowner, each request will be evaluated on its own merit. Each easement contract may be authorized up to one threshold level of impact in total, whether it occurs all at one time, or in different authorizations. Therefore, only up to 0.4 acres of potential wetland impact may be authorized for each easement contract for resolution of legitimate Health and Safety issues, or for other authorized uses.

**Public Review and Comment:**

The period of public review and comment began ________ and ended __________.

Posted notices were made in public places for each of the field stations listed on this Compatibility Determination.

**Determination:**

**Compatibility Threshold**: Material Interference of Detraction from the Purposes and/or Mission of the NWRS.

__________ Use is Not Compatible

__XXX____Use is Compatible with the Following Stipulations

**Stipulations Necessary to Ensure Compatibility:**

1. Issuance of a permit does not preclude the requirements for obtaining necessary permits and/or approvals from other County, State, or Federal Agencies and from local landowners.

2. The permit is issued subject to the revocation and appeals procedure contained in Title 50, Part 25 of the Code of Federal Regulations.

3. Regardless of the authorized threshold level, the permit will require the least amount of impact to the Service easement interest as is necessary to resolve the H&S issue.

4. If the requested use passes the flowchart and is authorized, and results in minor

impacts which are more than temporary, then the use will be subject to the terms and conditions of the easement permit.

5. If past authorizations for any reason have been granted for this easement, then the manager cannot authorize any use that will exceed the aggregate total authorization of 0.4 acres of wetland impact, including the past authorizations.

6. Site-specific stipulations may be added to the permit to address resolution of any potential secondary impacts.

**Justification:**

The administration of the FWS easement program in Region 6 requires managers to make decisions regarding requested uses of private lands encumbered by FWS Easement interests. Managers will use the Easement Permit Request Flowchart to determine if the requested use should be authorized. If the requested use is authorized, then this Compatibility Determination will be used for the requests which have passed through the evaluation process and that fall within the established levels of impact authorized for easement wetlands to approve means to resolve legitimate health and safety issues. It is anticipated that no more than 5-10 authorizations will be granted each year for the entire PPR portion of Region 6 (ND-SD-MT) which would require the use of this CD. Once again, the CD will only be used if temporary means cannot be used to resolve the issue.

Data provided by the Habitat and Population Evaluation Team (HAPET) have been used to predict the effect to waterfowl resources resulting from impacts to wetlands. When these habitat impacts occur on lands protected by FWS easements, then a determination must be made as to whether these impacts represent a material interference or detraction from the purposes for which the easement area was established or from the mission of the NWRS.

With the HAPET information about how waterfowl populations respond to habitat changes within the Prairie Pothole Region, managers may now use applied science and compelling data to quantify impacts resulting from wetland-altering activities, whereas before, they were using only a judgment. The level of wetland impact which corresponds with a "non-material" impact (as portrayed under Compatibility standards) is defined as one pair of ducks, the lowest whole unit and functional common denominator.

The impacts of wetland loss on breeding duck pairs (i.e., mallard, Northern pintail, gadwall, blue-winged teal, and Northern shoveler comprising approximately 90% of the breeding ducks in North and South Dakota) were evaluated using models developed with data collected by the FWS during the annual Four Square Mile Breeding Waterfowl Population (FSM) Survey. HAPET applied the models to all wetlands mapped by the National Wetland Inventory to predicted the average number of breeding duck pairs attracted to each wetland for 13 years (1987-99) of the FSM Survey. Summary of the

model results indicate that temporary and seasonal wetlands, on average, attract about 1 duck pair per acre; while semipermanent wetlands attract about 1 pair for every 1.5 wetland acres. While the average breeding pair densities are as identified above, the highest density occurring on a single wetland district for a single class of wetlands was 1.98 pairs/acre or one pair for 0.5 acres (Sand Lake–temporary wetlands). These estimates can be used as a foundation for identifying non-material levels of impact to wetlands. Wetland impacts which result in affecting less than one pair of breeding ducks is below a "material" impact relative to compatibility.

Even though the overall average for all classes of wetlands for all WMD's is approximately one pair of ducks for each wetland acre, and the highest density encountered is 1 pair per 0.5 acres, this proposal is to insure that any authorized use resulting in a wetland impact will not result in the loss of one whole pair of ducks on the landscape, regardless of where it is within the Region 6 PPR, and which class of wetland is affected. Therefore, the proposal to use 0.4 acres as the upper limit of impact to achieve compatibility inherently builds in an additional 20% margin of safety.

In addition, it is further determined that impacts must be less than 25% of the affected basin to be within these threshold criteria. This recommendation, combined with the wetland and duck pair relationship information provided by HAPET and outlined above, suggests that a wetland impact of 0.4 acres or less, and not including more than 25% of the wetland basin, will not materially interfere with nor detract from the purposes for which the wetland easement was acquired, nor will it detract from the mission of the NWRS.

The not-to-exceed threshold levels of impact to easement-protected wetlands which are necessary to insure compatibility are 0.4 acres or less, and not over 25% of the wetland basin. These levels were selected because (a) they result in built-in margins of safety (80%) from the actual figures determined by HAPET; (b) the represented levels are based on the best available science, the pair-wetland relationship model developed by HAPET and the Mallard Model, as well as many years of collected data from nearly the entire Prairie Pothole Region within Region 6; (c) the threshold levels of impact represent a biologically meaningful measure (i.e., one pair of ducks); (d) the levels establish a consistent, science-based method for managers to use when evaluating compatibility of proposed uses for less than fee-title land interests.

**Mandatory 10-Year Reevaluation Date:** 10 years from the date of APPROVAL signature

Enter Reevaluation Date:____________________

**Signatures:**

**Submitted:** _________________________ _________________________

Michael Bryant, Project Leader
Lake Andes WMD
Date

_________________________ _________________________

Tom Tornow, Project Leader
Madison WMD
Date

_________________________ _________________________

Harris Hoistad, Project Leader
Huron WMD
Date

_________________________ _________________________

Larry Martin, Project Leader
Waubay WMD
Date

_________________________ _________________________

Gene Williams, Project Leader
Sand Lake WMD
Date

_________________________ _________________________

Tom Koerner, Project Leader
Lacreek NWR
Date

_________________________ _________________________

Jack Lalor, Acting Project Leader
Tewaukon WMD
Date

_________________________ _________________________

Dave Azure, Acting Project Leader
Kulm WMD
Date

_________________________ _________________________

Kim D. Hanson, Project Leader
Date

Arrowwood WMD
Chase Lake WMD
Valley City WMD

| | |
|---|---|
| Gary Williams, Acting Project Leader<br>Audubon WMD | Date |
| Paul Van Ningen, Project Leader<br>Long Lake WMD | Date |
| Tedd Gutzke, Project Leader<br>J Clark Salyer WMD | Date |
| Roger Hollevoet, Project Leader<br>Devils Lake WMD | Date |
| Fred G. Giese, Project Leader<br>Lostwood WMD<br>Crosby WMD | Date |
| Michael Rabenberg, Acting Project Leader<br>NE Montana WMD | Date |
| Carmen Luna, Project Leader<br>Bowdoin WMD | Date |
| David Gilland, Project Leader<br>Benton Lake WMD | Date |
| Steve Kallan, Project Leader<br>NW Montana WMD | Date |
| Bill Berg, Acting Project Leader | Date |

C. M. Russell WMD

**Review:** ______________________________ ____________________
Lloyd Jones Date
Regional Compatibility Coordinator

______________________________ ____________________
Rod Krey Date
Refuge Supervisor, ND-SD

**Approval:** ______________________________ ____________________
Ronald D. Shupe, Region 6 Date
Acting Chief of Refuges

# COMPATIBILITY DETERMINATION
# for
# Authorized Early Haying
# of Grassland Easements
# for
# Management Purposes

**Use:** Authorized Early Haying of Grassland Easements and FmHA Conservation Easements.

**Station Names:**

**South Dakota Wetland Management Districts:**

Lake Andes WMD, SD
Madison WMD, SD
Huron WMD, SD
Waubay WMD, SD
Sand Lake WMD, SD
Lacreek NWR, SD

**North Dakota Wetland Management Districts:**

Tewaukon WMD, ND
Kulm WMD, ND
Arrowwood WMD, ND
Valley City WMD, ND
Chase Lake WMD, ND
Audubon WMD, ND
Long Lake WMD, ND
J Clark Salyer WMD, ND
Devils Lake WMD, ND
Lostwood WMD, ND
Crosby WMD, ND

**Montana Wetland Management Districts:**

Medicine Lake WMD, MT
Bowdoin WMD, MT
Benton Lake WMD, MT
Northwest Montana WMD, MT

**Establishing and Acquisition Authorities:**

Waterfowl Production Areas, Wetland Easements, Grassland Easements - The Migratory Bird Hunting and Conservation Stamp Act, March 16, 1934, (16 USC Sec. 718-718h, 48 Stat. 452) as amended August 1, 1958, (PL 85-585; 72 Stat. 486) for acquisition of "Waterfowl Production Areas"; the Wetlands Loan Act, October 4, 1961, as amended (16 USC 715k-3 - 715k-5, Stat. 813), funds appropriated under the Wetlands Loan Act are merged with duck stamp receipts in the fund and appropriated to the Secretary for the acquisition of migratory bird refuges under the provisions of the Migratory Bird Conservation Act, February 18, 1929, (16 USC Sec. 715, 715d - 715r, as amended.

FmHA deed restricted properties - Consolidated Farm and Rural Development Act - (7 USC Para. 2002).

Tall Grass Prairie Tracts - Land and Water Conservation Fund Act of 1965, as amended (16 U.S.C. 460*l*-4 through 460*l*-11)

**Refuge Purpose(s):**

"...as Waterfowl Production Areas" subject to "...all of the provisions of such Act [Migratory Bird Conservation Act] ...except the inviolate sanctuary provisions..." 16 USC 718(c) (Migratory Bird Hunting and Conservation Stamp)

"...for any other management purpose, for migratory birds." 16 USC 715d (Migratory Bird Conservation Act)

"...for conservation purposes..." 7 USC 2002 (Consolidated Farm and Rural Development Act)

**National Wildlife Refuge System Mission:**

"The Mission of the National Wildlife Refuge System is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans" (National Wildlife Refuge System Administration Act of 1966, as amended) [16 USC 668(dd)-668(ee)].

**Description of Use:**

Haying is the cutting and removal, by baling or stacking, and transport to an off-site location, of grass and/or forb species. Haying of grassland easement-protected properties is not restricted after July 15 each year. Landowners may hay their lands every year after

this date without compromising the terms of the easement. However, the use described in this compatibility determination is to permit early haying (prior to July 15) of the uplands to accomplish some management purpose on the land. The control of noxious weeds is primarily the target of early haying agreements. Canada thistle, a perennial, primary noxious weed, is required by state law to be controlled by each landowner. Haying can be an effective tool in controlling the seed dispersal of Canada thistle, but it must be done before the thistle flowers mature and develop wind-dispersed seeds. In many years, the thistle plants have matured and dispersed their seeds prior to July 15, and haying after seed dispersal would not be effective as a management tool.

Periodic early haying may also be authorized to help improve the vigor and health of the grass stand. It is expected that the authorized use of early haying for this purpose will be used very infrequently.

Haying prior to July 15th to increase plant density is also a management tool occasionally used. This is primarily done the first few years after a new seeding to encourage tillering and to accelerate establishment. Haying, rather than just mowing, the plants helps to prevent shading caused by the mowed vegetation left in the field. Haying done just prior to seed head development will stimulate most grass plants to propagate vegetatively by rhizomes rather than by seed production. This generally encourages grass plants to fill in bare soil areas between plants, compete more favorably with invasive species, and shorten the overall establishment period on new grass seedings.

**Availability of Resources:**

Financial and staff resources are determined to be sufficient at each field station to administer these requests. Staff time will be needed to evaluate the proposed use, to prepare the site-specific permits, and to insure compliance with the permit authorization and stipulations necessary to insure compatibility.

**Anticipated Impacts of the Use:**

Authorized early haying of grassland easements may displace some wildlife species during the time period the haying operation is being performed. It is possible, also, that some nesting migratory birds may be disturbed, and abandon their nests as a result of the haying operation. The decision to authorize early haying must weigh the potential benefits of legally required weed control, plant density management, and other management gains, against these short-term losses associated with the early haying.

Cutting and removal of standing grasses prior to July 15 will also result in short-term loss of habitat for those species requiring tall grasses for feeding and perching.

The impacts associated with this authorized use will be minimal since the area will likely be hayed after July 15 anyway, which is not prohibited by the easement agreement. Therefore, the impacts of the use are only between the time of authorized early haying, and July 16 in any given year.

## Public Review and Comment:

The period of public review and comment began April 10, 2005 and ended April 17, 2005.

Posted notices were made in public places for each of the field stations listed on this Compatibility Determination. This method was selected because the proposed activity is considered minor, incidental, infrequent, with only short-term disturbance, and/or displacement of wildlife. No comments were received as a result of the posted notices.

## Determination:

**Compatibility Threshold**: As this activity is an economic use, it must meet the compatibility threshold of "contributing to the Mission and Purposes" of the Refuge System and the Refuge Area.

__________ Use is Not Compatible

__XXX____Use is Compatible with the Following Stipulations

## Stipulations Necessary to Ensure Compatibility:

1. Issuance of a permit does not preclude the requirements for obtaining necessary permits and/or approvals from other County, State, or Federal Agencies and from local landowners.

2. The permit is issued subject to the revocation and appeals procedure contained in Title 50, Part 25 of the Code of Federal Regulations.

3. Permits for early haying will not be issued in consecutive years for the same land.

4. If a permit is issued for weed control on tame grassland, a condition of the permit must include a required fall herbicide treatment of the regrown noxious weeds at the permittee's expense.

5. Bales or stacks must be removed from the area within two weeks after baling.

6. Early haying to encourage tillering on new grass seedings should leave at least 5" of stubble to ensure sufficient leaf area needed for the responding growth.

**Justification:**

The control of noxious weeds is required of every landowner by state law, even on grassland easement-encumbered property. If infestations are severe, then a measure of weed control can be achieved by haying the lands with the infestation to limit the seed dispersal. Seed dispersal in Canada thistle often happens prior to July 15, so knocking the plants down prior to seed maturation and dispersal can help control the invading plants.

Additionally, more effective weed control can be achieved by removing the overstory of grass, allowing the tap-rooted noxious weeds to regrow, then applying a herbicide treatment. The grass will not regrow as quickly as the forb (weed) species, and the spraying application will be more effective, especially going into the fall season when the thistle plants are storing their root reserves for the winter dormant period.

Early haying to encourage tillering can shorten the establishment period of new grass seedings. Obtaining the best stand of grass in the shortest time period possible will increase wildlife use and minimize the need for weed control in subsequent years.

As such, it is concluded that the accrued benefits of more effective weed control and shorter establishment periods more than compensate for the potential short-term loss associated with authorized weed control and plant density management accomplished by haying the grassland area prior to July 15.

**Mandatory 10-Year Reevaluation Date:**

10 years from the date of APPROVAL signature Enter date: ______________________

**Signatures:**

**Submitted:** Michael Bryant, Project Leader, Lake Andes WMD — Date: 3/10/2005

Tom Tornow, Project Leader, Madison WMD — Date: 3-10-05

Harris Hoistad, Project Leader, Huron WMD — Date: 3-10-05

Larry Martin, Project Leader, Waubay WMD — Date: 3-10-05

Gene Williams, Project Leader, Sand Lake WMD — Date: 3-10-05

Tom Koerner, Project Leader, Lacreek NWR — Date: 3-10-05

Jack Lalor, Acting Project Leader, Tewaukon WMD — Date: 4/26/05

Dave Azure, Acting Project Leader, Kulm WMD — Date: 3-10-05

Kim D. Hanson, Project Leader, Arrowwood WMD, Chase Lake WMD, Valley City WMD — Date: 3/10/05

Gary Williams, Acting Project Leader, Audubon WMD — Date: 3/10/05

| | |
|---|---|
| Paul Van Ningen, Project Leader<br>Long Lake WMD | 3/10/2005<br>Date |
| Tedd Gutzke, Project Leader<br>J Clark Salyer WMD | 3/10/2005<br>Date |
| Roger Hollevoet, Project Leader<br>Devils Lake WMD | 3/10/05<br>Date |
| Fred G. Giese, Project Leader<br>Lostwood WMD<br>Crosby WMD | 04/26/05<br>Date |
| Michael Rabenberg, Acting Project Leader<br>Medicine Lake WMD | 04/26/05<br>Date |
| Carmen Luna, Project Leader<br>Bowdoin WMD | 4/26/05<br>Date |
| David Gilland, Project Leader<br>Benton Lake WMD | 4/26/05<br>Date |
| Steve Kallan, Project Leader<br>NW Montana WMD | 4/26/05<br>Date |

**Review:**

| | |
|---|---|
| Lloyd Jones<br>Regional Compatibility Coordinator | 4-27-05<br>Date |
| Rodney Krey / Ref. Sup | 4/28/05 |

**Approval:**

| | |
|---|---|
| Ronald D. Shupe, Region 6<br>Acting Chief of Refuges | 4 May 05, 2005<br>Date |

# COMPATIBILITY DETERMINATION
# for
# Authorized Health and Safety Needs Associated with FWS Wetland Easements resulting in NO Permanent Impacts

**Use:** Approved requests to temporarily pump or drain an easement protected wetland which is causing a Health and Safety problem or a major threat to personal or public property, such as flooding a road, driveway, resulting in seepage in a basement, surface waters affecting a domestic well or a sanitation system, or surface waters affecting a feed storage area or feedlot. The landowner's right to drain or otherwise alter the natural characteristics of the wetland is one of the rights the Service acquired with the easement. The use authorized under this CD is to permit temporary dewatering of protected wetlands which are posing a health and/or safety threat.

**Station Names:**

**South Dakota Wetland Management Districts:**

Lake Andes WMD, SD
Madison WMD, SD
Huron WMD, SD
Waubay WMD, SD
Sand Lake WMD, SD
Lacreek NWR, SD

**North Dakota Wetland Management Districts:**

Tewaukon WMD, ND
Kulm WMD, ND
Arrowwood WMD, ND
Valley City WMD, ND
Chase Lake WMD, ND
Audubon WMD, ND
Long Lake WMD, ND
J Clark Salyer WMD, ND
Devils Lake WMD, ND
Lostwood WMD, ND
Crosby WMD, ND

**Montana Wetland Management Districts:**

Medicine Lake WMD, MT
Bowdoin WMD, MT
Benton Lake WMD, MT
Northwest Montana WMD, MT

**Establishing and Acquisition Authorities:**

Waterfowl Production Areas Wetland Easements, Grassland Easements - The Migratory Bird Hunting and Conservation Stamp Act, March 16, 1934, (16 USC Sec. 718-718h, 48 Stat. 452) as amended August 1, 1958, (PL 85-585; 72 Stat. 486) for acquisition of "Waterfowl Production Areas"; the Wetlands Loan Act, October 4, 1961, as amended (16 USC 715k-3 - 715k-5, Stat. 813), funds appropriated under the Wetlands Loan Act are merged with duck stamp receipts in the fund and appropriated to the Secretary for the acquisition of migratory bird refuges under the provisions of the Migratory Bird Conservation Act, February 18, 1929, (16 USC Sec. 715, 715d - 715r, as amended.

FmHA deed restricted properties - Consolidated Farm and Rural Development Act - (7 USC Para. 2002).

Tall Grass Prairie Tracts - Land and Water Conservation Fund Act of 1965, as amended (16 U.S.C. 460*l*-4 through 460*l*-11)

**Refuge Purpose(s):**

"...as Waterfowl Production Areas" subject to "...all of the provisions of such Act [Migratory Bird Conservation Act] ...except the inviolate sanctuary provisions..." 16 USC 718(c) (Migratory Bird Hunting and Conservation Stamp)

"...for any other management purpose, for migratory birds." 16 USC 715d (Migratory Bird Conservation Act)

"...for conservation purposes..." 7 USC 2002 (Consolidated Farm and Rural Development Act)

**National Wildlife Refuge System Mission:**

"The Mission of the National Wildlife Refuge System is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans" (National Wildlife Refuge System Administration Act of 1966, as amended) [16 USC 668(dd)-668(ee)].

**Description of Use:**

During times of high water cycles or excessive runoff, prairie wetlands can temporarily swell to an oversized condition. The easement agreements provide for this natural fluctuation in wetland hydrology and relief is generally not authorized. However, when the over-full wetland basins result in situations which involve health, safety, or major threats to public or landowner appurtenances which cannot be resolved without violating the easement and for which no reasonable alternative exists, then the Service is authorized to provide relief to nullify the Health and Safety threat. The use associated with this category of request results in either pumping or draining the problem-causing wetland, lowering its elevation to a point that the problem is resolved. Situations involving Health and Safety include: major threats to buildings, roads, and infrastructure; basement flooding caused by high water in a nearby wetland, barnyard or feedlot flooding, driveway or other road flooding, or threat to domestic water supply or sewer system

The use results in ONLY a temporary lowering of the wetland. If a drainage ditch was used to lower the wetland, it must be filled to the original contour of the land after the wetland has been lowered, and the threat has subsided.

The use could occur in any of the Wetland Management Districts listed within the CD, and would likely occur during or shortly after the spring runoff or after a large rainstorm event. These are the conditions which sometimes result in the protected wetland basins becoming larger than the historic photo record would indicate.

Any requested use to lower the water levels of protected wetlands will result in ONLY temporary impacts, lasting a year or two.

**Availability of Resources:**

Financial and staff resources are determined to be sufficient at each field station to administer these requests. Staff time will be needed to evaluate the proposed use, to prepare the site-specific permits, and to insure compliance with the permit authorization and stipulations, as well as checking for satisfactory restoration of any disturbed sites after the wetland areas have returned to more historical elevations.

No specialized equipment will be necessary, as any work associated with these projects involves monitoring and compliance checking only. Actual work, including restoration needs, will be completed by the applicant as specified by the wetlands manager.

## Anticipated Impacts of the Use:

Short-term Impacts:

Short-term impacts include the temporary loss of some wetlands habitat because of the authorized lowering of the wetland causing the Health and Safety problem. Since this is only a temporary authorization, limitations of the amount of lowering needed will not be imposed except to require the least amount necessary to resolve the issue. The length of time will be "until the situation is resolved" NTE one year. Permits can be extended if necessary.

After the situation has been resolved, the wetland's hydrology will be restored, and if drainage was used to reduce the wetlands's volume, then the drainage facilities will be restored to a "pre-work" condition.

Long-term Impacts:

There will be no long-term impacts associated with this authorization to resolve a Health and Safety issue.

Cumulative Impacts:

There will be no cumulative impacts as a result of possible numerous authorizations because there are no permanent impacts. The authorization will be granted only to resolve the issue at hand.

## Public Review and Comment:

The period of public review and comment began April 10, 2005 and ended April 17, 2005.

Posted notices were made in public places for each of the field stations listed on this Compatibility Determination. This method was selected because the proposed activity is considered minor, incidental, infrequent, with only short-term disturbance, and/or displacement of wildlife. No comments were received as a result of the posted notices.

## Determination:

**Compatibility Threshold**: Material Interference of Detraction from the Purposes and/or Mission of the NWRS.

__________ Use is Not Compatible

__XXX____Use is Compatible with the Following Stipulations

**Stipulations Necessary to Ensure Compatibility:**

1. Issuance of a permit does not preclude the requirements for obtaining necessary permits and/or approvals from other County, State, or Federal Agencies and from local landowners.

2. The permit is issued subject to the revocation and appeals procedure contained in Title 50, Part 25 of the Code of Federal Regulations.

3. When the Health and Safety threat has subsided, the wetland will be allowed to function under natural hydrological cycles. Any drainage facilities which were installed to lower the wetland will be restored, compacted, and rendered non-functional.

4. If the area is also protected with a Service grassland easement, then the backfilled ditch will also be reseeded to the specifications of the wetland manager.

**Justification:**

There will be only temporary disturbance to the wetland and possible grassland resources protected by the Service's easement by this activity. The use will not detract from or materially interfere with the mission or purpose of the NWRS. The uses covered by this CD are considered NOT to be an economic use under the guidelines found in 50CFR29.1.

Where possible, and without compromising any preservation program goal or objective, and without affecting (in the long term) any land interest held by the Service, it is critically important that field stations be able to accommodate these requested uses which are designed to avert a human health and/or safety issue or a major threat to personal or public property.

**Mandatory 10-Year Reevaluation Date:**

10 years from the date of APPROVAL signature. Enter Reevaluation Date:_______________

**Signatures:**

**Submitted:** Michael Bryant, Project Leader, Lake Andes WMD — Date: 3/10/2005

Tom Tornow, Project Leader, Madison WMD — Date: 3-10-05

Harris Hoistad, Project Leader, Huron WMD — Date: 3-10-05

Larry Martin, Project Leader, Waubay WMD — Date: 3-10-05

Gene Williams, Project Leader, Sand Lake WMD — Date: 3-10-05

Tom Koerner, Project Leader, Lacreek NWR — Date: 3-10-05

Jack Lalor, Acting Project Leader, Tewaukon WMD — Date: 4/26/05

Dave Azure, Acting Project Leader, Kulm WMD — Date: 3-10-05

Kim D. Hanson, Project Leader, Arrowwood WMD, Chase Lake WMD, Valley City WMD — Date: 3/10/05

Gary Williams, Acting Project Leader, Audubon WMD — Date: 3/10/05

Paul Van Ningen, Project Leader — Date: 3/10/2005
Long Lake WMD

Tedd Gutzke, Project Leader — Date: 3/10/2005
J Clark Salyer WMD

Roger Hollevoet, Project Leader — Date: 3/10/05
Devils Lake WMD

Fred G. Giese, Project Leader — Date: 04/26/05
Lostwood WMD
Crosby WMD

Michael Rabenberg, Acting Project Leader — Date: 04/26/05
Medicine Lake WMD

Carmen Luna, Project Leader — Date: 4/26/05
Bowdoin WMD

David Gilland, Project Leader — Date: 4/26/05
Benton Lake WMD

Steve Kallan, Project Leader — Date: 4/26/05
NW Montana WMD

**Review:**

Lloyd Jones — Date: 4.27.05
Regional Compatibility Coordinator

Rodney Krey / Refuge Supervisor — 4/28/05

Steve Berendzen 4/28/05

**Approval:**

Ronald D. Shupe, Region 6 — Date: May 15, 2005
Acting Chief of Refuges

# COMPATIBILITY DETERMINATION for PUBLIC AND PRIVATE BURIED UTILITY LINES OCCURRING ON FWS EASEMENT PROPERTIES or Fee-Owned WPA's

**Use:** Projects associated with buried utility lines and/or cables where impacts to Service lands and interests are only temporary and minor. Requests from utility companies, rural water systems, and minor impacts associated with some highway improvement projects, and certain requests from private landowners. The use covered by this compatibility determination is in conjunction with the Region 6 Policy Memorandum of April 5, 2002, entitled "Rights-of Way and Permits for Minor Disturbance Projects". See Exhibit XII-7 for a copy of the Policy Memorandum.

**Station Names:**

**South Dakota Wetland Management Districts:**

Lake Andes WMD, SD
Madison WMD, SD
Huron WMD, SD
Waubay WMD, SD
Sand Lake WMD, SD
Lacreek NWR, SD

**North Dakota Wetland Management Districts:**

Tewaukon WMD, ND
Kulm WMD, ND
Arrowwood WMD, ND
Valley City WMD, ND
Chase Lake WMD, ND
Audubon WMD, ND
Long Lake WMD, ND
J Clark Salyer WMD, ND
Devils Lake WMD, ND
Lostwood WMD, ND
Crosby WMD, ND

**Montana Wetland Management Districts:**

Medicine Lake WMD, MT
Bowdoin WMD, MT
Benton Lake WMD, MT
Northwest Montana WMD, MT

**Establishing and Acquisition Authorities:**

Waterfowl Production Areas Wetland Easements, Grassland Easements - The Migratory Bird Hunting and Conservation Stamp Act, March 16, 1934, (16 USC Sec. 718-718h, 48 Stat. 452) as amended August 1, 1958, (PL 85-585; 72 Stat. 486) for acquisition of "Waterfowl Production Areas"; the Wetlands Loan Act, October 4, 1961, as amended (16 USC 715k-3 - 715k-5, Stat. 813), funds appropriated under the Wetlands Loan Act are merged with duck stamp receipts in the fund and appropriated to the Secretary for the acquisition of migratory bird refuges under the provisions of the Migratory Bird Conservation Act, February 18, 1929, (16 USC Sec. 715, 715d - 715r, as amended.

FmHA deed restricted properties - Consolidated Farm and Rural Development Act - (7 USC Para. 2002).

Tall Grass Prairie Tracts - Land and Water Conservation Fund Act of 1965, as amended (16 U.S.C. 460*l*-4 through 460*l*-11)

**Refuge Purpose(s):**

"...as Waterfowl Production Areas" subject to "...all of the provisions of such Act [Migratory Bird Conservation Act] ...except the inviolate sanctuary provisions..." 16 USC 718(c) (Migratory Bird Hunting and Conservation Stamp)

"...for any other management purpose, for migratory birds." 16 USC 715d (Migratory Bird Conservation Act)

"...for conservation purposes..." 7 USC 2002 (Consolidated Farm and Rural Development Act)

**National Wildlife Refuge System Mission:**

"The Mission of the National Wildlife Refuge System is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans" (National Wildlife Refuge System Administration Act of 1966, as amended) [16 USC 668(dd)-668(ee)].

**Description of Use:**

Wetland Management Districts receive frequent requests from utility companies to cross fee and easement properties with buried pipelines, electric cables, communications lines, natural gas lines, and/or rural or potable water lines or systems. These requests are generally part of an overall area-wide project to provide better services to the people residing in the area. When these types of projects are proposed in the Prairie Pothole Region, it may not be possible to avoid all Service land interests (fee and easement), and therefore, some Service property interests may be temporarily impacted during the construction period. This use includes requests for projects on wetland, grassland, FmHA, or conservation easements or fee-owned Waterfowl Production Areas. Construction methods may include cable-plowing, utilizing a vibrating cable-plow, or narrow trenching equipment. In each case, the surface disturbance is minimal, and the temporary cable or trenching scar will grow over with grass or marsh vegetation within a year or two.

A second area covered by this Compatibility Determination is requests received to temporarily alter upland sites in conjunction with highway maintenance projects to improve highway safety. These activities may be outside the existing highway right-of-way, but a formal ROW expansion is not needed because of the only temporary impacts to Service interests. An example of this type of request is for back-sloping a hill adjacent to the ROW to remove a snow catch area. Construction methods here include stripping away the vegetation and topsoil, removing enough of the hill to satisfy the sloping requirements, re-spreading the topsoil, and reseeding the vegetation to the manager's specifications.

It is expected that the use will be conducted as a one time event in the summer season when frost no longer exists and conditions have dried sufficiently to minimize grass disturbance. There is little to no future maintenance.

**Availability of Resources:**

Financial and staff resources are determined to be sufficient at each field station to administer these requests. Staff time will be needed to evaluate the proposed use, to prepare the site-specific permits, and to insure compliance with the permit authorization and stipulations, as well as checking for satisfactory restoration of any disturbed sites after the reseeded areas have had a chance to grow in.

No specialized equipment will be necessary, as the work requirement associated with these projects is monitoring and compliance checking only. Actual work, including restoration needs, will be completed by the applicant as specified by the wetlands manager.

**Anticipated Impacts of the Use:**

The uses authorized under this compatibility determination must result in impacts that are only very minor and temporary in nature. In other words, there will be NO long term negative impacts to Service land or water interests.

Examples of work authorized under this Compatibility Determination include:

- trenched and backfilled areas to accommodate buried pipelines and cables
- buried utility lines or PVC water lines using a cable plow
- excavated trenches using a backhoe equipped with a "trenching" bucket (approximately 8 inches wide).
- use of crawler-type equipment to shave hills and back-sloping associated with highway safety projects which may extend beyond the existing ROW.

Anticipated impacts are as follows:

- temporary disturbance to the grassland area during and for a period of time following the backfilled trench
- some wildlife may be temporarily displaced during the actual construction
- water quality may be temporarily and slightly reduced due to possible silt deposition if a rainstorm washes the exposed areas for a short period of time after backfilling the trenches or washing of the exposed back-sloped areas.

There will be no long-term impacts nor will there be any cumulative impacts to Service lands or interests.

**Public Review and Comment:**

The period of public review and comment began April 10, 2005 and ended April 17, 2005.

Posted notices were made in public places for each of the field stations listed on this Compatibility Determination. This method was selected because the proposed activity is considered minor, incidental, infrequent, with only short-term disturbance, and/or displacement of wildlife. No comments were received as a result of the posted notices.

**Determination:**

**Compatibility Threshold**: Material Interference of Detraction from the Purposes and/or Mission of the NWRS.

__________ Use is Not Compatible

__XXX____Use is Compatible with the Following Stipulations

**Stipulations Necessary to Ensure Compatibility:**

1. Issuance of a permit does not preclude the requirements for obtaining necessary permits and/or approvals from other County, State, or Federal Agencies and from local landowners.

2. The permit is issued subject to the revocation and appeals procedure contained in Title 50, Part 25 of the Code of Federal Regulations.

3. The proposed activity will result in no impacts to wetlands protected by FWS easements. No wetlands or any part thereof will be filled with any material, leveled by any equipment, drained by any means including pumping or by diverting water, or burned.

4. Any work within protected wetland basins will be backfilled and compacted to the normal contour of the wetland bottom. No excess, non-compacted fill will be permitted.

5. Upland impacts to areas protected by FWS grassland easements will be only temporary. Any disturbed areas will be leveled, seeded, and restored to pre-work condition as specified by the Refuge Manager.

6. Additional stipulations may be added to address specific concerns with individual projects.

7. The authorization under the permit issued in accordance with this determination is for the initial construction only; any future maintenance or repairs will require additional consultation with the Wetland Management District office, and will require a supplemental permit issued prior to the initiation of any remedial work.

**Justification:**

There will be minimal and temporary disturbance to the wetland and grassland resources protected by the Service's fee or easement by this activity. The use will not detract from or materially interfere with the mission or purpose of the NWRS. The uses covered by this CD are considered NOT to be an economic use under the guidelines found in 50CFR29.1.

Prior to issuing any permit, the manager will have worked with the applicant to avoid as many impacts as possible, and then to minimize any impacts to Service interests. The impacts are deemed to be minor and only temporary, and complete site restoration will occur, usually with the next growing season.

Where possible, and without compromising any preservation program goal or objective, and without affecting (in the long term) any land interest held by the Service, it is critically important that field stations be able to accommodate these requested uses which are designed to improve highway safety or the quality of life in rural America.

**Mandatory 10-Year Reevaluation Date:**

10 years from the date of APPROVAL signature.

Enter Reevaluation Date:____________

**Signatures:**

**Submitted:** [signature] 3/10/2005
Michael Bryant, Project Leader — Date
Lake Andes WMD

[signature] 3-10-05
Tom Tornow, Project Leader — Date
Madison WMD

[signature] 3-10-05
Harris Hoistad, Project Leader — Date
Huron WMD

[signature] 3-10-05
Larry Martin, Project Leader — Date
Waubay WMD

[signature] 3-10-05
Gene Williams, Project Leader — Date
Sand Lake WMD

[signature] 3-10-05
Tom Koerner, Project Leader — Date
Lacreek NWR

[signature] 4/26/05
Jack Lalor, Acting Project Leader — Date
Tewaukon WMD

[signature] 3-10-05
Dave Azure, Acting Project Leader — Date
Kulm WMD

[signature] 3/10/05
Kim D. Hanson, Project Leader — Date
Arrowwood WMD
Chase Lake WMD
Valley City WMD

[signature] 3/10/05
Gary Williams, Acting Project Leader — Date
Audubon WMD

| | |
|---|---|
| Paul Van Ningen, Project Leader<br>Long Lake WMD | 3/10/2005<br>Date |
| Tedd Gutzke, Project Leader<br>J Clark Salyer WMD | 3/10/2005<br>Date |
| Roger Hollevoet, Project Leader<br>Devils Lake WMD | 3/10/05<br>Date |
| Fred G. Giese, Project Leader<br>Lostwood WMD<br>Crosby WMD | 04/26/05<br>Date |
| Michael Rabenberg, Acting Project Leader<br>Medicine Lake WMD | 04/26/05<br>Date |
| Carmen Luna, Project Leader<br>Bowdoin WMD | 4/26/05<br>Date |
| David Gilland, Project Leader<br>Benton Lake WMD | 4/26/05<br>Date |
| Steve Kallan, Project Leader<br>NW Montana WMD | 4/26/05<br>Date |

**Review:**

Lloyd Jones
Regional Compatibility Coordinator — 4-27-05 Date

Refuge Supervisor — 4/28/05

4/28/05

**Approval:**

Ronald D. Shupe, Region 6
Acting Chief of Refuges — May 15, 2005 Date

Exhibit XII-4f

**Compatibility Determination**

**Use:** waterlines on grassland easements to provide livestock watering

**Refuge Name:**
Arrowwood Wetland Management District
Audubon Wetland Management District
Chase Lake Wetland Management District
Crosby Wetland Management District
Devils Lake Wetland Management District
Huron Wetland Management District
J. Clark Salyer Wetland Management District
Kulm Wetland Management District
Lake Andes Wetland Management District
Long Lake Wetland Management District
Lostwood Wetland Management District
Madison Wetland Management District
Sand Lake Wetland Management District
Tewaukon Wetland Management District
Valley City Wetland Management District
Waubay Wetland Management District

**County:** all counties within the Districts

**Establishing and Acquisition Authority(ies):**

Consolidated Farm and Rural Development Act, Migratory Bird Conservation Act, Migratory Bird Hunting and Conservation Stamp Tax, North American Wetlands Conservation Act, Emergency Wetlands Resources Act

**Refuge Purpose(s):**

> "...as Waterfowl Production Areas" subject to" ...all of the provisions of such Act [Migratory Bird Conservation Act] ...except the inviolate sanctuary provisions..." 16 U.S.C. 718(c) (Migratory Bird Hunting and Conservation Stamp)
>
> "...for any other management purpose, for migratory birds." 16 U.S.C. § 715d (Migratory Bird Conservation Act)
>
> "...for conservation purposes ... "7 U.S.C. § 2002 (Consolidated Farm and Rural Development Act)

**National Wildlife Refuge System Mission:**

> "The mission of the System is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans."

**Description of Use:**

What is the use? Is the use a wildlife-dependent public use?

The activity requested involves burying waterlines to provide for livestock watering on areas encumbered by Service grassland easements in North and South Dakota. The buried waterline is a new use of the grassland easement because of the surface grass disturbance which would be considered an economic use. There are approximately 2,500 individual grassland contract holders in the two states. It is estimated that no more than 10% or 250 will ever make a request for a buried waterline. In those cases where additional water supplies are provided there is a better distribution of grazing on the easement tract and overall health and sustainability of the grass is improved. The waterlines are installed by either a chisel plow or narrow trenching (not exceeding 2 feet) equipment to a depth of 6-8 feet. Minor and very temporary disturbance to the grass is confined to an area no greater than 10 feet on either side of the pipe location. The waterlines are polyethylene pipe of approximately 2 inches in diameter. The disturbance to grass is minimal (generally not exceeding 1 acre of disturbance) in relation to the acreage involved in the easement tract (average 600 acres). The disturbance caused by the trench is immediately restored and with residual and seeded grasses, the activity disturbance is temporary within 1-2 years little to no evidence remains of the activity. The activity will be permitted with a Special Use Permit and stipulations provided to ensure special and limiting conditions are adhered to and restoration is complete. The waterline will deliver water to a holding tank and gravel pad causing permanent disturbance to grass on an area of approximately 60 feet by 60 feet, representing less than one-tenth of one acre or less than 0.00001 percent of the average grassland easement tract.

Where would the use be conducted?

The use will be conducted on grassland easements in all the Wetland Management Districts listed including both North Dakota and South Dakota. Generally the grassland easement tracts are native grassland areas that are used predominately for cattle grazing. There will be minimal or non detected disturbance to wildlife as a result of the activity and what does occur will be very temporary. The disturbance to the average grassland easement tract will represent less than 0.002 percent of the average easement tract.

When would the use be conducted?

The use will be conducted as a one time event in the summer season when frost no longer exists and conditions have dried sufficiently to minimize grass disturbance. There is little to no future maintenance.
How would the use be conducted?

The activity will be conducted with either trenching equipment such as a back hoe or a chisel plow. Disturbance will not exceed 2 feet in width or be less if the chisel plow is used.

Why is this use being proposed?

It will be the grassland easement holder requesting the use. The request will be to provide better water availability for improved grass utilization due to more equal grazing distribution. Buried waterlines for livestock watering is a cost effective and reliable alternative to traditional stock watering dams, especially in times of drought or low precipitation conditions.

**Availability of Resources:**

Resource involved in the administration and management of the use:

No additional management or administrative costs will be associated with this activity.

Special equipment, facilities, or improvements necessary to support the use: None

Maintenance costs: None

Monitoring costs: None

Offsetting revenues: None

**Anticipated Impacts of the Use:**

Short-term impacts:

There will be only temporary disturbance to the grass from the construction activities so all impacts will be short-term. In 1-2 years little to no evidence exists of the activity. There will be no indirect impacts associated with this activity.

Long-term impacts:

There will be no long term impacts associated with this activity.

Cumulative impacts:

The only cumulative direct impact will be the loss of grassland from the installation of water holding facilities, estimated to be approximately 360 square feet, representing 0.008 of an acre or 0.00001 percent of the average grassland easement (600 acres). There are no indirect impacts from the proposed activity.

**Public Review and Comment:**

The period of public review and comment began 8/9/2004 and ended 8/13/2004.

The following methods were used to solicit public review and comment:

Posted notices in public places.

Why was this level of public review and comment selected?

The proposed activity is considered minor, incidental, one-time with minimal temporary disturbance.

Summarize comments received and any actions taken or not taken because of comments received.

No comments were received.

**Determination:**

Use is compatible with the following stipulations.

**Stipulations Necessary to Ensure Compatibility:**

1. Soil, if removed through trenching, will be replaced in the same soil profile as it was removed. Topsoil will be replaced and all soils compacted.

2. Activity will occur during the time when soils are dry and equipment activity will have reduced impact to grasses and soils.

3. Any areas that are disturbed will be reseeded to the appropriate grass mixture if determined necessary for reestablishment by the Refuge Manager.

**Justification:**

There will be minimal and temporary disturbance to the grassland resources protected by the Service's easement by this activity. The use will not detract from or materially

interfere with the mission or purpose of the NWRS. It is an economic use and as such the activity will benefit the Service mission and purpose through better management of the grassland community by providing improved grazing distribution.

If the proposed use is an economic use of refuge natural resources, how would it contribute to the purposes of the refuge or the mission of the National Wildlife Refuge System?

The activity of providing water for livestock grazing will contribute to the mission by providing improved grazing distribution and better range management of the grassland resources protected by the Service's easement.

**Text of Public Notice:**

The U.S. Fish and Wildlife Service (Service) is soliciting public comments on whether to allow buried waterlines to provide for livestock watering on Service Grassland Easements in North and South Dakota. The activity will cause minor and temporary disturbance to the grassland area. Restoration will be ensured through stipulations defined in a Special Use Permit agreed to by the landowner. Through better distribution of livestock grazing the health and sustainability to the grasslands will be better ensured. People wishing to provide comments can do so by August 13th by submitting them to the Wetland Habitat Office, 3425 Miriam Avenue, Bismarck, ND 58501. For more information contact Lloyd Jones at (701) 355-8529.

**Compatibility Determination**

**Signature:** Refuge Manager:

Kim Hanson, Arrowwood Wetland Management District (Signature) (Date)

Mike McEnroe, Audubon Wetland Management District (Signature) (Date)

Mick Erickson, Chase Lake Wetland Management District (Signature) (Date)

Tim Kessler, Crosby Wetland Management District (Signature) (Date)

Roger Hollevoet, Devils Lake Wetland Management District (Signature) (Date)

Harris Hoistad, Huron Wetland Management District (Signature) (Date)

Lee Albright, J. Clark Salyer Wetland Management District (Signature) (Date)

Bob Vanden Berge, Kulm Wetland Management District (Signature) (Date)

Mike Bryant, Lake Andes Wetland Management District (Signature) (Date)

Paul VanNingen, Long Lake Wetland Management District (Signature) (Date)

Todd Frerichs, Lostwood Wetland Management District (Signature) (Date)

Thomas Turnow, Madison Wetland Management District (Signature) (Date)

Gene Williams, Sand Lake Wetland Management District (Signature) (Date)

__________________________________________________ __________
Jack Lalor, Tewaukon Wetland Management District (Signature) (Date)

__________________________________________________ __________
Cory Richardson, Valley City Wetland Management District (Signature) (Date)

__________________________________________________ __________
Larry Martin, Waubay Wetland Management District (Signature) (Date)

**Review:** Regional
Compatibility Coordinator __________________________ __________
Lloyd Jones (Date)

**Review:** Zone Supervisor __________________________________ ___________
Rod Krey (Date)

**Concurrence:** Regional Chief _____________________________________ ___________
Rick Coleman (Date)

**Mandatory 10- or 15- year Re-Evaluation Date: __2019__**

# Compatibility Determination
# for
# Dugouts on FWS Easement Properties
# or
# Fee-Owned WPA's

**Use:** Dugouts on wetland easements, grassland easements, or fee-owned Waterfowl Production Areas to provide livestock water

**Refuge Name:**

**North Dakota Wetland Management Districts:**

Arrowwood Wetland Management District
Audubon Wetland Management District
Chase Lake Wetland Management District
Crosby Wetland Management District
Devils Lake Wetland Management District
J. Clark Salyer Wetland Management District
Kulm Wetland Management District
Long Lake Wetland Management District
Lostwood Wetland Management District
Tewaukon Wetland Management District
Valley City Wetland Management District

**Montana Wetland Management Districts:**

Benton Lake Wetland Management District
Bowdoin Wetland Management District
Charles M. Russell Wetland Management District
Northeast Montana Wetland Management District
Northwest Montana Wetland Management District

**South Dakota Wetland Management Districts:**

Huron Wetland Management District
Lake Andes Wetland Management District
Madison Wetland Management District
Sand Lake Wetland Management District
Waubay Wetland Management District

**County:** all counties within the District listed above

**Establishing and Acquisition Authority(ies):**

Consolidated Farm and Rural Development Act, Migratory Bird Conservation Act, Migratory Bird Hunting and Conservation Stamp Tax, North American Wetlands Conservation Act, Emergency Wetlands Resources Act

**Refuge Purpose(s):**

"…as Waterfowl Production Areas" subject to "…all of the provisions of such Act [Migratory Bird Conservation Act] …except the inviolate sanctuary provisions…" 16 U.S.C. 718(c) (Migratory Bird Hunting and Conservation Stamp)

"…for any other management purpose, for migratory birds." 16 U.S.C § 715d (Migratory Bird Conservation Act)

"…for conservation purposes…" 7 U.S.C. § 2002 (Consolidated Farm and Rural Development Act)

**National Wildlife Refuge Mission:**

"The mission of the System is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans."

**Description of Use:**

What is the use? Is the use a wildlife-dependent public use?

The activity requested involves the construction of dugouts to provide livestock water on areas encumbered by Service grassland and wetland easements or on fee-owned Waterfowl Production Areas (WPA) in North Dakota, South Dakota and Montana. The dugout would be considered a new use of the easement area because of the surface disturbance to the grass on grassland easements, and because of the potential impacts to protected wetlands on wetland easements. Likewise, the use would be considered a new use of a WPA due to surface disturbance of grass and/or impacts to wetlands. Because this use would be in support of livestock grazing, it would be considered an economic use. There are approximately 3,200 grassland easements in the three states with an average size of 600 acres; there are approximately 23,213 wetland easements and 3,830 WPAs. It is estimated that no more than 10% or about 300 individual grassland easement contract holders would ever request a permit for dugout construction. In those cases where additional water supplies are provided, distribution of grazing on the easement tract improves which enhances the overall health of the grassland and results in better nesting habitat. The dugouts would be constructed according to

Natural Resource Conservation Service specifications, typically dug with an excavator, would be 10-20 feet deep, have 3:1 side slopes. Dugouts would not be permitted in wetlands less than 1 acre in size. In wetlands greater than 1 acre, the fill material would be not placed within the wetland basins unless all other options are exhausted. The piling of spoil would result in minimal disturbance to grass in an area of approximately 100 feet by 100 feet, representing less than three-tenths of one acre or less than 0.0005 percent of the average grassland tract. This use is not a wildlife-dependent public use.

Where would the use be conducted?

The use would be conducted mostly on grassland easements and WPAs in all the Wetland Management Districts listed, and to a lesser extent, on wetland easements. Grassland easement tracts consist of both native and tame grassland areas; native grasslands are used predominately for cattle grazing. The WPAs where this use would occur typically would also be native and tame grasslands where grazing is being used to enhance the grass species diversity and structure. Though less likely, this use may also occur on the edges or within the seasonally-flooded zones of wetlands protected by wetland easements, especially where former cropland has been seeded to grass and grazing occurs.

When would the use be conducted?

The use would be conducted as a one-time spring, summer, or fall event when frost no longer exists in the ground. There is little future maintenance needed, especially in grasslands.

How would the use be conducted?

Dugouts are typically constructed with track hoes, scrapers, backhoes, or draglines.

Why is this use being proposed?

In the case of easements, the easement contract holder would request the use. The request would be to provide better water availability to improve grass utilization and distribution of grazing pressure. The result would be enhanced grassland health in terms of grass species composition and structure. A similar situation exists with WPAs, where increased water availability would improve grassland management.

**Availability of Resources:**

Resources involved in the administration and management of the use:

No additional management of administrative costs will be associated with this activity.

Special equipment, facilities, or improvements necessary to support the use:

None

Maintenance Costs: None

Monitoring Costs: None

Offsetting revenues: None

**Anticipated Impacts of the Use:**

Short-term impacts:

There will be temporary disturbance to the grass on grass easements and WPAs from the transportation of equipment to the dugout site; i.e. equipment tracks. There would be minimal or non-detected disturbance to wildlife as a result of the activity, and what would occur would be very temporary.

Long-term impacts:

The only long-term impact to grassland easements and WPAs would be the loss of the grass under the spoil piles and at the specific location of the dugout, an area under 0.3 acres. The disturbance to the average grassland easement tract (approximately 600 acres) would represent less than 0.0005 percent of the average easement tract. There would be no long-term impacts on wetland easement-only tracts.

Cumulative impacts:

The only cumulative direct impact would be the loss of grasslands on grass easements and WPAs directly under the spoil piles and at the site of the dugout. Relative to the average size of grassland easements and WPAs, this impact is insignificant. There would be no cumulative impacts to wetland easement-only tracts.

**Public Review and Comment:**

The period of public review and comment began 11/10/2008 and ended 11/24/2008.

The following methods were used to solicit public review and comment:

Posted notices in public places.

Why was this level of public review and comment selected?

The proposed activity is considered minor, incidental, one-time with minimal temporary disturbance and insignificant permanent and cumulative impacts.

Summarize comments received and any actions taken or not taken because of comments received:

None received.

**Determination:**

Use is compatible with the following stipulations:

**Stipulations Necessary to Ensure Compatibility:**

Permits for dugouts will be issued upon request for easements purchased prior to April 1, 1981 provided the dugout is constructed according to State NRCS specifications. Permits for dugouts on easements, purchased after April 1, 1981, may be issued in accordance with the following conditions or stipulations:

1. Every effort will be made to avoid construction of dugouts in wetlands.

2. Dugouts will not be permitted in wetlands 1 acre or smaller.

3. Dugouts may be permitted in wetlands larger than 1 acre provided they are constructed on the perimeter of the wetland in the seasonally-flooded zone. Every effort should be made to minimize the amount of spoil placed in the wetland. Spoil placed within the basin shall be piled adjacent to the dugout on either side of the excavation. Spoil placed outside the wetlands may be leveled so long as it is not used to fill other wetlands. If the uplands are protected under a grassland easement, then the manager must evaluate the value of leveling the spoil piles, particularly on native prairie.

4. Permits issued for dugout construction are not assignable to subsequent landowners; no maintenance is allowed without another permit.

**Justification:**

There will be minimal temporary disturbance and/or permanent impact to grassland and wetland resources protected or managed by the Service's easements or WPAs by this activity. The use will not materially interfere with or detract from the mission or purpose of the NWRS.

If the proposed use is an economic use of refuge natural resources, how would it contribute to the purposes of the refuge or the mission of the National Wildlife Refuge System?

It is an economic use, and as such, the activity would contribute to the achievement of the Service mission and purpose through better management of grassland by improving the distribution of grazing pressure, thereby reducing the likelihood of overgrazing.

**Text of Public Notice:**

The U.S. Fish and Wildlife Service (Service) is soliciting public comments on whether to allow the construction of dugouts to provide livestock water on Service Grassland Easements, Wetland Easement, or Waterfowl Production Areas in North Dakota, South Dakota and Montana. The activity will cause minor temporary disturbance and insignificant permanent impact to grassland areas. Permanent impacts to protected wetlands will be avoided through stipulations defined in a Special Use Permit agreed to by the landowner when dugouts are constructed on easement lands. Through better distribution of grazing pressure, the health and sustainability of grasslands will be ensured. People wishing to provide comments can do so by November 14th by submitting them to the Wetland Habitat Office, 3425 Miriam Avenue, Bismarck, ND 58501. For more information, contact Lloyd Jones at (701) 355-8529.

**Submitted:**

Kim Hanson, Project Leader
Arrowwood WMD
Chase Lake WMD
Valley City WMD

12/1/08
Date

Lloyd Jones, Project Leader
Audubon WMD

12/3/08
Date

Dave Gillund, Project Leader
Crosby WMD
Lostwood WMD

12/3/08
Date

Roger Hollevoet, Project Leader
Devils Lake WMD

12/3/08
Date

Kelly Hogan, Project Leader
J. Clark Salyer WMD

12/3/08
Date

Mick Erickson, Project Leader
Kulm WMD

12/3/08
Date

Paul Van Ningen, Project Leader
Long Lake WMD

12/3/08
Date

Jack Lalor, Acting Project Leader
Tewaukon WMD

12/3/2008
Date

Kathy Burchett, Project Leader — 12/02/08 — Date
Benton Lake WMD
NW Montana WMD

Carmen Luna, Project Leader — 12/2/08 — Date
Bowdoin WMD

Barron Crawford, Project Leader — 12-2-08 — Date
Charles M. Russell WMD

Jerry Rodriguez, Project Leader — 12/02/08 — Date
NE Montana WMD

Harris Hoistad, Project Leader — 12-2-08 — Date
Huron WMD

Mike Bryant, Project Leader — 12/2/08 — Date
Lake Andes WMD

Tom Tornow, Project Leader — 12-2-08 — Date
Madison WMD

John Jave, Acting Project Leader — 12/02/08 — Date
Sand Lake WMD

Larry Martin, Project Leader — 12-02-08 — Date
Waubay WMD

# ENVIRONMENTAL EVALUATION CHECKLIST
## REFUGES AND WILDLIFE
## REGION 6

**Project Description:** the construction of dugouts to provide livestock water on areas encumbered by Service grassland and wetland easements or on fee-owned Waterfowl Production Areas (WPA) in North Dakota, South Dakota and Montana.

**Submitted By:** Project Leaders of the Wetland Management Districts in the three States

### EFFECTS

| Category | Short-Term | Long-Term | Magnitude |
|---|---|---|---|
| Wetlands | Y | Y | 0 |
| Uplands | Y | Y | + |
| T&E and Candidate Species | N | N | 0 |
| Other wildlife | Y | Y | 0 |
| Cultural Resources | N | N | 0 |
| Water Quality | Y | Y | 0 |
| Water Quantity (conserve = +, deplete = -) | N | Y | + |
| Air Quality | N | N | 0 |
| Socio-Economic | N | N | 0 |
| Compatible? | Y | Y | 0 |
| Cumulative Impacts | Y | Y | + |

Y = Yes; N = No; + = Beneficial; - = Detrimental; 0 = none

**Decision**

__X__ Project is Categorically Excluded from NEPA documentation

_____ Start Environmental Assessment (EA)

Prepared By: David A. Azure, Wildlife Refuge Manager [signature] 12/1/08
(Name, Title, Signature) (Date)

Reviewed By: Lloyd Jones, Reg Compl. Coord [signature] 12/1/08
(Name, Title, Signature) (Date)

Concur: J. Paul Cornu, Refuge Supervisor 1/29/09
(Name, Title, Signature) (Date)

Concur: [signature] 4/28/09
(Name, Title, Signature) (Date)

Concur: Richard A Coleman ARD 4/29/09
(Name, Title, Signature) (Date)

# FINDING OF APPROPRIATENESS OF A REFUGE USE

Refuge Name: All Wetland Management Districts in ND, SD, and MT

Use: Dugouts on wetland easements, grassland easements, or WPAs

This form is not required for wildlife-dependent recreational uses, take regulated by the State, or uses already described in a refuge CCP or step-down management plan approved after October 9, 1997.

| **Decision Criteria:** | **YES** | **NO** |
|---|---|---|
| (a) Do we have jurisdiction over the use? | ✓ | |
| (b) Does the use comply with applicable laws and regulations (Federal, State, tribal, and local)? | ✓ | |
| (c) Is the use consistent with applicable Executive orders and Department and Service policies? | ✓ | |
| (d) Is the use consistent with public safety? | ✓ | |
| (e) Is the use consistent with goals and objectives in an approved management plan or other document? | ✓ | |
| (f) Has an earlier documented analysis not denied the use or is this the first time the use has been proposed? | ✓ | |
| (g) Is the use manageable within available budget and staff? | ✓ | |
| (h) Will this be manageable in the future within existing resources? | ✓ | |
| (i) Does the use contribute to the public's understanding and appreciation of the refuge's natural or cultural resources, or is the use beneficial to the refuge's natural or cultural resources? | ✓ | |
| (j) Can the use be accommodated without impairing existing wildlife-dependent recreational uses or reducing the potential to provide quality (see section 1.6D, 603 FW 1, for description), compatible, wildlife-dependent recreation into the future? | ✓ | |

Where we do not have jurisdiction over the use ("no" to (a)), there is no need to evaluate it further as we cannot control the use. Uses that are illegal, inconsistent with existing policy, or unsafe ("no" to (b), (c), or (d)) may not be found appropriate. If the answer is "no" to any of the other questions above, we will **generally** not allow the use.

If indicated, the refuge manager has consulted with State fish and wildlife agencies. Yes ___ No ✓

When the refuge manager finds the use appropriate based on sound professional judgment, the refuge manager must justify the use in writing on an attached sheet and obtain the refuge supervisor's concurrence.

Based on an overall assessment of these factors, my summary conclusion is that the proposed use is:

**Not Appropriate**_____ **Appropriate** ✓

Refuge Manager: [signature] Date: 12/1/08

If found to be **Not Appropriate**, the refuge supervisor does not need to sign concurrence if the use is a new use.

If an existing use is found **Not Appropriate** outside the CCP process, the refuge supervisor must sign concurrence.

If found to be **Appropriate**, the refuge supervisor must sign concurrence.

Refuge Supervisor: [signature] Date: 1/29/09

**A compatibility determination is required before the use may be allowed.**

**FWS Form 3-2319**
**02/06**

**Reviewed:**

Lloyd Jones, Regional Compatibility Coordinator 1-5-09 Date

Paul Cornes, Refuge Supervisor 1/29/09 Date

Dean Rundle, Refuge Supervisor Date

**Approved:**

Rick Coleman, ARD – Refuges/Partners for Fish & Wildlife 4/29/09 Date
Region 6

**Mandatory 10-year Re-Evaluation Date:**

10 years from the date of the "**Approved**" signature

# United States Department of the

FISH AND WILDLIFE
SERVICE Mountain-Prairie

IN REPLY REFER
Refuges/RE
LA-Rights-of-Way
Procedures
Mail Stop 60135

MAILING ADDRESS: Post Office Box 25486 Denver Federal Center Denver, Colorado 80225-0486

STREET LOCATION: 134 Union Blvd. Lakewood, Colorado 80228-1807

Simplified ROW Policy

APR 5 2002

Memorandum

To: All Refuge Project Leaders, Region 6

From: Acting Regional Chief, National Wildlife Refuge System, Region 6

Subject: Rights-of-Way and Permits for Minor Disturbance Projects

This memorandum addresses recent questions regarding minor surface disturbances and decisions on granting rights-of-way versus issuing permits for such disturbances. It follows an e-mail distributed by Ron Shupe and Harvey Wittmier in August 2001.

Recent right-of-way (ROW) requests involving rural water lines have raised the question of whether a formal ROW or a special use permit should be the appropriate permitting mechanism for crossing grassland easements. These projects usually involve very minor disturbance with immediate backfill by the contractor. When such projects cross grassland or wetland easements each project leader must make a judgment call on the significance of the action including long-term maintenance of the line.

Our basic guidance is that if the maintenance is very infrequent and the initial disturbance very. temporary and minor, a special use permit can be used. Examples of temporary, minor disturbances include a typical rural water line with a 12-inch wide trench, small underground cables, or roads where only the construction process, not the long-term disturbance, is the impact on the easement.

Professional judgment is required on a case-by-case basis and, when in doubt, give us a call and we can discuss what would be most appropriate. We want efficiency but not at the expense of protecting our interests. If a special use permit is used the applicant must understand that any future activity will require a new special use permit and such a permit request can be denied.

If you have any questions, please call your Refuge Program Supervisor or Harvey Wittmier, Chief, Division of Realty.

[signature]

cc: PFW State Coordinators

Ron
08/02/01 11:32

To: nd/sd/rw
cc: Ann

See Harvey's message below. This philosophy applies primarily to easements. If it is fee then a ROW is required. A lot of judgement is required on a case by case basis and when in doubt give either of us a call and we can discuss what would be most appropriate. We want efficiency, but not at the expense of protecting our interests. if a SUP is used the applicant must understand that any future activity will require a new SUP> Any questions give me a call.

Ron Shupe

Refuge Supervisor, ND/SD
(303) 236-8145 EXT 647
----- Forwarded by Ron Shupe/R6/FWS/D01 on 08/03/2001 12:15

Harvey Wittmier
08/02/2001 10:43 AM

To: Patrick Russell/R6/FWS/DOI@FWS, Tonna Hughes/R6/FWS/D01@FWS, Gary L Sullivan/R6/FWS/DOI@FWS, Stu Wacker/R6/FWS/DOI@FWS
cc: Betty Adler/R6/FWS/DOI@FWS, Ron Shupe/R6/FWS/DOI@FWS, Patty Stevens/R6/FWS/D01@FWS
Subject: ROW's for minor disturbance projects

Recent ROW requests in South Dakota involving rural water lines have raised the question of whether a formal ROW or a simple special use permit could be used as our permiting mechanism. These are projects that involve very minor, usually less than a 12" wide trench with immediate backfill by the contractor. When such projects cross grassland easements each project leader must make a judgement call on the significance of the action, including long term maintenance of the line. I discussed alternative approaches with Ron Shupe and there is no absolute answer on when to use a ROW and when to use a special use permit ...... it is a judgement call. Ron's basic guidance is that, if the maintenance is very infrequent and the initial disturbance very temporary and minor, a special use permit could be used. If, however, the maintenance is frequent and the disturbance longer term, then a ROW would be better. Since the pipeline owner would need a special use permit to do maintenance (if no ROW was granted) there is an efficiency of scale issue in making a decision.

I know this is not a clear cut answer to you questions, but it does give refuge project leaders some discretion.

______________________________
Harvey Wittmier

**United States Department of the Interior**

**FISH AND WILDLIFE SERVICE**
**LAKE ANDES NATIONAL WILDLIFE REFUGE COMPLEX**
**38672 291st Street**
**LAKE ANDES, SOUTH DAKOTA 57356-6838**
**605-487-7603**

LETTER OF AUTHORIZATION
FOOD PLOT: Aurora County 999G

DATE

Mr. Fred Feedum
Foodplot, SD
99999

Dear Mr. Feedum:

We received your request to establish and/or maintain a food plot on the NE1/4 section 34 T.105N.,R65W., Aurora County South Dakota. As you are aware, this land has a U.S. Fish and Wildlife Service wetland and grassland easement.

Through this Letter of Authorization (LOA), the U.S. Fish and Wildlife Service will grant your request to establish and/or maintain a food plot(s) on the grassland easement identified above. This LOA is in effect until revoked or terminated. As a condition of this LOA, the following special conditions must be followed:

1. This LOA is non transferable to any subsequent landowners.
2. This LOA may be revoked by the Service for failure to comply with any of these special conditions.
3. No native prairie shall be broken for food plot(s).
4. Food plots should avoid being planted in wetland areas.
5. Location of food plot(s) shall be identified on a FSA map with dimensions of each food plot identified. Increasing the size or re-locating the food plot(s) shall render this LOA null and void and may be considered a violation of the grassland easement contract.
6. The combination of food plots and shelterbelts shall not exceed 8 acres/160 acres of grassland easement.
7. Harvesting or grazing of food plot(s) shall be prohibited except after March 31, prior to spring planting.
8. The use of insecticides on food plot(s) is discouraged and the landowner must contact the refuge office prior to any insecticide application.
9. The landowner shall notify the Service if the food plot(s) is no longer wanted and the LOA will be terminated.
10. The landowner and the Service shall develop a grass re-establishment plan after the LOA is terminated.
11. The landowner is responsible for all costs incurred for re-establishment of grass on the grassland easement.

If you have any questions, please feel free to contact our office.

Sincerely,

Iam Watchin
Wetland Manager

Exhibit XIII-1a

# INSTRUCTIONS FOR COMPLETING APPLICATION FOR RIGHT-OF-WAY PERMIT

A. Complete, in detail, the application attached.

B. Recovery costs pursuant to 50 CFR 29.21.

1. A non-refundable **application fee** in accordance with the following schedule:
   **Linear** - Less than 5 miles, $50 per mile or fraction thereof; 5 to 20 miles, $500; 20 miles and over, $500 for each 20 miles or fraction thereof.
   **Non-linear** - $250 for each 40 acres or fraction thereof.

2. A non-refundable **monitoring fee** in accordance with the following schedule:
   **Linear** - Less than 5 miles, $20 per mile or fraction thereof; 5 to 20 miles, $200; 20 miles and over, $200 for each 20 miles or fraction thereof.
   **Non-linear** - $100 for each 40 acres or faction thereof.

3. When an application is received and **both linear and non-linear** facilities will exist, recovery of costs shall be computed using a combination of fees cited in B.1. and B.2.

4. If it is determined that the administrative costs expected to be incurred in the processing of the application exceed B.1 and B.2, the applicant shall be advised and the applicant shall make payment of costs by making periodic payments in advance of the incurrence of such costs.

5. The applicant shall pay a **fair market value** for the right-of-way, such value to be determined by appraisal according to 29.21-7. Any overpayment of B.4. can be applied to the value of the right-of-way.

C. Plans, Specifications, Drawings, Legal Description.

All plans and specifications, other drawings, and a legal description must be submitted with the application. Processing of the application will not proceed without four complete, neat and legible copies of plans and specifications or drawings.

If Right-of Way permit request is for a major structures (i.e. bridge) or major improvement (i.e. highway widening) all plans and specifications must be signed and sealed by a professional engineer licensed by the State where work is proposed.

D. Additional Requirements.

Applications filed pursuant to 29.21 must include a detailed **environmental analysis** and shall include information concerning the impact of the proposed use of the environment including the impact on air and water quality; scenic and esthetic features; historic, architectural, archaeological, and cultural features; wildlife, fish and marine life, etc.

The analysis shall be sufficient to enable the FWS to prepare an environmental assessment and/or impact statement in accordance with Section 102(2)(C) of the National Environmental Policy Act of 1969 and comply with the National Historic Preservation Act of 1966, the Archaeological and Historic Preservation Act of 1974, Executive Order 11593 dated May 13, 1971 and Procedures for the Protection of Historic and Cultural Properties.

Prior to entry upon lands under the jurisdiction of the Service to perform any of these additional requirements, applicant should contact the Refuge Manager and the Regional Archaeologist to determine if they have further requirements.

E. Submit the Application and Supporting Documents to:

U.S. Fish and Wildlife Service
Division of Realty
P.O. Box 25486
Denver, CO 80225

# APPLICATION FOR
# RIGHT-OF-WAY PERMIT

---

Complete all questions. Failure to submit the required information will cause delays in preparation time. Refer to the Instructions for Completing Application for Right-of-Way Permit for guidance. If you have questions please contact the Refuge Manager.

---

1. Name:

   Address:

   Telephone No.:

   Contact Person:

2. Detailed physical data and dimensions of proposed project (refer to Item C. of Instructions):

3. Legal Description (refer to Item C. of Instructions):

4. Attach Application Fee and Monitoring Fee Payment (refer to Item B. of Instructions):

5. Attach copies of environmental studies, cultural resources studies, and any other pertinent information (refer to Item D. of Instructions):

Comments:

**FOR FWS USE ONLY**

---

Ownership Status of Land: ___ Fee Acquired ___ Easement Interest Only
___Wetland ___Grassland

Tract Name(s):______________________________________________________________

Tract No(s).:________________________________________________________________

Comments/Recommendations:

Application Fee Received: $_____________
Monitoring Fee Received: $_____________

Exhibit XIII-2 COMPATIBILITY DETERMINATION

Proposed Use:

The South Dakota Department of Transportation proposes to regrade US Highway 281 from Redfield south to US Highway 14, a distance of 26.8 miles.

Refuge Unit:

Huron Wetland Management District, Beadle County Waterfowl Production Area Wetland Easements 139X; 219X,1; 252X; 371X. A total of five protected wetlands are involved in the proposed project.

Sand Lake NWR Complex, Sand Lake Wetland Management District, Spink County grassland easements 301G and 302G.

Establishing and Acquisition Authorities: Migratory Bird Conservation Act
Migratory Bird Hunting and Conservation Stamp Act

Refuge Purposes:

16 U.S.C. 718c (Migratory Bird Hunting and Conservation Stamp Act): As Waterfowl Production Areas subject to... All of the provisions of such Act [Migratory Bird Conservation Act] --except the inviolate sanctuary provisions ...
16 U.S.C. 715d (Migratory Bird conservation Act}: ._. for any other management purpose, for migratory birds.

Grassland Easement Contracts: ... to provide ... nesting cover, and food for a varied array of aquatic, terrestrial, and avian wildlife, particularly waterfowl and threatened and endangered species.

National Wildlife Refuge System Mission:

The mission of the NWRS is to administer a network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generation:. of Americans.

Description of Use:

The South Dakota Department of Transportation proposes to regrade US Highway 281 from Redfield south to the junction of US Highway 14, a distance of 26.8 miles. This road was originally constructed in 1941 with 11.5 foot driving lanes and no shoulders. Currently the road does not meet DOT design standards and requires reconstruction to meet those new standards. An additional 25 feet of permanent right-of-way is required on each side of existing right-ofway to bring the roadway up to meet current safety requirements. The foot pri nt of the reconstructed roadway will be an average of 10-14 feet wider on each side.

Availability of Resources:

There will not be any need for additional resources to administer the proposed use. All resources necessary will be expended during the permitting process.

Anticipated Impacts:

The anticipated impacts related to this use are very minor in nature. The five wetlands protected by easement involved in the proposed use will have small amounts of fill placed into them. The attached project summary list details each specific wetland easement site that will be impacted by the project. (See highlighted lines) Based on totals provided by the DOT summary, there will be a total of 39,200 square feet of new permanent fill placed into the five easement wetlands. This equates to a total of 0.90 wetland acres that will be impacted by the proposed use.

A total of approximately 5.04 acres of grassland protected by grassland easements will be impacted on a temporary basis. After construction activities are complete the DOT will reseed the disturbed area to an approved grass and forb mixture. All provisions of the grassland easement will remain in place and the DOT will post signs on the 5.04 acres of grassland easement to assure that the area is not hayed prior to July 16 each year.

There will be disturbance to wildlife during the construction activity. Other short term impacts include a minor reduction in the amount of grassland nesting habitat on the grassland easements until vegetation is re-established.

Public Review and Comment:

A news paper article regarding the project proposal regarding the grassland easement impacts will be published in the Redfield Press for a period of not less than 14 days.

The notice of this proposed use will be posted at the Huron WMD and Sand Lake NWR Office for a period of no less than 14 days to allow opportunities for public comment.

Determination:

The proposed use is compatible.

Stipulations Necessary to Ensure Compatibility:

Issuance of this permit does not preclude the requirements for obtaining necessary permits and/or approvals from other County, State Federal Agencies and local landowners.

This permit issued subject to the revocation and appeals procedure contained in Title 50, Part 25 of the Code of Federal Regulations.

All easement wetland impacts are minor modifications. By policy, the impacted acreage must be replaced by an equal amount of acreage excavated from around the edge of each easement wetland listed on the attached summary.

All replacement acreage must be in place by 12-31-2004.

or Wetlands

The DOT will place and maintain signs stating the haying and mowing restriction every eighth of a mile for the one and a half mile stretch of U.S. Fish and Wildlife Service Grassland.

South Dakota DOT is responsible for maintaining the compatibility provisions on the grassland easement within the right-of-way.

South Dakota DOT is responsible re-seeding specified grasses on the 5.04 acres of disturbed grassland easement. A seeding plan is attached to the R-O-W permit.

Justification:

Section 2.11 B of the compatibility policy explains how Managers are to determine if the proposed use will "materially interfere with or detract from" the purposes of the NWRS unit in question. The policy also states that compatibility is a threshold issue for managers to evaluate if the ecological integrity of the unit will be maintained based on the proposed use. Considering that the proposed use will be a minor modification to the right-of-way that pre-dates our easement interests, issuing a new right-ofway for an additional 25 feet is compatible.

Signatures:

| | |
|---|---|
| [signature] | July 29, 2002 |
| Huron Wetland District Manager | Date |
| [signature] | 7/30/02 |
| Sand Lake Refuge Manager | Date |
| [signature] | 8/8/02 |
| Refuge Supervisor | Date |
| [signature] | 8/9/02 |
| Regional Chief | Date |

Re-evaluation Date:

June 12, 2017

US Hwy 231 road project, Sand Lake Wetland District provisions...

Special Conditions:

1. Prohibit haying or mowing for any reason, including mowing for noxious weed control, until after July 15 without prior written approval by the Refuge Project Leader or District Manager.

2. Placement and maintenance of signs, stating first condition, placed every eighth of a mile for the one and a half mile stretch that US Fish & Wildlife Grassland Easement is affected.

3. South Dakota Department of Transportation is responsible for enforcement of US Fish & Wildlife Service's Grassland Easement provisions within the right-of-way.

4. Replanting of specified grasses on easement area ...Standard DOT mix is acceptable for Sec 22 and NW portion of Sec 34(see map). Remainder of Section 34 must be seeded to NRCS recommended native mix(see seeding plan and map).

5. The Fish & Wildlife Service shall not be responsible for any accidents, injury or liability for any portion of the project.

6. Permittee must obtain any other necessary county, state or federal permits necessary to complete the project.

Legal Descriptions for portion of easements affected by project:

-25 foot strip lying adjacent to the parcel deeded for highway purposes in the SWl/4 of Sec. 22, TI 16N, R64 W
-25 foot strip lying east of and adjacent to US HWY 281 in the NW 1/4 of Sec. 34, TI 16N, R64 W
-25 foot strip lying east of and adjacent to Lot H-1 in SW1/4 of Sec. 34. TI 16N, R64W
-25 foot strip lying east of and adjacent to Lot H-1 in SE 1/4 of Sec. 34, T1 16N, R64W
Spink County Grassland Easements: 301G & 302G

Length x Width = approximately 1.5 miles x 25 feet Total acreage impacted = approximately

5.04 acres

MINOR STRUCTURES INSTALLATION
ENVIRONMENTAL EVALUATION

Project HIGHWAY 281 Project

EFFECT

| | | Short | Long |
|---|---|---|---|
| Dominant Vegetation Altered | Y | N | 0 |
| T & E Species Habitat | N | N | © |
| Wetlands Incl. Riparian | | | ..,. |
| Cultural Resources | | | |
| Water Quality | | N | C) |
| Water Quantity (conserve=+ deplete=-) | | | |
| Air Quality | Y | | O |
| Socio-Economic | | N | O |
| Compatible? | | | |

Y=Yes; N=No; +=Beneficial; -=Detrimental; O=None

Remarks: The wetland impacts will be mitigated as outlined in the compatibility determination. (see attached.)

**Decision**

X ______

______ Start environmental assessment

BY [signature] 8-19-02
Date

Concur [signature], Acting Refuge Supervisor 8/26/02
Date

ENVIRONMENTAL EVALUATION
CHECKLIST Refuges and Wildlife
Region 6

Project Description:

To allow South Dakota Department of Transportation to regrade US Highway 231 from Redfield south to US Highway 14. The project would impact grassland easement tracts 301G and 302G in Spink county located in the Sand Lake Wetland Management District.

Submitted by:

Sand Lake Wetland Management District
(Field Station)

EFFECTS

| | Short Term | Long Term | Magnitude |
|---|---|---|---|
| Wetlands | 0 | 0 | |
| Uplands | --- | 0 | |
| T&E and Candidate Species | 0 | 0 | |
| Other Wildlife | --- | 0 | |
| Cultural Resources | 0 | 0 | |
| Water Quality | 0 | 0 | |
| Water Quantity (conserve =+. deplete = -) | 0 | 0 | |
| Air Quality | --- | 0 | |
| Socio-economic | + | + | |
| Compatible? | Yes | Yes | |
| Cumulative Impacts | --- | 0 | |
| | | | |

Y= Yes; N=No; +=Beneficial; -=Detrimental;

DECISION

. X _____Project is categorically excluded from NEPA documentation
___ Start environmental assessment (EA)

BY: John W Koerner 8/20/02
Project Leader Date

CONCUR:
Refuge Supervisor Date

# WIND ENERGY & REGION 6 GRASSLAND EASEMENTS

**Recommendations for Administering Wind Development Requests on Existing Easements and Acquisition of New Easements on Lands Encumbered by Wind Leases/Options and on Lands with Existing Wind Farms**

**Prepared by the Region 6 Refuges
Wind Energy Advisory Group
December 2007**



**Background**

Several factors have led to acceleration in the construction of wind farms across the nation. Technological advances in turbine design, favorable tax laws and economics, few regulatory hurdles, and a generally supportive public opinion toward "green" and "renewable" energy have combined to make wind energy the fastest growing electricity-producing industry in the country. Four of the top five states in wind development potential are within Region 6: North Dakota is ranked #1, Kansas is ranked #3, South Dakota is ranked #4, and Montana is ranked #5.

Wind resource maps produced by the National Renewable Energy Lab depict areas in each state which are most suitable for wind farm development based on where the wind blows the strongest. In the Dakotas, the areas with the highest wind development potential align closely with the Missouri Coteau. The Missouri Coteau contains some of the largest remaining tracts of mixed-grass native prairie and has a high density of wetlands making it the most valuable waterfowl-producing habitat in North America. Grasslands within the Coteau are currently being targeted by the Service for grassland easement acquisitions.

Simply put, the areas most desirable to wind farm developers are the same areas the Service has protected, or is trying to protect through the grass easement program; and, the question of whether or not to allow wind turbine development on lands protected by FWS grassland easements is one that has challenged the Service for several years. A Regional Solicitor's opinion in 2000 verified that the Service's easement rights restrict the right to destroy the vegetation, including that which would occur due to construction of turbine pads and access roads. Consequently, any development of wind resources occurring on easement lands is required to be permitted by the Service (and is subject to Appropriate Use and Compatibility policies).

Landowners upon whose land turbines are constructed generally receive an annual lease payment. Payments are on a "per turbine" basis; to date have been approximately $2,500 - $5,000 (in the Dakotas); and continue through the term of the lease agreement, typically 20 to 30 years as cited by a Florida Power and Light website (www.fplenergy.com/renewable/contents/faqs_wind.shtml). Presently, there are no state laws in North Dakota pertaining to the reclamation, or decommissioning of wind farms once they cease to operate. South Dakota requires bonding for reclamation on wind farms over 100 megawatts. In October 2007, the North Dakota Public Service Commission proposed new rules regarding wind turbine decommissioning. If adopted, these rules would make the operator or owner of a wind energy conversion facility responsible for decommissioning of the facility and for all costs associated with decommissioning of the facility and all associated facilities. The proposed rules would also give the Commission the authority to require a performance bond, letter of credit, or other form of financial assurance, after the 10th year of operation, to cover the anticipated costs of decommissioning. While it is difficult to ascertain the precise "lifespan" of a wind farm, some inferences can be made from the length of the lease agreements (20-30

years, as previously mentioned) and from the length of at least one warranty on wind turbine parts – 20 years.(www.nat**wind**power.co.uk/faq/offshore**wind**farms.asp)

The development of wind resources on easement lands may result in habitat fragmentation. Wind developers strive to place turbines on the landscape to maximize efficiency and profits; and, hilltops and ridges are typically the most suitable sites to a developer. Specific sites of turbines are generally selected independent of existing fragmentation and current land use (cropped vs. pasture) is usually not a consideration.

Bird and bat mortality due to direct strikes with turbine blades and/or towers is another concern. Erickson et al. (2005) estimates that in 2003, collisions with wind turbines killed an estimated 20,000 to 37,000 birds, with all but 9,200 occurring in California. Data regarding bat mortality are limited, but suggest migratory tree bats are the most likely to collide with turbines, especially those on forested ridge-tops (NRCNA 2007).

Finally, avoidance of otherwise suitable habitat by birds is a potential impact of wind development. Research addressing this specific issue is limited, and it remains unclear whether or not certain species are able to adapt or habituate to turbines on the landscape.

Clearly, additional research is needed and should be pursued at every opportunity in order to assess the potential influence wind development may have on breeding grassland birds, particularly waterfowl. Though focused on passerines, the protocols for investigating displacement effects of wind turbines on grassland birds that are outlined in Erickson et. al. 2007 provide examples of study design.

Given these concerns, and the uncertainties of potential detrimental impacts to migratory birds, it is understandable why many within the Service are of the opinion that we should simply say NO to development on easement lands. However, there are potential pitfalls to this course of action, and current political realities would make it very difficult to sustain our acquisition programs if the Service were to adopt this position.

It is important to remember that the intent of the grassland easement program in Region 6 has always been to prevent the conversion of grassland to cropland. It was designed to protect grass at the landscape level, while complementing existing agricultural practices; and, it was never intended to be a program to stop all development and prevent all fragmentation. This philosophy of protecting grasslands while maintaining flexibility to allow limited developments which complement agriculture is one reason the program is an overwhelming success. Key to sustaining that success will be to maintain a program that will continue to attract willing sellers (landowners).

While habitat fragmentation due to wind development is a legitimate concern, it will pale in comparison to the amount of native grasslands that are converted each year to cropland. The most recent estimates indicate that from 2002-2006, 74,524 acres of prairie were lost to the plow in ND, and an astonishing 244,497 acres were lost in SD…*in the Prairie Pothole Region of these states alone.* When the remainder of these states is considered, the losses are even more staggering. From 2005-2006, it is estimated that

Montana lost 16,618 acres of prairie to cropland conversion (Kurt Forman, USFWS-Brookings WHO, pers. comm.). Advances in seed varieties, pesticides, and fertilizers coupled with subsidy farm programs and the recent push for more ethanol production (especially from corn) are some of the reasons for accelerated conversion rates. The absence of "sod buster" provisions in the Farm Bill effective at stopping the conversion renders the Service's grassland easement program the only viable program with the capability to stem native prairie losses. Another caveat to consider is that the typical corn farmer will accept the annual royalty payments in exchange for the inconvenience of farming around the towers. He will continue to pursue the opportunity to convert native prairie knowing that he will receive these payments. The Service has the ability to conserve native prairie with an easement and then permit an insignificant level of impact which will result in preserving the vast majority of the parcel.

Should the Service adopt a policy which absolutely prohibits the development of wind on easement lands, it risks losing the key component that has made the program a success thus far: the willing seller. Any gains that might be made by keeping wind development off of easement-protected grasslands will be more than offset by the conversion of grasslands left unprotected. Those in support of allowing wind development on grassland easements still pang at the thought of pristine prairies being forever modified, but believe that it is necessary to ensure the sustainability of the easement acquisition program. "It's not the million acres that we have protected; it's the ten million acres that we don't" that is the main concern.

With these considerations in mind, the Wind Energy Advisory Group proposes the following policy guidance for addressing proposed wind energy development on grassland easements, and for proposed grassland easement acquisition on lands already encumbered by a wind option/lease or containing existing wind development.

***Scenario I: Proposed development on grassland easements***

The Service established procedures for handling proposed uses of easement lands in 2005 when the Easement Administration and Enforcement Manual was signed. In it, a flow chart was introduced that is used to evaluate requests for use or modification of easement properties. In short, prior to authorizing a use or modification, the wetland district manager must pass through several "filters" in the flowchart. In the case of proposed wind development on a grassland easement, the manager must first consider 1) if there are any alternatives off of the easement property that are acceptable to the landowner/developer, 2) whether or not the turbines are an "essential need," and 3) whether or not the development will "compromise the integrity of the easement area." Ultimately, if the proposed development passes all filters, it is likely going to be allowed. The manager then assesses the amount of impact that will occur (from turbine pads, roads, etc.) and determines if it is over or under the established "threshold" (8 acres per easement contract; justification for the threshold level is in the easement manual). If under the threshold, then the manager addresses the ***appropriate use policy*** and ***compatibility policy.*** If over the threshold, then the manager's only option is to do an exchange.

**Proposal:**

The advisory group endorses the existing guidance within the easement manual; i.e. follow the flowchart. The flowchart will need to be updated to address the Appropriate Use (AU) Policy after determining that the extent of the impact is under the threshold (pre-cursor to considering Compatibility).

In the completion of a compatibility determination (CD), there remain some questions regarding cumulative impacts. The first question pertains to the "phasing" of wind projects. Specifically, will the phasing of projects create the potential for future development on areas where the impacts have already been evaluated in a CD? As the size of wind turbines continues to increase, this group believes it is unlikely that the same parcel (i.e. quarter section of land) will undergo subsequent development in future years since the spacing requirements between turbines will likely also increase. However, it is possible that lands protected by the same easement contract could experience development in different phases. In this case, we believe the flowchart still provides adequate guidance. Once cumulative impacts on a specific easement exceed the allowable threshold, this group recommends the same course of action as would be followed if the original impacts were over threshold (see discussion below regarding impact over threshold).

The second question regarding cumulative impacts seems to center on defining what impacts should be evaluated. It is our understanding that only the impacts from the currently proposed project are evaluated under Compatibility. In other words, if there are three turbines proposed for construction on a grassland easement, then the impacts that those three turbines and associated facilities will have on the specific easement are evaluated, and not the larger issue of "turbine development on grassland easements," which remains highly speculative and nearly impossible to define. It is our understanding that this broader question is one more appropriately evaluated under NEPA.

If the impact is over threshold, or the proposal is otherwise determined to be either inappropriate or incompatible, then the only option is to do an exchange (unless the reason for the incompatible determination is due to unacceptable impacts to endangered/threatened species or special emphasis species, in which case the use must be denied). The group endorses utilizing the existing exchange policy where the Service will issue a partial release of interests that will allow the development of wind power on the easement property. The partial release of interests will be replaced by the wind power developer on other lands and upon decommissioning of the wind farm, the tower site and associated roads and other facilities will be removed and restored to grass.

The advantages of this approach are 1) on areas where the Service has relinquished the right to control wind energy, this use would not be evaluated for compatibility or appropriate use since it would essentially be an outstanding right. Any other proposed use of the relinquished area would still be subject to compatibility and appropriate use as the Service still retains an interest in that area, 2) the partial release of rights by the

Service will be replaced by the wind power company through the acquisition of easement rights on other property, 3) the reversionary clause will be specific in its intent to ensure that impacted acres are restored to grass in the future and the easement interests returned to the Service, 4) in all cases, the Service will still work with the landowner and wind company to minimize impacts to the extent possible (*alternatives* to impacts is among the first filters in the flowchart).

***Scenario II: Proposed easement acquisition on lands encumbered by a wind lease or option***

Under this scenario, the Service will have an opportunity to purchase a grassland easement on land where a third party has already secured the right to develop wind through a lease or option. Because the easement purchase would occur while the lease/option is in effect, the Service would have no authority under the easement to stop wind development, or even influence it in any way. However, this does not preclude a manager from working with the wind developer to minimize surface disturbance on a voluntary basis during the construction phase; but it must be clearly understood that because the Service's easement would be subject to the wind lease/option, the Service would lack jurisdiction in this case. Consequently, there would be no permits required (from Refuges & Wildlife [RW]) and no opportunity for conducting an Appropriate Use Determination, Compatibility Determination, NHPA review or NEPA review (the wind company may still have to address other issues such as endangered species and migratory birds, and may even be obligated to satisfy NEPA requirements, but this would be administered by other Service programs not related to the easement; i.e. not RW). For the Service to still purchase an easement under this scenario, the quality of the grassland must be such to warrant protection despite the possibility of turbine development.

Wind energy in the Dakotas has become a highly competitive industry. Many companies are attempting to "blanket" large areas with options and leases even though they may not have immediate plans for development. The presence of "speculative investing," whereby small entities tie up wind rights with the intent to sell to a larger developer, seems to only fuel the "feeding frenzy." In the end, this group believes that only a small fraction of lands encumbered by wind leases/options will actually be developed.

**Proposal:**

Originally, the group recommended the modification of the easement evaluation score sheet to factor in both the threat of grassland conversion (to cropland) as well as the potential of wind development. The goal was to still protect high quality, large tracts of native prairie with a high threat of conversion, even though the potential for wind development may be high. If a tract was of lower priority (supported fewer waterfowl pairs), a higher potential for development would not add to the overall score and an easement would likely not be purchased on that tract.

However, after a critical review of the existing easement evaluation score sheet, it became evident that the entire evaluation process was flawed. Consequently, a new

decision-making tool, the Grassland Easement Decision Tree, was crafted which clearly places emphasis on protecting the most valuable waterfowl habitat. Within this Decision Tree, refuge staffs will need to decide when (or if) the presence of a wind option or lease becomes a deterrent to acquisition. That decision has not been made at this time.

Wind leases are not perpetual; Service easements are. Development will likely occur on some (but not all) of these tracts. But, once wind operations cease and facilities are removed, the land can be restored to grass and our easement would become effective on the entire tract. This option is preferable to leaving high quality native prairie and grassland habitats which support high waterfowl pair densities unprotected and susceptible to conversion.

Before a grassland easement is purchased on a property with a pre-existing wind lease, the refuge or WMD manager must provide a separate memorandum or include a statement on the easement evaluation sheet that states he/she is aware there is a pre-existing wind power lease encumbering the property and is willing to acquire the easement subject to the lease. A review of the wind lease should be conducted by the refuge or WMD manager as part of the decision making process. Dependent on the restrictions of the wind lease, the wind company may have to consent to the easement in order to obtain clear title.

An important point to remember is that currently, options/leases that are signed prior to the planning of a wind farm will likely not specify who is responsible for site reclamation or decommissioning at the end of the wind farm's life span as this information is typically included in the lease agreement that covers actual construction and operation of the turbines. Ideally, the State Public Utility Commission (SD) and Public Service Commission (ND) will adopt rules which will require companies to have decommissioning plans to be in place prior to construction. If they do not, and if wind farms continue to be constructed without these plans in place, the Service will have to weigh the benefits of continuing to protect these areas with easements against the possibility of having structures on the landscape indefinitely.

Grassland easement payments on lands with pre-existing wind leases will be adjusted utilizing the approved methodology, attached. Tower densities and U.S. Treasury note rates should be reviewed at least annually and if necessary, the discounting adjusted to reflect the updated information.

***Scenario III: Proposed grass easement on lands with turbines already constructed***

**Proposal**

The group proposes to follow virtually the same procedures as outlined in Scenario II. The intent is still to protect high quality native prairie from conversion, so tracts that score high enough will still be pursued, but the offer will be reduced by an amount commensurate with the degree of development (be determined by Realty).

Under this scenario, the Service needs to obtain a copy of the lease agreement from the landowner or wind company to review the terms and conditions of the lease agreement. The Service needs to determine if any restoration or reclamation activities are included at the termination of the lease period. Ideally, restoration specifics (seed varieties, seeding rates, etc) would be outlined before the Service purchases an easement. This information would help the Service assess whether or not the lease holder planned future development. If restoration requirements cannot be specified or agreed upon, the Service will have to weigh the benefits of purchasing the easement against the amount of development. In other words, it may still be preferable to purchase an easement on 1,000 acres of native prairie containing one turbine, even if restoration cannot be clarified. It may not be if the easement consideration is only on 160 acres containing 5 turbines. It is fruitless at this time to attempt to define those parameters as the situation will change over time. What does not qualify for easement acquisition today may be the best habitat remaining in 30 years.

Wetland district managers should consider excluding developed areas from the easement if doing so will not result in a hard-to-define (spider web of impact) easement area. In other words, if a turbine and associated facilities exists near the edge of a parcel, and the area to be excluded can be easily defined, either by legal description or metes and bounds, the wetland district manager should consider this as an option.

Before a grassland easement is purchased on a property with existing wind towers, the refuge or WMD manager must provide a separate memorandum or include a statement on the easement evaluation sheet that states he/she is aware of the existing wind towers on the property and is willing to acquire the easement subject to the existing towers, access roads and related facilities. A review of the wind lease should be conducted by the refuge or WMD manager as part of the decision making process.

The grassland easement offer will be adjusted at the same discount rate as used in Scenario 2 for the actual acreage occupied by the wind towers, roads and related facilities already existing within the approved easement boundary.

## SUMMARY

**Scenario I** - **Use the existing guidance in the Easement manual and follow the flowchart. When appropriate, utilize an exchange with a reversionary clause to allow development to proceed while ensuring restoration requirements are clear and that the Service will regain its easement interests once wind operations cease.**

**Scenario II** - **Continue to purchase easements on high priority grasslands. Reduce the offer on 2 acres per every quarter by 85% utilizing the methodology as outlined in the attachment to this document. No ability to influence wind development, but**

**attempts should be made to ensure site restoration once wind operations cease. Review wind lease and make written statement to acquire easement.**

**Scenario III -** **Continue to purchase easements on high priority grasslands. Reduce the offer on the acres actually impacted by the existing wind towers, access roads and other related facilities by 85%. Review the wind lease to determine if restoration or reclamation agreements exist and make a written statement to acquire easement. If possible, outline restoration requirements/ agreements prior to purchasing the easement.**

LITERATURE CITED:

Erickson, W., D. Strickland, J. A. Shaffer, and D. H. Johnson. February 2007. Protocol for Investigating Displacement Effects of Wind Facilities on Grasslands Songbirds. Unpublished Report.

Erickson, W. P., G. D. Johnson, and D. P. Young. 2005. A Summary and Comparison of Bird Mortality from Anthropogenic Causes with an Emphasis on Collisions. USDA Forest Service General Technical Report PSW-GTR-191. Available online at www.fs.fed.us/psw/publications/documents/psw_gtr191/Asilomar/pdfs/1029-1042.pdf.

NRCNA (National Research Council of the Academies). May 2007. Environmental Impacts of Wind-Energy Projects. Prepublication Copy available from The National Academies Press, 500 Fifth Street, NW, Box 285, Washington, D.C. 20055.

Attachment #1

## Methodology for Discounting Grassland Easement Offers to Account for a Pre-existing Wind Power Lease

Background:
Leasing land for the development of wind farms within Region 6, particularly the Coteau Region of North and South Dakota, is progressing at an astonishing rate. Wind power leases already cover vast portions of the Coteau Region in the Dakotas and it is expected that other states will also experience similar development in the future as wind power becomes more popular. As a result, the Service is increasingly encountering situations where wind power leases encumber land that is targeted as a high priority grassland easement acquisition. In order for the Small Wetlands Acquisition Program to continue its success, the Service must find ways to protect the important habitat on properties already encumbered by wind power leases.

Issue:
In order to acquire grassland easements on property with a pre-existing wind power lease, it is important for the Service to develop a method to discount the grassland easement payment to account for the wind power rights that have been encumbered. Historically, discounting of easement payments has been accomplished by using appraisal based methodologies to estimate a discount of the easement payment to account for rights outstanding in other parties that will affect the easement interests acquired by the Service. Because the Service's realty specialists are no longer authorized to perform appraisals or to use appraisal based methodologies to develop discounting practices, the Service must develop other means to estimate the discount for a pre-existing wind power lease under the Adjusted Assessed Land Value (AALV) process authorized by Director's Orders 164 and 170.

Analysis:
Wind power companies have been willing to work with the Service to avoid sensitive areas when the Service's grassland easement is first in right. However, the Service has little or no direct control over tower density or siting on properties with pre-existing wind leases. A wind power lease executed prior to the time the Service acquires the grassland easement rights puts the wind power lease first in right and gives the wind power company the ability to alter the vegetation to construct wind towers and associated facilities. Therefore, the Service must discount its grassland easement payment to the landowner to account for the ability of the wind power company to alter a portion of the grassland vegetation.

Before a grassland easement is purchased on a property with a pre-existing wind power lease, the refuge or WMD manager must provide a separate memorandum or include a statement on the easement evaluation sheet that states he/she is aware there is a pre-existing wind power lease encumbering the property and is willing to acquire the easement subject to the lease.

Wind farms are being developed in phases to avoid the state permitting process required by both North and South Dakota for wind farms of 100 mega-watts and larger. Due to the phased development, it was felt that the quarter sections with no wind towers on them at this time will eventually have towers built on them in the future at similar or lesser densities due to an increase in the size of the wind towers.

To arrive at a supportable discount of the grassland easement payment, four wind farms were analyzed on the basis of the number of wind towers per quarter section. The first wind farm analyzed is the White Wind Farm in Brookings County, South Dakota. The project area covered a total of 115 quarter sections with 52 quarter sections having no towers, 36 quarter sections having one tower each, 22 quarter sections having two towers each and 5 quarter sections having 3 towers each. Sixty-three quarter sections contained 95 wind towers for an average density of 1.5 wind towers per quarter section.

| **White Wind Farm** | | |
|---|---|---|
| Towers per Quarter | Number of Quarters | Total Towers |
| 1 | 36 | 36 |
| 2 | 22 | 44 |
| 3 | 5 | 15 |
| Total | 63 | 95 |

**Average 1.5 towers per quarter section**

The second wind farm analyzed is the Tatanka Wind Farm in Dickey and McIntosh Counties, North Dakota and McPherson County, South Dakota. The project area covered a total of 208 quarter sections with 145 quarter sections having no towers, 22 quarter sections having one tower each, 26 quarter section having two towers each and 15 quarter sections having three towers each. Sixty-three quarter sections contained 119 wind towers for an average density of 1.9 wind towers per quarter section.

| **Tatonka Wind Farm** | | |
|---|---|---|
| Towers per Quarter | Number of Quarters | Total Towers |
| 1 | 22 | 22 |
| 2 | 26 | 52 |
| 3 | 15 | 45 |
| Total | 63 | 119 |

**Average 1.9 towers per quarter section**

The third wind farm analyzed is the Kulm Wind Farm in Lamoure County, North Dakota. The total project area is unknown, so the number of quarter sections with no towers is also unknown. There were 9 quarter sections having one tower each, 10 quarter sections having two towers each, 2 quarter sections having three towers each and 1 quarter section having 4 towers. Twenty-two quarter sections contained 39 towers for an average density of 1.8 wind towers per quarter section.

| Kulm Wind Farm | | |
|---|---|---|
| Towers per Quarter | Number of Quarters | Total Towers |
| 1 | 9 | 9 |
| 2 | 10 | 20 |
| 3 | 2 | 6 |
| 4 | 1 | 4 |
| Total | 22 | 39 |

**Average 1.8 towers per quarter section**

The fourth wind farm analyzed is the Wilton Wind Farm in Burleigh County, North Dakota. Again, the total project area is unknown, so the number of quarter sections with no wind towers is unknown. Five quarter sections contained 1 tower each, 5 quarter sections contained 2 towers each and 6 quarter sections contained 3 towers each. Sixteen quarter sections contained 33 towers for an average density of 2.1 towers per quarter section.

| Wilton Wind Farm | | |
|---|---|---|
| Towers per Quarter | Number of Quarters | Total Towers |
| 1 | 5 | 5 |
| 2 | 5 | 10 |
| 3 | 6 | 18 |
| Total | 16 | 33 |

**Average 2.1 towers per quarter section**

The wind tower density of the 4 wind farms analyzed ranges from 1.5 towers per quarter section to 2.1 towers per quarter section. Three of the wind farms had very similar densities with the Tatanka Wind Farm at 1.9 towers per quarter section, the Kulm Wind farm at 1.8 towers per quarter section and the Wilton Wind Farm at 2.1 towers per quarter section. Considering that three of the four wind farms were clustered very close to the 2.0 towers per quarter section density, it was felt that this data provided a very supportable tower density of 2.0 towers per quarter section that can be used for discounting purposes.

To complete the discounting process, the acreage impact per tower and associated facilities such as roads will need to be estimated since these alterations of the grassland will be permanent for the life of the wind farm. Other facilities such as buried power lines will return to grass cover very quickly. Information obtained from the South Dakota Utilities Commission and from the Tatanka Wind Farm indicated that approximately 1.0 acre of grassland is altered for the combined footprint of the wind tower and access road.

Using the 2.0 wind towers per quarter section density and the 1 acre per tower and access road impact, we conclude that the estimated discount per quarter section should be based upon 2.0 acres per quarter section being altered for the life of the wind farm. Each of the wind farms analyzed will eventually reach its projected project life and will be decommissioned. At that time, the towers and roads will be removed and the land they occupy will be reseeded to grass and the grassland easement interests in those acres will revert to the Service.

The discount rate for a 30 year Treasury note is presently 4.77 percent. Considering the life of most wind farms is expected to be approximately 40 years, a discount rate of 5.00 percent was felt to be appropriate for a 40 year term. The discounted value of $1.00 for 40 years at 5.00 percent is $0.15 (rounded) today. Therefore, if we estimate that in 40 years the grass will be restored on the acreage occupied by the tower and roads, the value of the grassland easement rights purchased today on that acreage should be discounted by 85 percent or ($1.00 - $0.15) = $0.85.

Example:
A landowner with a quarter section containing 160.00 acres with a pre-existing wind lease would like a grassland easement offer. We estimate the AALV value of the grassland easement to be $250.00 per acre.

Based on the information presented above, we expect that 2.0 wind towers per quarter section will be built on the example property, impacting 1.0 acre per wind tower or 2.0 acres. Therefore, (160.00 acres – 2.00 acres) = 158.00 acres with no discount and 2.0 acres will have the easement value discounted by 85 percent.

| | |
|---|---|
| No Discount: (158.00 acres x $250/acre) = | $39,500.00 |
| Discounted: [2.00 acres x ($250 x .15%)] = | $ 75.00 |
| Grassland Easement Offer: | $39,575.00 |

## NEPA- Some Definitions

**Migratory Bird Treaty Act (MBTA)-** Originally passed in 1918, implements the United States' commitment to four bilateral treaties, or conventions, for the protection of a shared migratory bird resource. The primary motivation for negotiation of the 1916 treaty and the passage of the MBTA was to stop the "indiscriminate slaughter" of migratory birds by market hunters and others. The MBTA was subsequently amended as treaties were signed with Mexico (1936, amended 1972 and 1999), Japan (1972), and Russia (1976). The Canadian treaty was amended in December 1995 to allow traditional subsistence hunting of migratory birds.

Each of the treaties protects selected species of birds and provides for closed and open seasons for hunting game birds. The MBTA protects over 800 species of birds by implementing the 4 treaties within the United States. The list of migratory bird species protected by the MBTA appears in Title 50, section 10.13, of the Code of Federal Regulations (50 CFR 10.13).

The MBTA provides that it is unlawful to pursue, hunt, take, capture, kill, possess, sell, purchase, barter, import, export, or transport any migratory bird, or any part, nest, or egg or any such bird, unless authorized under a permit issued by the Secretary of the Interior. Some regulatory exceptions apply. Take is defined in regulations as: “pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to pursue, hunt, shoot, wound, kill, trap, capture, or collect.” The MBTA protects over 800 species of birds that occur in the U.S. Additional information can be obtained at the following links:

http://www.fws.gov/permits/mbpermits/ActSummaries.html

http://www.fws.gov/permits/mbpermits/regulations/mbta.html

http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?c=ecfr&tpl=/ecfrbrowse/Title50/50cfr21_main_02.tpl

http://alaska.fws.gov/ambcc/ambcc/treaty_act.htm

**Endangered Species Act (ESA)-** Endangered Species Act of 1973 (16 U.S.C. 1531-1544, 87 Stat. 884), as amended -- Public Law 93-205, approved December 28, 1973, repealed the Endangered Species Conservation Act of December 5, 1969 (P.L. 91-135, 83 Stat. 275). The 1969 Act had amended the Endangered Species Preservation Act of October 15, 1966 (P.L. 89-669, 80 Stat. 926). The 1973 Act implemented the Convention on International Trade in Endangered Species of Wild Fauna and Flora (T.I.A.S. 8249), signed by the United States on March 3, 1973, and the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere (50 Stat. 1354), signed by the United States on October 12, 1940.

Through federal action and by encouraging the establishment of state programs, the 1973 Endangered Species Act provided for the conservation of ecosystems upon which threatened and endangered species of fish, wildlife, and plants depend. The Act:

- authorizes the determination and listing of species as endangered and threatened;
- prohibits unauthorized taking, possession, sale, and transport of endangered species;
- provides authority to acquire land for the conservation of listed species, using land and water conservation funds;
- authorizes establishment of cooperative agreements and grants-in-aid to States that – establish and maintain active and adequate programs for endangered and threatened wildlife and plants;
- authorizes the assessment of civil and criminal penalties for violating the Act or regulations;
- authorizes the payment of rewards to anyone furnishing information leading to arrest and conviction for any violation of the Act or any regulation issued there under.

Additional information can be obtained at the following links:

http://www.fws.gov/laws/lawsdigest/esact.html

http://www.fws.gov/Endangered/pdfs/esaall.pdf

http://www.nmfs.noaa.gov/pr/laws/esa/

http://www.nmfs.noaa.gov/pr/pdfs/laws/esa.pdf

http://www.epa.gov/lawsregs/laws/esa.html

**Section 7-** that section of the Endangered Species Act 1973, as amended, outlining procedures for interagency cooperation to conserve Federally listed species and designated critical habitats. Section 7(a)(1) requires Federal agencies to use their authorities to further the conservation of listed species. Section 7(a)(2) requires Federal agencies to consult with the Services to ensure that they are not undertaking, funding, permitting, or authorizing actions likely to jeopardize the continued existence of listed species or destroy or adversely modify designated critical habitat. Other paragraphs of this section establish the requirement to conduct conferences on proposed species; allow applicants to initiate early consultation; require FWS and NMFS to prepare biological opinions and issue incidental take statements. Section 7 also establishes procedures for

seeking exemptions from the requirements of section 7(a)(2) from the Endangered Species Committee.

Additional information can be obtained at the following links:

http://www.fws.gov/endangered/consultations/s7hndbk/s7hndbk.htm

http://www.fws.gov/Endangered/factsheets/consultations.pdf

http://www.fws.gov/Endangered/consultations/sec7_faq.html

http://www.nmfs.noaa.gov/pr/pdfs/laws/sec7regs.pdf

http://sero.nmfs.noaa.gov/pr/pdf/BA_guide_comboeh081105.pdf

**Action-** all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to: (a) actions intended to conserve listed species or their habitat; (b) the promulgation of regulations;(c) the granting of licenses, contracts, leases, easements, rights-of- way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air. See 50 CFR §402.02…

http://frwebgate.access.gpo.gov/cgi-bin/multidb.cgi

**Action Agency-** the agency proposing the action. Refer to definition of Action above. See 50 CFR §402…

http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?c=ecfr&tpl=/ecfrbrowse/Title50/50cfr402_main_02.tpl

**Applicant-** refers to any person, as defined in section 3(13) of the Act, who requires formal approval or authorization from a Federal agency as a prerequisite to conducting the action. See 50 CFR §402…

http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?c=ecfr&tpl=/ecfrbrowse/Title50/50cfr402_main_02.tpl

**Conference-** a process of early interagency cooperation involving informal or formal discussions between a Federal agency and the Services pursuant to section 7(a)(4) of the Act regarding the likely impact of an action on proposed species or proposed critical habitat. Conferences are: (1) required for proposed Federal actions likely to jeopardize proposed species, or destroy or adversely modify proposed critical habitat; (2) designed

to help Federal agencies identify and resolve potential conflicts between an action and species conservation early in a project's planning; and (3) designed to develop recommendations to minimize or avoid adverse effects to proposed species or proposed critical habitat. See 50 CFR §402.10…

http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?c=ecfr&sid=e05d9a0f53bd0bd0524eebfa5dba1abe&rgn=div8&view=text&node=50:7.0.3.11.2.2.33.1&idno=50

**Consultation(s)-** meetings, phone calls, e-mail, written documents etc., as it relates to ESA (MBTA, MMPA, etc.) related to a proposed action. May occur as an informal or formal consultation (see below) and may occur within (intra-agency) or between (inter-agency) Federal agencies related to a proposed action. Example of an intra-agency consultation would be Division of Refuges consulting informally with Ecological Services regarding a proposed wind project at a specific location. Such informal consultations may be elevated to the formal status if "the proposed action may affect a listed species or designated critical habitat."

**Formal Consultation-** a process between the Services and a Federal agency or applicant that:

1. determines whether a proposed Federal action is likely to jeopardize the continued existence of listed species or destroy or adversely modify designated critical habitat
2. begins with a Federal agency's written request and submittal of a complete initiation package
3. concludes with the issuance of a biological opinion and incidental take statement by either of the Services. If a proposed Federal action may affect a listed species or designated critical habitat, formal consultation is required (except when the Services concur, in writing, that a proposed action "is not likely to adversely affect" listed species or designated critical habitat). See 50 CFR §402.02 and 50 CFR §402.14…

http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?c=ecfr&sid=6bcb184a214bc12704bdde099b2e9cd1&rgn=div8&view=text&node=50:7.0.3.11.2.2.33.5&idno=50

**Informal Consultation-** an optional process that includes all discussions and correspondence between the Services and a Federal agency or designated non-Federal representative, prior to formal consultation, to determine whether a proposed Federal action may affect listed species or critical habitat. This process allows the Federal agency to utilize the Services' expertise to evaluate the agency's assessment of potential effects or to suggest possible modifications to the proposed action which could avoid potentially adverse effects. If a proposed Federal action may affect a listed species or designated

critical habitat, formal consultation is required (except when the Services concur, in writing, that a proposed action "is not likely to adversely affect" listed species or designated critical habitat). See 50 CFR §402.02 and 50 CFR §402.13…

http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?c=ecfr&sid=6bcb184a214bc12704bdde099b2e9cd1&rgn=div8&view=text&node=50:7.0.3.11.2.2.33.4&idno=50

**Intra-Service Consultation-** may be formal or informal consultation(s); within the USFWS such as discussed above.

**Inter-Agency Consultation-** typically takes the form of a formal consultation between the action agency and the USFWS (or NMFS), particularly if the proposed action may affect either a listed species or designated critical habitat.

**Biological Opinion (BO)-** document which includes: (1) the opinion of the U.S. Fish and Wildlife Service or the National Marine Fisheries Service as to whether or not a Federal action is likely to jeopardize the continued existence of listed species, or result in the destruction or adverse modification of designated critical habitat; (2) a summary of the information on which the opinion is based; and (3) a detailed discussion of the effects of the action on listed species or designated critical habitat. See 50 CFR §402.02 and 50 CFR §402.14(h)…

http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?c=ecfr&sid=6bcb184a214bc12704bdde099b2e9cd1&rgn=div8&view=text&node=50:7.0.3.11.2.2.33.5&idno=50

**Biological Assessment (BA)-** information prepared by, or under the direction of, a Federal agency to determine whether a proposed action is likely to: (1) adversely affect listed species or designated critical habitat; (2) jeopardize the continued existence of species that are proposed for listing; or (3) adversely modify proposed critical habitat. Biological assessments must be prepared for "major construction activities." See 50 CFR §402.02. The outcome of this biological assessment determines whether formal consultation or a conference is necessary. See 50 CFR §402.02 and 50 CFR §402.12…

http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?c=ecfr&sid=6bcb184a214bc12704bdde099b2e9cd1&rgn=div8&view=text&node=50:7.0.3.11.2.2.33.3&idno=50

**Environmental Impact Statement (EIS)-** mandated under Section 102(2)(C) of NEPA when the action agency *knows* or *suspects* the proposed action might be significant…the primary purpose of an environmental impact statement is to serve as an action-forcing device to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government. It shall provide full and fair discussion

of significant environmental impacts and shall inform decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment. Agencies shall focus on significant environmental issues and alternatives and shall reduce paperwork and the accumulation of extraneous background data. Statements shall be concise, clear, and to the point, and shall be supported by evidence that the agency has made the necessary environmental analyses. An environmental impact statement is more than a disclosure document. It shall be used by Federal officials in conjunction with other relevant material to plan actions and make decisions.

http://ceq.hss.doe.gov/NEPA/regs/ceq/1502.htm

**Environmental Assessment (EA)-** a concise public document for which a Federal agency is responsible that serves to:

1. briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact,
2. aid an agency's compliance with the Act when no environmental impact statement is necessary, and
3. facilitate preparation of a statement when one is necessary.

The EA shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

http://ceq.hss.doe.gov/Nepa/regs/ceq/1508.htm#1508.9

**Incidental Take-** take of listed fish or wildlife species that results from, but is not the purpose of, carrying out an otherwise lawful activity conducted by a Federal agency or applicant. See 50 CFR §402.02…

**"Take"-** Take is defined under MBTA and *ESA* as: "pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to pursue, hunt, shoot, wound, kill, trap, capture, or collect (*or to attempt to engage in any such activities*)." See also definition and information as it relates to the Marine Mammal Protection Act of 1972.

http://www.fws.gov/laws/lawsdigest/marmam.html

Incidental Take Authorization- letters or 'authorizations' from the USFWS or NMFS to provide for incidental take provided USFWS or NMFS provided the Service finds the takings will/would be of small numbers and have no more than a "negligible impact" on those species not listed as depleted under the MMPA (i.e., listed under the Endangered Species Act (ESA)), and not having an "unmitigable adverse impact" on subsistence harvests of these species. These "incidental take" authorizations, also known as Letters of Authorization or LOAs, require that regulations be promulgated and published in the Federal Register outlining:

1. permissible methods and the specified geographical region of taking

2. the means of effecting the least practicable adverse impact on the species or stock and its habitat and on the availability of the species or stock for "subsistence" uses, and,
3. requirements for monitoring and reporting, including requirements for the independent peer-review of proposed monitoring plans where the proposed activity may affect the availability of a species or stock for taking for subsistence uses.

In 1986, Congress amended both the MMPA, under the incidental take program, and the ESA to authorize takings of depleted (and endangered or threatened) marine mammals, again provided the taking (lethal, injurious, or harassment) was small in number and had a negligible impact on marine mammals.

http://www.nmfs.noaa.gov/pr/permits/incidental.htm

http://www.fws.gov/endangered/permits/index.html

http://www.fws.gov/forms/3-200-56.pdf

**Incidental Harassment Authorization (IHA)-**

**"Harassment"-** defined under ESA (see HCP below), MBTA, but included herein based on definition provided for MMPA in 1994…harassment is statutorily defined as, any act of pursuit, torment, or annoyance which--

- (Level A Harassment) has the potential to injure a marine mammal or marine mammal stock in the wild; or,
- (Level B Harassment) has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering but which does not have the potential to injure a marine mammal or marine mammal stock in the wild.

**Habitat Conservation Plan (HCP)-** Under section 10(a)(2)(A) of the Act, a planning document that is a mandatory component of an *incidental take permit application*, also known as a Conservation Plan. See information at link below.

http://www.fws.gov/endangered/hcp/hcpbook.html

**Categorical Exclusions (CATEX)-** a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (Sec. 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. An agency may decide in its procedures or otherwise, to prepare environmental assessments for the

reasons stated in Sec. 1508.9 even though it is not required to do so. Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

http://ceq.hss.doe.gov/Nepa/regs/ceq/1508.htm

http://ceq.hss.doe.gov/ntf/report/chapter5.pdf

**Compatibility Determination (CD)-** the agency requires compatibility determinations for any management activity on a national wildlife refuge resulting in generation of a commodity that we sell for income or revenue or trade for goods or services, as defined in 603 FW 2 as “refuge management economic activities.” Examples include farming, grazing, haying, and timber harvesting.We do not require compatibility determinations for habitat management activities that do not result in generation of a commodity. We do not require compatibility determinations for habitat management activities described in an HMP unless the HMP proposes a habitat management activity not addressed in the CCP.

When is a compatibility determination not required? For Refuge Management Activities.

- The agency does not require a compatibility determination for refuge management activities as defined by the term "refuge management activity" except for "refuge management economic activities." Examples of refuge management activities that do not require a compatibility determination include: prescribed burning; water level management; invasive species control; routine scientific monitoring, studies, surveys, and censuses; historic preservation activities; law enforcement activities; and maintenance of existing refuge facilities, structures, and improvements. In addition, we do not require compatibility determinations for State wildlife management activities on a national wildlife refuge pursuant to a cooperative agreement between the State and the Fish and Wildlife Service where the refuge manager has made a written determination that such activities support fulfilling the refuge purposes or the System mission.

Additional information relative to CDs and NEPA can be obtained at the following links:

http://www.fws.gov/policy/603fw2.html

http://www.fws.gov/policy/550fw3.html

http://www.fws.gov/policy/620fw1.html

Memorandum of Understanding
Between the
U.S. Fish and Wildlife Service, Huron Wetland Management District
And the
Clipper Wind Energy Consortium

I. AUTHORITY

This agreement between the U.S. Fish and Wildlife Service, Huron Wetland Management District (hereinafter referred to as the "Service") and the Clipper Wind Energy Consortium (hereinafter referred to as "Clipper") is entered into under the authority of the Fish and Wildlife Coordination Act, 16 U.S.C. 661-667, Intergovernmental Cooperation Act (31 U.S.C.6505) and the provisions of the Interior and Related Agencies Appropriation Act, Public Law 108-7 (Department of the Interior and Related Agencies Appropriations Act, 1995), National Wildlife Refuge Administration Act as amended by the National Wildlife Refuge System Improvement Act of 1997.

II. BACKGROUND

The Service currently holds and continues to acquire easement agreements with private landowners that protect wetland and grassland resources from being adversely impacted. These are perpetual agreements and as a deed restriction the agreements remain with the land as ownership changes. A variety of development activities or uses are occasionally proposed on easement lands, such as wind energy development, which can adversely impact these easements. The Service works with landowners and company representatives to avoid and reduce impacts to the resources protected by these easement contracts. The Service has a formal process in an Official Easement Manual which directs the review and response to these requested activities or uses..

III. PURPOSE AND OBJECTIVES

The purpose of this Memorandum of Understanding is to provide an understanding of the process and requirements of the Service in administration of grassland and wetland easements. The agreement also identifies the intent of the requesting entity to provide information and commit to various actions associated with a requested activity on a grassland or wetland easement.

IV. RESPONSIBILITIES OF THE PARTIES

The Service agrees to:

*provide companies, entities or landowners site specific information on the specific location of Service grassland and wetland easements and the requirements and terms of the areas protected.

*provide onsite review and consultation to discuss tower and facility siting with the

purpose of avoiding or reducing impacts to the extent possible. There may be special circumstances where avoidance of easement lands will be required.

*consult and assist in addressing National Environmental Protection Act (NEPA) requirements, including cultural and wildlife resources.

*issue the necessary permits either as a Special Use Permit and/or a Right of Way permit. In situations where location of towers and facilities are determined appropriate within an easement property, permits will be issued within a timely manner.

Clipper agrees to:

*provide location and siting information of wind towers and facilities to the Service as early in the planning process as possible.

*avoid easements to the extent possible and where reasonable alternatives are not available and when siting of towers or facilities are deemed unavoidable on easement lands, work with the Service to reduce impacts on the easements to the extent possible.

*for project activities that impact grassland and wetland easement protected areas, file an application for a right of way permit pursuant to the regulations in 50 CFR, part 29 subpart B. The right of way permit will require that the requesting entity provide full bonding to cover removal and complete site restoration of the wind tower and associated facilities that exist on easement areas.

*in consultation and cooperation with the Service, meet the requirements of NEPA. This will generally be addressed through an Environmental Assessment or a categorical exclusion, but does not preclude the development of an Environmental Impact Statement if necessary. This will include but not be limited to a review of cultural and wildlife resources,

V. PERIOD OF PERFORMANCE

The agreement shall stand in effect from the date of the last signature below until rescinded by either party with a 30 day notice. The agreement may be modified at any time by mutual agreement of both parties.

VI. PROJECT OFFICERS

Harris Hoistad
Project Leader
Huron Wetland Management District

Stu Webster
Field Representative
Clipper Wind

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be executed as of the date of the last signature below.

| U.S. FISH AND WILDLIFE SERVICE | CLIPPER WIND ENERGY |
| --- | --- |
| ______________________________ | ______________________________ |
| Harris Hoistad | Stu Webster |
| Date__________________________ | Date__________________________ |

# PARTIAL TERM RELINQUISHMENT AND RELEASE OF WATERFOWL HABITAT PROTECTION EASEMENT IN THE UNITED STATES

This instrument is made and executed this _________ day of ________________, 200_, by the UNITED STATES OF AMERICA, acting by and through the Secretary of the Interior or his authorized Representative.

WITNESSETH:

WHEREAS, under the authority of the of the North American Wetlands Conservation Act, 16 U.S.C. 4401-4412; the Migratory Bird Hunting and Conservation Stamp Act, 16 U.S.C. 718d(c); the Fish and Wildlife Act of 1956, 16 U.S.C. 742a-742j; the Emergency Wetlands Resources Act of 1986, 16 U.S.C. 3901; and the Land and Water Conservation Fund Act, 16 U.S.C. 460*l*-9(a)(1), the UNITED STATES OF AMERICA acquired an easement for waterfowl habitat protection dated _________________, and recorded on [date] in [recording information] in the records of _____________ County, [State] (hereinafter, the "Easement"), in which all right, title, and interest was assigned to the Secretary of the Interior for administration by the United States Fish and Wildlife Service as part of the National Wildlife Refuge System pursuant to the National Wildlife Refuge System Administration Act, 16 U.S.C. 668dd-ee.

WHEREAS, under the authority of the of the North American Wetlands Conservation Act, 16 U.S.C. 4401-4412; the Migratory Bird Hunting and Conservation Stamp Act, 16 U.S.C. 718d(c); the Fish and Wildlife Act of 1956, 16 U.S.C. 742a-742j; the Emergency Wetlands Resources Act of 1986, 16 U.S.C. 3901; and the Land and Water Conservation Fund Act, 16 U.S.C. 460*l*-9(a)(1), the UNITED STATES OF AMERICA, acting by and through the authorized representative, the U.S. Fish and Wildlife Service, for and on behalf of the Secretary of the Interior, is willing to accept a Conveyance of Easement for Waterfowl Habitat Protection dated ______________ to ________ acres of land in _________ County, [State], from [name of grantor], and as part of the consideration therefore is willing to exchange an interest in lands as authorized by the National Wildlife Refuge System Administration Act, 16 U.S.C. 668dd-ee.

NOW, THEREFORE, for and in consideration of the above-described exchange of interests in lands, the UNITED STATES OF AMERICA partially releases and relinquishes, for only the term and use herein specified, its waterfowl habitat protection easement interest in the following described lands (hereinafter, the "Released Lands"), as more particularly described on Map Exhibit A attached hereto and made a part hereof by reference, now owned by [landowner's name] and subject to the Easement:

[Legal description of the surveyed windpower facility footprint *or* legal subdivision of project site]

PROVIDED, This instrument releases and relinquishes only those waterfowl habitat

protection rights of the UNITED STATES OF AMERICA in the specific Released Lands described above and depicted on attached Map Exhibit A, and does not in any way affect those perpetual easement rights acquired by the UNITED STATES OF AMERICA in the other lands described in the Easement.

AND PROVIDED FURTHER, This instrument only releases and relinquishes the waterfowl habitat protection rights of the UNITED STATES OF AMERICA in the Released Lands for the duration and term of that instrument titled [name of windpower lease or other instrument], by and between [name of windpower company] (hereinafter, the "Company") and [name of landowner(s) or, as appropriate, his/her/their predecessor(s) in interest] dated ____________________________, and recorded on [date] in [recording information] in the records of _____________ County, [State] (hereinafter, the "Lease") [if not a lease, use another appropriate reference]). Upon termination of said Lease, this partial term relinquishment and release shall terminate, and the Easement shall automatically be reinstated on the Released Lands.

AND PROVIDED FURTHER, This instrument only releases and relinquishes the waterfowl habitat protection rights of the UNITED STATES OF AMERICA in the Released Lands for the purpose of the construction, operation, maintenance, and decommissioning of [number] wind power turbines and associated facilities, including but not limited to access roads and an energy collection system, as described in [NEPA document and/or license or other authorization: be sure to list all documents that precisely describe the project], and does not release or relinquish the waterfowl habitat protection rights of the UNITED STATES OF AMERICA in the Released Lands for any other purpose or use.

AND PROVIDED FURTHER, This instrument's partial term relinquishment and release of the waterfowl habitat protection rights of the UNITED STATES OF AMERICA in the Released Lands is expressly conditioned on the following terms:

(1) The Company shall comply with all environmental protection measures described in [NEPA document and/or license or other authorization], including, but not limited to, all measures specified in a restoration and protection plan for the Released Lands prepared by the Company and approved by the U.S. Fish and Wildlife Service.

(2) The Company shall comply with all facility decommissioning and site restoration and reclamation measures described in [NEPA document, restoration and protection plan, and/or license or other authorization]. As required by [that document/those documents], within __months of termination of the Lease and this partial term relinquishment and release, or within __ months of abandonment of the project (for purposes of this partial term relinquishment and release, "abandonment" means the cessation of operations for reasons other than a force majeuer event for a minimum of six months), the Company shall dismantle and remove from the Released Lands all towers, turbines, and associated facilities (including foundations and other subsurface facilities to a depth of __ feet). The Company shall remove all access roads and restore and reclaim the Released

Lands described above to their pre-project topography and topsoil quality, and reseed all disturbed areas with native vegetation, within __ months of project termination or abandonment.

(3) Financial surety.

(a) Before commencing construction, the Company shall furnish a continuing financial surety in the form of an irrevocable letter of credit (ILC) from a federally-insured financial institution rated investment-grade or higher in the amount of $____________ (said amount to be annually adjusted to reflect the percent of change in the average consumer price index for all items, city average, as published by the United States Department of Labor, Bureau of Labor Statistics), naming the UNITED STATES OF AMERICA as beneficiary thereof. The ILC shall be irrevocable, require presentation of no document other than a written demand and the ILC (and letter of confirmation, if any), expire only as provided in paragraph (3)(b) hereof, and be issued/confirmed by an acceptable federally insured financial institution as provided in paragraph (3)(c) hereof.

(b) The ILC shall cover the entire period for which financial security is required, as follows:

(i) The ILC shall expire no earlier than ___ months after termination of the Lease and this partial term relinquishment and release, or __ months after abandonment of the project. [Note: The ILC should expire no earlier than 12 months after the period allowed for site reclamation specified above; for example, if the Company is allowed 18 months after lease termination or project abandonment to reclaim the site, the ILC should expire no earlier than 30 months after lease termination or project abandonment]. The UNITED STATES OF AMERICA shall be entitled to draw on the ILC at any time during the 12 months preceding its expiration.

(ii) Alternately, the ILC shall have an initial expiration date that is a minimum period of one year from the date of issuance. The ILC shall provide that, unless the issuer provides the UNITED STATES OF AMERICA with written notice of non-renewal at least 60 days in advance of the current expiration date, the ILC is automatically extended without amendment (except for an annual adjustment in the amount of the ILC for inflation, as provided in paragraph (3)(a) hereof) for one year from the expiration date, or any future expiration date, until the period of coverage required by paragraph (3)(b)(i) hereof is completed and an authorized official of the UNITED STATES OF AMERICA provides the financial institution with a written statement waiving the right to payment. If the issuer provides a written notice of non-renewal at any time

during the period of coverage required by paragraph (3)(b)(1) hereof, the UNITED STATES OF AMERICA shall be entitled to immediately draw on the ILC.

(iii) In case of Lease renewal or extension, the period of coverage required by paragraph (3)(b)(i) hereof will be correspondingly extended.

(c) Only federally insured financial institutions rated investment grade or higher shall issue or confirm the ILC. Unless the financial institution issuing the ILC had letter of credit business of at least $25 million in the year preceding the issuance of the ILC, ILCs over $5 million must be confirmed by another federally-insured financial institution rated investment-grade or higher that had letter of credit business of at least $25 million in the year preceding the issuance of the ILC. The Company shall provide the United States Fish and Wildlife Service a credit rating from a recognized commercial rating service (as specified in Office of Federal Procurement Policy Pamphlet No. 7) that indicates the financial institution has the required rating(s) as of the date of issuance of the ILC. If, subsequent to issuance of the ILC, the issuing financial institution's rating drops below the required level, the Company shall have 30 days to substitute an acceptable ILC. If no such acceptable substitution is made within 30 days of the change in the financial institution's rating, the UNITED STATES OF AMERICA shall be entitled to immediately draw on the ILC.

(d) Any funds derived from the ILC by the UNITED STATES OF AMERICA shall be deposited in the General Fund of the United States Treasury without deduction for any charge or claim, and any performance of the project decommissioning and site restoration and reclamation activities described in paragraph (2) hereof by the UNITED STATES OF AMERICA is subject to the availability of appropriated funds. Nothing in this partial term relinquishment and release shall affect any liability or obligation of the Company or the owners of the Released Lands to perform project decommissioning or site restoration or reclamation activities pursuant to federal or state law.

(4) In case of non-compliance with the foregoing terms, the Company shall be entitled to thirty days following the receipt of written notice from the U.S. Fish and Wildlife Service to cure such noncompliance. If the noncompliance is not cured within this period of time, this partial term relinquishment and release shall terminate.

(5) In case of renewal or extension of the Lease by its own terms, this partial term relinquishment and release shall be similarly extended subject to each and every term and condition hereof, including but not limited to the financial surety requirements set forth in paragraph (3) hereof. Financial surety for the term of the

Lease renewal or extension must be submitted to the U.S. Fish and Wildlife Service no later than sixty days prior to the end of the initial Lease term. The provisions of this paragraph shall not apply to renewal or extension of the Lease term through amendment of the Lease or execution of a new lease; in such cases, this partial term relinquishment and release shall terminate and the Company's will be required to perform the facility decommissioning and site restoration and reclamation measures described in paragraph 2 hereof unless the UNITED STATES OF AMERICA executes a new partial term relinquishment and release.

(6) The terms and conditions of this partial term relinquishment and release shall be binding on the Company and its successors and assigns.

IN WITNESS WHEREOF, the UNITED STATES OF AMERICA has executed this instrument on the date first written above.

[Signature blocks]

**United States Department of the Interior**
FISH AND WILDLIFE SERVICE
Audubon National Wildlife Refuge
3275 11th St. NW
Coleharbor, ND 58531-9419

April 23, 2008

Tammy Fairbanks Realty Specialist
Bismarck Wetland Acquisition Office
Bismarck, ND 58501

Dear Tammy:

I'm writing concerning the Tim Strobel grassland easement acquisition. We are aware that a wind power lease has been acquired on this property by Ottertail Power. The lease allows for possible wind tower and transmission line construction. We are willing to accept the grassland easement subject to the wind lease. The wind lease does not guarantee that disturbance to the easement will occur. If or when it does occur we are willing to work with the power company to minimize the impact as best we can. The grassland easement acquisition should proceed. Any questions give me a call at 442-5474 ext 16.

Sincerely,

Mike Grabow
Biological Technician

This letter should also include the legal description of the wind lease and the proposed acquisition.

# CONSENT TO EASEMENT

Otter Tail Energy Services Company, Incorporated (OTESCO) is the successor in interest to Sheridan Ridge I, LLC, a Minnesota Limited Liability Company, whose address is 224 East Washington Avenue, Fergus Falls, Minnesota 56537, as the owner of a Wind Farm Easement Agreement of which Notice was executed by Timothy J. Strobel and Alberta Strobel, husband and wife, dated November 8, 2007, and recorded in Book C-83 of Misc. on Page 32, as Document Number 115792 in the office of the Register of Deeds/County Recorder/Registrar of Titles in the County of Sheridan, State of North Dakota.

For valuable consideration, OTESCO consents to an easement for Waterfowl Habitat Protection (grassland easement) executed by Timothy J. Strobel and Alberta Strobel, husband and wife, to United States Department of the Interior, U.S. Fish and Wildlife Service dated October 3, 2008, recorded in Book ______ of _________ on page __________, or as Microfilm, Document, or other Identifying Number _________________ in the office named above.

The easement is over the following described land in the above named county and state:

Grassland Easement

**T. 147 N., R. 75 W., 5th P.M.**
Section 17, N1/2N1/2NE1/4NE1/4SW1/4, W1/2SW1/4, W1/2E1/2SW1/4 less a tract described in Deed Book 58, page 14
Section 18, W1/2W1/2SE1/4, E1/2SW1/4SE1/4, W1/2NW1/4SE1/4SE1/4, S1/2SE1/4SE1/4
**T. 147 N., R. 76 W., 5th P.M.**
Section 23, South 18 acres of the West 30 acres of the NE1/4, W1/2NE1/4NW1/4, S1/2SE1/4NE1/4NW1/4, W1/2NW1/4, SE1/4NW1/4, E1/2SW1/4, E1/2E1/2E1/2W1/2SW1/4

OTESCO's consent to easement is premised upon the recognition by the U.S. Fish & Wildlife Service that the consent will not affect OTESCO's rights under the Wind Farm Easement Agreement, and that the grassland easement is subordinate to OTESCO's rights under its Wind Farm Easement Agreement.

Dated this 3rd day of April, 2009.

OTTER TAIL ENERGY SERVICES COMPANY, INC (OTESCO)

By: [signature]
George Koeck, Secretary

ACKNOWLEDGMENT

STATE OF NORTH DAKOTA )
) ss
COUNTY OF CASS )

On this 3rd day of April, 2009 before me personally appeared George Koeck, Secretary, known to me to be the person described in and who executed the foregoing instrument and acknowledged to me that he executed the same as his free act and deed.

Notary Public: [signature]

(SEAL) My Commission expires: ______________

JACQUELYN ROGNESS
Notary Public
State of North Dakota
My Commission Expires Jan. 10, 2012

Exhibit XV-1

**Process**
**for**
**Exchanging Land Interests**
**and**
**Implementing a Concept of**
**Biological Equivalency**
**Region 6 ONLY**

This document describes both the process that will be used to accomplish an exchange of easement interests and the process that will be used to insure a concept of biological equivalency or replacement of habitat values either in conjunction with an exchange of interests, or which must be accomplished independently of the actual exchange.

## Background:

All requests for use of easement properties must first be evaluated with the flowchart (Chapter XII) and managers will complete an "Easement Use Evaluation Form" (Exhibit XII-3) which will be a permanent record for the easement file. The flowchart will lead managers to a decision as to whether the request meets the criteria necessary for approval, and how they should address compatibility. If the impact to easement interests results in either no permanent impact or an impact which is below threshold levels, then compatibility must be addressed. Managers may use any of the programmatic CD's if they fit the circumstances at hand; if not, then they will need to develop an individual CD. If the resulting impact is either above threshold levels or fails compatibility because it is an economic use which cannot meet the higher standard, but has successfully passed the rest of the flowchart, then an exchange of interests is the only remaining option which may be considered. If an exchange is being proposed, compatibility requirements are not applicable; but the manager must, as part of the exchange proposal, complete a "biological analysis" statement for the property to be relinquished. This will be part of the Exchange Request Format, as described in Chapter XII-D, E, and F. The biological analysis is also discussed below. The actual exchange will be accomplished by Realty, under Realty guidelines and policy. The concept of habitat equivalency will be required of wetland management districts, and is explained more fully below.

## Authorized Uses Resulting in the Need for an Exchange of Easement Interests:

When managers authorize uses which cannot be resolved by temporary means, and which may have resulted in impacts to Service interests above established threshold levels, then the following procedures will apply:

### Easement Interest Exchange:

1. No CD will be required. However, a "biological analysis" of the relinquished interest will be completed as part of the proposal sent to Realty and the Zone Supervisor.

2. NEPA compliance will also need to be addressed.

3. The impacted Refuge interests will be relinquished.

   a. Follow the "Exchange Procedures and Format" discussion in Chapter XIIA-Section C of the Easement Manual.
   b. Wetland Managers must complete a "biological analysis" statement for the potentially divested property assuring that the impact, which may be the result of authorizing the exchange, will not affect any special emphasis species or critically-needed habitat. This essentially is what is required within a compatibility determination under an analysis of potential "secondary or associated" impacts.
   c. Realty will determine the current market value of the interest to be relinquished.
   d. Wetland Managers and Realty personnel will jointly complete the "Relinquished Interest" Checklist (see Exhibit XII-6), ensuring that all requirements have been satisfied.

A formal exchange has two primary requirements which need to be satisfied before the exchange can be approved: (1) the exchange must be in the interest of the Fish and Wildlife Service, and (2) it must be based on equal monetary values, or must be equalized by a cash payment.

If these two requirements are satisfied, then the exchange can move forward from a Realty point of view. In all cases, realty will determine the current market value of the interest to be relinquished. If an interest can be identified to bring into the refuge system, then Realty will also determine the current market value of that property. Any unequal values must be equalized through a cash payment.

EXAMPLE: A wetland to be relinquished is 5 acres, and determined to have an easement value of $100/acre or a total of $500. The landowner has other land containing 11 acres of wetland which he is willing to put into the easement program. These wetlands are also determined to have an easement value of $100/acre, or a total of $1100. In order to equalize this exchange, the Service will pay the requester $600.

Managers should always strive to propose a complete exchange package by identifying an acceptable piece of property to come into the system, and have the commitment of the landowner. Another option is the use of an approved "Exchange Bank." Currently, only ND has an approved exchange bank, and it is only for ND DOT projects. The banking concept not only accomplishes the needed exchange requirements for Realty, but it also accomplishes the required habitat equivalency for divested land interests, as described below.

If neither of these options is available, then, as a last resort option, it is acceptable for the second party involved in the exchange to acquire a property interest for the Service. The second party would write a check at closing on another easement being acquired by the Service. This check would be provided to the seller or escrow agent at closing; not to the Service. Again, the requester's money will go to the new easement vendor; the Service would pay the balance of the interest consideration. Diligence to locate restorable wetlands must be demonstrated and documented prior to using the last resort option.

**Requirements for Habitat Equivalency:**

Region 6 will require a concept of habitat equivalency when easement exchanges are accomplished. For wetland habitats which are divested, the requirement will be two options which are prioritized for managers to attempt to accomplish. For upland habitats, there is only one equivalency option which must be met. In all cases, the replacement habitat must be obtained within the same state in which the relinquishment took place.

**Divested wetlands**— When it has been determined that impact to easement wetlands cannot be avoided and an exchange of wetland is the only resolution to the problem (as determined by the Easement Permit Flow Chart and Easement Uses Evaluation form), managers must use the following alternatives to determine the proper avenue for exchange. The alternatives are listed in priority order and each must be thoroughly investigated prior to considering the next alternative.

1. **Onsite Restoration -** Drained wetlands of similar biological and economic values are restored within the same easement contract. The original easement agreement will be amended to add and/or delete the affected wetlands.

2. **Offsite Restoration -** Wetlands of similar biological and economic values are restored within the same geographic area on another easement contract or on land where a new contract will be acquired. Easement exchange banks are included in this alternative. The Service will make a differential payment for any unequal economic values based on a current appraisal.

3. **Onsite Creation** - Wetlands of similar biological and economic values are created within the same easement contract. The original easement agreement will be amended to add and/or delete the affected wetlands.

4. **Offsite Creation** -Wetlands of similar biological and economic values are created within another easement contract or land where an easement will be acquired. The original easement agreement will be amended to add and/or delete the affected wetlands.

5. **Protect Existing Wetland** - The Service easement rights are exchanged for easement rights or fee title on other existing wetlands. The Service will make differential payments for unequal economic values but will not accept exchanges where similar

payments are made by the landowners. In other words, the Service must receive equal or more habitat. It must be recognized that this alternative will not maintain the resource base because a loss of habitat is replaced with existing habitat.

**EXAMPLE:** Manager proposes to exchange out of 5 acres of easement wetlands. The landowner has a 6 acre drained wetland on non-easement property. He restores the wetland satisfactorily, and the easement value of this replacement land is more than the value of the relinquished interest. The Service would pay the difference. Same example, only landowner has a 3 acre restorable wetland. We can accept this offer, but the landowner will have to provide funding to acquire two additional acres or wetland habitat. If the value of the acquired easement interests is more than the relinquished easement interests, then the value of the two additional wetland acres needed to reach habitat equivalency can be deducted from the differential payment to the landowner.

Same example: Landowner has no restorable wetlands, and there are none reasonably available. If the value paid by the landowner for the relinquished interest preserves at least 5 acres, then it's a go; if not, then the landowner will have to make up the difference. If the value of the relinquished interest pays for more than 5 acres of wetland habitat, then it's good as is. No refund to landowner would be forthcoming.

**Divested Uplands—** Because of the difficulty in restoring upland habitats and the tremendous costs involved, the requirement here is to achieve at least an acre for acre exchange, in addition to Realty's requirement for dollar for dollar. There is not a requirement to restore upland habitat when considering an exchange involving uplands. One additional requirement is that relinquished native prairie must be replaced with native prairie. Again, the value of the relinquished interest must preserve at least an equal amount of native prairie as what is being relinquished. If not, the requester must make up the difference.

**EXAMPLE:** A manager is considering an exchange involving 10 acres of upland habitat (tame grass). The landowner was originally paid $50/acre or $500 in 1990. Realty now determines the easement value to be $200/acre or $2000. Even though the landowner may have been paid only $500 for the 10 acres of upland easement in 1990, he will have to pay the current easement value of $2000 to accomplish the exchange. If he has other land currently without an easement, and that land is acceptable to the manager, then the exchange can be accomplished. However, the values must work out so that his $2000 purchases at least 10 acres of upland; if not, the landowner may have to pay more, or donate a part or all of the value of the differential payment in order to fulfill the habitat equivalency requirement.

Same example: Only landowner wants to exchange native prairie, and he has no other native under his ownership. Value of the divested native is $100/acre or $1000. His $1000 must be used to acquire an easement on other native prairie, but this transaction does not necessarily have to take place within the immediate vicinity of the exchanged property. However, his $1000 must acquire at least 10 acres, wherever it takes place, or he will, again, have to make up the difference to acquire 10 acres of native prairie. If the

requester is a non-landowner such as a highway department or utility company (proposal evaluated by the Blue blocks on the Flowchart), then they must also pay the value of the relinquished interest, and pay for the value of the replacement habitat, using the same priority system. They, too, would have to agree to make up any difference if necessary. Undoubtedly, issues will arise which do not fit comfortably within these guidelines. That being the case, managers are encouraged to discuss their specific situation with Realty, their Zone supervisor, and possibly other wetland managers to obtain advice and concurrence with a potential solution.

# Fish and Wildlife Service Land Exchange Checklist

Project Name: ______________________ Location: ______________________

Acquired Tract Name/No.: ______________________ Divested Tract Name/No.: ______________________

Land Acquisition Planning Statement of Compliance ............................Date ________

Exchange Agreement executed by Vendor............................Date ________

Exchange Agreement expires ............................Date ________

Environmental Site Assessment Level I (acquired land) ............................Date ________

Environmental Site Assessment Level I (divested land) Date ________

Appraisal Review (acquired land) ............................Date ________

Appraisal Review (divested land)............................Date ________

## Service Divestiture Requirements

All associated NEPA and Service Divestiture Requirements have been met ............................ Yes__ No__

Divesting of Farm Service Agency Interest............................ Yes__ No__

## Attached Supporting Documents

Environmental Action Statement or Environmental Assessment ............................ Yes__ No__

Environmental Action Statement (divested land with supporting doc. if relevant) ............................ Yes__ No __

Maps showing acquired and divested land ............................ Yes__ No__
(Prepared to Service Standard)

I hereby certify that the above exchange complies with all requirement of law, rules or regulation applicable to FWS and any portion thereof or all documents will be available as requested.

______________________ ______________________
Regional Realty Officer Date

## ATTACHMENT

**References used to justify items below:**

A. Statement of Compliance. Referred to by memorandum from the Director to the Regional Directors, subject Changes to the Land Acquisition Planning Procedures, dated August 11, 2000. This Statement or Certificate, signed by the Regional Director lists various laws, regulations, policy directives, and Executive Orders that must be complied with prior to making decisions on land acquisition and land disposals. See also Service Manual (342 FW 5.7).

B. Environmental Site Assessment Level I for acquired land. Referred to by memorandum from the Director to the Regional Directors, subject Changes to the Land Acquisition Planning Procedures, dated August 11, 2000. (See 341 FW 3) Also, referred to by memorandum from the Director to the Regional Directors, Region 1-7, subject 1999 Appropriations Act and 342 FW 5.7.

C. Environmental Site Assessment Level I for divested land. This document is referred to by memorandum from the Director to the Regional Directors, Region 1-7, subject 1999 Appropriations Act and 342 FW 5.7.

D. Appraisal Review for acquired land. Appraised value is referred to by memorandum from the Director to the Regional Directors, Region 1-7, subject 1999 Appropriations Act and 342 FW 5.7.

E. Appraisal Review for divested land. Appraised value is referred to by memorandum from the Director to the Regional Directors, Region 1-7, subject 1999 Appropriations Act and 342 FW 5.7. (see below)

**F. Associated NEPA document is the Environmental Action Statement (EAS) with proper action statement marked. Even thought other NEPA documents might be required to determine the action and could be requested by HQ only the EAS with other supporting documents identified if necessary will be required with the checklist. The exception is Farmer Service Agency Interest; the EAS will have the following document identified and attached; 1) Explanation of no net loss of Habitat; 2) Refuge Suitability Statement or Biological Assessment; 3) request of Waiver for Conservation Easement; and 4) Statement of no objection from FSA. For more detail see "H" below.**

**G. Associated Service Divestiture Requirements. Before divesting any lands of the United States, it is essential that the requirements of the National Historic Preservation Act of 1966 (16 U.S.C. 470 et seq.); the Archeological and Historic Preservation Act of 1974 (16 U.S.C. 469 et seq.); the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (94 Stat. 2767 et seq.); the Resource Conservation and Recovery Act (98 Stat. 3221 et seq.) and Executive Orders 11988 (Floodplains Management) and 11990 (Protection of Wetlands) be complied with. Executive Orders 11988 (Floodplain Management) and 11990 (Protection of Wetlands). Service policy is included in 613 FW 1 and 2 (Natural Resources Protection). As to lands or interests in lands being conveyed out of United States ownership by exchange, the Regional Director must make a determination whether or not the lands are within a floodplain or wetlands within the scope of EO**

**11988 and EO 11990. The conveyance of land identified as being restricted by either of these orders must contain appropriate restrictive language. Any restrictive language to be used in the deed must also be included in the exchange agreement. The exchange agreement in such cases cannot be accepted until the procedures for public notices have been completed.**

H. Divesting of Farm Service Agency Interest. The December 4, 1989, National Policy Issuance #89-21, Protection of Important Resources on Farmers Home Administration Inventory Property, and the August 10, 1988, memorandum from the director to the Regional Directors, Region 1-7, subject Delegation of Authority and Procedures for Accepting Fee Titles Transfer of Farmers Home Administration Inventory Properties into the National Wildlife Refuge System.

I. **Attached Supporting Documents**

1. Environmental Action Statement. Referred to by memorandum from the Director to the Regional Directors, subject Changes to the Land Acquisition Planning Procedures, dated August 11, 2000. Formally the Environmental Action Memorandum (EAM) serves as the vehicle for the review and final approval for all Service actions that require NEPA documentation and establish the administrative record of compliance. In the FWS Environmental Quality Manual, Part 550 National Environmental Policy Act, 550 FW 3.3C through 3.3C(4)

**2. Environmental Action Statement (divested land). Serves as the vehicle for the review and final approval for all Service actions and establish the administrative record of compliance. In the FWS Environmental Quality Manual, Part 550 National Environmental Policy Act, 550 FW 3.5C (1) (b) through 3.5C(2) (f).**

3. Three (3) maps showing acquired and divested land prepared to Service standards.

| TABLE OF CONTENTS | |
|---|---|
| **TOPIC** | **Sections** |
| Overview of the Policy | 6.1 What is the purpose of this chapter?<br>6.2 What is the scope of this chapter?<br>6.3 What are the Service's authorities for acquiring and administering conservation easements?<br>6.4 Why does the Service acquire conservation easements, and what is the official Service policy on them?<br>6.5 What terms do you need to know to understand this chapter?<br>6.6 Who is responsible for administering Refuge System conservation easements? |
| Planning and Acquisition | 6.7 What are the steps the Service must take when planning a new easement acquisition area?<br>6.8 What must the planning team do when developing an easement document for use in a new or existing easement acquisition area?<br>6.9 Is there a requirement to use a standard easement document?<br>6.10 What must easement documents include, and what is their duration?<br>6.11 Does the Service ever acquire public access rights in conservation easements?<br>6.12 From which types of landowners can the Service acquire conservation easements?<br>6.13 Can the Service accept donations of conservation easements?<br>6.14 Can the Service acquire conservation easements through statutorily required compensatory mitigation plans or mitigation banks?<br>6.15 Can the Service modify or amend conservation easements? |
| Managing Easements and Uses | 6.16 What are the requirements for posting the boundaries of conservation easements?<br>6.17 How does the Refuge System conduct refuge management activities on conservation easement lands?<br>6.18 How does a Refuge Manager determine what uses are allowed on easements?<br>6.19 How does a Refuge Manager allow a use when he/she finds it compatible?<br>6.20 How does the Refuge System administer subsurface mineral rights on conservation easements?<br>6.21 What are the Service's responsibilities for documenting and recordkeeping at the field, Regional, and national levels? |
| Monitoring and Inspections | 6.22 What is the purpose and priority of conservation easement monitoring and inspection?<br>6.23 How can Refuge Managers and Federal Wildlife Officers reduce the incidence of conservation easement violations?<br>6.24 How often should Refuge Managers monitor/inspect conservation easements?<br>6.25 How do Refuge Managers monitor/inspect conservation easements for compliance? |
| Violations: Easement Investigations and Prosecution | 6.26 What is the purpose of an easement investigation?<br>6.27 Who may investigate easement violations?<br>6.28 What activates an easement investigation?<br>6.29 When should a Refuge Manager get a Federal Wildlife Officer to begin an easement investigation?<br>6. 30 What does an easement investigation include?<br>6.31 How do the Refuge Manager and Federal Wildlife Officer document an easement investigation?<br>6.32 How does a Refuge Manager close an easement violation?<br>6.33 What is the procedure for easement investigations that require criminal or civil prosecution? |

# OVERVIEW OF THE POLICY

**6.1 What is the purpose of this chapter?** This chapter provides national policy for planning, acquisition, administration, and enforcement of all conservation easements and easement refuges the U.S. Fish and Wildlife Service (Service) acquires as a part of the National Wildlife Refuge System (NWRS or Refuge System) for conservation purposes.

**6.2 What is the scope of this chapter?** This policy applies only to easements that we acquire for conservation purposes. It does not apply to easements that we acquire as rights-of-way, such as easements that provide access, utility service, or water conveyance to Service lands.

**6.3 What are the Service's authorities for acquiring and administering conservation easements?**

**A.** Alaska National Interest Lands Conservation Act (43 U.S.C. 1601-1624, as amended).

**B.** Consolidated Farmers Home Administration Act of 1961 (also known as the Consolidated Farm and Rural Development Act) (P.L. 87-128, as amended).

**C.** Emergency Wetlands Resources Act (16 U.S.C. 3901).

**D.** Endangered Species Act (16 U.S.C. 1531-1543).

**E.** Fish and Wildlife Act of 1956 (16 U.S.C. 742a-754d).

**F.** Fish and Wildlife Coordination Act (16 U.S.C. 661-667e).

**G.** Migratory Bird Conservation Act (16 U.S.C. 715-715r).

**H.** Migratory Bird Hunting and Conservation Stamp Act (16 U.S.C. 718-718j).

**I.** National Wildlife Refuge System Administration Act (also known as the Refuge Administration Act) (16 U.S.C. 668dd-668ee).

**J.** Refuge Recreation Act (16 U.S.C. 460k-460k-4).

**K.** Transfer of Certain Real Property and Administrative Services Act (16 U.S.C. 667b-667d, as amended).

**6.4 Why does the Service acquire conservation easements, and what is the official Service policy on them?**

**A. Why we have conservation easements:**

**(1)** Conservation easements offer an alternative to fee acquisition that can be ecologically effective, and may be more financially feasible and socially acceptable than fee acquisition.

**(2)** A significant portion of the wildlife habitat in the continental United States is privately owned. It is essential to achieving our mission and ensuring an enduring wildlife legacy for future generations of Americans to protect wildlife access to, and use of, some private lands.

**(3)** Acquisition and management of conservation easements is a valuable tool to protect working landscapes and habitat values for our wildlife trust resources. Changes in rural economies, human

population demographics, and new technologies for accessing energy sources and producing crops are changing human uses of the land and threatening the wildlife and habitat values of working landscapes.

**B. Our policy on acquiring conservation easements:** When acquiring real property interests, it is our policy to acquire the minimum interest necessary to reach wildlife conservation objectives. (See 341 FW 1.)

**C. Our policy on administering and enforcing conservation easements:** Conservation easements encumber private property, are subject to ownership changes, are typically perpetual in nature, and are often dispersed on the landscape. As a result, they are especially vulnerable to activities that violate Refuge System property rights and damage habitat values.

**(1)** It is necessary for us to regularly monitor/inspect conservation easements, maintain adequate records, and rigorously enforce easement provisions to preserve their value to trust resources and wildlife.

**(2)** Within the Refuge Law Enforcement program, easement enforcement is a high priority.

**6.5 What terms do you need to know to understand this chapter?**

**A. Approved Acquisition Boundary –** The boundary within which we have authority to acquire lands or interests in lands. This may encompass both public and private lands, and does not imply that we are targeting all parcels within the boundary for acquisition.

**B. Conservation Easement –** An interest in land that a property owner has voluntarily sold, donated, or otherwise granted to the Service. The purpose of a conservation easement is to protect or restore ecologically significant areas. They often include agreements to restrict development or particular uses (see 341 FW 6, Minimally Restrictive Conservation Easement Acquisitions). Our definition includes minimally restrictive conservation easements, such as grassland easements, habitat easements, and wetland easements, and also more restrictive conservation easements.

**C. Easement Acquisition Area** – An area of the Refuge System that we are planning to acquire and that will be comprised primarily of conservation easements. This may, but will not always, include conservation areas, limited-interest refuges, Waterfowl Production Areas (WPA), Wildlife Management Areas (WMA), and units within a national wildlife refuge. This term does not encompass individual conservation easements unless the individual easement will encompass the entire unit.

**D. Easement Document –** The legal document used to convey a conservation easement or right of use from a landowner to the Service and that describes the exact provisions of the conservation easement. The document often contains restrictions on the use or development of the land to protect its conservation values.

**E. Easement Refuge –** A project area that we have acquired or plan to acquire that is comprised primarily of conservation easements. Easement refuges include conservation areas, limited-interest refuges, WPAs, WMAs, and, in some cases, national wildlife refuges.

**F. Federal Wildlife Officers –** Commissioned law enforcement officers within the Refuge System.

**G. Ground Check –** An on-site visit of the easement tract to inspect for violations or collect evidence of violations.

**H. Landowner –** The owner of the land upon which the Service holds an easement.

**I. Land Protection Plan (LPP) –** The document that proposes an acquisition area boundary and outlines resource protection needs and an implementation schedule. See Part 602 of the Service Manual for the full definition and more information on LPPs and the planning process.

**J. Law Enforcement Case File –** A file Federal Wildlife Officers develop from pertinent documents in the easement file. We give it to the U.S. Attorney's office for criminal or civil prosecution.

**K. Law Enforcement Database –** The approved, secure, Web-based database that Refuge System Federal Wildlife Officers use to track, store, and manage case file information.

**L. Operator –** A person who farms land and typically is the landowner or a lessee.

**M. Realty Tract File –** The file the Division of Realty prepares that contains the signed easement document and all other necessary documentation. The Regional Realty Office prepares and retains this file in accordance with 342 FW 4, Title Evidence, Curative Action, and Conveyancing.

**N. Right-of-Way Permit –** A permit we use to authorize the use of or grant access over, across, upon, through, or under any areas within the Refuge System. Before we grant a permit, we must determine that such uses are compatible with the purposes for which the areas were established. See 340 FW 3 for more information on rights-of-way.

**O. Special Use Permit (SUP) –** A permit that enables the public to engage in activities on a national wildlife refuge. There are three types of SUPs— those for commercial activities, research and monitoring activities, or general activities.

**P. Station File** – The permanent file kept at the field station, which includes a history of all records and correspondence about an easement tract. Also may be called an easement file.

**6.6 Who is responsible for administering Refuge System conservation easements?** See Table 6-1.

**Table 6-1: Responsibilities for Refuge System Conservation Easements**

| This official… | Is responsible for… |
|---|---|
| **A. The Director** | Overseeing the management of all Service programs, including the Refuge System, to ensure they are fulfilling the Service mission. |
| **B. The Chief – NWRS** | **(1)** Administering the Refuge System, including conservation easements and easement acquisition areas;<br><br>**(2)** Establishing policy for the Refuge System, including policy on conservation easements and easement refuges; and<br><br>**(3)** Developing the budget to support the mission of the Refuge System. |
| **C. Regional Directors** | Administering the Refuge System units in the geographic area of their assigned Regions, including conservation easements and easement refuges. |
| **D. Regional Chiefs, NWRS** | **(1)** Ensuring that every property interest, including conservation easements, that is part of the Refuge System is assigned to a Refuge Manager for management, monitoring/inspection, planning, and enforcement;<br><br>**(2)** Ensuring that we monitor/inspect conservation easements on a regular basis, as needed, and not less than once every 3 years; and |

| Table 6-1: Responsibilities for Refuge System Conservation Easements | |
|---|---|
| **This official…** | **Is responsible for…** |
| | **(3)** Establishing any supplemental Regional policy and procedures necessary to implement this chapter effectively and efficiently in their Regions. |
| **E. Regional Realty Officers** | **(1)** Coordinating with the Refuge Managers in the Regions to make the initial contact and establish and maintain a working relationship with potential sellers of conservation easements;<br><br>**(2)** Working collaboratively with Refuge Managers and the Regional Solicitors to ensure that the terms of any new conservation easements are appropriate and consistent with existing laws and policies;<br><br>**(3)** Working with the planning team to develop easement documents for use in new or existing easement acquisition areas;<br><br>**(4)** Acquiring conservation easements in accordance with the existing procedures and policies for land acquisition;<br><br>**(5)** Ensuring that Realty Tract Files are developed, and the appropriate versions are transferred to Refuge Managers;<br><br>**(6)** Entering all conservation easement acquisitions into the cadastral and land record databases; and<br><br>**(7)** Working with Refuge Managers, Federal Wildlife Officers, and the Regional Solicitors to resolve any realty-related disputes that might arise after acquisition of conservation easements. |
| **F. Refuge Managers** assigned management responsibilities for conservation easements | **(1)** Administering conservation easements in accordance with this policy and regulations governing the Refuge System;<br><br>**(2)** Working collaboratively with the appropriate Refuge Supervisor and Regional Realty Officer on acquisition of new conservation easements, including recommending property suitable for protection by conservation easement;<br><br>**(3)** Maintaining easement records as required by this policy;<br><br>**(4)** Monitoring/inspecting conservation easements for compliance with the easement document;<br><br>**(5)** Maintaining communications with landowners;<br><br>**(6)** Managing uses of conservation easements, including:<br><br>**(a)** Compliance with compatibility regulations and with the National Environmental Policy Act (NEPA), and |

| Table 6-1: Responsibilities for Refuge System Conservation Easements | |
|---|---|
| **This official…** | **Is responsible for…** |
| | **(b)** Issuance, monitoring, and administration of refuge permits for uses of conservation easements;<br><br>**(7)** Ensuring that we monitor/inspect easement tracts for compliance as needed and not less than once every 3 years;<br><br>**(8)** Coordinating with Federal Wildlife Officers to ensure that they address easement violations expeditiously according to this chapter; and<br><br>**(9)** Ensuring that habitat values lost or damaged as a result of easement violations are restored as quickly and effectively as possible. |
| **G. Federal Wildlife Officers** | **(1)** Assisting Refuge Managers to communicate with easement landowners and operators, and with State and other Federal agencies on issues related to conservation easement administration and enforcement;<br><br>**(2)** Assisting Refuge Managers with monitoring conservation easements for compliance with easement documents;<br><br>**(3)** Investigating potential easement violations; and<br><br>**(4)** Working with Refuge Managers and Regional law enforcement management to coordinate prosecution of easement violations with the servicing U.S. Attorney's office. |

## PLANNING AND ACQUISITION

**6.7 What are the steps the Service must take when planning a new easement acquisition area?**

**A.** As is the case when developing new fee acquisition programs, the planning team must develop Land Protection Plans (LPPs) that articulate clear and concise goals for new easement programs (see 341 FW 1, 341 FW 2, and Part 602 of the Service Manual).

**B.** During the planning process, the planning team should consider the totality of resources in the planning area, and analyze which resources the Refuge System must protect to accomplish our conservation goals. Rights we should consider encumbering and resources we should consider protecting with conservation easements include, but are not limited to:

**(1) Overhead rights**, including:

**(a)** Overhead transmission lines,

**(b)** Overhang from wind turbines, and

**(c)** The view shed;

**(2) Surface resources**, including:

**(a)** Habitat,

**(b)** Vegetation,

**(c)** Wetlands,

**(d)** Surface waters (e.g., water rights, water quality, and water quantity),

**(e)** Development rights,

**(f)** Subdivision rights,

**(g)** Structures,

**(h)** Agricultural practices (e.g., animal confinement facilities, manure handling, seasonality of haying and grazing, and planting of wildlife-friendly crops), and

**(i)** Silvicultural practices; and

**(3) Subsurface resources**, including:

**(a)** Groundwater, and

**(b)** The mineral estate.

*State laws defining subsurface rights vary greatly, and we should make sure our easement documents reflect those requirements accurately. For example, in some States, sand, gravel, clay, and soil are part of the mineral estate, while in other States, those resources are included in the estate of the surface owner.*

**C.** The planning team may share the easement document with the public as needed.

**D.** Once the planning team has determined which rights to acquire in the new easement acquisition area, they must work closely with Regional Realty staff, Regional Refuge management, and others with easement expertise to develop the easement document we will use in the easement acquisition area.

**6.8 What must the planning team do when developing an easement document for use in a new or existing easement acquisition area?**

**A.** To develop a model easement document that other teams can use for the easement acquisition area in the future, the planning team must:

**(1)** Consider the resources we want to conserve and protect (see section 6.7B) and the threats to those resources. Examples of potential threats to resources include, but are not limited to:

**(a)** Changes in land use patterns, such as conversion of range land to crop land;

**(b)** Subdivision for housing development;

**(c)** Transfer of surface water or groundwater resources to another watershed or from traditional agricultural use to municipal use; and

**(d)** Subsurface mineral rights that allow resource extraction activities.

**(2)** Work closely with Regional Realty staff, Regional Refuge management, and others with easement expertise to carefully select the language to include in the document. This process should include:

**(a)** Reviewing existing easement documents and other resources at Regional and Headquarters offices and examining examples of easement language that have been both helpful and problematic to Refuge Managers so you know what to include and avoid in the easement document.

**(b)** Consulting with Realty staff, Refuge Managers, Federal Wildlife Officers, and, where appropriate, other Federal agencies (such as the U.S. Department of Agriculture's (USDA) Natural Resources Conservation Service) and non-governmental organizations that have experience developing, administering, and enforcing easements. These consultations will help the planning team make more informed decisions about what resources to protect, what rights to encumber, and how to craft the easement document.

**B.** Although it is our policy to acquire only the minimum real property interest necessary to achieve our conservation goals (see section 6.4B and 341 FW 1), nothing in this or any other section restricts Regions from acquiring easements that facilitate priority public uses of the Refuge System so that we continue to meet our goal of promoting our relevancy to the American people.

**6.9 Is there a requirement to use a standard easement document?** Although it is not a requirement, whenever possible we use a standard easement document within easement acquisition areas. Standardization of easement documents, especially within a project area, leads to:

**A.** Better public understanding of our conservation goals, which helps us to more easily achieve those conservation goals;

**B.** The landowners' better understanding of the terms and conditions of easement documents, which subsequently improves easement compliance; and

**C.** More effective monitoring of, enforcement of, and compliance with our conservation easements.

**6.10 What must easement documents include, and what is their duration?**

**A. Content:** All easement documents must:

**(1)** List the legal authorities for acquiring the conservation easement;

**(2)** State the goals of the project;

**(3)** Include a legal description and, if appropriate, a survey-grade map of the lands encumbered by the conservation easement;

**(4)** Define, to the extent possible, the uses, activities, and rights the landowner retains, including landowner activities that require no Service approval;

**(5)** Define the uses and activities the landowner must refrain from pursuing without Service authorization;

**(6)** Define the uses, activities, and rights the Service acquires. We may consider acquiring, but are not limited to the rights to:

**(a)** Drain, fill, burn, or otherwise impact wetlands;

**(b)** Plow or otherwise convert grasslands to cropland or other uses;

**(c)** Build structures such as buildings, fences, roads, or ditches;

**(d)** Apply water rights to a particular parcel of land;

**(e)** Harvest or manipulate native or non-native vegetation;

**(f)** Restore wetlands, grasslands, forests, or other habitats; and

**(g)** Implement refuge management activities, such as habitat restoration and management and ecological monitoring; and

**(7)** Include provisions for us to access the property for monitoring/inspection and enforcement.

**B. Duration:** The easement document must explain that the easement will exist in perpetuity. We may only acquire perpetual conservation easements for conservation purposes. If meeting our conservation goals requires less than perpetual land protection, we must use other methods for protection, such as leases, cooperative agreements, or overlay refuges.

**C. Subsurface Minerals:** To ensure the greatest possible protection of trust resources, we should, whenever possible, include in the easement document authority for the Service to require and approve a permit to access any associated subsurface minerals. (See section 6.20 for more information on administering subsurface mineral rights on conservation easements.)

**6.11 Does the Service ever acquire public access rights in conservation easements?** The Service does not require acquisition of public access rights to private lands in our conservation easement programs. Generally the landowner retains the right to determine who may enter the property for wildlife-dependent recreation or other recreational uses.

**A.** To provide public access rights to private lands, we should:

**(1)** Use our fee simple acquisition programs to acquire lands and waters for public access on national wildlife refuges;

**(2)** Work with State fish and wildlife agencies (many of whom have less-than-perpetual programs), land trusts, and other conservation organizations/agencies, that can purchase, lease, or provide incentives for public hunting, fishing, or other recreational access to private property;

**(3)** When it meets our needs and the needs of the State and the landowner, look for opportunities to combine our easement acquisition with shorter term, State-owned access leases onto the underlying fee; and

**(4)** Coordinate, when feasible, with other Federal agency access programs (such as USDA's Natural Resources Conservation Service).

**B.** When public access is necessary to meet landscape-scale conservation goals:

**(1)** If we are partnering with States, tribes, local governments, or non-government organizations to conserve landscapes and provide, for example, regional multi-jurisdictional trail systems, there may be a valid need to provide some public access across our conservation easements.

**(2)** In these instances, the planning team should consider other options during the LPP/NEPA analysis process. For instance:

- **(a)** Recommending acquisition of a special right-of-way easement, held by the Service or others, to provide connectivity.
- **(b)** Providing for a small degree of fee acquisition authority within the project area. This might include specific acreage limits or acreage percentages of the total easement acquisition area. We encourage the planning team to involve the public so that we can make a more informed decision about whether or not to include fee acquisition authority.

**6.12 From which types of landowners can the Service acquire conservation easements?**

**A. Private Ownership.** In most circumstances we only acquire conservation easements from willing landowners on property that either an individual or private entity owns.

**B. Units of Local Government.** We may acquire conservation easements on lands that units of local government own, but any decision to do so must be thoroughly vetted through the public planning process that establishes the easement acquisition area.

**C. State and Tribal Lands.** We must not acquire or attempt to acquire conservation easements on lands owned by States or tribes. Most State and tribal constitutions prohibit selling perpetual easements. If they do not prohibit it and we plan to include State or tribal lands in the Refuge System, we must use leases, cooperative agreements, or other tools.

**D. Federal Lands.** We cannot acquire conservation easements on other Federal lands. When the United States already owns the underlying fee, any easement interest the United States acquires merges into the underlying fee ownership, essentially dissolving the easement. There are other ways, such as through cooperative agreements or permits, to protect resources owned by other Federal agencies.

**6.13 Can the Service accept donations of conservation easements?** Yes, we may accept donations of conservation easements under certain conditions. When determining whether or not to accept a donation of a conservation easement, we must consider:

**A.** Whether the proposed donation is within an approved acquisition boundary.

**B.** What rights the landowner is willing to donate. Typically, we may only accept donations of conservation easements that include the same rights we would seek to acquire if we were purchasing the easement from a willing seller. We should not accept a donation if it does not include all of the rights necessary to achieve our conservation goals.

**C.** The enforcement and administration concerns associated with accepting the proposed donation.

**D.** Whether the donation meets Departmental donation guidelines (see 374 DM 6) and Service donation guidelines (see 212 FW 8 and 342 FW 5).

**6.14 Can the Service acquire conservation easements through statutorily required compensatory mitigation plans or mitigation banks?**

**A.** Yes, but only:

**(1)** If the property lies within an approved acquisition boundary, and the acquisition is in compliance with existing acquisition and mitigation policies (see 501 FW 2 and 46 FR 49229-49232), or

**(2)** The acquisition is specifically authorized by statute.

**B.** We cannot establish authority to acquire conservation easements through:

**(1)** An Endangered Species Recovery Plan,

**(2)** A Clean Water Act permitting process, or

**(3)** A memorandum of understanding or a memorandum of agreement.

**6.15 Can the Service modify or amend conservation easements?**

**A.** We cannot modify or amend provisions of a conservation easement document without completing the full acquisition process established in Service policy (see Parts 341 and 342). This involves meeting appraisal requirements, negotiating to acquire more rights or exchange rights or real property interests, and ensuring the Office of the Solicitor reviews the modification/amendment.

**B.** It may be appropriate in some situations to acquire new conservation easement lands through a formal land exchange. When exchanging a conservation easement, we should follow the same procedures we follow when exchanging any type of real property interest (see 342 FW 3, 342 FW 4, and 342 FW 5).

## MANAGING EASEMENTS AND USES

**6.16 What are the requirements for posting the boundaries of conservation easements?** See 343 FW 1 for the current boundary posting requirements for less than fee boundaries. There is no restriction against posting if the easement document gives us the right to do so, and we determine it is necessary.

**6.17 How does the Refuge System conduct refuge management activities on conservation easement lands?**

**A.** When we acquire management rights (e.g., the right to restore wetlands or grasslands, to inventory or monitor biological resources), those management activities are Federal actions or Federal undertakings. As a result, the Refuge Manager responsible for the conservation easement must ensure compliance with NEPA, Section 7 of the Endangered Species Act, Section 106 of the National Historic Preservation Act, and all other applicable laws and regulations in the same way that he/she would for refuge lands held in fee simple.

**B.** Refuge Managers also must notify the landowner and any operators in advance of our proposed management activities. For large or complex projects, Refuge Managers should provide them with regular progress updates.

**6.18 How does a Refuge Manager determine what uses are allowed on easements?**

**A.** Because easement interests are part of the Refuge System, Service policy and regulations (e.g., appropriateness and compatibility) apply to the interests that we acquire through the easement document. To determine what uses are allowed on easement lands, first we have to determine if the requested use affects the interests that we acquired in the easement document, or if it is a retained right of the landowner.

**(1)** Any uses the landowner retains as a real property right, and that we do not purchase, acquire, or otherwise limit in the easement document, are not refuge uses and are outside our jurisdiction. These uses are allowed as retained rights of the landowner.

**(2)** Any uses the landowner does not retain as a real property right, or that we purchase, acquire, or otherwise limit in the easement document, are refuge uses and are within our jurisdiction.

**B.** Then, if the landowner or a third-party applicant requests a particular temporary use that is not within the retained rights of the landowner, we apply existing policy, including our Appropriate Refuge Uses policy (603 FW 1), our Compatibility policy (603 FW 2), and associated regulations (50 CFR 25.21) to determine if we can authorize the requested use. The following rules apply:

**(1)** The Refuge Manager may issue a permit for the addition of portable, temporary structures on a conservation easement if the structure is found to be appropriate and compatible according to existing regulations (see 50 CFR 25.21) and policy (see 603 FW 1 and 603 FW 2).

**(2)** We will not allow (by permit or other authorization) construction of any permanent alterations on a conservation easement. Permanent alterations include the addition of a residence or other permanent structure. If the landowner expressly reserves the right in the easement document to construct a permanent structure, it is allowable. This section in no way affects our administration of rights-of-way under 50 CFR 29.21.

**C.** If the landowner requests a refuge use that falls within our jurisdiction, but that does not pass the appropriateness finding or compatibility determination or is otherwise not permissible, a land exchange might be suitable. When exchanging a conservation easement, we should follow the same procedures we follow when exchanging any type of real property interest (see 342 FW 3, 342 FW 4, and 342 FW 5).

**D.** See section 6.20 for the requirements related to mineral rights.

**6.19 How does a Refuge Manager allow a use when he/she finds it compatible?**

**A.** When a Refuge Manager finds a use appropriate and compatible and decides to authorize it on conservation easement lands, he/she must use or seek the appropriate permit or easement. The only types of permits or easements available for authorizing compatible uses of conservation easements are:

**(1)** A right-of-way permit or right-of-way easement (see 340 FW 3), or

**(2)** A refuge Special Use Permit (SUP) (see 50 CFR 25.44).

**B.** For all existing conservation easements that include language that requires “written authorization” from the Service to allow a use, the “written authorization” must be in the form of a permit. This requirement does not nullify previously issued Letters of Authorization; it just replaces that requirement with a permit.

**C.** We will administer the use of conservation easement lands with SUPs of up to 5 years duration.

**(1)** In limited circumstances, we can authorize temporary uses for longer than 5 years. For example:

**(a)** To deal with health and safety issues, such as rising water levels in an easement-protected wetland that is flooding basements or driveways at home sites in areas unencumbered by our conservation easements, or

**(b)** To authorize activities that we would consider a refuge management activity if we conducted them on lands held in fee simple, such as installing fencing or water tanks to implement an improved grazing system.

*In these situations, the Refuge Manager may issue a SUP for a period of no more than 10 years.*

**(2)** The SUP must include a provision that its continued validity is contingent on meeting permit conditions and compatibility of use over the life of the permit.

**6.20 How does the Refuge System administer subsurface mineral rights on conservation easements?**

**A.** Because acquisition of mineral rights is typically cost prohibitive, we rarely acquire the mineral estate on easement refuges or fee refuges. On many conservation easements, the underlying fee owner or one or multiple third parties own the mineral estate. Subsurface minerals may include oil and gas, hard rock minerals, coal, sand/gravel/clay, or rock/mineral materials.

**B.** We must not deny the mineral estate owner access to their property. When the Service's surface interests could be impacted by subsurface mineral access, the Refuge Manager should work with the subsurface mineral rights owner to outline conditions for access. Access to the mineral estate should avoid impacts to the easement interest wherever possible. If impacts are unavoidable, the Refuge Manager should use a SUP that sets restrictions, minimizes impacts, and administers full restoration efforts.

**C.** The extent of input into the exploration for and extraction of subsurface minerals on a conservation easement depends on the language in the easement document. (See section 6.10 for information on developing an easement document.)

**D.** It is important for the Refuge Manager to engage with the mineral owner/lessee and encourage them to use best management practices to avoid or minimize impacts to our portion of the surface estate and to return the surface back to the condition it was in when we acquired the conservation easement. The Refuge Manager should seek mitigation (e.g., land exchange) for impacts to our interest if State or Federal law allows it.

**E.** If an easement document gives us "approval authority" or states or implies that we have some discretion in allowing the owner/lessee to exploit the mineral estate, the Refuge Manager must consult with the Office of the Solicitor. If the Solicitor advises us that we have discretion, or if there is any permit contemplated, this is a Federal action and requires us to comply with NEPA, Section 7 of the Endangered Species Act, Section 106 of the National Historic Preservation Act, and all other applicable laws and regulations.

**6.21 What are the Service's responsibilities for documenting and recordkeeping at the field, Regional, and national levels?**

**A. Realty Tract Files** (see also 342 FW 4, Title Evidence, Curative Action, and Conveyancing). These files are kept in the Division of Realty at the Regional Office, and should include such information as:

**(1)** The easement agreement,

**(2)** The vesting deed,

**(3)** The Preliminary Title Opinion (see 342 FW 4, Title Evidence, Curative Action, and Conveyancing),

**(4)** A map of the interest acquired, and

**(5)** A survey of the interest acquired, if applicable.

**B. Permanent Station Files.** These files are kept at the field station responsible for managing the easement area and should include:

**(1)** The same documents contained in the Realty Tract File;

**(2)** A baseline report that documents the condition of the subject property at the time the easement is recorded;

**(3)** The name of the current landowner;

**(4)** Documentation of monitoring and inspection activities, either in individual files or as a collective report;

**(5)** Landowner contact and correspondence documentation;

**(6)** Notes to the file and other management information, such as:

> **(a)** Condition on the ground—both with compliance issues and if no issues are found,
>
> **(b)** Other management issues (e.g., invasive weeds, posting condition, fences), and
>
> **(c)** Photographic documentation of monitoring and inspection activities; and

**(7)** A map or photo, or both, of the easement area at the time of acquisition, including excluded areas or inholdings.

**C. Digital Information.** We maintain digital spatial records in the cadastral geodatabase, and other authoritative digital data in a land record database (such as Land Record System (LRS) or Financial and Business Management System (FBMS), or both) as follows:

**(1)** The Cadastral Data Working Group (CDWG) creates and manages spatial data representing boundary and tract information for all of our land interests, including conservation easements, as spatial data in our cadastral geodatabase. The CDWG is comprised primarily of cartographers from Regional Divisions of Realty and Planning. The Service's Chief Cartographer (in the Headquarters Division of Realty) is the team lead and data steward and is responsible for maintaining the cadastral geodatabase, which is available to anyone in the Service who needs to access it.

**(2)** Regional Realty Specialists are responsible for recording, updating, and retaining the appropriate data for each interest in land in the land record database.

## MONITORING AND INSPECTIONS

**6.22 What is the purpose and priority of conservation easement monitoring and inspection?**

**A.** We complete easement monitoring and inspections to ensure that the United States' interests in these lands are protected and that we and the landowner are in compliance with the Refuge Administration Act (16 U.S.C. 668dd, as amended).

**B.** Monitoring and inspection of conservation easements for compliance and the prompt investigation and restoration of easement violations is one of the highest priorities for Refuge Law Enforcement and land protection programs. These lands are especially vulnerable because:

**(1)** They remain privately owned and often support traditional economic land uses, which may accidently or intentionally degrade the conservation value of the interest we own, and

**(2)** They are often distant from the Refuge System field station responsible for their administration.

**6.23 How can Refuge Managers and Federal Wildlife Officers reduce the incidence of conservation easement violations?**

**A.** Because most Refuge System conservation easements are perpetual, we assume that ownership of the underlying property will change many times. With passage of time and ownership changes, future landowners are more likely to misunderstand their easement obligations and, subsequently, there likely will be more violations.

**B.** To help minimize the types of misunderstandings that often lead to conservation easement violations, Refuge Managers and Federal Wildlife Officers should communicate with landowners frequently using one or more of the following methods:

**(1)** Contacting new owners of easement-protected lands and giving them a copy of the easement document and applicable maps.

**(2)** Creating and disseminating an annual newsletter to each easement landowner in a particular project area. Potential subject matter for the newsletter includes:

> **(a)** Pertinent local conservation issues, conservation programs, and wildlife and habitat management issues;
>
> **(b)** Lists of contact information for technical assistance; and
>
> **(c)** Reminders of easement obligations.

**(3)** Sending a direct mailing to each easement landowner with a summary or update about relevant easement information. For example, if a new farming technology might damage our conservation easement interest, we could advise landowners to consult with us prior to changing their operations to include the new technology.

**C.** Refuge Managers and Federal Wildlife Officers may also work with other Federal and State agencies by:

**(1)** Regularly providing easement location information to the appropriate USDA agency (typically the Natural Resource Conservation Service);

**(2)** Establishing memorandums of understanding with USDA offices to share information when:

**(a)** Landowners or operators express interest in modifications to the land/operations that may affect our easement-protected interests,

**(b)** Land uses are observed that may affect a landowner's eligibility for Farm Bill benefits, and

**(c)** Violations of State law are suspected.

**D.** Federal Wildlife Officers (as designated by the Regional Chief, Refuge Law Enforcement) will work with the appropriate U.S. Attorneys to:

**(1)** Regularly evaluate collateral schedule amounts (the amount of the fine as established by the local Federal District Court) for balance, fairness, and effectiveness; and

**(2)** Modify, when necessary, the fines or penalties for easement violations.

**6.24 How often should Refuge Managers monitor/inspect conservation easements?** Refuge Managers must monitor/inspect (or assign staff to do so) conservation easements for compliance at appropriate intervals. Regions must develop their specific monitoring documentation guidelines, which might include requirements for documentation in annual reports and other local databases, and a process to record and recall easement monitoring activities. Typically, Refuge Managers arrange for monitoring/inspection at the time of year when violations most commonly occur or are most easily detected (e.g., during the State's hunting season, in mid-winter when there's little foliage). The Refuge Manager needs to monitor/inspect many conservation easements annually, and they must be monitored/inspected at least every 3 years.

**6.25 How do Refuge Managers monitor/inspect conservation easements for compliance?** Refuge Managers, their employees, or Federal Wildlife Officers should look for any irregularities or activity that may be a violation of the provisions in the easement document by:

**A.** Performing on-site visits,

**B.** Using aerial reconnaissance,

**C.** Reviewing current year aerial imagery, or

**D.** Using other remote sensing technology (e.g., satellite imagery, trail cameras, environmental sensors) that is effective and approved by appropriate line officers and the Office of the Solicitor.

## VIOLATIONS: EASEMENT INVESTIGATIONS AND PROSECUTION

**6.26 What is the purpose of an easement investigation?** We investigate potential violations of easement provisions to:

**A.** Determine if a violation has occurred, and

**B.** If a violation has occurred:

**(1)** Identify the responsible party,

**(2)** Determine damages,

**(3)** Determine restoration requirements,

**(4)** Communicate restoration requirements to the responsible party, and

**(5)** Ensure that compliance is achieved.

**6.27 Who may investigate easement violations?**

**A.** Only Service Federal Wildlife Officers (and rarely, if necessary, Office of Law Enforcement Special Agents) may investigate potential easement violations.

**B.** Non-commissioned employees may accompany and assist Federal Wildlife Officers during investigations if the Federal Wildlife Officer agrees and the Refuge Manager approves it.

**C.** Only Federal Wildlife Officers (and, if necessary, Special Agents) may lead site visits for enforcement purposes and make investigatory contacts with landowners and operators.

**6.28 What activates an easement investigation?** The triggers for an easement investigation are:

**A.** Easement monitoring/inspections that indicate irregularities or possible violations, or

**B.** Reports or information received about irregularities or possible violations.

**6.29 When should a Refuge Manager get a Federal Wildlife Officer to begin an easement investigation?** The investigation should begin as soon as practical after potential violations are detected or reported. The following guidelines apply:

**A.** Ground checks of suspected violations should occur within 30 days of detection.

**B.** The Federal Wildlife Officer should:

**(1)** Contact the landowner/operator within 30 days of the ground check,

**(2)** Follow up with the landowner/operator within 7 days from the initial contact, and

**(3)** Complete a return compliance check within 1 to 3 days from the established due date for compliance or restoration completion.

**C.** If the correction or restoration is inadequate, the Federal Wildlife Officer must contact the landowner/operator again within 1 to 3 days of the initial return compliance check.

**D.** Within 7 days after the established compliance date, if the Federal Wildlife Officer determines that the violation has not been corrected, the Refuge Manager or designee, which is often a Federal Wildlife Officer, should sign and mail a follow-up letter to the landowner or operator explaining the consequences of noncompliance. All correspondence sent to the landowner or operator pertaining to a violation should be certified with a return receipt

**E.** Once compliance is achieved, the Refuge Manager and Federal Wildlife Officer should mail a closure letter within 14 days after the objectives are met.

**6.30 What does an easement investigation include?** The requirements for an investigation depend on the nature of the suspected violation and development of the case. As the investigation proceeds, it typically includes the following actions:

**A.** Review the easement document and station file prior to a site visit,

**B.** Ground check with photo documentation of any violations,

**C.** Interview suspects or witnesses involved in the violations—these interviews must be documented in writing,

**D.** Determine (either the Refuge Manager or designee) the restoration requirements needed to bring the easement back into compliance,

**E.** Document restoration with photos, and

**F.** Case disposition.

**6.31 How do the Refuge Manager and the Federal Wildlife Officer document an easement investigation?**

**A.** The Refuge Manager must ensure that all information is documented during the investigation. Depending on the nature of the violation and results of the investigation, information may include:

**(1)** Photographs (aerial, ground checks, before/after, etc.);

**(2)** Field notes and sketches;

**(3)** Survey or GPS data;

**(4)** Restoration plans;

**(5)** Notes of all interviews with the landowner, operator, contractor, etc.; and

**(6)** Copies of correspondence, including the violation letter and closure letter, and return receipts.

**B.** The Federal Wildlife Officer records easement investigations through the Service's approved law enforcement database. The field station responsible for administering the easement must maintain all paper copies in the local easement files.

**6.32 How does a Refuge Manager close an easement violation?** Once a Refuge Manager or Federal Wildlife Officer makes the landowner/operator aware of actions necessary to correct the violation and bring them into compliance, they must also establish a compliance date and complete a follow-up inspection to ensure that restoration requirements are met. The Refuge Manager or Federal Wildlife Officer must notify the landowner/operator that either:

**A.** The restoration(s) is satisfactory and the case is closed, or

**B.** The restoration is not satisfactory and additional work is needed to close the case.

**6.33 What is the procedure for easement investigations that require criminal or civil prosecution?**

**A.** Refuge Managers or Federal Wildlife Officers should contact the appropriate Federal Wildlife Zone Officer to determine procedures for having easement cases prosecuted. Procedures will vary among different U.S. District Courts.

**B.** Each U.S. Attorney handles cases differently. It is important that we follow the appropriate U.S. Attorney's recommendations when planning to request criminal or civil prosecution and when issuing a Violation Notice for easement violations.

**C**. Although a Federal Wildlife Officer has discretion about issuing Violation Notices for easement violations, he/she must not issue one until:

**(1)** Restoration requirements are satisfied,

**(2)** He/she has conducted a complete review of the easement file, and

**(3)** He/she has coordinated with the Federal Wildlife Zone Officer for consistency and to determine if it is necessary to coordinate with the U.S. Attorney's office.

**D.** Factors to consider when issuing Violation Notices for easement violations include:

**(1)** The landowner's/operator's knowledge of the conservation easement and its provisions,

**(2)** Whether or not the violation is a repeat offense, and

**(3)** The severity of the violation and amount of damage to the interests of the United States.

/sgd/ Stephen Guertin
DEPUTY DIRECTOR

Date: January 12, 2015

**U.S. Department of the Interior**

**Fish and Wildlife Service**

**Midwest Region (3) & Mountain-Prairie Region (6)**

# Third Edition
of the
# ADMINISTRATIVE and ENFORCEMENT PROCEDURES
**For**
# FWS EASEMENTS
(Wetland, Grassland, Habitat, Tallgrass, and FmHA)




**within the**

**PRAIRIE POTHOLE STATES**

**Bloomington, Minnesota & Denver, Colorado**

**2016**

# 2016 Prairie Pothole Region Easement Manual
# U.S. Fish & Wildlife Service
# Regions 3 & 6

## Table of Contents

## EASEMENT ACQUISITION

### Chapter I – Purpose, Need & Background

The Prairie Pothole Region Easement Program........I-3
Easement Manual Background........I-5
Approval Signatures........I-6

### Chapter II – Acquisition of Easement Properties

Criteria for Acquisition........II-1
The Acquisition Process........II-2
Official Easement Records........II-4

### Chapter III – Easement Terms and Acquired Rights

Wetland Easements........III-1
Grassland Easements........III-3
Farmers Home Administration Deed-Restricted Easements and
Debt for Nature Contracts (Non-perpetual FmHA)........III-4
Combined Wetland and Grassland Easement........III-6
Habitat Easement........III-6

## EASEMENT ADMINISTRATION

### Chapter IV – Easement Administration

New Easement Inspection........IV-2
FmHA Conservation Easements........IV-2
Posting Boundaries for Management Purposes........IV-2
Actions to Help Prevent Future Violations........IV-2
Permitted Activities........IV-3
Activities Allowable Without a Permit........IV-3
Subsurface Resources and Minerals........IV-4

**Chapter V – Refuge Compatibility and Other Regulatory Requirements**


Compatibility ........ V-1
General NEPA Guidance ........ V-3
Cultural Resource Guidance ........ V-6
Endangered Species Act Guidance ........ V-6


**Chapter VI – Requested Uses of Easement Properties**


Region 3/Region 6 Requested Use Flowchart ........ VI-5
Process for Evaluating Requests for Use of Easement Properties ........ VI-6

- Jurisdiction ........ VI-6
- Refuge Management Activities ........ VI-6
- Reasonable Alternatives ........ VI-10
- Health and Safety or Major Threat to Personal or Public Property ........ VI-11
- Public Service, Government-supported, and/or Corporate Requests ........ VI-13
- Other Requests ........ VI-15

Supporting Information & Guidance ........ VI-16


**Chapter VII – Easement Exchange Procedures & Format**


Service Policy ........ VII-1
Regional Guidance ........ VII-1
Exchange Request Submission ........ VII-2
Exchange Request Format ........ VII-2
Property or Interest Divestiture Requirements ........ VII-3
Release of Easement Rights ........ VII-4


**Chapter VIII – Administration of Rights-of-Way on Easement Properties**


Work within Existing ROW ........ VIII-1
Activities not affecting a Service easement interest ........ VIII-1
Activities not adversely affecting a Service easement interest ........ VIII-2
Minor Disturbance Projects ........ VIII-2
Formal ROW Permits ........ VIII-2
Compatibility standard associated with minor expansions
or realignment of existing ROW ........ VIII-3
Exchange Option ........ VIII-3


**Chapter IX – Wind Energy Development**


Initial Contact with Wind Energy Companies and Consultants ........ IX-1
Information Gathering ........ IX-3
Permitting Requirements ........ IX-4
Partial Term Release and Relinquishment Document ........ IX-11
Bird Mortality Guidelines ........ IX-15

**Chapter X – Drain Tile**

Drain Tile and Wetlands ............ X-1
Requests for Drain Tile Installations ............ X-2

**Chapter XI – Mapping Procedures for Pre-1976 Wetland Easements**

Mapping Overview ............ XI-2
Mapping Process ............ XI-4
Specific Mapping Steps ............ XI-5
Revising Easement Maps that have been Finalized and Distributed ............ XI-9

## EASEMENT ENFORCEMENT

**Chapter XII – Easement Surveillance**

Aerial Inspection ............ XII-1
Ground Inspections ............ XII-5
LEMIS ............ XII-8

**Chapter XIII – Compliance Contacts**

Pre-contact Preparation ............ XIII-1
Landowner and/or Tenant Contact ............ XIII-2
Easement Officer Training ............ XIII-8

**Chapter XIV – Prosecution**

General Discussion ............ XIV-1
Determining Prosecutable Violations and Issuing Violation Notices ............ XIV-1
Easement File Review Preparation ............ XIV-11
Responsibilities of Managers and Easement Coordinators ............ XIV-12
General Case Brief Preparation ............ XIV-14
Wetland Easement Case Briefs ............ XIV-15
Department of Justice Acceptance of Easement Case ............ XIV-17
Other Legal Aspects ............ XIV-18

## Chapter I: Purpose, Need & Background

This manual establishes procedures for the acquisition, administration and enforcement of easement interests in the Prairie Pothole Region of Regions 3 & 6. It is intended to provide managers and officers with clear directions on how to effectively deliver the easement program while remaining in compliance with the applicable statutes, regulations and policies. Because consistency in application from one wetland management district to the next and from one state to another is vitally important, managers and officers are required to follow the guidelines within this manual.

The 2005 Easement Manual was the first time all guidance related to easement administration and enforcement was put under one cover. This is the third edition of that manual; and like that manual, this manual should be viewed as a “living document” and will require revisions and amendments as new information or issues arise. Regions 3 & 6 continue to maintain a loosely formed “Easement Manual Committee” which meets as needed to consider necessary changes or amendments to what is represented in this manual. Any changes and/or amendments to this guidance, which are recommended by the Easement Manual Committee, will be sent out under the signatures of the Assistant Regional Directors of the National Wildlife Refuge System.

The North American prairie once formed the largest expanse of grassland in the world and the glaciated northern part of the North American prairie, the Prairie Pothole Region (PPR), was covered with millions of small, shallow wetlands. Originally, wetland densities in this area averaged an astonishing 83 “potholes” per square mile. These wetlands, and their associated grassland habitats, are critically important to hundreds of migratory bird species for breeding and migration. In any given year, up to 50% of North America’s waterfowl production takes place in the PPR.

The conversion and destruction of wetland habitat within the PPR has long been recognized as a major factor in the decline of waterfowl populations. Unfortunately, the PPR has suffered severe habitat loss. North Dakota has 50% of its wetlands remaining, Minnesota only 10% and Iowa less than 2%. Upland habitat conversion is even more severe and the Northern Tallgrass Prairie is some of the most threatened habitat in all of North America. The 1938 Yearbook of Agriculture drew attention to the loss of waterfowl habitat by stating, “Drainage of the most productive waterfowl breeding places in the Northern Great Plains was one of the prime factors in reducing the continental populations of waterfowl.” Wetland drainage in the PPR accelerated in the years following World War II, and by the late 1950's, the need to conserve some of what remained was overwhelmingly apparent. Consequently, the Small Wetlands Acquisition Program (SWAP) was authorized by Congress in 1958 by an amendment to the Migratory Bird Hunting Stamp Act. The purpose of this important program is to ensure long-term protection of

breeding habitat for waterfowl and other migratory bird species located primarily within the PPR.

While the SWAP was initiated in the 1950's, the legislative foundation upon which the program was built dates back over 75 years. Prior to 1929, the United States entered into treaties and enacted legislation to protect migratory birds by limiting the numbers and methods of take and by providing for enforcement. The Migratory Bird Conservation Act of February 18, 1929 was the first piece of legislation that gave what is now the U.S. Fish and Wildlife Service (Service) the ability to acquire land without a special act from Congress. The Act also established a Migratory Bird Conservation Commission to approve areas recommended by the Secretary of the Interior for acquisition. The Migratory Bird Conservation Act authorized the acquisition of inviolate migratory bird sanctuaries and was later amended on November 8, 1978 to authorize the acquisition of land for purposes other than inviolate sanctuaries. This Act was the legislative precursor to the Migratory Bird Hunting Stamp Act of March 16, 1934, better known as the "Duck Stamp Act."

The Duck Stamp Act was a significant piece of legislation for the Service's early acquisition efforts because it provided a means to generate funds for land acquisition by requiring each waterfowl hunter 16 years of age or older to possess a valid Federal hunting stamp (Duck Stamp). The receipts from the sale of Duck Stamps were deposited in a special Treasury Department account known as the "Migratory Bird Conservation Fund" and were used to acquire migratory bird sanctuaries which we now refer to as refuges. On August 1, 1958, the Duck Stamp Act was amended by the passage of Public Law 85-585 to include the acquisition of "Waterfowl Production Areas" and "Easements for Waterfowl Management Rights" commonly referred to as "wetland easements." In 1976, the stamp was renamed the Migratory Bird Hunting and Conservation Stamp, in part to recognize the contributions of non-hunters toward wetland conservation.

Shortly after the passage of the 1958 amendment, it was realized funds derived from the sales of Duck Stamps alone could not keep pace with wetland destruction and on October 4, 1961, the Wetlands Loan Act (P.L. 87-383) was passed. The Wetlands Loan Act authorized the advance of funds against future revenues from the sale of Duck Stamps as a means of accelerating the acquisition of migratory waterfowl habitat. This Act also contained the stipulation that "no land shall be acquired with moneys from the Migratory Bird Conservation Fund unless the acquisition has been approved by the Governor of the State or appropriate State agency." Appropriations under the Wetlands Loan Act were to be merged with duck stamp receipts for a 15-year period beginning in 1962, with total appropriations not to exceed $105 million. Public Law 94-215 passed February 18, 1976, increased the loan ceiling to $200 million and extended the loan period to September 30, 1983. Then, in 1983 and 1984, repayment of the loan was extended to September 30, 1986. In November 1986, Public Law 99-645 forgave the advances made to the Migratory Bird Conservation Fund through the Wetlands Loan Act.

Acquisition of the first Waterfowl Production Area (WPA) took place on January 19, 1959 with the purchase of McCarlson WPA in Day County, SD. After the 1961 Wetlands Loan Act was passed, approvals were sought by the Service for fee and easement acquisition from states within the PPR with varying degrees of success. Service acquisitions varied from state to state and ranged from statewide blanket approval of easements to case by case approvals for both fee and easement acquisitions. Eventually, the Service obtained authority to acquire WPAs and/or wetland easements in 198 counties in the PPR.

From 1958 through 1962, all wetland easements acquired by the Service were for a term of 20 years. Since that time the perpetual easement has become the standard wetland easement purchased by the Service. In 1991, the Service began to purchase perpetual grassland easements in conjunction with existing or new wetland easements.

Wetlands Management Districts (WMD) were created in 1962 as the SWAP accelerated due to the appropriations made available through the Wetlands Loan Act. Today, 38 WMDs throughout the PPR administer and manage fee title WPAs and wetland and grassland easements acquired as part of the SWAP. The overwhelming majority of these fee and easement lands are located within the states of Minnesota, Montana, North Dakota and South Dakota. The long-term landscape level habitat preservation efforts of the SWAP are of national significance. Since the beginning of the program in the late 1950's, over 3 million acres of wetlands and grasslands have been protected.

## A. The Prairie Pothole Region Easement Program:

The PPR has been and continues to be the most important landscape within the continental U.S. for breeding waterfowl. Habitat easements are the manifestation of a conservation philosophy that believes the sustainability of North American waterfowl populations is dependent upon the conservation of the prairie landscape.

The Service first implemented this landscape approach by acquiring simple wetland easements containing provisions restricting the rights to burn, drain, fill, or level wetlands and by acquiring fee title interests in wetlands and uplands. The strategy was designed to protect large complexes of a diversity of wetlands with minimally-restrictive easements while providing waterfowl brood-rearing habitat and upland nesting cover with fee acquisition. The goal of this approach was to protect large landscapes for waterfowl production while minimally affecting the farming and ranching economy.

In 1991, the Migratory Bird Conservation Commission approved a proposal by Region 6 for the purchase of easements designed to protect grassland habitat while minimally affecting the farming and ranching operation. The grassland easement document further advanced the philosophy of protecting working landscapes in an agricultural setting. Region 6 developed a grassland easement that prohibits conversion of grassland to cropland, restricts the cutting of hay until after the primary nesting season (July 15th), but does not limit livestock grazing practices.

The refuge managers, biologists, and realty specialists who devised the easement made a clear choice to minimally restrict agricultural practices on large blocks of grassland while clearly prohibiting the conversion of such grassland to cropland. The biological foundation for this decision was rooted in data revealing the importance of grasslands to successful nesting of waterfowl. Region 3 further refined the grassland easement program and has developed additional habitat easement contracts that allow the landowner a choice in the level of protection they want to place on their property. Refer to Chapter III for a more detailed explanation of these habitat easements.

The first grassland easement manual, approved in 1992, further advanced the underlying thinking that grassland easements would protect larger blocks of habitat while allowing "normal" agricultural activities and non-cropland related agricultural development on working farms and ranches. The Service wanted to tightly control any conversion of grassland to cropland, but wanted flexibility to allow small and minor changes to the landscape related to agriculture uses. The 1997 version of the grassland easement manual reinforced this approach of flexibility by providing specific guidelines for easement managers to permit small foodplots, small shelter belts/tree rows, construction of stock-watering facilities, reseeding of grasslands, and early mowing. In addition, the guidance reiterated that the easement does not encumber any minerals, including sand and gravel. However, the easement manager was advised to treat mineral development similar to outstanding oil and gas rights; i.e., issue a permit for site occupancy with terms and conditions for disturbance and restoration, but not prohibit the extraction.

The founders of the document and writers of the guidance made clear their collective philosophy on grassland easement administration by incorporating into the 1992 and 1997 guidance the flexibility to allow "minor changes" affecting up to 5% of an easement via an easement permit. The Service intended the grassland easement and management guidance to reflect a partnership between the Service and the surface owner of the property. It was the desire of the founders of the program to apply reasonable flexibility in managing the large number of easements across large landscapes. While the Service no longer has a "5% rule" for grassland easements, there remains allegiance to a belief that conservation of the prairie pothole landscape requires a partnership with private landowners; and that partnership requires some flexibility on the Service's part in allowing for the legitimate needs of landowners. Chapter XII of this manual describes in detail the decision-making process when considering landowner request for uses on easement properties.

---

In light of the many and varied challenges, the Service has been successful in protecting over 3 million acres of critical migratory bird habitat with perpetual agreements. However, the total challenge is far from being reached, and the Service has defined a Conservation Strategy that calls for an additional 1.8 million acres of wetlands and 10 million acres of grasslands yet to be protected to sustain desired population levels of breeding waterfowl. It could be best phrased as

"what we have protected is important - what is left to protect is critical." The need to continue to have a functional and effective grassland and wetland easement program for the benefit of prairie-dependent migratory bird populations cannot be overstated. The Service's easement program is the *only* program in existence with the ability to apply perpetual wetland and grassland conservation at a landscape level.

Wetland and grassland easements are not extensively encumbering instruments and were never intended by their crafters as mechanisms to control normal farming and ranching activities or to needlessly frustrate the ability of a landowner to make minor modifications necessary to continue to make a living off their lands. The intent is to protect wetlands from being drained, burned, filled or leveled and grasslands from being converted into cropland while allowing landowners to carry on with normal farming and ranching activities. To exercise more restrictive jurisdiction on requested uses by denying those which are legitimate and compatible would exceed the basic premise of the easement agreement.

Wetland and grassland easements are only purchased from willing landowners and thus require a certain level of social acceptance. Therefore, the Service has always recognized the inherent need to treat the easement program as a partnership or cooperative venture with the private landowner. Formal agreements with past Governors of North Dakota, for example, reference specific actions with easements that will facilitate a partnership to protect wetland and grassland resources. Pledging cooperation, but then adopting a more restrictive approach to considering requested uses after easements are acquired would be counter to deliberate efforts taken to build a program that has gained social acceptance. Private landowners hold the majority of wetland and grassland resources within their management and control; and the vast majority of these landowners are farmers and ranchers. The Service's conservation goals will only be achieved if this partnership is maintained.

In summary, the Service's easement program represents the only biologically effective, financially feasible, and socially acceptable mechanism capable of effecting landscape conservation at the level needed to conserve the migratory bird resource, particularly those continental waterfowl populations that depend upon the PPR. There are no current or foreseen alternative habitat protection efforts or programs that are as long-term or extensive in nature.

## B. Easement Manual Background:

At the beginning of the easement program in the late 1950's and early 1960's, the Service believed that easements would require little or no maintenance or enforcement efforts. However, it soon became apparent that in order to protect the government's interest in these easements, a more systematic approach was necessary for easement administration and enforcement. This manual, which is a compilation and revision of several previous easement manuals, provides that approach for Regions 3 & 6. This manual replaces previous versions of the following manuals:

- The 1987 Easement Enforcement Guidelines (wetland) developed for Region 6.
- Administrative and Enforcement Procedures for Waterfowl Management Easements for Region 3 (1980 revised 1982)
- The 1992 (revised in 1997) Administrative and Enforcement Guidelines and Procedures for Perpetual Grassland Easements for Region 6.
- Perpetual Habitat Easements Administration + Enforcement Guidelines + Procedures Manual for Region3
- The 2005 Region 3/Region 6 easement manual.
- The 2010 Region 6 easement manual for "Administrative and Enforcement Procedures for FWS Easements."
- The 2012 Midwest Region Easements Manual
- The non-formalized guidance issued for administration of Farmer's Home Administration easements and deed-restricted properties, and
- Various policy letters and memos issued by each Region addressing specific easement issues.

***All of these previous guidance manuals will be archived and stored on the SERVCAT system.***

The intent of these revised procedures is to standardize how Service personnel collect and preserve information and make decisions in order to effectively enforce the terms and conditions of the easements. Given a set of circumstances, wetland managers in all Prairie Pothole states within Regions 3 and 6 should follow similar processes for making decisions regarding easement administration and enforcement. In addition to enforcing the easement agreements, these guidelines also provide information on how the Service's Compatibility Policy relates to the administration of "less than fee title" interests. These guidelines allow individual wetland managers some flexibility to adapt the procedures to unique situations. These administrative and enforcement procedures are mandatory, effective immediately, and are considered a minimum requirement.

**APPROVED:**

[signature] 8/9/16
Will Meeks — Date
ARD – National Wildlife Refuge System
Mountain-Prairie Region

[signature] 8/17/16
Charlie Blair — Date
ARD – National Wildlife Refuge System
Midwest Region

# Chapter II: Acquisition of Easement Properties

## A. Criteria for Acquisition

The delivery of the Small Wetland Acquisition Program (SWAP) and conserving migratory bird breeding habitat in the Upper Great Plains and Prairie Pothole Region (PPR) has always been a partnership effort, with Realty personnel purchasing the easements and Wetland Management District (WMD) personnel administering and enforcing the easements after acquisition. It is important for District staff and Realty specialists to continue to work together to ensure that only quality habitats are purchased as easements.

Over the course of the SWAP history, different criteria have been used to guide easement acquisitions. However, the quality of the habitat has always been the major criterion. The best waterfowl breeding habitat in the PPR includes wetland complexes and quality upland nesting habitat in close proximity to one another. Generally, the higher the number of wetlands, the higher the number of waterfowl breeding pairs; and the larger the tract of wetlands and quality upland cover, the better the nest success. These two elements - large numbers of wetlands and large tracts of quality upland habitat - are the cornerstones of the easement program.

***To guide Region 6 WMD managers and realty acquisition staff through the process of selecting and prioritizing the best habitats being offered for easement, "decision trees" for grassland and wetland easement acquisition have been developed. These tools are a compilation of different waterfowl, shorebird, and grassland bird surveys. The results of these surveys have been modeled by the Habitat and Population Evaluation Team in Bismarck to predict where the most suitable habitats are located. Background information regarding the development of these tools is contained in Exhibit II-1; the decision trees, priority maps, and Grassland and Wetland Easement Evaluation Worksheets are included in Exhibits II-2 a through j. WMD staff must use the decision trees to evaluate the tract(s) being offered by the landowner. The ranking process used in the decision trees will assign a priority ranking to the tract(s) and this ranking will determine if the parcel is eligible for an easement.***

***Region 3 WMD managers and realty acquisition staff in Minnesota use a Focus Area Map (Exhibit II-3a), and the Relative Geographic Priority for Delivery of the Small Wetlands Acquisition Program in Minnesota Map (Thunderstorm Map) (Exhibit II-3b) to help guide their acquisition efforts. In light of a continuing trend in the subdivision of property, steps should be taken to ensure a legal and physical access to each easement or fee-title tract being purchased to allow for law enforcement purposes."***

Managers and realty specialists should avoid purchasing wetland easements in areas that will likely be problematic in the future. Examples include wetland basins close to farmsteads, barns, or feedlots; wetlands close to existing or proposed industrial parks; wetlands near airports; or wetlands in areas where zoning ordinances foretell of imminent development. For grassland and

habitat easements, active farm residences (i.e. houses, out buildings, feedlots, etc.) and facilities should be excluded from the easement.

Active gravel pits, with little to no habitat value, should be excluded. However, remnant pits, especially when their boundary is ill-defined, might be included in the easement offer.

***PRE-EXISTING DRAINAGE FACILITIES - Region 6 requires that wetlands with pre-existing drainage facilities either be deleted from the easement agreement, or restored except in certain situations of backing water onto a neighbor, or impacting a road, building site, etc. Acquiring easements on partially-drained wetlands under the pretense that the ditch will eventually fill is no longer acceptable. In the extremely rare situation where a new wetland easement protects wetlands with drainage facilities present, it is mandatory that the easement contract and Exhibit A document the mean sea level elevation of the protected wetland levels.***

Details about the acquisition process, including roles and responsibilities of various staffs, are found in the U.S. Fish and Wildlife Service Manual, "341 FW 6, Minimally Restrictive Conservation Easement Acquisition." The responsibilities of the WMD manager are found at 6.8 E. (http://www.fws.gov/policy/341fw6.html)

## B. The Acquisition Process

The acquisition process is as follows:

1. WMD personnel evaluate the property proposed for easement.

2. After the property is determined to be eligible for the type of easement to be acquired, the completed approved evaluation package is forwarded to the Division of Realty as appropriate**. *In Region 3, the evaluations are passed through the refuge supervisor for approval. In Region 6, the evaluations are approved by the Project Leader.***

3. Once received in the Realty office, the evaluation is logged into the Regional land acquisition tracking system (LANDS). The evaluation is then assigned to a Realty specialist to begin the acquisition process.

4. The Realty specialist contacts the landowner* to discuss the easement program and to make arrangements to inspect the property for contaminants and finalize the legal description to be included in the easement area.

   *Note that the term "landowner" is referred to in this chapter and elsewhere in this manual but when applicable, it denotes tenant, too.

5. The Realty specialist visits the county courthouse to:

   a. conduct an abstract of the title to ascertain ownership of the property being proposed for easement;

b. determine if the property taxes are current or if unpaid taxes pose a lien on the property;

c. determine if a court has ordered a judgment against the landowner that involves the property proposed for easement; and,

d. determine if a lien has been filed against the property proposed for easement.

Service policy 341 FW 6, Minimally Restrictive Conservation Easement Acquisition (http://www.fws.gov/policy/341fw6.html) has authorized the use of the Adjusted Assessed Land Value (AALV) administrative calculation. The AALV replaced the easement appraisal process for determining wetland, grassland, and habitat easement payments. The AALV administrative calculation is also used when easement rights are donated or exchanged.

6. Once payment for the easement rights has been determined, an offer is either mailed or hand-delivered directly to the landowner. The offer consists of:

   a. a formal letter with a copy of the easement document,

   b. Exhibit A maps, and

   c. legal description of the easement area, the rights being acquired, and the amount being offered for the easement rights.

In addition, a separate document required by Public Law 91-646, known as a "Statement of Just Compensation," is included with the offer and contains similar information as the formal offer letter.

7. If the landowner accepts the offer, the Realty specialist prepares the easement conveyance document, and the landowner(s) sign it.

8. The easement file is prepared, title insurance is obtained from the title company, and the easement file is processed by the Regional Division of Realty.

   **a. In the State of Minnesota, county commissioner certification and Land Exchange Board approval are required and must be obtained prior to transferring the easement file to the Region 3 office.**

9. The Regional Division of Realty prepares additional documents for the easement file and sends the file to the Office of the Solicitor (Solicitor) for a preliminary opinion of title.

10. If the Solicitor finds that the information contained in the case file will result in the title to the easement rights being vested in the United States, the case file will be returned to the Regional Division of Realty with no objections and the Chief, Division of Realty for the Region will accept the case on behalf of the Secretary of the Interior. The Service

Realty specialist remedies any objections to title found by the Solicitor so that valid title vests in the United States.

11. Objections to title are listed on a "Certificate as to Rights-of-Way, Easements and Reservations," commonly referred to as the CROW.

12. The Chief, Division of Realty and in some cases the Project Leader reviews the CROW. If they determine that the objections do not interfere with the use of the property, then the Realty chief approves the CROW and accepts the easement on behalf of the Secretary of the Interior.

13. After the easement has been accepted by the United States:

    a. the landowner receives written notice;

    b. the check for consideration is ordered;

    c. arrangements are made for the closing;

    d. title insurance policy is ordered;

    e. original document(s) are recorded with the County;

    f. payment is made to the landowner;

    g. final title opinion is requested from the Solicitor;

    h. digitized final easement file is created; and

    i. easement documents are filed in the appropriate office.

14. Electronic archives are made of the easement document(s) and Exhibit A map(s) at the Regional Division of Realty Office. The original easement and Exhibit A maps are sent to the appropriate WMD office.

15. The WAO maintains a copy of the easement document and Exhibit A maps in its files. In addition, the WAO retains a copy of the easement acreage summary sheet, appraisal or easement calculation sheet, and acceptance letter.

## C. <u>**Official Easement Records**</u>

The Division of Realty is responsible for the maintenance of all real property records within the Service, and is also responsible for land status records. Although field stations (Realty and WMD offices) may have original and duplicate files, the official land records (i.e., signed documents) are maintained by Realty at the Regional office level.

These files and records may consist of the following:

- statistical record for each parcel of land acquired or interest acquired therein
- status map for each parcel
- cadastral survey reports if applicable
- appraisal report
- title insurance documents
- Solicitor's title opinion
- original maps including Drainage Facility Maps, Exhibit A's and maps associated with grassland and habitat easements
- Easement summary sheet and other documents collected during the acquisition process
- original easement file for each parcel

Copies of documents for any parcel of land can be obtained from the regional realty office.

The process for maintaining the file is as follows:

1. The official case file for each parcel of land is converted to an electronic storage format (i.e., recorded on microfiche) and maintained by the regional realty offices. The original easement file including the original documents are ultimately forwarded to the appropriate WMD office. The original easement files and records include information such as:

    a. type of real estate interest maintained by the Service (fee, easement, etc.)

    b. name of the vendor

    c. date of the transfer

    d. acres

    e. dollars

    f. legal description

    g. county recording information, etc.

These data are used to compile periodic reports on the status of lands and interests maintained by the Service. The Real Property Management Information System (RPMIS) is the database that contains this information.

The case file sometimes contains documentation of discussions between the landowner and the realty representative which may serve a useful purpose in the future. Even though the official record is retained in the Regional Office, it is strongly recommended that management offices maintain these files, or at a minimum, go through them to retain any pertinent information not necessarily part of the official easement file.

2. Prior to transferring the easement file to the field, the Region 3 office updates the Service's official Land Record System (LRS) with the new tract information. In Region 3, a backup card system is also maintained for identical land status records. Cards and maps are stored in the Region 3 Realty office as part of the official LRS; a duplicate LRS is located at Service headquarters. Original easement files are returned to the WMD for field use, safekeeping, and storage.

**IMPORTANT -** While the WAO and the Regional Office maintain copies and microfiche of the easement files, the records that are transferred to the WMD contain many original documents. As such, it is critical that the WMD maintain and protect the official easement files; e.g., store them in a fire-proof cabinet.

# Chapter III: Easement Terms and Acquired Rights

This chapter discusses the terms and acquired rights for wetland easements, grassland easements, FmHA deed-restricted easements, combined wetland/grassland easements, and habitat easements.

## A. <u>Wetland Easements</u>

The first wetland easement was purchased in the early 1960's. Over the history of the program, there have been multiple wetland easement documents, but they generally fall into the following categories:

- **Pre-1964 wetland easements** - These are the oldest of the perpetual easement agreements. Most have a map showing the wetlands and existing drainage facilities. There are generally two versions of these older easements. One version has a paragraph that refers to a map(s) showing "areas of existing marsh vegetation and depressions which may hold water during certain periods..." as well as the presence of "existing drainage facilities..." on the described land, while another version does not have this connecting language to a map(s). When included, the maps are often referred to as "Difficulty to Drain Maps" as wetlands on these maps have cross-hatching indicating whether they are easy, moderate or difficult to drain.

  **<u>Easements Containing Connecting Language to the Map</u>:** The protected wetlands are those shown on the map. ***If a wetland is on the ground but not on the map, it is not a protected wetland.*** See Exhibit III-1 for an example of this type of wetland easement and map.

  **<u>Easements without Connecting Language</u>:** The protected wetlands include all wetlands, including those that may have been missed when the map was drawn. There may be instances where a Drainage Facility Map (DFM) is appended to this type of easement document; if so, then the wetlands depicted on the DFM are <u>not</u> subject to the terms of the easement agreement. See Exhibit III-2 for examples of this type of easement and map.

The wetlands which are protected by a pre-1964 wetland easement *with* connecting language to a map are those wetlands depicted on that map. These do not need to be re-mapped according to the procedures outlined in Chapter XI of this manual and they should not be re-drawn. The map(s) that to which the contract refers is the wetland map for that easement.

The wetlands which are protected by a pre-1964 wetland easement *without* connecting language but with "difficulty to drain" maps in the file will need to be mapped according to the instructions found in Chapter XI. After the easement is mapped, then only the wetlands occurring on the map are protected by this category of easement.

- **Pre-1976 wetland easements -** These easements protect all wetlands "occurring or reoccurring due to natural causes" on the described property, except those which may be illustrated on an attached DFM. The DFM depicts wetlands that are either already drained, or are intact but deleted from the provisions of the easement. There are two types of DFMs that were used to show which wetlands were not protected in an easement contract. The first

type of DFM has dashed-line circles with arrows extending from the circles to depict drained wetlands that were deleted from the easement. The second type of DFM uses solid arrows to show existing drainage ditches that can be maintained; however, they do not contain dashed lines circles to identify the wetlands deleted from the easement. Variations of this DFM include wetlands shown in dashed lines with no arrows and wetlands shown in dashed lines with the letter "D" inside the shape. All wetlands shown on a DFM are deleted from the provisions of the easement whether drained or not. If there is no DFM attached to the pre-76 easement, and no "exception" language exists in the document, then all wetlands occurring on the easement tract are protected.* See Exhibit III-3 for an example of a pre-76 easement and accompanying DFM.

*Case law resulting from a 1997 decision in North Dakota (Johansen) limited the Service's pre-76 easements to the wetland acreage which appears on the Easement Summary sheet. Additional guidance on this issue and the resulting mapping requirements are found in Chapter XI of this manual. This 8th Circuit decision applies both in North Dakota, South Dakota, and Minnesota; even though Montana is not within the 8th Circuit, they will also abide by the Court's decision.

- **Post-1976 wetland easements -** These wetland easements have an attached Exhibit A which shows the wetlands which are protected by the easement. The Johansen decision does not affect post-76 wetland easements. A statement printed on the Exhibit A states that "lands covered by the conveyance include any enlargement of the delineated wetland areas resulting from normal or abnormal increased water." Therefore, on post-76 easements, the wetlands shown on the Exhibit A, and any enlargements thereof, are protected by the easement. See Exhibit III-4 for an example of a post-76 easement document and the attached Exhibit A. The language in the easement document and the statement just above the landowner's signature on the Exhibit A provide for normal fluctuations in water levels in protected wetlands. Under ordinary circumstances, the Service is entitled to protect the entire wetland basin.

- **Post-1976 wetland easements with wetland restorations -** Where wetland restorations are involved, the post-76 easement document may have a statement added which references the restorations and the Government's rights relative to the restored wetlands. The restored wetlands may or may not have mean sea level (MSL) elevations established for them. If MSL elevations are established, they will be identified on the Exhibit A. The following language is incorporated into the easement document when there are restored wetlands included on the Exhibit A: "The United States and its authorized representatives shall have the right to construct, reconstruct, and maintain all wetland restorations structures shown on Exhibit A" and if MSL elevations are established, then the additional statement is added "including the right to maintain structure outlets at the mean sea level elevations specified." Exhibit III-5 is an example of a Post-76 Easement document with restored wetlands. Exhibit III-6 is an example of an Exhibit A with the MSL elevation information added.

Common to all wetland easement documents (past as well as current versions) is the right of access by authorized Service personnel to inspect, conduct investigations, and determine compliance with the terms of the easement agreement.

**Acquired Property Interests -** Wetland easements restrict the rights to drain, burn, fill and level protected wetlands. As a general rule, any activity which may drain, burn, level, or fill a protected wetland without authorization is a violation of the easement provisions. Proposed uses to do the same are to be evaluated under applicable statutes, regulations and policies (see Chapter VI) prior to issuance of a permit. Activities which would occur on the uplands that do not drain, burn, fill or level an adjacent wetland are not restricted by the wetland easement.

## B. Grassland Easements

The intent of the grassland easement is to protect (not manage) grasslands encumbered by the easement. In almost all cases, wetlands are protected under a separate wetland easement on the same property. The easement does not grant the Service management capabilities in the same sense as owning the land in fee title. The landowner retains the majority of the property rights and is paid only for those rights specified in the easement contract and itemized below. The grassland easement:

- is perpetual, i.e., runs with the land and is binding on all successors in title;
- provides a one -time, lump sum payment;
- protects only those lands legally described in the easement document and described and depicted on the Exhibit A map(s);
- prohibits any alteration of permanent vegetative cover, including grasses, forbs, and low-growing shrubs except those alterations that may be authorized via permit;
- prohibits agricultural crop production except when authorized as part of a restoration plan;
- prohibits haying or mowing for any reason, including mowing for noxious weed control, until after July 15 without prior written approval by the District Manager;
- clarifies that weed control remains the responsibility of the landowner;
- authorizes representatives of the United States the right of ingress and egress for purposes of inspecting and enforcing the terms of the easement;

The grassland easement currently in use (Exhibit III-7b) has minor word changes from the document used previously (Exhibit III-7a).

Rotational grazing or other grazing regimes that improve grassland habitat for wildlife should be encouraged. Utilizing the Services' cost-shared program is also encouraged. Though, this requires an additional agreement with the landowner through the Service's Partners for Fish and Wildlife program.

Tall Grass Prairie (TGP) easements are acquired using the same grassland easement document and acquire the same rights. Land and Water Conservation Funds and, in some cases, North American Wetland Conservation Act (NAWCA) funds are used to acquire TGP easements; therefore, the purposes for acquiring these easements are broader than just "waterfowl."

## C. Farmers Home Administration Deed-Restricted Easements and Debt for Nature Contracts (Non-perpetual FmHA)

There is probably more variation among Farmers Home Administration (FmHA) Conservation Easements than any of the other easements administered by the Service. FmHA easements (and the more recent Farm Service Agency (FSA) easements) were the result of provisions in various versions of the Farm Bill. In "last resort" efforts to keep farmers on their lands, FmHA offered low interest emergency farm loans to farmers who could not otherwise obtain credit from commercial lenders. Some of these farmers defaulted on these loans, and their lands transferred to federal inventory. While in federal inventory, conservation easements with values commensurate with the outstanding loan amount were prescribed by FmHA and the land was re-sold, often times either to the original landowner or to those qualifying as "beginning" farmers at a much-reduced cost. The loans were forgiven; however, the lands were now encumbered with FmHA conservation easements. The Service was then granted administrative and enforcement responsibilities for these easements. In a few instances, direct fee title transfers to the Service occurred. More commonly, however, only certain rights were conveyed to the Service through deed restrictions granted by the FmHA. These range from full "boiler plate" coverage, where practically all land management rights are encumbered, to easements where only the wetlands are protected from draining, burning, filling and leveling or only the grasslands are protected from farming. FmHA Conservation Easements, like other Service easements, become part of the NWRS after they are recorded; they are subject to applicable statutes, regulations and policies and must be administered according to the guidance in this manual.

The purposes of FmHA conservation easements are for:

- conservation purposes under the Consolidated Farm and Rural Development Act (7 U.S.C. 2002)
- additional purposes derived from the Memoranda of Understanding with various state FmHA (now FSA) offices, and the 1985 Farm Bill (Food Security Act of 1985)

FmHA conservation easements may also be known as Rural Economic Community Development (RECD) easements, FSA Ag-credit easements, and U.S. Department of Agriculture (USDA) conservation easements, depending on the status of the USDA program responsible for these properties at the time they were in inventory.

**Quitclaim Deed Reservations**

All FmHA inventory lands were sold with a quitclaim deed. The early "no drain, burn, fill, or level" type of restrictions were stated on the front of page of the quitclaim deed and referenced in an attached Exhibit A map showing the locations of the wetlands, and all wording was very similar to the Service wetland easement documents. As the complexity of the FmHA conservation easement documents increased, the wording on the front page of the quitclaim deed was modified.

A copy of the recorded FmHA conservation easement quitclaim deed and exhibits is recommended for the field station's files. On a few occasions, when the landowner purchased the property from FmHA, the landowner may have been responsible for recording the quitclaim deed and easement document. If it is discovered that the easement document was not recorded

with the deed, then a Realty specialist and zone refuge law enforcement officer should be contacted regarding how to proceed.

There are a number of different conservation easement documents that have been used to transfer the rights from FmHA into the Refuge System. Please refer to Exhibit III-8a (ND), Exhibit III-8b (SD), or Exhibit III-8c (Region 3) to view the different kinds of FmHA documents used in each respective state or Region as well as for surveying, posting and fencing guidance.

**Rights Granted to the Service**

Regardless of what easement document was used, there are a number of landowner prohibitions and rights granted to the Service that are common to all FmHA easement documents. Rights granted to the Service are:

- The right of ingress and egress to conduct management, monitoring, and easement enforcement activities;
- The rights to install, operate, and maintain structures for the purpose of reestablishing, protecting, and enhancing wetland functional values;
- The right to establish or reestablish vegetation through seedings, plantings, or natural succession (except for "C" wetlands);
- The right to manipulate vegetation, topography, and hydrology on the easement area;
- The right to conduct predator control.

The following landowner prohibitions and rights granted to the Service are specific to certain easement documents. Each easement document needs to be checked to determine if these stipulations are part of the easement. For some easements, rights granted to the Service are:

- The right to construct and maintain fences in order to prevent grazing or other types of encroachment on the easement area.
- The right to prohibit or regulate hunting or fishing or other taking of migratory birds, fish, and wildlife.
- The right to exclude landowner and/or public entry.
- The right to allow access to and use of waters within the area necessary for stock watering under such terms and conditions as the Service deems necessary to protect and further the purposes of the easement - provided that the easement project leader or landowner (depending on the document) bears the cost of building and maintaining fencing or other facilities reasonably necessary to preclude stock from entering the easement area. Access for stock watering need not be permitted where other waters are reasonably available from other sources outside the easement area.

For an example of an FmHA conservation easement that has both the most restrictive provisions and least restrictive provisions for wetland protection involving the "no drain, burn, fill, or level" type covenants by the landowner, refer to Exhibit III-9.

**Service Responsibility**

The respective Region 3 or Region 6 Realty office can query their database and provide acres by county and tract. Each field station is responsible for verifying FmHA conservation easement acres as recorded by the Regional Realty office. Easement acres should not be duplicated even though some areas may have overlapping easement protection. Any discrepancies should be corrected and reported to the Regional Realty office.

"Covenants by the Landowner" determine the level of protection on each FmHA conservation easement. Some FmHA conservation easements may have additional discretionary protection to protect such resources as native tree claims, native sod, or even grass that had been established on a highly erodible location. The key to managing and enforcing FmHA conservation easements is to become fully aware of each individual easement and the covenants. FmHA conservation easements are not as standardized in the level of protection as other Service conservation easements. Please see Exhibit III-8a (ND), Exhibit III-8b (SD), or Exhibit III-8c (Region 3) for area specific guidance.

## D. <u>Combined Wetland and Grassland Easement</u>

This easement document was implemented in Region 6 in January 2014 and is specifically termed "Grant of Easement for Waterfowl Habitat Conservation." The intent of the combined easement document is to reduce the administrative costs associated with processing a separate wetland and grassland easement with the same landowner.

This document is used when purchasing a wetland and grassland easement from the same landowner, regardless of whether or not the footprint of the eased parcels is the same. The restrictions and terms of the combined easement document are just as they are in the traditional wetland and grassland easement documents. However, in the combined document, there are two sets of Exhibit maps; Exhibit A depicts the boundary and basins covered by the wetland easement restrictions and Exhibit B shows the boundary of the grassland easement.

The legal description found in the easement document is that of the larger parcel. The combined easement document language specifies the restrictions associated with either an Exhibit A (wetland) parcel or Exhibit B (grassland) parcel. It also states the right of access by authorized Service personnel to inspect, conduct investigations, and determine compliance with the terms of the easement agreement.

Exhibit III-10 is an example of a Grant of Easement for Waterfowl Habitat Conservation.

## E. <u>Habitat Easement</u>

Habitat easements protect both wetland and upland habitat. Four different versions or formats are used to convey different interests to the Service and different restrictions on the grantor. These easement documents are primarily used in Region 3, and the complete documents are found in Exhibit III-11. Habitat easements can be purchased with SWAP funding resulting in protected interests held by the WMD or using other funds, like LWCF, grant or partner funds, resulting in protected interests held by the Northern Tallgrass Prairie National Wildlife Refuge.

The following table displays the basic differences among the four documents:

| Document | Permits Haying, Mowing or Seed Harvest | Allows Grazing? | Protects Wetlands? |
|---|---|---|---|
| Form 01* | Yes – after July 15 | Yes – no restrictions | Yes |
| Form 02 | Yes – after July 15 | No | Yes |
| Form 03** | No | No | Yes |
| Form 04 | No | Yes – no restrictions | Yes |

* Least restrictive ** Most restrictive

All four versions of the easement documents have the following in common; they all:

1. are perpetual and binding on all successors in title;
2. provide a one lump sum payment;
3. cover only those lands described by legal description and/or identified on the attached Exhibit A map(s);
4. prohibit any alteration of permanent vegetative cover (including trees) except those alterations approved in writing by the project leader;
5. prohibit agricultural crop production except when approved in writing by the project leader;
6. authorize representatives of the United States the right of ingress and egress for purposes of enforcing the terms of the easement;
7. prohibit dumping refuse, wastes, sewage, or other debris;
8. prohibit burning by the landowner unless approved in writing by the project leader;
9. prohibit draining, filling, or leveling of wetlands;
10. denote that landowners pay all taxes on land and assessments;
11. denote that landowners are responsible for noxious weed control with the exception of the first two post planting seasons on new seedings,
    - a permit must be issued for any type of control except mowing or haying after July 15 on Forms 1 and 2;
12. prohibit buildings, structures, and dwellings;

13. denote that the Service has the right to sign, post, or otherwise identify the easement area,
    - posting is not required,
    - if posted, guidelines conform to those used on Waterfowl Production Areas except a sign is developed that clearly states that the property is not open to the public;
14. denote that the Service has the right to restore and/or maintain grasslands and wetlands on the easement area;
15. generally prohibit motor vehicle trespassing since the grantor may not alter or destroy the vegetation,
    - exceptions include vehicular travel needed to execute functions permissible under the easement document or by Special Use Permit (SUP),
    - casual recreational travel, such as retrieving a deer during the hunting season or occasional travel by a few horsemen can generally be tolerated,
    - a use such as the establishment of any kind of permanent trail is generally not permitted.

# Chapter IV: Easement Administration

Once a purchase agreement is signed by a landowner, the terms of the easement contract are binding upon the landowner. While technically binding, enforcement of certain terms such as haying grassland easements before July 15 or burning wetland vegetation is generally not enforced during the option period; however, any 'permanent' alteration of the landscape such as converting grassland, or wetland filling or draining which occurs after the purchase agreement has been signed needs to be immediately brought to the attention of the Realty Specialist (Realty Specialists should also be notified of any 'permanent' alterations to the landscape that occur after easement evaluations have been submitted even if a purchase agreement has not been executed).

After the landowner has been paid, the area will be administered as a part of the National Wildlife Refuge System and the Realty Office should forward the WMD office a copy of the:

- acceptance letter;
- title vesting memorandum with summary acreage sheet;
- easement contract including the Exhibit A map(s);
- original evaluation worksheets containing management office approvals, and any pertinent information regarding survey data or MSL elevations on wetlands.

It is recommended that these files be stored in fire-proof cabinets. Since landowners will change over time (and to ensure files do not inadvertently lead to Privacy Act violations), easement files should be titled by tract number as opposed to landowner name. The easement document, acceptance letter, title vesting memorandum, summary acreage sheet and Exhibit "A" should be secured to one side of the file and the other side should contain all correspondence, notes, letters, etc. relevant to the easement. This file will be the official field office record and must contain all material about the easement.

It is not expected, nor required, that every casual observation for every easement be recorded and placed in the easement file, but experience has taught managers an important rule to remember in easement administration: DOCUMENT, DOCUMENT, DOCUMENT. To ensure proper documentation, record in memo format pertinent conversations and every wetland map disseminated.

For various reasons, non-easement maps (e.g. aerial photos, USGS topos, etc.) are often shared with landowners and other entities as part of ongoing easement administration. Never give out a map or aerial photo without a legend on the same page. A map without a legend can be misinterpreted at a later time and cause confusion for the landowner and potentially weaken a case for the Service. If items are indicated on the map by certain colors, make sure the file copy is also in color. These easements are *perpetual*; your documentation is needed for 100 years or more, and if managers and their staff do not record conversations, etc., future enforcement efforts may be compromised.

## A. New Easement Inspection

It is no longer necessary to inspect new wetland or grassland easements or meet with the landowner to explain the easement provisions. All new wetland and habitat easements are mapped and visited on-site before the package is sent to the local Realty Office or the Regional Office for approval/processing. The Realty Specialist uses these maps and information to develop the draft easement contract which is thoroughly explained to the landowner. Managers should still consider an introductory letter to the landowner(s) of newly-acquired easements so that landowner(s) know who to contact if future questions arise.

## B. FmHA Conservation Easements

Although some fee title transfers are still occurring within this program, deed-restricted conservation easement properties are no longer being assigned to the Service. If new easement properties are received from Farm Service Agency (FSA), managers should use the guidance provided throughout this manual. Administration of FmHA easements follow many of the same guidelines throughout this manual with FmHA easements requiring more thorough reviews since deed language varies by contract.

## C. Posting Easement Boundaries for Management Purposes

Unlike Service wetland easements, grassland, habitat and FmHA easements delineate an exact area that must be protected. At times, boundaries may be difficult to discern without Service assistance and therefore, when necessary, it is important to post the boundaries as accurately as possible to prevent disturbance from operations on adjoining land. A combination of Geographic Information Systems (GIS) and field work are necessary to identify and mark the easement boundary. Final locations of posted easement boundaries and communications with landowners should be documented and filed in the permanent easement file.

## D. Actions to Help Prevent Future Violations

There are many opportunities for field offices to reduce the number of easement violations by maintaining an effective and proactive program that informs the public of the easement program and notifies property owners and operators regarding lands encumbered by easements.

### 1. Land Ownership Notifications

Landowner notifications are an important practice **required** of every field station. County records should be checked annually for new landowners on existing easements. Letters and maps notifying new landowners of the easement and associated terms and conditions should be included in the notification.

The value of notifying landowners of protective easements on their land serves as a reminder of the restrictions placed on their land and helps to avoid inadvertent violations. Additionally, notifications provide the “knowledge” element which has been an important component in

past court cases. Landowner notifications should always be accompanied with an Exhibit A or an approved pre-76 wetland map.

If a landowner requests permission to do something that violates the terms of the easement, then managers should document conversations in writing so there is no misunderstanding. Copies of such letters with the returned receipt should be kept in the easement file.

### 2. Inter-Agency Coordination/Cooperation

For those field stations with an active acquisition program, it is recommended that information for newly acquired easements is shared annually with the FSA and NRCS to help with their review of landowner requests that may affect Service interests. When sharing digital data, such as GIS shape files, purge the landowner information to protect Personally Identifiable Information that may be protected by U.S. privacy law.

### 3. County & State (DOT) Road Department Notification

Managers should annually contact townships and counties regarding planned road work. Assistance should be offered during the planning stage to minimize wetland impacts and prevent easement wetlands from being filled or drained along road rights-of-way.

Working proactively with the state Department of Transportation (DOT) is also an effective way to avoid impacts to protected Service interests. The Service has a long-standing and productive relationship with the North Dakota DOT and has streamlined roadway projects through the establishment of exchange banks and a formal process for material (fill, gravel, rip rap, etc.) source requests (Exhibit IV-1). These processes can be easily adapted for use in other states.

## E. Permitted Activities

All requests for uses of easement properties must first be evaluated under the guidelines found in Chapter VI. When a permit is issued to a landowner for an approved activity, managers need to include sufficient detail in the permit to ensure the requester receives a copy of the easement document and is aware of all the easement provisions of the easement document. Details in the permit can prevent violations incidental to the requested activity. As an example, dugout spoil that is leveled in a basin wetland is a violation that can be prevented with sufficient detail in a permit.

## F. Activities Allowable Without a Permit

Activities which relate to the operation of the land which are outside the rights acquired by the Service are allowable without the need for a permit. Examples are grazing on grassland easements, or farming on wetland easements. In addition, there are activities which do not interfere with the acquired rights which should be mentioned under this sub-chapter.

### 1. Noxious Weed Control

On R6 grassland easements, weed control is solely the responsibility of the landowner. Mowing of weeds on grassland easements prior to July 15 must be approved by the manager in writing via a SUP. Herbicide applications or mowing after July 15 may be completed without a permit or notification of district personnel.

On R3 habitat easements, a SUP must be issued for any type of control except mowing or haying after July 15 on easement forms 1 & 2.

### 2. Mowing of Rights-of-Way

Mowing of road rights-of-way that are located adjacent to grassland easements is generally considered a ROW maintenance activity and is allowable without a permit or prior approval from the Wetland Manager.

### 3. Burning of Upland Vegetation

It is permissible to burn upland vegetation on R6 grassland easements without a SUP. If protected wetlands are going to be burned in association with prescribed burning, then a Special Use Permit will be necessary.

A SUP is required for all prescribed burning activities on R3 habitat easements.

A SUP is generally required to burn upland vegetation within FmHA tracts, but because of the variability in FmHA contracts, managers are advised to review easement contracts before responding to burn requests.

### 4. Tree Cutting

Region 6 grassland easements does not restrict tree cutting. Vegetative cover in the easement is described as “grasses, forbs or low-growing shrubs.”

Region 3 habitat easements explicitly protect ‘woodland’ wildlife habitat and a SUP request is required to cut trees on R3 habitat easements.

FmHA easements are variable and should be individually reviewed to assess jurisdiction associated with cutting trees.

## F. Subsurface Resources and Minerals

### Grassland and Habitat Easements

Because of differences in the threats being addressed by R3 habitat easement and R6 grassland easements, there is variation in the acquisition, jurisdiction and administration of subsurface minerals and resources as it relates to R6 grassland easements and R3 habitat easements.

Region 6 acquires grassland easements with the understanding that easements are subject to extraction of the traditional minerals of oil, natural gas, and coal as well as sand and gravel (this does not include soil, clay, black dirt, scoria, potash, rock for rip rap, etc.). R6 background on the sand/gravel extraction and the grassland easement is more fully articulated in Exhibit IV-2. Until clarified and/or changed by Solicitor opinion or court ruling, this jurisdictional position is applicable to the states of Montana, North Dakota, and South Dakota and is intended to be consistent with the program intents for both the wetland easement and grassland easement preservation programs since the programs was initiated.

Because R6 grassland easements have an exception for mineral rights (which includes sand and gravel), surface interests and rights related to grassland easements are generally subject to impacts associated with extraction activities for these minerals. This is consistent with existing grassland easement language and past program administrative guidance which had given assurances to landowners and state governments regarding exceptions related to minerals including sand and gravel.

To clarify the intent of the grassland easement document and the combined wetland/grassland easement document, easements acquired after 2014 state "…and all mineral rights including sand and gravel, but not including soil, clay or scoria, unless and to the extent rights to mine such materials have vested in third parties prior to the date hereof; provided, however, that the mining, extraction, or development of sand and gravel may not cause a wetland to be drained, filled, leveled, or burned, directly or indirectly by development…unless and to the extent rights to mine, extract, or develop sand and gravel have vested in third parties prior to the date hereof."

While R3 habitat easement documents contain language stating that the easement is subject to all mineral rights, sand, gravel, soil, clay, etc. are not viewed as mineral rights in Minnesota. R3 habitat easements restrict subsurface material extraction if it results in vegetative destruction or results in surface water or subsurface water alterations (e.g. ditching, diversion, etc.).

**Wetland Easements**

Wetland easements are administered differently than habitat and grassland easements since they are a different agreement which encumbers different rights. The Service's procedure for wetland easements is that the Service will exercise jurisdiction over the extraction of subsurface resources (including: sand, gravel, clay, scoria, black soil, other soils, fill, rock-like materials, etc.) if those activities would result in filling or draining of protected wetland basins. This jurisdiction does not include mineral rights involving gas, oil or coal as they were exempted by the easement document wording. It needs to be emphasized that this jurisdiction relates only to the protected wetlands. If any of the subsurface resource extraction activities can be accomplished on upland sites without affecting protected wetlands either directly or indirectly (watershed interference), then the easement does not preclude such activities – there is no easement jurisdiction in these situations.

While the easement document may not encumber the extraction of certain minerals, it does not suggest that the manager is not involved in working with developers. The mineral estate owner

has a legal obligation to take reasonable measures to protect the surface estate under laws in most states. The Service's involvement is necessary in order to protect and minimize impacts to the wetland and grassland resources. The best situation is for the Service, the mineral company and the landowner to discuss the alternatives and options prior to any agreements between two of the three parties. The Service's requests/recommendations must be reasonable and limited to those aspects that affect our easement interests. Any recommendations from the Service should be provided to the energy/mineral company and the landowner in writing, and if possible signed by all three parties. Written, and hopefully agreed to, recommendations can be retained and passed on to various entities within the mineral company, and will protect the Service's and future landowner's surface interests in case the land or the company is sold.

There are situations on easements related to oil and gas production where the Service has the authority to permit or deny the use and where compatibility will apply. Some examples would include crossing easement lands with pipelines; roads to access oil and gas production on lands not encumbered with a Service easement.

# Chapter V: Refuge Compatibility and Other Regulatory Requirements

Refuge managers are often confronted with many issues and proposed projects including: right-of- way (ROW) improvements, utility line crossings, rural water system installations, oil and gas exploration, farm site expansions, and proposals to site wind energy facilities on easements. The purpose of this chapter is to provide general guidance on how to make decisions consistent with refuge compatibility regulations and policy, with the National Environmental Policy Act (NEPA), with section 106 of the National Historic Preservation Act (i.e., cultural resources) and with the Endangered Species Act (section 7).

## A. Compatibility

The compatibility policy can be found in the FWS Manual, 603 FW 2, Compatibility; http://www.fws.gov/policy/603fw2.html.

The concept of "refuge compatibility" existed prior to1920; however, the National Wildlife Refuge System Administration Act of 1966 (Act) brought compatibility issues to the forefront, requiring refuge managers to consider and evaluate compatibility every time they reviewed a proposed use of refuge lands, including those protected by U.S. Fish and Wildlife Service (Service) easements. The 1966 Act established that any use of a refuge must be compatible with the purposes for which the area was established. The passage of the Refuge Improvement Act in 1997 strengthened compatibility directly, but also resulted in a new Service policy on compatibility that was developed and finalized in 2000. This policy included some major changes for refuge managers evaluating proposed uses. In addition to refuge or unit purposes, the fulfillment of the mission of the National Wildlife Refuge System (Refuge System) was added to the criteria under which to evaluate compatibility. Under the new policy, the public is afforded a due process provision and must be provided an opportunity to comment on compatibility determinations. Perhaps the most significant change the compatibility policy has had on easement administration is that compensatory mitigation can no longer be used to achieve compatibility except for maintenance of an existing ROW (50 CFR 26.41). All other proposed uses or requests for uses on Refuge System lands must be compatible, with or without stipulations, or the use must be denied.

In general, compatibility applies anytime National Wildlife Refuge (NWR) or Wetland Management District (WMD) personnel are required to evaluate a proposed use of a Refuge System land interest. Compatibility only applies if the Service has jurisdiction or authority to permit or deny the proposed use. The current compatibility determination (CD) format can be found at http://www.fws.gov/policy/e2603fw2.html. The CD form is used to ensure a systematic process is followed to come to a logical and justifiable conclusion on compatibility, to document the decision, and to obtain regional refuge chief concurrence with the decision on refuge compatibility.

As mentioned, the compatibility policy requires refuge managers to consider how a proposed use would affect both the purposes for which the area was acquired and how a proposed use would impact the mission of the Refuge System (see the 2000 Refuge Compatibility Training Manual and the FWS Manual, 603 FW 2, Compatibility; http://www.fws.gov/policy/603fw2.html).

Specifically, the policy states that a compatible use is "A proposed or existing wildlife-dependent recreational use or any other use of a national wildlife refuge that, based on sound professional judgment, will not materially interfere with or detract from the fulfillment of the National Wildlife Refuge System mission or the purposes of the national wildlife refuge." (The terms used in this section are defined in the Refuge Compatibility manual and in the 2000 Compatibility Policy).

When evaluating compatibility, managers must evaluate if the use will materially interfere or detract from the purpose for which the refuge was established. Central to evaluating whether a use is compatible is to identify the acquiring authority and associated purposes for the unit where the use will occur. Most easements tracts administered by the Service were acquired utilizing one of three authorizations listed below. When evaluating compatibility in relation to refuge purposes, the following authorities and purposes are generally applicable:

<u>Migratory Bird Hunting Stamp Act of 1934</u> (16 U.S.C. 718-718j, 48 Stat. 452), as amended) – Commonly referred to as the "Duck Stamp Act." This Act provides the authorization and funding for most wetland easements in Regions 3 & 6. In addition to duck stamp sales, funding for the acquisition of waterfowl production area easements was also authorized via the Wetlands Loan Act of 1961. The majority of grassland easements in Montana, South Dakota, and Minnesota were also acquired under the authority of the Migratory Bird Hunting and Conservation Stamp Act and purchased with duck stamp dollars. Specific refuge purposes under this act include "…as Waterfowl Production Areas" subject to"…all of the provisions of such Act …except the inviolate sanctuary provisions…" 16 U.S.C. 718(c).

<u>Fish and Wildlife Act of 1956</u> (16 U.S.C. 742a-742j; as amended) - This Act provides authorization for the establishment of the Dakota Grassland Conservation Area, Dakota Tallgrass Prairie Wildlife Management Area, and the Northern Tallgrass Prairie National Wildlife Refuge. Section 7(a)(l) of the Land and Water Conservation Fund Act of 1965 as amended September 28, 1976, by P.L. 94-422 (16 USC 4601-9; 90 Stat. 1318) provides authority to use LWCF money for acquisition of refuge areas under paragraph (5) of section 7(a) of the 1956 Act. Specific refuge purposes under this act include "…for conservation…of…wildlife resources" 16 U.S.C. 742f (Fish and Wildlife Act). Additionally, NAWCA funds are another source that can be utilized to purchase easements for the Dakota Grassland Conservation Area and Dakota Tallgrass Prairie Wildlife Management Area.

<u>Agricultural Act of 1961 and Consolidated Farm and Rural Development Act</u> (Public Law 87-128; as amended) - This Act provides FSA (formerly FmHA) to enter into conservation easements and transfer those easements to other federal or state agencies. FmHA easements were acquired by USDA and transferred to the Service under the authority of this Act. Specific refuge purposes for FmHA easements include "…for conservation purposes…" (7 U.S.C. 2002).

Purposes for easements administered by the Service may vary, but the mission of the NWRS remains the same:

> "The mission of the [Refuge] System is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish,

wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans."

Any proposed use of an easement must be evaluated according to the criteria of not materially interfering with or detracting from the purposes for the easement or the mission of the NWRS, but only to the extent that the proposed use affects an acquired interest. In essence then, what is being evaluated under compatibility for less-than-fee-title interests are potential impacts to the interests acquired with the easement. The Compatibility Determination Flowchart (http://www.fws.gov/policy/e1603fw2.pdf) screens out potential issues that do not impact rights acquired by the Service early in the process. The discussion found in 50 CFR 25.44 (http://www.gpo.gov/fdsys/pkg/CFR-2010-title50-vol6/pdf/CFR-2010-title50-vol6-sec25-44.pdf) is also very helpful for guidance on compatibility issues involving limited property interests, as well as when ROW and other permits are required.

For new uses, prior to the initiation of a compatibility determination, managers should screen use requests through a Finding of Appropriateness of a Refuge Use (FWS 3-2319), the Compatibility Flowchart and the Easement Request Flowchart in Chapter VI of this manual. As observed on the Appropriate Use (AU) form (FWS 3-2319; http://www.fws.gov/forms/3-2319.pdf) and the Compatibility Determination flowchart, there are several areas where refuge managers can deny proposed uses without completing a CD. AU policy is valuable in that it provides a framework for refuge managers to deny proposed uses without having to complete a CD. It should be noted that ROW requests are not subject to the AU policy; ROW requests should be addressed per 50 CFR 29.21.

Any authorized economic use of refuge areas (including easements) must benefit the refuge area and not just result in a non-material impact. This is discussed in the more recent editions (post-2001) of 50 CFR 29.1. All easement documents also have a "subject to" section that provides exceptions to the acquired interests. These include statutory rights-of-way for road maintenance and/or reserved or excepted rights that pre-date the easement. The Government's interests are acquired subject to outstanding rights held in third party or reserved rights held by the landowner. These reservations are generally not itemized on individual easements. Refuge managers can find them in the servicing Realty office by reviewing the title insurance retained in the title file of each easement agreement (note that there are some easement agreements without title insurance). The Service has no jurisdiction over activities or uses that are covered by a reservation or an assignment in the easement agreement; hence, they are not subject to compatibility requirements.

## B. General NEPA Guidance

National Environmental Policy Act (NEPA) is not easily explained in a few paragraphs; the purpose of this section is to provide a few basic generalities to guide managers. There are multiple resources available which are particularly helpful in assisting managers with their NEPA obligation. In Region 3, one of the first contacts made should be with the Regional Environmental Coordinator to discuss the proposed project. In Region 6, the first guide to reference is entitled "NEPA Guidance for Region 6 Fish and Wildlife Service Field Staff as it relates to the American Recovery and Reinvestment Act 2009" and the second is entitled "NEPA

for National Wildlife Refuges – *A Handbook*." Both are available for download from the Region 6 Sharepoint site: https://fishnet.fws.doi.net/regions/6/nwrs/Easement%20Administration%20and%20Enforcement/Forms/AllItems.aspx. The Service's online version of the NEPA Reference Handbook http://www.fws.gov/r9esnepa/ also provides useful information about NEPA and general managerial responsibilities when evaluating potential impacts associated with proposed uses. Three basic premises of NEPA are as follows:

1. NEPA should integrate environmental considerations into agency planning processes.

2. Federal actions should ensure environmental, economic and social considerations are weighed before an action is taken.

3. Field personnel should ensure that the agency decision maker and the public are aware of the environmental consequences of an action and that informed decisions are made. Premise two isn't always accomplished at the categorical exclusion level of action. Determining that an action should be categorically excluded still falls under the NEPA umbrella, and while a categorical exclusion may not have impacts to disclose, you should document that you have considered all potential impacts. In cases where there may be doubt whether a categorical exclusion is appropriate, or if the action potentially could generate public controversy, include public disclosure and seek comment as appropriate. Complete NEPA action and other compliance prior to taking action.

***When does NEPA apply?***

NEPA applies to every action that the agency takes. However, the Service does not initiate NEPA documentation every time a routine action (e.g., flipping a light switch) is performed. Most basic actions including operating an office, personnel actions, easement surveillance and law enforcement are covered under Department of Interior (DOI) categorical exclusions and typically, these categorical exclusions are not documented ("Proposed Revised Procedures," DOI Department Manual, 516 DM 2, Appendix 1; http://www.fws.gov/r9esnepa/DOINEPAProced/DOI-PROPOSED%20CX%27S.pdf). Actions that are beyond these very routine duties, particularly where there is a possibility of having environmental impacts, should include documentation for NEPA.

Actions that should be documented include, but are not limited to the following:

- issuing special use permits and rights-of-way permits
- creation and reclamation of wetlands
- earth disturbing activities
- any activity that has a potential to impact a listed species or migratory birds
- changes in public uses
- actions that require a CD

***What are the levels of NEPA compliance?***

Basically, there are three levels of NEPA review that are available to cover federal actions:
- Categorical Exclusion
- Environmental Assessment (EA)
- Environmental Impact Statement (EIS)

*Categorical Exclusions*

An action may be categorically excluded if it is listed as a categorical exclusion in the departmental categorical exclusions (DOI Department Manual, 516 DM 2, Appendix 1; http://www.fws.gov/r9esnepa/DOINEPAProced/DOI-PROPOSED%20CX%27S.pdf). In order to utilize a categorical exclusion, the "Categorical Exclusions; Extraordinary Circumstances" (DOI Department Manual, 516 DM 2, Appendix 2; http://www.fws.gov/r9esnepa/DOINEPAProced/PROPOSED%20DOI%20EXTRAORDINARY.pdf) must be reviewed. If any of the extraordinary circumstances apply, a categorical exclusion cannot be used for a proposed action.

*Environmental Assessments and Environmental Impact Statements*

If a categorical exclusion does not apply to the proposed action or the action has not been previously addressed through a NEPA process, then an EA needs to be prepared. Most Service actions are covered by categorical exclusions, and the vast majority of Service actions are covered by either a categorical exclusion or an EA. If an EIS is required, it is usually prepared by a cooperator, contractor or an interdisciplinary Service team. If a proposed use/action is already covered by an existing EA (e.g., the action was covered in the EA for the Comprehensive Conservation Plan), the action may still require some manner of NEPA documentation to ensure that a site specific analysis (potentially pertaining to listed species or cultural resources) has been completed.

***How is compliance documented?***

NEPA documentation is usually kept with the project files and the official record. The NEPA Compliance Checklist (FWS Form 3-2185; http://www.fws.gov/forms/3-2185.pdf) is an excellent tool for documentation of categorical exclusions or actions covered by the existing EA. The U.S. Fish and Wildlife Service Environmental Action Statement for Categorical Exclusion (http://www.fws.gov/habitatconservation/EAS_revised_8_21_02_form.pdf) is used for approving categorical exclusions that result in negligible environmental impacts.
There are other forms that are used by field stations to document compliance with categorical exclusions. In Region 3, the most recent version of a form can be found under NEPA Section 7 and Related Forms at the NEPA Intranet website: https://intranet.fws.gov/region3/nepa

For Projects that do not require regional office approval, ensure that the form is signed by the refuge manager and kept in the field station files. In Region 3, per Director's Order 127, the NEPA Compliance Checklist requires the REC's signature for grants unless special provisions have been made.

## C. Cultural Resource Guidance

Federal cultural resource responsibilities for limited property interests are different than for fee-title properties. The Service acquires easements from private landowners to protect wetland and grassland habitats, not the cultural resources which may be present on the properties. However, even though the Service does not have any rights to cultural resources which may be present on lands encumbered by an easement, projects on easement lands may still be considered a federal undertaking if federal funding or the issuance of a special use permit is provided for the project. Many projects requested by other entities (DOT, utility companies) will have cultural resource evaluations already completed. Managers must ensure that these evaluations are reviewed for sufficiency by regional archaeological staff. Determination of undertakings and the effects of projects are not authorities that have been delegated to refuge managers.

Activities normally associated with easement properties are not usually considered "undertakings" under Federal cultural resource laws. Private landowners may generally do what is necessary to manage their property without the need to comply with Federal cultural resource laws. These laws, however, do apply to easement properties whenever a project is completed with federal funding or for which there is a federal action necessary to authorize the work. These activities are generally related to ground surface disturbance-type activities (permits for dugouts, shelterbelt establishment, wind generators, highway improvement projects, utility line crossings, etc.). When a request is received, managers must evaluate whether the Service has jurisdiction. If there is no jurisdiction, then no cultural resource compliance is necessary. An example would be a landowner who wants to build a house on an upland site where the land is encumbered with only a wetland easement.

Further guidance on the procedures for cultural resource reviews was prepared by Region 6 in 2013 and can be found in Exhibit V-1. The guidance also includes points of contact; managers should consult with the regional archaeological staff about cultural resource responsibilities as they are ultimately responsible for compliance with these laws and policies. In Region 3, archaeological compliance requires submitting Regional Archaeologist request form and required documentation. Contact the Regional Archaeologist for more information as needed.

## D. Endangered Species Act Guidance

The Endangered Species Act (ESA) directs all federal agencies to work to conserve endangered and threatened species and to use their authorities to further the purposes of the Act. Section 7 of the Act, called "Interagency Cooperation," is the mechanism by which federal agencies ensure the actions they take, including those they fund or authorize, do not jeopardize the existence of any listed species. Generally speaking, actions taken by wetland district managers that trigger NEPA and cultural resource evaluations also require compliance with Section 7. For Region 6 managers evaluating proposed uses on easements, this is documented by the completion of the Intra-Service Section 7 Biological Evaluation form (Exhibit V-2). If the biological evaluation concludes "no effect" to a listed or candidate species, then the project leader may sign the form and include it in the easement folder for documentation. If the proposed activity "may affect" a listed or candidate species, even if that effect is positive, then the manager must gain concurrence from the servicing Ecological Services office.

Questions often arise as to the necessary scope of the Section 7 evaluation. When evaluating a proposed action (e.g., a power line across a grass easement) the manager must also analyze the effects of interdependent actions. These are actions that have no independent utility apart from the primary action. Managers must also analyze the effects of interrelated actions. These are actions that are part of the primary action and dependent upon that primary action for their justification. Both the interdependent and interrelated activities are assessed by applying the "but for" test, which asks whether any action and its associated impacts would occur "but for" the action. For example, if a temporary permit or right-of-way permit for a power line across a grassland easement is necessary, and failure to obtain that permit would result in the entire power line project not being constructed, then potential effects to listed species from the entire power line project must be evaluated. However, if a particular project will proceed with or without a permit from the Service, then only the potential effects of the proposed activity to be covered by the permit need be evaluated.

Managers are encouraged to consult and work closely with the Ecological Services staff when questions pertaining to ESA arise.

## Cliff Notes for Appropriate Use, Compatibility, NEPA and other regulatory requirements

- Review the easement document to determine the property interests acquired by the easement, particularly for FmHA Conservation Easements (Chapter III).

- Review the easement document and title insurance to determine which interests acquired by the Service may be "subject to" pre-existing third party rights (e.g., road ROW, power lines, etc.).

- Appropriate Use Policy (603 FW 1), the Requested Use Easement Flowchart (Chapter VI), and the Compatibility Flowchart (Exhibit 1 603 FW 2) are valuable tools to screen-out uses before conducting a compatibility determination.

- Appropriate Use Policy does not apply to ROW requests (Federal Register Volume 71, No. 122).

- Compatibility must be evaluated against refuge purposes and the refuge system mission.

- If a requested use impacts a property interest held by the Service, then a Finding of Appropriateness and Compatibility Determination will need to be developed to evaluate the use and to determine whether it is appropriate and compatible. Programmatic CDs have been completed for uses that are commonly permitted.

- Compensatory mitigation cannot be used to achieve compatibility, except in cases of minor expansions or realignments of existing ROWs (50 CFR 26.41).

- For permitted economic uses, the compatibility threshold has been elevated from a non-material impact to the need to "contribute to achievement" of the mission of the NWRS or the purposes of the refuge area. Review 50 CFR, Part 29.1 for more specific information.

- Ensure compliance with NEPA requirements, Section 7 (Endangered Species Act) requirements, and Cultural Resource requirements associated with Section 106 of the National Historic Preservation Act.

- Consult with regional archaeological staff. Determinations related to cultural resources are not delegated to the refuge manager.

- Allow sufficient time for Regional review and approval.

# Chapter VI: Requested Uses of Easement Properties

This chapter is comprised of three distinct parts beginning with a prelude discussing the unique ability of easements to conserve working landscapes (pages VI-1 through VI-4). This introduction complements several concepts introduced in Chapter I and demonstrates the expression of the National Wildlife Refuge Improvement Act in the administration of the Regions 3 & 6 easements. The second part (pages VI-5 through VI-15) contains the flowchart and accompanying text which describes the evaluation process for requested uses on easement lands. The third part (pages VI-16 through VI-18) contains specific information and provides detailed instructions on how to address the multitude of issues associated with authorizing requested uses.

## A. Introduction

The Small Wetland Acquisition Program (SWAP) provides the unique opportunity to protect functioning grassland and wetland landscapes that still exist at levels capable of supporting populations of migratory birds. Biologists recognize that protecting landscapes which attract breeding birds to a suitable breeding area more effectively conserves populations than modifying landscapes surrounding isolated habitat patches. This is an extremely important point which cannot be overstated. The easement programs protect ***landscapes*** in the Prairie Pothole Region states. The protection of landscapes accomplishes the primary goal of the SWAP, which is to provide for the long-term viability of the breeding waterfowl population through the conservation of existing habitats.

The National Wildlife Refuge System Improvement Act (NWRSIA) provides clear direction to the Secretary of Interior, and thus to the Service, for administering the Refuge System, of which easements are a part. Specifically, the NWRSIA states "…the Secretary shall…(B) ensure that the ***biological integrity, diversity, and environmental health of the System*** are maintained…(C) plan and direct the ***continued growth of the System*** in a manner that is best designed to accomplish the mission of the System, to contribute to the ***conservation of the ecosystems*** of the United States, to complement efforts of the States and other Federal agencies to conserve fish and wildlife and their habitats, and to ***increase support for the System and participation from conservation partners and the public***…(E) ensure effective coordination, interaction, and cooperation with ***owners of land adjoining refuges*** and the fish and wildlife agency of the States in which the units of the System are located…" (emphasis added).

The Strategic Growth Policy (602 FW 5) provides additional guidance for meeting the requirements placed upon the Secretary by the NWRSIA as outlined above in (B-E). Specifically this policy addresses the need to ensure that the Refuge System continues to support the Service's mission; to ensure interaction, coordination, cooperation, and collaboration with the State fish and wildlife agencies while planning and acquiring parcels in a Refuge system Project Proposal; to ensure that existing refuges, new refuges, and refuge expansions support viable and persistent populations of priority conservation species and achieve measureable conservation target at various landscape levels (e.g., national, Regional, and local); to integrate the best available science from biological planning and conservation design into the process of identifying and prioritizing lands and waters for inclusion in the Refuge System; to ensure the future growth of the Refuge System supports species-based population objectives derived from

landscape conservation designs that further an ecologically-connected network of public and private lands that are resilient to climate change and support a broad range of species under changed conditions; and finally, to ensure we adequately collaborate with other local, State, and Federal government agencies, tribal governments, conservation organizations, and private landowners to identify new lands for the Refuge System.

The Biological Integrity, Diversity, and Environmental Health Policy (601 FW 3) describes the relationships among refuge purposes, System mission (both considered in determining compatibility of a proposed use), and maintaining biological integrity, diversity, and environmental health. Specifically, "Biological integrity, diversity, and environmental health can be described at various landscape scales from refuge to ecosystem, national, and international. Each landscape scale has a measure of biological integrity, diversity, and environmental health dependent on how the existing habitats, ecosystem processes, and wildlife populations have been altered in comparison to historic conditions. Levels of biological integrity, diversity, and environmental health vary among refuges, and often within refuges over time. Individual refuges contribute to biological integrity, diversity, and environmental health at larger landscape scales, especially when they support populations and habitats that have been lost at an ecosystem, national, or even international scale.

To date, the Service has protected over three million acres of wetland and grassland habitat in the PPR with easements. As mentioned, the Secretary is directed to "plan and direct the continued growth of the System in a manner that is best designed to…contribute to the conservation of ecosystems…" To this end, the Service began working towards a goal several years ago of conserving roughly an additional 12 million acres of grasslands and wetlands in the PPR; the amount of ecosystem conservation needed to support current waterfowl population levels. The vehicle to deliver this conservation must be ecologically effective, socially acceptable, and economically feasible. Easements represent the most important tool for achieving the conservation goals while satisfying these criteria.

In addition to mandating the growth of the Refuge System, the NWRSAA calls on the Secretary to "…ensure effective coordination, interaction, and cooperation with owners of land adjoining refuges…" Because participation in the Service's easement program is voluntary, the ability to purchase additional easements (continue the growth of the Refuge System) is dependent upon effective coordination, interaction, and cooperation with owners of land adjoining refuges. There can be no closer connection with a landowner than on private land where the Service has acquired a partial interest. It follows, then, that the key to growing the Refuge System is to ensure effective cooperation with current landowners of easement properties.

The NWRSAA, as amended, allows the refuge manager to permit a use of easement lands as long as the use is compatible. The basis for this determination is the manager's sound professional judgment based on his experience and knowledge of the easement area and proximate landscape. While incompatible uses cannot be allowed, the NWRSAA requires the manager to strive for effective cooperation, coordination, and interaction with owners of easement properties. Because the ability to conserve the Prairie Pothole landscape and the ability to meet the goals outlined in the Conservation Strategy rests squarely on the shoulders of landowners who voluntarily sell easements to the Service, it is essential the Service consider the

landowners' purposes on their own property and be willing to accommodate uses that do not undermine the purposes for which an easement was acquired.

***Evaluating Requested Uses on Easement Properties***

When the Service evaluates a potential easement tract, consideration is given to future uses of the property that may conflict with the easement provisions. Measures are taken prior to acquisition to eliminate future conflicts whenever possible. Examples include the exclusion of a former building site from a grassland easement which may be attractive for future development; the exclusion of wetlands that are situated near a landowner's home, feedlot, or farm yard which may interfere with his operation; or exclusion of areas where current or proposed uses will detract from the purpose of the easement. Despite these efforts, circumstances may surface from time to time causing undue hardship to a landowner, public service entity, or a municipality that may need to improve its public service facilities. In these cases, managers are encouraged to work with these entities when possible to alleviate or help minimize the hardship which may be created by the easement.

While the Service wishes to maintain flexibility to address legitimate needs to use easement areas, the landowner, public service entity, or municipality must not be given the impression that any use is guaranteed. In other words, the decision on whether or not to allow a requested use on an easement belongs solely to the Service, and may only be made after an exhaustive review process through the flowchart outlined in this chapter. It is not at the landowner's discretion to impact the easement whenever he/she sees fit; the *landowner has no flexibility* to impact an easement in a way that is restricted by the easement contract. Rather, the *Service has limited flexibility* to permit legitimate needs to use easement lands when the impacts are deemed less than material.

The next section of this chapter outlines the procedures that must be followed when evaluating requested uses of Service easements. It is not the intent of this chapter to allow for the exchange or amendment of easements for matters of convenience or simply because a landowner doesn't like the easement on his property. The criteria which may justify either temporary relief or an exchange of easement rights involve issues surrounding health, safety, or major threats to private or public property; issues associated with units of local government, public services, or corporations; or certain issues surrounding uses associated with the management or operation of the land.

This flowchart and process outlined herein must be followed for *all* requested uses of easement properties, including the authorized activities listed in the previous manual guidance known as "permitted activities." To provide as much consistency as possible among wetland management districts, managers *must* authorize a requested use if it passes the flowchart; has been documented as a compatible use by the region in which the use is proposed; and can be accomplished within the guidelines unless they can justify a denial of the request to the Assistant Regional Director (ARD)-Refuges. Proposals which fail to pass the flowchart but involve special circumstances should be referred to the ARD-Refuges through the Easement Coordinator in Region 6 or the Refuge Supervisor in Region 3.

Activities which do not impact the rights encumbered by the Service are allowable without a permit. This process for evaluating proposed uses is *not* intended to apply to commonly-accepted operational practices that do not impact the rights acquired by the Service like fencing needs, corrals, vehicle and equipment access trails, temporary hay storage or temporary watering tanks that do not violate the terms of the easement document and do not destroy vegetation. These and other operational necessities are allowed on easement properties *without* a permit or advance approval from the wetland management district.

The Easement Requested Use Flowchart guides managers through a logical process when evaluating requested uses of easement properties. When considering use requests, managers need to:

- Determine jurisdiction (whether the Service has the authority to regulate the proposed use under the terms and requirements of the easement).
- Determine whether the proposed use is either a refuge management activity or a refuge economic use—each requiring different levels of compatibility compliance.
- Evaluate whether there are any reasonable alternatives to possibly accommodating the request off easement property.

If the request falls under Service jurisdiction, is not a refuge management activity, and there are no reasonable alternatives off easement property, then managers can continue to use the lower part of the flowchart to evaluate the proposed use as a health and safety request, a public service, government or corporate request, or another request not fitting either of the other two categories. As stated above, activities that do not impact the rights acquired by the Service are allowable without the need for a permit.

*-Remainder of page intentionally left blank –*

**Region 3/Region 6**
**Requested Use Flowchart**
**2016**



## B. Process for Evaluating Requests for Use of Easement Properties

This process is designed as a "screen-out" mechanism, meaning that a proposal must meet all the criteria rather than any single criterion to be approved. Exhibit VI-1 contains the form that is completed for each request and is to be retained in the easement file as a record of the decision made and an accounting of all authorized uses for the easement area.

While the decision criteria used to evaluate a request for an easement use or modification are presented as a linear process in the flowchart, the actual consideration of a request should be made with the majority of the steps in mind. If a request is likely to be found not compatible due to secondary or associated impacts (such as the loss of an endangered species like the prairie fringed orchid or the loss of a water bird nesting colony), discussion with the requestor should focus on avoiding those impacts. When evaluating an exchange which does not require a compatibility determination, unique or rare values would be considered as part of the Environmental Site Assessment. Managers should keep in mind that some easements will protect unique or rare wildlife and habitats which the Service should maintain regardless of how well the request may meet the remainder of the criteria in the flowchart.

If the requested use successfully passes the flowchart, then managers should review Exhibits VI-2 (Region 3) or VI-3 (Region 6) to check for conditions and/or stipulations for some of the more commonly requested uses of easement properties. Regions 3 & 6 have developed programmatic CD's which can be used to address compatibility if the circumstances fit the description in the CD. If they do not, then an individual CD may need to be written.

### FLOWCHART GUIDANCE

### 1. Jurisdiction

When considering a requested use on an easement, the manager must first determine if the Service has jurisdiction under the terms of the easement. If the answer is "no," then the manager may choose to advise the requestor of other applicable laws/regulations to consider as appropriate.

An example of a proposed use decision being made by a manager is when USDA Wildlife Services requests to spray cattails for the purpose of eliminating blackbird roosting habitat. When this request is on land protected by a wetland easement only, then the Service has no jurisdiction to restrict the use since the activity does not constitute a "drain, burn, fill, or level." However, the Service would have jurisdiction when that same request is made on land protected by a grassland easement since the activity would effectively be "destroying the vegetative cover."

### 2. Refuge Management Activities

If the Service has jurisdiction, then the manager must determine if the request can be considered a "refuge management activity," defined as an activity that could be conducted by the Service or a Service-authorized agent to fulfill one or more purposes of the national wildlife refuge (area),

or NWRS mission. Service-authorized agents may include state or federal agencies, educational institutions, contractors, private organizations or individuals. These activities must benefit wildlife populations or easement habitat; they must further the purposes and goals of the wetland management district or the mission of the NWRS; and they must be commonly-accepted as practices which are normally accomplished by natural resource agencies to promote wildlife populations. Examples include but are not limited to prescribed burning of wetland vegetation to enhance breeding pair habitat, interseeding upland areas to introduce more resilient or diverse native grasses and/or forbs, and restoration of previously-drained wetlands.

If the requested use qualifies as a refuge management activity, then issue a SUP with the applicable stipulations. A CD is not required for a refuge management activity unless it is also an economic use.

***Refuge Management Economic Activities***

Authorized refuge management activities are exempt from compatibility requirements, except for *Refuge Management Economic Activities*. A refuge management activity which is also an economic use (e.g., early haying of a grassland easement) requires the preparation of an Appropriate Use (AU) Finding and a Compatibility Determination (CD) before the request can be authorized (see discussion below for more detail).

If the requested use is also a refuge management economic activity, then it must meet a higher standard of compatibility by "contributing to the achievement of the national wildlife refuge purposes or the National Wildlife Refuge System mission." The compatibility standard of not materially interfering with or detracting from the purposes or mission will not suffice for economic use requests.

Economic Uses are defined in 50 CFR 29.1 as "including, but not limited to grazing livestock, harvesting hay and stock feed, removing timber, firewood or other natural products of the soil, removing shell, sand, or gravel, cultivating areas, or engaging in operations that facilitate approved programs on national wildlife refuges." Another way of determining whether or not a use is an economic use is to consider if the activity results in the *harvest of the interest* the Service acquired in the easement.

A differentiation is made between refuge economic uses and potential commercial uses. Authorizing a communications cable to cross easement properties is a use request from a commercial entity, but it does not fit the definition of "economic use" for this section. Other examples of commercial uses which do not meet the definition of a "refuge economic use" include: buried waterlines completed by rural water companies, electric utility cables, television cable crossings, etc. In other words, if the use results in only an *occupation* of the easement property, then it is probably not an economic use. If the use results in a *withdrawal* of a product, then it probably is an economic use.

***What qualifies as a Refuge Management Activity?***

The following are specific requirements associated with some refuge management activities if permitted on easements. The following list is not intended to be all inclusive and other actions

may qualify as refuge management activities. The test should be: is the request a management action that a natural resource agency may conduct to promote wildlife populations in the local area? This list is also not intended to suggest that the manager must approve the requested use as a refuge management activity. It is the manager's responsibility to do field evaluations as needed and use professional judgment to determine if a requested use qualifies as a refuge management activity.

If the requested use is determined to be a refuge management activity, a CD is not required and it can be allowed by issuing a Special Use Permit with stipulations. However, if the refuge management activity is also an economic use, then Compatibility must be addressed. A programmatic CD may have already been approved. Managers should also follow any Regional policy/guidance developed for fee title lands that pertain to the refuge management activities on easements (i.e. farming, grazing, burning, etc). For more Regional specific guidance for refuge management activities, see Exhibit VI-2 for Region 3 and Exhibit VI-3 for Region 6.

- <u>Burning</u> – Generally, burning should not be authorized more than once in every 3 years, or not to exceed 1/3 of the wetland basins or upland acres annually. However, if a specific management objective is identified and approved by the manager, burning more often may be allowed. If FWS staff or funding is used to accomplish the burn, all FWS planning and policy must be followed, similar to fee title lands. Burning is not restricted in the R6 grassland easement document.

- <u>Planting Trees/shrubs</u> – Habitat and grassland easements are for grassland habitat protection, so planting trees would generally not be considered a refuge management activity. However, based on the terms of the easement and specifics of the requested use, planting trees/shrubs may qualify as a refuge management activity. To qualify as a refuge management activity, trees/shrubs planted must be of native species to the area, be planted on non-native grassland, and be needed to meet a local biological goal. Other requested tree/shrub plantings, such as field or farmstead windbreaks, will not fit this category, and must be evaluated under the "All Other Requests" portion of the flowchart.

- <u>Removing Trees</u> – Habitat and grassland easements are for grassland habitat protections, so tree removal would generally be considered a refuge management activity. However, some easements were acquired to protect trees, so make sure you have reviewed easement document and files. If the tree removal is for commercial harvest, Compatibility must be addressed. Tree removal is not restricted by the R6 grassland easement document.

- <u>Wetland Restorations</u> –Restorations or manipulations of wetlands on Service-administered easements may be allowable within the terms of the easements. Managers should carefully read and fully understand the easement document when considering such activities on wetlands and when making the determination of who has the right to conduct the work. For instance, on many habitat and FmHA easements, the Service has the right to restore or manipulate wetlands. On wetland easements, however, it is important to first establish jurisdiction Be mindful of and take into consideration:

- Wetlands that are partially drained and depicted on a Drainage Facility Map (DFM),
- existing or drained wetlands that were excluded from the original easement, which may or may not be shown on a DFM,
- whether or not wetlands are included on a wetland map for pre-1976 easements,
- any existing drainage agreements to third parties.

Occasions may arise when an easement landowner offers to restore drained wetlands as part of an agreement under the FWS's Partners for Fish and Wildlife (PFW) program, the U.S. Department of Agriculture's (USDA's) Conservation Reserve Program, USDA's Wetland Reserve Program, or a similar program. In these cases, the manager should consult the easement files and photographs to determine if a potential violation has occurred but was undetected. It is necessary to determine if the landowner allowed/caused drainage after the purchase date of the easement, in which case it may be a violation. Information on violations is located in Chapter XIV.

Follow these guidelines if the existing drainage to protected wetlands is not a violation:
The manager is encouraged to work with the landowner to restore the wetlands at Service or other expense. Landowner's permission is needed. If the landowner wishes to restore and protect wetlands that were not protected by an easement previously acquired on the land, a second easement must be acquired. The manager should contact the Realty office and acquire the additional rights to protect the wetland or wetlands. If water control structures (ditch plugs, sheet pile weirs, tile risers, or intakes) are required, the new easement should document the specific mean sea level (MSL) elevation of the structure. It is also recommended that MSL elevations are documented on any drainage ditches on partially drained wetlands when easements are acquired.

- Wildlife ponds/Wetland Creations- which are constructed in accordance with NRCS specifications for wildlife purposes or by the FWS's PFW program can be considered a refuge management activity. However, they should not intercept significant runoff water from natural wetlands.

- Dugouts - for stock water can be considered a refuge management activity if they are needed to manage grazing on the easement. The following stipulations apply.

    - They are constructed according to NRCS specifications.
    - They are constructed on the edge of wetlands larger than 1 acre. Larger wetlands are preferred to minimize dewatering shallow wetland zones.
    - No spoil is placed in a wetland unless it meets the parameters of a nesting island.

- Farming to improve perennial habitat – farming/tillage specifically for crop production is not allowed on upland easements. However, managers may authorize farming/tillage as a refuge management activity if the purpose is to improve the habitat quality, similar to what is often done on fee title lands. Farming/tillage should not be allowed on native prairie (no previous tillage history), but is allowable on upland easements with a farming/tillage history. This is

primarily done to eliminate undesirable plants and prepare the seed bed for reseeding to perennial vegetation. Food plots for the sole purpose of feeding wildlife are generally not allowed. However, requests for food plots may be allowed by following the above farming/tillage guidance. A SUP should be issued with a cropping/reseeding plan to accomplish this refuge management activity, generally for a length of 2-5 years, depending on regional farming guidance.

If the harvesting of a crop is planned, then this refuge management activity is also an economic use and Compatibility must be addressed. However, the farmed area can still be grazed or hayed according to the terms of the easement without authorization.

- Interseeding- to be considered a refuge management activity, habitat improvement must be the goal of interseeding. Requests for interseeding merely to benefit of the landowner's operation must be evaluated under the "All Other Requests" portion of the flowchart. Interseeding into native prairie must be with native grasses and forbs only and must be biologically necessary.

- Seed Harvest – Seed may be harvested if the landowner or FWS uses the seed to improve habitat conditions on other conservation lands. If the landowner agrees, the FWS may enter into an agreement to harvest the seed consistent with local rates of payment or crop sharing. If the harvest is being completed by a vendor for a share of the seed, then it is an economic use and Compatibility must be addressed.

- Mowing/Haying – Mowing or haying is a refuge management activity when it is used for weed control or to improve the habitat quality. However, if the hay is removed for livestock feed or to sell, it is an economic use and an AU determination and CD is required.

- Weed Control – Weed control is the responsibility of the landowner so by itself, the FWS does not have jurisdiction, except on habitat easements which explicitly state that the landowner must get permission to implement weed control. However, the tool to be used (i.e. mowing before July 16th, etc) may be restricted by the terms of the easement. Weed control usually will be considered a refuge management activity. However, caution should be used to insure that the landowner's intent is truly weed control and not for other reasons. The Manager may also choose to suggest other weed control tools instead of the requested tool.

## 3. Reasonable Alternatives to Impacting the Easement Interest

The manager should always try to determine if the requester can work around the easement interest by searching for **reasonable alternatives** off easement property which will accommodate the requester's need. For example, can the activity be accomplished on non-easement property without causing undue economic hardship or is there a past precedent for an alternative being proposed and used? Alternatives to the request should be thoroughly explored with the goal of developing an acceptable course of action that will not result in an impact to any portion of the Service's easement interest. In some cases the project can be modified so that it can occur on the easement tract, but in a manner that the easement interest is not affected. If the

need can be met on nearby or adjacent non-easement land, or modified in a way to not impact the easement interest, then a reasonable alternative is deemed to exist and the proposal must be denied and there is no need for further consideration.

Finding a reasonable alternative is a collaborative process with the requestor. Impacts may oftentimes be reduced but not eliminated. For example, during discussions regarding a wind development site, a manager may reduce the proposed miles of service roads and the number of towers on grassland easements; or during discussions on a pipeline project, a manger may reduce the number of easement tract crossings or successfully route the line around individual easement wetlands. At a point in these discussions, a manager can develop a feel for what may be a reasonable alternative. The reasonable alternative may include some easement impacts, but they have been reduced and minimized through discussion with a requestor. This discussion also helps the manager develop a feel for the nature of the request and whether it will fit the category of essential need or be in the general best interest of the American public.

If there is no reasonable alternative to the proposed action on easement property, then proceed to the next block. If there is a reasonable alternative, then the proposal must be denied.

## 4. Determining the Type of Requested Use of Easement Property

If the request is not a Refuge Management Activity, then the request can be one of three types:

- Health, Safety, or Major Threat to Public or Private Property which are evaluated using the green-colored blocks through the center of the flowchart

- Public Service, Government-sponsored or supported, or Corporate-type requests which are evaluated using the blue-colored blocks on the left side of the flowchart

- All Other Requests which are evaluated using the orange-colored blocks on the right side of the flowchart

## 5. Health and Safety or Major Threat to Personal or Public Property

Emergencies and situations involving health, safety, or major threats to buildings, roads, and infrastructure are evaluated here. Examples include a protected wetland which causes flooding of a basement, barnyard, feedlot, driveway or road; or poses a threat to a domestic water supply or sewer system. While most situations falling into this category will likely involve wetland easements, some may involve grassland easements; e.g., where dry grasslands adjacent to farm buildings constitute a fire hazard.

In very rare instances, health and safety issues may involve "economic uses" of easement properties as defined in 50 CFR 29.1. An example would be allowing a county or township to remove clay from a grassland easement to build up the road through a flooded wetland. The extraction of the clay material, even though deemed to be a temporary impact and necessary to address a safety issue, would still have to be covered by an AU Finding and CD written to the higher compatibility standard.

For situations involving health and safety or major threats to property which cannot be resolved without impacting the easement interest, and for which no reasonable alternative exists, the wetland manager, upon verification of the circumstances, may allow alteration of a wetland(s) or grassland under easement under the following guidelines (continue to evaluate the proposal under the "Emergency (Health/Safety)" guidance of the flowchart).

**A.** If the needed relief can be accomplished within 30 days, a Special Use Permit with necessary stipulations and restoration requirements should be issued. This action is considered a temporary action, and a CD is not required if resolution can be achieved in under 30 days.

**Emergencies Defined under Compatibility (FWM 360):** "The Refuge Administration Act states that the Secretary may temporarily suspend, allow, or initiate any use in a refuge if the Secretary determines it is necessary to immediately act in order to protect the health and safety of the public or any fish or wildlife population. Authority to make decisions under this emergency power is delegated to the refuge manager. Temporary actions should not exceed 30 days and will usually be of shorter duration. Such emergency actions are not subject to the compatibility determination process… When using this authority, the refuge manager will notify the Regional Chief in advance of the action, or in cases where the nature of the emergency requires immediate response, as soon as possible afterwards, and typically no later than the start of business on the first normal workday following the emergency action" . "The refuge manager will create a written record…" (see Exhibit VI-1) "…of the decision, the reasons supporting it, and why it was necessary to protect the health and safety of the public or any fish or wildlife population."

**B.** If resolving the situation requires longer than 30 days, then the requested use must be evaluated under the Compatibility standards before a permit may be issued. One of the programmatic CDs may be applicable; if not, then an individual CD will be necessary. If the situation is still unresolved at the end of 1 year, another one-year permit may be issued.

**C.** If the situation causing the emergency is a recurring one (i.e., lasting longer than a couple years), then the least amount of impact required to resolve the problem should be determined and the requested use should be evaluated under the compatibility standards. If the requested use is compatible (see programmatic CDs), then a Letter of Non-Objection from the Regional Director should be pursued (in lieu of a ROW permit for the impacts). If a programmatic CD is not applicable, the manager may need to develop an individual CD. If the requested use cannot be found compatible, then an easement exchange will be necessary in order to accommodate the request. The easement exchange process is detailed Chapter VII. A CD will not be required for the exchange, but NEPA, cultural resource, and Section 7 compliance must be achieved.

## 6. Public Service, Government-supported, and/or Corporate Requests

This category of requests includes highway improvement projects, rural water systems, electric transmission lines, fiber optic cables, and other projects which promote the greater public good. Generally, these are requests by municipalities, other governmental entities, or utility companies to extend city boundaries, build relay towers, relocate sewage lagoons, relocate landfills, etc. Other requests to be evaluated under this part of the flowchart are those received from corporate entities such as an ethanol production plant, a pipeline company, a manufacturing plant, or wind energy developer.

**A.** The next step is to determine whether or not the proposal is in the **general best interest of the American public**, such as being necessary for the greater public good or being essential to promoting the general public welfare. A rural water system installation which cannot be rerouted to avoid Service interests is an example of an essential need which is in the general best interest of the American public. The proposal must meet a level of importance beyond mere convenience and be absolutely necessary or indispensable. If the proposal is determined not essential or absolutely necessary, then it must be denied.

**B.** If there are no reasonable alternatives to fulfilling the proposal on easement property and the proposed use of the easement area is in the general best interest of the American public, then the manager must evaluate whether or not the project will compromise the **integrity of the easement**. If the proposal will destroy the very nature or integrity of the easement by affecting a high proportion of the easement area or seriously degrading the quality of the easement through fragmentation, then an exchange of easement interests should be considered. Activities which are confined to a corridor (issuance of a ROW permit or an expansion of an existing right-of-way) are likely not of the magnitude that will compromise the integrity of the easement area. However, proposals resulting in the destruction of an easement area that extends beyond a corridor or the destruction of a significant proportion of the easement interest will compromise the integrity of the easement area and should not be handled with a permit. One question to consider is "would the Service still be interested in purchasing the easement tract had the proposed use occurred first?" In other words, would there be habitat values worth protecting had the proposed use predated the easement purchase? If the answer is "yes," then the proposed use likely will not compromise the integrity of the easement area.

**C.** Upon reaching this stage in the flowchart evaluation, if the request is for wind energy development, then the manager should work with the project proponent to minimize unavoidable impacts to the extent practicable and then consider a partial term release and relinquishment of easement rights (exchange with reversionary clause). See Chapter IX for more details.

If the request is not for wind energy development, then proceed down the flowchart.

**D.** At this point in the evaluation process, the manager should determine whether or not the request is for a project where it is already known that an exchange of easement interests

will be required should the use occur. The most common example is a state department of transportation project where a road right-of-way is being expanded *through the purchase of additional land in fee.* In these cases, in order to avoid a Service easement encumbering state-owned lands, the affected easement interest within the new ROW corridor is generally exchanged

If an exchange of easement interests is necessary to accommodate a highway or road project, then a previously-established exchange bank may be available to replace these interests. For example, the Service has an MOU with the North Dakota Department of Transportation which outlines the qualifications for replacement acres and is structured to "bank" acres which can be applied to future wetland losses from other projects. Other banks have been established over the years, and it is expected that more will be established in the future. If an existing bank is not an option, the manager should then follow the exchange process as outlined in Chapter VII.

**E.** If the request does not fit one of the previously-discussed scenarios, the manager should consider whether or not the requested use is compatible. If the use is compatible, then the manager may issue a SUP, ROW permit, or obtain a letter of non-objection from the regional director to authorize the use.

As described in the 2000 Compatibility Policy, "maintenance of an existing ROW" includes minor expansion or minor alignment to meet safety standards. If the request will qualify under this category, then a compatibility determination must be prepared which outlines the required mitigation and stipulations necessary to achieve compatibility. *An Appropriate Use Finding is not required for projects related to maintenance of existing rights-of-way;* however, other compliance requirements must be satisfied (NEPA, cultural resources, Section 7, etc.). Per 50 CFR 29.21, requests for rights-of-way across lands in which the Service only has an easement interest may be authorized with a letter from the Regional Director as long as the easement interest is not adversely affected.

**F.** If a request passes all the previous filters and decision points, but is not compatible because it cannot meet the higher standard required of economic uses (shown as "29.1 criteria" on the flowchart, then an exchange of easement interests should be considered. If the proposal is determined to be not compatible because of secondary or associated impacts, then the request must be denied. It is expected that secondary or associated impacts will be evident much earlier in the process. Rarely will a proposal pass all the screens and filters, *and then* be denied at this level. When secondary impacts that will render a proposal not compatible are known, there is no need to proceed through the flowchart since the use will not be allowed anyway. Furthermore, because an exchange of easement rights requires the preparation of a biological analysis wherein the manager must ensure no impacts to critical habitat or special emphasis species (basically secondary or associated impacts), these impacts would preclude an exchange as well and these proposals must be denied.

## 7. Other Requests

Other requests are those which do not fit logically within either the Health and Safety category, or the Public Service Request category.

**A.** The managers should ask "is the proposed use an operational need which is related to and will facilitate the management of the easement land?" For example, is the request for a facility on the easement which will improve the landowner's ability to better manage the habitat? Examples might include a storage building for equipment or a small amount of wetland fill necessary to install a cross-fence needed for grazing. Requests that are not related to the management of the easement land will not be allowed. Examples include the construction of hunting lodges, convenience stores, or structures that are not directly tied to the management of the land.

**B.** The manager should next consider whether or not the requested use is an **essential need** for operational viability. The proposal must meet a level of importance beyond mere convenience and be absolutely necessary or indispensable. If the proposal is deemed to be not essential or absolutely necessary, then it must be denied.

**C.** If the request is for a building that is related to the operation of the land protected by the easement, and is determined to be essential for the landowner, and for which there are no reasonable alternatives, then an exchange of easement interest should be considered.

If the request is for something other than a building, then the manager should consider whether not the use is compatible. The programmatic CDs should be reviewed to see if one of them applies. If not, then the manager will need to do an individual CD. If the use is compatible, then the manager may issue a SUP, ROW permit, or obtain a letter of non-objection from the regional director to authorize the use.

If the proposal is determined to be not compatible because of secondary or associated impacts, then the request must be denied. It is expected that secondary or associated impacts will be evident much earlier in the process. Rarely will a proposal pass all the screens and filters, *and then* be denied at this level. When secondary impacts that will render a proposal not compatible are known, there is no need to proceed through the flowchart since the use will not be allowed anyway. Furthermore, because an exchange of easement rights requires a biological analysis wherein the manager must ensure no impacts to critical habitat or special emphasis species (basically secondary or associated impacts), these impacts would preclude an exchange as well. These proposals must be denied.

If a request passes all the previous filters and decision points, but is not compatible because it cannot meet the higher standard required of economic uses (shown as "29.1 criteria" on the flowchart, meaning related to the economic use discussion in 50 CFR 29.1), then an exchange may be considered.

## C. Supporting Information & Guidance

***Farmstead Expansion – Region 6***

Region 6 has treated farmstead expansion requests in a variety of ways in the past. The 1992 and 1997 revised Administration and Enforcement Guidelines and Procedures for Perpetual Grassland Easements and 1998 Grassland Easement Administration - 5 Percent Rule memo authorized the development of 5% or 20 acres (whichever was less) per section on grassland easement tracts. This guidance changed again with the release of the 2005 Administration and Enforcement Manual, which under certain conditions, authorized development of .4 acres of wetland not to exceed 25% of a basin, and/or 8 acres of easement protected upland. If there is historical file documentation for grassland easements in Region 6 that authorizes an easement development request based on past guidance, or a landowner is specific about their understanding that 5% of a grassland easement could be developed on an easement that was purchased between 1992 and 2005, those requests should be forwarded on to the Refuge Supervisor and/or Regional Easement Coordinator as appropriate. In absence of such documentation, requests for farmstead expansion should be treated as any other requested use on and easement; i.e., the flowchart should be used to evaluate the request.

***Issuance of Permits and/or Letters of Non-Objection***

The Regional Director, or his designee, may issue a permit when such activities are deemed appropriate and compatible. The Solicitor's Opinion of August 14, 1980 (Exhibit VI-4) discusses the legal aspects of permitting limited acts of draining, burning, filling, or leveling in wetlands under easement. While this opinion is specifically for wetland easements, the intent applies to other types of easement interests as well.

The permit application (use request) may be either in writing or verbal. In all cases, however, the manager must know exactly what is being requested. Even though use requests can be made verbally, in no case should the authorization be verbal. It must be in the form of a special use permit, right-of-way permit, or a signed letter of non-objection from the Regional Director. If a request is received from a 3rd party (e.g., a utility company, highway department, etc.), then it must be in writing. Managers must visit the site of any proposed activity prior to issuing authorization to impact any easement area (except for burn permits). If the request is to resolve an emergency, authorization can be granted prior to visiting the site, but the manager must visit the site as soon as practicable.

All permits must be issued before acts of burning, draining, filling, and leveling in wetlands, or cultivation or alteration of grasslands or other protected habitats are allowed. **No "after-the-fact" permits shall be issued.** All non-permitted acts of burning, draining, filling, and leveling of wetlands, or cultivation or alteration of grassland vegetation must be treated as easement violations.

Easement policy (601 FW 6) allows Special Use Permits to be issued for up to 5 years, and in limited circumstances, up to 10 years. These limited circumstances are those related to health and safety issues or refuge management activities. Managers in Region 3 should consult with the

regional office on permits over 3 year's duration; managers in Region 6 should do likewise for permits over 5 years.

Letters of authorization are no longer acceptable per a 2013 guidance memo signed by the R6 ARD-Refuges (Exhibit VI-5) as well as the Easement Policy (601 FW 6). Special Use Permits, right-of-way permits, and a letter of non-objection signed by the regional director (per 50 CFR 29.21 – 1(b)) are the only acceptable forms of authorization. Letters of non-objection signed by the regional director are applicable for requests for right-of-way across lands in which the Service owns only an easement, and where the easement interest is not adversely affected and the fee owner has no objections. See 50 CFR 29.21 for a more details.

The right-of-way permit application process is identified in CFR Subpart B – Rights-of-Way General Regulations, 50 CFR 29.21. ROW permits can be granted for as long as it is used for the purpose granted, generally up to 50 years or less where appropriate. Projects involving very temporary and very minor impacts, such as a small waterline that is knifed in to the ground as opposed to trenched in, may be handled with a short-term SUP in lieu of a ROW permit. However, the advantage of authorizing a use with a ROW permit is that current and future construction and maintenance would be allowed without any further administrative action for the term of the permit and within any limitations or stipulations within the permit. For example, if a ROW permit were granted for a buried waterline on a grassland easement and the line broke 20 years later, maintenance activity would be already approved under the ROW permit and no additional permit or authorization would be needed. Nonetheless, the requestor may not want to apply for a ROW permit due to cost or application requirements. They may determine that the need for future maintenance is limited and if needed, they may assume another SUP would be granted to cover that activity. The decision to apply for a ROW permit is that of the requestor.

Questions may arise relative to the extent of information needed to describe the location of the area covered by the ROW permit. The CFR (29.21-2) requires information sufficient to "show the right-of-way in such detail that the right-of-way can be accurately located on the ground." The CFR states that maps, sketches or a plat provided by the applicant are sufficient and provides direction on specific location information. There is no requirement for a legal survey completed by registered surveyors in order for a wetland manager to locate a ROW boundary. Managers have demonstrated the ability to accurately locate and relocate FmHA easement boundaries using GPS technology and very basic maps. Therefore, finding a ROW boundary for compliance purposes would be a similar, accurate and easy task. At a minimum, the requestor needs to provide a level of point information in the permit application that can be accurately duplicated by field managers, such as GPS coordinates. While a legal survey of the ROW is not required, if the project sponsor is surveying other features of the project off-easement they should be encouraged to provide survey data for the ROW as well.

If the project requestor chooses to apply for a ROW permit, there may be a time delay before the ROW permit is actually granted (typically 6-18 months). At the discretion of the field manager, the project sponsor can be issued a SUP to cover the initial construction while the ROW permit is being processed.

### *Programmatic Compatibility Determinations*

Programmatic compatibility determinations (CD) for some of the more common requested uses on easement properties received by managers are completed by both regions. For one of the programmatic CDs to be applicable, the scenario must fit the discussion in the programmatic CD exactly; otherwise, an individual CD will be required. Assurances have been incorporated into the process to protect the integrity of the NWRS, and to comply with policy requirements.

# Chapter VII: Easement Exchange Procedures & Format

By policy (342 FW 5, Non-Purchase Acquisition), there are two requirements for an exchange: (1) the exchange must be of benefit to the United States, and (2) the value of the lands or the interests in the lands be approximately equal or that the values be equalized by the payment of cash by the grantor or by the United States. Realty will ensure the second criterion is met; the wetland district manager is responsible for ensuring the first criterion is met. Exhibit VII-1 outlines parameters for acquiring replacement easement habitat to achieve "biological equivalency" (i.e., is of "benefit to the United States") when executing an exchange.

There are several scenarios where an exchange of easement interests may be necessary. For example, whenever a state Department of Transportation acquires land through fee-title acquisition which overlaps with an easement interest, an exchange is executed so that a state-owned interest is not encumbered with a Service easement (this is where exchange banks in ND have their greatest utility). Other examples include requested uses which successfully pass through the Flowchart but cannot be found compatible because either they cannot satisfy the 50 CFR 29.1 criteria covering economic uses or they have impacts that are deemed a material interference or detraction from the easement purposes or mission of the NWRS.

## A. Service Policy

Service policy governing property or property interest exchanges is detailed in the Fish and Wildlife Service Manual, Part 342 FW § 5.7. Exchange authorities are provided in 340 FW 1.

Regional Directors have the authority to exchange easement interests of any size or value acquired as part of the WPA program subject to the limitations discussed below. WPA program easement interests are those acquired with Migratory Bird Conservation Act funds, North American Wetland Conservation Act funds, or funds donated by a third party, such as a private individual or a private non-profit conservation organization.

Exchanges of non-WPA easement interests such as those acquired with Land and Water Conservation Funds (LWCF) can be approved by the Regional Director when the size of the easement interest is 40 acres or less. Exchanges of non-WPA easement interests larger than 40 acres must be approved by the Director.

Exchanges of non-WPA easement interests valued at $500,000 or more, regardless of the size of the interest, require Congressional approval. The $500,000 threshold is the combined value of the easement interest to be divested plus the interest to be acquired.

## B. Regional Guidance

Once wetland managers have determined that the requested use qualifies for an exchange of easement interests, the proposed exchange should be discussed with the Refuge Supervisor prior to submitting the exchange request in writing. Region 6 requires that the exchange proposal be submitted in writing to the Refuge Supervisor. The exchange proposal must be co-signed by the Refuge Supervisor and the Chief, Division of Realty for conceptual approval of the exchange. Final approval of exchanges within the WPA program has been delegated by the Regional Director to the Chief, Division of Realty.

Wetlands and grasslands impacted and proposed to be exchanged must be replaced with habitats similar to those being impacted. Proposed exchanges involving the alteration of native prairie should be avoided. All reasonable alternatives should be explored and impacts to native prairie should be a last resort.

**NOTE**: Within the States of North Dakota and South Dakota, some grassland easements have been acquired with LWCF funds and in North Dakota, some wetland easements in Ward County have been acquired with LWCF funds. Exchanges involving wetland and grassland easements acquired with LWCF funds over 40 acres in size require approval by the Director. Both wetland and grassland easements acquired with LWCF funds can be identified by the letter "C" following the tract number.

## C. Exchange Request Submission

To facilitate the administrative process of performing the exchange functions within the Division of Realty, it is necessary to submit requests for exchange using the following guidelines.

1. **Consider the number of requesters** - If there is one requester such as a landowner, a corporation or a government entity, submit one request for exchange. If there are two requesters (two different landowners, corporations etc.), submit a separate exchange request for each requester. Also include legible maps to illustrate the area being considered for an exchange.

2. **Consider the location of the easement interests to be divested -** Identify the state, county or counties and tract number(s) in which the easement interests to be divested are located. A request for exchange involving more than one county should have the easement interests impacted broken down by the number of easement acres impacted for each tract in each county.

3. **Consider the type(s) of easement interests to be divested -** Wetland easement interests impacted should be quantified on a wetland acre basis and identified by tract number and county. Grassland easement interests should be quantified on an acre basis and identified by tract number and county.

## D. Exchange Request Format

The request for exchange should be submitted in the form of a memorandum to the refuge supervisor from the project leader of the wetland management district. The subject title of the memorandum should be "Request for Exchange of Wetland(s)/Grassland(s) Easement(s), Tract Number(s), County, State."

Each request should include the following information in a narrative format.

1. Briefly described the history of the situation that has resulted in the request for exchange. Include as part of this section a brief "biological analysis" of the property to be relinquished to evaluate any special values to the property which would interfere with the exchange. Managers can review Exhibit VII-1 for more information.

2. Explain how the situation meets the criteria for an exchange.

**3.** Explain how the exchange will benefit the Service.

**4.** Briefly describe the request for exchange.

**a.** Party(ies) with whom the Service is exchanging interests

**b.** Interests to be divested

**1)** State, county, tract number and number of wetland acres to be divested

**2)** State, county, tract number and number of grassland acres to be divested

**c.** Interests to be acquired

**1)** State, county, number of replacement wetland acres to be acquired.

**2)** State, county, number of replacement grassland acres to be acquired.

**3)** On the last page of the memorandum, provide an approval signature line for the "Refuge Supervisor" and a concurrence signature line for the "Chief, Division of Realty, Region 3/6."

**4)** Attach copies of aerial photographs to the request for exchange.

**a)** Delineate the wetland(s) or grassland(s) to be divested on the copy(ies) of the aerial photograph(s) and at the top of the aerial photograph(s) identify the interest being divested "Wetland(s) to be Divested," "Grassland to be Divested."

**b)** Delineate the wetland(s) or grassland(s) to be acquired on a separate copy(ies) of the aerial photograph(s) and at the top of the aerial photograph(s) identify the interest to be acquired, "Wetland(s) to be Acquired," "Grassland to be Acquired."

If acceptable replacement lands cannot be identified, then Realty may apply the money provided by the requester, paying the current market value of the relinquished interest, to another easement simultaneously with relinquishing the interest.

## E. Property or Interest Divestiture Requirements

The following is a procedural requirement of the need to consider many aspects associated with land or interest divestiture. Exhibit VII-2 contains a checklist developed by the Washington Office-Realty to help with this process. The information needed to complete this form will require input from both Realty and the wetland management district office.

Before divesting any lands of the United States, compliance with the National Historic Preservation Act of 1966 (16 U.S.C. 470 et seq.); the Archeological and Historic Preservation Act of 1974 (16 U.S.C. 469 et seq.); the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (94 Stat. 2767 et seq.); the Resource Conservation and Recovery Act (98 Stat. 3221 et seq.) and Executive Orders (EO) 11988 (Floodplains Management) and 11990 (Protection of Wetlands) is required.

Service policy is included in **613 FW 1 and 2** (Natural Resources Protection). As to lands or interests in lands being conveyed out of United States ownership by exchange, the Regional Director must make a determination whether or not the lands are within a floodplain or wetlands within the scope of EO 11988 and EO 11990. The conveyance of land identified as being restricted by either of these orders must contain appropriate restrictive language. Any restrictive language to be used in the deed must also be included in the exchange agreement. The exchange agreement in such cases cannot be accepted until the procedures for public notices have been completed.

**F. Release of Easement Rights**

Once accepted, easements become part of the National Wildlife Refuge System. The National Wildlife Refuge Administration Act of 1966, as amended, limits disposition of lands in the NWRS. The Act states that no acquired lands or interest in lands which are part of the NWRS may be transferred or otherwise disposed of (except by exchange) unless the Secretary of the Interior determines, with the approval of the Migratory Bird Conservation Commission (MBCC), that such land or interest in lands is no longer needed for the purposes for which the NWRS was established.

If MBCA funding was used to acquire the area (interest), then approval from the MBCC would be required to release easement rights. If other authorities and money were involved in a parcel to be divested, then an act of Congress is required to divest the interest outside of an exchange.

# Chapter VIII: Administration of Rights-of-Way on Easement Properties

An important part of administering Service easement properties is the process of evaluating and processing requests related to existing and new rights-of-way (ROW). These can take the form of highway improvement projects, buried pipelines, utility crossings, rural water systems, etc. Since ROW administration will often require Compatibility, NEPA, ESA and Cultural Resources compliance, managers are encouraged to review *Chapter V: Refuge Compatibility and Other Regulatory Requirements* when working on activities associated with rights-of-way.

## A. <u>Work within Existing ROW</u>

The majority of Service easements are acquired subject to valid existing ROWs (statutory, reserved, or prior-granted). Because of this, the Service often lacks jurisdiction over (legitimate) activities within ROWs even if those activities will adversely affect an easement interest (the Service may have jurisdiction under other authorities such as the Migratory Bird Treaty Act or Endangered Species Act). If the ROW work can be accomplished within the confines and context of an existing ROW, the Service has no jurisdiction to regulate the activity. If the Service lacks jurisdiction over a use within a ROW, Compatibility Determinations (CD), Environmental Assessments (EA), ROW permits, and station-generated permits are not completed by the Service (other federal agencies may be required to complete NEPA and comply with other federal regulations or executive orders if another federal nexus to the project exists).

Managers should ensure that requested uses or other activities within existing ROWs are, in fact, uses that are explicitly expressed or implied in the ROW. Telecommunication companies and rural water suppliers will often attempt to avoid the ROW process by placing infrastructure within a statutory road ROW. To confuse this matter, multiple states have passed legislation which suggests that certain public utilities may be placed in existing road ROW if approved by the roadway administrator.

For ROW permits previously granted by the Service, it is important to review the Service issued ROW since specific stipulations related to construction or maintenance should be stipulated in the originally issued ROW permit.

While the Service may lack jurisdiction for work being conducting within existing ROWS, managers should communicate Service concerns about potential damages to easement interests and, if necessary, inspect the easement during construction activities or other ROW maintenance work. Common examples of situations where ROW work could impact easement areas include: road projects that affect wetlands through changes in culvert elevations, chemical applications under power lines that potentially damage protected upland vegetation via drift or runoff. Even if ROW projects occur within a valid existing ROW, managers should verify that projects proposed within valid ROWs are legitimate and not part of a guise or ruse to drain wetlands.

## B. <u>Activities not affecting a Service easement interest</u>

If a ROW request (or an existing ROW expansion) goes through a Service easement area, but a Service interest is not impacted (e.g., a ROW expands into a wetland easement property, but impacts only uplands with no involvement of protected wetlands) the Service may lack jurisdiction to regulate the activity. Managers are authorized to issue letters articulating that

projects do not fall within the jurisdiction of the Service or that Service interests are not impacted by the project.

It should be noted that a ROW, such as the construction of a new road through an easement property, could indirectly drain a wetland through substantial alteration of the wetland's watershed. In such a case the Service would exercise jurisdiction and should work with the project proponent to avoid impacts to the Service easement interest.

## C. Activities not adversely affecting a Service easement interest

There are times when a proposed ROW will impact a Service interest, but that impact will not have a long-term adverse effect on the interest(s) for which the easement was acquired. Per 50 CFR 29.21-1(b), if the requested ROW will not adversely affect the easement interest, then the Regional Director may issue a letter stating the easement interest will not be adversely affected. See Exhibit VIII-1 for an example of this type of letter.

## D. Minor Disturbance Projects

If a proposed project will result in only temporary and minor impacts, then a formal right-of-way permit from the Service may not be necessary (e.g. temporary parking area located outside a ROW). A Region 6 guidance memo, dated April 5, 2002 (Exhibit VIII-2) and Region 3 guidance (Exhibit VIII-3), provide examples when a station issued SUP may be utilized to address minor disturbance projects.

## E. Formal ROW Permits

ROW requests must be evaluated using the Easement Request Flowchart located in *Chapter VI Requested Uses of Easement Properties*. ROW requests may involve more than one easement because of the linear distance associated with highway improvement projects or rural water system installations. Each easement must be evaluated for potential impacts when evaluating compatibility, but only one CD is required to evaluate the project in total. The proposal is evaluated under the Public Service/ Corporate/ Governmental (blue) part of the Easement Request Flowchart. The proposal must be determined to be compatible; otherwise, an exchange of interests would be necessary for the project to proceed.

The procedures governing formal ROWs with regard to Service land interests are discussed in 50 CFR 29.21, 50 CFR 26.41 and 340 FW 3.

50 CFR 29.1 describes the need for economic uses to meet a higher standard of compatibility than other proposed uses. This standard does not apply to ROWs. Therefore, the general standard of not materially interfering with or detracting from the purposes of the easement or the mission of the Refuge System will apply when evaluating ROW permit requests.

If the manager concludes that a ROW permit will be necessary, the area supervisor and realty specialist should be contacted. Formal ROW permits require approval beyond the field station (NEPA, Cultural Resource Reviews, and Compatibility) and may require considerable time to process.

At times, issuance of a formal ROW may take longer to complete than is desired by the requester. If a ROW has been approved by the RO, managers can consider issuing a SUP to "bridge" the gap between the approval of a ROW by the RO office and issuance of a ROW permit. This is particularly applicable in R6 where realty resources are being devoted to easement acquisition rather than processing ROWs.

## F. Compatibility standard associated with minor expansions or realignments of existing ROWs

Minor expansions or realignments of an existing ROW which most frequently occur during road projects that are proposed to meet continually evolving roadway safety standards is authorized in accordance with the policies described in 50 CFR 26.41(b) & 50 CFR 26.41 (c). Contrary to other uses, where compensatory mitigation may not be used to make a proposed use compatible, compensatory mitigation may be used to make minor expansion or realignments of existing rights-of way compatible provided that:

- the project design "adopts appropriate measures to avoid resource impacts and includes provisions to ensure no net loss of habitat quality and quantity,"
- the mitigation area(s) are permanently protected under the National Wildlife Refuge System, and
- all mitigation/restoration work is completed prior to any title transfer or easement recording.

The CD associated with the minor expansion or realignment of the existing ROW must describe the mitigation and indicate that the project has been found to be compatible, only with the replacement habitat in place and according to the stipulations specified in the CD. A formal ROW permit must be completed for any newly expanded or realigned ROW.

## G. Exchange Option

If the requested right-of-way cannot be found compatible, either because it does not qualify under the maintenance of existing ROW criteria or it is a new ROW proposal that exceeds the threshold of compatibility, then the project must be denied or an exchange of easement interests may be considered.

*This Page Intentionally Left Blank*

# Chapter IX: Wind Energy Development

In 2015, the Service, in cooperation with Western Area Power Administration, prepared the Upper Great Plains Wind Energy Final Programmatic Environmental Impact Statement (PEIS) to streamline procedures for conducting environmental reviews of wind energy applications by implementing standardized evaluation procedures identifying measures to address potential environmental impacts associated with wind energy projects proposed on easement properties. The Final PEIS, the Record of Decision, and other project documents including the Biological Assessment and Species Evaluation Forms are available on the project web site at http://plainswindeis.ani.gov.

This chapter is devoted to assisting managers with the evaluation of proposals to site wind turbines (including associated facilities) on lands protected by Service easements and with outlining the process for accommodating a wind project on Service lands once all regulatory and permitting requirements have been met.

## A. Initial Contact with Wind Energy Companies and Consultants

It is now common for wetland management district staffs to receive questions from wind energy companies, consultants, land acquisition specialists and landowners about wind energy proposals. This guidance is intended to assist managers in fostering positive working relationships with wind developers while providing a consistent message when responding to contacts from the wind industry or their designated representatives. This section is not intended to direct managers on how to evaluate proposed wind developments or when to either approve or deny a request. It is simply a template to assist managers in addressing similar requests in a consistent fashion.

In order to become better prepared to work with the wind industry, some understanding of the steps involved to successfully construct a wind farm is helpful. The following is a simplified overview of the process a wind developer may go through in developing a wind project. Much of this information was gathered from the American Wind Energy Association Siting Handbook (www.awea.org).

- Analyze the wind resource. Companies will review available wind data to determine the wind speed and reliability within the proposed project site. This is generally gathered by installing meteorological towers (MET towers) within or in close proximity to the project site. These towers are usually very plain in nature, can be made of steel tubing or lattice construction, and can be free-standing or supported by guy wires. These towers can either be temporary if they are only used to measure wind speed and direction; or they can be more permanent if they assist in operation of the facility by transmitting information about wind speed and direction to each wind turbine and to the control facility. MET towers may be the first indication that someone is interested in putting turbines in the area.

- Establish the economics of the project. The developer will identify all the variables that may need to be considered when determining the potential for financial success of a proposed project. This step is very dependent on the developer and/or business model used to develop the wind project. These considerations include: cost of land

leases/agreements, environmental reviews and permits, transmission costs, power purchase agreements, and project investors and financing.

- Once a company is satisfied that an adequate wind resource exists, they will often approach the landowners and have them sign a "show of interest" contract or a "cooperation agreement." This agreement typically gives the wind company permission to further analyze the terrain for its potential to host turbines. It may also serve as a "development easement" in which the company gains the "right to first refusal" for any development. Basically, they are securing the rights to build turbines on that land for a specified period of time; e.g., 5- 20 years or more.

- At the same time landowner agreements are being signed, the company will likely have initiated a transmission capacity analysis to determine if the existing transmission system will be able to support the proposed project. The developer will work with the local independent system operator (ISO), regional transmission operator (RSO), or utility company to conduct a transmission capacity analysis. This interconnection study is needed to request access to "get into the queue" (i.e., get a place in line to put their power onto the grid).

- Once these steps have been taken, the company may then look for someone to purchase the power at a negotiated price. A "power purchase agreement" (PPA) is signed with someone like Montana Dakota Utilities (MDU), Ottertail Electric, or Basin Electric or the Western Area Power Administration (Western). However, more and more "merchant plans" are being pursued in which there is no PPA. In these instances, the developer is just planning to sell the power at the current market price, betting that the market price will exceed what can be negotiated.

- At some point, the company will initiate the necessary environmental review. Regulatory requirements vary from project to project depending on the location and the size of the project. The developer must identify early on in the process the federal, state, and local regulatory issues that will influence the project. This may be the first time they contact the Service. Often times, this initial contact is in the form of a phone call or a letter requesting information. This contact may come from the company itself, or an environmental consulting or engineering firm contracted to do the pre-work for them. These requests typically include solicitations for information pertaining to wetlands, rare or endangered species, conservation easements, cultural resources, or other sensitive environmental data within a defined area. A wetland manager may be presented with a map of "proposed" towers and asked to participate in a field review of the project area or comment on whether or not there are concerns about any of the locations. This initial tower layout may or may not represent the developer's true intentions and may simply be what is called a "fatal flaw analysis." In other words, they are looking early in the process for sensitive areas or conditions that would preclude a tower from being constructed on a particular site. Even after an actual turbine array has been drafted on paper, including all infrastructures (roads, collection lines, etc.), there is a very good chance that the final tower layout will change. During this initial contact, the Service will likely be asked to provide a map showing any lands owned or encumbered with

conservation easements. This is also the ideal time to inform the project proponent of the availability of the PEIS and the process outlined therein.

- The results of the critical environmental issues analysis often provides the developer with a better understanding of the site and the key issues that may require further investigation due to identified concerns or regulations. Detailed environmental and land use studies to identify potential impacts and develop avoidance and mitigation strategies are often needed to comply with regulatory or permitting requirements.

## B. Information Gathering

The initial meeting with the wind developer is a great opportunity to gain specific project information by asking many questions and sharing information. It also a great time to explain various USFWS program roles and responsibilities, specific land interests and their associated requirements, and the steps they need to satisfy to acquire necessary permits and approvals including the process outlined in the PEIS.

Following are recommended steps and associated questions that can be asked that will help determine how likely a wind project will be constructed and/or what additional coordination will need to take place.

1. There are numerous questions that can be asked in order to determine the company's actual stage of development or how likely the proposed wind project will be completed, such as:

- Do you have a purchase power agreement or a merchant agreement in place?

- How do you propose transmitting the electricity produced?

- Are you connecting to a Western line or a Rural Utility Service (RUS) line?

- Do you have financing in place?

- Do you have turbine components secured?

- New transmission lines proposed?

- Is there room on existing transmission line for the power?

- Project area finalized?

- Proposed project schedule?

- Construction methods

2. Ecological Services should be included in the discussions by referring to them questions pertaining to rare or endangered species, migratory birds, and other sensitive environmental conditions occurring on or off of easement lands. However, if development impacts easement lands, then the wetland manager will likely be the lead contact for the Service. It is advisable for the wetland manager, the E.S. biologist and the developer to meet in person to better discuss policies, environmental issues, NEPA, land interests, construction methods, and other features.

3. Before providing the company a map of easements, the wetland manager is encouraged to meet with the project proponent in person so that the different types of easements and their provisions can be explained. This meeting is also an ideal time to explain the process for evaluating proposed modifications of easement properties (the flowchart). It is recommended to send written correspondence after the meeting to reemphasize and summarize key points of the meeting and prevent any misunderstandings.

4. The presence of a Service easement on a particular tract of lands does not necessarily mean wind turbines cannot be constructed there. This is especially true on wetland easement tracts where only the specific wetlands which are identified on the Exhibit A or on the wetland map are actually covered by the provisions of the wetland easement. This is a point that should be emphasized to the project proponent.

5. The wetland manager may be offered a chance to comment on proposed turbine arrays; and Service input may help guide developers away from sensitive environmental areas. For example, the people in charge of staking the roads and routes for collection lines are probably not familiar with the landscape of the Prairie Pothole Region. A seasonal or temporary wetland in the middle of a soybean field during a dry August is not readily apparent to someone not experienced in wetland identification. The wetland manager should be available to assist staking crews to avoid impacts to protected wetlands.

Other possible suggestions to project proponents include the use of larger turbines (thus fewer needed), minimal road construction (especially in grasslands), underground collection and transmission lines, and use of existing prairie trails without disturbing the sod.

## C. PERMITING REQUIREMENTS

The majority of the time, managers will receive a phone call from a wind developer or environmental consultant explaining that they are considering building a wind project in their wetland management district. The developer or consultant may or may not be familiar with the various land interests the Service has, particularly the number and the locations of conservation easements or fee-title land the Service owns in their proposed project area.

In addition, they may or may not know the specific responsibilities held by Ecological Services and Refuges relative to proposed wind energy development. The National Environmental Protection Act (NEPA) is probably the most important policy that Service personnel and developers need to understand and comply with when reviewing a wind project. Service personnel involved in making and implementing decisions on an action or request are to establish an appropriate administrative record of the Service's decision. Close coordination with the Ecological Services field office will help to ensure the proper documents and procedures are correctly followed and completed to satisfy NEPA. For more detailed information on NEPA, refer to Fish and Wildlife Service Manual (550 FW 3) and to the Wind PEIS at http://plainswindeis.ani.gov.

NEPA review is required for all wind development projects with a federal nexus. A federal nexus is any activity that is conducted, funded, licensed or permitted by a federal agency. Below is a flowchart that provides refuge managers with a better understanding of the NEPA process when it comes to wind energy proposals. It also helps managers explain the permitting process

to wind developers and consultants depending on whether or not a federal nexus exists and/or when USFWS easements are involved.




If a proposed wind project involves Service conservation easements, all proposed modifications of easement properties must be first evaluated using the flowchart in Chapter VI. **Therefore, the following guidance only applies once a manager has considered the impacts of wind development through the flowchart, and has concluded that there are no reasonable alternatives to the development, that the development is in the general best interest of the American public, and that the impacts will not compromise the integrity of the easement area.** It is also expected that all reasonable measures will have been taken to avoid, reduce or minimize the impacts to the extent possible. Once these steps have been completed, the following illustration will help guide managers through the remainder of the permitting process:

## FWS Procedures Regarding Wind Projects on Easements




**STEP 1: USFWS is the federal action agency due to activity on or use of USFWS conservation easement.**

Once a manager has reviewed the proposed wind development plan and negotiated with company to avoid and/or minimize impacts to the conservation easement(s), the company needs to understand that their proposed wind project has triggered a federal nexus and therefore, considerable environmental reviews and administrative requirements will be necessary.

**STEP 2: USFWS Ecological Services Requirements**

It is very important to make sure managers contact and coordinate with their local Ecological Services field office and share information about the proposed project. It is also imperative that a clear and consistent response be provided to a wind developer regarding their proposed project. In fact, it is recommended that both the Refuge Manager and Ecological Services Biologist together meet in person with the wind developer or consultant to discuss the various issues, regulations and permit requirements needed for their proposed project to proceed. It is also suggested a combined follow-up letter be prepared that reiterates the important requirements, policies, and information discussed during the meeting. If a personal meeting is not feasible, a

letter explaining both programs' responsibilities and requirements should be sent to the company.

***NEPA Compliance*** **-** If a wind developer still proposes to construct turbines or infrastructure on FWS conservation easements and there are impacts to a service-protected interest, managers will need to review the proposed request and consult with Ecological Services for NEPA compliance. The proposed action on Service easements and the potential for impacts to listed species or designated critical habitat will determine what kind of consultations are required. The Wind PEIS with its associated Species Evaluation Forms and the resulting step-down Environmental Assessment will greatly aid the project proponent in fulfilling their NEPA obligations.

***Consultation(s)*** **-** meetings, phone calls, e-mail, written documents, etc. as it relates to ESA (MBTA, MMPA, etc.) regarding a proposed action. May occur as an informal or formal consultation (see below) and may occur within (intra-agency) or between (inter-agency) Federal agencies related to a proposed action. Example of an intra-agency consultation would be Division of Refuges consulting informally with Ecological Services regarding a proposed wind project at a specific location. Such informal consultations may be elevated to the formal status if "the proposed action may affect a listed species or designated critical habitat."

- Formal Consultation- a process between the Services and a Federal agency or applicant that:
  - Determines whether a proposed Federal action is likely to jeopardize the continued existence of listed species or destroy or adversely modify designated critical habitat.
  - Begins with a Federal agency's written request and submittal of a complete initiation package.
  - Concludes with the issuance of a biological opinion and incidental take statement by either of the Services. If a proposed Federal action may affect a listed species or designated critical habitat, formal consultation is required (except when the Services concur, in writing, that a proposed action "is not likely to adversely affect" listed species or designated critical habitat). See 50 CFR §402.02 and 50 CFR §402.14.

- Informal Consultation- an optional process that includes all discussions and correspondence between the Services and a Federal agency or designated non-Federal representative, prior to formal consultation, to determine whether a proposed Federal action may affect listed species or critical habitat. This process allows the Federal agency to utilize the Service's expertise to evaluate the agency's assessment of potential effects or to suggest possible modifications to the proposed action which could avoid potentially adverse effects. If a proposed Federal action may affect a listed species or designated critical habitat, formal consultation is required (except when the Services concur, in writing, that a proposed action "is not likely to adversely affect" listed species or designated critical habitat). See 50 CFR §402.02 and 50 CFR §402.13

**Intra-Service Consultation -** may be formal or informal consultation(s) within the USFWS such as discussed above.

**Inter-Agency Consultation -** typically takes the form of a formal consultation between the action agency and the USFWS (or NMFS), particularly if the proposed action may affect either a listed species or designated critical habitat.

**Biological Opinion (BO) -** document which includes: (1) the opinion of the U.S. Fish and Wildlife Service or the National Marine Fisheries Service as to whether or not a Federal action is likely to jeopardize the continued existence of listed species, or result in the destruction or adverse modification of designated critical habitat; (2) a summary of the information on which the opinion is based; and (3) a detailed discussion of the effects of the action on listed species or designated critical habitat. See 50 CFR §402.02 and 50 CFR §402.14(h).

**Biological Assessment (BA) -** information prepared by, or under the direction of, a Federal agency to determine whether a proposed action is likely to: (1) adversely affect listed species or designated critical habitat; (2) jeopardize the continued existence of species that are proposed for listing; or (3) adversely modify proposed critical habitat. Biological assessments must be prepared for "major construction activities." See 50 CFR §402.02. The outcome of this biological assessment determines whether formal consultation or a conference is necessary. See 50 CFR §402.02 and 50 CFR §402.12.

For more information on NEPA and the various requirements wind developers may need to comply with can be found in Exhibit IX-1.

**STEP 3: National Wildlife Refuge System Requirements**

If wind energy development activities are proposed on USFWS conservation easements, refuge managers will spend a significant amount of time and work in reviewing proposed plans, negotiating to reduce or eliminate impacts, ground checking construction activities and ensuring all administrative requirements are completed. Listed below are some of the permit requirements the Refuge Program currently requires of wind companies if Service easements are involved with wind projects.

**A. Easement Manual Flowchart**

If a proposed wind project involves Service conservation easements, all proposed modifications of easement properties must be first evaluated using the flowchart in Chapter VI. Managers should review proposed wind energy development proposals and investigate all reasonable alternatives, determine whether the proposal is of general benefit to the American public, and evaluate whether the proposed use will significantly affect the integrity of the easement.

Inevitably, once managers explain that by building and installing wind turbines and roads, "crane walk" routes, energy collection cables, transmission lines, MET towers, sub-stations or other infrastructure on FWS conservation easements, a federal nexus will trigger NEPA requirements, some wind developers will design their projects to avoid Service easements due to the extensive time and expense required to go through the NEPA process. However, in cases where the Service has been very successful in acquiring thousands of acres of grassland easements in large blocks, and especially if this location exhibits excellent wind resources, wind companies may be willing to go through the NEPA process. In any case, this is an opportunity to review their proposed wind project and suggest changes to reduce or eliminate impacts. Some suggestions managers could provide developers to avoid or reduce impacts include:

- If possible, the construction of roads/turbines on native prairie should be avoided. Reclamation time and expenses are considerable when trying to restore native grasses/forbs on steep slopes with little available topsoil. The time to establish native grasses/forbs, erosion areas, cattle grazing, steep slopes, proper seeding equipment and proper seeding dates are all things to consider when building on native grassland sites. Alternatively, building turbines and roads in cropland or tame grass require much less reclamation costs.
- Turbines should be sited near existing roads and trails near section lines when possible.
- Collection cables should be buried within road shoulders. Most roads are approximately 35-40 feet wide. After turbine construction, service roads are approximately 16 feet wide leaving 10-15 foot road shoulders that will be re-seeded to grass. Collection cables can be placed in these disturbed road shoulders rather than causing more disturbance across native prairie grasslands.
- All transmission lines should be buried if possible. If not, developers should be encouraged to mark all transmission lines to reduce bird strikes.

## B. Construction Plans

There are many activities involved with the construction of a wind farm than just constructing turbines and access roads that could involve FWS conservation easements. Land must be temporarily cleared and graded for construction trailers, parking lots, turbine component laydown areas, equipment staging areas, concrete mixing operations, construction of permanent operation and maintenance facilities, and other infrastructure. A list of common construction activities and issues to consider when evaluating a proposed wind project include:

- Improvements to township roads and section line trails to handle heavy construction equipment and widening of these roads to accommodate oversized equipment. This is especially important to consider on wetland easements where road improvements could extend outside of the road right-of-way.
- Clearing and grading of each turbine location for assembly and installation of each turbine. Typically, each turbine requires approximately a diameter of 150-250 feet around the tower site.
- Installation of miles of underground and/or overhead electrical collection lines to connect turbines to collection substations.
- Clearing and grading of sites for substations.
- Creation of transmission lines to connect the project to other transmission lines or power grid, including building access roads and laydown areas for transmission line construction.
- Construction of an operations and maintenance building(s), which could require clearing and grading, construction of roads and parking lots, septic systems, water systems and delivery lines.
- Construction of "Crane Walks." The large cranes needed to install turbines are not capable of crossing land with slopes greater than approximately 10 percent. Therefore, crane paths between turbines need to sloped, graded and approximately 40 feet wide to allow crane transportation. They also move very slowly so planning a time-efficient route from turbine to turbine may include crossing FWS easements.

- Construction of turbine access roads. Construction companies may use different construction equipment and methods to build access roads. Some use dozers and clear approximately a 40-foot wide area to construct roads. Some purchase a wider right of way (100+ feet wide) and may use chisel plows or discs to break up sod and clear the path with road graders. These areas are seeded back to grass after construction activities are completed, but this method disturbs much more area than necessary.

**C. Restoration plans**

If wind energy projects occur on grassland easements, it is important that managers clearly explain to the developers that all grassland impacts need to be restored back to FWS standards and manager satisfaction. Managers need to explain that disturbed areas need to be replanted to a species mix which is approved by the FWS. Wind companies should provide the manager with a restoration plan that describes the grass varieties and mixtures they propose to seed on each type of land use, proposed seeding dates, grass seeding equipment, erosion control methods and locations, and other details associated with establishing a grass stand on disturbed areas. Managers should review and approve these plans before construction begins.

**D. Memorandum of Understanding**

Discussions with wind developers can sometimes cover numerous topics, requirements and agreements by both FWS officials and wind energy companies and their associated contractors and sub-contractors. In most cases, these discussions will occur over many months to many years. Instead of relying on verbal agreements, phone and electronic messages and other correspondence over a long period of time, it is suggested to develop a memorandum of understanding that outlines in detail particular activities each party will agree to when developing a wind project. Exhibit IX-2 is an example of an MOU.

**STEP 4: Cultural Resource Protection Requirements**

The Region 6 Archeologist has provided comprehensive guidance to follow when considering a wind proposal on Service conservation easements. Refer to Exhibit IX-3 for detailed information on cultural resource review procedures in Region 6.

**STEP 5: USFWS Realty Requirements**

If wind energy development activities are proposed and allowed to occur on USFWS conservation easements managers will need to carefully review all easement contract acquisition dates to determine if the Service holds the primary right to these lands. In other words, did the USFWS purchase the easement before a landowner signed a wind option or agreement?

The following is a detailed explanation of how the Realty Program will handle impacts to easements depending on which scenario applies.

***A. Proposed development on existing grassland easements***

Once it has been determined that wind development on an existing grassland easement will occur, a Partial Term Relinquishment and Release of Waterfowl Habitat Protection Easement in

The United States will be required. A copy of this document is at Exhibit IX-4. This Realty transaction allows the development on the grassland easement to occur while the permanently affected easement acres are transferred to the wind company for the life of the project. After the project is decommissioned and the grassland restored, the grassland easement rights return to the Service. The wind company is also responsible for replacing the same amount of affected acres on a new grassland easement.

In order for Realty to complete the Partial Term Relinquishment and Release, a legal description of the surveyed wind power facilities or legal subdivision of the project site is required. Through an AALV calculation, Realty will determine the grassland easement value of the acres to be partially released. Since the value and size of the acres to be released is minimal, additional easement funding is required along with additional acres. Therefore, the replacement value will be combined with traditional easement funding to purchase a new grassland easement.

The manager will determine which parcel of property to purchase for the replacement acres. An easement evaluation will be completed and forwarded to Realty. Realty will calculate the easement consideration and make an offer to the landowner. The landowner will be made aware that replacement acres for wind development are being purchased on his property and a statement will be added to the easement contract. The statement will identify the vendor, who the payment is from, how much each is being paid, and how many acres are associated with each funding source. Replacement acres are not to be used for grant match purposes, so it is imperative that this statement is on the easement document. The easement case will be processed as normal. Realty will request a check from the contributors made payable to the vendor after the easement has been accepted. Once the easement is recorded and title policy is issued, the checks will be delivered to the vendor. Title vesting, FSA notification and final policy procedures will continue.

**Partial Term Relinquishment and Release Document:**

The partial term relinquishment document was developed to provide wind energy developers and FWS managers a method to address unavoidable impacts associated with the construction of the wind facilities on easement encumbered lands. This process partially releases and relinquishes, for only the term and use specified, the waterfowl habitat protection and management easement interests. This instrument releases and relinquishes only those waterfowl habitat protection and management rights of the Service in the specific released lands described in the release document and do not in any way affect those perpetual easement rights acquired by the Service on the other lands described in the original landowner's easement. This document only releases the waterfowl habitat protection and management rights of the Service in the released lands for the duration of time that the lands are used for wind energy purposes. See Exhibit IX-4 for a sample of the document.

In some cases, wind companies may request to begin construction activities on FWS easements while they negotiate and finalize the details of the Partial Term Relinquishment and Release Document. It is important that managers understand that Special Use Permits will not be issued until all details of the Partial Term Relinquishment and Release Document, including a Letter of Credit, Decommission Plans, Purchase of Replacement Acres, and NEPA documents. Some of these conditions include:

- **Decommission Plan:** If turbines and access roads are allowed on conservation easements, one of the conditions of the partial term relinquishment document is that the wind developer agrees that all turbines, roads and all infrastructure are removed and grasslands are restored to FWS requirements once the wind project easements expires or are no longer valid. The company will usually have up to 18-30 months or more after wind energy operations cease to remove the infrastructure and properly restore grasslands to FWS specifications.

  Most wind agreements between wind companies and landowners state that wind companies have a specified amount of time to remove any and all equipment, improvements, fixtures and other property above-ground, and owned or installed by the wind company. In general, they include met towers, turbines, transmission lines/poles, operation buildings, and any other property on the property. Failure to remove this property within a specified amount of time shall deemed an abandonment of this property and the landowner shall have the right to remove, or to cause the removal of, any property deemed abandoned by the company.

  An area of concern is that the access roads must also be removed and reseeded to grassland. Habitat fragmentation and its effects on wildlife are one of the major indirect impact concerns wind energy development has on wildlife populations. Wind companies and landowners will need to understand that all access roads will be required to be removed and restored back to grassland habitat. Refuge managers should expect some reluctance by wind companies and landowners who do not want to remove the roads due to the time and expense involved with reclaiming road sites.

- **Letter of Credit:** Prior to the execution of this partial release document, the wind company shall furnish a continuing financial surety in the form of an irrevocable letter of credit (ILC) or a cash deposit from a federally-insured financial institution rated investment-grade or higher. This letter of credit or cash deposit is insurance to cover the estimated cost of removing structures and facilities associated with the wind development project and restore those impacted acres back to grassland habitat. The account will act as an escrow account and will be adjusted annually to reflect the percent change for inflation to cover the estimated removal surface restoration costs.

- **Replacement Acres:** All permanent impacts to conservation easement lands must be replaced with lands of similar or greater biological and financial value. The wind company will be responsible for paying all the real estate expenses of purchasing an easement on these replacement acres. If the wind project is abandoned or terminated and all wind development equipment and infrastructure removed and all impacted areas restored, the replacement acres remain as perpetual easements with the Service. In other words, the replacement acres will be an addition to the National Wildlife Refuge System. Refuge manages will need to coordinate closely with their realty office and wind company representatives on this process.

Determining the amount of replacement acres wind companies are going to need to purchase will most likely require a formal survey of all permanently impacted acres. It may be difficult for wind companies to give you a definite acreage total until construction of all turbines and roads are completed. Wind companies should be able to give managers and realtors a close estimate of anticipated impacts but will have to follow up with solid impact acres once "as-built" surveys and drawings are completed.

***B. Proposed easement acquisition on lands encumbered by a wind lease or option***

Due to the landscape-level scope of the Service's easement program, there will be instances when a tract that is proposed for acquisition will already be encumbered by a wind lease agreement. When the refuge staff is making landowner contacts it is recommended that they ask interested landowners if there is currently a wind lease agreement on their property. If there is, then the refuge staff needs to decide if the presence of a wind lease agreement becomes a deterrent to the acquisition. If the staff determines that the wind lease is not a deterrent, then an easement evaluation is submitted to Realty with the comment that a wind lease agreement exists on the property.

There will be instances when either a wind lease agreement is signed after an easement evaluation is completed, or a landowner may not be direct with the Service on whether they have a wind lease agreement. At the time of acquisition, the Realty Specialist will meet with the landowner to review the property, discuss the easement program and answer any questions the landowner may have. At this time the Realty Specialist will either confirm with the landowner that there is a wind lease agreement, based on the comments on the evaluation, or ask if there is a wind lease agreement on the parcel to be acquired. The Realty Specialist will confirm any encumbrance associated with wind development when a review of the title is completed in the county courthouse records. Wind companies typically record a several page Notice of Wind Farm Easement Agreement instead of the entire wind lease document.

The Realty Specialist will make a copy of the notice filed by the wind company and any other associated documents. The Realty Specialist will obtain a copy of the wind lease agreement from the landowner and will send a copy to the refuge who will then review the agreement. Upon refuge review of the wind lease agreement a recommendation letter will be sent to the Realty Specialist from the manager stating that they are aware of the wind lease agreement on the property and they are in support of the easement acquisition, see Exhibit IX-5. Once the Realty Specialist receives the approval letter from the manager, then valuation of the easement can begin. This applies to both wetland and grassland easement acquisitions.

The Realty Specialist will complete the offer and explain to the landowner how the offer was calculated utilizing the discount procedure. Once the landowner accepts the offer the easement document is signed and title commitment is requested. Depending on the wording of the recorded documents, the Realty Specialist may be required to obtain Consent to Easement from the wind company, see Exhibit IX-6. The Realty Specialist will prepare the case package to be submitted to the Regional Office and include the original letter from the manager approving the acquisition. After the title curative requirements are completed, the case will proceed in accordance to standard operating procedures.

### *C. Proposed grassland easement on lands with turbines already constructed*

The refuge staff will submit an easement evaluation with a comment that there are wind turbines on the proposed acquisition parcel. Managers should consider excluding developed areas from the easement if doing so will not result in a hard-to-define (spider web of impact) easement area. In other words, if a turbine and associated facilities exists near the edge of a parcel, and the area to be excluded can be easily defined, by either metes or bounds or rectangular survey (i.e., NW1/4NW1/4NW1/4), the manager should consider this as an option.

At the time of acquisition, the Realty Specialist will meet with the landowner to review the property evaluated, discuss the easement program and answer any questions the landowner may have. The Realty Specialist will obtain a copy of the wind lease agreement from the landowner and will send a copy to the manager. Upon review of the wind lease agreement for provisions associated with decommissioning and restoration of the site, a recommendation letter will be sent to the Realty Specialist from the manager stating that they have reviewed the wind lease agreement, are aware of the development on the property and are in support of the easement acquisition which would be subject to the existing towers, access roads and related facilities. Once the Realty Specialist receives the approval letter from the manager, then valuation of the grassland easement can begin.

The Realty Specialist will complete the offer and if no developed areas are excluded by a metes and bounds or rectangular survey description, then a discount will be applied to the acres actually impacted by the existing wind towers, access roads and other related facilities by 85%.

Once the landowner accepts the offer the easement document is signed and title commitment is requested. Depending on the wording of the recorded documents, the Realty Specialist may be required to obtain "Consent to Easement" from the wind company, see Exhibit IX-6. The Realty Specialist will prepare the case package to be submitted to the Regional Office and include the original letter from the manager approving the acquisition. After the title curative requirements are completed, the case will proceed in accordance to standard operating procedures.

**STEP 6: USFWS Office of Law Enforcement**

Most wind development companies claim that mortality surveys are standard operating procedures for wind companies. If this is the case, managers should ask for annual survey results from these companies. At the same time, it is important to collect and review mortality data from wind projects to learn and understand if there is certain topography, habitat, turbine location or construction designs, or other factors that may cause bird mortality.

The Service, specifically the Office of Law Enforcement (OLE), is responsible for enforcing the Migratory Bird Treaty Act and other laws. It is important that the wind industry have one contact or person to communicate with and the OLE is the Service's voice on migratory bird mortalities. Following are guidelines designed to assist wind developers and their employees on the proper actions and activities required to manage bird mortality incidents. These guidelines may need updating or alteration as more wind turbines are constructed and become operational. These guidelines are similar to those requirements currently in use for the rural utility service industry, businesses or industries that are a cooperating partner with the Service.

## Bird Mortality Guidelines

1. Any migratory bird mortality will be reported immediately by the person who first locates the bird. The notification may be directly to OLE or to a designated person within the wind company, who will then immediately notify OLE. Notification will be via telephone to the Special Agents office and/or cell phone. In the event that contact with the Special Agent is not possible, a message will be left on one or both phone numbers with the necessary information for a return call. The Service is the only entity which can have the on-site employee move the migratory bird. Wind company employees must understand that they must leave the dead birds in place until they are directed by the USFWS to move the bird.

2. The employee on-scene will photograph the bird and document its location (township/range coordinates or preferably GPS coordinates). Additionally, the employee should document other information including:

- specific tower number near bird location
- weather conditions experienced since last inspection (e.g., last 24 hours)
- estimated/actual distance from nearest turbine

3. The employee on-scene or the designated person within the company will send (via postal service or electronically) a copy of the picture documenting the migratory bird mortality along with a brief narrative which documents the facts (who, what, when, where aspect surrounding the migratory bird mortality).

4. Some of the migratory birds and all of the threatened and endangered species and eagles will be kept by the USFWS. The Service, after being notified, may arrange for the company to transport the migratory bird to the nearest National Wildlife Refuge or Wetland Management District office, other Service office or the North Dakota Game and Fish Department office. The Special Agent will arrange for the migratory birds to be transported.

5. The Special Agent will forward/copy the information he/she receives to the appropriate Refuge/WMD and/or Ecological Services for their records.

Contacts:

| | | | | |
|---|---|---|---|---|
| Region 6: | Rich Grosz<br>Special Agent-USFWS<br>Phone: 701-255-0593<br>Cell Phone: 701-400-8433 | or | Region 3: | Pat Lund<br>Special Agent-USFWS<br>Phone: 651-778-8360<br>Cell Phone: 651-775-2758 |

## WIND ENERGY COORDINATION SUMMARY

### 1. GATHER PROJECT INFORMATION FROM DEVELOPER OR CONSULTANT

- Project Size/Location
- Number/Size of Turbines
- Transmission Lines?
- Power Agreement Secured?
- Turbine components acquired?
- Proposed Construction Schedule
- Connecting to WAPA, MISO or RUS line?
- Financing secured?

### 2. COMMUNICATE WITH USFWS ECOLOGICAL SERVICES EARLY

- Discuss NEPA requirements on or off easements lands

### 3. REVIEW PROJECT AREA AND DETERMINE IMPACTS TO FWS EASEMENTS

- Determine wetland, grassland and FmHA easements in proposed project area
- Prepare wetland maps for wetland easements if necessary
- Negotiate with developer to avoid and/or minimize impacts
- Check acquisition dates of wetland easements versus landowner wind leases/agreements.
- Review construction plans
- Develop and/or review restoration plan
- Develop Memorandum of Understanding

### 4. CONTACT REGIONAL ARCHEOLOGIST

- Section 106 of the National Historic Preservation Act

### 5. CONTACT REALTY OFFICE

- Partial Term Relinquishment Document
- Replacement of permanent impact acres
- Official Surveys of impacted acres
- Letter of credit/decommissioning plans

### 6. COMMUNICATE WITH DIVISION OF LAW ENFORCEMENT

- Proper procedures in handling direct mortality of migratory birds

# Chapter X: Drain Tile

The ability of tile to remove water from the soil profile is dependent upon soil characteristics, tile diameter, the depth of the tile, and topography and is referred to as the "lateral effect distance" (LED) of the tile. If a protected wetland is within the LED of installed tile, then drainage of that wetland is likely to occur. The administration and enforcement of wetland easements with respect to tile, therefore, is dependent upon an understanding of a particular tile line or tile system's impact on wetland hydrology. Based on the best available science; advice from engineers and wetlands specialists within U.S. Department of Agriculture's Natural Resources Conservation Service (NRCS); and the knowledge and expertise of U.S. Fish and Wildlife Service (Service or FWS) wetland managers, federal wildlife officers (FWO), hydrologists, and other scientists, this chapter outlines the Service's procedures for responding to requests for drain tile installation on lands protected by FWS wetland easements, and for negotiating compliance on easements where tile has been installed in a manner which negatively affects wetland hydrology.

## Drain Tile and Wetlands

In Paper No. 972034:1997 ASAE Annual International Meeting, Minneapolis, MN, by S.M.M. Jacobsen, NRCS, and R. Wayne Skaggs, NCSU, the authors acknowledge that "*All* drains have some effect on an adjacent wetland." They continue in answering the question of how far away drainage systems must be from wetlands to avoid being in violation of certain conservation provisions by stating "The real need is to determine what is an acceptable minimal effect hydrologically on the wetland."

The NRCS prescribes drain tile setback distances from wetland edges to ensure an acceptable "minimal" effect on wetlands, thereby allowing the producer to remain in compliance with conservation provisions of the Farm Bill (1985 Food Security Act, as amended). The NRCS determines these setback distances using the Van Shilfgaarde (VS) equation to calculate a lateral effect distances of drain tile. Specifically, for Farm Bill purposes, the NRCS uses the VS equation to determine a setback distance that results in no more than a 1 foot drawdown of subsoil moisture at the wetland edge.

There are a couple reasons why simply adopting NRCS setbacks for the placement of drain tile is not appropriate for FWS wetland easements. First, since one of the effects of drain tile is to draw down the water table, then it follows that there will exist a change in head between wetlands and the surrounding soils where tile is installed. Therefore, there is a tacit assumption that there will be some drainage effect on wetlands situated in proximity to drain tile. This is acknowledged by the NRCS in the paper referenced above where it is stated that "all drains have some effect on an adjacent wetland." Second, Service and USGS hydrologists have confirmed the VS equation does not account for impacts to surface runoff. Surface runoff constitutes a significant portion of a typical prairie wetland's water budget (approximately 69%, Brian Tangen, USGS, pers. comm.) One study suggests that drain tile reduces surface runoff by 18-60% based on tile spacing and soils (Sands and Canelon 2010). While it may be acceptable to use NRCS setbacks to determine eligibility for a FSA program (i.e., allow a "minimal effect"), it is not acceptable to allow a similar drainage effect to a property interest of the United States.

While it may not be appropriate to follow the NRCS procedure exactly, the use of the VS equation to calculate tile setbacks can be useful to define the outer extent of watershed protection when considering tile placement within a catchment. Specifically, in the case of relatively large catchments, at some distance from the wetland, the tile's ability to affect adjacent wetlands is likely lost. Based on current knowledge, the Service will use the VS equation to model for a 0.1' drawdown of soil saturation at the wetland's edge (as opposed to1.0' as used by NRCS for administration of Swampbuster provisions) to calculate the acceptable LED. The 0.1' drawdown best simulates "no impact" to the protected basin. Based on initial analysis, this LED will be outside the catchment in the overwhelming majority of cases. However, in rare circumstances where there exists a relatively large catchment compared to a small wetland, the LED may be within the catchment. Therefore, the Service generally considers the placement of drain tile within a protected wetland's catchment, or contributing watershed, to have a drainage effect on the wetland when the tile's direction of flow takes water away from the wetland. An exception exists when tile is placed within the catchment boundary, but is farther away from the wetland than the LED of the tile, as calculated by the Van Shilfgaarde (VS) equation modeling a 0.1' drawdown (as opposed to the 1' drawdown variable used by NRCS).

Tile that is outside the catchment, but placed in proximity to a wetland outlet (down-gradient) can also have an unacceptable negative effect on wetland hydrology. For this scenario, the FWS relies, in part, on the NRCS's South Dakota Technical Guide Notice 323 published in October 2011. This technical guide covers Wetland Restoration defined as "The return of a wetland and its functions to a close approximation of its original condition as it existed prior to disturbance on a former or degraded wetland site." It is *not* the same standard used to determine a producer's compliance with Swampbuster; rather, it is higher standard. To restore wetlands affected by subsurface drainage systems (e.g., tile), the technical guide prescribes the *minimum* distances of tile from the outside edge of the wetland, down-gradient, that must be removed. These distances range from 50 feet to 150 feet based upon the hydraulic conductivity of the adjacent soils. These distances are not precise; they are approximations. Soil map units can contain inclusions of various soil types with varying levels of soil hydraulic conductivity. Therefore, to ensure adequate protection of easement wetlands and to achieve some consistency with how the FWS treats open ditches, the minimum distance that tile must be kept away from a protected wetland's down-gradient outlet is 150'.

**Requests for Drain Tile Installations**

Mostly unregulated by local and state agencies, it can be difficult to track drainage tile projects on the landscape. Ideally, a landowner will contact the appropriate Wetland Management District (WMD) or county USDA Service Center who will then contact the appropriate WMD. Surrounding landowners may work together to link several properties into a complex drainage system. The drainage tile installation may be completed by a contractor, the landowner, or a neighbor with a tile plow. Contractors will typically use GPS and leveling equipment mounted on the tile plow. The contractor will likely keep detailed records of the work done, so they can properly bill the landowner. Landowners with a tile plow will likely not have the GPS and leveling equipment and may be unorganized in the installation of drainage tile.

The following procedures will be used to address drain tile installations on lands protected by FWS wetland easements:

1. When a landowner or tenant contacts the WMD office, the wetland manager should obtain the landowner's name, address, and legal description of the land they want to tile as well as a tile plan. Some landowners will attempt to get the manager to tell them where they can tile. Managers should instead attempt to obtain a tile plan to evaluate.

2. The wetland manager will review the wetland map(s) and/or Exhibit A maps (pre-1976 easements that have not yet been mapped will need to be mapped before proceeding) in light of the tile request.

3. If impacts are suspected, then the manager must calculate the LEDs for the applicable soil types. South Dakota WMDs have access to the ND Drain Program; North Dakota WMDs have access to a template using Excel to calculate setbacks. Managers in Region 3 should consult with the Regional Hydrologist for assistance in calculating LEDs.

   These resources are available for download from the Region 6 Sharepoint site at: https://fishnet.fws.doi.net/regions/6/nwrs/Easement%20Administration%20and%20Enforcement/Forms/AllItems.aspx

4. Using the LED spreadsheet, determine the appropriate setback for each soil class at the tile depth requested. Apply setbacks to protected basins based on the soil types of the land surrounding the wetland, not the soil type of the wetland, unless they are the same. If there are 2 soil types surrounding a wetland, use the LED that is greater for that basin's setback distance. Apply the setback distances as a buffer for each wetland on the easement tract. Compare this to the tile plan provided and determine where the wetland setbacks overlap the tile.

5. WMD will send wetland map(s) and a certified letter informing landowner of the areas that are protected. Illustrate for the landowner where tile placement would be expected to have a drainage effect on a protected wetland; and thus, violate the easement provisions. In most cases, this will be within the protected wetlands' watersheds or catchments.

6. The WMD's certified letter, with attached wetland map, will outline the provisions of the easement and show what is and is not protected. If tile will be allowed within the easement boundary, work with the landowner to accomplish the following:

   a. Flag the locations of the tile installation
   b. Inform WMD 3 days in advance of any tiling
   c. Inform WMD when tiling has been completed
   d. Request no tillage for 5 days after tiling is completed (this gives an opportunity to document and GPS tile lines as installed for future reference)
   e. Provide an "as built" diagram of the tiling, preferably the GIS data from the tiling contractor if available.

7. WMD ground checks or takes aerial pictures of completed tiling project. If any discrepancies, conduct follow up using the same procedures as if a violation occurred.

8. WMD keeps all records in easement file in case of any future requests for maintenance of drainage facilities.

**Other Considerations**

Drainage tile may be allowed within the LED and catchment of a protected basin provided that tile outlets into the protected basin. This will essentially preserve the catchment for the protected basin. It may be permissible to install non-perforated tile through the buffers of protected basins for unusual circumstances at the discretion of the manager, but only if completely necessary. A FWS representative MUST be present during the installation to confirm non-perforated tile is used in these areas.

Drain tile that is installed within the catchment or restricted LED, but not directly in a protected wetland, is a violation of the easement contract if it has an indirect drainage effect. More specifically, if the tile diverts water outside of the catchment, and away from the protected wetland, then it is a violation. Restoration options may include removal of some or all the tile, plugging certain areas of tile, or 'daylighting' the tile so that the tile discharges water into the wetland rather than away from it.

Restoration options for drain tile installed directly beneath a protected wetland are slightly different owing, in part, to the potential damage to the wetland soils that may occur by trenching to remove the tile. In most cases, removal or plugging of the tile from the wetland edge for a distance of 150' "downstream" will be sufficient to bring the easement back into compliance. Cross cutting of the tile or other methods that attempt to minimize the removal of tile in violation of the easement is not acceptable.

As easily as drainage tile seems to be installed, removal can be quite the opposite. At this time, plugging the tile with expanding polyurethane foam appears to be the best alterative and likely will result in the least amount of soil disturbance. However, it is typically more expensive than tile removal. While tile removal may be cheaper, tile plastics are relatively thin and pulling on them tends to create very short lengths of tile and a lot of work. The best option to fully remove tile from the ground is to use a backhoe to dig down to the depth of the top of the tile and then you may be able to tie onto the end and drag the tile up out of the trench. It is preferred that the restoration be done in the presence of a FWO. This will allow for immediate confirmation of compliance and someone to answer questions the landowner or contractor may have along the way. Removal of the tile may be done without the presence of an FWO, however, the tile trench should remain open with the removed tile laying alongside the trench until it can be confirmed removed.

For additional information on wetland restoration options relative to drain tile, refer to the Technical Guidance Document WRG-4A-2 on "Blocking Subsurface Drainage Tile" produced by the Minnesota Board of Water & Soil Resources; available at:

http://bwsr.state.mn.us/restoration/resources/documents/appendix-4a-2.pdf

References:

Jacobsen, S.M.M., NRCS and R Wayne Skaggs, NCSU. 1997. Paper No. 972034: ASAE Annual International Meeting, Minneapolis, MN.

Sands, G.R., and D. Canelon. 2010. Long-term field-scale computer simulation of subsurface drainage for three soils common to northwest Minnesota. University of Minnesota Extension, Department of Bioproducts and Biosystems Engineering.

South Dakota Natural Resources Conservation Service. 2011. Wetland Restoration Technical Guide Notice 323.

*This Page Intentionally Left Blank*

# Chapter XI: Mapping Procedures for Pre-1976 Wetland Easements

Following the 8th Circuit Court of Appeals ruling in the 1997 Johansen wetland easement case, the Service developed guidelines for the mapping of pre-1976 wetland easements. All WMDs within the Prairie Pothole Region will follow these wetland mapping procedures for pre-1976 wetland easements. Wetlands protected by post-1976 easements are depicted on Exhibit A maps which are included with the easement contracts; these easements do not have to be re-mapped and are not the subject of this chapter. Whether responding to a landowner's request for assistance in dealing with a water problem, a landowner request specifically for a map, or prior to determining whether a violation of the easement contract has actually occurred, Service personnel must have a map prepared of the subject wetland easement. The form of a landowner request should be liberally interpreted. For example, if a landowner or renter has a question regarding an easement, the Service shall interpret that as a request for a map showing which wetlands are protected.

The following guidelines and procedures are based on the 8th Circuit ruling. However, pre-1976 easement contracts are clear in stating that all wetlands "now existing or reoccurring due to natural causes on the above-entitled land" are covered by the terms of the agreement and are not limited by the acreage figure in the easement summary (the easement summary acreage figure was calculated by the Service Realty Specialist at the time of easement acquisition in order to make a fair market offer to the prospective seller; this easement summary acreage figure was also reported to the state). The 8th Circuit even recognized a U.S. Supreme Court ruling in North Dakota v. United States 460 U.S. 300 (1983) that stated in part "…it (easement contract) did not explicitly limit the wetland easement to the Summary Acreage." <u>However</u>, the 8th Circuit has specifically addressed easement summaries and held that the agreement <u>is limited</u> to those acres. <u>Until the 8th Circuit ruling is overturned, modified or changed in some fashion, this Manual will use the Appeal Court language as guidance to mapping pre-1976 easements.</u>

These procedures are consistent with the guidance from the U.S. Attorney's Office in North Dakota. According to the February 4, 1998 letter to the Honorable Rodney S. Webb (Chief Judge, U.S. District Court), Lynn Crooks (First Assistant United States Attorney) stated:

> "It is accepted by everyone, following the Eighth Circuit opinion that in future easement enforcement actions, the U.S. Fish and Wildlife Service will be required to prove which potholes were present at the time of the easement acquisition and thus included in the Total Wetland Acres notation on the Easement Summaries."

In simpler language, these elements of proof require the Service to show two things: 1) the protected wetland existed at the time the easement was purchased, and 2) that the mapped acreage of the wetland basins is not in excess of the easement summary acres.

It is important to note that wetlands are hydrologically dynamic systems. Water levels within those systems expand and contract due to annual precipitation levels, ground water or soil interaction, runoff patterns and evaporation. The U.S. Attorney's February 4th 1998 letter to Judge Webb emphasizes this point in notation #2, second paragraph:

> "The Eighth Circuit has always recognized the inherent expansion and contraction of prairie potholes. A pothole does not cease being a pothole just because it dries up. When it dries up it can be farmed, not ditched. There is no requirement anywhere that a pothole have water in it when the easement is acquired. Wetlands are defined by many factors other than the presence or absence of standing water on a particular day. Most North Dakota potholes are essentially dry by fall in a normal year."

Pre-1976 wetland easement maps represent the Service's effort to depict the approximate locations, sizes and shapes of the protected wetland areas based on information and photography available at the time the maps are prepared. Wetland maps are not meant to depict water levels in wetland basins in any given year.

It is important to keep the following points in mind with respect to wetland maps for pre-1976 wetland easements:

- Most mapping will be completed with off-site resources.
- There are NO acreages set for individual wetlands. Easement summary acreage is for the entire easement.
- The Johansen case did not require the Service to establish specific acreages for individual wetland basins.
- The wetland easement map only shows which wetland basins are protected and only provides approximate sizes, locations, and shapes of protected basins.
- Each question brought up on the size of an individual wetland will be evaluated on a case-by-case basis.
- Wetland maps identify protected wetland basins, not water levels in individual wetlands.

## A. Mapping Overview:

**Starting in FY11, Region 6 mapping of pre-76 easements shifted from the field to a centralized mapping team located in the Habitat and Population Evaluation Team (HAPET) in Bismarck, North Dakota. The mapping of pre-1976 easements is no longer completed at the field station level in Region 6. At this time most of Region 3's pre-76 easements have been mapped. Since the mapping workload is manageable and nearing completion in Region 3, the mapping is still done at the station level.**

The Service is required to provide a map anytime a landowner, operator, local government entity, or the Governor requests one. The Service is not required to map easements in response to third party request; e.g. from a wind company. However, the Service will strive to map an easement whenever the potential exists to impact a protected wetland basin. Be somewhat liberal in the interpretation of a map request. Anytime a landowner or tenant inquires about a particular wetland, or about what can and cannot be done on a wetland easement, consider this a request for a map of protected basins. In this process, the Service is mapping, not delineating wetlands. The map will become part of the easement file(s). It will not be an Exhibit A map. The final easement map(s) are to be sent to the requestor; or in the case of an easement violation, provided to the owner/operator on or shortly after the first landowner contact.

**Difficulty to Drain Maps:** Some of the earliest easement contracts refer to maps that were prepared and given to both parties at the time the easement was purchased. These maps that are referred to by connecting language in the contract are to be treated as the official easement map. There is no need to re-map these easements. Some easement folders will contain similar maps which characterize wetland areas based upon the ease or difficulty by which they could be drained (Exhibit XI-1); however, the easement contracts lack the connecting language. While these maps do not represent the official wetland map for the easement, considerable weight should be given to them in preparing a wetland map of protected basins.

In other situations, Wetland Enhancement Biologists with the Acquisition Program made maps of a number of the early easements, often with field notes describing wetland type, vegetation or waterfowl observations. All wetlands were protected in pre-1976 easements, unless wetlands were specifically excluded on a Drainage Facility Map (see below), including those that may have been missed when these maps were drawn. These are not official easement maps, but should be used as a reference when drawing the easement map.

**Drainage Facility Maps (DFM):** Wetlands that were deleted from the provisions of pre-1976 easements as well as allowable ditches were depicted on Drainage Facility Maps (Exhibit XI-2). If a DFM exists, the features shown on the DFM are to be traced on to the new wetland map. The DFM serves as a reference point and identifies the wetland(s) not protected in the easement.

There are two types of DFMs that were used to show which wetlands were not protected in an easement contract. The first type of DFM has dashed-line circles with arrows extending from the circles. These wetlands are not protected. Once the new map is drafted and the dashed-line circles are drawn on the map, mappers may observe the line with an arrow extending from the dashed-line circle though a non-DFM wetland. The non-DFM wetland should be considered protected because the arrow is not referencing that particular wetland. The arrow extending from a dashed-line wetland applies to the deleted wetland only. The arrow does not represent the actual length or location of the ditch draining the deleted wetland.

The second type of DFM includes maps indicating open ditches with solid arrowed lines where there are no dashed-lines identifying the wetlands deleted from the easement. These DFMs are a compilation of arrowed lines identifying specific locations of open ditches which may be maintained. These DFM-mapped arrows will be traced on to the new map. If the drainage facilities depicted by these arrowed lines intersect with mapped wetlands (which can only be determined on-site), then these wetlands are not protected by the easement.

**Renegotiation Maps:** In the late 1960's and early 1970's, several Service Realty Specialists in the Devils Lake WMD told landowners that annual fall drainage of wetlands by plow furrows was an acceptable farm practice. As a result, the Service offered to renegotiate these wetland easements with the landowners and certain wetlands were deleted from the easement(s). The renegotiation period ended in 1975. If the renegotiated map (Exhibit XI-3) depicts the protected wetland basins as well as the deleted basins and is consistent with the easement summary acres (see below), then it should be considered the official easement map. These renegotiated maps can be photocopied and sent to the requesting entity if the map includes all the protected wetlands. A standard cover letter should be sent with the map. Often times the renegotiated

maps only have deleted wetlands. In this case, follow the mapping procedures to map protected wetlands and then trace deleted wetlands on to the official map. Renegotiated easements will have a new easement summary acreage figure. The wetland acres that may have been deleted through renegotiation were subtracted from the original summary acres.

**Draft maps, easement information sheet maps, maps that have been mailed to landowners that depict wetlands and all other maps that may be in the file:** These maps can be used as tools when drawing the new easement maps. If an easement map has been drafted and/or approved but has not been provided to the landowner and/or other requestor, it should be reviewed before it is distributed.

**B. Mapping Process:** Once the determination to map an easement has been made, then:

1. (a) In Region 6, staff will send a mapping request to HAPET via email. This request should include the tract number(s), the purpose for the map (violation, landowner request, etc.), and copies of DFMs if applicable. If the required imagery has not been sent to HAPET by the Region 6 field station, it should also be done at this time.
   (b) In Region 3, maps are completed at the field station level; Region 3 field personnel will start and finish the mapping process without the assistance of a HAPET mapping technician.

   Mapping technicians listed below are referring to the person creating the maps. This will be HAPET in Region 6 and field personnel in Region 3.

   **[*Note: The easement Summary Acre figure is for the entire easement contract. If the request is for a portion of the original easement, mappers must map the entire easement and managers will have to compare the acreage for the entire easement contract with the Summary Acre figure. There is no way to compare the wetland acreage for only a portion of the easement with the easement summary acres.*]**

2. Mapping technicians will geo-reference the imagery, if necessary; and produce a draft map(s) based solely on off-site resources.

3. The mapping technician will then send the draft map(s), along with a copy of the easement summary, a list of the imagery used (e.g., NWI map and NRCS photo #CWO 2HH 128, date 8-8-67), and an initiated Wetland Easement Mapping Progress Form (Exhibit XI-4) to the field station, if applicable.

4. For draft maps prepared in response to a violation or landowner request, the field station will have 14 days to review the draft map in light of the easement summary, ground visit information (if available), and file history. For proactively-created maps, the 14 day limit does not apply.

5. If the total acres mapped *are not* consistent with the Easement Summary Sheet, then the manager must make corrections based on the steps outlined later in this chapter.

6. When applicable, there are a couple options for transmitting the necessary corrections to HAPET. For example, corrections can simply be noted on the draft maps, scanned, and sent back to HAPET along with the updated Wetland Easement Mapping Progress Form. Alternatively, managers can work directly with HAPET through WebEx to make corrections. For more information on WebEx, contact HAPET.

7. If no corrections are necessary, then final maps will be printed on Mylar, signed by the mapping technician, and signed by the appropriate field personnel who has reviewed the maps.

8. The original signed copies along with the Wetland Easement Mapping Progress Form and list of resources used will reside in the easement folder at the field station. When applicable, it will be the responsibility of the station to scan and distribute final maps to HAPET and the appropriate state Realty office.

## C. Specific Mapping Steps:

1. The mapping technician will prepare a wetland map of all naturally-occurring wetland basins utilizing all off-site mapping tools available (Exhibit XI-5). The map will include those basins which have historically been present over time; i.e., present on historical aerial photos. The mapper will use all wetland photographic signatures to help determine the presence or absence of wetlands basins. Wetland indicators may include hydrophytic vegetation, surface water, saturated conditions, mud flats, flooded or drowned-out crops, unharvested crops, isolated areas that are not farmed with the rest of the field, areas of greener vegetation (especially during dry years), mature upland tree rings, and recurring cropping patterns that avoid wet areas.

2. The draft maps will be sent to the field station, if applicable, where a thorough review of the easement file(s) will occur to ensure that the current mapping effort is as consistent as possible with any historical information in the easement file. It is the map approver/reviewer's responsibility to conduct a thorough file review of the easement contract, paying close attention to any wetlands with past violations, wetlands that may have been compromised administratively, ditches that were allowed to be maintained or any other pertinent information. Wetlands with a violation history should remain on the map if possible. A person other than the wetland mapper needs to review the draft maps. The person who reviews the file should have extensive experience in enforcing and/or administering wetland easement compliance. The reviewer should also verify basin identification, approximate size, shape and location of all drafted basins.

   Basin boundaries may be redrawn only if evidence from a ground check and/or consultation with a second map approver/review warrants modification of the basin size or shape. **Modifications will only be made to better define the wetland basin, not to save acres or to conform to Summary Acres**.

3. Only after the map reviewer completes the preceding steps is a comparison made between the draft map acres and the easement summary acres. There are three possible

conclusions upon which one will arrive after comparing mapped wetland acreage to summary acres:

**First Possible Conclusion:** The wetland draft mapper makes a preliminary map, then the approver/reviewer compares it to the easement summary acre figure and finds that the estimated mapped wetland basin acre figure is less than or equal to the Easement Summary Acre figure. In this case, prepare a final map according to the mapping guidelines.

**Second Possible Conclusion:** After completing the preliminary map and comparing it to the easement summary acre figure, the estimated mapped wetland acre figure for the draft map is approximately equal to, or actually exceeds the summary acres by a small amount. This may still be ok, as the judge in the Johansen case indicated that as long as the Service is in the ballpark, and the mapped wetlands existed at the time of acquisition, then a small acreage in excess of the summary acres is acceptable. Previous guidance from the Regional Directors of Region 3 and Region 6 suggested that a wetland "…map that is within 10 percent of the summary sheet…" is acceptable.

**Therefore, a draft map(s) that is within 10% of the easement summary (i.e., does not exceed 110% of the easement summary figure) may be acceptable. However, a closer look at the maps is necessary to ascertain whether or not the mapped wetland acreage is consistent with the summary acres.**

Begin by determining which of the possible two scenarios exists and then follow the applicable directions:

***Scenario One***

- The mapped acreage exceeds the summary acreage but is less than 110% of the easement summary acreage, *AND*
- *There* ***is not*** *a mapped basin with an estimated approximate size less than the difference between the mapped acreage and summary acreage.*

If these two conditions are met, then the draft map is considered consistent with the easement summary and can be finalized.

| | | |
|---|---|---|
| Example: | If | *the mapped acreage = 21 |
| | | *the summary acreage = 20 |
| | | *the smallest estimated mapped wetland size = 3 acres |
| | Then | *110% of summary acreage = 22 acres |
| | | *Mapped acreage of 21 is less than 22 |
| | | AND |
| | | *the smallest wetland (3 ac.) is not less than 1 acre (21 minus 20) |

Again, in this scenario, the map(s) can be finalized as the mapped acreage is deemed consistent with the summary acreage.

***Scenario Two***

- The mapped acreage exceeds the summary acreage but is less than 110% of the easement summary acreage, *AND*
- *There **is** a mapped wetland basin with an estimated approximate size less than the difference between the mapped acreage and the summary acreage,*

If these two conditions are met, then wetlands will have to be deleted from the draft map until the conditions ***"Scenario One"*** outlined above are met.

**IMPORTANT – wetlands are to be deleted according to the Wetland Elimination Criteria listed below and NOT according to wetland size.**

| | | |
|---|---|---|
| Example | If | *the mapped acreage = 21 |
| | | *the summary acreage = 20 |
| | | *the smallest estimated mapped wetland size = 0.5 acres |
| | Then | *110% of summary acreage = 22 acres |
| | | *Mapped acreage of 21 is less than 22 |
| | | BUT |
| | | *the smallest wetland (0.5 ac.) is less than 1 acre (21 minus 20) |

Use the Wetland Elimination Criteria to remove a wetland from the map. Then re-calculate the mapped acres and again compare it to the summary acres. Do this until either the "First Possible Conclusion" as described above or "Scenario One" outlined above exists. **Each time a basin is removed, a new mapped acreage must be calculated.**

**Third Possible Conclusion:** The mapped acreage exceeds the summary acre figure by more than 10%. Use the Wetland Elimination Criteria to remove a wetland from the map. Then re-calculate the mapped acres and again compare it to the summary acres. Do this until either the "First Possible Conclusion" as described above or "Scenario One" outlined above exists. **Each time a basin is removed, a new mapped acreage must be calculated.**

## WETLAND ELIMINATION CRITERIA

The wetland elimination criteria are divided into 4 categories: 1) Wetlands with inconclusive signatures, 2) Potential Health and Safety Issues and Non-typical Wetlands; 3) Biological Factors; 4) Last Resort Considerations. These categories are in priority order, but criteria within category "2" are not in priority order.

### 1) Wetlands with Inconclusive Signatures

Remove wetlands that only show up on one or two aerial photo resources or those that do not show up well on historic aerial photos from near the time of acquisition.

**2) Potential Health and Safety Issues and Non-typical Wetlands**

Remove wetlands that are not typically included in wetland easements purchased today and/or wetlands that may cause health and safety issues. The following criteria are not in priority order, so the manager has some flexibility in removing wetlands that may be of highest concern on the particular easement being mapped:

- Wetlands within the landowner's curtilage
- Co-owned wetlands
- Wetlands that impact well-traveled access roads and have potential to cause flooding
- Degraded wetlands (contaminated, in feedlots, not fully functional, silt-laden or partially-drained wetlands)
- Wetlands close to a town or city that are subject to development
- Wetlands lying in well-defined intermittent or permanent stream beds
- Intermittent streams, coulees, and impoundments

**3) Biological Factors**

Remove wetlands that were not the primary focus of the Small Wetlands Acquisition Program (SWAP) prior to 1976. This includes ephemeral wetlands (See Steward and Kantrud, 1971) as these wetland basins would not likely have been identified from photographic evidence available to the Service Realty Specialists at the time of acquisition. If the draft map is still over the easement summary acres, begin to eliminate lacustrine and semi-permanent wetlands. Consistent with the focus of the SWAP, temporary and seasonal wetlands are the last wetlands to be eliminated from a draft map.

**4) Last Resort Consideration**

If wetland acres still need to be removed to make the map consistent with the easement summary acres, consider the following:

- Protect definable lobes within the larger basin that would likely still hold water as the water level in the basin decreases.
- Protect the lowest part of a larger basin by setting a mean sea level (MSL) elevation.

In order to consider either of these two options, surveying will be necessary to determine the overflow MSL elevation.

The easement map will contain the following paragraph: "The U.S. Fish and Wildlife Service (Service) has purchased and owns perpetual rights which restrict or prohibit the right to drain, burn, level, and fill any wetland basin depicted on this map. This map represents the Service's effort to depict the approximate location, size and shape of all protected wetland basins based on information and maps available at the time this map was prepared. However, wetlands are hydrologically dynamic systems, with expanding and contracting water levels. This map is not

meant to depict water levels in the wetlands in any given year. The Service reserves the right to correct this map, provided the resulting mapped acreage remains consistent with the easement's Summary Acres." Also include this statement in the text of the cover letter transmitting the wetland map to the requestor.

The Exhibits in this chapter contain examples of three different letters to the landowners or others who have requested wetland easement maps. Exhibit XI-6 transmits the map to the landowner via certified mail in a non-violation situation. It states the map is an approximation of the wetland conditions and if the landowner or operators have questions, it is their responsibility to contact the Service. Exhibit XI-7 responds to a landowner's questions about the mapping process or about the size of individual wetlands. Exhibit XI-8 transmits a revised easement map with an explanation of the revision.

Send a copy of the final map to the requestor by certified mail with a standard cover memo and retain the original map(s) in the easement acquisition file and staple a copy in the easement folder. If the map was completed as a result of a violation, a copy of the map(s) should be sent to all parties involved including landowner, operator/renter and government entities (e.g., NRCS).

The time frame for responding to a request for an easement map should not be more than 60 days. If you are unable to complete the map within 60 days, respond to the requestor and landowner in writing with an explanation. In no case should the Service allow a map request to go unanswered for longer than 60 days.

There is Wetlands "Mapper" Utility Tool (WMUT) that the FWS has made available to the public on the internet. Anyone can pick an area anywhere in the U.S. and find NWI wetlands on that location. If a wetland is selected with the identity tool, the WMUT has a data table that reveals characteristics of the wetland including acres. The WMUT has potential to conflict with easement maps that the Service provides to landowners. It is well known that NWI does not capture all wetlands, especially in the Drift Prairie, and the wetlands depicted on NWI maps are determined from one year of aerial photography. Several years of aerial photography, oblique photographs, and possibly ground visits are used in making easement maps. The Service needs to be able to explain the difference in the Easement Maps compared to the wetland maps generated by the WMUT.

## D. Revising Easement Maps that have been Finalized and Distributed:

It may become necessary to make changes to maps that have been distributed to landowners, operators, and WAOs. For instance, mapped wetland basins are not present when conducting later field work and/or an existing wetland was missed. The Service may correct previously prepared maps as long as the revised acreage remains consistent with the Easement Summary Acres. The purpose for revising maps is to maintain as accurate a map as possible to help eliminate potential jurisdictional issues. **For pre-1976 wetland easements mapped before 2014, double-check the mapped acre estimate compared to the summary acres. If the wetland maps do not conform to 2014 modified mapping procedures, then revise the maps**

**prior to distribution. Revised maps for this purpose involve only the deletion of previously identified wetlands. *Absent obvious errors, do not redraw wetlands.***

When correcting an easement map, attach a signed and dated memo to the map describing the reasons for the change(s). Also, type a note on the revised map referencing the dated memo. Place the original revised map and the memo in the acquisition file and a copy of both in the easement file. Do not just put another new map in the file without a signed and dated memo explaining why the previous map was amended. **For wetland easement maps that were revised due to the 2014 change relative to summary acres, simply state "This easement map was revised to conform with the 2014 changes to the procedure pertaining to the comparison of estimated mapped acres and easement summary acres."**

On a revised map with fewer wetland basins, create a new map with the newly-deleted wetlands removed; do not merely cross out the deleted wetlands and re-date the old map. Keep both the old and revised map in the file, as they are both part of the permanent history of the easement. Send a copy of the amended map to the requestor as well as any landowners or other parties that received the previous map. Follow the procedures outlined earlier. Exhibit XI-8 transmits a revised easement map with an explanation.

**Mapping Priorities:** - easements within these priorities will be mapped on a first-come, first served basis.

a. Violations – The mapping of known violations will always be the first priority of the field station or mapping team. For the enforcement process to work, field stations must receive their maps in a timely fashion. Therefore, it will be necessary to manage this workload as efficiently as possible. To that end, ground checking of potential easement violations *before* starting or sending a mapping request is advised. This will prevent the expenditure of staff time on maps for easements where the violation falls out after a ground check. More importantly, it promotes timely ground visits of potential violations before evidence is lost.

b. Landowner Requests – A landowner request should be liberally interpreted as previously mentioned. Any time a landowner is asking questions about an easement, including what is and is not allowed, it should be treated as a landowner request and mapping should be initiated. Requests to install drain tile or any other request to impact wetlands on a wetland easement, when the status of wetlands is uncertain (protected or not protected), will fall under this category. Use all available off-site resources to map the protected wetlands. A ground check or aerial validation is valuable and encouraged, but not required in order to prepare an easement map. The lack of time to do a ground check or weather conditions should not prevent a response to the request for a map in a timely manner.

c. Special Projects - In most cases, it is not necessary to map easements in response to wind energy development, pipeline construction, etc. In these cases, wetland managers should first attempt to work with the company to avoid all wetland impacts. If it is determined that wetland impacts are unavoidable, and a Special Use Permit is necessary, the SUP can still be issued without the wetlands being mapped as long as the manager can reasonably ascertain that the affected wetland(s) are protected by the easement. For example, if a cursory review

and summarization of the wetland acreage on the easement is well within the Easement Summary Sheet, then it can be concluded that all wetlands are protected and a final map is not presently necessary. Under this scenario, a request for a map should only be sent to the mapping team when the protection status of a particular basin cannot be determined.

d. Proactive Maps – When mapping teams have mapped all potential violations and have fulfilled all landowner requests, then easements can be mapped proactively. In Region 6, mapping technicians will be assigned a specific WMD until all the pre-76 easements for that WMD have been completed.

If mapping is done proactively (there has not been a request or there is no potential violation), do not distribute maps until they are validated. Aerial or ground validation is preferred; however, some stations may have a year of exceptional aerial photography which can also serve as a validation tool. If there is any doubt as to the existence of a wetland while using aerial photography to validate a map, a ground visit is required.

*This Page Intentionally Left Blank*

## Chapter XII: Easement Surveillance

Easement enforcement work is vitally important to the continued success of the Fish and Wildlife Service program to preserve migratory bird habitat within the Great Lakes and Prairie Pothole Region. The procedures used for enforcing easements have been tested over time and were developed with the concurrence and support of law enforcement and, in some cases, the U.S. Attorney's Office. The following two chapters will discuss these procedures in detail which represent a stepped sequence of events starting with aerial inspections of easement properties, followed by second flights if necessary, case preparation, ground inspections, landowner contacts, and compliance requirements. Some manager flexibility is permitted within these guidelines, but mostly, these procedures are *required* of every Wetland Management District and National Wildlife Refuge which administers easements. This will help to ensure consistent application and enduring maintenance of the easement program. The Service's Law Enforcement Management Information System (LEMIS) is used to track easement violations.

### A. Aerial Inspection

All easements will be checked for compliance at least annually, either aerially or on the ground. The objective of the aerial inspections is to detect any activities which may constitute a violation whether it is drainage, leveling, filling or burning of wetlands; or early haying or grassland altering violations on grassland easements. Some easements, particularly those acquired through FmHA and those located outside the prairie pothole region, are scattered throughout the landscape. Aerial inspection of these scattered easements is very costly and therefore, many of these easements may be inspected through a ground check.

There are significant differences between Region 3 and Region 6 in the methods, timing, and techniques used for aerial inspection of easements. Region 6 easements are normally monitored with two observers aboard the aircraft, in addition to the pilot. Region 3 easements are normally monitored using the regional aircraft and belly mounted camera with no additional observers onboard. Region specific details are provided in Exhibit XII-1 (Region 3), and Exhibit XII-2 (Region 6).

**NOTE: New sources of high resolution commercial satellite imagery are becoming available each year. Many of these are low cost or free, and may supplement photography acquired through the use of Service owned or contracted aircraft.**

#### 1. Flight Activities

##### A. Aircrafts and Pilots

- High-wing aircraft offer better visibility and photographical capabilities than low wing aircraft.
- Vendor (contract) aircraft and pilots approved by the regional office in cooperation with Aviation Management Directorate (AMD) vary annually. Contact the RAM for a current list.

- Zone aircraft are equipped with belly-mounted camera holes and high definition cameras, if needed. Additionally, Zone aircraft are equipped with tablet computers and ArcPad software interfaced with GPS upon request.

## B. Aviation Safety Policy Pertinent to Easement Monitoring

- For flight profiles where the majority of the mission will take place at an altitude less than 500', special pilot and aircraft qualifications as well as equipment requirements apply; contact the RAM for additional guidance.

- Prior to each flight, passengers will receive a safety briefing by the pilot.

- Flight plans and flight following are required for all flights.

- Managers should review the Regional Aviation Plan (Jan 2008) for additional policy guidance.

## C. Miscellaneous Procedural Items and Tips

- Stations with historically high violation rates should arrange for two flights (one flight may be sufficient in those areas with widely scattered easements). If flown only once, all violations or suspected violations must be photographed concurrently.

- In general, easement monitoring should include two observers. Managers must insure all observers are properly trained (flight safety training and wetland ID training) and are familiar with the mission. New observers will fly initially only with another experienced observer. If using the Region 3 plane and belly-mounted camera for easement violation detection, no observers are needed with the pilot.

- Fly counties or blocks of easements at alternate directions every other year or 1 out of every 3 years. This will enable better coverage of violations which may occur immediately adjacent to the transect being flown; violations near the flight path can be difficult to detect when they are directly under the plane.

- When using the tablet computers interfaced with GPS, be sure to activate the flight log prior to the flight.

- Due to the limited number of Service pilots and aircraft, combined with the narrow windows of opportunity for flying easements, it is crucial all flight- and air-crewmembers (observers) maximize the amount of flight time each day as well as availability (including weekends). However, duty day limitations for the pilot will not be exceeded under any circumstance.

- Most observers photograph all suspected violations with a digital camera with an optical zoom lens. They later review these photographs, compare them to the maps in the easement files, and determine if suspected activities are violations of the easement.

At least one photo should be taken that will orient the viewer to the location and direction of the photographs. Activity should also be documented by editing layers on the tablet PC or mobile device. All suspected violations should be documented, including older activities which may have been missed in previous years. The potential exists to miss violations that occur after surveillance flights, are located directly under the plane, that have been made difficult to observe due to farming practices or deliberate attempts to cover up, etc. These violations in future years may not have fresh activity and will appear as established or old activities. Observers should note all suspected activity including those without fresh work and document with aerial photographs. Old activities should be treated as a current violation until a ground check, file review or the mapping process proves otherwise.

- If an old activity is determined to be a violation, it should be treated as a current violation. Old violations may present a challenge in obtaining restoration and/or prosecution because of a lack of evidence, landowner/operator changes, etc. Nevertheless, as much information should be collected as possible.

- Known older activities that experienced observers have documented in previous years as allowed do not have to be documented each year. These situations should be rare. When in doubt, the observer should photograph the activity from the air and initiate further investigation.

- Digital photographs are recommended for documenting suspected violations. It is important to maintain original photographs and to be aware of how to properly transfer original photos from the digital camera to the computer. It is recommended that these digital photos are stored on a protected device that has a scheduled back-up procedure.

- Written notes should be kept for each suspected violation and reference them to the proper photograph and easement. Abbreviations should be used to speed up note taking: (PF) for plow furrow drainage, (SD) for scraper ditch drainage, (F) for filling activity and (B) for burning. These symbols are also helpful in aiding the observer on the follow-up flight.

- *If a potential violation is later determined to be allowed, a copy of the photograph should be dated, labeled, and placed in the easement file.*

## D. Aviation Safety Training

Aviation safety and training requirements are noted in applicable Department, Service, and Regional Policies. Persons serving as flight crewmembers are required to complete initial training requirements prior to flying on service or contracted aircraft. Refresher training must then be completed at specified intervals for crewmembers to maintain a valid status. Required courses are available on-line at https://www.iat.gov or through your Regional Aviation Manager (RAM). Additional information and specific course requirements are provided in Exhibit XII-3.

### 2. Follow-up Flights

When monitoring wetland easements in the fall, some managers prefer to conduct second flights to screen out suspected violations before conducting ground checks; others prefer to do all the aerial documentation on the first flight. It is suggested that two flights be performed for stations with historically high easement violation rates. For those stations that conduct second flights in the fall, the following are additional guidance:

#### A. Pre-flight Preparation

- Assemble aerial photographs (8-inch FSA aerial copies work very well) that contain the easement areas with potential violations. Outline the area protected by the easement and, if it is a pre-76 easement, identify DFM-deleted wetlands and, if a post-76 easement, identify wetlands in blue. Arrange the photographs numerically by county for easy retrieval during the flight.

- Compare aerial photos taken during the first flight (if applicable) to the FSA map to determine whether the suspected violation is a deleted (DFM) wetland. If there is any doubt, include this possible violation for second flight photography.

- Document the aerial photograph numbers that correspond to each suspected violation on your flight map so the corresponding photos can be retrieved as each suspected violation is inspected.

- Two observers are desirable; but, if necessary, one observer may be sufficient depending on the volume of suspected violations.

#### B. Flight Parameters

Fly low and slow enough to get a good view and photographs without compromising safety. Keep in mind sustained flights below 500 feet AGL require additional safety and administrative requirements.

#### C. Flight Activities

The purpose of second flights is to screen out suspected violations before performing ground checks and to obtain good photo and written documentation of suspected violations from the air.

- Identify ditching and other suspected violation activities on base photographs to aid ground inspection.

- If more than one type of violation is present, each should be identified and described on the photograph.

- Record notes for each suspected violation.

### D. Video Equipment

The use of video equipment should be considered, especially in cases of serious or second time violations. If the case is expected to go to court, record the entire violation. This would include aerial and ground coverage that would show the violation, actual work, wetland vegetation, etc. Video documentation is in addition to, not a substitute for good photos.

### E. Grassland/Habitat Easements

Use the general guidelines above for documenting suspected violations from the air. Since follow-up flights are normally not conducted during summer evaluation flights, make sure the photo documentation is sufficient during the first flight for any suspected violations.

## B. Ground Inspections

On-the-ground inspection of suspected violations must be completed as soon as possible. If early snow cover prevents fall flights and/or ground inspections, complete as early as possible the following spring (within two weeks after snow melt). Spring ground inspections need to be completed within one month after detection from the air or before landowners begin field work, whichever comes first.

### 1. Pre-Ground Inspection Requirements

Prior to conducting a ground check, a file review is necessary to determine if the observed activity is indeed a violation. In the case of old activity, old photos should be reviewed to try to determine if the work was present when the easement was acquired or if the work had been missed by observers in previous years. U. S. Department of Agriculture slides and photographs may be helpful to establish when the violation occurred. Utilizing a soil expert may aid in collecting evidence on the ground and interviewing the landowner/operator may also provide additional evidence. It is also recommended to discuss the case with the Regional Easement Coordinator or appropriate Zone Officer, especially if evidence is lacking. If the activity is allowed, the photograph should be labeled and placed in the easement file, with a note depicting what was observed and what the file and photograph review determined. This will help future officers in determining new violations.

Before actual inspection, initiate an Easement Violation Documentation form. See Exhibit XII-4 for an example of an Easement Violation Documentation form.

The following should be included:

A. Photocopy of the section of the aerial photograph where the alleged violation is located or a copy of the Exhibit A /wetland map transposed onto the form.

B. The boundary of the easement should be plotted with a black outline.

C. If a drainage facility map exists for the easement in question, plot the allowable facilities in green.

D. Plot all alleged illegal activities as follows:

- Scraper ditches, single plow furrow, double plow furrow, dozer ditches, etc. with a solid red line.
- Filling of any type material (rocks, earth, trees) with a red X.
- Tiling is shown by a dotted red line.
- Any stock pond, level ditch or donut that may be in violation is plotted with a small red rectangle.

E. Show section numbers in black and label and locate buildings or farmsteads with a small black triangle.

F. Identify all distinct coulees or natural drainages with black dash-dot lines and label. Coulees can be difficult to define. Those found on USGS 7½ minute topographic maps can be used as a guide. Be aware that these maps may not show all bona fide coulees.

G. For grassland/habitat easements, plot the suspected violations on the map and indicate the concern–early haying, cultivation, etc.

Set up a case folder that includes:

- Entire easement file
- Completed Easement Violation Documentation form
- Verified identity of the landowner and/or tenant (FSA has these records and the Service has signed MOU with FSA in the past to share this information, refer to Exhibit VI-2 for an example of an MOU. This information is also recorded at the courthouse and may be available through on-line records).
- All memoranda, letters, maps, photos, etc., which apply to the case.

**Complete a file review to determine past history and if observed activity is authorized. There is a chance for a contact with the landowner during the ground check. It is imperative to know the easement's history as the first contact is extremely important for gathering information from the landowner.**

## 2. Ground Investigation

An actual ground check is required prior to a landowner contact to verify that a violation of the terms of the easement has actually taken place. This applies to suspected violations of all easement types; e.g., wetland, grassland/habitat, and FmHA. Aerial photographs will not, by themselves, be adequate for a case. They can only complement the ground inspection and photographs.

All easement documents contain language granting the right of access for authorized Service personnel to investigate a potential violation. The Service recognizes that vehicle use to access easements can be a sensitive issue for some landowners. If contacted by a landowner, officers and managers should consider a property owner's access requests and if the requests are reasonable, they should be honored. Service personnel should avoid entering standing crops or utilizing a vehicle when field conditions are too wet. The Service also recognizes that we cannot honor every access request by a landowner. There may be a past history with a landowner involving threats or other behavior that would make the request unreasonable or unacceptable due to safety concerns. Use of a vehicle while conducting easement ground inspections or compliance checks can greatly aid in the efficiency of the work; and for transporting cameras, surveying equipment, LE equipment, or file and photo information. In addition, a vehicle provides radio communication and cover in case of a threatening situation. If a specific issue or concern surfaces about vehicle access, contact the appropriate Zone Law Enforcement Officer for guidance.

While most easement cases will not end up in court, every case must be investigated with that possibility in mind. Thorough documentation of violations is necessary and required and includes the following:

- Record the size and extent of the violation.
- Record the cover type: grass, forb, or shrub species in the area, cropland, etc.
- Record the actual activity in terms that describe the violation of the provisions of the easement – protected wetland drained or filled; grassland hayed prior to July 16th, etc. Note anything else which might be pertinent (implement used to violate the provisions, any loss of wildlife species, dead nesting hens, disturbed nests observed during the ground check).
- Document other aspects of the violation and wetland including excavated materials dumped in the wetland or near the ditch. Tan or light brown clay soils may be present in the excavated material which generally demonstrates excavation beyond any sedimentation that may have occurred. It may be helpful to document evidence of the wetland prior to the violation. This includes verifying the existence of any aquatic plants or soils in the wetland as well as signs of previously standing water (e.g., crop residue washed up showing a high water line).

Compile photographic evidence of all aspects of the alleged violation. Good quality photographs will likely be the best evidence. For wetlands:

- Use color print film or digital photography. It may be necessary to take more than one photograph from each viewpoint, especially on more serious violations.

- The photograph should depict whether a wetland is burned, drained or filled. Photograph ditches from both directions.

- Photograph the most serious aspect of the alleged violation. The use of red and white poles (range poles) is recommended. These poles show one-foot increments and are used to prove the width and depth of ditches.

- Photograph those areas where arguments may later be anticipated concerning compliance. Try to show the general contour of the land so adequate compliance can be easier to achieve.

- In cases of fill that might not constitute a violation or require restoration, documentation with photographs is still needed. Future accumulation of the fill can then be documented and enforcement action taken at a later time. For example, photographs of a rock pile can be used for enforcement if the rock pile grows in the future.

- Record all pertinent data concerning each photograph taken. After the photographs are printed, each must be labeled with the necessary information.

- Prepare a map showing photo points and direction from which all photographs were taken.

- Easement mapping: To reiterate, once a potential violation has been observed from the air and verified by a ground check, pre-76 easements must be mapped to see if the activity impacted a wetland that is protected. There is no violation until the wetland manager has compared the map and acreage of the protected wetlands and verified that the potential violation has occurred on a protected wetland. See Chapter XI on mapping procedures.

By the end of the ground inspection, if not before, the Service should be in a position to determine whether or not a violation has taken place. If a violation has taken place, then the following tracking system will provide an orderly method for recording pertinent information and reporting the progression of the enforcement process to the appropriate Zone Officer.

*The need to conduct a thorough investigation and complete the necessary documentation cannot be overstated. All phone calls, meetings, and/or casual conversations concerning violations must be documented. All subsequent on-site visits to the violation site should be documented with photos, survey notes, etc. This documentation could be the difference between winning and losing a case.*

## C. LEMIS

Tracking easement violations is critical to the integrity of the entire easement program. Easement violations are recorded and tracked using the Law Enforcement Management Information System (LEMIS). This system provides the consistency needed throughout the easement

enforcement program and contains all of the pertinent information needed to successfully conduct easement investigations. LEMIS provides a central database, administered by Refuge Law Enforcement, to store and track easement violations. It also allows other officers to access information regarding cases or people involved in cases

A printed copy of the LEMIS report shall be included as part of the permanent easement file.

After confirming an easement violation, the investigating Federal Wildlife Officer should complete the applicable information fields in LEMIS within seven days. Within 14 days after documented completion of an easement investigation (e.g., compliance or court adjudication), the Federal Wildlife Officer or person responsible for the specific easement will complete the applicable information fields in LEMIS.

*This Page Intentionally Left Blank*

# Chapter XIII: Compliance Contacts

Once a violation has been discovered, confirmed, and documented according to the criteria outlined in the previous chapter, it is time for the compliance contact with the landowner and/or tenant. Because of the potential of encountering adversarial situations, the Service should be thoroughly prepared for a frank discussion of the violation, and be able to explain the terms of the required compliance.

## A. Pre-contact Preparation

- Verify the landowner and/or tenant and/or contractor. Verification can be accomplished by using the MOU with FSA, station records, courthouse records, plat books, on-line property records, etc.

- Review the easement case file to become completely familiar with it. This is essential when discussing the case with the landowner or tenant. An interview can take many unexpected turns, so be prepared for any eventuality.

On easements with a known history of confrontation, managers might want to "red flag" the easement file to alert future easement managers/officers of potential problems with ground checks and contacts. Information in the file indicating previous confrontational contacts, derogatory statements made by the landowner or a landowner that demonstrated unstable, highly emotional, or a vindictive type attitude would be basis for "red flagging" a particular file. Managers may also want to check with county sheriff offices for potential problem landowners or pay particular attention to foreclosure actions or actions of individuals or groups of landowners who are objecting to taxing systems or government intervention in the farm community. "Red flag" these cases and use special precautions in continuing with a case that has been "flagged." Contact the appropriate Zone Law Enforcement Officer or Regional Easement Coordinator for assistance prior to contacting people with a known history of instability or violence.

Be cautious when "red flagging" a file. Do not include statements that are derogatory, highly opinionated, or reflect a dislike for the landowner. Remember, if the case ever results in court action, the <u>entire</u> easement file may be viewed by the defense. Inappropriate statements could jeopardize the case and make Service employees appear to be unprofessional or vindictive. However, the officer or manager should accurately document statements even if the words utilized by the individual are obscene.

- Assemble the entire file, county atlas, photos, maps of violation, etc. to take along on the interview for reference if needed.

Assemble all note-taking materials for documentation of interviews. This will include note paper for writing memos to the file or a Mobile Video and Audio Recorder (MVAR) for dictated accounts that should be typed later in memorandum form or included as digital evidence in the case file. Follow current FWS policies on Consensual Monitoring and using MVAR devices (Exhibit XIII-1).

## B. Landowner and/or Tenant Contact

### 1. Interview Phase

Investigations should be completed in accordance with the Administration of National Wildlife Refuge System Conservation Easements chapter of the Refuge Manual (601 FW 6). Prior to making contacts with subjects known to be confrontational, officers should contact the Sheriff's Office, State Patrol, or local conservation officers. They should provide the name of the person to be interviewed, location of the interview, and expected length of time they will be at the location. The officer should notify the same office when they have finished the interview and left the area.

During the interview:

- Officers should immediately identify themselves, stating where they are from, and why they are there. The landowner, tenant or contractor must know who is addressing them.

- Verify the identity of the individual being interviewed. Initially, this may be the landowner or tenant. Verify the individual's address with the name and date of birth, or the individual's vehicle license plate number; this information may be obtained from the Sheriff's Office before making a contact.

- Always be aware of the subject's description. Note the sex, race, approximate age, height, weight, eyes, hair, and any distinguishing features (beard, scars, etc.). This information is especially important if the subject refuses to identify himself.

- It is important to verify the operator or the individual that farms the land in question.

- Before discussing the violation, establish whether or not the subject is aware of the Service Easement for Waterfowl Management Rights on the land in question. This is necessary even if the current landowner is the original seller of the easement. If the subject is a second or subsequent owner, knowledge of the easement becomes very important. The extent of the landowner's knowledge will help to determine whether the case will be handled as a criminal or a civil matter if voluntary compliance is not accomplished.

- Try to establish who is responsible for the activity that is considered a violation. Who did the actual work? Was the wetland drained by a contractor? Who hayed the area prior to July 16? If possible, establish who ordered the work done and whether it was done by an employee or through contract.

- Identify all persons involved. An interview with each may be necessary.

- Do not take the entire easement file into the actual contact. Take only the information necessary to conduct the interview leaving the file itself in the vehicle. During the

interview, do not show the individual the contents of the easement file. Sometimes, it is advisable to show the subject some of the evidence photos, the contract, and field sketches. By doing this, the subject may be convinced that he is unlikely to win in court. Closely control how much of the file the subject is allowed to see. If the subject requests to see the entire file, explain that the file is not available at that time. An appointment may be made to have the file reviewed at a later time at the Wetland Management District office.

- If, at any point during the conversation, issues arise that may weaken or destroy the case, advise the subject that additional investigative work will be conducted and he will be re-contacted upon completion of the investigation. Take the time to make a solid case. Contact the Regional Easement Coordinator and/or a ZLEO before making any demands.

**2. Compliance Requirements:**

Based on all the evidence which has been collected from the aerial and ground inspections, officers should have a good idea what will be required for compliance in terms of restoration. In some cases, the landowner's explanation of events may change some of the pre-determined compliance requirements, but plan on going to the landowner contact with a reasonably firm and well thought out restoration plan, be it wetland-related or upland-related. In any event, officers must discuss compliance requirements with landowners and obtain their verbal commitment to complete the necessary restoration if possible. A follow-up certified letter will also be sent to the landowner as discussed below.

Some violations, such as early haying of a habitat easement, will not require compliance and restoration actions. Others, like protected grasslands that have been converted to crop, or wetland draining or filling, will require restoration to be performed and a firm date set for the restoration. At some point during the interview, the officer should:

- Establish a date for which all restoration work must be completed.
- Ask for the landowner's acknowledgment that they understand and will comply with the requirements.
- Ask if he has any questions about the restoration requirements, or what will be needed to bring the easement back into compliance.

**Key points to remember about establishing compliance requirements:**

- Explain in detail what is expected of the subject in the way of compliance requirements.
- If a ditch is to be filled, require 10 percent overfill to allow for settling.

- In cases of filling violations, all fill must be removed.

A visit to the site with the landowner or operator may be helpful and should be made, if possible. Sometimes, marking out the restoration requirements with stakes or flags is advisable to prevent misunderstandings. It is a good practice for Service personnel to be on-site during all but the very minor restorations, if possible. This is especially true in cases involving the removal of drainage tile. Since the violation is underground, it can be extremely difficult to confirm compliance without being present during the removal process. Being on-site during restoration helps ensure the work is completed in a satisfactory manner and minimizes the need for additional work in the future.

For an upland site violation requiring restoration (such as converting grass to cropland), the restoration will need to incorporate commonly accepted seeding practices:

- Depending upon when the violation is discovered, officers may have to wait until the following spring.
- The compliance requirement should specify seed mixtures and seeding rates.
- Use the seeding guidelines listed in the back of Exhibit XIII-2 of this manual. The quality of the restored grassland must be at least as good as it was before the violation took place.

**Establish A Compliance Deadline:**

- If fall contacts are made and conditions allow, a fall deadline should be made. Under these conditions, a 48-hour or short deadline is appropriate.
- If a spring deadline is necessary, require that the landowner complete the work as soon as conditions allow, but not later than a set date such as May 1 or May 15.
- Request that the landowner call when the work is completed.

**Compliance Deadline Extensions:**

- If it becomes necessary to extend the deadline, call or write the landowner as a reminder of the deadline.
- If extending a deadline by a phone contact with the landowner, make a note of the conversation for the easement file.
- Mitigating circumstances such as weather, high water levels, or illness should be taken into consideration.

- Seeding the crop or other work excuses are not extenuating circumstances. However, avoiding the destruction of already-planted crops would be considered as an extenuating circumstance in most cases.

- Plan to complete the needed restoration prior to spring seeding.

The following restoration guidelines, related to wetland violations, should be considered when setting deadlines for landowners or tenants:

1st deadline: Within 30 days after the first contact advising the owner or tenant of a violation.

2nd deadline: Two weeks after the first deadline.

3rd deadline: Two weeks after the second deadline.

These deadlines may be extended at the discretion of the Wetland Manager.

Explain to the landowner/tenant that non-compliance will result in the matter being referred to the U.S. Attorney's office or Regional Solicitor's office for possible legal action. Do not make threats that are unfounded, such as stating that the case <u>will</u> be processed through the criminal court system. The Assistant U. S. Attorney makes this decision, and an unfounded threat could ultimately jeopardize the case.

General Time Line Guidelines:

*Ground checks..........................................within 30 days after flights*
*Contacts..............................................within 30 days after ground check*
*Contact follow-up...........................................within 7 days after contact*
*Compliance check....................................1-3 days after compliance date*
*Contact for inadequate compliance...........1-3 days after compliance check*
*Letter for unsatisfactory compliance..........7 days after compliance date*
*Closure letter (satisfactory compliance)....within 14 days after compliance check*

**3. <u>Post-interview Procedures</u>:**

As soon as the officer has departed from the subject's location, pull off the road so that a thorough job of documenting all information obtained during the interview can be accomplished. Important information may be lost if trusted only to memory. Considerable time can pass between the interview and the time when the information may be needed in court. Therefore, the officer should immediately prepare written notes or a tape recording of all issues discussed during the interview. The importance of this cannot be overstated.

a. Complete the Easement Violation Interview Checklist (Exhibit XIII-3).

b. Prepare a memo to the file.

- Use the format as shown in Exhibit XIII-4.

- Include the name, address, and a complete description of the subject.

- Include a reference to the tract of land (legal description and easement number) covered by easement.

- Include comments on the attitude and cooperativeness of the subject, but do not use derogatory statements. Remember that in court cases, the defendant will have access to everything in the easement file, not just in the case file. Do not write anything that you would not like to have seen by the subject's attorney.

- Above all else, record direct quotes that the subject made, either voluntarily or in response to specific questions. Do not be afraid to record profanity in direct quotes that the individual may have made during the interview. The individual's choice of words reflects that person's attitude.

c. Send certified letter (Exhibit XIII-5).

- In the letter, reiterate what was told to the individual about compliance requirements and restate the deadline date.

- Attach a map, showing where compliance is needed and how much (Exhibit XIII-6).

- If tenants or renters are the primary contact for the violation, it may also be helpful to copies of all correspondence to the landowner. This includes the certified letter, restoration map, and all other correspondence mentioned in this section.

- This letter must be sent certified with return receipt requested. The receipt is the only evidence that will show later in court that the individual received the letter. Some people will not accept a certified letter. If a letter is refused, the post office will return it. They will include documentation with the letter that was refused. Save the letter and documentation for possible use in court. Follow up a refused certified letter with either a personal hand-delivered letter by an officer or a letter in a plain envelope. This letter should contain a valid return address. Make copies of this letter and the envelope addressed to the individual. Document how this plain letter was sent by recording who mailed it, the date and time it was mailed, and from where it was mailed. Have the post office date stamp the envelope by hand and, if possible, make a copy of the envelope containing the date stamp. If this letter does not come back to the return address, your documentation and photocopies will provide evidence that the landowner received the letter.

- Inform the individual that if compliance is not obtained, the case will be referred to the U.S. Attorney for possible prosecution. In the initial letter, it may not be necessary to mention prosecution in order to keep a positive tone to the communication. In any follow-up letters, it should be mentioned if restoration is not obtained.

**4. <u>Compliance Check</u>:**

Consider having a Federal Wildlife Officer be onsite when restoration work is performed.

- Explain to the landowner that the officer's presence during restoration helps to ensure that the work will be completed thoroughly without the need of having the landowner return should any work in the officer's absence not conform to restoration specifications.

- If the work is done without a Service representative present, at minimum, follow-up inspections must be completed *within 3 days* after the restoration deadline to ensure that the restoration is satisfactory.

In many cases, Service representatives will have been at the site during the compliance work. Ensure that a filled ditch has been packed and 10-percent overfill added, that all fill material has been removed from the basin, and there is no depression where the ditch was. *If the work is unsatisfactory, be prepared to require total restoration. This may be the hardest part of easement enforcement work.*

Compliance requirements for upland sites will not be as definitive as with wetland compliance work. If a seeding is required to bring a violation back into compliance, the determination of achievement of compliance may take a year or more to assure that a satisfactory stand has been re-established. Wetland district personnel may have to work with the landowner over an extended period of time and require additional interim steps (e.g. clipping weeds) before a satisfactory restoration has been completed. Make sure the compliance requirement(s) are clearly explained and understood by the landowner. The case will be considered "open" for the entire restoration period. The case can be closed only when satisfactory compliance has been achieved.

When the subject has complied, send a letter (Exhibit XIII-7) notifying the individual that the Service is satisfied with the compliance and that the U.S. Government will close the case. Thank the subject for his compliance, but also remind him that future violations may be referred to the U.S. Attorney's office for possible legal action. Letters sent as a result of satisfactory compliance do not need to be sent certified, but managers may do so if they wish. Officers should also photo-document that compliance has been satisfactorily completed. These photos prove invaluable later if/when the same violation occurs.

If the individual does not comply with any of the deadlines given, notify the individual by <u>certified</u> letter of their failure to comply (Exhibit XIII-8). At some point, when it is

obvious that compliance will not be gained, officers should contact the Regional Easement Coordinator or Zone Law Enforcement Officer for possible referral to the U.S. Attorney's office.

**5. Assume Every Case Will Go to Court:**

Compliance is the ultimate goal of the Service's easement enforcement program. The Service realizes that through enforcement of its easement program, conflicts will arise between landowners and the Service. If the conflicts cannot be solved through contacts with the landowners, the final method of dispute resolution is through the court system. The Service must, at all times, maintain its professionalism when speaking to landowners and in documenting contacts and violations. Easement files must be maintained with the realization that all of the contents could one day be used for trial purposes. With the understanding that each easement violation has the potential to be settled in court, the Service must be pro-actively prepared to present its Case-in-Chief to the U.S. Attorney's Office and ultimately, the courts.

## C. Easement Officer Training

All Federal Wildlife Officers whose main duties involve protecting easements must be given the opportunity to acquire the required skills and training necessary to be successful in easement enforcement work. At a minimum, Federal Wildlife Officers should receive instruction in easement enforcement issues, and work with an officer experienced in easement work. Further information regarding recommended training for officers working with easements is provided in Exhibit XIII-9.

# Chapter XIV: Prosecution

## A. General Discussion:

Before any action toward prosecution may begin, the Service must recognize the difference between violations and violations that have prosecutorial appeal. Hard decisions must be made based on reality, not ideals. The Service must assess investigations and potential violations from a neutral perspective. The Service must be able to prove that the action "destroyed or injured real property of the United States." The Service must be able to show biological damage, and not just physical damage.

The Service's role in easement enforcement is in the investigation, documentation, and presentation of the violation to the U.S. Attorney's Office, Exhibit XIV-1 is a 1981 letter which established the protocol for the Service to work directly with Department of Justice (DOJ) on easement cases. The U.S. Attorney's Office makes the decision on whether to prosecute, and whom to prosecute for a violation of federal law. The decision as to whether or not to proceed with a civil case referred to DOJ by the Solicitor ultimately belongs to the DOJ. Once DOJ accepts the case, the Service is then responsible for preparation of the case for trial. It is important to work closely with the easement coordinator on any case that may be referred to the U.S. Attorney's Office.

Exhibit XIV-2 contains a historical collection and overview of relevant court decisions involving the Service's easement programs.

Note that the term easement coordinator is referred to in this chapter and elsewhere in this manual but when applicable, it denotes the regional easement lead which could be a Refuge Law Enforcement Zone Officer or a Regional Easement Coordinator.

Also note that the term "landowner" is referred to in this chapter and elsewhere in this manual but when applicable, it denotes tenant, too.

## B. Determining Prosecutable Violations and Issuing Violation Notices:

The goal of the Service's easement enforcement program is to gain compliance through wetland and/or grassland restoration. There will be instances, however, when the issuance of a Violation Notice (VN) may be appropriate for addressing repeat violations of an easement or when the specific circumstances surrounding a violation warrant such action; e.g., a violation is committed with full knowledge and disregard of the easement provisions and protected areas. Before issuing a VN for an easement violation, the officer must complete a comprehensive file review and should work with the easement coordinator for consistency and the possible need to coordinate the US Attorney's Office. The credibility and effectiveness of the easement program requires uniform and consistent procedures for dealing with easement violations. By following a consistent set of procedures, officers can effectively use VNs as a deterrent to future violations while ensuring the continued viability and sustainability of the easement program. The following provides general guidelines for the issuance of VNs by violation type:

## 1. Drainage Violations

Drainage is the most common violation of wetland and FmHA easements. Violation notices may be warranted when the following conditions exist and are properly documented.

- The landowner had knowledge of the easement and subsequently drained or caused to be drained, one or more of the easement-protected wetlands. Prior knowledge must be properly documented in the easement file. Examples of what may be considered prior knowledge include, but are not limited to, an easement map having already been mailed to the landowner, previous easement violations on the same easement tract by the same landowner, or documented phone or personal conversations regarding the easement in question.

- First-time offender of a particularly egregious violation.

- Repeat violations of any type, including plow furrow violations.

***A Violation Notice should not be issued until restoration work has been completed.***

## 2. Burn Violations

A VN may be issued based upon case history and easement file documentation. Violation notices and warning letters related to burn violations must be sent via certified mail. Letters issued merely as a warning will not require mapping of pre-76 easements; however, if an officer intends to issue a VN for a burn violation, then all investigative protocols must be followed including mapping of pre-76 easements. In cases of roadside burning or insignificant burning without clear intent or culpability, notification is not necessary. Burn violations require the same in-depth documentation as is required for drain, fill, and level violations. Knowledge of the easement by the landowner is essential and documentation of the repeat violation is necessary.

## 3. Fill and Level Violations

Serious fill or level violations that cause significant harm by impairing wetland functions may warrant the issuance of a VN. One small rock pile in a five-acre wetland would not constitute significant harm. While diligent effort should be made to have this type of violation corrected, officers should be judicious in the issuance of VNs in this situation. Regular consultation with the easement coordinator will help to achieve consistency from one WMD to the next and from officer to officer.

In cases of minor amounts of fill in a protected wetland where restoration is not sought, officers or managers should still photograph the site so that any accumulation or increase of fill over time can be documented and measured. Adding to an existing rock pile is an example where good documentation will be needed should future enforcement become necessary. At a minimum, the Service should follow through on this type of violation just like any other; i.e., contact the landowner, provide them with the easement contract and map(s), explain the easement provisions and inform the landowner that future violations may result in additional enforcement action.

## 4. Sheet water

Sheet water, as defined by this manual, is a non-depressional area covered by shallow water that is generally moving off the land. A VN may be issued if a depressional wetland area protected under the provisions of the easement is drained by a landowner provided the proper documentation has been collected. However, drainage of sheet water under this definition is not considered an easement violation and action is not required.

Landowners should be encouraged to consult with the wetland manager prior to drainage of any sheet water to ensure that easement violations don't occur.

All pertinent information such as photographs and soil surveys should be reviewed and a ground inspection completed before a sheet water drainage determination is made. If a sheet water drainage determination is made, then work with the landowner to ensure that the impact will not adversely affect easement protected wetland basins. Pumping of sheet water is preferred to ditching or any other type of earth moving activity.

## 5. Pumping

Pumping is considered drainage and a violation of the wetland and FmHA easement contracts. Pumping can be a violation where issuance of a VN is warranted, provided the landowner had previous knowledge of the wetland or FmHA easement and the violation resulted in a significant impact to the wetland basin.

## 6. Enlargements and "Topping Off" of Wetlands

Enlargements of easement-protected wetland basins can be an issue in wet years or successive years of high annual precipitation. Enlarged wetlands may expand onto areas that have been previously farmed, hayed, or grazed thus causing the farmer, rancher, or tenant to want to reduce the size of a wetland to its "normal" size. All requests for this activity will be evaluated individually.

**Pre-76 Easements:** As a result of the 8th Circuit decision in the Johansen case, wetland easements purchased before 1976 are required to be mapped, and those wetland maps are limited by the acreage figure listed on the easement summary sheet which was developed at the time the easement was acquired (see Chapter XI).

Water levels within wetland basins naturally fluctuate. In some years, protected wetlands may be totally dry; in others, water levels may exceed the boundaries of wetlands as they are depicted on wetland maps. Pre-1976 wetland maps are intended to show which wetlands are protected and their *approximate* sizes, shapes and locations. A normal fluctuation in water levels is expected and a reasonable amount of expansion beyond what is depicted may still be protected by the easement. If a specific wetland in question is depicted on the easement map, then it is protected. If a landowner believes that the water level in a mapped wetland is abnormally high and wishes to drain some of that water away, then the wetland manager must evaluate the situation on a case-by-case basis to determine if the Service can reasonably assert jurisdiction. If

the water level is determined to be within normal fluctuation by the manager, then the Service has jurisdiction and the proposed activity must be evaluated using the flowchart in Chapter VI. If the manager determines that the water level is beyond the range of normal fluctuation and cannot be reasonably protected by the jurisdiction of the easement, then discussion with the landowner should focus on reaching an agreement as to the amount of water that can be removed before the easement interest is affected.

**Post-76 Easements:** These easements have an Exhibit A map which shows the approximate location, size, and shape of protected wetland basins. The easement contract for post-76 easements has wording which describes the fluctuation of water levels resulting from natural or man-made causes, and states that enlargements from normal or abnormal water levels is still covered. In other words, water levels that expand beyond the wetland boundaries depicted on Exhibit A's are still protected by the language in the easement itself. Requests for relief from expanded wetlands on post-76 easements must be evaluated using the flowchart in Chapter XII. The manager should discuss this issue with the easement coordinator for concurrence and consistency.

A difference may exist on certain FmHA easements with enlarged wetlands. Specifically, the "B" covenant which protects some wetlands and an associated grass buffer does not afford protection outside the buffer strip. If the "enlarged" wetland expands beyond the buffer strip, the Service would lack jurisdiction on that portion outside the buffer strip; therefore, the provisions of the easement would not apply to this expanded area. However, a landowner may not remove the "enlarged" portion of an expanded wetland as long as the expansion is within the buffer strip (presuming one is present) identified around the wetland basin on the Exhibit A map.

## 7. Co-owned Wetlands

Several factors must be considered before deciding whether or not to legally pursue the drainage of co-owned basins, and consultation with the easement coordinator is encouraged. Situations requiring special attention include:

- those where the majority of the co-owned wetland is protected by the easement.
- those where the protected side of the wetland is owned by the same landowner or family as the non-protected side.
- those where the easement landowner participated in or encouraged the drainage from the non-protected side of the co-owned wetland.

While not conclusive, the materials in Exhibit XIV-3 are helpful and provide more guidance on things to consider when dealing with co-owned wetland drainage.

## 8. Unauthorized Maintenance of non-DFM Ditches

During the negotiation process between the Service Realty Specialist and the landowner, the landowner had the opportunity to identify ditches on their property which they wanted to

maintain. The wetlands and their ditches were identified by the landowner and were drawn on a Drainage Facility Map (DFM). The DFM was ultimately incorporated into the easement contract. Any other ditch not identified by the landowner on the DFM cannot be maintained. The rationale, at that time, was if a non-DFM wetland had an existing drainage ditch, the ditch would fill in eventually and the full function and value of the wetland would be restored. Time has shown that this is generally not the case; and furthermore, easement landowners will occasionally clean out old ditches in an effort to maintain the drain and/or further drain a protected wetland basin.

The Service can only require restoration to the condition prior to the recent work constituting the violation. In other words, what just came out must go back in, but this is a very difficult and subjective decision. For guidance, consider these factors:

- Determine, if possible, from older photographs, the history and extent of the original drainage. The time the drain was constructed and its effectiveness is important. Review of the FSA annual photographs may be useful. Examine recent aerial photographs and the remaining wetland vegetation at the site to help establish the wetland's normal high water mark prior to the ditch cleanout.
- Attempt to ascertain the amount of fill removed. If possible document and measure spoil piles or look for a vegetative line disturbance which may help to establish the historical ditch depth.
- Negotiate with the landowner to have that which was removed replaced. The extent of restoration that will be requested will be based on the amount of background information collected on the old drain. Without specific information or obvious spoil piles remaining after restoration, the Service may have to live with the negotiated fill amount. Whatever the result, document to the extent possible the elevation of the drain for future reference. Survey work is mandatory to have a basis for future enforcement action.

**9. Farming/Breaking/Cultivation Violations:**

Farming, breaking, and cultivation violations may come in many forms and mean something different depending upon which easement program applies. The following is a brief overview of some issues to consider when viewing a potential violation:

**Habitat Easements (Region 3) -** All habitat easements convey to the Service the right to post the easement boundary. If encroachment by farming is a problem, then meet with the landowner to explain the ramifications and ensure that the posting of the easement area is complete and well understood by the landowner. Plowing of any protected habitat easement constitutes a serious violation and could result in a possible irreplaceable loss of habitat. Violations that occur when the landowner has previous knowledge of the easement will generally be a criminal violation; however, both civil and criminal penalties could be considered.

If the activity that results in a violation on the habitat easement cannot be proven beyond a reasonable doubt, only civil penalties are available. For civil prosecution, use value penalties and restoration. This should determine how much the resource was worth and how much it will

cost to restore. National Wildlife Refuge (NWR, refuge) or Wetland Management District (WMD) personnel should convene a panel of knowledgeable individuals to determine the value penalties based on hay or forage value and documented or surveyed wildlife losses (number of nests destroyed or ducklings lost).

Restitution or restoration of tame grass, established vegetation from the Conservation Reserve Program, or seeded natives should be done to pre-violation grass and plant species compositions. Restoration includes reseeding and a period of idleness to allow reestablishment. Restoration is not complete until establishment of the grassland is satisfactory. The Natural Resource Conservation Service, county agent, or others may be able to assist the Service in this evaluation process.

Cultivation or plowing of native prairie grasslands represents the loss of an irreplaceable habitat. If the violation was knowingly committed, the Service will consider it an aggravated violation and seek a court-developed penalty plus value (wildlife resources and habitat) and restoration to a prescribed condition. The prescribed restoration will be based on an evaluation of soils and the condition of the tract after alteration or cultivation and may include forb and shrub plantings as well as reseeding of native grasses.

**Wetland Easements** – Those who observe potential wetland easement violations should always ask themselves what the intent of the earth moving activity was. Landowners who are farming by normal or routine farming practices that incidentally reduce the water holding capacity of a wetland may not have violated the terms of the wetland easement. However, a landowner using a farming practice with the intent to drain a wetland would be doing so in violation of the easement. The observer must be able to determine what the intent of any drainage activity is. Obvious plow furrows which enter easement protected wetlands or plow furrows that are unusually deep, would be two examples of earth moving activity which would be deemed a violation. VNs may be warranted if the landowner had previous knowledge of the easement, and their intent was to drain protected easement wetlands.

**Grassland Easements (Region 6) –** Blatant violations of grassland easements may range from breaking of native prairie and cultivation of large tracts of tame grass to cultivation of the edges of the grassland easement tracts. There is a need to determine whether or not the landowner had knowledge of the easement and the reason why the activity was conducted. As with wetland easements, the goal is restore any damage that may have been done. It may be necessary to place posts at the boundaries to form a visual barrier for the landowner to see in the future. When this is done, the posts should be photographed and a map created with GPS coordinates indicating the locations of the posts. Landowners with knowledge of the easement who repeatedly violate the easement may be issued a VN after restoration has been completed.

**FmHA Easements -** These include a blend of wetland and grassland easement issues including drainage through farming practices in protected wetland areas and loss of upland habitats through the breaking or cultivation of prairie, pasture, or previously farmed land that is encumbered by the easement. FmHA easements are further complicated by having different provisions which apply to the easement based upon the time it was acquired and the state it was acquired in (See FmHA Easement discussion in Chapter III). Because of this, each FmHA

easement file should be thoroughly reviewed before any contact is made with the landowner. As with wetland and grassland easements, an attempt should be made to determine whether or not the landowner had knowledge of the easement and its provisions as well as determine why the activity was conducted. An attempt should also be made to have the landowner restore any damage that may have been done. It may be necessary to place posts at the boundaries to form a visual barrier for the landowner to see in the future. When this is done, the posts should be photographed and a map created with GPS coordinates indicating the locations of the posts. Landowners with knowledge of the easement who repeatedly violate an FmHA easement may be issued a VN after restoration has been completed.

Restoration of tame grass or natives should be done to pre-violation grass and plant species compositions. The restoration will include reseeding and a period of idleness to allow reestablishment. Restoration is not complete until establishment of the grassland is satisfactory. The Natural Resources Conservation Service, county agent or others may be able to assist the Service in this evaluation process.

Cultivation or plowing of native prairie grasslands represents the loss of an irreplaceable habitat. If the violation was knowingly committed, the Service will consider it an aggravated violation and seek a court-developed penalty plus value (wildlife resources and habitat) and restoration to a prescribed condition. The prescribed restoration will be based on an evaluation of soils, condition of the tract after alteration or cultivation and may include forb and shrub plantings as well as reseeding of native grasses.

### 10. Haying Violations

Haying violations may occur on habitat (Region 3), grassland (Region 6) and FmHA easements.

**Grassland Easements (Region 6) -** Landowners who have knowledge of the easement and who repeatedly cut hay on or before July 15 of each year without a permit may be subject to a VN. The officer must look at the severity and extent of the haying and figure out why the landowner hayed the easement. Factors that could minimize a first time violation could include haying or mowing to control noxious weeds or for the creation of a firebreak. The landowner should be educated about the easement restrictions and the extent of the damage should be documented. It may be necessary to place posts at the boundaries to form a visual barrier for the landowner to see in the future. When this is done, photograph the posts and draw a map with GPS coordinates indicating the locations of the posts.

**FmHA Easements -** Some FmHA easements prohibit the mowing or haying of upland areas; others do not. Again with FmHA easement issues, one must review the document thoroughly to determine if any of the rights held by the Service have been violated. With any potential violation, an attempt should be made to determine whether or not the landowner had knowledge of the easement and its provisions and as well as why the activity was conducted. It may be necessary to place carsonite posts at the boundaries to form a visual barrier for the landowner to see when haying around the easement protected areas. Photos and GPS coordinates of the posts should be collected.

**Habitat Easements (Region 3) -** All four documents restrict haying to some degree. Forms 1 and 2 restrict haying until after July 15 each year, and Forms 3 and 4 restrict haying in total. Haying or mowing prior to July 16 constitutes a serious violation of the habitat easement. Generally, the earlier grassland is hayed or mowed, the more extensive its loss of habitat and wildlife will be.

Both civil and criminal penalties could be considered if the landowner/operator had knowledge of the easement. If knowledge of the easement and the provisions cannot be proven, it is likely that only civil penalties are available. A civil penalty of 3% of the value of the hay per day prior to July 16 is recommended.

Refuge/District personnel should confer with the easement coordinator in regard to prosecuting repeat violators. It is recommended that repeat violations result in a 100% fine in the amount of the hay's value. A repeat violation may be considered as an aggravated violation, subject to a greater criminal penalty (such as $500 plus hay value and restoration). The Service will use a court-developed bond schedule for criminal penalties and restitutions.

## 11. Seed Harvest

Seed harvesting is an issue to be aware of when dealing with habitat (Region 3), grassland (Region 6), and FmHA easements. Seed harvest may be allowed if the time and location within the easement are correct.

**Grassland Easements (Region 6) -** Seed harvest is treated the same as haying and mowing. Seed harvest may be completed without a permit, after July 15 of any calendar year. Any seed harvesting undertaken by a landowner on or before July 15 of a calendar year would be considered a violation, unless authorized in advance. Like haying and mowing, landowners who have knowledge of the easement and who gather seed on or before July 15 of each year, without prior approval, may be subject to receiving a VN.

The authorized harvesting of seed on a grassland easement prior to July 15 would be considered an economic use, and therefore, be subject to a higher standard of compatibility.

**FmHA Easements -** Generally speaking, FmHA easements treat seed gathering the same as haying or mowing. Seed gathering is prohibited in all of the easement areas, except for some of the protected wetlands and some of the discretionary easement areas. Like haying and mowing, any seed gathering completed outside of these two areas of the easement would be considered a violation of the easement contract.

**Habitat Easements (Region 3) -** In most situations, seed harvest prior to July 16 is a violation. Most seed harvest operations cut or remove the underlying forbs. The landowner may receive a notice of violation by the United States court system under the appropriate schedule.

## 12. Other Grassland Altering Practices

Grassland may be altered in any number of ways and by any number of methods. An attempt should be made to determine why an alteration has taken place and specifically apply what has happened to the terms of the specific easement contract. All of the Service easements have specific prohibited activities. Many of the early FmHA easements (deed restrictions) prohibit grazing unless authorized by the Service, which is the easement project leader. Unauthorized grazing of these areas is treated similarly to other violations of the easement agreements. Any activity not specifically prohibited by the contract is allowed. When a question arises regarding the legality of a specific action, consult with the easement coordinator and possibly other project leaders for consistency. See 13.D Responsibilities of the managers and the easement coordinator below for details.

**For habitat easements (Region 3) -** again, other activities may alter or destroy protected habitat easement habitat. Such alterations will be handled as deemed appropriate by the Service in consultation with the U.S. Attorney's Office and/or the Regional Solicitor's office. Possible activities that may be included here are intentional burning of protected upland habitats, chronic vehicle use (via trespassing), and grazing under some of the habitat easement documents (Forms 2 and 3).

## 13. Other Violations

Other violations encountered that do not fit logically into one of the previous categories are addressed here. Listed below are some of the more common violations along with general guidance on how to handle the situation.

**Coulee clean outs** - Maintenance or clean out of a natural waterway can be addressed in some situations by allowing clean out to the upstream edge of the wetland basin. A no-maintenance/no clean out buffer is then left untouched for 200-500 feet downstream of each wetland basin in the waterway. At the end of the last buffer, maintenance or clean out may continue. Landowners should be encouraged to leave the grass buffer strip in place without manipulation. The Service does not have a legal nexus to allow protection of the buffer strip. The landowner should be advised that compromise of the buffer strip could facilitate the wetland sill to blow out and it would be the landowner's responsibility to repair and maintain the wetland. Managers and officers who encounter these kinds of potential easement issues are encouraged to contact the easement coordinator for advice.

Wetlands within a coulee are protected by the wetland easement unless deleted on the DFM (pre-1976 easements); however, third party interests (e.g., viable legal drains) may have prior rights. In situations where a violation has already occurred, handle case documentation as with any other violation and if deemed appropriate, prepare a file review, and contact the appropriate easement coordinator.

**Plow furrows/dead furrows -** Furrows are used to drain wetlands while maintaining the appearance that normal farming practices are in place. If a wetland was intentionally drained using this technique the Service will ask for restoration to stop the drainage. If the landowner

and/or operator had knowledge the wetland was protected, and their intent was to drain with the use of this technique, a citation may be warranted after restoration.

**Culverts** - Culverts in existing township-, county-, or state-owned roads generally are located on a transportation easement or right-of-way that usually pre-dates the easement. In most cases, the local governing entity can do what is necessary within the road easement or right-of-way for transportation purposes and public safety. The Service may have little legal role in setting culvert elevations within road rights-of-way unless federal funds or permits are involved. A Service representative should recommend that the culverts be set to a level to improve the safety of the road and not to facilitate drainage of wetlands protected by the easement. Culverts set lower than necessary to facilitate wetland drainage may be a violation of the easement, but once again the Service must be able to prove the intent to drain a protected wetland. When dealing with these state and local entities, negotiation skills may be the best tool to protect or minimize adverse wetland basin impacts. Replacement of culverts that may impact protected wetlands should be placed at the same level as the old culvert inverts unless it is shown that there is a negative safety impact in doing so.

**Subsurface Tile Installation** - Drain tile that is installed to directly drain a protected wetland should be treated as any other violation (prepare a file review and contact the easement coordinator if appropriate). The "as-built" tile plan from the landowner or tile contractor should be obtained if possible. Many contractors will GPS the tile as it is installed. Make note of whether it is perforated or non-perforated tile and where any inlets or outlets are located. GPS the tile trenches if they are still visible and document with photos. Drain tile installation within the boundary of a wetland easement that does not directly intersect with a protected wetland can be a more difficult issue to address since the Service's jurisdiction is limited to the draining, burning, filling, and leveling of protected wetland basins. Of particular concern is the installation of tile that could potentially adversely affect a protected wetland basin by diverting water from its watershed. A VN may be warranted when the elements listed in the Drainage Violations subsection have been met and documented.

Tile installation is generally not allowed on a habitat (Region 3) or grassland (Region 6) easements unless the tile is necessary to restore wetlands.

See Chapter X for guidance on tiling on easements.

**Timber Harvest** - This mainly applies to FmHA Easements in Region 3. It should be determined who authorized the cutting of the timber and the person or company that is responsible should be located. Collect all documents and invoices associated with the timber harvest and determine the area that was affected. If possible, count the number of trees harvested and the size and diameter of the cut bases. This is important as restitution may be based on this information according to the forfeiture of collateral schedule

**Building Construction -** This can be a very sensitive issue that may involve anything from a grain bin to a permanent residence to a man camp. Due diligence is required in determining if the construction is a violation by verifying the easement boundary. Once it has been determined that a structure has been built or placed on the easement, contact the easement coordinator, who

should then be in contact with the appropriate Regional Office to apprise them of the situation. These situations cannot be taken lightly and should be dealt with as violations and appropriate action should be taken. In the past, exchanges or letter of authorizations may have been issued for these instances. Letter of authorizations should no longer be used. It may be necessary to use the exchange process or remove the structure to restore the Service's interest, but these violations must be treated as such and the landowner needs to be aware that this is a violation and future violations will not be tolerated. It is important to work closely with the easement coordinator when dealing with these situations.

## C. Easement File Review Preparation:

An easement file review must be prepared by the officer before any VN will be issued. The officer must conduct a thorough easement file review to identify any problems that may exist which may bar the issuance of the VN. The officer must be able to sort through large easement files and determine what information is germane to the current case. The Service will not, under any circumstance hide, destroy, or alter any evidence in the easement file, which is exculpatory in nature or that may bar the issuance of a VN. The officer should be mindful of the "De minimus" and "Laches" Doctrines when reviewing the file. These doctrines are defined later in this Chapter. Once the easement file review has been completed, the officer may contact the easement coordinator for assistance or expertise with reviewing the easement file. The officer must be prepared to point out the strengths and weaknesses of the case to the easement coordinator when discussing the file review.

Typically, easement file reviews are organized in a chronological format, paying particular attention to prior violations, prosecutions, and the violator's knowledge of the easement. The officer will prepare an individual summary by easement number and legal description for each easement violation. This will be relatively simple for a single violation, but can become significantly more complex in cases of extensive historical violations and/or multiple violations within the same easement. The following is a minimum of information that must be documented when conducting an easement file review.

- The officer will need to obtain and review copies of the specific Service Realty Easement files which, depending upon the location of the easement, will be located at the Service's local WMD office and the servicing Realty Office: Fergus Falls for Minnesota, Minot and Bismarck for North Dakota, Aberdeen and Huron for South Dakota, Benton Lake NWR for Montana. Additional realty records may be obtained in the Regional Realty offices
- In the case of Pre-76 wetland easements, the officer must review the wetland map(s) for consistency with the current mapping guidelines as outlined in Chapter XI. If the map(s) do not conform to current guidance, then revised map(s) must be completed.
- If questions arise concerning the map and any protected basins or other areas within the easement, the officer will ground-truth the map(s).

- The officer must have on-the-ground inspection information which illustrates the violation(s). Photographs and field notes will typically suffice to document the violation(s).
- The officer must identify the current landowner and possible tenants.

**D. Responsibilities of Managers and Easement Coordinators:**

When the file review has been completed by the officer, and the officer is convinced a violation has occurred, he or she must begin processing the incident as a violation of the easement contract. Keep in mind that easement coordinators are available to help officers with easement violation decisions if necessary. At a minimum, keep the easement coordinator informed of any cases that may require easement coordinator assistance.

Each violation is reviewed and evaluated on its own merit realizing that not all violations are the same. Managers and officers should work together to ensure easement violations are being tracked through the designated easement tracking system, which may vary by Region and station.

The easement coordinator can review the easement file documentation with the officer who prepared the file. Questions or requests for additional information will be handled directly between the easement coordinator and the officer. A file review may be completed at any time when an easement violation has occurred.

As previously stated, VNs will not be issued until the officer has conducted an easement file review, and has coordinated with the easement coordinator for consistency and the possible need to coordinate with the US Attorney's Office. **It is the responsibility of the easement coordinator to communicate with the United States Attorney's Office to ensure support if the defendant chooses to contest the VN**.

In each instance where a VN is issued, the facts must be documented, prepared, and readied for potential United States Attorney's Office review. **VNs will only be issued after satisfactory restoration of the easement has been accomplished and the officer has verified the restoration.**

The National Wildlife Refuge System Administration Act of 1966 (16 U.S.C. 668dd) contains only criminal penalties within the wording of the Statute. The National Wildlife Refuge System Administration Act as of October 28, 1998 established two penalties based upon the culpability of the violator.

The most stringent penalty, a Class A Misdemeanor, states in part, "Any person who **knowingly** violates or fails to comply with any of the provisions of this Act [16 U.S.C. ' ' 668aa et seq.] or any regulation issued thereunder shall be fined under title 18, United States Code, or imprisoned for not more than one year, or both." [See 16 U.S.C. 668dd(f)(1)].

The second and least stringent penalty, a Class B Misdemeanor, states in part, "Any person who otherwise violates or fails to comply with any of the provisions of this Act (including a

regulation issued under this Act) shall be fined under title 18, United States Code, or imprisoned not more than 180 days, or both." [See 16 U.S.C. 668dd(f)(2)].

Violations that occurred before 10/28/1998 are still considered Class "A" Misdemeanors and must be cited in the Offense Charged Box of the VN as 16 U.S.C. 668dd(c) and 16 U.S.C. 668dd(f)(1).

The following verbiage will be used in the Offense Description box of the VN for a Class "A" Misdemeanor:

"Subject did knowingly disturb or injure, real or personal property of the United States, to wit; drain or cause to be drained a wetland protected by Ramsey County Easement 199x-1, without being permitted to do so."

The following citation will be used in the Offense Charged Box of the VN for a Class "B" Misdemeanor: 16 U.S.C. 668dd(c) and 16 U.S.C. 668dd(f)(2). The last citation is imperative in order that the violation be charged under a Class "B" Misdemeanor. The last citation may only be used for a violation that occurred on or after 10/28/1998.

The following verbiage will be used in the Offense Description box of the VN for a Class "B" Misdemeanor:

"Subject did disturb or injure real or personal property of the United States, to wit; plow or cause to be plowed land protected by Burleigh County Easement 16G, without being permitted to do so."

The two major differences between these charges lie in the level of awareness by the violator ("knowingly" for a Class "A" and "strict liability" for a Class "B") and in the trial itself (option of a jury trial for Class "A" and only a bench trial for Class "B"). It is ultimately up to the U.S. Attorney's Office to decide on whether to charge a Class "A" misdemeanor or a Class "B" misdemeanor. To date, most easement violations that have resulted in VNs have been charged as Class "B" misdemeanors.

Once issued, VNs will be tracked through the Central Violations Bureau by the easement coordinator. In the event that a VN is contested, the easement coordinator, with the assistance of the officer, will be responsible for presentation of the case to the U.S. Attorney's Office and preparation for trial in Federal Court. Officers are also responsible for completing the LEMIS requirements found in Chapter XII.

Undoubtedly, there will be occasional incidents which are either uncommon, sensitive, or outside the "normal" run of easement issues. When these situations are encountered, managers should feel free to collaborate with other refuge and law enforcement interests before taking any action. The easement coordinator will also be available to assist with these "special-case" situations. This is obviously a judgment issue, and the station project leader will decide whether to consult or handle the easement issue alone.

## E. <u>General Case Brief Preparation:</u>

Having previously conducted an easement file review, the process to prepare the case brief should be easier, and there should be a minimum of questions arising at this time. The primary purpose of a case brief, like that of an easement file review, is to completely and adequately address a multitude of issues that may present hurdles for potential prosecution or identify problems which may preclude prosecution. The difference between a case brief and easement file review is that a case brief is the first formal process that is undertaken in the process of preparing for litigation. When the officer and easement coordinator believe a violation has prosecutorial appeal and the violation has been thoroughly researched and documented through the preparation of a case brief by the refuge officer, a formal Report of Investigation incorporating the case brief and its attachments will be prepared by the officer with the assistance of the easement coordinator.

The case brief should be treated as attorney-client privileged information and labeled as such. The brief, prepared by the officer, should chronologically document the current violation, and include any and all information germane to the investigation to include exculpatory information. The officer should remember briefs are just that, BRIEF, and should not include extraneous information, personal bias, or anything that is not necessary to understand the events surrounding the current violation and the history of the easement and landowner. The case brief can be prepared in several different ways and may include all or several of the following headings:

Synopsis
Narrative
Predication
Details of Investigation
Description of Subjects
Prior Violations
Witnesses with Testimony Summaries
Laws Violated
Evidence (list of all photographs and documents germane to the case)
Attachments - may include Reports of Investigation, select photographs, Chain of Title,
    Easement Map(s) marked with locations of violations.
Damage Report – completed by Biologist or other expert
Restoration Plan - a short detailed plan that explains exactly what the Service expects to restore the drained wetland basins. Specific information to include is the amount of fill (inches) to be removed from the wetland, length of ditch to be filled, amount of clay needed in the ditch bottom, amount of tile to be removed, etc. The restoration plan is very beneficial to the AUSA when dealing with a defense attorney during any plea agreement processes.

In addition to and included with the aforementioned outline, the Service must ensure the case brief includes good evidence and documentation. The Service has the burden of establishing sound, credible evidence in a criminal prosecution and/or civil action. The Service must be able to document the damage that has taken place with an easement violation. Documentation can be in the form of, but is not limited to, ground and aerial photographs, ground surveillance documentation, and timely interviews of the potential violator and his/her accomplices, his/her

neighbors and other state and federal agencies. Since the United States Attorney's Office, a judge, or jury does not have the ability to visit the easement site, it is the Service's responsibility to portray, through documentation, the easement violation in the courtroom.

The Service must be ready to gather original documents or certified original documents in a timely fashion upon notification from the United States Attorney's Office of acceptance of the case for prosecution. Examples of documentation include, but are not limited to, certified copies of the easement and deed showing current land ownership in criminal case. Civil cases will require the Service to produce certified copies of the easement and a Chain of Title from the filing of the easement, which documents the current landowner (proposed defendant) along with certified copies of the deeds. In civil cases, the Chain of Title should include all entries except utility and road rights-of-way easements.

The Service will be required to produce witness lists of the individuals who may be called upon to testify on behalf of the prosecution. Witnesses are generally broken down into two categories of witnesses:

- **Fact witnesses**- include all witnesses to be called by the Government except expert and rebuttal witnesses. Fact witnesses could include but are not limited to Federal Wildlife Officers, Service employees, neighbors, prior landowners/tenants, and contractors. When drafting the fact witness list, the officer and/or easement coordinator must include the fact witness's name, work address, phone #, and a brief statement of his or her expected testimony.

- **Expert witnesses**- include all witnesses who may be called by the government to provide expert testimony in a given field. The list prepared by the Service must include the expert witness' names, field of expertise - (i.e., Wetlands Biologist, Photo-interpreter, Soil Scientist, Hydrologist, etc.), and the expected testimony of the expert witness - (i.e. impact of drainage on a semi-permanent wetland, impact on waterbird production, soil type and wetland classification). Expert witnesses will be necessary when identifying wetland basins and a host of other topics in which the average Service employee is not trained and has not received the appropriate certification. The Service must be prepared to pay for the expert witnesses' travel and field review time before trial preparation begins. Many times, the Department of Justice will pay for these costs.

If deemed appropriate and necessary, Project Leaders may authorize potentially needed expert witnesses to accompany officers during the investigation phase. These experts must be escorted by two officers onto the easement property to assist with documentation and data collection such as wetland soils determination, etc.

## F. Wetland Easement Case Briefs:

In addition to the previous section dealing with general case briefs, wetland easement case briefs add additional elements that the courts have identified the Service needs to prove. Those additional elements should be covered in the wetland easement case brief and include the following:

**Proof That Wetland(s) Have Existed Over Time:** As a result of the Johansen decision, the courts now require the Service to prove the wetland(s) that have been negatively impacted through a prohibited activity, existed at the time the Service acquired the wetland easement. The Service must also demonstrate the wetland(s) have existed over the period of time the Service has retained the easement. To aid in this requirement, federal wildlife officers may document the existence of the wetlands through the interpretation of historical aerial photographs, both at or near the time the easement was acquired. One dark spot on an aerial photograph does not fulfill the Service's obligation in this matter, and an expert witness may need to be contracted to interpret aerial photographs. The Service has the obligation and responsibility to review as many aerial photographs as is reasonably necessary to develop an aerial photograph timeline for each wetland that has a violation.

Additional photographs may be accessible through other agencies' resources. Remember, just because a ditch has been documented on the easement doesn't mean an identifiable and defendable wetland exists and that the wetland has been drained. Officers should also consider obtaining documentation of the existence of hydric soils, aquatic plants, and hydrology (evidence of previously standing water) as confirmation that a wetland existed.

**Protected Wetland Statement:** As a result of the Johansen decision, the courts have established that on pre-1976 wetland easements, the Service is only entitled to the wetland acres purchased and documented on the easement acreage summary sheet. There have been instances where a Service Realty specialist acquired a wetland easement tract that had more wetland acres than the Service had originally paid for and documented on the easement acreage summary sheet. The officer must check to ensure that the Service has not protected more wetland acres than what was initially acquired. Unless previously mapped, a thorough wetland easement case brief must be completed before the federal wildlife officer determines what wetland(s) the Service meant to identify and protect.

In order to document the wetland easement case brief to the court's satisfaction, the Service must demonstrate that it had only laid claim to the wetland acres the Service purchased, and the Service must provide a protected wetland summary acreage statement in easement cases. This statement should be included in both referrals to the U.S. Attorney's Office and the Regional Solicitor's office. The written statement should be completed by the project leader or officer and should include that the wetland is part of the easement acreage summary sheet. Wetlands that receive protection include, but are not limited to:

- Wetlands that the Service has identified to the landowner as being protected. This includes historical wetlands that the Service has protected.
- Any co-owned wetlands that the Service has previously protected referencing other wetland easement owners and/or easement files.
- Any wetlands that have been previously involved in any criminal or civil litigation.
- Service-identified wetlands, as identified by the easement acreage summary sheet, which are not listed above, do not exceed the easement acreage summary sheet, and remain protected.

**Proof of damage:** As a result of the Johansen case it is the responsibility of the Service to prove that actual damage occurred to the easement, not just that the easement covenants had been violated. The U.S. Attorney's Office will ask for a damage report to be prepared before they file a case. The report can be prepared by having a Service Biologist or subject matter expert onsite documenting specific damages.

Again, federal wildlife officers should be familiar with easement mapping. See Chapter XI: Mapping Procedures for pre-76 Easements, which provides more information on mapping requirements.

**U.S. Attorney's Office Discovery Policy – Amended June 16, 2010**

Discovery of both inculpatory and exculpatory evidence to the defense has become an issue across the country and within the District of North Dakota. As a result, the Service has been directed by North Dakota's U.S. Attorney's Office to ensure that investigative reports, witnesses statements, photographs, etc. are compiled in a timely manner by the case agents and that they are shared with the assigned AUSA in a timely manner. Exhibit XIV-4 contains specific guidance and a form letter that must be completed and submitted for any case brought forward in North Dakota.

## G. Department of Justice Acceptance of Easement Case:

Using the case brief, the easement coordinator and the officer will determine whether the case warrants referral for criminal prosecution or a civil action. The easement coordinator and the officer will present the case to the U.S. Attorney's Office. If the case fails to meet the standards for criminal prosecution, the easement coordinator will transmit the case report to the Regional Solicitor's Office, through the Regional Director, for civil action.

Once a case is accepted by the United States Attorney's Office or the Regional Solicitor's Office, the Service must be prepared to devote 100% of its time to the case. The United States Attorney's Office may request additional materials be gathered and submitted, and the Service will need to respond with the requested information quickly. The Service, when engaged in trial preparation, will treat all requests from the United States Attorney's Office or Field Solicitor as top priority and will delay whatever activities were being completed before the request.

All inquiries about the ongoing case from defense attorneys, the media, or the general public **will be referred without comment** to the U.S. Attorney, or Field Solicitor, whichever is appropriate. Copies of all related correspondence concerning easement violations, including congressional inquiries and letters, will immediately be forwarded to the easement coordinator.

Once a civil case has been forwarded to the Solicitor, further communications concerning that case can be directed between the Solicitor, easement coordinator, and the U.S. Attorney's Office. It is the responsibility of the easement coordinator to track the case through the judicial system, and inquiries concerning the status of the case will be directed to the easement coordinator. **Unless other arrangements are made and agreed upon, communications with the U.S. Attorney's Office or Solicitor will be through the easement coordinator.** The easement

coordinator will keep the respective NWR/WMD and officers involved and abreast of the investigation's development.

When a case is closed, and restoration of the protected habitats has been completed, the Wetland Management District will send the violator a notification that the case has been closed. See Exhibit XIII-7 for an example of this communication. All original documentation gathered throughout the investigation will ultimately remain in the specific easement file stored at the respective NWR/WMD.

**H. Other Legal Aspects:**

***De minimus* doctrine**- The law does not care for or take notice of very small or trivial matters, the law does not concern itself about trifles. (Black's Law Dictionary)

***Laches* doctrine**- defined as neglect to assert right or claim which, taken together with lapse of time and other circumstances causing prejudice to adverse party, operates as bar in court of equity (civil litigation). A failure to do something which should be done or to claim or enforce a right at a proper time. (Black's Law Dictionary)

**Easement Authority-**

**Wetland and Grassland Easements** - The authority for the Secretary of the Interior (i.e., U.S. Fish and Wildlife Service), to acquire Easements for Waterfowl Management Rights is granted under the Hunting Stamp Tax Act, 16 U.S.C. 718d(c), the Fish and Wildlife Act of 1956, (16 U.S.C. 742a-742j), the Emergency Wetlands Resources Act of 1986, (16 U.S.C. 3901), the Land and Water Conservation Fund Act [16 U.S.C. 4601-9(a)(1)], and the North American Wetlands Conservation Act (16 U.S.C. 4401 - 4412).

**FmHA Easement -** The authority for the Secretary of the Agriculture (i.e., Farm Service Agency), to acquire Conservation Easements is granted under the Consolidated Farm and Rural Act of 1981 and 1985 (7 U.S.C. 331 and 335), Executive Orders 11990 and 11988, and Section 1314 of the 1985 Food Security Act. The Food Security Act of 1985, Section 1314 and 1318 stipulates the role of the Service to assist the FmHA in the enforcement of the Conservation Easement. This role is further defined in a Memorandum of Understanding between the FmHA and the Service, signed in 1987, which addresses interagency coordination. The Service is authorized to enforce Conservation Easements through the National Wildlife Refuge System Administrative Act (16 U.S.C. 668dd et. seq.).

**Applicable Easement Enforcement Authorities**

The National Wildlife Refuge System Administration Act, specifically, 16 U.S.C. 668dd and the accompanying regulations found in 50 CFR Part 25, 26, and 27, are not binding to the general operation of the land identified by the easement contract and the landowner's actions. As an example, the right of the landowner to allow or prohibit such activities as trapping, snowmobiling, and hunting is not encumbered so long as these activities do not result in one of the prohibited activities specifically listed within the easement contract attached to the land. A

1986 revision of 50 CFR, Subchapter C, clarified the Service authority on easements. For additional information regarding this change, review **50 CFR 25.11, 25.12, and 25.44.**

**Burden of Proof (Criminal)**

In order to proceed against the violator in a criminal case, the Government must be able to prove that the person violated the provisions of the easement contract and in all cases, the Government should strive to prove that the violator had knowledge of the easement's existence. **"Knowingly"** means that the person had knowledge of the facts involved. Otherwise stated, the violator knew that the area was protected by an "easement" and, for wetland easements, this means that the same person had some influence on draining, filling, leveling, or burning the protected wetlands. A change in the law [16 USC 668dd (f2)] allows individuals to be charged "criminally" without having to satisfy the "knowingly" part, but refuge officers should still strive to meet this burden before proceeding criminally. If in doubt, consult with the easement coordinator.

The Government must prove its case to the Court **"beyond a reasonable doubt."** It is important during the investigation and documentation phases of these cases to establish who did the actual draining, filling, leveling, or burning and if the landowner(s) or other violator were aware of the easement provisions. If the Government proves its case, the U.S. Attorney will recommend to the judge that the violator restore the habitats in accordance with Service specifications. In addition, the judge may assess other penalties as he or she deems necessary under the Statute.

**Burden of Proof (Civil)**

In a civil action, the Government does not need to prove that the defendant "knowingly" violated, only that he or she actually caused the damage to the easement. Knowledge of the easement or its provisions is not a necessary element. The Service must be prepared to show the Court that measurable damage did occur (draining, filling, leveling, burning, etc.), that restoration is necessary, and that monetary damages for permanent loss of wetlands would not be adequate compensation. The degree of proof required in a civil case is a **"preponderance of the evidence."** This is a lesser standard of proof than required in criminal cases. However, the investigation and documentation of the violation must be done with the same quality and completeness as in criminal cases.

**Statute of Limitations (Civil and Criminal)**

Statute of limitations is an enactment in a common law legal system that sets forth the maximum time after an event that legal proceedings based on that event may be initiated. There is no statute of limitations barring a civil action where the United States is seeking only equitable relief, and it is a well-established rule of law that the United States is not subject to any statute of limitations in enforcing its rights unless Congress explicitly provides otherwise. Civil penalties are not specifically provided for in the Statute. However, a civil action requiring restoration of the affected wetlands or grasslands, and in some cases a settlement for damages, may be undertaken by the U.S. Solicitor's Office. Civil actions are handled in conjunction with the U.S. Attorney's Office.

With respect to criminal cases, in United States v. Lhotka, CR. 4-84-116, slip. op. (D. Minn. August 5, 1985), Judge Cudd found that the criminal prosecution of an easement violation was not barred by the five-year statute of limitations set forth at 18 U.S.C. 3282, because the violation was continuing in nature. However, the Service is obligated in any judicial process (criminal or civil) to have investigated an easement violation without unnecessary delay. Delay in investigating an easement violation or placing a known violation back into a file could result in a U.S. Attorney's Office declination or Laches Motion made by the defense.

# Exhibits


| | | |
|---|---|---|
| **CHAPTER II** | | **Acquisition of Easement Properties** |
| Exhibit II-1 | | Introduction to acquisition decision trees, priority maps, and worksheets |
| Exhibit II-2 | a. | Wetland Easement Acquisition Decision Tree |
| | b. | ND Wetland Easement Priority Zone |
| | c. | SD Wetland Easement Priority Zone |
| | d. | Wetland Easement Evaluation Form |
| | e. | Grassland Easement Acquisition Decision Tree |
| | f. | ND Grassland Easement Priority Zones |
| | g. | SD Grassland Easement Priority Zones |
| | h. | Grassland Easement Evaluation Form |
| | i. | MT Grassland Easement Priority Zones |
| | j. | MT Wetland Easement Priority Zones |
| Exhibit II-3 | a. | MN Focus Area Map |
| | b. | MN Thunderstorm Map |
| **CHAPTER III** | | **Easement Terms and Acquired Rights** |
| Exhibit III-1 | | Pre-64 wetland easement and map with connecting language to the map |
| Exhibit III-2 | | Pre-64 wetland easement and map without connecting language to the map |
| Exhibit III-3 | | Pre-76 wetland easement and drainage facility map (DFM) |
| Exhibit III-4 | | Post-76 wetland easement document and Exhibit A map |
| Exhibit III-5 | | Post-76 wetland easement with wetland restorations |
| Exhibit III-6 | | Exhibit A map used to document MSL elevations |
| Exhibit III-7a | | 1989 grassland easement document |
| Exhibit III-7b | | 1999 grassland easement document |
| Exhibit III-8a | | North Dakota FmHA guidance |
| Exhibit III-8b | | South Dakota FmHA guidance |
| Exhibit III-8c | | Region 3 FmHA guidance |
| Exhibit III-9 | | FmHA easement example with most restrictive and least restrictive provisions |
| Exhibit III-10 | | Combined wetland/grassland easement document |
| Exhibit III-11 | | Habitat Easement example |
| **CHAPTER IV** | | **Easement Administration** |
| Exhibit IV-1 | | ND roadway exchange banks & material source requests |
| Exhibit IV-2 | | Region 6 letter from Realty Chief on Sand & Gravel |

| | |
|---|---|
| **CHAPTER V** | **Refuge Compatibility** |
| Exhibit V-1 | Cultural resource review procedures for Region 6 |
| Exhibit V-2 | Intra-service Section 7 form |
| **Chapter VI** | **Requested Uses** |
| Exhibit VI-1 | Easement Use Evaluation Form |
| Exhibit VI-2 | Region 3 Refuge Management Activities Specific Guidance |
| Exhibit VI-3 | Region 6 Refuge Management Activities Specific Guidance |
| Exhibit VI-4 | Solicitor Opinion on Permitted Activities |
| Exhibit VI-5 | Region 6 Letter of Authorization memo |
| **CHAPTER VII** | **Exchanges** |
| Exhibit VII-1 | Replacement Habitat |
| Exhibit VII-2 | Exchange Checklist |
| **CHAPTER VIII** | **Right-of-Way Administration** |
| Exhibit VIII-1 | Signed Regional Director Letter 6-17-09 |
| Exhibit VIII-2 | Region 6 Guidance memo |
| Exhibit VIII-3 | Region 3 ROW Help Sheet |
| **CHAPTER IX** | **Wind Energy Development** |
| Exhibit IX-1 | NEPA Definitions |
| Exhibit IX-2 | Wind MOU Example |
| Exhibit IX-3 | Region 6 Cultural Resource Review Procedures |
| Exhibit IX-4 | Reversionary Clause Example |
| Exhibit IX-5 | Letter to Realty |
| Exhibit IX-6 | Consent to Easement |
| **CHAPTER XI** | **Mapping Procedures for Wetland Easements** |
| Exhibit XI-1 | Duebbert Map Examples |
| Exhibit XI-2 | Drainage Facility Map (DFM) |
| Exhibit XI-3 | Renegotiation Map |
| Exhibit XI-4 | Mapping Progress Form |
| Exhibit XI-5 | Mapping References |
| Exhibit XI-6 | Map Request Letter to Landowner |
| Exhibit XI-7 | Map Explanation Letter to Landowner |
| Exhibit XI-8 | Revised Map Letter to Landowner |

| | |
|---|---|
| **CHAPTER XII** | **Surveillance** |
| Exhibit XII-1 | Region 3 Aerial Inspection Guidance |
| Exhibit XII-2 | Region 6 Aerial Inspection Guidance |
| Exhibit XII-3 | Aviation Safety Training |
| Exhibit XII-4 | Easement Violation Documentation Form |
| **CHAPTER XIII** | **Compliance Contacts** |
| Exhibit XIII-1 | Body Camera memo |
| Exhibit XIII-2 | Seeding Guidelines |
| Exhibit XIII-3 | Easement Violation Interview Checklist |
| Exhibit XIII-4 | Memo to File Example |
| Exhibit XIII-5 | Restoration Letter Example |
| Exhibit XIII-6 | Violation Map Examples |
| Exhibit XIII-7 | Case Closure Letter |
| Exhibit XIII-8 | Certified Non-compliance Letter Example |
| Exhibit XIII-9 | Easement Officer Training |
| **CHAPTER XIV** | **Prosecution** |
| Exhibit XIV-1 | 1981 Solicitor Letter Regarding Coordination of Criminal Cases with the AUSA |
| Exhibit XIV-2 | Relevant Court Decisions |
| Exhibit XIV-3 | Solicitor Opinion from 1985 on co-owned wetlands |
| Exhibit XIV-4 | North Dakota Discovery Policy |

*This page intentionally left blank*

# INTRODUCTION

The Prairie Pothole Region (PPR) of the United States supports some of the highest breeding duck populations in the nation and is particularly important to upland nesting species such as mallard, northern pintail, gadwall, blue-winged teal, and northern shoveler. The PPR of the Dakotas comprises approximately 7% of the principal breeding area for ducks in North America, yet supported >20% of all breeding ducks in the traditional survey area during 1996-2005. In addition to the importance of the PPR to duck populations, the region also provides critical breeding and migration habitat for many species of shorebirds, waterbirds, and grassland birds.

The Small Wetlands Acquisition Program (SWAP) was created to perpetuate migratory bird populations, particularly waterfowl, by acquiring and maintaining critical breeding habitat in the PPR. Waterfowl Production Areas, comprised of fee-title lands and grassland and wetland easements, are acquired to fulfill the goals of this program. During 2004, in order to guide the acquisition of grassland and wetland easements in the PPR of Region 6, the Dakota Working Group (DWG) developed and adopted a conservation strategy focusing on the 5 primary upland nesting duck species which provided for the consideration for other trust species benefits. This strategy applies an adaptive approach for integrating biological priorities with current socio-economic threats to habitat to target the acquisition of SWAP grassland and wetland easements in the PPR of Region 6. The goal of this strategy is to permanently protect adequate grassland and wetland habitat to support >90% of the breeding duck carrying capacity and productivity observed in the region between the years 1987-1998. These goals would equate to an average of approximately 3.6 million breeding duck pairs, and a recruitment rate of 0.6. This conservation strategy consists of two primary elements: 1) Protection of the capacity of the landscape to attract breeding ducks through the acquisition of wetland easements, and 2) Protection of the productivity by these breeding ducks through the acquisition of wetland and grassland easements. Models developed by the Bismarck HAPET office were used to identify the extent and location of grasslands and wetlands required to meet these goals. These models indicated that protection of all grasslands and wetlands within areas accessible to >25 pairs of ducks (i.e., areas that support > 25 duck pairs/square mile), plus a one mile buffer, would meet the conservation goal of protecting adequate habitat to support >90% of the duck productivity from the region. It is currently estimated that approximately 1.4 million additional high priority wetland acres and 10.4 - 16 million additional grassland acres are needed to meet the goal . This strategy is based on the knowledge that breeding duck distribution is determined primarily by the wetland community, while reproductive success is determined by the characteristics of surrounding wetlands and uplands and is positively related to the amount of perennial grass cover in the landscape. Due to the willingness of hens to travel some distance from core wetlands to nesting cover, grassland protection is most effective when applied to areas accessible to the greatest number of hens. HAPET models indicated that if all grasslands accessible to >25 duck pairs were protected, >90% of the breeding duck population would benefit. Due to the landscape influences of surrounding grassland on

duck nest success, a 1 mile buffer was added to the >25 duck pair zone. It is assumed that protection of grasslands accessible to >25 duck pairs, plus supporting grassland within 1 mile of these areas, will maintain adequate nesting habitat, while protection of wetlands within this same area will maintain adequate breeding pair and brood habitat for >90% of the duck population.

## GRASSLAND EASEMENT PRIORITIZATION

**Decision tree**
Acknowledging that in addition to ducks, many other trust species benefit from grassland protection, and that risk of grassland loss is high throughout the PPR, a decision tree was adopted for integrating multiple trust species benefits and risk factors into the grassland easement prioritization process. The decision tree identifies hierarchical priorities that incorporates risk of loss and allows for consideration of benefits to other priority trust species while preventing lower priorities from inappropriately influencing higher-level priorities. The attached decision tree is intended to describe the structure of the decision-making process, while the associated maps depict the spatial distribution of conservation opportunities resulting from application of spatial models driven by the decision making process.

Ducks
Grasslands accessible to the greatest number of breeding duck pairs will be the primary determinant for prioritizing grassland easements. Although the long term goal for grassland protection includes all grasslands accessible to >25 duck pairs, plus a 1 mile buffer, shorter-term objectives were developed. These objectives were set to prioritize grasslands accessible to the greatest number of breeding ducks. Grasslands were divided into the three categories: 1) accessible to >60 duck pairs 2) accessible to 40-60 duck pairs 3) accessible to 25-40 duck pairs.

Threats/Risk
Due to the pervasive and dynamic nature of grassland loss resulting from changes in landowner demographics; farm implement size, efficiency, and capability; crop genetics, and types; and markets for agricultural commodities, threats to grasslands are extremely high throughout the Prairie Pothole Region. In addition to these risk factors, waterfowl distribution varies spatially and temporally due to variations in precipitation. Because of the high degree and broad distribution of risks, and the spatial and temporal variation in habitat conditions in the PPR, it is believed the best strategy for grassland protection is to apply the above prioritization within each WMD, thereby focusing protection on the best areas within each WMD rather than focusing efforts on any particular WMD. In order to allow a reasonable level of flexibility to accommodate local opportunities and needs, maximize acquisition of the highest priority grasslands, and remain consistent with biological priorities, short-term objectives for new grassland easement acquisitions were adopted. Three priority levels were selected based on the risk of grassland conversion and the accessibility of grasslands to nesting ducks. Within these priority levels annual

targets were set to ensure that new grassland easements were accessible to the greatest number of duck pairs.

Priority 1: ≥80% of new acres will be acquired in areas accessible to >60 duck pairs per square mile.
Priority 2: ≤20% of new acres will be acquired in areas accessible to 40-60 duck pairs per square mile.
Priority 3: ≤5% of new acres will be acquired in areas accessible to 25-40 duck pairs per square mile.

Endangered Species and other Migratory Birds
It was decided that secondary priorities will focus on listed species (endangered or threatened) for which grassland easements would benefit recovery efforts (noted as A or B in the decision tree). Migratory birds (excluding the 5 primary upland nesting duck species) for which grassland easements would be appropriate conservation actions were identified as the third highest priority (noted as C or D in the decision tree). Managers will determine when and which species to incorporate into the prioritization process for their respective areas of responsibility, and the HAPET Office will provide assistance with model development and integration of these additional species. Pending incorporation of endangered species and/or other migratory bird priorities, grassland easement prioritization will occur based solely on current duck prioritization criteria. Inclusion of endangered species and other migratory birds is intended to further refine selections within, but not between, Priority 1-3 grassland tracts (e.g. Priority 2 or 3 tracts with endangered species or other migratory bird benefits do not rise to a higher priority than Priority 1 tracts without these additional species benefits).

Note:
Priority areas will be identified by HAPET models and updated periodically as new information becomes available. It is understood that shorter term objectives will also be updated periodically to reflect changes in opportunities and risks. Opportunities for new protection will decrease through time as more of the remaining habitat is either protected or converted to cropland.

## ADDITIONAL GRASSLAND PRIORITIZATION CRITERIA

After using the decision tree to identify the biological priority zone for a tract, the following criteria should be applied prior to final acceptance of a tract for easement purchase. These criteria are designed to provide additional guidance on current policies, and logistical and economic considerations relevant to grassland easement acquisition.

**Highest Habitat Value per Dollar Spent:** For tracts within the same biological priority zone, preference will be given to parcels where the Service can acquire the best habitat at the lowest financial and administrative cost. The GAO Report of September 2007, page 31 stated that "analysis indicate that an important opportunity for gains in efficiency would be for the Service to target the lowest cost easements in the high priority zone." In

addition to biological prioritization, the following guidance is provided to further aid in attaining our acquisition goals as quickly and efficiently as possible:

1. When funds are limiting, emphasis will be placed on acquiring tracts that are the lowest cost per acre.
2. When personnel needed to complete the required evaluations, site visits, document preparation, etc. are limiting, emphasis will be placed on acquiring larger tracts.

**Vegetation Type:** For tracts within the same biological priority zone, preference will be given to unbroken prairie. In order to meet the conservation strategy goals, protection of all grassland habitat within priority areas is necessary. Tame grass is not precluded from acquisition, however preference will be given to unbroken prairie for the following reasons:

1. The biological diversity and ecological functions associated with native prairie habitats are of value to numerous trust species. Although some of the diversity and functionality can be restored, it is unlikely that the full functionality of native prairie ecosystems can ever be fully restored once lost.
2. Planted grass requires greater long term management input by landowners and therefore increased support and enforcement efforts by the Service
3. Conservation of unbroken prairie is politically more acceptable to state and local governments, and therefore receives greater support than conservation of planted grass. Conservation of unbroken prairie is viewed by many as being supportive of the ranching industry, while conservation of planted grass is often viewed as conflicting with the farming industry. It is believed that sensitivity to these views will enable the Service to more effectively acquire grassland easements.

**Other Funding Sources:** If individual WMDs have secured partners and additional funding, **and** the proposed acquisitions lie in one of our biological priority areas, there may be considerations given to meet the terms of the partner's contribution (e.g. if a tract would be excluded based on "lower habitat value per dollar" criteria, but partners are willing to contribute adequate support to overcome the deficit, then the tract should be acquired).

1. Circumstances in a particular WMD may require the easement acquisition be completed using NAWCA grants, Ducks Unlimited contributions, Pheasants Forever monies or any other special funds that may become available. Acquisitions of this type need to be coordinated with the Realty Chief so they are aware of the special monies available.

## WETLAND EASEMENT PRIORITIZATION

**Decision tree**

Acknowledging that in addition to ducks, many other trust species benefit from wetland protection, and that risk of wetland drainage varies among wetlands, a decision tree was adopted for integrating multiple trust species benefits and risk factors into the wetland

easement prioritization process. The decision tree identifies hierarchical priorities that incorporate risk of drainage and allow for consideration of benefits to other priority trust species while preventing lower priorities from inappropriately influencing higher-level priorities. The attached decision tree is intended to describe the structure of the decision-making process, while the associated maps depict the spatial distribution of conservation opportunities resulting from application of spatial models driven by the decision making process.

Ducks

Protection of wetlands in areas accessible to >25 duck pairs, plus a 1 mile buffer, is the primary determinant for prioritizing wetland easements. In order for areas identified as high priority for acquisition of grassland easements (nesting habitat) to continue to be productive, the associated high priority wetlands, which attract and support breeding duck pairs to an area, also must be protected. Protection of these wetlands is necessary regardless of the habitat within which they occur. Although all associated wetlands contribute to attracting duck pairs, temporary wetlands, seasonal wetlands, and small (<1 ac.) semipermanent wetlands attract higher densities of ducks than more permanent and larger wetlands. Shorter-term objectives were set to prioritize wetlands supporting the highest densities of breeding pairs. These wetlands were divided into the following three categories: 1) temporary, seasonal, and ≤1 acre semipermanent wetlands 2) semipermanent wetlands >1-25 acres and 3) semipermanent wetlands >25 acres and lakes.

Threats/Risk

Because the risk of wetland drainage differs among wetlands, risk criteria were incorporated into the prioritization process. These risk criteria considered size and class of the wetland, and surrounding land use. Drainage history in the PPR, as well as numerous past efforts to modify/remove Swampbuster Provisions of the Farm Bill, demonstrate that the risk of wetland drainage is highest and more immediate for smaller, less permanent wetlands embedded in cropland. Current information suggests that about 70% of all breeding waterfowl pairs in the Prairie Pothole Region occur on wetlands in crop fields. In order to allow a reasonable level of flexibility to accommodate local opportunities and needs, maximize acquisition of the highest priority wetlands, and remain consistent with biological priorities, short term objectives for new wetland easement acquisitions were adopted. These short term objectives apply 5 priority levels to wetlands within priority waterfowl areas, based on the risk of wetlands being drained and the capacity of wetlands to attract duck pairs.

Wetlands embedded in cropland:
Priority 1: Temporary wetlands, seasonal wetlands, or ≤1 acre semipermanent.
Priority 2: Semipermanent or lake wetlands ≤25 acres.

Wetlands embedded in grassland:
Priority 3: Temporary wetlands, seasonal wetlands, or <1 acre semipermanent.
Priority 4: Semipermanent or lake wetlands ≤25 acres.

Wetlands embedded in cropland or grassland
Priority 5: >25 acre wetlands.

The above priority levels are applied to potential easement tracts based on the highest priority (1-5) wetland associated with a tract. Wetland easement offers being considered should be prioritized to acquire the highest priority tracts available for priorities 1-4. Although acquisition of some Priority 5 wetlands may be necessary in order to acquire higher priority wetlands, this should be minimized when possible. Priority 5 wetlands are generally at low risk of drainage due to their large size and water permanency.

Endangered Species and other Migratory Birds
It was decided that secondary priorities will focus on listed species (endangered or threatened) for which wetland easements would benefit recovery efforts (noted as A or B in the decision tree). Migratory birds (excluding the 5 primary upland nesting duck species) for which wetland easements would be appropriate conservation actions were identified as the third highest priority (noted as C or D in the decision tree). Managers will determine when and which species to incorporate into the prioritization process for their respective areas of responsibility, and the HAPET Office will provide assistance with model development and integration of these additional species. Pending incorporation of endangered species and/or other migratory bird priorities, wetland easement prioritization will occur based solely on current duck prioritization criterion. Inclusion of endangered species and other migratory birds is intended to further refine selections within, but not between, Priority 1-5 wetland tracts (e.g. Priority 2-5 tracts with endangered species or other migratory bird benefits do not rise to a higher priority than Priority 1 tracts without these additional species benefits).

Note:
Priority areas will be identified by HAPET models and updated periodically as new information becomes available. It is understood that shorter term objectives will also be updated periodically to reflect changes in opportunities and risks. Opportunities for new protection will decrease through time as more of the remaining habitat is either protected or converted to cropland.

## ADDITIONAL WETLAND PRIORITIZATION CRITERIA

After using the decision tree to identify the priority zone for a tract, the below criteria should be applied prior to final acceptance of a tract for easement purchase. These criteria are designed to provide additional guidance on current policies, and logistical and economic considerations relevant to wetland easement acquisition.

**Highest Habitat Value per Dollar Spent:** For tracts within the same biological priority zone, preference will be given to parcels where the Service can acquire the best habitat at the lowest financial and administrative cost. The GAO Report of September 2007, page 31 stated that "analysis indicate that an important opportunity for gains in efficiency would be for the Service to target the lowest cost easements in the high priority zone." In

addition to biological prioritization, the following guidance is provided to further aid in attaining our acquisition goals as quickly and efficiently as possible:

1. When funds are limiting, emphasis will be placed on acquiring tracts that are the lowest cost per acre.
2. When personnel needed to complete the required evaluations, site visits, document preparation, etc. are limiting, emphasis will be placed on acquiring larger tracts.

**Other Funding Sources:** If individual WMDs have secured partners and additional funding, and the proposed acquisitions lie in one of our biological priority areas, there may be considerations given to meet the terms of the partner's contribution (e.g. if a tract would be excluded based on "highest habitat value per dollar" criteria, but partners are willing to contribute adequate support to overcome the deficit, then the tract should be acquired).

1. Circumstances in a particular WMD may require the easement acquisition be completed using NAWCA grants, Ducks Unlimited contributions, Pheasants Forever monies or any other special funds that may become available. Acquisitions of this type need to be coordinated with the Realty Chief so they are aware of the special monies available.

**Funding Restrictions:** In North Dakota, the Service's ability to acquire wetland easements is limited by an agreement with the Governor of ND. This agreement places a county-level cap on the number of wetland acres that can be acquired under easement using MBCF funds. As a result, MBCF funds should be used only for the highest risk wetlands (priority 1 and 2) in ND, and that other funding sources should be used for acquisition of lower risk wetlands (priority 3 and 4).

*This page intentionally left blank*

## Field Evaluation For Wetland Easement Offers

Exhibit II-2a




AR001003

*This page intentionally left blank*

Exhibit II-2b

## U.S. Fish & Wildlife Service

# Priority Zones for USFWS Wetland Easement Acquisition
## North Dakota Portion of the Prairie Pothole Region




**Legend**

- Wetland Management District Boundary
- County Boundary
- Wetland Priority Zone

Waterfowl pair density information was generated using GIS modeling techniques utilizing USFWS National Wetland Inventory digital data, the USFWS-Region 6 Four Square Mile Breeding Waterfowl Survey results, and regression equations predicting duck pair/wetland relationships developed by the USFWS Habitat and Population Evaluation Team and USGS Northern Prairie Wildlife Research Center. The information presented represents the priority zone for USFWS Wetland Easements and all small, shallow wetlands that are currently not protected within the zone are considered priority. The zone is based on the accessibility of 37.58 acre landscape units to the combined predicted breeding pairs for mallard, blue-winged teal, gadwall, pintail, and shoveler.

For more information contact the HAPET Office, USFWS, Bismarck, North Dakota.

Current to 2012.

**Map Location**

North Dakota Wetland Management Districts

*This page intentionally left blank*

Exhibit II-2c

U.S. Fish & Wildlife Service

# Priority Zones for USFWS Wetland Easement Acquisition

## South Dakota Portion of the Prairie Pothole Region




Waterfowl pair density information was generated using GIS modeling techniques utilizing USFWS National Wetland Inventory digital data, the USFWS-Region 6 Four Square Mile Breeding Waterfowl Survey results, and regression equations predicting duck pair/wetland relationships developed by the USFWS Habitat and Population Evaluation Team and USGS Northern Prairie Wildlife Research Center. The information presented represents the priority zone for USFWS Wetland Easements and all small, shallow wetlands that are currently not protected within the zone are considered priority. The zone is based on the accessibility of 37.58 acre landscape units to the combined predicted breeding pairs for mallard, blue-winged teal, gadwall, pintail, and shoveler.

For more information contact the HAPET Office, USFWS, Bismarck, North Dakota.

Current to 2012.

Map Location




South Dakota Wetland Management Districts

*This page intentionally left blank*

Exhibit II-2d

# Wetland Easement Acquisition Evaluation Form

**Acquisition #** ______________ **Acquisition Biologist** ______________ **Date** ______________

**Landowner** ______________ **County** ______________ **Total Acres** ______________

**Address** ______________ **Township** ______________ **Wetland Acres** ______________

**Range** ______________ **Restoration Needed** ______________

**Phone** ______________ **Section** ______________

**Cell Phone** ______________

**Email** ______________

**Comments**




**Endangered Species Priority List**

- ______ Piping Plover
- ______ Whooping Crane
- ______ Least Tern
- ______ W.P. Fringed Orchid
- ______

**Wetland Dependant Migratory Bird Priority List**

- ______ Willet
- ______ Marbled Godwit
- ______ Wilsons Phalarope
- ______ Black Tern
- ______ Sora
- ______ American Bittern
- ______ Northern Harrier

Recommendation: ______ Approved ______ Not Approved

Acquisition Biologist: ______________ Project Leader: ______________

*This page intentionally left blank*

# Evaluation For Grassland Easement Offers

Exhibit II-2e




AR001011

*This page intentionally left blank*