U.S. Fish & Wildlife Service

Exhibit II-2f

# Priority Zones for USFWS Wetland Easement Acquisition

## North Dakota Portion of the Prairie Pothole Region




DUCK PAIRS

Waterfowl pair density information was generated using GIS modeling techniques utilizing USFWS National Wetland Inventory digital data, the USFWS-Region 6 Four Square Mile Breeding Waterfowl Survey results, and regression equations predicting duck pair/wetland relationships developed by the USFWS Habitat and Population Evaluation Team and USGS Northern Prairie Wildlife Research Center. The information presented represents the priority zones for USFWS Grassland Easements and colors match Evaluation For Grassland easement Offers form. Zones are based on the accessibility of 37.58 acre landscape units to the combined predicted breeding pairs for mallard, blue-winged teal, gadwall, pintail, and shoveler.

PRIORITY ZONES

Priority Zones were derived from the Thunderstorm Map. However, pair value polygons were buffered an additional 1 mile to prioiritize grassland in the landscape surrounding a target location to retain the value of the supporting grass to nest success.

Priority Zone 1 = areas with > 60 breeding duck pairs
Priority Zone 2 = areas with 40-60 breeding duck pairs
Priority Zone 3 = areas with 25-40 breeding duck pairs

For more information contact the HAPET Office, USFWS, Bismarck, North Dakota.

Produced by the Region 6 HAPET Office, Bismarck, ND
Current to: 2012
File: home31\projects\tstorm_12
d grass priority areas 2012 8x11.mxd

Map Location



North Dakota Wetland Management Districts

*This page intentionally left blank*

U.S. Fish & Wildlife Service

Exhibit II-2g

# Priority Zones for USFWS Grassland Easement Acquisition

## South Dakota Portion of the Prairie Pothole Region




**Legend**

Wetland Management District Boundary

County Boundary

**PriorityZone**

Priority Zone 1

Priority Zone 2

Priority Zone 3

DUCK PAIRS

Waterfowl pair density information was generated using GIS modeling techniques utilizing USFWS National Wetland Inventory digital data, the USFWS-Region 6 Four Square Mile Breeding Waterfowl Survey results, and regression equations predicting duck pair/wetland relationships developed by the USFWS Habitat and Population Evaluation Team and USGS Northern Prairie Wildlife Research Center. The information presented represents the priority zones for USFWS Grassland Easements and colors match Evaluation For Grassland easement Offers form. Zones are based on the accessibility of 37.58 acre landscape units to the combined predicted breeding pairs for mallard, blue-winged teal, gadwall, pintail, and shoveler.

PRIORITY ZONES

Priority Zones were derived from the Thunderstorm Map. However, pair value polygons were buffered an additional 1 mile to prioiritize grassland in the landscape surrounding a target location to retain the value of the supporting grass to nest success.

Priority Zone 1 = areas with > 60 breeding duck pairs
Priority Zone 2 = areas with 40-60 breeding duck pairs
Priority Zone 3 = areas with 25-40 breeding duck pairs

For more information contact the HAPET Office, USFWS, Bismarck, North Dakota.

Produced by the Region 6 HAPET Office, Bismarck, ND
Current to: 2012
File: home31\projects\tstorm_12\sd grass priority areas 2012 8x11.mxd

Map Location




South Dakota Wetland Management Districts

UTM ZONE 14
NAD 83

Scale: 1:830,000

0 5 10 20 30 40 Miles

0 5 10 20 30 40 Kilometers

*This page intentionally left blank*

Exhibit II-2h

# Grassland Easement Acquisition Evaluation Form

**Acquisition #** **Acquisition Biologist** **Date**

**Landowner** ____ **County** ____ **Total Acres Considered for Easement** ____

**Address** ____ **Township** ____

**Range** ____ **Wetland Acres** ____

**Phone** ____ **Section** ____ **Restoration Needed** ____

**Cell Phone** ____

**Email** ____

**Comments**




**Endangered Species Priority List**

____ Piping Plover
____ Whooping Crane
____ Least Tern
____ W.P. Fringed Orchid
____

Recommendation: ____ Approved ____ Not Approved

Acquisition Biologist: ____ Project Leader: ____

*This page intentionally left blank*

U.S. Fish & Wildlife Service

Exhibit II-2i

# Priority Zones for USFWS Grassland Easement Acquisition

## Montana Portion of the Prairie Pothole Region




UTM ZONE 14
NAD 83

Scale: 1:200,000

0 5 10 20 30 40 Miles

0 5 10 20 30 40 Kilometers

### Legend

Wetland Management District Boundary

County Boundary

### Grassland Priority Area

Priority Zone 1

Priority Zone 2

Priority Zone 3

**Map Location**




**Montana Wetland Management Districts**

DUCK PAIRS

Waterfowl pair density information was generated using GIS modeling techniques utilizing USFWS National Wetland Inventory digital data, the USFWS-Region 6 Four Square Mile Breeding Waterfowl Survey results, and regression equations predicting duck pair/wetland relationships developed by the USFWS Habitat and Population Evaluation Team and USGS Northern Prairie Wildlife Research Center. The information presented represents the priority zones for USFWS Grassland Easements and colors match Evaluation For Grassland easement Offers form. Zones are based on the accessibility of 37.58 acre landscape units to the combined predicted breeding pairs for mallard, blue-winged teal, gadwall, pintail, and shoveler.

PRIORITY ZONES

Priority Zones were derived from the Thunderstorm Map. However, pair value polygons were buffered an additional 1 mile to prioiritize grassland in the landscape surrounding a target location to retain the value of the supporting grass to nest success.

Priority Zone 1 = areas with > 60 breeding duck pairs
Priority Zone 2 = areas with 40-60 breeding duck pairs
Priority Zone 3 = areas with 25-40 breeding duck pairs

For more information contact the HAPET Office, USFWS, Bismarck, North Dakota.

Current to 2012.

*This page intentionally left blank*

U.S. Fish & Wildlife Service

Exhibit II-2j

# *Priority Zones for USFWS Wetland Easement Acquisition*

## *Montana Portion of the Prairie Pothole Region*




UTM ZONE 14
NAD 83

Scale: 1:200,000

### Legend

- Wetland Management District Boundary
- County Boundary
- Wetland Priority Zone

Waterfowl pair density information was generated using GIS modeling techniques utilizing USFWS National Wetland Inventory digital data, the USFWS-Region 6 Four Square Mile Breeding Waterfowl Survey results, and regression equations predicting duck pair/wetland relationships developed by the USFWS Habitat and Population Evaluation Team and USGS Northern Prairie Wildlife Research Center. The information presented represents the priority zone for USFWS Wetland Easements and all small, shallow wetlands that are currently not protected within the zone are considered priority. The zone is based on the accessibility of 37.58 acre landscape units to the combined predicted breeding pairs for mallard, blue-winged teal, gadwall, pintail, and shoveler.

For more information contact the HAPET Office, USFWS, Bismarck, North Dakota.

Current to 2012.

**Map Location**




**Montana Wetland Management Districts**

*This page intentionally left blank*

U.S. Fish & Wildlife Service

Exhibit III-3a

# MINNESOTA "FOCUS AREAS"

## FWS Habitat Conservation Priority Areas




Coordinate System: North America Albers Equal Area Conic
Datum: North American Datum 1983
Map Created: April 01, 2014
Produced: Division of Realty, Bloomington, Minnesota
Base Map Source: Esri 2009 North America StreetMap, Minnesota NWR/WMD Focus Area Analysis

1:1,200,000



*This page intentionally left blank*

Exhibit II-3b

# Relative Geographic Priority for Delivery of the Small Wetlands Acquisition Program in Minnesota



*This page intentionally left blank*

[redacted]

Exhibit III-1

3-1916
July 1960

# UNITED STATES DEPARTMENT OF THE INTERIOR

## U. S. FISH AND WILDLIFE SERVICE
## BUREAU OF SPORT FISHERIES AND WILDLIFE

### CONVEYANCE OF EASEMENT FOR WATERFOWL MANAGEMENT RIGHTS

THIS INDENTURE, by and between________________ , residing at ***Ipswich, South Dakota***

parties of **the first part, and** the UNITED STATES OF AMERICA, acting by and through the Secretary of the Interior or his authorized representative, party of the second part.

WITNESSE

WHEREAS, section 4 of the Migratory Bird Hunting Stamp Act of March 16, 1934, as amended by section 3 of the Act of August 1, 1958 (72 Stat. 486, 16 U.S.C., see, 718d (c)), authorizes the Secretary of the Interior to acquire small wetland and pothole areas, and interests therein; and

WHEREAS, the lands described below contain or include small wetland or pothole areas suitable in their present condition for use as waterfowl production areas:

NOW THEREFORE, for and in consideration of the sum of eight **hundred** fifty dollars ;, the parties of the first part hereby convey to the United States, for a term commencing with the acceptance of this indenture by Secretary of the Interior or his authorized representative which acceptance must be made within_____months of the execution of this Indenture

by the parties of the first part a perpetual easement or right of use for the maintenance of the land described below as a waterfowl production area, including the right of access thereto by authorized representatives of the United States:

**SOUTH DAKOTA, EDMUNDS COUNTY,**
**T. 123 N., R. 69 W., 5th P.M.**
**Sec. 1, S½**
**T. 124 N., R. 69 W., 5th P.M.**
**Sec. 27, SE¼**
**Sec. 34, N½, SE¼**

Subject, however, to all existing rights-of-way for highways, roads, railroads, canals, laterals, electrical transmission lines, telegraph and telephone lines and all outstanding mineral rights.

The parties of the first part, for themselves and for their successors and assigns, covenant and agree that they will cooperate in the maintenance of the aforesaid land as a waterfowl production area by not draining or permitting the draining, through the transfer of appurtenant water rights or otherwise, of any of the wetlands, including lakes, ponds, above-described sloughs, swales, swamps, or potholes, now existing or hereafter occurring on the above-described tract, by ditching or any other means; by not filling in with earth or any other material, any low areas or wetlands, Including lakes, ponds, marshes, sloughs, swales, swamps,or potholes, and by not burning any areas covered with marsh vegetation. It is understood and agreed that this indenture imposes no other obligations or restrictions upon the parties of the first part and that neither they nor their successors,. **assigns, lessees, licensees, or any other person** or party claiming under them shall in any way be restricted from carrying on farming practices such as grazing, hay cutting, plowing, working and cropping wetlands when the same are dry of natural causes, and that they may utilize all of the subject lands in the customary manner except for the draining, filling, and burning provisions mentioned above.

Areas of existing marsh vegetation and depressions which may hold water during certain periods, as well as existing drainage facilities, including drainage ditches, tiles, outlets, and pumps, are shown on a map of the above-described property, a copy of which has been filed with a copy of this document in the files of both of the parties hereto.

SPECIAL PROVISIONS

1. This indenture shall be of no force or effect until accepted on behalf of the United States by the Secretary of the Interior or his authorized representative.

2, In the event the use of the land covered by this indenture is required by a body possessing the power of eminent domain for public purposes other than draining the land, the Secretary. of the Interior or his **authorized representative may release the rights** of the United States under this indenture upon the payment of the pro rata amount of the consideration for the unexpired term of this indenture.

3, Notice of acceptance of this agreement shall be given the parties of the first part by certified mail addressed to **Henry Schneider** at ***Ipswich, South Dakota*** and such notice shall be binding upon a11 of the parties of the first part without sending a separate notice to each.

Exhibit III-1

4. The parties of the first part warrant that no person or selling agency has been employed or retained to solicit or secure this contract upon agreement or understanding for a commission , percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the vendors for the purpose of securing business. For breach or violation of this warranty the United States shall have the right to annul this contract without liability or in its discretion to deduct from the contract price or consideration the full amount of such commission, percentage, brokerage, or contingent fee.

5. It is further mutually agreed that m Member of or Delegate to Congress, or Resident Commissioner, shall be admitted to any share or part of this contract, or to any benefit to arise thereupon. Nothing, however, herein contained shall be construed to extend to any incorporated company, where such contract is made for the general benefit of such incorporation or company.

6. Payment of the consideration will be made by Disbursing Officer's check after acceptance of this indenture by the Secretary of the Interior or his authorized representative, and processing of the usual Government voucher.

IN WITNESS WHEREOF the parties of the first part have hereunto set their hands and seals this day of , 19 .

/s/ Henry Schneider (L.S.)

/s/ Olga Schneider (L.S.)
Olga Schneider

/s/ Esther K. Schneider (L.S.)
Esther K. Schneider

/s/ Julius Schneider (L.S.)

ACKNOWLEDGMENT

STATE OF South Dakota )
) as:
COUNTY . Edmunds

On this day of , in the year , personally appeared Esther K. Schneider, single, Schneider, his wife, , his wife, known to me to be th persons described in and who executed the foregoing instrument and acknowledged to me that they (lie) executed the same as their (hi ) free act and deed.

/s/ Gerald C. Pearson

Gerald C. Pearson
Notary Public
(Official Title)

(SEAL)

My commission expires May 8, 1970

ACCEPTANCE

This indenture is accepted on behalf of the United States this day of , 19 , under the authority contained in section 4 of the Migratory Bird Hunting Stamp Act, as amended, and pursuant to authority delegated by 210 DM 1.3, Commissioner of Fish and Wildlife Order No. 4, and 4 AM 4,5D(1).

THE UNITED STATES OF AMERICA

By /s/ R. W. Burwell

(Title) Regional Director
Bureau of Sport Fisheries and Wildlife

#11.61

Exhibit III-1

United States Department of the Interior
Fish And Wildlife Service
Bureau of Sport Fisheries and Wildlife
Branch of Realty

DESCRIPTION

Schneider ET AL, HENRY

WATERFOWL PRODUCTION AREA — Edmunds COUNTY — South Dakota

EASEMENT AUTHORIZED BY' MIGRATORY BIRD *HUNTING STAMP ACT OF MARCH 16,* 1934, AS AMENDED DESCRIPTION: FIFTH PRINCIPAL MERIDIAN
R 69 W T. 123 N. Sec 1 S 1/2




Wetlands Areas

Scale – 4" = 1 mile

Tracing Compiled by: ________ Date: 3/15/63 Checked by: ________ Date: ________

Exhibit III-1

United States Department of the
Interior Fish and Wildlife Service
Bureau of Sport Fisheries and Wildlife
Branch of Realty

*DESCRIPTION*

*Schneider, HENRY TRACT (21X-1 ₁)* 640.00 ACRES

WATERFOWL PRODUCTION AREA EDMUNDS COUNTY, SOUTH DAKOTA

EASEMENT AUTHORIZED BY MIGRATORY BIRD *HUNTING STAMP* ACT OF MARCH 16, 1934, AS AMENDED

DESCRIPTION: FIFTH PRINCIPAL

R, 69 *W T. 124 N*

*sec. 27,SE 1/4*

Sec 34, N ½, SE ¼




Wetlands Areas

*Scale – 4" = 1 mile*

*Tracing Compiled by:* AIM *Date:* *Checked by:* *Date:*

Exhibit III-2

UNITED STATES DEPARTMENT OF THE INT E IOR
FISH AND WILDLIFE SERVICE BUREAU OF SPORT
FISHERIES AND WILDLIFE

Easement Summary

State . South Dakota

Day

Location T. 123 N., R. 55 W., 5th

P.M. Sec. 30, SW 1/4

T. 123 N., R. 56 W., 5th P.M.

sec. 11, SE¼SE¼ exc. Highway R/W
sec. 12, E½SW¼, SW¼SW¼ exc. Highway R/W, SE¼

Tract Name . [redacted], [redacted]

(92X,-1,-2)

Easement Dated 8/27/63 OCT -9 1963

Easement Option Expires: 2/26/64

Term of Easement: Perpetual

Easement Consideration: $400.00

Tract Acreage , 477.32 Cost per acre: $0.84

Wetland Acreage: 66.00 Wetland cost per acre: $6.06

$400.00

Accounting Number 14-16-0003-5866

Authorization to acquire easements in Day County, South Dakota, given by Walter J. Fillmore, Director S.D. Dept. of Game, Fish, & Parks in letter dated 1/12/62 .

Exhibit III-2

3-1916
Rev.

ABERDEEN AAO

**UNITED STATES DEPARTMENT OF THE INTERIOR**

**U. S. FISH AND WILDLIFE SERVICE**

**BUREAU OF SPORT FISHERIES AND WILDLIFE**

**CONVEYANCE OF EASEMENT FOR WATERFOWL MANAGEMENT RIGHTS**

THIS INDENTURE, by and between ***, a widower residing at*** Webster, ***South Dakota***

parties of the first part, and the UNITED STATES OF AMERICA, acting by and through the Secretary of the Interior or his authorized representative, party of the second part.

WITNESSE

WHEREAS, section 4 of the Migratory Bird Hunting Stamp Act of March 16, 1934, as amended by section 3 of the Act of August 1, 1958 (72 Stat. 486, 16 U.S.C., sec. 718d (c)), authorizes the Secretary of the Interior to acquire small wetland or pothole areas suitable for, use as waterfowl production areas:

WHEREAS, the lands described below contain or include small wetland or pothole areas suitable for use as waterfowl production areas:

NOW, THEREFORE, for and in consideration of the sum of *Four Hundred - - -* Dollars *($400.00 ),* the parties of the first part hereby convey to the United States, commencing with the acceptance of this indenture by the Secretary of the Interior or his authorized representative which acceptance must be made within ____ months of the execution of this indenture by the parties of the first part, or any subsequent date as may be mutually agreed upon during the term of this option, an easement or right of use for the maintenance of the land described below as a waterfowl production area in perpetuity, including the right of access thereto by authorized representatives of the United States:

*T. M N., R»* 55 ***W., 5th PM Day County South***

***Dakota 11"» 30, SW1/4***

**T. 123 N., R » 56 Ti., MUM**

Subject, however, to all existing rights-of-way for highways, roads; railroads, pipelines, canals, laterals, electrical transmission lines, telegraph and telephone lines, and all outstanding mineral rights.

The parties of the first part, for themselves and for their heirs, successors and assigns, covenant and agree that they will cooperate in the maintenance of the aforesaid lands as a waterfowl production area by not draining or permitting the draining, through the transfer of appurtenant water rights or otherwise, of any surface water including lakes, ponds, marshes, sloughs, swales, swamps, or potholes, now existing or reoccurring due to natural causes on the above-described tract, by ditching or any other means; by not filling in with earth or any other material or leveling, any part or portion of the above-described tract on which surface water or marsh vegetation 1s now existing or hereafter reoccurs due to natural causes; and by not burning any areas covered with marsh vegetation. It is understood and agreed that this indenture imposes no other obligations or restrictions upon the parties of the first part and that neither they nor their successors, assigns, lessees, or any other person or party claiming under them shall in any way be restricted from carrying on farming practices such as grazing, hay cutting, plowing, working and cropping wetlands when the same are dry of natural causes, and that they may utilize all of the subject lands in the customary manner except for the draining, filling, leveling, and burning provisions mentioned above.

SPECIAL

Existing drainage facilities are shown on a map in the files of both parties.

1. This indenture shall not be binding upon the UNITED STATES OF AMERICA until accepted on behalf of the United States by the Secretary of the Interior or his authorized representative, although this indenture is acknowledged by the parties of the first part to be presently binding upon the parties of the first part and to remain so until the expiration of said period for acceptance, as hereinabove described, by virtue of the payment to parties of the first part, by the UNITED STATES OF AMERICA, of the sum of One Dollar, the receipt of which is hereby expressly acknowledged by parties of the first part.

2. Notice of acceptance of this_ agreement shall be given the parties of the first part by certified mail addressed to at Webster, SD, and such notice shall be binding upon all the parties of the first part without sending a separate notice to each.

3. The parties of the first part warrant that no person or selling agency has been employed or retained to solicit or secure this contract upon agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the vendors for the purpose of securing business. For breach or violation of this warranty the United States shall have the right to annul this contract without liability or in its discretion to deduct from the contract price or consideration the full amount of such commission, percentage, brokerage; or contingent fee.

Exhibit III-2

4. It is further mutually agreed that no Member of or Delegate to Congress, or Resident Commissioner, shall be admitted to any share or part of this contract, or to any benefit to arise thereupon. Nothing, however, herein contained shall be construed to extend to any incorporated company, where such contract is made for the general benefit of such incorporation or company.

5. Payment of the consideration will be made by Disbursing Officers check after acceptance of this indenture by the Secretary of the Interior or his authorized representative, and after the Attorney General or in appropriate cases, the Field Solicitor of the Department of the Interior shall have approved the easement interest thus vested in the United States.

IN WITNESS WHEREOF the parties of the first part have hereunto set their hands and seals this 27th day of August, 1963.

/s/

(L.S

Witness (L.S.)

(L.S.

ACKNOWLEDGE

STATE South -DOM

COUNTY OF Day

On this 27th day of a W , in the year 1963 , before me appeared W= ,)==[A known to me to

e persons described in an xecuted the foregoing instrument and acknowledged to me that *#(he) executed the same as" (his) free act and deed.

/a/ Gerald C.

**Notary Public**
(Official Title)

(SEAL) So"

My commission expires May 8,

ACCEPTA

This indenture is accepted on behalf of the United States this day of , 19 , under the authority contained in section 4 of the Migratory Bird Hunting Stamp Act, as amended, and pursuant to authority delegated by 210 DM 1.3, Commissioner of-Fish and Wildlife Order No. 4, and 4 AM 4.5D(1).

THE UNITED STATES OF

By /s/ R. W.

(Title) Regional_Director

Bureau of Sport Fisheries and Wildlife24,,,

Exhibit III-2

United States Department of the Interior

Fish and Wildlife Service

Bureau of Sport Fisheries and Wildlife
Branch of Realty

DESCRIPTION

GAIKOWSKI, IGNATZ TRACT -2) 477.32 ACRES

WATERFOWL PRODUCTION AREA DAY COUNTY **SOUTH DAKOTA**

**EASEMENT** AUTHORIZED BY MIGRATORY BIRD HUNTING STAMP ACT OF MARCH 16, 1934, AS AMENDED
DESCRIPTION: FIFTH PRINCIPAL MERIDIAN
R. 55 W., T. 123 N., 5th P.M.
Sec. 30,
R. 56 W.,: T. 123 N., 5th P. M. **sec. 11,**
**SE1/4SE1/4 exc highway r/w sec.** 12,
E1/2SW1/4, SW1/4SW1/4 exc highway r/w,




Easily Drainable Wetlands Areas

Scale - 4" = 1 mile

Moderately drainable

Difficult to drain

Drained Wetlands

Tracing Compiled by: GCP Date: 9-6 -63 Checked by: Date: 9-9-63

Exhibit III-2

UNITED STATES DEPARTMENT OF THE INTERIOR
FISH AND WILDLIFE SERVICE BUREAU OF
SPORT FISHERIES AND WILDLIFE

Easement

State . South Dakota

County . P!7

Location: T. 123 N., R. 56 W., 5th P.M.
sec. 1, SW¼ exc. Hwy. R/W
sec. 12, NE¼NW¼

Tract Name . [redacted]

Tract (91x)

Easement Dated 7/31/63 Easement Option Expires: 1/30/64
OCT - 9 1963 Term of Easement: Perpetual

Easement Consideration: $280,00 Tract Acreage : 197.47
Cost per acre: $1.42 Wetland Acreage: 51.00
Wetland cost per acre: $5.49

Estimate of Value: $

Accounting Number

Authorization to acquire easements in "DAY County, South Dakota, given by Walter J. Fillmore, DIrector SD Dept of Game, Fish, Parks in letter dated 1/12/62

REFUGE MANAGER

3-1916
Rev. 1963

Exhibit III-2

UNITED STATES DEPARTMENT OF THE INTERIOR U. S.
FISH AND WILDLIFE SERVICE
BUREAU OF SPORT FISHERIES AND WILDLIFE

THIS INDENTURE, bv and between **a widower, residing** at Webster, **South Dakot**

parties of the first part, and the UNITED STATES OF AMERICA, acting_ by and through the Secretary of the Interior or his authorized representative, party of the second part.

WITNESSE

/ WHEREAS, section 4 of the Migratory Bird Hunting Stamp Act of March 16, 1934, as amended by section 3 of the Act of August 1, 1958 (72 Stat. 486, 16 U.S.C., sec. 718d (c)); authorizes the' Secretary of the Interior to acquire small wetland or pothole areas suitable for, use as waterfowl produ ion areas:

In

WHEREAS, the lands described below contain or include small wetland or pothole areas suitable for use as waterfowl production areas:

NOW, THEREFORE, for and in consideration of the sum of two **hundred eighty** Dollars the parties of the first part hereby convey to the United States, commencing with the acceptance of this indenture by the Secretary of the Interior or his authorized representative which acceptance must be made within Six months of the execution of this indenture by the parties of the first part, or any subsequent date as may be mutually agreed upon during the term of this option, an easement or right of use for the maintenance of the land described below as a waterfowl production area in perpetuity, including the right of access thereto by authorized representatives o£ the United States:

**T. 123 N., R. 56 W., 5th P.M.** **Day County South Dakota**
**sec. 1, SW¼ exc. Hwy. R/W**
**sec. 12, NE¼NW¼**
**Subject to flowage easement unto above described land to Norman W. Monson as recorded in Book B-49 Misc., page 91.**

Subject, however, to all existing rights-of-way for highways, roads; railroads, pipelines, canals, laterals, electrical transmission lines, telegraph and telephone lines, and all outstanding mineral rights.

The parties of the first part, for themselves and for their heirs, successors and assigns, covenant and agree that they will cooperate in the maintenance of the aforesaid lands as a waterfowl production area by not draining or permitting the draining, through the transfer of appurtenant water rights or otherwise, of any surface water including lakes, ponds, marshes, sloughs, swales, swamps, or potholes, now existing or reoccurring due to natural causes on the above-described tract, by ditching or any other means; by not filling in with earth or any other material or leveling, any part or portion of the above-described tract on which surface water or marsh vegetation is now existing or hereafter reoccurs due to natural causes; and by not burning any areas covered with marsh vegetation. It is understood and agreed that this indenture imposes no other obligations or restrictions upon the parties o£ the first part and that neither they nor their successors, assigns, lessees, or any other person or party claiming under them shall in any way be restricted from carrying on farming practices such as grazing, hay cutting, plowing, working and cropping wetlands when the same are dry of natural causes, and that they may utilize all of the subject lands in the customary manner except for the draining, filling, leveling, and burning provisions mentioned above.

SPECIAL

I. This indenture shall not be binding upon the UNITED STATES OF AMERICA until accepted on behalf of the United States by the Secretary of the Interior or his authorized representative, although this indenture is acknowledged by the parties of the first part to be presently binding upon the parties of the first part and to remain so until the expiration of said period for acceptance, as hereinabove described, by virtue of the payment to parties of the first part, by the UNITED STATES OF AMERICA, of the sum of One Dollar, the receipt of which is hereby expressly acknowledged by parties of the first part.

2. Notice of acceptance of this agreement shall be given the parties of the first part by certified mail addressed to at **Webster, South Dakota** and such notice shall be binding upon all the p of the first part w thout sen ing a separate notice to

3. The parties of the first part warrant that no person or selling agency has been employed or retained to solicit or secure this contract upon agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bone fide employees or bona fide established commercial or selling agencies maintained by the vendors for the purpose of securing business. For breach or violation of this warranty the United States shall have the right to annul this contract without 'liability or in its discretion to deduct from the contract price or consideration the full amount of such commission, percentage, brokerage, or contingent fee.

3a. **Vendor agrees** to **pay the administrative fee** of **the Federal Land Bank.**

Exhibit III-2

4: It is further mutually agreed that no Member of or Delegate to Congress, or Resident Commissioner, shall be admitted to any share or part of this contract, or to any benefit to arise the r upon. Nothing, however, herein contained shall be construed to extend to any incorporated company, where such contract is made for the general benefit of such incorporation or company.

5• Payment of the consideration will be made by Disbursing Officers check after acceptance of this indenture by the Secretary of the Interior or his authorized representative, and after the Attorney General or in appropriate cases, the Field Solicitor of the Department of the Interior shall have approved the easement interest thus vested in the United States.

IN WITNESS WHEREOF the parties of the first part have hereunto set their hands and seals this **31st** day of **July** 19 63.

**/s/** [redacted] (L.S.

(L.S.

(L.S.

(L.S.)

**/a/ Gerald C. Pearson** (L.S.)
(Witness)

(L.S.)

ACKNOWLEDGE

STATE S ou th Dam- )
ss COUNTY OF
ha

On this **31st** day of **July** , in the year **1963** , before me personally appeared known to me to be the persons described in and who executed the foregoing instrument and acknowledged to me that X*= (he) executed the same as their (his) free act and deed.

**/s/ Gerald C. Pearson**
**Gerald C. Pearson**
**Notary Public**
(Official Title)

(SEAL

**goal Affixed** My commission **May 8, 1470**

ACCEPTA

This indenture is accepted on behalf of the United States this day of , 19 , under the authority contained in section 4 of the Migratory Bird Hunting Stamp Act, as amended, and pursuant to authority delegated by 210 DM 1.3, Commissioner of-Fish and Wildlife Order No. 4 and 4 AM 4•5D(1)

THE UNITED STATES OF

/s/ R. W. Burwell
B

, (Title) Regional Director
Bureau of Sport Fisheries and Wildlife 180

Exhibit III-2

United States Department of the
Interior Fish and Wildlife Service
Bureau of Sport Fisheries and Wildlife
Branch of Realty

DESCRIPTION

197.47 ACRES

WATERFOWL PRODUCTION AREA COUNTY SOUTH DAKOTA
EASEMENT AUTHORIZED BY MIGRATORY BIRD HUNTING STAMP ACT OF MARCH 16, 1934, As AMENDED DESCRIPTION: FIFTH PRINCIPAL MERIDIAN

R. 56 W., T. 123 N.
sec. 1, SW¼ exc. Hwy. R/W
sec. 12, NE¼NW¼




Easily Drainable Wetlands Areas

Moderately drainable

Difficult to Drain

Scale - 4' = 1 mile

Tracing Compiled by: Date: Checked by:

Exhibit III-3

3-1916
Rev.

# UNITED STATES DEPARTMENT OF THE INTERIOR U. S.
# FISH AND WILDLIFE SERVICE
# BUREAU OF SPORT FISHERIES AND WILDLIFE
## CONVEYANCE OF EASEMENT FOR WATERFOWL MANAGEMENT RIGHTS

THIS INDENTURE, by and , *a widow, of Roslyn, South*

parties of the first part, and the UNITED STATES OF AMERICA, acting by and-through the Secretary o£ the Interior or his authorized representative, party of the second part.

WITNESSE

WHEREAS, section 4 of the Migratory Bird Hunting Stamp Act of March 16, 1934, as amended by, section 3 of the Act of August l, 1958 (72 Stat. 486, 16 U.S.C., sec. 718d (c)), authorizes the Secretary of the Interior to acquire small wetland or pothole areas suitable for, use as waterfowl production areas:

WHEREAS, the lands described below contain or include small wetland or pothole areas suitable for use as waterfowl production areas:

NOW, THEREFORE, for and in consideration of the sum of *two hundred / thirty* Dollars the parties of the first part hereby convey to the United States, commencing with the acceptance of this indenture by the Secretary of the Interior or his authorized representative which acceptance must be made within six months of the execution of this indenture by the parties of the first part, or any subsequent date as may be mutually agreed upon during the term of this option, an easement or right of use for the maintenance o£ the land described below as a waterfowl production area in perpetuity, including the right of access thereto by authorized representatives of the United States:

T. 124 N., R. 56 W., 5th P.M. Day County, South Dakota
sec. 14, W½SW¼,W½SE¼SW¼.
sec. 15, SE¼.

Subject, however, to all existing rights-of-way for highways, roads, railroads, pipelines, canals, laterals, electrical transmission lines, telegraph and telephone lines, and all outstanding mineral rights.

The parties of the first part, for themselves and for their heirs, successors and assigns, covenant and agree that they will cooperate in the maintenance of the aforesaid lands as a waterfowl production area by not draining or permitting the draining, through the transfer of appurtenant water rights or otherwise, of any surface water including lakes, ponds, marshes, sloughs, swales, swamps, or potholes, now existing or reoccurring due to natural causes on the above-described tract, by ditching or any other means; by not filling in with earth or any other material or leveling, any part or portion of the above-described tract on which surface water or marsh vegetation is now existing or hereafter reoccurs due to natural causes; and by not burning any areas covered with marsh vegetation. It is understood and agreed that this indenture imposes no other obligations or restrictions upon the parties of the first part and that neither they nor their successors, assigns, lessees, or any other person or party claiming under them shall in any way be restricted from carrying on farming practices such as grazing, hay cutting, plowing, working and cropping wetlands when the same are dry of natural causes, and that they may utilize all of the subject lands in the customary manner except for the draining, filling, leveling, and burning provisions mentioned above. Excepted are certain drainage ditches which the parties of the first part may maintain and/or wetlands which are deleted from the provisions of this easement. The above exceptions are shown on a map certified by the Regional Director at the time of acceptance.

SPECIAL

1. This indenture shall not be binding upon the UNITED STATES OF AMERICA until accepted on behalf of the United States by the Secretary of the Interior or his authorized representative, although this indenture is acknowledged by the parties of the first part to be presently binding upon the parties of the first part and to remain so until the expiration o£ said period for acceptance, as hereinabove described, by virtue of the payment to parties of the first part, by the UNITED STATES OF AMERICA, o£ the sum of One Dollar, the receipt of which is hereby expressly acknowledged by parties of the first part.

2. Notice of acceptance of this agreement shall be given the parties of the first part by certified mail addressed to at Roslyn, *South Dakota 57261,* and such notice shall be binding upon all the parties of the first part without sending a separate notice to each.

3. The parties of the first part warrant that no person or selling agency has been employed or retained to solicit or secure this contract upon agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the vendors for the purpose of securing business. For breach or violation of this warranty the United States shall have the right to annul this contract without liability or in its discretion to deduct from the contract price or consideration the full amount of such commission, percentage, brokerage, or contingent fee.

Exhibit III-3

4. It is further mutually agreed that no Member of or Delegate to Congress, or Resident Commissioner, shall be admitted to any share or part of this contract, or to any benefit to arise thereupon. Nothing, however, herein contained shall be construed to extend to any incorporated company, where such contract is made for the general benefit of such incorporation or company.

5. Payment of the consideration will be made by Disbursing Officers check after acceptance of this indenture by the Secretary of the Interior or his authorized representative, and after the Attorney General or in appropriate cases, the Field Solicitor of the Department of the Interior shall have approved the easement interest thus vested in the United States.

IN WITNESS WHEREOF the parties of the first part have hereunto set their hands and seals this 26 day of **October** , 19

/s/ _______________ (L.S.)

_______________ (L.S.

_______________ (L.S.)

_______________ (L.S.)

(Witness (L.S.)

(L.S.)

ACKNOWLEDGE

STATE South Dakota

COUNTY OF Day

On this 26 day of **October** , in the year **1967** , before me personally appeared **g widow** known to me to be the person described in and who executed the foregoing instrument and acknowledged to me that (he) executed the same as their (his) free act and deed.

ha/ **Alfred John Pavne**

**Alfred John Payne**

(SEAL) (Official Title)

*SEAL AFFIXED*

My commission expires January **30. 1975**

ACCEPTA

This indenture is accepted on behalf of the United States this day DEC 27 1967 19 , under the authority contained in section 4 of the Migratory Bird Hunting Stamp Act, as amended and pursuant to authority delegated by 210 DM 1.3, Commissioner of Fish and Wildlife Order No. O and 4 AM 4.5D(1)

THE UNITED STATES OF

By /s/ W. P. Schaefer
W. P. Schaefer
Acting Regional Director

(Title) Bureau of Sport Fisheries and Wildlife

Exhibit III-3

United States Department of the
Interior Fish and Wildlife Service
Bureau of Sport Fisheries and Wildlife
Branch of Realty

DRAINAGE FACILITY

TRAC

100.00 ACRES

WATERFOWL PRODUCTION AREA DAY COUNTY SOUTH

EASEMENT AUTHORIZED BY MIGRATORY BIRD HUNTING STAMP ACT OF MARCH 16, 1934

AS

DESCRIPTION: FIFTH PRINCIPAL

sec. 14, W1/2SW 1/4, W




I hereby certify that this map represents the excepted drainage ditches and/or deleted wetlands referred to in the easement agreement executed 10/26/67 and accepted ____________.

/s{ •. P. Schaefer

Acting Regional Director




Wetlands deleted from the Provisions of the Easement

Wetlands Drained

Open ditch

Scale: 4″ = 1 mile

Map drawn ajP Date: **10-31-67**

*This page intentionally left blank*

Exhibit III-4

Form 3-1916
(Revised Sept. 1976)

MAR 25 1987

# UNITED STATES DEPARTMENT OF THE INTERIOR U, S. FISH AND WILDLIFE SERVICE CONVEYANCE OF EASEMENT FOR WATERFOWL MANAGEMENT RIGHTS

THIS INDENTURE, by and between r
and his wife, of Ipswich, South Dakota

parties of the first part, and the UNITED STATES OF AMERICA, acting by and through the Secretary of the Interior or his authorized representative, party of the second part.

W ITNESSETH:

WHEREAS, section 4 of the Migratory Bird Hunting Stamp Act of March 16, 1934, as amended by section 3 of the Act of August 1, 1958 (72 Stat. 486, 16 U.S.C., sec. 718d (c)), authorizes the Secretary of the Interior to acquire small wetland or pothole areas suitable for use as waterfowl production areas:

WHEREAS, the lands described below contain or include small wetland or pothole areas suitable for use as waterfowl production areas:

NOW, THEREFORE, for and in consideration of the sum of ($ 2, 500.00 )

Two Thousand Five Hundred--- Dollars, the parties of the first part do hereby convey to the United States, commencing with the acceptance of this indenture by the Secretary of the Interior or his authorized representative which acceptance must be made within 12 months of the execution of this indenture by the parties of the first part, or any subsequent date as may be mutually agreed upon during the term of this option, a permanent easement (in perpetuity) or right of use for the maintenance of the land described below as

The lands covered by this conveyance are those wetland areas, including lakes, ponds, marshes, sloughs, swales, swamps, potholes, and other wholly or partially water-covered areas, now existing or subject to recurrence th'ough natural or man-made causes, delineated on the map(s) attached hereto as Exhibit A and incorporated herein by this reference; provided, always, that the lands covered by this conveyance shall include any enlargements of said wetland areas resulting from normal or abnormal increased water. Said lands are located within, and the aforementioned right of access extends over all lands within the following

described legal subdivision(s) in Edmunds _ County, State of South Dakota to wit.

T. 123 N., R, 68 W., 5th P.M.
sec. 20, SW1/4

Subject, however, to all existing rights-of-way for highways, roads, railroads, pipelines, canals, laterals, electrical transmission lines, telegraph and telephone lines, cable lines, and all mineral rights.

The parties of the first part, for themselves, their heirs, successors and assigns, covenant and agree that they will cooperate in the maintenance of the aforesaid lands as a waterfowl production area by not draining, causing or permitting the draining by construction of ditches, or by any means, direct or indirect, whether through the transfer of appurtenant water rights or otherwise, of any surface waters in or appurtenant to these wetland areas delineated on Exhibit A; by not filling in with earth or any other material or leveling any part or portion of said delineated wetland areas; and by not burning any marsh vegetation on any part or portion of said delineated wetland areas. It is understood and agreed that this indenture imposes no other obligations or restrictions upon the parties of the first part and that neither they nor their successors, assigns, lessees, or any other person or party claiming under them shall in any way be restricted from carrying on farming practices such as grazing at any time, hay cutting, plowing, working and cropping wetlands when the same are dry of natural causes, and that they may utilize all of the subject lands in the customary manner except for the draining, filling, leveling, and burning provisions mentioned above.

Copies of the above-referenced map(s), being Exhibit A, are on file in the Office of the Regional Director, U.S. Fish and Wildlife Service.

SPECIAL PROVISIONS

I. This indenture shall not be binding upon the UNITED STATES OF AMERICA until accepted on behalf of the United States by the Secretary of the Interior or his authorized representative, although this indenture is acknowledged by the parties of the first part to be presently binding upon the parties of the first part and to remain so until the expiration of said period for acceptance, as hereinabove described, by virtue of the payment to parties of the first part, by the UNITED STATES OF AMERICA, of the sum of One Dollar, the receipt of which is hereby expressly acknowledged by parties of the first part.

14-16-0006

2. Notice of acceptance of this agreement shall be given the parties of the first part by certified mail addressed to

at Ipswich, SD 5 /451

1. It is further mutually agreed that no Member of or Delegate to Congress, or Resident Commissioner, shall be admitted to any share or part of this contract, or to any benefit to arise thereupon. Nothing, however, herein contained shall be construed to extend to any incorporated company, where such contract is made for the general benefit of such incorporation or company.

4. Payment of the consideration will be made by a United States Treasury check after acceptance of this indenture by the Secretary of the Interior or his authorized representative and after the Attorney General, or in appropriate cases, the Solicitor of the Department of the Interior shall have approved the easement interest thus vested in the United States.

[illegible] day of [illegible] , 17 [illegible]

________________ ________________

________________ ________________

________________ (L. ________________

ACKNOWLEDGMENT

STATE South Dakota
COUNTY OF McPherson ss

On this 19 day of February , in the year 1987 , before me Personally appeared
John M, Schumacher and Mariann M. Schumacher

, his wife, known to me to

Melvin M Geist
(Notary Public)
MELVIN M. GEIST
Notary Public, South Dakota

(SEAL)

My commission expires My Commission Expires 3-9-93

ACCEPTANCE

This Secretary of the Interior, acting by and through his authorized representative, has executed this agreement on behalf of the United States this ___ day of ___

In consideration of payment which is determined to be adequate from the standpoint of the FHA as mortgagee, for the foregoing easement as provided in paragraph ___ thereof, the United States of America acting through FHA hereby subordinates its mortgage dated 06-18-86 recorded in Book 132 page 269 of the records [illegible] Edmunds County, State of South Dakota to [illegible]

THE UNITED STATES OF AMERICA

BY ________________

U. S. Fish and Wildlife Service

THE UNITED TATES Of AMERICA

[illegible] 8 [signature]
Dat FHA County S[illegible]

78-782-

Exhibit III-4

UNITED STATES DEPARTMENT OF THE INTERIOR U.S. FISH AND WILDLIFE SERVICE EXHIBIT "A" Map 1 of 1

TRAC 575

WATERFOWL PRODUCTION AREA Edmunds COUNTY, STATE OF South Dakota EASEMENT AUTHORIZED BY MIGRATORY BIRD HUNTING STAMP ACT OF MARCH 16, 1934, AS AMENDED. T. 123 N., R. 68 W., 5th -- PRINCIPAL MERIDIAN

Sec.20 SW1/4




Scale: 4 Inches = 1 Mile

This map delineates wetlands referred to in the easement conveyance dated 2/19/87 *which* the parties of the first part agree to maintain as a waterfowl production area. The lands covered by this conveyance include any enlargement of the delineated wetland areas resulting from normal or abnormal increased water.

LEGEND

Landowner Signature



Boundary of Easement

Wetlands covered by provisions of the easement

Nonfunctional drainage facilities which the landowner agrees NOT to repair or clean out

Prepared by: Betty Kuckelburg Date 2/3/87

K&F 10 1153 5-77

*This page intentionally left blank*

MISC 2001

Exhibit III-5

Form 3-1916

Revised October 1989

UNITED STATES DEPARTMENT OF THE INTERIOR U.S. FISH AND WILDLIFE SERVICE CONVEYANCE OF EASEMENT FOR WATERFOWL MANAGEMENT RIGHTS

THIS INDENTURE, by and between Eugene P. Mack and Carol L. Mack, his wife, of Watertown, South Dakota and Kevin N. Mack, a single person, of Castlewood South Dakota

parties of the first part, and the UNITED STATES OF AMERICA. acting by and through the Secretary of the Interior or his authorized representative party of 'he second part

WITNESSETH:

WHEREAS, the Migratory Bird Hunting and Conservation Stamp Act,16 U.S.C. 718d(c); the Fish and Wildlife Act of 1956, 16 U.S.C. 742a-742; the Emergency Wetlands Resources Act of 1986, 16 U.S.C. 3901; and the Land and Water Conservation Fund Act, 16 U.S.C. 4061-9(a)(1), authorize the Secretary of the Interior to acquire small wetland or pothole areas suitable for use as waterfowl production areas:

WHEREAS, the lands described below contain or include small wetland or pothole areas suitable for use as waterfowl production

NOW, THEREFORE, for and in consideration of the sum of Seven Thousand Seven Hundred Fifty -

Dollars (S 7,750.00 ),the parties of the first part do hereby convey to the United States, commencing with the acceptance of this indenture by

the Secretary of the Interior or his authorized representative which acceptance must be made within 12 months of the execution of this

The lands covered by this conveyance are those wetland areas, including lakes, ponds, marshes, sloughs, swales, swamps, potholes, and other wholly or partially water-covered areas, now existing or subject to recurrence through natural or manmade causes. delineated on the map(s) attached : hereto as Exhibit A and incorporated herein by this reference; provided, always, that the lands covered by this conveyance shall include any enlargements of said wetland areas resulting from normal or abnormal increased water. The lands described on Exhibit A, and the aforementioned right of ingress to and egress extends on, over, across and through any and all lands within the following described legal

subdivision(s) in Deuel County, State of South Dakota , to-wit: T. 116 M„ R, 48 W., 5th P.M.

sec. 36, E except the N 52 rods, E1/2W1/2 except the N 52 rods.

Vendors, successors and assigns relinquish all interest in vested drainage rights recorded in Book 1992 on page 3508, Book 1992 on page 3510, Book 1992 on page 3511 and Book 1992 on Page 3509, which are appurtenant to wetlands on attached Exhibit A's.

Subject, however, to all valid existing rights-of-way for highways, roads, railroads, pipelines, canals, laterals, electrical transmission lines, telegraph and telephone !Ines, cable lines, and all mineral rights.

The parties of the first part, for themselves, their heirs, successors and assigns, covenant and agree that they will cooperate in the maintenance of the aforesaid lands as a waterfowl production area by not draining, causing or permitting the draining by construction of ditches, or by any means, direct or indirect, whether through the transfer of appurtenant water rights or otherwise of any surface waters in or appurtenant to these wetland areas delineated on Exhibit A; by not filling, causing or permitting the filling in with earth or any other material or leveling, causing or permitting the leveling of any par or portion of said delineated wetland areas; and by not burning, causing or permitting the burning of any wetland vegetation on any part or portion of said delineated wetland areas. It is understood and agreed that this indenture imposes no other obligations or restrictions upon the parties

of the first part and that neither they nor their successors, assigns, lessees, or any other person or party claiming under them shall in any way be restricted from carrying on farming practices such as grazing at any time, hay cutting, plowing, working and cropping wetlands when the same are dry of natural causes, and that they may utilize all of the subject lands in the customary manner except for the draining, filling, leveling, and burning provisions mentioned above.

Copies of the above-referenced map(s), being Exhibit A, are on file in the Office of the Regional Director, U.S. Fish and Wildlife Service.

la. The United States and its authorized representatives shall have the right to construct, reconstruct, and maintain all wetland restoration structures shown on Exhibit A.

SPECIAL PROVISIONS

1 This indenture shall not be binding upon the UNITED STATES OF AMERICA until accepted on behalf of the United Sates by the Secretary of the Interior of his authorized representative, although this indenture is acknowledged by the parties of the first part to be presently binding upon the parties of the first part and to remain so until the expiration of said period for acceptance, as herein above described, by virtue of the payment to parties of the first part, by the UNITED STATES OF AMERICA. of the sum of One Dollar, the receipt of which is hereby expressly acknowledged by parties of the first part.

This for- was electronically produced by Elite Federal Form Inc.

Exhibit III-5

2. Notice of acceptance of this agreement shall be given the parties of the first part by certified mail addressed Eugene P. Mack, 59 Sunrise Drive, Watertown, SD 57201 and such notice shall be binding upon all the parties of the first part without sending a separate notice to

3. It is further mutually agreed that no Member of or Delegate to Congress, or Resident Commisioner shall be admitted to any share or part of this contract, or to any benefit to arise thereupon. Nothing, however, herein contained shall be construed to extend to any incorporated company, where such contract is made for the general benefit of such incorporation or company.

4. Payment of the consideration will be made by a United States Treasury check after acceptance of this indenture by the Secretary of the Interior or his authorized representative and after the Attorney General, or in appropriate cases, the Solicitor of the Department of the Interior shall have approved the easement interest thus vested in the United States.

IN WITNESS WHEREOF the parties of the first part have hereunto set their hands and seals ______ day September 2000

| | |
|---|---|
| Eugene P. Mack (L.S.)<br>Eugene P. Mack | Carol L. Mack (L.S.)<br>Carol L. Mack |
| Kevin N. Mack (L.S.)<br>Kevin N. Mack | (L.S.) |
| (L.S.) | (L.S.) |
| (L.S.) | (L.S.) |
| (L.S.) | (L.S.) |
| (L.S.) | (L.S.) |

ACKNOWLEDGMENT

STATE South Dakota )
)ss
COUNTY OF Codington )

On this 7th day of Sept 2000 before ma personally appeared . Eugene P. Mack Carol L. Mack, his wife , known to me to be the person(s) described in

(SEAL) WM. J. KURTENBACH SEAL NOTARY PUBLIC SEAL SOUTH DAKOTA My Commission expires 8-30-04

Wm. J. Kurtenbach
Notary Public

My commission 8-30-04

ACCEPTANCE

The Secretary of the Interior, acting by and through his authorized representative, has executed this agreement on behalf of

this DEC 19 day 2000.

DEC 19 2000

THE UNITED STATES OF AMERICA

By: [signature]

Title: CHIEF, DIVISION OF REALTY
U.S. Fish and Wildlife Service

Exhibit III-5

UNITED STATES DEPARTMENT OF THE
INTERIOR FISH AND WILDLIFE SERVICE
EXHIBIT "A"

TRACT 198X MAP 1 of 1

WATERFOWL PRODUCTION AREA Deuel COUNTY, STATE OF South Dakota EASEMENT AUTHORIZED BY MIGRATORY BIRD HUNTING STAMP ACT OF MARCH 16, 1934, AS AMENDED.

T. 116 N., R. 4$ W., 5th PRINCIPAL




Scale: 4 Inches = 1 Mile

This map delineates wetlands referred to in the easement conveyance dated 9-7-00 which the parties of the first part agree to maintain as a waterfowl production area.

The lands covered by this conveyance include any enlargement of the delineated wetland areas resulting from normal or abnormal increased water.

| | |
|---|---|
| Kevin M Mack<br>**Landowner Signature** | **Landowner Signature** |
| Eugene P. Mack<br>**Landowner Signature** | **Landowner Signature** |
| Carol L. Mack<br>**Landowner Signature** | **Landowner Signature** |

LEGEN

Boundary of Easement Description

Wetland Restoration Structure

Wetlands covered by provisions of the easement

Prepared Wm. J. Kurtenbach **Date:** 9-6-00

*This page intentionally left blank*

UNITED STATES DEPARTMENT OF THE INTERIOR U. S. FISH AND WILDLIFE SERVICE EXHIBIT "A" Map of

Exhibit III-6

TRACT

WATERFOWL PRODUCTION AREA_______________ COUNTY, STATE OF________________

EASEMENT AUTHORIZED BY MIGRATORY BIRD HUNTING STAMP ACT OF MARCH 16, 1934, AS AMENDED. T. N., R. W., PRINCIPAL MERIDIAN

| Structure No- | Elevation (MSL) |
| --- | --- |



The parties of the first part concur with the structure outlet elevations specified above.

______________________________
Landowner Signature

Date____________________

Scale: 4 inches - 1 mile

This map delineates wetlands referred to in the easement conveyance dated______________which the parties of the first part agree to maintain as a waterfowl production area. The lands covered by this conveyance include any enlargement of the delineated wetland resulting from normal to abnormal increased water.

LEGEN

Boundary of easement description

Wetlands covered by provisions of the easement

*Nonfunctional* drainage facilities which the landowner agrees not to repair or clean

Wetland restoration structure

______________________________
Landowner Signature

Prepared by:________________ Date:_

*This page intentionally left blank*

Grassland Easement
November 1989

# UNITED STATES DEPARTMENT OF THE INTERIOR U.S. FISH AND WILDLIFE SERVICE GRANT OF EASEMENT FOR WATERFOWL HABITAT PROTECTION

Exhibit III-7a

THIS INDENTURE, by and between ,/ *his wife, of Britton, SD*

*also* known *as*

hereinafter referred to as Grantors, and the UNITED STATES OF AMERICA, acting by and through the Secretary of the Interior or his authorized representative.

WITNESSETH

WHEREAS, the Migratory Bird Hunting and Conservation Stamp Act, 16 U.S.C. 718d(c); the Fish and Wildlife Act of 1956, 16 U.S.C. 742a-742j; the Emergency Wetlands Resources Act of 1986, 16 U.S.C. 3901; and the land and Water Conservation Fund Act, 16 U.S.C. 4601-9(a)(1), authorize the Secretary of the Interior to acquire lands and waters or interests therein for the development, advancement, management, conservation, and protection of fish and wildlife resources. The purpose of this easement is to protect the habitat quality of the lands described on Exhibit A and such lands shall be maintained to provide cover, especially nesting cover, and food for a varied array of aquatic, terrestrial, and avian wildlife, particularly waterfowl, and threatened and endangered species. The lands described on Exhibit A are hereinafter referred to as a wildlife management area, and

WHEREAS, the lands described below contain habitat suitable for use as wildlife management areas.

NOW, THEREFORE, for and in consideration of the sun of *Sixteen Thousand Five Hundred Eighty*

Dollars (E 16,580.00 ), the Grantors hereby grant to the United States, commencing with the acceptance of this Indenture by the Secretary of the interior or his authorized representative, an easement which includes a right of use for the maintenance of the lands described on Exhibit A, as wildlife management areas, in perpetuity, including the right of ingress to and egress on, over, across the through any and all lands of the Grantors, as described below, by authorized representatives of the United States. No rights herein are granted to the general public for access to or entry upon the land subject to this grant of easement for any purpose. The lands described on Exhibit A are located within, and the aforementioned right of ingress and egress extends on, over, across and through any and all lands within the following-described legal subdivision(s) in Marshall County, State of *South Dakota* , to-wit:

*T. 127 N., R. 56 W., 5th P.M.*
*sec. 1, SW¼, W½NW¼SE¼, W½E½NW¼SE¼, N½N½SW¼SE¼, SE¼NE¼SW¼SE¼, NE¼SE¼SW¼SE¼, S½S½SW¼SE¼, W½W½SE¼SE¼*
*sec. 2, E½NE¼SE¼, E½W½NE¼SE¼, N½NE¼SE¼SE¼, the S 1240' of the E 620' of the W 1150' of the SW¼SE¼*
*sec. 12, SE¼NW¼, S½S½NE¼NW¼, NW¼SW¼NE¼NW¼, W½NW¼NE¼NW¼, S½S½NW¼NE¼, SW¼SW¼NE¼NE¼, E½W½NE¼NE¼, E½NE¼NE¼*

Subject, however, to all valid existing rights-of-way for highways, roads, railroads, pipelines, canals, laterals, electrical transmission lines, telegraph and telephone lines, cable lines, and all mineral rights.

The conveyance hereunder shall be effective on the date of the execution of this Indenture by the Secretary of the interior or his authorized representative; provided, however, that such acceptance must be made within 9 calendar months from the date of the execution of this Indenture by the Grantors, or any subsequent date as may be mutually agreed upon in writing by the parties hereto prior to the expiration of such date; and provided further, however, that in the event such acceptance is not made by such date, this Indenture shall be null and void.

The Grantors, for themselves and for their heirs, successors, and assigns, lessees, and any other person claiming under them, covenant and agree that they will cooperate in the maintenance and protection of the habitat areas, delineated on the map(s) attached hereto as Exhibit A, as wildlife management areas for the protection of fish and wildlife resources and to maintain the quality of these lands to provide cover for wildlife, especially nesting cover, and food for a varied array of aquatic, terrestrial, and avian wildlife, particularly waterfowl and threatened and endangered species. To that end and for the purpose of accomplishing the intent of this Indenture, the Grantors, for themselves and for their heirs, successors, assigns, lessees, and any other person claiming under them, covenant and agree as follows:

1. Grantors will cooperate in maintenance of the wildlife management area by maintaining permanent vegetative cover, consisting of grasses, forbs and low-growing shrubs, on said habitat areas, as follows: There shall be no haying or mowing until after July 15 in any calendar year, no alteration of grassland, wildlife habitat or other natural features, and no agricultural crop production upon the habitat areas delineated on Exhibit A, unless prior approval in writing is granted by the U.S. Fish and Wildlife Service; except that grazing the aforesaid lands is permitted at any time throughout the calendar year without approval in writing.

2. Grantors will pay taxes and assessments, if any, which may be levied against the land.

3. Noxious weed control and emergency control of pests necessary to protect the public good are allowed and will be the responsibility of the Grantors, subject to Federal and State Statutes and Regulations.

4. This easement and the covenants and agreements contained herein shall run with the land, shall be binding on alt persons and entities who shall come into ownership or possession of the lands subject to this easement. The Grantors, successors and assigns shall notify the Regional Director, U.S. Fish and Wildlife Service in writing of any sate or transfer at least 30 days following the sale or transfer of any portion of the lands subject to this easement.

Exhibit III-7a

Copies of the above-referenced map(s), Exhibit A, are on file in the Office of the Regional Director, U.S. Fish and Wildlife Service.

it is understood that this indenture imposes no other obligations or restrictions upon the Grantors and that neither they nor their successors, assigns, lessees, nor any other person or party claiming under them shall, in any way, be restricted from utilizing all of the subject lands in the customary manner for agricultural purposes except as provided herein.

It is further understood that the rights and interests granted to the United States of America herein shall become part of the National Wildlife Refuge System and shall be administered by the U.S. Fish and Wildlife Service, pursuant to the National Wildlife Refuge System Administration Act, 16 U.S.C. 668dd.

SPECIAL

1. This Indenture shall not be binding upon the UNITED STATES OF AMERICA until accepted on behalf of the United States by the Secretary of the Interior of his authorized representative, although this Indenture is acknowledged by the Grantors to be presently binding upon them and to remain so until the expiration of said period for acceptance, as hereinabove described, by virtue of the payment to the Grantors, by the UNITED STATES OF AMERICA, of sum of One Dollar, the receipt of which is hereby expressly acknowledged by Grantors.

2. Notice of acceptance of this Indenture shall be given the Grantors by certified mail addressed addressed to

Britton, SD 57430

shall be effective upon the date of mailing, and such notice shall be binding upon all Grantors without sending a separate notice to each.

3. Payment of the consideration will be made by a United States Treasury check after acceptance of this Indenture by the Secretary of the Interior or his authorized representative, arid after the Attorney General, or in appropriate cases, the Solicitor of the Department of the Interior shall have approved the easement interest thus vested in the United States.
Check shall be drawn in favor _-r

Uni ted States

1N WITNESS WHEREOF, the Grantors have hereunto set their hands and seals this 10th day of March, 1992.

_(L.S.) _(L.S.)

_______________(L.S.) _______________(L.S.)

_______________(L.S.) _______________(L.S.)

_______________(L.S.) _______________(L.S.)

ACKNOWLEDGMENT

State South Dakota )
)ss
County of Marshall )

On this 10th day of March, in the year 1992, before me personally appeared
nc 1, also known as
, his wife, known to me to be the person(s) described in and who executed the foregoing instrument and acknowledged to me that they (he/she) executed the same as their (his/her) free act and deed.

Robert Severson
Notary Public

(SEAL)

MY commission expires 12-6-93

ACCEPTANCE

The Secretary of the interior, acting by and through his authorized representative, has executed this agreement on behalf of the United States this dav of , 19

THE UNITED STATES OF AMERICA
DEPARTMENT OF THE INTERIOR

By _______________

Title _______________
U.S. Fish and Wildlife Service

Grassland Easement

' November, 1988

UNITED STATES DEPARTMENT OF THE INTERIOR
U.S. FISH AND WILDLIFE SERVICE
EXHIBIT "A"

Exhibit III-7a

Mop 1 Of 3

*TRACT 300G,1*

Wildlife E MANAGEMENT AREA *Marshall* COUNTY, STATE OF *South Dakota*

*127* N., R. 56 W. 5th PRINCIPAL MERIDIAN

sec. 1, $SW\frac{1}{4}$, $W\frac{1}{2}NW\frac{1}{4}SE\frac{1}{4}$, $W\frac{1}{2}E\frac{1}{2}NW\frac{1}{4}SE\frac{1}{4}$, $N\frac{1}{2}N\frac{1}{2}SW\frac{1}{4}SE\frac{1}{4}$, $SE\frac{1}{4}NE\frac{1}{4}SW\frac{1}{4}SE\frac{1}{4}$, $NE\frac{1}{4}SE\frac{1}{4}SW\frac{1}{4}SE\frac{1}{4}$, $S\frac{1}{2}S\frac{1}{2}SW\frac{1}{4}SE\frac{1}{4}$, $W\frac{1}{2}W\frac{1}{2}SE\frac{1}{4}SE\frac{1}{4}$



Scale: 4 Inches = 7 Mile

This map delineates lands referred to in the easement conveyance dated 3-10-92 which the parties of the first pert agree to maintain as a Wildlife Management Area.

LEGEN

Landowner Signature

Boundary of Easement Description

Lands covered by provisions of the easement

Prepared by. *Robert Severson* Date 3/9/9

*This page intentionally left blank*

**North Dakota**
**Grassland Easement**
(Revised June 1999)

UNITED STATES DEPARTMENT OF THE INTERIOR
U.S. FISH AND WILDLIFE SERVICE
GRANT OF EASEMENT FOR WATERFOWL HABITAT PROTECTION

THIS INDENTURE, by and between
hereinafter referred to as Grantors, and the UNITED STATES OF AMERICA, hereinafter referred to as United States, acting by and through the Secretary of the Interior or his authorized representative.

WITNESSETH:

WHEREAS, the North American Wetlands Conservation Act, 16 U.S.C. 4401-4412; the Migratory Bird Conservation Act, 16 U.S.C. § § 715-715s, the Migratory Bird Hunting and Conservation Stamp Act, 16 U.S.C. § § 718-718j, the Fish and Wildlife Act of 1956, 16 U.S.C. § § 742a-742j, the Emergency Wetlands Resources Act of 1986, 16 U.S.C. § § 3901-3932, and the Land and Water Conservation Fund Act, 16 U.S.C. § 460*l*-4 to 460*l*-11, authorize the Secretary of the Interior to acquire lands and waters or interests therein for the development, advancement, management, conservation, and protection of fish and wildlife resources. The purpose of this easement is to protect the habitat quality of the lands described on Exhibit A and such lands shall be maintained to provide cover, especially nesting cover, and food for a varied array of aquatic, terrestrial, and avian wildlife, particularly waterfowl and threatened and endangered species. The lands described on Exhibit A are hereinafter referred to as a wildlife management area, and

WHEREAS, the lands described below contain habitat suitable for use as wildlife management areas.

NOW, THEREFORE, for and in consideration of the sum of ** ** Dollars ($ ), the Grantors hereby grant to the United States, commencing with the acceptance of this indenture by the Secretary of the Interior or his authorized representative, an easement which includes a right of use for the maintenance of the lands described on Exhibit A, as wildlife management areas, in perpetuity, including the right of ingress to and egress on, over, across and through any and all lands of the Grantors, as described below, by authorized representatives of the United States. No rights herein are granted to the general public for access to or entry upon the land subject to this grant of easement for any purpose. The lands described on Exhibit A are located within, and the aforementioned right of ingress and egress extends on, over, across and through any and all lands within the following-described legal subdivision(s) in ____________ County, State of ______________, to-wit:

SUBJECT, however, to all statutory rights-of-way and other valid existing rights-of-way for highways, roads, railroads, pipelines, canals, laterals, electrical transmission lines, telegraph and telephone lines, cable lines, and all mineral rights.

The conveyance hereunder shall be effective on the date of the execution of this Indenture by the Secretary of the Interior or his authorized representative; provided, however, that such acceptance must be made within **12** calendar months from date of the execution of this Indenture by the Grantors, or any subsequent date as may be mutually agreed upon in writing by the parties hereto prior to the expiration of such date; and provided further, however, that in the event such acceptance is not made by such date, this Indenture shall be null and void.

The Grantors, for themselves, and for their heirs, successors and assigns, lessees, and any other person claiming under them, covenant and agree that they will cooperate in the maintenance and protection of the habitat areas, delineated on the map(s) attached hereto as Exhibit A, as wildlife management areas for the protection of fish and wildlife resources and to maintain the quality of these lands to provide cover for wildlife, especially nesting cover, and food for a varied array of aquatic, terrestrial, and avian wildlife, particularly waterfowl, and threatened and endangered species. To that end and for the purpose of accomplishing the intent of this Indenture, the Grantors, for themselves or for their heirs, successors, and assigns, lessees, or any other person or person claiming under them covenant and agree as follows:

1. Grantors will cooperate in maintenance of the wildlife management area by maintaining permanent vegetative cover, consisting of grasses, forbs and low-growing shrubs, on said habitat areas, as follows: There shall be no haying or mowing or seed harvesting for any reason until after July 15 in any calendar year, no alteration of grassland, wildlife habitat or other natural features by digging, plowing, disking or otherwise destroying the vegetative cover, and no agricultural crop production upon the habitat areas delineated on Exhibit A, unless prior approval in writing is granted by the U.S. Fish and Wildlife Service; except that grazing the aforesaid lands is permitted at any time throughout the calendar year without approval in writing.

2. Grantors will pay taxes and assessments, if any, which may be levied against the land.

3. Noxious weed control and emergency control of pests necessary to protect the public good are allowed and will be the responsibility of the Grantors, subject to Federal and State Statutes and Regulations. However, mowing/haying noxious weed is prohibited in accordance with the easement terms stated above.

4. This easement and the covenants and agreements contained herein shall run with the land and shall be binding on all persons and entities who shall come into ownership or possession of the lands subject to this easement. The Grantors, successors and assigns shall notify the Regional Director, U.S. Fish and Wildlife Service in writing of any sale or transfer at least 30 days following the sale or transfer of any portion of the lands subject to this easement.

Copies of the above-referenced map(s), Exhibit A, are on file in the Office of the Regional Director, U.S. Fish and Wildlife Service.

It is understood that this Indenture imposes no other obligations or restrictions upon the Grantors and that neither they nor their successors, assigns, lessees, nor any other person or party claiming under them shall, in any way, be restricted from utilizing all of the subject lands in the customary manner for agricultural purposes except as provided herein.

It is further understood that the rights and interests granted to the United States herein shall become part of the National Wildlife Refuge System and shall be administered by the U.S. Fish and Wildlife Service, pursuant to the National Wildlife Refuge System Administration Act, 16 U.S.C. 668dd.

## SPECIAL PROVISIONS

1. This indenture shall not be binding upon the United States until accepted on behalf of the United States by the Secretary of the Interior or his authorized representative, although this indenture is acknowledged by the Grantors to be presently binding upon them and to remain so until the expiration of said period for acceptance, as hereinabove described, by virtue of the payment to the Grantors, by the United States, of the sum of One Dollar, the receipt of which is hereby expressly acknowledged by Grantors.

2. Notice of acceptance of this Indenture shall be given the Grantors by certified mail addressed to

   shall be effective upon the date of mailing, and such notice shall be binding upon all Grantors without sending a separate notice to each.

3. Payment of the consideration will be made by a United States Treasury check or a check from a private conservation organization after acceptance of this indenture by the Secretary of the Interior or his authorized representative and after the Attorney General, or in appropriate cases, the Solicitor of the Department of the Interior shall have approved the easement interest thus vested in the United States.

IN WITNESS WHEREOF the Grantors have hereunto set their hands and seals on this _____ day of_________________ in the year 20___.

______________________________________(L.S.)

## ACKNOWLEDGMENT

STATE_______________________)
)ss
COUNTY _____________________)

On this ______ day of_______________ in the year 20___ before me personally appeared _________ known to me to be the person described in and who executed the foregoing instrument and acknowledged to me that he executed the same as his free act and deed.

Notary Public:_________________________________

(SEAL)

My commission expires: __________________________

## ACCEPTANCE

The Secretary of the Interior, acting by and through his authorized representative, has executed this agreement on behalf of the United States this _____day of ____________________, 20____.

THE UNITED STATES OF AMERICA

By:_____________________________________

Title:____________________________________
U.S. Fish and Wildlife Service

*This page intentionally left blank*

# ND FmHA

# CONSERVATION EASEMENT

# GUIDELINES

ND FmHA CONSERVATION EASEMENTS RESTRICTIONS

Various restrictions apply to FmHA Conservation Easements. These restrictions are described in the easement document under Section II., Covenants by the Landowner (Lessee, when property is under lease by FmHA). Restrictions are delineated on Exhibit "A" maps attached to the easement as "A", "B", "C", and/or "D" Easement Areas. Restrictions are as follows:

**"A" Easement Areas**

For "A" Easement Areas of the easement which include permanent grassland vegetation and the wetland area, the vegetation or hydrology of the described easement area will not be altered in any way or by any means or activity on the property conveyed by this deed, or property owned or under the control of the landowner, including: (1) cutting or mowing; (2) cultivation; (3) grazing; (4) harvesting wood products; (5) burning; (6) placing of refuse, wastes, sewage, or other debris; (7) draining, dredging, channeling, filling, discing, pumping, diking, impounding, and related activities; or (8) diverting or affecting the natural flow of surface or underground water into, within, and out of the easement area.

" FULLY " RESTRICTED

Note: In this case, grazing restrictions are only enforceable after FWS constructs a fence to keep cattle off the easement area.

**"B" Easement Areas**

For "B" Easement Areas of the easement which include permanent grassland vegetation and the wetland area, the vegetation or hydrology of the described easement area will not be altered in any way or by any means or activity on the property conveyed by this deed, or property owned or under the control of landowner, including: (1) cutting or mowing; (2) cultivation; (3) harvesting wood products; (4) burning; (5) placing of refuse, wastes, sewage, or other debris; (6) draining, dredging, channeling, filling, discing, pumping, diking, impounding, and related activities; or (7) diverting or affecting the natural flow of surface or underground water into, within, and out of the easement area.

" GRAZING " ALLOWED

**"C" Easement Areas**

For "C" Wetland Areas of the easement, either by an activity on the property conveyed by this deed, or on property owned or under control of the landowner, the vegetation or hydrology will not be altered through: (1) burning; (2) placing of refuse, wastes, sewage, or other debris; (3) draining, dredging, channeling, leveling, filling, pumping, diking, impounding, and related activities; or (4) diverting or affecting the natural flow of surface or underground waters into, within, and out of "C" Wetland Areas. The landowner shall have the right to carry on farming practices such as grazing, hay cutting, plowing, working, and cropping "C" Wetland Areas when they are dry of natural causes. "C" Wetland Areas shall include any enlargements of said wetland areas resulting from normal or abnormal increases in water.

" NO BURN, " DRAIN, FILL

**"D" Easement Areas**

"GRASS/TREE" PROTECTION

For "D" Easement Areas of the easement, which consist of perennial grassland/tree vegetation, the grasslands and trees within the easement shall be maintained in vegetation consisting of grasses, grass-like plants, trees, and/or forbs. This vegetation is to be maintained without any disturbance to the soil surface other than that caused by burning, grazing, or haying. The harvest and/or removal of live trees is prohibited, unless permitted by the easement manager. The planting or seeding of any crop, grass, legume, forb, shrub, vine, or tree is prohibited, unless permitted by the easement manager.

A few County Supervisors and producers are confused by the use of "G" to delineate grassland/trees within easement boundaries. "G" is not a separate restriction. It merely denotes the non-wetland portions of an easement area that are restricted in the same way as the wetlands, under either "A" or "B" restrictions.

## FmHA & FWS EASEMENTS ON THE SAME PROPERTY

Earlier FmHA Conservation Easements were placed on several properties already encumbered by a FWS Wetland Easement. Greater restrictions ("A" & "B" Easement restrictions) were placed on many wetlands in this case. These wetlands are delineated on Exhibit "A" maps of the FmHA Conservation Easement.

However, in these cases many wetlands that would normally be restricted to burning, draining, filling and leveling (“C” Wetland Areas) under an FmHA Conservation Easement were deleted from the FmHA Easement because these wetlands were already protected in the same way by the FWS Wetland Easement. FmHA Easements written from this point forward will contain all wetlands, whether or not they are already covered by a FWS Easement.

The FWS Wetland Easement will remain in force on these properties, and violations of burning, draining, filling, and leveling should be enforced under this easement rather than the FmHA Easement due to our long-standing track record in enforcing FWS easements. Of course, violations of FmHA easement restrictions different from those of the FWS easement will be enforced under the FmHA easement. Coordinate enforcement activities in these particular situations with the Zone Law Enforcement Officer.

In cases where a property is encumbered by both a FWS Wetland Easement and a FmHA Conservation Easement, field personnel should make a special effort to discuss both easements with a new landowner.

ND FmHA CONSERVATION EASEMENTS SAMPLE LETTER OF INTRODUCTION

It is important to contact the landowner or lessee of a property personally as soon as possible after the Conservation Easement is approved, and again when the property is sold or the easement is recorded. Because this is not always possible, a letter of introduction may be used until such time that you can make a personal contact. The letter is not to be used in lieu of personal contact.

CERTIFIED MAIL
Return Receipt Requested

Mr. F. Armer
RR # 1
Plowdown, North Dakota

Dear Mr. Armer:

You have recently leased/purchased (choose one) Farmers Home Administration (FmHA) property containing a FmHA Conservation Easement. This is a perpetual easement which has been attached to the lease/quitclaim deed (choose one). The Fish and Wildlife Service has agreed to manage and enforce the provisions of the easement for FmHA.

I am sure that the FmHA County Supervisor for your county has discussed the provisions of the FmHA Conservation Easement with you. I would like to meet personally with you on the property as soon as possible. I will be contacting you sometime in the next two months to set up a meeting time that is most convenient with you.

Until then, please be sure that you have read and understand the provisions of the FmHA Conservation Easement. If you have any questions concerning the easement, please call me at (phone number), Monday through Friday, from 8 a.m. to 5 p.m.

Because of the late date that FmHA released the easements, you are authorized to crop easement areas surrounding wetlands, if the easement area is currently tilled cropland and only if grain crops are planted. Wetland basins located in "A" and "B" Easement Areas should not be cropped, however. Fall tillage is prohibited on "A" and "B" Easement Areas.

Cutting, mowing, and haying are not authorized without permit on "A" and "B" Easement Areas.

After meeting with you to discuss the provisions of the FmHA Conservation Easement, we hope to mark the easement boundaries this fall and seed down grass in "A" and "B" Easement Areas next spring.
I look forward to meeting you. Again, please call me if you have any questions or concerns.

Sincerely,

Joe Mallard
Wetland Manager

Administration of FmHA Conservation Easements will be handled similarly to FWS Waterfowl Management Easements (see Administrative and Enforcement Procedures for FWS Easements, Chapter V), with the following additions and/or revisions:

**A. Permanent Field Office File**

Handled the same as FWS Easements.

**B. New Easement Inspection**

Handled the same as FWS Easements, except that it is imperative that field station representatives meet with the County Supervisor and the landowner or lessee to discuss provisions of the easement, tentative schedule of field activities, etc., prior to conducting any field work on the property.

**C. Activities Permitted in Wetlands under Easement**

Handled the same as FWS Easements with the following additions:

1. <u>Cutting or Mowing</u> - Cutting or mowing of vegetation within "A" or "B" Easement Areas is permissible by permit issued by the Wetland Manager.

A permit will always be issued when the landowner or lessee provides justification for control of <u>existing</u> noxious weeds. The cut or mowed vegetation may be removed as hay in these instances at the Wetland Manager's discretion. All other cases of cutting, mowing, and hay removal may be permitted at the discretion of the Wetland Manager. However, in this instance the permitted activity should not be allowed until after the primary nesting season for waterfowl, generally August 1 or later. Permits for cutting or mowing shall not be assignable to subsequent landowners.

2. <u>Cultivation</u> - Cultivation of "A", "B", or "D" Easement Areas is permissible by permit issued by the Wetland Manager. Cultivation is authorized generally for rejuvenation or seedbed preparation for reseeding of easement areas as deemed necessary by the Wetland Manager.

3. <u>Harvest of Wood Products</u> - Removal of live timber in "A", "B", or "D" Easement Areas is permissible by permit issued by the Wetland Manager. Permits for this activity should only be issued for maintaining or enhancing wildlife habitat. Removal of willows choking a wetland would be a good example. Replacing Chinese Elm in a shelterbelt with ash or other more permanent trees is another example. However, in a case like this, the activity should only be permitted if tree replacement is assured.

4. <u>Grazing</u> - Grazing is restricted only in "A" Easement Areas. Grazing is permissible by permit issued by the Wetland Manager.

Prior to field delineation of easement boundaries, field stations should discuss locations and marking thoroughly with the FmHA County Supervisor and the landowner or lessee.

There are two types of easement boundaries: straight-line (blocks), and meandering (basin contour).

**Straight-Line (Blocks)**

FmHA has normally agreed to this type of boundary only when the easement area was in grass at the time it was reviewed, or when it affects cropland little more than a meandering boundary. For this reason, straight-line buffers are usually located in grassed areas, tree areas, or along the edges of crop fields. **Straight-line boundaries should be marked according to the procedures outlined below, or according to the procedures outlined in Chapter V of the Easement Manual for "Posting Grassland Easements for Management Purposes," whichever is most appropriate given the deed restrictions and availability of spatial data.**

Nearly all "D" Easement Areas have straight-line boundaries, and normally are not applicable to prior owners. "D" Easement Areas should be marked only when the prior owner/operator has relinquished all rights to buy back the property. Check with the County FmHA Supervisor on prior-owner status when "D" Easement areas are involved.

**Meandering (Basin Contour)**

FmHA requested this type of boundary in the majority of cases because it places restrictions on the minimum amount of upland. For this reason, meandering boundaries are far more common on wetlands located in cropland.

Meandering boundaries follow the contour of a wetland or watercourse at a set distance from the basin edge; normally at 33, 66, or 100 foot widths. **Meandered boundaries should be marked according to the procedures outlined below.**

Marking meandered boundaries in crop fields should only be done after crops are harvested and/or near the time that the easement area will be planted to grass. In cropland, we expect land use lines to become fairly well established within one year of planting.

When meandering boundaries are located in existing grass, (i.e., tame pastures, native prairie, CRP), flagging will not be necessary until such time that the landowner may wish to break out the adjacent lands for crops or rejuvenation of the stand. Each new landowner should be asked to contact the appropriate field station prior to breaking adjacent lands. Document this by letter.

***Boundary Marking Procedures:***

Though "Meandering (basin contour)" type boundaries are described with Exhibit A maps, similar to wetlands protected by the FWS wetland easement program, it is important to realize and understand the inherent differences in protection afforded wetlands under these two programs.

All FWS wetland easement purchased after 1976 have Exhibit A maps depicting protected wetland basins that were prepared at the time the easement was purchased. Those purchased prior to 1996 did not have Exhibit A maps prepared at the time of purchase; rather, wetland district personnel are responsible for mapping the protected wetlands. Regardless, once these wetlands are mapped, the FWS contends that

"because climatological and other natural conditions may cause the shape and location of wetland basins to change over time and from time to time, this map (Exhibit A) may or may not show wetlands as they appear in any given year." Therefore, it is possible under wet conditions for the actual wetland acreage on the ground to temporarily exceed that which was mapped or reported on the acreage summary sheet. That being said, the FWS does have procedures to allow landowners to drain or partially drain wetlands that flood beyond reasonableness, or when health or human safety is at risk. However, the FWS maintains that once a basin is delineated on an Exhibit A map, it is protected, regardless of shape or size.

Wetlands protected by the "B" provision of a FmHA conservation easement cannot be treated similarly. Unlike FWS wetland easements, the FmHA conservation easement delineates an exact area that must be protected. Recently in some counties, this area was calculated by county FSA offices, and the resulting acres were removed from the producers' farm bases that were eligible for farm program benefits. Because of this, and because these areas are planted back to permanent grass cover, it is necessary to mark the boundaries as accurately as possible prior to grass establishment. We will not get a second chance to return, should water levels rise, and move the boundaries of the protected areas. Nor will we return to move the boundaries when the wetlands are dry.

With these thoughts in mind, the following procedures were developed by a field station in North Dakota to post "B" easement meandered boundaries in an accurate, repeatable, and most importantly, fair and defendable, manner (these procedures can also be used to mark straight line boundaries).

- As previously mentioned, the first step in posting protected areas of an FmHA conservation easement should be a visit with the county FSA office. These offices were directed by their state office to remove from producers' bases, any lands not eligible to be farmed (such as areas protected by the "B" easement provisions of an FmHA easement). However, FSA will not take this action until they are notified that the FWS will enforce the easement. When visiting with the FSA, explain the easement provisions if necessary, and ask them how they are determining the acres encumbered by the easement. Some counties are using the acreage figure contained in the easement document, others are calculating the acres from the Exhibit A maps with a planimeter. Verify the fact that you intend to post the easement as depicted in the Exhibit A maps, and ensure that the acres will be similar to those removed from the farm program. Ensuring that the actions FSA and FWS take are consistent will add credibility and validity in the eyes of the landowners.

- Caronsite markers in the field serve two purposes: 1) they identify to the landowner/operator the protected areas that cannot be cultivated, and 2) they identify to the FWS personnel, or its designee, the protected areas for the purposes of re-seeding grass. Prior to entering the field to post the buffered wetlands, make copies of all Exhibit A maps to use in the field. On these maps, measure cross-sections of easy-to-identify features of each protected area. For example, the cross-sections of the long and short axis across an "egg-shaped" wetland and buffer. For oddly-shaped wetlands/buffers, more cross-sections will be needed and more carsonite markers will be needed in the field to adequately identify the area. Diagram the cross-sections right on the Exhibit A map and indicate the distances. Laminate these maps for use in the field.

- Two crew members, preferably both experienced in wetland identification, are needed to post wetlands/buffers in the field. One crew member should be equipped with a digital range finder, the second with a GPS unit. The crew members position themselves along a previously measured cross-section of a protected area, equidistant from the wetland edge (33', 66' or 100', depending on the Exhibit A). The crew member with the digital range finder "shoots" the distance to the ND FmHA

other crew member. Depending on the reading, the two crew members simultaneously move an equal distant towards or away from each other until the target distance is reached (portable radios aid this process tremendously). Once reached, they both pound a carsonite marker.

- The locations of these markers are recorded with a GPS unit capable of assigning unique identifiers to each. For example, each post will have an X-Y coordinate, usually a UTM, along with a unique label. It is recommended that the posts of the protected areas be labeled "1A, 2A, 3A....," "1B, 2B, 3B...," and so forth. Where the number indicates a unique post location and the letter indicates a unique protected area. A record of these locations, which includes the identifier and the coordinate, should be prepared and included in the permanent easement file. Also, it is essential to document how the GPS data was collected; i.e. what equipment was used and in what projection datum the data were collected (assuming UTM coordinates are used). Future managers will be able to use this information should it be necessary to return to the field and re-post areas that have been disturbed.

- Upon completion of the posting of protected areas, the GPS data can be downloaded and displayed in a GIS. The protected areas can then be estimated by "connecting the dots" and producing a polygon. These polygons can be qualitatively assessed to ensure they resemble the general shapes of protected areas as depicted on the Exhibit A maps, and they can be quantitatively assessed by adding up the acres. It is imperative that this acre figure be compared to that recorded in the easement documents to ensure that you do not post more land than is protected. It is better to be at, or just under, the acres recorded in the easement documents.

- Once posting is completed, the permanent easement file should contain:
  1. The laminated Exhibit A maps containing cross-section measurements of protected areas used to place the carsonite markers,
  2. A list of the coordinates and unique identifiers of all carsonite posts,
  3. Documentation describing the equipment used, and the projection datum of GIS data.
  4. A photograph (Digital ortho-quad, geo-referenced satellite imagery or infra-red photograph, etc) with the carsonite post locations and estimated protected areas depicted.

- Alternative methods that can be used are to scan and geo-reference the Exhibit A maps and download the spatial data to a GPS unit. The GPS unit can then be used exclusively to locate the edges of the protected areas. This removes the need to use rangefinders.

- Finally, have the landowner sign the map depicting the protected areas if possible; provide copies of the signed map to the landowner and the FSA office and retain the original for the file.

ND FmHA CONSERVATION EASEMENTS — SEEDING EASEMENT AREAS

It is the Service's responsibility in all cases to plant vegetation in "A" and "B" Easement Areas. This means planting the "buffer" areas around wetlands to grass or a grass/legume mixture.

Field stations can choose the grass varieties that they believe will work best for the particular situation. Native grass varieties are recommended because of their permanency. FWS Special Scientific Report No. 234 (H. Duebbert) titled "Establishment of Seeded Grasslands for Wildlife Habitat in the Prairie Pothole Region" is an excellent source of information to use for this purpose.

Choosing grass varieties should be based on a thorough field review to determine what variety or mix of varieties will work best. Consideration has to be given to such things as soil alkalinity, expected extent of flooding period, and grass permanency. Protective of the wetland from agricultural runoff and erosion is the primary objective.

Many FmHA properties have been idled or poorly managed in the past, and seedbed preparation will be a necessity. This may be accomplished by allowing the landowner/lessee to plant a grain crop in the easement areas.

Easement areas can be planted by contract or by field station. In either case, planting equipment must be compatible with the grass variety being planted, i.e., don't use a grain drill to plant bluestem.

Weed control should be performed similar to that for establishment of grass on refuge lands.

ND FmHA CONSERVATION EASEMENTS WETLAND RESTORATIONS

The Service is authorized to restore wetlands that are marked Exhibit "A" maps with the letter "R." Some important considerations have to be made first.

- In every case, FmHA has agreed to restoration of drained wetlands (marked "R" on Exhibit "A") only to the extent and size delineated on Exhibit "A." In some cases this may be smaller than the original wetland basin. Restoration in these instances can only be done in a way which makes it possible for excess water to runoff. This can be accomplished by constructing an earthen dam with an earthen spillway or culvert set at the proper elevation.

- Some wetlands given restorable status on Exhibit "A" maps may be tied into extensive drainage systems or may, when restored, inundate lands under different ownership. A formal survey will be necessary with these cases to determine if restoration is in fact feasible and to what extent, if any, the restoration(s) will affect lands under different ownership. Every attempt will be made to obtain flowage easements where necessary, or to restore the wetland so that it doesn't affect lands under different ownership. If after these attempts it is still not feasible to restore, the wetland maintains its restorable status until such time that it is feasible to restore.

- Once the Conservation Easement is approved by FmHA, maintenance of drainage facilities for restorable wetlands must cease immediately in order for the landowner/lessee to comply w/terms of the easement.

Wetlands can be restored by contract or by field stations. Contracting with the landowner has worked with good results under the Wildlife Extension Program. Contracting with the landowner will, of course, depend on his disposition and may not be practical in some cases. However, it may provide the landowner with a greater appreciation of the easement when he's doing the work himself, and increase compliance.

When restoring wetlands, ditches should be plugged or filled a minimum distance of 150 feet from the restored basin to increase its permanency. Tile and pipe drains will be removed entirely from the wetland basin, plus an additional 100 feet from the basin edge. At that point the drain should be plugged or destroyed so that it cannot pass water.

Restorations should be well documented with photos, maps showing locations of plugs, and narrative describing the work, date, and signature of field personnel.

There may be a few instances where a drained wetland is now protected by a FmHA Easement but is not marked as restorable. This is due to one of two reasons. First, the lessee/landowner may have initiated drainage since we field reviewed the property. In this instance, the drain is treated as a violation of the easement. Contact the Zone LEO before taking action. Report the drainage as a potential Swampbuster violation to the NRCS.

It may be a case where the drain was inadvertently missed during the field review. If the wetland is drained, covered by the FmHA easement, and not marked restorable, we may not restore the wetland. However, maintenance of the drain must cease from this point forward, and the drain allowed to fill naturally. This must be explained to the lessee/landowner.

There may be situations where the lessee/landowner strongly disputes the existence of a wetland, our determination or wetland basins, and/or the location of easement boundaries. The following guidelines may be used in resolving disputes:

1. Easement Boundaries - Disputes will probably arise for delineation of straight-line boundaries in cropland more than any other case. A formal survey is the best way to solve these disputes. The Service will be responsible for conducting the survey. Formal surveys should be based primarily on locating the easement boundary delineated on Exhibit "A" of the easement, rather than the measurements established on Exhibit "A." Formal surveys shall be requested through the RO.

2. If a landowner disputes the actual existence of a wetland, then refer to the “FmHA Easements and Disputed Wetland Status” at the end of these Guidelines.

3. Wetland Basin Edge - This is expected to be the most common dispute. The vast majority of basin edges will usually be easily determined by an experienced wetland manager. Every attempt should be made to resolve this dispute at that time. If the dispute cannot be resolved, advise the landowner to request a determination from the NRCS while coordinating with the NRCS at the same time.

ND FmHA CONSERVATION EASEMENTS PHOTODOCUMENTATION

To adequately enforce the provisions of the FmHA Easements it is important that the easement property and management of them are properly documented. The following list serves as a minimum guideline for photo-documentation of FmHA Easements:

1. Aerial photos of entire property before and after grass in easement areas is established. These should be scheduled in the spring to better show wetlands. All drainage facilities should be photographed during the initial flight.

2. Take before and after photos of wetland restoration plugs in a way to show the wetland basin as well.

3. Photograph drains that are not identified as "Restorable" but cannot be maintained as soon as possible.

4. Photograph subsequent violations from the same point that initial photos were taken.

5. Less important for enforcement but necessary to document program successes, photograph resource enhancement (i.e., ducks using a restored wetland, wildlife in easement areas, build-up of eroded soil outside an easement area, etc.).

6. Photograph at least one post/boundary.

**A. Aerial Inspections**

All easements will be checked aerially for compliance at lease once each year. The objective is to detect all activities which may constitute a violation. Easement surveillance will be conducted similar to that for FWS Wetland Easements, (see “Administrative and Enforcement Procedures for FWS Easements, Chapter VI”). FmHA Easements should be colored differently on maps prepared for the flight. Wetland Management Districts with fewer FmHA Conservation Easements may find it possible to conduct annual surveillance in conjunction with their regular easement flights. Wetland Management Districts with several FmHA Conservation Easements may find it necessary to schedule separate surveillance flights to cover those easements alone. In this case, surveillance flights can be handled the same as a follow-up flight for waterfowl management easements.

**B. Ground Inspection**

See “Administrative and Enforcement Procedures for FWS Easements, Chapter VI” for procedures. Waterfowl Management Easement Data Sheets can be used for this purpose with alterations to fit the situation.

FmHA Conservation Easements should be ground checked at least every two years to monitor encroachment and other problems that may not be readily visible from the air.

ND FmHA CONSERVATION EASEMENTS COMPLIANCE

The following compliance actions will be handled the same as for Waterfowl Management Easements as described in the “Administrative and Enforcement Procedures for FWS Easements, Chapter VII.”

A. Pre-contact Preparation

B. Landowner and/or Tenant Contact

1. Interview Phase
2. Compliance Deadline
3. Post-interview Procedures
4. Compliance Check

Easements will be enforced the same way whether under lease from FmHA or under private ownership.

Many actions under this heading are exactly the same as for Waterfowl Management Easements. (*denotes that the procedure is taken directly from the "Administrative and Enforcement Procedures for FWS Easements, Chapter VIII".) It is imperative that the Zone LEO be contacted in all cases.

**1. Drainage Violations***

a. Issue Violation Notices when any of the following conditions are met.

(1) The landowner had knowledge of the easement.

(2) First-time offenders of a serious violation involving a scraper ditch, backhoe, or activity having a major effect on a wetland or series of wetlands. Generally, this will only involve seasonal and semi-permanent wetlands.

(3) Repeat violations of any type, including subsequent plow furrow violations.

b. Before the decision to issue a violation notice is made, it must be in coordination with the Zone LEO

c. Do not issue the violation notice until the restoration work has been completed.

**2. Burning Violations***

a. Certified letters must be sent to the landowner on burning violations. In cases of roadside burning or insignificant burning without clear intent, no notification is necessary.

b. If repeat violations occur, consult with the Zone LEO.

(1) Knowledge of the easement by the landowner is essential.
(2) Documentation of repeat violations is necessary.

c. A violation notice may be issued based on the case history and consultation with the Zone LEO.

**3. Fill and Level Violations***

Serious violations of fill or level can constitute issuance of a violation notice.

a. The violation must be determined to be of significant harm. One small rock pile in a 5-acre wetland would not constitute significant harm. All efforts should be made to have this type of violation corrected but it would not be considered a case to issue a violation notice. Notification to the landowner that a continual practice of dumping rocks in the wetland could result in a violation may be advisable.

b. In cases of fill that do not constitute a violation or require restoration, documentation with photographs is needed. Accumulation of the fill activity can then be documented and enforcement action taken at a later time. Adding rocks to existing rock piles is an example where documentation will aid in future action if the rock pile continues to grow. Efforts to document existing rock piles or fill would be useful information for dealing with possible problems in the future.

**4. Construction Violations**

New construction of dwellings, barns, outbuildings, or other structures within an easement area is a violation. However, it is a difficult enforcement situation. Contact the Zone LEO in all cases prior to taking action.

**5. Cutting or Mowing Violations ("A" & "B" Easement Areas Only)**

a. Certified letters must be sent to the landowner on cutting or mowing violations. In cases where it appears the action was taken to control noxious weeds, i.e., cutting or mowing was used as a method to control existing noxious weeds and it does not appear to be a case of removing vegetation for hay, notify landowner that an easement permit is necessary and available for this action.

b. If repeat violations occur, consult with the Zone LEO.

(1) Knowledge of the easement by the landowner is essential.

(2) Documentation of repeat violations is necessary.

c. A violation notice may be issued based on the case history and consultation with the Zone LEO.

**6. Cultivation Violations ("A," "B," and "D" Easements Areas Only)**

Serious violations of breaking or cultivation of easement areas can constitute issuance of a violation notice.

a. The violation must be determined to be of significant harm. Encroachment by a few feet would not constitute significant harm. All efforts should be made to have this type of violation corrected but it would not be considered a case to issue a violation notice. The violation should be documented and the landowner notified that a continual practice of encroachment in the easement area could result in a violation.

b. Before the decision is made to issue a violation notice for a more serious violation, it must be in coordination with the Zone LEO.

**7. Grazing Violations ("A" Easement Areas Only)**

a. Certified letters must be sent to the landowner on grazing violations.

b. If repeat violations occur, consult with the Zone LEO.

(1) Knowledge of the easement by the landowner is essential.

(2) Documentation of repeat violations is necessary.

c. A violation notice may be issued based on the case history and consultation with the Zone LEO.

**8. Harvesting Wood Products ("A," "B," & "D" Easement Areas Only)**

For these easement areas, but particularly in the case of "D" Easement Areas, this restriction has been prescribed to protect stands of trees from mass destruction (e.g., dozing a shelterbelt to clear land for farming).

a. The violation must be determined to be of significant harm. Removal of one or two trees from a multi-row shelterbelt would not constitute significant harm. Removal of one or two trees from a multi-row shelterbelt would not constitute significant harm. The landowner should be notified of the provisions of the easement, but it would not be considered a case to issue a violation notice.

b. Before the decision is made to issue a violation notice for a more serious violation, it must be in coordination with the appropriate Zone LEO.

**9. Other Possible Violations***

a. **Coulee cleanout** represents a difficult issue to address but some direction can aid in enforcement of easement protected wetlands.

(1) Wetlands within a coulee are covered by the easement unless deleted on the drainage facility map (pre-1976 easements); however, third party interests (viable legal drains) may have prior rights.

(2) Maintenance or cleanout of a natural waterway can be addressed in some situations by allowing cleanout upstream of wetlands to the upstream edge of the wetlands. A 200 to 500 foot no-maintenance should be allowed in the wetland basin or on the downstream portion of the no-maintenance buffer.

b. **Sheetwater** is yet another difficult issue. Sheetwater is defined by this handbook as a nondepressional area covered by shallow water that is generally moving off the land. Any depressional area, regardless how temporary, is considered a wetland. Contact appropriate Zone LEO in all cases prior to taking action.

c. **Pumping** is a problem in certain areas usually under high water conditions. Pumping is considered drainage and thus is a violation of the easement. Pumping can be a violation where issuance of a violation notice is warranted.

(1) Knowledge of the easement by the landowner is a requirement.

(2) The violation must be of a serious nature resulting in a significant impact to the wetland.

(3) Coordinate any violations of this nature with the appropriate Zone LEO before the violation notice is issued.

d. **Enlargements** of the easement protected wetlands are an issue in high run-off years. Unauthorized drainage to reduce the size of a wetland to its "normal" size does occur. The easement document does address this issue and does not allow for the drainage of "enlarged" wetlands. In most cases, the enlarged wetlands are the result of upstream drainage and the landowner should be directed to the appropriate water board.

e. **Co-owned Wetlands** or wetlands partially on easement lands present a difficult enforcement situation if they are drained. No precedent for enforcing drainage of co-owned wetlands has occurred. However, there may be certain situations that warrant documentation and possible enforcement action. These include:

(1) Situations where the majority of the co-owned wetland is covered by easement, the larger the percentage covered by easement, the easier it will be to litigate if necessary.

(2) Ownership of co-owned wetlands is important to determine. If the co-owned wetland is owned by the same landowner or family member with the only difference being that only part is covered by easement, the drainage of such a wetland may be grounds for enforcement action.

(3) The involvement of the easement landowner is also an important issue. If the easement landowner participated in or encouraged the non-easement drainage, this could be useful.

(4) If any co-owned drainage involves the above criteria, contact the appropriate Zone LEO for coordination and how or if to proceed.

f. Any **plow furrow** that removes water is a violation.

g. **Culverts** may be an effective tool in resolving certain easement conflicts. However, if not properly used, they can be very damaging to easement protected wetlands. For basic guidance, consider the following:

(1) Extreme caution should be used in agreeing to culvert placement where none previously existed. If a culvert is needed, for example, to protect a road, the

elevation must be such that it protects the integrity of any easement wetland involved.

(2) Culverts that are replaced for any reason must be placed at the old or previous elevation, no lower. The elevation of the bottom of the culvert is critical, regardless of how large the culvert is.

(3) In setting elevations for wetlands that will be lowered for health, safety, or endangerment of property, it may be useful to use culverts to set permanent elevations at the outlet. This may better ensure that the set elevation will be maintained.

ND FmHA CONSERVATION EASEMENTS PROSECUTION

Prosecution will be handled similar to prosecution of other FWS Easements. Appropriate Zone LEO is to be contacted in all instances. Consult the "Administrative and Enforcement Procedures for FWS Easements, Chapter VIII" for more details.

# FmHA Easements[1] and Disputed Wetland Status

PURPOSE: This document establishes policy and procedures for situations and disputes in which an area considered to be wetland and protected and recorded by FmHA easement is later determined to be non-wetland.

**SCOPE:** The policy and procedures outlined here apply only to FmHA easements recorded in the State of North Dakota and managed by the U.S. Fish and Wildlife Service.

**POLICY:** The U.S. Fish and Wildlife Service may grant relief from easement restrictions for areas considered to be wetland and protected and recorded by FmHA easement that are later determined to be non-wetland. By law, the Service may not divest itself of an area protected by FmHA easement, because the area is considered to be an interest in the National Wildlife Refuge System. Therefore, when an area is determined to be non-wetland, the Service may only exchange the easement area for another, unprotected wetland, or reduce the level of easement restriction on the easement area. The level of relief from easement restrictions depends on the type of easement restrictions in place and the time period in which the easement was prescribed.

**PROCEDURE:**

**Applicable to all Cases:**

- USFWS WPA wetland easement takes precedence if such easement also encumbers the property.

- Exchanges and revisions are subject to review and approval of the ND Refuges Coordinator. Managers shall involve the ND Refuges Coordinator as early as possible in the process.

- An area may be determined to be non-wetland only if the area was not considered to be cropland, per FSA definition, on the date of the field review performed to prescribe the easement, and,

    1. It is an obvious mistake such as rockpile or hilltop, or error by NRCS using off-site tools to determine wetland, or

    2. The area is not depressional, and an NRCS-Certified Soil Scientist determines that the area does not contain hydric soils.

- When exchanges or revisions are prescribed, the ND Refuges Coordinator shall, in coordination with the Bismarck Realty Office, prepare an amended Exhibit "A" easement map indicating the change in easement restriction or with the non-wetland area removed,

[1] FmHA easements are also known as RECD easements, FSA Ag-Credit Easements, and USDA Conservation Easements depending on the status of the USDA program responsible for these properties at the time.

depending on the specific situation. In certain cases, for example when a "B"[2] easement restriction is changed to a "C"[3] easement restriction and no "C" easement restrictions were part of the original easement, it may be necessary to prepare an amended easement and Exhibit "A" easement map. The Bismarck Realty Office will then submit an easement amendment package to the Regional Realty Office. The Regional Realty Chief is responsible for final approval and recording of the amendment of the FmHA easement. The District Manager will forward the amended Exhibit "A" easement map to the landowner via certified mail, with a copy placed in the easement file, and will also forward a copy to the county USDA Service Center, with an explanation of the changes in the easement.

**Easements prescribed under 1985 Farm Bill:**

**Procedure:** Areas determined to be non-wetland will be reduced to "C" easement restrictions that allow cropping and cutting or mowing.

**Discussion:** During this period, wetlands were identified by USFWS only, and all easement areas were field reviewed. Any and all wetlands and other important resources were subject to encumbrance, and the "C" easement restriction was authorized for use. While obvious wetlands were normally encumbered with "B" easement restrictions, ephemeral and other small, isolated wetlands were encumbered with "C" easement restrictions in most cases. "C" easement restrictions allow cropping, cutting or mowing (haying) when the area is dry from natural causes. If an area considered to be wetland and protected and restored by FmHA easement, as prescribed under the 1985 Farm Bill, is later determined to be non-wetland, it will in nearly all cases have been encumbered with "C" easement restrictions.

**Easements prescribed under 1990 Farm Bill:**

**Procedure:** Areas determined to be non-wetland may be exchanged for wetlands located on the original inventory property and not protected by FmHA easement at a recommended 1:1 acreage ratio of non-wetland acreage to replacement wetland acreage. Total easement encumbrance cannot exceed 10% of prior converted cropland or 20% of other cropland that existed on the original inventory property at the time the easement was prescribed.

Wetlands considered to replace non-wetland must have been identified in the wetland determination prepared by NRCS at the time the easement was prescribed. Replacement wetland(s) will be encumbered with "C" easement restrictions that allow cropping and cutting or mowing.

If there are no wetlands identified in the wetland determination prepared by NRCS at the time the easement was prescribed and located on the original inventory property and not protected by FmHA easement, or if the acreage of one or more unprotected wetlands considered for exchange

---

[2] "B" easement area is defined as an easement area containing a narrow band of grass that follows the contour of a wetland or watercourse at a set distance from the basin edge, normally 33, 66, or 100 feet in width, or the buffer is delineated in straight lines or "blocks" surrounding the wetland.

[3] "C" easement area is defined as an easement area that encumbers the wetland basin only. The easement allows cropping and cutting or mowing. It is normally prescribed for small, isolated temporary wetlands less than 1 acre in size.

exceeds 10% of the acreage being replaced, easement restrictions for the area determined to be non-wetland will be reduced to "C" easement restrictions that allow cropping and cutting or mowing.

If the area determined to be non-wetland is protected with a Straight Line/Block buffer[4], it is subject to change or revision only if all wetlands located within the straight line/block buffer are determined to be non-wetland. If this proves to be the case, the non-wetland area will be considered for exchange or a change in easement restriction as described in the above two paragraphs.

NRCS was responsible for determining all wetlands encumbered by FmHA easements under the 1990 Farm Bill. Therefore, NRCS is also responsible for determining wetland status of the disputed easement area as well as wetlands not protected by FmHA easement and considered for exchange. In nearly all cases, the landowner must file an NRCS-CPA-038 <u>Request for Certified Wetland Determination</u> before NRCS can access the property to determine wetland status.

The current landowner shall be given the option to determine which wetland(s) will be used for replacement acreage. Managers have the discretion to forego this option if the landowner has a history of violations. Easement areas determined to be non-wetland must be exchanged with unprotected wetland acreage when it exists.

**Discussion:** Under 1990 Farm Bill criteria, FmHA easements could encumber no more than 10% of prior converted wetland, 20% of other cropland, and 50% of forage land (with a forage management plan applied). Therefore, in most cases the property contains wetlands that were not protected by FmHA easement that may be available for exchange. "C" easements were not applicable. Wetlands were encumbered with a "B" easement including a contour strip buffer or straight line/block buffer. NRCS was given responsibility to determine all wetlands on the inventory property. In nearly every case, NRCS used off-site tools (FSA slides, NWI, etc.) and did not perform a field certification of wetlands. Since NRCS was originally responsible for determining wetlands on FmHA inventory lands, they must also be responsible for determining non-wetland status.

**Easements prescribed under 1996 Farm Bill:**

Easement restrictions for the area determined to be non-wetland will be reduced to "C" easement restrictions that allow cropping and cutting or mowing.

An easement area is not subject to change or revision due to disputes involving its farm history.

[4] Straight Line/Block buffer is defined as an easement area containing straight-lined boundaries. This type of easement area normally contains more than 1 wetland.

# Farmers Home Administration Conservation Easements in South Dakota

The following guidelines are designed to provide South Dakota easement managers dealing with Farmers Home Administration conservation easements with guidance on how to proceed when encountering requests with potential impacts to easements interests or by a potential easement violation. This document is divided into two sections which encompass the administration and management procedures related to FmHA easements. Managers are reminded that this document is designed to interact closely with the wetland and grassland easement manual and that guidance related to specific topics such as easement enforcement, are addressed in greater detail in other sections of the main easement manual. Secondly, this document makes numerous references directing easement managers to thoroughly review the easement documents and attached Exhibits whenever faced with making a decision related to FmHA easements. This step in the process cannot be overstated.

The key to managing and enforcing FmHA easements is to become fully aware of each individual easement and the covenants by the landowner. FmHA conservation easements are not as standardized in the level of protection such as the FWS wetland and grassland easements. FmHA easements are extremely variable in the degree of protection described in each specific contract therefore, it is imperative that each easement file be thoroughly reviewed prior to making any decisions regarding the easement.

Various restrictions apply to FmHA conservation easements. In many cases, multiple restrictions are identified on the same property. These restrictions are defined in detail in Section II of the easement document; Covenants by the Landowner. Restrictions outlined on Exhibit maps as part of the legislation of the 1985 Farm Bill are denoted using the alpha designators B, B1, C, D and E. During this time frame, the “E” easement restriction was primarily used to address special situations primarily specific to individual field stations. Definitions for restrictions associated with “E” easements may vary from station to station. Definitions for these restrictions are listed below and referenced as pre 1992.

Changes in the administration of FmHA easements resulted from the passing of the 1990 FarmBill legislation. These administrative changes primarily focused on a restructuring of the conservation easement restrictions listed in Section II of the easement document; Covenants by the Landowner. In October 1992, five new conservation restrictions were developed which replaced those developed under the guidelines of the 1985 Farm Bill. These restrictions correspond with the following alpha designators: A, A1, B, C and D. Eventually, an “E” easement and a Discretionary easement were also added. The Discretionary easement was used to protect unique or important habitats which did not fit criteria for protection under other restrictions such as native tree claims.

In certain instances, alpha designators used to define conservation easement restrictions for easements sold prior to October 1992, have been used to define a differing set of restrictions for easements recorded after this time frame. Therefore, it is very important to not only understand the type of easement restriction you are dealing with, but also the definition that accompanies

that restriction. For example, the "B" easement prior to 1992 was the "most restrictive" allowing management related uses by permit only. However after October 1992, the "A" easement became the "most restrictive" and the "B" easement permitted haying and grazing with an approved management plan.

It is also important to note that the easement restrictions are determined by the date the easement is recorded. Therefore, easements recorded prior to October 1992 will continue to be managed and administered according to the restrictions defined by the parameters of the 1985 Farm Bill.

Although the following provides a general description of the easement restrictions, it is recommended that managers consult Section II; Covenants by the Landowner and Section III; Rights Reserved by the United States, of the FmHA conservation easement document.

**"A" Easement Areas**

No dwellings, barns, outbuildings, or other structures shall be built within the easement area.

The existing vegetation and hydrology described in this easement area will not be altered in any way or by any means or activity conveyed by this deed or property owned by or under the control of the landowner. Activities **restricted** by this easement include: (1) cutting or mowing; (2) cultivation; (3) grazing; (4) harvesting wood products; (5) burning; (6) placing of refuse, wastes, sewage, or other debris; (7) draining, dredging, channeling, filling, discing, pumping, diking, impounding and related activities; (8) diverting or affecting the natural flow of surface or underground waters into, within, or out of the easement area.

Cattle grazing and other types of encroachment are only restricted if the FWS constructs and maintains the fence on the easement area (section III F). The FWS is also responsible for initial re-establishment of vegetation on the easement area. The FWS has the right to install, operate and maintain structures for the purpose of re-establishing, protecting and enhancing functional wetland values. The FWS also has the right to manipulate existing vegetation, topography and hydrology in consultation with the existing landowner (section III D).

**"A1" Easement Areas**

No dwellings, barns, outbuildings, or other structures shall be built within the easement area.

The existing vegetation and hydrology described in this easement area will not be altered in any way or by any means or activity conveyed on the deed or property owned by or under the control of the landowner. Activities **restricted** by this easement include: (1) cutting or mowing; (2) cultivation; (3) harvesting wood products; (4) burning; (5) placing of refuse, wastes, sewage, or other debris; (6) draining, dredging, channeling, filling, discing, pumping, diking, impounding and related activities; or (7) diverting or affecting

the natural flow of surface or underground waters into, within, or out of the easement area.

**"B" Easement Areas**

Pre 1992

No dwellings, barns, outbuildings, or other structures shall be built within the easement area.

For "B" easement areas which include permanent grassland vegetation and the wetland area, the vegetation or hydrology of the described easement area will not be altered in any way or by any means or activity on the property conveyed by this deed, or on the property owned or under the control of the landowner, including; (1) cutting or mowing; (2) cultivating; (3) grazing; (4) harvesting wood products; (5) burning; (6) placing of refuse, wastes, sewage, or other debris; (7) draining, dredging, channeling, filling, discing, pumping or affecting the natural flow of surface or underground waters into, within, or out of the easement area.

Post 1992

No dwellings, barns, outbuildings, or other structures shall be built within the easement area.

The vegetation or hydrology of the described easement area will not be altered in any way or by any means or activity on the property conveyed by this deed, or property owned by or under the control of the landowner, including; (1) cultivation; (2) harvesting wood products; (3) burning; (4) placing of refuse, wastes, sewage, or other debris; (5) draining, dredging, channeling, filling, discing, pumping, diking, impounding and related activities; or (6) diverting or affecting the natural flow of surface or underground waters into, within, or out of the easement area. The landowner shall have the right to graze domestic livestock and harvest hay by cutting or mowing, in accordance with a management plan jointly developed and agreed to by the U.S. Fish and Wildlife Service and the Natural Resources Conservation Service (SCS) (prior to the disposal of the property from inventory), provided:

(1) hay cutting or mowing is provided for in the management plan and is limited to once annually between July 15 and September 1 with the actual scheduled date set to ensure that there is adequate regrowth or vegetation to provide winter cover and early spring nesting cover;

(2) grazing is provided for in a management plan and does not exceed 25 percent Harvest Efficiency in any given year and ensures adequate regrowth of vegetation to provide winter cover and early spring nesting cover.

(3) the timing and intensity of hay cutting or mowing, and of grazing shall provide for the protection and restoration or wetlands functions and values as the overriding easement

purpose and the purpose of the management plan including the prohibition of both where woody vegetation is to be maintained or established; and,

(4) any subsequent changes to the timing and intensity of hay cutting or mowing and of grazing provided for in the management plan at the (time of property disposal from inventory) shall require the joint approval of the U.S. Fish and Wildlife Service of the U.S. Department of the Interior, Natural Resources Conservation Service (SCS) of the U.S. Department of Agriculture, and the landowner.

**"B1" Easement Areas**

Pre 1992

No dwellings, barns, outbuildings, or other structures shall be built within the easement area.

For "B1" easement areas which include permanent grassland vegetation and the wetland area, the vegetation or hydrology of the described easement area will not be altered in any way or by any means or activity on the property conveyed by this deed or on property owned or under the control of the landowner, including; (1) cutting or mowing; (2) cultivating; (3) harvesting wood products; (4) burning; (5) placing of refuse, wastes, sewage, or other debris; (6) draining, dredging, channeling, filling, discing, pumping or affecting the natural flow of surface or underground waters into, within, or out of the easement area.

**"C" Easement Areas**

Pre 1992

No dwellings, barns, outbuildings, or other structures shall be built within the easement area.

For "C" wetland areas of the easement, either by an activity on the property conveyed by this deed, or on property owned or under the control of the landowner, the vegetation or hydrology will not be altered through: (1) burning; (2) placing of refuse, wastes, sewage, or other debris; (3) draining, dredging, channeling, leveling, filling, diking, pumping, impounding and related activities; or (4) diverting or affecting the natural flow of surface or underground waters into, within, or out of "C" wetland areas. The landowner shall have the right to carry on farming practices such as grazing, hay cutting, plowing, working and cropping "C" wetland areas when they are dry of natural causes. "C" wetland areas shall include any enlargements of said wetland areas resulting from normal or abnormal increases in water.

Post 1992

No dwellings, barns, outbuildings, or other structures shall be built within the easement area.

The vegetation or hydrology of the described easement area will not be altered in any

way or by any means or activity on the property conveyed by this deed, or property owned by or under the control of the landowner, including: (1) harvesting wood products: (2) burning; (3) placing of refuse, wastes, sewage, or other debris; (4) draining, dredging, channeling, filling, pumping, diking, impounding and related activities; or (5) diverting or affecting the natural flow of surface or underground waters into, within, or out of the easement area. The landowner shall have the right to use the easement area for the production of agricultural crops to the extent that present wetland conditions are not damaged.

**"D" Easement Areas**

Pre 1992

No dwellings, barns, outbuildings, or other structures shall be built within the easement area.

For "D" easement areas of the easement, which consist of perennial grassland/tree vegetation, the grasslands and trees within the easement area shall be maintained in vegetation consisting of grasses, grass-like plants and forbs native to the State of South Dakota, as listed by the United States Department of Agriculture, Natural Resources Conservation Service. This vegetation is to be maintained without any disturbances to the soil surface other than that caused by grazing, haying or burning. The planting or seeding of any crop, grass, legume, forb, shrub, vine, or tree is prohibited, unless permitted by the easement manager.

Post 1992

No dwellings, barns, outbuildings, or other structures shall be built within the easement area.

The existing vegetation and hydrology described in this easement areas will not be altered in any way or by any means or activity conveyed on the deed or property owned by or under the control of the landowner. Activities **restricted** by this easement include: (1) cutting or mowing; (2) cultivation; (3) grazing; (4) harvesting wood products; (5) burning; (6) placing of refuse, wastes, sewage, or other debris; (7) draining, dredging, channeling, filling, discing, pumping, diking, impounding and related activities; (8) diverting or affecting the natural flow of surface or underground waters into, within, or out of the easement area. Manager may permit access to water through the easement area for domestic animals if no other water sources are available.

The FWS may maintain fences and re-establish vegetation through seeding planting or natural succession.

**"E" Easement Areas**

Pre1992

No dwellings, barns, outbuildings, or other structures shall be built within the easement area.

For "E" easement areas of the easement, the vegetation or hydrology of the described easement area will not be altered in any way or by any means or activity on the property conveyed by this deed or on property owned or under the control of the landowner, including; (1) cultivating; (2) grazing; (3) harvesting wood products; (4) burning; (5) placing of refuse, wastes, sewage, or other debris; (6) draining, dredging, channeling, filling, leveling, discing, pumping, diking, impounding, and related activities; or (7) diverting or affecting the natural flow of surface or underground waters into, within, and out of the easement area. Haying within the easement area can occur no more frequently than every other year and hay cutting/mowing can not begin prior to August 10 in the year of harvest and all harvested hay must be removed from the easement area by October 15 of the year of harvest.

Post 1992

No dwellings, barns, outbuildings, or other structures shall be built within the easement area unless prior approval in writing is granted by the FWS.

The existing vegetation and hydrology described in this easement areas will not be altered in any way or by any means or activity conveyed on the deed or property owned by or under the control of the landowner. Activities **restricted** by this easement include: (1) placing of refuse, wastes, sewage, or other debris; (2) draining, dredging, channeling, filling, discing, pumping, diking, impounding and related activities; (3) diverting or affecting the natural flow of surface or underground waters into, within, or out of the easement area.

No alteration of grassland areas, wildlife habitat or other natural features is permitted. Agricultural crop production is not permitted on grassland areas. Existing cropland areas depicted on the Exhibit "A" map(s) can be maintained in a manner consistent with normal farming practices such as grazing, haying, cultivation. Managers should monitor these areas to make sure that existing grassland areas depicted on the Exhibit "A" map(s) are not converted to cropland especially if existing fence lines are changed or moved. Cropland may also be converted to grassland if desired.

In some cases, the use of "G" to delineate grassland and "C" for cropland within the easement boundary, has caused confusion on the part of landowners and easement managers. The alpha designators associated with "E" easements ("G" and "C") are not separate restrictions, they merely denote the non-wetland (grassland or cropland) easement areas.

**Discretionary Easement Areas**

The discretionary easement is used to protect unique or important habitats which did not fit the criteria for protection under other restrictions such as native tree claims.

No dwellings, barns, outbuildings, or other structures shall be built within the easement area unless prior approval in writing is granted by the FWS.

The existing vegetation and hydrology described in this easement area will not be altered in any way or by any means or activity conveyed on the deed or property owned by or under the control of the landowner. Activities **restricted** by this easement include: (1) cutting or mowing; (2) cultivation; (3) grazing; (4) harvesting wood products; (5) burning; (6) placing of refuse, wastes, sewage, or other debris; (7) draining, dredging, channeling, filling, discing, pumping, diking, impounding and related activities; or (8) diverting or affecting the natural flow of surface or underground waters into, within, or out of the easement area.

## Conservation Easement Administration

The administration of FmHA conservation easements is similar in many aspects to that required for wetland and grassland easements. As such, many of the procedures followed when conducting administrative activities associated with FmHA easements will be discussed in detail within chapters of the main body of the wetland and grassland easement manual. When encountered by a particular issue, land managers should review the language in the FmHA manual as well as the counterpart section in the wetland or grassland easement manual if applicable. This step is particularly important when evaluating permit requests.

A. New Easement Inspection

The transfer of new tracts from Farmers Home Administration has dramatically slowed since the mid 1990's. Inspection of any newly transferred tracts will be handled in the same manner as Fish and Wildlife Service easements with the exception that a field station representative must meet with the County FHA Supervisor and the landowner and/or tenant to discuss provisions of the easement. Any proposed work including restoration activities, and a tentative schedule of field activities, should also be discussed prior to conducting any field work on the property.

B. Permanent Field Office File

The permanent field office file will follow the same procedures as those outlined for wetland and grassland easements. Field offices should include at a minimum a recorded copy of the QuitClaim Deed and/or Easement document including an Exhibit "A" map, acceptance letter and all pertinent notes and correspondence.

Tract surveys or those completed as part of a wetland restoration should be kept for future references.

It is recommended that managers review existing permanent field office files and discard materials that are no longer applicable to the administration or management of the easement. Such items would include documents used by Service employees to make recommendations to FHA on lands to be encumbered by conservation easements. These documents appear at face value, to be very similar to the recorded easement document and
can be very confusing when trying to interpret the restrictions of the easement.

Easement contracts often have multiple restrictions and exhibit maps which indicate protection for specific resources on the same tract such as "A", "B" or "B1"easements. Under this scenario, the easement manager may wish to develop a "master map" that incorporates all of the restrictions for that tract onto one color coded map. This will permit the easement manager to quickly reference all of the easement restrictions that are on a particular parcel of land. **Exhibit 1**, is an example of a “master map” drawn on an FSA map however, GIS based maps may offer another alternative. Because this map is a reproduction of the original exhibit documents, always double check the easement document before making any management decisions.

Easement managers may also find it helpful to develop a tracking system in spread sheet format, which delineates the county, tract number, and acres of each type of easement for the entire Complex. Another option is to provide this information in each easement file as depicted on the Easement Cover Sheet, **Exhibit 2.** Both of these systems would provide a quick reference for reporting purposes or when visiting with landowner regarding a particular tract.

C. Photograph Documentation

To adequately enforce the provisions of FmHA easements, it is important that the easement property and management are properly documented. The following list serves as a minimal guideline for photo documentation of FmHA easements.

1. During the first year following transfer of a new easement, vertical aerial photographs will be taken for each new easement. It is generally recommended that these photographs be taken when water conditions are optimum for easy identification of wetland basins. New vertical photographs should be taken of all easements at least every five years or as needed.

2. Aerial photos of the entire property should be taken before and after permanent vegetation in easement areas is established. These should be scheduled in the spring to better show wetlands. All drainage facilities (whether marked as

nonfunctional or not) should be photographed during the initial flight.

3. During the initial on-the-ground inspection, take photographs to document boundaries, especially those that are irregular and other significant features of facilities to be maintained in the future.

4. Take photos of wetland restoration ditch plugs and fills in a way to show the wetland basin as well. Conversely, drains that are not restorable but cannot be maintained, should be photographed as soon as possible.

5. Less important for enforcement but necessary to document program successes, photograph resource enhancement (i.e., ducks using a restored wetland, wildlife in easement areas, build-up of eroded soil outside an easement area, etc.).

D. Landowner Certification Letters

Landowner certification letters for FmHA conservation easements will be handled in a manner similar to other FWS easements. New owners will be contacted in person if possible, and provided a copy of the easement document confirmed by a certified return-receipt letter. If personal contact is not possible, the Manager should send a certified return-receipt letter to the new owner to inform them about the easement

E. Permitted Activities and Compatibility

Activities permitted within the framework of FmHA conservation easements and their relationship to FWS compatibility guidelines is addressed under the permitted activities and compatibility sections of the wetland and grassland easement manual.

Requests for the evaluation of certain activities should be addressed by first reviewing the restriction language in the FmHA easement document to determine if the FWS has jurisdiction. This step is necessary, due to the fact that FmHA easements are often more restrictive in nature, than FWS easements. Once jurisdiction is established, easement managers should treat requests in a manner identical to the administration of FWS wetland or grassland easements.

F. Rights-of-Way Requests

Right-of-Way requests with the potential to impact FmHA easement interests should be carefully evaluated by first thoroughly reviewing the FmHA easement document to determine FWS jurisdiction. Once it is determined that the Service has a vested interested in the location of the proposed right-of-way, Easement Managers should follow the guidelines established in the Right-of-Way section of the wetland and

grassland easement manual.

G. Resolving Disputes

Situations may occur where the landowner/tenant strongly disputes the existence of a wetland, our determination of wetland basins, and/or the location of easement boundaries. The following guidelines may be used in resolving disputes.

1. Easement Boundaries - Disputes will probably arise for delineation of straight-line boundaries in cropland more than any other case. A formal survey is the best way to solve these disputes. The Service or its designees will be responsible for conducting the survey. Formal surveys should be based primarily on locating the easement boundary delineated on the Exhibit “A” of the easement and the legal subdivision description. Removal of easement boundary markers by the landowner or tenant should also be treated as an easement violation. Under certain circumstances the landowner may be responsible for reimbursement to the Service for survey costs.

2. A landowner/tenant may dispute the actual existence of a wetland. The existence of wetlands has already been substantiated through field review, NWI photography, and in some cases, SCS wetland determinations and FSA slides. FmHA has concurred that the wetland exists and it is established on a legally-binding easement document. There will be no process by which a producer can appeal the existence of a wetland. However, if the Service determines that the easement area is not a wetland, relief may be granted depending on the level of protect provided by the individual easement restriction. Keep in mind that for tracts also encumbered by U.S. Fish and Wildlife Service wetland easements, the wetland easement will always take precedence in these situations. For further guidance, see the exchange policy for FmHA easements.

H. FmHA & FWS Easements on the Same Property

FmHA conservation easements may have been placed on properties already encumbered by a FWS wetland easement. In such cases, greater restrictions were placed on wetlands which may preclude grazing, haying, cultivation as well as other restrictions in addition to those already imposed by the FWS wetland easement. These wetlands are delineated on the Exhibit “A” maps of the FmHA conservation easement.

In some instances, wetlands that would normally restrict burning, draining, filling and leveling (“C” wetland areas) under a FmHA conservation easement were deleted from the FmHA easement contract during the property evaluation phase and prior to resale of the property back into private ownership. This was done because these wetlands were already protected in the same manner under the FWS wetland easement.

The FWS wetland easement will remain in force on these properties and violations of burning, draining, filling and leveling should be enforced under this easement rather that the FmHA easement, due to our long-standing track record in enforcing FWS easements. Of course, violations of FmHA easement restrictions different from those of the FWS easement will be enforced under the FmHA easement.

In cases where a property is encumbered by both a FWS wetland easement and A FmHA conservation easement, field personnel should make a special effort to discuss both easements with a new landowner.

I. Easement Monitoring and Compliance

FmHA easement monitoring will be conducted similar to that for FWS wetland and grassland easements. FmHA easements should be color-coded differently on easement flight maps. However, easement managers may wish to color-code FmHA tracts with restrictions that protect resources similar to the FWS wetland or grassland easements. For example, FmHA easements with "C" type restrictions (no draining, filling or burning of protected wetland basins) may choose to color-code these easements the same color as that used for wetland easements.

Wetland Management Districts with fewer FmHA easements may find it possible to conduct annual surveillance in conjunction with their normal easement flights. Those Districts with several FmHA easements may find it necessary to schedule separate surveillance flights to cover those easements alone. Easement managers may also find that taking a simple photograph of all FmHA easements during the normal easement flights will provide adequate documentation to determine compliance.

All compliance protocol for FmHA easements will be handled in the same manner as FWS wetland and grassland easements.

## Conservation Easement Management

Habitat management on conservation easements varies depending on the type of easement restriction encumbering the tract. Under certain easement restrictions, easement managers may prescribe management treatments ranging from no intervention of the natural process (rest)to intensive manipulation or restoration of soil, water or vegetative cover. Whatever the level of management, it must be consistent with the terms of the conservation easement document and conform to the policies governing the NWRS. Special attention must also be given to endangered species or species of special concern. Procedures for implementing common management activities are outlined below.

A. Surveys, Posting and Fencing

1. Surveys of "Blocked" Boundaries

These boundaries should be surveyed and marked using "informal" procedures by FWS field personnel whenever feasible. If the WMD manager believes that there are justifiable circumstances which would warrant a certified survey on a tract, forward a request to the Regional Surveyor with responsibilities for your geographic area. In South Dakota, most tracts of this nature were defined by legally describable 2.5 acre blocks. The majority of these tracts had a certified survey completed and were marked after the property was sold from FHA's inventory. A copy of the certified survey should be located in the permanent easement file. If one is not present, a survey was likely not completed on that property.

Surveys of Meandered Boundaries (floodplains)

FmHA has agreed to complete these surveys if they will not agree with "blocking" the easement area into 2.5 acre blocks and a meets and bounds survey is required to legally register the deed to the property. In these instances the WMD Manager and the FmHA County Supervisor should reach an agreement that FmHA will complete the survey. If this is not possible, then the FWS should complete an informal survey and mark the boundaries above ground.

2. Posting/Signing of Easements

The Service field office responsible for managing the conservation easement is also responsible for coordinating the posting and permanent marking of the easement boundaries. Likewise, this office is responsible for regular maintenance of these boundary markers.

Easement signs should be placed in a manner to clearly inform the landowner/tenant of the easement boundary. Boundary markers, consisting of 6" carsonite posts, should be driven into the ground at each corner of the conservation easement. In addition, boundary posts shall be placed within three feet of each corner (two per corner) to properly identify converging boundaries of the easement. Where easement boundaries correspond to permanent existing use lines, posting at 1/4 mile intervals is sufficient. Conservation easements with irregular boundaries should be marked with boundary posts at a maximum of 1/10 mile intervals or as needed along the length of an irregular boundary or in areas where the landowner habitually encroaches.

All conservation easement boundary signs are required to be the standard 3" x 4

½" metal or vinyl stick on type (**Exhibit 3**). Easement boundary signs may be affixed to the carsonite posts at the discretion of the easement manager. Whenever possible, signs should not be placed along roads, etc., where the general public could misinterpret the signs as allowing public access.

3. <u>Fencing</u>

Under certain circumstances, more restrictive conservation easements may include the construction and maintenance of fences in order to prevent grazing or other types of encroachment on the easement area. Landowners, however, can be permitted access to water within these areas when deemed necessary for stock watering. The Service is responsible for any expense involved for the construction and/or maintenance of such fences. All fences constructed should be designed, depending upon their intended usage, for individual easement requirements (i.e.: the control of cattle, sheep, pigs or human trespass). Construction may be handled by force account, Easement Permit or with a contract. Refuge Managers may also want to review state fencing laws. Adoption of state law requirements may help avoid a tort claim or provide a better legal position should a claim be filed.

B. <u>Habitat Manipulation</u>

Rights conveyed to the Service via FmHA conservation easements may include the right to prescribe management treatments similar to the implementation of management activities on Waterfowl Production Areas. The planning and implementation of management treatments should be completed in close coordination with the existing landowner. Easement managers have the discretion to implement practices such as grazing, haying, water management, prescribed burning, and selective timber management techniques when deemed necessary. The following briefly describes three basic areas of habitat management for conservation easements.

1. Wetland Management

In wetland areas that are being restored, created or manipulated, water control may be desired but not always possible. The following should be considered prior to implementing the use of a water control structure.

- water depth, for fish or vegetation control
- seasonal flooding
- drainage facility downstream
- flows into wetland
- soils
- watershed
- surrounding wetland complex

All applicable Federal, state and local permits governing wetland restoration, creation or manipulation need to be followed.

2. Grassland Management

Management of grasslands involves striking a balance between manipulation and letting nature take its course. Desirable management replaces certain natural influences with periodic manipulation to promote vigorous grassland communities. Some common techniques for manipulating grassland areas are grazing, haying and prescribed burning. Implementation of these techniques on conservation easements should follow approved and established procedures and guidelines outlined in policy governing Waterfowl Production Area management activities.

Establishment of a unit management plan is recommended. Grassland management activities on conservation easements can often times be handled by Easement Permit or through Cooperative Agreements.

Grazing and haying management plans were required and developed for FmHA easement tracts with "B" easement restrictions recorded after October 1992. These plans were developed in concert between the Soil Conservation Service (NRCS) and U.S. Fish and Wildlife Service personnel and attached to the easement document prior to transfer of the land back into private ownership. Plans were very similar in content and generally contained the following points:

1. Grazing is not to exceed 25% Harvest Efficiency on an annual basis.

2. Haying is permitted once annually after August 1.

3. Grazing and haying during the same growing season are not permitted.

3. Forest Management

Forest management on FmHA conservation easements in South Dakota will likely be limited to discretionary and other types of easements, protecting native tree claims or riparian areas. Cutting and harvesting of wood products is also restricted on easements that allow grazing. Easement managers should always review the Covenants by the Landowner section of the easement document to determine if tree harvest is permitted. Managers may permit the harvest of wood products or the establishment of new tree plantings provided FWS grassland easement policy permitting new trees is followed. Cutting and harvesting of wood in native tree claims, or in riparian areas should not be permitted under most circumstances.

## C. Wetland Restoration

It is the policy of the Service to propose conservation easements to protect all wetlands (this includes drained wetlands) on FmHA Inventory Land. Once the easement has been recorded, the Service should initiate wetland restoration activities.

The Service is authorized to restore wetlands that are marked on Exhibit "A" maps with the letter "R or RW". Some important considerations have to be made first.

1. In every case, FmHA has agreed to restoration of drained wetlands (marked "R or RW" on Exhibit "A") only to the extent and size delineated on the Exhibit "A". In some cases this may be smaller than the original wetland basin. Restoration in these instances can only be completed in a way which makes it possible for excess water to runoff. If only a partial restoration can be accomplished, a benchmark for elevation should be established using a permanently fixed object such as an existing USGS survey benchmark. In the case of partially restored wetlands, detailed survey notes should be well documented in the easement file including photographs of the restoration work. Easements managers are encouraged to monitor these sites frequently to ensure compliance.

   Earthen embankments constructed to fully restore drained wetlands should be constructed in a manner that fills the drainage ditch back to the natural contour of the land for a minimum distance of 200 feet downstream of the wetland. A distance of less than 200 feet is acceptable providing that soils are suitable for construction purposes. An informal survey of the wetland and surrounding landscape is highly recommended to ensure that the restored wetland will not impact lands which are not encumbered by FmHA easement.

2. Some wetlands given restorable status on Exhibit "A" maps may be tied into extensive drainage systems or may, when restored, inundate lands under different ownership. A formal survey will be necessary with these cases to determine if restoration is in fact feasible and to what extent, if any, the restoration(s) will affect lands under different ownership. Every attempt will be made to obtain flowage easements where necessary, or to restore the wetland so that it doesn't affect lands under different ownership.

3. Once the conservation easement is approved by FmHA, maintenance of drainage facilities for restorable wetlands must cease immediately in order for the landowner/tenant to comply with the terms of the easement.

4. Wetland restorations will follow policy and guidelines outlined in the wetland easement manual. Easement managers should keep in mind that these restorations are of a permanent nature and should be designed and constructed

accordingly.

A few instances may exist where a drained wetland is now protected by a FmHA easement but is not marked as restorable. This is due to one of two reasons. First, the tenant or landowner may have initiated drainage since we field reviewed the property. In this instance, the drain is treated as a violation of the easement. Easement managers should handle this in the same manner as a wetland easement violation.

Secondly, it may be a case where the drain was inadvertently missed during the field review. If the wetland is drained, covered by the FmHA easement, and not marked restorable, we may not restore the wetland. However, maintenance of the drain must cease from this point forward, and the drain allowed to fill naturally.

Restorations should be well documented with photos, maps indicating the locations of plugs and narrative describing the work, date and field personnel involved. Managers should also periodically monitor all restored wetlands on conservation easements to evaluate vegetative response, wildlife usage, and to assess damage to water management structures.

D. Grassland Establishment (Seeding)

Once an easement has been recorded or a conservation easement deed has been signed, the establishment of vegetation on easement areas must be addressed. It is the Service's responsibility in some cases to establish vegetation according to the conditions of the easement contract. In South Dakota the Service agreed to establish grass in the most restrictive "A" and "B" easements, but did not agree to do so on the "B1" or "B" easements which permit grazing or haying. Easement managers should review the "Rights Reserved in the United States" section of the easement document to determine if the Service has the authority to reestablish upland cover/grass in the easement area. Field stations may choose the grass/legume varieties they believe will work best for the particular situation. If the landowner wishes to interseed into existing grassland cover with a previous farming history, this may be accomplished by issuing an easement permit. Interseeding into native sod is not permitted.

Special objectives to consider include providing a cover type which meets the needs of wildlife species indigenous to the easement area and the protection of water quality and soils from erosion. Choosing grass varieties and ecotypes should be based on a thorough field review to determine what variety or mix will work best. Consideration has to be given to such things as soil alkalinity, anticipated use (grazing -v- haying) and grass permanency.

Under the provisions of the most restrictive "A" and "B" easements, cropland areas can be planted by contract or by the field station. Seed bed preparation may be necessary prior to completing the grass planting. This may be accomplished by permitting the

landowner/tenant to plant soybeans or other suitable crop in the easement area. Weed control should be performed similar to that for establishment of grass on refuge system lands.

E. Weed Control

In accordance with the conservation easement document, the landowner is responsible for the control of all noxious weeds as stipulated by local, State and Federal law. Service involvement in this area is handled identically to the administration of grassland easement contracts. Under certain circumstances, easement managers may permit landowners/tenants to cut or mow vegetation for the control of noxious weeds on easement areas that restrict cutting, mowing or haying prior to July 15 or whatever date was established in the Covenants by the Landowner section of the easement document. Easement managers should evaluate these requests on a case by case basis to determine if cutting or mowing is justified and to determine an approximate acreage to be cut. Easement managers should add the requirement that a fall herbicide be applied to all areas where mowing was permitted in an effort to gain control of the weed infestation. Mowing or cutting of weedy areas is preferred to haying to reduce the potential for erroneous requests.

F. Predator Management

Predator management activities are conveyed to the Service under Part III, "Rights Reserved in the United States", on all easements except those limited to protection of "C" wetland basins and those defined as No Drain, Burn or Fill easements. This management strategy may be conducted at the discretion of the Refuge Manager. Predator management activities must be conducted according to current Service policy and should be reviewed with landowners prior to implementation.

G. Public Use

Landowners will retain the rights of access for hunting, fishing and other recreational uses on conservation easement properties.

**Exhibit 1**, FmHA Easement File Master Map



**Exhibit 2**, FmHA Easement Cover Sheet

## CONSERVATION EASEMENT OR FEE TITLE TRANSFER COVER SHEET

*TRACT NUMBER ________

INVENTORY PROPERTY __
VOLUNTARY CONVEYANCE __

FEE TITLE TRANSFER __
CONSERVATION EASEMENT __

FORMER LANDOWNER'S NAME____________________

COUNTY_________ STATE__

LEGAL DESCRIPTION (SECTION, TOWNSHIP, RANGE)

CONSERVATION EASEMENT ACRES: APPROXIMATE ACRES TO SURVEY:

| CONSERVATION EASEMENT ACRES | | APPROXIMATE ACRES TO SURVEY | | | | | |
|---|---|---|---|---|---|---|---|
| A | _____ | A | _____ | | | | |
| A1 | _____ | A1 | _____ | | | | |
| B | _____ | B | _____ | | | | |
| C | _____ | C | _____ | | | | |
| D | _____ | D | _____ | DISCRETIONARY | _____ | DISCRETIONARY | _____ |

TOTAL EASEMENT ACRES REQUESTED _____ TOTAL APPROXIMATE ACRES TO SURVEY _____

FEE TITLE:

TOTAL FEE TITLE ACRES REQUESTED _____

RESTORED WETLAND BASINS ___ RESTORED WETLAND ACRES ___OTHER WETLAND BASINS ___ OTHER WETLAND ACRES __

TOTAL WETLAND BASINS ___ TOTAL WETLAND ACRES ___

MANAGED BY ___________
RECORDED DATE _________
ACCEPTANCE DATE ________

* Assign numbers consecutively in each county, beginning with tract (10C), using the suffix (C) in all cases to identify FmHA conservation easements.

**Exhibit 3,** FmHA Easement Boundary Sign




| | |
|---|---|
| Size: | 3" X 4½" |
| Color: | White with FWS blue letters |
| Lettering: | Large = ¼" helvetica medium<br>Small = 1/3" |
| Materials: | Type 1 = aluminum, painted<br>Type 2 = stick-on vinyl |

# ADMINISTRATIVE PROCEDURES FOR FARMERS HOME ADMINISTRATION CONSERVATION EASEMENTS IN REGION3

## I. PURPOSE AND BACKGROUND

Since the Food Security Act of 1985 the U.S. Fish and Wildlife Service (Service) has acquired a number of conservation easements on Farmers Home Administration (FmHA) inventory properties in Region 3. This appendix has been developed to provide guidance to Project Leaders on the administration and enforcement of the FmHA conservation easement program. Wetland Management Districts and National Wildlife Refuges in Region 3 that are within the approved geographic area for the Small Wetlands Acquisition Program will use this appendix as the procedural policy for FmHA easements.

## II. ACQUISTION OF EASEMENTS

Conservation easements on FmHA Inventory Property are agreements between FmHA and the Service for the protection of wetlands, floodplains, riparian corridors and endangered species habitat. These agreements conveyed important resource interests from FmHA into the National Wildlife Refuge System (NWRS). These easements restrict the landowner from altering the important natural resources on the lands covered by the easement. Region 3 has four different conservation easement documents that have been used to transfer the rights from FmHA into the NWRS.

<u>Standard Conservation Easement (Exhibit 1)</u>

This document conveys a perpetual interest in the lands covered by the easement and provides authorities, legal description, covenants by the landowner, rights reserved by the United States, easement management and general provisions. The document includes an Exhibit “A” map of the easement area.

<u>Non-Standard Conservation Easement (Exhibit 2)</u>

This document is similar to the Standard to the Standard Conservation Easement except that it may include a variance that allows farming activity on all or some wetlands identified as “C” wetlands on Exhibit “A”. These farming activities include grazing, haying, cutting, plowing, working and cropping when the “C” wetlands are dry of natural causes.

<u>Conservation Easement Deed (Exhibit 3)</u>

This easement is very similar to the Standard Conservation Easement. This easement is only different in the method that it was transferred into the NWRS.

<u>Debt Restructure Conservation Easement (Exhibit 4 and 5)</u>

FmHA may grant debt relief to a landowner by placing a Debt Restructure Conservation Easement on the property for a term of not less than 50 years. In the past, the Service had the option to retain enforcement authority and accept the easement into the NWRS (Exhibit 4). If the Service did not wish for the easement to become part of the NWRS they may assist FmHA in reviewing the property, but FmHA would be assigned the enforcement authority (Exhibit 5).

Caretaker Agreement (Exhibit 6)

At one time the Service and FmHA utilized "Caretaker Agreements" to manage potential Conservation Easements prior to transfer into the NWRS. These agreements are no longer in use and all lands previously covered by caretaker agreements have been transferred in the NWRS or sold to private landowners.

Rights Granted to the Service

Regardless of what easement document was used, there are a number of landowner prohibitions and rights granted to the Service that are common to all four easement documents. They are as follows:

1. The Service has the right of ingress and egress to conduct management, monitoring, and easement enforcement activities.

2. The Service has the right to install, operate and maintain structures for the purpose of reestablishing, protecting, and enhancing wetland functional values.

3. The Service has the right to establish or reestablish vegetation through seedings, plantings, or natural succession (except for "C" wetlands).

4. The Service has the right to manipulate vegetation, topography and hydrology on the easement area.

5. The Service has the right to conduct predator control.

The following landowner prohibitions and rights granted to the Service are specific to certain easement documents. Each easement document needs to be checked to determine if these stipulations are part of the easement.

1. The right to construct and maintain fences in order to prevent grazing or other types of encroachment on the easement area.

2. The right to prohibit or regulate hunting or fishing or other taking of migratory birds, fish and wildlife.

3. The right to exclude landowner and/or public entry.

4. The right to allow access to and use of waters within the area necessary for stock watering under such terms and conditions as the Service deems necessary to protect and further the purposes of the easement, provided:

A. the easement manager or landowner (depending on the document) bears the cost of building and maintaining fencing or other facilities reasonably necessary to preclude stock from entering the easement area;

B. access for stock watering need not be permitted where other waters are reasonably available from other sources outside the easement area.

## III. EASEMENT ADMINISTRATION

A. <u>New Easement Inspection</u>

Once a Conservation easement enters into the National Wildlife Refuge System it is the responsibility of the Project lead or his/her representative to conduct an initial site visit on the property. This process includes: contacting the landowner and/or tenant, inspecting the land, and photographing important easement features for file documentation. In all cases, with a new easement a field office representative will personally meet with the landowner to discuss the provisions of the easement and to provide as a contact for the landowner should a problem arise in the future. It is important to note that the landowner has previously dealt with FmHA, but now the emphasis shifts to the Service. Since the Service will be responsible for ensuring compliance with the easement, it must be certain that the landowner understands subsequent actions and what his/her role will be in the future. The Project Leader should send a follow up letter to the landowner reiterating the points covered during the easement discussion. If the property is sold, the new landowner must be made aware of the conservation easement. The Service will assure that the new landowner is fully aware of the provisions of the conservation easement.

During the initial on-the-ground inspection, take photographs to document boundaries, the presence of wetlands (existing, restored, or drained), floodplain, riparian habitat or endangered species habitat, and any drainage facilities which exist but cannot be maintained in the future. Past experience has shown that existing drainage facilities are a troublesome area in easement administration. To counter future problems, the Service representative should photograph them in a way which documents their location and dimensions (length, width, depth). Use a copy of an aerial photograph (preferably a 4-inch to the mile) to show what was photographed, direction of photograph, photographer, camera type, date and time. Place photograph negatives in protective envelopes and keep them in the easement file along with the necessary information about the photograph. Attach self-adhering labels (Exhibit 7) to the back of each photograph to provide the spaces for the necessary documentation.

Generally, it is not Service policy to survey existing drainage facilities. However, in some instances it is best for enforcement purposes if dikes, ditches and other existing drainage facilities, which could be altered by the landowner to facilitate drainage. Surveys of dikes or ditch plugs have most likely been completed and records should be kept for future reference.

B. <u>Land Ownership Verification</u>

Field stations will need to verity the ownership of each conservation easement on an annual basis.

A check with County Treasures may be helpful in determining land ownership since each county must record the name of the individual paying property taxes. Most counties will have a tax parcel number and the number of acres per parcel. An annual check of these should show any changes in ownership. Other agencies such as the Department of Agriculture (Farm Service Agency) may also be of help.

C. <u>Vertical Photographs</u>

During the first year following acquisition of an easement, a vertical aerial photograph will be taken for each new easement. New vertical photographs should be taken of all easements at least every five years. The photographs should be taken in the spring when the water conditions in wetlands are at optimum levels. The Regional Office's aircraft and camera will be used to obtain photographs whenever possible. Maintain negatives or slides at the field level and document date, time, height, direction, photographer, and type of camera. One contact print (10x10) is maintained by the field station responsible for the easement. This photograph is placed in the easement file.

D. <u>Permanent Field Office File</u>

Following Service acceptance of a conservation easement, the field station will obtain the following documents:

1. Copy of Acceptance letter
2. Recorded copy of the Deed and/or Easement document including an Exhibit "A" map (survey if necessary)
3. Conservation easement cover sheet
4. Photographs of the easement
5. Correspondence, including memorandums to the file

The field station will establish a permanent file for each easement. Use a regular size folder and fasten on the right-hand side: the easement document, acceptance letter, and all other correspondences notes and letters relative to the easement.

Attach a Chronological List of Events (Exhibit 8) to the left-hand side of the file folder. Use this form to maintain a list of events, notes, observations, conversations, etc., concerning the easement. Notes suspected violations and the eventual disposition of each suspected violation. Document all visits to the easement area and observations such as wildlife usage, water conditions, land use practices, and other items of interest. Every field and aerial surveillance must be documented here as well. A positive report (no evidence of violation) is just as important as a negative report. The individual making the visit will date and sign his or her

name on each entry and on each item of documentation. The documentation may be either neatly handwritten or typed.

Document the content of any conversations with a landowner or tenant concerning an easement. In some cases a certified letter to the landowner and/or tenant may be necessary. Keep copies of all letters and return receipts in the easement file.

A map of the easement area should be drawn on a copy of an aerial photograph (4 inch to the mile). Items to include are:

1. Date prepared
2. Name of preparer
3. Name of landowner
4. County
5. State
6. Tract number
10. Easement location (Township, Range, Section)
11. Indicator for "north"
12. Easement boundary
13. Existing wetlands/streams
14. Restored Wetlands
15. Drainage Facilities
16. Upland Type and Use (Crop, pasture, wooded)
17. Trails
18. Anything Unique or Unusual

<u>Contacts and letters</u>

1. Current landowners

A letter sent annually to all easement holders and tenants, if any is worthwhile and will serve as a reminder to the owner and/or tenant that the easement is still in effect and that the Service is monitoring it. The letter should also express our appreciation for their cooperation in preserving important resources (Exhibit 9).

2. New landowners

On an annual basis, each Project Leader will verify ownership of the land upon which conservation easements were placed. New owners will be contacted and provided a copy of the easement document. The Project Leader will outline the terms and conditions of the easement. This should be done in person, if possible, and confirmed by a certified return-receipt letter. If personal contact is not possible, the Project Leader should send a certified return-receipt letter to all new owners to inform them about the easement. A copy of this letter with the certified return-receipt attached will be maintained in the FWS District easement file. This is a very important procedure which needs to be completed. In order to ensure compliance, new owners must be made aware of the easement and what it means.

## E. Activities Permitted on Lands Under Conservation Easements

### 1. General

Where the Service owns an easement interest for the protection of wetlands, floodplains, riparian, endangered species habitat, or other trust resources, certain activities of a limited nature may be allowed. These acts would be permitted by issuance of a Permit for Activities in Conservation Easements (Exhibit 10). The Project Leader may issue the permit if specific acts are appropriate and compatible with the purpose of the easement.

An application form the landowner is required for all permitted activities on conservation easements. This process does not apply to those management activities normally administered by a Special Use Permit or Cooperative Farming Agreement. For activities that require a permit, no special form of application is required, pending development of a specific form. The applicant should submit a letter to the Project Leader outlining specific information and details about the proposed activity.

If the proposed activity has been identified and approved in the station Comprehensive Conservation Plan then the Project Leader may issue a Permit for Activities in Conservation Easements, since these activities have already gone through the NEPA compliance procedure. All proposed activities that involve an "undertaking" (movement of earth) must be reviewed by the State Historical Preservation Office (SHPO). Once SHPO has had a 30 day period to review the proposed activity a Permit for Activities in Conservation Easements may be issued by the Project Leader.

If the activity is not in the station Comprehensive Conservation Plan then the Project Leader will be required to prepare a Compatibility Determination and an Intra-Service Section 7. The Compatibility Determination must be approved by the Regional Refuge Chief and the Intra-Service Section 7 will be approved by the Ecological Service's Field Supervisor. Again, if the proposed project involves any undertaking SHPO must given 30 days to review the activity. Once the Compatibility Determination, Intra-Service Section 7, and SHPO review has been completed and approved the Project Leader may issue a permit.

All permits must be issued before any activities are allowed. No "after-the-fact" permits shall be issued. All non-permitted acts will be treated as violations of the conservation easement.

### 2. Emergencies Involving Health, Safety, or Major Threats to Property

The Project Leader may issue a special use permit for temporary alteration of the easement area to alleviate critical problems, especially flooding, whenever there is a threat to human health, safety, or appurtenances. The term of the permit shall be limited to the period necessary to alleviate the emergency but shall not exceed one year. Any easement area so altered must be allowed to revert to its natural condition. If ditches are constructed or dikes altered, they must be filled or altered to the Project Leader's specification. No maintenance is allowed without another permit.

Permits for emergency purposes shall not be assignable to subsequent landowners. The original copy of the permit will go to the landowner and the carbon copy will be retained by the office issuing the permit.

G. Right-of-Way Requests

Refer to the Right-of-Way chapter in the Easement Manual for guidance.

H. Release of Easement Rights

Once accepted, conservation easements become part of the NWRS. The National Wildlife Refuge Administration Act of 1966, as amended, limits disposition of lands in the NWRS. The Act states that no acquired lands or interests in lands which are part of the NWRS may be transferred or otherwise disposed of, unless the Secretary of the Interior determines, with the approval of the Migratory Bird Conservation Commission, that such lands or interest in lands are no longer needed for the purpose for which the NWRS was established.

## CONSERVATION EASEMENT MANAGEMENT

Habitat management on conservation easements encompasses a variety of activities ranging from no intervention of the natural process to intensive manipulation of soil, water or vegetative cover. Whatever the level of management required, it must be consistent with the objectives of the conservation easement and conform to the policies governing the NWRS. Special attention must also be given to endangered or threatened species. Planning and implementation of some activities are outlined by the following.

### 6.1.1 Surveys, Posting and Fencing

#### *Surveys*

All FSA conservation easements are posted and permanently marked with surface and subsurface monuments in the field. This posting and marking reflects the boundaries of the easement as described in the easement document and, if applicable, the Exhibit A map.

#### *Posting*

The Service field office responsible for managing the FSA conservation easement is also responsible for coordinating the posting and permanent marking of the easement boundaries as well as regular maintenance of these boundary markers. The procedure is as follows:

1. Drive surface markers, consisting of 1-inch diameter steel pipe and approximately 18 inches long, into the ground at each corner of the FSA conservation easement.
2. Ensure that the pipes are no more than 1 inch above the surface of the ground.
3. Bury subsurface magnetic markers immediately below the surface marker but not less than 18 inches below the surface of the ground.
4. Mark FSA conservation easements with irregular boundaries with metal surface and magnetic subsurface markers at a maximum of 1/10 mile intervals along the length of the irregular boundary.
5. Demarcate all corner points on easement boundaries with permanent corner posts.
    - The corner point demarcation shall consist of 6-foot to 8-foot steel posts and signs.
6. Place boundary signs within 3 feet of each corner to properly identify converging boundaries of the easement.
    - Between corner posts the recommended post placement is at maximum intervals of 1/10 of a mile.
    - Where easement boundaries correspond to permanent existing use lines, posting at ¼ mile intervals is sufficient.

An example of the sign used for boundary posting is shown on the next page.

Exhibit III-8c

**CONSERVATION**

**EASEMENT**

**BOUNDARY**

**U.S. Fish and Wildlife Service**

| | |
|---|---|
| Size: | 3" X 4½" |
| Color: | White with FWS blue letters |
| Lettering: | Large = ¼" helvetica medium<br>Small = 1/3" |
| Materials: | Type 1 = aluminum, painted<br>Type 2 = stick-on vinyl |

### *Fencing*

Rights conveyed to the Service by FSA conservation easements may include the construction and maintenance of fences in order to prevent grazing or other types of encroachment on the easement area. Landowners, however, can be permitted access to water within these areas when it is deemed necessary for stock watering. The Service is responsible for any expense involved for the construction and/or maintenance of such fences. All fences constructed should be designed, depending upon their intended usage, for individual easement requirements (i.e., the control of cattle or horses). Project leaders may also want to review state fencing laws. Adoption of state law requirements may help avoid a tort claim or provide a better legal position should a claim be filed.

C. <u>Habitat Manipulation</u>

The attainment and maintenance of a natural diversity on easement areas should be considered in all habitat management activities. The least intensive management measures required to attain management objectives should be used. Project Leaders, however, must be responsive to the habitat needs of wildlife, to intervene with practices such as grazing, haying, water management, prescribed burning, and selective timber management techniques when necessary. The following briefly describes three basic areas of habitat management for conservation easements.

1. Water Management

In wetland areas that are being restored, created or manipulated, water control is desirable but not always possible. The following should be considered where water control structures are available.

-water depth, for fish or vegetation control
-seasonal flooding
-drainage facility downstream
-flows into wetland
-soils
-watershed
-surrounding wetland community

A water management plan should be developed for all wetlands where water levels can be controlled.

2. Grassland Management

Management of grasslands involves striking a balance between manipulation and letting nature take its course. Desirable management replaces certain natural influences with periodic manipulation to promote vigorous grassland communities. Some common techniques for manipulating grassland areas are grazing, haying, prescribed burning, fertilization and mechanical or chemical treatments. Grassland management activities on conservation easements can often times be handled by a permit.

3. Forrest Management

The forest management objectives of tracts will vary greatly across the Region and are dependent upon the species using the area. For example, the project leader may decide to manage one forested area for cavity nesting wildlife species and another area for neotropical birds. Generally speaking, forested species historically common to those tracts should be reestablished.

Removal of firewood by the landowner may be allowed if it is consistent with the objectives of the easement. Where firewood cutting is allowed, this activity should be authorized by a permit and limited only to the personal use of the landowner.

D. Wetland Restoration

It is the policy of the Service to propose conservation easements to protect all wetlands, including drained wetlands on FmHA Inventory Lands.

While working on a restorable wetland, staff members must not only consider the individual wetland being restored, but also the surrounding wetland community and/or properties affected by such a restoration. Staff should monitor all restored wetlands on conservation easements to evaluate vegetative response, wildlife usage, and to assess damage to water control structures.

E. Grassland Restoration

Once an easement has been recorded the establishment or re-establishment of vegetation on these areas must be considered. Special objectives to consider include providing a cover type which meets the needs of wildlife species indigenous to the easement area and the protection of water quality and soils form erosion.

F. Weed Control

In accordance with the Conservation Easement Document, the landowner is responsible for compliance with all Federal, State, and Local laws for the control of noxious weeds or other undesirable plants. In most circumstances, cutting or mowing is the preferred control method. Herbicides may be used by the landowner considering they follow the label instructions.

G. Public Use and Other Uses

Landowners will retain the rights of access for hunting, fishing, and other recreational uses on conservation easement properties.

**Conservation Easement Reservations in the United States**

*By this instrument there is reserved in the UNITED STATES OF AMERICA, its successors and assigns, a perpetual conservation easement on the property conveyed by this deed. The United States in the conservation easement refers to the United States of America, Farmers Home Administration, United States Department of Agriculture, as defined in the quitclaim deed to which this easement is attached and incorporated herein.*

*This easement is under the authority and in furtherance of the provisions of Federal law, including sections 331 and 335 of the Consolidated Farm and Rural Development Act (7 U.S.C. 1981, 1985), Executive Order 11990 providing for the protection of wetlands, and Executive Order 11988 providing for the management of floodplains. The restrictions and covenants contained in this easement constitute a perpetual servitude on and run with the property. The Grantee and all successors and assigns ("landowner") of the property described below covenants with the United States to do or refrain from doing, severally and collectively, the various acts mentioned later in this easement. The United States is reserved the rights enumerated in this easement for itself and its successors, agents, and assigns.*

***1. Description of the Easement Area:***

*The lands, waters and access rights covered by this easement are located within the following described legal subdivisions in_________________County, State of South Dakota. The easement boundaries are further delineated on the map(s) attached hereto as Exhibit "A." Wetland Areas shall include any enlargements of said wetland areas resulting from normal or abnormal increases in water.*

*T. N., R. W., 5th P.M.*

*Section_____:___________and access across the*

*________________________.*

*Easement Areas, as depicted on Exhibit "A," are further described as:*

*T. N., R. W., 5th P.M.*

*Section :______and access across the____________.*

*This easement is subject to all existing rights-of-way for highways, roads, railroads, pipelines, canals, laterals, electric transmission lines, telegraph and telephone lines, cable lines, and all mineral rights.*

***2. Covenants by the Landowner:***

*A. No dwellings, barns, outbuildings, or other structures shall be built within the easement area.*

*B.1. For "**Most Restrictive**" Easement Areas of the easement which include permanent grassland vegetation and the wetland area, the vegetation or hydrology of the described easement area will not be altered in any way or by any means or activity on the property conveyed by this deed, or property owned or under the control of the landowner, including: (1) cutting or mowing; (2) cultivation; (3) grazing; (4) harvesting wood products; (5) burning; (6) placing of refuse, wastes, sewage, or other debris; (7) draining, dredging, channeling, filling, discing, pumping, diking, impounding, and related activities; or (8) diverting or affecting the natural flow of surface or underground waters into, within, and out of the easement areas.*

*B.2. For "**Least Restrictive**" Wetland Areas of the easement, either by an activity on the property conveyed by this deed, or on property owned or under the control of the landowner, the vegetation or hydrology will not be altered through: (1) burning; (2) placing of refuse, wastes, sewage, or other debris, (3) draining, dredging, channeling, leveling, filling, pumping, diking, impounding and related activities; or (4) diverting or affecting the natural flow of surface or underground waters into, within, and out of "**Least Restrictive**" Wetland Areas. The landowner shall have the right to carry on farming practices such as grazing, hay cutting, plowing, working and cropping "**Least Restrictive**" Wetland Areas when they are dry of natural causes. "**Least Restrictive**" Wetland Areas shall include any enlargements of said wetland areas resulting from normal or abnormal increases in water.*

*C. Notwithstanding the provisions of B.1. and B.2. above, the landowner shall be responsible for compliance with all Federal, State, and local laws for the control of noxious or other undesirable plants on the easement area. For "**Most Restrictive**" Easement Areas, the responsibility for such plant control may be assumed in writing by and at the option of the easement manager where control or manipulation of such plants is deemed by the manager to affect easement management programs or policies.*

*D. Cattle or other stock shall not be permitted on "**Most Restrictive**" Easement Areas, except that the easement manager shall permit access to and use of waters within the area necessary for stock watering under such terms and conditions as the easement manager deems necessary to protect and further the purposes of this easement, provided:*

> *(1) the easement manager bears the costs of building and maintaining fencing or other facilities reasonably necessary to preclude stock from entering the easement area; and*
>
> *(2) access for stock watering need not be permitted where other waters are reasonably available from other sources outside the easement area.*

***3. <u>Rights Reserved in the United States</u>:***

*The United States, on behalf of itself, its successors or assigns, reserves and retains the right, at its sole discretion, to manage the easement area, including the following authorities (rights reserved for "**Most Restrictive**" Easement Areas are described in A, B, C, D, E, and F.; rights reserved for "**Least Restrictive**" Wetland Areas are described in A.):*

*A. The right of ingress and egress to conduct management, monitoring, and easement enforcement activities. The easement manager may utilize any reasonably convenient route of access to the easement area(s), across Section , T.___N, R. W, 5th P.M.,______County,_____________. However, the landowner may provide a designated route to and from the easement area so that damage to farm operations can be reasonably avoided.*

*B. For "**Most Restrictive**" Easement Areas, the right to install, operate, and maintain structures for the purpose of reestablishing, protecting, and enhancing wetlands functional values including the taking of construction materials to and from said sites.*

*C. For "**Most Restrictive**" Easement Areas, the right to establish or reestablish vegetation through seedings, plantings, or natural succession.*

*D. For "**Most Restrictive**" Easement Areas, the right to manipulate vegetation topography and hydrology on the easement areas through diking, pumping, water management, excavating, island construction, burning, cutting, pesticide application, fertilizing, and other appropriate practices.*

*E. For "**Most Restrictive**" Easement Areas, the right to conduct predator management activities.*

*F. For "**Most Restrictive**" Easement Areas, the right to construct and maintain fences in order to prevent grazing or other types of encroachment on the easement area.*

***4. <u>Easement Management and Administration</u>:***

*A. All right, title, and interests of the United States in this easement are assigned to the Secretary of the Interior for administration by the United States Fish and Wildlife Service as part of the National Wildlife Refuge System pursuant to the National Wildlife Refuge System Administration Act, 16 U.S.C. 668dd et. seq. The U.S. Fish and Wildlife Service may enforce all the terms and conditions of this easement, along with exercising all rights and powers reserved in this easement through such general or specific regulations or orders as have been or may be, from time to time, promulgated under the authority of the Secretary of the Interior. Notwithstanding the above rights in paragraphs II and III retained by the United States, the U.S. Fish and Wildlife Service*

*may permit the landowner to pursue such activities on said sites as would be consistent with preservation and enhancement of floodplain and wetland functional values.*

*B. As used in this easement, the term "easement manager" shall refer to the authorized official of the U.S. Fish and Wildlife Service.*

***5. General Provisions:***

*A. The agreed upon purposes of this easement are the preservation and maintenance of the wetland and floodplain areas existing as of the date of this conveyance as well as protection and enhancement of plant and animal habitat and populations. Such purposes shall constitute the dominant estate within the easement area. Wetland Areas are defined by reference 7(c) of Executive Order 11990 and a "floodplain" is defined by reference to section 6(c) of Executive Order 11988. Any ambiguities in this easement shall be construed in a manner which best effectuates wetland and plant preservation, and fish and wildlife purposes.*

*B. Any subsequent amendment to or repeal of any Federal law or order which authorizes this reservation shall not affect the rights reserved by the United States or subsequently held by its successors or assigns.*

*C. For purposes of this easement, wetland management rights reserved by the United States include, but are not limited to, inspection for compliance with the terms of this easement; research regarding water, wetlands, fish and wildlife and associated ecology; and any other activity consistent with the preservation and enhancement of wetland functional values.*

*D. The United States, its successors and assigns, including the easement manager, shall have the right to make surveys, take photographs, and prepare such other documentation as may be necessary or desirable to administer the provisions of this easement. Any such map, plat, or other suitable document may be recorded in the land records of the respective county in which the property is located.*

*E. The easement reservation does not authorize public entry upon or use of land. Unless the easement manager prohibits public entry to "**Most Restrictive**" Easement Areas, the landowner may permit it at the landowner's discretion.*

*F. The landowner and invitees may hunt and fish on the easement area in accordance with all Federal, State, and local game and fishery regulations.*

*G. This easement shall be binding on the landowner, and the landowner's heirs, successors or assigns. The landowner covenants to warrant and defend unto the United States, its successors or assigns, the quiet and peaceable use and enjoyment of the land and interests in the land constituting this reservation against all claims and demands.*

*H. The easement manager shall be the agent of the United States or its successors and assigns. The manager shall have discretionary powers of the United States under this easement. In performance of any rights of the United States under this easement, the manager may permit, contract, or otherwise provide for action by employees, agents, or assigns which may include the landowner.*

*This page intentionally left blank*

Exhibit III-10

Revised July 2014

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**U.S. FISH AND WILDLIFE SERVICE**
**GRANT OF EASEMENT FOR WATERFOWL HABITAT CONSERVATION**

78C
444X-1,2

THIS INDENTURE is by and between **Darrell R. Grade and Laurie Grade, also known as, Laurie A. Grade, husband and wife, of 2063 8th Ave. NE, Kief, ND 58723,** hereafter referred to as "Grantors," and the UNITED STATES OF AMERICA, and its assigns hereafter referred to as "United States" or "Grantee," acting by and through the Secretary of the Interior or the Secretary's authorized representative ("Secretary"), hereafter, collectively, referred to as the "Parties."

RECITALS

WHEREAS, the Migratory Bird Conservation Act, 16 U.S.C. §§ 715-715s, the Migratory Bird Hunting and Conservation Stamp Act, 16 U.S.C. §§ 718-718j; the Land and Water Conservation Fund Act of 1965, 16 U.S.C. § 460l-4 to 460l-11; the Fish and Wildlife Act of 1956, 16 U.S.C. §§ 742a-742j; the Emergency Wetlands Resources Act of 1986, 16 U.S.C. §§ 3901-3932; North American Wetlands Conservation Act, 16 U.S.C. § § 4401-4412, and the Endangered Species Act, 16 U.S.C. §§ 1531-1544, authorize or provide funding to the Secretary to acquire lands and waters, or interests therein, for the conservation, development, advancement, management, and protection of fish and wildlife species and resources; and

WHEREAS, real property ("Property") owned by the Grantors, more particularly described below, contains habitat suitable for fish and wildlife conservation purposes, including vegetation and wetlands; and

WHEREAS, Grantors, as owners of the Property, intend the Property be preserved and maintained in perpetuity as habitat to benefit fish and wildlife species; and

WHEREAS, Grantors desire and intend, as owners of the Property, to convey to the United States the right to preserve and protect the fish and wildlife habitat values of the Property in perpetuity; and

WHEREAS, Grantee intends to acquire an interest in the Property consistent with the desires of the Grantors;

NOW, THEREFORE, for and in consideration of the above recitals and the terms and covenants of this Indenture, the Parties agree as follows:

Section I. Consideration and Grant of Easement
In consideration of the payment of ****Fifty-Two Thousand One Hundred Twenty-Five and No/100**** Dollars (**$52,125.00**), Grantors hereby grant, warrant, and convey to the United States a perpetual Grant of Easement for Waterfowl Habitat Conservation ("Easement") as described below.

<u>Section II. Description of Easement</u>
The Easement is a right to use the Property for wildlife habitat conservation purposes and includes the right of ingress and egress on, over, across and through any and all lands of the Grantors, as described below, to the United States and its authorized representatives. This Indenture provides no rights to the general public for access to or entry upon the Property for any purpose.

The Grantors, on behalf of themselves, their heirs, executors, administrators, lessees, successors, and assigns, and any other person claiming under them, covenant with the United States, forever, to do and refrain from doing upon the Property the various activities hereinafter recited, it being hereby agreed that the doing and refraining from such activities on the Property is and shall be for the benefit of the United States for the preservation and conservation of the Property as habitat for the protection of fish and wildlife species, particularly waterfowl.

The Property encumbered by this Easement is located in **Sheridan** County, State of **North Dakota** to wit:

**T. 149 N., R. 76 W., 5th P.M.**
Section 15, SW1/4SW1/4; Section 20, SW1/4NE1/4NE1/4, N1/2NW1/4SE1/4NE1/4, E1/2NW1/4NE1/4, E1/2W1/2NW1/4NE1/4, SW1/4NE1/4

SUBJECT, however, to all valid existing rights-of-way for highways, roads, railroads, pipelines, electrical transmission lines, telegraph and telephone lines, cable lines, and all mineral rights including sand and gravel, but not including soil, clay or scoria, unless and to the extent rights to mine such materials have vested in third parties prior to the date hereof; provided, however, that the mining, extraction, or development of sand and gravel may not cause a wetland to be drained, filled, leveled, or burned, directly or indirectly by development, as described by "Prohibited Activities" in Section V, unless and to the extent rights to mine, extract, or develop sand and gravel have vested in third parties prior to the date hereof.

The terms of this Easement apply to the above-described real property owned by Grantors and are intended to protect fish and wildlife habitat occurring on said real property, including grasslands, forbs, shrubs and wetlands, identified on the map(s) attached as Exhibits A and B and incorporated herein by reference. The term "wetlands" includes lakes, ponds, marshes, sloughs, swales, swamps, potholes, and other wholly or partially water-covered areas, now existing or subject to recurrence or which may be restored through natural or manmade causes, identified on the map(s) attached as Exhibit A; provided, however, that the terms of this Easement shall apply to any enlargements of said wetlands resulting from normal or abnormal increases of water.

This Easement is being acquired by the U.S. Department of the Interior for administration by the U.S. Fish and Wildlife Service.

<u>Section III. Purpose and Requirements of Easement</u>
The purpose of this Easement is to preserve and protect in perpetuity fish and wildlife habitat, including, but not limited to, wetlands, grasses, forbs and shrubs, on the Property. Protected habitat includes, but is not limited to, cover, nesting cover, and food for a varied array of aquatic, terrestrial, and avian fish and wildlife, particularly waterfowl. Grantors will maintain and protect the fish and wildlife habitat values on the Property and associated wetlands described above and identified on Exhibit(s) A and maintain permanent vegetative cover, consisting of grasses, forbs, and shrubs on the Property described above and identified on Exhibit(s) B.

<u>Section IV. Authorized Uses</u>
The following uses and practices by the Grantor, though not an exhaustive recital of all uses and practices on said lands, are hereby deemed to be consistent with the conservation purposes of the Easement:

1. Livestock grazing is permitted at anytime throughout the calendar year.
2. With respect to any wetlands identified on Exhibit A but not included in the waterfowl habitat areas depicted on Exhibit B, Grantors may engage in farming practices such as grazing at any time, hay cutting, plowing, working and cropping wetlands when the same are dry of natural causes, and Grantors may utilize all of the subject wetlands in the customary manner except for the draining, filling, leveling, and burning provisions

described below. With respect to those wetlands identified on Exhibit A and also included in the waterfowl habitat areas depicted on Exhibit B, the provisions of this paragraph IV.2 do not apply and all prohibitions set forth in this easement shall apply.

3. Grantors may hay, mow and seed harvest or allow haying, mowing and seed harvesting on the Property depicted on Exhibit B after July 15 in any calendar year.

4. Noxious weed control and the emergency control of pests are allowed and will be the responsibility of the Grantors, subject to applicable federal and state statutes and regulations. Provided, however, the mowing or haying of noxious weeds will not occur until after July 15 in any calendar year unless prior approval, in writing, is granted by the U.S. Fish and Wildlife Service.

5. Grantors will pay taxes and assessments, if any, which may be levied against the Property.

6. Hunting, fishing and trapping on the easement property is allowed, subject to compliance with federal and state statutes and regulations.

Section V. Prohibited Activities

For the purpose of accomplishing the intent of this Easement, the following uses and practices on the Property are hereby deemed to be inconsistent with the purpose of this Indenture and are expressly prohibited:

1. Causing or permitting the draining by tiling, pumping, construction of ditches, level ditches, or by any means, direct or indirect, whether through the transfer of appurtenant water rights or otherwise, of any waters in or appurtenant to the wetlands identified on Exhibit(s) A.

2. Filling, or causing or permitting the filling in with earth or any other material, or leveling, or causing or permitting the leveling on any part or portion of the wetlands identified on Exhibit(s) A; or burning, or causing or permitting the burning of any wetland vegetation on any part or portion of the wetlands identified on Exhibit(s) A.

3. Alteration of vegetation, grasslands, wetlands, wildlife habitat, or other natural features by excavation, digging, plowing, disking, chemical application (except chemical application for noxious weed control, as provided for under Section IV) or construction of buildings or other structures, unless prior written approval is granted by the U.S. Fish and Wildlife Service on any habitat area depicted on Exhibit(s) B.

4. Haying, mowing, or seed harvesting prior to July 15, or cutting or otherwise destroying or removing the vegetative cover (except haying, mowing and seed harvesting after July 15 as provided under Section IV) on any habitat area depicted on Exhibit(s) B, unless prior written approval is granted by the U.S. Fish and Wildlife Service.

5. Production of agricultural crops or any alteration of the Property in order to produce agricultural crops on any habitat area depicted on Exhibit(s) B, unless prior written approval is granted by the U.S. Fish and Wildlife Service.

Section VI. Effective Date

This conveyance will be effective on the date of the execution of this Indenture by the Secretary; provided, however, that such acceptance of this conveyance by the Secretary must be made within **12** months from the date of execution of this Indenture by the Grantors, or any subsequent date as the Parties may mutually agree to, in writing, prior to the expiration of such date; and provided further, that in the event that the Secretary does not accept this conveyance by such date, this Indenture will be null and void.

Section VII. Property as Part of the National Wildlife Refuge System

The Parties acknowledge that the rights and interests granted to the United States by this Indenture will become part of the National Wildlife Refuge System to be administered by the U.S. Fish and Wildlife Service pursuant to the National Wildlife Refuge System Administration Act, 16 U.S.C. § 668dd et seq.

Section VIII. Additional Provisions

1. This Indenture will not be binding upon the United States until accepted on behalf of the United States by the Secretary. The Grantors acknowledge that the Indenture is binding upon them from the date of execution by them and will remain so until the expiration of the acceptance period, as described in Section VI, by virtue of the consideration recited in the Recitals and Section I.

2. The U.S. Fish and Wildlife Service will provide notice of the acceptance of this Indenture to the Grantors by certified mail addressed to:

**Darrell R. Grade, 2063 8th Ave. NE, Kief, ND 58723**

This notice will be effective upon the date of mailing and will be binding upon all Grantors without sending a separate notice to each.

3. Payment of the consideration will be made by the United States or other authorized entity after acceptance of this Indenture by the Secretary and after the Attorney General, or in appropriate cases, the Solicitor of the Department of the Interior, has approved the easement interest thus vested in the United States.

4. Any failure by the United States to discover a violation or any forbearance by the United States to exercise its rights under this Easement, in the event of any breach of any term of this Easement by Grantors, will not be deemed or construed to be a waiver by the United States of such term or any subsequent breach of any other term of this Indenture or of any of the United States' rights under this Indenture. No delay or omission by the United States in the exercise of any right or remedy for any breach by the Grantors will impair such right or remedy or be construed to be a waiver. Grantors hereby specifically waive the defenses of laches and estoppel.

5. It is understood that the Easement and the covenants and agreements contained in this Indenture will run with the land and will be binding in perpetuity on all persons and entities who come into ownership or possession of the Property.

6. Grantors hereby relinquish and forfeit any and all vested drainage rights associated with the wetlands identified herein and on Exhibit(s) A and any and all vested rights to the alteration of vegetation, grasslands, wildlife habitat or other natural features upon areas defined herein and on Exhibit(s) B.

7. It is further mutually agreed that no Member of or Delegate to Congress, or Resident Commissioner, shall be admitted to any share or part of this contract, or to any benefit to arise thereupon. Nothing, however, herein contained shall be construed to extend to any incorporated company, where such contract is made for the general benefit of such incorporation or company.

TO HAVE AND TO HOLD, this Grant of Easement unto the United States of America and its assigns, forever.

IN WITNESS WHEREOF the Grantors intend to legally bind themselves, successors and assigns and have executed this Grant of Easement this 23 day of July, 20 14.

Darrell R. Grade [signature]
**Darrell R. Grade**

Laurie A Grade [signature]
**Laurie Grade, also known as, Laurie A. Grade**

Exhibit III-10

**ACKNOWLEDGMENT**

STATE OF North Dakota )
) §§
COUNTY OF Burleigh )

On this 23 day of July in the year 20 14 before me personally appeared **Darrell R. Grade, a married man,** known to me to be the person described in and who executed the foregoing instrument and acknowledged to me that he executed the same as his free act and deed.

(SEAL) DOUGLAS MOSSER
Notary Public
State of North Dakota
My Commission Expires Dec. 13, 2014

Notary Public: [signature]

My commission expires: 12/13/14

STATE OF North Dakota )
) §§
COUNTY OF Burleigh )

On this 23 day of July in the year 20 14 before me personally appeared , **Laurie Grade, also known as, Laurie A. Grade, a married woman** known to me to be the person described in and who executed the foregoing instrument and acknowledged to me that she executed the same as her free act and deed.

(SEAL) DOUGLAS MOSSER
Notary Public
State of North Dakota
My Commission Expires Dec. 13, 2014

Notary Public: [signature]

My commission expires: 12/13/14

**ACCEPTANCE**

The Secretary of the Interior, acting by the through his authorized representative, has executed this agreement on behalf of the United States this _____day of ____________, 20___.

THE UNITED STATES OF AMERICA

By:______________________________

Title:_____________________________
U.S. Fish and Wildlife Service

Exhibit III-10

UNITED STATES DEPARTMENT OF INTERIOR
U.S. FISH AND WILDLIFE SERVICE
GRANT OF EASEMENT FOR WATERFOWL HABITAT CONSERVATION - EXHIBIT "A"

Grade, Darrell R. TRACT: 444X-1,2 Map: 1 of 2

WATERFOWL PRODUCTION AREA Sheridan County, State of North Dakota
EASEMENT AUTHORIZED BY MIGRATORY BIRD HUNTING AND CONSERVATION STAMP ACT OF MARCH 16, 1934, AS AMENDED.
T. 149 N., R. 76 W., 5th Principal Meridian
Section 15, SW1/4SW1/4




Scale: 4" = 1 mile

This map is intended to identify the approximate location of encumbered wetlands referred to in the easement conveyance dated 7/23/2014, which the Grantors agree to maintain as wildlife habitat. Because wetlands are hydrologically dynamic systems, with regularly expanding and receding water levels, this map is not meant to depict wetland size or water levels in any given year.

[signature] [signature]

Legend:

Boundary of Easement Description
Wetland Restoration Structure
Wetlands Covered by Provisions of the Easement

Map prepared by: Doug Mosser

Date: 7/2/2014

Exhibit III-10

UNITED STATES DEPARTMENT OF INTERIOR
U.S. FISH AND WILDLIFE SERVICE
GRANT OF EASEMENT FOR WATERFOWL HABITAT CONSERVATION - EXHIBIT "A"

Grade, Darrell R. TRACT: 444X-1,2 Map: 2 of 2

WATERFOWL PRODUCTION AREA Sheridan County, State of North Dakota
EASEMENT AUTHORIZED BY MIGRATORY BIRD HUNTING AND CONSERVATION STAMP ACT OF MARCH 16, 1934, AS AMENDED.
T. 149 N., R. 76 W., 5th Principal Meridian
Section 20, SW1/4NE1/4NE1/4, N1/2NW1/4SE1/4NE1/4, E1/2NW1/4NE1/4, E1/2W1/2NW1/4NE1/4, SW1/4NE1/4




Scale: 4" = 1 mile

This map is intended to identify the approximate location of encumbered wetlands referred to in the easement conveyance dated 7/23/2014, which the Grantors agree to maintain as wildlife habitat. Because wetlands are hydrologically dynamic systems, with regularly expanding and receding water levels, this map is not meant to depict wetland size or water levels in any given year.

[signature] [signature]

**Legend:**

Boundary of Easement Description

Wetland Restoration Structure

Wetlands Covered by Provisions of the Easement

Map prepared by: Doug Mosser

Date: 7/2/2014

Exhibit III-10

UNITED STATES DEPARTMENT OF INTERIOR
U.S. FISH AND WILDLIFE SERVICE
GRANT OF EASEMENT FOR WATERFOWL HABITAT CONSERVATION - EXHIBIT "B"

Grade, Darrell R. TRACT: 78C Map: 1 of 1

WATERFOWL PRODUCTION AREA Sheridan County, State of North Dakota
EASEMENT AUTHORIZED BY MIGRATORY BIRD HUNTING AND CONSERVATION STAMP ACT OF MARCH 16, 1934, AS AMENDED.
T. 149 N., R. 76 W., 5th Principal Meridian
Section 20, SW1/4NE1/4NE1/4, N1/2NW1/4SE1/4NE1/4, E1/2NW1/4NE1/4, E1/2W1/2NW1/4NE1/4, SW1/4NE1/4




Scale: 4" = 1 mile

This map identifies the lands referred to in the easement conveyance dated 7/23/2014, which the Grantors agree to maintain in permanent vegetative cover as wildlife habitat.

Darrell R. Grade          Laurie A Grade

**Legend:**

Boundary of Easement Description

Lands covered by provisions of the easement

Map prepared by: Doug Mosser

Date: 7/2/2014

UNITED STATES DEPARTMENT OF INTERIOR
U.S. FISH AND WILDLIFE SERVICE
GRANT OF EASEMENT FOR WILDLIFE HABITAT PROTECTION

THIS INDENTURE, by and between

hereinafter referred to as the Grantors, and the UNITED STATES OF AMERICA, acting by and through the Secretary of the Interior or his authorized representative.

WITNESSETH

WHEREAS, the Migratory Bird Hunting and Conservation Stamp Act, 16 U.S.C. 718d(c); the Fish and Wildlife Act of 1956, 16 U.S.C. 742a-742j; the Emergency Wetland Resources Act of 1986, 16 U.S.C. 3901; the Endangered Species Act of 1973, as amended, 16 U.S.C. 1534 and the Land and Water Conservation Fund Act, 16 U.S.C. 4601-9(a)(1), authorize the Secretary of the Interior to acquire lands or waters or interests therein for the development, advancement, management, conservation and protection of fish and wildlife resources. The purpose of this easement is to provide and protect quality habitat on the lands and wetlands described herein and such lands and wetlands shall be maintained and improved to provide cover and food for a varied array of aquatic, terrestrial, and avian wildlife, particularly migratory birds, and threatened and endangered species, and

WHEREAS, the lands and wetlands described below contain existing or potential habitat suitable for use for wildlife management purposes.

NOW, THEREFORE, for and in consideration of the sum of ____________________________________________ Dollars ($ ____________ ), the Grantors hereby grant to the United States, commencing with the acceptance of this Indenture by the Secretary of the Interior or his authorized representative, an easement in perpetuity, which includes a right of use for the maintenance of the lands and wetlands described herein, to wit:

____________________ County, State of Minnesota:

Together with the right of ingress and egress to the above described lands and wetlands on, over, across and through the following described lands, to wit:

Subject, however, to all valid existing rights-of-way for highways, roads, railroads, pipelines, canals, laterals , electrical transmission lines, cable lines, and all mineral rights.

The conveyance hereunder shall be effective on the date of the execution of this Indenture by the Secretary of the Interior or his authorized representative; provided, however, that such acceptance must be made within ____________________ calendar months from the date of the execution of this Indenture by the Grantors, or any subsequent date as may be mutually agreed upon in writing by the parties hereto prior to the expiration of such date; and provided further, however, that in the event that such acceptance is not made by such date, this Indenture shall be null and void.

No rights herein are granted to the general public for access to or entry upon the land subject to this grant of easement for any purpose.

The Grantors, for themselves, and for their heirs, successors, and assigns, lessees, and any other person claiming under them, covenant and agree that they will cooperate in the maintenance and protection of the aforesaid lands and wetlands for the protection and management of fish and wildlife resources and to maintain the quality of these lands and wetlands to provide cover and food for a varied array of aquatic, terrestrial, and avian wildlife, particularly migratory birds, and threatened and endangered species. To that end and for the purpose of accomplishing the intent on this Indenture, the Grantors, for themselves, and for their heirs, successors, and assigns, lessees, and any other person claiming under them, covenant and agree as follows:

1. Grantors will not perform, cause to be performed or permit haying, mowing or seed harvesting upon the easement area until after July 15 in any calendar year.

2. Grantors will not perform, cause to be performed or permit the following activities upon the easement area: altering of grassland, woodland, wildlife habitat or other natural features by digging, plowing, disking, cutting or otherwise destroying the vegetative cover; dumping refuse, wastes, sewage or other debris; burning; draining, dredging, channeling, filling, leveling, pumping, diking, impounding or related activities; altering or tampering with water control structures or devices; diverting or causing or permitting the diversion of surface or underground water into, within or out of the easement area by any means including ditching or the construction of wells; building or placing buildings or structures on the easement area; and producing agricultural crops, unless prior approval in writing is granted by the U.S. Fish and Wildlife Service; except that grazing the aforesaid lands is permitted at anytime throughout the calendar year.

3. Grantors will pay all taxes and assessments, if any, which may be levied against the land.

4. Grantors will be responsible for noxious weed control and emergency control of pests to protect the public good subject to Federal and State Statutes and Regulations. Methods used to control noxious weeds and pests must be approved in writing by the U.S. Fish and Wildlife Service prior to implementation by the Grantors. However, mowing or haying noxious weeds is prohibited until after July 15 in any calendar year in accordance with the easement terms stated above.

5. The United States and its authorized representatives shall have the right to sign, post, mark or otherwise identify the easement area and to maintain said identification.

6. The United States and its authorized representatives shall have the right to restore and/or maintain grasslands and wetlands on the easement area.

It is understood that this easement and the covenants and agreements contained herein shall run with the land and shall be binding on all persons and entities who shall come into ownership or possession of the lands and wetlands subject to this easement. The Grantor, successors and assigns shall notify the Regional Director, U.S. Fish and Wildlife Service in writing of any sale or transfer within 30 days following the sale or transfer of any portion of the lands and wetlands subject to this easement.

It is further understood that the rights and interests granted to the UNITED STATES OF AMERICA herein shall become part of the National Wildlife Refuge System and shall be administered by the United States Fish and Wildlife Service, pursuant to the National Wildlife Refuge Systems Administration Act, 16 U.S.C. 668dd.

SPECIAL PROVISIONS

1. This Indenture shall not be binding upon the UNITED STATES OF AMERICA until accepted on behalf of the United States by the Secretary of the Interior or his authorized representative, although this Indenture is acknowledged by the Grantors to be presently binding upon them and to remain so until the expiration of said period of acceptance, as hereinabove described, by virtue of payment to the Grantors, by the UNITED STATES OF AMERICA, of the sum of One Dollar, the receipt of which is hereby expressly acknowledged by Grantors.

2. Notice of acceptance of this Indenture shall be given to the Grantors by certified mail addressed to

and shall be effective upon the date of mailing, and such notice shall be binding upon all Grantors without sending a separate notice to each.

3. It is further mutually agreed that no Member of or Delegate to Congress, or Resident Commissioner, shall be admitted to any share or part of this contract, or to any benefit to arise thereupon. Nothing, however, herein contained shall be construed to extend to any incorporated company, where such contract is made for the general benefit of incorporation or company.

4. Payment of the consideration shall be made by a United States Treasury check after acceptance of this Indenture by the Secretary of the Interior or his authorized representative and after the Attorney General, or in appropriate cases, the Solicitor of the Department of the Interior shall have approved the easement interest thus vested in the United States.

IN WITNESS WHEREOF the Grantors have hereunto set their hands and seals this ______ day of ________________________, 19_______.

______________________________(L.S.) ______________________________(L.S.)

______________________________(L.S.) ______________________________(L.S.)

______________________________(L.S.) ______________________________(L.S.)

ACKNOWLEDGEMENT

STATE OF ________________________ )
)ss
COUNTY OF ______________________ )

On this ______ day of ________________, in the year 19_____, before me personally appeared

known to me to be the person(s) described in and who executed the foregoing instrument and acknowledged to me that they (he/she) executed the same of their (his/her) free act and deed.

________________________________________
Notary Public, State of

(SEAL) My commission expires : ________________________

This instrument was drafted by Steve Durkee, Realty Specialist, U.S. Fish and Wildlife Service, Wetlands Acquisition Office, 971 East Frontage Road, Litchfield, Minnesota 55355.

ACCEPTANCE

The Secretary of the Interior, acting by and through his authorized representative, has executed this agreement on behalf of the United States this ______ day of ______________________, 19_______.

THE UNITED STATES OF AMERICA
DEPARTMENT OF THE INTERIOR

By: ________________________________________
Senior Realty Officer, Division of Realty
U.S. Fish and Wildlife Service

UNITED STATES DEPARTMENT OF INTERIOR
U.S. FISH AND WILDLIFE SERVICE
GRANT OF EASEMENT FOR WILDLIFE HABITAT PROTECTION

THIS INDENTURE, by and between

hereinafter referred to as the Grantors, and the UNITED STATES OF AMERICA, acting by and through the Secretary of the Interior or his authorized representative.

WITNESSETH

WHEREAS, the Migratory Bird Hunting and Conservation Stamp Act, 16 U.S.C. 718d(c); the Fish and Wildlife Act of 1956, 16 U.S.C. 742a-742j; the Emergency Wetland Resources Act of 1986, 16 U.S.C. 3901; the Endangered Species Act of 1973, as amended, 16 U.S.C. 1534 and the Land and Water Conservation Fund Act, 16 U.S.C. 4601-9(a)(1), authorize the Secretary of the Interior to acquire lands or waters or interests therein for the development, advancement, management, conservation and protection of fish and wildlife resources. The purpose of this easement is to provide and protect quality habitat on the lands and wetlands described herein and such lands and wetlands shall be maintained and improved to provide cover and food for a varied array of aquatic, terrestrial, and avian wildlife, particularly migratory birds, and threatened and endangered species, and

WHEREAS, the lands and wetlands described below contain existing or potential habitat suitable for use for wildlife management purposes.

NOW, THEREFORE, for and in consideration of the sum of ________________________________________

________________________ Dollars ($ ______________________________), the Grantors hereby grant to the United States, commencing with the acceptance of this Indenture by the Secretary of the Interior or his authorized representative, an easement in perpetuity, which includes a right of use for the maintenance of the lands and wetlands described herein, to wit:

________________________ County, State of Minnesota

Together with the right of ingress and egress to the above described lands and wetlands on, over, across and through the following described lands, to wit:

Subject, however, to all valid existing rights-of-way for highways, roads, railroads, pipelines, canals, laterals , electrical transmission lines, cable lines, and all mineral rights.

The conveyance hereunder shall be effective on the date of the execution of this Indenture by the Secretary of the Interior
or his authorized representative; provided, however, that such acceptance must be made within ____________ calendar months from the date of the execution of this Indenture by the Grantors, or any subsequent date as may be mutually agreed upon in writing by the parties hereto prior to the expiration of such date; and provided further, however, that in the event that such acceptance is not made by such date, this Indenture shall be null and void.

No rights herein are granted to the general public for access to or entry upon the land subject to this grant of easement for any purpose.

The Grantors, for themselves, and for their heirs, successors, and assigns, lessees, and any other person claiming under them, covenant and agree that they will cooperate in the maintenance and protection of the aforesaid lands and wetlands for the protection and management of fish and wildlife resources and to maintain the quality of these lands and wetlands to provide cover and food for a varied array of aquatic, terrestrial, and avian wildlife, particularly migratory birds, and threatened and endangered species. To that end and for the purpose of accomplishing the intent on this Indenture, the Grantors, for themselves, and for their heirs, successors, and assigns, lessees, and any other person claiming under them, covenant and agree as follows:

Exhibit III-11

1. Grantors will not perform, cause to be performed or permit haying, mowing or seed harvesting upon the easement area until after July 15 in any calendar year.

2. Grantors will not perform, cause to be performed or permit the following activities upon the easement area: altering of grassland, woodland, wildlife habitat or other natural features by digging, plowing, disking, cutting or otherwise destroying the vegetative cover; dumping refuse, wastes, sewage or other debris; burning; grazing; draining, dredging, channeling, filling, leveling, pumping, diking, impounding or related activities; altering or tampering with water control structures or devices; diverting or causing or permitting the diversion of surface or underground water into, within or out of the easement area by any means including ditching or the construction of wells; building or placing buildings or structures on the easement area; and producing agricultural crops, <u>unless prior approval in writing is granted by the U.S. Fish and Wildlife Service</u>.

3. Grantors will not permit the grazing of livestock and will be responsible for excluding livestock from the easement area and will provide, construct and maintain fences as necessary to accomplish this exclusion of livestock.

4. Grantors will pay all taxes and assessments, if any, which may be levied against the land.

5. Grantors will be responsible for noxious weed control and emergency control of pests to protect the public good subject to Federal and State Statutes and Regulations. Methods used to control noxious weeds and pests must be approved in writing by the U.S. Fish and Wildlife Service prior to implementation by the Grantors. However, mowing or haying noxious weeds is prohibited until after July 15 in any calendar year in accordance with the easement terms stated above.

6. The United States and its authorized representatives shall have the right to sign, post, mark or otherwise identify the easement area and to maintain said identification.

7. The United States and its authorized representatives shall have the right to restore and/or maintain grasslands and wetlands on the easement area.

It is understood that this easement and the covenants and agreements contained herein shall run with the land and shall be binding on all persons and entities who shall come into ownership or possession of the lands and wetlands subject to this easement. The Grantor, successors and assigns shall notify the Regional Director, U.S. Fish and Wildlife Service in writing of any sale or transfer within 30 days following the sale or transfer of any portion of the lands and wetlands subject to this easement.

It is further understood that the rights and interests granted to the UNITED STATES OF AMERICA herein shall become part of the National Wildlife Refuge System and shall be administered by the United States Fish and Wildlife Service, pursuant to the National Wildlife Refuge Systems Administration Act, 16 U.S.C. 668dd.

SPECIAL PROVISIONS

1. This Indenture shall not be binding upon the UNITED STATES OF AMERICA until accepted on behalf of the United States by the Secretary of the Interior or his authorized representative, although this Indenture is acknowledged by the Grantors to be presently binding upon them and to remain so until the expiration of said period of acceptance, as hereinabove described, by virtue of payment to the Grantors, by the UNITED STATES OF AMERICA, of the sum of One Dollar, the receipt of which is hereby expressly acknowledged by Grantors.

2. Notice of acceptance of this Indenture shall be given to the Grantors by certified mail addressed to

and shall be effective upon the date of mailing, and such notice shall be binding upon all Grantors without sending a separate notice to each.

3. It is further mutually agreed that no Member of or Delegate to Congress, or Resident Commissioner, shall be admitted to any share or part of this contract, or to any benefit to arise thereupon. Nothing, however, herein contained shall be construed to extend to any incorporated company, where such contract is made for the general benefit of incorporation or company.

4. Payment of the consideration shall be made by a United States Treasury check after acceptance of this Indenture by the Secretary of the Interior or his authorized representative and after the Attorney General, or in appropriate cases, the Solicitor of the Department of the Interior shall have approved the easement interest thus vested in the United States.

IN WITNESS WHEREOF the Grantors have hereunto set their hands and seals this ______ day of ____________________________, 19________.

________________________________(L.S.) ________________________________(L.S.)

________________________________(L.S.) ________________________________(L.S.)

________________________________(L.S.) ________________________________(L.S.)

ACKNOWLEDGEMENT

STATE OF ________________________)
)ss
COUNTY OF ______________________)

On this ______ day of __________________, in the year 19_____, before me personally appeared

known to me to be the person(s) described in and who executed the foregoing instrument and acknowledged to me that they (he/she) executed the same of their (his/her) free act and deed.

________________________________
Notary Public, State of

(SEAL) My commission expires : ________________________

This instrument was drafted by Steve Durkee, Realty Specialist, U.S. Fish and Wildlife Service, Wetlands Acquisition Office, 971 East Frontage Road, Litchfield, Minnesota 55355.

ACCEPTANCE

The Secretary of the Interior, acting by and through his authorized representative, has executed this agreement on behalf of the United States this _______ day of __________________________, 19________.

THE UNITED STATES OF AMERICA
DEPARTMENT OF THE INTERIOR

By: ________________________________
Senior Realty Officer, Division of Realty
U.S. Fish and Wildlife Service

UNITED STATES DEPARTMENT OF INTERIOR
U.S. FISH AND WILDLIFE SERVICE
GRANT OF EASEMENT FOR WILDLIFE HABITAT PROTECTION

THIS INDENTURE, by and between

hereinafter referred to as the Grantors, and the UNITED STATES OF AMERICA, acting by and through the Secretary of the Interior or his authorized representative.

WITNESSETH

WHEREAS, the Migratory Bird Hunting and Conservation Stamp Act, 16 U.S.C. 718d(c); the Fish and Wildlife Act of 1956, 16 U.S.C. 742a-742j; the Emergency Wetland Resources Act of 1986, 16 U.S.C. 3901; the Endangered Species Act of 1973, as amended, 16 U.S.C. 1534 and the Land and Water Conservation Fund Act, 16 U.S.C. 4601-9(a)(1), authorize the Secretary of the Interior to acquire lands or waters or interests therein for the development, advancement, management, conservation and protection of fish and wildlife resources. The purpose of this easement is to provide and protect quality habitat on the lands and wetlands described herein and such lands and wetlands shall be maintained and improved to provide cover and food for a varied array of aquatic, terrestrial, and avian wildlife, particularly migratory birds, and threatened and endangered species, and

WHEREAS, the lands and wetlands described below contain existing or potential habitat suitable for use for wildlife management purposes.

NOW, THEREFORE, for and in consideration of the sum of ______________________________

______________________ Dollars ($ ________________ ), the Grantors hereby grant to the United States, commencing with the acceptance of this Indenture by the Secretary of the Interior or his authorized representative, an easement <u>in perpetuity</u>, which includes a right of use for the maintenance of the lands and wetlands described herein, to wit:

______________ County, State of Minnesota

Together with the right of ingress and egress to the above described lands and wetlands on, over, across and through the following described lands, to wit:

Subject, however, to all valid existing rights-of-way for highways, roads, railroads, pipelines, canals, laterals , electrical transmission lines, cable lines, and all mineral rights.

The conveyance hereunder shall be effective on the date of the execution of this Indenture by the Secretary of the Interior or his authorized representative; provided, however, that such acceptance must be made within __________ calendar months from the date of the execution of this Indenture by the Grantors, or any subsequent date as may be mutually agreed upon in writing by the parties hereto prior to the expiration of such date; and provided further, however, that in the event that such acceptance is not made by such date, this Indenture shall be null and void.

No rights herein are granted to the general public for access to or entry upon the land subject to this grant of easement for any purpose.

The Grantors, for themselves, and for their heirs, successors, and assigns, lessees, and any other person claiming under them, covenant and agree that they will cooperate in the maintenance and protection of the aforesaid lands and wetlands for the protection and management of fish and wildlife resources and to maintain the quality of these lands and wetlands to provide cover and food for a varied array of aquatic, terrestrial, and avian wildlife, particularly migratory birds, and threatened and endangered species. To that end and for the purpose of accomplishing the intent on this Indenture, the Grantors, for themselves, and for their heirs, successors, and assigns, lessees, and any other person claiming under them, covenant and agree as follows:

1. Grantors will not perform, cause to be performed or permit the following activities upon the easement area: haying, mowing or seed harvesting for any reason; altering of grassland, woodland, wildlife habitat or other natural features by digging, plowing, disking, cutting or otherwise destroying the vegetative cover; dumping refuse, wastes, sewage or other debris; burning; grazing; draining, dredging, channeling, filling, leveling, pumping, diking, impounding or related activities; altering or tampering with water control structures or devices; diverting or causing or permitting the diversion of surface or underground water into, within or out of the easement area by any means including ditching or the construction of wells; building or placing buildings or structures on the easement area; and producing agricultural crops, unless prior approval in writing is granted by the U.S. Fish and Wildlife Service.

2. Grantors will not permit the grazing of livestock and will be responsible for excluding livestock from the easement area and will provide, construct and maintain fences as necessary to accomplish this exclusion of livestock.

3. Grantors will pay all taxes and assessments, if any, which may be levied against the land.

4. Grantors will be responsible for noxious weed control and emergency control of pests to protect the public good subject to Federal and State Statutes and Regulations. Methods used to control noxious weeds and pests must be approved in writing by the U.S. Fish and Wildlife Service prior to implementation by the Grantors. However, mowing or haying noxious weeds is prohibited until after July 15 in any calendar year in accordance with the easement terms stated above.

5. The United States and its authorized representatives shall have the right to sign, post, mark or otherwise identify the easement area and to maintain said identification.

6. The United States and its authorized representatives shall have the right to restore and/or maintain grasslands and wetlands on the easement area.

It is understood that this easement and the covenants and agreements contained herein shall run with the land and shall be binding on all persons and entities who shall come into ownership or possession of the lands and wetlands subject to this easement. The Grantor, successors and assigns shall notify the Regional Director, U.S. Fish and Wildlife Service in writing of any sale or transfer within 30 days following the sale or transfer of any portion of the lands and wetlands subject to this easement.

It is further understood that the rights and interests granted to the UNITED STATES OF AMERICA herein shall become part of the National Wildlife Refuge System and shall be administered by the United States Fish and Wildlife Service, pursuant to the National Wildlife Refuge Systems Administration Act, 16 U.S.C. 668dd.

## SPECIAL PROVISIONS

1. This Indenture shall not be binding upon the UNITED STATES OF AMERICA until accepted on behalf of the United States by the Secretary of the Interior or his authorized representative, although this Indenture is acknowledged by the Grantors to be presently binding upon them and to remain so until the expiration of said period of acceptance, as hereinabove described, by virtue of payment to the Grantors, by the UNITED STATES OF AMERICA, of the sum of One Dollar, the receipt of which is hereby expressly acknowledged by Grantors.

2. Notice of acceptance of this Indenture shall be given to the Grantors by certified mail addressed to

and shall be effective upon the date of mailing, and such notice shall be binding upon all Grantors without sending a separate notice to each.

3. It is further mutually agreed that no Member of or Delegate to Congress, or Resident Commissioner, shall be admitted to any share or part of this contract, or to any benefit to arise thereupon. Nothing, however, herein contained shall be construed to extend to any incorporated company, where such contract is made for the general benefit of incorporation or company.

4. Payment of the consideration shall be made by a United States Treasury check after acceptance of this Indenture by the Secretary of the Interior or his authorized representative and after the Attorney General, or in appropriate cases, the Solicitor of the Department of the Interior shall have approved the easement interest thus vested in the United States.

IN WITNESS WHEREOF the Grantors have hereunto set their hands and seals this ______ day of ____________________________, 19________.

__________________________________(L.S.) __________________________________(L.S.)

__________________________________(L.S.) __________________________________(L.S.)

__________________________________(L.S.) __________________________________(L.S.)

ACKNOWLEDGEMENT

STATE OF ____________________________)
)ss
COUNTY OF ___________________________)

On this ______ day of ________________, in the year 19_____, before me personally appeared

known to me to be the person(s) described in and who executed the foregoing instrument and acknowledged to me that they (he/she) executed the same of their (his/her) free act and deed.

________ __________________________________
Notary Public, State of ________

(SEAL) My commission expires : ____________________
__________

This instrument was drafted by Steve Durkee, Realty Specialist, U.S. Fish and Wildlife Service, Wetlands Acquisition Office, 971 East Frontage Road, Litchfield, Minnesota 55355.

ACCEPTANCE

The Secretary of the Interior, acting by and through his authorized representative, has executed this agreement on behalf of the United States this _______ day of _________________________, 19________.

THE UNITED STATES OF AMERICA
DEPARTMENT OF THE INTERIOR

By: __________________________________
Senior Realty Officer, Division of Realty
U.S. Fish and Wildlife Service
______

UNITED STATES DEPARTMENT OF INTERIOR
U.S. FISH AND WILDLIFE SERVICE
GRANT OF EASEMENT FOR WILDLIFE HABITAT PROTECTION

THIS INDENTURE, by and between

hereinafter referred to as the Grantors, and the UNITED STATES OF AMERICA, acting by and through the Secretary of the Interior or his authorized representative.

WITNESSETH

WHEREAS, the Migratory Bird Hunting and Conservation Stamp Act, 16 U.S.C. 718d(c); the Fish and Wildlife Act of 1956, 16 U.S.C. 742a-742j; the Emergency Wetland Resources Act of 1986, 16 U.S.C. 3901; the Endangered Species Act of 1973, as amended, 16 U.S.C. 1534 and the Land and Water Conservation Fund Act, 16 U.S.C. 4601-9(a)(1), authorize the Secretary of the Interior to acquire lands or waters or interests therein for the development, advancement, management, conservation and protection of fish and wildlife resources. The purpose of this easement is to provide and protect quality habitat on the lands and wetlands described herein and such lands and wetlands shall be maintained and improved to provide cover and food for a varied array of aquatic, terrestrial, and avian wildlife, particularly migratory birds, and threatened and endangered species, and

WHEREAS, the lands and wetlands described below contain existing or potential habitat suitable for use for wildlife management purposes.

NOW, THEREFORE, for and in consideration of the sum of ______________________________ ______________________________Dollars ($ ), the Grantors hereby grant to the United States, commencing with the acceptance of this Indenture by the Secretary of the Interior or his authorized representative, an easement in perpetuity, which includes a right of use for the maintenance of the lands and wetlands described herein, to wit:

__________________ County, State of Minnesota

Together with the right of ingress and egress to the above described lands and wetlands on, over, across and through the following described lands, to wit:

Subject, however, to all valid existing rights-of-way for highways, roads, railroads, pipelines, canals, laterals , electrical transmission lines, cable lines, and all mineral rights.

The conveyance hereunder shall be effective on the date of the execution of this Indenture by the Secretary of the Interior or his authorized representative; provided, however, that such acceptance must be made within ________ calendar months from the date of the execution of this Indenture by the Grantors, or any subsequent date as may be mutually agreed upon in writing by the parties hereto prior to the expiration of such date; and provided further, however, that in the event that such acceptance is not made by such date, this Indenture shall be null and void.

No rights herein are granted to the general public for access to or entry upon the land subject to this grant of easement for any purpose.

The Grantors, for themselves, and for their heirs, successors, and assigns, lessees, and any other person claiming under them, covenant and agree that they will cooperate in the maintenance and protection of the aforesaid lands and wetlands for the protection and management of fish and wildlife resources and to maintain the quality of these lands and wetlands to provide cover and food for a varied array of aquatic, terrestrial, and avian wildlife, particularly migratory birds, and threatened and endangered species. To that end and for the purpose of accomplishing the intent on this Indenture, the Grantors, for themselves, and for their heirs, successors, and assigns, lessees, and any other person claiming under them, covenant and agree as follows:

1. Grantors will not perform, cause to be performed or permit the following activities upon the easement area: haying, mowing or seed harvesting for any reason; altering of grassland, woodland, wildlife habitat or other natural features by digging, plowing, disking, cutting or otherwise destroying the vegetative cover; dumping refuse, wastes, sewage or other debris; burning; draining, dredging, channeling, filling, leveling, pumping, diking, impounding or related activities; altering or tampering with water control structures or devices; diverting or causing or permitting the diversion of surface or underground water into, within or out of the easement area by any means including ditching or the construction of wells; building or placing buildings or structures on the easement area; and producing agricultural crops, unless prior approval in writing is granted by the U.S. Fish and Wildlife Service; except that grazing the aforesaid lands is permitted at anytime throughout the calendar year.

2. Grantors will pay all taxes and assessments, if any, which may be levied against the land.

3. Grantors will be responsible for noxious weed control and emergency control of pests to protect the public good subject to Federal and State Statutes and Regulations. Methods used to control noxious weeds and pests must be approved in writing by the U.S. Fish and Wildlife Service prior to implementation by the Grantors. However, mowing or haying noxious weeds is prohibited until after July 15 in any calendar year in accordance with the easement terms stated above.

4. The United States and its authorized representatives shall have the right to sign, post, mark or otherwise identify the easement area and to maintain said identification.

5. The United States and its authorized representatives shall have the right to restore and/or maintain grasslands and wetlands on the easement area.

It is understood that this easement and the covenants and agreements contained herein shall run with the land and shall be binding on all persons and entities who shall come into ownership or possession of the lands and wetlands subject to this easement. The Grantor, successors and assigns shall notify the Regional Director, U.S. Fish and Wildlife Service in writing of any sale or transfer within 30 days following the sale or transfer of any portion of the lands and wetlands subject to this easement.

It is further understood that the rights and interests granted to the UNITED STATES OF AMERICA herein shall become part of the National Wildlife Refuge System and shall be administered by the United States Fish and Wildlife Service, pursuant to the National Wildlife Refuge Systems Administration Act, 16 U.S.C. 668dd.

SPECIAL PROVISIONS

1. This Indenture shall not be binding upon the UNITED STATES OF AMERICA until accepted on behalf of the United States by the Secretary of the Interior or his authorized representative, although this Indenture is acknowledged by the Grantors to be presently binding upon them and to remain so until the expiration of said period of acceptance, as hereinabove described, by virtue of payment to the Grantors, by the UNITED STATES OF AMERICA, of the sum of One Dollar, the receipt of which is hereby expressly acknowledged by Grantors.

2. Notice of acceptance of this Indenture shall be given to the Grantors by certified mail addressed to

and shall be effective upon the date of mailing, and such notice shall be binding upon all Grantors without sending a separate notice to each.

3. It is further mutually agreed that no Member of or Delegate to Congress, or Resident Commissioner, shall be admitted to any share or part of this contract, or to any benefit to arise thereupon. Nothing, however, herein contained shall be construed to extend to any incorporated company, where such contract is made for the general benefit of incorporation or company.

4. Payment of the consideration shall be made by a United States Treasury check after acceptance of this Indenture by the Secretary of the Interior or his authorized representative and after the Attorney General, or in appropriate cases, the Solicitor of the Department of the Interior shall have approved the easement interest thus vested in the United States.

Exhibit III-11

IN WITNESS WHEREOF the Grantors have hereunto set their hands and seals this ______ day of ____________________________, 19________.

______________________________(L.S.) ______________________________(L.S.)

______________________________(L.S.) ______________________________(L.S.)

ACKNOWLEDGEMENT

STATE OF ____________________________)
)ss
COUNTY OF __________________________)

On this _______ day of __________________, in the year 19_____, before me personally appeared

known to me to be the person(s) described in and who executed the foregoing instrument and acknowledged to me that they (he/she) executed the same of their (his/her) free act and deed.

______________________________

Notary Public, State of

(SEAL) My commission expires : ____________________

This instrument was drafted by Steve Durkee, Realty Specialist, U.S. Fish and Wildlife Service, Wetlands Acquisition Office, 971 East Frontage Road, Litchfield, Minnesota 55355.

ACCEPTANCE

The Secretary of the Interior, acting by and through his authorized representative, has executed this agreement on behalf of the United States this _______ day of _________________________, 19________.

THE UNITED STATES OF AMERICA
DEPARTMENT OF THE INTERIOR

By: ______________________________

Senior Realty Officer, Division of Realty
U.S. Fish and Wildlife Service

## North Dakota Department of Transportation Road Projects and U.S. Fish and Wildlife Service Easements

- DOT receives input from 8 districts around the State; **Planning Division** then does a Scoping Report on the projects and develops a 5-year ***Statewide Transportation Improvement Plan*** (STIP). This STIP is posted on-line and available to contractors; some contractors will anticipate future road projects and begin to line up material sources in the vicinity well in advance of project initiation.

- **Office of Project Development –** Includes the *Design Division*, the *Bridge Division*, and the *Environmental Transportation Services Division*

- **Milestone Meetings** are held to discuss projects and to each Division decides if their necessary work will be accomplished in-house or by a consultant; then…

    - A field visit is completed by all Divisions; then a Scoping Letter with a “Solicitation of Views” is sent to all other agencies five days after the field visit. This is the letter that goes to USFWS Ecological Services and is the Service’s first notification of a project; E.S. informs the appropriate WMD.
    - “*Environmental*” writes a Project Concept Report to get a Categorical Exclusion, AND
    - The WMD needs to get a photo to DOT with points indicating protected wetland basins.
        - These last two bullets are the NEPA phase for DOT; previously, NEPA depended on Federal Highway Administration 4f compliance, which depending on the FWS confirming the exchange would be satisfactory. ***Since easements are no longer considered to be “4f” properties, this process has been simplified.***

- ***Current Process***…DOT will complete their NEPA and provide to the FWS indicating a Categorical Exclusion; this will include documentation for ESA compliance and Cultural Resource clearance.
- If DOT needs FWS approval to move forward with the project (let for bids) before the easement exchange is completed, then the WMD should issue a Special Use Permit.

**SUMMARY:**

Because FWS easements are no longer considered 4f properties:

*Ideal Process* - …DOT will complete their NEPA (Cat. Ex.) which will include documentation of ESA and Cultural Resource compliance; and Easement Exchange will be executed; the bids will be let; the work will be completed.

OR

*Alternative Process* - …DOT will complete their NEPA (same as above); the FWS will issue an SUP so that bids can be let; work will be completed; Easement Exchange will be executed.

**Material Source Process**

1. Material Source Approval Request sent from contractor to DOT which will include a legal description and map (down to the quarter-quarter section).

2. DOT sends to FWS (Ecological Services)

    1. Ecological Services will check to determine whether or not parcel is protected by easement.

    2. E.S. sends letter back to DOT with ESA, BGEPA, and MBTA guidance as well and a WMD contact if appropriate; the WMD manager is cc'ed on this correspondence.

3.WMD manager will then work with the contractor, if necessary, to ensure the "mining activities" do not violate the provisions of the easement. ***No longer need to conduct field visits with DOT representative.*** (WMD will still get calls from DOT on state-optioned sites).

## REQUESTS FOR SUBSURFACE RESOURCES FROM FWS WETLAND EASEMENTS FOR ND DOT ROAD PROJECTS

### Addressing "Reasonable Alternatives" in the Flowchart

All requests for materials (subsurface resources) will be evaluated with the Region 6 Easement Request Flowchart (Chapter XII).

Due to extreme flooding in many areas of North Dakota, requests for materials on wetland easement tracts (mainly clay, gravel, and rip rap) for road projects have increased significantly. If the ND DOT is involved in the project, the aggregate or borrow site must have a ND DOT "Certificate of Approval." Sites with this certificate are listed on the ND DOT website. For those sites not previously approved, the ND DOT will coordinate with the FWS (Bismarck E.S.) during the approval process.

In an effort to meet requests for material source approval while protecting FWS easement interests, the ND Department of Transportation has developed a system to identify FWS easement tracts and to coordinate onsite visits with Service personnel. The following represents the typical and preferred chain of events:

1. If the proposed borrow site does not have a Certificate of Approval, then the contractor submits a Material Source Approval Request Form to NDDOT Environmental Section.

2. The NDDOT will work with the FWS (Bismarck E.S.) to identify requests which fall on easement lands. Requests affecting FWS interests will require onsite visits with the appropriate WMD personnel, the NDDOT District staff, and potentially the contractor.

The FWS may receive direct material requests from individuals. In these situations the FWS should inquire if the project inquiry is a NDDOT-affiliated project; if so, the FWS will utilize the above-described NDDOT system. However, the FWS should invite the contractor to attend the anticipated future onsite between the FWS and NDDOT as part of the NDDOT approval process described above in step 2. If the materials request is not a NDDOT project, then the FWS should directly meet with the landowner, public service, or contractor.
As mentioned previously, all requests for uses on easement lands will be evaluated using the Region 6 Easement Request Flowchart. The following sequence pertains to the "Reasonable Alternatives" section of the flowchart as it relates to requests for materials and should be addressed in this order:

1. Avoidance of the Easement; i.e., can the use be accommodated on nearby non-easement land?

Options for moving the borrow site off of easement lands may be limited at this point since the contractor has often times already negotiated an agreement with the landowner. Nevertheless, it is still worth exploring options that may exist elsewhere on the landowner's property that may not be protected by easement and pursuing these options if they exist.

2. Avoidance of protected wetlands and their catchments or contributing watersheds.

For NDDOT projects, the FWS (Refuges) and NDDOT staff will meet onsite to review material requests. FWS personnel will identify protected easement wetlands and their associated watersheds. NDDOT will generate maps identifying avoidance areas that are comprised of protected wetlands and their watersheds. NDDOT will submit the maps to the FWS for approval. Once approved by the FWS, the maps identifying avoidance areas will be submitted to the contractor. ***The FWS and NDDOT will stake the avoidance areas onsite*** *(it may be more practical, depending on the site, to stake the approved area instead of the avoidance areas).*

For non NDDOT projects, the FWS (Refuges) and contractor will complete an onsite visit. FWS personnel will identify protected easement wetlands and their associated watersheds. ***The FWS will generate maps identifying avoidance areas and will stake the avoidance areas onsite***. This is also an opportunity to provide the contractor and landowner copies of the official wetland map identifying protected easement wetlands.

3. Avoidance of protected wetlands and avoidance of impacts while working within contributing watersheds (however, ***still no pits or closed excavations allowed within watersheds of protected wetlands***).

In situations were no reasonable alternative site for materials exists off-easement, and where quantities of material from outside protected wetland watersheds are insufficient, the FWS will explore the removal of limited quantities of material from within the watersheds of protected wetlands. Removal of material from within protected wetlands' watersheds may be considered if the following criteria are met: 1) The size/area of the wetland watersheds are not reduced, 2) The watershed divides/breaks between wetlands are maintained, 3) The watersheds maintain a positive grade (1% minimum) to the wetland boundary, 4) The wetlands are not drained or filled during excavation operations within the watershed.

The FWS requires some assurance that excavation activities will not negatively impact the easement interests. To that end, assuming the above criteria can be met while removing material from within the watershed of protected wetlands, the contractor will provide a contour map which will include elevations prior to excavation that includes wetland and watershed boundaries. This map may be produced by a variety of methods, including but not limited to a "total station survey" or mapping with a survey-grade GPS. The contractor will then agree to maintain watershed areas, breaks/divides and grades while avoiding the filling and draining of protected wetlands. The contractor will agree to complete a post-excavation survey to provide elevations once the project is complete. The contractor will also agree to a site visit with FWS staff prior to equipment demobilization.

This option applies to the lowering of highs between wetlands but maintains positive slope and watershed area of protected wetlands. ***This scenario is NOT applicable in situations where pits or closed excavations are constructed within wetland watersheds.***

NWRS/RE
LA-WA Easement
Acquisition Policy and
Procedure
Mail Stop 60135

Memorandum

To: Realty Supervisors, Region 6

From: Chief, Division of Realty, Region 6

Subject: Sand, Gravel, and Clay Extraction on Lands Encumbered by Grassland Easements -- Background and Policy

In 2001, the Solicitor's Office reviewed and provided an opinion (June 29, 2001) on a specific wetland easement enforcement case in North Dakota. This opinion revolved around the right to remove certain minerals, i.e., sand, gravel, and clay from land encumbered by a wetland easement. From that opinion, Region 6 developed an interim policy (April 12, 2002) relative to all wetland and grassland easements acquired in Montana, North Dakota, and South Dakota. The intent of the interim policy was to provide field offices guidance on extraction of sand, clay, and gravel for personnel who acquire and manage easements until such time as a long-term policy could be developed.

This memorandum articulates Region 6's policy regarding the mining of sand, gravel, and clay underlying grassland easements in the Prairie Pothole Region. This policy is being formally incorporated into the administrative and enforcement manual.

In April 1992, Region 6 issued administrative policy on management of grassland easements. That policy was the culmination of over 3 years work on developing a grassland easement document and associated policy. It was reviewed by refuge field staff and approved by the Assistant Regional Director, National Wildlife Refuge System. The 1992 policy stated on page 14: *"subsurface mineral rights are not encumbered by the easement; however the owner of the mineral estate should notify the Refuge Project Leader of the intent to develop. The Refuge Project Leader should issue a permit for surface disturbance and follow procedures similar to those followed for Waterfowl Production Areas and other Service fee-owned lands."*

The 1992 policy went on to declare guidance on how to accommodate extraction of sand and gravel and other surface disturbance by stating on page 14: *"Managers are encouraged to cooperate with landowners to modify easement areas up to this limitation to accommodate feed lots; buildings and corral construction; sand, gravel, coal and other development of subsurface rights . . . ."* It was clear from this approved policy how the original drafters of the grassland easement intended to address the sand and gravel issue and interpret the easement.

The first grassland easement was acquired in 1991 in South Dakota and the program rapidly accelerated, particularly in northeastern South Dakota. The Region decided to review the program and accompanying policy in 1996. The 1992 policy was reviewed by field and regional office staff resulting in minor changes and clarification to the policy. In a memorandum dated May 12, 1997, the Region officially revised the grassland easement policy and provided the revised policy to all Montana, North Dakota, and South Dakota field stations. The revised policy added clarification to the mineral rights issue on page 14 by stating: *"Subsurface mineral rights including coal, oil, gas, sand, or gravel are not encumbered by the easement. Clay for fill or road projects is not a mineral and the easement does not allow clay excavation as a preexisting mineral exclusion. However, the owner of the mineral estate should notify the Refuge Project Leader of the intent to develop. The Refuge Project Leader should issue a permit for surface disturbances and follow procedures similar to those followed for Waterfowl Production Areas and other Service fee owned lands."*

The original 1992 policy did not define 'subsurface minerals' in the first reference on what rights were encumbered by the easement; however, the second reference revealed the policy intent when discussing permit issuance by stating "sand, gravel, coal and other development of subsurface rights." The policy update team in 1996-1997 clarified this statement by adding the further reference to sand and gravel in the first paragraph and specifically stating that clay was not a mineral and was, therefore, encumbered by the easement.

These additional policy statements were based upon discussions with legal counsel at the time and clearly indicate both a legal interpretation of the easement language and policy approach to easement management. The drafters and reviewers of the easement did not provide any guidance to refuge or realty staff to consider sand and gravel values when preparing appraisals, which have clear commercial value, when appraising, acquiring, or enforcing the grassland easement. Furthermore, the understanding at the time was that the word 'minerals' in the legal document included 'subsurface' sand and gravel. While the understanding of the legal definition of 'surface' and 'subsurface' may be blurred in the articulation of policy, the understanding of Fish and Wildlife Service (Service) intent regarding sand and gravel was not blurred.

Subsequently, a 2001 Solicitor's opinion concerning the Service's wetland easement indicated that, in North Dakota, gravel and clay are not considered minerals and, therefore, were not reserved by the landowner via the easement reference to "all minerals." This opinion did not apply to Montana or South Dakota. It followed that

because sand, gravel, and clay were not reserved, encumbrance of the surface by the grassland easement also encumbers, i.e., prohibits, removal of clay, sand, and gravel. (The Service grassland easement aims to protect wildlife habitat by precluding surface disturbance.) That being said, if an easement is disputed in court, judges will look for evidence of intent, that is, what did the grantor intend to reserve or except from the conveyance document, such as the right to remove gravel, sand, and clay from the property. If the conveyance document itself does not indicate the grantor's intent, that is, specifically, by name, reserve these materials thereby retaining the landowner's right to extract these materials, courts may conclude that such materials were intended to transfer to the grantee. However, courts, in order to determine intent, often will go beyond the four corners of the document and bring in ancillary evidence to make such determinations, particularly if the document is ambiguous. Such evidence would include any documents shedding light on the intent of the respective parties, e.g., current and former agency policy, agency memoranda of guidance, negotiation notes, and other documentation. The encumbrance of sand and gravel, when viewed in light of all documentation, would indicate the buyer (Service) did not intend to prohibit the extraction of the sand and gravel interests and articulated this intent in both policy and negotiations.

Furthermore, the Service did not acquire the fee estate, which, if acquired, would better serve the implications rendered by the 2001 opinion. The court cases referenced in the 2001 Solicitor's opinion involved two parties, one owning the fee estate and one owning the 'mineral' estate. Any legal case involving a grassland easement would involve the fee estate (surface owner), easement estate (Service), and possibly third parties claiming any or all minerals. Conservation easements require specificity regarding intended encumbrances. Lacking the specificity found in other conservation easements on this right, the likelihood is great that additional evidence would be presented in court reflecting that it was not the intent of the Service to prevent sand and gravel extraction because the easement document does not specifically define that right. In other words, the easement does not explicitly prohibit extraction of sand and gravel. This lack of express prohibition, combined with Service policy, suggests the Service intended to allow sand and gravel extraction after the land was encumbered by a Service grassland easement.

The Service's perspective and intent regarding sand and gravel was clear from both the 1992 and 1997 versions of the approved policy guidance. We did not intend, nor did we desire, to preclude sand and gravel extraction via the grassland easement. In addition, while there is very often a market for those aggregates there was no guidance provided to appraisers to value these materials for the purposes of acquiring the easement. We intended to manage sand and gravel removal the same way we manage oil and gas rights. We would issue permits for site occupancy to minimize damage to our grassland interests, but could not preclude such development.

To date, we have acquired over 900,000 acres of grassland easements with the same easement document. All such easements will be enforced and managed under the understanding that sand and gravel are owned by the fee title estate and the Service grassland easement does not impede the right to remove such materials.

The updated wetland and grassland easement administrative manual currently being reviewed for signature in the Regional Office will reflect in policy this view of sand and gravel rights for grassland easement administration.

If you have any questions regarding this clarification, please contact me at 303-236-8130.

cc: Audubon NWR/Lloyd Jones
Sand Lake NWR/Gene Williams
ARD/NWRS, R6
Deputy ARD/NWRS, R6
Refuge Supervisors, R6

bcc: HWittmier, MMazel, BAdler
RE file, RE rf, NWRS rf

RE:HWittmier:cg:9/14/05/I:\Secty\HARVEY\Sand-Gravel Policy Revised.doc

Exhibit IV-2

*This page intentionally left blank*

**Cultural Resource Review Procedures for Projects in Region 6**
21 October 2013

The U.S. Fish and Wildlife Service is responsible for the stewardship of thousands of cultural resources, including both archaeological and historic sites, located on lands under their jurisdiction. The following procedures are designed to help fulfill that obligation and commitment by outlining the process for the cultural resource review of projects in Region 6. The purpose of this process is to ensure that historic properties are considered during project planning and implementation and to facilitate compliance with federal laws, executive orders, regulations and Service policies.

Projects Needing Cultural Resource Review
All undertakings, as defined below, should be evaluated for their potential to impact cultural resources. This applies to projects on fee-title, easement, and private lands. These general procedures should also be followed during processes associated with the National Environmental Protection Act (NEPA).

Purpose and Legal Framework
The following procedures outline the process for the cultural resource review of projects in Region 6. This is largely accomplished through Section 106 of the National Historic Preservation Act (NHPA), although a suite of laws govern Federal agency responsibilities concerning cultural resources. Please see attached summary of some of the applicable cultural resource laws, regulations, and policies.

If there are any questions concerning these procedures, whether a project needs review or has already undergone review, or any other aspect of the cultural resource program, please contact any of the staff listed below. The cultural resource staff will make recommendations concerning various options to fulfill our legal obligations but compliance with cultural resource laws, as with other compliance obligations, is ultimately the responsibility of the Project Leaders (614 FW 1.6.I).

| | | |
|---|---|---|
| Brant Loflin | Montana, Wyoming, Utah | 406.994.9949 (Bozeman) |
| Meg Van Ness | Colorado, Kansas, Nebraska | 303.236.8103 (Denver Regional Office) |
| Barry Williams | South Dakota, North Dakota | 701-355-8577 (Bismarck) |

Definitions
Below are three key definitions for terms used in the process:

Cultural resources

Cultural Resources are sites, buildings, structures and objects that are the result of human activities and are over 50 years old. They include prehistoric, historic, and architectural sites, artifacts, historic records, and traditional use areas or sacred sites that may or may not have artifactual evidence.

Historic Properties

Historic properties are cultural resources (historic or prehistoric) that are listed on, or are eligible to be listed on, the National Register of Historic Places.

Undertaking (16 U.S.C. 470w, Section 301(7)

"Undertaking" means a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including —

(A) those carried out by or on behalf of the agency;
(B) those carried out with Federal financial assistance;

(C) those requiring a Federal permit, license, or approval; and
(D) those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency.

Cultural Resource Review Procedures
The following six steps summarize the general procedure for cultural resource review. A flow chart diagramming these steps is attached. The exact application of these procedures will vary from project to project depending on the nature, size, location of the project, and the cultural resources involved. Additional information and details can be found in the Section 106 regulations (36 CFR 800; http://www.achp.gov/work106.html).

Cultural Resource staff should be notified as early in the planning process as possible – even if the project is still in the conceptual phase as this process can take just a few days or can extend over many months. A project should not proceed until the cultural resource review has been completed and you have received confirmation from the cultural resource staff of such.

1. Information sent to cultural resource staff
   A *Request for Cultural Resource Review* form should be completed and submitted for each project (see attached form). A PDF version of this form which you can complete is available. The information can be mailed, faxed, or emailed.

2. Initial review of the project
   The cultural resource staff will recommend if further review of the project is necessary. If the project does not qualify as an undertaking, or if it is determined that the undertaking has no potential to affect historic properties, the review process may be over, the project lead will be contacted, and the project may proceed.

   If it is determined that the project is an undertaking with the potential to affect historic properties additional review will be recommended. The project lead will be contacted and the status of the review and plans for additional work will be discussed. Consultation with the State Historic Preservation Officer (SHPO), Tribal Historic Preservation Officers (THPOs), and other interested parties may be initiated at this point.

   If you do not hear back from the cultural resource staff when you need to please contact us and remind us that the project is waiting for review – do not assume there are no cultural resource concerns. At certain times of the year we get extremely busy and reminding us of your schedule is a great help in prioritizing reviews.

3. Investigations
   Depending on the nature, size, and timing of the project, FWS staff will continue the review process or it will be done by consultants. Most refuge, fire, and PFW projects are done by the cultural resource staff. The staff will collect the necessary information, from existing records or in the field, to determine if historic properties will be affected. If, due to project schedule, need for specialized expertise or workload, the cultural resource staff cannot perform the work necessary, a consultant may need to be hired as a part of the project budget.

   If the project involves a commercial company (pipelines, wind towers, railroads, oil and gas development, etc.), or if the project involves another agency (Department of Transportation, County, etc.) that company or agency will be asked to hire a consultant to do the work. If the work is done by a paid consultant rather than a federal agency archeologist, the consultant needs

to contact the cultural resource staff and obtain an ARPA permit before they do any field work and the report documenting the findings needs to be sent to the cultural resource staff for review.

4. Report preparation and findings recommendation
A report will be prepared summarizing the project, the results of the information gathering and the field work, and findings with recommendations. Either historic properties will be affected or not. If there are no historic properties present or there are historic properties present but the undertaking will have no effect upon them, it will be recommended that the project proceed with no further review. If there are historic properties which may be affected by the undertaking, it will be recommended that additional consultation and planning take place.

5. Consultation on findings
The report will be sent to the SHPO by the cultural resource staff along with a letter requesting their concurrence with the findings. It may also be sent to the appropriate THPOs or other interested parties for their concurrence or comments. Consulting parties initially have 30 days to comment but may require additional time.

   If the finding is that no historic properties will be affected (no adverse effect) and the consulting parties concur with those findings then the project may proceed with no further review after the letter(s) of concurrence is received.

   If the finding is that no historic properties will be affected (no adverse effect) and a consulting party disagrees additional consultation may be necessary.

   If the finding is that historic properties will be affected (adverse effect), then the cultural resource staff will continue consultation in coordination with the project manager to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize or mitigate adverse effects on historic properties. In this case another entity, the Advisory Council on Historic Preservation (ACHP) may also become a consulting party.

6. Resolution of Adverse Effects
If agreement to resolve the adverse effect to a historic property can be made in consultation with the SHPO/THPO, possibly the ACHP, and other interested parties, a Memorandum of Agreement (MOA) will be implemented outlining the plans to resolve the adverse effects. The activities outlined in the MOA need to be completed prior to the start of the project unless other arrangements have been made. The MOA will be signed by the field manager or other official and it is the responsibility of the station to assure that the provisions outlined in the documents are successfully completed.

Special Considerations

Human Remains

If human remains are possibly present (looks like a grave site, local residents believe there is a burial, possible human bones are present, etc.) or if human remains are found during project construction, stop work in that area immediately and call the cultural resource staff for that state. Do not remove anything and close-off public access. This holds true for all projects regardless of land status and for all states. Because of looting problems, do not discuss the matter with anyone until the cultural resource staff has a chance to respond.

Unanticipated Discoveries

If you find any cultural resource or paleontological remains please let us know as soon as possible. If it is in danger (in a road, eroding out, in a place where public might pick it up, etc.) take photos, GPS it in, and collect it. Otherwise leave it in place but take photos and GPS the location. In any case, contact the FWS cultural resource staff for your state as soon as possible. If there is any chance there are human remains or anything associated with a burial, don't remove anything, stop work in that area, and contact us immediately.

Educational and Training Opportunities

Let us know if there is anything we can do (training, workshops, presentations, etc.), for the staff or the public that would be of help. Also let us know if you need information on the cultural resource work that has been done in your area.

Exhibit V-1


Cultural Resource Review for Projects in Region 6
Please see procedure narrative for details
1
Information sent to cultural resource staff
2
Initial review of the project
2.1
Project is an undertaking – additional review and file search needed
2.1
Not an undertaking / no potential to affect a historic property
DONE
3
Record search and possibly field work
4.1
No historic properties affected
4.2
Historic properties affected
5.1
Consultation parties agree
DONE
5.2
Consultation parties don't agree.
Possible additional consultation
5.3
Consultation parties agree
6
MOA executed and implemented
DONE

# Key Cultural Resource Legislation, Regulations and Policies: Summary Information

NOTE: This is a brief summary of some of the laws and regulations concerning USFWS responsibilities for cultural resources. It is not intended to be comprehensive and additional information is available on the USFWS web page (www.fws.gov/historicPreservation/crp/authorities.html)

## National Laws

1. Antiquities Act of 1906 as amended
   Public Law 59-209; 34 Stat. 225; 16 USC 431-433
   This is the earliest and most basic legislation for protecting cultural resources on Federal lands. It provides misdemeanor-level criminal penalties to control unauthorized uses. Appropriate scientific uses may be authorized through permits, and materials removed under a permit must be permanently preserved in a public museum.

2. American Indian Religious Freedom Act of 1978 as amended
   Public Law 95-431; 92 Stat. 469; 42 USC 1996
   This Act (AIRFA) resolves that it shall be the policy of the United States to protect and preserve for the American Indian, Eskimo, Aleut, and Native Hawaiian the inherent right of freedom to believe, express, and exercise their traditional religions, including access to religious sites, use and possession of sacred objects, and freedom to worship through ceremonial and traditional rites.

3. Archeological and Historic Preservation Act of 1974 as amended
   Reservoir Salvage Act 1960, PL 86-523; 74 Stat. 220, 221; 16 USC 469; PL 93-291; 88 Stat. 174; 16 USC 469
   This Act provides for the preservation of historical and archaeological data that might otherwise be lost as the result of Federal construction projects or Federally-licensed or assisted programs.

4. Archaeological Resources Protection Act of 1979 as amended
   Public Law 96-95; 93 Stat. 721; 16 USC 47Oaa et seq.
   Often referred to as ARPA, this act is primarily a permitting and law-enforcement law that has felony-level penalties for excavating, removing, damaging, altering, or defacing any archaeological resource more than 100 years of age, on public or Indian lands, unless authorized by a permit. It prohibits the sale, purchase, exchange, transportation, receipt, or offering of any archaeological resource obtained in violation of any regulation or permit under the act or under any Federal, State, or local law.

5. Historic Sites Act of 1935 as amended
   Public Law 74-292; 49 Stat. 666; 16 USC 461
   The Historic Sites Act declares national policy to identify and preserve nationally significant "historic sites, buildings, objects and antiquities."

6. National Environmental Policy Act of 1969, as amended
   42 USC 4321, and 4331 - 4335
   NEPA states it is the Federal government's continuing responsibility to use all practicable means to preserve important historic, cultural, and natural aspects of our national heritage. It also instructs Federal agencies to prepare environmental impact statements for each major Federal action having an effect on the environment.

NEPA and NHPA Coordination (Sec. 101 [42 USC § 4331]
(b) In order to carry out the policy set forth in this Act, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may --

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity, and variety of individual choice;

7. <u>National Historic Preservation Act of 1966</u> as amended
Public Law 89-665; 80 Stat. 915; 16 USC 470
NHPA is perhaps the premier legislation that governs cultural resource work on USFWS lands. The Act creates the National Register of Historic Places and extends protection to historic places of State and local as well as national significance. It establishes the Advisory Council on Historic Preservation, State Historic Preservation Officers, Tribal Preservation Officers, and a preservation grants-in-aid program. Section 106 directs Federal agencies to take into account effects of their actions ("undertakings") on properties in or eligible for the National Register, and Section 110(a) sets inventory, nomination, protection, and preservation responsibilities for Federally-owned cultural properties. Section 110(c) requires each Federal agency to designate a Preservation Officer to coordinate activities under the act. Section 106 of the act is implemented by regulations of the Advisory Council on Historic Preservation, 36 CFR Part 800. The Department of the Interior criteria and procedures for evaluating a property's eligibility for inclusion in the National Register are at 36 CFR Part 60.

8. <u>Native American Graves Protection and Repatriation Act of 1990</u>, as amended
Public Law 101-601; 104 Stat. 3048; 25 USC 3001 et esq.
NAGPRA establishes rights of Indian tribes and Native Hawaiian organizations to claim ownership of certain cultural items, including human remains, funerary objects, sacred objects, and objects of cultural patrimony, held or controlled by Federal agencies and museums that receive Federal funds. It requires agencies and museums to identify holdings of such remains and objects, and to work with appropriate Native Americans toward their repatriation. Permits for the excavation and/or removal of cultural items protected by the act require Native American consultation, as do discoveries of cultural items made during Federal land use activities. The Secretary of the Interior's implementing regulations are at 43 CFR Part 10.

9. <u>National Wildlife Refuge System Improvement Act of 1997</u>
Public Law 105–57
This Act outlines general management goals for the Refuge system including protection and interpretation of cultural resources.

10. <u>Reservoir Salvage Act of 1960</u>, as amended
16 USC 469-469c
This extended the Historic Sites Act of 1935. It gave the Department of the Interior, through the National Park Service, major responsibility for preservation of archaeological data that might be lost specifically through dam construction.

# Executive Orders, Policies and Guidelines

1. Consultation and Coordination with Indian Tribal Governments
   Executive Order 13175, 2000
   "By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to establish regular and meaningful consultation and collaboration with tribal officials in the development of Federal policies that have tribal implications, to strengthen the United States government-to-government relationships with Indian tribes, and to reduce the imposition of unfunded mandates upon Indian tribes…"

2. Indian Sacred Sites
   Executive Order 13007, 1996
   "By the authority vested in me as President by the Constitution and the laws of the United States, in furtherance of Federal treaties, and in order to protect and preserve Indian religious practices, it is hereby ordered…"

3. Preserve America
   Executive Order 13287
   "It is the policy of the Federal Government to provide leadership in preserving America's heritage by actively advancing the protection, enhancement, and contemporary use of the historic properties owned by the Federal Government, and by promoting intergovernmental cooperation and partnerships for the preservation and use of historic properties".

4. Fulfilling the Promise
   "[Refuges] are places where the people of today can renew the ties to their cultural heritage by viewing ancient and historic sites. These ties, delivered through the System's public use programs, strengthen the connection between wildlife and people".

5. USFWS Cultural Resources Management Policy
   1992, 614 FW 1, Policy, Responsibilities and Definitions
   This establishes, in section I.4, that "It is the policy of the Service to identify, protect, and manage cultural resources located on Service lands and affected by Service undertakings, in a spirit of stewardship, for future generations". Undertaking is defined in Section I.7(M) as "Any Federal, federally assisted, or federally licensed project, activity, or program that can result in changes in the character or use of known or unknown historic properties, if any such properties are located in the area of potential effects. These may include new and continuing projects, activities, or programs and any of their elements not previously considered under the provisions of 36 CFR 800.

6. Administrative and Enforcement Procedures for FWS Easements within the Prairie Pothole States (Regions 3 and 6) 2005: Pages 12-13
   Activities normally associated with easement properties are not usually considered "undertakings" under Federal cultural resource laws. Private landowners may do what is necessary to manage their property without the need to comply with Federal cultural resource laws. These laws, however, do come into play for easement properties when either the project is completed with Federal funding, or for which there has been a permit issued authorizing the work, or both.

   Therefore, projects federally funded on private lands (ie Partners for Fish and Wildlife Program) are subject to NHPA requirements and need to be evaluated. Also, any activity for which

managers issue a Permit will also be subject to Section 106 of NHPA. These activities are generally restricted to ground surface disturbance-type activities (permits for dugouts, shelterbelt establishment, wind generators, highway improvement projects, utility line crossings, etc.). When a request is received, managers must evaluate whether the Service has jurisdiction. If we have no jurisdiction, then no permit is needed, and no CR compliance is necessary. An example would be a landowner who wants to build a house on an upland site where the land is encumbered with only a wetland easement.

Many of the projects requested by other entities (DOT, utility companies) will have CR evaluations already considered, but managers must insure that these issues are addressed before issuing a permit, and should be reviewed for sufficiency by your regional CR staff.

Consult with your regional Cultural Resources staff about CR responsibilities. They are ultimately responsible for compliance with these laws and policies. Their addresses and phone numbers are found in Exhibit II-4. The FWS website provides useful information about Cultural Resource responsibilities: www.refuges.fws.gov/cultural/links

7. <u>Department of the Interior Policy on Consultation with Indian Tribes</u>
December 2011, Secretary of the Interior Order No. 3317
The purpose of this Order is to update, expand, and clarify the Department'sPolicy on consultation with American Indian and Alaska Native tribes; and to acknowledge that The provisions for conducting consultation in compliance with Executive Order (E.O) 13175 (Consultation and Coordination with Indian Tribal Governments) and applicable statutes or administrative actions are expressed in the Department of the Interior Policy on Consultation with Indian Tribes.

8. <u>Memorandum of Understanding Regarding Interagency Coordination and Collaboration for the Protection of Indian Sacred Sites</u>
December 2012
The Departments of Defense, the Interior, Agriculture, Energy, and the Advisory Council on Historic Preservation (Participating Agencies) enter into this Memorandum of Understanding (MOU) to improve the protection of and tribal access to Indian sacred sites through enhanced and improved interdepartmental coordination and collaboration.

*This page intentionally left blank*

Exhibit V-2

# Intra-Service Section 7 Biological Evaluation Form - Region 6

Originating Person: ____________________ Date Submitted: ________________

Telephone Number: ____________________

I. **Service Program and Geographic Area or Station Name**:

II. **Flexible Funding Program** (e.g. Joint Venture, etc) if applicable:

III. **Location**: Location of the project including County, State and TSR (township, section & range):

IV **Species/Critical Habitat**: List federally endangered, threatened, proposed, and candidate species or designated or proposed critical habitat that may occur within the action area.

V. **Project Description:** Describe proposed project or action or, if referencing other documents, prepare an executive summary (attach additional pages as needed):

VI. **Determination of Effects:**

**(A) Description of Effects**: Describe the action(s) that may affect the species and critical habitats listed in item IV. Your rationale for the Section 7 determinations made below (B) should be fully described here.

**(B) Determination**: Determine the anticipated effects of the proposed project on species and critical habitats listed in item IV. Check all applicable boxes and list the species (or attach a list) associated with each determination**.**

**<u>Determination</u>**

*No Effect*: This determination is appropriate when the proposed project will not directly or indirectly affect (neither negatively nor beneficially) individuals of listed/proposed/candidate species or designated/proposed critical habitat of such species. **No concurrence from ESFO required.** ______

*May Affect but Not Likely to Adversely Affect*: This determination is appropriate when the proposed project is likely to cause insignificant, discountable, or wholly beneficial effects to individuals of listed species and/or designated critical habitat. **Concurrence from ESFO required.** ______

*May Affect and Likely to Adversely Affect*: This determination is appropriate when the proposed project is likely to adversely impact individuals of listed species and/or designated critical habitat. **Formal consultation with ESFO required.** ______

*May affect but Not Likely to Jeopardize candidate or proposed species/critical habitat*: This determination is appropriate when the proposed project may affect, but is not expected to jeopardize the continued existence of a species proposed for listing or a candidate species, or adversely modify an area proposed for designation as critical habitat. **Concurrence from ESFO optional.** ______

*Likely to Jeopardize candidate or proposed species/critical habitat*: This determination is appropriate when the proposed project is reasonably expected to jeopardize the continued existence of a species proposed for listing or a candidate species, or adversely modify an area proposed for designation as critical habitat. **Conferencing with ESFO required.** ______

Signature ______________________________ Date _______________
[Supervisor at originating station]

**Reviewing Ecological Services Office Evaluation** (check all that apply):

A. **Concurrence _____** **Nonconcurrence _____**
Explanation for nonconcurrence:

B. Formal consultation required _____
List species or critical habitat unit

C. Conference required _____
List species or critical habitat unit

Name of Reviewing ES Office ______________________________

Signature ____________________________________ Date ________________

*This page intentionally left blank*

**Easement Use Evaluation Form**
**to be used with the Flowchart in Chapter VI**

Request:______________________________________________________________

Station:______________________________ Wetland Manager:______________________

This is a permanent easement file record for Easement No.______________________(County and Number)

Date of request:________________________ This request was: Approved / Denied (circle one)

Impact is: Permanent / Temporary (circle one). If temporary, authorization expires on:_______________

Special Use Permit No.__________________ was issued to authorize this request; OR

A Letter of Non-Objection dated__________________ was issued to authorize this request; OR

A Right-of-Way Permit dated______________ was issued to authorize this request; OR

An Exchange of Easement Interests is recommended_______________ (check if applicable); OR

This request was Denied for the following reason(s):_____________________________________

______________________________________________________________________

______________________________________________________________________

Permanently impacted acres counted towards threshold:_____________(refuge management activities excluded)

Accumulative total for this easement contract:____________________(must not exceed 8 acres of grassland or 0.4 acres of wetland)

**Attach Narrative_____**(check here when completed)

*This page intentionally left blank*

**Requested Uses: Refuge Management Activities**
Refuge management activities are defined as an activity that could be conducted by the Service or a Service-authorized agent to fulfill one or more purposes of the refuge or Refuge System mission. Service-authorized agents include state or federal agencies, educational institutions, contractors, private organizations or individuals.

These activities must benefit wildlife populations, further the purposes and goals of the NWR/WMD and the mission of the Refuge System; and be commonly accepted as practices that are normally accomplished by natural resource agencies to promote wildlife populations. Refuge management activities must be authorized by a Special Use Permit. They are, however, exempt from the compatibility requirements.

Examples include, but are not limited to:

- prescribed burning of upland or wetland vegetation to enhance vigor or provide better breeding pair habitat in wetlands
- inter-seeding upland areas to introduce more resilient grasses and/or forbs

If the request is considered to be a "refuge management economic activity," then it must meet a higher standard of compatibility by "contributing to the achievement of the national wildlife refuge purposes or the National Wildlife Refuge System mission." If the request is approved, the manager must be able to demonstrate how the economic use contributes to the achievement of the purposes and mission statement and justify such in the CD. The "normal" compatibility standard of not "interfering with or detracting from" the purposes or mission does not suffice for economic use requests.

"Economic use" is defined in 50 CFR 29.1 (http://www.gpo.gov/fdsys/pkg/CFR-2010-title50-vol6/pdf/CFR-2010-title50-vol6-part29.pdf) as "including, but not limited to grazing livestock, harvesting hay and stock feed; removing timber, firewood, or other natural products of the soil; removing shell, sand, or gravel; cultivating areas, or engaging in operations that facilitate approved programs on national wildlife refuges." Another way of defining an economic use is if the activity results in the "harvest of the interest" the Service acquired in the easement.

A differentiation is made between refuge economic use and potential commercial use. Authorizing a communications cable to cross easement properties is a use request from a commercial entity, but it does not fit the definition of "economic use" for this section. Other examples of commercial use that do not meet the definition of "refuge economic use" include: buried water pipelines completed by incorporated rural water companies, electric utility cables, and television cable crossings.

If the request falls under the category of a "refuge economic use," then the manager must complete a CD written to the higher standard and submit for approval. After approval, the manager must issue an SUP.

Examples of currently permitted refuge management activities are listed here followed by a description of each:

1) Prescribed Burning

2) Nesting Islands

3) Farming

4) Tree Removal

5) Invasive Species Management

6) Wetland Restoration/Sediment Basins

7) Prescribed Grazing

8) Stock Watering

9) Haying and Mowing

10) Seed Harvest

**1) Prescribed Burning**

Refuge management rights purchased by the Service on both wetland and habitat easements (including most FmHA easements) can include the use of prescribed burning. Improving protected habitats must be the management treatment objective of the prescribed burn. While landowners are specifically prohibited from burning under terms of the easement, an SUP may be issued to allow a landowner to burn his land under the following conditions:

1.1) **Site Inspection:** The site is inspected by Service staff and has been determined that a prescribed burn is necessary to restore or maintain the vegetation on the easement area. This determination uses the same criteria Service personnel use in planning burns on nearby Service lands.

1.2) **Percent of Area and Frequency:** Generally, no more than 33 percent of the easement area should be burned annually, or the entire tract should be burned no more frequently than 1 year out of every three. However, with input from Service staff, the management treatment objective(s) of the prescribed burn dictate how often or how much of the easement area is treated with fire. For that reason, burning more than 33 percent of the easement area annually or burning the entire tract more frequently than 1 year out of every three may be warranted when needed to meet specific habitat objectives.

1.3) **Implemented in Accordance with Policy:** If either Service staff or funding is used to implement a prescribed burn on an easement, the burn must be implemented in accordance with the U.S. Department of the Interior and Service fire policy. A written prescribed fire plan must be prepared, reviewed, and approved according to Service and Region 3 policies and guidelines. Prescribed burns implemented without Service personnel or funding do not require a Service-prepared, reviewed, and approved prescribed fire plan and can be permitted by the Service as described above. Conditions of the permit must direct the landowner to obtain all

other required permits, adhere to all state and local laws governing wildland fire management activities, and indicate that the landowner is solely responsible for the burn.

**2) Nesting Islands**
In some situations, nesting islands may be permitted in wetlands under the terms of the easement. Issuance of a Service permit does not subordinate the approvals that may be required from other agencies such as the U.S. Corps of Engineers, the state, and local units of government.

Benefit to waterfowl production should be the major goal, and avoidance or reduction of predation is a necessary requirement. Islands can be good waterfowl nesting sites in large, brackish marshes (Type IV) or open water lakes (Type V). Construction specifications are recommended in Fish and Wildlife leaflet 13.2.11 (Lokemoen, 1993) The following are characteristics of nesting islands that may be permitted in wetlands under the terms of the easement:

- The minimum basin size must be 50 acres, and the wetland must exist in an altered state requiring other restoration. A natural basin may not be altered or drained to construct a nesting island even if re-flooding is planned.
- Island sites must have 40 or more wetlands within 1 mile. Wetland complexes are best if they include seasonally flooded ponds for breeding pair habitat and semi-permanently flooded ponds for broods.
- The island must be separated from the nearest shoreline by 425 feet to deter mammalian predators.
- If more than one island is constructed in a single wetland, a minimum of 300 feet shall be between islands.
- To maximize habitat value and cost effectiveness, islands should range in size from 0.25 acres to no more than 1 acre in size, and no more than 1 acre of islands should be constructed in any square mile.
- Wetlands for island placement must have a surface of at least 80 percent open water.
- Islands should be constructed of a non-erodible base. They should be of irregular shape or resemble other natural islands in the vicinity.
- Tops must be leveled and covered with a minimum of 1 foot of soil capable of supporting good stands of vegetation. Usually, volunteer vegetation is adequate for nesting requirements.
- The top of the island must be at least 1 foot above the highest expected water level, but not more than 3 feet above such a level.

Permits for nesting island construction are issued by the manager for a period of 12 months. No maintenance is allowed without another permit. This construction permit is not assignable to subsequent landowners. Permit distribution is as follows: original to landowner, copy for field station files, and copy to the Region 3 office. Nesting Islands should be added to the Exhibit A on the easement document when the easement is being acquired.

**3) Farming**
The primary purpose of agricultural activity must be for a purpose other than providing food for wildlife. Farming using GMGT crops for the sole purpose of providing food for wildlife is not allowed on refuge lands including easements. If temporary agricultural use for the purpose of re-establishing more desirable permanent cover is permitted, all or a portion of the crop may be left

over winter to provide food for wildlife. GMGT crops may be used for habitat restoration only.

Cooperative farming may be used to prepare areas for seeding to native grass. Short-term permits/agreements may be issued to convert exotic grassland (e.g., brome) to native grass or to prepare the proper seed bed for establishment of native grasses. This activity represents an "economic use," which must meet the higher standard of compatibility. An SUP must be issued using the 2014 Region 3 Farm Program Guidance. The GMGT EA (2011) and Farm Program Guidance (2014) are located at on the Region 3 Refuge Operations Sharepoint site below. All portions of the guidance apply to easements as well as fee title refuge tract management, except that the landowner may be the cooperator or choose a cooperator, unless the landowner requests that the Service help them find a cooperator, then the guidance for cooperator selection applies.

https://fishnet.fws.doi.net/regions/3/nwrs/refugeoperations/region3agriguidelines/Farming/Forms/AllItems.aspx

**4) Tree Removal or Cutting and Timber Harvest**

Removing invasive trees that have no economic value, whether along wetland edges or in grasslands, is permitted under the guidelines of a refuge management activity. Managers may issue permits for the removal of firewood cut from dead and downed trees for personal use only. Managers may also permit the removal of individual trees or small groups of trees that are dangerous, damaging property, or blocking authorized access routes.

How the trees are removed or harvested may make tree removal a refuge economic use on habitat and FmHA easements and requires the advanced written approval of the manager. If the requested use falls under the category of a "refuge economic use," then the manager must meet compatibility requirements.

In areas that are described by a state or nationally recognized land cover typing system as native forest, harvest of standing timber is not allowed until a forest management plan is developed by a trained, professional forester. Forest management plans must be consistent with the purpose of the easement and meet Refuge System compatibility requirements. In areas where a state or nationally recognized land cover typing system describes the easement area as prairie, grassland, savannah or similar, a forest management plan is not required. This tree removal is considered prairie management and must also be consistent with the purpose of the easement and meet Refuge System compatibility requirements.

A Special Use Permit must be used to permit tree removal, and the permit must address:

- method of removal
- location of removal
- restoration of area impacted
- method of disposal if tree removal occurs on the easement
- personal use will be defined as 10 cords a year or less, unless documentation can show a greater need that will not impact the easement interest.

### 5) Invasive Species Management

Invasive plant species management can become complicated, because habitat easement documents convey the rights to manage or alter vegetation to the federal government but state and county regulations (as well as the federal easement documents) require landowners to control noxious weeds. The habitat easement document states that the method of weed control must be approved in writing by the Service. Wetland easements and FmHA easements do not convey the right to manage vegetation to the federal government. FmHA easements do not allow the cover to be destroyed, but each easement may be slightly different.

When dealing with FmHA easements, SUPs are not required if noxious weeds are being managed appropriately and little or no other vegetation or wildlife habitat is being damaged. If activities such as excessive mowing, haying, or spraying herbicides are impacting desirable vegetation under the guise of weed control, the project leader must step in and let easement owners know that the Service takes its responsibility to prevent the destruction of habitat seriously. Initial contacts with landowners can be informal. A phone call may be all that is needed to correct the problem, but a follow-up letter must be sent to make sure that both project leader and easement owners are clear as to what is expected. This letter should convey the project leader's concern by stating which actions are not compatible with the terms of the easement and describe what weed control actions are acceptable. If appropriate, the project leader may want to include a copy of the easement and maps that show locations, approximate sizes, and acceptable dates for treatment.

A habitat easement owner should get noxious weed control authorization via a SUP from the refuge manager. The SUP should convey the manager's desired outcome of the noxious weed control by stating which actions are not compatible with the terms of the easement and describe what weed control actions are acceptable. If appropriate, the manager may want to include a copy of the easement and maps that show locations, approximate sizes, and acceptable dates for treatment. If the desired method of weed control to protect the habitat on the easement is more costly to the easement owner, the Service should consider offering the chemical to the landowner or providing other assistance to order to maintain the habitat that is most desirable on the easement as well as meet the easement owner's obligation to manage noxious weeds per state and local laws.

If time and resources allow, the manager may also consider offering assistance to landowners with such things as management, re-seeding, or the development of an integrated pest management plan to help them address their noxious weed/invasive species problems.

The permit:

- may be issued for a period of up to 3 years,
- will describe the methods and dates of treatment, and
- state that failure to adhere to the conditions of the permit may result in the issuance of a "Notice of Violation" and federal court appearance or fine.

### 6) Wetland Restoration/Sediment Basins

#### *6.1) Wetland Restorations*

Restorations or manipulations of wetlands on Service-administered easements may be allowable within the terms of the easements. Managers should carefully read and fully understand the easement document when considering such activities on wetlands within the

easement and when making the determination of who has the right to conduct the work. For instance, on many habitat and FmHA easements, the Service has the right to restore or manipulate wetlands. On wetland easements, however, those rights depend on any number of possible scenarios, such as:

- whether the wetland is partially drained and protected by a Drainage Facility Map (DFM),
- whether the existing or drained wetland was excluded from the original easement, which may or may not be shown on a DFM,
- what the outcome of a new Exhibit A for pre-1976 easements may be, or
- if prior drainage agreements to third parties exist.

Occasions may arise when an easement landowner offers to restore a drained wetland or wetlands under the Service's Partners for Fish and Wildlife program, the U.S. Department of Agriculture's (USDA's) Conservation Reserve Program, USDA's Wetland Reserve Program, or a similar program. In these cases, the manager should consult the easement files and photographs to determine if a potential violation has occurred but was undetected. It is necessary to determine if the landowner allowed/caused drainage after the purchase date of the easement, in which case it may be a violation.

<u>Follow these guidelines if the existing drainage to protected wetlands is not a violation:</u>

- The manager is encouraged to work with the landowner to restore the wetlands at Service or other expense. Landowner's permission is needed.
- If a landowner decides to restore a protected wetland (e.g., fill in the ditch), then the restored outlet becomes the new elevation. Landowners do not have the option to lower the level of the ditch at a later date. The MSL of the new outlet is recorded and must be maintained in the future. This MSL should be documented in the easement management file. If additional acres need to be protected, then a second easement must be acquired to cover the additional acreage.
- If the landowner wishes to restore and protect wetlands that were not protected by an easement previously acquired on the land, a second easement must be acquired. The manager should contact the Region 3 Realty office and acquire the additional rights to protect the wetland or wetlands.
- If water control structures (ditch plugs, sheet pile weirs, tile risers, or intakes) are required, the new easement should document the specific mean sea level (MSL) elevation of the structure. It is also recommended that MSL elevations are documented on any drainage ditches on partially drained wetlands when easements are acquired.

***6.2) Sediment Basins***

The USDA is promoting projects for the installation of sediment basins to address erosion in highly erodible soils. These projects are often associated with tiling and often use drained wetlands to temporarily slow the flow of water through highly erodible lands to prevent further erosion/sediment transport. Caution should be used when evaluating landowner requests for installation of a sediment basin on an easement. However, this practice of installing sediment basins might be appropriate if a protected wetland, drained through natural erosion, can be fully restored.

If a manager decides to pursue restoration of an easement wetland through a cooperative

project using USDA's sediment basin program, the following guidelines should be followed to achieve consistency in the Region:

- Protected wetlands in good condition (have not been drained/damaged by erosion and have functioning hydrology) should not be altered with the installation of a sediment basin.

**7) Prescribed Grazing**

Habitat easement Forms 2 and 3 and some of the FmHA easement documents restrict grazing. Where restricted, the authorized use of grazing must conform to the compatibility criteria found in 50 CFR 29.1 (http://www.gpo.gov/fdsys/pkg/CFR-2010-title50-vol6/pdf/CFR-2010-title50-vol6-part29.pdf).

Habitat easement Forms 1 and 4 allow grazing with no restrictions; therefore, no permit is required. However, implementation of grazing plans should be encouraged through various partners. In those cases where native plant communities are being severely impacted, conversion to a more restrictive easement should be sought. All fencing costs, labor, and maintenance are the responsibility of the landowner (excluding FmHA easements, which are generally the responsibility of the Service).

Forms 2 and 3 and some FmHA easements require permits using the following guidelines:

- Grazing is authorized only to enhance the vegetation on the easement tract.
- Permits do not exceed 3 years in length, and the manager must ensure permittees do not establish a long-term economic dependence on National Wildlife Refuge System (Refuge System) lands.
- Management restrictions (e.g., grazing dates and rates of stocking) are developed by the manager. Grazing restrictions should generally coincide with those on nearby Service fee lands.

This activity represents an "economic use," which must meet the higher standard of compatibility.

An SUP must be issued using the 2014 Region 3 Grazing and Haying Program Guidance (2014) located on the Region 3 Refuge Operations Sharepoint site below. All portions of the guidance apply to easements as well as fee title refuge tract management, except that the landowner may be the cooperator or choose a cooperator, unless the landowner requests that the Service help them find a cooperator, then the guidance for cooperator selection applies.

https://fishnet.fws.doi.net/regions/3/nwrs/refugeoperations/region3agriguidelines/Grazing/Forms/AllItems.aspx

**8) Stock Watering**

Non-permanent water facilities are allowed on all easement where the easement owner retained the grazing rights. The Service has no jurisdiction over grazing rights or non-permanent grazing infrastructure. Dugout construction in wetlands under easement may be permitted, provided the landowner can show a need, such as for stock watering, the watering is a clear need associated with the permitted grazing, and there are no other practical alternatives. As is the case with nesting islands, issuance of a permit shall not preclude requirements for obtaining other approvals from the U.S. Army Corps of Engineers, the state, etc. A statement to this effect should be included in the "conditions" section of the SUP.

Permits for dugouts are issued upon request for easements purchased prior to April 1, 1981,

provided the dugout is constructed according to state Natural Resource Conservation Service (NRCS) specifications. Permits for dugouts on easements, purchased after April 1, 1981, may be issued in accordance with the following conditions or stipulations:

- Dugouts are not permitted in wetlands 1 acre or smaller unless it is determined that there is no other suitable site or other source of water.
- All spoil is removed from the wetland.
- Dugouts may be allowed in wetlands larger than 1 acre, provided they are constructed on the perimeter of the wetland in the seasonally flooded zone.
- No spoil should be placed in the wetland basin. An exception can be made for spoil used for nesting island construction.
- Spoil placed outside the wetland may be leveled so long as it is not used to fill other wetlands.
- If the uplands are protected under a habitat easement, then the manager must evaluate the need to level the spoil piles, particularly on native grasslands.
- Permits for dugout construction are issued by the manager for a period not to exceed 12 months and are not assignable to subsequent landowners.
- No maintenance is allowed without another permit.

**9) Haying and Mowing**

Haying and mowing grassland on FmHA easements should only occur after landowners/operators are issued a permit specifically authorizing the conditions and locations for the activity.

Most easements require landowners to control noxious weeds in accordance with state and local regulations, but easement owners still need to notify the Service if mowing or haying outside of their retained rights is needed to control noxious weeds.

Before a permit to hay or mow is issued, the landowner/operator must demonstrate that:

- The haying or mowing is necessary to preserve or enhance the stand of grass (e.g., during establishment, for weed/brush control, to rejuvenate a decadent stand of grass), or
- The haying or mowing is necessary to meet noxious weed laws.
- The beginning date for the permit is set by the manager to avoid/minimize impacts on nesting birds or other wildlife.
- If necessary, permits can be extended until December 31 of the same calendar year, but multiple year permits will not be issued.

Management restrictions are developed by the manager. Haying restrictions should generally coincide with those on nearby Service fee lands. This activity represents an “economic use,” which must meet the higher standard of compatibility.

An SUP must be issued using the 2014 Region 3 Grazing and Haying Program Guidance (2014) located on the Region 3 Refuge Operations Sharepoint site below. All portions of the guidance apply to easements as well as fee title refuge tract management, except that the landowner may be the cooperator or choose a cooperator, unless the landowner requests that the Service help them find a cooperator, then the guidance for cooperator selection applies.

https://fishnet.fws.doi.net/regions/3/nwrs/refugeoperations/region3agriguidelines/Grazing/Forms/

AllItems.aspx

**10) Seed Harvest**
For habitat easements, seed harvest is not restricted with Forms 1 and 2 after July 15. Because the Service controls the method of noxious weed control, a possible conflict could arise here since the seed must comply with state seed laws. Management discretion should be used with herbicide application to ensure that no long-term harm occurs to the plant community. The permitting policy should adhere as closely as possible to the noxious weed control permitting guidelines. See 5) Invasive Species Management in this Exhibit for additional information on invasive species management.

Seed harvest on Forms 3 and 4 is not allowed except under the following conditions:

- Native prairie tracts may be harvested if the landowner or Service uses the seed to restore nearby croplands to grasslands.
- If the landowner agrees, the Service may enter into a cooperative or purchase agreement for the harvest of the native prairie seed. Agreements should parallel prevailing rates of payment or crop sharing in the local community.
- If the requested use falls under the category of a "refuge economic use", ie. the harvest is being completed by a vendor who is purchasing the seed from the easement owner, then the manager must meet compatibility requirements.

*This page intentionally left blank*

**This Exhibit contains conditions/stipulations which may be helpful for issuing permits for any of the following activities. This list is merely a carryover from previous Region 6 manual guidance, and is not intended to imply that these are the only requests which may be authorized on easement properties through use of the flowchart process.**

**Based on the best professional judgment at the time the easement was acquired, landowners may have been told that certain activities would be permitted. For the integrity of the Easement Program, it is important to ascertain what the current landowner may have understood at the time the easement was acquired, what may be documented in the file, and for the FWS to honor previous commitments. If the easement manager is confident that previous commitments were made by the FWS, some of the following guidance can help address current requested uses.**

**1. Irrigation Travel ways:**

a. Prerequisites: Before a permit is granted, the landowner must demonstrate that:

(1) Equipment and/or topography modifications cannot be accomplished to avoid wetlands.

(2) Equipment is incapable of traversing wetlands in their natural condition.

(3) There will be no ground water impacts to protected easement wetlands: If there are concerns over ground water related to easement wetlands, the Service will not issue an easement permit for travel ways.

b. The term of the Permit is ten (10) years. The travel way permit is assignable to subsequent landowners and allows maintenance of the permitted facilities only under Service supervision. All permits for irrigation travel ways shall be issued by the Regional Director. Permit distribution: original to landowner, copy to Project Leader, copy to Regional Office.

c. Examples of travel ways that can be permitted to accommodate sprinkler irrigation equipment are:

(1) Placement of 4-foot to 5-foot wide wooden beams “laced” together with cable in a “railroad track” style.

(2) placement of 4-foot to 5-foot wide metal mats made of corrugated, expanded or punched metal,

(3) removal of the muck layer not to exceed 10 feet in width in the bottom of the wetland and replacing it with sand or gravel to the natural bottom contour of the wetland,

(4) exposure of the hard substrate by removal of muck layer not to exceed 10 feet width in the bottom of the wetland (only permitted in high water table wetlands). In both cases (3) and (4) the spoil material must be placed outside the basin. In larger marshes where spoil deposition outside the marsh is impractical, use other approved travel way types.

d. Stipulations necessary to insure Compatibility:

(1) Travel way construction shall be permitted during times of low wildlife use, ie., when wetland is naturally dry or in late summer after mating and nesting season (August 1),

(2) the Service may request to be present during construction, and will have to approve any maintenance or modification of travel ways.

With the above pre-requisites and stipulations, impacts from this permitted use will be temporary during the construction phase and little to none during the operation. This use will not diminish the long-term productivity of the easement wetland(s) for waterfowl production or other migratory bird values. Thus, the use will not materially interfere with the waterfowl production or conservation purpose of the easement.

**2. Dugouts:**

Dugout construction in wetlands under easement may be permitted, provided the landowner can show a need, such as for stock watering and fire protection, and there are no other practical alternatives. Issuance of a permit shall not preclude requirements for obtaining other approvals from the Corps of Engineers, State, etc.

Permits for dugouts will be issued upon request for easements purchased prior to April 1, 1981, provided the dugout is constructed according to State NRCS specifications. Permits for dugouts on easements, purchased after April 1, 1981, may be issued in accordance with the following conditions or stipulations:

a. Dugouts will not be permitted in wetlands 1 acre or smaller unless determined that there is no other suitable site or other source of water. All spoil will be removed from the wetland.

b. Dugouts may be allowed in wetlands larger than one (1) acre, provided they are constructed on the perimeter of the wetland in the seasonally flooded zone. Every effort should be made to minimize the amount of spoil placed in the wetland. Spoil placed within the basin shall be piled adjacent to the dugout on either side of the excavation. Spoil placed outside the wetland may be leveled so long as it is not used to fill other wetlands. If the uplands are protected under a grassland easement, then the manager must evaluate the value of leveling the spoil piles, particularly on native grasslands.

c. Permits for dugout construction are issued by the Manager for a period not to exceed 12 months and <u>are not assignable</u> to subsequent landowners. No maintenance is allowed without another permit. Permit distribution: original to landowner, copy for station files. Copies to the RO are no longer required.

**3. Level Ditching:**

All level ditching shall be <u>prohibited</u> in wetland basins under easement except when the landowner can prove that he, personally, was told at the time the easement was negotiated that level ditching was permissible. Landowners who sold easements prior to April 1, 1981, may have been told that level ditching was permissible.

**4. Nesting Islands (Habitat Management Activity):**

In some situations, nesting islands may be permitted in wetlands under easement. Issuance of a Service permit will not subordinate the approvals that may be required from other agencies such as the Corps of Engineers, State, and local units of government. Criteria for issuing permits for nesting islands are:

a. Benefit to waterfowl production should be the major consideration, and avoidance or reduction of predation is a necessary requirement. Islands can be good waterfowl nesting sites in the following situation:

(1) In large, brackish marshes (Type IV) or open water lakes (Type V); the minimum basin size must be 50 acres. The island must be separated from the nearest shoreline by 600 feet to deter mammalian predators. If more than one island is constructed in a single wetland, a minimum of 600 feet shall be between islands. Minimum island size should be 50 feet by 100 feet. Islands over 1 acre in size are necessary to support dense aggregations of duck nests (100 nests or more). Wetlands for island placement must have a surface of at least 80 percent open water.

b. Islands must be constructed of rock or other non-erodible base. They should be of irregular shape or resemble other natural islands in the vicinity. Tops must be leveled and covered with a minimum of 1 foot of soil capable of supporting good stands of vegetation. Usually, volunteer vegetation will be adequate for nesting requirements. The top of the island must be at least 1 foot above the highest expected water level, but not more than 3 feet above such a level.

c. Permits for nesting island construction are issued by the Manager for a period of 12 months. No maintenance is allowed without another permit. This construction permit is not assignable to subsequent landowners. Permit distribution: original to landowner, copy for station files.

**5. Burning (Habitat Management Activity):**

The Manager may permit the burning of vegetation within wetland basins under easement. Conditions or stipulations for issuing burning permits are:

a. No more than one-third of the wetlands may be burned in any 1 year, or all the wetlands may not be burned more than once every 3 years.

b. As a general rule, cattail and bulrush marshes will not be burned so that nesting habitat for divers can be maintained, unless a determination is made that such management is necessary.

c. The Manager will issue burning permits and they cannot be assigned to subsequent landowners. Permit distribution: original to landowner, copy to Project Leader.

**6. Beaver Dams:**

Beaver dams may be removed from existing ditches or natural outlets without a permit, provided that no soil is removed from the bottom of the ditch or outlet.

**7. Culverts:**

Culverts may be an effective tool in resolving certain conflicts. **However, if not properly used, they can be very damaging to easement wetlands.**

Extreme caution should be used in agreeing to culvert placement where none previously existed. If a culvert is needed to protect a road, the elevation must be such that it protects the integrity of any easement wetland involved.

Culverts that are replaced for any reason must be placed at the old or previous elevation, no lower. The elevation of the bottom of the culvert is critical, regardless of how large the culvert is.

In setting elevations for wetlands that will be lowered for health, safety, or endangerment of property, it may be useful to use culverts to set permanent elevations at the outlet. This may better ensure that the established elevation will be maintained.

Managers should be observant when road improvement projects encounter easement-protected wetlands. Even though county or state highway departments may have statutory authority or a specific road easement which pre-dates our protective easement, they are not entitled to drain wetlands which may not be necessary for road maintenance purposes. They can do what is reasonably needed to maintain the road, but when plans call for drainage beyond what is reasonable, then managers must get involved to protect the property interests acquired by the easement. Obviously, this is a judgment issue, but managers need to be aware of wetland drainage which goes beyond what is necessary for road maintenance. If federal funding is involved with the road project, then other requirements need evaluation, such as Cultural Resource issues, NEPA, and Section 4f of Federal Highway Administration regulations.

**8. Commercial Bait Operations:**

Easement holders often inquire about commercial bait operations. This is not restricted under the terms of the easement contract, and the Service has no authority to prevent it on easement properties.

**9. Impoundments:**

In post-1976 Wetland easements there is an Exhibit "A" map that identifies all protected wetlands. By Realty policy, the Service did not acquire easements on artificial wetlands or impoundments. As a rule, draining, burning, filling, or leveling of an artificial wetland will not be a violation of the easement contract. The only exception may be a rare case in which a post-1976 Exhibit "A" map depicts an artificial wetland. In this case, the artificial wetland is protected.

When considering dugouts or stockponds construction on Grassland, Habitat or FmHA easements, the Manager must adhere to the following conditions or stipulations:

a. must follow NRCS and/or PFW specifications,

b. may not dewater any easement protected wetlands on the easement, and,

c. all other federal, state, or county permits must be applied for and received before pond construction may begin.

**10. Partners for Wildlife or CRP Wetland Restorations:**

Occasions may arise when a landowner offers to restore a drained wetland or wetlands under the Service's Partners for Wildlife program, the USDA's Conservation Reserve Program (CRP), or a similar program. In these cases, the Wetland Manager should consult the easement files and photographs to determine if a potential violation has occurred, but was undetected. Following are the types of scenarios that may be encountered when dealing with wetland restorations after easement acquisition:

1. Pre-1976 Easement without DFM:

   These easements protect all wetlands included within the Summary Sheet acreage.

   Drained wetlands should not be encountered on these easements except in a few cases where the easement contract states that the existing ditches cannot be maintained. If drained wetlands are found, it will be necessary to determine if the drainage occurred after the easement was purchased, in which case it may be a violation. Contact the ZLEO and the state Private Lands Coordinator before taking any action. If it is determined that the drainage is not a violation, work with the landowner and USDA to restore the wetland according to NRCS specifications. After the CRP or PFW agreement, the wetland can be drained to the scope and effect it was drained at the time of enrollment in the conservation program.

2. Pre-1976 easement with a DFM:

   These easements include a map(s) showing wetlands excluded from the terms of the easement. Wetlands identified by the DFM may be drained and the ditches may be maintained. These DFM wetlands may be restored under the CRP, PFW, or a similar program for the length of the appropriate contract. At the end of the conservation agreement, the wetland(s) may again be drained under the terms of the easement agreement. The landowner must check with FSA/NRCS about their regulations.

3. Post-1976 Easements with Exhibit "A" Maps:

   Any wetland not identified on a post-1976 easement map is excluded from the easement and may be restored under the various conservation agreements. Such drainage is not a violation of the Service's easement and the wetland(s) may be re-drained at the end of the conservation agreement. However, if the drained wetland is shown as a protected wetland on the Exhibit "A" map, it may be a violation of the easement.

If a landowner has an easement wetland that is partially drained that is NOT a violation of the easement contract (ie protected by a non-functional drainage facilities which the landowner agrees not to repair or clean out) and wants to permanently restore the wetland to pre-drainage conditions, a second easement should be acquired. There may be some doubt as to what portion of the basin had been acquired when the easement was first negotiated, the entire basin or only the functional part of the basin. If the entire basin was acquired under the presumption that the ditch would fill in over time, then a secondary easement should not be acquired. The Manager should contact Realty and the Service should acquire the additional rights to construct and maintain a wetland restoration structure (ditch plug, tile riser) to a specific MSL, if appropriate.

**11. Weed Control:**

a. For **grassland easements**, weed control is the sole responsibility of the landowner. A permit will be required for any weed control by mowing which is to commence prior to July 15 in any year. A permit will not be required for weed control by mowing **after** July 15, nor is it required for herbicide applications.

b. For **wetland easements,** weed control is solely the responsibility of the landowner. Prior approval is not necessary, unless the landowner wants to control weeds through burning of the wetlands.

**12. Mowing or Haying:**

a. Pre-requisites : Before a permit to hay prior to July 16 is issued, the landowner/operator must demonstrate that:

(1) Haying or mowing is necessary to preserve or enhance the stand of grass (such as mowing CRP or a newly planted grass stand for weed control or to rejuvenate a decadent stand of grass).

(2) The haying or mowing will be in accordance with management restrictions developed by the Manger.

(3) The haying or mowing will result in a positive impact on protected grasslands, or

(4) the mowing is to meet noxious weed laws.

b. The term of the permit is from the commencement date prior to July 16 until December 31 of the same calendar year. The ending date may be shortened if necessary.

**13. Seeding, Reseeding, or Interseeding (Habitat Management Activity):**

**Pre-requisites for Grassland Easements:** Before a permit is issued, the landowner/operator must:

(1) describe the need for the seeding, reseeding, or re-establishment of the grass stand;

(2) designate the native species/varieties, or the reason why not to plant native species,

(3) agree to follow stand establishment requirements, seeding rates, and seedbed preparation as set forth by the FWS.

Native species to be reseeded should provide for protection of fish and wildlife resources and to maintain the quality of these lands to provide cover for wildlife, especially nesting cover, and food for a varied array of aquatic, terrestrial, and avian wildlife, particularly waterfowl and threatened and endangered species.

The term of the permit shall be one growing season, spring to fall to allow for a spring, summer, or late season dormant seeding. No other seeding permit shall be issued until the results of the permitted seeding are evaluated in accordance with NRCS and FSA requirements.

**14. Annually Planted Food Plots:**

If the manager determines that a commitment was made by the FWS at the time the easement was acquired, he/she can approve permits for planting wildlife food plots within grassland easements provided the landowner/operator agrees to leave the entire crop for wildlife. If it is determined that no prior commitment was made by the FWS, the Manager should follow the "farming to improve perennial habitat" guidance in Chapter XII. If approving a food plot, the easement permit shall include the following stipulations:

a. not to exceed 5 years in duration with one possible renewal,
b. no food plots to be planted in wetlands protected by grassland easements,
c. specify the type of crop to be planted for the 5 years,
d. no harvesting or grazing of the crop is permitted except after March 31,
e. must include a plan for the re-establishment of grass after the food plot is terminated,
f. limited to no more than 8 acres per quarter section of Grassland Easement,
g. the use of insecticides is discouraged on food plots,
h. no food plots will be permitted on native prairie

**15. Tree or Shrub Plantings as a Habitat Management Activity:**

The Manager may permit planting of **native** trees and shrubs on Grassland Easements as a Habitat Management activity. Other requests for plantings must be evaluated by the flowchart. If either are approved, the following guidelines are applicable:

a. not to exceed 5 years with possible renewal (permit is for establishment and cultivation of tree rows, not the presence of the tree planting);
b. specify the type of trees to be planted;
c. be no larger than 8 acres per quarter section of grassland easement
d. no tree or shrub plantings will be permitted on native prairie tracts; and,
e. the easement does not prohibit the harvest of planted trees.

**16. Chaining:**

Chaining of brush species will be permitted only if the landowner/operator can demonstrate that it will not be detrimental to the grassland and the wildlife habitat in accordance with the easement purpose, "for the protection of fish and wildlife resources and to maintain the quality of these lands to provide cover for wildlife, especially nesting cover, and food for a varied array of aquatic, terrestrial, and avian wildlife, particularly waterfowl and endangered and threatened species."

**17. Chemical Control of Buckbrush:**

Any chemical control of woody plants that are not noxious weeds (e.g. buckbrush) will be addressed on a case-by-case basis by the Manager to determine if the control is compatible with the purpose of the easement.

**18. Grazing (Habitat Management Activity):**

Grazing is restricted only on some of the FmHA documents. If grazing is authorized, it must benefit the refuge area (economic use requires a higher standard of compatibility)

**19. Seed Harvest:**

For Grassland Easements, seed harvest is generally restricted until after July 15 each year. There is little legitimate reason to allow seed harvest before July 16th. However, if the Manager determines a ligament reason for seed harvest before July 16th, he/she should follow the guidance in Chapter XII.

*This page intentionally left blank*

Exhibit VI-4

UNITED STATES
DEPARTMENT OF THE
INTERIOR OFFICE OF THE
SOLICITOR WASHINGTON D.C. 20246

Memorandum

To: Associate Director, Wildlife Resources, FWS

From: Assistant Solicitor, Fish and Wildlife

Subject: Proposed Guidelines for Wetland Easement Enforcement

We have reviewed the draft administrative guidelines for wetland easement enforcement jointly submitted by Regions 3 and 6. Although the sole legal question raised by the transmittal memorandum is the authority of the Service to allow certain activities pursuant to a permitting system, we feel that certain implications of the proposal for the easement program in general require a wider discussion.

It must first be understood that through the easement agreement, the government has received, and therefore has a proprietary interest in, only the rights of draining, filling, burning and leveling. 1/

1/ The government has also acquired the right of access to the subject property, but this is not important for purposes of the instant discussion.

' The landowner has retained all other normal incidents of ownership in fee. 2/

This has two important implications: (1) The landowner can undertake all activities other than "filling, draining, burning or leveling" whether or not the activities destroy the wetland or impair its value as a waterfowl production area; 3/ and (2)

2/ This conclusion conflicts with a memorandum dated November 30,-1977 from the Minneapolis Field Solicitor to the Regional Director. The Field Solicitor concluded that the property rights received through the easement agreement were 1) the right to maintain the land as a waterfowl production area, and 2) the concomitant right to expect from the owner of the servient estate certain specific kinds of cooperation in this effort (not to fill, drain, burn or level). However, the estate received by the government is commensurate with that relinquished by the servient estate. See Restatement of' Property, § 452 (1944); Thompson, Real Property, 427 (1961). In this case, the landowner specifically relinquishes only the rights to drain, fill, level and burn. U.S. Gov. Form 3-1916 (1970). This language surely defines the ambiguous "easement . . . or right of use for the maintenance of the land . . . as a waterfowl production area." Restatement of Property supra, §4F83. In this we agree with the U.S. Attorney's appraisal of the Minneapolis Field Solicitor's opinion. Letter from U.S. Attorney,.North Dakota, to Minneapolis Field Solicitor, April 21, 1978.

3/ The landowner could, for example, build a structure adjacent to the easement area which would eliminate the wetland's attractiveness to nesting waterfowl.

the **landowner may allow** third parties to undertake such activities. 4/.

Since the Service holds a proprietary interest only in the rights to drain, fill, level and burn, its authority as an owner of property to regulate the use of its property extends only to those activities. In the instant context, therefore, the Service can regulate only those activities that can fairly be said to have been contemplated within the pertinent terms of the easements, 5/ since this was the extent of rights bargained and paid for. 6%

4/ It is in this context that the opinions discussed in Note 2 supra, were issued. The Field Solicitor concluded that the estate held by the Service vis-a-vis third parties was larger than that held vis-a-vis the landowner. The Service could then regulate acts of third parties, in this case a power line right-of-way applicant, which it could not regulate if undertaken by the landowner. The U.S. Attorney concluded that since the activities could be undertaken by the landowner, third parties could be allowed to undertake the same activities. We subscribe to the opinion of the U.S. Attorney: See Restatement of Property, § 510, comment a, (1944).

5/ This conclusion requires a modification of the present regulations pertaining to the National wildlife Refuge System. 50 CFR Subchapter C. Under the pertinent definitions, Waterfowl Production Area Easements are defined as part of the wildlife Refuge System. 50 CFR § 25.12(a). Management of the Refuge System includes restriction on access, 50 CFR Part 26, land use, 50 *CFR* Part 29, hunting and fishing, 50 CFR Part 30, and other miscellaneous actions, 50 CFR Part 27. Since the Service holds only a limited property right in a Waterfowl Production Area easement, it has no authority to regulate activities such as hunting, fishing, sightseeing, snowmobiling, etc., which are not in conflict with the terms of the acquired estate; the regulation of those types 'of activities remains the prerogative of the fee owner and his or her licensees. Serious consideration should be given, therefore, to delineating those provisions of the general refuge regulations which do not apply to wetland easement areas.

6/ The Chief of the Realty Division in Washington, D.C. has confirmed that our analysis coincides with Realty's understanding of its bargaining position when negotiating wetland easements. This is an important factor in determining the content and scope of the easements.

If it is determined that contemplated activities fall within the scope of the Service's property interest (ie., involve filling, draining, leveling or burning), the Service is still authorized to permit the activities if it is determined that they are "compatible with the purposes for which the area was established." 16 U.S.C. § 668dd(d)(1)(8). Present regulations provide authority to the Service to issue permits allowing burning, 50 CFR § 27.95, filling, 50 CFR § 27.94, and leveling and draining, SO CFR §27.51. 7/

A landowner operating pursuant to, and in compliance with, a permit issued by the Service may undertake the activities without violating the terms of the easement agreement. The permit acts as a license authorizing activities otherwise forbidden by the easement agreement.

The draft administrative guidelines submitted by Regions 3 and 6 contemplate the regulation of six activities: pivot irrigation systems, dugouts, level ditching, construction of nesting islands, burning, and emergency draining. The above analysis has demonstrated that the Service may only purport to regulate these activities if they can be considered draining, filling, burning or leveling. Of these activities, only construction of pivot irrigation systems poses problems of definition. 8/

7/ We advise adoption of the following amendment to 50 CFR Subchapter C to clarify this authority:

Section 29.4 Waterfowl Production Area Easement

> Where the Service owns an easement interest to preserve potholes or other wetland habitat, certain acts such as draining, burning, filling or leveling of a limited nature may be allowed by permit issuedby the Regional Director or the Regional Director's designee, when in that person's judgment, such activities are compatible with the basic purposes of waterfowl production for which such easement interest was acquired.

8/ Dugouts and level ditches serve to reduce the water area of the wetland by concentrating available water and thus can be considered draining. Nesting islands require accumulation of material in the wetland basin and therefore may be considered filling. Burning and emergency draining are contemplated activities by their terms.

The irrigation construction options outlined in the proposed administrative guidelines all require placing some material In the wetland basin (ie., wire mesh, trench-fill material, pilings). It is our opinion that the placing of such material in the wetland basin constitutes "filling" within the terms of the easement agreement. 9/

The Service has previously had occasion to apply such an inclusive definition.. **Letter, Minnesota Field** Solicitor to Mr. John A. Eidsmore, May 17, 1979. The Service has also attempted to define "filling" in terms of gradation. Memorandum from the Acting Regional Director, Region 6, to Wetland Acquisition Offices and Wetland **Management Districts,** February 7, 1975, ("spreading" manure **in wetland basins** is not "filling", but "dumping" manure is; placing a few rocks in a wetland is not "filling", but moving a rock pile to the wetland is).. It is our opinion that this position is untenable because it is **vague** and ambiguous and therefore open to uneven application. It also overlooks the fact that the same volume of material is 'being deposited in the wetland regardless of whether it is dumped or spread; over a sufficient period of time, the impact

9/ We note that other agencies struggling with the proper definition of "filling" have tended toward very inclusive definitions. See, eg. the definition promulgated by the Corps of Engineers pursuant to § 404 of the Federal Water Pollution Control Act, 33 USC § 1344:

> -"fill material" means any material used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of a waterbody. 33 *CFR* § 323(m)
>
> "discharge of fill material" means the addition of fill material into waters of the United States. The term generally includes, without limitation, the following activities. Placement of fill that is necessary to the construction of any structure in the water of the United States. . . . 33 CFR § 323(n)

Because undertaking the activities outlined in the draft administrative guidelines constitutes draining, filling, leveling or burning, it is within the Service's proprietary authority to regulate these activities and to allow them to occur. In regulating these activities, however, the Service must keep in mind two potentially conflicting considerations: (1) The easement agreement guarantees to the landowner the somewhat limited right to undertake farming practices and to utilize the lands in the "customary manner." 10/ (2) The contemplated activities may only be allowed if '•compatible with the purposes for which the area was established." 16 U.S.C. § 668dd(d)(1)(B).

The compatibility finding must take into account the nature of the interest held by the Service. "Use" provisions in easements, such as that in the instant agreement allowing for limited farming activities in "the customary manner", tend to expand with technological developments. Thompson, 2 Real Property § 385 (1961). The development of standards, as in the drpt administrative guidelines, is a proper technique for factoring the "customary use" rights allowed to the landowner into the compatibility finding. -

10/ "It is understood and agreed that this indenture imposes no other obligations or restrictions upon the parties of the first part and that neither they nor their successors, assigns, lessees, or any person claiming under them shall in any way be restricted from carrying on farming practices such as grazing at any time, hay cutting, plowing, working and cropping wetlands when the same are dry of natural causes, and that they may utilize all of the subject lands in the customary manner except for the draining, filling, leveling and burning provisions mentioned above." U.S. Gov. Form 3-1916 (1970) (emphasis added).

We caution, however, against use of the guidelines as a per se test of compatibility. -A comprehensive administrative record would be necessary to support a compatibility *finding* on a generic basis for all irrigation construction proposals for all wetlands. In fact, a- good argument can be made that the Service should adopt a rebuttable presumption against finding proposed "filling" activities to be compatible with the purposes for which a wetland easement area was established. In acquiring wetland easements, the government has paid considerable sums of money to prevent "draining, filling, burning and leveling" from occurring, since these activities have been deemed to be inimical to the preservation of -wetlands. For the Service then to turn around and routinely approve the very type of activity that compensation was paid to prevent, without an affirmative showing that in each particular case the impact would be minimal and compatible, would be contrary to the requirements of the Refuge- System Administration Act.

In addition, violation of easement agreements has been prosecuted as an "injury" to government property under 18 U.S.C. § 1361. Determination of compatibility on a case-by-case basis precludes an argument, if a prosecution were to be brought for failure to obtain a permit, that simple failure to obtain a permit cannot be a basis for "injury" of government property.

It is the opinion of this office, therefore, that the Service has acquired, through Waterfowl Production Area easements, a proprietary interest in, and therefore the ability to regulate, only draining, filling, leveling and burning. Since the activities outlined in the draft administrative guidelines all involve either draining, filling, leveling or burning, *they* are within the Service's regulatory authority. A landowner may be allowed to undertake these activities by permit only after an affirmative finding has been made by the Service that the contemplated activities *will* be compatible with the purposes for which the area was established, i.e., maintenance of the particular area for waterfowl production.

We recognize that this is a. very complex area of the law and that it may be difficult to strike a proper balance between the requirement of allowing only compatible irrigation systems to be developed and the rights of "customary" use accorded the landowner in the easement agreement. We are, therefore, quite willing to answer any additional questions that you may have concerning this issue.

Please contact David Fisher (343-2172) for additional information.

David Fisher for
Donald J. Barry

Exhibit VI-5

# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Mountain-Prairie Region

IN REPLY REFER TO:
FWS/R6/NWRS
Mail Stop 60130

MAILING ADDRESS:
Post Office Box 25486
Denver Federal Center
Denver, Colorado 80225-0486

STREET LOCATION:
134 Union Boulevard
Lakewood, Colorado 80228-1807

DEC 13 2013

Memorandum

To: Wetland Management District Project Leaders

From: Assistant Regional Director, National Wildlife Refuge System, Region 6

Re: Letters of Authorization

As you know, there is a national Easement Team which was sanctioned by the Chief of the National Wildlife Refuge System and endorsed by Regional Refuge Chiefs. This team is working on a national easement policy which will guide the acquisition, administration, and enforcement of the FWS's easement estate system-wide. Once this team's work is complete, Region 6 will make the necessary changes to its Easement Manual to conform to national policy. More comprehensive and specific guidance is forthcoming, however due to concern over the issuance of "Letters of Authorization" for permanent structures on grassland easements, I am rescinding the guidance outlined in the Easement Manual which directs their use. This does not necessarily mean that requests for uses cannot be accommodated; it merely means that our use of Letters of Authorization to authorize such uses will no longer be acceptable. Should you receive a request for a structure or building on a grassland easement, or any other use that might lead you to issue a letter of authorization, you should still apply the evaluation process outlined by the flowchart. However, for requests that successfully pass the flowchart evaluation, the only options currently available are 1) to execute an exchange of easement interests, 2) to issue a right-of-way permit, or 3) to issue a special use permit. You are urged to consult with your Refuge Supervisor and the Regional Easement Coordinator on such requests.

From time to time, you may discover historical file documentation that authorizes an easement development request based on past guidance and/or administrative procedures, or a landowner who is specific about their understanding of past Service positions (e.g., that 5% of a grassland easement could be developed on an easement that was purchased between 1992 and 2005). If this happens, work with your Refuge Supervisor and the Regional Easement Coordinator to consider these requests as applicable.

Please call your Refuge Supervisor or Dave Azure, Region 6 Easement Coordinator, with questions or concerns.

*This page intentionally left blank*

# Process For Acquiring Replacement Habitat

All requests for use of easement properties must first be evaluated with the Flowchart (Chapter XII) and managers will complete an "Easement Use Evaluation Form" (Exhibit XII-3) which will be a permanent record for the easement file. The Flowchart will lead managers to a decision resulting in one of three general actions: the request may be denied; the request may be authorized via a special use permit, letter of no objection signed by the Regional Director, or right-of-way permit; or the request may be accommodated through an exchange of easement interests. This document describes the process that is used to secure replacement habitat for easement exchanges or to offset permanent impacts resulting from project authorizations.

## Easement Exchanges

Per Service policy (342 FW 5), criteria for an exchange are (1) that the exchange be of benefit to the United States, and (2) that the value of the lands or interests in lands be approximately equal or that values may be equalized by the payment of cash by the grantor or by the United States.

If these two requirements are satisfied, then the exchange can move forward from a Realty point of view. In all cases, Realty will determine the current market value of the interest to be relinquished. If an interest can be identified to bring into the refuge system, then Realty will also determine the current market value of that property. Any unequal values must be equalized through a cash payment.

**Wetland Easements -** The alternatives for replacement habitat to execute a wetland easement exchange are listed below in priority order; the first must be thoroughly investigated prior to considering the second.

1. **Onsite Restoration -** Drained wetlands of similar biological and economic values are restored within the same easement contract. The original easement agreement will be amended to add and/or delete the affected wetlands. The Service or the grantor will make a differential payment for any unequal economic values based on a current appraisal.

2. **Offsite Restoration -** Wetlands of similar biological and economic values are restored on another easement contract or on land where a new contract will be acquired. ***Easement exchange banks***[*] are included in this alternative. The Service or the grantor will make a differential payment for any unequal economic values based on a current appraisal.

   [*]*Currently, only ND has an approved exchange bank, and it is only for ND DOT projects. Easement exchange banks have several advantages and managers are encouraged to seize opportunities to establish banks wherever and whenever possible.*

3. **Wetland Creation** - is the least desirable alternative for replacement habitat and should rarely be used. As with restoration, onsite is preferred to offsite when it wetland creation is determined to be the only feasible alternative.

**The protection of existing wetland habitat through new acquisition is not an acceptable alternative for exchanges. In order to better achieve the requirement that the exchange is in "the interest of the Service," and to ensure no net loss of wetland habitat (EO 11990), only restored/created wetland habitat can be used for easement exchanges.**

EXAMPLE #1: A wetland to be relinquished is 1 acre, and determined to have an easement value of $100. The landowner has a 1 acre DFM wetland on the same easement tract that he is willing to restore and put into the easement program. The landowner can restore the wetland and Realty will modify the easement to divest of the impacted wetland and protect the restored wetland.

EXAMPLE #2: A wetland to be relinquished is 5 acres, and determined to have an easement value of $100/acre or a total of $500. The landowner has other land containing 11 acres of drained wetlands which he is willing to restore and put into the easement program. These wetlands are also determined to have an easement value of $100/acre, or a total of $1100. In order to equalize this exchange, the Service will pay the requester $600.

**Grassland Easements -** Because of the expense and difficulty in restoring grassland habitat coupled with the fact that unbroken native prairie is deemed more desirable than restored grassland, the requirement for grassland easement exchanges is to achieve at least acre-for-acre in addition to Realty's requirement of dollar-for-dollar. There is no requirement to restore grassland habitat when executing a grassland easement exchange.

EXAMPLE #1: Ten acres of grassland easement is to be divested. The landowner was originally paid $50/acre or $500. Realty determines the easement value now to be $200/acre or $2000. Even though the landowner may have been paid only $500 for the 10 acres of grassland easement, he will have to satisfy the current easement value of $2000 to accomplish the exchange. The landowner has 160 acres of unprotected native prairie that qualifies for a grassland easement and he is willing to use it for the exchange. Assuming the value of the divested grassland is the same as the newly-acquired grassland, the landowner will be paid for 150 acres on the new grassland easement, using the remaining 10 acres for the exchange. If the value per acre of the divested grassland exceeds that of the newly-acquired grassland (for example, the divested grassland may be former cropland), then the payment for the new easement will be adjusted accordingly to satisfy the "dollar-for-dollar" requirement.

EXAMPLE #2: One acre of grassland easement is to be divested as a result of a Department of Transportation project. The value of the divested grassland easement is $500. DOT may contribute funds towards another grassland easement acquisition on native prairie; and this transaction does not necessarily have to take place within the immediate vicinity of the exchanged property. However, DOT's $500 must acquire at least 1 acre or it will have to make up the difference. In other words, the requirements of "acre-for-acre" and "dollar-for-dollar" must both be satisfied.

**Special Use Permits, Letters of Non-objection, or Rights-of-Way Permits**

Region 6 requires replacement of permanent impacts to easement-protected habitats which result from the issuance of special use permits, rights-of-way permits, or letters of non-objection signed by the Regional Director in lieu of a right-of-way permit. This replacement of habitat is done outside of and does not factor into the determination of compatibility (with the exception of the compensatory mitigation option for the maintenance of existing rights-of-way).

Because the Service is not releasing or relinquishing easement rights with the issuance of permits or authorization, the options outlined below are slightly different than those for easement exchanges. The reader is cautioned to avoid confusing the process for the replacement of habitat for easement exchanges with the process for replacement of habitat for permits or authorizations.

When restoration opportunities are lacking, and the protection of existing habitat is used to offset impacts, then the affected area resulting from these types of projects (where the Service retains jurisdiction over the impacted area) will be *rounded up* to the nearest acre and replaced. For example, power line poles placed within a protected wetland having a total impact of 0.08 acres will be rounded up to 1 acre. A use having an impact of 0.4 acres to a grassland easement will be rounded up to 1 acre. An expanded right-of-way impacting 1.2 acres of grassland easement will be rounded up to 2 acres. The rationale for this approach is two-fold. First, Realty purchases easements based on whole numbers and does not acquire fractions of acres. Second, this methodology ensures no net loss of habitat from the Refuge System.

**Wetland Easements –** There are three alternatives for replacement wetland habitat to offset impacts from authorized projects. They are listed below in priority order and each alternative must be exhausted prior to moving on to the next.

1. **Onsite Restoration -** Drained wetlands of similar biological and economic values are restored within the same easement contract. The original easement agreement will be amended to add and/or delete the affected wetlands. The Service will make a differential payment for any unequal economic values based on a current appraisal.

2. **Offsite Restoration –** Drained wetlands of similar biological and economic values are restored on another easement contract or on land where a new contract will be acquired. The Service will make a differential payment for any unequal economic values based on a current appraisal. Replacement banks may be established where applicable.

3. **Protect Existing Wetland** – Payment can be made towards another easement contract for the value of the impacted easement habitat. For example, if power line poles are permitted in a protected wetland, and the total impact is 0.08 acres, then the power line company will have to pay for 1 acre of a subsequent wetland easement.

**Grassland Easements –** As already mentioned, because of the expense and difficulty in restoring grassland habitat coupled with the fact that unbroken native prairie is deemed more desirable than restored grassland, the requirement for offsetting impacts to grassland easements to achieve at least acre-for-acre. There is no requirement to restore grassland habitat when

replacing impacts to grassland easements; and unlike an easement exchange, there is no “dollar-for-dollar” requirement.

If the permittee is a landowner with other unprotected native prairie, then a new grassland easement may be used to offset the impacts. If the permittee is a landowner without additional unprotected native prairie, or is not a landowner at all, then the only option is to make a payment commensurate with the value of the impacted area (rounded up to the nearest acre) towards another easement purchase.

**<u>Special Situations</u>**

**Emergency, Health & Safety Authorizations –** Landowners will not be required to pay for easement exchanges or permanent impacts authorized to address health and safety needs. Grant monies or a replacement bank established for these types of needs will be used.

**Projects impacting protected wetlands on a grassland easement –** wetlands on a grassland easement are protected by provisions of two separate easement contracts; therefore, the easements must be satisfied independently. For example, a state DOT ROW project that impacts 2 acres of grassland easement, 0.5 acres of which is a wetland, would necessitate an easement exchange for 2 acres of grassland and 0.5 acres of wetland.

# Fish and Wildlife Service Land Exchange Checklist

Project Name: ______________________ Location: ______________________

Acquired Tract Name/No.: ______________________ Divested Tract Name/No.: ______________________

Land Acquisition Planning Statement of Compliance ........................ Date ________

Exchange Agreement executed by Vendor ........................ Date ________

Exchange Agreement expires ........................ Date ________

Environmental Site Assessment Level I (acquired land) ........................ Date ________

Environmental Site Assessment Level I (divested land) Date ________

Appraisal Review (acquired land) ........................ Date ________

Appraisal Review (divested land) ........................ Date ________

## Service Divestiture Requirements

All associated NEPA and Service Divestiture Requirements have been met ........................ Yes__ No__

Divesting of Farm Service Agency Interest ........................ Yes__ No__

## Attached Supporting Documents

Environmental Action Statement or Environmental Assessment ........................ Yes__ No__

Environmental Action Statement (divested land with supporting doc. if relevant) ........................ Yes__ No__

Maps showing acquired and divested land ........................ Yes__ No__
(Prepared to Service Standard)

I hereby certify that the above exchange complies with all requirement of law, rules or regulation applicable to FWS and any portion thereof or all documents will be available as requested.

______________________ Regional Realty Officer

______________________ Date

## ATTACHMENT

**References used to justify items below:**

A. Statement of Compliance. Referred to by memorandum from the Director to the Regional Directors, subject Changes to the Land Acquisition Planning Procedures, dated August 11, 2000. This Statement or Certificate, signed by the Regional Director lists various laws, regulations, policy directives, and Executive Orders that must be complied with prior to making decisions on land acquisition and land disposals. See also Service Manual (342 FW 5.7).

B. Environmental Site Assessment Level I for acquired land. Referred to by memorandum from the Director to the Regional Directors, subject Changes to the Land Acquisition Planning Procedures, dated August 11, 2000. (See 341 FW 3) Also, referred to by memorandum from the Director to the Regional Directors, Region 1-7, subject 1999 Appropriations Act and 342 FW 5.7.

C. Environmental Site Assessment Level I for divested land. This document is referred to by memorandum from the Director to the Regional Directors, Region 1-7, subject 1999 Appropriations Act and 342 FW 5.7.

D. Appraisal Review for acquired land. Appraised value is referred to by memorandum from the Director to the Regional Directors, Region 1-7, subject 1999 Appropriations Act and 342 FW 5.7.

E. Appraisal Review for divested land. Appraised value is referred to by memorandum from the Director to the Regional Directors, Region 1-7, subject 1999 Appropriations Act and 342 FW 5.7. (see below)

**F. Associated NEPA document is the Environmental Action Statement (EAS) with proper action statement marked. Even thought other NEPA documents might be required to determine the action and could be requested by HQ only the EAS with other supporting documents identified if necessary will be required with the checklist. The exception is Farmer Service Agency Interest; the EAS will have the following document identified and attached; 1) Explanation of no net loss of Habitat; 2) Refuge Suitability Statement or Biological Assessment; 3) request of Waiver for Conservation Easement; and 4) Statement of no objection from FSA. For more detail see "H" below.**

**G. Associated Service Divestiture Requirements. Before divesting any lands of the United States, it is essential that the requirements of the National Historic Preservation Act of 1966 (16 U.S.C. 470 et seq.); the Archeological and Historic Preservation Act of 1974 (16 U.S.C. 469 et seq.); the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (94 Stat. 2767 et seq.); the Resource Conservation and Recovery Act (98 Stat. 3221 et seq.) and Executive Orders 11988 (Floodplains Management) and 11990 (Protection of Wetlands) be complied with. Executive Orders 11988 (Floodplain Management) and 11990 (Protection of Wetlands). Service policy is included in 613 FW 1 and 2 (Natural Resources Protection). As to lands or interests in lands being conveyed out of United States ownership by exchange, the Regional Director must make a determination whether or not the lands are within a floodplain or wetlands within the scope of EO**

**11988 and EO 11990. The conveyance of land identified as being restricted by either of these orders must contain appropriate restrictive language. Any restrictive language to be used in the deed must also be included in the exchange agreement. The exchange agreement in such cases cannot be accepted until the procedures for public notices have been completed.**

H. Divesting of Farm Service Agency Interest. The December 4, 1989, National Policy Issuance #89-21, Protection of Important Resources on Farmers Home Administration Inventory Property, and the August 10, 1988, memorandum from the director to the Regional Directors, Region 1-7, subject Delegation of Authority and Procedures for Accepting Fee Titles Transfer of Farmers Home Administration Inventory Properties into the National Wildlife Refuge System.

I. **Attached Supporting Documents**

1. Environmental Action Statement. Referred to by memorandum from the Director to the Regional Directors, subject Changes to the Land Acquisition Planning Procedures, dated August 11, 2000. Formally the Environmental Action Memorandum (EAM) serves as the vehicle for the review and final approval for all Service actions that require NEPA documentation and establish the administrative record of compliance. In the FWS Environmental Quality Manual, Part 550 National Environmental Policy Act, 550 FW 3.3C through 3.3C(4)

**2. Environmental Action Statement (divested land). Serves as the vehicle for the review and final approval for all Service actions and establish the administrative record of compliance. In the FWS Environmental Quality Manual, Part 550 National Environmental Policy Act, 550 FW 3.5C (1) (b) through 3.5C(2) (f).**

3. Three (3) maps showing acquired and divested land prepared to Service standards.

*This page intentionally left blank*

Exhibit VIII-1

# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Bishop Henry Whipple Federal Building
1 Federal Drive
Fort Snelling, MN 55111-4056

IN REPLY REFER TO:
FWS/R3/NWRS-MNV

JUN 17 2009

Mr. Daniel M. Jobe, Design Engineer
Scott County Highway Department
600 County Trail East
Jordan, Minnesota 55329-9339

Dear Mr. Jobe:

The U.S. Fish and Wildlife Service (Service) has reviewed your application letter dated June 8, 2009, submitted on behalf of the Scott County Highway Department, requesting a minor expansion of County State Aid Highway 23 onto Service administered habitat and wetland easements in Scott County, Minnesota. We have determined that the proposal would have no long-term adverse effects on the interests for which the easement was acquired and a right-of-way permit from the Service would not be required for the work as described in the application in keeping with Code of Federal Regulations 50 Part 29.21-1(b).

The United States easements are on the fee title ownership of Daniel M. and Lois Wixon property and the Steven J. and Barbara P. Cervneka property in Section 34 Township 113 North Range 22 West, Scott County, Minnesota. We have no objection to the project, provided that there are no objections by the fee owners (Daniel and Lois Wixon, Steven and Barbara Cervneka).

To ensure that the mitigation measures outlined in the document "State of Minnesota Department of Transportation and Scott County Department of Public Works and Rice County Highway Department Project Memorandum and Programmatic Section 4(f) Document"

For
SP 70-686-01 (Scott County)/SP 66-686-01 (Rice County)
SP 6602-26 (TH19=100) and SP 7013-02 (TH19=100)
Minn. Proj. No. STPX 7009(015)
Scott County SCAH 86 and Rice County CSAH 86

are implemented for this project, a special use permit containing specific stipulations will be issued to you by Mr. Charles W. Blair, Refuge Manager, Minnesota Valley National Wildlife Refuge and Wetland Management District. Mr. Blair can be contacted at 952-858-0721.

Sincerely,

Charles M. Wooley
Acting Regional Director

*This page intentionally left blank*

Exhibit VIII-2

# United States Department of the

FISH AND WILDLIFE
SERVICE Mountain-Prairie

IN REPLY REFER
Refuges/RE
LA-Rights-of-Way
Procedures
Mail Stop 60135

MAILING ADDRESS: Post Office Box 25486 Denver Federal Center Denver, Colorado 80225-0486

STREET LOCATION: 134 Union Blvd. Lakewood, Colorado 80228-1807

APR 5 2002

Simplified ROW Policy

Memorandum

To: All Refuge Project Leaders, Region 6

From: Acting Regional Chief, National Wildlife Refuge System, Region 6

Subject: Rights-of-Way and Permits for Minor Disturbance Projects

This memorandum addresses recent questions regarding minor surface disturbances and decisions on granting rights-of-way versus issuing permits for such disturbances. It follows an e-mail distributed by Ron Shupe and Harvey Wittmier in August 2001.

Recent right-of-way (ROW) requests involving rural water lines have raised the question of whether a formal ROW or a special use permit should be the appropriate permitting mechanism for crossing grassland easements. These projects usually involve very minor disturbance with immediate backfill by the contractor. When such projects cross grassland or wetland easements each project leader must make a judgment call on the significance of the action including long-term maintenance of the line.

Our basic guidance is that if the maintenance is very infrequent and the initial disturbance very. temporary and minor, a special use permit can be used. Examples of temporary, minor disturbances include a typical rural water line with a 12-inch wide trench, small underground cables, or roads where only the construction process, not the long-term disturbance, is the impact on the easement.

Professional judgment is required on a case-by-case basis and, when in doubt, give us a call and we can discuss what would be most appropriate. We want efficiency but not at the expense of protecting our interests. If a special use permit is used the applicant must understand that any future activity will require a new special use permit and such a permit request can be denied.

If you have any questions, please call your Refuge Program Supervisor or Harvey Wittmier, Chief, Division of Realty.

cc: PFW State Coordinators

Exhibit VIII-2


Ron
08/02/01 11:32

To: nd/sd/rw
cc: Ann

See Harvey's message below. This philosophy applies primarily to easements. If it is fee then a ROW is required. A lot of judgement is required on a case by case basis and when in doubt give either of us a call and we can discuss what would be most appropriate. We want efficiency, but not at the expense of protecting our interests. if a SUP is used the applicant must understand that any future activity will require a new SUP> Any questions give me a call.

Ron Shupe

Refuge Supervisor, ND/SD
(303) 236-8145 EXT 647
----- Forwarded by Ron Shupe/R6/FWS/D01 on 08/03/2001 12:15


Harvey Wittmier
08/02/2001 10:43 AM

To: Patrick Russell/R6/FWS/DOI@FWS, Tonna Hughes/R6/FWS/D01@FWS, Gary L Sullivan/R6/FWS/DOI@FWS, Stu Wacker/R6/FWS/DOI@FWS
cc: Betty Adler/R6/FWS/DOI@FWS, Ron Shupe/R6/FWS/DOI@FWS, Patty Stevens/R6/FWS/D01@FWS
Subject: ROW's for minor disturbance projects

Recent ROW requests in South Dakota involving rural water lines have raised the question of whether a formal ROW or a simple special use permit could be used as our permiting mechanism. These are projects that involve very minor, usually less than a 12" wide trench with immediate backfill by the contractor. When such projects cross grassland easements each project leader must make a judgement call on the significance of the action, including long term maintenance of the line. I discussed alternative approaches with Ron Shupe and there is no absolute answer on when to use a ROW and when to use a special use permit ...... it is a judgement call. Ron's basic guidance is that, if the maintenance is very infrequent and the initial disturbance very temporary and minor, a special use permit could be used. If, however, the maintenance is frequent and the disturbance longer term, then a ROW would be better. Since the pipeline owner would need a special use permit to do maintenance (if no ROW was granted) there is an efficiency of scale issue in making a decision.

I know this is not a clear cut answer to you questions, but it does give refuge project leaders some discretion.

_______________________________

Harvey Wittmier

US Fish and Wildlife Service Help Sheet
for Road Rights-of -Way Expansion Permit
Applications

This Help Sheet is intended to assist State, County and Township road authorities seeking a permit for road reconstruction or expansion projects that affect US Fish and Wildlife Service (Service) lands within the counties of Otter Tail, Wilkin, Grant, Douglas and Wadena Counties. The MN DOT and County Engineers should have up to date maps and/or GIS layers showing the location of all US Fish and Wildlife Service fee title and easement lands. If not individuals can contact the US Fish and Wildlife Service Office in Fergus Falls for this information.

The Service is required to comply with a number of federal laws before they can grant a permit to expand a road right-of-way (ROW). These regulations cover both fee title and wetland/habitat easement properties. If at all possible road authorities should consider construction that completely stays within the existing ROW. This will negate the need for a permit. ROW requests for totally new roads across Service lands cannot be found compatible with the purposes for these lands and will more than likely be denied. Generally ROW permits cannot be approved by the local Service office but rather are issued by the Regional Office in Fort Snelling, MN.

Situations where a <u>Special Use Permit can be issued bv</u> the Local Office

If the following circumstances apply a Special Use Permit can be issued by the local office. Because Archeological clearance is needed it will take 60-90 days to issue the special use permit.

1. No expanded permanent ROW is needed over Service lands only a temporary construction easement. Signs, fences, parking areas, etc. will be replaced at their original locations and all disturbed sites outside of the existing ROW will be restored.

2. Construction activities outside of the existing ROW will be limited to <u>Upland Areas.</u> (i.e. no fill will be placed in any Service protected wetlands within the temporary easement area)

3. No native prairie will be impacted. (i.e. sod that has never been broken and farmed) Service staff will need to determine if the site contains native prairie.

4. No impacts occur to federally endangered, threatened or candidate species as well as state species of special concern.

5. Clearance in writing must be obtained from the State Historical Preservation Officer (30+ days required).

If the above conditions cannot be met a formal ROW permit is needed.

*This page intentionally left blank*

## NEPA- Some Definitions

**Migratory Bird Treaty Act (MBTA)-** Originally passed in 1918, implements the United States' commitment to four bilateral treaties, or conventions, for the protection of a shared migratory bird resource. The primary motivation for negotiation of the 1916 treaty and the passage of the MBTA was to stop the "indiscriminate slaughter" of migratory birds by market hunters and others. The MBTA was subsequently amended as treaties were signed with Mexico (1936, amended 1972 and 1999), Japan (1972), and Russia (1976). The Canadian treaty was amended in December 1995 to allow traditional subsistence hunting of migratory birds.

Each of the treaties protects selected species of birds and provides for closed and open seasons for hunting game birds. The MBTA protects over 800 species of birds by implementing the 4 treaties within the United States. The list of migratory bird species protected by the MBTA appears in Title 50, section 10.13, of the Code of Federal Regulations (50 CFR 10.13).

The MBTA provides that it is unlawful to pursue, hunt, take, capture, kill, possess, sell, purchase, barter, import, export, or transport any migratory bird, or any part, nest, or egg or any such bird, unless authorized under a permit issued by the Secretary of the Interior. Some regulatory exceptions apply. Take is defined in regulations as: "pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to pursue, hunt, shoot, wound, kill, trap, capture, or collect." The MBTA protects over 800 species of birds that occur in the U.S. Additional information can be obtained at the following links:

http://www.fws.gov/permits/mbpermits/ActSummaries.html

http://www.fws.gov/permits/mbpermits/regulations/mbta.html

http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?c=ecfr&tpl=/ecfrbrowse/Title50/50cfr21_main_02.tpl

http://alaska.fws.gov/ambcc/ambcc/treaty_act.htm

**Endangered Species Act (ESA)-** Endangered Species Act of 1973 (16 U.S.C. 1531-1544, 87 Stat. 884), as amended -- Public Law 93-205, approved December 28, 1973, repealed the Endangered Species Conservation Act of December 5, 1969 (P.L. 91-135, 83 Stat. 275). The 1969 Act had amended the Endangered Species Preservation Act of October 15, 1966 (P.L. 89-669, 80 Stat. 926). The 1973 Act implemented the Convention on International Trade in Endangered Species of Wild Fauna and Flora (T.I.A.S. 8249), signed by the United States on March 3, 1973, and the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere (50 Stat. 1354), signed by the United States on October 12, 1940.

Through federal action and by encouraging the establishment of state programs, the 1973 Endangered Species Act provided for the conservation of ecosystems upon which threatened and endangered species of fish, wildlife, and plants depend. The Act:

- authorizes the determination and listing of species as endangered and threatened;
- prohibits unauthorized taking, possession, sale, and transport of endangered species;
- provides authority to acquire land for the conservation of listed species, using land and water conservation funds;
- authorizes establishment of cooperative agreements and grants-in-aid to States that – establish and maintain active and adequate programs for endangered and threatened wildlife and plants;
- authorizes the assessment of civil and criminal penalties for violating the Act or regulations;
- authorizes the payment of rewards to anyone furnishing information leading to arrest and conviction for any violation of the Act or any regulation issued there under.

Additional information can be obtained at the following links:

http://www.fws.gov/laws/lawsdigest/esact.html

http://www.fws.gov/Endangered/pdfs/esaall.pdf

http://www.nmfs.noaa.gov/pr/laws/esa/

http://www.nmfs.noaa.gov/pr/pdfs/laws/esa.pdf

http://www.epa.gov/lawsregs/laws/esa.html

**Section 7-** that section of the Endangered Species Act 1973, as amended, outlining procedures for interagency cooperation to conserve Federally listed species and designated critical habitats.  Section 7(a)(1) requires Federal agencies to use their authorities to further the conservation of listed species.  Section 7(a)(2) requires Federal agencies to consult with the Services to ensure that they are not undertaking, funding, permitting, or authorizing actions likely to jeopardize the continued existence of listed species or destroy or adversely modify designated critical habitat.  Other paragraphs of this section establish the requirement to conduct conferences on proposed species; allow applicants to initiate early consultation; require FWS and NMFS to prepare biological opinions and issue incidental take statements.  Section 7 also establishes procedures for

seeking exemptions from the requirements of section 7(a)(2) from the Endangered Species Committee.

Additional information can be obtained at the following links:

http://www.fws.gov/endangered/consultations/s7hndbk/s7hndbk.htm

http://www.fws.gov/Endangered/factsheets/consultations.pdf

http://www.fws.gov/Endangered/consultations/sec7_faq.html

http://www.nmfs.noaa.gov/pr/pdfs/laws/sec7regs.pdf

http://sero.nmfs.noaa.gov/pr/pdf/BA_guide_comboeh081105.pdf

**Action-** all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to: (a) actions intended to conserve listed species or their habitat; (b) the promulgation of regulations;(c) the granting of licenses, contracts, leases, easements, rights-of- way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air. See 50 CFR §402.02…

http://frwebgate.access.gpo.gov/cgi-bin/multidb.cgi

**Action Agency-** the agency proposing the action. Refer to definition of Action above. See 50 CFR §402…

http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?c=ecfr&tpl=/ecfrbrowse/Title50/50cfr402_main_02.tpl

**Applicant-** refers to any person, as defined in section 3(13) of the Act, who requires formal approval or authorization from a Federal agency as a prerequisite to conducting the action. See 50 CFR §402…

http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?c=ecfr&tpl=/ecfrbrowse/Title50/50cfr402_main_02.tpl

**Conference-** a process of early interagency cooperation involving informal or formal discussions between a Federal agency and the Services pursuant to section 7(a)(4) of the Act regarding the likely impact of an action on proposed species or proposed critical habitat. Conferences are: (1) required for proposed Federal actions likely to jeopardize proposed species, or destroy or adversely modify proposed critical habitat; (2) designed

to help Federal agencies identify and resolve potential conflicts between an action and species conservation early in a project's planning; and (3) designed to develop recommendations to minimize or avoid adverse effects to proposed species or proposed critical habitat. See 50 CFR §402.10…

http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?c=ecfr&sid=e05d9a0f53bd0bd0524eebfa5dba1abe&rgn=div8&view=text&node=50:7.0.3.11.2.2.33.1&idno=50

**Consultation(s)-** meetings, phone calls, e-mail, written documents etc., as it relates to ESA (MBTA, MMPA, etc.) related to a proposed action. May occur as an informal or formal consultation (see below) and may occur within (intra-agency) or between (inter-agency) Federal agencies related to a proposed action. Example of an intra-agency consultation would be Division of Refuges consulting informally with Ecological Services regarding a proposed wind project at a specific location. Such informal consultations may be elevated to the formal status if "the proposed action may affect a listed species or designated critical habitat."

**Formal Consultation-** a process between the Services and a Federal agency or applicant that:

1. determines whether a proposed Federal action is likely to jeopardize the continued existence of listed species or destroy or adversely modify designated critical habitat
2. begins with a Federal agency's written request and submittal of a complete initiation package
3. concludes with the issuance of a biological opinion and incidental take statement by either of the Services. If a proposed Federal action may affect a listed species or designated critical habitat, formal consultation is required (except when the Services concur, in writing, that a proposed action "is not likely to adversely affect" listed species or designated critical habitat). See 50 CFR §402.02 and 50 CFR §402.14…

http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?c=ecfr&sid=6bcb184a214bc12704bdde099b2e9cd1&rgn=div8&view=text&node=50:7.0.3.11.2.2.33.5&idno=50

**Informal Consultation-** an optional process that includes all discussions and correspondence between the Services and a Federal agency or designated non-Federal representative, prior to formal consultation, to determine whether a proposed Federal action may affect listed species or critical habitat. This process allows the Federal agency to utilize the Services' expertise to evaluate the agency's assessment of potential effects or to suggest possible modifications to the proposed action which could avoid potentially adverse effects. If a proposed Federal action may affect a listed species or designated

critical habitat, formal consultation is required (except when the Services concur, in writing, that a proposed action "is not likely to adversely affect" listed species or designated critical habitat). See 50 CFR §402.02 and 50 CFR §402.13…

http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?c=ecfr&sid=6bcb184a214bc12704bdde099b2e9cd1&rgn=div8&view=text&node=50:7.0.3.11.2.2.33.4&idno=50

**Intra-Service Consultation-** may be formal or informal consultation(s); within the USFWS such as discussed above.

**Inter-Agency Consultation-** typically takes the form of a formal consultation between the action agency and the USFWS (or NMFS), particularly if the proposed action may affect either a listed species or designated critical habitat.

**Biological Opinion (BO)-** document which includes: (1) the opinion of the U.S. Fish and Wildlife Service or the National Marine Fisheries Service as to whether or not a Federal action is likely to jeopardize the continued existence of listed species, or result in the destruction or adverse modification of designated critical habitat; (2) a summary of the information on which the opinion is based; and (3) a detailed discussion of the effects of the action on listed species or designated critical habitat. See 50 CFR §402.02 and 50 CFR §402.14(h)…

http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?c=ecfr&sid=6bcb184a214bc12704bdde099b2e9cd1&rgn=div8&view=text&node=50:7.0.3.11.2.2.33.5&idno=50

**Biological Assessment (BA)-** information prepared by, or under the direction of, a Federal agency to determine whether a proposed action is likely to: (1) adversely affect listed species or designated critical habitat; (2) jeopardize the continued existence of species that are proposed for listing; or (3) adversely modify proposed critical habitat. Biological assessments must be prepared for "major construction activities." See 50 CFR §402.02. The outcome of this biological assessment determines whether formal consultation or a conference is necessary. See 50 CFR §402.02 and 50 CFR §402.12…

http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?c=ecfr&sid=6bcb184a214bc12704bdde099b2e9cd1&rgn=div8&view=text&node=50:7.0.3.11.2.2.33.3&idno=50

**Environmental Impact Statement (EIS)-** mandated under Section 102(2)(C) of NEPA when the action agency *knows* or *suspects* the proposed action might be significant…the primary purpose of an environmental impact statement is to serve as an action-forcing device to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government. It shall provide full and fair discussion

of significant environmental impacts and shall inform decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment. Agencies shall focus on significant environmental issues and alternatives and shall reduce paperwork and the accumulation of extraneous background data. Statements shall be concise, clear, and to the point, and shall be supported by evidence that the agency has made the necessary environmental analyses. An environmental impact statement is more than a disclosure document. It shall be used by Federal officials in conjunction with other relevant material to plan actions and make decisions.

http://ceq.hss.doe.gov/NEPA/regs/ceq/1502.htm

**Environmental Assessment (EA)-** a concise public document for which a Federal agency is responsible that serves to:

1. briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact,
2. aid an agency's compliance with the Act when no environmental impact statement is necessary, and
3. facilitate preparation of a statement when one is necessary.

The EA shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

http://ceq.hss.doe.gov/Nepa/regs/ceq/1508.htm#1508.9

**Incidental Take-** take of listed fish or wildlife species that results from, but is not the purpose of, carrying out an otherwise lawful activity conducted by a Federal agency or applicant. See 50 CFR §402.02…

**"Take"-** Take is defined under MBTA and *ESA* as: "pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to pursue, hunt, shoot, wound, kill, trap, capture, or collect (*or to attempt to engage in any such activities*)." See also definition and information as it relates to the Marine Mammal Protection Act of 1972.

http://www.fws.gov/laws/lawsdigest/marmam.html

Incidental Take Authorization- letters or 'authorizations' from the USFWS or NMFS to provide for incidental take provided USFWS or NMFS provided the Service finds the takings will/would be of small numbers and have no more than a "negligible impact" on those species not listed as depleted under the MMPA (i.e., listed under the Endangered Species Act (ESA)), and not having an "unmitigable adverse impact" on subsistence harvests of these species. These "incidental take" authorizations, also known as Letters of Authorization or LOAs, require that regulations be promulgated and published in the Federal Register outlining:

1. permissible methods and the specified geographical region of taking

2. the means of effecting the least practicable adverse impact on the species or stock and its habitat and on the availability of the species or stock for "subsistence" uses, and,
3. requirements for monitoring and reporting, including requirements for the independent peer-review of proposed monitoring plans where the proposed activity may affect the availability of a species or stock for taking for subsistence uses.

In 1986, Congress amended both the MMPA, under the incidental take program, and the ESA to authorize takings of depleted (and endangered or threatened) marine mammals, again provided the taking (lethal, injurious, or harassment) was small in number and had a negligible impact on marine mammals.

http://www.nmfs.noaa.gov/pr/permits/incidental.htm

http://www.fws.gov/endangered/permits/index.html

http://www.fws.gov/forms/3-200-56.pdf

**Incidental Harassment Authorization (IHA)-**

**"Harassment"-** defined under ESA (see HCP below), MBTA, but included herein based on definition provided for MMPA in 1994…harassment is statutorily defined as, any act of pursuit, torment, or annoyance which--

- (Level A Harassment) has the potential to injure a marine mammal or marine mammal stock in the wild; or,
- (Level B Harassment) has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering but which does not have the potential to injure a marine mammal or marine mammal stock in the wild.

**Habitat Conservation Plan (HCP)-** Under section 10(a)(2)(A) of the Act, a planning document that is a mandatory component of an *incidental take permit application*, also known as a Conservation Plan. See information at link below.

http://www.fws.gov/endangered/hcp/hcpbook.html

**Categorical Exclusions (CATEX)-** a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (Sec. 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. An agency may decide in its procedures or otherwise, to prepare environmental assessments for the

reasons stated in Sec. 1508.9 even though it is not required to do so. Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

http://ceq.hss.doe.gov/Nepa/regs/ceq/1508.htm

http://ceq.hss.doe.gov/ntf/report/chapter5.pdf

**Compatibility Determination (CD)-** the agency requires compatibility determinations for any management activity on a national wildlife refuge resulting in generation of a commodity that we sell for income or revenue or trade for goods or services, as defined in 603 FW 2 as “refuge management economic activities.” Examples include farming, grazing, haying, and timber harvesting.We do not require compatibility determinations for habitat management activities that do not result in generation of a commodity. We do not require compatibility determinations for habitat management activities described in an HMP unless the HMP proposes a habitat management activity not addressed in the CCP.

When is a compatibility determination not required? For Refuge Management Activities.

- The agency does not require a compatibility determination for refuge management activities as defined by the term "refuge management activity" except for "refuge management economic activities." Examples of refuge management activities that do not require a compatibility determination include: prescribed burning; water level management; invasive species control; routine scientific monitoring, studies, surveys, and censuses; historic preservation activities; law enforcement activities; and maintenance of existing refuge facilities, structures, and improvements. In addition, we do not require compatibility determinations for State wildlife management activities on a national wildlife refuge pursuant to a cooperative agreement between the State and the Fish and Wildlife Service where the refuge manager has made a written determination that such activities support fulfilling the refuge purposes or the System mission.

Additional information relative to CDs and NEPA can be obtained at the following links:

http://www.fws.gov/policy/603fw2.html

http://www.fws.gov/policy/550fw3.html

http://www.fws.gov/policy/620fw1.html

# Memorandum of Understanding
Between the
U.S. Fish and Wildlife Service, Huron Wetland Management District
And the
Clipper Wind Energy Consortium

## I. AUTHORITY

This agreement between the U.S. Fish and Wildlife Service, Huron Wetland Management District (hereinafter referred to as the “Service”) and the Clipper Wind Energy Consortium (hereinafter referred to as “Clipper”) is entered into under the authority of the Fish and Wildlife Coordination Act, 16 U.S.C. 661-667, Intergovernmental Cooperation Act (31 U.S.C.6505) and the provisions of the Interior and Related Agencies Appropriation Act, Public Law 108-7 (Department of the Interior and Related Agencies Appropriations Act, 1995), National Wildlife Refuge Administration Act as amended by the National Wildlife Refuge System Improvement Act of 1997.

## II. BACKGROUND

The Service currently holds and continues to acquire easement agreements with private landowners that protect wetland and grassland resources from being adversely impacted. These are perpetual agreements and as a deed restriction the agreements remain with the land as ownership changes. A variety of development activities or uses are occasionally proposed on easement lands, such as wind energy development, which can adversely impact these easements. The Service works with landowners and company representatives to avoid and reduce impacts to the resources protected by these easement contracts. The Service has a formal process in an Official Easement Manual which directs the review and response to these requested activities or uses..

## III. PURPOSE AND OBJECTIVES

The purpose of this Memorandum of Understanding is to provide an understanding of the process and requirements of the Service in administration of grassland and wetland easements. The agreement also identifies the intent of the requesting entity to provide information and commit to various actions associated with a requested activity on a grassland or wetland easement.

## IV. RESPONSIBILITIES OF THE PARTIES

The Service agrees to:

*provide companies, entities or landowners site specific information on the specific location of Service grassland and wetland easements and the requirements and terms of the areas protected.

*provide onsite review and consultation to discuss tower and facility siting with the

purpose of avoiding or reducing impacts to the extent possible. There may be special circumstances where avoidance of easement lands will be required.

*consult and assist in addressing National Environmental Protection Act (NEPA) requirements, including cultural and wildlife resources.

*issue the necessary permits either as a Special Use Permit and/or a Right of Way permit. In situations where location of towers and facilities are determined appropriate within an easement property, permits will be issued within a timely manner.

Clipper agrees to:

*provide location and siting information of wind towers and facilities to the Service as early in the planning process as possible.

*avoid easements to the extent possible and where reasonable alternatives are not available and when siting of towers or facilities are deemed unavoidable on easement lands, work with the Service to reduce impacts on the easements to the extent possible.

*for project activities that impact grassland and wetland easement protected areas, file an application for a right of way permit pursuant to the regulations in 50 CFR, part 29 subpart B. The right of way permit will require that the requesting entity provide full bonding to cover removal and complete site restoration of the wind tower and associated facilities that exist on easement areas.

*in consultation and cooperation with the Service, meet the requirements of NEPA. This will generally be addressed through an Environmental Assessment or a categorical exclusion, but does not preclude the development of an Environmental Impact Statement if necessary. This will include but not be limited to a review of cultural and wildlife resources,

V. PERIOD OF PERFORMANCE

The agreement shall stand in effect from the date of the last signature below until rescinded by either party with a 30 day notice. The agreement may be modified at any time by mutual agreement of both parties.

VI. PROJECT OFFICERS

| | |
|---|---|
| Harris Hoistad | Stu Webster |
| Project Leader | Field Representative |
| Huron Wetland Management District | Clipper Wind |

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be executed as of the date of the last signature below.

| | |
|---|---|
| U.S. FISH AND WILDLIFE SERVICE | CLIPPER WIND ENERGY |
| ______________________________ | ______________________________ |
| Harris Hoistad | Stu Webster |
| Date______________________________ | Date______________________________ |

*This page intentionally left blank*

# Cultural Resource Review Procedures for Projects in Region 6

21 October 2013

The U.S. Fish and Wildlife Service is responsible for the stewardship of thousands of cultural resources, including both archaeological and historic sites, located on lands under their jurisdiction. The following procedures are designed to help fulfill that obligation and commitment by outlining the process for the cultural resource review of projects in Region 6. The purpose of this process is to ensure that historic properties are considered during project planning and implementation and to facilitate compliance with federal laws, executive orders, regulations and Service policies.

<u>Projects Needing Cultural Resource Review</u>

All undertakings, as defined below, should be evaluated for their potential to impact cultural resources. This applies to projects on fee-title, easement, and private lands. These general procedures should also be followed during processes associated with the National Environmental Protection Act (NEPA).

<u>Purpose and Legal Framework</u>

The following procedures outline the process for the cultural resource review of projects in Region 6. This is largely accomplished through Section 106 of the National Historic Preservation Act (NHPA), although a suite of laws govern Federal agency responsibilities concerning cultural resources. Please see attached summary of some of the applicable cultural resource laws, regulations, and policies.

If there are any questions concerning these procedures, whether a project needs review or has already undergone review, or any other aspect of the cultural resource program, please contact any of the staff listed below. The cultural resource staff will make recommendations concerning various options to fulfill our legal obligations but compliance with cultural resource laws, as with other compliance obligations, is ultimately the responsibility of the Project Leaders (614 FW 1.6.I).

| | | |
|---|---|---|
| Brant Loflin | Montana, Wyoming, Utah | 406.994.9949 (Bozeman) |
| Meg Van Ness | Colorado, Kansas, Nebraska | 303.236.8103 (Denver Regional Office) |
| Barry Williams | South Dakota, North Dakota | 701-355-8577 (Bismarck) |

<u>Definitions</u>

Below are three key definitions for terms used in the process:

Cultural resources

Cultural Resources are sites, buildings, structures and objects that are the result of human activities and are over 50 years old. They include prehistoric, historic, and architectural sites, artifacts, historic records, and traditional use areas or sacred sites that may or may not have artifactual evidence.

Historic Properties

Historic properties are cultural resources (historic or prehistoric) that are listed on, or are eligible to be listed on, the National Register of Historic Places.

Undertaking (16 U.S.C. 470w, Section 301(7)

"Undertaking" means a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including —

(A) those carried out by or on behalf of the agency;
(B) those carried out with Federal financial assistance;

(C) those requiring a Federal permit, license, or approval; and
(D) those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency.

Cultural Resource Review Procedures

The following six steps summarize the general procedure for cultural resource review. A flow chart diagramming these steps is attached. The exact application of these procedures will vary from project to project depending on the nature, size, location of the project, and the cultural resources involved. Additional information and details can be found in the Section 106 regulations (36 CFR 800; http://www.achp.gov/work106.html).

Cultural Resource staff should be notified as early in the planning process as possible – even if the project is still in the conceptual phase as this process can take just a few days or can extend over many months. A project should not proceed until the cultural resource review has been completed and you have received confirmation from the cultural resource staff of such.

1. Information sent to cultural resource staff

   A *Request for Cultural Resource Review* form should be completed and submitted for each project (see attached form). A PDF version of this form which you can complete is available. The information can be mailed, faxed, or emailed.

2. Initial review of the project

   The cultural resource staff will recommend if further review of the project is necessary. If the project does not qualify as an undertaking, or if it is determined that the undertaking has no potential to affect historic properties, the review process may be over, the project lead will be contacted, and the project may proceed.

   If it is determined that the project is an undertaking with the potential to affect historic properties additional review will be recommended. The project lead will be contacted and the status of the review and plans for additional work will be discussed. Consultation with the State Historic Preservation Officer (SHPO), Tribal Historic Preservation Officers (THPOs), and other interested parties may be initiated at this point.

   If you do not hear back from the cultural resource staff when you need to please contact us and remind us that the project is waiting for review – do not assume there are no cultural resource concerns. At certain times of the year we get extremely busy and reminding us of your schedule is a great help in prioritizing reviews.

3. Investigations

   Depending on the nature, size, and timing of the project, FWS staff will continue the review process or it will be done by consultants. Most refuge, fire, and PFW projects are done by the cultural resource staff. The staff will collect the necessary information, from existing records or in the field, to determine if historic properties will be affected. If, due to project schedule, need for specialized expertise or workload, the cultural resource staff cannot perform the work necessary, a consultant may need to be hired as a part of the project budget.

   If the project involves a commercial company (pipelines, wind towers, railroads, oil and gas development, etc.), or if the project involves another agency (Department of Transportation, County, etc.) that company or agency will be asked to hire a consultant to do the work. If the work is done by a paid consultant rather than a federal agency archeologist, the consultant needs

to contact the cultural resource staff and obtain an ARPA permit before they do any field work and the report documenting the findings needs to be sent to the cultural resource staff for review.

4. Report preparation and findings recommendation
A report will be prepared summarizing the project, the results of the information gathering and the field work, and findings with recommendations. Either historic properties will be affected or not. If there are no historic properties present or there are historic properties present but the undertaking will have no effect upon them, it will be recommended that the project proceed with no further review. If there are historic properties which may be affected by the undertaking, it will be recommended that additional consultation and planning take place.

5. Consultation on findings
The report will be sent to the SHPO by the cultural resource staff along with a letter requesting their concurrence with the findings. It may also be sent to the appropriate THPOs or other interested parties for their concurrence or comments. Consulting parties initially have 30 days to comment but may require additional time.

   If the finding is that no historic properties will be affected (no adverse effect) and the consulting parties concur with those findings then the project may proceed with no further review after the letter(s) of concurrence is received.

   If the finding is that no historic properties will be affected (no adverse effect) and a consulting party disagrees additional consultation may be necessary.

   If the finding is that historic properties will be affected (adverse effect), then the cultural resource staff will continue consultation in coordination with the project manager to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize or mitigate adverse effects on historic properties. In this case another entity, the Advisory Council on Historic Preservation (ACHP) may also become a consulting party.

6. Resolution of Adverse Effects
If agreement to resolve the adverse effect to a historic property can be made in consultation with the SHPO/THPO, possibly the ACHP, and other interested parties, a Memorandum of Agreement (MOA) will be implemented outlining the plans to resolve the adverse effects. The activities outlined in the MOA need to be completed prior to the start of the project unless other arrangements have been made. The MOA will be signed by the field manager or other official and it is the responsibility of the station to assure that the provisions outlined in the documents are successfully completed.

<u>Special Considerations</u>

Human Remains

If human remains are possibly present (looks like a grave site, local residents believe there is a burial, possible human bones are present, etc.) or if human remains are found during project construction, stop work in that area immediately and call the cultural resource staff for that state. Do not remove anything and close-off public access. This holds true for all projects regardless of land status and for all states. Because of looting problems, do not discuss the matter with anyone until the cultural resource staff has a chance to respond.

Unanticipated Discoveries

If you find any cultural resource or paleontological remains please let us know as soon as possible. If it is in danger (in a road, eroding out, in a place where public might pick it up, etc.) take photos, GPS it in, and collect it. Otherwise leave it in place but take photos and GPS the location. In any case, contact the FWS cultural resource staff for your state as soon as possible. If there is any chance there are human remains or anything associated with a burial, don't remove anything, stop work in that area, and contact us immediately.

Educational and Training Opportunities

Let us know if there is anything we can do (training, workshops, presentations, etc.), for the staff or the public that would be of help. Also let us know if you need information on the cultural resource work that has been done in your area.

Exhibit IX-3


Cultural Resource Review for Projects in Region 6
Please see procedure narrative for details
1
Information sent to cultural resource staff
2
Initial review of the project
2.1
Project is an undertaking – additional review and file search needed
2.1
Not an undertaking / no potential to affect a historic property
DONE
3
Record search and possibly field work
4.1
No historic properties affected
4.2
Historic properties affected
5.1
Consultation parties agree
5.2
Consultation parties don't agree.
Possible additional consultation
5.3
Consultation parties agree
DONE
6
MOA executed and implemented
DONE

**Key Cultural Resource Legislation, Regulations and Policies:**
**Summary Information**

NOTE: This is a brief summary of some of the laws and regulations concerning USFWS responsibilities for cultural resources. It is not intended to be comprehensive and additional information is available on the USFWS web page (www.fws.gov/historicPreservation/crp/authorities.html)

## National Laws

1. Antiquities Act of 1906 as amended
   Public Law 59-209; 34 Stat. 225; 16 USC 431-433
   This is the earliest and most basic legislation for protecting cultural resources on Federal lands. It provides misdemeanor-level criminal penalties to control unauthorized uses. Appropriate scientific uses may be authorized through permits, and materials removed under a permit must be permanently preserved in a public museum.

2. American Indian Religious Freedom Act of 1978 as amended
   Public Law 95-431; 92 Stat. 469; 42 USC 1996
   This Act (AIRFA) resolves that it shall be the policy of the United States to protect and preserve for the American Indian, Eskimo, Aleut, and Native Hawaiian the inherent right of freedom to believe, express, and exercise their traditional religions, including access to religious sites, use and possession of sacred objects, and freedom to worship through ceremonial and traditional rites.

3. Archeological and Historic Preservation Act of 1974 as amended
   Reservoir Salvage Act 1960, PL 86-523; 74 Stat. 220, 221; 16 USC 469; PL 93-291; 88 Stat. 174; 16 USC 469
   This Act provides for the preservation of historical and archaeological data that might otherwise be lost as the result of Federal construction projects or Federally-licensed or assisted programs.

4. Archaeological Resources Protection Act of 1979 as amended
   Public Law 96-95; 93 Stat. 721; 16 USC 47Oaa et seq.
   Often referred to as ARPA, this act is primarily a permitting and law-enforcement law that has felony-level penalties for excavating, removing, damaging, altering, or defacing any archaeological resource more than 100 years of age, on public or Indian lands, unless authorized by a permit. It prohibits the sale, purchase, exchange, transportation, receipt, or offering of any archaeological resource obtained in violation of any regulation or permit under the act or under any Federal, State, or local law.

5. Historic Sites Act of 1935 as amended
   Public Law 74-292; 49 Stat. 666; 16 USC 461
   The Historic Sites Act declares national policy to identify and preserve nationally significant "historic sites, buildings, objects and antiquities."

6. National Environmental Policy Act of 1969, as amended
   42 USC 4321, and 4331 - 4335
   NEPA states it is the Federal government's continuing responsibility to use all practicable means to preserve important historic, cultural, and natural aspects of our national heritage. It also instructs Federal agencies to prepare environmental impact statements for each major Federal action having an effect on the environment.

NEPA and NHPA Coordination (Sec. 101 [42 USC § 4331]
(b) In order to carry out the policy set forth in this Act, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may --

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity, and variety of individual choice;

7. <u>National Historic Preservation Act of 1966</u> as amended
Public Law 89-665; 80 Stat. 915; 16 USC 470
NHPA is perhaps the premier legislation that governs cultural resource work on USFWS lands. The Act creates the National Register of Historic Places and extends protection to historic places of State and local as well as national significance. It establishes the Advisory Council on Historic Preservation, State Historic Preservation Officers, Tribal Preservation Officers, and a preservation grants-in-aid program. Section 106 directs Federal agencies to take into account effects of their actions ("undertakings") on properties in or eligible for the National Register, and Section 110(a) sets inventory, nomination, protection, and preservation responsibilities for Federally-owned cultural properties. Section 110(c) requires each Federal agency to designate a Preservation Officer to coordinate activities under the act. Section 106 of the act is implemented by regulations of the Advisory Council on Historic Preservation, 36 CFR Part 800. The Department of the Interior criteria and procedures for evaluating a property's eligibility for inclusion in the National Register are at 36 CFR Part 60.

8. <u>Native American Graves Protection and Repatriation Act of 1990</u>, as amended
Public Law 101-601; 104 Stat. 3048; 25 USC 3001 et esq.
NAGPRA establishes rights of Indian tribes and Native Hawaiian organizations to claim ownership of certain cultural items, including human remains, funerary objects, sacred objects, and objects of cultural patrimony, held or controlled by Federal agencies and museums that receive Federal funds. It requires agencies and museums to identify holdings of such remains and objects, and to work with appropriate Native Americans toward their repatriation. Permits for the excavation and/or removal of cultural items protected by the act require Native American consultation, as do discoveries of cultural items made during Federal land use activities. The Secretary of the Interior's implementing regulations are at 43 CFR Part 10.

9. <u>National Wildlife Refuge System Improvement Act of 1997</u>
Public Law 105–57
This Act outlines general management goals for the Refuge system including protection and interpretation of cultural resources.

10. <u>Reservoir Salvage Act of 1960</u>, as amended
16 USC 469-469c
This extended the Historic Sites Act of 1935. It gave the Department of the Interior, through the National Park Service, major responsibility for preservation of archaeological data that might be lost specifically through dam construction.

# Executive Orders, Policies and Guidelines

1. Consultation and Coordination with Indian Tribal Governments
   Executive Order 13175, 2000
   "By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to establish regular and meaningful consultation and collaboration with tribal officials in the development of Federal policies that have tribal implications, to strengthen the United States government-to-government relationships with Indian tribes, and to reduce the imposition of unfunded mandates upon Indian tribes..."

2. Indian Sacred Sites
   Executive Order 13007, 1996
   "By the authority vested in me as President by the Constitution and the laws of the United States, in furtherance of Federal treaties, and in order to protect and preserve Indian religious practices, it is hereby ordered..."

3. Preserve America
   Executive Order 13287
   "It is the policy of the Federal Government to provide leadership in preserving America's heritage by actively advancing the protection, enhancement, and contemporary use of the historic properties owned by the Federal Government, and by promoting intergovernmental cooperation and partnerships for the preservation and use of historic properties".

4. Fulfilling the Promise
   "[Refuges] are places where the people of today can renew the ties to their cultural heritage by viewing ancient and historic sites. These ties, delivered through the System's public use programs, strengthen the connection between wildlife and people".

5. USFWS Cultural Resources Management Policy
   1992, 614 FW 1, Policy, Responsibilities and Definitions
   This establishes, in section I.4, that "It is the policy of the Service to identify, protect, and manage cultural resources located on Service lands and affected by Service undertakings, in a spirit of stewardship, for future generations". Undertaking is defined in Section I.7(M) as "Any Federal, federally assisted, or federally licensed project, activity, or program that can result in changes in the character or use of known or unknown historic properties, if any such properties are located in the area of potential effects. These may include new and continuing projects, activities, or programs and any of their elements not previously considered under the provisions of 36 CFR 800.

6. Administrative and Enforcement Procedures for FWS Easements within the Prairie Pothole States (Regions 3 and 6) 2005: Pages 12-13
   Activities normally associated with easement properties are not usually considered "undertakings" under Federal cultural resource laws. Private landowners may do what is necessary to manage their property without the need to comply with Federal cultural resource laws. These laws, however, do come into play for easement properties when either the project is completed with Federal funding, or for which there has been a permit issued authorizing the work, or both.

   Therefore, projects federally funded on private lands (ie Partners for Fish and Wildlife Program) are subject to NHPA requirements and need to be evaluated. Also, any activity for which

managers issue a Permit will also be subject to Section 106 of NHPA. These activities are generally restricted to ground surface disturbance-type activities (permits for dugouts, shelterbelt establishment, wind generators, highway improvement projects, utility line crossings, etc.). When a request is received, managers must evaluate whether the Service has jurisdiction. If we have no jurisdiction, then no permit is needed, and no CR compliance is necessary. An example would be a landowner who wants to build a house on an upland site where the land is encumbered with only a wetland easement.

Many of the projects requested by other entities (DOT, utility companies) will have CR evaluations already considered, but managers must insure that these issues are addressed before issuing a permit, and should be reviewed for sufficiency by your regional CR staff.

Consult with your regional Cultural Resources staff about CR responsibilities. They are ultimately responsible for compliance with these laws and policies. Their addresses and phone numbers are found in Exhibit II-4. The FWS website provides useful information about Cultural Resource responsibilities: www.refuges.fws.gov/cultural/links

7. Department of the Interior Policy on Consultation with Indian Tribes
December 2011, Secretary of the Interior Order No. 3317
The purpose of this Order is to update, expand, and clarify the Department'sPolicy on consultation with American Indian and Alaska Native tribes; and to acknowledge that The provisions for conducting consultation in compliance with Executive Order (E.O) 13175 (Consultation and Coordination with Indian Tribal Governments) and applicable statutes or administrative actions are expressed in the Department of the Interior Policy on Consultation with Indian Tribes.

8. Memorandum of Understanding Regarding Interagency Coordination and Collaboration for the Protection of Indian Sacred Sites
December 2012
The Departments of Defense, the Interior, Agriculture, Energy, and the Advisory Council on Historic Preservation (Participating Agencies) enter into this Memorandum of Understanding (MOU) to improve the protection of and tribal access to Indian sacred sites through enhanced and improved interdepartmental coordination and collaboration.

*This page intentionally left blank*

**PARTIAL TERM RELINQUISHMENT AND RELEASE**
**OF**
**WATERFOWL HABITAT PROTECTION EASEMENT IN THE UNITED STATES**

This instrument is made and executed this _________ day of ________________, 200_, by the UNITED STATES OF AMERICA, acting by and through the Secretary of the Interior or his authorized Representative.

WITNESSETH:

WHEREAS, under the authority of the of the North American Wetlands Conservation Act, 16 U.S.C. 4401-4412; the Migratory Bird Hunting and Conservation Stamp Act, 16 U.S.C. 718d(c); the Fish and Wildlife Act of 1956, 16 U.S.C. 742a-742j; the Emergency Wetlands Resources Act of 1986, 16 U.S.C. 3901; and the Land and Water Conservation Fund Act, 16 U.S.C. 460*l*-9(a)(1), the UNITED STATES OF AMERICA acquired an easement for waterfowl habitat protection dated _________________, and recorded on [date] in [recording information] in the records of _____________ County, [State] (hereinafter, the "Easement"), in which all right, title, and interest was assigned to the Secretary of the Interior for administration by the United States Fish and Wildlife Service as part of the National Wildlife Refuge System pursuant to the National Wildlife Refuge System Administration Act, 16 U.S.C. 668dd-ee.

WHEREAS, under the authority of the of the North American Wetlands Conservation Act, 16 U.S.C. 4401-4412; the Migratory Bird Hunting and Conservation Stamp Act, 16 U.S.C. 718d(c); the Fish and Wildlife Act of 1956, 16 U.S.C. 742a-742j; the Emergency Wetlands Resources Act of 1986, 16 U.S.C. 3901; and the Land and Water Conservation Fund Act, 16 U.S.C. 460*l*-9(a)(1), the UNITED STATES OF AMERICA, acting by and through the authorized representative, the U.S. Fish and Wildlife Service, for and on behalf of the Secretary of the Interior, is willing to accept a Conveyance of Easement for Waterfowl Habitat Protection dated ______________ to ________ acres of land in _________ County, [State], from [name of grantor], and as part of the consideration therefore is willing to exchange an interest in lands as authorized by the National Wildlife Refuge System Administration Act, 16 U.S.C. 668dd-ee.

NOW, THEREFORE, for and in consideration of the above-described exchange of interests in lands, the UNITED STATES OF AMERICA partially releases and relinquishes, for only the term and use herein specified, its waterfowl habitat protection easement interest in the following described lands (hereinafter, the "Released Lands"), as more particularly described on Map Exhibit A attached hereto and made a part hereof by reference, now owned by [landowner's name] and subject to the Easement:

[Legal description of the surveyed windpower facility footprint *or* legal subdivision of project site]

PROVIDED, This instrument releases and relinquishes only those waterfowl habitat

protection rights of the UNITED STATES OF AMERICA in the specific Released Lands described above and depicted on attached Map Exhibit A, and does not in any way affect those perpetual easement rights acquired by the UNITED STATES OF AMERICA in the other lands described in the Easement.

AND PROVIDED FURTHER, This instrument only releases and relinquishes the waterfowl habitat protection rights of the UNITED STATES OF AMERICA in the Released Lands for the duration and term of that instrument titled [name of windpower lease or other instrument], by and between [name of windpower company] (hereinafter, the "Company") and [name of landowner(s) or, as appropriate, his/her/their predecessor(s) in interest] dated ____________________________, and recorded on [date] in [recording information] in the records of _____________ County, [State] (hereinafter, the "Lease") [if not a lease, use another appropriate reference]). Upon termination of said Lease, this partial term relinquishment and release shall terminate, and the Easement shall automatically be reinstated on the Released Lands.

AND PROVIDED FURTHER, This instrument only releases and relinquishes the waterfowl habitat protection rights of the UNITED STATES OF AMERICA in the Released Lands for the purpose of the construction, operation, maintenance, and decommissioning of [number] wind power turbines and associated facilities, including but not limited to access roads and an energy collection system, as described in [NEPA document and/or license or other authorization: be sure to list all documents that precisely describe the project], and does not release or relinquish the waterfowl habitat protection rights of the UNITED STATES OF AMERICA in the Released Lands for any other purpose or use.

AND PROVIDED FURTHER, This instrument's partial term relinquishment and release of the waterfowl habitat protection rights of the UNITED STATES OF AMERICA in the Released Lands is expressly conditioned on the following terms:

(1) The Company shall comply with all environmental protection measures described in [NEPA document and/or license or other authorization], including, but not limited to, all measures specified in a restoration and protection plan for the Released Lands prepared by the Company and approved by the U.S. Fish and Wildlife Service.

(2) The Company shall comply with all facility decommissioning and site restoration and reclamation measures described in [NEPA document, restoration and protection plan, and/or license or other authorization]. As required by [that document/those documents], within __months of termination of the Lease and this partial term relinquishment and release, or within __ months of abandonment of the project (for purposes of this partial term relinquishment and release, "abandonment" means the cessation of operations for reasons other than a force majeuer event for a minimum of six months), the Company shall dismantle and remove from the Released Lands all towers, turbines, and associated facilities (including foundations and other subsurface facilities to a depth of __ feet). The Company shall remove all access roads and restore and reclaim the Released

Lands described above to their pre-project topography and topsoil quality, and reseed all disturbed areas with native vegetation, within __ months of project termination or abandonment.

(3) Financial surety.

(a) Before commencing construction, the Company shall furnish a continuing financial surety in the form of an irrevocable letter of credit (ILC) from a federally-insured financial institution rated investment-grade or higher in the amount of $____________ (said amount to be annually adjusted to reflect the percent of change in the average consumer price index for all items, city average, as published by the United States Department of Labor, Bureau of Labor Statistics), naming the UNITED STATES OF AMERICA as beneficiary thereof. The ILC shall be irrevocable, require presentation of no document other than a written demand and the ILC (and letter of confirmation, if any), expire only as provided in paragraph (3)(b) hereof, and be issued/confirmed by an acceptable federally insured financial institution as provided in paragraph (3)(c) hereof.

(b) The ILC shall cover the entire period for which financial security is required, as follows:

(i) The ILC shall expire no earlier than ___ months after termination of the Lease and this partial term relinquishment and release, or __ months after abandonment of the project. [Note: The ILC should expire no earlier than 12 months after the period allowed for site reclamation specified above; for example, if the Company is allowed 18 months after lease termination or project abandonment to reclaim the site, the ILC should expire no earlier than 30 months after lease termination or project abandonment]. The UNITED STATES OF AMERICA shall be entitled to draw on the ILC at any time during the 12 months preceding its expiration.

(ii) Alternately, the ILC shall have an initial expiration date that is a minimum period of one year from the date of issuance. The ILC shall provide that, unless the issuer provides the UNITED STATES OF AMERICA with written notice of non-renewal at least 60 days in advance of the current expiration date, the ILC is automatically extended without amendment (except for an annual adjustment in the amount of the ILC for inflation, as provided in paragraph (3)(a) hereof) for one year from the expiration date, or any future expiration date, until the period of coverage required by paragraph (3)(b)(i) hereof is completed and an authorized official of the UNITED STATES OF AMERICA provides the financial institution with a written statement waiving the right to payment. If the issuer provides a written notice of non-renewal at any time

during the period of coverage required by paragraph (3)(b)(1) hereof, the UNITED STATES OF AMERICA shall be entitled to immediately draw on the ILC.

(iii) In case of Lease renewal or extension, the period of coverage required by paragraph (3)(b)(i) hereof will be correspondingly extended.

(c) Only federally insured financial institutions rated investment grade or higher shall issue or confirm the ILC. Unless the financial institution issuing the ILC had letter of credit business of at least $25 million in the year preceding the issuance of the ILC, ILCs over $5 million must be confirmed by another federally-insured financial institution rated investment-grade or higher that had letter of credit business of at least $25 million in the year preceding the issuance of the ILC. The Company shall provide the United States Fish and Wildlife Service a credit rating from a recognized commercial rating service (as specified in Office of Federal Procurement Policy Pamphlet No. 7) that indicates the financial institution has the required rating(s) as of the date of issuance of the ILC. If, subsequent to issuance of the ILC, the issuing financial institution's rating drops below the required level, the Company shall have 30 days to substitute an acceptable ILC. If no such acceptable substitution is made within 30 days of the change in the financial institution's rating, the UNITED STATES OF AMERICA shall be entitled to immediately draw on the ILC.

(d) Any funds derived from the ILC by the UNITED STATES OF AMERICA shall be deposited in the General Fund of the United States Treasury without deduction for any charge or claim, and any performance of the project decommissioning and site restoration and reclamation activities described in paragraph (2) hereof by the UNITED STATES OF AMERICA is subject to the availability of appropriated funds. Nothing in this partial term relinquishment and release shall affect any liability or obligation of the Company or the owners of the Released Lands to perform project decommissioning or site restoration or reclamation activities pursuant to federal or state law.

(4) In case of non-compliance with the foregoing terms, the Company shall be entitled to thirty days following the receipt of written notice from the U.S. Fish and Wildlife Service to cure such noncompliance. If the noncompliance is not cured within this period of time, this partial term relinquishment and release shall terminate.

(5) In case of renewal or extension of the Lease by its own terms, this partial term relinquishment and release shall be similarly extended subject to each and every term and condition hereof, including but not limited to the financial surety requirements set forth in paragraph (3) hereof. Financial surety for the term of the

Lease renewal or extension must be submitted to the U.S. Fish and Wildlife Service no later than sixty days prior to the end of the initial Lease term. The provisions of this paragraph shall not apply to renewal or extension of the Lease term through amendment of the Lease or execution of a new lease; in such cases, this partial term relinquishment and release shall terminate and the Company's will be required to perform the facility decommissioning and site restoration and reclamation measures described in paragraph 2 hereof unless the UNITED STATES OF AMERICA executes a new partial term relinquishment and release.

(6) The terms and conditions of this partial term relinquishment and release shall be binding on the Company and its successors and assigns.

IN WITNESS WHEREOF, the UNITED STATES OF AMERICA has executed this instrument on the date first written above.

[Signature blocks]

*This page intentionally left blank*

Exhibit IX-5

# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Audubon National Wildlife Refuge
3275 11th St. NW
Coleharbor, ND 58531-9419

April 23, 2008

Tammy Fairbanks Realty Specialist
Bismarck Wetland Acquisition Office
Bismarck, ND 58501

Dear Tammy:

I'm writing concerning the Tim Strobel grassland easement acquisition. We are aware that a wind power lease has been acquired on this property by Ottertail Power. The lease allows for possible wind tower and transmission line construction. We are willing to accept the grassland easement subject to the wind lease. The wind lease does not guarantee that disturbance to the easement will occur. If or when it does occur we are willing to work with the power company to minimize the impact as best we can. The grassland easement acquisition should proceed. Any questions give me a call at 442-5474 ext 16.

Sincerely,

Mike Grabow
Biological Technician

This letter should also include the legal description of the wind lease and the proposed acquisition.

*This page intentionally left blank*

Exhibit IX-6

# CONSENT TO EASEMENT

Otter Tail Energy Services Company, Incorporated (OTESCO) is the successor in interest to Sheridan Ridge I, LLC, a Minnesota Limited Liability Company, whose address is 224 East Washington Avenue, Fergus Falls, Minnesota 56537, as the owner of a Wind Farm Easement Agreement of which Notice was executed by Timothy J. Strobel and Alberta Strobel, husband and wife, dated November 8, 2007, and recorded in Book C-83 of Misc. on Page 32, as Document Number 115792 in the office of the Register of Deeds/County Recorder/Registrar of Titles in the County of Sheridan, State of North Dakota.

For valuable consideration, OTESCO consents to an easement for Waterfowl Habitat Protection (grassland easement) executed by Timothy J. Strobel and Alberta Strobel, husband and wife, to United States Department of the Interior, U.S. Fish and Wildlife Service dated October 3, 2008, recorded in Book ______ of ________ on page ________, or as Microfilm, Document, or other Identifying Number ______________ in the office named above.

The easement is over the following described land in the above named county and state:

Grassland Easement

**T. 147 N., R. 75 W., 5th P.M.**
Section 17, N1/2N1/2NE1/4NE1/4SW1/4, W1/2SW1/4, W1/2E1/2SW1/4 less a tract described in Deed Book 58, page 14
Section 18, W1/2W1/2SE1/4, E1/2SW1/4SE1/4, W1/2NW1/4SE1/4SE1/4, S1/2SE1/4SE1/4
**T. 147 N., R. 76 W., 5th P.M.**
Section 23, South 18 acres of the West 30 acres of the NE1/4, W1/2NE1/4NW1/4, S1/2SE1/4NE1/4NW1/4, W1/2NW1/4, SE1/4NW1/4, E1/2SW1/4, E1/2E1/2E1/2W1/2SW1/4

OTESCO's consent to easement is premised upon the recognition by the U.S. Fish & Wildlife Service that the consent will not affect OTESCO's rights under the Wind Farm Easement Agreement, and that the grassland easement is subordinate to OTESCO's rights under its Wind Farm Easement Agreement.

Dated this 3rd day of April, 2009.

OTTER TAIL ENERGY SERVICES COMPANY, INC (OTESCO)

By: [signature]
George Koeck, Secretary

ACKNOWLEDGMENT

STATE OF NORTH DAKOTA )
) ss
COUNTY OF CASS )

On this 3rd day of April, 2009 before me personally appeared George Koeck, Secretary, known to me to be the person described in and who executed the foregoing instrument and acknowledged to me that he executed the same as his free act and deed.

Notary Public: [signature]

(SEAL) My Commission expires: ______________

JACQUELYN ROGNESS
Notary Public
State of North Dakota
My Commission Expires ... 10, 2012

*This page intentionally left blank*

Exhibit XI-1

United States Department of the
Interior Fish and Wildlife Service
Bureau of Sport Fisheries and Wildlife
Branch of Realty

DESCRIPTION

FAHEY, EDWARD TRACT ($5^2$X-1 ) 160,00 ACRES WATERFOWL PRODUCTION AREA RAMSEY COUNTY **NORTH DAKOTA** EASEMENT AUTHORIZED BY MIGRATORY BIRD HUNTING STAMP ACT OF MARCH 16, 1934, AS AMENDED DESCRIPTION: FIFTH PRINCIPAL MERIDIAN

R. 61 W. , T. 153 N., SEC. 36, SE1/4




Wetland Areas Easily

Wetland Areas Moderately

Scale - 4" = 1 mile

Wetland Areas Difficult to

Tracing Compiled by: R.S.B. Date: 1014/63 Checked by: W.A.R. Date: 10/4/63

Exhibit XI-1

CERTIFICATE OF INSPECTION AND POSSESSION
(Lands other than Federal Building

I, **Harold F. Duebbert**

a **Wetland Manager** of the Department of the Interior, Bureau of Sport Fisheries and Wildlife, hereby certify that on the 16th day of **January**, 19 *6 4*, I made a personal examination and inspection of that certain tract or parcel of land situated in the County of **Ramsey**, State of **North Dakota**, designated as Tract (32X, 1) and containing •' acres, (proposed to be) acquired by the United States of America for **Waterfowl Management Rights**,

l, That I am fully informed as to the boundaries, lines and corners of said tract; that I found no evidence of any work or labor having been performed or any materials having been furnished in connection with the making if any repairs or improvements on said land; and that I made careful inquiry of the above-named vendor .. ) and ascert ai ned that nothing had been done on or about said premises within the past six months that would entitle any person to a lien upon said premises

2. That I also made inquiry of the above-named vendor a XME s to (his) (XXXXX) rights of possession and the rights of possession of any person or persons known to (him) **(XXXX)** and neither found any evidence nor obtained any information showing or tending to show that any person had any rights of possession or other interest in said premises adverse to the rights of the above-named vendor or the

3. That I was informed by the above-named vendor (

xxxxxxx) that to the best of (his) (xxxxx) knowledge and belief there is no outstanding unrecorded deed, mortgage, lease, contract or other instrument adversely affecting the title to said premises.

' 4. That to the best of my information and belief after actual and diligent inquiry and physical inspection of said premises there is no evidence whatever of any vested or accrued water rights for mining, agricultural, manufacturing or other purposes; nor any ditches or canals constructed by or being used thereon under authority of the United States, nor any exploration or operations whatever for the development of coal, oil, gas, or other minerals on said lands; and that there are no possessory rights now in existence owned or being actively exercised by any third party under any reservation contained in any patent or patents heretofore issued by the United States for said land.

Exhibit XI-1

5. That to the best of my knowledge and belief based upon actual and diligent inquiry made there is no outstanding right whatsoever in any person to the possession of said premises nor any outstanding right, title, interest, lien or estate, existing or being asserted in or to said premises except such as are disclosed and evidenced by the public records.

6. That said premises are now wholly unoccupied and vacant except for the occupancy of
as tenant (s) at will, from whom disclaimer (s) of all right, title and interest in and to said premises, executed on the day of ,

Dated this

day o f **January**, **1964**

Harold F. Duebbert

Approved

Exhibit XI-1

United States Department of the
Interior Fish and Wildlife Service
Bureau of Sport Fisheries and Wildlife
Branch of Realty

DESCRIPTION

RYSAVY, ADOLPH TRACT (21X-1) 480,00
ACRES WATERFOWL PRODUCTION AREA RAMSEY COUNTY
NORTH DAKOTA EASEMENT AUTHORIZED BY MIGRATORY
BIRD HUNTING STAMP ACT OF MARCH 16, 1934, AS AMENDED DESCRIPTION: FIFTH
PRINCIPAL MERIDIAN

R. 60 W. , T. 156 N., SEC. 25, SE1/4




Wetlands

Scale - 4" = 1

Tracing Compiled by: W.A.R. Date: 2/26/63 Checked by: R.S.B.

Exhibit XI-2

United States Department of the Interior
Fish and Wildlife Service
Bureau of Sport Fisheries and Wildlife
Branch of Realty

DRAINAGE FACILITY MAP

MEIER, WILLIAM H. TRACT (10X,1-5) 474.50 ACRES
WATERFOWL PRODUCTION AREA FOSTER COUNTY NORTH DAKOTA
EASEMENT AUTHORIZED BY MIGRATORY BIRD HUNTING STAMP ACT OF MARCH 16, 1934, AS AMENDED
DESCRIPTION: FIFTH PRINCIPAL MERIDIAN
T. 147 N., R. 64 W. section 24, W½NE¼, NW¼, SE¼, except R.R. R.O.W. & strip of land listed in B. A5, P. 359




I hereby certify that this map represents the excepted drainage ditches and/or deleted wetlands referred to in the easement agreement executed March 30, 1973 and accepted on ________ ________.

/S/ JAMES G. GRITMAN
AREA MANAGER




Wetlands Deleted from the Provisions of the Easement

Wetlands Drained

Open Ditch

Scale - 4" = 1 mile

Map drawn by: W.A.R. Date: 6/5/73

*This page intentionally left blank*

Exhibit XI-3

# UNITED STATES DEPARTMENT OF THE INTERIOR
## FISH and WILDLIFE SERVICE
## BUREAU OF SPORT FISHERIES and WILDLIFE
## DIVISION OF LAND MANAGEMENT

JAGOW, WALLACE TRACT (69X, 1) ±60.[00] ACRES

EASEMENT AUTHORIZED BY MIGRATORY BIRD HUNTING STAMP ACT OF MARCH 16, 1934 AS AMENDED

DESCRIPTION: FIFTH PRINCIPAL MERIDIAN

T, 159 N R, 63 W Section 17, $SE^1/4$




I HEREBY CERTIFY THAT THIS SKETCH REPRESENTS THE FUNCTIONAL TILE OR OPEN DITCH DRAINS, INCLUDED IN THE EASEMENT AGREEMENT AMENDED 9/15/75 , IT IS UNDERSTOOD AND AGREED THAT THESE DRAINS CAN BE DEEPENED OR MAINTAINED AS DRAINAGE

Wallace Jagow (signature) — WALLACE

for Willard E. Stutz (signature) — RALPH F. FRIES, WETLAND

SCALE: 4 inches = I MILE

WETLANDS INCLUDED IN THE PROVISIONS OF THE EASEMENT.

DRAINAGE FACILITY NOT TO BE MAINTAINED

DRAINAGE FACILITIES THAT CAN BE MAINTAINED

MAP DRAWN BY: (signature) DATE: 9/15/75

AR001251

*This page intentionally left blank*

Exhibit XI-4

# Wetland Easement Mapping Progress Form

Easement County & Number:______________________________Map Initiation Date:_________________

Wetland District:___________________________Initiated By:______________________________________

Purpose (check one): ☐ Violation ☐ Request ☐ Proactive

Drafted By:_________________________Date(s) draft(s) sent to field office:_________________________

Reviewed By:_______________________Date(s) draft(s) sent back to HAPET:________________________

Verified (check one): ☐ Ground ☐ Aerial Date:________________

Easement Summary Acres___________________Estimated Mapped Acres____________________________

(*Notice: mapped acres listed here are only an estimate and are not meant to depict exact values. There is known error associated with off-site mapping and approvers use all available tools to ensure the error range (±10%) associated with the mapped acres listed does not exceed summary acres derived during the purchasing of the easement.)*

If originally over acres, estimate of acres deleted from the draft map(s):____________________________

Date digital wetland files merged and secured:______________________

Date final map printed to archival-quality paper:____________________

Final Map(s) Approved By:_______________________________________Date:_______________________

Date copy of map(s) sent to requesting landowner:________________________________

*This page intentionally left blank*

Exhibit XI-5

# Easement Mapping References

Easement Number ____________________ County ______________________________

| REFERENCE USED | FILE NUMBER\NAME (S) |
|---|---|
| ASCS Aerial Photo 195__ | |
| ASCS Aerial Photo 196__ | |
| ASCS Aerial Photo 197__ | |
| ASCS Aerial Photo 198__ | |
| ASCS Aerial Photo 199__ | |
| National Wetland Inventory Slide Film | |
| USGS DEM Topology (Quadrangle Name) | |
| APFO B & W Mid 1990's | ☐ Yes ☐ No |
| FSA 2003 True Color | ☐ Yes ☐ No |
| FSA 2004 True Color | ☐ Yes ☐ No |
| FSA 2005 True Color | ☐ Yes ☐ No |
| FSA 2006 True Color | ☐ Yes ☐ No |
| FSA 2008 True Color | ☐ Yes ☐ No |
| FSA 2009 True Color | ☐ Yes ☐ No |
| FSA 2010 True Color | ☐ Yes ☐ No |
| Digital Raster Graphics (Topo map) | ☐ Yes ☐ No |
| NWI Point, Line & Polygon Data | ☐ Yes ☐ No |
| Soils Maps | ☐ Yes ☐ No |
| Landcover Maps | ☐ Yes ☐ No |
| Other: | |
| Other: | |
| Other: | |
| Other: | |
| Other: | |

Notes:

*This page intentionally left blank*

Certified Mail #

County

Easement #000

John Landowner
Address
Town, ND 00000

Dear Mr. Landowner:

On March 3, 2001, you requested that the U.S. Fish and Wildlife Service (Service) provide you with map of protected wetlands located in the SW1/4 Section 1, T. 148 N., R. 85 W., County, North Dakota. Attached is the map as you requested.

The Service has purchased and owns perpetual rights which restrict or prohibit the right to drain, burn, level or fill any wetland basin depicted on the attached map. This map represents the Service's effort to depict the approximate location, size and shape of all protected wetlands based on information, maps and aerial photographs available at the time this map was prepared. However, wetlands are hydrologically dynamic systems, with expanding and contracting water levels. This map is not meant to depict water levels in the wetland in any given year. The Service reserves the right to correct this map provided the mapped acreage remains consistent with the Easement's Summary Acres.

The water levels of these wetlands naturally increase and decrease depending on the natural water cycle. The Service has procedures which allow landowners to remove sheet water or water from wetlands that are affecting roads and buildings. If issues arise concerning individual wetland basins represented on the map, each will be looked at on a case by case basis. It is the landowner's responsibility to contact the Service if there are any questions concerning the burning, draining, filling, and/or leveling of wetlands depicted on the easement wetland map you are being provided.

In summary there are three points to remember about this wetland easement map:

1. The map does not and is not intended to provide the exact size or configuration of the wetlands protected by the provisions of the easement.

2. Any burning, draining, filling or leveling of wetlands depicted on the wetland easement map without a permit issued by the Service is a violation of the provisions of the easement.

3. It is the landowner's responsibility to contact the Service if there are any questions concerning mapped wetlands.

If you have any questions about this map or the easement contract, please contact this office at phone number (701)

Sincerely,

Refuge Officer

Att: map; County Easement OOOOx

Cc: U.S. Fish & Wildlife Service (RE), Bismarck,

Certified Mail #

County

Easement #000

John Landowner
Address
Town, ND 00000

Dear Mr. Landowner:

On April 7, 1998, the U.S. Fish and Wildlife Service (Service) completed a map of wetlands located in the SW1/4 Section 1, T. 148 N., R. 85 W., protected by Service wetland easement OOOx County, North Dakota. The Service has purchased and owns perpetual rights which restrict or prohibit the right to drain, burn, level or fill any wetland basin that is shown on the map.

The Service purchased the County OOOx easement in 1967. To arrive at a payment figure for the easement, the Service realtor would have circled those areas he would have identified as wetlands on a black and white aerial photograph. These photos were not maintained as permanent file records and were used for many other purposes. There was no on the ground identification or inventory of the wetlands. The realtor then would have dot counted the circles to arrive at one approximate acreage figure, which is referred to as the "Summary Acreage", for the entire easement. Dot gridding is not a measurement of the exact size of individual wetlands. Each dot on the grid corresponded to a 0.4 acre area. Dots that overlaid wetlands were counted and the resultant number of dots, times 0.4 acres gave an approximation of the wetland acreage on the entire easement tract. The Service does not have acreage figures of individual wetland basins protected by the provisions of the County OOOx easement contract. A per acre monetary value was then applied to the "Summary Acreage" figure to obtain a payment value. Our records indicate that the Service Realtor based payment to the landowner for estimated - acres ("Summary Acreage" figure) for this easement.

The attached map(s) provided to you represents the Service's effort to depict the approximate location, size and shape of all wetland basins protected by the provisions of the easement contract using the "Summary Acreage" figure information, maps and aerial photographs available at the time this map was prepared. However, wetlands are hydrologically dynamic systems, with expanding and contracting water levels. This map is not meant to depict water levels in the wetland in any given year. The Service reserves the right to correct this map provided the mapped acreage remains consistent with the Easement's Summary Acres.

The water levels of these wetlands naturally increase and decrease depending on the natural water cycle. The Service has procedures which allow landowners to remove sheet water or water from wetlands that are affecting roads and buildings. If issues arise concerning individual

wetland basins represented on the map, each will be looked at on a case by case basis. It is the landowner's responsibility to contact the Service if there are any questions concerning the burning, draining, filling, and/or leveling of wetlands depicted on the easement wetland map you are being provided.

In summary there are three points to remember about this wetland easement map:

l. The map does not and is not intended to provide the exact size or configuration of the wetlands protected by the provisions of the easement.

2. Any burning, draining, filling or leveling of wetlands depicted on the wetland easement map without a permit issued by the Service is a violation of the provisions of the easement.
3. It is the landowner's responsibility to contact the Service if there are any questions concerning mapped wetlands.

If you have any questions about this map or the easement contract, please contact this office at phone number (701)

Sincerely,

Refuge Officer

Att: map; County Easement OOOOx

Cc: U.S. Fish & Wildlife Service (RE), Bismarck, ND WMD Easement File

Certified Mail #

County

John Landowner
Address
Town, ND 00000

Dear Mr. Landowner:

On March 3, 2001, the U.S. Fish and Wildlife Service (Service) provided you with a map of protected wetlands located in the SW1/4 Section 1, T. 148 N., R. 85 W., County, North Dakota. The Service has purchased and owns perpetual rights, which restrict or prohibit the right to drain, burn, level or fill any wetland basin that is shown on the map. [While conducting routine surveys of the wetland easement, on your land, it was noticed that a circle that had been drawn on the map indicating a wetland was, in actuality, a hill. Hills are not protected by the easement contract and the Service is sending you a revised map to reflect this change. - Or - While conducting routine surveys of the wetland easement on your land, it was noticed that a wetland had been missed during the mapping process. This is not unusual as easement maps are drawn with off-site tools such as, information, maps and aerial photographs available at the time the maps are prepared and are rarely ground checked, due to time constraints. The mapped acreage remains consistent with the wetland easement summary acres, with the addition of this wetland.] The attached wetland easement map is a revision of the map sent to you on March 3, 2001, to reflect the above change(s).

The attached map represents the Service's effort to depict the approximate location, size and shape of all protected wetland basins based on information, maps and aerial photographs available at the time this map was prepared. However, wetlands are hydrologically dynamic systems, with expanding and contracting water levels. This map is not meant to depict water levels in the wetlands in any given year. The Service reserves the right to correct this map provided the mapped acreage remains consistent with the Easement's Summary Acres.

The water levels of these wetlands naturally increase and decrease depending on the natural water cycle. The Service has procedures which allow landowners to remove sheet water or water from wetlands that are affecting roads and buildings. If issues arise concerning individual wetland basins represented on the map, each will be looked at on a case by case basis. It is the landowner's responsibility to contact the Service if there are any questions concerning the burning, draining, filling, and/or leveling of wetlands depicted on the easement wetland map you are being provided.

In summary there are three points to remember about this wetland easement map:

1. The map does not and is not intended to provide the exact size or configuration of the

wetlands protected by the provisions of the easement.

2. Any burning, draining, filling or leveling of wetlands depicted on the wetland easement map without a permit issued by the Service is a violation of the provisions of the easement.
3. It is the landowner's responsibility to contact the Service if there are any questions concerning mapped wetlands.

If you have any questions about this map or the easement contract, please contact this office at phone number (701)

Sincerely,

Refuge Officer

Att: map; County Easement OOOOx

Cc: U.S. Fish & Wildlife Service (RE), Bismarck, ND WMD Easement File

# REGION 3 EASEMENT SURVEILLANCE

**Region 3 Easement Aerial Inspection:**

Techniques have been developed for the use of in-flight navigation and surveillance equipment. Specifically, the use of Global Positioning Systems (GPS), Geographic Information Systems (GIS), and laptop and tablet computers to track the progress of the plane and display the locations of easements on-screen is now common. This technology replaces the use of a paper map as a means for navigating and recording violations from the plane. Steps should be taken to ensure that GIS layers are set-up as desired and navigation systems are operating correctly prior to flight day. It is advisable to retain paper county-wide maps during flights as backups just in case the electronic systems fail.

All easements will be checked for compliance at least once each year, either aerially or on the ground. The majority of Region 3 easements are located in Minnesota's Prairie Pothole Region. Current policy requires that all Small Wetland Acquisition Program (SWAP) and Northern Tallgrass Prairie Refuge easements (wetland and habitat are the two main types) in Minnesota be checked each year.

In geographic areas where easements are in high concentration, particularly in Minnesota, the most efficient way to monitor compliance is by aerial reconnaissance. However, in geographic areas where concentrations of easement properties are very low, acquiring aerial imagery becomes more costly and time prohibitive. For this reason annual flights are not required for FmHA easements or other easements in Region 3, outside the Prairie Pothole Region in accordance with Department, Service, and Region aviation policies.

The objective of the aerial inspections is to detect activities that may constitute a violation. Wetland easement violations include draining, filling, leveling, or burning of protected wetlands. Habitat and FmHA violations may include construction activities, encroachment, early haying, dumping, or grassland altering violations. For situations where an aerial flight is needed to address a known or possible problem, using Region 3's pilot, plane, and photography equipment, if available is recommended. If the Region 3 plane is not available, use a contract pilot. Because of the timing of the aerial inspections, discussed below under "Wetland Easement Flight Scheduling (Fall and Spring)," and "Habitat or FmHA Easement Flight Scheduling," wetland easements can be checked two times each year. However, July aerial surveys are primarily for habitat or FmHA easements. Wetland-altering violations generally are not visible during this time of the year. FmHA easements present a unique challenge for aerial inspection as many are wooded. An effort should be made to fly FmHA easements once a year during optimum times of little to no leaf cover.

## 1. <u>Pre-Flight Preparations</u>

In 2006, new techniques were developed for the use of in-flight navigation and surveillance equipment. Specifically, the use of Global Positioning System (GPS), Geographic Information Systems (GIS) software, and laptop computers to track the progress of the plane and display the locations of easements on-screen are now common. This technology replaces the use of a paper map as a means for navigating and recording violations from the plane.

The most relevant piece of GIS data for law enforcement compliance flights is the easement boundary layer.

Boundaries and tract information of all Service fee and less than fee lands (including easements) are recorded and managed as spatial data in the Service cadastral geodatabase, managed by the Cadastral Data Working Group (CDWG). The CDWG is comprised of Service realty and planning staff with GIS and/or surveyor backgrounds, with the Service Chief Cartographer serving as the team lead and data steward. The team records and updates all owned and managed land in the dataset, which is then provided to the Service and the public. In Region 3, tracts are spatially recorded in the Service cadastral database in addition to the tabular systems (Lands, Financial and Business Management System). Service Realty specialists work with the Service Realty cartographer to properly record each tract.

It is vitally important that this database be kept up-to-date and that federal wildlife officers monitor the accuracy of the database as it pertains to the easements in their jurisdiction. Minor easement boundary inaccuracies need to be addressed, but the information most important to aerial imagery acquisition is that all easements be present in the database and that the easement type is accurate. This information is used to develop flight plans for all of the easement flights. If the cadastral database is not accurate, there is a chance that some of the easements may be missed in the flight plan.

Another important function of the cadastral database is to target the correct easement types for the different flight periods. Flight plans could be more efficient if the easement attributes were accurate. For instance, conservation, FmHA, and flowage easements could be eliminated from the spring flights if necessary and be targeted during the summer flights, when more flight time is available.

## 2. <u>Wetland Easement Flight Scheduling (Fall and Spring)</u>

Fall flights (after crops are harvested and before snowfall) are preferred for detection of wetland-impacting activities on wet easements and provide the best timing to detect and record suspected violations with a follow-up ground check.

Field stations wishing to aerially inspect their easements with the use of a Service plane and camera must:

1. Contact their respective refuge law enforcement zone officer (RLEZO) and Service pilot with their request.

- These requests should be made during the winter (January or February) prior to inspection flight dates.

2. Once the request and dates have been confirmed the pilot contacts the designated GIS Wildlife Biologist who develops a flight plan for the area to be inspected through the use of GIS and camera software.

- If the Service plane and camera are not available other sources of aerial inspection should be investigated in accordance with Department, Service, and Region policies.

Due to the limited number of Service pilots and aircraft, combined with fewer vendors, the project leader should schedule flights as early as possible. If snow cover precludes completion of the survey, reschedule flights for the spring after the snow cover melts, but before crops are planted.

Spring flights for wetland easements, which should assist in detection of older, previously missed ditches, should be considered at least every 3 years. Alternately, the project leader should consider aerially inspecting one-third of the WMD each spring. The primary drawback of spring flights is the reduced time available for ground checks, file review, loss of fresh evidence, and landowner contacts prior to the start of the busy field season. The primary benefit is the increased visibility of all ditching activity due to spring runoff with water in ditches. Re-scheduling of spring flight rotations may necessary to ensure coverage of easements that were not able to be flown the previous fall.

### 3. <u>Habitat or FmHA Easement Flight Scheduling</u>

The mid-summer flight is primarily to check habitat easements and upland-restricted versions of FmHA easements that, due to the type of grassland and latitude, are most likely to be hayed or burned prior to July 16. Some NWRs/WMDs may not have habitat easement densities that would either require transects and/or second flights. If the manager can accomplish required surveillance by flying from easement to easement, can evaluate the easements adequately with only one flight, and/or can adequately and safely accomplish the monitoring with only one observer (in addition to the pilot), then it is acceptable to do so. If monitoring is occurring by taking aerial photos with the Service's belly-mounted camera it is not necessary to have an observer in addition to the pilot.

Some NWRs/WMDs may experience limited or no haying violation issues and in this case may choose to combine the annual habitat surveillance flight with the fall wetland easement surveillance flight, resulting in a single, combined all-inclusive fall easement surveillance flight. The use of a single all-inclusive fall flight is at the discretion of the

project leader and is dependent primarily on the NWR/WMD's violation history. Otherwise, the project leader should schedule the July flight close to July 15 (July 1-12) but early enough to ground-check, document, and measure the extent of any violation prior to the July 16 release date.

FmHA flights should occur during the fall, early or late winter, or spring. The demand for the use of the Service's plane and equipment may make it difficult to schedule flights when wetland easements are being aerially inspected during the middle of October to the middle of November. If aerial inspections are not possible during these times summer flights will work. It is important to get aerial photos of FmHA easements, even if it is during the summer.

Typical violations to watch for when flying over FmHA easements include illegal cropping, encroachment, timber harvest, ditching of wetlands, and building construction. It is important to read the covenants of the easements as they vary from one

**Service Plane and Pilot:**

Schedule flights the prior winter through your respective Zone Officer and Service pilot. Understand the following aspects of inspecting and photographing easements with the use of the Service plane, pilot, and equipment; and use these guidelines:

- The Service plane is equipped with a high resolution digital camera, GIS, and a flight following system. A pre-planned flight schedule will have been developed in advance by the Service's designated GIS Wildlife Biologist (GWB) for all confirmed easement flights.
- Depending upon the weather, use of the Service's belly-mounted camera may not be an option.
- Depending upon the weather, low level aerial inspection flights for wetland easements may have to be performed and if so, will require two employees in addition to the pilot. During the dates the NWR/WMD's wetland easements are scheduled to be flown, two employees need to be available as low level visual flights may be the only option.
- Paper easement maps must be available.
- All photographs taken with the Service's belly-mounted camera are saved on a hard drive
- At the end of the flight the pilot places the hard drive into a locked container that is picked up by the GWB.
- The GWB then uses software to convert the data into aerial images and geo-referenced pictures.

- The completed geo-referenced pictures are then sent overnight to the appropriate easement enforcement officer or federal wildlife officer. If the field station does not have an officer this information should be sent to the project leader.

- For time sensitive photos, the total time for field stations to receive surveillance photos—which is the time the pictures are taken by the pilot, the GWB converts the images, to sending the data overnight—should be no more than 3 days. Certain conditions could delay this 3-day turnaround, but every effort should be made to avoid delays. The two most likely issues that could cause a delay are the pilot not returning to the home airport after each day of flying and instances where photography is delivered for processing on Friday or Saturday.
- Once the officer receives this data he or she downloads the information, returns the hard drive, and starts reviewing the photographs looking for possible easement violations.
- These photographs are saved on the Region 3 office server.

*This page intentionally left blank*

# REGION 6 EASEMENT SURVEILLANCE

**Region 6: Easement Aerial Inspections**

## 1. Pre-flight preparations

Techniques have been developed for the use of in-flight navigation and surveillance equipment. Specifically, the use of Global Positioning Systems (GPS), Geographic Information Systems (GIS), and laptop and tablet computers to track the progress of the plane and display the locations of easements on-screen is now common. This technology replaces the use of a paper map as a means for navigating and recording violations from the plane. Steps should be taken to ensure that GIS layers are set-up as desired and navigation systems are operating correctly prior to flight day. It is advisable to retain paper county-wide maps during flights as backups just in case the electronic systems fail.

## 2. Wetland Easement Flight Scheduling (fall and spring)

Fall flights (after crops are harvested and before snow fall) are preferred for detection of wetland-impacting activities on wetland easements and provide the best timing to detect and record suspected violations with a follow-up ground checks. Traditionally, each wetland management district was responsible for scheduling their flights which often led to competition among stations for available planes. Flight scheduling was modified in 2013 to 1) ensure that stations with traditionally high violation rates are flying the optimum times, 2) provide station managers and officers with some certainty on when they can expect to be flying, and 3) remove the burden of annual flight scheduling from the pilots and station managers and instead move towards a structured approach which aligned easement flights with expected fall harvest progression.

While the timing of spring flights can be variable and is entirely dependent upon snow pack and the anticipated commencement of spring field work, fall flights are not. The challenge in timing fall flights is to fly after most ditching has occurred and before snow cover precludes detection. Also to be considered is the time necessary to complete ground checks before evidence of drainage is obscured, which can vary from one to several days depending on the number of violations. Ideally, stations with traditionally high violation rates will fly in early November and still have one to three weeks before snow pack. This would allow ground checks to be completed and hopefully restoration to take place.

Important Note: An early spring (planting season) and subsequent early harvest does not necessarily mean that it will be an early winter; therefore, it ***does not*** equate to earlier fall

flights. Again, the objective of fall flights is to detect as many violations as possible and to do that, flights should be conducted in late October and in November. The only exception is to wait and fly later (if at all) in years of an unusually late harvest.

Finally, the schedule below would require 20+ days with planes in the air; however, from 2010 through 2013, Service pilots have only been able to fly between 11 and 18 days due to weather/logistic constraints. It is highly unlikely that the schedule can be kept and all stations must remain flexible to react to changing conditions and opportunities.

*In general*, if a station is prevented from flying during its scheduled time due to weather, then all subsequent stations can expect to be bumped back. However, if a station only loses a day, then the planes should move on (keep the schedule below) with the hope of returning later in the fall, weather permitting. ***EXCEPTION…***priority station **hot zones** will be flown as scheduled and before planes move on (Devils Lake, JCS, Valley City, Madison).

Spring flights for wetland easements, which should assist in detection of older, previously missed ditches, should be considered at least every 3 years. Alternatively, the manager should consider flying one-third of the district each spring. The primary drawback of spring flights is the reduced time available for ground checks, file review, and landowner contacts prior to the start of the field season. The primary benefit is the increased visibility of all ditching activity due to spring runoff.

**Empirical Information – Minimum Flight Days Required**
**(For analysis purposes only)**

**Devils Lake - BEGINS THE SECOND TO LAST MONDAY OF OCTOBER**

5 flight days + 1 day for belly cam photos    2 planes for 3 days

Audubon and JCS on standby as backups

Caveat: Devils Lake typically experiences the highest violation rate in the Region with dozens of new cases each fall. They fly early with the understanding that, if necessary, they will fly their "hot zones" again in November. In this way, there exists ample time to do ground checks, landowner contacts, and complete restoration prior to freeze up.

**Group A: BEGINS LAST MONDAY OF OCTOBER**

| | | | |
|---|---|---|---|
| Lo/Cr/ML | - | 5 days | 1 plane for the week |
| Audubon | - | 2 days | 1 plane for 2 days |
| J. Clark | - | 3 days | 1 plane for 3 days |

Long Lake and Chase Lake on standby as backups

**Group B: BEGINS no later than the FIRST WEEK OF NOVEMBER**

| | | | |
|---|---|---|---|
| Valley City | - | 3 days | 1 plane for 3 days, 1 day for belly cam photos |
| Chase Lake | - | 2 days | 1 plane for 2 days |
| Arrowwood | - | 2 days | 1 plane for 2 days |

Kulm and Waubay on standby as backups

**Group C: BEGINS no later than the SECOND WEEK OF NOVEMBER**

| | | | |
|---|---|---|---|
| Long Lake | - | 2 days | 1 plane for 2 days |
| Kulm | - | 2 days | 1 plane for 2 days |
| Tewaukon | - | 2 days | 1 plane for 2 days |

Sand Lake and Madison as backup for weather

**Group D: BEGINS no later than the THIRD WEEK OF NOVEMBER**

| | | | |
|---|---|---|---|
| Sand Lake | - | 4 days | 2 plane for 3 days |
| Waubay | - | 3 days | 1 plane for 3 days, possible belly cam photos |
| Madison | - | 3 days | 1 plane for 3 days, possible belly cam photos |

If weather and ground cover remain clear, the second and/or third airplane could return to ND to complete northernmost areas desiring to finish as much as possible before snow covers everything.

**Group E: BEGINS no later than the FOURTH WEEK OF NOVEMBER**

| | | | |
|---|---|---|---|
| Huron **(2)** | - | 4 days | 1 plane for 4 days |
| Lake Andes | - | 2 days | 1 plane for 2 days |

- **If flights occurred only during weekdays, then it would take 4+ weeks to complete flights. However, there is an expectation that flights occur whenever weather is conducive, including weekends.**
- **Fall flights beginning on the last full week of October would, in most years, ensure flights were completed by the end of November unless weather and/or crop conditions delayed the flights. It's better to fly later and risk no fall flights than to fly too early.**
- **Spring flights are used to make-up for flights not completed during the fall, those areas called for in the easement manual, and/or to re-fly of hot zones.**
- **Fall flights should never commence prior to the second-to-last Monday in October.**

### 3. <u>Grassland Easement Flight Scheduling</u>

The mid-summer flight is primarily to check grassland/habitat easements and upland-restricted versions of FmHA easements which, due to the type of grassland and latitude, are most likely to be hayed or burned prior to July 16. Some districts may not have grassland/habitat easement densities that would either require transects and/or second flights. If managers can accomplish required surveillance by flying from easement to easement, can evaluate the easements adequately with only one flight, and/or can adequately and safely accomplish the monitoring with only one observer (in addition to the pilot), then it is acceptable to do so. Some districts may experience limited or no haying violation issues, and in this case may choose to combine the annual grassland surveillance flight with the fall wetland easement surveillance flight, resulting in a single combined all-inclusive fall easement surveillance flight. The use of a single all-inclusive fall flight is the discretion of the Manager, and is dependent primarily on the district's violation history. Otherwise, managers should schedule the July flight as close to July 15 as possible, but early enough to ground check, document, and measure the extent of any violation prior to July 16. Grassland easement flight scheduling will incorporate a three year rotation enabling stations to complete flights as close to July 15 as possible, utilizing Service planes and pilots. This type of scheduling will break the cycle of the same stations flying "early" (July 1-10) every year. The Regional Aviation Manager will coordinate the summer flight scheduling.

# AVIATION SAFETY TRAINING FOR EASEMENT MONITORING ACTIVITIES

## Aviation Safety Training Requirements

The initial training required for an individual to serve as a flight crewmember is as follows:

- A-100 Basic Aviation Safety
- A-110 Aviation Transport of Hazardous Materials
- A-116 General Awareness Security Training
- A-200 DOI/USFS Accident Review
- A-312 Water Ditching and Survival (only required for flights over water)

A-100, A-110, A-116, and A-200 can all be taken on-line, if A-312 is required, it must be taken in an instructor lead class. The on-line modules can be found at https://www.iat.gov.

For a flight crewmember to maintain a valid status, the following classes must be taken at the following intervals:

- A-100 Every two years
- A-110 Every three years
- A-200 Every three years
- A-312 (if required) Every two years, and you can substitute A-325 webinar

A-116 is only required to be taken once, there is no refresher.

Supervisors of observers and/or those who are responsible and accountable for using aviation resources to accomplish bureau programs are required to complete Aviation Management for Supervisors (M-3) and A-200, DOI/USFS Accident Review. The initial M-3 course must be taken in an instructor led course and the on-line refresher training must be taken every 2 years. A-200 can be taken on-line for both the initial training and the refresher. The refresher training must be taken every two years.

Exhibit XII-3

# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

In Response Reply to:
FWS/AMB/049695

OCT 1 7 2011

Memorandum

To: Service Directorate

From: Deputy Director [signature]

Subject: U.S. Fish and Wildlife Service Aviation Reforms

In December 2010, a U.S. Fish and Wildlife Service (Service) plane struck a wire in Reedsport, Oregon while conducting a migratory bird survey. Fortunately, no one was injured although the plane suffered significant damage. The DOI-Aviation Management's (DOI-AM) report (Aircraft Mishap Report 11-1H01-O-FWS) regarding the wire strike incident was reviewed by the National Aviation Manager, Migratory Birds and Refuges. Based on the Reedsport Report, we contracted a Service-wide aviation program review by an independent, unbiased entity. Bowhead Systems Management (Bowhead) was selected to perform this review. Although Bowhead's final report is forthcoming, we request your immediate attention to this very important issue because of outstanding safety concerns.

Regional Directors are responsible for implementing the following action items no later than December 31, 2011. Many of these issues can be addressed in a one stop method by organizing an Aviation Safety day within your respective Region/Program. Accomplishments of the items below are to be reported to the National Aviation Manager (NAM) through the Regional Aviation Manager.

1. All pilots and crewmembers will be in compliance with OPM 04 and 22. Pilots, crewmembers and their supervisors will make it their highest priority to complete all mandatory training obligations. All applicable on-line training must be completed prior to any aviation activities. Training deficiencies that require classroom or webinar presentations must be completed at the next available course offering. Aviation privileges will be suspended until pilots, crewmembers and/or their supervisors have complied with their mandatory training requirements.

2. Refresher training for Basic Aviation Safety (B3), Aviation Safety for Supervisors (M3) and Water Ditching and Survival when required, will be reduced to 2 years from 3 years. Initial Water Ditching and Survival training will include classroom and simulated dunking in a controlled environment with water depth no greater than 4 feet. Refresher Water Ditching and Survival training may be accomplished with a classroom only session but inclusion of the simulated dunking is preferred.

3. Project Aviation Safety Plans are required for "special-use" operations, excluding training and point to point travel. All existing plans are to be reviewed and/or developed and must include the following items:

- Supervision
- Project name/objective
- Justification
- Project date and location
- Projected cost of aviation resources
- Aircraft pilot and names of all aircrew and participants
- Flight following and emergency search and rescue
- Risk assessment utilizing the Safety Management System
- Personal protective clothing/equipment
- Load calculations and/or weight and balance information requirements.
- Supervisor and line officer approval signature

4. All Station Aviation Plans will be reviewed to ensure the following are included:

- Aerial hazard map
- Aircraft Pre-accident Plan
- Go/No go risk matrix. This standardized matrix will be developed by the National Aviation Manager and distributed no later than December 31, 2011. It must be included in all Station Aviation Plans as soon as it is available.

5. Attendance is mandatory at the upcoming National Pilot Ground School (NPGS). Non-attendance must be approved by Regional Directors. Regional Aviation Managers will advise the National Aviation Manager of any pilot that has been excused. The NPGS is scheduled for December 12-15, 2011 in New Orleans. The NPGS will be conducted every 2 years and will be rotated between Alaska and lower 48 States. The intent of the NPGS is to provide natural resource oriented training to Service pilots and to maintain their DOI training currency. The Washington Office will pay for the instructor's travel and associated costs. Each Region is responsible for their pilots' travel and per diem.

In addition to implementing the actions above, a Service Aviation Safety Policy Statement will now be included in all messages to the field when referencing aviation issues. This Aviation Safety Policy Statement will be posted to the FWS aviation home page.

We often refer to our employees as our greatest resource and there is no better way to demonstrate this than to provide them the resources and the training they need so that they can accomplish their work with the highest regard to safety and our conservation mission. Please contact Acting National Aviation Manager, Mr. Glenn Cullingford at 321-431-9352 if you have any questions. Thank you all for promoting a positive aviation safety culture within you're the Service.

Exhibit XII-3

# Interagency Aviation
# TRAINING BULLETIN

**No. IATNG 14-01** **Date: December 6, 2013**

**SUBJECT: A-100 Basic Aviation Safety Course**

In a collaborative effort, OAS Training Division worked with subject matter experts from DOI bureaus and the USFS to update and consolidate the existing B3 curriculum into one course: A-100 Basic Aviation Safety. The new course has been available for use for "bricks and mortar" delivery and is now available online.




The course replaces five older courses –
A-101 Aviation Safety
A-105 Aviation Life Support Equipment (ALSE)
A-106 Aviation Mishap Reporting
A-108 Preflight Checklist & Briefing/Debriefing
A-113 Crash Survival

DOI and USFS personnel who are required to take the B3 curriculum will now be required to take the A-100 Basic Aviation Safety course in order to maintain their qualifications. The next revision of the OPM-04 and the Interagency Aviation Training Guide will reflect these changes.

Personnel who previously completed the B3 curriculum will maintain currency in accordance with existing policy requirements. They are not required to take the A-100 prior to the date their B3 recurrence would be due. However, users are encouraged to take it sooner if able.

Bureau and agency aviation training instructors are encouraged to immediately begin using the new course materials and discontinue the use of the older modules. As of January 1, 2014, credit will no longer be given for the older modules. Instructors may request course materials by sending an email to iat_admin@ios.doi.gov.

/s/ Rick Gividen
Chief, Training Division
Office of Aviation Services
U.S. Department of the Interior

/s/ Donna Kreiensieck
Aviation Training Program Manager
U.S. Forest Service
U.S. Department of Agriculture

Exhibit XII-4

# EASEMENT VIOLATION DOCUMENTATION

EAS. NO. ______ COUNTY ______ DATE RECORDED ______

LEGAL DESCRIPTION ______ SEC. ______ T. ______ R. ______

OWNER ______ ADDRESS ______

TENANT ______ ADDRESS ______

TYPE OF VIOLATION ______ DATE DISCOVERED ______ BY ______

DATE VIOLATION FIELD CHECKED ______ BY ______

DATE VIOLATION OCCURRED ______ TYPE OF EQUIPMENT USED ______

DATE GROUND PHOTOS TAKEN ______ DATE AERIAL PHOTOS TAKEN ______

**WETLAND INVOLVED (IDENTIFY ON MAP)**

| WETLAND NUMBER | TYPE | ACRES | DITCH L x W x D | COMMENTS |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |

| **CONTRACTS** | **BY/DATE** | **ACTION** |
|---|---|---|
| REG. OF DEEDS | | |
| NRCS | | |
| FSA | | |
| SPECIAL AGENT | | |

| **PROGRESS CHECK LIST** | **DATE COMPLETED/BY** | **COMMENTS** |
|---|---|---|
| LANDOWNER CONTACT | | |
| CERTIFIED LETTER | | |
| 3rd PARTY STATEMENT | | |
| COMPLIANCE STATUS | | |
| RECOMMENDATIONS | | |
| DISPOSITION | | |
| | | |

## ADDITIONAL COMMENTS

PHOTO:

PHOTO:

Exhibit VII - 7 Exhibit XIII-1

# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

NOV 1 3 2013

In Reply Refer To:
FWS/AMRS/DRLE/054755

Memorandum

To: Regional Directors

From: Director

Subject: Using a Mobile Video Audio Recorder

This memorandum authorizes the use of government furnished electronic recording equipment (e.g. car cameras, personal video/audio recording devices) when operated by Federal Wildlife Officers (FWOs) while carrying out an authorized law enforcement activity.

The use of Mobile Video Audio Recorder (MVAR) is authorized, when any of the following apply:

a. FWOs are monitoring or recording conversations to which they are a party and while carrying out their official duties;

b. In situations in which all parties have given prior consent;

c. FWOs have obtained a court order to use an MVAR; or;

d. Providing video surveillance of areas visible in plain or open view where there is no reasonable expectation of privacy.

MVAR refers to a video and/or audio device, regardless of the medium, installed in a vehicle, or worn on the FWO's person (including, but not limited to: recording devices worn on the body, cell phone cameras, flashlight cameras, and "taser" cameras) and utilized to record a series of events.

FWOs must conform with Memorandum LE-9 (Consensual Monitoring) when recording audio conversations in situations where they do not identify themselves as a Federal law enforcement officer or are not readily identifiable as a Federal law enforcement officer (i.e. be in uniform).

A FWO is not authorized to use the MVAR for other than official government business. Nothing shall be construed as to require compliance of this memo when the FWO is in a situation beyond their immediate control (i.e. mechanical failures, actions by a third party).

It is recommended that FWOs complete an MVAR training course approved by the Chief, Branch of Training (BOT). The training, at a minimum, should include the following topics: situations for use of an MVAR; legalities of MVAR use; proper security procedures, evidence handling, and access restrictions for recording mediums and devices; and proper operation and maintenance of recording devices.

*This page intentionally left blank*

# VEGETATION ESTABLISHMENT AGREEMENT

This agreement, dated 2 - 1?, 19 95 by and between

Lynn Meyer and Guynell Meyer, husband and wife, hereinafter referred to as "landowner(s)", and the Fish and Wildlife Service, Department of the Interior, for and on behalf of the United States of America, hereinafter referred to as "Service", is entered into as required by the "Administrative and Enforcement Guidelines and Procedures for Perpetual Grassland Easements Manual" dated April 1, 1992.

Landowner(s) hereby agree(s) to conduct certain vegetation establishment practices on the land owned by (him) (them_ in Ward County, State of North Dakota, described as follows:

T. 155 N., _R. 87_ W., 5th P.M.

Section 27, SE1/4

containing 160 acres, more or less.

Landowner(s) and Service must agree to the conditions to be set forth under "Special Provisions" of this agreement before execution of a grassland easement on the above described property and landowner(s) agree to carry out those terms and conditions as set forth. The agreement may be modified at any time by written mutual consent of the landowner(s) and Service.

## SPECIAL PROVISIONS

The following vegetative seed mixtures and seeding rates will be established on the described agricultural land.

| | Vegetative Seed Species | | Pounds of Live _Seed per Acre |
|---|---|---|---|
| 1. | Western Wheatgrass | (ND common) | 4.0 |
| 2. | Slender Wheatgrass | (Prinar) | 0.54 |
| 3. | Green Needlegrass | (Lodorm) | 1.8 |
| 4. | Blue Grama | (SD common) | 0.13 |
| S. | Side Oats Grama | (Killdeer) | 1.14 |
| 6. | Big Bluestem | (MN common) | 4.0 |

Exhibit XIII-2

The following method and -schedules will be used to establish the required vegetative cover. (Specify ground preparation, planned seeding dates, and shortterm land use.)

SEE ATTACHED

Dat 2 - 17 - 95 ______ Landowner

Date 2/20/95 ______ U.S. Fish and Wildlife Service Department of the

ACKNOWLEDGEMENT

STATE OF NORTH
COUNTY OF TOWNER SS

On this 17th day of uar , 19 95 , before me personally appeared (he) executed the same.

LAURENCE R. VEIKLEY (Seal) NOTARY PUBLIC STATE OF NORTH DAKOTA

Laurence R. Veikley, Notary Public Ward County, North Dakota My commission expires March 2, 1999

ACKNOWLEDGEMENT

STATE OF NORTH DAKOTA )
COUNTY OF WARD SS

On this 21st day of 19 95 , before me personally appeared

Michael W. Goos . known to me to be the same person(s) described in

Laurence R. Veikley, Notary Publi
Ward County, Nor h
Dakot a

LAURENCE R. VEIKLEY (Seal) NOTARY PUBLIC STATE OF NORTH DAKOTA

Exhibit XIII-2

EXHIBIT A

SPECIAL PROVISIONS

PLANNED WORK:

Mr. Meyer agrees to plant 45.30 acres of cropland to Native Grass.This tract is being placed under a grassland easement which will protect the grass planting in perpetuity, and this agreement is contingent on the acceptance of said grassland easement *by* the United States of America. Mr. Meyer agrees to allow FWS personnel access to the area to monitor the success of the project.

Mr. Meyer agrees to prepare the seedbed and plant the grass by May 30, 1995 using a grass drill . Seeding depth shall be at an optimum 4 to -k"

The seed shall *be* planted in a firmly packed, clean seedbed. A properly compacted seedbed shall be firmed in a manner so that adult footprints are hardly visible.

The seeded site shall not be grazed for 2 full growing seasons, or until the native grasses are adequately established.

Mr. Meyer may hay the native grass planting after July 15th of each year, or when weed control is necessary, and he agrees to leave 10 to 12 " of stubble during the first 2 years if mechanical weed control is necessary.

Mr. Meyer agrees to plant the native grass species, improved varieties and mixtures as shown on the foregoing "Vegetation Establishment Agreement."

# EXHIBIT Native Grass Establishment Requirements

Dear Landowner,

You have made a perpetual decision to protect the grasslands on your property. You have requested to seed, reseed, or re- establish prior cropland to grassland. Depending on available funds and grants you may be able to receive cost share assistance for native grass seed. Since this is a perpetual grass stand we recommend that you plant native grass and forb species. There are several conditions that are required for you to receive a permit, such as seed bed preparation, seeding dates, seeding rates, clippings and no grazing the first two years.

If you want to seed existing cropland back to native grass, the best seed bed is to drill directly into soybean stubble the spring after harvest. Round-up ready soybeans would be best if drilled and not cultivated. Do not disturb the field after harvest, ie do not fall or spring till. A combination of chemicals could be used prior to seeding if necessary to control weed growth. If soybeans are not an option for your property, a chemically treated seedbed may be another option. The County Conservation District has a native grass drill that can be used for planting the native grass seed or a list of contractors can be provided.

If you want to re-establish native grass on a field that had been previously planted to tame grass such as smooth bromegrass, we recommend fall breaking and planting the field for two consecutive years to round-up ready soybeans. Then follow the same guidelines as above. Again if soybeans are not an option on your property, a treatment of haying, discing, chemically treating and planting may be another option.

If you want to inter-seed a monotypic stand or a weak stand of native grass, we recommend that you hay the field in September. Try to remove all of the top litter by raking, this will result in exposing areas of soil for the inter-seeding the following spring.
Native grass plantings generally have their greatest success when seeded in the spring from May 1 to July 1. You will be required to plant during this time frame or receive approval to deviate from these dates.

You may choose a variety of native grasses and forbs. When selecting native species to be planted, identify the prairie zone and the soil types of where your land is located. We recommend a minimum mixture of at least 5 species whether you are in the tall grass prairie, mixed grass prairie, or the short grass prairie zones. We also recommend a minimum of 8 pounds of Pure Live Seed be planted per acre.

Example of mixtures:

**Tall Grass Seeding**

| | |
|---|---|
| Big bluestem - | 2 lbs. PLS (Pure Live Seed) |
| Switch grass - | 2 lbs. PLS |
| Indian grass - | 2 lbs. PLS |
| Sideoats gramma - | 1 lbs. PLS |
| Western wheatgrass - | 1 lbs. PLS |

**Mixed Grass Seeding**

| | |
|---|---|
| Slender wheatgrass - | 1.30 lbs. PLS (Pure Live Seed) |
| Western wheatgrass - | 3.57 lbs. |
| Sideoats gramma - | 1.70 lbs. |
| Green needlegrass - | 1.95 lbs. |
| Little bluestem - | 1.25 lbs. |
| Blue gramma - | 0.23 lbs. |

Try to insure that the seed you buy has at least 80% purity and 80% germination. The origin of the seed should be locally within 100 miles of your field. If seed is not available of local origin, purchasing seed originating further than 100 miles east or west longitude or further north is acceptable. Do not purchase any seed over 100 miles south in latitude, as this seed will not be adapted to the shorter growing season. You can purchase the seed from any dealer you want to, or **the FWS** can give you the names of vendors that sell native grass seed.

After you get the native grass seed planted, you will need to monitor the annual weed growth. It is critical that the new native grass seedlings receive sun light and do not have to compete for moisture with annual weeds. You will be authorized in the easement permit to conduct clippings or hayings of the annual weeds the first two growing seasons prior to July 15 to get an established stand of native grass. We recommend no herbicide treatments the first growing season. You may apply a herbicide during the second growing season to control noxious weeds.

During the first two growing seasons, it is critical that the native grass gets a well established root system. This means that you will not be able to graze on the seeded area during the first two growing seasons because cows grazing can actually pull out new plants that haven't established a deep root system.

No matter what type of grassland restoration you are attempting, an easement permit is required. The permit will allow enough time for seedbed preparation, planting the native grass seed, and to conduct weed clippings the first two growing seasons. No other additional easement permits will be issued for the same field, until after the results of the permitted planting are evaluated in accordance with the above requirements.

*This page intentionally left blank*

Exhibit XIII-3

# Waterfowl Management Easement
# VIOLATION INTERVIEW CHECKLIST

Landowner of Record:
Address:
Person (s) Interviewed:
Address:
Easement Number:

Type of Violation:

Dated violation first observed: By:
Date violation confirmed: By:
Date of interview: Time:

Place of interview:

| | Yes | No |
|---|---|---|
| A. Explained Easement Contract | | |
| B. Aware of Easement | | |
| C. Committed Violation (See Comments) | | |
| D. Showed Violation Location on Map | | |
| E. Issued Copy of Map (Will be sent with confirmation letter) | | |
| F. Explained Restoration work Required | | |
| G. Set Compliance Deadline (If yes, when: after beans are harvested this fall) | | |
| H. Explained Consequences of Non-Compliance | | |
| I. Wants Copy of Easement Contract | | |
| J. Follow-up Certified Letter Sent | | |

Attitude of person (s) interviewed and subjects discussed:

This sheet prepared by: Date:
Other FWS personnel present during interview:
Concur:

*This page intentionally left blank*

Exhibit XIII-4

**U.S. Department of the Interior**
**U.S. FISH AND WILDLIFE SERVICE**
**KULM WETLAND MANAGEMENT DISTRICT**
**1 FIRST STREET SW, P.O. BOX E**
**KULM, NORTH DAKOTA 58456**
**PH. 701/647-2866**
**FAX 701/647-2221**

16 December 2002

NOTE TO FILE
To: Dickey 40x
From: Dave Azure, Deputy Refuge Manager

At about 11:00 am this morning, I contacted Mr. Brent Klipfel by cell phone from Ellendale concerning the wetland easement protecting the SE1/4 of section 15, T. 130 N., R. 64. Officer Ed Meendering and I just finished meeting with the District Conservationist in Ellendale's NRCS office on an unrelated easement; I told Mr. Klipfel that we were passing through town and needed to briefly meet with him. Mr. Klipfel said that he was leaving in a few minutes, but would wait for us. A few minutes later, Officer Ed Meendering and I met Mr. Klipfel at his residence at 708 3rd Ave. North in Ellendale.

Mr. Klipfel met Officer Meendering and me at the door of his house. I introduced ourselves and asked him if he farmed the tract of land described above. He said that he did. I then explained that this piece of land was protected by a FWS wetland easement which was purchased in 1964. I further explained that the wetland easement prohibited the draining, burning, filling, and leveling of protected basins. I asked Mr. Klipfel if he was aware of the easement, he said that he was not. I asked if he was the one who created the scraper ditch in the NE portion of the quarter. At first, Mr. Klipfel said that there was no scraper ditch there. I then took out the aerial and ground photos that I took and showed them to Mr. Klipfel. He then admitted that, yes, he had removed a little dirt from that area, but that it didn't do any good. I acknowledged that I did not know if water had ever run through the ditch, but that it was nonetheless, a violation of the easement provisions. I explained that to be in compliance, the ditch would have to be filled in. After visiting about what could be done, we agreed that Mr. Klipfel would use a loader to fill the ditch and would pack it with a tractor tire. We agreed that the work would be done by 05/01/03, conditions permitting. Mr. Klipfel said that he may even try to get out there yet this winter since the top was still soft. I told Mr. Klipfel that I would send him a copy of the map and easement contract. Mr. Klipfel was friendly and cooperative. Officer Meendering and I left the residence approximately 10 minutes after arriving.

Mr. Klipfel is a white male, approximately 40 years old, with short black hair. He is about 5'8"

and approximately 185 lbs. He was wearing blue jeans, a sweatshirt, and an orange “Arizona” clothing brand ball cap.

Exhibit XIII-5

# United States Department of the Interior

**FISH AND WILDLIFE SERVICE**
Detroit Lakes Wetland Management District
26624 North Tower Road
Detroit Lakes, Minnesota 56501-7959

In reply refer to:

08078 cm
Cert#70070710000045939008

March 20, 2008

Randy ???????
#### 57th Ave North
Hawley, MN 56549

Dear Sir:

I am writing you concerning the land that you own and operate in T140N, R45W, 5th PM, Section 15, W1/2SE1/4; Section 22, NE1/4, E1/4NW1/4, Cromwell Township, Clay County. This land contains wetlands that are protected by a U.S. Fish & Wildlife Service Easement for Waterfowl Management Rights (easement). The easement prohibits the burning, draining, leveling, or filling of the protected wetlands on this property.

On 11/23/07 Officer Taylor and I met you in the field while we were inspection burned, filled, and drained wetlands protected by easement. Officer Taylor informed you that you have been told several times not to Burn, Drain, or Fill protected wetlands. In the fall of 2007 we have found several violations that need to be restored. We discussed the violations that were observed in Area B, C, D, E, and F on map. After our conversation Officer Taylor and I continued to check protected wetlands. We found violation of drainage and fill in Area A, and G on map. These areas are protected by easement. You agreed during our conversation to restore the drainage and fill violation.

The service request that all fill material in area A, C, E, and G on map is removed from protected wetlands. All ditches in areas A,B,D,E,F and G on map will need to be filled for 100' to the natural level plus 10% fill for settlement.

The Service is requiring that the restoration work be completed by April 30, 2008. A Service employee must be present during the restoration work. Please contact the Service when a date can be set for restoration. If weather or field conditions do not permit work to be completed by April 30, 2008 please contact myself to see what options are available.

If you have any questions or need to set date for restoration please contact me at #218-844-3423

Sincerely,

Charles Melvin III
Refuge Law Enforcement

Encl: Easement Contract, Easement Map, Easement Violation Map

*This page intentionally left blank*

# U.S. Fish and Wildlife Easement Violation Map

Tract: 74X

Exhibit XIII-6
Map 1 of 1




**Legend**

- Easement Boundary
- Fill in Wetland
- Drainage Ditch
- Approved Drainage Ditch

Date: 3/19/08

Exhibit XIII-6

UNITED STATES DEPARTMENT OF THE INTERIOR
FISH AND WILDLIFE SERVICE

TRACT 336x MAP 1 of 3

WATERFOWL PRODUCTION AREA Dickey COUNTY, STATE OF North Dakota
EASEMENT AUTHORIZED BY MIGRATORY BIRD HUNTING STAMP ACT OF MARCH 16, 1934, AS AMENDED.
T. 130 N., R. 62 W., 5th PRINCIPAL MERIDIAN

Section 16, W1/2

→ = scraper ditch
• = dirt fill




Scale: 4 Inches = 1 Mile

The U.S. Fish and Wildlife Service (Service) has purchased and owns perpetual rights which restrict or prohibit the right to drain, burn, level, and fill any wetland basin on the ownership represented by this map. This map represents the Service's effort to depict the approximate location of all protected wetland basins based on information and maps available at the time this map was prepared. However, because climatological and other natural conditions may cause the shape and location of wetland basins to change over time and from time to time, this map may or may not show wetlands as they appear in any given year.

LEGEND

Boundary of Easement Description

Wetlands covered by provisions of the easement

Wetland deleted from easement by Drainage Facility Map prepared when the easement was purchased.

Prepared by: Ed Meendering Date: 3-10-04

Concur: David A. [signature] Date: 3-10-04

# United States Department of the Interior

**FISH AND WILDLIFE SERVICE**
**Detroit Lakes Wetland Management District**
**26624 North Tower Road**
**Detroit Lakes, Minnesota 56501-7959**
**(218) 847-4431**

12005crm
Cert#70100290000218972806

December 8, 2011

Bruce ????
10944 280th St.
Hawley, MN 56549

Dear Bruce and Christopher ????:

On October 31, 2011 you met with me in regards to the restoration of a wetland protected by a US Fish and Wildlife (USFWS) wetland easement in Section 27, lot 5, SW1/4SE1/4, Parke Township. This property consists of wetlands that are protected from any attempt to Burn, Drain, Fill or Level.

I wanted to take the time to thank you for working with me on the filling of drainage ditch and the removal of fill from wetland. Completion of wetland restoration has corrected the violations observed in the fall of 2010. Please note that elevations have been set on ditch and any future erosion that causes the drainage of wetland will be the responsibility of the landowner to correct. At this time I am considering this case closed.

You had questions about the restoring of a large wetland located south east of easement. I spoke with my private lands specialist, and was informed that he would be interested in restoring the basin. I explained to him the importance of the pasture lands. As discussed, after the deer season is completed and as long as snow does not stop field work. I will take some elevations of wetland and ditch so you would have a better understand of how it would look. I will contact you later in the month to discuss options if interested. If you have any questions, please do not hesitate to call me at #218-844-3423. Again, thank you for cooperation with me over this issue.

Sincerely,

Chuck Melvin
Easement Enforcement Officer

*This page intentionally left blank*

Exhibit XIII-8

**U.S. Department of the Interior**
**U.S. FISH AND WILDLIFE SERVICE**
**KULM WETLAND MANAGEMENT DISTRICT**
**1 FIRST STREET SW, P.O. BOX E**
**KULM, NORTH DAKOTA 58456**
**PH. 701/647-2866**
**FAX 701/647-2221**

9 May 2003

Certified Mail: 7002 2410 0006 2393 5059
Return Receipt requested

Logan County
310x, 1

Mr. Conrad Jangula
6142 40th Ave.
Napoleon, ND 58561

Dear Mr. Jangula:

This letter is to follow up the phone conversation we had yesterday. I called to discuss the wetland easement violations in the N1/2 of section 35, T. 136 N., R. 73 W. During our December 20th, 2002 meeting, we had agreed to a May 1st compliance date to have rocks removed from protected wetlands.

Officer Ed Meendering and I visited the site on Wednesday, May 7th and documented that the rocks have not been moved. You mentioned that you had asked Mrs. Jangula to call our office; however, we were not notified that you were unable to move the rocks by May 1st. You mentioned that you had looked at the areas before we received this last shot of rain and that it was still too wet. Finally, you had requested that we allow you to wait until this fall to complete the work.

I explained that, though it's a little wet now after this rain, I'd still like for you to try to at least move the two rock piles to the west this spring. You agreed and we set a second compliance date of May 23rd, 2003. Again, please call me if you are unable to complete this work by the compliance date. Failure to comply with the May 23rd, 2003 restoration date without notification, or future violations of the easement contract may result in the issuance of a Violation Notice including a fine. If you have any questions, please contact me at 647-2866.

Sincerely,

David A. Azure, Deputy Refuge Manager

cc: WMD easement file

## TRAINING FOR EASEMENT LAW ENFORCEMENT

Newly-hired Federal Wildlife Officers attend the Natural Resources Police Training Program at the Federal Law Enforcement Training Center (FLETC). Upon completion of this training program, the Federal Wildlife Officer is placed in the Service's Field Training and Evaluation Program (FTEP), a nationally-recognized training program. The FTEP is designed to help the Federal Wildlife Officer make the transition from the classroom environment of the law enforcement academy to the practical application of skills in actual on-duty situations. It is recommended that Federal Wildlife Officers who will be conducting easement investigations be placed at a training site that provides easement enforcement experience for a portion of the FTEP. For example, if the Federal Wildlife Officer is to be stationed at a WMD, he or she should be assigned to a field training officer who is engaged in easement law enforcement. This would provide the new officer with several weeks of experience covering some of the recommended instruction and training.

The instruction for these officers should cover many subjects including:

- easement contract language
- file and record reviews
- flight map preparation
- aerial reconnaissance and transects of suspected violations
- aerial photography and interpretation
- draft easement maps
- physical evidence of easement violations
- surveying techniques
- interviews/interrogations of suspected violators
- case documentation
- easement case reports
- instruction on sending out compliance and closure letters
- wetland types and descriptions
- soil science

All easement enforcement officers should be given priority to attend the FLETC Criminal Investigator and Interviewer bridge courses.

**Discussions have taken place about the need to develop an Easement Enforcement School, similar to the current Federal Wildlife Officer Basic School (FWOBS). This school would provide officers with a comprehensive series of training modules incorporating the knowledge and skills necessary to effectively conduct easement enforcement activities. The Easement Enforcement School would be followed up with field training involving easement enforcement violations and investigations. This Easement Enforcement School would be highly recommended for all officers working with any type of easements.**

*This page intentionally left blank*

UNITED STATES
DEPARTMENT OF THE INTERIOR
OFFICE OF THE SOLICITOR
WASHINGTON, D.C. 20240

Exhibit XIV-1

Exhibit VIII-2

DEC 23 1981

Memorandum

To: Assistant Secretary for Fish and Wildlife and Parks
Assistant Secretary - Land and Water Resources
Assistant Secretary - Energy and Minerals
Assistant Secretary for Territorial & International Affairs
Assistant Secretary for Indian Affairs
Assistant Secretary - Policy, Budget, and Administration

From: Solicitor [signature]

Subject: Bureau and Office Relationships with United States Attorneys

The Solicitor's Office is responsible for coordinating and handling, as the case may be, litigation regarding the programs and activities of this Department, regardless of whether the litigation is brought against or initiated by the Department. Control over litigation is essential for the proper implementation of the programs and policies of the Secretary of the Interior.

In this context we are concerned over the existing procedures used by the various Bureaus and Offices for direct access by agency personnel to the Justice Department and more specifically to the various United States Attorneys Offices regarding law enforcement activities. The purpose of this memorandum is to request that the various Assistant Secretaries coordinate with their respective Associate Solicitors the "ground rules" by which the Solicitor's Office will coordinate legal matters involving law enforcement and referral of criminal matters to the U.S. Attorneys.

While we recognize that there is no need for the Solicitor's Office to be involved in certain agency activities, such as the Park Service writing a traffic ticket for speeding in Yellowstone, a criminal referral to a United States Attorney

RECEIVED
FEB 03 '82
LAW ENFORCEMENT

Exhibit XIV-1

could raise in a litigation context significant legal issues which affect the programs and policies of the Secretary. A strategy must be devised by which these types of criminal cases are effectively and timely coordinated with the Solicitor's Office.

We would appreciate your office giving this matter immediate attention in order that the program objectives and coordination can be achieve during the month of January. It is essential, in my judgment, that these issues be resolved in fashion that is cost effective, but nonetheless provides the Solicitor's Office with appropriate control over criminal litigation.

Your immediate attention to this matter would be appreicated.

cc:
All Associate Solicitors
All Regional Solicitors

# United States Department of the Interior

OFFICE OF THE SOLICITOR

Exhibit XIV-1

DENVER REGION
P.O. BOX 25007
DENVER FEDERAL CENTER
DENVER, COLORADO 80225

NOV 13 1981
SOLICITORS DOCKET

November 6, 1981

Memorandum 16436 DCW

To: Associate Solicitor, Conservation and Wildlife, Washington

From: Regional Solicitor, Rocky Mountain Region

Subject: Direct Access to U.S. Attorneys by Law Enforcement Personnel - Fish and Wildlife Service, National Park Service, Bureau of Land Management, and Office of Surface Mining

We have been concerned for some time about existing procedures concerning direct access of agency personnel to the Justice Department and specifically to the U.S. Attorneys' Offices as to allegedly routine misdemeanor law enforcement actions.

As we understand the existing rules, if a misdemeanor citation is issued (for example under 36 C.F.R. or 50 C.F.R. for a violation of park or fish and wildlife regulations for speeding, improper camping, hunting out of season, hunting in a closed area, or the like) and it is anticipated that the matter will be handled by a U.S. Magistrate without an appearance of the private attorney representing the party to whom the citation was issued, agency personnel are authorized to refer the matter directly to the U.S. Attorney's Office. Over the years, this practice has spread to a number of other types of misdemeanor violations. A specific example is the violation of a fish and wildlife easement acquired under the Duck Stamp Act. Technically, this is regarded as a violation of 16 U.S.C. 668dd(c) and has been generally regarded over the years as being covered by the existing policy.

Where substantial legal or policy issues are involved even in a criminal misdemeanor case, the matter is supposed to go through the Solicitor's Office. Where felonies are involved, normally agency personnel do not carry the principal load of investigation, that being done by the FBI with the assistance of NPS, FWS, or BLM personnel. The Solicitor's Office is not usually involved with felonies. If, however, it is desired to bring a civil action against a party arising out of the same or similar conduct, existing rules require that the matter go through the Solicitor's Office and that the matter be referred to the

Justice Department over the signature of the Solicitor in most cases. Exceptions would be those permitted by § I.5.1 of the Solicitor's Regulation Manual, which also currently requires the advance approval of the Solicitor before direct referral by a Regional or Field Solicitor.

These procedures concerning misdemeanor referral have proven to have some undesirable consequences. First of all, the agency law enforcement personnel in a locality tend to build up a considerable amount of rapport with their local U.S. Attorney's Office and have exhibited the tendency to look to the U.S. Attorney's Office for general legal advice rather than to the Solicitor's Office.

Secondly, there is a pronounced and developing tendency by agency personnel to "shop" for legal advice by trying both the Solicitor's Office and the local U.S. Attorney's Office to see which will give advice more nearly acceptable to the preconceived ideas of the local agency law enforcement personnel.

A third major problem is that in some instances, local law enforcement agency personnel have not exhibited sensitivity to the identification and need for clearance of significant policy issues raised by misdemeanor citations. The typical result is that neither the Solicitor's Office nor the responsible agency regional officials are consulted about such matters and that decisions affecting significant agency and departmental policy issues are made simply by the local law enforcement personnel and an Assistant U.S. Attorney.

In the past several months, we have had several incidents in this region which tend to suggest that the time has come for re-examination of these existing policies. The first series of events surrounded the establishment of two camps by dissident members of the Pine Ridge Sioux Reservation at Wind Cave National Park and Devils Tower National Monument. Both of these occurrences were recognized quite early by local agency officials to present serious policy problems, and they were referred to both the Solicitor's Office and to the Director for guidance as to their handling. The problems came, however, in communications with the local U.S. Attorney's Offices. Experience suggests that in similar instances in the past, one of the difficulties is in obtaining accurate information about the various parties involved. In this instance, these included among others, the State of South Dakota, local state law enforcement personnel, Indian tribal officials, and leaders of several other Indian groups (e.g., AIM splinter groups). The

situation became very confused and because of the many channels of communication which were open, including those between local agency law enforcement personnel and the Justice Department, it was extremely difficult to accurately follow events, to assimilate and evaluate intelligence information, and to coordinate the positions of the Justice Department and the Department of Interior. We do not fault the regional officials of the Park Service with whom we dealt in this instance. They tried very hard to provide us with accurate information and to involve our office at all signficant points. However, communications with the Justice Department, particularly the U.S. Attorney's Office in South Dakota, became impossible to manage because of the many parties who ultimately became involved and who attempted in one way or another to "run" the matter.

A second more serious problem also developed in South Dakota. Some time back, the Yankton Sioux Tribe brought an action in Federal District Court against the State of South Dakota and several adjoining landowners to adjudicate the ownership of the bed of Lake Andes in South Dakota. The United States was not named as a party. Only recently we have been advised that the Fish and Wildlife Service has an interest in the matter because it manages the Lake Andes National Wildlife Refuge which encompasses lands adjacent to and within the bed of the Lake. Specifically, FWS holds interests below a Congressionally established high water mark of the Lake which were acquired from adjacent landowners and the State of South Dakota. These lands form a considerable portion of the Refuge.

On September 9, 1981, Judge Nichol entered a memorandum decision holding that the bed of the Lake belongs to the Yankton Sioux Tribe. We were advised of the entry of this decision by FWS about October 1. Some time later, after FWS had asked us for advice about the potential implications of this decision on the Refuge, we also learned that a senior resident agent had apparently seen fit, on his own initiative, to approach the Court to ask for clarification of the decision and to determine how it might impact the Refuge. Upon inquiry, we were told that such a meeting did occur between the senior resident agent and Judge Nichol. Apparently Judge Nichol was not visibly offended by this obviously improper inquiry but did, in fact, briefly discuss the decision with the SRA.

Naturally, when we heard about this conversation, we were very concerned because of the obvious impropriety involved. We have subsequently made it clear to the Fish and Wildlife Service that no such activity should occur in the future.

The last significant occurrence was a recent trial in a case entitled U.S. v. Welte as to an alleged violation of a Duck Stamp waterfowl production area easement. This matter was tried to the U.S. Magistrate by an Assistant U.S. Attorney. This matter was appealed to the Court by the defendant.

As you know, the subject of enforcement of alleged waterfowl easement violations via the criminal route has been a very controversial subject recently in the State of North Dakota. Nevertheless, it has been accepted practice for such matters to be handled by the local FWS law enforcement personnel and the U.S. Attorney's Office in Bismarck, N.D. without involvement of either the Regional Office of the FWS or the Solicitor's Office.

There were two significant occurrences in the course of the Welte proceeding. The first was that the attorney for the defendant challenged the enforceability of the easement because of the lack of definition of the covered area. In particular, we have heard that the Fish and Wildlife Service agent stated in response to questions from the defense attorney that the easement purported to cover the entire farm of the defendant, that the wetlands embraced a much lesser part of the farm acreage (22 acres), but that he could not identify the specific 22 acres. Enforcement of easements under this description format where the actual wetlands are not specifically identified has been a major concern of this office for some time, particularly where the wetlands are intermittent or substantially fluctuate in size.

The second difficulty in Welte occurred at the pre-sentencing hearing. For reasons that we do not understand, this hearing was held on Columbus Day, October 12, 1981. The Assistant U.S. Attorney who had prosecuted the case was not present and only the Fish and Wildlife Service's resident agent (SRA) was there. We are advised by FWS that the Magistrate asked the SRA for his recommendation as to the proposed sentence, and he suggested a 6-month jail term with all but a small portion of it suspended on the condition that a $500 fine be paid and a requirement that the easement violation be corrected. The Court apparently did not impose a jail sentence but imposed a fine, a portion to be suspended if the easement area was restored. We have subsequently ascertained that the suggestion by the local FWS agent had been discussed and approved in advance by the Assistant U.S. Attorney who had tried the case. It had not been discussed with the Regional Office of the FWS nor submitted to this office for consideration. We have

requested a transcript of both hearings. From what we understand of the facts and the evidence that may have been adduced, we are concerned about this case and now wonder whether it should be pursued before the District Court. We will fully consider these issues when we receive the transcript.

As we see it, the suggestion of the imposition of a jail sentence in this instance raised serious policy implications, particularly in view of the widespread controversy involving the Duck Stamp easement enforcement program in North Dakota. FWS defends the request for a jail sentence on the theory that North Dakota farmers consider that being caught and punished for violation of a Duck Stamp easement is a "normal risk of doing business."

These and similar matters are valid considerations in arriving at an appropriate recommendation to U.S. Attorneys, but we are concerned that here they were made directly to the Court by the FWS SRA. We are even more troubled to learn from both FWS and Justice that such appearances by SRA's without an Assistant U.S. Attorney being present are common in easement violation cases in North Dakota and perhaps elsewhere. These facts also suggest that initiating a misdemeanor proceeding not only has its limitations but that there may often be serious policy questions involved in such matters which have not heretofore been seriously considered by the agency or by Solicitor Office personnel.

In contrast to these troubling situations, we would also point out one recent occasion in this region where proper procedures were followed. This involved the proposal to initiate legal action against unlicensed, outside-park canoe outfitters at Ozarks National Riverway pursuant to United States v. Richards, 636 F.2d 236 (8th Cir. 1980). It was early recognized that there were policy issues involved as to whether any legal action should be taken and as to whether the civil or criminal route should be followed. With the concurrence of NPS, we referred the matter to you by memorandum of August 14, 1981 and the Solicitor asked Justice to act by letter of September 28, 1981 in which the Solicitor's Office preference for initiation of an injunction action was stated but in which it was also indicated that we would not object to criminal proceedings.

We recently discussed misdemeanor referral procedures with the Solicitor when he visited this office and suggested that perhaps the time had come for a reconsideration of the entire

situation. Obviously, the Solicitor's Office does not have sufficient personnel to involve itself in every petty offense, including speeding tickets, illegal parking, hunting out of season, possession of more game than permitted, or a multitude of similar minor violations. On the other hand, we think it is apparent that the overly friendly relationship which has grown up between local agency law enforcement personnel and the Justice Department has led to decisionmaking on matters which are obviously policy in nature without consideration of its impact by either agency policy personnel or the Solicitor's Office in disregard of at least our understanding of proper procedure. Secondly, it manifests a potentially serious misunderstanding of lines of authority so that the agency law enforcement personnel in the field has come to regard the local U.S. Attorney's staff as "our lawyers" in disregard of either the Solicitor's Office or the regional agency policy personnel.

We have attempted to work closely with the U.S. Attorneys' Offices and agency regional offices in our region to bring these difficulties to their attention and to point out the risks involved to both their offices and to the Solicitor's Office if agency field personnel "shop" for legal advice. Still, considerable confusion remains. The several incidents set out above point up the confusion and the potential mischief which can result to departmental programs. Assuming continuation of these practices, we request that you consider the issues and advise us with respect to the appropriate procedures that should be followed. In this regard, we propose the following procedures for your consideration:

1. Repeal the exception that all misdemeanors are referred directly by the agency to the U.S. Attorney and institute a selective policy. For example, we suggest that the Solicitor's Office refer all alleged wetland easement violations and all proposed prosecutions arising out of demonstrations, occupations, sit-ins, or the like to the Justice Department. There may be others that should also be included in this list. Traffic matters, or other citation issues which obviously will not involve serious legal consequences, should continue to be handled as in the past, by direct referral by the agency to the U.S. Attorney.

2. The policy regarding referrals of misdemeanor matters through the Solicitor's Office where legal or policy issues are involved should be reemphasized to all agency law

enforcement personnel and closer communication had with the Solicitor's Office where there is a question that such an issue exists.

We have supplied copies of this memorandum to the Associate Solicitor for Energy and Resources and the Associate Solicitor for Surface Mining, because both the BLM and OSM have recently obtained law enforcement capabilities. While our experience with law enforcement personnel of these two agencies has been limited, nevertheless, it appears that the same problems of communication and roles may be developing with respect to those two agencies as exists with the NPS and FWS. We are also supplying a copy of this memorandum to the Solicitor as a follow-up to our conversation when he visited the office last month.

If we can be of further assistance, please advise.

John R. Little, Jr.
Regional Solicitor

cc: Associate Solicitor, Energy and Resources, Washington
Associate Solicitor, Division of Surface Mining, Washington

*This page intentionally left blank*

# RELEVANT COURT DECISIONS

The easement contract, the acquisition procedures, and the enforcement of the easement have all been sources of arguments in individual court cases decided from 1971 to present. In 1981, the State of North Dakota appealed to the Supreme Court of the United States in an effort to overturn a judgment entered by the Eighth Circuit of Appeals. As a result of these court cases and challenges, the administration and enforcement of easements by the Service have become better defined and the easement contract has become stronger as a means to protecting wetlands. Easement enforcement is inherently controversial. When violations occur, the restoration of protected habitats is the officer's primary goal. A strong enforcement posture is necessary in order to provide a deterrent to those who would be inclined to destroy easement-protected habitat. It is imperative that Service personnel conduct their assigned easement duties so as not to weaken the strong position assigned to the easement by the courts. The following represents some of the court decisions that have helped define the Service's easement program. Several court opinions, including some of those discussed below, can be found on the Region 6 Easement Administration and Enforcement Sharepoint site at:

https://fishnet.fws.doi.net/regions/6/nwrs/Easement%20Administration%20and%20Enforcement/Forms/AllItems.aspx

## A. Federal Magistrate/District Court Decisions

### 1. U.S. v. Earl P. Morehouse [CIV No. 86-1034, U.S.D.C., D. S.D. (1986)]

Morehouse was charged by information with a violation of 16 U.S.C. 668dd(c) by draining and burning of wetland basins which were subject to protection by an Easement for Waterfowl Management Rights. Trial was held before U.S. Magistrate at Aberdeen, South Dakota on December 9, 1986. As a defense, Morehouse contended that the Service Realty Specialist misrepresented the easement and that an attached drainage facility map was not a part of the parties' contract, nor was the drainage facility map an accurate reflection of his (Morehouse) understanding of the contract. Morehouse maintained that the wetlands that he had drained were erroneously placed under protection by the easement, and he was not properly notified of their inclusion in the contract by the Service.

The Magistrate found that the Service proved beyond a reasonable doubt that proper letters of notification and a valid drainage facility map were sent to Morehouse for his inspection and acceptance. Thus a binding easement was executed on the face of the written agreement and both parties are bound by its execution. Morehouse was found guilty, fined $500.00 plus court costs, and a stipulation for restoration of the wetlands was filed by the U.S. Attorney. Morehouse appealed to the Eighth District Court of Appeals.

### 2. U.S. V. Myron D. Lhotka [CR No. 4-84-116 U.S.D.C. D. Minn (1985)]

Lhotka was charged in a single count criminal information with knowingly violating the easement document protecting wetlands. Lhotka had executed the easement with the Service in June 1964, and on November 27, 1968, the first of several easement violations was observed by Service personnel. Additional contacts with Lhotka took place between 1968 and 1984. By 1984, a total of 96 wetland basins on one section and 61 wetland basins on another section had been drained or filled by Lhotka.

The court found that all of the non-exempted (by drainage facility map) ditches on defendant's property in Sections 14 and 24 had been created and maintained by the defendant. It was also found that the conveyance of easement is a valid, enforceable contract supported by consideration under which the defendant is prohibited from draining or filling wetland areas. The Service's repeated warnings and contact with the defendant, coupled with the numerous attempts to get him to restore the property, demonstrates without doubt that the defendant knowingly violated the statute. As to the claim by defendant that the statute of limitations bars prosecution, the court found that, based upon the evidence presented by the Service, the offense charged is considered to be a continuing offense. Lhotka was found guilty of violating 16 U.S.C. 668dd(c) from on or about November 27, 1968, to the date of his conviction, August 5, 1985.

**3. U.S. v. Alvin Peterson, [Case No. 2:08-mj-16 (2008), U.S. Dist. Court, Dist. Of ND]**

Alvin Peterson was charged with draining four wetlands covered by the provisions of Walsh County easements 124x and 56x-2. Three of the four ditches were previous violations that were restored by a U.S. District Court order {U.S. v. Alvin Peterson [2:04-cr-102 (2005)] [05-4248(8th Circuit)]} in September 2006. A two-day bench trial was held and Peterson was found guilty a second time.

Magistrate Judge Alice Senechal presided over both of Peterson's trials. Her post-trial memorandum filed for the 2008 trial found that the government met its burden of proof beyond a reasonable doubt as to all the elements described in U.S. v. Johansen. These elements are 1) that the United States holds a property interest, established through a properly recorded and accepted easement, 2) that identifiable wetlands existed at the time the easement was conveyed, 3) that Peterson knew that the wetlands at issue were subject to an easement, 4) that Peterson engaged in prohibited activity by disturbing, injuring, or destroying the wetlands at issue, 5) that the activity was not permitted or otherwise authorized, and 6) that Peterson's actions caused surface and/or subsurface damage which injured, disturbed, or destroyed the wetlands.

Peterson did not argue that the U.S. holds a property interest in the wetlands. He did argue that the government must prove that there was water in the wetlands when the easement was acquired. Judge Senechal ruled that the absence of water does not mean that the areas were not wetlands in existence when the easement was created. Regarding Element 3, Peterson argued that he did not own the property covered by Easement 124x

when he signed a renegotiated map, thus he had no legal authority to sign it. He therefore contended that the Service had never provided him with notice as to which wetlands were subject to the easement. The court stated that his signature on the renegotiated map was not necessary to establish the easement and that Peterson's signature on the map actually further demonstrated his knowledge that the wetlands were subject to the easement.

The government established Element 4 by proving that Peterson directed a contractor to perform the prohibited activity. Peterson argued that the ditching was authorized by North Dakota law in that he was maintaining natural waterways (Element 5). The court disagreed with Peterson's interpretation and stated that there is no credible evidence that he was granted permission for the excavations. As to Element 6, Peterson alleged that the government did not present evidence comparing the current condition of the wetlands to their condition when the easement was established. Magistrate Senechal stated that the government was not required to prove the precise water levels as they existed at the time the easement was purchased.

**4. <u>U.S. v. Kurt A. Skinnemoen [CR No. 03-268 U.S.D.C.: D. Minn (2004)]</u>**

Skinnemoen was charged by information with a violation of 16 U.S.C. 668dd(c), 668dd(f)(1) and Title 18 U.S.C, Section 2 by knowingly ditching, draining, filling, removing and otherwise inuring and destroying real property covered by the United States Fish and Wildlife Service Wetland Easement Contract G-49x in Grant County, MN. On May 18, 2004, Skinnemoen pleaded guilty to the charge (Class A Misdemeanor) and agreed to restore the wetlands accordance with the USFWS "Restoration Plan" agreed to by the parties and that a U.S. Fish and Wildlife Service employee will be present during restoration.

This violation involved a wetland that was half on and half off the easement description with the ditch draining the wetland located outside of the easement description. Skinnemoen owned both the easement and non-easement portions of the wetland as well as the entire drainage ditch and was ordered to restore the wetland. Skinnemoen restored the drained wetland off the easement and the case was closed September 22, 2004. This was the first successful prosecution of a wetland basin located both on and off the easement where the drainage violation was off the easement description.

**5. <u>U.S. v. Jerome J. Schoenborn [CIV No. 3-84-1662 U.S.D.C.: D. Minn (1986)]</u>**

The primary issues in this action were the validity and enforceability of a wetland easement signed by Schoenborn's parents in 1965 and passed to him as a successor. Schoenborn claimed that the easement was invalid and unenforceable and that he had not violated it. His counterclaims alleged unconstitutional taking, quiet title, negligence, and abuse of due process.

Schoenborn claimed that the Service Realty Officer made oral misrepresentations to Edward Schoenborn (Jerome's father), that the easement entitled the Schoenborns and

their successors to maintain all ditches then existing, regardless of whether or not the ditches were then functioning, and to drain all basins affected by those ditches. He also claimed that he and his father justifiably relied on these representations and never consented to the scope of the easement as shown on the drainage facility map.

The court held that the written easement and drainage facility map had been available for examination before the Schoenborns were bound by it, and they accepted the document by affixing their signature and receiving payment. The neglect displayed by the Schoenborns in not becoming cognizant with the terms of the written contract was unjustifiable as a defense. The easement is valid and enforceable. The defendant was directed to restore the wetlands and was permanently enjoined from draining or permitting the draining of any wetlands protected by the terms of the easement. Memorandum and Order entered by Judge Edward J. Devitt, District of Minnesota, October 16, 1986.

**6. U.S. v. Vesterso et. al. [CR No. 2-86-1 U.S.D.C.: D. N.D. (1986)]**

Warren Anderson, David Leas, and Kent Vesterso, acting as the Towner County Water Board, contracted for two drainage projects. The projects were termed "watercourse maintenance" projects and went through seven sections of land. Located within the projects were several wetlands covered by three separate Service easements.

Investigation showed that the members of the water board knew of the Service easements when the projects were designed and prior to any of the drainage work being done. The investigation also showed that the projects would directly benefit two of the board members by draining wetlands on lands farmed by them. The investigation further showed that the water board was prepared to use this case as a test case on state water rights versus Service easement rights.

The decision was made by the U.S. Attorney's office to charge the members as individuals with a criminal violation of 16 U.S.C. 668dd(c). The U.S. Attorney's Office believed it proper to charge them as individuals in that an individual cannot use his status as a board member to violate State or Federal laws. The water board, through the State's attorney, raised the following issues:

a. That the State has a reserved right to the watercourses within the State, and the Service cannot prevent the State from cleaning out such watercourses;
b. That a landowner could not grant an easement to the Service for wetlands found on a watercourse as the State maintained control of watercourses;
c. That easements “taken” by the Service are subject to easements for existing “canals and laterals” which include servitude of drains held by the State;
d. That the projects were not “drainage projects” but were simply cleanouts of old natural watercourses that had filled in during the past 50 years; and

e. The wetlands found along the watercourses were not "natural" wetlands but instead were created as a result of farming practices which plugged the natural watercourses.

Judge Benson, in an unwritten opinion, ruled that the State Interest argument is not valid stating that interest of the State is an interest in the water, not an interest in the property itself. The easements as purchased by the Service are valid and the United States has a real property interest which was damaged. Wetlands were present along the watercourse, and those wetlands were adversely affected by the projects. The court further held that the subjects acted as individuals and did not have the authority as board members to do what they did. Ruling entered by Judge Paul Benson, District of North Dakota, April 3, 1986.

**7. U.S. v. Conrad Rostvet [Civil No. A2-01-007, U.S.D.C.: D.N.D.-NE Div. (2001)]**

In 1996, Rostvet reported to the Service three ditches draining three wetlands on a wetland easement. Rostvet was in the process of purchasing the property when he reported the ditches to the Service. An investigation confirmed that these ditches were constructed in the mid-1970s, unbeknownst to the Service. The investigation also revealed that the construction of the ditches was partially funded by the U.S. Department of Agriculture.

The Service offered Rostvet the opportunity to fill the ditches. He refused. On January 4, 2001, a civil complaint was filed in U.S. District Court for the District of North Dakota Northeastern Division against Rostvet for the restoration of three drained wetlands on his property covered by the provisions of Walsh County Easement 109x.

Rostvet again refused to fill the ditches, citing the fact that he had no part in constructing the ditches. The government agreed to restore the wetlands at no cost to Rostvet. The Service hired a private contractor to close the ditches in October 2001. The complaint was then dismissed.

**8. U.S. v. James Bosek Mag. No. 11:MJ-346 (LIB) (8th cir. Ct)**

The defendant, James Bosek, constructed a road through an easement protected wetland, Douglas Co. 17X, Minnesota. Officers investigating the violation were notified by the defendant that he had been given prior verbal permission. Bosek had also received permits from state and local governments to place the road through the wetland. Based on his claimed verbal permission and additional government permits he refused to remove the road. In 2012 the case was brought before a magistrate judge. The Service was tasked with and succeeded in proving beyond a reasonable doubt the following six elements:

1. That the United States holds a property interest, established through a properly

recorded and accepted easement.
This was not contested.

2. That identifiable wetlands existed at the time the easement was taken.
The use of the wetland map and aerial photography the Service was able to prove this element.

3. That [Defendant] knew that the wetlands at issue were subject to an easement.
The government introduced correspondence and the defendant admitted to knowing about the easement. The defendant tried arguing he did not know which wetlands were protected but the court stated "A defendant who knows "that the parcel [is] encumbered by a wetland easement, cannot claim that [he] did not know a particular wetland was covered by the easement because such a lack of knowledge would be caused by 'willful blindness.'" But even if the Government were required to show that Defendant understood the precise area he altered was covered by an easement, the Government has made the required showing." **

*** This case was charged as a class B offense so the knowing element did not need to be proven but because this was not being contested the prosecution decided not to argue this fact. - FWO Brent Taylor*

4. That [Defendant] engaged in prohibited activity by disturbing, injuring, cutting, burning, removing, or destroying the wetlands at issue.
Defendant admitted to the construction of the road.

5. That the activity was not permitted or otherwise authorized.
The defendant claimed he was given verbal permission for construction of the road by a former Refuge Officer. The government was able to show that all conversations and meetings were always documented and the lack of documented permission favored the Service. Also the court found the defendants testimony less credible then that of the Refuge Officer who was accused of giving verbal permission.

6. That [Defendant's] actions caused surface and/or subsurface damage which injured, disturbed, or destroyed the wetlands.
To prove this element the Government placed a Service biologist on the stand as an expert witness to testify to the biological damage caused by the road. Based on the biologist's education, training, experience, and no objection from the defense, the court found the witness to be qualified as an expert in the field of conservation biology. The government proved this element based on the biologist's testimony.

## B. <u>Appellate Court Decisions</u>

**1. <u>U.S. v. Albrecht [496 F.2d 906 (1974)] [CIV No. 4758, D. North Dakota, C.A. 8, No.73-1814]</u>**

Appeal by defendants, Mr. and Mrs. Robert Albrecht, from U.S. District Court for District of North Dakota. Defendants were ordered by District Court in a civil case, to restore the area to the conditions which existed prior to ditching. In addition, the Court permanently enjoined the defendants from draining or permitting the draining of wetlands under easement (See 362 P. Supp. 13419 [1973]). In its decision, the Eighth Circuit made the following points:

a. "Robert Albrecht complained during trial and as a legal argument on appeal that the defendants herein had been discriminated against, and singled out by the Government concerning the enforcement of the easement. The claimed discrimination does not affect the plaintiff's easement and is not defense to the plaintiff's right to have the easement observed and respected by the dominant fee owner."

b. "Defendants' major argument is that North Dakota Statutory Law does not specifically allow the type of easement, servitude, or right to property conveyed by the Herbels to the Government . . . (NOTE: Reinhard and Mary Herbel sold the easement to the Service. The Albrechts later purchased the land from the Herbels). . . . We fully recognize that laws of real property are usually governed by the particular states; yet, the reasonable property right conveyed to the U.S. in this case effectuates an important rational concern, the acquisition of necessary land for Waterfowl Production Areas, and should not be defeated by any possible North Dakota law barring the conveyance of this property right . . . to hold otherwise would be to permit laws to defeat the acquisition of reasonable rights to their citizens' property pursuant to 16 U.S.C. 718d(c) and to destroy a national program of acquiring property to aid in the breeding of migratory birds. We, therefore, specifically hold that the property right conveyed to the United States in this case, whether or not deemed a valid easement or other property right under North Dakota law, was a valid conveyance under Federal law and vested in the United States the rights as stated herein. Section 718d(c) specifically allows the United States to acquire wetland and pothole areas and the Interest therein."

c. "It was well within the power of the Secretary of the Interior to acquire the reasonable easement conveyed in this case. The Albrechts and their successors are not restricted from farming the land, when such land is dry due to natural causes."

**2. Werner et. al. v. U.S. Department of the Interior, Fish and Wildlife Service, Bureau of Sport Fisheries and Wildlife [581 F.2d 168 (1978)] (No. 77-1958 8th Cir. Ct.)**

Edwin Werner and 34 other North Dakota landowners, who entered into wetland easement agreements with the Service, brought an action in Federal District Court seeking injunctive relief against enforcement of the easements and damages. The appellants claimed that they were induced to sell the easements by the false oral representations of two Service Realty Specialists. The Eighth Circuit Court of Appeals upheld the dismissal of the appellants' claim for damages and the finding that the District Court had no jurisdiction over the appellants' equitable claims. The Eighth Circuit Court held: . . . "It is undisputed that the oral representations of Fish and Wildlife Service negotiators Brasch and Resman were contrary to the express written terms of the wetlands easements. Further, the District Court found that the oral representations of Brasch and Resman were unauthorized. We are satisfied that this finding is clearly erroneous."

"It is well established that the U.S. is not bound by the unauthorized acts or representations of its agents . . . appellants took this risk when they signed written easements containing express terms contrary to their oral understandings. We therefore find that the dismissal of the appellants' claim for damages was proper."

**3. U.S. v. Seest [631 F2d 107 (1980)] (No. 80-1348 8th Cir. Ct.)**

Appeal by defendant Donald Seest from the District Court, District of Minnesota. Seest was convicted of violating the National Wildlife Refuge Act, by constructing a subsurface drainage system and making other alterations to an area under easement which he owned. The Court sentenced Seest to six months imprisonment and ordered him to pay a fine of $500. The sentence of imprisonment was suspended and Seest was placed on probation provided he paid the fine and . . . "restore the wetlands to their natural state."

The Eighth Circuit Court affirmed the conviction and remanded the terms of probation for review and clarification. Seest subsequently restored the area. In its decision, the court made the following points:

a. "We think it is clear that the ditching and trenching and use of drain tile altered the flow of natural waters, both surface and subsurface. Accordingly, we reject the appellant's claim that the Government has not established a violation of law in this case."

b. In a petty offense matter, the defendant is not entitled to a jury trial.

c. In a criminal trial, the District Court Judge is vested with discretion to determine where, within the District, a trial will be held.

d. Under probation, the offender may be required to make restitution or reparation to aggrieved parties.

## 4. U.S. v. Welte [696 F.2d 999 (1982)] (No. 82-1340 8th Cir. Ct.)

Defendant Peter Welte appealed a decision by the District Court, District of North Dakota, which affirmed his conviction before a U.S. Magistrate for draining a pothole which was subject to a wetland easement. The Eighth Circuit Court of Appeals affirmed Welte's conviction and cited the following facts: On March 21, 1966, the U.S. Fish and Wildlife Service purchased an easement from John Lunney covering a quarter section of land which Lunney owned in Grand Forks County, North Dakota. This quarter section was subsequently transferred to Welte by contract for deed which reflected the easement in perpetuity. Upon the transfer of this land, the Government sent Welte a courtesy letter reminding him that such land was subject to a wetland easement. In November of 1979, the Government observed a fresh scraper ditch out of one of the potholes covered by the easement. Recognizing that Welte was a new owner, the Government agreed with Welte that if he would restore the area to its former condition, no legal action would be taken against him. The area was later checked and the restoration work was approved by the Government. The Government, acting on an anonymous phone tip, returned to the area and discovered that when the ditch had been filled, drain tiles had been placed in the same location where the ditch had previously been scraped. Thereafter, the Government issued a violation notice. Welte was tried and convicted before a U.S. Magistrate.

On appeal to the District Court, his conviction was affirmed. The District Court held that Welte's act of draining a pothole which was subject to a wetland easement was clearly a violation of 16 U.S.C. 668dd(c). The District Court then affirmed the judgment of conviction entered by the U.S. Magistrate.

## 5. U.S. v. Kerry Johansen, 93 F.3d 459 (8th Cir. 1996)

Defendants Kerry and Michael Johansen entered a conditional plea of guilty to the North Dakota District Court with appeal to Eighth Circuit due to the District Court's refusal to hear the Johansens' argument. The Johansens argued that during the wet years, wetland acreage size had increased above the acreage that was initially acquired by the Service in the 1960's from the Johansens' predecessors. Involved in the argument were three separate easement tracts totaling 105 wetland acres owned by the Johansens. The Johansens contended that even with unauthorized drainage of the "excess" water, there still remained more acres of wetlands on the three easement tracts than was purchased by the Service and recorded on the "Easement Summary" sheets that were completed at the time of acquisition. The Government's stance was that all wetlands on the described tract or parcel were protected and that the draining activity negatively impacted individual wetlands covered by the easement conveyance. The North Dakota District Court's contention was that all wetland acreage on a described easement tract was subject to protection as provided through prior precedence.

The Eighth Circuit reversed the District Court's refusal to hear the Johansens' argument and conditional guilty plea and remanded the District Court for action consistent with the Eighth Circuit opinion. The Eighth Circuit largely based its opinion on the U.S. Supreme Court decision of North Dakota v. United States (U.S., 1983 103 S. CT. 1095) and the North Dakota District Court decision of United States v. Vesterso, 828 F.2d 1234 (8th Circuit, 1987). The Eighth Circuit held that the Service acquired an easement and paid the landowner based upon the Easement Summary acreage and that the acreage of the drained wetlands must be included in the Easement Summary acreage.

The Eight Circuit, interpreting the Vesterso decision also noted "the United States must prove beyond a reasonable doubt that identifiable, covered wetlands (as existing at the time of the easement's conveyance and described in the Easement Summary) were damaged and that the defendant knew that the parcel was subject to a federal easement."

## 6. U.S. v. Alvin Peterson [2:04-cr-102 (2005)][05-4248(8th Circuit)]

Defendant Alvin Peterson, Lawton, ND, appealed the decisions of the U.S. District Court, District of North Dakota, which affirmed his conviction by a U.S. Magistrate Judge of draining four wetlands protected by the provisions of a Fish and Wildlife Service Easement for Waterfowl Management Rights, specifically, Walsh County Easement 124x, 1-3. The Eighth Circuit affirmed the judgment of the district court.

In 1966, Peterson's parents granted wetlands easements to the United States. Peterson later inherited the land subject to the easement. Peterson disputed the easement many times. In 1973, to resolve these disputes, Peterson and the Service signed a map that clearly shows, among other things, four wetlands that were not to be drained. Nevertheless, in 1999 and 2003, Peterson hired contractors to dig ditches that drained these four wetlands.

The magistrate judge held a bench trial in which Peterson presented evidence and the testimony of an expert witness. Peterson did not dispute the fact that he hired contractors to dig the ditches. Instead, he argued that the ditches were permissible. In particular, he argued that by digging the ditches, he merely cleaned out areas that were existing watercourses excluded from the easement. He also argued that the government failed to prove beyond a reasonable doubt that the wetlands he allegedly damaged were in existence prior to, and therefore subject to, the easement. Finally, he argued that evidence he introduced at trial proved that none of his activities actually damaged the wetlands. The government presented evidence including expert testimony as to the impact that Peterson's actions had on the wetlands. In a thorough and well-reasoned opinion, the magistrate judge rejected Peterson's arguments and found that Peterson's actions were in violation of the easement and in violation of 16 USC 668dd(c) and (f)(2). The district court affirmed.

The first and second issues that Peterson raised were related to the extent of the easements. The admissions, testimony, maps, and photographic evidence provided more

than adequate support for the district court's ruling as to the extent of the easement. The Eighth Circuit noted in particular that, even if the 1966 easements and older materials left room for doubt, the 1973 map clearly identifies that the areas subject to Peterson's actions fall within the easement. As to the third issue, the district court found the government witness more credible on the issue of damage to the wetlands than Peterson's expert.

The four wetlands were restored by U.S. Magistrate Judge Senechal's order on September 6, 2006. The Service supervised a local contractor as they constructed the four ditch plugs. Mr. Peterson bore the costs of the restorations.

All four of the wetlands involved in the above-described proceedings were drained again in 2007. As a result, the government charged Peterson with two counts of draining easement wetlands. In addition, a fifth wetland, covered by the provisions of Walsh County Easement 56x, 1 was also drained. A bench trial in U.S. District Court was held in July 2008, with U.S. Magistrate Judge Senechal presiding. The details of that trial are outlined above.

**7. <u>U.S. v. Alvin Peterson [2:08-mj-16 (2008)][10-1577(8th Circuit)]</u>**

Defendant Alvin Peterson, Lawton, ND, appealed the decisions of the U.S. District Court, District of North Dakota, which affirmed his conviction by a U.S. Magistrate Judge of draining four wetlands covered by the provisions of Walsh County Easements 124x and 56x-2. Three of these wetlands were restored by U.S. District Court order {U.S. v. Alvin Peterson [2:04-cr-102 (2005)] [05-4248(8th Circuit)]} in September 2006. The Eighth Circuit affirmed the judgment of the district court.

In Peterson's appeal, Peterson claimed the Government's evidence was insufficient to prove that the drained wetlands existed at the time of the 1966 easement's acquisition. The court disagreed with this argument based on aerial photos taken in 1962 and expert testimony from a FWS biologist. The 1962 photo was also compared with a 1973 photo which shows the wetlands were still present and of a similar size and shape. Therefore, the court found that the wetlands were indeed present in 1966 when the easement was acquired.

Peterson's second argument was that the Government failed to show that the specific wetlands he drained were covered in the 1966 easement, due to the fact that there is no "contemporaneously-filed map" or a "delineation of the wetland acreage." Peterson argued that the Government cannot prove which wetlands were included in the easement summary acres. The court noted the Government does "not need to legally describe the confines of each covered wetland under the pre-1976 easements" based on the *Johansen* decision (see above). However, it is insufficient to show only that the drained wetlands were in existence at the time of easement conveyance. With no map or other method of identifying specific wetlands covered, the Government can still prevail by proving that the easement encumbers *all* wetlands that were in existence at the time of the

conveyance. The court ruled that the drained wetlands were covered by the 1966 easement because the drained wetlands were in existence at the time of the conveyance, and because the 1966 easement covers all wetlands that were in existence at the time of the acquisition, despite the easement's failure to include a contemporaneously-filed map or provide a section-by-section breakdown of the wetland's acreage.

Peterson's third argument was that the Government failed to show that he knew the scope of the 1966 easement. The court disagreed with this as the court again referenced the *Johansen* case, that the Government need only prove that Peterson "knew that *the parcel* was subject to a federal easement." The court determined Peterson's earlier conviction for draining the same wetlands was evidence enough that he knew of the easement.

Peterson's final argument was that his actions amounted only to the permissible cleaning of natural waterways that had become overgrown and filled with silt. The court determined that Peterson's claim had no merit as the contractor removed, at Peterson's direction, the man-made earthen plugs that were installed as restoration measures required by his previous conviction, and breached the wetland basins.

## C. **U.S. Supreme Court Decisions**:

### 1. **North Dakota v. United States [U.S.. 1983 103 S. CT. 1095]**

This case arose out of a longstanding dispute between the State of North Dakota and the Fish and Wildlife Service. In brief summary, the Federal Migratory Bird Hunting Stamp Act authorizes the Secretary of the Interior to acquire easements over wetland areas suitable for migratory waterfowl breeding and nesting grounds. Section 3 of the Wetlands Act of 1961 (Loan Act) provides that no land suitable for waterfowl habitats can be acquired with money from the fund established for such acquisitions unless the acquisition "has been approved" by the Governor or an appropriate agency of the State in which the land is located. Between 1961 and 1977, successive Governors of North Dakota consented to the acquisition of easements covering approximately 1.5 million acres of wetlands in that State. By 1977, the United States had obtained easements covering about half of this acreage. In the 1970's however, cooperation between North Dakota and the United States began to break down, and in 1977, North Dakota enacted statutes restricting the United States' ability to acquire easements over wetlands. These statutes set out certain conditions that must be met "prior to final approval" of the acquisition of the easements, permitted a landowner to drain any after-expanded wetland in excess of the legal description in the easement, and limited all easements to a maximum term of 99 years. The United States brought suit in Federal District Court, seeking a declaratory judgment that, *inter alia*, the 1977 North Dakota Statutes were hostile to Federal law and could not be applied and any easement acquired in violation of

such Statutes would nevertheless be valid. The District Court granted summary Judgment for the United States, and the Court of Appeals affirmed.

North Dakota then appealed to the Supreme Court of the United States. The Supreme Court subsequently upheld the Government's right to secure wetland areas by deciding the following two issues:

a. The consent required by Section 3 of the Wetlands Loan Act cannot be revoked at the will of an incumbent Governor. To hold otherwise would be inconsistent with the Loan Act's purpose of facilitating the acquisition of wetlands. Here, the acquisition in question clearly "has been approved" by North Dakota's Governors as Section 3's language provides. Nothing in the statute authorizes the withdrawal of approval previously given. Nor does Section 3's legislative history suggest that Congress intended to permit Governors to revoke their consent.

b. Since Section 3 of the Loan Act does not permit North Dakota to revoke its consent outright, the State may not revoke its consent based on noncompliance with the conditions set forth in the 1977 legislation. And to the extent that such legislation authorizes landowners to drain after expanded wetlands contrary to the terms of their easement agreements, it is hostile to Federal interest and may not be applied. For the same reason, the statute limiting easements to a maximum term of 99 years may not be applied to wetlands acquired by the United States pursuant to previously given consents.

The Court also stated that: "North Dakota [the State] must yield to the overriding national interest in protecting migratory birds."

**Additional Easement Court Cases Involving Other Agencies**

**1. <u>United States (NRCS) v. Arthur Polk (Case No. 08-CR-128, District of Wisconsin 2008)</u>**

On May 6, 2008, the grand jury returned an indictment against defendant Arthur Polk for a felony pursuant to Title 18 U.S.C. § 641. On May 27, 2009, the Government reduced the charge to a single count misdemeanor pursuant to Title 18 U.S.C. §§ 1853 & 2. Arthur Polk voluntarily agreed to plead guilty to the count and had signed a plea agreement indicating so. The defendant agreed to pay restitution at or before sentencing in the amount of $8,000
Background

The Wetlands Reserve Program (WRP) is administered by the U.S. Department of

Agriculture's (USDA) Natural Resources Conservation Service (NRCS). Among other things, the program provides landowners with financial incentives to restore, protect, and enhance wetlands. As part of the program, landowners are paid for easement rights to their land in perpetuity. Landowners participating in the WRP control access to the land in the easement and may sell their property (so long as they disclose the existence of the easement). In addition, they may use (or lease) the land for hunting, fishing, and other recreational activities. However, the easement agreement prohibits certain other activities, such as harvesting wood products, cutting hay, or grazing livestock, unless they are first approved as "compatible" by the NRCS.

Duffy's Marsh is a 1700-acre freshwater marsh in Marquette County, Wisconsin. Prior to being restored a wetland, it had been drained and used as cropland for four decades. Appreciating the value of wetlands as habitat for wild animals and especially birds, the landowners surrounding the marsh voluntarily joined the WRP and granted permanent conservation easements to the Government in exchange for cash payments. Payments reflected the value of the land, including the loss of its use for agricultural purposes. Among the landowners who joined the WRP's Duffy's Marsh project were Arthur Polk and his wife. In 1996, they executed a warranty easement deed giving NRCS permanent easement rights to restore, protect, manage, maintain, and enhance 457 acres of their land in the marsh.

In exchange, they received $231,293.57. The terms of the easement reserve certain rights to the Polks, including record title (and the right to convey the property, subject to the easement), the right to quiet enjoyment, control of access, the right to "undeveloped" recreational uses such as hunting and fishing, and subsurface mining rights. The easement confers upon the Government the right to engage in certain other activities, including the harvesting of wood products, and states that such activities "are prohibited of the landowner on the easement area." However, the easement also provides that the NRCS may authorize, in writing, a landowner's use of the easement area for "compatible" economic uses, including managed timber harvest, if such uses are deemed by NRCS as "consistent with the long-term protection and enhancement of the wetland and other natural values of the easement area."

Polk was an active participant in the Duffy's Marsh project and attended meetings in 1997and again in 2001 where the requirement of obtaining a "compatible use permit" for any vegetation management was reviewed. A letter to Polk in early 2001 also emphasized this requirement as follows: This letter is your notification of the need to request and receive written authorization for any compatible use activities on your WRP easement area. A compatible use can be defined as any activity that impacts vegetation or hydrology (positive or negative). A compatible use authorization is required prior to engaging in any activity not reserved to the landowner under the terms of the WRP Warranty Easement Deed . . . If you desire to engage in any . . . activities on the easement area [other than those reserved to the landowner], you must request authorization from the NRCS.

The same requirement was also addressed in a WRP newsletter sent to landowners in May of 2002.

On March 1, 2004, while working on nest boxes in Duffy's Marsh, Gregory Kidd, an NRCS biologist, discovered that trees had been cut on the easement area of the Polks' land. He could observe tire tracks and logs stacked in a pile. He went back 2 days later to take photographs and determined that approximately 100 trees had been cut. Kidd's discovery triggered an investigation by NRCS and eventually the USDA's Office of Inspector General.

The WRP employee who worked most closely with Polk was Alison Pena. She met with Polk and other landowners in 1995 to review the terms of the conservation easements and worked with the Polks in reviewing their easement deed before it was recorded. Pena stated that Polk had never requested a compatible use permit or asked to harvest trees on the easement area of his land.

A former WRP participant in the area told investigators that he saw several trees cut and hauled out of Polk's easement area between January and March 2004. He related that Polk had told him he had the trees cut by a local contractor and that "as long as he [was] paying the taxes on the property, he [could] do whatever he wanted to do . . . . "
An employee of the contractor confirmed that between January and March 2004, Polk had asked him to cut some trees for him as a favor (Polk had apparently allowed the contractor to use his property so that the contractor could access a worksite on adjacent land). The employee of the contractor stated that Polk told him he owned the land and pointed out which trees he wanted cut. He recalled taking about half of the felled trees to be burned and leaving the other half onsite. Polk did not pay for removal of the trees.
Chapter 13: Relevant Court Decisions

Polk admits that in approximately December of 2003 he had the contractor cut trees from the easement area of his property. He also admits that he did not seek written permission from NRCS to have the trees cut. According to Polk, the trees felled were cottonwood trees that he wanted removed because they are "dirty seeding trees."
This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, this offense.

**United States (Forest Service) v. Edward Higley (Civil No. 92-04448-N-HLR, District Court of Idaho 1994)**
Defendant built a road on a scenic easement in violation of the U.S. Forest Service’s scenic easement covenants. The defendant was found in violation by the court and ordered to restore the area in question. The court also stipulated if the area was not restored by a set date the Forest Service could restore the area to the sum of $4,088.00, which would be paid by the defendant.

*This page intentionally left blank*

File Orig Basin Drainage
Copy - Loose Leaf Binder ✓ MP

# United States Department of the Interior

Exhibit XIV-3

OFFICE OF THE SOLICITOR

DENVER REGION
P.O. BOX 25007
DENVER FEDERAL CENTER
DENVER, COLORADO 80225

Wildlife Res. JUL - 2 1985

RECEIVED

July 1, 1985

JUL 22 1985

AUDUBON NWR

FWS.RM.9950

Memorandum

To: Regional Director, Fish and Wildlife Service
Attn: Terry Grosz
✓Marvin Plenert

From: Regional Solicitor, Rocky Mountain Region

Subject: Drainage of Partially Owned Wetlands

Enclosed is an opinion from our Minneapolis field office that is of interest to you. North Dakota uses the reasonable use test as does Minnesota so much of this memo though based on Minnesota cases, is applicable to situations in this region. Please distribute to appropriate regional and field office staff.

Margot Zallen

Margot Zallen
For the Regional Solicitor
Rocky Mountain Region

Enclosure

Audubon
National Wildlife Refuge

| To | Routing | Action |
|---|---|---|
| | P.L. | |
| | A.P.L. Pa | |
| | B.T. | |
| | R.A | |
| | B.A | |
| | Shop | |
| | Other | |
| File | Destroy | |

# United States Department of the Interior

OFFICE OF THE SOLICITOR
Office of the Field Solicitor
686 Federal Building, Fort Snelling
Twin Cities, Minnesota 55111

Marg FYI

IN REPLY REFER TO:

Exhibit XIV-3

June 3, 1985

FWS.TC.0263

Mr. Harvey K. Nelson
Regional Director
U.S. Fish and Wildlife Service
Federal Building, Fort Snelling
Twin Cities, Minnesota 55111

Attention: Tom Follrath, Realty

Re: Drainage of Partially Owned Wetlands

Dear Mr. Nelson:

In April of 1985 this office received an oral request for an opinion on the current status of the law in Minnesota regarding the drainage of wetlands. The request specifically asked what evidence would need to be produced in order to enjoin a private landowner from draining a wetlands basin lying partially on the landowner's property and partially on Fish and Wildlife Service property. We have attempted to set forth the rule of law followed in Minnesota, along with the factors and evidence relevant to obtaining a remedy in equity.

In the absence of applicable federal law, the federal courts will apply state law. Erie R. Co. v. Tompkins, 304 U.S. 64 (1938). Since no federal statute or regulation specifically sets forth the standards to be applied in situations involving the drainage of federally-owned wetlands, state law must be looked to as controlling the substantive issues of law. Hence, Minnesota law will be looked to in federal court proceedings concerned with the drainage of wetlands located within that state.

The rule of law used by the courts in Minnesota in cases concerned with the drainage of surface waters is the "reasonable use" rule. In Enderson v. Kelehan, 32 N.W.2d 286 (Minn. 1948), a farmer drained a portion of his land to make it tillable, discharging the water onto the land of a neighbor. The Supreme Court of Minnesota concluded that, in effecting a reasonable use of his land for a legitimate purpose, a landowner acting in good faith might drain his land and cast the surface waters on the land of another if four conditions were satisfied: (1) there was a reasonable necessity for doing so, (2) reasonable care was taken to avoid unnecessary injury to the land receiving the water, (3) the utility or benefit accruing reasonably outweighed

the gravity of the harm resulting, and (4) where practicable, the drainage was accomplished by reasonably improving and aiding normal and natural drainage systems. Id. at 289.

In Enderson, the court relied on evidence that the defendant landowner's new drainage system had rendered a large area of his farm tillable with only a comparatively insignificant increase in the amount of water discharged on his neighbor's land. The court affirmed the lower court's finding that the drainage system was justified. Although the Fish and Wildlife Service is concerned with drainage from instead of onto its lands, the same principles and rule of law would apply in such cases.

Later court decisions in Minnesota have also applied the "reasonable use" rule to drainage problems. The court in Johnson v. Agerbeck, 77 N.W.2d 539 (Minn. 1956) cited the four-part test set forth in Enderson, supra. In concluding that the evidence in that case did not support a finding that the defendants had unreasonably increased the flow of surface waters onto the plaintiffs' land, the court in Agerbeck emphasized the fact that the defendant had only augmented natural drainage channels. In both Highview North Apartments v. County of Ramsey, 323 N.W.2d 65 (Minn. 1982), and Miles v. Oakdale, 33 N.W.2d 51 (Minn. 1982), the court applied the reasonable use rule to drainage systems established by local units of government. In the latter case, the court emphasized that the burden and damage to the affected landowner must be given particular attention. Thus, while the court has emphasized different factors depending upon the particular circumstances of each case, the four-part test used in Enderson, supra, is still the basis for determining reasonableness in drainage cases in Minnesota.

In applying the reasonable use rule, Minnesota courts have attempted to determine the rights of the parties by an assessment of all the relevant factors. Following is a list of factors which could increase the likelihood of obtaining an injunction against the drainage of a co-owned wetland if they were proved:

1. Adverse effects on water quality in the area.

2. The existence of few, if any, alternatives to achieving FWS objectives in the area.

3. Clearly measurable adverse effects on fish and wildlife resources.

4. Adverse impact on the environment.

5. Adverse impact on public waters in the area.

6. Clear knowledge by the defendant of the FWS program and its objectives and of the adverse effects his actions would have thereon.

7. Prior notice to the defendant of the damage his actions would cause to FWS lands.

8. Reasonably foreseeable damages resulting from defendant's actions.

9. Defendant's intent to drain FWS lands and/or defendant's motivation to damage FWS lands.

10. Lack of historic diversion of the water, e.g., drains, tiles, etc. which never existed before.

11. Failure to follow natural watercourses.

12. More acres drained on FWS land than on private landowner's land.

13. Value of defendant's property not appreciably increased by drainage.

14. Drained property not particularly suitable for farming (or whatever use to which defendant has or proposes to put it).

15. FWS property highly valuable for fish and wildlife purposes.

16. Little need of defendant to drain his portion of the wetland.

17. Methods used by the defendant inappropriate to the objectives sought by the defendant in that they unnecessarily damaged FWS property.

18. FWS property rendered valueless for purposes for which it was acquired.

19. Adjoining and/or surrounding property not being used (or likely to be used) for the purposes for which the defendant uses or proposes to use the drained property; i.e. use made by defendant is not one which an ordinary landowner would make.

20. Resulting injuries to FWS such that people of common sensibilities and tastes would not be required to endure.

21. FWS property:
   a. has a fairly well-defined shoreline,
   b. is not low and swampy,
   c. is not intermittently dry.

If these factors are proved, the court is more likely to find the water body a "pond," which adds value to property and therefore should not be drained.

22. The FWS property is almost all or is totally marsh which is or will be affected by defendant's actions.

23. Defendant's land is not very productive after being drained.

24. Marsh on FWS property increasing rather than shrinking in size.

25. If defendant uses existing drainage ditches:
 a. ditch was ineffective in draining marsh when originally constructed.
 b. ditch was purposefully filled in or dammed up at some point in time (with good reason).

One of the factors recently emphasized by the Minnesota Court of Appeals, in Roach v. Commissioner of Department of Natural Resources, 356 N.W.2d 432 (Minn. App. 1984), is whether feasible alternatives exist to the landowner's proposed action which would lessen the impact on natural resources. In Roach, a developer wanted to construct a causeway to an island by filling in a portion of the lakebed. The court concluded that ample evidence supported the findings of the Commissioner that a roadway filling the lake would impair natural resources and that a longer bridge constructed out of timber was a feasible and prudent alternative. The court reached this conclusion even though it was estimated that the bridge would cost $53,500 while the causeway would cost only $5,000. This decision indicates that an alternative will still be considered feasible, and will be weighed by the court, even though it might be much more expensive than the landowner's proposed action.

The court in Roach, supra, also applied a balancing approach, assessing the benefits that might conceivably result to offset the environmental disruption that would be caused. The court subscribed to the conclusion of the Commissioner in a memorandum attached to his Order:

> "The Applicant here seeks to appropriate a portion of the public domain, the lakebed, for enhancing his development of the island, a private property. As part of this appropriation, there will be: water quality disruption during construction, destruction of protected vegetation, destruction of wildlife habitat, destruction of fish spawning and adult habitat, obstruction of navigation, and creation of an esthetic intrusion and a potential water safety hazard. In return, the value of the lots will probably increase because a few future owners can drive their cars out there. There is no general benefit or return to the public at large, and there is no benefit at all that could conceivably offset the environmental disruption that would be caused."

Roach, supra at 435.

The impact cited by the court in Roach would also be weighed by a court in balancing the benefits and detriments in a wetlands drainage case. It appears from the court's decision in Roach that mere increase in land value would not automatically justify the improvement. Instead, the increase in value must be weighed against environmental, wildlife and even aesthetic impacts. While the impacts cited by the court in Roach indicate what considerations will be weighed in balancing benefits against detriments, ascertaining the "value" of wetlands so as to give them proper weight is not an easy task. Some guidance can be obtained by looking at cases where courts have had to assess the proper amount of monetary damages in actions for recovery of damages to natural resources under statutes designed to protect the environment.

One case which extensively explored this issue was Commonwealth of Puerto Rico v. SS Zoe Colocotroni, 628 F.2d 652 (1st Cir. 1980), cert. denied, 450 U.S. 912 (1981). The evidence in that action indicated that the defendants were responsible for releasing oil which contaminated approximately 20 acres of coastal mangrove forest in a virtually uninhabited area of Puerto Rico. The defendants claimed that damages should be limited to the diminution of market value of the affected lands, the traditional measure of liability. Puerto Rico argued, however, that the mangrove area had no significant commercial or market value but considerable ecological value. The court reasoned that, because the Puerto Rico statute authorized recovery of the total value "of damages to the environment," that to use the traditional "diminution of value" measure of damages would frustrate the apparent intent of Puerto Rico to preserve natural areas like the one despoiled. 628 F.2d at 673. The search for an appropriate alternative measure of damages led the district and appellate courts to two different conclusions.

The major element of damages, in the decision of the district court in Colocotroni, has been determined by calculating the "replacement cost" of individual organisms affected by the spill. 456 F.Supp. 1327 (D.P.R. 1978). The evidence presented to the court indicated that some 92 million invertebrate organisms had been affected and that the cost of acquiring similar organisms from biological supply houses was in excess of five million dollars. The Court of Appeals, however, rejected this as a proper measure of damages. The court reasoned that the cost of "replacement" was an appropriate component of damages only when such replacement was in fact to be carried out as part of a larger restoration program. 628 F.2d at 676-77. The proper measure of damages, in the opinion of the Court of Appeals, was

> ". . . the cost reasonably to be incurred by the sovereign or its designated agency to restore or rehabilitate the environment in the affected area to is

> [sic] pre-existing condition, or as close thereto as is feasible without grossly disproportionate expenditures. The focus in determining such a remedy should be on the steps a reasonable and prudent sovereign or agency would take to mitigate the harm done by the pollution, with attention to such factors as technical feasibility, harmful side effects, compatibility with or duplication of such regeneration as is naturally to be expected, and the extent to which efforts beyond a certain point would become either redundant or disproportionately expensive." Colocotroni, supra at 675.

The Colocotroni standard leaves a court with considerable discretion in determining what restoration costs are reasonable. Examples of such discretion being employed by the Minnesota Supreme Court appear in the cases of Baillon v. Carl Bolander & Sons Co., 235 N.W.2d 613 (Minn. 1975), and Rector, Etc. v. C.S. McCrossan, 235 N.W.2d 609 (Minn. 1975). Both cases involved claims for damages for destruction of trees. In Baillon, the trees were, "for the most part, quite small, ill formed, and not particularly desirable as shade trees or ornamental trees but did serve to prevent erosion and act as a sound barrier." 235 N.W.2d at 615. The court in Baillon said that the measure of damages for destruction of the trees was the diminution in value of the real estate rather than the replacement cost of the trees.

In contrast, the court in Rector held that the proper measure of damages was the replacement cost of the trees rather than the diminution in value of the real estate.

> "[I]t is the better rule that where trees and shrubbery have aesthetic value to the owner as ornamental and shade trees or for purposes of screening sound and providing privacy, replacement cost may be considered to the extent that the cost is reasonable and practical." Rector, supra at 611.

The court admitted to the flexibility inherent in its holdings, noting that if the cost of replacement is excessive in relation to the damage to the land itself, the court will, in its discretion, allow the jury to consider more than one measure of damages "in order to permit flexibility and achieve a just and reasonable result." Id. at 613.

The decisions in these cases indicate that the courts are willing to consider other factors besides purely economic replacement costs or market values in assessing damages for destruction of natural resources. In particular, following the Rector ruling, aesthetic value will be weighed. Other factors considered in assessing damages for injury to real property include:

1. Value of the property before and after injury.
2. Character of property.
3. Original cost.
4. Reproduction cost.
5. Depreciation.
6. Use being made of property.
7. Use to which property may be adopted.
8. Income produced.
9. Prices realized in sale of comparable properties.
10. Cost of repairs or restoration.
11. Rental value.
12. Use Value.
13. Particular injury or interference with use and enjoyment.
14. Injury to plants, animals.
15. Pollution of streams, percolating waters, springs or wells.
16. Deprivation of use of water.
17. Loss of swimming, boating, fishing or hunting privileges.

Once the decision has been made to seek an injunction against the drainage of a particular parcel of land or to sue for damages and the factors favoring the issuance of an injunction have been identified, it is then necessary to determine and collect the evidence which will best present these favorable factors to the court. The Minnesota Supreme Court in Roach was impressed by the testimony offered by an hydrologist, a fishery supervisor, a wildlife manager and a county conservation officer on behalf of the Department of Natural Resources. In deciding for the Department, the court stated that: "The expertise of these witnesses is noteworthy, and their testimony rests as uncontroverted proof of significant impairment of natural habitat for waterfowl and for the spawning and rearing of fish." Roach, supra at 434-35. Thus, the testimony of experts can have a significant role in persuading a court or jury of the value of a wetland.

Some of the beneficial purposes of a wetland which might be testified to by expert witnesses include:

1. Water supply for municipal, industrial, or agricultural purposes;

2. Recharge of underground water strata;

3. Retention of water to prevent or reduce downstream flooding, thereby minimizing erosion and resultant property damage;

4. Entrapment and retention of nutrients and other materials which impair the quality of natural resources;

5. Recreational activities such as swimming, boating, fishing and hunting;

6. Public navigation other than for recreational purposes;

7. Wildlife habitat areas for the spawning, rearing, feeding and nesting of wildlife;

8. Areas designated as scientific and natural areas;

9. The existing land use of the area;

10. The soil types surrounding and underlying the marsh;

11. The relative agricultural and wildlife productivity of the area; or

12. Relevant provisions of a county or municipal shorelands ordinance.

Matter of Plum Grove Lake (Lake 3-564), 297 N.W.2d 130, 134 (Minn. 1980).

The testimony of long-time local residents may also be used to produce evidence on matters personally known to them. Useful physical or demonstrative evidence might include: surveys or aerial photos of the marsh, maps showing damaged areas, flowages (natural and man-made), topography, etc., photographs of dams, ditches, burning, etc., appraisals of subject property and comparable parcels, or reports relating to water levels, wildlife production, etc. The actual witnesses to be called and physical evidence to be introduced will, of course, be determined in consultation with the attorneys representing the Service.

In conclusion, an action to enjoin a landowner from draining co-owned wetlands and to obtain restoration will succeed if it can be proved that the drainage was unreasonable. In proving the unreasonableness of the drainage, attention should be given to the four-part test set forth in Enderson, supra, as well as the factors listed on pages 2-4 of this letter. The Service should attempt to show that feasible alternatives are available to the

Exhibit XIV-3

defendant and that the damage to FWS lands outweighs the benefits to the landowner. The value of the wetlands in more than mere economic terms should be attested to by experts.

In deciding which neighboring landowners to proceed against, those cases where favorable factors can be proved most easily should be pursued first. If you have further questions, please contact this office. Your file materials are enclosed.

Sincerely,

Mariana R. Shulstad
Field Solicitor

Enclosure

cc:
John Decker, Law Enforcement

SGM:pjn

Exhibit XIV-4

**U. S. Department of Justice**

*United States Attorney*
*District of North Dakota*

*Quentin N. Burdick United States Courthouse* *701-297-7400*
*655 First Avenue North - Suite 250* *FAX: 701-297-7405*
*Fargo, ND 58102-4932* *ADMIN FAX: 701-297-7425*
*FLU FAX: 701-297-7435*
*TOLL FREE: 1-888-716-7395*

TO: LAW ENFORCEMENT AGENCY HEADS
FROM: LYNN C. JORDHEIM, Acting United States Attorney
DATE: June 14, 2010
RE: United States Attorney's Office Discovery Policy

Due largely to several recent high-profile cases, disclosure of both inculpatory and exculpatory evidence to the defense has become a hot button topic around the country. It has also become an issue within the District of North Dakota, including in a very recent case in which the Indictment was dismissed and the presiding judge wrote a letter criticizing the investigators for failure to turn over materials to the AUSA handling the case. I note that this failure was not the stated reason for the dismissal, but we are of the view that it likely influenced the judge and, perhaps more importantly, prevented this office from accurately assessing the strengths and weaknesses of the case when making the decision to indict.

We believe that it is necessary for this office and yours to make a more concerted effort to ensure that investigative reports, witnesses statements, photographs, and the like, are compiled in a timely manner by the case agents, and that they are shared with the assigned AUSA(s) in a timely manner. To that end, I have prepared the attached document, styled in the form of a letter to our office, to be prepared by the case agent in each case which is to be presented to the grand jury.

It is a simple form letter which in itself will require minimal effort on the part of your agents to complete and send. It serves two essential purposes: 1) it forces your agents to review their case file at key moments to ensure that their investigation is thorough and complete; and, 2) it documents, for the benefit of your agent and our office, good faith efforts to ensure that all relevant information has been shared in a timely manner.

As you will see, each case agent is responsible for making this certification before presentation of the case to the grand jury. If we do not have the certification, we will not present the case to the grand jury. A second certification is required for cases going to trial. It must be presented to us two weeks before trial. Note that this is not "at least" two weeks, but two weeks - this will enable us to know that the information is complete as we enter that critical window of pretrial preparation for both the prosecution and the defense.

It is very important that the agents realize that this is not meant to be in lieu of their obligation to continually collect and share information with us as it is gathered in every case.

Our hope that no one is offended by this policy that we have adopted. It is not meant to be a negative reflection on the agents with whom we work, as we believe them to be the finest kind, with whom we are proud to be associated. It is meant to be a tool for case agent and prosecutor alike to help ensure that all of our cases are as strong as they can be.

Please, if you have any questions or concerns, let me know right away so that we can discuss them; I value your input. Meanwhile, this policy takes effect immediately and therefore applies to any cases that are to be presented at the July grand jury, for which the indictment deadline is June 28. It also applies to any currently charged cases awaiting trial.

LCJ:tla
Attachment

# INVESTIGATIVE DISCLOSURE CERTIFICATION

Recent developments in criminal cases throughout the United States, including in the District of North Dakota, have emphasized and enhanced the obligation of the government to make timely disclosure of certain investigative materials to the defense. Failure to make timely disclosure has resulted in the exclusion of such evidence at trial, and, in some cases, the outright dismissal of cases, even cases which have resulted in guilty verdicts. To ensure compliance with statutory and constitutional disclosure requirements, the United States Attorney's Office for the District of North Dakota has developed the policies described in this letter.

You are receiving this letter because you are either the case agent in charge of an investigation of a matter that may result in a federal prosecution in the District of North Dakota or are assisting in conducting such an investigation. The agency case number is

______________________.

Every law enforcement officer, whether federal, state, local or tribal, assisting in the investigation of this matter has a separate obligation to ensure that all items of evidence and information gathered in the course of the investigation are disclosed in a timely manner to the Assistant United States Attorney (AUSA) assigned responsibility for the case in the United States Attorney's Office. It is the responsibility of the case agent to ensure that all individuals assisting in the investigation understand their responsibilities in this regard and comply with the directives of this letter.

It is the policy of the United States Attorney's Office for the District of North Dakota that all items collected (including, but not limited to, physical items, documents, photographs, sketches, hand-written statements of subjects and witnesses, audio and video recordings), all interviews conducted, as well as all reports generated in the course of the investigation, be provided to the assigned AUSA before the case is scheduled for presentation to the Grand Jury for indictment so that the AUSA can fully evaluate the strengths and weaknesses of the case and begin the process of identifying material which must ultimately be disclosed to the defense. The case agent will certify below that all necessary steps have been undertaken to ensure compliance with this requirement.

Because it is not uncommon for additional investigative materials to be generated or collected after indictment, the case agent will again certify two weeks before the scheduled date for trial of the matter that all necessary steps have been taken to identify and acquire such materials and that the same have been disclosed to the assigned AUSA.

Finally, the obligations of the case agent and those assisting the case agent with respect to the disclosures described above are ongoing, meaning that, even after the certifications below have been executed, they are required to take all necessary steps to

ensure that ALL investigative materials are discovered and disclosed to the assigned AUSA as soon as possible after their discovery or creation.

Lynn C. Jordheim
Acting United States Attorney
District of North Dakota

## PRE-INDICTMENT CERTIFICATION

I, ________________________________________, am the case agent/assisting in the investigation identified above and certify that I have taken all necessary steps to identify and collect all items discussed above and that I have disclosed their existence to the AUSA assigned to the case. If I am the case agent, I further certify that I have identified and disclosed to the assigned AUSA all those individuals who assisted in the investigation of this matter and have further ensured that they executed a separate INVESTIGATIVE DISCLOSURE CERTIFICATION and have provided the same to the assigned AUSA.

________________________________ ________________
Certifying Officer's signature Date

## PRE-TRIAL CERTIFICATION

I, ________________________________________, am the case agent/assisting in the investigation identified above and certify that I have taken all necessary steps to identify and collect all items discussed above and that I have disclosed their existence to the AUSA assigned to the case. If I am the case agent, I further certify that I have identified and disclosed to the assigned AUSA all those individuals who assisted in the investigation of this matter and have further ensured that they executed a separate INVESTIGATIVE DISCLOSURE CERTIFICATION and have provided the same to the assigned AUSA.

________________________________ ________________
Certifying Officer's signature Date

# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

In Response Reply to:
FWS/ANRS/BP35142

DEC 23 2019

Memorandum

To: Regional Directors Interior Regions 3 and 5

From: Principal Deputy Director

Subject: Template for a Revised Format for Pre-1976 Wetland Easement Maps

The Department of the Interior Secretary's Fiscal Year 2020 priorities for the U.S. Fish and Wildlife Service (FWS) stipulate that pre-1976 wetland easements will be mapped and mailed to landowners in a new format. Effective immediately, correspondence sent to owners regarding lands encumbered by pre-1976 wetland easements will include a map depicting the protected wetland areas, overlaid on a high-quality aerial image (example attached), and shall be sent via certified mail. These maps shall:

1. Be created by Section (1 mile x 1 mile) and produced on a 6" scale;
2. List the easement number, county, and legal description of the easement tract above the upper left corner of the image;
3. Include a legend that identifies Section Boundary, Easement Boundary, and Wetland Areas Covered by Provisions of the Easement;
4. Include a clarifying statement that reiterates the provisions of the wetland easement and limitations of the map;
5. List the map data sources and map creation date;
6. Include a scale immediately below the image, and a map direction symbol on the lower right side of the image; and
7. List the acreage of each wetland area that is subject to the wetland easement.

The correspondence will also include a copy of the wetland easement agreement and identify the servicing wetland management district office, which the landowner should contact with any questions.

Finally, the correspondence shall inform them of their right to appeal these mapping determinations to the FWS Regional Director and FWS Director. The following language shall be inserted into all initial correspondence from the FWS to landowners transmitting pre-1976 wetland easement maps:

"Please review the enclosed contract and map carefully. You may contact me at the address listed above within the next 40 calendar days from the date you received this letter via certified mail if you have objections with the map. I am willing to discuss and/or meet with you and review your concerns and correct any errors. If we cannot agree on the boundaries and location depicted on the map within 30 calendar days of our initial contact, you may appeal the map as follows:

- Submit your appeal and any supporting materials or explanation in writing within 30 calendar days of the date of the decision from the Refuge Manager to the Regional Director at the address listed below. Include a detailed explanation of why you are appealing the map.

  Regional Director<br>C/O: Map Appeal<br>U.S. Fish and Wildlife Service<br>P.O. Box 25486<br>Denver, Colorado 80225

  or

  Regional Director<br>C/O: Map Appeal<br>U.S. Fish and Wildlife Service<br>5600 American Blvd. West<br>Suite 990<br>Bloomington, MN 55437-1458

- The Regional Director will review and make a decision on your appeal within 45 calendar days from receipt of your letter. The Regional Director is willing to discuss and/or meet with you and review your concerns. If the Regional Director grants your appeal, the wetland map will be revised and a new copy of the map, with an explanation of the decision, will be sent to you and the local U.S Fish and Wildlife Service office.

- If your appeal is not granted, you may submit your appeal to the Director of the U.S. Fish and Wildlife Service. Submit your appeal and any supporting materials or explanation in writing within 30 calendar days of the date of the decision from the Regional Director to the Director of the U.S. Fish and Wildlife Service at the address listed below. Include a detailed explanation of why you are appealing the map.

  Director<br>C/O: Map Appeal<br>U.S. Fish and Wildlife Service<br>U.S. Department of the Interior<br>1849 C Street, NW<br>Washington, D.C. 20240

- The Director of the U.S. Fish and Wildlife Service will review and make a decision on your appeal within 45 calendar days of receipt of your letter. If the Director grants your appeal, the wetland map will be revised and a new copy of the map, with an explanation of the decision, will be sent to you and the local U.S. Fish and Wildlife Service office.

- If your appeal is not granted, a copy of the final wetland map and an explanation of the decision will be sent to you and the local U.S. Fish and Wildlife Service office. The decision of the Director will be considered the final agency action on the determination and, at this point, your administrative appeals will have been deemed exhausted.

Please be advised that if you choose to appeal your wetland easement map, no action will be taken against you, based on the map, until you have exhausted your appeal within the FWS."

All future correspondence with the landowner in which the Service provides wetland easement maps and wetland easement contracts are to include a map that displays the protected wetland areas over an updated aerial image.

# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington D.C. 20240

In Reply Refer to:
FWS/ANRS-NRCP/075165

Memorandum

To: Regional Directors, Interior Regions 3, 5, and 7

From: Chief, National Wildlife Refuge System Digitally signed by CYNTHIA MARTINEZ Date: 2021.07.14 17:23:49 -04'00'

Subject: Maintaining Summary Acreage During the Pre-1976 Wetland Easement Mapping and the Appeal Process

This memorandum provides supplemental, internal guidance for the U.S. Fish and Wildlife Service's (Service) pre-1976 wetland easement mapping process to ensure we fully maintain the property interests of the United States originally acquired from property owners to the extent possible. When landowners object to, or appeal, pre-1976 wetland easement maps, and map revisions reduce the total mapped acreage (e.g., mapped areas are removed, resized smaller, etc.) below summary acreage and additional identifiable wetland areas exist for the easement, then the Service shall map additional identifiable wetland areas as protected under the easement to meet or come close to mapping up to summary acreage. This is necessary in order to maintain the property interest originally acquired by the United States (5 CFR 2635.704).

The initial landowner correspondence should include language that informs the landowners that if the conditions described above apply, and the Service agrees to remove certain wetland areas from a map, then those acres deleted from the map must be replaced by other identifiable wetland areas not included on the original map. This ensures that the map reflects as close to summary acreage as possible, which is necessary to preserve the United States' property interests. The Service will coordinate with the landowner throughout this process to ensure they are aware of potential adjustments to the map as a result of their appeal.

This guidance would apply when a landowner provides objections to the Refuge Manager as well as appeals to the Regional Director and Director.

The new template letter to be used and mailed to landowners is shown in the attached Appendix A.

This guidance is effective immediately.

Attachment

An official website of the United States government Here's how you know

# Administration of National Wildlife Refuge System Conservation Easements

**Citation:** 601 FW 6
**FWM Number:** N/A
**Date:** Oct 27, 2022
**Supersedes:** 601 FW 6, 1/12/2015
**Originating Office:** Division of Natural Resources and Conservation Planning

**TABLE OF CONTENTS**


| Topics | Sections |
|---|---|
| **OVERVIEW OF THE POLICY** | 6.1 What is the purpose of this chapter? |
| | 6.2 What is the scope of this chapter? |
| | 6.3 What are the Service's authorities for acquiring and administering conservation easements? |
| | 6.4 Why does the Service acquire conservation easements, and what is the official Service policy on them? |
| | 6.5 What terms do you need to know to understand this chapter? |
| | 6.6 Who is responsible for administering Refuge System conservation easements? |

| Topics | Sections |
|---|---|
| **PLANNING AND ACQUISITION** | 6.7 What are the steps the Service must take when planning a new easement acquisition area? |
| | 6.8 What must the planning team do when developing an easement document for use in a new or existing easement acquisition area? |
| | 6.9 Is there a requirement to use a standard easement document? |
| | 6.10 What must easement documents include, and what is their duration? |
| | 6.11 Does the Service ever acquire public access rights in conservation easements? |
| | 6.12 From which types of landowners can the Service acquire conservation easements? |
| | 6.13 Can the Service accept donations of conservation easements? |
| | 6.14 Can the Service acquire conservation easements through statutorily required compensatory mitigation plans or mitigation banks? |
| | 6.15 Can the Service modify, amend, or exchange a conservation easement ? |
| | 6.16 What areas should be excluded from the easement document? |

| Topics | Sections |
| --- | --- |
| **MANAGING EASEMENTS AND USES** | 6.17 What are the requirements for posting the boundaries of conservation easements?<br>6.18 How does the Refuge System conduct refuge management activities on conservation easement lands?<br>6.19 How does a Refuge Manager determine what uses are allowed on easements?<br>6.20 How does a Refuge Manager allow a use when they find it compatible?<br>6.21 How does the Refuge System administer subsurface mineral rights on conservation easements?<br>6.22 What are the Service's responsibilities for documenting and recordkeeping at the field, Regional, and national levels? |
| **MONITORING AND INSPECTIONS** | 6.23 What is the purpose and priority of conservation easement monitoring and inspection?<br>6.24 How does the Service proactively protect its easement interests?<br>6.25 How often should conservation easements be monitored/inspected?<br>6.26 How do Refuge Managers monitor/inspect conservation easements for compliance? |
| **VIOLATIONS** | 6.27 What is the process by which easement violations are addressed? |

| Topics | Sections |
|---|---|
| **COMPLIANCE MANAGEMENT** | 6.28 What is the purpose of compliance management for an easement violation? |
| | 6.29 How does compliance management work? |
| | 6.30 How is the compliance management process documented? |
| | 6.31 How does a Refuge Manager close an easement violation processed through compliance management? |
| | 6.32 What happens if compliance management is unsuccessful? |
| **CRIMINAL INVESTIGATION** | 6.33 What is the purpose of a criminal investigation for easement violations? |
| | 6.34 How is a criminal investigation different from compliance management? |
| | 6.35 Who may conduct criminal investigations of easement violations? |
| | 6.36 What does a criminal investigation include? |
| | 6.37 How is a criminal investigation documented? |
| | 6.38 When may a criminal violation be closed? |
| | 6.39 What is the procedure for investigations that require criminal prosecution or civil action? |

# OVERVIEW OF THE POLICY

**6.1 What is the purpose of this chapter?** This chapter:

**A.** Provides national policy for planning, acquisition, administration, and enforcement of all conservation easements the U.S. Fish and Wildlife Service (Service) acquires as a part of the National Wildlife Refuge System (NWRS or Refuge System) for conservation purposes.

**B.** Establishes the Service's *Conservation Easement Handbook* (*Easement Handbook*), which employees and supervisors should review for more detailed information on how to acquire, manage, and enforce easements.

**6.2 What is the scope of this chapter?** This chapter applies only to easements that we acquire for conservation purposes. It does not apply to easements that we acquire as rights-of-way, such as easements that provide access, utility service, or water conveyance to Service lands, nor does it apply to flowage easements (i.e., where the Service has acquired the rights to overflow or flood private land).

**6.3 What are the Service's authorities for acquiring and administering conservation easements?**

**A.** Alaska National Interest Lands Conservation Act (16 U.S.C. 3101-3233).

**B.** Consolidated Farmers Home Administration Act of 1961 (also known as the Consolidated Farm and Rural Development Act) (P.L. 87-128, as amended).

**C.** Emergency Wetlands Resources Act (16 U.S.C. 3901).

**D.** Endangered Species Act (16 U.S.C. 1531-1543).

**E.** Fish and Wildlife Act of 1956 (16 U.S.C. 742a-754d).

**F.** Fish and Wildlife Coordination Act (16 U.S.C. 661-667e).

**G.** Land and Water Conservation Fund Act of 1965 (54 U.S.C. 200301-200310).

**H.** Migratory Bird Conservation Act (16 U.S.C. 715-715r).

**I.** Migratory Bird Hunting and Conservation Stamp Act (16 U.S.C. 718-718j).

**J.** National Wildlife Refuge System Administration Act of 1966, as amended by the National Wildlife Refuge System Improvement Act of 1997 (Administration Act, as Amended) (16 U.S.C. 668dd-668ee).

**K.** Refuge Recreation Act (16 U.S.C. 460k-460k-4).

**L.** Transfer of Certain Real Property and Administrative Services Act (16 U.S.C. 667b-667d, as amended).

### 6.4 Why does the Service acquire conservation easements, and what is the official Service policy on them?

**A. Why we have conservation easements:**

**(1)** Conservation easements offer an alternative to fee acquisition that can be ecologically effective and may be more financially feasible and socially acceptable than fee acquisition.

**(2)** A significant portion of the wildlife habitat in the continental United States is privately owned. It is essential to achieving our mission and ensuring an enduring wildlife legacy for future generations of Americans to protect wildlife access to, and use of, some private lands.

**(3)** Acquisition and management of conservation easements is a valuable tool to protect working landscapes and habitat values for our wildlife trust resources. Changes in rural economies, human population demographics, and new technologies for accessing energy sources and producing crops are changing human uses of the land and threatening the wildlife and habitat values of working landscapes.

**B. Our policy on acquiring conservation easements:** When acquiring real property interests, it is our policy to acquire the minimum interest necessary from willing sellers to reach wildlife conservation objectives. (See 341 FW 1.)

**C. Our policy on administering and enforcing conservation easements:** Conservation easements encumber private property, are subject to ownership changes, are typically perpetual in nature, and are often dispersed on the landscape. As a result, they are especially vulnerable to activities that violate Refuge System property rights and damage habitat values.

**(1)** Our priority is to work collaboratively with landowners/operators to implement or maintain beneficial habitat management practices on conservation easement lands. This includes Refuge Managers proactively communicating with landowners about easement restrictions to avoid misunderstandings on permitted land uses.

**(2)** It is necessary for us to regularly monitor/inspect conservation easements, maintain adequate records, and enforce easement provisions to preserve their value to trust resources and wildlife.

**(3)** Easement enforcement is a high priority for the Refuge System.

**6.5 What terms do you need to know to understand this chapter?**

**A. Approved acquisition boundary**: The boundary within which we have authority to acquire lands or interests in lands.

**B. Compliance management:** A process of ensuring parties are following the terms of an easement where a Refuge Manager (or their designee) works with a landowner/operator to develop and implement a plan to restore habitat damaged by an easement violation.

**C. Conservation easement:** An interest in land that a property owner has voluntarily sold, donated, or otherwise granted to the Service through a legal document. The purpose of a conservation easement is to protect or restore ecologically significant areas. They often include agreements to restrict development or particular uses (see 341 FW 6, Minimally Restrictive Conservation Easement Acquisitions). Our definition includes minimally restrictive conservation easements, such as grassland easements, habitat easements, and wetland easements, and also more extensive conservation easements.

**D. Criminal investigation:** In the context of easement violations, a criminal investigation includes gathering facts and evidence that may be tried in a court of law. Investigations can only be performed by Federal Wildlife Officers. Factors influencing whether a violation is referred to a Federal Wildlife Officer for a criminal investigation include previous history of violations, extent of the violation, and level of landowner cooperation.

**E. Easement acquisition area:** An area of the Refuge System where the Service plans to primarily acquire conservation easements. This may, but will not always, include conservation areas, limited-interest refuges, Waterfowl Production Areas (WPA), Wildlife Management Areas (WMA), and units within a national wildlife refuge . This term does not encompass individual conservation easements unless the individual easement will encompass the entire unit.

**F. Easement document:** The legal document used to convey a conservation easement or right of use from a landowner to the Service and that describes the exact provisions of the conservation easement. The document often contains restrictions on the use or development of the land to protect its conservation values.

**G. Easement tract:** The land covered by the easement, as described by the legal description in the easement document.

**H. Federal Wildlife Officer:** Commissioned, uniformed law enforcement officer of the U.S. Fish and Wildlife Service.

**I. Ground check:** An onsite visit of the easement tract to inspect for suspected violations or collect evidence that violations have occurred. Some Service staff use the term "ground check" informally to refer to pre-acquisition site inspections to delineate wetlands, conduct realty due diligence, etc. For the purposes of this chapter, "ground check" refers to visits related to criminal investigations.

**J. Inspection:** In the context of easement administration and compliance management, an inspection includes file reviews, photo interpretation, aerial reconnaissance, and onsite visits to determine whether the conservation easement is in compliance and, if not in compliance, what actions must occur to bring the conservation easement back into compliance. Both Refuge Managers and Federal Wildlife Officers can perform inspections.

**K. Landowner:** The owner of the land upon which the Service holds an easement.

**L. Land Protection Plan (LPP):** A document that we develop to evaluate project proposals to create new refuges or expand existing refuges. These project proposals are initially identified through the landscape planning and design process. LPPs include details about the project proposal and inform the public and landowners within the project proposal area about our plans. LPPs either incorporate a National Environmental Policy Act (NEPA) document or include evidence of NEPA compliance and compliance with other applicable laws, regulations, policies, and Executive Orders. See Part 602 of the Service Manual for more information on LPPs and the planning process.

**M. Law enforcement case file:** A file Federal Wildlife Officers develop from pertinent documents in the easement file. We give it to the U.S. Attorney's office for criminal prosecution.

**N. Law enforcement database:** The approved, secure, web-based database that Federal Wildlife Officers use to track, store, and manage case file information.

**O. Operator:** A person who farms or ranches land. The operator may be the landowner or a lessee.

**P. Realty acquisition case file:** Where the Division of Realty stores all the documents related to a single acquisition. The Regional Realty Officer must preserve acquisition case files in accordance with Service policy. The realty acquisition case file is sometimes referred to as the title file or tract file.

**Q. Right-of-way permit:** A permit we use to authorize the use of or grant access over, across, upon, through, or under any areas within the Refuge System. Before we grant a permit, we must determine that such uses are compatible with the purposes for which the areas were established. See 340 FW 3 and 50 CFR 29.21 for more information on rights-of-way.

**R. Service-initiated contact:** Used in context of easement violations, the first formal contact by the Service with the responsible landowner/operator confirming that a conservation easement exists on the landowner/operator's property and that the Service has noted a potential violation of the easement agreement.

**S. Special Use Permit (SUP):** A permit that enables the public to engage in activities on a national wildlife refuge. There are three types of SUPs—those for commercial activities, research and monitoring activities, or general activities.

**T. Station file:** The file kept at the field station in perpetuity, which includes material pertaining to the acquisition, administration, and enforcement of the easement. This may also be referred to as an easement file or management file.

**U. Violation:** An activity that has occurred on a conservation easement that is restricted or prohibited by the easement's terms/provisions. A violation is also referred to as noncompliance.

**6.6 Who is responsible for administering Refuge System conservation easements?** See Table 6-1.

**Table 6-1: Responsibilities for Refuge System Conservation Easements**

| This official... | Is responsible for... |
|---|---|
| **A. The Director** | Overseeing the management of all Service programs, including the Refuge System, to ensure they are fulfilling the Service mission. |
| **B. The Chief – NWRS** | **(1)** Administering the Refuge System, including conservation easements and easement acquisition areas;<br>**(2)** Establishing policy for the Refuge System, including policy on conservation easements; and<br>**(3)** Developing the budget to support the mission of the Refuge System. |
| **C. Regional Directors** | Administering the Refuge System units in the geographic area of their assigned Regions, including conservation easements. |

| This official... | Is responsible for... |
| --- | --- |
| **D. Regional Chiefs, NWRS** | **(1)** Ensuring that every real property interest that is part of the Refuge System, including conservation easements, is assigned to a Refuge Manager for management, monitoring/inspection, planning, and enforcement;<br><br>**(2)** Ensuring that we monitor/inspect conservation easements on a regular basis, as needed, and not less than once every 3 years; and<br><br>**(3)** Establishing any supplemental Regional policy and procedures necessary to implement this chapter effectively and efficiently in their Regions. |

| This official... | Is responsible for... |
| --- | --- |
| **E. Regional Realty Officers** | **(1)** Coordinating with the Refuge Managers in the Regions to make the initial contact and establish and maintain a working relationship with potential sellers of conservation easements;<br><br>**(2)** Working collaboratively with Refuge Managers and the Regional Solicitors to ensure that the terms of any new conservation easements are appropriate and consistent with existing laws and policies;<br><br>**(3)** Working with the planning team to develop easement documents for use in new or existing easement acquisition areas;<br><br>**(4)** Acquiring conservation easements in accordance with the existing procedures and policies for land acquisition;<br><br>**(5)** Ensuring that realty acquisition case files are developed, and the appropriate versions are transferred to Refuge Managers;<br><br>**(6)** Entering all conservation easement acquisitions into the cadastral and land record databases; and<br><br>**(7)** Working with Refuge Managers, Federal Wildlife Officers, and the Regional Solicitors to resolve any realty-related disputes that might arise after acquisition of conservation easements. |

| This official... | Is responsible for... |
| --- | --- |
| **F. Refuge Managers** assigned management responsibilities for conservation easements | **(1)** Administering conservation easements in accordance with this policy and regulations governing the Refuge System;<br><br>**(2)** Working collaboratively with the appropriate Refuge Supervisor and Regional Realty Officer on acquisition of new conservation easements, including recommending property suitable for protection by conservation easement;<br><br>**(3)** Maintaining easement records as required by this policy;<br><br>**(4)** Monitoring/inspecting conservation easements for compliance with the easement documents;<br><br>**(5)** Maintaining relationships and communications with landowners/operators by:<br><br>**(a)** Working collaboratively to implement or maintain beneficial habitat management practices,<br><br>**(b)** Proactively informing landowners/operators about easement restrictions to avoid misunderstandings on permitted land uses, and<br><br>**(c)** Working with landowners/operators to conduct restoration when violations occur;<br><br>**(6)** Managing uses of conservation easements, including:<br><br>**(a)** Compliance with compatibility regulations and with NEPA, and<br><br>**(b)** Issuance, monitoring, and administration of refuge permits for uses of conservation easements;<br><br>**(7)** Ensuring that we monitor/inspect easement tracts for compliance as needed and not less than once every 3 years;<br><br>**(8)** Coordinating with Federal Wildlife Officers to ensure that easement violations are addressed expeditiously according to this chapter; and |

| This official... | Is responsible for... |
|---|---|
| | **(9)** Ensuring that habitat values lost or damaged as a result of easement violations are restored as quickly and effectively as possible. |
| **G. Federal Wildlife Officers** | **(1)** Assisting Refuge Managers and communicating with easement landowners and operators, and with State and other Federal agencies, on issues related to conservation easement administration and enforcement;<br><br>**(2)** Assisting Refuge Managers with monitoring conservation easements for compliance with easement documents;<br><br>**(3)** Investigating easement violations; and<br><br>**(4)** Working with Refuge Managers and Regional law enforcement management to coordinate prosecution of easement violations with the servicing U.S. Attorney's office if necessary. |

# PLANNING AND ACQUISITION

**6.7 What are the steps the Service must take when planning a new easement acquisition area?**

**A.** As is the case when developing new fee acquisition programs, the planning team must implement Refuge System land protection planning consistent with the Service's Strategic Growth Policy (602 FW 5), and develop Land Protection Plans (LPPs) that articulate clear and concise goals for new easement programs (see 341 FW 1, 341 FW 2, and Part 602 of the Service Manual).

**B.** During the planning process, the planning team should consider the totality of resources in the planning area and analyze which resources the Refuge System must protect to accomplish our conservation goals. Rights we should consider encumbering and resources we should consider protecting with conservation easements include, but are not limited to:

**(1)** *Surface resources*, including:

**(a)** Habitat,

**(b)** Vegetation,

**(c)** Wetlands,

**(d)** Surface waters (e.g., water rights, water quality, and water quantity),

**(e)** Development rights,

**(f)** Subdivision rights,

**(g)** Structures,

**(h)** Agricultural practices (e.g., animal confinement facilities, manure handling, seasonality of haying and grazing, and planting of wildlife-friendly crops), and

**(i)** Silvicultural practices.

**(2)** *Subsurface resources*, including:

**(a)** Groundwater, and

**(b)** The mineral estate.

*State laws defining subsurface rights vary greatly, and we should make sure our easement documents reflect those requirements accurately. For example, in some States, sand, gravel, clay, and soil are part of the mineral estate, while in other States, those resources are included in the estate of the surface owner.*

**(3)** *Overhead rights*, including:

**(a)** Overhead transmission lines,

**(b)** Overhang from wind turbines, and

**(c)** The view shed.

**C.** The planning team may share the easement document with the public as appropriate.

**D.** Once the planning team has determined which rights to acquire in the new easement acquisition area, Regional Realty staff will coordinate with the planning team, Regional Refuge System management, the Solicitor, and others with easement expertise to develop the easement document we will use in the easement acquisition area.

**6.8 What must the planning team do when developing an easement document for use in a new or existing easement acquisition area?**

**A.** To develop a model easement document that other teams can use for the easement acquisition area in the future, the planning team must:

**(1)** Consider the resources we want to conserve and protect (see section 6.7B) and the threats to those resources. Examples of potential threats to resources include, but are not limited to:

**(a)** Changes in land use patterns, such as conversion of range land to crop land;

**(b)** Subdivision for housing development;

**(c)** Transfer of surface water or groundwater resources to another watershed or from traditional agricultural use to municipal use; and

**(d)** Subsurface mineral rights that allow resource extraction activities.

**(2)** Work closely with Regional Realty staff, Regional Refuge System management, and others with easement expertise to carefully select the language to include in the document. This process should include:

**(a)** Reviewing existing easement documents and other resources at Regional and Headquarters offices and examining examples of easement language that have been both helpful and problematic to Refuge Managers so you know what to include and avoid in the easement document.

**(b)** Consulting with Realty staff, Refuge Managers, Federal Wildlife Officers, and, where appropriate, other Federal agencies (such as the U.S. Department of Agriculture's (USDA) Natural Resources Conservation Service), and non-governmental organizations that have experience developing, administering, and enforcing easements. These consultations will help the planning team make more informed decisions about what resources to protect, what rights to encumber, and how to craft the easement document.

**B.** Although it is our policy to acquire only the minimum real property interest necessary to achieve our conservation goals (see section 6.4B and 341 FW 1), nothing in this or any other section restricts Regions from acquiring easements that facilitate priority public uses of the Refuge System.

**6.9 Is there a requirement to use a standard easement document?** Although it is not a requirement, whenever possible we use a standard easement document within easement acquisition areas. Standardization of easement documents, especially within a project area, leads to:

**A.** Better public understanding of our conservation goals, which helps us to more easily achieve those conservation goals and attract new landowners to the program;

**B.** The landowners' better understanding of the terms and conditions of easement documents, which subsequently improves landowner satisfaction with and trust in our conservation easement program and leads to easement compliance and the long-term protection of the habitats that conservation easements are intended to safeguard; and

**C.** More effective monitoring of, enforcement of, and compliance with our conservation easements.

**6.10 What must easement documents include, and what is their duration?**

**A. Content:** All easement documents must contain certain content, including legal authorities, goals, a legal description, allowed uses and retained rights, prohibited activities, the rights acquired by the Service, and access for monitoring and inspection. See Section V of the *Easement Handbook* for more details.

**B. Duration:** The easement document must explain that the easement will exist in perpetuity. We may only acquire perpetual conservation easements for conservation purposes. If meeting our conservation goals requires less than perpetual land protection, we must use other methods for protection, such as leases, cooperative agreements, or overlay refuges.

**C. Subsurface minerals:** To ensure the greatest possible protection of trust resources, we should, whenever possible, include in the easement document authority for the Service to require and approve a permit to access any associated subsurface minerals. (See section 6.21 for more information on administering subsurface mineral rights on conservation easements.)

**6.11 Does the Service ever acquire public access rights in conservation easements?** The Service is not required to acquire public access rights to private lands in our conservation easement programs. Generally, the landowner retains the right to determine who may enter the property for wildlife-dependent recreation or other recreational uses.

**A.** To provide public access rights to private lands, we should:

**(1)** Use our fee simple acquisition programs to acquire lands and waters for public access on national wildlife refuges;

**(2)** Work with State fish and wildlife agencies (many of whom have less-than-perpetual programs), land trusts, and other conservation organizations/agencies, that can purchase, lease, or provide incentives for public hunting, fishing, or other recreational access to private property;

**(3)** When it meets our needs and the needs of the State and the landowner, look for opportunities to combine our easement acquisition with shorter term, State-owned access leases onto the underlying fee; and

**(4)** Coordinate, when feasible, with other Federal agency access programs (such as USDA's Natural Resources Conservation Service).

**B.** When public access is necessary to meet landscape-scale conservation goals:

**(1)** If we are partnering with States, Tribes, local governments, or non-government organizations to conserve landscapes and provide, for example, regional multi-jurisdictional trail systems, there may be a valid need to provide some public access across our conservation easements.

**(2)** In these instances, the planning team should consider other options during the LPP/NEPA analysis process. For instance:

**(a)** Recommending acquisition of a right-of-way, held by the Service or others, to provide connectivity.

**(b)** Providing for a small degree of fee acquisition authority within the project area. This might include specific acreage limits or acreage percentages of the total easement acquisition area. We encourage the planning team to involve the public so that we can make a more informed decision about whether or not to include fee acquisition authority.

**6.12 From which types of landowners can the Service acquire conservation easements?**

**A. Private ownership:** In most circumstances we only acquire conservation easements from willing landowners on property that either an individual or private entity owns.

**B. Units of local government:** We may acquire conservation easements on lands that units of local government own, but any decision to do so must be thoroughly vetted through the public planning process that establishes the easement acquisition area.

**C. State and Tribal lands:** We may only acquire or attempt to acquire conservation easements on lands owned by States or Tribes with the Director's approval. Some State and Tribal constitutions prohibit selling perpetual easements. If they do not prohibit it and we plan to include State or Tribal lands in the Refuge System, we should consider leases, cooperative agreements, or other tools.

**D. Federal lands:** We cannot acquire conservation easements on other Federal lands. There are other ways, such as through cooperative agreements or permits, to protect resources owned by other Federal agencies.

**6.13 Can the Service accept donations of conservation easements?** Yes, we may accept donations of conservation easements under certain conditions. When determining whether or not to accept a donation of a conservation easement, we must consider:

**A.** Whether the proposed donation is within an approved acquisition boundary.

**B.** What rights the landowner is willing to donate. Typically, we may only accept donations of conservation easements that include the same rights we would seek to acquire if we were purchasing the easement from a willing seller. We should not accept a donation if it does not include all of the rights necessary to achieve our conservation goals.

**C.** The enforcement and administration concerns associated with accepting the proposed donation.

**D.** Whether the donation meets Departmental donation guidelines (see 374 DM 6 ) and Service donation guidelines (212 FW 8 and 342 FW 5).

**6.14 Can the Service acquire conservation easements through statutorily required compensatory mitigation plans or mitigation banks?**

**A.** Yes, but only if:

**(1)** The property lies within an approved acquisition boundary, and the acquisition is in compliance with existing acquisition and mitigation policies (see 501 FW 2); or

**(2)** The acquisition is specifically authorized by statute.

**B.** We cannot establish authority to acquire conservation easements through:

**(1)** An Endangered Species Recovery Plan,

**(2)** A Clean Water Act permitting process, or

**(3)** A memorandum of understanding or a memorandum of agreement.

**6.15 Can the Service modify, amend, or exchange a conservation easement?**

**A.** The National Wildlife Refuge System Administration Act (Administration Act), as amended, generally prohibits the Service from divesting real property interests that are part of the Refuge System, including those the Service has acquired through a conservation easement. The Administration Act allows the Service to divest of real property interests that are part of the Refuge System through an equal value land exchange, though the Service may pursue such exchanges only where we determine they will better contribute to, and not diminish, achievement of the conservation purposes for which the unit was established or the Refuge System's conservation mission (see 342 FW 5).

**B.** To modify or amend provisions of a conservation easement document, we must complete the full land acquisition or land exchange process (whichever is appropriate) established in Service policy, which is extensive (see Service Manual, Parts 341 and 342). We may pursue a modification or amendment to a conservation easement only when it will better support habitat conservation in furtherance of the Refuge System's conservation mission.

**C.** To exchange a conservation easement for another real property interest, we must complete the full land exchange process established in Service policy, which is extensive (see 342 FW 3, 342 FW 4, 342 FW 5, and Section VI of the *Easement Handbook*).

**D.** There are very limited circumstances when we may exchange a conservation easement for another real property interest to address a use that would not pass the Service's appropriateness or compatibility standards or to bring an easement violation into compliance.

**(1)** We must not use an exchange to address a use that would not pass the Service's appropriateness or compatibility standards, or that would otherwise not be permissible, except as follows:

**(a) Regional Refuge Chief's pre-approval to initiate work on the exchange.** The Division of Realty may not initiate work on such an exchange until written approval to do so is received from the Regional Refuge Chief.

**(b) Refuge Manager's written finding and Regional Refuge Chief's concurrence.** Before finalizing an exchange, a written finding must be made, at the Refuge Manager's discretion, that the exchange will better contribute to, and not diminish, achievement of the conservation purposes for which the unit was established or the Refuge System's conservation mission. The exchange agreement must not be presented to the Regional Director for signature unless the Regional Refuge Chief concurs in writing with the Refuge Manager's written finding.

**(c) Regional Director acceptance of the exchange agreement.** The exchange agreement may be signed only by the Regional Director.

**(2)** We must not use an exchange to bring an easement violation into compliance, except as follows:

**(a) Regional Refuge Chief's pre-approval to initiate work on the exchange.** The Division of Realty may not initiate work on such an exchange until written approval to do so is received from the Regional Refuge Chief.

**(b) Refuge Manager's written finding and Regional Refuge Chief's concurrence.** Before finalizing an exchange, a written finding must be made, at the Refuge Manager's discretion, that the exchange is the only way to make the Service's interests whole. The exchange agreement must not be presented to the Regional Director for signature unless the Regional Refuge Chief concurs in writing with the Refuge Manager's written finding.

**(c) Regional Director acceptance of the exchange agreement.** The exchange agreement may be signed only by the Regional Director.

**6.16 What areas should be excluded from the easement document?** As noted in section 6.15, modifying, amending, or exchanging a conservation easement are time intensive processes. Thus, if the landowner has plans to construct a structure on any portion of the land subject to the conservation easement, that area should be excluded from the easement document before the easement is appraised or should be allowed for in the easement document before it is appraised. The Regional Division of Realty must be informed of the landowner's plans as early in the acquisition process as possible.

# MANAGING EASEMENTS AND USES

**6.17 What are the requirements for posting the boundaries of conservation easements?** See 343 FW 1 for the current boundary posting requirements for less than fee boundaries. There is no restriction against posting if the easement document gives us the right to do so, and we determine it is necessary.

**6.18 How does the Refuge System conduct refuge management activities on conservation easement lands?**

**A.** When we acquire management rights (e.g., the right to restore wetlands or grasslands, to inventory or monitor biological resources), those management activities are Federal actions or Federal undertakings. As a result, the Refuge Manager responsible for the conservation easement must ensure compliance with NEPA, Section 7 of the Endangered Species Act, Section 106 of the National Historic Preservation Act, and all other applicable laws and regulations in the same way that they would for Refuge System lands held in fee simple.

**B.** Refuge Managers also must proactively notify and collaborate with the landowner and any operators in advance of our proposed management activities. For large or complex projects, Refuge Managers should maintain frequent communications and provide them with regular progress updates.

**C.** Activities on conservation easement lands must be consistent with the vision and goals in an associated and approved Comprehensive Conservation Plan (CCP) (16 U.S.C. 668dd(e)(1)(E)).

**6.19 How does a Refuge Manager determine what uses are allowed on easements?**

**A.** Because easement interests are part of the Refuge System, Service policy and regulations (e.g., appropriateness and compatibility) apply to the real property interests that we acquire through the easement document. To determine what uses are allowed on easement lands, first we have to determine if the requested use affects the interests that we acquired in the easement document, or if it is a retained right of the landowner.

**(1)** Any land interests the landowner retains as a real property right, and that we do not purchase, acquire, or otherwise limit in the easement document, are not refuge uses and are outside our jurisdiction. These uses are allowed as retained rights of the landowner.

**(2)** Any land interests the landowner does not retain as a real property right, or that we purchase, acquire, or otherwise limit in the easement document, are refuge uses and are within our jurisdiction.

**B.** Then, if the landowner or a third-party applicant requests a particular temporary use that is not within the retained rights of the landowner, we apply existing policy, including our Appropriate Refuge Uses policy (603 FW 1), our Compatibility policy (603 FW 2), and associated regulations (50 CFR 25.21) to determine if we can authorize the requested use. The following rules apply:

**(1)** The Refuge Manager may issue a permit for the addition of portable, temporary structures on a conservation easement if the structure is found to be appropriate and compatible according to existing regulations (see 50 CFR 25.21) and policy (see 603 FW 1 and 603 FW 2).

**(2)** We will not allow (by permit or other authorization) construction of any permanent alterations on a conservation easement. Permanent alterations include the addition of a residence or other permanent structure. If the landowner expressly reserves the right in the easement document to construct a permanent structure, it is allowable. This section in no way affects our administration of rights-of-way under 50 CFR 29.21.

**C.** If the landowner requests a refuge use that falls within our jurisdiction, but that does not or would not pass the appropriateness finding or compatibility determination or is otherwise not permissible, there are very limited circumstances in which a land exchange may be approved. See section 6.15 for the guidance on exchanges of conservation easements.

**D.** See section 6.21 for the requirements related to mineral rights.

**6.20 How does a Refuge Manager allow a use when they find it compatible?**

**A.** When a Refuge Manager finds a use appropriate and compatible and decides to authorize it on conservation easement lands, they must use or seek the appropriate permit. The only types of permits available for authorizing compatible uses of conservation easements are:

**(1)** A right-of-way permit (see 340 FW 3 and 50 CFR 29.21), or

**(2)** A refuge Special Use Permit (SUP) (see 50 CFR 25.44).

**B.** For all existing conservation easements that include language that requires "written authorization" from the Service to allow a use, the written authorization must be in the form of a permit. This requirement does not nullify previously issued letters of authorization; it just replaces that requirement with a permit.

**C.** We will administer the use of conservation easement lands with SUPs of up to 5 years duration.

**(1)** In limited circumstances, we can authorize temporary uses for longer than 5 years. For example:

**(a)** To deal with health and safety issues, such as rising water levels in an easement-protected wetland that is flooding basements or driveways at home sites in areas unencumbered by our conservation easements; or

**(b)** To authorize activities that we would consider a refuge management activity if we conducted them on lands held in fee simple, such as installing fencing or water tanks to implement an improved grazing system.

*In these situations, the Refuge Manager may issue an SUP for a period of no more than 10 years.*

**(2)** The SUP must include a provision that its continued validity is contingent on meeting permit conditions and compatibility of use over the life of the permit.

**6.21 How does the Refuge System administer subsurface mineral rights on conservation easements?**

**A.** Because acquisition of mineral rights is typically cost prohibitive, we rarely acquire the mineral estate on units of the Refuge System. On many conservation easements, the underlying fee owner or one or multiple third parties own the mineral estate. Subsurface minerals may include oil and gas, hard rock minerals, coal, sand/gravel/clay, or rock/mineral materials.

**B.** We must not deny the mineral estate owner access to their property. When the Service's surface interests could be impacted by subsurface mineral access, the Refuge Manager should work with the subsurface mineral rights owner to outline conditions for access. Access to the mineral estate should avoid impacts to the easement interest wherever possible. If impacts are unavoidable, the Refuge Manager should use an SUP that sets restrictions, minimizes impacts, and administers full restoration efforts.

**C.** The extent of input into the exploration for and extraction of subsurface minerals on a conservation easement depends on the language in the easement document. (See section 6.10 for information on developing an easement document.)

**D.** It is important for the Refuge Manager to engage with the mineral owner/lessee and encourage them to use best management practices to avoid or minimize impacts to our portion of the surface estate and to return the surface back to the condition it was in when we acquired the conservation easement. The Refuge Manager should seek mitigation (e.g., land exchange) for impacts to our easement interest if State or Federal law allows it.

**E.** If an easement document gives us approval authority or states or implies that we have some discretion in allowing the owner/lessee to exploit the mineral estate, the Refuge Manager must consult with the Office of the Solicitor. If the Office of the Solicitor advises us that we have discretion, or if there is any permit contemplated, this is a Federal action and requires us to comply with NEPA, Section 7 of the Endangered Species Act, Section 106 of the National Historic Preservation Act, and all other applicable laws and regulations.

**F.** See the Management of Non-Federal Oil and Gas Rights regulation (50 CFR 28 and 29) for more information.

**6.22 What are the Service's responsibilities for documenting and recordkeeping at the field, Regional, and national levels?**

**A. Realty acquisition case files** (see also policy at Part 342 of the Service Manual and the *Easement Handbook*, Section VI): These files are managed by the Division of Realty at the Regional office and include original versions of documents generated during the acquisition process.

**B. Station files:** These files are kept in perpetuity at the field station responsible for managing the easement area and should include material pertaining to the acquisition, administration, and enforcement of the easement. A list of documents that the station file should include can be found in the *Easement Handbook*, Section X. Documenting and Recordkeeping.

**C. Digital spatial information:** We maintain digital spatial records in the cadastral geodatabase, and other authoritative digital data in a land record database (such as the Land Record System (LRS) or Financial and Business Management System (FBMS), or both) as follows:

**(1)** The Cadastral Data Working Group (CDWG) creates and manages spatial data representing boundary and tract information for all our real property interests, including conservation easements, as spatial data in our cadastral geodatabase. The CDWG is comprised primarily of cartographers from Regional Divisions of Realty. The Service's Chief Cartographer (in the Headquarters Division of Realty) is the team lead and data steward and is responsible for maintaining the cadastral geodatabase, which is available to anyone in the Service who needs to access it.

**(2)** Regional Realty Specialists are responsible for recording, updating, and retaining the appropriate data for each real property interest in the land record database.

# MONITORING AND INSPECTIONS

**6.23 What is the purpose and priority of conservation easement monitoring and inspection?**

**A.** We complete easement monitoring and inspections to ensure that the United States' interests in these lands are protected and that we and the landowner are following the Refuge Administration Act (16 U.S.C. 668dd, as amended).

**B.** Proactive communication with landowners about conservation easement restrictions, monitoring easements for compliance, and the prompt investigation and restoration of easement violations is one of the highest priorities for the Service. These lands are especially vulnerable because:

**(1)** They remain privately owned and often support traditional economic land uses, which may accidently or intentionally degrade and threaten the conservation value and the habitat and wildlife protection interests of the United States in these lands;

**(2)** They are perpetual and therefore ownership of the underlying property will likely change many times. With passage of time and ownership changes, future landowners are more likely to misunderstand their easement obligations and, subsequently, there likely will be more violations; and

**(3)** They are often distant from the Refuge System field station responsible for their administration, limiting the ease of inspection and management and opportunities for frequent communication with landowners/operators.

**6.24 How does the Service proactively protect its easement interests?**

**A.** To help minimize the types of misunderstandings that often lead to conservation easement violations, Refuge Managers and Federal Wildlife Officers should communicate with landowners frequently.

**B.** Refuge Managers and Federal Wildlife Officers may also work with other Federal and State agencies by:

**(1)** Regularly providing conservation easement location information to the appropriate USDA agency (such as the Natural Resources Conservation Service).

**(2)** Establishing memorandums of understanding with USDA offices to share information when:

**(a)** Landowners or operators express interest in modifications to the land/operations that may affect our easement interests,

**(b)** Landowners express interest in other conservation programs that will be beneficial to the habitat,

**(c)** Land uses are observed that may affect a landowner's eligibility for Farm Bill benefits, and

**(d)** Violations of State law are suspected.

**C.** Federal Wildlife Officers will work with the appropriate U.S. Attorneys to:

**(1)** Regularly evaluate the forfeiture of collateral schedule amounts (the amount of the fine as established by the local Federal District Court) for balance, fairness, and effectiveness; and

**(2)** Modify, when necessary, the fines or penalties for easement violations.

**6.25 How often should conservation easements be monitored/inspected?** Refuge Managers must monitor/inspect (or assign staff to do so) conservation easements for compliance at appropriate intervals. Regions must develop their specific monitoring documentation guidelines, which might include requirements for documentation in annual reports and other local databases, and a process to record and recall easement monitoring activities. Typically, Refuge Managers arrange for monitoring/inspection at the time of year when violations most commonly occur or are most easily

detected (e.g., during the State's hunting season, in mid-winter when there's little foliage). The Refuge Manager needs to monitor/inspect many conservation easements annually, and all conservation easements must be monitored/inspected at least every 3 years.

**6.26 How do Refuge Managers monitor/inspect conservation easements for compliance?** Refuge Managers, their employees, or Federal Wildlife Officers should look for any irregularities or activity that may be a violation of the provisions in the easement document by:

**A.** Performing onsite visits,

**B.** Using aerial reconnaissance,

**C.** Reviewing current year aerial imagery, or

**D.** Using other remote sensing technology as allowed by Service policy (e.g., satellite imagery, trail cameras, environmental sensors, unmanned aerial systems).

# VIOLATIONS

**6.27 What is the process by which easement violations are addressed?**

**A.** When Refuge System Management, Refuge Law Enforcement, or a third party report identifies a potential violation of a conservation easement through routine monitoring or other observations, Refuge System Management and Refuge Law Enforcement will discuss three areas they need to consider and agree upon:

**(1)** Assessment of any safety risks as employee safety is the most important consideration in deciding how to resolve an easement violation,

**(2)** Review of landowner/operator past acts, and

**(3)** Assessment of the extent and potential degradation of the interest protected by the conservation easement.

**B.** Once monitoring/inspection is completed and a violation has been confirmed, the Refuge Manager and Federal Wildlife Officer will determine the best way to work with the landowner to achieve voluntary compliance and restore the interests of the United States, which is always our intent.

**C.** The Service will then initiate contact with the landowner/operator to:

**(1)** Identify the United States' real property interest;

**(2)** Ensure that the landowner/operator is aware of the easement interest on the identified property;

**(3)** Advise the landowner/operator that there is a violation of the easement agreement between the Service and the landowner/operator; and

**(4)** Assess the landowner/operator's intention regarding the violation.

**D.** The Refuge Manager makes this formal contact after the initial discussion, review, and assessment (section 6.27A) of the violation. There may be instances where the Refuge Manager and Federal Wildlife Officer agree that the Federal Wildlife Officer should assist with compliance management by making the first contact with the landowner/operator (e.g., for safety reasons).

**E.** As compliance with the terms of the conservation easement is sought, law enforcement activities will be led by law enforcement personnel, and management activities will be led by Refuge Managers.

# COMPLIANCE MANAGEMENT

**6.28 What is the purpose of compliance management for an easement violation?** We use compliance management for easement violations to allow/encourage Refuge Managers to work with landowners to address violations collaboratively and manage easement interests to the greatest extent that is safe and practicable. Voluntary compliance is the intent of the Service, but criminal investigation can be triggered at any time during compliance management. See section 6.32.

**6.29 How does compliance management work?** The Refuge Manager (or their designee) develops a restoration plan and works with the landowner/operator to implement the plan to restore a violation and bring the property back into compliance with the terms of the easement document. This could include a physical restoration plan or be as simple as informing the landowner/operator that their activities violated the provisions of the conservation easement and are prohibited unless permitted by the Service. When the Refuge Manager, in consultation with a Federal Wildlife Officer, identifies an elevated safety risk, the Federal Wildlife Officer must assist the Refuge Manager with compliance management (this does not, however, trigger a criminal investigation).

**6.30 How is the compliance management process documented?** The Refuge Manager provides information to the Federal Wildlife Officer for input into the Service's approved law enforcement database. The field station that is responsible for administering the conservation easement must maintain all paper copies in the local easement files.

**6.31 How does a Refuge Manager close an easement violation processed through compliance management?** Once a Refuge Manager makes the landowner/operator aware of actions necessary to correct the violation and bring the conservation easement into compliance, they must also establish a compliance date and complete a followup inspection to ensure that restoration requirements are met. The Refuge Manager must notify the landowner/operator that either:

**A.** The restoration(s) is satisfactory, and the case will be closed by the Service, or

**B.** The restoration is not satisfactory and additional work is needed to address the violation.

**6.32 What happens if compliance management is unsuccessful?**

**A.** The Refuge Manager may contact the landowner/operator to negotiate compliance, or

**B.** The conservation easement violation may be referred to Refuge Law Enforcement for criminal investigation.

# CRIMINAL INVESTIGATION

**6.33 What is the purpose of a criminal investigation for easement violations?** A criminal investigation is conducted to gather facts and evidence that can be used in a court of law to support criminal charges against someone who violates the provisions of an easement. We use criminal investigations for easement violations when:

**A.** The landowner/operator is unwilling to work with the Refuge Manager or fails to complete the required restoration as agreed upon during compliance management; or

**B.** The violation is particularly egregious or the Service has documented/communicated with the landowner/operator on a prior violation that was also egregious, or both.

**6.34 How is a criminal investigation different from compliance management?** Compliance management is a process where a Refuge Manager (or their designee) works with a landowner/operator to address a non-compliant activity that occurs on an easement and may include the development and implementation of a restoration plan. At the Refuge Manager's discretion, a Federal Wildlife Officer may assist with compliance management (for example, when an elevated safety risk exists); however, the participation of a Federal Wildlife Officer does not change compliance management into a criminal investigation. Criminal investigations are the gathering of facts and evidence to be used in a court of law and are used as a last resort to gain compliance.

**6.35 Who may conduct criminal investigations of easement violations?**

**A.** Only Service Federal Wildlife Officers (and rarely, if necessary, Office of Law Enforcement Special Agents) may conduct criminal investigations of easement violations.

**B.** Non-commissioned employees may accompany and assist Federal Wildlife Officers during investigations.

**C.** Only Federal Wildlife Officers (and, if necessary, Special Agents) may lead site visits for enforcement purposes and make investigatory contacts with landowners and operators.

**6.36 What does a criminal investigation include?** The requirements for an investigation depend on the nature of the violation and development of the case. As the investigation proceeds, it typically includes the following actions:

**A.** Review the easement document and station file,

**B.** Ground check with photo documentation of any violations,

**C.** Identify and interview people involved in the violations (these interviews must be documented in writing),

**D.** Determine damages and document the restoration requirements needed to bring the conservation easement back into compliance, as determined by the Refuge Manager or designee,

**E.** Document restoration with photos or, if restoration is not achieved, consider referring the case to the Department of Justice, and

**F.** Document the case disposition in the Service's law enforcement database.

**6.37 How is a criminal investigation documented?**

**A.** Collection of information and documentation must meet Refuge Law Enforcement standards for use as evidence.

**B.** Federal Wildlife Officers record easement investigations through the Service's approved law enforcement records management system. The field station that is responsible for administering the conservation easement must maintain all paper copies in the local easement files.

**6.38 When may a criminal violation be closed?** Once a Refuge Manager or Federal Wildlife Officer makes the landowner/operator aware of actions necessary to correct the violation and bring them into compliance, they must also establish a compliance date and complete a followup inspection to

ensure that restoration requirements are met. The Refuge Manager or Federal Wildlife Officer must notify the landowner/operator that either:

**A.** The restoration(s) is satisfactory, and the case is closed, or

**B.** The restoration is not satisfactory and additional work is needed to close the case.

**6.39 What is the procedure for investigations that require criminal prosecution or civil action?**

**A.** Refuge Managers or Federal Wildlife Officers should contact the appropriate Patrol Captain to determine procedures for having easement cases criminally prosecuted. Civil cases must be discussed with the Regional Solicitor. Procedures will vary among different U.S. District Courts.

**B.** Each U.S. Attorney handles cases differently. It is important that we follow the appropriate U.S. Attorney's recommendations when planning to request criminal or civil prosecution and when issuing a violation notice for easement violations.

**C**. Although a Federal Wildlife Officer has discretion about issuing violation notices for easement violations, they must not issue one until:

**(1)** Restoration requirements are satisfied,

**(2)** They have conducted a complete review of the easement file**,** and

**(3)** They have coordinated with the Patrol Captain for consistency and to determine if it is necessary to coordinate with the U.S. Attorney's office.

**D.** Factors to consider when issuing violation notices for easement violations include:

**(1)** The landowner's/operator's knowledge of the conservation easement and its provisions,

**(2)** Whether or not the violation is a repeat offense, and

**(3)** The severity of the violation and amount of damage to the interests of the United States.

# *Conservation Easement Handbook*

## *Supplements 601 FW 6 (Administration of National Wildlife Refuge System Conservation Easements)*

National Wildlife Refuge System
October 2022

# Contents


I. Policy Framework for the Service's Conservation Easement Acquisition Program 2

II. Basic Steps in the Acquisition Process 2

III. Determining if a Conservation Easement is the Right Conservation Tool 3

IV. Standard Easement Documents Versus Tailored Easement Documents 4

V. Language in the Easement Document 6

VI. Exchanging a Conservation Easement 8

VII. Conducting Refuge Management Activities (601 FW 6.18) and Allowing Uses (601 FW 6.19-20) on Conservation Easement Lands 9

VIII. Determining What Uses Are Allowed on Conservation Easements (601 FW 6.19) 10

IX. Allowing a Use When We Find It Compatible (601 FW 6.20) 13

X. Documenting and Recordkeeping (601 FW 6.22) 17

XI. Working with Landowners to Promote Compliance of Easement Provisions (601 FW 6.23) 19

XII. Monitoring Conservation Easements (601 FW 6.23-6.26) 21

XIII. Conservation Easement Enforcement - Responsibility and Safety 23

XIV. Communication and Coordination Regarding Conservation Easement Violations 24

XV. Conservation Easement Enforcement Process 24

XVI. Compliance Management 26

XVII. Criminal Investigation 27

XVIII. Documenting Easement Violations (601 FW 6.30 and 6.37) 28

**Foreword**

Conservation easements are an effective alternative to fee acquisition that helps the U.S. Fish and Wildlife Service (Service) achieve the mission of the National Wildlife Refuge System (NWRS) while keeping land in private ownership. Delivery of the Service's conversation easement programs across the country takes a connected and collaborative approach, not only within the agency but with our landowner partners. The NWRS Improvement Act emphasizes this need for collaboration by directing the Secretary to "…ensure effective coordination, interaction, and cooperation with owners of land adjoining refuges...." With conservation easements, there can be no closer neighbor than the landowner who owns in fee the land upon which an easement exists.

This unique relationship between the Service and landowners amplifies the needs for "coordination, interaction, and cooperation." We strive to be good neighbors and collaborate with private landowners who share our conservation ethic to safeguard the habitat values the easements were acquired to protect. Our Refuge Managers are tasked with the responsibility of developing and fostering relationships with landowners and are assisted by a cadre of Service employees, including biologists, Regional Realty Officers and Federal Wildlife Officers, to ensure that we responsibly acquire and administer easement contracts.

This handbook was developed to assist employees in the implementation of 601 FW 6, Administration of NWRS Conservation Easements. Each Region may provide additional guidance for implementation that incorporates the processes outlined in the national policy and this handbook. Existing Regional manuals should be updated to ensure alignment with national guidance.

## I. Policy Framework for the Service's Conservation Easement Acquisition Program

Service Manual chapter 341 FW 1, section 1.3A, Policy and Responsibilities, tells us that the Service will acquire lands and waters consistent with legislation, other congressional guidelines, and Executive Orders, for the conservation of fish and wildlife and related habitat and to provide wildlife-oriented public use for educational and recreational purposes. The same policy states that when lands are to be acquired, we are to acquire only the minimum interest necessary to reach management objectives. In addition, all acquisitions must be in alignment with the Service's Strategic Growth Policy (602 FW 5).

All Service acquisitions of land and interests in land must comply with the policies set forth in 340 FW 1 through 343 FW 5. Additional requirements for acquisition of conservation easements are in 601 FW 6; additional requirements for acquisition of minimally restrictive conservation easements are in 341 FW 6, Minimally Restrictive Conservation Easement Acquisitions. The Division of Realty is responsible for the acquisition of lands or interest in lands.

## II. Basic Steps in the Acquisition Process

The basic steps in the conservation easement acquisition process are:

a. Planning and prioritization,

b. Identifying willing sellers,

c. Valuation,

d. Preparing and making the offer,

e. Due diligence (title work and land), and

f. Closing.

Regions must follow the Strategic Growth Policy, 602 FW 5, as well as the planning guidance in 602 FW 2 (*under development*) and 601 FW 6.7-8. After the planning and prioritization processes are completed, consistent with existing Service policy, the Division of Realty leads the acquisition process, implementing the Regional Refuge Chief's acquisition priorities in accordance with the Land Protection Plan (LPP), while maintaining close communication with Regional Refuge management and the Refuge Manager.

A Service conservation easement may not be a good fit for a particular property or landowner. Before referring a potential acquisition to the Division of Realty, the Refuge Manager must consider whether acquisition of the conservation easement might create management problems because of the location of the property or a neighboring land use. Examples of this might include proximity to farmsteads, barns, feedlots, existing or proposed industrial parks, airports, areas that are zoned for uses that conflict with the Service's conservation interests, gravel pits, and mines. If there are questions about the long-term integrity of a conservation easement, the Refuge Manager should consult the appropriate member(s) of Regional Refuge management.

If we are considering purchasing a conservation easement on land where the condition of the land at the time of acquisition would not meet the terms of the easement, we should either: (1) require that the landowner restore the habitat before we purchase the conservation easement, (2) document an agreement for restoration to take place after we acquire the conservation easement, or (3) exclude that land from the conservation easement.

## III. Determining if a Conservation Easement is the Right Conservation Tool

When determining whether the conservation easement is the right tool to help the Service reach management objectives, there are a number of considerations that come into play. These may include:

a. Science – Does the acquisition meet the Service's conservation targets and goals?

b. Service Policy – Does the acquisition comply with the Service's policy to acquire the minimum interest to achieve conservation and management goals (341 FW 1.3(A)(1))?

c. Funding – Is funding available for the acquisition and for operations and management?

d. Land Use – For what is the land being used? What are the potential future uses of the surface and subsurface estate?

e. Location – Does the land lie within an approved acquisition boundary (AAB)?

f. Willing Sellers – Is the landowner a willing seller?

g. Socio-political Considerations – What is the local community's view on the Service's conservation easements? Is there local support or opposition to Federal ownership?

h. Alternative Acquisition Tools – Is there a tool that would better achieve conservation and management goals? Other tools might include: acquisition of fee title, entering into a lease agreement, and entering into a cooperative agreement.

i. Coordination with Partners – How does the proposed conservation easement acquisition fit in with the conservation efforts of, and programs offered by, other conservation agencies and our partners?

The Service decides whether a conservation easement is the right tool in two main circumstances: (1) when we are doing conservation planning for a new or existing acquisition area, and (2) when we are working within an existing approved fee title acquisition area where, for the reasons stated in this section, a conservation easement might be the right tool.

## IV. Standard Easement Documents Versus Tailored Easement Documents

When the planning team is developing an easement document for use in a new or existing easement acquisition area within either a new or expanded approved acquisition boundary, Service policy encourages, but does not require, that we use a standard easement document within an easement acquisition area (601 FW 6.9). For additional information on how we consider conservation easement acquisitions during the planning process, see 601 FW 6.7-16.

A standard easement document is sometimes referred to as a conservation easement template. A standard easement document contains terms and conditions that are set and non-negotiable. Easement documents that use the same template will contain exactly the same language. Conversely, tailored easement documents allow the Service and the landowner to choose terms and conditions to fit a target property. Each tailored easement document is unique. Individual situations will dictate the most appropriate choice, a tailored or standard easement document. Both types of easement documents must include certain terms and conditions (see 601 FW 6.10).

a. Standard Easement Documents

As noted, within an easement acquisition area, a standard easement document is the preferred tool, according to Service policy. The advantages of using a standard easement document include:

i. Improved public understanding of our conservation goals, which helps us to more easily achieve those conservation goals and attract new landowners to the easement program;

ii. Simplification of the negotiations with the landowner;

iii. Once the easement document is approved for use, minimal involvement from the Solicitor is required;

iv. Potentially a simplified valuation process;

v. Usually less expensive than tailored easement documents because we typically acquire fewer rights with a standard easement document;

vi. More streamlined administration, monitoring, and enforcement; and

vii. Better landowner understanding of the terms and conditions of easement documents, which subsequently improves landowner satisfaction with and trust in the easement program and therefore, easement compliance and the long-term protection of the habitat values the easements are intended to safeguard.

Some of the disadvantages of using a standard easement document include:

i. Less landowner acceptance because there is no flexibility in negotiations,

ii. The standard provisions may not address all specific conservation goals or targets, and

iii. They generally afford us less management control because we typically acquire fewer rights than with tailored conservation easements.

b. <u>Tailored Easement Documents</u>

On the other hand, sometimes a tailored easement document is the preferred easement document. The advantages of using a tailored easement document include:

i. Greater landowner acceptance because of the flexibility to meet individual landowner needs,

ii. The ability to address specific conservation goals and targets, and

iii. They generally afford us greater management control because we typically acquire more rights than with standard easement documents.

Some of the disadvantages of using a tailored easement document include:

i. Less public understanding of our conservation goals;

ii. Complication of the negotiations with the landowner;

iii. More involvement from the Office of the Solicitor because of the need to attain Solicitor approval on every conservation easement we use;

iv. More complex and time-consuming valuation process;

v. Usually more expensive than standard easement documents because we typically acquire more rights with a tailored conservation easement;

vi. More challenging monitoring and enforcement logistics; and

vii. Potentially less landowner understanding of the terms and conditions of easement documents, which subsequently complicates easement compliance.

Regional Refuge management decides whether to use a standard easement document or a tailored easement document, in consultation with the Refuge Manager, Regional Realty Officer, the planning team, and others with conservation easement expertise. For guidance on developing the easement document(s) that we will use, see 601 FW 6.7-16.

## V. Language in the Easement Document

The Division of Realty is responsible for working with the Regional Solicitor (or Field Solicitor, where appropriate) to ensure that the language in every easement document receives Solicitor approval. The Division of Realty should work collaboratively with Regional Refuge management to ensure that the language in the easement document meets management objectives.

As stated in 601 FW 6.10, all easement documents must:

a. Information in easement documents

- List the legal authorities for acquiring the conservation easement;
- State the goals of the project;
- Include a legal description and, if appropriate, a survey-grade map of the lands encumbered by the conservation easement;

- Define, to the extent possible, the uses, activities, and rights the landowner retains, including landowner activities that require no Service approval;
- Define the uses and activities the landowner must refrain from pursuing without Service authorization;
- Define the uses, activities, and rights the Service acquires. For examples of rights we might want to acquire, see 601 FW 6.7B;
- Include provisions that allow the Service to access the property for monitoring/inspection and enforcement; and
- State that the conservation easement will exist in perpetuity. See 601 FW 6.10B for additional information.

In addition, the following guidance will help ensure a successfully drafted easement document:

b. Legal enforceability of the easement document

All of the provisions of the easement document should be legally enforceable. The Division of Realty is responsible for working with the Regional Solicitor (or Field Solicitor, where appropriate) to this end.

c. Acquiring the minimum interest necessary

When acquiring real property interests, it is our policy to acquire the minimum interest necessary to reach management objectives. (See 341 FW 1A(1).) Thus, when we acquire a conservation easement, the easement document should convey to the Service only the rights necessary to enable us to reach those management objectives. If we acquire more rights than are necessary to reach those management objectives, we risk creating an unnecessary administrative burden for management and enforcement of the conservation easement.

d. Purpose of the conservation easement

The easement document should include language that clearly defines the purpose of the conservation easement.

e. Modification of the easement document

The easement document must not include language that allows the parties to modify the easement document in the future. We may only modify an easement document via the land acquisition process, led by the Division of Realty, in coordination with Refuge management. We cannot modify an easement document without Solicitor approval of the modifications. (See 601 FW 6.15.)

f. Restrictions on uses vs. retained rights

An easement document typically encumbers the landowner's use of the land by placing restrictions on the ways the landowner may use the land. An affirmative or retained right explicitly allows the landowner to use the land in the specified manner. A restriction is easier to administer than an affirmative or retained right.

g. Proceeds of sales

If we intend for the Service to be the recipient of the proceeds from the sale of a natural resource derived from the land subject to the conservation easement, the easement document must explicitly state this intent.

h. Third party uses of the land

The easement document should state that a landowner must inform the Service before they allow a third party to encumber the land subject to the conservation easement. (An example of this would be a request for a third-party right-of-way.) This will help to ensure that the landowner does not convey property rights that the Service acquired through the conservation easement.

i. References to management plans

The easement document should not refer to management plans. Any restrictions on use should be incorporated into the provisions of the easement document.

j. Subsurface minerals

We should, whenever possible, include in the easement document authority for the Service to require and approve a permit to access any associated subsurface minerals. (See 601 FW 6.10C.)

## VI. Exchanging a Conservation Easement

The National Wildlife Refuge System Administration Act, as amended, prohibits the Service from divesting real property interests that are part of the Refuge System, including those the Service has acquired through a conservation easement. The Administration Act allows the Service to divest of real property interests that are part of the Refuge System through an equal value land exchange, though land exchanges are only approved in very limited circumstances (see 342 FW 5).

It is Service policy to pursue a land exchange only when we determine the exchange will better contribute to, and not diminish, achievement of the conservation purposes for which the unit was established or the Refuge System's conservation mission.

Land exchanges typically take a minimum of 18 months for the Service to complete and require at least twice the amount of staff time and resources that a standard land acquisition requires. This is because of the increased complexity of the negotiations; the requirement to obtain

appraisals, land surveys, environmental due diligence, and title work for both the land we would acquire and the land we would divest; and the additional approval and notification requirements to the Regional Director, the Director, the Department of the Interior (Department), and Congress, where required.

Our conservation easements are real property interests so they are subject to the same laws, regulations, and policies as any other real property that is part of the National Wildlife Refuge System. Therefore, when exchanging a conservation easement, we are required to follow the same procedures we must follow when exchanging any other real property interest, which are extensive (see 342 FW 3, 342 FW 4, and 342 FW 5 and section 6.15B of 601 FW 6).

These processes include, among other steps, meeting appraisal and just compensation requirements, negotiating to acquire more rights or interests, and ensuring review of the modification or amendment by the Office of the Solicitor. See 342 FW 5 for the requirements, steps involved, approval levels, and congressional notification requirements for all exchanges. As with all land transactions, the Regional Realty office is responsible for conducting exchanges and will be familiar with the most current documentation requirements.

As noted in 601 FW 6.15, there are very limited circumstances in which it may be appropriate to exchange a conservation easement (or a portion of a conservation easement) for another real property interest.

We must not use a land exchange to facilitate a refuge use that we did not or would not find to be appropriate or compatible ((see the compatibility regulation (50 CFR 26.41) and the Compatibility policy (603 FW 2)), or that would not otherwise be permissible.

We also must not use a land exchange to bring an easement violation into compliance unless an exchange is the only way to make the Service's interests whole. Violations should instead be addressed by obtaining restoration of habitat.

If the Refuge Manager has determined that the conservation easement is an appropriate candidate for an exchange, they must discuss the proposal with the appropriate Refuge Supervisor (and any additional Regional Refuge management, as determined by the Region) prior to submitting the exchange request in writing to the Regional Realty Officer.

Refuge Chief approval is required in writing and on a case-by-case basis before the Division of Realty may initiate work on an exchange of a conservation easement that either (1) would facilitate a use that we did not or would not find appropriate or compatible (or that would be otherwise impermissible), or (2) is undertaken to bring an easement violation into compliance and is the only way to make the Service's interests whole. The exchange cannot proceed unless the Refuge Manager and the Regional Refuge Chief concur in writing on the written findings required in 601 FW 6.15D. Also note that these exchange agreements can only be signed by the Regional Director.

## VII. <u>Conducting Refuge Management Activities (601 FW 6.18) and Allowing Uses (601 FW 6.19-20) on Conservation Easement Lands</u>

This section provides a brief summary of what refuge management activities are and how they are conducted on conservation easements. It also provides Refuge Managers with an overview of the process for assessing use requests for land subject to a conservation easement.

Refuge management activities are designed to conserve fish, wildlife, and plants and their habitats and are conducted by the Service. Refuge management activities are fish and wildlife population or habitat management actions including, but not limited to: prescribed burns, water level management, invasive species control, routine scientific monitoring, and habitat restoration. When we acquire management rights through a conservation easement (e.g., the right to restore wetlands or grasslands, to inventory or monitor biological resources), those management activities are Federal actions or Federal undertakings and are not considered refuge uses (see 603 FW 2).

We receive use requests from landowners, private third parties (such as farm operators and energy development proponents), and public third parties (such as local, State, and Federal Government agencies).

Examples of the diverse array of use requests we receive include (but are not limited to) requests to:

a. Clear vegetation,

b. Plant food plots,

c. Maintain drainages that existed before we acquired the conservation easement,

d. Install oil or gas pipelines,

e. Install rural water lines,

f. Install electrical or telecommunication transmission lines, and

g. Install wind or solar energy projects.

Regardless of the requester or the requested use, the Refuge Manager evaluates use requests on land subject to a conservation easement in accordance with the Appropriate Refuge Uses policy (603 FW 1), the Compatibility policy (603 FW 2), and other environmental compliance laws and regulations (such as the National Environmental Policy Act (NEPA)) before allowing or disallowing the request.

*HELPFUL HINT: In this chapter, we use "NEPA" to refer to not only the NEPA process, but also other environmental laws (such as the National Historic Preservation Act), regulations, and Executive Orders that we commonly address through the NEPA process.*

## VIII. Determining What Uses Are Allowed on Conservation Easements (601 FW 6.19)

a. Applying the Appropriate Refuge Uses policy to use requests on conservation easements

Appropriate use findings serve to ensure consistency across the easement program. The Refuge Manager should initially screen conservation easement use requests using the Service's Appropriate Refuge Uses policy (603 FW 1). The Appropriate Refuge Uses policy and subsequent Appropriate Refuge Uses guidance memos (Hall 2008 and Guertin 2018) create a process that helps the Refuge Manager make appropriate use findings and determine whether we should further analyze a requested use with a Compatibility Determination (CD) and possibly through a NEPA process. The Refuge Manager should use the *Finding of Appropriateness of a Refuge Use* form (FWS Form 3-2319, 2018). This helps the Service to document appropriate use findings consistently across the Service.

If the Refuge Manager denies a use request during the appropriate use finding, we should complete an FWS Form 3-2319 and file it in the station file for that tract. Findings that deny an existing use or authorize a new use require approval from the appropriate Refuge Supervisor. It is important to maintain complete records of appropriate use findings to inform future Refuge Managers about past use requests and to inform future findings. Screening uses through the Appropriate Refuge Uses policy is particularly important for larger easement acquisition areas, such as those in the minimally restrictive conservation easement acquisition programs in Regions 3 and 6. In these Regions, Refuge Supervisors have typically coordinated appropriate use findings over an area that encompasses several million acres of conservation easement interests. It is critical to the long-term sustainability of conservation easement programs that we treat use requests across a large conservation easement area consistently.

b. Determining jurisdiction – a key component in administering refuge uses on conservation easements

As part of the appropriate use review, it is critical that the Refuge Manager understand what jurisdiction the easement document conveyed to the Service. Our jurisdiction is limited to those rights the Service explicitly acquired through the easement document. We cannot exercise jurisdiction over the use of a property interest if we have not acquired that property interest.

*HELPFUL HINT: Acquired rights are not the same as the purpose for which we acquired the conservation easement. Listing the purposes in the easement document does not typically convey rights to the Service; acquired rights must be specifically listed in the easement document.*

When completing an appropriate use review, the Refuge Manager should be aware that most easement documents contain a "subject to" section that lists any exceptions or reservations to the rights and/or interests that the Service acquired. Reserved rights may include statutory road rights-of-way, mineral rights, and other rights-of-way that pre-date the conservation easement. The interests we acquired are subject to the outstanding rights that are held by a third party or reserved by the landowner. The Service can take proactive approaches to avoiding adverse impacts on our conservation easements by sharing information with private industry such as oil/gas companies, wind companies, telecommunications companies, and other utility companies

regarding the presence of a Service conservation easement, especially when our conservation rights potentially overlap with their acquired rights on the same properties.

Often, the easement document does not list specific exceptions and/or reserved rights. The Refuge Manager can identify reservations by reviewing the title commitment (though we do not always acquire title commitment when we acquire a conservation easement), the pre-acquisition title opinion (previously referred to as the preliminary title opinion), or the post-acquisition title opinion (previously referred to as the final title opinion) from the Regional Solicitor (or Field Solicitor, as appropriate), or through a records search at the courthouse. The Service generally has limited jurisdiction over activities or uses that are covered by a reservation or an assignment in the easement document; hence, they are usually not subject to the Appropriate Refuge Uses policy (or the Compatibility policy) but could under some circumstances require a permit.

Landowners commonly reserve mineral rights in easement documents. While the easement document may not encumber the extraction of certain minerals, the Refuge Manager can and should be involved in conversations with developers who are seeking to exercise their mineral rights. Under most State laws, the owner of the mineral estate has a legal obligation to take reasonable measures to protect the surface estate. Our involvement in conversations with the developer is necessary to protect and minimize impacts to habitat resources. Ideally, the Service, the mineral company, and the landowner would discuss alternatives and options prior to any agreements between two of the three parties. The Service's requests/recommendations must be reasonable and limited to those aspects that affect our conservation easement interests. We should provide our recommendations to the energy/mineral company and the landowner in writing. We should retain and pass the written recommendations on to entities within the mineral company. The written recommendations will help to protect the Service's (and any future landowner's) interests should the land or the company be sold. See 50 CFR 29 subpart D for regulations specific to reserved oil and gas rights.

When a Refuge Manager determines that a proposed use is non-jurisdictional, the Refuge Manager should inform the requester that a permit from the Service is not required. The Refuge Manager should include documentation of these conversations in the station file for that tract.

> *HELPFUL HINT: To the extent possible, the Refuge Manager should work with the requester to minimize adverse impacts to the Service's conservation easement interest even if reserved rights are exercised. Requesters, particularly for large projects (such as roadways, oil and gas pipelines, and wind energy development), will often voluntarily avoid adversely affecting a Service conservation easement interest if they are aware of it.*

c. Coordination with the landowner

Before we can find that a request for a third-party refuge use is appropriate, the Refuge Manager should ensure that the landowner is willing to grant the third party the use. Similarly, we generally cannot issue a Special Use Permit (SUP) on a conservation easement to a third party unless the landowner has approved the use (see permitting section).

d. Uses for which the Service has jurisdiction

When a Refuge Manager determines that the Service has jurisdiction over a requested use, they should work closely with the requester to avoid or minimize impacts to the Service's conservation easement interest. Communication and early coordination with the applicant often help us to avoid negative impacts to our conservation easement interests. After a Refuge Manager works with an applicant to reasonably minimize impacts to a conservation easement interest, the Refuge Manager should finalize the Appropriate Use worksheet (in coordination with their Refuge Supervisor) and determine if the use is appropriate or not appropriate.

e. Requiring a written SUP application

It is common for refuge use requests to come up during regular collaborative discussions between the Refuge Manager and landowner. These requests are often conceptual in nature and develop into a formal request after further discussions. In many situations, it may be advisable to defer a written use request until the Refuge Manager and landowner have worked through the details of the request.

For third-party use requests, particularly for use requests where multiple Service programs and other Federal and State agencies are simultaneously coordinating a large project (such as a request for an interstate, buried oil pipeline), development of the use request is often an iterative process. For example, construction details (such as directional boring vs. open trenching), centerline location, and the timing of installation may be flexible, and the use request will frequently be modified during the early planning stages. In such cases, request of a formal SUP application or right-of-way permit application may not be appropriate until the planning process nears completion. However, if a manager suspects that the use will be denied, the Refuge Manager should require that the requester submit a written application early in the process.

f. Special cases when the Appropriate Refuge Uses policy does not apply to conservation easement use requests

As stipulated in the Appropriate Use worksheet, we do not use appropriate use reviews when assessing requests for a right-of-way permit. We evaluate right-of-way requests (see 340 FW 3 and 50 CFR 29) through the Compatibility policy and the appropriate level of NEPA. In addition, an appropriate use finding is not required for third-party, non-Federal oil and gas exploration or development outside of Alaska. The regulations on third-party oil and gas permitting are found in 50 CFR 29 subpart D. For questions when implementing the regulations found in 50 CFR 29 subpart D, the Refuge Manager should consult the Regional oil and gas coordinator or the national Environmental Contaminants Specialist in the Branch of Wildlife Resources.

## IX. Allowing a Use When We Find It Compatible (601 FW 6.20)

a. Applying compatibility policy to conservation easement use requests

We apply the Compatibility policy (603 FW 2) to conservation easements in much the same way we apply it to fee title refuge lands. The Compatibility policy requires the Refuge Manager to consider both how a proposed use would affect refuge purposes and how a proposed use would

impact the mission of the Refuge System. The Refuge Manager must follow the Compatibility policy, including using the specified process, standardized templates, and required forms. A key point in addressing compatibility of requested uses on conservation easements is that we evaluate the impacts of the use in the context of the interests we have acquired.

Before the Refuge Manager completes a Compatibility Determination (CD), they should use the CD flowchart (found in 603 FW 2) to screen out uses that are not compatible. Many parts of the CD flowchart address similar topics covered in the Appropriate Use worksheet; however, the Refuge Manager may be able to screen out and deny permit requests with the CD flowchart before needing to develop a CD. For example, when using the CD flowchart, the Refuge Manager should deny a right-of-way permit request that is not manageable with available resources or that would conflict with resource management objectives before even completing a CD (603 FW 2.12A(7) & 2.15). The Refuge Manager should document any use requests that they deny and file it in the station file. The requester can appeal an SUP or right-of-way permit request that we have denied to the Regional Director/Director, so it is important that the Refuge Manager maintain adequate administrative records to document any decisions on the matter.

If the Refuge Manager finds that a use is appropriate and/or passes through the CD flowchart, the next step is to prepare a CD. We must evaluate any requested use of a conservation easement according to the criteria that it will “not materially interfere with or detract from the fulfillment of the National Wildlife Refuge System mission or purposes of the national wildlife refuge,” but only to the extent that the proposed use affects an acquired interest. Thus, for use requests on land subject to our conservation easements, what we evaluate through a compatibility determination are the potential impacts to the interests we acquired through the conservation easement.

> *HELPFUL HINT: Compatibility for the same common uses can be applied to easements with the same authorizing language and the same template easement document.*

b. <u>Refuge management activities</u>

Most commonly, Service conservation easements protect habitats and wildlife through encumbrances that restrict activities (such as wetland drainage, grassland conversion, and timber harvest). While encumbrances make up most of the rights conveyed to the Service through conservation easements, conservation easements may also convey management rights to the Service. Some refuge management activities acquired by the Service through a conservation easement include rights to restore and/or maintain water control structures, manipulate water levels, harvest timber, and maintain grassland vegetation.

When a refuge management activity results in the harvest of a commodity (such as farming, timber, hay, grazing rights) that can be sold or traded, it is referred to as a refuge management economic activity (603 FW 2.6N). In accordance with the Compatibility policy, these refuge management economic activities require that we complete a CD.

If a refuge management economic activity (e.g., farming, grazing, haying) is conducted on a conservation easement, the landowner should be offered the opportunity to complete that activity. If the landowner does not want to complete the work or, for instance, has no need for hay, a third party may be contracted to complete the work. If proceeds are generated from a refuge management economic activity, those proceeds should be distributed to the landowner. Share-in-kind agreements should not be used to complete refuge management economic activities on conservation easements because the Service does not typically hold the right to any products harvested from a conservation easement.

It is crucial that we conduct all refuge management activities on conservation easements in partnership with the landowner. If the landowner opposes a refuge management activity that the Service determines is necessary to restore and maintain the rights the Service purchased via the easement, the Refuge Manager should work with the landowner to explain the habitat needs and rights the Service owns and try to find compromise. An example might be altering the timing of the refuge management activity so that it does not conflict with the rights retained by the landowner. If the Refuge Manager and landowner cannot reach consensus, the Service still owns rights and can complete the refuge management activity, and the Refuge Manager should notify the landowner in writing of the refuge management activity.

> *HELPFUL HINT: Economic use standards associated with 50 CFR 29.1 do not apply to conservation easements. This regulation was stepped down from the Refuge Revenue Sharing Act and, as such, only applies to fee title lands.*

c. Compatibility and commercial use requests

Refuge Managers frequently receive refuge use requests for commercial activities that may adversely impact a conservation easement interest. Requests for telecommunication towers, pipelines, or wind energy projects can fall into this category. We cannot issue a permit for a requested refuge use unless we find the use to be compatible.

d. NEPA guidance

All refuge management activities and permitting actions for conservation easements require some level of NEPA compliance and possibly compliance with other environmental laws and regulations (such as the Endangered Species Act). NEPA documentation, in the form of a Categorical Exclusion (CATEX), Environmental Assessment (EA), or Environmental Impact Statement (EIS), is required for refuge management activities and any conservation easement uses authorized through an SUP or right-of-way permit. The Refuge Manager should contact their Refuge Supervisor, Regional NEPA coordinator, and the *NEPA for National Wildlife Refuges Handbook* for guidance in applying NEPA to conservation easement administration and permitted uses.

Federal cultural resource responsibilities for limited property interests are different than those for fee title properties. The Service acquires conservation easements from private landowners to protect wetland and grassland habitats, not the cultural resources that may be present on the properties. Even though the Service does not have any rights to cultural resources that may be

present on lands encumbered by a conservation easement, projects on conservation easement lands may be considered a Federal undertaking if the Refuge Manager issues an SUP for the use. Many projects requested by other entities (such as the Department of Transportation or utility companies) will have cultural resource evaluations already completed. The Refuge Manager must ensure that these evaluations are reviewed for sufficiency by Regional archaeological staff. Determination of undertakings and the effects of projects are not authorities that have been delegated to Refuge Managers. Contact the Regional Archaeologist for more information as needed.

e. Authorizing uses on conservation easements (601 FW 6.20)

As outlined in 601 FW 6.20, the only types of permits we can issue for a compatible use of a conservation easement are an SUP and a right-of-way permit. The applicant must submit a formal SUP or right-of-way permit application before we can process the request or authorize the requested use. If the request is substantially different from a request that the applicant has previously submitted, the Refuge Manager may request that the applicant revise and resubmit the request.

i. Special use permits

The issuance of SUPs on conservation easements is specifically outlined in 50 CFR 25.44. According to the regulation, the Service can only issue permits to a third party with the landowner's agreement. The Refuge Manager should document landowner consent before issuing a third-party SUP.

If the third-party applicant is a government agency that has acquired a partial interest in the landowner's property, landowner consent is not required (see 50 CFR 25.44(c)). An example of this exception is when a State's department of transportation holds a right-of-way for the construction of a roadway over land that is subject to a Service conservation easement. In this situation, landowner agreement with the requested third party use is not required, and the Refuge Manager should work directly with the State agency to minimize, avoid, or mitigate any adverse impacts that the project may have to our conservation easement interest.

ii. Right-of-way permits

The issuance of right-of-way permits is covered in detail in 50 CFR 29.21; less than fee interests, including conservation easement interests, are addressed in 29.21-1.

It is not unusual for easement documents (for example, the wetland easements used in Regions 3 and 6, and Farmers Home Administration (FmHA) easements) to describe a large area (such as a ¼ section of land), even though the encumbrances affect a much smaller area (such as a 20' linear riparian buffer or wetland areas) within the legally defined tract. In these cases, some right-of-way permit requests may occur within the conservation easement, but the use will not adversely affect the Service's conservation easement interest, and the Regional Director can issue a "letter of no objection" (if the use is found compatible) stating that the Service's interest

will not be adversely affected by the activity and a right-of-way permit from the Service is not required under 50 CFR 29.21.

An example where a letter of no objection may be applicable could include the installation of a fiber optic cable through a FmHA easement area with a grassland area. With appropriate stipulations (such as construction methods and timing), the project could be constructed within the easement tract without adversely affecting the easement interest. We would then use an SUP (and associated CD and NEPA documentation) to authorize the use. A right-of-way permit for the use would not be required because the buried fiber optic cable would not result in longer-term impacts to grassland habitat (it would not adversely affect the easement interest). If future unanticipated maintenance of the fiber optic cable became necessary, an SUP would be required. If regular maintenance of the waterline would be required and if we expected this maintenance to adversely affect the Service interest, a right-of-way permit would be required.

f. <u>Considerations for use requests</u>

i. Determining jurisdiction is a key first step when addressing conservation easement use requests; it is important that the Refuge Manager understand the property interests that the Service acquired, and which property interests may be subject to pre-existing third-party rights.

ii. Conservation easement use requests should be evaluated using a consistent process through the national framework established by the Appropriate Refuge Uses policy, Compatibility policy, and NEPA.

iii. The Appropriate Refuge Uses policy (603 FW 1) and the CD flowchart (Exhibit 1, 603 FW 2) are valuable tools to screen refuge use requests before we conduct a more thorough evaluation.

iv. If we deny a request for a conservation easement use, we must document the decision in the station file.

v. We should coordinate conservation easement use requests with the landowner; conservation easements are an important conservation tool that we should cooperatively manage with landowners.

vi. If a requested use impacts a real property interest held by the Service, then we will need to develop a finding of appropriateness and CD in order to evaluate the use and to determine whether it is appropriate and compatible.

vii. We should only issue SUPs or right-of-way permits for conservation easement use requests after the Refuge Manager has ensured compliance with NEPA, the Endangered Species Act, and cultural resource assessments.

## X. Documenting and Recordkeeping (601 FW 6.22)

The Division of Realty is responsible for the maintenance of all real property records for lands and interests in lands, including original, signed documents. For the recordkeeping requirements that pertain to the Division of Realty, see 342 FW TBD, Realty Records [*in development*] and 342 FW 4, Title Curative and Conveyancing). These files are managed by the Division of Realty at the Regional office and include original versions of documents generated during the acquisition process.

We keep a perpetual station file for each conservation easement at the field station responsible for managing the conservation easement. The responsible field station should work with the Division of Realty to ensure that it has the documentation it needs to efficiently administer its conservation easements.

The station file should include the following documentation generated during the acquisition process by the Division of Realty:

a. A copy of the original easement evaluation (typically generated when acquiring minimally restrictive conservation easements),

b. A copy of the original recorded easement agreement (and any subsequently recorded exhibit maps or amendments, if applicable),

c. A copy of the acceptance letter that the Service has signed and a copy of the proof of receipt by the landowner,

d. A copy of the final title policy (see 342 FW 4 for information on these documents),

e. A copy of the survey of the interest acquired, if applicable, and

f. A copy of the signed environmental due diligence that we completed before acquiring the easement (see 341 FW 3, Pre-Acquisition Environmental Site Assessments, for information on the required environmental due diligence).

The station file should include the following documentation pertaining to management of the conservation easement:

a. The name of the current landowner;

b. A baseline report that documents the condition of the subject property at the time the conservation easement is recorded;

c. Documentation of monitoring/inspection activities, either in individual files or as a collective report;

d. Landowner contact and correspondence documentation;

e. Notes to the file and other management information, such as:
    i. Condition on the ground, both with compliance issues and if no issues are found,

    ii. Other management issues (such as invasive weeds, posting condition, and fences), and

    iii. Photographic documentation, including the date/time and who took the photos, of monitoring and inspection activities; and

f. A map or photo, or both, of the conservation easement at the time of acquisition, including excluded areas or inholdings.

For recordkeeping requirements pertaining to enforcement of conservation easements, see 601 FW 6.30 and 6.37.

> *HELPFUL HINT: We must compile and maintain a record of site inspections as part of the station file for each conservation easement. Methods to document compliance visits may vary, but this record should, at a minimum, include a monitoring sheet with date, name of staff conducting monitoring, specific field conditions, and any findings of significance.*

## XI. <u>Working with Landowners to Promote Compliance of Easement Provisions (601 FW 6.23)</u>

a. <u>Value of communication</u>

Frequent communication with landowners, operators, and other stakeholders on the landscape must be a priority for Refuge Managers and others involved in managing conservation easements. During these communications, it is important that we emphasize the terms of the easement document and provide the landowner with copies of the easement document and any maps associated with the conservation easement. We also should ensure that the landowner knows whom to contact if they have any questions pertaining to the easement document.

> *HELPFUL HINT: When possible, we should strive to station employees responsible for managing conservation easements within local communities. When employees become part of the community and are not located at a distance, we have found that relationships are more successful.*

For large easement acquisition areas that use relatively standard easement documents, such as wetland and grassland easements that we administer in the Prairie Pothole Region, it may only be possible or necessary to contact landowners every 3-5 years through mass mailings.

Alternatively, for smaller easement acquisition areas or for tailored easement documents, annual face-to-face meetings may be appropriate.

We should notify new landowners of the conservation easement as soon as practical. Often, new landowners are unfamiliar with the terms of the easement document, and it is not unheard of that landowners who recently purchased a tract of land may not even know that there is a conservation easement on their property. Unintentional violations can often be avoided through timely communication with new landowners.

If the Service's conservation easement interests and the habitat values for which the land was conserved are to be successfully maintained in perpetuity, it is essential that the Refuge Manager take proactive steps to reduce the occurrence of actions that are inconsistent with easement provisions. Ongoing communications with the landowner are one of the most effective methods to accomplish this to ensure that there is a mutual understanding of the requirements of the easement. Therefore, Refuge Managers and other Service staff should communicate with landowners frequently using one or more of the following methods:

i. Face-to-face meetings

ii. Landowner workshops

iii. Phone calls

iv. Direct mailing to each easement landowner with a summary or update about relevant easement information. For example, if a new farming technology might damage our conservation easement interest, we could advise landowners to consult with us prior to changing their operations to include the new technology.

v. Annual newsletter to each easement landowner in a particular project area. Potential subject matter for the newsletter includes:

1) Pertinent local conservation issues, conservation programs, and wildlife and habitat management issues;

2) Lists of contact information for technical assistance; and

3) Reminders of easement obligations.

b. <u>Communicating the value of the conservation easement</u>

When communicating with landowners, especially new landowners, it is important to explain the purpose of the conservation easement and the importance of working together to protect the integrity of the conservation easement. We must convey that the conservation easement is a partnership between the Service and the landowner that protects important natural resources. An

example would be explaining to a new owner of land that is subject to a Northern Tallgrass Prairie conservation easement how rare this habitat is, and that the native forbs found in the prairie are not weeds and provide important wildlife habitat. Often, the Service can further partner with the landowner by using programs such as the FWS Partners for Fish and Wildlife Program and other funding sources to manage and improve the habitat on conservation easements. An informed landowner is much less likely to conduct activities that are inconsistent with the terms of the conservation easement.

c. Boundary posting

While it is not a traditional form of communication, boundary posting can be an effective way to communicate the presence of a conservation easement. This is particularly relevant for certain Farm Service Agency (FSA, sometimes referred to as the Farmers Home Administration, or FmHA) easements that have irregularly shaped boundaries, such as buffer strips around wetlands or streams. Boundary posting can create an intensive initial and ongoing workload; however, it is one of the more effective means of ensuring compliance with the terms of the conservation easement. There is no Service wide standard or requirement for posting the boundaries of conservation easements (343 FW 1.4.E) and any posting requirements should be established at the Regional level or field station.

d. Importance of communicating with local units of government

In addition to communication with landowners, it is important that we share information regarding the presence of conservation easements and general restrictions related to Service conservation easements with other agencies or local units of government, such as the Natural Resources Conservation Service, the U.S. Army Corps of Engineers, local watershed districts, county drainage districts, road authorities, and planning and zoning departments. We typically contact these agencies and local units of government early during project planning because of their jurisdiction over wetlands or other natural features. The agency or local unit of government would then have the opportunity to inform the landowner that there is a conservation easement on their property.

*HELPFUL HINT: Familiarity of Service conservation easements by these agencies and local units of government can help prevent violations, particularly if a landowner contacts the agency or local unit of government with questions.*

## XII. Monitoring Conservation Easements (601 FW 6.23-6.26)

a. Why we monitor conservation easements

Easement monitoring is an opportunity to build positive relationships with landowners, share ideas about land management techniques, and possibly connect landowners with beneficial conservation programs for which they may qualify. Monitoring and inspection of conservation easements also ensures that conservation easements remain in compliance with the terms of the easement document. A properly implemented monitoring plan will not only detect conservation easement violations, but it will also serve as a deterrent for future violations. The Refuge

Manager is responsible for compliance monitoring at appropriate intervals as well as documenting when and how the monitoring was completed. For most conservation easements the appropriate interval for monitoring is annually. Frequent monitoring has many advantages. For example:

i. Many violations are more easily detected during or shortly after the activity, thus allowing for restoration in a timely manner. This may also discourage the landowner/operator from conducting additional activities that may be in violation of the terms of the easement document.

ii. If a violation is detected, working with landowners/operators to bring the conservation easement back into compliance is much easier when the violation is recent. Obtaining compliance on old violations or those that may have been conducted by a previous landowner/operator can be very difficult.

iii. Some activities that are not in compliance with the terms of the easement document, such as trespass farming, may progress slowly over a period of years, so addressing these in a timely manner may avoid larger impacts to the conservation easement.

iv. Restoring lost habitat following a conservation easement violation is often expensive for the Service and the landowner. Additionally, restored habitat often does not fully replace habitat that was impacted by a violation. An example is if the native prairie on a conservation easement was converted to cropland, the values of that prairie would be lost forever since native prairie cannot be recreated.

While it is highly recommended to monitor easements annually, in some situations this may not be appropriate or achievable. At a minimum, monitoring must occur at least every 3 years, and Regions are responsible for developing specific monitoring guidelines and considering the following:

i. Number of conservation easements to monitor,

ii. When violations normally occur, and

iii. Relevant ecological factors (such as leaf cover, water levels, and snow cover).

b. Types of monitoring

Inspections for the purpose of monitoring easements can take countless forms. The most common inspection techniques to monitor conservation easements include aerial observation and other remote imagery and onsite inspections. Each method has benefits and disadvantages and, since

conservation easements vary across the country, no single inspection methodology will apply to all easement acquisition areas.

i. Aerial observation and other remote imagery

Aerial reconnaissance, current year aerial imagery, or other effective remote sensing technology (e.g., satellite imagery, trail cameras, environmental sensors) are often more practical and efficient to monitor conservation easements across broad geographic scales. Simply put, these methods can be used to rapidly monitor large areas in a short period.

ii. Onsite monitoring

Onsite monitoring provides a thorough way to check on most conservation easements, but it is time consuming and may not be practical when an extensive number of conservation easements or widely scattered conservation easements must be monitored in a relatively short period. For some easement programs, onsite monitoring generally occurs when initial observations from the air indicate a potential violation and a "second look" is conducted (as deemed safe to do so) to determine if restoration is necessary to bring the landowner/operator back into compliance with the terms of the easement document. Prior to any onsite monitoring, the Refuge Manager must conduct a safety risk assessment and must coordinate those activities with a Federal Wildlife Officer.

*HELPFUL HINT: We should also consider the probability of encountering a landowner/operator when we conduct onsite monitoring. When it is likely that we will encounter the landowner/operator during an inspection, the Refuge Manager and Federal Wildlife Officer should together consider the situation and whether or not to contact the landowner/operator prior to entering their property.*

## XIII. Conservation Easement Enforcement - Responsibility and Safety

Refuge Managers are responsible for administering and monitoring conservation easements and for ensuring that lost or damaged habitat values resulting from easement violations are restored. Communications with landowners/operators must be led by Refuge Managers. Refuge Managers should maintain proactive positive communication with landowners when possible.

Law enforcement activities must be led by law enforcement officers. Federal Wildlife Officers are tasked with assisting Refuge Managers with monitoring conservation easements for compliance and, if necessary, investigating potential easement violations. They must work with Refuge Managers and Regional law enforcement management to coordinate criminal prosecution of easement violations through the servicing U.S. Attorney's office when other avenues of compliance have been exhausted.

The safety of our employees is of paramount importance and must be considered during all phases of easement administration and enforcement. Risk assessments conducted by Refuge Managers, in consultation with Federal Wildlife Officers, are an important tool to help identify potential safety concerns. When an identifiable safety risk is present during easement monitoring or compliance management (described below), Refuge Managers must enlist the support of a Federal Wildlife Officer. Importantly, the presence or assistance provided by a Federal Wildlife Officer is not the trigger for a criminal investigation (described below). Their participation in monitoring or compliance management is to mitigate the identified safety risk, not to investigate a violation.

If there is disagreement between the Refuge Manager responsible for administering the conservation easement and the Federal Wildlife Officer responsible for investigating easement violations on how to resolve an enforcement issue, the Federal Wildlife Officer and Refuge Manager should consider and discuss alternatives that would mitigate any concerns. When concerns cannot be successfully mitigated so that both parties agree, they should elevate the matter to the Regional Refuge leadership for resolution.

## XIV. Communication and Coordination Regarding Conservation Easement Violations

Close communication and coordination between Refuge Managers and Federal Wildlife Officers is required throughout the assessment and resolution of conservation easement violations. Refuge Managers must ensure that all restoration requirements are biologically and ecologically sufficient, and Federal Wildlife Officers must ensure that that the restoration requirements are within the jurisdiction provided by the easement document and would be supported by the Assistant U.S. Attorney if a court case becomes needed. To ensure that both standards are met, communication and coordination between the Refuge Manager and the Federal Wildlife Officer must be memorialized in an agreed upon method.

Methods for ensuring the close communication and coordination between Refuge Managers and Federal Wildlife Officers may include, but are not limited to, documenting it in the Annual Law Enforcement Management Plan, the development of annual work plans, standard operating procedures, and benchmarks in employee performance appraisal plans. The nature of the specific conservation easement program will help determine the methods of communication and coordination that are most appropriate.

Close communication and coordination between Refuge Managers and Federal Wildlife Officers is ongoing during easement monitoring and continues after easement monitoring occurs and a review of the conservation easement management file is conducted. Communication and coordination must continue throughout the rest of the compliance process regardless of which resolution avenue is pursued.

## XV. Conservation Easement Enforcement Process

When a violation has been detected through monitoring/inspection, our primary goal is to work collaboratively with the landowner/operator, achieve voluntary compliance and restoration, and

foster relationships where landowners trust and understand that the Service takes our conservation mission and partnership with them seriously. Historically, most violations have been resolved this way.

When we become aware of an easement violation, Federal Wildlife Officers and Refuge Managers must have a common understanding of the steps that they should follow. Throughout the enforcement process, the Refuge Manager and Federal Wildlife Officer will discuss potential safety concerns and collaboratively determine how best to proceed. At any time while working with the landowner to achieve compliance with the provisions of the easement, the Refuge Manager and Federal Wildlife Officer may determine a criminal investigation is necessary. The approaches to achieve compliance are explained below, followed by a list of trigger points that would move compliance management to criminal investigation.

a. <u>Compliance management</u> – Compliance management is a process of easement enforcement where a Refuge Manager (or their designee) works with a landowner/operator to develop and implement a plan to address an easement violation. Our intention is that easement compliance be gained voluntarily as a more collaborative process with the landowner/operator and a more cost-effective way to resolve the violation than taking legal action. Compliance management is the Service's preferred course of action and should be the default process followed by Refuge staff.

b. <u>Criminal investigation</u> – Some circumstances require that an easement violation be referred to NWRS Law Enforcement for a criminal investigation. Still, our intention is that easement compliance be gained voluntarily through a collaborative process. A criminal investigation should be pursued only when compliance management has been attempted and was unsuccessful and/or one or more of the criteria below has been met.

   An easement violation must be referred to NWRS Law Enforcement for a criminal investigation when, after consultation between the Refuge Manager and Federal Wildlife Officer it is determined that the current easement violation is one that is egregious in nature, or the Service has previously documented and communicated with the landowner/operator regarding a prior easement violation that was egregious in nature, or both.

   A Refuge Manager may refer an easement violation to the Federal Wildlife Officer for a criminal investigation when they determine:

   i. The landowner/operator is unwilling to work with the Service through compliance management to correct the easement violation.

   ii. The landowner/operator has failed to complete all restoration activities as agreed to during compliance management, and compliance management is no longer a viable option for the Service to address the easement violation.

iii. Impacts of the easement violation are egregious in nature, and compliance management is not an appropriate option.

The Refuge Manager should make the Service's formal first contact to the landowner/operator regarding a violation by phone, written correspondence, or in-person meeting at a government office rather than at the site of the violation.

The purpose of making this contact is to:

i. Formally identify the Service's land interest and inform the landowner/operator that there is an easement interest on the identified property,

ii. Advise the landowner/operator that there is a violation of the easement agreement between the Service and the landowner/operator, and

iii. Assess the landowner/operator's intention regarding the violation.

This initial contact with a landowner/operator regarding a violation is not for the purpose of performing tasks associated with a criminal investigation, such as collecting evidence, which are the responsibility of a Federal Wildlife Officer.

Onsite visits to the easement area, when unaccompanied by a Federal Wildlife Officer, should include two Service employees. This allows the employees to take into consideration safety concerns and determine how to address them, and it allows for a witness to the discussion. In some cases where there may not be two Service employees, someone with appropriate legal authority from a partner agency can be invited as a proxy.

The Refuge Manager and Federal Wildlife Officer will discuss the outcome of the initial landowner/operator conversation (i.e., did the landowner/operator agree to restoration to bring the easement back into compliance?) and cooperatively move forward with either compliance management or criminal investigation.

*HELPFUL HINT: In conservation easement programs with long-standing and well-established monitoring and investigatory protocols, that common understanding may take the form of an easement violation log that the Federal Wildlife Officer and the Refuge Manager jointly prepare and maintain. We use the easement violation log to track the stage of each easement violation investigation and ensure that both manager and officer are kept apprised of case status. This system of tracking is especially useful for those programs that typically experience many easement violations that are similar in nature, and for which the investigatory steps are well established.*

## XVI. <u>Compliance Management</u>

Our goal with the compliance management process is to work in partnership with the landowner/operator to amicably resolve the violation through proactive communication, restoration (if necessary), and to ensure that the violation does not happen again. The Refuge Manager oversees the compliance management process, and the Federal Wildlife Officer documents it in the Service's approved law enforcement records management system. When the Refuge Manager contacts the landowner/operator, it is not for criminal investigatory purposes of gathering evidence regarding the violation, but rather to confirm responsibility for the conservation easement, notify the landowner/operator of the conservation easement violation, and begin discussion of remedies/restoration.

Sound information collection is also imperative. The Refuge Manager is responsible for ensuring that any notes and other documentation are thorough and included in the easement file. Communication between the Refuge Manager and the Federal Wildlife Officer will ensure that notes and documentation meet a standard that makes it useful if a violation becomes a criminal investigation.

Once a restoration plan is formalized with the landowner/operator and work is completed, it is the Refuge Manager's responsibility to determine if the restoration is satisfactory. If so, the Refuge Manager must contact the Federal Wildlife Officer to close the conservation easement violation case in the Service's approved law enforcement database. If the restoration work is not satisfactory, we must promptly notify and inform the landowner (or responsible party) of additional work that is needed to close the case. If the violation remains unresolved, the Refuge Manager should refer the issue to a Federal Wildlife Officer.

> *HELPFUL HINT: A restoration plan may be as simple as a certified letter that reiterates the easement provisions, the offending action, and the required restoration (if applicable).*

## XVII. <u>Criminal Investigation</u>

Either during the initial Refuge Manager and Federal Wildlife Officer post-monitoring/inspection discussion, or as non-compliance, or degradation continues during the compliance management process, the conservation easement violation can be referred to Refuge Law Enforcement for pursuit of a criminal investigation.

Only Federal Wildlife Officers (and in some cases, supported by Service Special Agents) may investigate potential easement violations, lead site visits for enforcement purposes, and make investigatory contacts (see 601 FW 6.35). While the goal of a criminal investigation is voluntary compliance and restoration of the Service interest, a Federal Wildlife Officer conducts the investigation to also determine whether the elements of a crime have been met and whether the case should be referred to the servicing U.S. Attorney's office for potential prosecution.

Under the management and direction of law enforcement, Refuge Managers and other non-commissioned staff may assist with an investigation when mutually acceptable to both the Federal Wildlife Officer and the Refuge Manager. For example, a Refuge Manager may assist in a landowner/operator contact, a hydrologist may assist in determining the impact of drain tile, a soil scientist may aid in delineating a wetland area, or a botanist may be necessary to assess the effects of an illegally applied herbicide. Refuge Managers and other staff may also assist a Federal Wildlife Officer in situations where we discover easement violations during easement administration or other work. In these circumstances, it is important that we document the violation and pass the information on to the Federal Wildlife Officer.

The following guidelines apply to criminal investigations:

a. Ground checks of suspected violations should occur within 30 days of detection.

b. The Federal Wildlife Officer should:

    i. Contact the landowner/operator within 30 days of the ground check,

    ii. Follow up with the landowner/operator within 7 days from the initial contact, and

    iii. Complete a return compliance check within 1 to 3 days from the established due date for compliance or restoration completion.

c. If the correction or restoration is inadequate, the Federal Wildlife Officer must contact the landowner/operator again within 1 to 3 days of the initial return compliance check.

d. Within 7 days after the established compliance date, if the Federal Wildlife Officer determines that the violation has not been corrected, the Refuge Manager or designee, which is often a Federal Wildlife Officer, should sign and mail a followup letter to the landowner or operator explaining the consequences of noncompliance. All correspondence sent to the landowner or operator pertaining to a violation should be certified with a return receipt.

e. Once compliance is achieved, the Refuge Manager and/or Federal Wildlife Officer should mail a closure letter within 14 days after the objectives are met. The Federal Wildlife Officer must then close the conservation easement violation case in the Service's approved law enforcement records management system.

## XVIII. Documenting Easement Violations (601 FW 6.30 and 6.37)

Easement violations and the way they are discovered are as varied as the conservation easements within the Refuge System. We discover many easement violations through the execution of a routine and deliberate monitoring plan. We may discover other easement violations, especially

those that are incidental to another activity (such as buried infrastructure, road improvement projects, etc.), by happenstance.

Regardless of how we discover a conservation easement violation or who discovers it, the task of documenting all information that may be pertinent and necessary for the successful remediation of the easement violation begins immediately. For example, a biologist conducting a pre-construction bird survey may discover that a landowner/operator has cut hay on a grassland easement before the prescribed date. In this situation, the biologist should prepare to be a good witness if necessary. This may include taking photographs, creating field notes or sketches, or capturing conversations with individuals with notes to the file. Thorough documentation of the violation will be completed later with a ground check, and the information discovered/provided previously by any employee helps with this process. Ultimately, documenting an easement violation in the station file is the joint responsibility of the Refuge Manager and the Federal Wildlife Officer.

Documentation should be thorough and meet evidence collection standards. Depending on the nature of the violation and results of the investigation, documentation may include:

a. Photographs with date/time and who took the picture (aerial, ground checks, before/after, etc.);

b. Field notes and sketches;

c. Survey or GPS data;

d. Restoration plans;

e. Notes of all conversations with the landowner/operator, contractor, etc.; and

f. Copies of correspondence, including the violation letter and closure letter, and return receipts.

Once the Refuge Manager determines that the restoration requirements have been satisfied, the Service may, or may not, issue a violation notice. When deciding whether to issue a violation notice for an easement violation, the Federal Wildlife Officer leading the case will coordinate closely with the Refuge Manager, the Patrol Captain, and when necessary, the servicing U.S. Attorney’s office.

**U.S. Department of the Interior**
**U.S. FISH AND WILDLIFE SERVICE**
**KULM WETLAND MANAGEMENT DISTRICT**
**1 FIRST STREET SW, P.O. BOX E**
**KULM, NORTH DAKOTA 58456**
**PH. 701/647-2866**
**FAX 701/647-2221**

SENT JAN 05 2012 KULM WMD KULM, ND

LaMoure County 69X

Dear Mr. / Ms. Cody Peterson

Since 1961, as part of its Small Wetlands Acquisition Program, the U.S. Fish and Wildlife Service has been acquiring “Easements for Waterfowl Management Rights”, or as they are often called “wetland easements”. The purpose of the wetland easement is to preserve and protect wetlands for waterfowl and other wildlife. Wetlands also provide flood control, ground water recharge, act as natural filters for water, and are sources of forage and water for livestock.

Public records of land transactions indicate that you have acquired property that is covered by a U.S. Fish and Wildlife Service wetland easement. The property is more specifically described as:

T. 136 N., R. 61 W., Sec. 2 W1/2

This letter is being sent to you as a courtesy so you can familiarize yourself with the terms of the wetland easement. U.S. Fish and Wildlife Service wetland easements are recorded at the Register of Deeds Office located in the county courthouse. A copy of the easement document is attached for your records. Please note that the wetland easement is a permanent fixture to the title to the land and remains so even when ownership of the land changes.

As the current owner of the land, you have become responsible for not draining, burning, filling, or leveling the wetlands protected by the wetland easement. Please inform all current and future tenants of these easement provisions. Burning of certain wetlands may be allowed if a special permit is obtained from the Wetland District Manager prior to burning the wetlands. All wetlands located on the lands within the legal description appearing on the wetland easement document are covered by the terms of the easement, unless specifically deleted by an accompanying “Drainage Facility Map” (DFM). The wetlands depicted on the accompanying DFM are not covered by the terms of the wetland easement. Ditches extending from covered wetlands and existing at the time the easement was purchased cannot be maintained,

deepened, or cleaned out. Wetlands with ditches were included in the easement with the understanding that without maintenance, the ditches would eventually silt in and restore the wetlands.

Your cooperation, by respecting the terms of the easement, is appreciated. Violations of the wetland easement may result in legal action by the U.S. Fish and Wildlife Service. If you have any questions regarding the terms of the wetland easement on your property or wish to receive a wetland and/or grassland easement offer on other lands under your ownership, please contact the Manager of the Kulm Wetland Management District, Mick Erickson, P.O. Box E, Kulm, North Dakota 58456, or telephone (701) 647-2866.

If we have made an error and you are not the current owner of the property described above, please contact this office.

Sincerely,

Mick Erickson
Refuge Manager

Att: Easement 69X Contract and "Drainage Facility Map "if applicable

# United States Department of the Interior

FISH AND WILDLIFE SERVICE

Kulm Wetland Management District
1 First Street SW, P.O. Box E
Kulm, North Dakota 58456
Office: 701-647-2866 Fax: 701-647-2221


COPY

February 18, 2016

LaMoure County 69X

SENT
FEB 18 2016
KULM WMD
KULM, ND

Cody Peterson
6883 County Road 63
LaMoure, ND 58458

Dear Mr. Peterson:

The U. S. Fish and Wildlife Service (Service) recently completed maps of wetlands protected by Service wetland easement 69X in LaMoure County, North Dakota. This letter and included map(s) are intended to provide you a better understanding of the wetland easement.

The U. S. Fish and Wildlife Service has purchased and owns perpetual rights which restrict or prohibit the right to drain, burn, level, and fill any wetland basin on the ownership represented by these maps. These maps represent the Service's effort to depict the approximate location of all protected wetland basins based on information and maps available at the time these maps were prepared. However, because climatological and other natural conditions may cause the shape and location of wetland basins to change over time and from time to time, these maps may or may not show wetlands as they appear in any given year.

The water levels of these wetlands naturally increase and decrease depending on the natural water cycle. The Service has procedures which allow landowners to remove sheet water or water from wetlands that are affecting roads and buildings. If issues arise concerning individual wetland basins represented on the maps, each will be looked at on a case by case basis. It is the landowner's responsibility to contact the Service if there are any questions concerning the draining, burning, filling, and/or leveling of wetlands depicted on the easement wetland maps.

In summary, there are three points to remember about the wetland easement maps:

1. The maps do not and are not intended to provide the exact size or configuration of the wetlands protected by the provisions of the easement.

2. Any burning, draining, filling, or leveling of wetlands depicted on the wetland easement map without a permit issued by the Service is a violation of the provisions of the easement.

3. It is the landowner's responsibility to contact the Service if there are any questions concerning mapped wetlands.

If you should lease your land(s), please make all current and subsequent operators aware of the easement and associated wetland maps. If you no longer own these lands, we apologize for the error. Please let us know so we can notify the proper owner. Thank you.

If you have any questions about this map or the easement contract, please contact this office at 701-647-2866.

Sincerely,

Krista Lundgren

Krista Lundgren
Wildlife Refuge Specialist

Att: Map (1), LaMoure 69X

cc: WMD easement folder (w/o contract)

UNI_ STATES DEPARTMENT OF THE _RIOR
FISH AND WILDLIFE SERVICE

Tract: 69X

Map 1 of 1

WATERFOWL PRODUCTION AREA LAMOURE COUNTY, STATE OF NORTH DAKOTA EASEMENT AUTHORIZED BY MIGRATORY BIRD HUNTING STAMP ACT OF MARCH 16, 1934, AS AMENDED.
T. 136 N., R. 61 W., 5th PRINCIPAL MERIDIAN

SECTION 2, W1/2




The U.S. Fish and Wildlife Service (Service) has purchased and owns perpetual rights which restrict or prohibit the right to drain, burn, level, and fill any wetland basins depicted on this map. This map represents the Service's effort to depict the approximate location, size and shape of all protected wetlands based on information and maps available at the time this map was prepared. However, wetlands are hydrologically dynamic systems, with expanding and contracting water levels. This map is not meant to depict water levels in the wetland in any given year. The Service reserves the right to revise this map, provided the mapped acreage remains consistent with the Easement's Summary Acres.

Prepared by: [signature]
Josh Schoenfelder

Approved by: [signature]
Wayne Henderson

Date: 10 February 2015

LEGEND

- Section Boundary
- Boundary of Easement Description
- Wetlands Covered by Provisions of the Easement
- Wetlands Deleted from the Easement
- Approved Drainage Facility

U.S. DEPARTMENT OF THE INTERIOR
FISH AND WILDLIFE SERVICE
KULM WETLAND MANAGEMENT DISTRICT
1 FIRST STREET SW - P.O. BOX E
KULM, NORTH DAKOTA 58456

OFFICIAL BUSINESS
PENALTY FOR PRIVATE USE, $300




**First Class**

Cody Peterson
6883 County Road 63
LaMoure, ND 58458

# United States Department of the Interior

FISH AND WILDLIFE SERVICE

Kulm Wetland Management District
1 First Street SW, P.O. Box E
Kulm, North Dakota 58456
Office: 701-647-2866 Fax: 701-647-2221
www.fws.gov/refuge/kulm_wmd

January 4, 2018

Cody Peterson
6685 98th Ave. SE
Lamoure, ND 58458

LaMoure County 69X

Dear Cody Peterson:

Since 1961, the U.S. Fish and Wildlife Service (FWS) has purchased conservation easements, often called "wetland" or "grassland" easements. The purpose of a wetland easement is to preserve and protect wetlands for waterfowl and other wildlife. Wetlands also provide flood control, ground water recharge, act as natural filters for water, and are sources of forage and water for livestock. Grassland easements are meant to preserve and protect grassland and wetland habitats for the use of waterfowl, grassland-nesting birds, and other wildlife. The FWS also administers FmHA easements, which have varying habitat protections.

Public land records indicate that you own property covered by a U.S. Fish and Wildlife Service conservation easement. The property is more specifically located in:

T. 136N., R. 61W., 5th P.M., (Sheridan Township)
Section(s) 2

This letter is being sent to you as a courtesy. U.S. Fish and Wildlife Service conservation easements are recorded at the Register of Deeds Office located in the county courthouse. Please note that the conservation easement is a permanent fixture to the title to the land and remains so even when ownership of the land changes.

As the current owner of the land, you are responsible for not draining, burning, filling, or leveling wetlands protected by the easement. Please inform all current and future tenants of these easement provisions. Burning of certain wetlands may be allowed if a special use permit is obtained from the Wetland District Manager prior to burning the wetlands.

Your cooperation, by respecting the terms of the easement, is appreciated. Please contact our office, by means provided in the header above, if you would like a copy of the easement contract(s) or if you have any questions regarding the terms of the easement on your property. If you have other lands that qualify and wish to receive an easement offer, please ask for Wes Weisenburger in your communications.

If I have sent you this letter in error, I apologize for the mistake and would appreciate it if you contact our office to correct our records.

Sincerely,

Mick Erickson

Mick Erickson
Refuge Manager

**U.S. DEPARTMENT OF THE INTERIOR**
FISH AND WILDLIFE SERVICE
KULM WETLAND MANAGEMENT DISTRICT
1 FIRST STREET SW - P.O. BOX E
KULM, NORTH DAKOTA 58456

OFFICIAL BUSINESS
PENALTY FOR PRIVATE USE, $300

SENT
JAN 18 2018
KULM WMD
KULM ND


USA FOREVER 2016

**First Class**

Cody Peterson
6685 98th Ave. SE
Lamoure, ND 58458

# United States Department of the Interior

FISH AND WILDLIFE SERVICE
1 First Street Southwest
P.O. Box E
Kulm, North Dakota 58456

In Reply Refer to:
FWS/R6

TO: File

FROM: Krista Lundgren, Wildlife Refuge Specialist

SUBJECT: Wetland Map Appeal LA 69X

DATE: February 24, 2020

I answered a call from Cody Peterson (701-320-2644) at 11:10 am on February 24, 2020. He began by asking how a wetland map can include a stock pond, since stock ponds aren't even allowed to be placed in wetland areas. At the start of the call, he sounded very frustrated with the map and letter he'd received. I told him that is exactly the type of discrepancy that we are looking for calls back on, and that we want to look into things like that and get the most accurate maps possible. He also told me he'd previously received a map (maps?) from us that did not include a couple of the wetlands that now show up on this one. He had briefly looked for his copy of that map, but was unable to locate it. He spoke about other frustrations he and a brother had had in dealing with USFWS (His brother is in Barnes County.), and all of the time and money it had cost them. He stated that he is currently pumping water out of this stock pond. He said that it will also pull water from the wetland that is included on this map. [I was unclear if it was one of the wetlands that wasn't previously on his map or if it is a wetland that is just expanded.] He referenced that Fish and Wildlife doesn't have a good name in the area among other things. After listening to his points, he did allow me to give a little history of the easement program and a quick methodology of our mapping process that includes using historical imagery from 1957, 1964, and 1979 to identify wetlands that appear and reappear over time. He had made a comment about getting rid of all those little ones that dot the map (<0.1 and such). He expressed frustration about "lost money" due to time and high water (30 acres of flooded farmland plus areas that are now saline [sodic] and have lost productivity. He had a better understanding of the map by the end of our conversation, but I let him know I would document his appeal request and we would give him a call back, probably next week to set up a time to meet about his appeal and try to address his concerns. I encouraged him to look for the maps he'd been previously sent again. He told me he was planning to be in the field tomorrow trying to combine corn, and I told him we'd try to find a time that worked out best for everyone.

# [EXTERNAL] Cody Peterson - US FWS Easement (W 1/2 Sec. 2-136N-61W)

Kale Van Bruggen <KVanBruggen@rinkenoonan.com>
Wed 3/18/2020 10:51 AM
**To:** Erickson, Michael <michael_erickson@fws.gov>

1 attachments (445 KB)
USPS.com® - USPS Tracking® Results_Cody Peterson.pdf;

Mick,

Thank you for taking my phone call today regarding the February 18, 2020 Service letter to Cody Peterson with the Service's revised map for contract 69X (W ½ Sec. 2-136N-61W).

This email is to confirm our conversation about the timelines of Cody's potential appeal. Cody received the letter on February 24, which is confirmed by the USPS postal receipt for the Certified Letter# on his letter (7015 3010 0000 6958 3598). Here is a link to the USPS website and attached is a printout of that page:
https://tools.usps.com/go/TrackConfirmAction?tRef=fullpage&tLc=3&text28777=&tLabels=70153010000069583598%2C%2C

In our discussion we agreed Cody would have 40 days from February 24 to submit objections and evidence to you for your consideration. You will then review that evidence and may meet with us in person or by telephone (COVID-19 in consideration) and render a decision within 30 days of the date you receive our objection. If the decision is still adverse to Cody, he has 30 days after the date of your decision to appeal to the Regional Director. As we discussed, I intend to provide the objections via a letter from me with evidence enclosed to you on or before **Friday, April 3.** For my letter to you, is electronic mail acceptable?

Please confirm your receipt of this email and that we have a mutual understanding of the appeal timelines. Otherwise, if you believe or learn other timelines apply, I ask that you please contact me as soon as possible as those timelines impacts Cody's ability to present his objections and evidence to the Service for review.

Thanks, Mick. I look forward to working with you.

KRV

Kale R. Van Bruggen
Attorney

RINKE NOONAN
Suite 300, US Bank Plaza
P.O. Box 1497
St. Cloud, MN 56302
(320) 656-3522 Direct
(320) 656-3500 Fax

website | email | bio | map

RINKE NOONAN
attorneys at law

LinkedIn

s

---

NOTICE: This electronic mail transmission (including attachments) may contain an attorney-client, work-product or trade-secret communication that is privileged at law. If you are not the intended recipient, do not read, distribute, or reproduce this transmission. It is not intended for transmission to, or receipt by, any unauthorized persons. This E-mail (including attachments) is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521. If you are not the intended recipient, you are hereby notified that any retention, dissemination, distribution or copying of this communication may be strictly prohibited. Recipients should ensure that proper security measures are taken to maintain any privileged or confidential information. Recipients should inform the originator of this email if you do not want to receive and transmit communications by email or other electronic means at this email address. If you have received this electronic mail transmission in error, please delete it from your system without copying it, and notify the sender by reply e-mail or by calling 320-251-6700, so that our address record can be corrected.

IRS Circular 230 Disclosure

To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any matters addressed herein.

---

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

---

# USPS Tracking®

FAQs >

Track Another Package +

**Tracking Number:** 70153010000069583598

Remove ✕

Your item was delivered to an individual at the address at 11:03 am on February 24, 2020 in LAMOURE, ND 58458.

## Delivered

February 24, 2020 at 11:03 am
Delivered, Left with Individual
LAMOURE, ND 58458

**Get Updates**

Feedback

**Text & Email Updates**

**Tracking History**

**February 24, 2020, 11:03 am**
Delivered, Left with Individual
LAMOURE, ND 58458
Your item was delivered to an individual at the address at 11:03 am on February 24, 2020 in LAMOURE, ND 58458.

**February 24, 2020, 7:37 am**
Available for Pickup
LAMOURE, ND 58458

**February 24, 2020, 7:29 am**
Arrived at Unit
LAMOURE, ND 58458

**February 23, 2020, 9:19 pm**
Departed USPS Regional Facility
FARGO ND DISTRIBUTION CENTER

**February 23, 2020**
In Transit to Next Facility

**February 21, 2020, 10:05 pm**
Arrived at USPS Regional Facility
FARGO ND DISTRIBUTION CENTER

**February 21, 2020, 11:21 am**
Arrived at USPS Facility
KULM, ND 58456

**February 21, 2020, 11:20 am**
USPS in possession of item
KULM, ND 58456

Feedback

**Product Information**

**Postal Product:**
First-Class Mail®

**Features:**
Certified Mail™

**See Less**

## Can't find what you're looking for?

# United States Department of the Interior

FISH AND WILDLIFE SERVICE
1 First Street; P.O. Box E
Kulm, North Dakota 58456

In Reply Refer to:
FWS/IR05/IR07

TO: LaMoure County 69X File

FROM: Mick Erickson, Refuge Manager

SUBJECT: Phone Conversation with Cody Peterson

DATE: March 18, 2020

On March 17, 2020, I called Mr. Peterson to follow up on a February 24, 2020 phone call between himself and Wildlife Refuge Specialist, Krista Lundgren. I explained that while I would prefer to meet in person, due to the coronavirus concern, a phone call would probably be safer to do business.

Mr. Peterson proceeded to ask the same questions as he did on the February 24, 2020. I explained that from what I could determine, the dugout was installed sometime between 1979 and 1997. I do not have any documentation that this dugout was permitted. Mr. Peterson admitted that he pumps water out of this dugout to draw down water elevations from this wetland. I explained that since this wetland meets our wetland mapping criteria, pumping water without a permit is a conflict of the easement and is not allowed.

Mr. Peterson again mentioned that we sent him a map a couple of years ago and that the map did not have a couple of wetlands on it. Now, the recent map shows these wetlands. I explained that I am unaware of this map he was referring to but I did explain that we sent him a letter and a black/white map, dated February 18, 2016, however, all the wetlands on that map is also on the recent photograph. I mentioned that if he received a different map, I would be willing to review it.

He then asked me what the FWS would do if he keeps pumping out of the dugout. I explained that we would consider it a violation of the terms and conditions of the easement contract. He expressed his frustration and said that he will contact his lawyer and get this straightened out.

RINKE NOONAN
*attorneys at law*

March 23, 2020

Direct Dial: 320-656-3522
Kvanbruggen@RinkeNoonan.com

U.S. Fish and Wildlife Service
Attn: Kulm Refuge Manager, Mr. Mick Erickson
P.O. Box E
Kulm, ND 58456

**SENT VIA EMAIL ONLY TO: MICHAEL_ERICKSON@FWS.GOV**

**Re: Records Request**
**Our File No. 29364-0001**

Dear Mr. Erickson:

Our firm has been hired by Cody Peterson and Leonard and Patty Peterson ("The Petersons") for legal consultation regarding the USFWS Easement No. 69X located on their property. As owners of this land, the Petersons have authorized our firm to request on their behalf a copy of the following records:

1. Any and all records including, but not limited to, books, papers, maps, charts, plats, letters, memoranda, external or internal communications or comments, electronic mail related to or discussing easements held by the United States Department of Interior, the U.S. Fish and Wildlife Service, or other related federal agencies for waterfowl management rights on the following property, which is located in the state of North Dakota:

    a. Section 2, Township 136 North, Range 61 West (Sec.2-T136N-R61W), LaMoure County.

2. Any and all easements including easement summaries and related attachments held by the United States Department of the Interior, the U.S. Fish and Wildlife Service, or other related agency for waterfowl management rights on the property listed in Paragraph 1 above.

3. Any and all shapefiles, aerial photography, topographic maps, soil maps and/or LiDAR data used by the United States Department of the Interior or the U.S. Fish and Wildlife Service to determine wetland area locations, delineate wetland boundaries or analyze easement areas on the property listed in Paragraph 1 above.

Suite 300 US Bank Plaza
1015 W. St. Germain St
P.O. Box 1497
St. Cloud, MN 56302
320 251 6700
www.rinkenoonan.com

In order to save the agency's time and resources, it is preferred and recommended that the records be sent electronically (if the requested records are available in electronic format). You may email the records to my email address below. Otherwise, if the records are too large to send over email, you may contact me and my office can then send you a file transfer link to upload the records.

We would appreciate a timely response to this letter as any objections to the new 2020 map of Easement No. 69X that my clients received are due soon. My clients cannot adequately assess whether they have objections to the location, boundaries, and acreage of wetland areas on the new 2020 map without opportunity to review, at a minimum, the summary record for the easement and the aerial photos, maps, shapefiles and other data your office used to create the map. If you anticipate that we will not receive the requested documents by April 2, 2020, please contact me at 320-251-6700 or by email at kvanbruggen@rinkenoonan.com.

Thank you for your anticipated cooperation. I look forward to hearing from you soon. If you should have any questions regarding this request, please do not hesitate to contact me.

Sincerely,

*<u>/s/ Kale R. Van Bruggen</u>*
Kale R. Van Bruggen
KRV/ksb

cc: Cody Peterson
Leonard & Patty Peterson

# Information for LaMoure Co. 69x - (Cody Peterson & Leonard Peterson)

Erickson, Michael <michael_erickson@fws.gov>
Wed 3/25/2020 3:30 PM
To: Kale Van Bruggen <KVanBruggen@rinkenoonan.com>

7 attachments (4 MB)
1979 & 2002 photos for LaMoure 69x.pdf; Contract-LaMoure 69X.pdf; Fw__Lamoure_69X.zip; LaMoure 69x file info 2 of 2.pdf; LaMoure 69X map info.pdf; Redacted document LaMoure 69x.pdf; Redacted LaMoure 69x info 1 of 2.pdf;

Kale-

Attached are scanned documents from our management file for LaMoure County 69x wetland easement you requested on March 23, 2020. I understand you have been communicating with Matt Sprenger, Devils Lake WMD, concerning our ability to provide all aerial imagery at this time. I did include two photos that the FWS owns and will provide all the other imagery once this matter is cleared up. Please call if you have any questions.

*The attached digital wetland area shapefile(s) represent thte approximate size, shape and location of wetland areas protected by the terms of the easement contract. A permit is required from the Service before conducting activities that result in the draining, burning, filling or leveling of wetland areas depicted by these shapes.*



2002 Photo #5450




#7
1979 NWI
N

AR001424

# [EXTERNAL] 29364-0001: Objection to Revised US FWS Easement Map – 69X

Kale Van Bruggen <KVanBruggen@rinkenoonan.com>
Fri 4/3/2020 7:19 PM

**To:** Henderson, Wayne <wayne_henderson@fws.gov>; Erickson, Michael <michael_erickson@fws.gov>
**Cc:** Jayne Esch <JEsch@rinkenoonan.com>; Kathleen Bundy <KBundy@rinkenoonan.com>

2 attachments (17 MB)
Van Bruggen letter to Refuge Manager (easement objections).pdf; Wenck_Wetland Easement Review.pdf;

Mr. Henderson & Mr. Erickson,

Please see the attached letter from me on behalf of clients Leonard, Patty, and Cody Peterson as well as the attached report from Wenck Associates regarding objections to the revised US FWS map for contract 69X. If you have any questions, do not hesitate to contact me. Please confirm your receipt of this email.

Thank you,

Kale R. Van Bruggen
Attorney

**RINKE NOONAN**
Suite 300, US Bank Plaza
P.O. Box 1497
St. Cloud, MN 56302
(320) 656-3522 Direct
(320) 656-3500 Fax

website | email | bio | map

RINKE NOONAN
attorneys at law

LinkedIn

NOTICE: This electronic mail transmission (including attachments) may contain an attorney-client, work-product or trade-secret communication that is privileged at law. If you are not the intended recipient, do not read, distribute, or reproduce this transmission. It is not intended for transmission to, or receipt by, any unauthorized persons. This E-mail (including attachments) is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521. If you are not the intended recipient, you are hereby notified that any retention, dissemination, distribution or copying of this communication may be strictly prohibited. Recipients should ensure that proper security measures are taken to maintain any privileged or confidential information. Recipients should inform the originator of this email if you do not want to receive and transmit communications by email or other electronic means at this email address. If you have received this electronic mail transmission in error, please delete it from your system without copying it, and notify the sender by reply e-mail or by calling 320-251-6700, so that our address record can be corrected.

IRS Circular 230 Disclosure

RINKE NOONAN
attorneys at law

April 3, 2020

Direct Dial: 320-656-3522
Kvanbruggen@RinkeNoonan.com

Wayne A. Henderson
Fish and Wildlife Service
1 First Street SW; P.O. Box E
Kulm, North Dakota 58456

**SENT VIA EMAIL ONLY TO: WAYNE_HENDERSON@FWS.GOV**

**Re: Objection to Revised US FWS Easement Map – 69X**
**Our File No. 29364-0001**

Dear Mr. Henderson:

I write this letter on behalf of my clients, Leonard, Patty, and Cody Peterson (the "Petersons"), with objections to the new map of U.S. Fish and Wildlife Service Easement 69X in LaMoure County, North Dakota that my clients received by certified mail on February 24, 2020. Easement 69X covers West ½ of Section 2, Township 136N, Range 61W. The letter dated February 18, 2020 enclosing the new map of Easement 69X provides landowners 40 calendar days from the date they receive the new map to contact the Refuge Manager with any objections to the map. This letter and objections to the map are therefore timely.

***History and Previous Mapping***

Easement 69X was conveyed by previous landowners, Lyle and Vivian Trapp, to the U.S. Fish and Wildlife Service ("FWS") on November 15, 1963. FWS's summary record for Easement 69X notes the following information:

> Easement Consideration: $630.00; Tract Acreage: 327.73; Cost per acre: $1.92; Wetland Acreage 42.00; Wetland cost per acre: $15.00; Estimate of Value: $630.00

According to my client's records and the records we have received from your office thus far, it appears Easement 69X was first mapped by FWS in 2015, which was sent to my clients by letters dated February 18, 2016. The historical record of Easement 69X indicates FWS mapped 42 acres of wetlands and "deleted 27 acres." The files we received from your office do not contain any additional information pertaining to these 27 deleted acres.

***Applicable Law***

Easements are contractual nonpossessory property interests that give the easement holder the right to use property owned by another in a certain manner. Pursuant to N.D. Cent. Code § 47-05-07, "[t]he extent of a servitude is determined by the terms of the grant . . . ."

The language of the grant of FWS waterfowl production area easements, like Easement 69X, specifically restrict the landowner from "draining or permitting the draining, through the transfer of appurtenant water rights or otherwise, of any surface water . . . now existing or recurring due to natural causes on the above-described tract by ditching or any other means; . . . filling in with earth or any other material or leveling any part or portion of the above-described tract on which surface water or marsh vegetation is now existing or hereafter recurs due to natural causes; and . . . burning any areas covered with marsh vegetation." The easement gives examples of naturally-existing or recurring surface water as "including lakes, ponds, marshes, sloughs, swales, swamps, or potholes . . . ."

Case law holds that restrictions contained in these FWS waterfowl production area easements only apply to wetland areas on the property at the time the easement was conveyed and do not apply to fluctuating, after-expanded or after-developed wetland areas. *U.S. v. Johansen*, 93 F.3d 459, 465-66 (8th Cir. 1996) (citing *North Dakota v. U.S.*, 460 U.S. 300 (1983)). The key inquiry when interpreting contracts that convey an interest in real property "is to ascertain and effectuate intent of the grantor." *Id.* at 463 (citing *Malloy v. Boettcher*, 334 N.W.2d 8, 9 (N.D. 1983)). Accordingly, and absent a negotiated and agreed-upon map between the grantor and FWS showing areas subject to the easement's restrictions, the location and boundaries of wetland areas on the property that were in existence at the time the easement was conveyed are protected by the easement because those are the areas that the grantor knew were present on the landscape and intended to be subject to the easement's restrictions. *Id.* at 467.

Restrictions contained in FWS waterfowl production area easements are also limited, at a maximum, to the number of acres that FWS noted it paid the landowner for in the summary record. *Id*. at 465-66. The court in *Johansen* found that interpreting the easement's restrictions as covering fluctuating, after-expanded, or after-developed wetland areas violates the easement program's enabling statutes because the number of protected acres would constantly fluctuate and could thereby exceed the gubernatorial consent limitation. *Id*.

Easement 69X does not have a negotiated and agreed-upon map between FWS and the grantor, or any other landowner, showing the areas that are subject to the easement's restrictions. In accordance with the terms of the easement and applicable law, any areas with surface water existing or occurring on the property due to natural causes at the time the easement was conveyed cannot be drained or filled.

***Objections to 2020 Mapping***

The Petersons have the following objections to the 2020 map of Easement 69X that covers their land in the W ½ of 2-136-61:

First, the Easement Mapping References checklist indicates the aerial photos taken in the following years were utilized to create the map: 1957, 1964, mid-1990s, 2002, 2003, 2004, 2005, 2006, 2008, 2009, and 2012. Only two of these eleven photos were taken prior-to or relatively close in time to when the Easement was conveyed in 1963. The remaining nine photos used to create the map were taken approximately 32 to 49 years after the easement was conveyed. As discussed above, the key inquiry when determining the scope of pre-1976 FWS easements is to determine the location and boundaries of wetland areas present on the property at the time the easement was conveyed. Photos taken over three decades after Easement 69X was conveyed do not represent the condition of the property at the time and, as such, are not an accurate representation of the contracting parties' intent and agreement.

Second, the FWS map indicates numerous, small 0.2, 0.1 and <0.1-acre wetland areas are protected by the Easement. These areas are identified as A, G, K, N, O, P, Q, R, S, T, and U on the enclosed map in the Wenck report. These areas are almost always cropped straight through and do not have evidence of surface water on images prior to 1969, as is specifically protected by the Easement. Accordingly, under the terms of the Easement, we do not believe FWS purchased the right to protect these areas.

Third, the FWS map indicates one large 12.9-acre wetland along the eastern portion of the property. This area is identified as area L on the enclosed map. This area actually consists of two, smaller wetland areas – totaling 8.3 and 1.8 acres respectively. Area L is not one continuous wetland because there is higher ground in the middle that is consistently been farmed through and does not pond water.

Fourth, the FWS map indicates a 6.8-acre wetland in the northeastern portion of the property. This area is identified as area B on the enclosed map. The inundation and marsh vegetation in this area is much larger than the area drawn by FWS. Accordingly, we believe this area to approximately 14.9 acres, not 6.8.

Fifth, the FWS map indicates five medium sized wetlands of 2.5 acres, 2.8 acres, 0.6 acres, 1.3 acres, and 5.2 acres. These acres are identified as H, I, J, M, and V on the enclosed map. The actual inundation and marsh vegetation in these areas at the time the easement was conveyed is much smaller, however. We determined the inundation and marsh vegetation in these areas to be 1.64 acres, total.

Please see the enclosed report from Matt Retka that further details the above objections. Upon review, we do not object to the acres mapped for the sites labeled in the Wenck Report as C, D, E, & F. We reserve the right to supplement these objections as this matter progresses.

In accordance with the above, we respectfully request a meeting with you to discuss and review the concerns addressed in this letter. Please contact me (or my paralegal Kat Bundy) to let us know your availability for a meeting. Our office has videoconference technology, and we would be happy to arrange a meeting by such means if it is convenient for you. We ask that you please keep us informed of any decision on this matter or any alteration to the 2020 map of Easement 69X that your office may make.

Thank you for your attention to this matter. If you have any questions or need any additional information, please do not hesitate to contact me.

Sincerely,

*/s/ Kale R. Van Bruggen*

Kale R. Van Bruggen
KRV/JEE

Enclosure

cc: Leonard & Patty Peterson (w/encls.)
Cody Peterson (via email only w/encls.)
Mr. Mick Ericson (via email only – michael_erickson@fws.gov w/encls.)

# Wetland Easement Review

WENCK
Responsive partner.
Exceptional outcomes.

**To:** Cody Peterson

**Copy:** Kale Van Bruggen, Rinke Noonan
Jayne E. Esch, Rinke Noonan

**From:** Matt Retka, Wenck Associates, Inc.

**Date:** April 3rd, 2020

**Subject:** Wetland Easement Review: USFWS Easement 69X, LaMoure Co., ND

Wenck Associates, Inc. (Wenck) was retained by Mr. Cody Peterson to review selected mapped wetland areas recently provided by the USFWS in the West ½ of Section 2, Township 136 North, Range 61 West. This review focused on the "Wetland Areas Covered by the Provisions of the Easement" as identified on the attached USFWS map (See Attachment 1).

Wenck conducted a desktop review of the locations identified as "Wetland Areas Covered by Provisions of the Easement" by USFWS within the West half of Section 2 and created unique identification labels for each of these areas (i.e., A-V, see Attachment 1). Note that Wenck's investigation focused on areas requested for review by the landowner. The easement conveyance was completed in November 1963, and thus, the focus of the historic aerial review was on photographs near or prior to the date of the easement. To obtain a reasonable size subset from the time-period of the easement conveyance, review of all available site images through and including 1969 were included. These photos were geo-referenced using GIS software for the desktop analysis. Obtained historical aerial images from 1969 and prior are provided as Attachment 2. A summary of the results is provided as Attachment 3.

**Areas A, G, H, I, J, K, M, N, O, P, Q, R, S, T, U, and V.**

Wenck reviewed Areas A, G, H, I, J, K, M, N, O, P, Q, R, S, T, U, V (16 in total) for indications of inundation. Areas A, G, K, N, O, P, Q, R, S, T and U (11 in total) revealed no indications of inundation on obtained images prior to 1969. Inundation was observed at areas H, I, J, M, and V (5 in total) at least once on the obtained historic photos. These areas of observed inundation were delineated using GIS, and found to be smaller than identified by the USFWS mapped boundaries. In some cases, the interpretation of inundation included what appeared to be areas of marsh vegetation potentially obscuring a more direct observation of inundation. The areas showing historically observable inundation corresponding to basins H, I, J, M, and V total 1.64 acres.

**Area B**

Wenck reviewed historic aerial photos of Area B for the maximum signatures of wetness. These wetness signatures showing the likely maximum historic size of wetland at Area B was delineated, and totals 14.9 acres.

**<u>Area L</u>**

Wenck was requested to review area L and delineate the wetness signatures prevalent outside of cropped portions of this area. Wenck delineated a total of 9.9 acres, specifically focusing on signatures of wetness observed on the 1960 aerial photograph.

**Enclosures:**

Attachment 1: USFWS Wetland Easement Map (and Unique IDs)
Attachment 2: Pre-1969 Aerial Photographs
Attachment 3: Summary of Desktop Review

# Attachment 1

69X
T. 136 N., R. 61 W.
SECTION 2, W1/2

LaMoure County, North Dakota




The U.S. Fish & Wildlife Service (Service) has purchased and owns a perpetual easement which restricts the rights to drain, burn, fill or level any wetland areas depicted on this map. This map represents the Service's effort to depict the approximate sizes, shapes, and locations of all protected wetland areas and is not intended to depict water levels in wetland areas for any given year. Wetland area acre estimates are provided to demonstrate that mapped wetland areas are consistent with the acres for which the Service paid. Any other interpretation of the estimated wetland area acreages may lead to a mischaracterization of the easement conveyance. A permit is required from the Service before conducting activities that result in the draining, burning, filling or leveling of wetland areas identified on this map.

Section Boundary
Boundary of Easement Description
Wetland Areas Covered by Provisions of the Easement

*Data Sources: Farm Service Agency: NAIP Imagery 2019, USFWS: Easement Boundary, BLM: Public Land Survey System (Sections). Map Date: 2/11/2020*

69X
T. 136 N., R. 61 W.
SECTION 2, W1/2

LaMoure County, North Dakota




The U.S. Fish & Wildlife Service (Service) has purchased and owns a perpetual easement which restricts the rights to drain, burn, fill or level any wetland areas depicted on this map. This map represents the Service's effort to depict the approximate sizes, shapes, and locations of all protected wetland areas and is not intended to depict water levels in wetland areas for any given year. Wetland area acre estimates are provided to demonstrate that mapped wetland areas are consistent with the acres for which the Service paid. Any other interpretation of the estimated wetland area acreages may lead to a mischaracterization of the easement conveyance. A permit is required from the Service before conducting activities that result in the draining, burning, filling or leveling of wetland areas identified on this map.

Section Boundary
Boundary of Easement Description
Wetland Areas Covered by Provisions of the Easement

*Data Sources: Farm Service Agency: NAIP Imagery 2019, USFWS: Easement Boundary, BLM: Public Land Survey System (Sections). Map Date: 2/11/2020*

# Attachment 2




CODY A. PETERSON

October 24, 1941

WENCK
Responsive partner. Exceptional outcomes.

MAR 2020


USFWS Identified Wetland Areas
W 1/2 Section 2
700 350 0 700
Feet
N
CODY A. PETERSON
July 28, 1952
WENCK
Responsive partner. Exceptional outcomes.
MAR 2020
A
B
C
D
E
F
G
H
I
J
K
L
M
N
O
P
Q
R
S
T
U
V




CODY A. PETERSON

August 13, 1957

WENCK

Responsive partner. Exceptional outcomes.

MAR 2020




CODY A. PETERSON

August 8, 1964

WENCK

Responsive partner. Exceptional outcomes.

APR 2020