**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION**

| | |
|---|---|
| CODY PETERSON, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 3:25-cv-00078-PDW-ARS |
| v. | ) |
| | ) |
| | ) |
| UNITED STATES OF AMERICA; UNITED | ) **MEMORANDUM IN SUPPORT OF** |
| STATES FISH & WILDLIFE SERVICE; | ) **PLAINTIFF'S MOTION FOR** |
| PAUL SOUZA, in his official capacity as | ) **PARTIAL SUMMARY** |
| Acting Director of the U.S. Fish & Wildlife | ) **JUDGMENT** |
| Service; MATT HOGAN, in his official | ) |
| capacity as Regional Director, Mountain-Prairie | ) |
| Region of the U.S. Fish & Wildlife Service; | ) |
| UNITED STATES DEPARTMENT OF | ) |
| INTERIOR; | ) |
| DOUG BURGUM, in his official capacity as | ) |
| Secretary of the U.S. Department of the | ) |
| Interior, | ) |
| | ) |
| Defendants. | ) |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ...........................................................................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS ...........................................................2

STANDARD OF REVIEW ..............................................................................................10

ARGUMENT ...............................................................................................................12

I.   This Court Should Hold Unlawful and Vacate the Service's 2020 Map of Easement 69X ....12

II.  This Court Should Hold Unlawful and Set Aside the 2024 Rule's "No Effect" Standard
     Because It Illegally Expands the Scope of the Waterfowl Production Area Easements .........17

III. This Court Should Hold Unlawful and Vacate the 2024 Rule Because It Fails to Articulate
     a Satisfactory Standard for Determining Drain Tile Setbacks .................................................20

CERTIFICATE OF SERVICE .........................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Barthel v. U.S. Dep't of Agric.*,
181 F.3d 934 (8th Cir. 1999) ..................................................................................19

*Branstad v. Veneman*,
212 F. Supp. 2d 976 (N.D. Iowa 2002)...................................................................16

*Buffalo Field Campaign v. Zinke*,
289 F. Supp. 3d 103 (D.D.C. 2018) .......................................................................11

*Burlington N., Inc. v. United States*,
549 F.2d 83 (8th Cir. 1977) ...................................................................................11

*Butte Cnty. v. Hogen*,
613 F.3d 190 (D.C. Cir. 2010) ..........................................................................20–21

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971).................................................................................................10

*Mass. ex rel. Div. of Marine Fisheries v. Daley*,
170 F.3d 23 (1st Cir. 1999).....................................................................................21

*Friends of Boundary Waters Wilderness v. Bosworth*,
437 F.3d 815 (8th Cir. 2006) .............................................................................10, 16

*Gen. Land Off. v. United States Dep't of the Interior*,
947 F.3d 309 (5th Cir. 2020) ..................................................................................11

*Krenz v. XTO Energy, Inc.*,
890 N.W.2d 222 (N.D. 2017) .................................................................................2, 19

*Kunkel v. Comm'r*,
821 F.3d 908 (7th Cir. 2016) ..................................................................................21

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)..................................................................................................11

*Malloy v. Boettcher*,
334 N.W.2d 8 (N.D. 1983) .......................................................................................17

*Marbury v. Madison*,
5 U.S. 137 (1803)......................................................................................................11

ii

*McDonnell v. United States*,
    579 U.S. 550 (2016)..........................................................................................................21

*Menorah Med. Ctr. v. Heckler*,
    768 F.2d 292 (8th Cir. 1985) ...........................................................................................16

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)...........................................................................................................11

*Niobrara River Ranch, L.L.C. v. Huber*,
    373 F.3d 881 (8th Cir. 2004) ...........................................................................................10

*North Dakota v. United States*,
    460 U.S. 300 (1983)..........................................................................................................12

*Price v. District of Columbia*,
    792 F.3d 112 (D.C. Cir. 2015)....................................................................................11, 14

*Qwest Corp. v. F.C.C.*,
    689 F.3d 1214 (10th Cir. 2012) .......................................................................................20

*Ramaprakash v. FAA*,
    346 F.3d 1121 (D.C. Cir. 2003)........................................................................................22

*Royse v. Easter Seal Society for Crippled Children & Adults, Inc.*,
    256 N.W.2d 542 (N.D. 1977) ..........................................................................................17

*Sackett v. Env't Prot. Agency*,
    598 U.S. 651 (2023)..........................................................................................................21

*San Luis Obispo Mothers for Peace v. U.S. Nuclear Regul. Comm'n*,
    789 F.2d 26 (D.C. Cir. 1986)............................................................................................21

*Sierra Club v. Salazar*,
    177 F. Supp. 3d 512 (D.D.C. 2016)..............................................................................16, 21

*St. James Hosp. v. Heckler*,
    760 F.2d 1460 (7th Cir. 1985) .........................................................................................16

*Tourus Records, Inc. v. DEA*,
    259 F.3d 731 (D.C. Cir. 2001)..........................................................................................20

*Transcon. Gas. Pipe Line Corp. v. FERC*,
    54 F.3d 893 (D.C. Cir. 1995)............................................................................................21

*United States v. Albrecht*,
    496 F.2d 906 (8th Cir. 1974) ...........................................................................................17

*United States v. Johansen*,
   93 F.3d 459 (8th Cir. 1996) ............................................................................... *passim*

*United States v. Little Lake Misere Land Co.*,
   412 U.S. 580 (1973)...........................................................................................17

*United States v. Mast*,
   No. 4:17-CR-40078-01-KES, 2020 WL 2574634 (D.S.D. May 21, 2020),
   *judgment entered* (D.S.D. 2020), *aff'd*, 999 F.3d 1107 (8th Cir. 2021) ...................................13

## Statutes

5 U.S.C. § 706.......................................................................................10–11, 21–22

5 U.S.C. § 706(2)(A)...........................................................................................10–11

Food Security Act of 1985, Pub. L. No. 99-198, 99 Stat. 1354................................9, 19

N.D. Cent. Code § 47-09-11 (1978) ........................................................................17

N.D. Cent. Code § 47-05-07 ...................................................................................17

## Regulation

89 Fed. Reg. 41336 (May 13, 2024) ....................................................................... *passim*

## Rule

Fed. R. Civ. P. 56(a) ..............................................................................................10

## Other Authorities

*Drain*, Black's Law Dictionary 582 (4th ed. 1968) ........................................................18

Holmes, O.W., *The Common Law* (1881) ....................................................................22

Restatement of Property § 451 (1944)......................................................................17

Restatement (Third) of Property (Servitudes) § 4.9................................................2, 19

Restatement (Third) of Property (Servitudes) § 4.10.............................................2, 19

**INTRODUCTION**

Plaintiff Cody Peterson is a farmer and landowner in LaMoure County, North Dakota. *See* Administrative Record, Dkt. No. 21-3, AR001411. Like many farmers in the upper Midwest, Mr. Peterson's land is burdened by a wetland conservation easement held by Defendant United States Fish and Wildlife Service ("the Service" or "FWS"). *Id.* The Service acquired many such easements in the 1960s and 1970s. *Id.* But prior to 1976, the deeds of easements prepared by the Service—including the deed for an easement on farmland Mr. Peterson owns—did not describe what wetlands they covered on a property. *See United States v. Johansen*, 93 F.3d 459, 461 (8th Cir. 1996). As a result, "there has been a considerable amount of confusion regarding what the earlier wetland easements actually covered." *Id.* at 463.

In 2020, the Service issued a guidance memo to address the confusion over these easements. Dkt. No. 21-1, AR0065–66. Pursuant to the memo, the Service informed landowners and farmers that it would issue estimates of what it believed to be the scope of existing wetland easements and how it would calculate where farmers could install drain tile on their encumbered properties. *Id.*

In February 2020, the Service issued a map of the property at issue in this case that showed what the agency believes its easement (Easement 69X) covered. Dkt. No. 21-6, AR 001641–43. In issuing this map, however, the Service relied on aerial images of the land decades after the easement was conveyed, Dkt. No. 21-6–21-14, AR001676–1717, despite Eighth Circuit precedent that holds restrictions contained in waterfowl production area easements only apply to wetland areas on the property at the time the easement was conveyed and do not apply to fluctuating, after-expanded or after-developed wetland areas, *Johansen*, 93 F.3d at 465–66. Mr. Peterson objected to the map, arguing that the map did not reflect what wetlands existed on the property at the time

the easement was conveyed, but the Service only made minor changes to the map. Dkt. No. 21-4, AR001490–99.

Making matters worse, in 2024, the Service promulgated a final rule interpreting the scope of these wetland easements ("2024 Rule"). 89 Fed. Reg. 41336 (May 13, 2024). The 2024 Rule severely restricts farmers' ability to make their land farmable and states that *any impact*—no matter how minor—on a purported wetland is a violation of the terms of the easements. *Id.* at 41337. But North Dakota law and the common law generally recognize that the owner of property encumbered by an easement may use his or her property in a reasonable manner even when such use minimally impacts an easement holder. *See Krenz v. XTO Energy, Inc.*, 890 N.W.2d 222, 231 (N.D. 2017); Restatement (Third) of Property (Servitudes) §§ 4.9, 4.10.

The 2020 map and the 2024 Rule misinterpret Easement 69X's location and scope and unlawfully restrict the amount of land Mr. Peterson can farm. Accordingly, the Service's map of Mr. Peterson's farm and its 2024 Rule are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. This Court should grant Plaintiff's Motion for Partial Summary Judgment, hold unlawful the Service's mapping decision and its 2024 Rule, and set aside both decisions.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### Mr. Peterson's Property and Easement 69X

Cody Peterson is a farmer and owner of property in LaMoure County, North Dakota. Dkt. No. 21-3, AR001411. He owns a portion of the west half of Section 2, Township 136 North, Range 61 West in LaMoure County and leases the rest of the west half of Section 2 from his parents Leonard and Patty Peterson. *Id.* at AR001420. The easement at issue in this case, Easement 69X, was granted from the Petersons' predecessors on November 15, 1963, and accepted by the United

States on April 22, 1964. Dkt. No. 21-6, AR001614–15. The Easement covers the West 1/2 of Sec. 2, T136N, R61W. *Id.*

On the day the United States accepted the Easement, it created an "Easement Summary" for the U.S. Fish and Wildlife's internal records. *Id.* at AR001630. The Service's summary record for Easement 69X notes the following information: "Easement Consideration: $630.00; Tract Acreage: 327.73; Cost per acre: $1.92; Wetland Acreage 42.00; Wetland cost per acre: $15.00; Estimate of Value: $630.00." *Id.* This easement summary was not a part of the contract or deed conveying the easement. *Id.* at AR001614–15.

### Prairie Pothole Easements

Easement 69X is one of many held by Defendant United States of America and managed by Defendant U.S. Fish and Wildlife Service in the "Prairie Pothole" region of the Upper Midwest. Dkt. No. 21-3, AR001411. During the early 1960s, Defendant U.S. Fish and Wildlife Service acquired conservation easements over many prairie potholes, including Easement 69X. *Id.* Like with Easement 69X, all easements acquired before 1976 did not describe where they applied or what "wetlands" they covered. *See Johansen*, 93 F.3d at 461. The only clue to how much land was governed by these easements was an agreement between the Governor of North Dakota and the Service that 1.5 million acres had been encumbered. *Id.* This was because the statute allowing the Service to acquire these easements required consent of the state involved. *See id.*

"Since 1976, [the Service] has recorded a map locating the covered wetland acres as part of every easement document. However, as a consequence of the former practice and the fact that prairie potholes, by nature, are ill-defined and subject to fluctuation, there has been a considerable amount of confusion regarding what the earlier wetland easements actually covered." *Id.* at 463. Despite not being part of the easements, the Service later published an easement summary for each

3

tract of land, which purported to identify the covered wetlands and the acreage subject to the easement on each tract. *Id.* at 462. The United States has routinely indicted and prosecuted farmers in North Dakota for allegedly draining wetlands subject to these easements. *See id.* at 463.

**2020 Guidance**

In 2020, in response to the legal uncertainty concerning the Service's wetland easements and the growing use of drain tile on farmlands with such easements, the agency issued a guidance memo titled *Drain Tile Setbacks and Legal Action on U.S. Fish and Wildlife Services Wetland Easements* (Feb. 26, 2020) ("2020 Guidance"). Dkt. No. 21-1, AR000065–66. The 2020 Guidance informed landowners that the Service would issue estimates of what it believed to be the scope of existing wetland easements and calculate where farmers could install drain tile on their encumbered properties. *Id.*

The 2020 Guidance expressly stated that when the Service works with a landowner to design a tile installation plan, the Service's actions should aim to protect the wetland areas from drainage without needlessly restricting activities on the remainder of the easement. *Id.* at AR000066. To that end, the 2020 Guidance provided that when the landowner coordinated their tile planning with the Service, and adhered to Service-provided setback distances, the Service would not pursue legal action if it is later determined that the distances are inadequate to protect wetland areas from drainage. *Id.* at AR000065.

According to the 2020 Guidance, if a landowner did not follow Service-provided setback distances, or changed the tiling parameters on which setback calculations are based, and drainage of the protected wetland occurred, the Service would request that tile within the setback distances be removed to restore the affected wetland area. AR000065. The 2020 Guidance specified that the Service would use the van Schilfgaarde equation to calculate where farmers could install drain

4

tiles. The van Schilfgaarde equation was developed to determine the effect of drainage systems on water table drawdown in saturated soil conditions. *Id.*

### Fish and Wildlife Service's Wetland Map of Mr. Peterson's Property

On February 18, 2020, Wayne Henderson, the Wetland District Manager for the Kulm Wetland Management District, sent a letter to Mr. Peterson with an enclosed map that "represents the U.S. Fish and Wildlife Service's effort to depict the approximate sizes, shapes and locations of all wetland areas protected by the provisions of the easement [Easement 69X]." Dkt. No. 21-6, AR001641. This letter informed Mr. Peterson that if he disagreed with the map he could object to the map by writing to the Kulm Refuge Manager and, subsequently, he could appeal the map to the Service's Regional Director and then to the Director. *Id.* A similar letter was sent to Mr. Peterson's parents. *Id.* at AR001638.

On April 3, 2020, counsel for the Petersons sent a letter objecting to the 2020 map. Dkt. No. 21-3, AR001426–43. Included in that objection was a "Wetland Easement Review" conducted by Wenck Associates, Inc. *Id.* at AR001430–43. This document summarized Wenck's findings after conducting a historic aerial photograph review of Mr. Peterson's property. *Id.* Wenck concluded that the 2020 map did not accurately reflect the wetlands that existed at the time Easement 69X was conveyed and recommended specifics on how the 2020 map should be revised. Included was a map summarizing the recommendations:

5



Dkt. No. 21-4, AR001443.

On April 30, 2020, Mick Erickson, the Refuge Manager for the Kulm Wetland Management District, issued a decision on Mr. Peterson's objection. *Id.* at AR0001445–46. Mr. Erickson said that FWS uses "all available resources" to determine the protected wetland areas,

6

and the "[m]apping resources that we use are not limited to aerial photos taken before the easement

acquisition." *Id.* at AR0001445. Mr. Erickson also stated that "The presence of surface water in

photography near the time of acquisition is not a requirement for mapping of wetland areas.

Wetlands do not cease being protected when they naturally dry or are devoid of marsh vegetation."

*Id.*

Mr. Erickson did make some minor changes to the original map, and removed wetland

areas N, Q, and T. *Id.* at AR001446. But with regard to wetland L, Mr. Erickson "agree[d] that

there is likely higher ground that reappears during drier periods" but that it "often appears as one

continuous wetland as mapped" and therefore did not reshape area L. *Id.* Mr. Erickson also did not

make any adjustments to the size of wetland B and stated that "FWS utilized and adhered to all

four criteria" the agency follows "[i]n situations where more wetland area is present than the

purchased summary acreage." *Id.*

On May 28, 2020, Mr. Peterson appealed to Noreen Walsh, the Director of the Service's

Mountain-Prairie Region. *Id.* at AR001450–56. Mr. Peterson reiterated his objections, *id.*, and also

objected to the Service's use of the 2016 Prairie Pothole Region Easement Manual (the "Manual")

to map areas protected by the easement because the Manual's instructions are inconsistent with

the applicable law on determining the size and scope of the waterfowl production area easements,

*id.* at AR001454.

> In response to Mr. Peterson's objections, Regional Director Walsh stated that
>
> The key inquiry when determining what is protected by the terms of the easement
> is to determine what wetland areas 1) existed at the time the easement was
> conveyed, and 2) are included in the acres for which the original landowner was
> paid. The term "existed" does not refer to the water levels in the wetland areas on
> the day the easement was signed. . . . The FWS uses a variety of resources to
> determine the locations and boundaries of wetland areas and is not limited to aerial
> photos taken before easement acquisition. Courts have concluded that comparing
> photographs of the landscape from before and after an easement was conveyed is

7

an acceptable and reliable method of establishing the existence of wetland areas at a certain moment in time. (see *U.S. v. Mast; U.S. v. Peterson*).

*Id.* at AR001487.

In response to Mr. Peterson's objection to the agency use of the Manual, Regional Director Walsh responded that "[t]he manual sets forth and provides current procedures and standards for the administration of the easement program in order to be compliant with the applicable statutes, regulations and policies while adhering to case law." *Id.* She also said the mapping technicians review aerial photography for "basins," "saturated conditions," and "isolated areas that are not farmed" because those are "indicators of recurring surface water[.]" *Id.*

Finally, in response to Mr. Peterson's argument that certain areas mapped by the FWS do not show evidence of inundation and marsh vegetation and therefore are not protected by the easement, Regional Director Walsh said, "The absence of surface water or marsh vegetation on photos taken near the time of the easement conveyance does not provide evidence that a wetland area did not exist" and concluded that she found "the wetland areas in question existed at the time of easement conveyance and meet the wetland area definition as defined in the easement contract which includes ' . . . any surface water including lakes, ponds, marshes, sloughs, swales, swamps or potholes, now existing or reoccurring . . .'" *Id.* After laying out her response, Regional Director Walsh slightly revised the sizing of wetland areas B, I, L, M, V, and U. *Id.* at AR001487–88.

On August 7, 2020, Mr. Peterson appealed to the Director of the Fish and Wildlife Service. *Id.* at AR001490–99. Mr. Peterson reiterated his objections, including his objections to the Regional Director's interpretation of the U.S. District Court for the District of South Dakota's decision in *United States v. Mast*. *Id.* at AR001497. Mr. Peterson also reiterated that, although Regional Director Walsh revised some of the sizing of wetland areas B, I, L, M, V, and U, further

8

changes were necessary. *Id.* at AR001498–99. On March 25, 2021, the Director issued a decision affirming the previous decisions. AR001599–1601.

## 2024 Rule

On May 13, 2024, the Service issued a final rule entitled "National Wildlife Refuge System; Drain Tile Setbacks." 89 Fed. Reg. 41336 (May 13, 2024). The rule states that the Service "promulgate[d] new regulations pertaining to wetland easements to bring consistency, transparency, and clarity for both easement landowners and the Service in the administration of conservation easements[.]" *Id.*

But despite stating that "the guidance memo remains in full effect[,]" the 2024 Rule promulgates regulations that are inconsistent with the 2020 Guidance. *Id.* at 41339. For example, while the 2020 Guidance stated that the purpose was to protect wetlands from drainage, the 2024 Rule lays out a much stricter purpose. Specifically, the final rule states that "[t]he regulations we are adopting in this final rule provide clarity and certainty to landowners that drain tile may be installed on lands encumbered by a wetland easement provided that protected wetland areas are not drained, directly or indirectly." *Id.* at 41337.

The 2024 Rule further states that it "distinguishes Service wetland easements from the 'Swampbuster' provisions of the Food Security Act of 1985 (also known as the 'Farm Bill'; Pub. L. 99-198), which allow drain tile to have a 'minimal effect' to wetlands." *Id.* Instead, the 2024 Rule codifies the Service's position that "wetland easement agreements with landowners include provisions that allow for no effect; hence, drain tile may be installed on a wetland easement tract, but it is a violation of the easement contract if the result is that the tile drains a protected wetland area." *Id.*

9

Finally, the final rule also distinguishes itself from the 2020 Guidance by not committing to any specific process to calculate the setback distances. *Id.* at 41341. The 2024 Rule does not specify a calculation process because "[i]ncluding the calculation processes of the Service's guidance memo in the regulations, however, would not be in the interest of the Service or landowners." *Id.* Instead, the rule states that "the Service has codified our obligation to use the best available science in regulation and will then keep our publicly available, detailed internal guidance up-to-date and effective." *Id.*

## STANDARD OF REVIEW

A motion for summary judgment must be granted when there is no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Judicial review of federal agency administrative decisions is, unless expressly stated otherwise, governed by the Administrative Procedure Act ("APA"). 5 U.S.C. § 706; *Friends of Boundary Waters Wilderness v. Bosworth*, 437 F.3d 815, 821 (8th Cir. 2006). Under the APA standard of review, a reviewing court "shall hold unlawful and set aside" agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

"Even where an agency is accorded deference, the 'agency must provide a satisfactory explanation for its actions based on relevant data.'" *Bosworth*, 437 F.3d at 822 (quoting *Niobrara River Ranch, L.L.C. v. Huber*, 373 F.3d 881, 884 (8th Cir. 2004)). This requires an "analysis of whether the decision was 'based upon consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id.* (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). Normally, an agency rule or decision is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs

10

contrary to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

As a matter of law, "[a]n agency's decision is an abuse of discretion if the agency has applied an incorrect legal standard in making its decision." *Buffalo Field Campaign v. Zinke*, 289 F. Supp. 3d 103, 109 (D.D.C. 2018) (citing *Price v. District of Columbia*, 792 F.3d 112, 114 (D.C. Cir. 2015)); *see also Burlington N., Inc. v. United States*, 549 F.2d 83, 88 (8th Cir. 1977) (Under the APA, courts "have a duty to thoroughly explore the record and carefully examine the Commission's conclusions to determine whether the Commission's findings are supported by the evidence and whether proper legal standards have been applied."); *Gen. Land Off. v. United States Dep't of the Interior*, 947 F.3d 309, 320 (5th Cir. 2020) ("An agency decision is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A), if the agency applies an incorrect legal standard.").

Finally, the APA requires courts to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. "The APA thus codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to *Marbury* [*v. Madison*, 5 U.S. 137 (1803)]: that courts decide legal questions by applying their own judgment." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391–92 (2024). The APA "specifies that courts, not agencies, will decide '*all* relevant questions of law' arising on review of agency action, § 706 (emphasis added)—even those involving ambiguous laws—and set aside any such action inconsistent with the law as they interpret it." *Id.*

11

**ARGUMENT**

**I.    This Court Should Hold Unlawful and Vacate the Service's 2020 Map of Easement 69X**

This Court should set aside the mapping decision because the Service applied the incorrect legal standard, failed to base its decision upon consideration of the relevant factors, and disregarded unfavorable evidence that went against its decision.

As the Eighth Circuit held in *Johansen*, restrictions contained in waterfowl production area easements only apply to wetland areas on the property at the time the easement was conveyed and do not apply to fluctuating, after-expanded or after-developed wetland areas. 93 F.3d at 465–66 (citing *North Dakota v. United States*, 460 U.S. 300 (1983)). This is not to say that the water levels within a wetland area on the property do not fluctuate; however, wetland areas for which there is no evidence of existence prior to or at the time of conveyance are not protected. *See id.* Accordingly, and absent a negotiated and agreed-upon map between the grantor and the Service showing areas subject to the easement's restrictions, the location and boundaries of wetland areas on the property that were in existence at the time the easement was conveyed are the only areas protected by the easement because those are the areas the grantor could have known were present on the landscape and intended to be subject to the easement's restrictions. *Id.* at 467.

But in issuing the map for Easement 69X, the Service relied primarily on images taken decades after the easement was conveyed. *See* Dkt. No. 21-6–21-14, AR001676–1717. Indeed, the administrative record contains no aerial photography between 1964 and 1997. *See id.* Refuge Manager Erickson acknowledged in his decision letter that the agency uses all imagery available to it at the time of mapping and conceded the agency believes that areas, which are "devoid" of surface water and marsh vegetation in aerial photos close in time to the easement's acquisition, can still be protected by the easement if they show up on later aerial images. Dkt. No. 21-4,

AR001445. The contracting parties, however, could not have known that such areas would appear wet much further into the future and, thus, could not have intended or agreed that the easement would protect these after-occurring or after-expanded areas. These are acres that the parties to the contract had not, in their lifetimes, experienced as containing surface water or reoccurring surface water.

In justifying its use of images taken decades after the easement was conveyed, the Service cited to the U.S. District Court for the District of South Dakota's decision in *United States v. Mast*. Dkt. No. 21-4, AR001487. In doing so, the Service misinterpreted the court's actions in that case. In *United States v. Mast*, Mast filed a motion in limine to exclude aerial photos taken after the easement was conveyed. *See* Dkt. No. 21-4, AR001511. The Honorable Karen E. Schreier ruled from the bench on this motion at the pretrial conference. *Id.* Judge Schreier's ultimate ruling on the motion was that an easement map developed by the FWS in 2010, which primarily utilized aerial photos taken after the easement conveyance, was not admissible for the purpose of evidencing the wetland areas actually present at the time of the easement conveyance and thus actually protected by the easement; the map was only admissible for the purpose of showing the defendant had knowledge that FWS believed the areas identified on its map to be protected by the easement. *Id.* at AR001511–12.

Judge Schreier clarified in her May 21, 2020, decision in the second *Mast* trial that aerial photos taken after the easement's conveyance could be relevant to verifying wetland areas already identified on photos pre-dating the easement, but maintained that such wetland areas must first be identified on aerial images pre-dating the easement. *United States v. Mast*, No. 4:17-CR-40078-01-KES, 2020 WL 2574634, at *8 (D.S.D. May 21, 2020), *judgment entered* (D.S.D. 2020), and *aff'd*, 999 F.3d 1107 (8th Cir. 2021). This conclusion is consistent with *Johansen* and the terms of

13

the easement. *See Johansen*, 93 F.3d at 461. The Service's use of aerial maps post-dating the easement is inconsistent with *Johansen*. Thus, the Service's reliance on aerial photos taken decades after the easement was conveyed was necessarily abuse of discretion. *See Price*, 792 F.3d at 114 ("[a]n agency's decision is an abuse of discretion if the agency has applied an incorrect legal standard in making its decision").

The Service's use of the 2016 Prairie Pothole Region Easement Manual further demonstrates that the Service applied incorrect legal standards and based its decision upon irrelevant factors. As a matter of contract law, the Manual itself was created decades after the easement was conveyed and is not a part of the agreement with the landowner. But even if the Manual is applicable, the Manual contains instructions that are inconsistent with case law and with the specific contractual language of the easement agreement. For example, the Manual provides that

> [t]he U.S. Attorney's February 4th 1998 letter to Judge Webb emphasizes this point in notation #2, second paragraph: "The Eighth Circuit has always recognized the inherent expansion and contraction of prairie potholes. . . . There is no requirement anywhere that a pothole have water in it when the easement is acquired. Wetlands are defined by many factors other than the presence or absence of standing water on a particular day. Most North Dakota potholes are essentially dry by fall in a normal year."

Dkt. No. 21-2, AR000941–42. But the U.S. Attorney's letter to Judge Webb is not the law and has no legal binding authority. The Eighth Circuit in *Johansen* specifically rejected the government's interpretation of after-expanded or "future wetlands" and "easement restrictions [] fluctuat[ing] with the amount of rainfall." 93 F.3d at 466. The court explained that such an interpretation is inconsistent with "traditional norms of real property conveyance," which "requir[e] definiteness" and also inconsistent with the Service's notation of the wetland acres in its easement summary record and "the gubernatorial-consent component of the program's authorizing statute." *Id.* The

14

Eighth Circuit therefore found that the easements only protect "identifiable, covered wetlands (as existing at the time of the easement's conveyance and described in the [e]asement [s]ummary)." *Id*. at 467.

> The Manual also provides:

> The mapping technician will prepare a wetland map of all naturally-occurring wetland basins utilizing all off-site mapping tools available (Exhibit XI-5). The map will include those basins which have historically been present over time; i.e., present on historical aerial photos. The mapper will use all wetland photographic signatures to help determine the presence or absence of wetlands basins. Wetland indicators may include hydrophytic vegetation, surface water, saturated conditions, mud flats, flooded or drowned-out crops, unharvested crops, isolated areas that are not farmed with the rest of the field, areas of greener vegetation (especially during dry years), mature upland tree rings, and recurring cropping patterns that avoid wet areas.

*Id.* at AR000945. But the language of the easement does not cover "basins," "saturated conditions," "mud flats," "flooded or drowned-out crops," "unharvested crops," "isolated areas that are not farmed," "areas of greener vegetation," "mature upland tree rings," or "recurring cropping patterns." The easement protects areas with "surface water" (i.e., inundated areas with water at or above the surface of the ground) and "marsh vegetation" (hydrophytic vegetation) that is "now existing" (existing at the time the easement was conveyed) or "reoccurring" (it occurred and reoccurred prior to when the easement was conveyed; reoccurring is commonly known to mean occurring and then occurring again periodically or repeatedly over time) "due to natural causes" (due to normal precipitation and not due to artificial or manmade drainage or other manipulation of the landscape). Dkt. No. 21-6, AR001614. Thus, the Manual leads to identifying areas that are not a part of the Easement and the Service's use of the Manual is inconsistent with the governing legal standards for interpreting waterfowl production area easements.

Finally, in rendering its mapping decision, the Service disregarded unfavorable evidence that went against its decision, leading to a decision that was contrary to the evidence before the

15

agency. In his objections to the Service's map, Mr. Peterson submitted a report from technical consultant Matt Retka of Wenck Associates. Dkt. No. 21-3, AR001430. Mr. Retka looked at historical aerial photos close in time to when the easement was conveyed and determined that those maps did not show conclusive evidence of inundation and marsh vegetation in many areas covered by the Service's 2020 map. *Id.*

An agency may not cite "favorable evidence and disregard[] unfavorable evidence." *Sierra Club v. Salazar*, 177 F. Supp. 3d 512, 540 (D.D.C. 2016). Indeed, "[s]uch cherry-picking embodies arbitrary and capricious conduct." *Id.* But here, the Service dismissed Wenck's Aerial photography from the same decade the easement was conveyed, and instead relied on photography from three decades after the easement was conveyed. *See* Dkt. 21-6–21-14, AR001676–1717; *see also Branstad v. Veneman*, 212 F. Supp. 2d 976, 989 (N.D. Iowa 2002) (*Branstad III*) (judicial review asks whether the agency decision runs counter to the evidence presented). But instead of responding to the evidence against its decision, the Service merely responded that it could use photographs from decades after the easement was conveyed. Dkt. No. 21-4, AR001445. The agency's failure to engage with unfavorable evidence renders the mapping decision arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Cf. Bosworth*, 437 F.3d at 825 (critiques of survey methodology "cautions the agency to identify the potential weaknesses in the data and to seek validation of the results obtained through other means or to apply correction factors to the survey data" (citing *Menorah Med. Ctr. v. Heckler*, 768 F.2d 292, 295–96 (8th Cir. 1985) for the proposition that "the failure to respond to criticisms that a survey was untrustworthy makes reliance upon the survey arbitrary and capricious," and *St. James Hosp. v. Heckler*, 760 F.2d 1460, 1467 n.5 (7th Cir. 1985), for the proposition that "it is an agency's duty to establish the

16

statistical validity of the evidence before it prior to reaching conclusions based upon that evidence").

This Court should grant Mr. Peterson's motion for partial summary judgment and hold unlawful and set aside the Service's mapping decision.

**II.    This Court Should Hold Unlawful and Set Aside the 2024 Rule's "No Effect" Standard Because It Illegally Expands the Scope of the Waterfowl Production Area Easements**

The 2024 Rule states and codifies that the Service's position is "wetland easement agreements with landowners include provisions that allow for no effect" to wetlands from farming operations. 89 Fed. Reg. at 41377. But the Service's decision to adopt a "no effect" standard in the 2024 Rule illegally expands the scope of the government's waterfowl production area easements and is thus arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

The "primary purpose in construing a deed is to ascertain and effectuate the intent of the grantor." *Malloy v. Boettcher*, 334 N.W.2d 8, 9 (N.D. 1983). State law will generally govern the interpretation of a deed conveying property to the federal government—either through direct application or through the "borrowing" principles of federal law—so long as state law is neither aberrant nor hostile to federal property rights. *Johansen*, 93 F.3d at 463 (citing *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 591–96 (1973); *United States v. Albrecht*, 496 F.2d 906, 911 (8th Cir. 1974)). Under North Dakota law, "[t]he extent of a servitude is determined by the terms of the grant," N.D. Cent. Code § 47-05-07, with the principles of contract law guiding the inquiry, *see* N.D. Cent. Code § 47–09–11 (1978). *See also Royse v. Easter Seal Society for Crippled Children & Adults, Inc.*, 256 N.W.2d 542, 544 (N.D. 1977). And interpreting the scope of waterfowl production area easements, courts should also consider "traditional norms of real property conveyance[.]" *See Johansen*, 93 F.3d at 466 (citing Restatement of Property § 451, cmt. m (1944)).

17

The purpose of easement 69X, as with all the waterfowl production easements, is to ensure "reasonable cooperation" to preserve wetlands that existed at the time the easement was granted. *See Johansen*, 93 F.3d at 468. This purpose is reflected by the text of the easement, which states that

> draining or permitting the draining, through the transfer of appurtenant water rights or otherwise, of any surface water . . . now existing or reoccurring due to natural causes on the above-described tract, by ditching or any other means; . . . filling in with earth or any other material or leveling any part or portion of the above-described tract on which surface water or marsh vegetation is now existing or hereafter recurs due to natural causes; and . . . burning any areas covered with marsh vegetation.

Dkt. No. 21-6, AR001614. In the 1960s, the term "drain" meant: "[t]o conduct water from one place to another, *for the purpose of drying the former*. *To make dry*; to draw off water; to rid land of its superfluous moisture by adapting or improving natural water courses and supplementing them, when necessary, by artificial ditches." *Drain*, Black's Law Dictionary 582 (4th ed. 1968) (emphasis added).

The easement also reflects a purpose to preserve normal farming practices. The easement provides that the landowner shall not "in any way be restricted from carrying on farming practices such as grazing, hay cutting, plowing, working and cropping wetlands when the same are dry of natural causes, and that they may utilize all of the subject lands in the customary manner except for the draining, filling, leveling, and burning provisions mentioned above." Dkt. No. 21-6, AR001614. Thus, the easement must be interpreted with both the wetlands preservation purpose and the preservation of farming practices in mind. *See Johansen*, 93 F.3d at 468 (stating that the goal of the waterfowl production area easement is "co-existence between Waterfowl Production Areas and 'normal farming practices'"). Indeed, it strains credulity to believe that "the intent of the grantor" farmer would be to unreasonably limit farming operations. *See id.* ("[T]he government ignores the obvious potential consequence of its interpretation: the reduction of cultivatable land

18

on tract 21X by over sixteen percent would be a significant economic impediment to the continued viability of normal farming practices.").

Traditional norms of property conveyance also provide that the rights of an easement holder should be balanced with the rights of the underlying land owner. *See* Restatement (Third) of Property (Servitudes) §§ 4.9, 4.10 (2000). "An easement is an interest in land consisting in the right to use or control the land, or an area above or below it, for a specific limited purpose[,]" *Krenz*, 890 N.W.2d at 231, and crucially, an easement does not give the holder unlimited rights over the servient estate, *see* Restatement (Third) of Property (Servitudes) §§ 4.9, 4.10. Instead, "the holder of the servient estate is entitled to make any use of the servient estate that does not unreasonably interfere with enjoyment of the servitude." Restatement (Third) of Property (Servitudes) § 4.9 (2000). Likewise, "the holder is not entitled to cause unreasonable damage to the servient estate or interfere unreasonably with its enjoyment." Restatement (Third) of Property (Servitudes) § 4.10 (2000). Moreover, "[i]n resolving conflicts among the parties to servitudes, the public policy favoring socially productive use of land generally leads to striking a balance that maximizes the aggregate utility of the servitude beneficiary and the servient estate." *Id.* at cmt. b; *see also Johansen*, 93 F.3d at 468 (considering the economic impacts of the Service's interpretation of a waterfowl production area easement).

Accordingly, farming operations that only minimally affect wetlands do not violate the terms of a waterfowl production area easement like easement 69X. Indeed, other federal programs designed to protect wetlands on farms recognize that the wetland protection goal can be achieved even if farming practices minimally affect wetlands. *See Barthel v. U.S. Dep't of Agric.*, 181 F.3d 934, 937 (8th Cir. 1999) ("[Swampbuster's] proclaimed purpose is to preserve wetlands"); 89 Fed. Reg. at 41377 (noting that "the 'Swampbuster' provisions of the Food Security Act of 1985 (also

19

known as the 'Farm Bill'; Pub. L. 99-198), which allow drain tile to have a 'minimal effect' to wetlands").

But the Service's "no effect" standard unreasonably interferes with Mr. Peterson's use and enjoyment of the servient estate—and significantly reduces the amount of cultivatable land on his farm—even though a less stringent standard would still achieve the wetland preservations goals of the easement. The Service's "no effect" standard thus expands the scope of the easement beyond the language of the deed, in a manner inconsistent with traditional norms of property conveyance, and contrary to the easement's goal of reasonable cooperation between wetlands preservation and farming practice. Accordingly, this Court should hold unlawful and set aside the provisions of the 2024 Rule that adopts a "no effect" standard for drain tile setbacks.

### III.   This Court Should Hold Unlawful and Vacate the 2024 Rule Because It Fails to Articulate a Satisfactory Standard for Determining Drain Tile Setbacks

All agencies—including the Service—must articulate a satisfactory explanation for their actions. *Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("[T]he agency must explain why it decided to act as it did. The agency's statement must be one of 'reasoning'; it must not be just a 'conclusion'; it must 'articulate a satisfactory explanation' for its action." (quoting *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001))). Integral to this principle is the rule that an agency may not decide an issue without articulating a standard or measure to explain its decision—an agency may not "shift[] . . . the policy goalpost[s]" in the course of deciding on a matter, much less fail altogether to set up the goalposts. *See Qwest Corp. v. F.C.C.*, 689 F.3d 1214, 1228 (10th Cir. 2012) (citing various authorities).

Yet the 2024 Rule does not state how the Service will determine the setback distances for drain tiles. Unlike the 2020 guidance—which states that setback distances will be determined by the van Schilfgaarde equation, Dkt. No. 21-1, AR000065—the 2024 Rule states that setback

20

distances will be determined by "individualized calculations" based on a nebulous "best available science" standard. 89 Fed. Reg. at 41337. The Service believed that "[i]ncluding the calculation processes of the Service's guidance memo in the regulations, however, would not be in the interest of the Service or landowners." *Id.* at 41341.

But including a calculation process would not just be in the interest of landowners, it is required by the APA. *Butte Cnty.*, 613 F.3d at 195 ("Reasoned decisionmaking is not a procedural requirement. It stems directly from § 706 of the APA." (internal citation omitted)). If the Service can determine a drain tile setback without setting forth a standard against which to judge its actions, it will always be able to insulate its decision-making from scrutiny. The Service will be able to thwart judicial review of its decision-making, as a court will have no yardstick to measure the rationality of the agency's determinations. *See Sierra Club*, 177 F. Supp. 3d at 532 ("As to transparency, the agency 'must, of course, reveal the reasoning that underlies its conclusion' [and] 'give the court the rationale underlying the importance of factual distinctions as well as the factual distinctions themselves.'" (quoting respectively *Transcon. Gas. Pipe Line Corp. v. FERC*, 54 F.3d 893, 898 (D.C. Cir. 1995), and *San Luis Obispo Mothers for Peace v. U.S. Nuclear Regul. Comm'n*, 789 F.2d 26, 48 (D.C. Cir. 1986))). And regulated farmers will be prevented from developing the necessary data to support assessing the validity of the Service's setback determinations. *Cf. Kunkel v. Comm'r*, 821 F.3d 908, 910 (7th Cir. 2016) ("[Y]ou can't beat something with nothing."); *Mass. ex rel. Div. of Marine Fisheries v. Daley*, 170 F.3d 23, 30 (1st Cir. 1999) ("If no one propose[s] anything better, then what is available is the best.").

Knowing what is and is not regulated is essential to due process and the agency's fair implementation of the waterfowl production area easement program. *Cf. Sackett v. Env't Prot. Agency*, 598 U.S. 651, 680 (2023) ("Due process requires Congress to define penal statutes 'with

sufficient definiteness that ordinary people can understand what conduct is prohibited' and 'in a manner that does not encourage arbitrary and discriminatory enforcement.'" (quoting *McDonnell v. United States*, 579 U.S. 550, 576 (2016))); *Ramaprakash v. FAA*, 346 F.3d 1121, 1130 (D.C. Cir. 2003) (Roberts, J.) (because "'the tendency of the law must always be to narrow the field of uncertainty,'" an agency's "unexplained departures from precedent" are arbitrary and capricious (quoting O.W. Holmes, *The Common Law* 127 (1881))). The federal government has prosecuted farmers for alleged violations of the waterfowl production area easements. *See Johansen*, 93 F.3d 459. Without a standard to determine whether their conduct is lawful, farmers will be at the mercy of "individualized calculations" to determine if they are indicted are not.

But the APA requires more than nebulous standards and individualized calculations. The Service must set out the standards that guide its decision-making. Because the 2024 Rule does not lay out those standards, this Court should hold it unlawful and set it aside.

Dated: July 6, 2026.

Respectfully submitted,

s/ Jeffrey W. McCoy
JEFFREY W. MCCOY
Email: jmccoy@pacificlegal.org
Pacific Legal Foundation
1745 Shea Center Dr., Ste. 400
Highlands Ranch, CO 80129
Telephone: (916) 419-7111
Facsimile: (916) 419-7747

AUSTIN W. WAISANEN
Email: awaisanen@pacificlegal.org
Pacific Legal Foundation
508 17th Street
Cody, WY 82414
Telephone: (307) 213-0511

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2026, I filed the foregoing document with the Clerk of Court through the District Court's ECF system, which will send notice of this filing to all counsel of record.

s/ Jeffrey W. McCoy
JEFFREY W. MCCOY
*Attorney for Plaintiff*
