UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

CODY PETERSON,

Plaintiff,

v.

UNITED STATES OF AMERICA; UNITED STATES FISH & WILDLIFE SERVICE; BRIAN NESVIK,[1] in his official capacity as Director of the U.S. Fish & Wildlife Service; MATT HOGAN, in his official capacity as Regional Director, Mountain-Prairie Region of the U.S. Fish & Wildlife Service; UNITED STATES DEPARTMENT OF INTERIOR; DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior,

Defendants,

Case No. 3:25-cv-00078

**UNITED STATES' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

The United States of America, by Nicholas W. Chase, United States Attorney for the District of North Dakota, and Michael D. Schoepf, Assistant United States Attorney, on behalf of the Defendants United States of America; United States Fish and Wildlife Service ("FWS" or the "Service"); Brian Nesvik, in his official capacity as Director of the FWS; Matt Hogan, in his official capacity as Regional Director, Mountain Prairie Region of the FWS; United States Department of the Interior ("DOI" or "Interior"); and Doug Burgum, in his official capacity as Secretary of the DOI (collectively "Defendants"

---

[1] Brian Nesvik is substituted for Paul Souza pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

or "United States"), submits this Memorandum of Law in Support of the United States' Motion for Partial Summary Judgment. The Motion should be granted, and Plaintiff Cody Peterson's Motion should be denied, because subject map is not arbitrary, capricious, or otherwise contrary to law.

## INTRODUCTION

Much of the wildlife habitat in the United States is privately owned. That leaves Congress with a problem: How to protect and preserve that habitat without trampling the rights of private property owners? One way Congress has sought to solve the problem is through the purchase of conservation easements from the private property owners. Such easements allow the United States to permanently protect habitat while still allowing the private landowners to continue to use their property for beneficial purposes, like crop farming, grazing, and hay production. Notwithstanding the effort to preserve habitat while allowing owners to continue to use their property, sometimes disputes arise between the United States and the property owner about the scope of the United States' easement and the extent to which the easement limits the landowner's use of the property. This case presents such a dispute.

Plaintiff Cody Peterson ("Peterson") is a landowner in Lamoure County, North Dakota whose property is burdened by a specific kind of conservation easement commonly called a wetland easement. The 320-acre parcel of property at issue in this case is dotted with prairie potholes—small depressions, often less than one-acre in size, that seasonally fill with water and provide habitat for nesting ducks. In 1964, the United States purchased the wetland easement to protect those prairie potholes from drainage

and thereby protect important habitat for ducks. The Easement specifically provides that the Petersons predecessors in interest, on behalf of any heirs or assigns in perpetuity, agreed to

> cooperate in the maintenance of the aforesaid lands as a waterfowl production area by not draining or permitting the draining, through the transfer of appurtenant water rights or otherwise, of any surface water including lakes, ponds, marshes, sloughs, swales, swamps, or potholes, now existing or reoccurring due to natural causes on the above-described tract, by ditching or any other means; by not filling in with earth or any other material or leveling, any part or portion of the above-described tract on which surface water or marsh vegetation is now existing or hereafter reoccurs due to natural causes; and by not burning any areas covered with marsh vegetation.

AR 001614 (ECF 21-6). In exchange for a payment from the United States, the wetland easement prevents the landowner from draining or modifying the prairie potholes on the property, but allows the landowner to continue farming otherwise, including through the potholes in years where they are dry enough to farm. In essence, the wetland easement seeks to strike a balance between farming and conservation by paying the farmer not to artificially drain the land but otherwise allowing continued farming.

The dispute in this case arises from the United States' efforts to better define the area covered by the easement. When the easement was purchased, the prairie potholes were not mapped or otherwise identified. The United States has attempted to remedy that oversight by creating a map of the potholes covered by the easement. However, Peterson does not like the United States' map and has challenged the process used to create it and the resulting identification of the wetlands on his property.

Peterson contends the FWS went too far in protecting the prairie potholes and unreasonably, and unlawfully, limited his right to continue farming the property by identifying wetlands on the map that did not exist at the time of the easement conveyance. The United States believes otherwise. The United States contends that there is a rational basis to uphold its decision to map the potholes as depicted in the map. Therefore, that decision is not arbitrary, capricious, or otherwise not in compliance with the law. The United States specifically requests that the Court uphold the map and, for the reasons explained more fully below, deny Peterson's motion for partial summary judgment and grant the United States' motion for partial summary judgment.

## PROCEDURAL BACKGROUND

The United States acquired the wetland easement at issue in this case, which is known as Easement 69X, in 1964. AR 001614 (ECF 21-6).[2] As already noted, Easement 69X prevented the landowner from draining the wetlands "now existing or recurring" on the property. *See id.* The easement covered the W/2 of Section 2, Township 136 North, Range 61 West, Lamoure County, North Dakota. *Id.* Sometime later, Peterson acquired an interest in the property. *See* Pl.'s Br. at 2. Peterson owns half of the property at issue, and leases the other half from his parents. *See id.*

In 2018, after Peterson acquired his interest in the property, the United States sent him a courtesy notice informing him of the United States ownership interest in the property. *See* AR 1411–12 (ECF 21-3). The notice specifically informed Peterson that

[2] The initial offer for the easement occurred in 1963, but it was acquired pursuant to an option contract that was not accepted by the United States until 1964. *See* AR 001615 (ECF 21-6).

Easement 69X was a "permanent fixture to the title to the land," regardless of ownership, and noted that the wetland easement prevented "draining, burning, filling, or leveling wetlands protected by the easement." *See id.*

One problem with Easement 69X, which is common to many of the wetland easements acquired by FWS in the 1960s and early 1970s, is that it does not specifically identify the location of the wetlands on the property. The easement applies to all wetlands, "existing or recurring," but it does not say where those wetlands are located. *See* AR 001614–001615 (ECF 21-6). This has led to a "considerable amount of confusion" about what Easement 69X and similar wetland easements actually cover. *See United States v. Johansen*, 93 F.3d 459, 463 (8th Cir. 1996).

The 8th Circuit has provided some clarification, which is instructive to this case. *See id.* Specifically, in *Johansen*, the 8th Circuit held that "federal wetland easements," including Easement 69X, "are limited to the acreage provided in the Easement Summaries." *Id.* at 466. The "easement summaries" are documents that were provided with the easement that identified, among other things, the cost of the easement and the number of "wetland acres" covered by the easement. *See* AR 001630 (ECF 21-6). The easement summary for Easement 69X indicates there are 42 wetland acres covered by Easement 69X. *Id.* Thus, based on the 8th Circuit's holding in *Johansen* and the easement summary for Easement 69X, there are 42 wetland acres covered by Easement 69X.

The conclusion that there are 42 acres covered by the wetland easement still leaves the question of which 42 acres are covered by the wetland easement. To attempt to answer that question, the Service has endeavored to map the wetland acres on Easement

69X on at least two occasions. The first attempt to map the acreage occurred in 2013 to 2015 and resulted in a map that was apparently created for FWS use and was shared with Peterson in 2016. *See* AR 001627–29 (ECF 21-6); AR 001407–09 (ECF 21-3). According to the letter sharing the 2015 map with Peterson, the purpose of sharing the map with Peterson was to provide him with a better understanding of the wetland easement burdening his property. *See* AR 001407 (ECF 21-3). The 2015 map was not intended to provide an "exact size or configuration" of the protected wetlands. *See id.* There is no information in the record indicating Peterson contacted the Service regarding the 2015 map or otherwise objected to the Service's attempt to better define the wetlands covered by Easement 69X.

The second attempt to map the acres covered by Easement 69X was done in cooperation with the landowner and resulted in a map that is currently subject to this appeal. In February 2020, the FWS created a revised map of Easement 69X. AR 001672 (ECF 21-6). The revised map altered the mapping of some of the smaller wetlands on the property and is overlaid on an aerial photograph of the property but otherwise is similar to the 2015 map. *See id.* Peterson did not like the revised map, and called the Service on February 24, 2020, to express his concerns about the map. *See* AR 001414 (ECF 21-3). Among other issues, Peterson expressed dissatisfaction with the many small wetlands (less than .1 acre) depicted on the map, and with a stock pond that had been mapped as a wetland. *See id.* Krista Lundgren, a Wildlife Refuge Specialist at the FWS, explained the history of the wetland easement program and that the Service had used old aerial photos,

including photos from 1957, 1964, and 1979, to create the map. *See id.* Peterson indicated his intention to appeal the map. *See id.*

On March 17, 2020, the Service had a follow-up call with Peterson concerning the map and Peterson's frustrations with the restrictions imposed by Easement 69X on his efforts to drain the water from the property. *See* AR 001419 (ECF 21-3). Mick Erickson, Refuge Manager for the FWS, again explained that pumping water out of the stock pond on the property, which in turn lowered the water in the adjacent wetlands, violated the terms of the easement. *See id.* Peterson also suggested that the new map was inconsistent with an earlier map he had received from the Service. *See id.* However, Peterson was apparently unable to produce that earlier map, and the 2015 map, discussed above, is consistent with the 2020 revised map. *See id.* Ultimately, Peterson indicated he would contact a lawyer to get the issue straightened out. *See id.*

On March 18, 2020, the FWS received an e-mail from Peterson's lawyer, indicating an intention to appeal the 2020 map and seeking clarification regarding the appeal timeline. *See* AR 001415 (ECF 21-3). On April 3, 2020, Peterson, through counsel, submitted his appeal of the 2020 map. *See* AR 001426–1443 (ECF 21-3 and ECF 21-4). Peterson's appeal included a report completed by Wenck and Associates, which included a proposed alternative map, and also outlined five specific objections to the map proposed by the Service. *See id.* First, Peterson objected to the use of modern aerial photographs in creating the map. *See* AR 001428 (ECF 21-3). According to Peterson, only photos taken before or at the time of the easement's conveyance are relevant because the relevant inquiry in creating the maps was whether the wetlands were

present at the time of the easement's conveyance; subsequently expanded or created wetlands are not covered by the easement. *See id.* Second, Peterson objected to the inclusion of small wetlands—two tenths of an acre or less—on the easement map. *See id.* Peterson argued that "[t]hese areas are almost always cropped straight through and do not have evidence of surface water on images prior to 1969 . . . ." *See id.* Third, Peterson objected to one of the larger mapped wetlands—the 12.9-acre area on the eastern portion of the property. *See id.* Peterson argued that the 12.9-acre wetland was really two wetlands with a higher area in the middle. *See id.* Fourth, Peterson objected that a 6.8-acre wetland in the northeast portion of the property was actually a larger 14.9-acre wetland. *See id.* And fifth, Peterson objected to the depictions of five mid-size wetlands on the property as being considerably smaller than the wetlands depicted on the map. *See id.* In total, Peterson's objections and the Wenck and Associates proposed map reduced the total wetlands identified on the property from 42 acres to 26.64 acres. *See* AR 001442 (ECF 21-4).

On May 1, 2020, the FWS responded to Peterson's appeal of the 2020 map. AR 001444–47 (ECF 21-4). The FWS accepted some of Peterson's arguments regarding the map and rejected others, providing a revised map of Easement 69X with the response. *See* AR 001447 (ECF 21-4). The FWS explained: First, the Service is not limited to consideration of aerial photos taken before the easement was granted. *See* AR 001445 (ECF 21-4). The Service considers all available evidence when attempting to locate the wetlands on a parcel of property, including aerial photos, soils information, topographic data, and field visits. *See id.* Likewise, surface water or marsh vegetation need not be

present at the time of the acquisition for an area to constitute a wetland. *See id.* "Wetlands do not cease being protected when they naturally dry or are devoid of marsh vegetation." *See id.* With respect to the specific wetlands identified in Objections 3–5, the Service agreed to remove three smaller wetlands from the map, but it did not change the size of the other wetlands identified on the property. *See id.* The FWS noted in the decision letter that in cases, like this one, where there is more wetland present on the property than the number of acres purchased by FWS pursuant to the Easement Summary,

> the FWS will first remove areas with weak signatures on older imagery. Second, the FWS will then remove wetland areas with potential health and safety issues and non-typical wetlands. Third, the FWS will then consider biological factors and remove wetland areas that were not the focus of the Small Wetlands Acquisition Program. This includes ephemeral, lacustrine and semi-permanent wetlands. Temporary and seasonal wetlands are the last wetland areas to be removed from the map. Fourth, to produce the map to the summary acreage, semipermanent wetlands were mapped at definable lobes within the larger basins that would likely hold water as the water level in the basins decrease. The FWS utilized and adhered to all four criteria to produce this map.

AR 001446 (ECF 21-4).

On May 28, 2020, Peterson appealed the revised map to the Regional Director for the FWS. *See* AR 001450–80. The appeal packet included a letter from Peterson's counsel, explaining the basis for the appeal to the FWS Regional Director, and a copy of the previous correspondence exchanged by the parties regarding the map. *See id.* In the letter, Peterson reiterated his position that the only areas on the property that could qualify as wetlands are areas that show inundation with water or marsh vegetation at the time of the conveyance (or in aerial photos taken at or near the time of conveyance). *See* AR 001455. As a result, in Peterson's view, many of the smaller wetland areas mapped

by the FWS are not wetlands at all and are not protected by the easement. *See id.* Peterson objected to every wetland mapped by the FWS, in some form, and reiterated his belief that the Wenck and Associates map provided a better representation of the wetlands on the property at the time of the conveyance of the easement than the Service's map. *See id.* Peterson did not explain why the Wenck and Associates map, which identified less than 42 acres of wetlands, should be adopted in light of the easement summary.

After receiving his appeal, the FWS Regional Director held a listening session with Peterson and his counsel to better understand Peterson's objections to the FWS map. *See* AR 001481–83. At the listening session, Peterson and his counsel reemphasized many of the points from the letter, including their position that there must be evidence of water or marsh vegetation on the property at the time of the conveyance or that part of the property does not constitute a wetland. *See id.*

On July 9, 2020, the Service, acting through the Regional Director, released a new revised map dated July 7, 2020, and provided Peterson another letter explaining the Service's position regarding the revised map. *See* AR 001484–88.

> The key inquiry when determining what is protected by the terms of the easement is to determine what wetland areas 1) existed at the time the easement was conveyed, and 2) are included in the acres for which the original landowner was paid. The term "existed" does not refer to the water levels in the wetland areas on the day the easement was signed. Wetland areas are hydrologically dynamic systems with naturally fluctuating water levels. The FWS uses a variety of resources to determine the locations and boundaries of wetland areas and is not limited to aerial photos taken before easement acquisition. Courts have concluded that comparing photographs of the landscape from before and after conveyance of an easement is an

> acceptable and reliable method of establishing the existence of wetland areas at a certain moment in time (see *U.S. v. Mast*; *U.S. v. Peterson*).
>
> . . .
>
> Your clients objected to and are now appealing the Refuge Manager's decision to include several wetland areas that the clients believe do not show conclusive evidence of inundation or marsh vegetation on photos taken close to the time of easement conveyance. The absence of surface water or marsh vegetation on photos taken near the time of easement conveyance does not provide evidence that a wetland area did not exist. Small, and even larger wetland areas during dry periods, are often dry by late spring and summer and may not display surface water or marsh vegetation on an aerial photo. The FWS easement contract states that wetland areas " ... now existing or *reoccurring* ..." (emphasis added) are intended to be protected. Wetland areas persist over time. When there is no contemporaneously-filed map identifying the protected wetland areas, the courts will look at all evidence to determine whether identifiable wetland areas existed at the time the easement was conveyed, not merely photographs taken from near the time of easement conveyance (*see U.S. v. Mast*; *U.S. v. Peterson*). I find the wetland areas in question existed at the-time of easement conveyance and meet the wetland area definition as defined in the easement contract which includes " ... any surface water including lakes, ponds, marshes, sloughs, swales, swamps or potholes, now existing or reoccurring ..."

AR 001487 (ECF 21-4). In short, Peterson's myopic focus on whether there is water or marsh vegetation present in specific aerial photographs misses the larger question—whether there are wetlands "now existing or reoccurring" on the property, even if such wetlands were dry at the time of conveyance.

Peterson appealed the Regional Director's revised map to the Director of the FWS on August 7, 2020. *See* AR 001490–99 (ECF 21-4). He reiterated his arguments from his previous appeals, starting with the argument that the FWS erred in relying on aerial photos taken after the conveyance of Easement 69X. *See* AR 001497–98 (ECF 21-4). According to Peterson, relying on aerial photos taken after the conveyance creates a

situation where FWS is claiming protection for wetlands that did not exist at the time of the conveyance. *See id.* Instead, Peterson asserted, the wetlands should not be mapped unless there is "conclusive evidence of inundation or hydrophytic vegetation" on "aerial imagery pre-dating the easement conveyance." *See* AR 001498 (ECF 21-4). Peterson also took issue with the FWS reliance on certain case law, particularly *United States v. Mast*, discussed below, and continued to dispute the sizes and shapes of the mapped wetlands that had been revised by the FWS. *See* AR 001497–98 (ECF 21-4). Despite the significant revisions made by the FWS, Peterson continued to argue that the only wetlands "now existing or reoccurring" on the property at the time of the easement conveyance were those mapped by Wenck and Associates. *See id.* The FWS made significant revisions to its map in response to its discussions with Peterson; Peterson never revised his map in response to the information provided by the FWS.

On March 25, 2021, a Senior Advisor to the Secretary of the Interior, exercising delegated authority of the FWS Director, issued a final decision for the DOI on the map. *See* AR 001599–1601 (ECF 21-6). The decisionmaker aptly summarized the state of the dispute and the FWS's investigation at that juncture:

> For my investigation into your case, we reviewed the signed 1963 easement conveyance agreement and the Easement Summary for LaMoure 69X, the easement maps, your easement appeal package, aerial photographs, case law, and Service manuals. In review of the Refuge Manager's and Regional Director's decisions, we understand that the Refuge Manager removed three areas and the Regional Director resized six areas. So, in further evaluation of your appeal, we assessed the process used in delineating the maps, and considered input from the Refuge Manager, the Service's Realty Specialists, and Solicitors within the Department of the Interior. We also reviewed multiple aerial images, taken at various seasons of the year from 1957 through 2019.

*See* AR 001599 (ECF 21-6). The decisionmaker explained that the FWS were evaluating Peterson's request to reject the map created and adjusted by the Service and instead use the map created by Wenck and Associates. *See id.* The decisionmaker declined to grant Peterson's appeal. *See id.* First, the decisionmaker again rejected Peterson's argument that only aerial photography predating the easement should be used to identify the wetland areas. *See* AR 001600 (ECF 21-6). The Service noted that the wetlands at issue were created centuries ago by glaciers, and "will continue to exist unless destroyed" by human interference. *See id.* Thus, using multiple different photos from different seasons and time periods "provides a more accurate identification of wetland basins crated by glaciation, rather than solely relying on the location or extent of surface water which varies across seasons and years." *See id.*

> The maps submitted in your appeal used aerial photographs from only three years: 1952, 1964 and 1969. That selectivity discounts the ability to ascertain the existence or size of the wetland, because an emphasis is placed on the varying precipitation and other climatic conditions rather than the characteristics or signatures of the wetlands. The easement conveyance agreement describes the wetland areas protected by the easement were not necessarily those that had water in them at the time of conveyance referencing wetlands protected as those "now existing or reoccurring due to natural causes[.]"

*Id.* (citation omitted). The Service rejected Peterson's request to replace the Service-created map with Wenck and Associates map, noting in its final comment that the Service-created map includes 41.5 acres of mapped wetlands, consistent with case law holding that the easement can only cover, at a maximum, the number of wetland acres set forth in the easement summary. *See* AR 001601. Peterson's proposed map covered substantially less acreage than the acreage delineated in the easement summary.

Following receipt of the final map on March 24, 2021, Peterson initiated the above-captioned case on April 9, 2025, seeking, among other things, to set the map aside as arbitrary, capricious, and not in accordance with the law. Peterson contends that the Court should set aside the Service's map and instead adopt the map proposed by Wenck and Associates.

## ARGUMENT

### I. Standard of Review.

The review standards of the APA apply to this case. 5 U.S.C. §§ 701–706. The APA provides that agency action, findings, and conclusions may be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or are "unsupported by substantial evidence in a case . . . reviewed on the record of an agency hearing provided by statute." 5 U.S.C. § 706. Courts have consistently held that the APA establishes a narrow standard of review. Under the arbitrary and capricious standard, an agency action may be invalidated only if it is not rational or is not based on a consideration of relevant factors. *F.C.C. v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 803 (1978).

The standard of review is also narrow under the substantial evidence test. The United States Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Fed. Mar. Comm'n.*, 383 U.S. 607, 619-620 (1966) (citation omitted). The Court determined that substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent

an administrative agency's findings from being supported by substantial evidence." *Id.* at 620 (citations omitted). In applying the substantial evidence standard, the Court may not "displace the . . . [Secretary's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. Nat'l. Labor Relations Bd.*, 340 U.S. 474, 488 (1951). A reviewing court may "not substitute its judgment for that of the agency." *Lloyd Noland Hosp. and Clinic v. Heckler*, 762 F.2d 1561, 1565 (11th Cir. 1985).

As the 8th Circuit recently explained, "[u]nder the APA, review of an agency decision is limited. This standard of review gives 'agency decisions a high degree of deference.'" *Mandan, Hidatsa, and Arikara Nation v. U.S. Dep't of the Interior*, 95 F.4th 573, 579 (8th Cir. 2024) (quoting *Sierra Club v. EPA*, 252 F.3d 943, 947 (8th Cir. 2001)). " 'If an agency's determination is supportable on any rational basis,' then a reviewing court 'must uphold it.'" *Id.* (quoting *Org. for Competitive Mkts. v. U.S. Dep't of Agric.*, 912 F.3d 455, 459 (8th Cir. 2018), citing *Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 763 (8th Cir. 2004)).

The United States moves for partial summary judgment. "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is an appropriate mechanism for deciding cases brought before the Court under the APA because resolution of the matter does not require fact finding on behalf of the Court. Judicial review of an agency's decision is limited to

review of the administrative record. 5 U.S.C. § 706; *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971).

### II. Easement 69X Protects All Wetlands "Now Existing or Reoccurring" at the Time of the Easement Conveyance.

Peterson wants to drain the surface water from his property and lower the water table through the installation of drain tile to make the property more conducive to crop farming. The problem for Peterson is that his ownership interest in the property is burdened by an easement owned by the United States. Easement 69X provides that Peterson must cooperate with the United States in maintaining the land as a waterfowl production area

> by not draining or permitting the draining, through the transfer of appurtenant water rights or otherwise, of any surface water including lakes, ponds, marshes, sloughs, swales, swamps, or potholes, now existing or reoccurring due to natural causes on the above-described tract, by ditching or any other means; by not filling in with earth or any other material or leveling, any part or portion of the above-described tract on which surface water or marsh vegetation is now existing or hereafter reoccurs due to natural causes; and by not burning any areas covered with marsh vegetation. It is understood and agreed that this indenture imposes no other obligations or restrictions upon the parties of the first part and that neither they nor their successors, assigns, lessees, or any other person or party claiming under them shall in any way be restricted from carrying on farming practices such as grazing, hay cutting, planting, working and cropping wetlands when the same are dry of natural causes, and that they may utilize all of the subject lands in the customary manner except for the draining, filling, leveling, and burning provisions mentioned above.

*See* AR 001614 (ECF 21-6). In other words, Easement 69X prohibits Peterson from draining prairie potholes or other wetlands on his property that existed or reoccurred at the time the easement was granted. The easement did not, however, specifically identify the location of those wetlands.

This case is about the United States' efforts to specifically identify the location of the wetlands on the property. To do so, the United States used all available evidence, including aerial photos taken after the time of the easement conveyance. Peterson now contends, as he did throughout the administrative process, that it was error to rely on post-conveyance aerial photos to help identify the location of the wetlands. His argument is based primarily on *Johansen v. United States*. 93 F.3d 459 (8th Cir. 1996).

In *Johansen*, the United States criminally prosecuted landowners for draining water from a wetland protected by easements essentially identical to the easement at issue in this case. 93 F.3d at 460–61. After the landowners were convicted, they appealed one of the district court's evidentiary rulings. *Id.* Specifically, the landowners argued that the protected wetlands on the property were limited to the number of acres identified in the easement summaries for the property, but the district court disagreed and held that the landowners could be prosecuted for draining *any* wetland on the property, regardless of the number of wetland acres identified in the easement summaries, and therefore the easement summaries were irrelevant to the case. *Id.* The 8th Circuit reversed the convictions and the district court's evidentiary ruling, holding "that the United States' wetland easements acquired titled on the acreage specified in the Easement Summaries." *Id.* at 468. Thus, in this case, applying the holding of *Johansen*, the United States acquired title to 42 wetland acres described in the easement summary. *See* AR 1630. The United States cannot claim more than 42 wetland acres on the property.

The easement map created by the United States is entirely consistent with the limitations imposed by *Johansen*. The United States is claiming 41.5 acres of covered wetland—one-half acre less than the acreage identified in the easement summary. *See* AR 1630. Accordingly, *Johansen* does not limit or restrict the United States' ability to map and identify easement acreage as it has done in this case.

The United States is not arguing that the number of easement acres fluctuates with rainfall of other climatic changes; the level of water in the wetlands may fluctuate, but the protected wetlands remain the same. *Cf. Johansen*, 93 F.3d at 466 (noting the problems that would be attendant to an easement description that was allowed to fluctuate with climatic changes). That is the reason the United States looks at a broad range of aerial photographs to identify the easement locations, and does not limit itself to a narrow pre-conveyance window of time to review the easement locations.

As the United States Supreme Court has acknowledged, the location of these wetlands was set by the glaciers centuries ago, and the location of the wetlands does not change. *See North Dakota v. United States*, 460 U.S. 300, 304n.4 (1983) ("When the glaciers retreated from the northern Great Plains at the end of the last ice age, they left in their wake thousands of shallow depressions. These depressions, known as prairie potholes, provide excellent breeding grounds for migratory ducks."). Even Easement 69X itself acknowledges that during many years, at many times, the wetlands will be dry and can be cropped through. After

noting the drainage restrictions, Easement 69X provides that "this indenture imposes no other obligations or restrictions upon" the landowners, and the landowner "shall" not "be restricted from carrying on farming practices such as grazing, hay cutting, plowing, working and cropping wetlands when the *same are dry of natural causes* . . . ." *See* AR 001614. But on the other hand, when the small depressions that constitute prairie potholes are wet and filled with water, the landowner may not artificially drain them to allow continued farming. Thus, the fact that the potholes may have been dry at the time of conveyance does not mean they do not "exist or reoccur," and it was perfectly reasonable for the FWS to rely on post-conveyance aerial photographs to identify the potholes existing at the time of conveyance.

Peterson also cites *United States v. Mast* in support of his argument that the Service applied the incorrect legal standard to identify the wetland areas by utilizing aerial photographs taken after the easement was conveyed. *See* AR 001523–62 (ECF 21-5). *Mast* is another criminal case where the issues, as relevant here, were the extent to which the United States and the Defendant could use aerial photographs to identify the wetlands that were alleged to have been drained. *See id.*[3] Similar to this case, the aerial photographs used by the United States in

[3] It is worth noting that district court evidentiary rulings, like the rulings at issue in *Mast*, are not necessarily binding on the Service outside of that case. A district court judge has considerable discretion with respect to what evidence to admit in a criminal case, and admissible evidence on the question of guilt or innocence in a criminal proceeding may not exactly match the admissible evidence in an administrative decision attempting to classify the approximate location of the protected wetlands on the property. A district court's evidentiary rulings on the morning of trial

*Mast* were taken before and after conveyance of the easement. *See* AR 001533, 1535, 1541–42 (ECF 21-5). The *Mast* court did not exclude post conveyance aerial photographs from the evidentiary record. *See id.*

The United States largely agrees with Peterson's statements concerning the relevant law, but not how that law applies to this case. While its true under *Johansen* that the acreage covered by the easement cannot exceed the acreage identified in the easement summary, it is does not follow from that conclusion that the only potholes that can be protected by the easement are those that were inundated with water or marsh vegetation at the time of the easement conveyance. In *Mast*, for example, the Court discussed at length the wetland "signatures" that an aerial photo may display to give clues as to were the wetlands are located—there is nothing inherently wrong in relying on those "signatures" to map the wetlands on the property. *See* AR 001544–45.

Peterson next argues that the Service erred in relying on the 2016 Prairie Pothole Region Easement Manual. Pl.'s Br. at 14–15. It is not clear the extent to which the easement manual was actually relied on in making the mapping decision in this case—the easement manual is lengthy and covers many topics—but to the extent it was included in the decision-making process in this case, it was not an error. *See* AR 000855–57. Peterson cherry picks certain paragraphs out of the

---

in a criminal case do not define forever the universe of evidence the Service can consider in defining the location of wetlands. Thus, even if *Mast* had prohibited the introduction of post-conveyance aerial photographs, which it did not, that would not necessarily mean post-conveyance aerial photographs could not be used in this case.

manual and argues that those paragraphs show the whole manual cannot be relied on, but when those paragraphs are reviewed in context it becomes clear that far from being arbitrary or capricious the manual actually grapples in a fair way with difficult legal issues. The quote from the U.S. Attorney's office is not wrong: The 8th Circuit "has always recognized the inherent expansion and contraction of prairie potholes. A pothole does not cease being a pothole just because it dries up." AR 000941–42. That is an accurate statement of fact and law—the extent of inundation often changes even though the defined size of the wetlands does not. As the Supreme Court stated in *North Dakota v. United States*: "To respond to the inherently fluctuating nature of wetlands, the Secretary has chosen to negotiate easement agreements imposing restrictions on after-expanded wetlands as well as those described in the easement itself." 460 U.S. 300, 319 (1983). Under the more restrictive holding of *Johansen*,[4] it is no longer true that standard wetland easements are held to apply to "after-expanded wetlands" to the extent the expansion exceeds the "existing or reoccurring" wetlands present at the time of acquisition and listed in the easement summary. But the easement certainly applies to wetlands that are dry. As the U.S. Attorney's Office letter stated, "When it dries up it can be farmed, not ditched." *See* AR 000942.

[4] Before *Johansen*, the 8th Circuit read wetland easements like Easement 69X much more broadly than it does now. As the *Johansen* case acknowledged, before *North Dakota v. United States*, wetland easements were read to prevent drainage on any part of the property covered by the wetland easement. *See Johansen*, 93 F.3d at 464 (citing *United States v. Albrecht*, 496 F.2d 906, 912 (8th Cir. 1974); *United States v. Seest*, 631 F.2d 107, 108 (8th Cir.1980); *United States v. Welte*, 635 F. Supp. 388, 389 (D.N.D.1982), *aff'd*, 696 F.2d 999 (8th Cir.1982).).

Likewise, the manual correctly describes the mapping process a mapping technician must use to map a wetland on an easement. *See* AR 000945. The words used in the manual do not make the manual arbitrary. As Peterson emphasizes, the easement protects from drainage surface water that is "now existing or reoccurring" on the easement property. To identify the areas where surface water is "now existing or reoccurring" the mapper must use all "wetland photographic signatures to help determine the presence or absence of wetland basins." *See id.* It is not arbitrary for the Service to use "wetland basin" as shorthand for a "place where surface water exists or reoccurs." And it is not error for the Service to look for "photographic signatures" of wetland basins in things like "hydrophytic vegetation, surface water, saturated conditions, mud flats, flooded or drowned-out crops, unharvested crops, isolated areas that are not farmed with the rest of the field, areas of greener vegetation (especially during dry years), mature upland tree rings, and recurring cropping patterns to avoid wet areas." *See id.* All of those things are signs of areas where water collects during certain times of the year—exactly the same areas that Easement 69X is designed to protect.

Peterson's final argument is that the United States disregarded unfavorable evidence in reaching a decision in this case. The United States does not view evidence as "favorable" or "unfavorable"—all available evidence was looked at and considered, including the evidence reviewed in creating the Wenck and Associates report. The Service considered all available aerial photographs, including those considered by Wenck and Associates. *See* AR 001676–001716

(ECF 21-6–ECF 21-13). If any party cherry picked evidence inappropriately, it was Wenck and Associates' choice to use only three of the available aerial photographs. Moreover, the Service appropriately responded to the criticism it received regarding its choice to use all available aerial photographs. The criticism was not that the FWS disregarded unfavorable evidence; the criticism was that the FWS considered too much evidence. The FWS responded by explaining why it considered all available aerial photographs in reaching its decision.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant the United States Motion for Partial Summary Judgment, deny Peterson's Motion for Partial Summary Judgment, and uphold the mapping decision of the FWS.

Dated: August 20, 2026

NICHOLAS W. CHASE
United States Attorney

By: /s/ Michael D. Schoepf
MICHAEL D. SCHOEPF
Assistant United States Attorney
ND Bar ID 07076
P.O. Box 699
Bismarck, ND 58502-0699
(701) 530-2420
michael.schoepf@usdoj.gov
Attorney for United States